**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| ) | |
| In re: ) | Chapter 11 |
| ) | |
| TRONOX INCORPORATED, <u>et al.</u>,[1] ) | Case No. 09-_____ |
| ) | |
| Debtors. ) | Joint Administration Requested |
| ) | |

## DECLARATION OF GARY BARTON, SENIOR DIRECTOR AT ALVAREZ & MARSAL NORTH AMERICA LLC, IN SUPPORT OF FIRST DAY MOTIONS

Pursuant to 28 U.S.C. § 1746, I, Gary Barton, hereby declare:

1.      I am a Senior Director at Alvarez & Marsal North America LLC ("A&M").

A&M was retained by Tronox Incorporated ("Tronox Inc.") as restructuring consultants in July

2008.[2]  Tronox Inc. is a publicly held company organized under the laws of the State of

Delaware that is the direct or indirect parent corporation of each of the other debtors and debtors

in possession (collectively, together with Tronox Inc., the "Debtors").  Since July 2008, I have

been providing restructuring services to Tronox Inc. as a Senior Director at A&M, including

assisting in the development of short-term cash projections and various cash management

activities, providing strategic advice on restructuring issues, and coordinating the Debtors'

---

[1]   The Debtors in these cases are Tronox Luxembourg S.ar.l; Tronox Incorporated; Cimarron Corporation; Southwestern Refining Company, Inc.; Transworld Drilling Company; Triangle Refineries, Inc.; Triple S Minerals Resources Corporation; Triple S Refining Corporation; Triple S, Inc.;  Triple S Environmental Management Corporation; Tronox Finance Corp.; Tronox Holdings Inc.; Tronox LLC; Tronox Pigments (Savannah) Inc.; and Tronox Worldwide LLC.

[2]   I have over 18 years of experience advising debtors and creditors with respect to turnarounds, restructurings and bankruptcies in a variety of industries, including the oil and gas, petrochemical and energy industries.  Before joining A&M, I worked in the restructuring practices of FTI Consulting, Inc. and PricewaterhouseCoopers, where I was a partner.  I earned a bachelor's degree and a master's degree in business administration from Texas A&M University.

efforts to prepare for a chapter 11 filing.  In this role, I have become familiar with the Debtors' day-to-day operations, businesses, financial affairs, and books and records.[3]

2.      On the date hereof (the "Petition Date"), each of the Debtors filed a petition with this Court under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code").  The Debtors are operating their businesses and managing their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  Concurrently with the filing of this Declaration, the Debtors have sought procedural consolidation and joint administration of these chapter 11 cases.

3.      To minimize the adverse effects of the commencement of these chapter 11 cases on their businesses, the Debtors have requested various relief in "first day" motions and applications (each, a "First Day Motion"), filed concurrently herewith.  I am familiar with the contents of each of the First Day Motions, and I believe that the relief sought therein is necessary to permit an effective transition into chapter 11.  Indeed, absent the immediate ability to make certain essential payments as sought in the First Day Motions, I believe that the estates would suffer immediate and irreparable harm.  In my opinion, approval of the First Day Motions will minimize disruptions to the Debtors' business operations, thereby preserving and maximizing the value of the Debtors' estates and assisting the Debtors in achieving a successful reorganization.

4.      This Declaration is submitted pursuant to rule 1007-2 of the Local Rules of the United States Bankruptcy Court for the Southern District of New York (the "Local Bankruptcy Rules") and I am authorized to submit it on behalf of the Debtors.  No one individual at Tronox Inc. has personal knowledge of all of the facts set forth in this Declaration.  All facts set forth

---

[3]     The Debtors intend to file an application to retain A&M in these chapter 11 cases promptly.

herein are based upon my personal knowledge of the Debtors' operations and finances, information learned from my review of relevant documents, and/or information supplied to me by members of the Debtors' management and the Debtors' financial advisors. If called upon to testify, I would testify to the facts set forth herein on that basis.

5. This Declaration is divided into three sections. Part I describes the Debtors' businesses, the formation of Tronox as a spinoff from Kerr-McGee Corporation, and the circumstances leading to the commencement of these chapter 11 cases. Part II describes the relief sought by the Debtors in each of the First Day Motions. Part III contains schedules setting forth certain additional information about the Debtors, as required by Local Bankruptcy Rules 1007-2(a) and (b).[4]

# PART I

## THE DEBTORS' BUSINESSES AND EVENTS LEADING
## TO THE COMMENCEMENT OF THESE CHAPTER 11 CASES

**A.     Tronox's Businesses**

6. Tronox Inc., together with its Debtor and non-Debtor subsidiaries (collectively, "Tronox"), is a multinational organization that manufactures and markets titanium dioxide and electrolytic and other specialty chemicals.[5] As described below, its businesses are divided into two segments: a pigments segment and the electrolytic and specialty chemical segment.

7. As of the date hereof, Tronox employed approximately 1,845 people. Approximately 996 of these employees work in the United States and 849 work outside of the

---

[4]   Capitalized terms used but not otherwise defined herein shall have the meanings set forth in the relevant First Day Motion.

[5]   Tronox's corporate organization chart is attached hereto as <u>Exhibit A</u>.

United States. Approximately 48% of Tronox's employees are represented by collective bargaining agreements, works councils or similar representative groups.

8. For the first nine months of 2008, Tronox's net sales totaled $1.171 billion. As of the date hereof, Tronox has approximately 1,100 customers that are located in more than 100 countries.

9. Until September 30, 2008, Tronox Inc. was publicly traded on the New York Stock Exchange under the symbols TRX and TRX.B. Since then, Tronox Inc. has traded on the Over the Counter Bulletin Board under the symbols TROX.A.PK and TROX.B.PK. As of December 31, 2008, Tronox Inc. had 19,107,367 outstanding shares of class A common stock and 22,889,431 outstanding shares of class B common stock.

### i. Tronox's Pigment Segment

10. Tronox's pigment segment consists primarily of its titanium dioxide business. It also includes heavy mineral production at Tronox's Australian joint venture, the Tiwest Joint Venture (which is discussed and defined below). In the first nine months of 2008, Tronox's pigment segment represented approximately 92% of the company's net sales globally.

11. Tronox's main product is titanium dioxide pigment, which creates whiteness, brightness, and opacity in consumer products such as paint, paper, plastic, and certain specialty products. Tronox is the world's third-largest producer and marketer of titanium dioxide. It has an approximate 12% share of the global titanium dioxide market with an annual global production capacity of 642,000 metric tons. The global titanium dioxide market presently has approximately $11 billion in industry-wide annual revenue and an annual capacity exceeding 5.1

million metric tons.  Tronox is one of five major titanium dioxide producers that collectively accounted for approximately 68% of worldwide titanium dioxide production in 2007.[6]

### a. The Pigment End-Use Market

12.     Titanium dioxide is used in three main types of consumer products: (a) coatings; (b) plastics; and (c) paper and specialty products.  The largest of these end-use markets is coatings, which includes residential, commercial, automotive and traffic paints.  Coatings is a $6.3 billion global market.  It accounts for approximately 60% of worldwide titanium dioxide demand and comprised approximately 69% of Tronox's global sales volume in 2007.

13.     The plastics market accounts for 24% of titanium dioxide demand and comprised approximately 22% of Tronox's global sales volume in 2007.  Products in this market include polyvinyl chloride products such as vinyl siding and fencing; plastic films used in food packaging; and engineering plastics used in computer housings and cell phone cases.

14.     The paper and specialty products markets account for approximately 16% of titanium dioxide demand and comprised approximately 9% of Tronox's global sales volume in 2007.  Products in the paper and specialty products market include beverage container packaging, wallboard, ink for various food containers, and sunscreen and other body care products.

15.     Over the last decade, global titanium dioxide consumption has grown at a compounded annual rate of approximately 2.8%.  In 2008, the global consumption level was approximately 5 million metric tons.

---

[6]   These major producers are Tronox, E.I. duPont de Nemours and Company ("DuPont"), National Titanium Dioxide Company Ltd. ("Cristal"), Huntsman Corporation ("Huntsman") and Kronos Worldwide, Inc. ("Kronos").

### b. Tronox's Pigment Operations

16.     Tronox operates titanium dioxide production facilities in the Americas, Europe and Australia.  Tronox operates two domestic facilities: a 225,000 metric ton capacity facility in Hamilton, Mississippi; and a 110,000 metric ton capacity facility in Savannah, Georgia.  Tronox also operates three facilities abroad: a 90,000 metric ton capacity facility in Botlek, the Netherlands; a 107,000 metric ton capacity facility in Uerdingen, Germany; and a 110,000 metric ton capacity facility that is operated as a joint venture in Western Australia.  In the first nine months of 2008, Tronox operated these facilities at an average of 90% of total rated capacity.

17.     Tronox's joint venture in Western Australia (the "Tiwest Joint Venture") includes a titanium dioxide plant in Kwinana, Western Australia, a mining venture in Cooljarloo, Western Australia, and a mineral separation plant and a synthetic rutile processing facility in Chandala, Western Australia.  Tronox, through its subsidiary Tronox Western Australia Pty. Ltd. ("TWA"), has a 50% undivided interest in the assets of the Tiwest Joint Venture with Exxaro Australia Sands Pty Ltd, a subsidiary of Exxaro Resources Limited.  Under separate marketing agreements, Tronox has the right to market 100% of the titanium dioxide produced at the Kwinana facility.

18.     Approximately 83% of Tronox's gross titanium dioxide production capacity utilizes a chloride manufacturing process to produce pigment from titanium-bearing ores.  This chloride process is superior to the traditional sulfate process because it produces a higher quality pigment, particularly with regard to whiteness, and has other desirable characteristics which customers prefer for many end-use applications.  In addition, the chloride process generates less waste, uses less energy, requires less labor and allows Tronox to reuse a major processing chemical (chlorine) later in the production process -- all of which result in lower overall

production costs. Tronox is one of a limited number of titanium dioxide producers that holds proprietary rights to a chloride manufacturing process.

### ii. Tronox's Electrolytic and Specialty Chemical Segment

19. In addition to its pigment segment, Tronox has smaller operations that manufacture and market three types of electrolytic and specialty chemical products: manganese dioxides for the manufacture of batteries; sodium chlorate for pulp and paper manufacture; and specialty boron products serving the semi-conductor, pharmaceutical and igniter industries. The specialty chemical segment represented an aggregate total of 8% of Tronox's net sales in the first nine months of 2008.

### a. The Battery Market and Operations

20. Tronox is a leading manufacturer and supplier of electrolytic manganese dioxide ("EMD"), which is the active cathode material used in non-rechargeable alkaline batteries. The domestic non-rechargeable battery market, of which Tronox has an estimated 41% market share, is dominated by alkaline battery technology and accounts for more than one-third of global demand for EMD. Tronox manufactures EMD at a 27,000 gross metric ton capacity facility in Henderson, Nevada.

21. Tronox also is a leading manufacturer and supplier of lithium manganese dioxide ("LMO"), which is one of the active cathode materials used in rechargeable lithium batteries. Tronox is a leading manufacturer and supplier of LMO for lithium batteries used in high-power applications such as power tools and hybrid electric vehicles. Tronox manufactures LMO at a 720 gross metric ton capacity facility in Soda Springs, Idaho.

### b. The Sodium Chlorate Market and Operations

22. Tronox also produces sodium chlorate for use in the pulp and paper industry as a bleaching agent. Tronox produces sodium chlorate at a 150,000 gross metric ton capacity

facility in Hamilton, Mississippi. This capacity represents an estimated 10% of the total North American sodium chlorate capacity.

### c. The Boron Market and Operations

23.     Tronox produces two types of boron specialty products: boron trichloride and elemental boron. Boron trichloride is a specialty chemical gas that is used in a range of consumer products including pharmaceuticals, semi-conductors, fibers, ceramics and epoxies. Elemental boron is a specialty chemical that is used in igniter formulas. Tronox produces these boron compounds at a 525 gross metric ton capacity facility in Henderson, Nevada. This capacity represents a leading market share for both boron specialty products.

### B.     Tronox's Corporate History

24.     Tronox became an independent company on March 31, 2006 when Kerr-McGee Corporation completed the separation of its chemicals business (the "Spinoff"). The original Kerr-McGee Corporation ("Old Kerr-McGee") was founded in 1929 as an oil and gas exploration company. In 1945, Old Kerr-McGee entered the oil refining business with the purchase of its first refinery. Several years later, Old Kerr-McGee began expanding into various other energy-related businesses. In 1952, Old Kerr-McGee entered the uranium industry and, shortly thereafter, constructed a sizable uranium-processing mill. In the 1950s, Old Kerr-McGee also expanded into service station operations and potash mining. During the early 1960s, Old Kerr-McGee entered the forestry business through a series of asset purchases. In 1967, Old Kerr-McGee completed a merger with American Potash and Chemical Corporation, and began to manufacture and market a variety of ammonium perchlorate chemicals such as fertilizers, potash, boron, titanium dioxide, sodium chlorate, and manganese. That same year, Old Kerr-McGee started construction of its first coal mine shaft in Stigler, Oklahoma and Kerr-McGee Coal Corporation became a subsidiary of Old Kerr-McGee in 1973. In the 1970s, Old Kerr-McGee

also became involved in various other aspects of the nuclear industry, including exploration, mining, milling, and conversion of uranium oxide into uranium hexafluoride, pelletizing of these materials, and fabrication of fuel elements.

25.     By 2000, Old Kerr-McGee had discontinued most of its historic business operations (collectively, the "Legacy Businesses"), leaving it with two core operating businesses: oil and gas exploration and production (the "Oil & Gas Business"), and chemicals (the "Chemicals Business"). While it discontinued the majority of the Legacy Businesses, Old Kerr-McGee remained responsible for significant residual environmental, tort, workers' compensation, and post-employment pension, medical and other benefit liabilities related to the Legacy Businesses (collectively, the "Legacy Liabilities").

### i.     "Project Focus"

26.     By 2001, Old Kerr-McGee was engaged in an internal reorganization known as "Project Focus" through which Old Kerr-McGee transferred all of its oil and gas exploration and production assets to other related businesses and attempted to isolate the Legacy Liabilities in the Chemicals Business regardless of their source. To sever the oil and gas assets from the Legacy Liabilities, Old Kerr-McGee engaged in a series of internal mergers, stock and asset transfers, and other reorganizations that resulted in the Oil & Gas Business becoming a subsidiary of Kerr-McGee Oil & Gas Corporation ("KMG Oil & Gas"), while the Chemicals Business (along with the Legacy Liabilities) was left behind as a residual subsidiary of Kerr-McGee Chemical Worldwide LLC ("Chemical Worldwide"). KMG Oil & Gas and Chemical Worldwide also became wholly owned subsidiaries of a newly-created parent company that was also known as Kerr-McGee Corporation ("New Kerr-McGee"). Through these and other internal transactions, New Kerr-McGee isolated the Legacy Liabilities in the Chemicals Business. New Kerr-McGee, however, continued to fund and manage these Legacy Liabilities at the parent company level.

This was necessary because the assets that generated the cash flow needed to support those Legacy Liabilities had been transferred to other subsidiaries of New Kerr-McGee and the Chemicals Business did not have sufficient independent cash flow to service the Legacy Liabilities.

27.     Between approximately 2002 and 2005, New Kerr-McGee took further steps to extract cash from the Chemicals Business, including by selling assets from the Legacy Businesses.  For example, New Kerr-McGee sold a forest products facility in The Dalles, Oregon in early 2005 for $3.9 million.  New Kerr-McGee retained the proceeds from the sale.

### ii.     The Spinoff of the Chemicals Business

28.     After isolating the Legacy Liabilities in the Chemicals Business and removing the oil and gas exploration and production assets, New Kerr-McGee sought to transfer the Chemicals Business with the Legacy Liabilities to a third party.  In the spring of 2005, New Kerr-McGee commenced a sale process for the Chemicals Business.  Numerous potential purchasers, however, expressed concerns regarding the Legacy Liabilities that would be included with any purchase.  Several explicitly refused to assume the Legacy Liabilities.  These concerns regarding the Legacy Liabilities crystallized when New Kerr-McGee received a letter from the Environmental Protection Agency (the "EPA") on April 15, 2005 asserting that New Kerr-McGee was liable under CERCLA for $179 million in clean-up costs at a former wood-treatment site at Manville, New Jersey where the EPA was conducting clean up activities.

29.     In the summer of 2005, New Kerr-McGee engaged in extensive negotiations with one potential purchaser of the Chemicals Business: Apollo Investment Corporation ("Apollo"). Apollo's initial bid assumed that all Legacy Liabilities would be excluded from the transaction. New Kerr-McGee, however, wanted a cleaner separation from the Legacy Liabilities than Apollo's proposal would provide.  As a result, Apollo conducted extensive due diligence to

determine the terms on which it might be willing to assume the Legacy Liabilities. Ultimately, New Kerr-McGee offered to provide more than $400 million in environmental indemnities if Apollo would accept the Legacy Liabilities as part of a sale transaction.

30.     At this same time, New Kerr-McGee also was considering a spinoff of the Chemicals Business. On September 12, 2005, New Kerr-McGee created Tronox Inc. by filing an Amended and Restated Certificate of Incorporation of Tronox Incorporated with the Secretary of State of the State of Delaware. Less than a month later, New Kerr-McGee's board of directors approved the Spinoff of the Chemicals Business on October 6, 2005. The Spinoff would be achieved in two steps. First, New Kerr-McGee would conduct an initial public offering ("IPO") of Tronox's class A common stock, which constituted approximately 20 percent of New Kerr-McGee's ownership stake in Tronox. Second, New Kerr-McGee would distribute its remaining 80 percent ownership interest in Tronox to New Kerr-McGee's shareholders.

31.     New Kerr-McGee unilaterally dictated the material terms of the Spinoff. Although New Kerr-McGee had offered $400 million in environmental indemnities to Apollo, New Kerr-McGee only provided Tronox with up to a $100 million indemnity for legacy environmental liabilities. As discussed below, that $100 million indemnity has significant strings attached.

32.     In each year from 2000 to 2004, New Kerr-McGee spent between $35 million and $126 million (net of recovery) on legacy environmental liabilities. New Kerr-McGee, however, took all cash from the Chemicals Business in excess of $40 million.

33.     New Kerr-McGee further required Tronox to assume debt of $550 million in connection with the Spinoff. In 2006, the interest expense associated with this debt was

approximately $49 million. The net proceeds of this debt went to New Kerr-McGee -- not Tronox.

34. New Kerr-McGee and its advisors suggested Tronox could cover any cash shortfalls resulting from the Legacy Liabilities through asset sales, specifically the sale of certain surplus land in Henderson, Nevada. At the time of the Spinoff, an affiliate of New Kerr-McGee had a contract for the sale of certain remediated land in Henderson with Centex. Centex, however, walked away from the deal in January 2007. Tronox's subsequent sale efforts to date have resulted in only $8 million in total proceeds from sales of property in Henderson. Even if the Centex deal had closed, the proceeds from any sale of land had to be used to repay Tronox's borrowings under the terms of the debt it was required to assume at the Spinoff -- not as a means to cover any cash shortfalls as New Kerr-McGee and its advisors had budgeted.

35. The terms of the Spinoff were set out in the Master Separation Agreement (the "MSA"), which was executed on November 28, 2005. The MSA's terms were dictated by New Kerr-McGee, as were a number of other agreements that governed the Spinoff and the business relationships among the companies following the Spinoff (collectively, the "Spinoff Agreements").

36. Under the MSA, New Kerr-McGee caused 100 percent of its ownership interests in Chemical Worldwide (which became known as Tronox Worldwide LLC) to be transferred, assigned and conveyed to Tronox Inc., eliminated certain intercompany debt, and, as discussed below, provided an indemnity of up to $100 million for certain environmental Legacy Liabilities. In return, New Kerr-McGee received 22,889,431 of class B shares in Tronox Inc. and approximately $787.8 million from Tronox Inc. consisting of: (a) $224.7 million in net proceeds from the IPO of Tronox's class A common stock; (b) $537.1 million in net proceeds from $550

million in debt that Tronox was required to incur in connection with the Spinoff; and (c) approximately $26 million in cash (which represented all of Tronox's cash in excess of $40 million). As discussed below, Tronox also was required to sign agreements to indemnify New Kerr-McGee and other Kerr-McGee entities for the Legacy Liabilities.

37. In addition to the MSA, Tronox was required to provide indemnities to New Kerr-McGee and other Kerr-McGee entities under other Spinoff Agreements. For example, under the Tax Sharing Agreement between New Kerr-McGee and Tronox Inc., Tronox was required to indemnify New Kerr-McGee for tax liability that might result from certain stock transactions undertaken by Tronox in the first two years following the Spinoff.

38. On November 28, 2005, New Kerr-McGee completed an IPO of approximately 17.5 million shares of Tronox Inc. class A common stock (approximately 20 percent of New Kerr-McGee's ownership interest in Tronox Inc.). On March 30, 2006, New Kerr-McGee completed the Spinoff by distributing 100% of the Tronox Inc. class B common stock to New Kerr-McGee's public stockholders.

39. Upon completion of these transactions, Tronox (comprised of Old Kerr-McGee's Chemicals Business and the residual Legacy Liabilities from Old Kerr-McGee's wide-ranging Legacy Businesses) became an independent company on March 31, 2006.

### iii. Anadarko Acquired New Kerr-McGee

40. Less than five months after the Spinoff was completed and the Legacy Liabilities severed, on August 10, 2006, New Kerr-McGee's shareholders approved an offer by Anadarko Petroleum Corporation ("Anadarko") to acquire New Kerr-McGee for $16.4 billion in cash and the assumption of $1.6 billion in debt. New Kerr-McGee became and remains a wholly owned subsidiary of Anadarko.

41.     Since acquiring New Kerr-McGee, Anadarko has admitted that it could be financially responsible for the Legacy Liabilities should Tronox fail.  In both its 2006 and 2007 Annual Reports, Anadarko stated:  "Kerr-McGee could be subject to joint and several liability for certain costs of cleaning up hazardous substance contamination attributable to the facilities and operations conveyed to Tronox if Tronox becomes insolvent or otherwise unable to pay for certain remediation costs. As a result of the merger, we will be responsible to provide reimbursements to Tronox pursuant to the MSA, and we may be subject to potential joint and several liability, as the successor to Kerr-McGee, if Tronox is unable to perform certain remediation obligations."

**C.     The Legacy Liabilities**

42.     Pursuant to the Spinoff Agreements, New Kerr-McGee forced Tronox to assume the Legacy Liabilities, including unknown, implied and contingent Legacy Liabilities and obligations.  The Legacy Liabilities are almost entirely unrelated to the operation of Tronox's core titanium dioxide businesses.  The most significant of the Legacy Liabilities relate to: (a) environmental remediation and cleanup at allegedly contaminated sites of the Legacy Businesses; (b) defense of tort suits brought by third parties arising from alleged hazardous releases and contamination related to the Legacy Businesses; and (c) welfare, benefit and pension obligations for former Old Kerr-McGee employees who once worked for the Legacy Businesses.

43.     Since the Spinoff, Tronox has spent more than $118 million to satisfy the residual Legacy Liability obligations.  A nominal amount of that figure relates to titanium dioxide operations.

44.     As a result of these Legacy Liabilities, Tronox is required to maintain a large environmental remediation group that is responsible for remediation and other activities on

approximately 100 sites related to the Legacy Businesses.  Absent the Legacy Liabilities, the resources and personnel focused on ensuring that the Legacy Liabilities are properly managed could be used to develop other aspects of Tronox's businesses.  Additionally, the Legacy Liabilities have effectively eliminated any potential strategic transaction that could have alleviated Tronox's current financial and operational problems without the need to file for chapter 11.

### i.       Environmental Legacy Liabilities

45.       At the Spinoff, New Kerr-McGee required Tronox to assume and indemnify it for environmental cleanup and remediation at sites related to the Legacy Businesses.  Specifically, pursuant to an Assumption, Assignment and Indemnity Agreement (the "Indemnity Agreement") between Chemical Worldwide and KMG Oil & Gas, New Kerr-McGee required Chemical Worldwide to indemnify not only KMG Oil & Gas, but also New Kerr-McGee and certain other New Kerr-McGee entities.  The scope of the indemnity was not limited to liabilities and obligations arising from Tronox's product lines; rather, the indemnity extended to all historic Old Kerr-McGee business operations other than limited oil and gas entities that had been carved out. Similarly, under the MSA, Tronox Inc. was required to indemnify New Kerr-McGee and its remaining subsidiaries not only for the same liabilities in the Indemnity Agreement, but also for all other Legacy Liabilities not expressly assumed by Oil & Gas.

46.       Under the MSA, New Kerr-McGee agreed to indemnify Tronox for certain future environmental remediation costs.  This indemnification obligation, however, is limited to reimbursement of 50 percent of qualifying remediation costs paid in excess of reserves established for each site by New Kerr-McGee at the time of the Spinoff.  It does not provide any indemnification or reimbursement for tort claims arising from Legacy Businesses.  With respect

to environmental, New Kerr-McGee's obligations are capped at $100 million in the aggregate and terminate in November 2012.

47. To date, Tronox has spent a total of approximately $148 million on environmental remediation costs. Over time, Tronox has been reimbursed for approximately $75 million of this amount from various third parties. New Kerr-McGee, however, has only contributed approximately $4 million through the indemnity provisions of the MSA.

### ii. Tort Legacy Liabilities

48. At the Spinoff, New Kerr-McGee also required Tronox to assume and indemnify New Kerr-McGee and related entities for third-party tort liability related to the alleged release of hazardous materials by the Legacy Businesses on the same terms as the environmental legacy liabilities. There is, however, no reimbursement obligation on the part of New Kerr-McGee.

49. Tronox is presently defending approximately 120 tort suits related to a variety of hazardous materials that were allegedly released by the Legacy Businesses, including but not limited to creosote, benzene, low-level radioactive substances and asbestos. These suits involve thousands of plaintiffs and have cost Tronox at least $26.9 million (net of reimbursements) to manage since the Spinoff. Significant suits include, among others, claims related to former wood-treatment plants located in Columbus, Mississippi, Avoca, Pennsylvania, and Texarkana, Texas, including a group of 238 federal court suits with more than 2,000 plaintiffs and a group of 35 state court suits with more than 4,000 plaintiffs.

### iii. Retiree and Employee Benefit Legacy Liabilities

50. In conjunction with the Spinoff, New Kerr-McGee also required Tronox to assume responsibility for retirement and other employee benefit liabilities for current and former employees of the Chemicals Business and the Legacy Businesses pursuant to the terms of an Employee Benefits Agreement (the "EBA"). Tronox Inc. was required to sponsor specific

employee and retiree benefit plans for the employees and retirees allocated to it during the Spinoff. These programs included defined benefit and retiree medical and life insurance plans.

51.     These benefit programs were not competitive with those offered by Tronox's competitors. Nevertheless, under the terms of the MSA, Tronox was required to maintain the programs, and could not modify them, for three years after the completion of the Spinoff. The cost of these benefit programs was more than $6 million per year.

## D.     Summary of Prepetition Indebtedness

52.     As of the date hereof, Tronox's prepetition indebtedness included the following facilities: (a) $450 million in senior secured credit, comprised of a revolver and a term loan (as amended, the "Secured Debt Facility"); and (b) $350 million in aggregate principal amount of senior unsecured notes (as exchanged, the "Unsecured Notes"). The following chart accurately summarizes Tronox's prepetition indebtedness:

| Financing | Original Amount | Outstanding Amount | Maturity Date | Security |
|---|---|---|---|---|
| Revolver | $250 million | $109.8 million | Nov. 28, 2010 | Secured |
| Term Loan | $200 million | $103.0 million | Nov. 28, 2011 | Secured |
| Unsecured Notes | $350 million | $350.0 million | Nov. 28, 2012 | Unsecured |

In addition, certain of the Debtors are parties to a $75 million accounts receivables securitization program (as amended, the "Receivables Securitization").

### i.     The Secured Debt Facility

53.     The Debtors' Secured Debt Facility consists of a $250 million five-year multicurrency revolver (the "Revolver") due November 28, 2010 and a $200 million six-year term loan (the "Term Loan") due November 28, 2011. As of the date hereof, $212.8 million is outstanding under the Secured Debt Facility. This balance includes $109.8 million outstanding on the Revolver, $103.0 million outstanding on the Term Loan, and outstanding letters of credit in the face amount of approximately $80 million.

54.     The Debtors entered into the Secured Debt Facility at the time of the Spinoff.  It is memorialized by a credit agreement dated as of November 28, 2005 by and among Tronox Inc., Tronox Worldwide as borrower, Lehman Brothers Inc. and Credit Suisse as joint lead arrangers and joint bookrunners, ABN Amro Bank N.V., as syndication agent, JPMorgan Chase Bank, N.A. and Citicorp USA, Inc., as co-documentation agents, and Lehman Commercial Paper Inc., as administrative agent (as amended, the "Secured Debt Agreement").[7]

55.     The obligations under the Secured Debt Agreement are unconditionally guaranteed by Tronox Inc. and substantially all of the domestic subsidiaries of Tronox Worldwide, including Tronox Finance Corp., Cimarron Corporation, Tronox Holdings, Inc., Triple S Minerals Resources Corporation, Tronox Pigments (Savannah) Inc., Triple S Refining Corporation, Southwestern Refining Company, Inc., Transworld Drilling Company, Triangle Refineries, Inc., Triple S, Inc. and Tronox LLC (collectively, the "Subsidiary Guarantors").  The Secured Debt Facility is secured by a first priority security interest in certain domestic assets and real property of the Debtors.  The Secured Debt Facility is secured further by pledges of the equity interests in the domestic subsidiaries of Tronox Inc. and up to 65% of the voting equity interests in certain direct and indirect foreign subsidiaries of Tronox Worldwide.

56.     As of the date hereof, the Debtors are in default under the Secured Debt Agreement.  Certain of these defaults, however, have been waived pursuant to an amendment and waiver, dated October 28, 2008, which waiver subsequently was extended pursuant to extensions dated November 20, December 4 and December 19.  This waiver, as extended, expired no later than January 9, 2009.  In addition, the Debtors did not make the scheduled

---

[7]     Prior to the Petition Date, in light of Lehman Brothers' chapter 11 filing, Credit Suisse replaced Lehman Commercial Paper Inc. as administrative agent.

amortization payment or pay the interest due under the Existing Secured Debt Agreement on or about December 31, 2008.

### ii.     The Unsecured Notes

57.     The 9.5% Unsecured Notes were issued by two wholly-owned subsidiaries of Tronox Inc. in a private offering at the time of the Spinoff.  The Unsecured Notes are governed by that certain Indenture, dated as of November 21, 2005, by and among Tronox Worldwide and Tronox Finance Corp. as issuers, Tronox Inc. and certain domestic subsidiaries thereof as guarantors, and Citibank, N.A. as trustee (the "Notes Indenture").  The stated maturity date of the Unsecured Notes is December 1, 2012.

58.     In the second quarter of 2006, Tronox registered the Unsecured Notes with the Securities and Exchange Commission (the "SEC") and subsequently completed an exchange of all Unsecured Notes and related guarantees for publicly traded notes and guarantees having substantially identical terms on July 14, 2006.  As exchanged, the Unsecured Notes are guaranteed by the material direct and indirect wholly owned subsidiaries of Tronox Worldwide and Tronox Finance Corp.

59.     Under the Notes Indenture, the issuers are required to make interest payments on June 1 and December 1 of each year during the life of the notes.  The December 1, 2008 interest payment was not made.  However, under the terms of the Notes Indenture, the issuers had a 30-day grace period within which to make the required interest payment.  This grace period expired on January 1, 2009.  As of the date hereof, the issuers are in default under the Notes Indenture.

### iii.     The Receivables Securitization

60.     In the fall of 2007, certain Tronox subsidiaries entered into the Receivables Securitization Facility with ABN AMRO Bank N.V. ("ABN") to provide them with additional liquidity.  The Receivables Securitization is evidenced primarily by a sale agreement, dated as of

September 26, 2007, among Tronox Funding LLC ("Tronox Funding"), as seller, Tronox Worldwide, as initial collection agent, The Royal Bank of Scotland plc ("RBS"), the successor in interest to ABN, as agent and committed purchaser and Amsterdam Funding Corporation ("Amsterdam"), as conduit purchaser (as amended, the "Receivables Sale Agreement"). Pursuant to the Receivables Sale Agreement and related documentation, receivables generated by two of Tronox's domestic debtor subsidiaries, Tronox Pigments (Savannah) Inc. and Tronox LLC, are continuously sold to Tronox Funding, a special purpose, bankruptcy remote Tronox affiliate that is wholly owned by Tronox Inc. Upon receipt of such receivables, Tronox Funding sells ownership interests in the receivables to RBS. RBS funds its purchase by either providing new cash to Tronox Funding or releasing collections to Tronox Funding from previously conveyed receivables. Tronox Inc. is a guarantor of the performance of certain obligations owed under the Receivables Securitization.

61.     The initial term of the Receivables Sale Agreement was one year, and the aggregate maximum commitment under the agreement was originally $100 million. However, in conjunction with the waivers obtained with respect to the Secured Debt Agreement, the parties to the Receivables Securitization agreed to a series of amendments to the Receivables Sale Agreement. As modified, the term of the Receivables Securitization expired on January 9, 2009. In addition, through these amendments, the parties have reduced the maximum amount of the conduit purchaser's commitment to $75 million and have further limited availability under the facility. Moreover, with the expiration of the waiver, RBS is no longer purchasing receivables. As of the date hereof, the outstanding balance of the receivables purchased by Tronox Funding and funded by RBS is approximately $40.7 million.

### E. Events Leading to These Chapter 11 Cases

62.     Since the Spinoff, Tronox has spent more than $118 million to satisfy the Legacy Liabilities.  The assets that were transferred to Tronox by New Kerr-McGee at the Spinoff were insufficient to service these Legacy Liabilities.  From Tronox's inception, the Legacy Liabilities have consumed a significant portion of the cash generated by Tronox's ongoing business operations.  The deteriorating global economy, rising raw material and energy costs, and decreasing demand for consumer products resulted in these Legacy Liability costs representing an even greater proportion of Tronox's overall cash flow.  As a result, Tronox's financial performance has materially declined.

63.     Tronox has attempted to alleviate the significant burden of the Legacy Liabilities through discussions with New Kerr-McGee's owner, Anadarko.  To date, Anadarko has not assumed any of the Legacy Liabilities.  In addition, Tronox has pursued various forms of financial assistance from third parties, including Anadarko, to address its overall liquidity issues.  These efforts also have been unsuccessful.

64.     In 2007 and 2008, Tronox embarked on efforts to streamline its European operations and legal structure, implemented both a domestic and foreign work force reduction program, and announced various changes to its retiree medical, life insurance and pension plans.  Moreover, as discussed above, in September 2007, Tronox executed a $100 million Receivable Securitization Facility agreement that provided additional liquidity to fund, among other things, the continued cash payments of the Legacy Liabilities.  Tronox further sought and obtained a number of amendments to the financial covenants in its Secured Debt Agreement, the last of which was obtained on December 19, 2008.  Unfortunately, these efforts were also insufficient to remedy the company's problems.

65.     Additionally, during the second half of 2008, Tronox and its advisors engaged in discussions with certain parties regarding potential strategic transactions. These discussions led to the execution of a letter of intent with one strategic participant in December 2008 regarding the potential sale by Tronox of certain assets. While negotiations regarding such a sale have continued, the letter of intent terminated by its own terms upon the commencement of the Chapter 11 Cases prior to the execution of any sales agreement.

66.     As a result, for the foregoing reasons, Tronox has concluded that it is in the best interests of its businesses, creditors, and stakeholders to commence these chapter 11 cases to, among other things, reduce Tronox's Legacy Liability obligations by reallocating them to their rightful obligors.

# PART II

## FIRST DAY MOTIONS

67.     To enable the Debtors to minimize the adverse effects of the commencement of these chapter 11 cases on their ongoing business operations and promote a smooth transition to chapter 11, the Debtors have requested various relief in their First Day Motions. The First Day Motions seek authority to, among other things, obtain debtor in possession financing on an interim basis, preserve customer relationships, maintain employee morale, and ensure the continuation of Tronox's cash management systems and other business operations without interruption. Receiving Court approval of the relief sought in the First Day Motions is essential to giving the Debtors an opportunity to work towards a successful restructuring that will benefit all of the Debtors' constituents.

68.     Several of the First Day Motions request authority to pay certain prepetition claims. Rule 6003 of the Federal Rules of Bankruptcy Procedures provides that "except to the extent relief is necessary to avoid immediate and irreparable harm," the Court shall not consider

motions to pay prepetition claims during the first twenty days following the filing of a chapter 11 petition. Accordingly, as set forth below, the Debtors have narrowly tailored their requests for authority to pay prepetition claims to those circumstances where the failure to pay such claims would cause immediate and irreparable harm to the Debtors and their estates.

**A.      Administrative Motions**

> ### i.      Motion of the Debtors for Entry of an Order Directing Joint Administration of Their Related Chapter 11 Cases

69.      The 15 Debtors in these chapter 11 cases are "affiliates" as that term is defined in section 101(2) of the Bankruptcy Code. The Debtors request that, in light of the fact that Tronox Inc. and its 14 affiliates have each filed petitions in this Court, the Court can and should jointly administer the chapter 11 cases. In addition, and perhaps more importantly, I believe that joint administration will facilitate the ability of parties in interest to monitor these cases by grouping all pleadings together on one docket.

> ### ii.      Motion of the Debtors for Entry of an Order Granting an Extension of Time To File (A) Statements of Financial Affairs and Schedules of Assets and Liabilities, (B) Schedules of Current Income and Expenditures, (C) Statements of Executory Contracts and Unexpired Leases and (D) Lists of Equity Security Holders

70.      The Debtors have requested that the Court extend by an additional 30 days, for a total of 45 days, the date by which the schedules and statements of financial affairs (collectively, the "Schedules and Statements") must be filed, pursuant to Bankruptcy Rule 1007. I believe that the substantial size, scope, and complexity of these chapter 11 cases and the volume of material that must be compiled and reviewed by the Debtors' staff to complete the Schedules and Statements for each Debtor during the initial days of these chapter 11 cases provides ample "cause" for justifying, if not compelling, the requested extension.

### iii. Motion of the Debtors for Entry of an Order Establishing Certain Notice, Case Management and Administrative Procedures

71.     The Debtors have requested that this Court enter an order providing for certain notice, hearing, and other case management procedures in these chapter 11 cases.  Given the number of parties in interest in these chapter 11 cases, requiring that service be made upon each of these parties would waste Debtors' limited resources.  Thus, the Debtors believe that requiring paper service of certain pleadings only upon the main parties in interest, as well as authorizing service on all parties by email, will be efficient and save the estates significant time and expense.  Additionally, due to the likely volume of motions and other pleadings that will be filed in these cases, the Debtors have proposed that such special hearing procedures be created, including the creation of regularly scheduled omnibus hearings at which the Court, the Debtors and other main parties in interest can address several motions at once, thereby avoiding the substantial time and expense of scheduling separate hearings on each discrete matter.

### iv. Motion of the Debtors for Authority to (A) Prepare a List of Creditors in Lieu of Submitting a Formatted Mailing Matrix, (B) File a Consolidated List of the Debtors' Thirty Largest Unsecured Creditors and (C) Mail Initial Notices

72.     The Debtors estimate that there are tens of thousands of parties in interest in these chapter 11 cases.  Thus, converting the Debtors' computerized information to a format compatible with the matrix requirements would be an exceptionally burdensome task, which would greatly increase the risk and recurrence of error with respect to information already intact on computer systems maintained by the Debtors or their agents.  The Debtors have already prepared a single, consolidated list of the Debtors' creditors and are prepared to make such list available in electronic form to any party in interest who so requests and in non-electronic form at such requesting party's sole cost and expense, in lieu of submitting a mailing matrix.

73.     Similarly, I believe that requiring each of the Debtors to file a separate list of top twenty creditors in each of their respective cases would generate hundreds of names, addresses, and claim amounts.  Considering the tremendous burden that would be imposed upon the Debtors and their respective estates by filing individual top twenty lists and the absence of any corresponding benefit to the U.S. Trustee or parties in interest, the Debtors seek authority to file a single consolidated list of the thirty largest unsecured creditors in these cases.  I believe that such relief is not only appropriate under the circumstances, but also necessary for the efficient and orderly administration of these cases.

**B.      Financing Motions**

> **i.      Motion Of The Debtors For Entry Of Interim And Final Orders (A) Authorizing The Debtors To Obtain Superpriority Priming Postpetition Secured Financing And Utilize Cash Collateral; (B) Authorizing The Debtors To Repay Their Receivables Securitization Facility; (C) Granting Adequate Protection To Prepetition Secured Lenders; And (D) Scheduling Final Hearing**

74.     The Debtors have requested that the Court enter interim and final orders authorizing them to enter into a $125 million superpriority priming senior secured debtor in possession financing facility and to use cash collateral.  The Debtors have an urgent need to obtain access to debtor in possession financing ("DIP Financing") and use cash collateral to, among other things, continue the operation of their businesses in an orderly manner, maintain business relationships with vendors, suppliers and customers, pay employees and satisfy other working capital and operational needs -- all of which are vital to preserving and maintaining the Debtors' going-concern value.  The Debtors are unable under any scenario to operate solely in reliance on their cash on hand and the use of cash collateral.

75.     Accordingly, after contacting a wide range of financial and strategic participants and other interested parties regarding potential DIP Financing, and engaging in extensive

discussions and arm's length, good faith negotiations with a variety of potential lenders, the Debtors in consultation with their legal and financial advisors, determined that DIP Financing was not available except on a superpriority priming basis.  The Debtors further determined that it was in the best interests of the estates to enter into a credit agreement with the Debtors' existing Secured Debt lenders (the "DIP Credit Agreement," among Tronox Inc., Tronox Worldwide, as Borrower, Credit Suisse Securities (USA) LLC as Sole Lead Arranger and Sole Bookrunner, Credit Suisse as Administrative Agent (the "DIP Agent"), JPMorgan Chase Bank, N.A. as Collateral Agent, and the banks, financial institutions and other lenders parties thereto (collectively, together with the DIP Agent and the Collateral Agent, the "DIP Lenders")).

76.     Subject to Court approval, the proceeds of the DIP Financing will be used to, among other things, (a) pay fees and expenses related to the DIP Financing, (b) support the working capital and general corporate purposes of the Debtors, (c) make adequate protection and other expense payments incurred during the pendency of the Chapter 11 Cases, (d) issue letters of credit to support the payment of, and guarantee, the Debtors' obligations and (e) fund the repurchase of receivables (and the payment of related fees and expenses) in connection with the termination of the Receivables Securitization.

77.     For the reasons set forth in the DIP Motion, filed contemporaneously herewith, I believe that the DIP Financing is the best financing option available to the company under the present circumstances.  Moreover, I believe that entering into the DIP Financing is a sound exercise of the Debtors' business judgment and is in the best interest of the Debtors' estates because this financing will preserve the value of the Debtors' assets and operations for the benefit of their creditors, employees and other parties-in-interest.

ii. ***Ex Parte*** **Motion Of The Debtors For Entry Of An Order (A) Authorizing The Debtors To File Under Seal the Confidential Exhibit to the Debtor In Possession Financing Motion and (B) Limited Notice Thereof**

78.     In connection with the Debtors' entry into the DIP Credit Agreement, and as consideration for the DIP Agent's agreements thereunder, the Debtors have agreed to pay certain fees as set forth in a Fee Letter between Tronox Inc., Tronox Worldwide, Credit Suisse Securities (USA) LLC and Credit Suisse, Cayman Islands Branch (the "Fee Letter").  The Fee Letter, however, contains sensitive, confidential commercial information regarding, *inter alia*, the structure and amount of the fees relating to the DIP Facility.  Because the public disclosure of this information could harm the DIP Agent, the Debtors seek to file the Fee Letter under seal and provide for limited disclosure of the Fee Letter.

iii. **Motion of the Debtors for Entry of an Order Authorizing the Debtors to: (A) Continue (I) Using their Existing Cash Management System, Bank Accounts and Business Forms, and Paying Any Related Fees; (II) Transferring Funds Between the Debtors and their Foreign Subsidiaries; (III) Use of Electronic Debit, Wire Transfers and Automated Clearing House Payments; (IV) Investing Excess Funds Pursuant to Section 345 of the Bankruptcy Code; (B) Grant Postpetition Intercompany Claims Administrative Expense Priority Pursuant to Sections 364, 503(b)(1) and 507(a)(2) of the Bankruptcy Code; and (C) Continue Intercompany Arrangements in Accordance with Historical Practices**

79.     In the ordinary course of business, the Debtors maintain an integrated cash management system (the "Cash Management System") that provides well-established mechanisms for the collection, concentration, management and disbursement of funds and allows the Debtors to operate their businesses in a unified and effective manner.  The Debtors' Cash Management System consists of 22 bank accounts; the Debtors' foreign subsidiaries maintain an additional 62 bank accounts.  The Cash Management System is managed primarily by the Debtors' financial personnel at their corporate headquarters in Oklahoma City, Oklahoma.

80. The Cash Management System is similar in economic scope and geographic reach to those commonly employed by corporate enterprises comparable to the Debtors. Large, multiple-entity businesses, including the Debtors, use such systems because of the numerous benefits provided, including the ability to: (a) quickly create status reports on the location and amount of funds, allowing management to track and control corporate funds; (b) ensure cash availability; and (c) reduce administrative expenses by facilitating the movement of funds. Preserving this system is particularly important for the Debtors since, when considering receipts, disbursements and transfers between accounts, between $190 and $200 million flows through the Debtors' integrated Cash Management System on a weekly basis.

      **iv.**     **Motion of the Debtors for Entry of an Order (A) Establishing Notification And Hearing Procedures for Transfers of Certain Common Stock and (B) Granting Related Relief**

81. The Debtors have incurred significant net operating losses ("NOLs") and likely also have unrealized built-in losses in their assets. The Debtors' NOLs are an extremely valuable asset which the Debtors can use to offset their future taxable income for up to 20 taxable years and thereby reduce their future aggregate tax obligations. Unrestricted trading of equity securities, however, could adversely affect the Debtors' NOLs. Thus, I believe that, to prevent immediate and irreparable harm to the Debtors' valuable tax attributes, it is necessary to establish procedures that will enable the Debtors to closely monitor certain transfers of equity securities so as to be in a position to act expeditiously to prevent such transfers, if necessary, to preserve the Debtors' tax attributes.

**C.**    **Supply Chain Motions**

82. Preserving and maintaining the Debtors' raw material supply chain is fundamental to enabling the ongoing operation of the Debtors' businesses during the chapter 11 cases. Any disruption in this supply chain would immediately and irreparably harm the continued operation

of the Debtors' businesses by, among other things, requiring an unplanned shut down of the Debtors' production facilities. The Debtors' operations are particularly sensitive to disruption: as explained in detail in the motions discussed below, the Debtors maintain a "just in time" raw material inventory supply at their production facilities. However, in certain circumstances, it can take up to 100 days between the time that the Debtors place a raw material order and the time when that order is delivered at the Debtors' facilities. Moreover, in light of current economic and industry conditions, the availability of certain essential raw materials is limited. For these and other reasons, I believe it is necessary to prevent immediate and irreparable harm to the Debtors' businesses that the Debtors be authorized to take the requisite steps to ensure that the chapter 11 cases do not materially disrupt this supply chain.

> ### i. Motion of the Debtors for Entry of Interim and Final Orders (A) Authorizing, But Not Directing, the Debtors to Pay Prepetition Claims of Critical Vendors and Service Providers and (B) Approving Procedures Related Thereto

83. In the ordinary course of business, a number of vendors provide goods to the Debtors that are essential to their operations. The Debtors believe that certain of these vendors (the "Critical Vendors") will likely stop providing the Debtors with these essential goods if such vendors are not paid on account of amounts owed prior to the bankruptcy filing. The Critical Vendors can be generally categorized as: (a) vendors that provide processed chemicals to the Debtors; (b) vendors that provide gas and other energy resources to the Debtors for use in their manufacturing processes; (c) vendors that provide specialized parts needed to maintain the Debtors' production facilities; and (d) vendors that provide information technology services to the Debtors.

84. The Debtors estimate that, as of the Petition Date, the amount of Critical Vendor Claims will be approximately $12 million. However, the Debtors are seeking the authority, but

not the direction, only to pay up to $9.8 million on an interim basis. Additionally, of the estimated $12 million amount, the Debtors estimate that approximately $8.1 million is on account of essential goods that were received during the twenty day period before the bankruptcy filing and thus would be entitled to priority under section 503(b)(9) of the Bankruptcy Code. Pursuant to this motion, the Debtors seek entry of an interim order authorizing, but not directing, them to pay prepetition amounts owed to these Critical Vendors as necessary to avoid an interruption in the Debtors' business operations.

ii. **Motion of the Debtors for Entry of Interim and Final Orders Authorizing, But Not Directing, the Debtors to Pay Prepetition Claims of Foreign Vendors**

85. The Debtors' supply chain is dependent upon a number of foreign suppliers (the "Foreign Vendors") who provide goods and services that are essential to the Debtors' businesses. Specifically, the Debtors' supply chain includes approximately five foreign vendors who supply raw materials necessary for the Debtors' operations and approximately twenty foreign carriers who deliver the raw materials to the Debtors' production facilities in the United States and finished products to customers overseas. Because vendors located outside of the United States are unlikely to comply with the automatic stay, and as a result, they will have no incentive to continue providing goods to the Debtors and to continue performing under existing contracts, the Debtors request the authority to pay amounts owing to such Foreign Vendors as of the Petition Date. The Debtors estimate that, as of the Petition Date, the amount of Foreign Vendor Claims will be approximately $16.5 million. However, the Debtors are seeking the authority, but not the direction, only to pay up to $9 million on an interim basis.

### iii. Motion of the Debtors for Entry of an Order Authorizing, but not Directing, the Debtors to Pay Prepetition Claims of Carriers, Warehousemen and Other Lien Claimants

86.     As explained above, in the ordinary course of producing their finished products, the Debtors maintain an intricate supply and distribution network to receive raw materials for their production facilities.  Accordingly, through this motion, the Debtors seek the authority, but not the direction, to pay prepetition claims of Carriers, Warehousemen and other Lien Claimants. I believe that the relief requested in this motion is necessary to preventing severe disruptions to the Debtors' ability to produce goods, and thereby render the Debtors' businesses inoperative.

## D.     Operational Motions

### i. Motion of the Debtors for Entry of Interim and Final Orders Authorizing, But Not Directing, the Debtors to (A) Pay Certain Prepetition Compensation and Reimbursable Employee Expenses, (B) Pay and Honor Employee Medical and Other Benefits and (C) Continue Employee Wage and Benefit Programs

87.     The Debtors and their non-Debtor affiliates employ approximately 1,845 employees.  Through this motion, the Debtors seek the authority, but not the direction, to pay wages, commissions and reimbursable expenses in the ordinary course of business as well as pay any amounts in arrears as of the Petition Date.  The Debtors also provide their employees with a number of benefits including health plans, workers compensation, vacation time, retirement plans, flexible spending plans, insurance benefits and other ancillary programs, which the Debtors also seek the authority, but not direction, to continue as they see fit in their business judgment.

88.     I believe that the commencement of these chapter 11 cases will likely cause uncertainty and concern among the Debtors' employees.  Nonpayment of compensation and benefits, in addition to imposing hardship on the employees, would likely also generate doubts regarding the stability of the Debtors and their prospects for reorganization.  Failure to pay the

employee obligations would undermine morale and create significant risk of attrition. The relief requested in this motion will greatly assist the Debtors in alleviating these concerns and retaining their employees.

ii. **Motion of the Debtors for Entry of Interim and Final Orders Authorizing the Debtors to (A) Continue Prepetition Insurance Policies, (B) Continue Prepetition Insurance Bond Programs and (C) Obtain New Insurance Policies and Bonds**

89.     In the ordinary course of business, the Debtors maintain certain insurance coverage as required by various laws. The Debtors' insurance coverage includes property, casualty, directors' and officers' risk, environmental and other types of insurance policies, as well as numerous insurance bonds. The Debtors are required to maintain appropriate insurance coverage during the chapter 11 cases. Accordingly, to prevent immediate and irreparable harm to the Debtors, I believe that is necessary to obtain the authority, but not the direction, to pay any amounts owed prepetition regarding its insurance coverage, including any premiums due on account of the bonds and any fees or taxes associated with the policies, and to renew existing policies and bonds as they expire as well as enter into new insurance policies and bonds as the Debtors see fit in their business judgment.

iii. **Motion of the Debtors for Entry of Interim and Final Orders Determining Adequate Assurance of Payment for Future Utility Services**

90.     In connection with the operation of their businesses and management of their properties, the Debtors obtain gas, water, sewer, electric, telephone, and other similar utility services provided by over 75 utility companies (the "Utility Providers"). On average, the Debtors spend approximately $5.8 million each month on utility costs. The Debtors' production processes are energy-intensive. Thus, uninterrupted utility services are essential to the Debtors' ongoing operations and, therefore, to the success of the Debtors' reorganization. Should the

Utility Providers refuse or discontinue service, even for a brief period, the Debtors' business operations would be severely disrupted.

91.     Accordingly, the Debtors have requested the entry of interim and final orders:  (a) determining that their Utility Providers have been provided with adequate assurance of payment within the meaning of section 366 of the Bankruptcy Code; (b) approving the Debtors' proposed procedures for Utility Providers to request additional or different adequate assurance; (c) prohibiting the Utility Providers from altering, refusing, or discontinuing services on account of prepetition amounts outstanding or on account of any perceived inadequacy of the Debtors' proposed adequate assurance; (d) establishing procedures for the Utility Providers to object to the Debtors' proposed adequate assurance procedures; and (e) determining that the Debtors are not required to provide any additional adequate assurance beyond what is proposed by the motion.

> **iv.     Motion of the Debtors for Entry of an Order Authorizing, but not Directing, the Debtors to Continue their Customer and Sales Commission Programs and Honor Prepetition Commitments Related Thereto**

92.     Preservation of the Debtors' relationships with their customers is of paramount importance to the Debtors' business operations.  Accordingly, the Debtors provide certain incentive programs to its customers to induce and maintain the customers' loyalty consisting primarily of quick-pay, volume discounts and rebates.  The Debtors also maintain a consignment program with certain customers.  This motion seeks the authority, but not the direction, to pay prepetition claims related to these incentive and consignment programs and continue to offer them to the Debtors' customers.  I believe that the Debtors' failure to pay these claims would dissuade customers from purchasing goods from the Debtors in the future, which would have an immediate and irreparable adverse impact on the Debtors' business operations.

> **v.** **Motion of the Debtors for Entry of Interim and Final Orders Authorizing, But Not Directing, the Debtors to Remit and Pay Certain Taxes and Fees**

93.     In the ordinary course of their businesses, the Debtors incur sales, use, excise, franchise, income, gross receipts, single business, real and personal property and other taxes necessary to operate their businesses, including incidental interest and penalties, and are charged fees, licenses, permits and other similar charges and assessments on behalf of various taxing and licensing authorities. This motion seeks the authority, but not the direction, to pay prepetition claims for such taxes and fees to the applicable taxing authorities. Failure to pay these taxes and fees could have a material adverse impact on the Debtors, resulting in additional interest and penalty charges, thereby reducing the assets available for distribution to the Debtors' other creditors. Accordingly, I believe that the relief requested in this motion is necessary to prevent immediate and irreparable harm to the Debtors.

**E.      Professional Retention and Compensation Motions**

94.     The following professional retention applications and compensation motions have been filed contemporaneously herewith, but, with the exception of the application to retain Kurtzman Carson Consultants LLC as the Debtors' notice and claims agent, these applications and compensation motions will be noticed for hearing approximately twenty days following the Petition Date.

> **i.** **Application of the Debtors for Entry of an Order Authorizing the Employment and Retention of Kirkland & Ellis LLP as Attorneys for the Debtors and Debtors In Possession Effective Nunc Pro Tunc to the Petition Date**

95.     The Debtors seek to retain Kirkland & Ellis LLP ("K&E") as their attorneys because K&E has extensive experience and knowledge and an excellent reputation in providing high quality legal services in the field of debtors' protections, creditors' rights and business

reorganizations under chapter 11 of the Bankruptcy Code. In preparing for these chapter 11 cases, K&E has become familiar with the Debtors' business and the legal issues that may arise in these cases. K&E is well qualified and uniquely able to represent the Debtors in these chapter 11 cases.

> **ii.** **Application of the Debtors for Entry of an Order Authorizing the Employment and Retention of Rothschild, Inc. as Investment Banker and Financial Advisor for the Debtors and Debtors In Possession**

96. The Debtors seek to retain Rothschild, Inc. ("Rothschild") as their investment banker and financial advisor because, among other things, Rothschild has extensive experience and knowledge in providing high quality investment banking services to debtors and creditors in bankruptcy reorganizations and other restructurings. Rothschild has been working with Tronox since May 2008 with respect to various restructuring and other related matters.

> **iii.** **Application of the Debtors for Entry of an Order Authorizing the Employment and Retention of Kurtzman Carson Consultants LLC as Notice and Claims Agent for the Debtors and Debtors in Possession**

97. The Debtors seek to retain Kurtzman Carson Consultants LLC ("KCC") as their notice and claims agent because, among other things, KCC has extensive experience and an excellent reputation in providing high quality and cost effective services as the notice and claims agent to debtors and creditors in bankruptcy reorganizations. KCC has been working with Tronox since October 2008 with respect to its restructuring efforts.

> **iv.** **Motion of the Debtors for Entry of an Order Authorizing the Retention and Compensation of Certain Professionals Utilized in the Ordinary Course of Business**

98. Due to the number and geographic diversity of certain legal professionals (each an "OCP" and, collectively, the "OCPs") that are regularly retained by the Debtors as necessary to provide legal counsel related to the day-to-day operations of the Debtors' businesses, it would be unwieldy and burdensome to both the Debtors and this Court to request each such OCP to apply

separately for approval of its employment and compensation. The Debtors seek permission to continue to employ the OCPs postpetition without the necessity of each OCP filing a formal application for employment and compensation pursuant to sections 327, 328 and 330 of the Bankruptcy Code and pursuant to the compensation procedures set forth in the motion.

> **v.** **Motion of the Debtors for Entry of an Order Establishing Procedures for Monthly Compensation and Reimbursement of Expenses for Professionals and Members of Official Committees**

99.     The Debtors propose that the monthly payment of compensation and reimbursement of expenses of separately retained chapter 11 professionals be structured pursuant to certain procedures which, I believe, will enable the Debtors to monitor closely costs of administration, maintain a level cash flow availability and implement efficient cash management procedures. Moreover, these procedures will allow the Court and key parties in interest to ensure the reasonableness of the compensation and reimbursement sought pursuant to such procedures. The Debtors submit that the efficient administration of the chapter 11 cases will be significantly aided by establishing the foregoing interim compensation and expense reimbursement procedures.

100.     I have reviewed each of the First Day Pleadings. The facts stated therein are true and correct to the best of my information and belief, and I believe that the relief sought in each of the First Day Pleadings: (a) is necessary to enable the Debtors to operate in chapter 11 with minimal disruption to the business operations; and (b) constitutes a critical element in successfully restructuring the Debtors' businesses.

I declare under penalty of perjury that the foregoing is true and correct.  Executed on this 12th day of January, 2009.

By:     /s/ Gary Barton
Name:   Gary Barton
Title:    Senior Director, Alvarez & Marsal
         North America LLC

# Part III

<u>**SCHEDULE 1**</u>

**List of Committees Formed Prior to the Petition Date**

Prior to the Petition Date, the following financial institutions formed the following informal group:

| Type of Group | Group Members | Counsel for the Informal Group |
|---|---|---|
| Informal Group of Unsecured Noteholders | AIG Global Investment Corp.<br>MacKay Shields LLC<br>Fidelity Investment<br>Aegon USA Investment Management Inc. | Alan W. Kornberg<br>Paul, Weiss, Rifkind, Wharton & Garrison LLP<br>1285 Avenue of the Americas<br>New York, NY 10019-6064 |

The Informal Group of Unsecured Noteholders was formed in August 2008.

**30 Largest Unsecured Claims (Excluding Insiders)**

Pursuant to Local Bankruptcy Rule 1007-2(a)(4), the following lists the Debtors' thirty largest unsecured claims, on a consolidated basis as of December 31, 2008, excluding claims of insiders as defined in 11 U.S.C § 101.

| Count | Name, telephone number and complete mailing address including, zip code of employee, agent or department of creditor familiar with claims who may be connected. | Nature of claim. (trade debt, bank loan, government contract, etc.) | Indicate if claim is contingent, unliquidated, Disputed, or subject to setoff. | Amount of claim. (if secured, also state value of security) |
|---|---|---|---|---|
| 1 | Wilmington Trust Company, as indenture trustee<br>Attn: James McGinley<br>Rodney Square North<br>1100 North Market Street<br>Wilmington, DE 19890<br>(P) (302) 651-1000<br>(F) (302) 651-8010 | Corporate Debenture | | $350,000,000 (face amount) |
| 2 | Richards Bay Iron & Titanium Pty Ltd<br>George Deyzel, Managing Director<br>P.O. Box 401<br>Richards Bay South Africa 39000<br>(P) 27 35 901 3111<br>(F) 27 35 901 3200 | Trade | | 8,931,290 |
| 3 | Oxbow Calcining Llc<br>Richard Callahan, Chief Executive Officer<br>1601 Forum Place<br>West Palm Beach, FL 33401-8101<br>(P) (561) 697-4300<br>(F) (561) 697-1876 | Trade | | 1,773,480 |
| 4 | Gulbrandsen Co Inc<br>Donald Gulbrandsen, President<br>2 Main Street<br>Clinton, NJ  08809<br>(P) (908) 735-5458<br>(F) (908) 735-0983 | Trade | | 902,725 |

| Count | Name, telephone number and complete mailing address including, zip code of employee, agent or department of creditor familiar with claims who may be connected. | Nature of claim. (trade debt, bank loan, government contract, etc.) | Indicate if claim is contingent, unliquidated, Disputed, or subject to setoff. | Amount of claim. (if secured, also state value of security) |
|---|---|---|---|---|
| 5 | Olin Corp - Chlor Alkali<br>Joseph D. Rupp, Chairman, President & Chief Executive Officer<br>190 Carondelet Plaza, Ste. 1350<br>Clayton, MO  63105-3443<br>(P) (314) 480-1400<br>(F) (314) 862-7406 | Trade | | 838,609 |
| 6 | Powertrack Network<br>Richard K. Davis, Chairman, President & Chief Executive Officer<br>800 Nicolett Mall<br>Minneapolis, MN  55402-7014<br>(P) (651) 466-3000<br>(F) (612) 303-0782 | Trade | | 806,002 |
| 7 | P P G Industries<br>Charles E. Bunch, Chairman & Chief Executive Officer<br>1 PPG Place<br>Pittsburgh, PA  15272<br>(P) (412) 434-3131<br>(F) (412) 434-2011 | Trade | Subject to setoff | 686,549 |
| 8 | Southern Ionics, Inc.<br>Milton Sundbeck, President & Chief Executive Officer<br>201 Commerce Street<br>West Point, MS  39773<br>(P) (662) 494-3055<br>(F) (662) 495-2590 | Trade | | 376,143 |
| 9 | Marmetal Industries, LLC<br>Jerry Lynd, President<br>903 Sheehy Drive<br>Horsham, PA 19044<br>(P) (215) 675-4645<br>(F) (215) 675-9947 | Trade | | 347,477 |
| 10 | Veolia Water North AmericaLaurent Auguste, Chief Executive Officer14950 Heathrow Forest Parkway, Suite 200Houston, TX  77032(P) 281-449-1500(F) 281-449-5970 | Trade | | 345,092 |

| Count | Name, telephone number and complete mailing address including, zip code of employee, agent or department of creditor familiar with claims who may be connected. | Nature of claim. (trade debt, bank loan, government contract, etc.) | Indicate if claim is contingent, unliquidated, Disputed, or subject to setoff. | Amount of claim. (if secured, also state value of security) |
|---|---|---|---|---|
| 11 | Lanxess Corp<br>Randall S. Dearth, President & Chief Executive Officer<br>111 RIDC Park West Drive<br>Pittsburgh, PA  15275<br>(P) (412) 809-1000<br>(F) (412) 809-3599 | Trade | Subject to setoff | 344,491 |
| 12 | Watson Wyatt<br>John J. Haley, President & Chief Executive Officer<br>901 N Glebe Rd<br>Arlington, VA 22203-1853<br>(P) (703) 258-8000<br>(F) (703) 258-8585 | Trade | | 335,484 |
| 13 | Macaljon/Scl Inc<br>Ben Macmillan, President<br>4524 Ogeechee Road<br>Savannah, GA  31405-1208<br>(P) (912) 236-9333<br>(F) (912) 236-1925 | Trade | | 334,946 |
| 14 | K.A. Steel Chemicals<br>Robert Steel, President<br>15185 Main Street<br>Lemont, IL  60439<br>(P) (630) 257-3900<br>(F) (630) 257-5096 | Trade | | 301,311 |
| 15 | De Nora Tech Inc<br>Renato Gazzangia, Chief Executive Officer<br>100 Seventh Ave, Suite 300<br>Chardon, OH 44024<br>(P) (440) 285-0334<br>(F) (440) 285-0195 | Trade | | 285,000 |

| Count | Name, telephone number and complete mailing address including, zip code of employee, agent or department of creditor familiar with claims who may be connected. | Nature of claim. (trade debt, bank loan, government contract, etc.) | Indicate if claim is contingent, unliquidated, Disputed, or subject to setoff. | Amount of claim. (if secured, also state value of security) |
|---|---|---|---|---|
| 16 | ESK Ceramics<br>c/o Ceradyne, Inc<br>Joel Moskowitz, Chairman and Chief Executive Officer<br>3169 Red Hill Avenue<br>Costa Mesa, CA 92626<br>(P) (800) 839-2189<br>(F) (714) 549-5787 | Trade | | 266,405 |
| 17 | Ideal Chemical & Supply Company<br>Sam Block, President<br>4025 Air Park Street<br>Memphis, TN 38118<br>(P) (901) 363-7720<br>(F) (901) 366-0864 | Trade | | 256,541 |
| 18 | Kemira Water Solutions, Inc<br>Joseph W. Richey, President<br>808 E. Main Street<br>Lakeland, FL 33801<br>(P) (800) 533-5990<br>(F) (863) 797-1087 | Trade | | 243,610 |
| 19 | Jimco Integrated Services<br>3786 Noel C. Conaway Road<br>Guyton, GA 31312<br>(P) (912) 728-6794<br>(F) (912) 728-8325 | Trade | | 241,441 |
| 20 | Gulf Coast Marine Supply Co IncM. Mostellare, Chairman and Treasurer501 Stimard Road Mobile, AL 36610(P) (251) 452-8066(F) (251) 456-8860 | Trade | | 232,571 |
| 21 | Industrial Metalworks<br>T Edward Huncke Jr., President<br>2501 Tremont Rd<br>Savannah, GA 31405<br>(P) (912) 233-3703<br>(F) (912) 233-4735 | Trade | | 227,964 |

| Count | Name, telephone number and complete mailing address including, zip code of employee, agent or department of creditor familiar with claims who may be connected. | Nature of claim. (trade debt, bank loan, government contract, etc.) | Indicate if claim is contingent, unliquidated, Disputed, or subject to setoff. | Amount of claim. (if secured, also state value of security) |
|---|---|---|---|---|
| 22 | Rath Refractories Inc<br>Edwin Kirkland, Plant Manager<br>290 Industrial Park Drive<br>Milledgeville, GA 31061<br>(P) (478) 452-0015<br>(F) (478) 452-0070 | Trade | | 220,706 |
| 23 | Brenntag Pacific Inc<br>Steven Pozzi, President<br>10747 Patterson Place<br>Santa Fe Springs, CA 90670<br>(P) (562) 903-9626<br>(F) (562) 903-9622 | Trade | | 206,010 |
| 24 | CSAV, Inc<br>Scott Gill, President<br>8401 Eagle Creek Parkway<br>Savage, MN 55378-1224<br>(P) (952) 894-6280<br>(F) (952) 277-3991 | Trade | | 190,512 |
| 25 | AECOM<br>Robert C. Weber, President & Chief Executive Officer<br>2 Technology Park Drive<br>Westford, MA 01886<br>(P) (978) 589-3000<br>(F) (978) 589-3100 | Trade | | 188,298 |
| 26 | Oracle Corporation<br>Jeff Epstein, Chief Financial Officer<br>500 Oracle Parkway<br>Redwood Shores, CA 94065<br>(P) (650) 633-4075<br>(F) (650) 633-3255 | Trade | | 181,051 |

| Count | Name, telephone number and complete mailing address including, zip code of employee, agent or department of creditor familiar with claims who may be connected. | Nature of claim. (trade debt, bank loan, government contract, etc.) | Indicate if claim is contingent, unliquidated, Disputed, or subject to setoff. | Amount of claim. (if secured, also state value of security) |
|---|---|---|---|---|
| 27 | Tubes Inc<br>Michael Amburn, President<br>9401 Telge Road<br>Houston, TX 77095<br>(P) (281) 858-8300<br>(F) (281) 858-4055 | Trade | | 165,792 |
| 28 | B E & K Industrial Services<br>Ted Kennedy, Chief Executive Officer<br>2000 International Park Drive<br>Birmingham, AL  35243<br>(P) (205) 972-6000<br>(F) (205) 972-6300 | Trade | | 147,723 |
| 29 | The G.C. Broach Company<br>Roger Broach, President<br>7667 East 46 Place<br>Tulsa, OK 74145<br>(P) (918) 664-7420<br>(F) (918) 627-4083 | Trade | | 135,550 |
| 30 | Aberdeen Machine Works IncRobley E. Wooten, President79 Hwy 25 SouthAberdeen, MS 39730(P) (662) 369-9357(F) (662) 369-9377 | Trade | | 134,941 |

## SCHEDULE 3

### 5 Largest Secured Claims

Pursuant to Local Bankruptcy Rule 1007-2(a)(5), the following lists the Debtors' five largest secured claims on a consolidated basis.

The information contained herein shall not constitute an admission of liability by, nor is it binding on, the Debtors. The Debtors reserve all rights to assert that any debt or claim listed herein is a disputed claim or debt, and to challenge the priority, nature, amount or status of any such claim or debt. The descriptions of the collateral securing the underlying obligations are intended only as brief summaries. In the event of any inconsistencies between the summaries set forth below and the respective corporate and legal documents relating to such obligations, the descriptions in the corporate and legal documents shall control. The schedule estimates outstanding claim amounts (including principal and interest) as of December 31, 2008.

| Creditor | Contact; Mailing Address & Phone Number | Amount of Claim as of December 31, 2008 | Description of Claim | Collateral | Value of Collateral |
|---|---|---|---|---|---|
| **Lehman Commercial Paper Inc.** | Paul Arzouian<br><br>Lehman Commercial Paper Inc.<br>745 Seventh Ave.<br>New York, NY 10119<br><br>(P) (646) 758-4980<br>(F) (212) 526-5803 | $109,800,000 | Revolving Credit Facility | Security interests in and liens upon (i) any property of Borrower or Guarantor constituting (a) all stock of Borrower or domestic subsidiary, except that with respect to any foreign subsidiary (other than a special purpose subsidiary) of the Borrower or any Guarantor, only 65% of the voting capital stock and 100% of the non-voting capital stock thereof; or (b) inventory, equipment or accounts or certain other personal property where a lien is purported to be created and (ii) the mortgaged properties | Unknown |
| **Lehman Commercial Paper Inc.** | Paul Arzouian<br><br>Lehman Commercial Paper Inc.<br>745 Seventh Ave.<br>New York, NY 10119<br><br>(P) (646) 758-4980<br>(F) (212) 526-5803 | $103,000,000 | Variable Rate Term Loan | Security interests in and liens upon (i) any property of Borrower or Guarantor constituting (a) all stock of Borrower or domestic subsidiary, except that with respect to any foreign subsidiary (other than a special purpose subsidiary) of the Borrower or any Guarantor, only 65% of the voting capital stock and 100% of the non-voting capital stock thereof; or (b) inventory, equipment or accounts or certain other personal property where a lien is purported to be created and (ii) the mortgaged properties | Unknown |

| | | | | | |
|---|---|---|---|---|---|
| **ABN AMRO Bank N.V.** | Lender Agent<br><br>ABN AMRO Bank N.V.<br>540 West Madison<br>Chicago, IL 60661<br><br>(P) (312) 904-6263<br>(F) (312) 992-1527 | 40,700,000 | Receivables Securization Facility | Security interest and lien upon Seller's interest in all Receivables, Related Security, Collections, Lock-Box Accounts and the Purchase Agreement and assignment and transfer of Seller's rights under the Purchase Agreements to the extent they relate to such Receivables, the Related Security and the indemnification and payment obligations of the Originators thereunder. | Unknown |
| **U.S. E.P.A.** | USEPA Region 5 Superfund Division (SR-6J)<br>77 W. Jackson Blvd.<br>Chicago, IL 60604<br><br>(P) (312) 353-2000<br>(F) (312) 353-4135 | Unknown | Environmental remediation | Backed by letter of credit. | 26,500,000 |
| **US Nuclear Regulatory Commission** | Office of Nuclear Materials Safety and Safeguards<br>US Nuclear Regulatory Commission<br>Washington D.C. 20555<br><br>(P) (301) 415-7000<br>(F) (301) 415-5398 | Unknown | Environmental remediation | Backed by letter of credit. | 3,600,000 |

**Summary of the Debtors' Assets and Liabilities**

      The following financial data (unaudited) is the latest available information and reflects the Debtors' financial condition, as consolidated with its domestic affiliated debtors and non-debtors as of November 30, 2008. The following financial data shall not constitute an admission of liability by the Debtors. The Debtors reserve all rights to assert that any debt or claim listed herein as liquidated or fixed is in fact a disputed claim or debt. The Debtors reserve all rights to challenge the priority, nature, amount or status of any claim or debt.

| | |
|---|---|
| **Total Assets (Book Value):** | $ 1,557.0 million |
| **Total Liabilities:** | $ 1,221.6 million |

<u>**SCHEDULE 5**</u>

**Schedule of Publicly Held Securities**

As of December 31, 2008, Tronox, Incorporated ("Tronox") had outstanding 18,835,539 shares of class A common shares. There are 12 holders of record of Tronox class A common shares. Tronox also has outstanding 271,828 shares of its restricted A shares held by 812 stockholders and 22,889,431 shares of its class B common shares held by 12,592 stockholders.

In addition, the following table sets forth information, as of December 31, 2008, concerning beneficial ownership of Tronox's outstanding common shares held by each of its current officers and directors.

| **Directors and Executive Officers** | **Class A Common Shares** | **Restricted A Shares** | **Class B Common Shares** |
|---|---|---|---|
| Robert D Agdern | — | 10816 | — |
| Bradley Richardson | — | 12566 | — |
| David G Birney | 11542 | 24108 | — |
| Michael J. Foster | 2590 | 8200 | 123 |
| Jerome Adams | — | 12566 | — |
| John Romano | 9552 | 23609 | 10287 |
| Dennis L. Wanlass | — | 62800 | — |
| Edward G. Ritter | 3924 | — | 181 |
| Kelly A. Green | — | 22974 | — |
| Stephen T. Wachnowsky | 100 | 13384 | — |
| Mary Mikkelson | 11923 | 45714 | 5241 |
| Patrick Corbett | 3720 | 10687 | 373 |
| Peter Kinnear | — | 12566 | — |
| Robert C Gibney | 9053 | 9003 | 4285 |

<u>**SCHEDULE 6**</u>

**Debtors' Property Not in the Debtors' Possession**

Pursuant to Local Bankruptcy Rule 1007-2(a)(8), the following lists the Debtors' property that is in the possession or custody of any custodian, public officer, mortgagee, pledge, assignee of rents, secured creditor, or agent for any such entity.

In the ordinary course of the Debtors' business, titanium dioxide is held on consignment by customers. As a result of the Debtors' consignment arrangements, as of November 30, 2008, approximately 5,544 metric tons of titanium dioxide pigment with a total estimated value of approximately $6.70 million, was located in various warehouses.

In addition, as of November 30, 2008, the Debtors had finished goods inventory in transit of approximately $5.23 million in total value.

<u>**SCHEDULE 7**</u>

**Debtors' Property**

Pursuant to Local Bankruptcy Rule 1007-2(a)(9), the following lists the property or premises owned, leased or held under other arrangement from which the Debtors operate their businesses.[1]

| Debtor | Description | Address | Leased/Owned |
|---|---|---|---|
| Tronox LLC | Plant | P.O. Box 180<br>Hamilton, MS 39746 | Owned |
| Tronox LLC | Plant | 800 W. Lake Mead Dr.<br>Henderson, NV 89015 | Owned |
| Tronox LLC | Plant | 1864 Highway 34<br>Soda Springs, ID 83276 | Owned |
| Tronox Pigments (Savannah) Inc. | Plant | P.O. Box 368<br>Savannah, GA 31402 | Owned |
| Tronox LLC | Technical Sales Service Location | 3301 NW 150th Street<br>Oklahoma City, Oklahoma, 73134 | Leased |
| Tronox LLC | Corporate Office | 211 N. Robinson, Suite 300<br>Oklahoma City, OK 73102-7109 | Leased |
| Tronox Pigments (Savannah) Inc. | Warehouse | 151 Port Side Ct.<br>Savannah, GA 31407-9728 | Leased |
| Tronox LLC | Warehouse | 40935 Old Hwy 45 South<br>Lackey, MS 39730 | Leased |
| Tronox LLC | Warehouse | 41033 Hwy 45 S.<br>Aberdeen, MS 39730 | Leased |
| Tronox LLC | Warehouse | 2720 NW 35th<br>Portland, OR 97210 | Leased |
| Tronox LLC | Warehouse | 2743 Thompson Creek Rd.<br>Pomona, CA 91767 | Leased |
| Tronox LLC | Warehouse | 50 Waverly St.<br>Pittsfield, MA 012101 | Leased |
| Tronox LLC | Warehouse | 31 Riverview Rd.<br>Lenoxdale, MA 01201 | Leased |
| Tronox LLC | Warehouse | 10 Plum St.<br>Verona, PA 15147 | Leased |

---

[1]  In addition, the Debtors own certain other properties that are not used in connection with their business operations and are, therefore, not listed herein.

| Tronox LLC | Warehouse | 7715 S. 78th Ave. Bridgeview, IL 60455 | Leased |
|---|---|---|---|
| Tronox LLC | Warehouse | 2908 Steven F. Austin Dr. Brownwood, TX 76801 | Leased |

<u>**SCHEDULE 8**</u>

**Location of Debtors' Assets, Books, and Records**

Pursuant to Local Bankruptcy Rule 1007-2(a)(10), the following lists the locations of the Debtors' substantial assets, the location of their books and records, and the nature, location, and value of any assets held by the Debtors outside the territorial limits of the United States.

**Location of Debtors' Substantial Assets in the United States**

<u>See</u> Schedule 7, attached hereto and incorporated herein by this reference.

In addition and in the ordinary course of business, the Debtors have ore, process chemicals and inventory that may be in transit domestically. As of January 11, 2008, the net book value of assets that might be in transit was approximately $18.5 million.

**Books and Records**

One Leadership Square, Suite 300
211 N. Robinson
Oklahoma City, OK 73102-7109

**Nature, Location and Value of Debtors' Assets Outside the United States**

The Debtors do not hold property outside the territorial limits of the United States, except to the extent that the Debtors have, in the ordinary course of business, ore, process chemicals and inventory in transit in Africa, Australia, Canada, or other foreign countries. As of January 11, 2009, the net book value of assets that might be in transit was approximately $7.0 million. [2]

---

[2] This summary does not include the holdings of the Debtors' foreign non-Debtor affiliates. Various Debtors own equity or other interests in affiliates outside the United States.

## SCHEDULE 9

### Litigation

Pursuant to Local Bankruptcy Rule 1007-2(a)(11), the following is a list of the nature and present status of each action or proceeding, pending or threatened against the Debtors or their properties where a judgment against the Debtors or a seizure of their property may be imminent.

N/A

<u>**SCHEDULE 10**</u>

**Senior Management**

Pursuant to Local Bankruptcy Rule 1007-2(a)(12), the following provides the names of the individuals who comprise the Debtors' existing senior management and a brief summary of their relevant responsibilities and experience.

| Name | Title | Tenure | Responsibility | Prior Experience |
|------|-------|--------|----------------|------------------|
| Dennis Wanlass | Interim Chairman and Chief Executive Officer | 2008 | Oversees total company operations. | Previously served as chief executive officer for Special Metals Corporation. |
| Mary A. Mikkelson | Senior Vice President and Chief Financial Officer | 2005 | Responsible for oversight of financial reporting and management. | Previously served as vice president and chemical controller for Kerr-McGee Chemical LLC. |
| Gary L. Pittman | Vice President of Special Projects | 2008 | Oversees restructuring issues and special projects. | Previously served as Chief Financial Officer of Pioneer Companies Inc. |
| John D. Romano | Vice President of Sales | 2005 | Responsible for global marketing strategy and sales initiatives. | Previously served as vice president of global sales and marketing for Kerr-McGee Chemical LLC. |
| Kelly A. Green | Vice President of Market Management | 2005 | Responsible for product management and product research and development. | Previously served as vice president and general manager for plastics for Kerr-McGee Chemical LLC. |
| Michael J. Foster | Vice President, General Counsel and Secretary | 2005 | Responsible for the administration of the law department. | Previously served as staff attorney for Kerr McGee Corporation. |
| Stephen T. Wachnowsky | Vice President of Global Pigment Operations | 2005 | Responsible for global management of pigment manufacturing. | Previously served as manufacturing director for Calanese Ltd. |

<u>**SCHEDULE 11**</u>

**Payroll**

       Pursuant to Local Bankruptcy Rule 1007-2(b)(1)-(2)(A) and (C), the following provides the estimated amount of weekly payroll to the Debtors' employees (not including officers, directors and stockholders) and the estimated amount to be paid to officers, stockholders, directors and financial and business consultants retained by Debtors, for the thirty (30) day period following the filing of the chapter 11 petitions.

| | |
|---|---|
| **Payments to Employees (Not Including Officers, Directors and Stockholders)** | Approximately $5.8 million for 30 days. |
| **Payments to Officers, Directors and Stockholders** | **Officers:** Approximately $235,000 for 30 days<br><br>**Directors**: None.<br><br>**Stockholders**: None |
| **Payments to Financial and Business Consultants** | Approximately $500,000 for 30 days to be paid in accordance with applicable first day motions. |

## <u>SCHEDULE 12</u>

**Cash Receipts and Disbursements, Net Cash Gain or Loss, Unpaid Obligations and Receivables.**

        Pursuant to Local Bankruptcy Rule 1007-2(b)(3), the following provides, for the thirty (30) day period following the filing of the Chapter 11 petitions, the estimated cash receipts and disbursements, net cash gain or loss, and obligations and receivables expected to accrue that remain unpaid, other than professional fees.

| | |
|---|---|
| **Cash Receipts** | $60 million |
| **Cash Disbursements** | $75 million |
| **Net Cash Gain** | ($15) million |
| **Unpaid Obligations** | $15 million |
| **Unpaid Receivables** | $55 million |

**Exhibit A:**
**Tronox Incorporated Corporate and Capital Structure Chart**

# Tronox Incorporated Corporate and Capital Structure Chart

