Richard M. Cieri
Jonathan S. Henes
Patrick J. Nash, Jr. (admitted *pro hac vice*)
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, New York  10022
Telephone:    (212) 446-4800
Facsimile:    (212) 446-4900

Counsel to the Debtors
and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | ) )  Chapter 11 |
| TRONOX INCORPORATED, <u>et al.</u>,[1] | ) )  Case No. 09-10156 (ALG) |
| Debtors. | ) )  Jointly Administered |

## NOTICE OF TRONOX'S EMERGENCY MOTION FOR INTERIM AND FINAL ORDERS (A) AUTHORIZING (I) REPLACEMENT POSTPETITION SECURED FINANCING, (II) USE OF CASH COLLATERAL AND (III) REPAYMENT OF EXISTING POSTPETITION FINANCING AND PREPETITION SECURED FINANCING; (B) AUTHORIZING ENTRY INTO PLAN SUPPORT AGREEMENT; (C) AUTHORIZING ENTRY INTO EQUITY COMMITMENT AGREEMENT; AND (D) SCHEDULING A FINAL HEARING

PLEASE TAKE NOTICE that a hearing (the "Hearing") on the above-captioned debtors'

(collectively, "Tronox") Emergency Motion for Interim and Final Orders (A) Authorizing (I)

Replacement Postpetition Secured Financing, (II) Authorizing Use of Cash Collateral, and (III)

Authorizing Repayment of Existing Postpetition Financing and Prepetition Secured Financing;

(B) Authorizing Entry Into Plan Support Agreement; (C) Authorizing Entry Into Equity

---

[1]   The debtors in these chapter 11 cases include:  Tronox Luxembourg S.ar.l; Tronox Incorporated; Cimarron Corporation; Southwestern Refining Company, Inc.; Transworld Drilling Company; Triangle Refineries, Inc.; Triple S, Inc.; Triple S Environmental Management Corporation; Triple S Minerals Resources Corporation; Triple S Refining Corporation; Tronox LLC; Tronox Finance Corp.; Tronox Holdings, Inc.; Tronox Pigments (Savannah) Inc.; and Tronox Worldwide LLC.

Commitment Agreement; and (D) Scheduling a Final Hearing (the "Motion") will be held before the Honorable Allan L. Gropper of the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court"), in Room 617, One Bowling Green, New York, New York, on **December 22, 2009 at 11:00 a.m. (ET)**.

PLEASE TAKE FURTHER NOTICE that any responses or objections to the Motion must be in writing, shall conform to the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and the Local Bankruptcy Rules for the Southern District of New York (the "Local Bankruptcy Rules"), and shall be filed with the Bankruptcy Court electronically by registered users of the Bankruptcy Court's case filing system (the User's Manual for the Electronic Case Filing System can be found at www.nysb.uscourts.gov, the official website for the Bankruptcy Court) and, by all other parties in interest, on a 3.5 inch disk, in text-searchable Portable Document Format (PDF), Wordperfect or any other Windows-based word processing format (in either case, with a hard-copy delivered directly to Chambers), and shall be served upon (a) counsel to Tronox, Kirkland & Ellis LLP, 601 Lexington Avenue, New York, New York 10022, Attn: Jonathan S. Henes, Esq.; (b) the Office of the United States Trustee for the Southern District of New York, 33 Whitehall Street, 21st Floor, New York, New York 10004, Attn: Susan D. Golden, Esq.; (c) counsel to the agent for Tronox's prepetition and postpetition secured lenders, Cravath, Swaine & Moore LLP, 825 Eighth Avenue, New York, NY 10019-7475, Attn: Robert H. Trust, Esq.; (d) counsel to the official committee of unsecured creditors, Paul, Weiss, Rifkind, Wharton & Garrison LLP, 1285 Avenue of the Americas, New York, New York 10019-6064, Attn: Brian S. Hermann, Esq. and Elizabeth McColm, Esq.; (e) counsel to the official committee of equity security holders, Pillsbury Winthrop Shaw Pittman LLP, 1540 Broadway, New York, New York 10036-4039, Attn: Craig A. Barbarosh, Esq., David A.

K&E 15978564.

Crichlow, Esq. and Karen B. Dine, Esq.; (f) the Office of the United States Attorney for the Southern District of New York, 86 Chambers Street, 3rd Floor, New York, New York 10007, Attn: Matthew L. Schwartz, Esq., Assistant United States Attorney; (g) counsel to the agent for Tronox's proposed replacement DIP lenders, Latham & Watkins LLP, 233 South Wacker Drive, Suite 5800, Chicago, Illinois 60606, Attn: Richard A. Levy, Esq. and (h) all those persons and entities that have formally requested notice by filing a written request for notice pursuant to Bankruptcy Rule 2002 and the Local Bankruptcy Rules (with service on such parties by email only), so as to be actually received **no later than 4:00 p.m. (ET) on December 21, 2009**.

Only those responses that are timely filed, served and received will be considered at the Hearing. Failure to file a timely objection may result in entry of a order granting the Motion as requested by Tronox.

New York, New York
Dated: December 20, 2009

/s/ Jonathan S. Henes
Richard M. Cieri
Jonathan S. Henes
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, New York 10022
Telephone:    (212) 446-4800
Facsimile:    (212) 446-4900

- and -

Patrick J. Nash, Jr.
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, Illinois 60654
Telephone:    (312) 862-2000
Facsimile:    (312) 862-2200

Counsel to the Debtors
and Debtors in Possession

K&E 15978564.

Richard M. Cieri
Jonathan S. Henes
Patrick J. Nash, Jr. (admitted *pro hac vice*)
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, New York  10022
Telephone:    (212) 446-4800
Facsimile:    (212) 446-4900

Counsel to the Debtors
and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| TRONOX INCORPORATED, <u>et al.</u>,[1] | Case No. 09-10156 (ALG) |
| Debtors. | Jointly Administered |

**TRONOX'S EMERGENCY MOTION FOR INTERIM AND FINAL
ORDERS (A) AUTHORIZING (I) REPLACEMENT POSTPETITION
SECURED FINANCING, (II) USE OF CASH COLLATERAL AND
(III) REPAYMENT OF EXISTING POSTPETITION FINANCING AND
PREPETITION SECURED FINANCING; (B) AUTHORIZING ENTRY INTO
PLAN SUPPORT AGREEMENT; (C) AUTHORIZING ENTRY INTO EQUITY
<u>COMMITMENT AGREEMENT; AND (D) SCHEDULING A FINAL HEARING</u>**

The above-captioned debtors and debtors in possession (collectively, "Tronox"), hereby

move the Court, pursuant to this emergency motion (the "Motion"), (a) for entry of an interim

order, substantially in the form attached hereto as <u>Exhibit A</u> (the "Interim Order"), and a final

order (the "Final Order" and, together with the Interim Order, the "Replacement DIP Orders"),

authorizing Tronox to (i) obtain postpetition secured financing on a priming and superpriority

---

[1]    The debtors in these chapter 11 cases include:  Tronox Luxembourg S.ar.l; Tronox Incorporated; Cimarron
Corporation; Southwestern Refining Company, Inc.; Transworld Drilling Company; Triangle Refineries, Inc.;
Triple S, Inc.; Triple S Environmental Management Corporation; Triple S Minerals Resources Corporation;
Triple S Refining Corporation; Tronox LLC; Tronox Finance Corp.; Tronox Holdings, Inc.; Tronox Pigments
(Savannah) Inc.; and Tronox Worldwide LLC.

basis, (ii) use cash collateral and (iii) repay its existing prepetition and postpetition secured debt; (b) for entry of an order, substantially in the form attached hereto as <u>Exhibit B</u> (the "Plan Agreement Order"), authorizing Tronox to (i) enter into a plan support agreement (the "Plan Support Agreement"), substantially in the form attached hereto as <u>Exhibit C</u>, and (ii) enter into an equity commitment agreement (the "Equity Commitment Agreement"), substantially in the form attached hereto as <u>Exhibit D</u>; and (c) scheduling a final hearing (the "Final Hearing") to consider entry of the Final Order.  In support of this motion, Tronox respectfully states as follows:

<u>**Preliminary Statement**</u>

1.     Throughout these chapter 11 cases, Tronox has worked diligently to maximize the value of its estates for the benefit of all stakeholders.  To that end, Tronox has pursued a dual path process whereby Tronox has considered both a sale of substantially all of its operating assets and a standalone reorganization.  As Tronox has previously explained to this Court and its stakeholders, any possible standalone reorganization required two key prerequisites: (a) reaching a settlement with the government regarding Tronox's substantial legacy environmental liabilities; and (b) obtaining committed financing to fund a reorganized Tronox's emergence from chapter 11.  Today, as a result of incredible effort, focus and creativity over the last few weeks on the part of Tronox, certain key stakeholders and their respective advisors, Tronox has satisfied both of these requirements.

2.     *First*, Tronox has successfully negotiated an agreed-upon framework for the resolution of Tronox's legacy environmental liabilities and the key provisions of a plan of reorganization built around that settlement.  These terms are set forth in a plan term sheet (the "Term Sheet") that is annexed hereto as an exhibit to the Plan Support Agreement.  The Plan Support Agreement is signed by Tronox, the United States of America (the "United States"), the

2

official committee of unsecured creditors (the "Creditors' Committee"), certain members of the Creditors' Committee in their individual capacity[2] and holders of approximately two-thirds of Tronox's 9.5% unsecured notes due December 1, 2012 (the "Bondholders"). Under the Plan Support Agreement, Tronox has agreed to work with these key stakeholders to draft, file and seek confirmation of a plan of reorganization that is consistent with the Term Sheet and pursuant to a specific timeline.

3. *Second*, Tronox has successfully located the financing necessary to fund its emergence from chapter 11. This financing involves two separate but interdependent agreements. The first agreement is a fully negotiated $425 million debtor in possession financing facility (the "Replacement DIP Facility", and that agreement, the "Replacement DIP Agreement"[3], which is attached hereto as <u>Exhibit E</u>) from a syndicate of lenders (each, a "Lender", and collectively, the "Lenders") led by Goldman Sachs Lending Partners LLC ("Goldman", or the "Agent"). The Replacement DIP Facility will replace Tronox's current secured debt in its entirety immediately upon approval by the Bankruptcy Court and then, subject to certain conditions set forth in the Replacement DIP Agreement, will convert to exit financing on the effective date of Tronox's chapter 11 plan. The second agreement is the Equity Commitment Agreement, pursuant to which the Bondholders have committed to provide a $105 million equity infusion on the effective date of Tronox's chapter 11 plan through a backstopped

---

[2] These members are Michael E. Carroll, who serves as the unofficial spokesperson for, and negotiated on behalf of, holders of tort claims against Tronox (collectively, the "Tort Claimants"), and Rio Algom Mining LLC, the holder of certain non-governmental CERCLA claims against Tronox. Aegon USA Investment Management LLC, as chair of the Creditors' Committee, signed the Plan Support Agreement on behalf of the Creditors' Committee.

[3] Senior Secured Super-Priority Debtor-in-Possession and Exit Credit and Guaranty Agreement, dated as of December 20, 2009, among Tronox Incorporated, Tronox Worldwide LLC, Certain Subsidiaries of Tronox Worldwide LLC, as Guarantors, Various Lenders, Goldman Sachs Lending Partners LLC, as Sole Lead Arranger and Sole Bookrunner, Goldman Sachs Lending Partners LLC, as Syndication Agent, and Goldman Sachs Lending Partners LLC, as Administrative Agent and Collateral Agent.

K&E 15978564.

rights offering that will be made available to certain unsecured creditors. Each of these financing agreements is incorporated into the Term Sheet and thus enjoys the support of the signatories to the Plan Support Agreement.

4. Together, the Plan Support Agreement, the Replacement DIP Agreement and Equity Commitment Agreement (collectively, the "Plan Agreements", and together with the Term Sheet, the "Global Settlement") form the cornerstones of a chapter 11 plan of reorganization. The Global Settlement represents a compromise of certain stakeholders' rights and claims, and it provides Tronox's key stakeholders with the form of consideration that these stakeholders desired to realize from Tronox's estates. Specifically, and as set forth more fully in the Term Sheet, the Global Settlement provides that:

- Tronox will reorganize around its existing operating businesses, including its facilities at Oklahoma City, Oklahoma; Hamilton, Mississippi; Henderson, Nevada; Botlek, Netherlands and Kwinana, Australia;

- Government claims related to Tronox's legacy environmental sites (both owned and non-owned) will be settled with the United States and certain state governments through creation of custodial trusts and a litigation trust, to which Tronox will contribute $115 million in cash, 88% of its interest in the litigation against Anadarko Petroleum Corporation and Kerr-McGee Corporation (the "Anadarko Litigation") and other consideration;

- Tort Claimants, holders of claims related to potential asbestos, benzene, creosote and other liabilities, collectively will receive $7 million in cash, 12% of Tronox's interest in the Anadarko Litigation and proceeds from applicable insurance policies (the "Tort Claims Pool");

- Tronox's existing secured lenders will be repaid in full in cash immediately upon approval of the Replacement DIP Facility, with the exception of certain amounts withheld pending resolution of the Creditors' Committee's litigation against Tronox's prepetition secured lenders (the "Prepetition Lenders");[4]

- 70% of the equity in reorganized Tronox will be distributed to eligible holders of general unsecured claims that are "accredited investors" (as that term is defined in Rule 501 of

---

[4]    Tronox, the Creditors' Committee and the Prepetition Lenders have reached an agreement to settle this suit, which, upon documentation and approval by this Court, will provide for the dismissal of the suit and a release of the Prepetition Lenders from the claims underlying the suit.

K&E 15978564.

Regulation D of the rules and regulations promulgated under the Securities Act of 1933) and that participate in a $105 million rights offering, backstopped by the Bondholders;

- 30% of the equity in reorganized Tronox will be distributed to certain holders of general unsecured claims on account of such claims (the "GUC Pool"); and

- Claims of private parties under CERCLA and similar state statutes will be divided equally between participation in the GUC Pool and the Tort Claims Pool.

5.     Accordingly, having successfully negotiated and executed the Plan Agreements and having obtained the consensus of key stakeholders regarding the path of these chapter 11 cases, Tronox has determined that it is in the best interests of its estates to pursue a standalone plan of reorganization, the foundation for which is the Global Settlement.  Consequently, Tronox respectfully requests that this Court authorize Tronox to execute the Plan Agreements and replace its existing secured debt as the first step towards consummating a consensual plan of reorganization and the Global Settlement.

## Jurisdiction

6.     This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.  This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).

7.     Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

8.     The statutory bases for the relief requested herein are sections 105, 362, 363 and 364 of title 11 of the United States Code (the "Bankruptcy Code"), Rules 4001, 6004(h) and 9006(c) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and Rule 4001-2 of the Local Rules for the Bankruptcy Court for the Southern District of New York (the "Local Rules").

## Relief Requested

9.     Tronox respectfully requests entry of (a) the Interim Order and the Final Order, pursuant to sections 105(a), 362, 363(b), 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1) and 364(e) of the Bankruptcy Code, authorizing Tronox to enter into the Replacement DIP Facility and repay

K&E 15978564.

its existing secured debt facilities, and (b) the Plan Agreement Order, pursuant to sections 105(a) and 363(b) of the Bankruptcy Code, authorizing Tronox to enter into the Plan Support Agreement and the Equity Commitment Agreement.

10. More specifically, in the Interim Order, Tronox seeks authority to:

a. obtain $425 million of senior postpetition secured financing consisting of a tranche B-1 term loan facility (the "Tranche B-1 Facility") in an aggregate principal amount of $335 million and a tranche B-2 term loan facility (the "Tranche B-2 Facility") in an aggregate principal amount of $90 million, pursuant to and in accordance with the terms and conditions of the Replacement DIP Agreement;

b. use proceeds of the Replacement DIP Facility to provide working capital for and fund other general corporate purposes of Tronox;

c. use cash collateral and other collateral pursuant to sections 363(c) and 363(e) of the Bankruptcy Code and Rule 4001(b) and the Local Rules on the terms and conditions set forth in the Interim Order;

d. grant the Agent, for the ratable benefit of the Agent and the Lenders, liens (as defined in section 101(37) of the Bankruptcy Code) on property of Tronox's estates pursuant to sections 364(c)(2), (c)(3) and (d)(1) of the Bankruptcy Code, subject and subordinate only to the payment of the Carve-Out, as provided in and as contemplated by the Interim Order, Replacement DIP Agreement and related collateral documents;

e. grant the Agent, for the ratable benefit of the Agent and the Lenders, superpriority administrative expense claims pursuant to sections 364(c)(1) and 507(b) of the Bankruptcy Code with respect to the DIP Obligations (as defined in the Interim Order), subject and subordinate only to the payment of the Carve-Out, on the terms and conditions set forth herein and in the Replacement DIP Agreement and the Interim Order;

f. repay the approximately $10 million outstanding under its existing debtor in possession credit facility (the "Existing DIP Facility") in full;

g. repay the approximately $212.8 million outstanding under Tronox's prepetition secured term loan and revolving credit facilities (the "Prepetition Facilities" and, together with the Existing DIP Facility, the "Existing Facilities") in full;

h. cash collateralize all letters of credit under the Existing Facilities; and

i. pursuant to Bankruptcy Rule 4001, set a date for a hearing to consider entry of the Final Order, authorizing and approving Replacement DIP Facility on a final basis.

11.     In the Plan Agreement Order, in addition to seeking authority to enter into the

Plan Support Agreement and the Equity Commitment Agreement, Tronox seeks authority to:

a.    pay a break-up fee and expense reimbursement to Goldman in accordance with the terms of the Plan Support Agreement, if Tronox does not consummate the transactions contemplated thereby;

b.    pay a break-up fee to the Bondholders in accordance with the terms of the Equity Commitment Agreement, if Tronox does not consummate the transactions contemplated thereby; and

c.    pay the reasonable and documented (i) fees and out-of-pocket expenses of the legal advisors to the Bondholders and (ii) out-of-pocket expenses of the financial advisors to the Bondholders, in each case for such advisors' services in connection with the transactions contemplated by the Equity Commitment Agreement.

**Concise Statement Pursuant to Local Rule 4001-2[5]**

12.     Pursuant to Bankruptcy Rule 4001(b) and Local Rule 4001-2(a), Tronox submits

this concise statement (the "Concise Statement") listing certain material terms of the relief

requested in the Replacement DIP Agreement and the Replacement DIP Orders.  Specifically,

Tronox believes that the following financing terms are required to be identified in accordance

with Local Rule 4001-2 and, as discussed in detail below, are necessary and justified in the

context of, and circumstances relating to, these chapter 11 cases.

a.    **Local Rule 4001-2(a)(1) -- Use of Cash Collateral and DIP Borrowing.** Tronox seeks authority to use the cash collateral of the Lenders and to cash collateralize letters of credit under the Existing Facilities.  Tronox seeks to borrow an aggregate of $425 million under the Replacement DIP Facility, consisting of the $335 million Tranche B-1 Facility and the $90 million Tranche B-2 Facility, in its entirety upon entry of the Interim Order.  Interim Order at ¶ 2(b), 3; Replacement DIP Agreement § 2.1.  Subject to certain conditions, the Replacement DIP Facility will convert to an exit financing facility on the effective date of Tronox's chapter 11 plan.  Replacement DIP Agreement §§ 3.4-3.6.

---

[5]    This statement is qualified in its entirety by reference to the provisions of the Replacement DIP Agreement.  To the extent of any inconsistency between this concise statement and the Replacement DIP Agreement, the Replacement DIP Agreement shall govern.

K&E 15978564.

b. **Local Rule 4001-2(a)(2) -- Conditions to Closing and Borrowing.** Among the conditions for borrowing under the Replacement DIP Facility are entry of an order substantially in the form of the Interim Order, payment of fees and expenses to the Agent, execution of the Plan Support Agreement and entry of the Plan Agreement Order, delivery of the Initial Approved Budget and the Initial Cash Flow Forecast and evidence of Excess Availability of greater than $70,000,000. Interim Order at ¶ 2(b); Replacement DIP Agreement § 3.1.

c. **Local Rule 4001-2(a)(3) -- Pricing, Economic Terms and Fees.** The Replacement DIP Facility contemplates the payment of fees and reimbursement of certain costs and expenses of the Agent and the Lenders. Interim Order at ¶ 2(a); Replacement DIP Agreement § 10.2. The Replacement DIP Facility also includes closing, duration, extension, and conversion fees. Interim Order at ¶ 2(a); Replacement DIP Agreement § 2.8. The provisions with respect to the Base Rate, Adjusted Eurodollar Rate, Applicable Margin and Default Interest are set forth in §§ 1.1, 2.5 and 2.7 of the Replacement DIP Agreement.

d. **Local Rule 4001-2(a)(4) -- Effect on Existing Liens.** The Replacement DIP Facility includes priming liens granted pursuant to section 364(d)(1) of the Bankruptcy Code with respect to the Existing Facilities (and any liens junior to the liens securing the Existing Facilities). However, the Existing Facilities will be repaid in full on the Closing Date. Interim Order at ¶ 2(e); Replacement DIP Agreement § 4.24.

e. **Local Rule 4001-2(a)(5) -- Carve-Out.** The Carve-Out (as defined in the Interim Order) applies to (i) U.S. Trustee fees, (ii) allowed unpaid professional fees and expenses of Tronox, the Creditors' Committee and the Bondholders, in each case that are incurred prior to the first business day after the delivery by the Agent of a Carve-Out Trigger Notice, (iii) in an aggregate amount not to exceed $5,000,000, allowed unpaid professional fees and expenses of Tronox and the Creditors' Committee, in each case incurred on or after the first business day after the delivery of a Carve-Out Trigger Notice. Interim Order at ¶ 6; Replacement DIP Agreement § 8.2 and definition of Carve-Out.

f. **Local Rule 4001-2(a)(8) -- Waivers and Limitations.** Except as otherwise provided in the Interim Order, Tronox is required to waive the right to non-consensual use of cash collateral. Replacement DIP Agreement § 2.25.

g. **Local Rule 4001-2(a)(9) -- Limitations on Funding.** The Replacement DIP Agreement prohibits Tronox from using any proceeds of the Replacement DIP Facility to commence or prosecute or join in any action against any Agent or Lender seeking (i) to avoid, subordinate or recharacterize the Obligations or any of the Collateral Agent's Liens, (ii) any monetary, injunctive or other affirmative relief against any Agent or Lender or their Collateral in connection with the Credit Documents, or (iii) to prevent or restrict the exercise by any Agent or Lender of any of their respective rights or remedies under the Credit Documents. Replacement DIP Agreement § 2.3.

8

h. **Local Rule 4001-2(a)(10) -- Events of Default.** The Replacement DIP Agreement sets forth a number of Events of Default, including (a) entry of an order approving or filing of a motion by Tronox seeking additional postpetition financing under sections 364(c) or (d) of the Bankruptcy Code other than permitted in the Replacement DIP Agreement or provided in the Replacement DIP Orders; (b) the granting of liens not permitted under the Replacement DIP Agreement; (c) dismissal or conversion of any of Tronox's chapter 11 cases; (d) the granting of relief from the automatic stay to permit any secured creditor (other than the Lenders) to take action against the Collateral; (e) the reversal, modification, amendment, stay or vacating of either of the Replacement DIP Orders or the Confirmation Order without consent of the Agent and Requisite Lenders; (f) the Court does not enter the Final Order on or before 45 days after entry of the Interim Order; (g) any breach or amendment to the Plan Support Agreement that adversely affects the Agent and the Lenders; and (h) the filing of a plan of reorganization or disclosure statement other than as specified in the Plan Support Agreement. Replacement DIP Agreement § 8.1(o).

An Event of Default also includes the expiration or termination of the Equity Commitment Agreement on or prior to the Exit Facility Conversion Date. Replacement DIP Agreement § 8.1(n).

An Event of Default also includes any failure of Tronox to perform or comply with (a) § 2.3 (Use of Proceeds), (b) certain of the affirmative covenants contained in § 5.1 (Financial Statements and Other Reports) and any of the affirmative covenants contained in §§ 5.2 (Existence), 5.9 (Environmental), 5.14 (Plan Support Agreement), 5.15 (Plan of Reorganization), 5.17 (Adverse Motions), 5.18 (Post-Closing Covenants), 5.20 (Sale Covenant) and 5.21 (Excess Working Capital) and (c) any of the negative covenants in § 6. In particular, § 5.15 requires that until the Confirmation Order is entered, Tronox shall comply in all material respects with the Plan Support Agreement and not take any action that would create a Termination Event under, and as defined in, the Plan Support Agreement. § 5.15 requires that (w) on or prior to February 28, 2010, the DOJ shall have confirmed that the form of each Plan Support Document is acceptable, subject only to the required public notice requirements and entry of the Confirmation Order by the Bankruptcy Court; (x) on or prior to June 30, 2010, the applicable Plan Support Documents shall have become the valid and binding obligations of each Environmental Claimant party thereto, enforceable against such Environmental Claimant in accordance with its respective terms, subject only to entry of the Confirmation Order by the Bankruptcy Court; (y) on or prior to April 30, 2010 (or in the event that Borrower has delivered a Facility Extension Notice, the initial Maturity Date), the Bankruptcy Court shall have entered an order, in form and substance reasonably satisfactory to Administrative Agent, approving the Disclosure Statement and (z) on or prior to June [__], 2010 (such date being 5 Business Days prior to the initial Maturity Date) (or in the event that Borrower has delivered a Facility Extension Notice, August 31, 2010),

K&E 15978564.

the Bankruptcy Court shall have entered the Confirmation Order. § 5.20 (Sale Covenant) is discussed below.

i.  **Local Rule 4001-2(a)(11) -- Change of Control.** The occurrence of a Change of Control, as defined in the Replacement DIP Agreement, constitutes an Event of Default. Replacement DIP Agreement § 8.1(k).

j.  **Local Rule 4001-2(a)(12) -- Sale Requirement.** Upon the written request of the Agent (acting at the direction of the Requisite Lenders) after the earlier to occur of five business days after (a) a breach of any of the covenants contained in § 5.15 (Plan of Reorganization), (b) termination of the Plan Support Agreement or (c) upon the occurrence of certain Events of Default specified in § 5.20, Tronox is required to use commercially reasonable efforts to market the sale of its assets and businesses on terms and conditions acceptable to the Agent and Requisite Lenders, including the negotiation and preparation of documentation for such a sale and seeking entry of orders of the Bankruptcy Court approving such sale. Interim Order at ¶ 14; Replacement DIP Agreement § 5.20

k.  **Local Rule 4001-2(a)(14) -- Joint Liability.** Tronox Worldwide LLC is the Borrower and each of the other debtors (except Tronox Pigments (Savannah) Inc. and Tronox Luxembourg S.ar.l) is a Guarantor under the Replacement DIP Facility. The liens and superpriority claims granted under the Replacement DIP Facility apply to the estate of each of the debtors. Interim Order at ¶¶ 2(b), 2(h); Replacement DIP Agreement § 7; Replacement DIP Agreement definitions of Borrower and Guarantor.

l.  **Local Rule 4001-2(a)(15) -- Funding of Non-debtor Affiliates.** The Replacement DIP Facility permits Tronox to make certain loans to and investments in non-debtor affiliates and subsidiaries, including intercompany loans not to exceed $15,000,000 at any time outstanding and other Investments not to exceed $7,500,000 at any time outstanding. Replacement DIP Agreement §§ 6.6(e), 6.6(f).

## Background

13.  On January 12, 2009, Tronox filed petitions with the Court under chapter 11 of the Bankruptcy Code (the "Petition Date"). Tronox continues to operate its businesses and manage its properties as a debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. Tronox's chapter 11 cases are consolidated for procedural purposes only and are being jointly administered pursuant to Bankruptcy Rule 1015(b).

K&E 15978564.

14.     On January 21, 2009, the United States Trustee for the Southern District of New York (the "U.S. Trustee") appointed the Creditors' Committee.  On March 13, 2009, the U.S. Trustee appointed an official committee of equity security holders (the "Equity Committee"). No request for the appointment of a trustee or examiner has been made in these chapter 11 cases.

### Tronox's Existing Facilities

15.     In connection with the commencement of these chapter 11 cases, Tronox obtained the $125 million superpriority senior priming secured revolving Existing DIP Facility, pursuant to a credit agreement with Credit Suisse as Administrative Agent (the "Existing DIP Agent"), JPMorgan Chase Bank, N.A. as Collateral Agent, and certain banks, financial institutions and other lenders parties thereto (collectively, and together with the Existing DIP Agent and the Collateral Agent, the "Existing DIP Lenders") and certain ancillary documents, including a guaranty and collateral agreement.  The Existing DIP Lenders are a subset of the Prepetition Lenders.  As of the Petition Date, the aggregate amount of borrowings outstanding under the Prepetition Facilities was approximately $212.8 million.

16.     On February 9, 2009, this Court entered a final order authorizing Tronox's entry into the Existing DIP Facility.[6]  The Existing Final DIP Order imposes certain requirements and obligations on Tronox with regard to the Existing DIP Facility.  Notably, pursuant to paragraph 13 of the Final DIP Order, in the event that the Existing DIP Facility is repaid in full by Tronox prior to its stated maturity date of January 12, 2010, the protections of the Existing Final DIP Order (such as consent for Tronox to use cash collateral and the requirement for Tronox to sell substantially all of its assets) continue for the benefit of the Prepetition Lenders until the

---

[6]     Corrected Final Order (I) Authorizing Debtors (A) To Obtain Postpetition Financing Under 11 U.S.C. §§ 105, 361, 362, 363(b), 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1) And 364(e), (B) To Utilize Cash Collateral Under 11 U.S.C. § 363 and (C) To Use Postpetition Financing To Purchase Receivables Portfolio And (II) Granting Adequate Protection to Prepetition Secured Parties Under 11 U.S.C. §§ 361, 362, 363 And 364 [Dkt. No. 151] (the "Existing Final DIP Order").

K&E 15978564.

Prepetition Facilities are paid in full. <u>See</u> Existing Final DIP Order at ¶ 13. As of the date hereof, the aggregate amount of borrowings outstanding under the Existing DIP Facility was approximately $10 million.

***Existing DIP Facility Sale Requirement; Auction and Sale Hearing Dates***

17. The Existing DIP Facility, as amended, imposes certain milestones on Tronox in connection with its efforts to sell substantially all of its assets under section 363 of the Bankruptcy Code. In accordance with these milestones, after extensive marketing and negotiation with potential purchasers, on August 28, 2009, Tronox executed an asset and equity purchase agreement (the "AEPA") with affiliates of Huntsman Corporation ("Huntsman") for the sale of substantially all of Tronox's operating assets for $415 million. On September 23, 2009, this Court approved bidding procedures that govern the marketing and auction process and grant certain protections to Huntsman as the stalking horse bidder.[7] The Bidding Procedures Order set December 8, 2009 as the auction date and December 10, 2009 as the sale hearing date, subject to adjournment or rescheduling as provided in the Bidding Procedures Order. For the reasons set forth below, on December 4, 2009, the auction and sale hearing were rescheduled for December 21 and 22, respectively. <u>See</u> Order Adjourning Auction and Sale Hearing [Dkt. No. 946] (the "Adjournment Order").

18. Subsequent to Tronox's entry into the AEPA, the Existing DIP Facility was further amended to require Tronox to conduct an auction on or before December 8, 2009 and a sale hearing on or before December 20, 2009, which dates could be extended at the discretion of the Existing DIP Agent. On December 7, 2009, at Tronox's request, the Existing DIP Agent

---

[7] Order (A) Approving Bidding Procedures and Overbid Protections in Connection with the Sale of Substantially All of Tronox's Assets; (B) Approving the Form and Manner of Notice; (C) Scheduling an Auction and a Sale Hearing; and (D) Approving Procedures for Determining Cure Amounts [Dkt. No. 715] (the "Bidding Procedures Order").

K&E 15978564.

extended these dates to December 21, 2009 and December 22, 2009, respectively, thus harmonizing the Existing DIP Facility milestones with the Adjournment Order.

**Tronox's Standalone Reorganization Efforts**

19.     Throughout these chapter 11 cases, Tronox has stated that it will pursue any and all alternatives to maximize value for stakeholders. During the first half of 2009, Tronox was primarily focused on the sale process, influenced by both market conditions and the requirements of the Existing DIP Facility. However, to ensure that entry into the AEPA with Huntsman did not foreclose the possibility of a standalone reorganization, Tronox specifically negotiated the right under the AEPA to work with its stakeholders to pursue a standalone reorganization. <u>See</u> AEPA at § 5(l) ("From and after the date the Bidding Procedures Order is entered by the Bankruptcy Court, [Tronox is] permitted… to… engage in discussions with the official committees appointed in the Chapter 11 Cases or third parties in consultation with such official committees with respect to a Restructuring Transaction"); § 8(a)(xiii) (permitting termination by Tronox "until the entry of the Sale Order, to pursue a Restructuring Transaction").[8]

20.     Accordingly, Tronox and its advisors pursued a dual path process that involved marketing Tronox's assets to ensure a robust and competitive auction, while also working with the Creditors' Committee, the United States and various third parties, including the Bondholders, to explore the viability of a standalone reorganization. Throughout this process, Tronox maintained that it would not abandon the sale process unless it was confident that a viable standalone reorganization could be achieved. <u>See, e.g.</u>, Dkt. Nos. 649, 843, 933 and 974 (discussion of dual path process). This goal was predicated on, among other things, Tronox and

---

[8]     Under the AEPA, a Restructuring Transaction is defined as "(a) a recapitalization transaction involving, in whole or in part, Sellers and their existing security holders or creditors, or (b) a transaction or series of transactions, including by way of a plan of reorganization or plan of arrangement or compromise, in connection with a liquidation or reorganization or other continuation of the Business relating to all or any material portion of the Acquired Assets". AEPA § 1.

certain of its key stakeholders reaching a settlement with the government regarding Tronox's legacy environmental liabilities and obtaining committed exit financing.

***Efforts to Reach an Environmental Settlement with the Government***

21.     Reaching a settlement with the United States concerning the future treatment of Tronox's environmental liabilities was a threshold issue for a successful standalone reorganization. Without such an agreement, Tronox likely would not be able to emerge from chapter 11 as a reorganized entity free from those liabilities. <u>See</u> Statement of the United States in Response to the Equity Committee's Motion [Dkt. No. 877] at 4 (asserting that Tronox's environmental liabilities "cannot be discharged or otherwise resolved in a plan of reorganization without the Government's consent"). Accordingly, in mid-September 2009, Tronox circulated a plan term sheet to the United States and other stakeholders that included a proposed framework for an environmental settlement. Since that time, Tronox, the United States and the Creditors' Committee, together with their respective legal and financial advisors, have met in person on multiple occasions regarding the proposal. In connection with those negotiations, the parties exchanged drafts of the plan term sheet, and Tronox provided significant due diligence regarding all aspects of its business and its estates. Beginning in mid-October 2009, as a result of efforts undertaken by Tronox, the Bondholders organized and became involved in these negotiations, leading to the agreement in principle described below.

***Efforts to Obtain Exit Financing***

22.     As Tronox's environmental negotiations developed, Tronox also began to pursue debt financing that could fund its exit from chapter 11. In September 2009, Tronox developed a forecast for a reorganized company (published in a Form 8-K, dated October 7, 2009) and a teaser for exit financing. Upon soliciting input from the Creditors' Committee and the Equity Committee concerning which parties should receive the teaser, Tronox ultimately provided the

teaser and forecast to 96 potential financing parties. Thereafter, Tronox executed confidentiality agreements with 11 new parties (in addition to the numerous parties who had executed confidentiality agreements at earlier stages of these chapter 11 cases), conducted management meetings with potential financing parties and facilitated significant due diligence. As a result of this effort, in October 2009, Tronox received ten non-binding financing proposals from potential lenders. It was clear to Tronox, from its canvassing of the credit markets generally and from these proposals specifically, that Tronox would not be able to obtain an exit financing commitment of sufficient duration that such commitment would be in place at the indeterminate point in time when Tronox would be in position to consummate a plan of reorganization. Thus, Tronox determined to focus on securing DIP financing that would convert into exit financing.

23. After evaluating those exit financing proposals, Tronox entered into letter agreements with each of General Electric Capital Corporation ("GE") and Goldman regarding their efforts to provide a replacement DIP facility that would convert into exit financing. See Form 8-K, dated November 17, 2009. In connection with those agreements, and with the consent of the Creditors' Committee, Tronox paid work fees to both GE and Goldman to facilitate their continued due diligence and syndication efforts.[9] Negotiations with GE and Goldman continued in December 2009. While Tronox ultimately was unable to agree on terms with GE, Tronox reached agreement with Goldman regarding the terms of the Replacement DIP Agreement, which agreement is described in detail below. The Replacement DIP Agreement is the result of more than three weeks of nearly nonstop good faith and arm's length negotiations

---

[9] See Order Authorizing Tronox to Pay Due Diligence Costs Incurred by Interested Lenders in Connection with their Financing Efforts, entered November 12, 2009 [Dkt. No. 870]; see also Dkt. No. 915 and Dkt. No. 997, each amending Dkt. No. 870.

among principals and advisors for each of Tronox, Goldman, the Bondholders, the Creditors' Committee and the United States.

*Efforts to Obtain an Equity Commitment*

24.     As efforts to obtain debt financing evolved, it became apparent that debt financing alone would not be sufficient to fund both a reorganized Tronox and an environmental settlement with the government.  Thus, Tronox pursued equity financing that, in tandem with exit financing, would be sufficient to fund obligations under a plan of reorganization and provide the necessary liquidity for the company post-emergence.  Among other efforts, Tronox approached its existing bondholders as a potential source of capital.  To that end, Tronox held two public meetings in mid-October 2009, at which Tronox provided bondholders with a status update regarding these chapter 11 cases and explained the need for equity financing.  Interested bondholders organized into the *ad hoc* Bondholder group, which provided Tronox with an initial proposal for a back-stopped rights offering and a plan of reorganization on November 4.

25.     In the ensuing weeks, numerous meetings occurred among Tronox, the Bondholders, the Creditors' Committee and the United States regarding both the terms of the Bondholders' investment in reorganized Tronox and how that investment would impact a potential settlement of Tronox's legacy environmental liabilities.  These meetings involved the negotiation of both chapter 11 plan and equity commitment term sheets.  In addition, Tronox's management team provided extensive due diligence to the Bondholders, meeting in person with their representatives on numerous occasions.  During the week of December 7, 2009, the parties began to work on definitive documentation regarding the Bondholders' equity investment.  Tronox and the Bondholders successfully executed the resulting Equity Commitment Agreement on the date hereof, which agreement is described in detail below.  The Equity Commitment Agreement is the result of extensive good faith and arm's length negotiations among principals

16

and advisors for each of Tronox and the Bondholders, and has the support of all parties to the Plan Support Agreement, including the United States and the Creditors' Committee.

***December 2, 2009 Agreement in Principle***

26.     On December 2, 2009, the Bondholders, the Creditors' Committee and the United States presented Tronox with an agreement in principle regarding the terms of a plan of reorganization that included a settlement and resolution of Tronox's environmental liabilities and incorporated the debt and equity financing under negotiation by the parties.   After careful consideration and analysis of the agreement in principle, and following a meeting of the board of directors of Tronox Incorporated and a status conference with the Court regarding the latest developments in the dual path process, on the evening of December 3, 2009, Tronox determined that providing the parties with additional time to reach definitive documentation reflecting the agreement in principle was in the best interests of its estates.   Accordingly, on December 4, 2009, after notifying Huntsman and other qualified bidders of this decision, Tronox, with the support of the Existing DIP Agent, the Creditors' Committee, the Equity Committee, the United States and the Bondholders, requested that the Court adjourn the auction and sale hearing to December 21, 2009 and December 22, 2009, respectively.   The Court granted that request and entered the Adjournment Order on December 4, 2009.

27.     Since that time, Tronox has worked with the various parties, including the Creditors' Committee, the United States, the Bondholders, Goldman and the Tort Claimants, nearly nonstop to finalize the Plan Agreements.   Each of these agreements is contingent upon the others: Goldman would not commit to providing the Replacement DIP Facility without assurances of both an equity investment and a resolution of Tronox's legacy environmental liabilities.   Likewise, the Bondholders would not backstop an equity investment unless Tronox could obtain replacement DIP financing on terms acceptable to the Bondholders.   Finally, the

17

United States would not agree to a settlement of Tronox's legacy environmental liabilities unless it was certain that Tronox could adequately fund environmental remediation and litigation trusts that would form the basis of that settlement.

28.     To ensure that the parties' dedication to and obligations with respect to the Global Settlement were documented clearly, the parties also negotiated the terms of a Plan Support Agreement.     These efforts culminated in a series of all-day, all-hands meetings in mid-December, including in-person meetings on December 15 and 16, 2009 attended by advisors for each of Tronox, the Creditors' Committee, the Existing DIP Lenders, Goldman, the Bondholders and the United States.     Further negotiations continued nearly nonstop from December 17, 2009 up to and including the date hereof.     As a result of these extensive efforts, on the date hereof, the parties executed the Plan Support Agreement and the Equity Commitment Agreement, and placed signature pages to the Replacement DIP Agreement in escrow.     The key terms of each document are set forth immediately below:

## Terms of the Plan Support Agreement

29.     The Plan Support Agreement, which is attached hereto as <u>Exhibit C</u>, sets forth the parties' commitment to and obligations with respect to a plan of reorganization (the "Plan") based on the Term Sheet.     It includes customary conditions for such documents, such as an agreement to support such a Plan, negotiate in good faith to reach definitive documentation, and not take any actions that will delay or impede consummation of the proposed Plan.

30.     The Term Sheet, in turn, outlines Tronox's proposed Plan.  The key terms of the proposed Plan are as follows:[10]

- **Reorganized Business:** Reorganized Tronox will emerge from chapter 11 as the owner and operator of the headquarters facility at Oklahoma City, Oklahoma and the titanium dioxide facilities at Hamilton, Mississippi and Botlek, Netherlands.  Reorganized Tronox also will own and operate the electrolytic chemical facility at Henderson, Nevada (but Reorganized Tronox will not be responsible for environmental remediation at that site related to legacy contamination) and will hold Tronox's interests in BMI, Landwell and the Tiwest Joint Venture in Australia.  Reorganized Tronox will be funded by the Replacement DIP Facility, which will convert to exit financing on the Effective Date.

- **Recoveries for the Government/Environmental Settlement:**  In full satisfaction of all claims filed by the United States and its instrumentalities, and state, local or municipal governmental entities and in settlement of all civil obligations arising under environmental laws related to Tronox's legacy environmental liabilities, these governmental entities will receive, collectively, $115 million in cash,  88% of Tronox's interest in the Anadarko Litigation and certain other consideration.  These amounts will be used to fund custodial trusts that will conduct remediation at sites presently owned by Tronox and satisfy remediation obligations at sites that are not owned by Tronox but at which Tronox may be liable for certain remediation costs.  Under the Plan, reorganized Tronox will emerge from chapter 11 free and clear of such liabilities to the maximum extent provided under the law and all such claims shall be discharged.

- **Recoveries for Tort Claimants:**  Tort Claimants, who include, among others, holders of claims for personal injury and property damages arising from or related to environmental contamination, chemical, asbestos, benzene, creosote and other exposure, collectively will receive $7 million in cash, 12% of Tronox's interest in the Anadarko Litigation and proceeds of applicable insurance policies.

- **Rights Offering:** Holders of allowed general unsecured claims that are "accredited investors", as that term is defined in Rule 501 of Regulation D of the rules and regulations promulgated under the Securities Act of 1933, will have the opportunity to participate in a $105 million rights offering that will be backstopped by the Bondholders.  Participants in the rights offering will receive 70% of the equity in Reorganized Tronox.

- **Recoveries for Holders of General Unsecured Claims:** Holders of allowed general unsecured claims will receive their pro rata share of the GUC Pool, which will be funded with 30% of the equity in Reorganized Tronox.

---

[10]   This summary of the Term Sheet is provided for the convenience of the Court and parties in interest.  This summary is qualified in its entirety by reference to the provisions of the Term Sheet.  To the extent of any inconsistency between this summary and the Term Sheet, the Term Sheet shall govern.  Capitalized terms used but not otherwise defined in this summary shall have the meanings set forth in the Term Sheet.  Attached hereto as Exhibit F is a chart depicting a summary of the Global Settlement.

- **Recoveries for Holders of Private Party CERCLA Claims:** Recoveries for claims of private parties under CERCLA and similar state statutes will be divided equally between participation in the GUC Pool and the Tort Claims Pool.

- **Anadarko Litigation:** Interests in the Anadarko Litigation will be transferred to a litigation trust for the benefit of the government entities and those claimants sharing in the Tort Claims Pool. This trust will be administered by a trustee to be appointed by Tronox and the United States, in consultation with the representatives for the Tort Claimants and other governmental entities.

- **Recovery for Existing DIP and Prepetition Lenders/Lender Litigation:** The Existing DIP Facility and Prepetition Facilities will be paid in full in cash with the proceeds of the Replacement DIP Facility. While the Term Sheet preserves the suit of the Creditors' Committee currently pending against the Prepetition Lenders (Adv. Proc. No. 09-01388), Tronox, the Creditors' Committee and the Prepetition Lenders have reached an agreement to resolve that suit. Such resolution will include a release of the Prepetition Lenders from the claims underlying that suit. The parties intend to seek the Court's approval of that settlement once it is documented.

31.     In addition, the Term Sheet sets forth interim obligations and events that will facilitate Tronox's consummation of the Plan. *First*, the Term Sheet contemplates Tronox's continuing obligation to perform environmental monitoring and remediation work at contaminated sites, consistent with its current postpetition practice, pending the consummation of the Global Settlement. *Second*, the Plan Support Agreement contains related provisions regarding the parties' support for such interim obligations, including entry of the Interim and Final DIP Orders and the Plan Agreement Order. Specifically, the Plan Support Agreement provides that:

- by December 31, 2009, the Interim Order approving entry into the Replacement DIP Facility and the Plan Agreement Order approving entry into the Plan Support Agreement and the Equity Commitment Agreement shall have been entered;

- by April 30, 2010 (or, in the event that Tronox extends the term of the Replacement DIP Facility past the initial six month term pursuant to the Facility Extension Option described below, on or about June 30, 2010), the Bankruptcy Court shall have entered an order approving the Disclosure Statement;

- by June 30, 2010, the applicable Plan support documents shall have become the valid and binding obligations of each governmental entity party thereto, enforceable against such entity in accordance with its respective terms, subject only to entry of the Confirmation Order by the Bankruptcy Court; and

- by five business days prior to expiration of the initial six month term of the Replacement DIP Facility (on or about June 20, 2010, or in the event that Tronox extends the term of the Replacement DIP Facility pursuant to the Facility Extension Option described below, August 31, 2010), the Bankruptcy Court shall have entered the Confirmation Order.

Failure to comply with these milestones constitutes an event of default under each of the Plan Support Agreement, the Replacement DIP Facility and the Equity Commitment Agreement.

32.     Notably, the proposed resolution of Tronox's legacy environmental claims set forth in the Term Sheet will require the agreement of not only the United States, but also of certain states and other governmental entities.   Thus, while the United States is the only governmental signatory to the Plan Support Agreement, the Plan Agreements specifically contemplate (and have milestones regarding) obtaining necessary approvals and consents from applicable governmental entities.   Promptly upon approval of the Global Settlement, the parties will turn their attention to drafting definitive documentation concerning the proposed environmental settlement and pursuing all necessary approvals related thereto.   The United States' obligations to support a Plan based on the Term Sheet is expressly conditioned on the United States also obtaining such approval and successfully passing all required notice and comment periods.

33.     Finally, under the Plan Support Agreement and Term Sheet, the signatories thereto have agreed to pay the reasonable fees and expenses (including professionals' fees) of Goldman and the Bondholders.   In addition, the parties have agreed to support Tronox's payment to Goldman of an $8 million fee (representing approximately 1.88% of the principal amount of the Replacement DIP Facility) (such fee, together with the fees and expenses (including professionals' fees) of Goldman, collectively, the "Goldman Break-up Fee"), in the event that Tronox determines not to enter into the Replacement DIP Facility.   Tronox and the other signatories have agreed to this protection for Goldman on account of the extensive efforts and

costs expended by Goldman over the past few weeks to negotiate, document and syndicate a definitive Replacement DIP Facility that can serve as a foundation for the Global Settlement. This fee will be payable to Goldman only in the event that, following the filing of this Motion, Tronox elects not to consummate the Replacement DIP Facility and instead either consummates an alternative debtor in possession financing facility, extends the maturity date of the Existing DIP Facility or pursues a transaction other than entry into the transactions contemplated by the Plan Agreements on or before December 31, 2010. Such fee would be payable from the proceeds of such alternative transaction or from general funds if Tronox extends the maturity date of the Existing DIP Facility.

*Cancellation of Auction and Termination of AEPA*

34.     The signatories to the Plan Support Agreement have requested, as a condition of moving forward with the Global Settlement, that Tronox cancel the auction currently scheduled for December 21, 2009. As such, in accordance with paragraph 4 of the Bidding Procedures Order, Tronox has provided for the cancellation of the auction in the proposed Plan Agreement Order. In addition, upon Court approval and the funding of the Replacement DIP Facility, Tronox will terminate the AEPA with Huntsman pursuant to section 8(a)(vi) thereof.

## Terms of the Equity Commitment Agreement

35.     The Equity Commitment Agreement, which is attached hereto as <u>Exhibit D</u>, sets forth the terms and conditions upon which the Bondholders will backstop a rights offering under the Plan. The material terms of the Equity Commitment Agreement are as follows:

- **Equity Investment:** The Bondholders have committed to provide up to $105 million in new equity financing to Reorganized Tronox on the Effective Date pursuant to a rights offering. These funds will be utilized, in conjunction with the proceeds of the Exit Facilities, to satisfy Tronox's obligations under the Plan and Reorganized Tronox's operating needs.

K&E 15978564.

- **Backstop Commitment:** In exchange for the equity investment, the Bondholders will receive up to 70% of the equity in Reorganized Tronox, depending on the participation levels of eligible unsecured creditors in the rights offering.

- **Backstop Fee:** On account of their equity financing commitment, the Bondholders will receive a backstop fee, paid in shares of common stock on the Effective Date, of 4% of the shares issued in the rights offering. If the Plan is not consummated, then, subject to certain exceptions, 4% of the $105 million backstop amount (or $4.2 million) will be paid in cash to the Bondholders as an administrative claim.

- **Fees and Expenses:** Tronox will pay the reasonable and documented fees and out-of-pocket expenses of the legal and financial advisors to the Bondholders incurred in connection with their equity financing commitment; provided, however, that in no event will Tronox pay the fees of the financial advisors to the Bondholders in the event that the Plan is not consummated.

36.     The Equity Commitment Agreement contains covenants that are similar to, and termination events that parallel, those contained in the Replacement DIP Agreement and the Plan Support Agreement.

## Terms of the Replacement DIP Facility

37.     The Replacement DIP Facility enables Tronox to consummate a standalone reorganization. In accordance with the terms and conditions of the Replacement DIP Agreement, Goldman and the other Lenders have agreed to provide $425 million of senior secured super-priority debt financing, consisting of the $335 million Tranche B-1 Facility and the $90 million Tranche B-2 Facility. Subject to certain conditions, the Replacement DIP Facility will convert into an exit facility upon Tronox's emergence from chapter 11. The material terms of the Replacement DIP Agreement and the Interim Order, which are attached hereto as Exhibits E and A, respectively, are summarized as follows:[11]

---

[11]   This summary of the Replacement DIP Agreement and the Interim Order is provided for the benefit of the Court and other parties in interest. To the extent that there are any conflicts between this summary and the Replacement DIP Agreement or the Interim Order, the terms of the Replacement DIP Agreement and the Interim Order shall govern. Capitalized terms used but otherwise not defined in this summary shall have the meanings set forth in the Replacement DIP Agreement or the Interim Order, as applicable.

K&E 15978564.

| Provision | Summary of Provision |
|---|---|
| **Borrower**<br>*Bankruptcy Rule 4001(c)(1)(B)* | Tronox Worldwide LLC (the "Borrower"). |
| **Guarantors**<br>*Bankruptcy Rule 4001(c)(1)(B)* | Tronox Incorporated ("Holdings") and certain of Holdings' domestic subsidiaries that are debtors in Tronox's chapter 11 cases. |
| **Administrative Agent, Collateral Agent, Syndication Agent, Sole Lead Arranger and Sole Bookrunner**<br>*Bankruptcy Rule 4001(c)(1)(B)* | Goldman Sachs Lending Partners LLC ("Goldman"). |
| **Replacement DIP Facility Lenders**<br>*Bankruptcy Rule 4001(c)(1)(B)* | Goldman and certain other lenders (each, a "Lender" and collectively, the "Lenders") |
| **Amount of Replacement DIP Facility**<br>*Bankruptcy Rule 4001(c)(1)(B)* | $425 million of senior secured super-priority debtor in possession bank financing, consisting of (a) a $335 million senior secured super-priority tranche B-1 term loan (the "Tranche B-1 Facility") and (b) a $90 million senior secured super-priority debtor in possession tranche B term loan (the "Tranche B-2 Facility"). One drawing may be made under each of the Tranche B-1 Facility and the Tranche B-2 Facility on the Closing Date.<br><br>Interim Order at ¶ 2(b), 3; Replacement DIP Agreement definitions of "Tranche B-1 Term Loan Commitment" and "Tranche B-2 Term Loan Commitment"; Replacement DIP Agreement §§ 2.1(a); see also Concise Statement above. |
| **Term**<br>*Bankruptcy Rule 4001(c)(1)(B)* | The earliest of (a) the date that is six months after the Closing Date, which date (i) may be extended to September [__], 2010 or December [__], 2010, as applicable, upon exercise of the Facility Extension Option pursuant to § 3.3 and (ii) may be further extended to the third anniversary of the Exit Facility Conversion Date upon exercise of the Exit Facility Option pursuant to § 3.4, (b) the date on which all Loans shall become due and payable in full, whether by acceleration or otherwise, and (c) with respect to the Replacement DIP Facility only, the |

| Provision | Summary of Provision |
|---|---|
| | effective date of any plan of reorganization confirmed by the Bankruptcy Court in any Chapter 11 Case other than the Plan of Reorganization.<br><br>Interim Order at ¶¶ 3, 14, 19(f); Replacement DIP Agreement definitions of "DIP Facility", "Exit Facility Conversion Date", "Exit Facility Option", "Final Extension Option" and "Maturity Date"; Replacement DIP Agreement §§ 2.1(a), 3.3 and 3.4. |
| **Six-Month Extension Option**<br>*Bankruptcy Rule 4001(c)(1)(B)* | Tronox may request two extensions of the Maturity Date, in each case for a single period of up to three months, subject to, among other things, Tronox's compliance with certain financial metrics and the absence of an Event of Default. Tronox may only exercise (a) the first extension if the Bankruptcy Court has entered an order approving Tronox's Disclosure Statement and (b) the second extension if the Bankruptcy Court has entered an order confirming the Plan.<br><br>Replacement DIP Agreement § 3.3. |
| **Exit Facility Option**<br>*Bankruptcy Rule 4001(c)(1)(B)* | Subject to the consummation of Tronox's chapter 11 plan, completion of the environmental settlements contemplated thereby and certain other customary conditions precedent set forth in § 3.5 of the Replacement DIP Agreement, the Replacement DIP Agreement shall convert to exit financing on the effective date of the Plan.<br><br>Replacement DIP Agreement §§ 3.4, 3.5, 3.6. |
| **Use of the Replacement DIP Facility**<br>*Bankruptcy Rule 4001(c)(1)(B)* | Tranche B-1 Term Loans: used (a) for costs, fees and expenses related to the transaction, (b) to repay the Existing Facilities in full, (c) to cash collateralize all of the letters of credit under the Existing Facilities, (d) for general corporate and working capital purposes, and (e) in an aggregate principal amount of $35,000,000 (i) to fund one or more environmental or litigation trusts under the Plan and (ii) on and after the Exit Facility Conversion Date, for general corporate and working capital purposes in accordance with § 3.2 (and to repay the Tranche B-1 Term Loans on the maturity date as set forth in §2.26).<br><br>Tranche B-2 Term Loans: used to fund general corporate purposes and working capital for Tronox in accordance with § 3.2 (and to repay the Tranche B-2 Term Loans on the Maturity |

K&E 15978564.

| Provision | Summary of Provision |
|---|---|
| | Date as set forth in § 2.26).<br><br>Replacement DIP Agreement § 2.3. |
| **Interest Rates**<br>*Bankruptcy Rule 4001(c)(1)(B);*<br>*Local Rule 4001-2(a)(3)* | Applicable Interest Rate: if a Base Rate Loan, at the Base Rate, which shall be a rate per annum equal to the greater of (a) the Prime Rate in effect on such day and (b) the Federal Funds Effective Rate in effect on such day plus ½ of 1.0%, *plus* the Applicable Margin, a rate equal to 6.0% per annum; *provided, however,* that the Base Rate shall at no time be less than 3.0% per annum; or, if a Eurodollar Rate Loan, at the Adjusted Eurodollar Rate *plus* the Applicable Margin, a rate equal to 7.0% per annum; *provided, however*, that the Adjusted Eurodollar Rate shall at no time be less than 2.0% per annum.<br><br>Default Interest:  The rate that would otherwise be applicable plus 2.0% per annum.<br><br>Replacement DIP Agreement definitions of "Adjusted Eurodollar Rate", "Applicable Margin", "Base Rate", "Base Rate Loan", "Eurodollar Rate" and "Eurodollar Rate Loan"; Replacement DIP Agreement §§ 2.5, 2.7. |
| **Fees**<br>*Bankruptcy Rule 4001(c)(1)(B);*<br>*Local Rule 4001-2(a)(3)* | Closing Fee: (a) 4.0% of the stated principal amount of such Lender's Tranche B-1 Term Loan and (b) 2.0% of the stated principal amount of such Lender's Tranche B-2 Term Loan.<br><br>Conversion Fee (for conversion from DIP to exit facility): (a) 2.0% of the aggregate outstanding principal amount of the Tranche B-1 Term Loans and (b) 1.0% of the aggregate outstanding principal amount of the Tranche B-2 Term Loans.<br><br>Duration Fee: 3.0% of the aggregate outstanding principal balance of such Lender's Tranche B-2 Term Loans, payable on the earlier of six months after exit or March 30, 2011.<br><br>Extension Fee: (a) 0.5% of the aggregate outstanding principal balance of the Loans immediately prior to giving effect to the Initial Facility Extension Option and (b) 0.5% of the aggregate outstanding principal balance of the Loans immediately prior to giving effect to the subsequent Facility Extension Option.<br><br>Replacement DIP Agreement definitions of "Conversion Fees", |

| Provision | Summary of Provision |
|---|---|
| | "Duration Fees", "Extension Fees", "Initial Facility Extension Date", "Initial Facility Extension Option" and "Subsequent Facility Extension Date"; Replacement DIP Agreement §§ 2.8(a), (b), (c) and (d).<br><br>Arranging Fee. This fee is confidential, but has been disclosed and consented to by all of the parties to the Global Settlement. This fee will be disclosed to the Court on a confidential basis. |
| **Liens and Priorities**<br>*Bankruptcy Rules 4001(c)(1)(B), 4001(c)(1)(B)(i); Local Rule 4001-2(a)(4)* | Liens: all Obligations are secured by:<br><br>(a) pursuant to section 364(c)(2) of the Bankruptcy Code, a perfected First Priority Lien on all unencumbered Collateral;<br><br>(b) pursuant to section 364(c)(3) of the Bankruptcy Code, a junior Lien on all Collateral (i) that is subject to valid, perfected and unavoidable Liens in existence as of the Petition Date or (ii) that is subject to valid Liens in existence on the Petition Date that are perfected subsequent to the Petition Date as permitted by section 546(b) of the Bankruptcy Code, in each case, solely to the extent such Liens were senior to the Liens securing the Existing Facilities; and<br><br>(c) pursuant to section 364(d)(1) of the Bankruptcy Code, a senior priming Lien on all Collateral that is senior to (i) all Liens securing the Existing Facilities (which Liens are required to be released on the Closing Date) and (ii) all Liens that are junior to the Liens securing the Existing Facilities;<br><br>Priorities: Pursuant to section 364(c)(1) of the Bankruptcy Code, Obligations at all times shall constitute allowed super-priority administrative expense claims in the Chapter 11 Cases having priority over all other costs and expenses of the kinds specified in any provision of the Bankruptcy Code or otherwise, and shall at all times be senior to the rights of Tronox, its estates and any successor trustee or estate representative in the Chapter 11 Cases or any subsequent proceeding or case under the Bankruptcy Code, subject only to the Carve-Out; *provided,* that such super-priority administrative claim shall be pari passu with the super-priority administrative claim of the Agent pursuant to the Replacement DIP Agreement.<br><br>Interim Order at ¶¶ 2(e), (f); Replacement DIP Agreement §§ |

K&E 15978564.

| Provision | Summary of Provision |
|---|---|
| | 2.21, 4.24. |
| **Carve-Out**<br>*Local Rule 4001-2(a)(5)* | The Carve-Out applies to (a) U.S. Trustee fees, (b) allowed unpaid professional fees and expenses of Tronox, the Creditors' Committee and the Bondholders, in each case that are incurred prior to the first business day after the delivery by the Agent of a Carve-Out Trigger Notice and (c) in an aggregate amount not to exceed $5,000,000, allowed unpaid professional fees and expenses of Tronox and the Creditors' Committee, in each case incurred on or after the first business day after the delivery of a Carve-Out Trigger Notice.<br><br>Interim Order at ¶ 6; Replacement DIP Agreement definitions of "Carve-Out", "Carve-Out Cap" and "Carve-Out Event Notice"; Replacement DIP Agreement § 8.2. |
| **Conditions to Borrowing**<br>*Bankruptcy Rule 4001(c)(1)(B);*<br>*Local Rule 4001-2(a)(2)* | Customary borrowing conditions, including: (a) delivery of credit documents; (b) delivery of organizational documents, signature and incumbency certificates, board resolutions, and good standing certificates; (c) delivery of Tronox's organizational structure and capital structure; (d) evidence that the Existing Facilities have been repaid or terminated in full; (e) delivery of all governmental authorizations and consents; (f) delivery of valid, perfected First Priority security interest in Tronox's personal property Collateral in the United States; (g) evidence that all partnership, corporate, and other proceedings in connection with the contemplated transactions are complete; (h) delivery of certain financial statements and projections; (i) delivery of Borrower's counsel's opinion; (j) payment of all fees and expenses payable pursuant to §§ 2.8(a) and (g) and § 10.2, respectively; (k) delivery of a Closing Date Certificate; (l) no litigation that materially impairs the transaction or could have a Material Adverse Effect; (m) delivery of a letter of direction directing the disbursement of the Tranche B-1 Term Loans; (n) Closing Date must occur by December 24, 2009; (o) delivery of pro forma Consolidated Adjusted EBITDAR of Tronox showing not less than $115,000,000 for the latest twelve-month period and the period ending October 31, 2009; (p) delivery of all documentation and other information required in compliance with the Patriot Act; (q) delivery of the Funding Notice; (r) no Event of Default; (s) delivery of the Plan Support Agreement; (t) delivery of the Initial Approved Budget; (u) delivery of the Cash Flow Forecast; (v) evidence of Excess Availability of Tronox of |

| Provision | Summary of Provision |
|---|---|
| | at least $70,000,000, and (w) evidence of the Escrow Accounts.<br><br>There are also separate conditions for Withdrawals from the Working Capital Escrow Account.<br><br>Replacement DIP Agreement definition of "Working Capital Escrow Account"; Replacement DIP Agreement §§ 3.1, 3.2. |
| **Budget**<br>*Bankruptcy Rule 4001(c)(1)(B);*<br>*Local Rule 4001-2(a)(2)* | For the period from the Closing Date to the Exit Facility Conversion Date, the Borrower must operate within an approved budget substantially in the form of the Initial Approved Budget.<br><br>Replacement DIP Agreement definitions of "Closing Date", "Maturity Date", "Initial Approved Budget"; Replacement DIP Agreement § 5.1(f). |
| **Covenants**<br>*Bankruptcy Rule 4001(c)(1)(B);*<br>*Local Rules 4001-2(a)(2), 4001-2(a)(8)* | Financial Covenants: Among other things, compliance with certain metrics related to the Fixed Charge Coverage Ratio, Leverage Ratio, Consolidated Adjusted EBITDAR and Interest Coverage Ratio. Tronox is not permitted to make Consolidated Capital Expenditures in any Fiscal Year in an aggregate amount in excess of $55,000,000; *provided, however,* that such amount may be increased by the Carry Over Amount from the immediately preceding Fiscal Year, in an amount not to exceed $15,000,000.<br><br>Affirmative Covenants: Among other things, regarding (a) delivery of certain reports and financial statements, (b) existence, (c) payment of taxes and claims, (d) maintenance of properties, (e) maintenance of insurance, (f) books and records, (g) inspections, (h) lender meetings, (i) compliance with laws, (j) cash management, (k) plan support agreement, (l) plan of reorganization, (m) sale covenant and (o) excess working capital.<br><br>**Negative Covenants**: Among other things, restrictions regarding: (a) indebtedness, (b) liens, (c) pledges, (d) junior payments, (e) subsidiary distributions, (f) investments, (g) financial covenants, (h) fundamental changes; (i) disposition of assets or acquisitions, (j) disposal of subsidiary interests, (k) sales and leasebacks, (l) transactions with shareholders and affiliates, (m) conduct of business, (n) amendments or waivers of organizational documents, additional facility credit |

29

| Provision | Summary of Provision |
|---|---|
| | documents or approved budget, (o) amendments or waivers of with respect to certain indebtedness, (p) Chapter 11 Claims, (q) Critical Vendor and Other Payments and (r) the Kwinana Investment.<br><br>Replacement DIP Agreement §§ 5 and 6. |
| **Events of Default**<br>*Bankruptcy Rule 4001(c)(1)(B)* | <u>See</u> Concise Statement above.<br><br>Replacement DIP Agreement § 8.1. |
| **Change of Control**<br>*Local Rule 4001-2(a)(11)* | The occurrence of any Change of Control constitutes an Event of Default under the Replacement DIP Agreement.<br><br>Replacement DIP Agreement definition of "Change of Control"; DIP Credit Agreement § 8.1(k). |
| **Use of Cash Collateral**<br>*Bankruptcy Rules 4001(b)(1)(B)(ii, iii), 4001(d)(1)(B);*<br>*Local Rule 4001-2(a)(1)* | For the duration of the Replacement DIP Facility and subject to the terms of the Replacement DIP Agreement and the Interim Order, Cash Collateral, along with the proceeds of the Replacement DIP Facility, may be used to provide working capital and for the general corporate purposes of Tronox, to repay in full in cash the Existing Facilities and to cash collateralize certain letters of credit outstanding under the Existing Facilities.<br><br>Interim Order at Preamble and ¶ 3. |
| **Entities with Interest in Cash Collateral**<br>*Bankruptcy Rule 4001(b)(1)(B)(i)* | The Existing DIP and Collateral Agents, the Existing DIP Lenders and the Prepetition Lenders.<br><br>Interim Order at Preamble; Replacement DIP Agreement recitals. |
| **Restructuring Milestones**<br>*Bankruptcy Rule 4001(c)(1)(B)(v)-(vi)* | Compliance with restructuring milestones related to Tronox's chapter 11 cases within the time periods set forth above.<br><br>In addition, by February 28, 2010, the United States shall have confirmed that the form of each Plan support document is acceptable, subject only to the required public notice requirements and entry of the Confirmation Order by the Bankruptcy Court |

| Provision | Summary of Provision |
|---|---|
| | Replacement DIP Agreement § 5.15. |
| **Remedies Upon Default**<br>*Local Rule 4001-2(a)(10)* | Subject to any notice requirements in the Interim or Final Orders, upon the occurrence of an Event of Default that is continuing and at the request or consent of Requisite Lenders, upon notice to Borrower by Administrative Agent, (a) each of the following shall immediately become due and payable, in each case without presentment, demand, protest or other requirements of any kind, all of which are hereby expressly waived by Tronox: (i) the unpaid principal amount of and accrued interest on the Loans and (ii) all other Obligations; and (b) the Agent may cause the Collateral Agent to enforce any and all Liens and security interests created pursuant to the Collateral Documents.<br><br>Replacement DIP Agreement § 8.1. |
| **Waiver or Modification of the Automatic Stay**<br>*Bankruptcy Rule 4001(c)(1)(B)(iv)* | Subject to five business days' prior written notice to Tronox and certain other parties, the automatic stay is vacated to the extent necessary to permit the enforcement of remedies by the Agent and Lenders against the Collateral.<br><br>Interim Order at ¶ 13(d). |
| **Indemnification**<br>*Bankruptcy Rule 4001(c)(1)(B)(ix)* | Tronox shall indemnify and hold harmless the Agent and each Lender and their officers, partners, members, directors, trustees, advisors, employees, agents, sub-agents and Affiliates (as defined in the Replacement DIP Agreement) in connection with or as a result of the Replacement DIP Facility (as more fully described in the Replacement DIP Agreement), *provided, however*, such indemnity shall not be available to the extent such indemnity arises from gross negligence or willful misconduct. To the extent that the undertakings to defend, indemnify, pay and hold harmless may be unenforceable in whole or in part because they are violative of any law or public policy, the applicable Credit Party shall contribute the maximum portion that it is permitted by law to satisfy incurred indemnified liabilities.<br><br>Replacement DIP Agreement § 10.3. |
| **Section 506(c) Waiver** | Upon entry of the Interim Order, Tronox waives its right to |

| Provision | Summary of Provision |
|---|---|
| *Bankruptcy Rule 4001(c)(1)(B)(x)* | surcharge against the Collateral pursuant to section 506(c) of the Bankruptcy Code.<br><br>Interim Order at Preamble; Replacement DIP Agreement § 2.21. |

### Basis for Relief

38.     At the outset of these chapter 11 cases, it appeared, based on general economic conditions and the debt markets, that Tronox would have no alternative but to sell its operating assets pursuant to section 363 of the Bankruptcy Code, as required by the terms of the Existing DIP Facility.  However, after extraordinary efforts on the part of Tronox, its key stakeholders and their respective advisors, Tronox has now obtained binding commitments and the support of its key stakeholders that pave the way for Tronox's exit from chapter 11 as a going concern.

39.     As Tronox has previously explained to this Court, Tronox was not prepared to forego the sale process unless it was confident that it would be able to successfully emerge from chapter 11 as a reorganized company.  The proposed Global Settlement accomplishes this goal. *First*, the Replacement DIP Facility, because it will convert to exit financing on the effective date of Tronox's chapter 11 plan (subject to certain conditions), provides Tronox with assurance that it has sufficient liquidity to operate following emergence from chapter 11.  It also provides Tronox and its stakeholders with time to propose and confirm the Plan.  *Second*, the Equity Commitment Agreement provides Tronox with assurance that Tronox will have sufficient funds available at the end of its chapter 11 cases to fund its obligations under the Plan.  *Finally*, the Plan Support Agreement commits the main constituencies to work in good faith towards consummation of the Plan, the key terms of which have been negotiated, and sets the framework for the parties' efforts over the coming months to consummate the Global Settlement.

40.     Each element of the Global Settlement, however, is contingent upon Court approval. Without Court approval, the parties' obligations under the Global Settlement will not be binding, and Tronox's ability to successfully consummate the Plan will be significantly hampered. More immediately, Tronox faces a looming January 12, 2010 maturity date of the Existing DIP Facility and remains obliged to proceed with a sale of its assets. Without Court approval of the Global Settlement, Tronox will not be able to repay the Existing Facilities. In that circumstance, Tronox would be forced to hold the auction -- an outcome that is no longer Tronox's only option, and one that is vehemently opposed by all of Tronox's key stakeholders. (Indeed, Tronox notes that even the Existing DIP Lenders, who imposed the sale requirement in the Existing DIP Facility, do not oppose Tronox's reorganization efforts and the Global Settlement generally.[12]) For these reasons, this Court should approve Tronox's entry into the Global Settlement.

## I.     The Replacement DIP Facility Should Be Approved.

41.     Pursuant to section 364(c) of the Bankruptcy Code, a court may authorize a debtor to incur debt that is (a) entitled to a superpriority administrative expense status, (b) secured by a line on otherwise unencumbered property, or (c) secured by a junior lien on encumbered property if the debtor cannot obtain postpetition credit on an unsecured basis, on an administrative expense priority or secured solely by junior liens on the debtor's assets. See 11 U.S.C. § 364(c);[13] Pearl-Phil GMT (Far East) Ltd. v. Caldor Corp., 266 B.R. 575, 584 (S.D.N.Y.

---

[12]   Similarly, while the Equity Committee currently is not a party to any of the Plan Agreements, it has made clear its opposition to a sale. In accordance with the Plan Support Agreement, Tronox will reach out to the Equity Committee regarding the Plan following approval of the relief requested herein.

[13]   Specifically, section 364(c) of the Bankruptcy Code provides, in pertinent part, that:

If the trustee [or debtor-in-possession] is unable to obtain unsecured credit allowable under section 503(b)(1) of this title as an administrative expense, the court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt – (1) with priority over any or all administrative expenses of the kind specified in

2001) (superpriority administrative expenses authorized where debtor could not obtain credit as an administrative expense).

42.     Additionally, section 364(d)(1) of the Bankruptcy Code provides that a court may authorize a debtor to incur postpetition debt on a senior or "priming" basis if (a) the debtor is unable to obtain credit otherwise and (b) there is "adequate protection" of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted. <u>See</u> 11 U.S.C. § 364(d)(1).[14]

43.     Courts in this jurisdiction and others have fashioned guidelines in applying these statutory requirements.  Generally, courts advocate using a "holistic approach" to evaluate superpriority postpetition financing agreements, which focuses on the transaction as a whole.  As one court has noted:

> Obtaining credit should be permitted not only because it is not available elsewhere, which could suggest the unsoundness of the basis for use of the funds generated by credit, but also because the credit acquired is of significant benefit to the debtor's estate and . . . the terms of the proposed loan are within the bounds of reason, irrespective of the inability of the debtor to obtain comparable credit elsewhere.

<u>In re Aqua Assocs.</u>, 123 B.R. 192, 196 (Bankr. E.D. Pa. 1991).

44.     More specifically, in evaluating a debtor's proposed postpetition financing, courts consider whether the postpetition financing (a) is necessary to preserve the assets of the estate and is necessary, essential and appropriate for continued operation of a debtor's business; (b) is in the best interests of a debtor's creditors and estates; (c) is an exercise of a debtor's sound and

---

section 503(b) or 507(b) of this title; (2) secured by a junior lien on property of the estate that is not otherwise subject to a lien; or (3) secured by a junior lien on property of the estate that is subject to a lien.

11 U.S.C. § 364(c).

[14]     Although the Replacement DIP Facility will prime the Existing DIP Facility and the Prepetition Facilities, the Existing DIP Lenders and the Prepetition Lenders are adequately protected because they will be repaid in full immediately upon funding of the Replacement DIP Facility.

reasonable business judgment; (d) was negotiated in good faith and at arm's length between the debtor, on the one hand, and the agents and the lenders on the other; and (e) contains terms that are fair, reasonable and adequate given the circumstances of the debtor and the proposed postpetition lender.  In re Farmland Indus., Inc., 294 B.R. 855, 862-79 (Bankr. W.D. Mo. 2003) (Hr'g Trans. at 733:3-7, In re Lyondell Chem. Co., No. 09-10023 (Bankr. S.D.N.Y. Mar. 5, 2009)); In re Ames Dep't Stores, Inc., 115 B.R. 34, 37-39 (Bankr. S.D.N.Y. 1990); In re Barbara K. Enters., Inc., No. 08-11474, 2008 WL 2439649, at *10 (Bankr. S.D.N.Y. June 16, 2008).

45.     For the reasons set forth below, Tronox submits that entry into the Replacement DIP Facility satisfies each of these factors.

**A.     Entry into the Replacement DIP Facility Is in the Best Interests of Tronox's Creditors and Estates, Is Necessary to Preserve Estate Assets and Is an Exercise of Tronox's Sound and Reasonable Business Judgment.**

46.     A debtor's decision to enter into a postpetition lending facility under section 364 of the Bankruptcy Code is governed by the business judgment standard.  See, e.g., Ames, 115 B.R. at 38 (noting that financing decisions under section 364 of the Bankruptcy Code must reflect a debtor's business judgment); Barbara K. Enters., 2008 WL 2439649, at *14 (explaining that courts defer to a debtor's business judgment "so long as a request for financing does not 'leverage the bankruptcy process' and unfairly cede control of the reorganization to one party in interest."); Trans World Airlines, Inc. v. Travellers Int'l AG (In re Trans World Airlines, Inc.), 163 B.R. 964, 974 (Bankr. D. Del. 1994) (approving postpetition loan and receivables facility because such facility "reflect[ed] sound and prudent business judgment").

47.     Generally, the business judgment standard requires that, absent evidence to the contrary, a debtor in possession is afforded discretion to act with regard to business planning activities.  See In re Simasko Prod. Co., 47 B.R. 444, 449  (Bankr. D. Colo. 1985) ("[D]iscretion to act with regard to business planning activities is at the heart of the debtor's power.") (citations

omitted). Specifically, to determine whether the business judgment standard is met, a court is "required to examine whether a reasonable business person would make a similar decision under similar circumstances." In re Exide Techs., 340 B.R. 222, 239 (Bankr. D. Del. 2006); see also In re Curlew Valley Assocs., 14 B.R. 506, 513-14 (Bankr. D. Utah 1981) (noting that courts should not second guess a debtor's business decision when that decision involves "a business judgment made in good faith, upon a reasonable basis, and within the scope of [the debtor's] authority under the [Bankruptcy] Code.") (citation omitted).

48.     Tronox's decision to enter into the proposed Replacement DIP Facility indisputably satisfies this standard. The decision to seek (and, ultimately, to enter into) the Replacement DIP Facility was driven by the desire to pursue a consensual plan of reorganization -- if one was feasible. To determine if such a plan was feasible, Tronox engaged in an intense, three-month process targeted at procuring the best available financing under the circumstances to serve as the foundation for a consensual plan of reorganization. Tronox weighed initial proposals from ten lenders and proceeded with involved negotiations with two potential lenders, Goldman and GE. Tronox's decision to enter into the Replacement DIP Facility with Goldman is a sound exercise of Tronox's business judgment.

49.     Goldman is the only party willing to lend on the timeline and on the terms necessitated by Tronox's chapter 11 cases. Tronox faced three key restrictions on its ability to obtain replacement financing. *First*, under the AEPA, Huntsman can terminate the AEPA if an order approving the sale to Huntsman is not a final order by December 31, 2009.[15] Thus, Tronox's time to pursue a value-maximizing alternative to the sale was short. *Second*, as a result of the protections granted in the Existing Final DIP Order to Tronox's Prepetition Lenders, any

---

[15]     See AEPA at § 8(a)(x).

replacement facility would have to repay in full the Existing DIP Facility and the Prepetition Facilities, lest Tronox face a contested cash collateral fight. *Third*, to ensure Tronox's ability to successfully emerge from chapter 11, Tronox required replacement financing that would convert into exit financing at the conclusion of its chapter 11 cases.

50.     Tronox has made clear that it would not abandon the sale to Huntsman unless a deal for a standalone reorganization was firmly in place. Thus, the board of directors of Tronox Incorporated only authorized Tronox to pursue the reorganization and file this Motion after (a) Tronox and Goldman agreed on the terms of the Replacement DIP Agreement, (b) Tronox, the Creditors' Committee, the Bondholders and the United States signed the Plan Support Agreement and (c) Tronox and the Bondholders signed the Equity Commitment Agreement.

51.     The majority (if not all) of Tronox's stakeholders support Tronox's pursuit of a standalone reorganization. Entry into the Replacement DIP Facility enables Tronox to consummate such a reorganization. These stakeholders have weighed the risks associated with owning Tronox's assets against the certainty of the sale process and have expressed a clear preference for the standalone reorganization. These stakeholders have already indicated their opposition to a sale to Huntsman or any other bidder through pleadings and statements before this Court. Tronox would likely face extensive litigation if it was to pursue a sale rather than a standalone reorganization supported by stakeholders. Such litigation would deplete estate assets and could severely diminish recoveries for creditors. Thus, Tronox's entry into the Replacement DIP Facility is in the best interest of Tronox's creditors, is necessary to preserve the value of estate assets and is an exercise of Tronox's sound and reasonable business judgment.

**B.     The Replacement DIP Facility Is the Only Source of Funding Available.**

52.     It is well-recognized in this jurisdiction and others that the appropriateness of a proposed postpetition financing facility must be considered in light of current market conditions.

See, e.g., Hr'g Trans. at 734-35:24-1, In re Lyondell Chem. Co., No. 09-10023 (Bankr. S.D.N.Y. Mar. 5, 2009) (recognizing "the terms that are now available for DIP facilities in the current economic environment aren't as desirable" as they have been in the past); In re Snowshoe Co. Inc., 789 F.2d 1085, 1088 (4th Cir. 1986) (noting that a debtor is not required to seek credit from every possible lender before determining such credit is unavailable). A debtor must demonstrate that it made a reasonable effort to seek credit from the sources available. See Snowshoe, 789 F.2d at 1088; see also In re Plabell Rubber Prods., Inc., 137 B.R. 897, 899-900 (Bankr. N.D. Ohio 1992).

53. The current market for financing remains strained as the global economy struggles to emerge from a lengthy recession. Because of current economic conditions, the market for DIP and exit financing has not been restored to pre-recession levels, and provisions once considered "extraordinary" in debtor-in-possession financing arrangements have, for the time being, become standard. See, e.g., Lyondell, 3/5/09 Hr'g Trans. at 740:4-6 ("[B]y reason of present market conditions, as disappointing as the [DIP] pricing terms are, I find the provisions [of a DIP that included a roll-up of prepetition secured debt] reasonable here and now.").

54. Tronox conducted an extensive search for financing, distributing a financing teaser to 96 parties, evaluating initial proposals from ten parties and intensively negotiating with two parties. At the end of this process, Goldman was the only lender willing to provide financing under the circumstances. Moreover, no party, including Goldman, was willing to provide financing (a) in the form of unsecured credit allowable under section 503(b)(l) of the Bankruptcy Code, (b) solely as an administrative expense under section 364(a) and (b) of the Bankruptcy Code or (c) solely in exchange for the grant of a superpriority administrative expense

38

claim pursuant to section 364(c)(1) of the Bankruptcy Code. Accordingly, the terms of the Replacement DIP Facility are the only terms available to Tronox at this time.

### C. The Terms of the Replacement DIP Facility Are Fair, Reasonable and Appropriate in Light of Tronox's Needs and Current Market Conditions.

55. In considering whether the terms of postpetition financing are fair and reasonable, courts consider the terms in light of the relative circumstances of both the debtor and the potential lender. In re Farmland, 294 B.R. at 886; see also Unsecured Creditors' Comm. of Mobil Oil Corp. v. First Nat'l Bank & Trust Co. (In re Elingsen McLean Oil Co., Inc.), 65 B.R. 358, 365 (W.D. Mich. 1986) (recognizing a debtor may have to enter into hard bargains to acquire funds for its reorganization).

### 1. The Scope of the Carve-Out Is Appropriate.

56. The Replacement DIP Facility subjects the security interests and administrative expense claims of Goldman to the Carve-Out. Such carve outs for professional fees have been found to be reasonable and necessary to ensure that a debtor's estate and any statutory committee can retain assistance from counsel. See Ames, 115 B.R. at 40. The Replacement DIP Facility does not directly or indirectly deprive Tronox's estates or other parties in interest of possible rights and powers by restricting the services for which professionals may be paid in these cases. See Ames, 115 B.R. at 38 (observing that courts insist on carve-outs for professionals representing parties-in-interest because "[a]bsent such protection, the collective rights and expectations of all parties-in-interest are sorely prejudiced"). Additionally, the Carve-Out protects against administrative insolvency during the course of the chapter 11 cases by ensuring that assets remain for the payment of U.S. Trustee fees and the professional fees of Tronox, the Creditors' Committee and the Bondholders, notwithstanding the grant of superpriority and administrative liens and claims under the Replacement DIP Facility.

K&E 15978564.

## 2. The Payment of Fees to Goldman Is Appropriate.

57. The various fees and charges to be paid to Goldman, as described in the summary of the Replacement DIP Facility and provided for in section 2.8 of the Replacement DIP Agreement and section 10(b) of the Plan Support Agreement (or as otherwise disclosed herein), are reasonable and appropriate under the circumstances. Courts routinely authorize similar lender incentives beyond the explicit liens and rights specified in section 364 of the Bankruptcy Code. See In re Defender Drug Stores, Inc., 145 B.R. 312, 316 (9th Cir. BAP 1992) (approving financing facility pursuant to section 364 of the Bankruptcy Code that included a lender "enhancement fee").

### D. The Replacement DIP Facility Was Negotiated in Good Faith and Should Be Afforded the Protection of Section 364(e) of the Bankruptcy Code.

58. Pursuant to section 364(e) of the Bankruptcy Code, any reversal or modification on appeal of an authorization to obtain credit or incur debt or a grant of priority or a lien under section 364 of the Bankruptcy Code shall not affect the validity of that debt incurred or priority or lien granted as long as the entity that extended credit "extended such credit in good faith."

59. As explained in detail herein, the terms of the Replacement DIP Facility were negotiated in good faith and at arm's length among Tronox, Goldman, the Bondholders, the Creditors' Committee and the United States, and all of the Replacement DIP Facility obligations will be extended by Goldman in good faith (as such term is used in section 364(e) of the Bankruptcy Code). No consideration is being provided to any party to, or guarantor of, obligations arising under the Replacement DIP Facility, other than as set forth herein. Moreover, the Replacement DIP Facility has been extended in express reliance upon the protections offered by section 364(e) of the Bankruptcy Code, and Goldman should be entitled to the full protection

40

of section 364(e) of the Bankruptcy Code in the event that the Interim Order or any provision thereof is vacated, reversed, or modified on appeal or otherwise.

## II. Tronox Should Be Authorized to Repay the Existing Facilities in Full, Enter into the Plan Support Agreement and Equity Commitment Agreement, Use Cash Collateral and Cash Collateralize Existing Letters of Credit.

60.     Section 363(b)(1) of the Bankruptcy Code provides that a debtor, "after notice and a hearing, may use, sell or lease, other than in the ordinary course of business, property of the estate."  11 U.S.C. § 363(b)(1).  In the Second Circuit, approval of a debtor's actions under section 363(b)(1) of the Bankruptcy Code requires the debtor to show that its decision was based on its business judgment.  See Committee of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.), 722 F.2d 1063, 1070 (2d Cir. 1983) (requiring "some articulated business justification" to approve the use, sale or lease of property outside the ordinary course of business); In re Ionosphere Clubs, Inc., 100 B.R. 670, 675 (Bankr. S.D.N.Y. 1989) (noting that the standard for determining a section 363(b) motion is "good business reason").  To determine whether the business judgment test is met, "the court 'is required to examine whether a reasonable business person would make a similar decision under similar circumstances.'" In re Dura Auto. Sys. Inc., No. 06-11202, 2007 Bankr. LEXIS 2764, at *272 (Bankr. D. Del. Aug. 15, 2007) (quoting In re Exide Techs., Inc., 340 B.R. 222, 239 (Bankr. D. Del. 2006)).

61.     Once the debtor articulates a valid business justification, the business judgment rule creates "a presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action was in the best interests of the company."  In re Integrated Res., Inc., 147 B.R. 650, 656 (S.D.N.Y. 1992) (citation omitted).  The debtor's business judgment "should be approved by the court unless it is shown to be 'so manifestly unreasonable that it could not be based upon sound business judgment, but only on bad faith, or whim or caprice.'"  In re Aerovox, Inc., 269 B.R. 74, 81

(Bankr. D. Del. 2001) (quoting In re Interco, Inc., 128 B.R. 229, 234) (Bankr. E.D. Mo. 1991). "Courts are loathe to interfere with corporate decisions absent a showing of bad faith, self interest or gross negligence." Integrated Res., 147 B.R. at 656.

62. Tronox, in its sound business judgment, believes that the transactions contemplated by the Global Settlement will promote a prompt and consensual consummation of these chapter 11 cases and are in the best interest of all stakeholders. The effectiveness of each of the Plan Agreements is conditioned upon the approval of the other two, and thus approval of all three is necessary to effectuate the transactions contemplated therein. Therefore, pursuant to section 363(b) of the Bankruptcy Code, Tronox requests authorization to repay the Existing DIP Facility and Prepetition Facilities in full with the proceeds of the Replacement DIP Facility (subject to certain conditions set forth in paragraph 4 of the Interim Order regarding the proposed resolution of the Creditors' Committee's suit against the Prepetition Lenders) and use cash collateral as set forth in the Interim Order and in the Replacement DIP Agreement, including to cash collateralize existing letters of credit under the Existing DIP Facility and the Prepetition Facilities. This authority is necessary for Tronox to implement the transactions contemplated by the Global Settlement, and for Tronox to have access to the liquidity it needs to operate its businesses going forward. In particular, repayment of the Existing DIP Facility and the Prepetition Facilities will allow Tronox to move forward in these chapter 11 cases free of the conditions of the Existing Final DIP Order (such as consent for Tronox to use cash collateral and the requirement for Tronox to sell substantially all of its assets), which continue for the benefit of the Prepetition Lenders until the Prepetition Facilities are paid in full.

63. In addition, Tronox requests that this Court determine that entry into the Plan Support Agreement by the parties thereto, and the performance of their obligations thereunder,

does not violate any law, including the Bankruptcy Code, and does not give rise to any claim or remedy against any of the parties thereto under section 1125(e) of the Bankruptcy Code, including the designation of the vote of any party thereto under section 1126(e) of the Bankruptcy Code. The parties to the Plan Support Agreement have negotiated that agreement in good faith and would not be willing to enter in that agreement if so doing would expose them to liability for potential claims.

64.    Moreover, this Court should approve the payment of the Goldman Break-up Fee because Goldman has made a substantial contribution to these chapter 11 cases and has not received a full commitment fee in connection with the Replacement DIP Facility. This fee is only payable if (a) Tronox does not consummate the Replacement DIP Facility on or before December 24, 2009 and (b) Tronox consummates a transaction other than the transactions contemplated by the Plan (from the proceeds of such transaction) or if Tronox extends the maturity of the Existing DIP Facility. For example, confirmation that Tronox would have sufficient funding to pursue a standalone reorganization and emerge from chapter 11 as a going concern has aided significantly the efforts to finalize the Term Sheet and the Equity Commitment Agreement. In addition, the confirmation of such funding has also improved Tronox's sale dynamic: as a result of the meaningful progress made in pursuit of a reorganization, Tronox recently received revised bids from two bidders (Huntsman and another Qualified Bidder), each of whom substantially increased the price that the party was willing to offer for Tronox's assets. Given the positive impact of Goldman's financing efforts on Tronox's dual path process, Tronox believes, in the exercise of its business judgment, that payment of the Goldman Break-up Fee is appropriate and reasonable in the event that, subsequent to the filing of this Motion, Tronox determines not to consummate the Replacement DIP Facility in favor of some other, more

43

attractive alternative. The signatories to the Plan Support Agreement similarly have recognized Goldman's outstanding contributions and have consented to the Goldman Break-up Fee.

65. Finally, this Court should authorize Tronox's entry into the Equity Commitment Agreement. As the Replacement DIP Facility alone is insufficient both to fund Tronox's obligations under a plan of reorganization and to provide adequate liquidity for Tronox to operate post-emergence, the Equity Commitment Agreement is a necessary component of the standalone reorganization. The fee of 4% of the shares issued in the rights offering, to be paid to the Bondholders in stock, is reasonable given the benefit they are providing to Tronox's estates with their equity commitment: ensuring that Tronox will emerge from chapter 11 as a reorganized company. It is likewise reasonable for Tronox to pay the fee of 4% of the $105 million backstop amount (or $4.2 million) in cash upon termination of the Equity Commitment Agreement if Tronox never consummates the Plan. Like the Goldman Break-up Fee, payment of this 4% fee to the Bondholders if Tronox never consummates the Plan in favor of a more attractive alternative recognizes the substantial contribution the Bondholders have provided pursuant to the Equity Commitment Agreement.

66. Courts in this district have granted relief similar to the relief requested in this section II. See, e.g., In re Dana Corp., No. 06-10354 (BRL) (Bankr. S.D.N.Y. Aug. 1, 2007) [Dkt. No. 5879] (authorizing entry into plan support agreement); In re Calpine Corp., No. 05-60200 (BRL) (Bankr. S.D.N.Y. Mar. 7, 2007) [Dkt. No. 3913] (authorizing replacement DIP financing); In re Delphi Corp., No. 05-44482 (RDD) (Bankr. S.D.N.Y. Jan. 12, 2007) [Dkt. No. 6589] (authorizing entry into equity purchase and commitment agreement and plan framework support agreement in connection with refinancing of postpetition secured debt); Delphi, (Bankr. S.D.N.Y. Jan. 5, 2009) [Dkt. No. 6461] (authorizing replacement DIP financing).

67. Based on the foregoing, Tronox has exercised sound business judgment in deciding to enter into the Global Settlement, and this Court should authorize and approve Tronox's entry into the Global Settlement.

### III. Approval of the Replacement DIP Facility on an Interim Basis Is Necessary to Prevent Immediate and Irreparable Harm.

68. Bankruptcy Rule 4001(c)(2) governs the procedures for acquiring authorization to obtain postpetition financing and provides, in relevant part:

> The court may commence a final hearing on a motion for authority to obtain credit no earlier than 15 days after service of the motion. If the motion so requests, the court may conduct a hearing before such 15 day period expires, but the court may authorize the obtaining of credit only to the extent necessary to avoid immediate and irreparable harm to the estate pending a final hearing.

Fed. R. Bankr. P. 4001(c)(2).

69. In examining requests for interim relief under the immediate and irreparable harm standard, courts apply the same business judgment standard applicable to other business decisions. See, e.g., Ames, 115 B.R. at 36; Simasko, 47 B.R. at 449. After the 15-day period, the request for financing is not limited to those amounts necessary to prevent the destruction of the debtor's business, and the debtor is entitled to borrow those amounts that it believes are prudent to the operation of its business. Ames, 115 B.R. at 36.

70. Immediate and irreparable harm would result if the relief requested herein is not granted on an interim basis. Tronox is only permitted a single draw of the proceeds of the Replacement DIP Facility, and the majority of those proceeds will be used immediately to repay the Existing Facilities. Tronox's immediate repayment of the Existing Facilities is a crucial aspect of the Tronox's entry into the Global Settlement. Moreover, Tronox's existed secured lenders would have opposed the relief requested herein if a portion of the proceeds of the Replacement DIP Facility was not used immediately to repay the Existing Facilities. Thus, this

Court should authorize Tronox to access the full amount of the Replacement DIP Facility upon entry of the Interim Order.

71.     The crucial importance of a debtor's ability to secure postpetition financing to prevent immediate and irreparable harm to its estate is repeatedly recognized in this district in similar circumstances.  See, e.g., In re Ion Media Networks, Inc., No. 09-13125 (JMP) (Bankr. S.D.N.Y. June 2, 2009 (approving postpetition financing on an interim basis); In re Chemtura Corp., No. 09-11233 (REG) (Bankr. S.D.N.Y. Mar. 20, 2009) (same); In re Tronox Inc., No. 09-10156 (ALG) (Bankr. S.D.N.Y. Jan. 13, 2009) (same); In re Lyondell Chemical Co., No. 09-10023 (REG) (Bankr. S.D.N.Y. Jan. 8, 2009) (same); In re Lenox Sales, Inc., No. 08-14679 (ALG) (Bankr. S.D.N.Y. Nov. 25, 2008) (same); In re Wellman, Inc., No. 08-10595 (SMB) (Bankr. S.D.N.Y. Feb. 27, 2008) (same).

72.     Accordingly, under the circumstances, entry of the Interim Order is necessary to prevent immediate and irreparable harm to Tronox's estates and therefore is warranted under the requirements of Bankruptcy Rule 4001(c)(2).

## IV.     Modification of the Automatic Stay Provided under Section 362 of the Bankruptcy Code Is Appropriate under the Circumstances.

73.     Paragraphs 5 and 13 of the proposed Interim Order provides that the automatic stay imposed under section 362(a) of the Bankruptcy Code is hereby lifted to, among other things, permit Tronox to grant various superpriority liens and claims, perform various obligations, incur various liabilities, permit the exercise of remedies by Goldman following a default under the Replacement DIP Facility and to allow the Goldman to file and record financing statements, mortgages or other instruments to provide notice and evidence the grant and perfection of its liens.

74.     Stay modification provisions of this sort are ordinary and usual features of debtor in possession financing facilities and, in Tronox's business judgment, are reasonable under the present circumstances. Accordingly, the Court should modify the automatic stay to the extent contemplated under the Replacement DIP Agreement and the Replacement DIP Orders.

## V.     Request for Final Hearing.

75.     Pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2), Tronox requests that the Court set a date that is no longer than 30 days from the entry of the Interim Order as a hearing for consideration of entry of the Final Order.[16]

76.     Tronox requests that it be authorized to serve a copy of the signed Interim Order, which fixes the time and date for the filing of objections, if any, by first class mail upon the notice parties listed below. Tronox further requests that the Court consider such notice of the final hearing on the Motion to be sufficient notice under Bankruptcy Rule 4001(c)(2).

## Request for Waiver of Stay

77.     Tronox further seeks a waiver of any stay of the effectiveness of the order approving this Motion. Pursuant to Bankruptcy Rule 6004(h), "a[n] order authorizing the use, sale, or lease of property other than cash collateral is stayed until the expiration of fourteen (14) days after entry of the order, unless the court orders otherwise." As set forth above, Tronox's entry into the Replacement DIP Agreement, the Plan Support Agreement and the Equity Commitment Agreement is related, and each agreement's effectiveness is conditioned upon approval of the other two. Immediate approval of these agreements will preserve Tronox's operations and value and will help ensure that it emerges from chapter 11 as a going concern.

---

[16]    It is an Event of Default under § 8.1(o)(v) of the Replacement DIP Agreement if the Final Order is not entered within 45 days after the entry of the Interim Order.

K&E 15978564.

Accordingly, ample cause exists to justify a waiver of the 14-day stay imposed by Bankruptcy Rule 6004(h).

**Cause Exists to Shorten Notice with Respect to the Relief Requested Herein**

78.     Bankruptcy Rule 9006(c)(1) authorizes the Court, for cause shown, to reduce the notice period otherwise required for the requested relief.  See Fed. R. Bankr. P. 9006(c)(1). While notice periods of 14 or 21 days would ordinarily apply to the various relief requested herein, time is of the essence to implement the Global Settlement.  Goldman's commitment to fund the Replacement DIP Facility expires at 5:00 p.m. (ET) on December 24, 2009.  Without the Replacement DIP Facility, the Global Settlement will fall apart and Tronox's hopes for a consensual resolution to these cases may evaporate.  Moreover, all of Tronox's key stakeholders are either party to the Plan Support Agreement or are otherwise aware of the Global Settlement. Thus, these parties will not be prejudiced by the reduced notice period.  As such, ample cause exists to waive any notice period ordinarily applicable to the relief sought herein.

**Motion Practice**

79.     This Motion includes citations to the applicable rules and statutory authorities upon which the relief requested herein is predicated, and a discussion of their application to this Motion.  Accordingly, Tronox submits that this Motion satisfies Rule 9013-1(a) of the Local Bankruptcy Rules for the Southern District of New York.

**Notice**

80.     Tronox has provided notice of this Motion by email (or facsimile where email is not available) to: (a) the U.S. Trustee; (b) counsel to the Existing DIP Agent; (c) counsel to the Creditors' Committee; (d) counsel to the Equity Committee; (e) the United States; (f) counsel to Goldman; (g) counsel to the Bondholders; (h) Internal Revenue Service; (i) Securities and Exchange Commission; and (j) all those persons and entities that have formally appeared and

requested service in these chapter 11 cases pursuant to Bankruptcy Rule 2002. In light of the nature of the relief requested, Tronox respectfully submits that no further notice is necessary.

### **No Prior Request**

81.     No prior motion for the relief requested herein has been made to this or any other court.

K&E 15978564.

WHEREFORE, Tronox respectfully requests that the Court grant the relief requested herein and such other and further relief as it deems just and proper.

New York, New York
Dated: December 20, 2009

/s/ Jonathan S. Henes

Richard M. Cieri
Jonathan S. Henes
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, New York  10022
Telephone:    (212) 446-4800
Facsimile:    (212) 446-4900

- and -

Patrick J. Nash, Jr.
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, Illinois  60654
Telephone:    (312) 862-2000
Facsimile:    (312) 862-2200

Counsel to the Debtors
and Debtors in Possession

50

**EXHIBIT A**

**Proposed Interim Order**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| TRONOX INCORPORATED, et al.,[1] | ) | Case No. 09-10156 (ALG) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

## INTERIM ORDER (I) AUTHORIZING DEBTORS (A) TO OBTAIN POSTPETITION SECURED FINANCING PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1) AND 364(e), (B) TO UTILIZE CASH COLLATERAL PURSUANT TO 11 U.S.C. § 363 AND (C) TO USE POSTPETITION FINANCING TO REPAY PREPETITION SECURED FINANCING AND EXISTING DEBTOR-IN-POSSESSION FINANCING, AND (II) SCHEDULING FINAL HEARING UNDER BANKRUPTCY RULE 4001(B) AND (C)

Upon the motion, dated December 20, 2009 (the **"DIP Motion"**), of Tronox Incorporated ("**Holdings**"), Tronox Worldwide LLC (the "**Borrower**") and its affiliated debtors, each as debtor and debtor-in-possession (together with Holdings and the Borrower, the "**Debtors**"), in the above-captioned Chapter 11 cases (the "**Cases**"), seeking entry of an interim order (this **"Interim Order"**) pursuant to sections 105, 361, 362, 363(b), 363(c)(2), 364(c)(l), 364(c)(2), 364(c)(3), 364(d)(l), 364(e) and 552 of chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.* (as amended, the **"Bankruptcy Code"**), and Rules 2002, 4001, 6004 and 9014 of the Federal Rules of Bankruptcy Procedure (the **"Bankruptcy Rules"**) and the corresponding local rules of this District (the "**Local Rules**"), that, among other things:

    (i)  authorizes the Borrower to obtain, and authorizes Holdings and certain subsidiaries of the Borrower (collectively, "**Guarantors**") to guarantee, jointly and severally, the

---

[1] The debtors in these chapter 11 cases include: Tronox Luxembourg S.ar.l; Tronox Incorporated; Cimarron Corporation; Southwestern Refining Company, Inc.; Transworld Drilling Company; Triangle Refineries, Inc.; Triple S, Inc.; Triple S Environmental Management Corporation; Triple S Minerals Resources Corporation; Triple S Refining Corporation; Tronox LLC; Tronox Finance Corp.; Tronox Holdings, Inc.; Tronox Pigments (Savannah) Inc.; and Tronox Worldwide LLC.

Borrower's obligations in respect of, senior secured postpetition financing, which if approved on a final basis, would consist of:

(a) a senior secured, super priority, non-amortizing term loan facility consisting of $425.0 million aggregate principal amount (such term loan facility, the "**DIP Facility**") and separated into a $335.0 million single draw tranche and a $90.0 million single draw tranche (both tranches, the "**DIP Loans**"), provided pursuant to the terms and conditions of (x) this Interim Order and the Final Order (as defined below) (collectively, the "**Replacement DIP Orders**"), (y) that certain Senior Secured Super-Priority Debtor-In-Possession And Exit Credit and Guaranty Agreement, in substantially the form attached to the DIP Motion as <u>Exhibit E</u> (as the same may be amended, restated, supplemented or otherwise modified from time to time in accordance with its terms, the "**DIP Credit Agreement**"),[2] by and among Holdings, the Borrower, the Guarantors, Goldman Sachs Lending Partners LLC ("**GS Lending Partners**"), as sole lead arranger, bookrunner and syndication agent (in such capacities, the "**DIP Arrangers**"), and GS Lending Partners, as administrative agent and collateral agent (in such capacities, and including any successor administrative agent and collateral agent, the "**DIP Administrative Agent**," and together with the DIP Arrangers and any other documentation agent, administrative agent, collateral agent, syndication agent, co-agent and all other agents (and successor agents) for the DIP Lenders in respect of the DIP Facility, collectively, the "**DIP Agents**"), for itself and a syndicate of financial institutions as term lenders (the "**DIP Lenders,**" and together with the DIP Agents and any other party to which DIP Obligations (as defined below) are owed pursuant to the DIP Loan Documents and/or this Interim Order (including any Lender Counterparty and the Escrow Agent, collectively, the "**DIP Secured Parties**"), and (z) any and all other Credit

---

[2] Unless otherwise specified, all capitalized terms used herein without definition shall have the respective meanings given such terms in the DIP Credit Agreement.

Documents (as defined in the DIP Credit Agreement) (together with the DIP Credit Agreement, the "**DIP Loan Documents**") (all DIP Loans made to or for the benefit or account of, and all guaranties issued by, the respective Debtors pursuant to the DIP Loan Documents, this Interim Order and any Final Order, and all other obligations and liabilities of the Debtors to, or for the benefit of, any or all of the DIP Secured Parties under any or all of the DIP Loan Documents, this Interim Order and any Final Order, including, without limitation, all indemnification obligations and all other Obligations as defined in the DIP Credit Agreement, and all obligations owing to the Escrow Agent under the Escrow Agreement (collectively, the "**DIP Obligations**");

(b)    Liens and super-priority administrative claims granted to DIP Administrative Agent, for the benefit of itself and the other DIP Secured Parties, in all DIP Collateral (as defined below) in accordance with the Collateral Documents and this Interim Order to secure any and all of the DIP Obligations;

(c)    repayment in full in cash of the outstanding indebtedness and other obligations (and the cash collateralization of issued and outstanding letters of credit) under the Prepetition Credit Facility (as defined below) and the Existing DIP Credit Facility (as defined below and together with the Prepetition Credit Facility, the "**Existing Credit Facilities**") as provided herein and in the DIP Credit Agreement, subject to the terms and conditions of this Interim Order, the Final Order, and the DIP Loan Documents, and the extinguishing of any and all liens and obligations (except, in each case contingent indemnification obligations as provided in Paragraph 4(c) hereof) arising under the Prepetition Credit Facility and the Existing DIP Credit Facility;

(ii)    approves the terms of, and authorizes the Debtors to execute and deliver, and perform under, the DIP Credit Agreement, the other DIP Loan Documents and this Interim

Order, and to perform such other and further acts as may be required in connection with the DIP Loan Documents and this Interim Order;

(iii)     authorizes each Debtor to grant (x) to the DIP Administrative Agent, for the benefit of itself and the other DIP Secured Parties, Liens on all of the DIP Collateral (as defined below) pursuant to sections 364(c) and (d) of the Bankruptcy Code, which Liens shall be senior to the Primed Liens (as defined below) but shall be junior to any valid, enforceable and non-avoidable Liens that are (I) in existence on the Petition Date, (II) identified on Schedule 6.2 of the DIP Credit Agreement, (III) either perfected as of the Petition Date or perfected subsequent to the Petition Date as permitted by section 546(b) of the Bankruptcy Code, and (IV) senior to the Liens securing the Existing Credit Facilities, (y) to the DIP Secured Parties super-priority administrative claims that are senior to all Environmental Claims (as defined in the Plan Support Agreement referenced below), all Tort Claims (as defined in the Plan Support Agreement referenced below), and any other administrative claims, and that have recourse to all prepetition and postpetition property of the Debtors' estates and proceeds thereof, now owned or hereafter acquired, including Avoidance Actions (as defined below) and proceeds thereof;

(iv)     authorizes the Debtors to use "cash collateral," as such term is defined in section 363 of the Bankruptcy Code (the "**Cash Collateral**"), including, without limitation, Cash Collateral in which the DIP Secured Parties have a Lien or other interest, in each case whether existing on the Petition Date, arising pursuant to this Interim Order or otherwise;

(v)     vacates the automatic stay imposed by section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms and provisions of the DIP Loan Documents and the Replacement DIP Orders;

(vi)     schedules an emergency interim hearing (the "**Interim Hearing**") on the DIP Motion for the Court to consider entry of this Interim Order, which authorizes the Borrower at any time prior to the entry of the Final Order to borrow $425.0 million in aggregate principal amount under the DIP Facility;

(vii)    schedules a final hearing on the DIP Motion to be held within thirty days after the entry of this Interim Order (the "**Final Hearing**") to consider entry of a final order, acceptable in form and substance to the DIP Administrative Agent, which grants all of the relief requested in the DIP Motion and provided in this Interim Order on a final basis (the "**Final Order**"); and

(viii)   waives any applicable stay (including under Bankruptcy Rule 6004) and provides for immediate effectiveness of this Interim Order.

Having considered the DIP Motion, the DIP Credit Agreement, and the evidence submitted at the Interim Hearing; and in accordance with Bankruptcy Rules 2002, 4001(b), (c), and (d) and 9014 and all applicable Local Rules, due and proper notice of the DIP Motion and the Interim Hearing having been given; an Interim Hearing having been held and concluded on December 22, 2009; upon consideration of all pleadings filed with this Court and all objections, if any, to the interim relief requested in the DIP Motion having been withdrawn, resolved or overruled by the Court; and it appearing that approval of the interim relief requested in the DIP Motion is necessary to avoid immediate and irreparable harm to the Debtors pending the Final Hearing and otherwise is fair and reasonable and in the best interests of the Debtors, their creditors, their estates and their equity holders, and is essential for the continued operation of the Debtors' business and the pursuit of solicitation, confirmation and consummation of the Plan in accordance with the DIP Loan Documents and the Plan Support Agreement (as defined below);

and after due deliberation and consideration, and for good and sufficient cause appearing therefor:

**IT IS FOUND, DETERMINED, ORDERED AND ADJUDGED,[3] that:**

A.     **Petition Date**.  On January 12, 2009 (the **"Petition Date"**), the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code with the United States Bankruptcy Court for the Southern District of New York (the **"Court"**).  The Debtors have continued in the management and operation of their business and property as debtors-in-possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.  The Office of the United States Trustee for the Southern District of New York (the "**U.S. Trustee**") has appointed a statutory committee of unsecured creditors (the "**Creditors' Committee**") and a statutory committee of equity security holders (the "**Equity Committee**") in these Cases pursuant to section 1102(a) of the Bankruptcy Code (the Creditors' Committee, the Equity Committee and any other statutory committee appointed in these Cases or any Successor Case (as defined below) shall be collectively referred to herein as the "**Committees**").

B.     **Jurisdiction and Venue**.  This Court has core jurisdiction over the Cases, the DIP Motion and the parties and property affected hereby pursuant to 28 U.S.C. §§ 157(b) and 1334.  Venue for the Cases and proceedings on the DIP Motion is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.  The statutory predicates for the relief sought herein are sections 105, 361, 362, 363, 364 and 507 of the Bankruptcy Code and Bankruptcy Rules 2002, 4001, 6004 and 9014 and the Local Bankruptcy Rules.

C.     **Notice**.  The Interim Hearing is being held pursuant to the authorization of Bankruptcy Rule 4001.  Notice of the Interim Hearing and the emergency relief requested in the

---

[3] Findings of fact shall be construed as conclusions of law, and conclusions of law shall be construed as findings of fact, pursuant to Bankruptcy Rule 7052.

DIP Motion has been provided by the Debtors, whether by facsimile, electronic mail, overnight courier or hand delivery, on December 20, 2009, to certain parties in interest, including: (i) the Office of the United States Trustee, (ii) the United States Securities and Exchange Commission, (iii) the Internal Revenue Service, (iv) those Persons included on the Debtors' list of largest unsecured creditors on a consolidated basis, (v) counsel to the Existing DIP Agents and the Prepetition Agents (as each term is defined below), (vi) the Existing DIP Agents and the Prepetition Agents, (vii) the Existing DIP Lenders and the Prepetition Lenders (as defined below), (viii) counsel to the DIP Agents; (ix) counsel to the Creditors' Committee; (x) counsel to the Equity Committee; (xi) the Pension Benefit Guaranty Corporation; and (xii) all parties signatory to the Plan Support Agreement (as defined below).  Under the circumstances, such notice of the DIP Motion, the relief requested therein and the Interim Hearing constitutes due and sufficient notice thereof and complies with Bankruptcy Rule 4001(b), (c) and (d) and the Local Bankruptcy Rules, and no further notice of the relief sought at the Interim Hearing and the relief granted herein is necessary or required.

D.      **The Existing DIP Credit Facility and the Prepetition Credit Facility**

(i)      On February 9, 2009, the Court entered the Corrected Final Order (I) Authorizing Debtors (A) to Obtain Postpetition Financing, (B) to Utilize Cash Collateral and (C) to use Postpetition Financing to Purchase Receivables Portfolio and (II) Granting Adequate Protection to Prepetition Secured Parties (the "**Initial Final DIP Order**").  Pursuant to the Initial Final DIP Order, the Borrower was authorized to borrow up to $125.0 million under that certain Credit Agreement, dated as of January 12, 2009 (as amended, restated, supplemented or otherwise modified, the "**Existing DIP Credit Agreement**," and together with the other Loan Documents (as defined in the Existing DIP Credit Agreement), in each case as amended,

restated, supplemented or otherwise modified, collectively with the Existing DIP Credit Agreement, the **"Existing DIP Loan Documents,"** and the credit facility contemplated therein, the "**Existing DIP Credit Facility**") among Tronox Worldwide LLC, as borrower, and Holdings, as guarantor, the financial institutions parties thereto from time to time as lenders (the **"Existing DIP Lenders"**), Credit Suisse AG (formerly Credit Suisse) ("**Credit Suisse**"), as administrative agent for the Existing DIP Lenders (in such capacity, the "**Existing DIP Administrative Agent**"), and JPMorgan Chase Bank, N.A. as collateral agent for the Existing DIP Lenders (in such capacity, the "**Existing DIP Collateral Agent**," and together with the Existing DIP Administrative Agent, the "**Existing DIP Agents**," and together with the Existing DIP Lenders, the "**Existing DIP Secured Parties**"). All loans made to or for the benefit or account of, and all guaranties issued by, the respective Debtors pursuant to the Existing DIP Loan Documents, the Initial Final DIP Order (or prior to the entry thereof, the interim order approving the Existing DIP Credit Facility (the "**Initial Interim DIP Order**")) and all other obligations and liabilities of the Debtors arising under the Existing DIP Loan Documents, the Initial Interim DIP Order and Initial Final DIP Order, including, without limitation, all Obligations as defined in the Existing DIP Credit Agreement and the Initial Final DIP Order, shall hereinafter be collectively referred to as the "**Existing DIP Obligations**."

(ii)    Tronox Worldwide LLC, as borrower, certain financial institutions as lenders from time to time (the **"Prepetition Lenders"**), and Credit Suisse[4] as administrative agent and collateral agent for the Prepetition Lenders (in such capacity, the "**Prepetition Administrative Agent**," and together with any other syndication agent, documentation agent, administrative agent, collateral agent, co-agent and other agents for the Prepetition Lenders in

---

[4] In light of Lehman Brothers Inc.'s chapter 11 filing in 2008, Credit Suisse replaced Lehman Commercial Paper Inc. as administrative agent for the Prepetition Credit Facility (as defined below) prior to the Petition Date.

respect of the Prepetition Credit Facility (as defined below), collectively, the "**Prepetition Agents**," and together with the Prepetition Lenders, the "**Prepetition Secured Parties**") are parties to that certain Credit Agreement, dated as of November 28, 2005 (as amended, restated, supplemented or otherwise modified from time to time prior to the Petition Date, the "**Prepetition Credit Agreement**," and together with the Prepetition Guarantee and Collateral Agreement (as defined in the Initial Final DIP Order) and the other Prepetition Agreements (as defined in the Initial Final DIP Order), in each case as amended, restated, supplemented or otherwise modified prior to the Petition Date, collectively with the Prepetition Credit Agreement, the "**Prepetition Loan Documents**") (the credit facility contemplated in the Prepetition Loan Documents, the "**Prepetition Credit Facility**," and together with the Existing DIP Credit Facility, the "**Existing Credit Facilities**").  As of the Petition Date, the Debtors (i) were indebted and liable to the Prepetition Secured Parties in an amount not less than $212,816,978 in respect of loans made by the Prepetition Secured Parties, comprised of a revolving loan facility in an amount not less than $110,073,083 (the "Prepetition Revolving Facility") and a term loan facility in an amount not less than $102,743,895 (the "Prepetition Term Loan Facility") and (ii) contingently liable to the Prepetition Secured Parties in an amount not less than $79,500,000 (the "Prepetition Letters of Credit") in respect of reimbursement obligations with respect to letters of credit issued under the Prepetition Credit Facility (which Prepetition Letters of Credit became Rolled Prepetition Obligations secured by the Rolled Liens and the Rolled Superpriority Claims, each as defined in the Initial Final DIP Order).  All loans, letters of credit and other financial accommodations made to or for the benefit or account of, and all guaranties issued by, the respective Debtors pursuant to the Prepetition Loan Documents prior to the Petition Date, and all other obligations and liabilities of the Debtors arising under the Prepetition Credit Facility, the

Initial Interim DIP Order and Initial Final DIP Order, including, without limitation, all Prepetition Debt (as defined in the Initial Final DIP Order), shall hereinafter be collectively referred to as the "**Prepetition Obligations**."

        E.      **<u>Findings Regarding the DIP Facility</u>**.

        (i)      <u>Need for Postpetition Financing</u>.  In light of the imminent January 12, 2010 maturity date of the Debtors' Existing DIP Obligations under the Existing DIP Credit Facility, the covenant requiring the Debtors to consummate a sale and certain other factors, including the difficulty in priming the Prepetition Secured Parties over their objection, the Debtors have an immediate need to obtain the DIP Facility and use Cash Collateral, among other things, to repay the Existing Credit Facilities (and to cash collateralize the letters of credit issued and outstanding under the Existing Credit Facilities (each, an "**Existing Letter of Credit**")), and to permit the orderly continuation of the operation of their businesses, to facilitate the Debtors' emergence from chapter 11, to maintain business relationships with vendors, suppliers and customers, to make payroll, to make capital expenditures, to satisfy other working capital and operation needs and to perform their obligations under the Plan Support Agreement (as defined below).  The Debtors' access to sufficient working capital and liquidity through the use of Cash Collateral and borrowing under the DIP Facility is vital to the preservation and maintenance of the going concern values of the Debtors during the Cases and the Debtors' ability to convert the DIP Facility into an exit facility upon satisfaction of certain conditions set forth in the DIP Loan Documents is critical to their ability to consummate a successful reorganization that will preserve and maintain the Debtors' going concern values in accordance with the terms of the Plan Support Agreement (as defined below).

(ii)     No Credit Available on More Favorable Terms.  The Debtors have been and continue to be unable to obtain financing on more favorable terms from sources other than the DIP Secured Parties under the DIP Loan Documents and this Interim Order.  The Debtors are unable to obtain adequate unsecured credit allowable under section 503(b)(1) of the Bankruptcy Code as an administrative expense.  The Debtors are also unable to obtain secured credit allowable under sections 364(c)(1), 364(c)(2), 364(c)(3) and 364(d) of the Bankruptcy Code without the Debtors granting to the DIP Secured Parties the rights, remedies, privileges, benefits and protections provided herein and in the DIP Loan Documents, including, without limitation, the DIP Liens and the DIP Super-Priority Claims (as defined below) (collectively, the "**DIP Protections**").

(iii)     Plan Support Agreement.  Contemporaneously with the filing of the DIP Motion, the Debtors, the Creditors' Committee, an ad hoc committee of holders (the "**Ad Hoc Noteholder Committee**") of more than 66% in principal amount of the 9.5% senior unsecured notes (collectively, the "**Noteholders**") issued under the Indenture, dated November 28, 2005, between Tronox Worldwide LLC, as issuer, and Citibank N.A., as indenture trustee, and the United States of America (the "**United States**"), have entered into that certain Plan Support Agreement (the "**Plan Support Agreement**")**,** pursuant to which, among other things, (x) the Debtors agreed to file and use commercially reasonable efforts to obtain confirmation of, and to consummate, the Plan (as defined in the DIP Credit Agreement), the principal terms of which are described in the Plan Support Agreement pursuant to the timetable set forth therein, (y) the non-Debtor parties thereto agreed, subject to receipt of a Court-approved Disclosure Statement, to vote to accept the Plan, and to support the confirmation and consummation of the Plan and all transactions contemplated thereby, and (z) certain Noteholders and other entities agreed,

pursuant to the terms and conditions of a certain Equity Commitment Agreement between the Debtors and such parties (the "**Equity Commitment Agreement**"), to provide a standby commitment to purchase any unsubscribed portion of the equity of the applicable reorganized Debtors to be offered to certain of the Debtors' prepetition unsecured creditors. In addition, the parties to the Plan Support Agreement have consented to, and have agreed to support, the DIP Facility and the parties' undertakings in the Plan Support Agreement are conditioned upon, among other things, this Court's approval of the DIP Facility pursuant to this Interim Order and the Final Order.

        F.        **Business Judgment and Good Faith Pursuant to Section 364(e)**.

        (i)        The DIP Secured Parties have indicated a willingness to provide postpetition secured financing via the DIP Facility to the Borrower in accordance with the DIP Loan Documents and this Interim Order.

        (ii)        The terms and conditions of the DIP Facility pursuant to the DIP Loan Documents and this Interim Order, and the fees, costs, expenses and other charges paid or to be paid thereunder, are fair, reasonable, and the best available under the circumstances, reflect the Debtors' exercise of prudent business judgment consistent with their fiduciary duties, and are supported by reasonably equivalent value and consideration.

        (iii)        The DIP Facility and DIP Loan Documents were negotiated in good faith and at arms' length among the Debtors and the DIP Secured Parties with the assistance and counsel of their respective advisors, and all of the DIP Obligations shall be deemed to have been extended by the DIP Secured Parties and their affiliates for valid business purposes and uses and in good faith, as that term is used in section 364(e) of the Bankruptcy Code, and in express reliance upon the protections offered by section 364(e) of the Bankruptcy Code, and the DIP

Liens, the DIP Super-Priority Claims and the other DIP Protections shall be entitled to the full protection of section 364(e) of the Bankruptcy Code in the event this Interim Order or any other order or any provision hereof or thereof is vacated, reversed, amended or modified, on appeal or otherwise.

G. **Relief Essential; Best Interest**. For the reasons stated above, the Debtors have requested immediate entry of this Interim Order pursuant to Bankruptcy Rule 4001(b)(2) and 4001(c)(2) and the Local Bankruptcy Rules. Absent granting the relief set forth in this Interim Order, the Debtors' estates and their ability to successfully reorganize will be immediately and irreparably harmed. Consummation of the DIP Facility, repayment of the Existing Credit Facilities and authorization of the use of Cash Collateral in accordance with this Interim Order and the DIP Loan Documents is therefore in the best interests of the Debtors' estates consistent with their fiduciary duties.

**NOW, THEREFORE**, on the DIP Motion and the record before this Court with respect to the DIP Motion, and with the consent of the Debtors, the DIP Secured Parties, the Prepetition Secured Parties, the Existing DIP Secured Parties and the other parties to the Plan Support Agreement to the form and entry of this Interim Order, and good and sufficient cause appearing therefor,

**IT IS ORDERED** that:

1. **Motion Granted**. The DIP Motion is granted in accordance with the terms and conditions set forth in this Interim Order and the DIP Loan Documents. Any objections to the DIP Motion with respect to the entry of this Interim Order that have not been withdrawn, waived or settled, and all reservations of rights included therein, are hereby denied and overruled.

2. **DIP Loan Documents and DIP Protections**.

(a) <u>Approval of DIP Loan Documents</u>.  The Debtors are expressly and immediately authorized and empowered and directed to enter into and establish the DIP Facility, to execute, deliver and perform under the DIP Loan Documents and to incur the DIP Obligations in accordance with, and subject to, the terms of this Interim Order and the DIP Loan Documents, and to execute, deliver and perform under all other instruments, certificates, agreements and documents which may be required, necessary or prudent for the performance by the applicable Debtors under the DIP Loan Documents and the creation and perfection of the DIP Liens and other DIP Protections described in, and provided for, by this Interim Order and the DIP Loan Documents, including, without limitation, entering into and performing under Hedging Agreements and the Escrow Agreement to the extent required or permitted under the DIP Loan Documents.  The Debtors are hereby further authorized to do and perform all acts and pay all principal, interest, fees, expenses and other amounts described in the DIP Loan Documents as such become due pursuant to the DIP Loan Documents and this Interim Order, including, without limitation, all closing fees (including arranger fees), administrative fees, commitment fees, letter of credit fees, escrow agent fees and reasonable attorneys' fees, financial advisors' and accountants' fees and disbursements arising under the DIP Loan Documents and this Interim Order, which amounts shall not be subject to further approval of this Court and shall be non-refundable.  Upon their execution and delivery by the Debtors, the DIP Loan Documents shall represent valid and binding obligations of the applicable Debtors enforceable against such Debtors in accordance with their terms.  Each officer of a Debtor acting singly is hereby authorized to execute and deliver each of the DIP Loan Documents, such execution and delivery to be conclusive of their respective authority to act in the name of and on behalf of the Debtors.

14

(b) <u>Authorization to Incur DIP Obligations</u>. To enable the Debtors to continue to operate their business, during the period from the entry of this Interim Order through and including the earlier of the entry of a Final Order (as defined below) or [insert 45th day after entry of Interim Order _____ ___, 2010] or such later date to which the DIP Administrative Agent consents (the "**Interim Period**"), and subject to the terms and conditions of this Interim Order and the DIP Loan Documents, the Borrower is hereby authorized to (i) borrow DIP Loans under, or as otherwise provided in, the DIP Facility in an aggregate outstanding principal amount not to exceed $425 million; and (ii) repay in cash and cash collateralize, as applicable, all of the Existing DIP Obligations and the Prepetition Obligations under the respective Existing Credit Facilities in accordance with the provisions of Paragraph 4 hereof. Upon the expiration of the Interim Period, the Borrower's authority to borrow further DIP Loans and use Cash Collateral, if any, will be governed by the terms of the Final Order, and if no such Final Order has been entered by the expiration of the Interim Period, the Debtors' right to borrow DIP Loans and use Cash Collateral shall automatically terminate as provided in this Interim Order. All DIP Obligations of the Borrower shall be unconditionally guaranteed by each of the Guarantors on a joint and several basis, in each case as further provided in the DIP Loan Documents.

(c) <u>Application of DIP Facility and DIP Collateral Proceeds</u>. The proceeds of the DIP Facility and DIP Collateral (in each case net of any amounts used to pay fees, costs and expenses pursuant to, and in accordance with, the DIP Loan Documents and this Interim Order) shall be used in accordance with the terms and conditions of the DIP Loan Documents and this Interim Order solely for (i) payment in cash and cash collateralization, as applicable, of all of the Existing DIP Obligations and the Prepetition Obligations under the respective Existing Credit Facilities in accordance with the provisions of Paragraph 4 hereof; (ii) working capital; (iii) other

general corporate purposes of the Debtors (including intercompany loans and investments (including to and in foreign subsidiaries) solely to the extent permitted by the DIP Loan Documents and this Interim Order); (iv) payment of any related transaction costs, fees and expenses; and (v) the costs of administration of the Cases. Without limiting the foregoing, upon entry of this Interim Order, the Debtors shall not be permitted to make any payments on account of any prepetition debt or obligation prior to the effective date of the Plan or any other Chapter 11 plan or plans with respect to any of the Debtors, except with respect to the Prepetition Obligations as set forth in this Interim Order or as otherwise provided in the DIP Credit Agreement, any other order of this Court entered prior to the filing of the DIP Motion or any other order of this Court consented to by the DIP Administrative Agent. A copy of a condensed version of the Debtors' initial 13-week cash flow forecast is attached as <u>Exhibit A</u> hereto.

(d)     <u>Conditions Precedent</u>. The DIP Secured Parties shall have no obligation to make any DIP Loan or provide any other extension of credit or financial accommodation in respect of the DIP Facility or otherwise during the Interim Period unless and until all conditions precedent to the making of any such DIP Loan or other extension of credit or financial accommodation under the DIP Loan Documents and this Interim Order have been satisfied in full or waived by the requisite DIP Secured Parties in accordance with the DIP Loan Documents and this Interim Order.

(e)     <u>DIP Liens</u>. Effective immediately upon the entry of this Interim Order, as set forth more fully in this Interim Order, the DIP Administrative Agent (as provided in the DIP Loan Documents and for itself and the ratable benefit of the other DIP Secured Parties) is hereby granted the following Liens (which shall immediately, and without any further action by any Person, be valid, binding, permanent, perfected, continuing, enforceable and non-avoidable) on

all property of the Debtors, now existing or hereinafter acquired, including, without limitation, all cash and cash equivalents (whether maintained with any of the DIP Agents or otherwise), and any investment in such cash or cash equivalents, money, inventory, goods, accounts receivable, other rights to payment, intercompany loans and other investments, investment property, contracts, contract rights, claims, causes of action, properties, plants, equipment, machinery, general intangibles, payment intangibles, accounts, deposit accounts, documents, instruments, chattel paper, documents of title**,** letters of credit, letter of credit rights, supporting obligations, leases and other interests in leaseholds, real property, fixtures, patents, copyrights, trademarks, trade names, other intellectual property, intellectual property licenses, capital stock of subsidiaries (subject to the restriction set forth below), tax refunds, insurance proceeds, commercial tort claims, membership interests and other equity ownership interests, in joint ventures and other non-wholly owned entities affiliated with the Debtors (collectively, the **"Joint Venture Entities"**) (subject to the restrictions set forth below), all other Collateral (as defined in the DIP Credit Agreement) and all other "property of the estate" (within the meaning of the Bankruptcy Code) of any kind or nature, real or personal, tangible, intangible or mixed, now existing or hereafter acquired or created, and all rents, products, substitutions, accessions, profits, replacements and cash and non-cash proceeds of all of the foregoing; <u>provided</u>, <u>however</u>, that notwithstanding any provision herein or in any DIP Loan Document to the contrary, (i) no Debtor organized under U.S. law shall be required to pledge in excess of 65% of the voting capital stock of its direct foreign subsidiaries or any of the capital stock of its indirect foreign subsidiaries, and (ii) the DIP Collateral (as defined below) shall not include any of: (A) Avoidance Actions (as defined below) or proceeds of Avoidance Actions, or (B) any L/C Cash Collateral Account (as defined below) or any funds deposited therein (or proceeds from the

investment of such funds deposited in such L/C Cash Collateral Account) until such funds are released from such L/C Cash Collateral Account in accordance with this Interim Order (all of the foregoing collateral referenced in this subparagraph (c) (subject to the aforementioned express exclusions) is collectively referred to as the "**DIP Collateral**," and all such Liens granted to the DIP Administrative Agent, for the ratable benefit of the DIP Secured Parties pursuant to this Interim Order and the DIP Loan Documents, the "**DIP Liens**"):

(I)     pursuant to section 364(c)(2) of the Bankruptcy Code, a perfected, binding, continuing, enforceable, non-avoidable, first priority Lien on all unencumbered DIP Collateral other than the Debtors' claims and causes of action under sections 502(d), 544, 545, 547, 548, 549, 550 and 553 of the Bankruptcy Code, and any other avoidance or similar action under the Bankruptcy Code or similar state law (collectively, the "**Avoidance Actions**") and the proceeds thereof, whether received by judgment, settlement or otherwise;

(II)    pursuant to section 364(c)(3) of the Bankruptcy Code, a perfected junior Lien upon all DIP Collateral that is subject to (x) valid, enforceable, non-avoidable and perfected Liens in existence on the Petition Date and which are identified on Schedule 6.2 of the DIP Credit Agreement, and are senior to the Liens securing the Existing Credit Facilities, after giving effect to any intercreditor or subordination agreement, and (y) valid, enforceable and non-avoidable Liens in existence on the Petition Date that are perfected subsequent to the Petition Date as permitted by section 546(b) of the Bankruptcy Code and which are identified on Schedule 6.2 of the DIP Credit Agreement, and are senior to the Liens securing the Existing Credit Facilities, after giving effect to any intercreditor or subordination agreement, in each case, other than Liens which are expressly stated to be primed by the Liens to be granted to the DIP Administrative Agent described in clause (III) below (subject to such exception, the "**Prepetition Senior Liens**"); and

(III)   pursuant to section 364(d)(1) of the Bankruptcy Code, a perfected first priority, senior priming Lien on all DIP Collateral (including, without limitation, Cash Collateral) that is senior to (x) the Liens securing any or all of the Existing DIP Obligations and the Prepetition Obligations, or (y) except for the Prepetition Senior Liens, any other Liens in favor of any other Person, including, without limitation, all Liens junior to the Liens securing any or all of the Existing DIP Obligations and the Prepetition Obligations (the Liens referenced in clauses (x) and (y), collectively, the

"**Primed Liens**"), which Primed Liens, together with any Liens granted on or after the Petition Date to provide adequate protection in respect of any Primed Liens, shall be primed by and made subject and subordinate to the perfected first priority senior priming DIP Liens.

(f)　　　DIP Lien Priority.　Notwithstanding anything to the contrary contained in this Interim Order or the other DIP Loan Documents, and for the avoidance of doubt, the DIP Liens granted to the DIP Administrative Agent for the benefit of the DIP Secured Parties shall in each and every case be first priority senior Liens that (i) are subject only to the Prepetition Senior Liens and, solely to the extent provided in this Interim Order and the DIP Loan Documents, the payment of the Carve-Out, and (ii) except as provided in clause (i), are senior to all other prepetition and postpetition Liens of any other Person (including, without limitation, the Primed Liens).　The DIP Liens and the DIP Super-Priority Claims (as defined below) (i) shall not be subject to sections 506(c), 510, 549, 550 or 551 of the Bankruptcy Code or the "equities of the case" exception of section 552 of the Bankruptcy Code, (ii) shall not be subordinate to, or pari passu with, (x) any Lien that is avoided and preserved for the benefit of the Debtors and their estates under section 551 of the Bankruptcy Code, (y) any Liens arising on or after the Petition Date (except to the extent such Liens are expressly permitted under the DIP Loan Documents), or (z) any intercompany or affiliate Liens of the Debtors, and (iii) shall be valid and enforceable against any trustee or any other estate representative appointed in the Cases, upon the conversion of any of the Cases to a case under chapter 7 of the Bankruptcy Code or in any other proceedings related to any of the foregoing (each, a "**Successor Case**"), and/or upon the dismissal of any of the Cases.

(g)　　　Enforceable Obligations.　The DIP Loan Documents shall constitute and evidence the valid and binding DIP Obligations of the applicable Debtors, which DIP

CH\1138322.15

Obligations shall be enforceable against such Debtors, their estates and any successors thereto (including, without limitation, any trustee or other estate representative in any Case or Successor Case), and their creditors, in accordance with their terms. No obligation, payment, transfer or grant of security under the DIP Credit Agreement, the other DIP Loan Documents or this Interim Order shall be stayed, restrained, voidable, avoidable or recoverable under the Bankruptcy Code or under any applicable law (including, without limitation, under sections 502(d), 544, 547, 548 or 549 of the Bankruptcy Code or under any applicable state Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act or similar statute or common law), or subject to any avoidance, reduction, setoff, recoupment, offset, recharacterization, subordination (whether equitable, contractual or otherwise) counterclaim, cross-claim, defense or any other challenge under the Bankruptcy Code or any applicable law or regulation by any Person.

(h) <u>Super-Priority Administrative Claim Status</u>. In addition to the DIP Liens granted herein, effective immediately upon entry of this Interim Order, all of the DIP Obligations shall constitute allowed super-priority administrative claims pursuant to section 364(c)(1) of the Bankruptcy Code, which shall have priority, subject only to the payment of the Carve-Out to the extent specifically provided in the DIP Loan Documents and this Interim Order, over all administrative expense claims (including all Environmental Claims (as defined in the Plan Support Agreement) and Tort Claims (as defined in the Plan Support Agreement)), adequate protection and other diminution claims, unsecured claims and all other claims against the applicable Debtors, now existing or hereafter arising, of any kind or nature whatsoever, including, without limitation, administrative expenses or other claims of the kinds specified in, or ordered pursuant to, sections 105, 326, 328, 330, 331, 503(a), 503(b), 506(c), 507(a), 507(b), 546, 726, 1113 and 1114 or any other provision of the Bankruptcy Code, whether or not such

expenses or claims may become secured by a judgment Lien or other non-consensual Lien, levy or attachment (the "**DIP Super-Priority Claims**"). The DIP Super-Priority Claims shall for purposes of section 1129(a)(9)(A) of the Bankruptcy Code be considered administrative expenses allowed under section 503(b) of the Bankruptcy Code, shall be against each other Debtor on a joint and several basis, and shall be payable from and have recourse to all prepetition and postpetition property of the Debtors and all proceeds thereof, including, without limitation, all Avoidance Actions (and all proceeds thereof). Other than as provided in the DIP Credit Agreement and this Interim Order with respect to payment of the Carve-Out, no costs or expenses of administration, including, without limitation, professional fees allowed and payable under sections 327, 328, 330, and 331 of the Bankruptcy Code, or otherwise, that have been or may be incurred in these Cases, or in any Successor Cases, and no priority claims are, or will be, senior to, prior to or on a parity with the DIP Liens and the DIP Super-Priority Claims or the DIP Obligations, or with any other claims of the DIP Secured Parties arising hereunder.

3.     **Authorization to Use Cash Collateral and Proceeds of the DIP Facility.**

Subject to the terms and conditions of this Interim Order and the DIP Loan Documents, (a) each applicable Debtor is authorized to use proceeds of DIP Loans from and after the Closing Date (as defined in the DIP Credit Agreement), and (b) each applicable Debtor is authorized to use all Cash Collateral, and each Debtor shall be enjoined and prohibited from any time using proceeds of DIP Loans, Cash Collateral or other DIP Collateral except in accordance with the terms and conditions of this Interim Order and the DIP Loan Documents. The applicable Debtors' right to use proceeds of DIP Loans, Cash Collateral and other DIP Collateral shall terminate automatically upon the occurrence of the earlier of (i) the Term Loan Maturity Date (as defined in the DIP Credit Agreement) or (ii) notice of such termination by the DIP Administrative Agent to the Debtors after the occurrence and during the continuance of an Event

of Default under, and as defined in, the DIP Credit Agreement (each, an "**Event of Default**") (the applicable termination date specified in clause (i) or (ii) above, the "**Cash Collateral Termination Date**").

4. **Payoff of Existing DIP Obligations and Prepetition Obligations**. Subject to the occurrence of the Closing Date (as defined in the DIP Credit Agreement), the Debtors shall use the proceeds of DIP Loans and Cash Collateral to repay in full in cash, and cash collateralize as applicable, the Existing DIP Obligations and the Prepetition Obligations in the manner required by the Existing DIP Loan Documents and the Prepetition Loan Documents, respectively, and in accordance with the following provisions:

(a) On the business day of the receipt by the Existing DIP Administrative Agent of written notice of entry of this Interim Order, the Existing DIP Administrative Agent shall deliver to the Debtors and the DIP Administrative Agent a duly executed payoff letter (the "**DIP Facility Payoff Letter**") (i) setting forth its calculation of all amounts then due and payable in respect of the Existing DIP Obligations, including the unpaid principal balance of outstanding loans, the face amounts of outstanding letters of credit, accrued and unpaid interest, swap breakage costs (if any) and any other fees, costs and/or expenses due and payable pursuant to the terms of the Existing DIP Loan Documents (the "**Asserted Existing DIP Facility Payoff Amount**"), (ii) agreeing to deliver to the DIP Administrative Agent all DIP Collateral in their possession (and agreeing to take reasonable steps to have any Existing DIP Secured Party deliver to the DIP Administrative Agent all DIP Collateral in such Existing DIP Secured Party's possession), together with any necessary endorsements, immediately upon payment of the Asserted Existing DIP Facility Payoff Amount, and (iii) providing customary further assurance provisions with respect to termination or release of Liens and with respect to the taking of further

actions, including, without limitation, providing reasonable cooperation and assistance (at the Debtors' expense) with respect to effectuating the assignment (to the extent assignable) of existing deposit account control agreements and securities control agreements as requested by the DIP Administrative Agent.  In the event the Debtors dispute the accuracy or validity of the Asserted Existing DIP Facility Payoff Amount, then the Debtors shall deliver to the Existing DIP Administrative Agent and the DIP Administrative Agent, prior to the Closing Date (as defined in the DIP Credit Agreement) and within one business day after the Debtors' receipt of the Existing DIP Facility Payoff Letter, a written notice (the "**Existing DIP Facility Payoff Amount Dispute Notice**") specifying the portion of the Asserted Existing DIP Facility Payoff Amount that the Debtors dispute (such disputed portion, the "**Disputed Asserted Existing DIP Facility Payoff Amount**" and the undisputed portion, the "**Undisputed Asserted Existing DIP Facility Payoff Amount**"). Promptly upon the Debtors' and the DIP Administrative Agent's receipt of the Existing DIP Facility Payoff Letter and, if applicable, the Existing DIP Facility Payoff Amount Dispute Notice, and subject to the occurrence of the Closing Date (as defined in the DIP Credit Agreement), the Debtors shall use the proceeds of DIP Loans under the DIP Credit Agreement and Cash Collateral to irrevocably repay to the Existing DIP Administrative Agent, for its benefit and the benefit of the Existing DIP Secured Parties, the entire Asserted Existing DIP Facility Payoff Amount (including the Disputed Asserted Existing DIP Facility Payoff Amount) in full satisfaction of the Existing DIP Obligations (including by replacing or cash collateralizing, in each case in accordance with the Existing DIP Loan Documents and any agreement entered into by the Debtors providing for the cash collateralization of such letters of credit, letters of credit outstanding under the Existing DIP Loan Documents and the Initial Final DIP Order); provided, that the Existing DIP Administrative Agent shall retain (and not distribute to the Existing DIP

Secured Parties) the Disputed Asserted Existing DIP Facility Payoff Amount pending final resolution of the dispute specified in the Existing DIP Facility Payoff Amount Dispute Notice either by mutual agreement of the parties or by order of the Court. Immediately upon payment of the Asserted Existing DIP Facility Payoff Amount (the date on which such payment occurs, the "**Existing DIP Facility Payment Date**"), (i) all Superpriority Claims (as defined in the Initial Final DIP Order), all DIP Liens (as defined in the Initial Final DIP Order) including, without limitation, all Rolled Liens (as defined in the Initial Final DIP Order), and any other Liens securing any or all of the Existing DIP Obligations shall be automatically terminated, discharged and released in their entirety without any further action of this Court or any other Person, (ii) the Existing DIP Secured Parties shall deliver to the DIP Administrative Agent all DIP Collateral in their possession, together with any necessary endorsements, in each case at the sole cost and expense of the Debtors; <u>provided</u>, that the DIP Liens on such DIP Collateral shall remain valid, enforceable and effective with the priority specified in this Interim Order and the other DIP Loan Documents at all times, notwithstanding that such DIP Collateral may not have been delivered to the DIP Administrative Agent, (iii) each deposit account control agreement and each securities account control agreement entered into in connection with the Existing DIP Loan Documents shall be, at the sole discretion of the DIP Administrative Agent, either (x) assigned, to the extent such agreement can be assigned, to the DIP Administrative Agent on terms and conditions satisfactory to the DIP Administrative Agent or (y) automatically terminated without any further action of this Court or any other Person, and (iv) the Existing DIP Agents shall take all reasonable actions requested by any of the DIP Administrative Agent or the Debtors to effect or evidence the foregoing (including, without limitation, the execution and delivery of UCC-3 termination statements, mortgage releases and other instruments and documents evidencing the

release of any and all Liens securing any or all of the Existing DIP Obligations), in each case at the sole cost and expense of the Debtors. Nothing in this paragraph shall require the DIP Secured Parties to loan any funds or provide any other financial accommodations that they are not otherwise required to loan or provide under the terms of the DIP Credit Agreement and this Interim Order.

(b)     On the business day of the receipt by the Prepetition Administrative Agent of written notice of entry of this Interim Order, the Prepetition Administrative Agent shall deliver to the Debtors and the DIP Administrative Agent a duly executed payoff letter (the "**Prepetition Credit Facility Payoff Letter**") (i) setting forth its calculation of all amounts then due and payable in respect of the Prepetition Obligations, including the unpaid principal balance of outstanding loans, the face amounts of outstanding letters of credit, accrued and unpaid interest (including default interest through the Prepetition Credit Facility Payment Date (as defined below)), swap breakage costs (if any) and any other fees, costs and/or expenses due and payable pursuant to the terms of the Prepetition Loan Documents (the "**Asserted Prepetition Credit Facility Payoff Amount**"), (ii) agreeing to deliver to the DIP Administrative Agent all DIP Collateral in their possession (and agreeing to take reasonable steps to have any Prepetition Secured Party deliver to the DIP Administrative Agent all DIP Collateral in such Prepetition Secured Party's possession), together with any necessary endorsements, immediately upon payment of the Asserted Prepetition Credit Facility Payoff Amount, and (iii) providing customary further assurance provisions with respect to termination or release of Liens and with respect to the taking of further actions. In the event the Debtors dispute the accuracy or validity of the Asserted Prepetition Credit Facility Payoff Amount, then the Debtors shall deliver to the Prepetition Administrative Agent and the DIP Administrative Agent, prior to the Closing Date

CH\1138322.15

(as defined in the DIP Credit Agreement) and within one business day after the Debtors' receipt of the Prepetition Credit Facility Payoff Letter, a written notice (the "**Prepetition Credit Facility Payoff Amount Dispute Notice**") specifying the portion of the Asserted Prepetition Credit Facility Payoff Amount that the Debtors dispute (such disputed portion, the "**Disputed Asserted Prepetition Credit Facility Payoff Amount**" and the undisputed portion, the "**Undisputed Asserted Prepetition Credit Facility Payoff Amount**"). Promptly upon the Debtors' and the DIP Administrative Agent's receipt of the Prepetition Credit Facility Payoff Letter and, if applicable, the Prepetition Credit Facility Payoff Amount Dispute Notice, and subject to the occurrence of the Closing Date (as defined in the DIP Credit Agreement), the Debtors shall use the proceeds of DIP Loans under the DIP Credit Agreement and Cash Collateral to repay to the Prepetition Administrative Agent, for its benefit and the benefit of the Prepetition Secured Parties, the entire Asserted Prepetition Credit Facility Payoff Amount (including the Disputed Asserted Prepetition Credit Facility Payoff Amount) in full satisfaction of the Prepetition Obligations; provided, that the Prepetition Administrative Agent shall retain (and not distribute to the Prepetition Secured Parties) the Disputed Asserted Prepetition Credit Facility Payoff Amount pending final resolution of the dispute specified in the Prepetition Credit Facility Payoff Amount Dispute Notice either by mutual agreement of the parties or by order of the Court. Immediately upon payment of the Asserted Prepetition Credit Facility Payoff Amount (the date on which such payment occurs, the "**Prepetition Credit Facility Payment Date**"), (i) all adequate protection duties or obligations owed by the Debtors to or for the benefit of any of the Prepetition Secured Parties (including, without limitation, all Adequate Protection Liens, 507(b) Claims and all other Adequate Protection Obligations (as each of the foregoing three terms are defined in the Initial Final DIP Order) provided to or for the benefit of such parties)

CH\1138322.15

under the terms of any of the Initial Final DIP Order and the Existing DIP Loan Documents shall be automatically terminated, discharged and released in their entirety without any further action of this Court or any other Person, (ii) all Prepetition Liens (as defined in the Initial Final DIP Order) and all other Liens securing any or all of the Prepetition Obligations shall be automatically terminated, discharged and released in their entirety without any further action of this Court or any other Person, (iii) the Prepetition Secured Parties shall deliver to the DIP Administrative Agent all DIP Collateral in their possession, together with any necessary endorsements, in each case at the sole cost and expense of the Debtors; provided, that the DIP Liens on such DIP Collateral shall remain valid, enforceable and effective with the priority specified in this Interim Order and the other DIP Loan Documents at all times, notwithstanding that such DIP Collateral may not have been delivered to the DIP Administrative Agent, (iv) each deposit account control agreement and each securities account control agreement entered into in connection with the Prepetition Loan Documents, at the sole discretion of the DIP Administrative Agent, shall be either (x) assigned, to the extent such agreement can be assigned, to the DIP Administrative Agent on terms and conditions satisfactory to the DIP Administrative Agent or (y) automatically terminated without any further action of this Court or any other Person, and (v) the Prepetition Secured Parties shall take all reasonable actions requested by any of the DIP Administrative Agent and/or the Debtors to effect or evidence the foregoing (including, without limitation, the execution and delivery of UCC-3 termination statements, mortgage releases and other instruments and documents evidencing the release of any and all Liens securing any or all of the Prepetition Obligations), in each case at the sole cost and expense of the Debtors.  Nothing in this paragraph shall require the DIP Secured Parties to loan any funds

or provide any other financial accommodations that they are not otherwise required to loan or provide under the terms of the DIP Credit Agreement and this Interim Order.

(c)     Subsequent to the Prepetition Credit Facility Payment Date and the Existing DIP Facility Payment Date, respectively, (i) the Debtors shall promptly pay and/or reimburse the applicable Prepetition Secured Parties and Existing DIP Secured Parties for any and all fees, costs and expenses and losses and damages (including, without limitation, any fees, costs, losses, damages and expenses contemplated by section 10.5 of the Prepetition Credit Agreement or section 9.5 of the Existing DIP Credit Agreement) incurred thereafter to the extent the Prepetition Credit Agreement or the Existing DIP Credit Agreement, as applicable, expressly entitles them to such payment, indemnity or reimbursement after termination of the Prepetition Credit Agreement and the Existing DIP Credit Agreement, respectively (subject to all parties' reservation of rights on whether such fees, costs, losses, damages or expenses are entitled to payment, indemnity or reimbursement by the Debtors); and (ii) such amounts shall, until paid in full in cash, constitute superpriority administrative expense claims under section 503(b)(1) of the Bankruptcy Code (which shall be subject and junior in all respects to the DIP Super-Priority Claims, DIP Liens and other DIP Protections of the DIP Secured Parties) but senior to all other administrative expense claims.

(d)     Immediately upon the occurrence of the Prepetition Credit Facility Payment Date and the Existing DIP Facility Payment Date, the Initial Final DIP Order shall have no further force and effect, except that: (i) the restrictions in Paragraph 20 of the Initial Final DIP Order on the payment of the Creditors' Committee's professional fees incurred in connection with the Lender Litigation shall remain in full force and effect so long as the Lender Litigation remains pending (provided that nothing in this Interim Order shall affect the Creditors'

Committee's right, if any, under the Initial Final DIP Order or otherwise to seek allowance and payment of additional professional fees and expenses of its professionals in connection with the Lender Litigation (as defined below) otherwise restricted by Paragraph 20 of the Initial Final DIP Order); and (ii) Paragraphs 4, 12 and 19 of the Initial Final DIP Order shall remain in full force and effect and be binding upon the Debtors and any successor thereto (including, without limitation, any chapter 7 or chapter 11 trustee appointed or elected for any of the Debtors), the Committees and any other party in interest in these Cases. As a consequence of the foregoing and the stipulations and admissions contained in Paragraphs 4, 12 and 19 of the Initial Final DIP Order, in each case except to the extent that any such stipulations and admissions have been expressly challenged in respect of the Prepetition Term Loan Facility by the Creditors' Committee in the Lender Litigation (as defined below), (i) the Prepetition Debt shall constitute allowed claims, not subject to counterclaim, setoff, subordination, recharacterization, recovery, defense or avoidance for all purposes in these Chapter 11 cases and any subsequent Chapter 7 case, (ii) the liens securing the Prepetition Debt on the Prepetition Collateral (as defined in the Initial Final DIP Order) shall be deemed to be legal, valid, binding, perfected and of the priority described in Paragraph 4(b) of the Initial Final DIP Order, not subject to recharacterization, subordination, avoidance or reduction, (iii) the release of the Claims and Defenses (as defined in the Initial Final DIP Order) by the Debtors shall be binding on all parties in interest in the Cases and any case under Chapter 7 of the Bankruptcy Code and (iv) the Prepetition Debt, the liens securing the Prepetition Debt, the Prepetition Administrative Agent, the Prepetition Lenders and the Released Parties (as defined in the Initial Final DIP Order) shall not be subject to any other or further challenge by any party in interest seeking to exercise the rights of the Debtors' estates, including, without limitation, any successor thereto (including, without limitation, any estate

CH\1138322.15

representative or a chapter 7 or chapter 11 trustee appointed or elected for any of the Debtors). Such stipulations and admissions shall be binding on all parties in interest in respect of the Prepetition Term Loan Facility if the Court approves the proposed settlement of the Lender Litigation pursuant to a separate motion to be made by the Debtors' under Federal Bankruptcy Rule 9019.

(e) The Debtors are hereby authorized to execute and deliver one or more agreements providing for the establishment of one or more letter of credit cash collateral accounts (each, a "**L/C Cash Collateral Account**") in which amounts shall be deposited in accordance with the Existing Credit Facilities and the Initial Final DIP Order to cash collateralize the Existing Letters of Credit, which letters of credit may be extended or renewed on the terms and conditions set forth in such agreement. The letter of credit issuer (or agent therefor) (the "L/C Bank") holding such L/C Cash Collateral Account shall have a perfected, unavoidable first priority lien, senior to all other prepetition and postpetition liens, under section 364(c)(2) of the Bankruptcy Code, on any L/C Cash Collateral Account and any investment of the funds contained therein until such funds are released from such L/C Cash Collateral Account in accordance with this Interim Order, to secure the letter of credit issuer's obligations in respect of the Existing Letter(s) of Credit being secured by such L/C Cash Collateral Account), and a superpriority administrative expense claim under Section 364(c)(1) junior to the DIP Super-Priority Claims and senior to all other administrative expense claims against the Debtors' estates. Subject to the immediately following sentence, the Debtors, the estates and creditors (and any successors thereto, including any Chapter 7 trustee) shall not have any authority, and are hereby prohibited from requesting authority, (i) under section 363 of the Bankruptcy Code or otherwise to use the funds deposited (or any investment of those funds) in any of the L/C Cash Collateral

Accounts for any purpose at any time during these Cases or in any Chapter 7 case of any Debtor converted thereto or (ii) to grant or suffer to exist a lien of any priority on any L/C Cash Collateral Account or the funds therein (or any investment of those funds) (in each case until such funds are released from such L/C Cash Collateral Account in accordance with this Interim Order) to secure any other obligations of the Debtors or their estates. Notwithstanding the foregoing, the DIP Liens shall attach to the Debtors' rights with respect to the L/C Cash Collateral Accounts and the funds deposited therein (and any proceeds of investments of such deposited funds), and any letter of credit cash collateral agreement shall provide that as and when any Existing Letter of Credit terminates or expires, the L/C Bank shall return to the Debtors that portion of the cash deposited in the L/C Cash Collateral Account securing such Existing Letter of Credit as set forth in any such agreement, and thereafter the L/C Bank shall have no lien, claim or other interest in such released funds.

(f) Notwithstanding the foregoing, the Debtors shall hold in escrow $5,000,000 in the aggregate (the "**Settlement Amount**") in respect of the repayment of the Prepetition Term Loan Facility pending approval by the Court of the proposed settlement of the civil action captioned *Official Committee of Unsecured Creditors of Tronox Incorporated et al., on behalf of the Estates of Tronox Incorporated et al. v. Credit Suisse et al.* (Case No. 09-01388) (the "**Lender Litigation**"). In the event that such settlement is approved by the Court in a final, non-appealable order, the Settlement Amount shall be retained by the Debtors. In the event that such settlement is not approved by the Court by a final, non-appealable order, the Settlement Amount shall be paid ratably to the Prepetition Secured Parties in satisfaction of the amounts owed under the Prepetition Term Loan Facility, and the Creditors' Committee's shall have the right to seek disgorgement of all or any portion of such amounts paid to the Prepetition Secured

Parties solely in respect of the Prepetition Term Loan Facility (including the Settlement Amount) pursuant to a final, non-appealable resolution of the Lender Litigation. Nothing in this Interim Order shall be construed to release, discharge or constitute a waiver of any of the Creditors' Committee rights or claims in the Lender Litigation. If the Creditors' Committee continues to prosecute the Lender Litigation for any reason, then the Debtors shall deposit an amount not less than $15,000,000 with the Prepetition Administrative Agent in respect of the professional fees to be incurred by the Prepetition Secured Parties in connection with the Lender Litigation. If the proposed settlement of the Lender Litigation is approved by the Court in a final, non-appealable order, then the fees and expenses of the Creditors' Committee's professionals in connection with the Lender Litigation shall not be subject to the restrictions set forth in Paragraph 20 of the Initial Final DIP Order. For the avoidance of doubt, any amount paid to satisfy the obligations owing in respect of the Prepetition Revolving Facility, or to cash collateralize the Prepetition Letters of Credit, shall not be subject to disgorgement under any circumstances.

5. **Automatic Postpetition Lien Perfection**. This Interim Order shall be sufficient and conclusive evidence of the validity, enforceability, perfection and priority of the DIP Liens without the necessity of (a) filing or recording any financing statement, deed of trust, mortgage, or other instrument or document which may otherwise be required under the law of any jurisdiction, (b) obtaining consents from any landlord, licensor, or other party in interest, (c) taking possession of any DIP Collateral, the exercising of control over any lock box, deposit account or securities account or escrow account, or the taking of any action to have security interests or liens noted on certificates of title or similar documents, or (d) taking any other action to validate or perfect the DIP Liens or to entitle the DIP Liens to the priorities granted herein. Notwithstanding the foregoing, the DIP Administrative Agent may, in its sole discretion, file

financing statements, mortgages, security agreements, notices of Liens and other similar documents, and is hereby granted relief from the automatic stay of section 362 of the Bankruptcy Code in order to do so, and all such financing statements, mortgages, security agreements, notices and other agreements or documents shall be deemed to have been filed or recorded at the time and on the Closing Date (as defined in the DIP Credit Agreement) and shall constitute DIP Loan Documents. The applicable Debtors shall execute and deliver to the DIP Administrative Agent all such financing statements, mortgages, notices and other documents as such parties may reasonably request to evidence, confirm, validate or perfect, or to insure the contemplated priority of, the DIP Liens granted pursuant hereto. Without limiting the foregoing, the DIP Administrative Agent may file a photocopy of this Interim Order as a financing statement with any recording officer designated to file financing statements or with any registry of deeds or similar office in any jurisdiction in which any Debtor has real or personal property, and in such event, the subject filing or recording officer shall be authorized to file or record such copy of this Interim Order. Any provision of any lease, loan document, easement, use agreement, proffer, covenant, license, contract, organizational document, or other instrument or agreement that requires the payment of any fees or obligations to any governmental entity or non-governmental entity in order for the Debtors to pledge, grant, mortgage, sell, assign, or otherwise transfer any fee or leasehold interest or the proceeds thereof or other DIP Collateral, is and shall be deemed to be inconsistent with the provisions of the Bankruptcy Code, and shall have no force or effect with respect to the DIP Liens on such leasehold interests or other applicable DIP Collateral or the proceeds of any assignment and/or sale thereof by any Debtor, in favor of any DIP Secured Parties in accordance with the terms of the DIP Loan Documents and this Interim Order.

CH\1138322.15

6. **Carve Out**. Subject to the terms and conditions contained in this Paragraph 6, each of the DIP Liens and DIP Super-Priority Claims shall be subject and subordinate to the Carve-Out (as defined below):

(a) For purposes of this Interim Order, "Carve-Out" means (i) all unpaid fees required to be paid in these Cases to the clerk of the Bankruptcy Court and to the office of the United States Trustee under 28 U.S.C. §1930(a), whether arising prior to or after the delivery of the Carve-Out Trigger Notice; (ii) (x) all unpaid fees and expenses incurred by professionals retained by the Debtors or the Creditors' Committee in these Cases (collectively, the **"Professionals"**) and the professionals retained by the Ad Hoc Noteholder Committee, in each case, that are incurred prior to the first business day after the delivery by the DIP Administrative Agent of a Carve-Out Trigger Notice (as defined below) and are finally allowed by the Court under sections 105(a), 330 and 331 of the Bankruptcy Code or otherwise, and that remain unpaid after application of available funds remaining in the Debtors' estates for such professionals and creditors and (y) in an aggregate amount not to exceed $5,000,000 (the **"Carve-Out Cap"**), all unpaid and allowed fees and expenses of Professionals that are incurred on or after the first business day after the delivery of a Carve-Out Trigger Notice and that remain unpaid after application of available funds remaining in the Debtors' estates for such professionals and creditors (clauses (i), (ii)(x) and (ii)(y), collectively, the **"Carve-Out"**). The term **"Carve-Out Trigger Notice"** shall mean a written notice delivered by the DIP Administrative Agent to the Debtors' lead counsel, the U.S. Trustee, and lead counsel to the Creditors' Committee, which notice may be delivered at any time following the occurrence and during the continuation of any Event of Default under the DIP Credit Agreement and the commencement by the DIP Administrative Agent of the exercise of any default-related rights and remedies under the DIP

Credit Agreement, which notice shall expressly state that the Carve-Out in clause (ii)(y) above (and the Carve-Out Cap) is invoked.

(b)     Following the delivery of the Carve-Out Trigger Notice, any payments actually made pursuant to Bankruptcy Code sections 327, 328, 330, 331, 503 or 1103 or otherwise, to such Professionals shall (i) not be paid from the proceeds of any DIP Loan, DIP Collateral, Prepetition Collateral or Cash Collateral until such time as all retainers, if any, held by such Professionals have been reduced to zero, and (ii) in the case of any payments made on account of any fees and expenses described in clause (ii)(y) of the definition of Carve-Out, reduce the Carve-Out Cap on a dollar-for-dollar basis.  So long as no Carve-Out Trigger Notice has been delivered, the Debtors shall be permitted to pay compensation and reimbursement of expenses allowed and payable under 11 U.S.C. §§ 328, 330 and 331, as the same may be due and payable, and any such compensation and expenses previously paid, or accrued but unpaid, prior to the delivery of the Carve-Out Trigger Notice shall not reduce the Carve-Out or the Carve-Out Cap.

(c)     Notwithstanding any provision in this Paragraph 6 to the contrary, no portion of the Carve-Out, Cash Collateral, DIP Collateral or proceeds of the DIP Facility shall be utilized for the payment of professional fees and disbursements to the extent restricted under Paragraph 14 hereof.

(d)     Notwithstanding any provision herein or in any of the DIP Loan Documents to the contrary, cash proceeds of the DIP Loans in an amount equal to the Carve-Out Cap (as such cap shall be reduced from time to time in accordance with the terms of this Interim Order) (the "**Carve-Out Funds**") shall remain on deposit in the Escrow Account for so long as

the Carve-Out has not been fully satisfied and shall be used solely to fund payments in satisfaction of the Carve-Out in accordance with this Interim Order.

(e)     Nothing herein shall be construed as consent to the allowance of any professional fees or expenses of any of the Debtors, any Committee, any other official or unofficial committee in these Cases, or of any other Person, or shall affect the right of any DIP Secured Party to object to the allowance and payment of such fees and expenses. In addition, the Equity Committee, the members of the Equity Committee, and the Equity Committee's professionals shall not be entitled to the benefit of the Carve-Out.

7.     **Waiver of Section 506(c) Claims**.  As a further condition of the DIP Facility and any obligation of the DIP Secured Parties to make credit extensions pursuant to the DIP Loan Documents (and their consent to the payment of the Carve-Out to the extent provided herein), no costs or expenses of administration of the Cases or any Successor Case shall be charged against or recovered from or against any or all of the DIP Secured Parties, the Cash Collateral or any other DIP Collateral pursuant to section 506(c) of the Bankruptcy Code or otherwise, without the prior written consent of the DIP Administrative Agent, and no such consent shall be implied from any other action, inaction, or acquiescence of any or all of the DIP Secured Parties.

8.     **After-Acquired Property**.  Except as otherwise provided in this Interim Order, pursuant to section 552(a) of the Bankruptcy Code, all property acquired by the Debtors on or after the Petition Date is not, and shall not be, subject to any Lien of any Person resulting from any security agreement entered into by the Debtors prior to the Petition Date, except to the extent that such property constitutes proceeds of property of the Debtors that is subject to a valid, enforceable, perfected, and unavoidable Lien as of the Petition Date which is not subject to subordination under the Bankruptcy Code or other provisions or principles of applicable law.

CH\1138322.15

9.  **Protection of DIP Secured Parties' Rights**.

(a)     Unless the DIP Administrative Agent and the requisite other DIP Secured Parties under the DIP Loan Documents shall have provided their prior written consent or all DIP Obligations have been indefeasibly paid in full in cash, and as applicable fully cash collateralized, in accordance with the provisions of the applicable DIP Loan Documents and all commitments thereunder have been terminated ("**Paid in Full**" or "**Payment in Full**"), there shall not be entered in any Case or in any Successor Case, any order which authorizes any of the following: (i) the obtaining of credit or the incurring of indebtedness that is secured by a security, mortgage, or collateral interest or other Lien on all or any portion of the DIP Collateral and/or that is entitled to administrative priority status, in each case which is superior to or pari passu with the DIP Liens, DIP Super-Priority Claims and other DIP Protections granted pursuant to this Interim Order to the DIP Secured Parties; or (ii) the use of Cash Collateral for any purpose other than to Pay in Full the DIP Obligations or as otherwise permitted in the DIP Loan Documents and this Interim Order.

(b)     The Debtors (and/or their legal and financial advisors in the case of clauses (ii) through (iv) below) will (i) maintain books, records and accounts to the extent and as required by the DIP Loan Documents, (ii) cooperate, consult with, and provide to the DIP Agents all such information as required or allowed under the DIP Loan Documents or the provisions of this Interim Order, (iii) permit representatives of the DIP Agents such rights to visit and inspect any of the Debtors' respective properties, to examine and make abstracts or copies from any of their respective books and records, to conduct a collateral audit and analysis of their respective inventory and accounts, to tour the Debtors' business premises and other properties, and to discuss, and provide advice with respect to, their respective affairs, finances, properties, business

operations and accounts with their respective officers, employees and independent public accountants as and to the extent required by the DIP Loan Documents, and (iv) permit representatives of the DIP Agents to consult with the Debtors' management and advisors on matters concerning the general status of the Debtors' businesses, financial condition and operations.

10. **Proceeds of Subsequent Financing**. Without limiting the provisions and protections of Paragraph 9 above, if at any time prior to the Payment in Full of all DIP Obligations (including subsequent to the confirmation of the Plan or any other Chapter 11 plan or plans with respect to any of the Debtors), the Debtors' estates, any trustee, any examiner with enlarged powers or any responsible officer subsequently appointed, shall obtain credit or incur debt pursuant to sections 364(b), 364(c), 364(d) or any other provision of the Bankruptcy Code in violation of the DIP Loan Documents, then all of the cash proceeds derived from such credit or debt and all Cash Collateral shall immediately be turned over to the DIP Administrative Agent for application to, and until Payment in Full of, the DIP Obligations pursuant to the applicable DIP Loan Documents. Without limiting the foregoing, no cash proceeds derived from such credit or debt or any Cash Collateral may be applied to any Environmental Claims (as defined in the Plan Support Agreement), Tort Claims (as defined in the Plan Support Agreement), or any other administrative claims prior to and until Payment in Full of the DIP Obligations.

11. **Cash Collection**. Except as otherwise provided in the DIP Loan Documents, cash collections (including, but not limited to, payments from customers with respect to accounts receivable) constituting proceeds of DIP Collateral (including Cash Collateral) shall be directed to lock-box, deposit and/or escrow accounts ("**Cash Collection Accounts**") under the sole dominion and control of the DIP Administrative Agent pursuant to a structure satisfactory to the

CH\1138322.15

DIP Administrative Agent. Subject to the obligations in respect of the Carve-Out set forth in Paragraph 6 hereof, upon the direction of the DIP Administrative Agent at any time after the occurrence of an Event of Default (as defined in the DIP Credit Agreement) and not less than three business days' written notice to the Debtors and the Committees (which notice period shall be inclusive of, and not in addition to, any other notice period required under this Interim Order as a condition to enforcing rights and remedies in respect of the DIP Collateral), all proceeds in the Cash Collection Accounts shall be remitted to the DIP Administrative Agent for application to, and until Payment in Full of, the DIP Obligations pursuant to the applicable DIP Loan Documents, and the DIP Administrative Agent may take all action that is reasonably necessary or appropriate to effectuate the foregoing. Unless the DIP Credit Agreement otherwise provides, or the DIP Administrative Agent otherwise agrees in writing, the Debtors shall maintain no accounts except those identified in any order of the Court approving the Debtors' cash management system (the "**Cash Management Order**"). The Debtors and the financial institutions where the Debtors' cash collection accounts are maintained (including those accounts identified in any Cash Management Order), are authorized and directed to remit funds in such Cash Collection Accounts upon receipt of any direction to that effect from the DIP Administrative Agent. The Debtors are authorized to incur obligations and liabilities for treasury, depositary or cash management services, including without limitation, overnight overdraft services, controlled disbursement, automated clearinghouse transactions, return items, overdrafts and interstate depository network services provided on a postpetition basis by any financial institution at which any Cash Collection Account is maintained; provided, however, that (i) any Lien securing any such obligations shall be junior to the DIP Lien on the funds in the cash collection accounts at such financial institution, and (ii) nothing herein shall require any

DIP Secured Party to incur any overdrafts or provide any such services or functions to the Debtors.

12.    **Disposition of DIP Collateral**.    The Debtors shall not sell, transfer, lease, encumber or otherwise dispose of any portion of the DIP Collateral without the prior written consent of the DIP Administrative Agent and the requisite DIP Secured Parties under the DIP Loan Documents (and no such consent shall be implied from any other action, inaction or acquiescence by any DIP Secured Party or any order of this Court), except for sales of inventory in the ordinary course of business and except as otherwise permitted in the DIP Loan Documents and this Interim Order and approved by the Court to the extent required under applicable bankruptcy law.    Except to the extent otherwise expressly provided in the DIP Loan Documents, all proceeds from the sale, transfer, lease, encumbrance or other disposition of any DIP Collateral shall be promptly remitted to the DIP Administrative Agent for application to, and until Payment in Full of, the DIP Obligations pursuant to and in accordance with the applicable DIP Loan Documents.    For the avoidance of doubt, subject to the obligations in respect of the Carve-Out set forth in Paragraph 6 hereof, all proceeds from the sale, transfer, lease, encumbrance or other disposition of any DIP Collateral following the occurrence of any Event of Default shall be applied first to Payment in Full of the DIP Obligations, and only after Payment in Full of the DIP Obligations may any such proceeds be applied to any Environmental Claims (as defined in the Plan Support Agreement), Tort Claims (as defined in the Plan Support Agreement), or any other administrative claims.

13.    **Events of Default**.

(a)    <u>Rights and Remedies Upon Event of Default</u>.    Any automatic stay otherwise applicable to the DIP Secured Parties is hereby modified, without requiring prior notice to or

authorization of, this Court, to the extent necessary to permit the DIP Secured Parties to exercise (i) immediately upon the occurrence and during the continuance of an Event of Default (as defined in the DIP Credit Agreement), all rights and remedies under this Interim Order and the DIP Loan Documents other than those rights and remedies against the DIP Collateral as provided in clause (ii) below, and (ii) upon the occurrence and during the continuance of an Event of Default (as defined in the DIP Credit Agreement) and the giving of five days' prior written notice (the "**Enforcement Notice**") to the Debtors (with a copy to the United States Trustee and the respective lead counsel to the Creditors' Committee), all rights and remedies against the DIP Collateral provided for in any DIP Loan Documents or applicable law (including, without limitation, the right to set off against accounts maintained by the Debtors with any DIP Agent or any other DIP Secured Party); provided, however, that notwithstanding anything to the contrary in clause (ii) above, immediately following the giving of an Enforcement Notice by the DIP Administrative Agent; (w) the Debtors shall deliver and cause the delivery of the proceeds of DIP Collateral to the DIP Administrative Agent for application to, and until Payment in Full of, the DIP Obligations pursuant to the applicable DIP Loan Documents (subject to the obligations in respect of the Carve-Out set forth in Paragraph 6 hereof); (x) the DIP Administrative Agent shall apply such proceeds in accordance with the provisions of the DIP Loan Documents; (y) the Debtors shall have no right to use any such proceeds, any Cash Collateral or other proceeds of DIP Collateral other than towards the Payment in Full of the DIP Obligations and the payment of the Carve-Out, as provided herein and in the applicable DIP Loan Documents; and (z) any obligation otherwise imposed on any or all of the DIP Agents and the other DIP Secured Parties to provide any loan, advance or other financial accommodation to the Debtors pursuant to the DIP Facility shall immediately be suspended. Following the giving of an Enforcement Notice by

the DIP Administrative Agent, the Debtors and the Creditors' Committee shall be entitled to an emergency hearing before this Court solely for the purpose of contesting whether an Event of Default under the DIP Credit Agreement has occurred, and section 105 of the Bankruptcy Code may not be invoked by the Debtor, the Creditors' Committee or any other party in interest to restrict or preclude any DIP Secured Party from exercising any rights or remedies set forth in this Interim Order and the DIP Loan Documents. If the Debtors and the Creditors' Committee do not contest the right of the DIP Secured Parties to exercise their rights and remedies based upon whether an Event of Default (as defined in the DIP Credit Agreement) has occurred within such five day time period or if the Debtors or the Creditors' Committee do timely contest the occurrence of an Event of Default (as defined in the DIP Credit Agreement) and the Court after notice and hearing declines to find that no such Event of Default has occurred, the automatic stay, as to the DIP Secured Parties, shall automatically terminate at the end of such notice period.

(b)     Subject to the provisions of Paragraph 13(a), upon the occurrence of an Event of Default under the DIP Credit Agreement, the DIP Administrative Agent and the other DIP Secured Parties are authorized to exercise their rights and remedies and to proceed against any or all of the DIP Collateral under or pursuant to the DIP Loan Documents, this Interim Order and applicable law, including without limitation, exercising any of the Debtors' rights with respect to the Debtors' interests in the Joint Venture Entities and the Debtors' interests in leaseholds, including without limitation, selling, leasing or otherwise transferring any of the Debtors' interests in any Joint Venture Entity or leasehold notwithstanding any contractual provision that would otherwise prohibit, restrict, condition or delay any or all of the DIP Agents and the other DIP Secured Parties from taking any such action. Subject to the obligations in respect of the Carve-Out set forth in Paragraph 6 hereof, all proceeds realized in connection with the exercise

42

of the rights and remedies of the DIP Secured Parties shall be turned over to the DIP Administrative Agent for application to, and until Payment in Full of, the DIP Obligations pursuant to the applicable DIP Loan Documents.

(c)     Subject to entry of a Final Order, and notwithstanding anything contained herein to the contrary, and without limiting any other rights or remedies of the DIP Administrative Agent or the other DIP Secured Parties contained in this Interim Order or the DIP Loan Documents, or otherwise available at law or in equity, and subject to the terms of the DIP Loan Documents, upon five (5) days' written notice to the Debtors and any landlord, lienholder, licensor or other third party owner of any leased or licensed premises or intellectual property that an Event of Default under the DIP Credit Agreement has occurred and is continuing, the DIP Administrative Agent (i) may, unless otherwise provided in any separate agreement by and between the applicable landlord or licensor and the DIP Administrative Agent (the terms of which shall be reasonably acceptable to the parties thereto), enter upon any leased or licensed premises of the Debtors for the purpose of exercising any remedy with respect to DIP Collateral located thereon and (ii) shall be entitled to all of the Debtors' rights and privileges as lessee or licensee under the applicable license and to use any and all trademarks, trade names, copyrights, licenses, patents or any other similar assets of the Debtors, which are owned by or subject to a Lien of any third party and which are used by Debtors in its businesses, in either the case of subparagraph (i) or (ii) of this Paragraph without interference from lienholders or licensors thereunder, subject to such Lienholders or licensors rights under applicable law, provided, however, that the DIP Administrative Agent, on behalf of the DIP Secured Parties, shall pay only rent and additional rent, fees, royalties or other obligations of the Debtors that first arise after the written notice referenced above from the DIP Administrative Agent and that are payable during

43

the period of such occupancy or use by such DIP Agent calculated on a *per diem* basis. Nothing herein shall require the Debtors, the DIP Agents or the other DIP Secured Parties to assume any lease or license under Bankruptcy Code section 365(a) as a precondition to the rights afforded to the DIP Agents and the other DIP Secured Parties in this Paragraph.

(d)     The automatic stay imposed under Bankruptcy Code section 362(a) is hereby modified pursuant to the terms of the DIP Credit Agreement as necessary to (i) permit the Debtors to grant the DIP Liens and other DIP Protections and to incur all DIP Obligations, (ii) authorize the DIP Secured Parties to retain and apply payments hereunder, and (iii) otherwise to the extent necessary to implement and effectuate the provisions of this Interim Order and the DIP Loan Documents, including, without limitation, the repayment of the Existing DIP Obligations and the Prepetition Obligations.

14.     **Sale Covenant.** Upon the occurrence of any event, condition or circumstance described in clauses (A), (B) or (C) of Section 5.20 of the DIP Credit Agreement (each, a "**Sale Covenant Event**"), the Debtors shall strictly and timely comply with the covenants set forth in Section 5.20 of the DIP Credit Agreement (the "**Sale Covenants**"). The Debtors are authorized and directed to take all actions necessary or prudent to timely and strictly comply with the terms, conditions and milestones set forth in the Sale Covenants, and such terms, conditions and milestones are hereby expressly authorized and approved. To the extent that the Debtors seek approval of an Acceptable Sale Transaction at any point after the occurrence of a Sale Covenant Event, no objection to such Acceptable Sale Transaction by any Person including, without limitation, all parties signatory to the Plan Support Agreement, shall be sustained on account of: the fact that such Acceptable Sale Transaction fails to generate proceeds sufficient to pay in full all administrative expense claims incurred in the Cases and/or Successor Cases as applicable, or

that such administrative expense claims are not otherwise resolved by such Acceptable Sale Transaction. In furtherance of the Debtors' compliance with the Sale Covenants, the signatories to the Plan Support Agreement shall not object to, or otherwise interfere with, the Debtors' compliance with the Sale Covenants, including, without limitation, the Debtors' motion to approve any Acceptable Sale Transaction and the Debtors' consummation of any Acceptable Sale Transaction; provided, however, that such signatories may object to the commercial reasonableness of (A) any bidding procedures for which the Debtors seek approval of the Bankruptcy Court and/or (B) the manner in which such sale process is conducted by the Debtors (except, for the avoidance of doubt, no such signatory shall be permitted to argue that an Acceptable Sale Transaction must be consummated after the Term Loan Maturity Date to be commercially reasonable); provided, further, that the United States may object to any Acceptable Sale Transaction to the extent such Acceptable Sale Transaction (i) purports to release the purchaser from any liability under the environmental laws as an owner or operator of any property acquired by the purchaser pursuant to the Acceptable Sale Transaction or (ii) contains provisions that are contrary to the environmental laws; provided, further, that the bidding procedures to be approved by the Bankruptcy Court shall permit any creditor to submit a bid that meets the qualified bid requirements included in such bidding procedures.

Any Sale Order entered in connection with approval of an Acceptable Sale Transaction shall provide that the assets being sold pursuant to the Acceptable Sale Transaction shall be free and clear of all liens, claims, interests, encumbrances and successor liability claims that have been or could be asserted against any or all of the Debtors' estates or their respective properties, and except to the extent the DIP Administrative Agent otherwise consents in writing, the proceeds from such Acceptable Sale Transaction shall be first applied to the Payment in Full in

cash of the DIP Obligations in accordance with the DIP Loan Documents and this Interim Order prior to payment of any administrative expense claims or any other prepetition unsecured claims against the Debtors' estates.

15. **Restriction on Use of Proceeds**. Notwithstanding anything herein to the contrary, no proceeds from the DIP Facility, Cash Collateral or proceeds of other DIP Collateral (including any prepetition retainer funded by the Existing DIP Facility), or any portion of the Carve-Out may be used by any of the Debtors, the Creditors' Committee, the Equity Committee or any trustee or other estate representative appointed in any Case or any Successor Case, or any other Person to (or to pay any professional fees and disbursements incurred in connection therewith): (a) request authorization to obtain postpetition loans or other financial accommodations pursuant to Bankruptcy Code section 364(c) or (d), or otherwise, other than from the DIP Secured Parties unless expressly permitted in the DIP Loan Documents; (b) investigate, assert, join, commence, support or prosecute any action for any claim, counter-claim, action, proceeding, application, motion, objection, defense, or other contested matter seeking any order, judgment, determination or similar relief against, or adverse to the interests of, in such capacity, any or all of the DIP Agents and the other DIP Secured Parties and their respective officers, directors, employees, agents, attorneys, affiliates, assigns, or successors, with respect to any transaction, occurrence, omission, action or other matter (including formal discovery proceedings in anticipation or in connection thereof), including, without limitation, (i) any Avoidance Actions or other actions arising under chapter 5 of the Bankruptcy Code; (ii) any so-called "lender liability" claims and causes of action; (iii) any action with respect to the amount, validity, enforceability, perfection, priority, characterization and extent of or asserting any defense, counterclaim or offset to the DIP Obligations, or the validity, extent, priority,

enforceability, perfection and characterization of the DIP Liens (or the value of any of the DIP Collateral), DIP Super-Priority Claims, any other DIP Protections; (iv) any action seeking to invalidate, set aside, avoid or subordinate, in whole or in part, the DIP Liens, the DIP Super-Priority Claims or any other DIP Protections; (v) except to contest the occurrence or continuation of any Event of Default (as defined in the DIP Credit Agreement) as permitted in Paragraph 13(a), any action seeking, or having the effect of, preventing, hindering or otherwise delaying any or all of the DIP Secured Parties' assertion, enforcement or realization on the Cash Collateral or other DIP Collateral in accordance with the DIP Loan Documents or this Interim Order; and (vi) any action seeking to modify any of the rights, remedies, priorities, privileges, protections and benefits granted to any or all of the DIP Secured Parties hereunder or under the DIP Loan Documents.

16. **Collateral Rights**.  In the event that any party who has both received notice of the Interim Hearing and holds a Lien on the DIP Collateral that is junior and/or subordinate to any of the DIP Liens in such DIP Collateral receives or is paid the proceeds of such DIP Collateral, or receives any other payment with respect thereto from any other source, prior to Payment in Full of all DIP Obligations under the DIP Loan Documents, such junior or subordinate Lienholder shall be deemed to have received, and shall hold, the proceeds of any such DIP Collateral in trust for the DIP Administrative Agent and the other DIP Secured Parties, and shall immediately turn over such proceeds to the DIP Administrative Agent for application to, and until Payment in Full of, the DIP Obligations pursuant to the applicable DIP Loan Documents.

17. **Preservation of Rights Granted under the Order**.

(a) <u>No Non-Consensual Modification or Extension of Interim Order</u>.  Unless all DIP Obligations shall have been Paid in Full, the Debtors shall not seek, and it shall constitute

an Event of Default under the DIP Credit Agreement (resulting, among other things, in the termination of the Debtors' right to use Cash Collateral and to borrow under the DIP Facility), if there is entered (i) an order amending, supplementing, extending or otherwise modifying this Interim Order or (ii) an order converting or dismissing any of the Cases, in each case, without the prior written consent of the DIP Administrative Agent, and no such consent shall be implied by any other action, inaction or acquiescence.

(b) <u>Dismissal</u>.  If any order dismissing any of the Cases under section 1112 of the Bankruptcy Code or otherwise is at any time entered, such order shall provide (in accordance with sections 105 and 349 of the Bankruptcy Code), to the fullest extent permitted by law, that (i) the DIP Protections shall continue in full force and effect and shall maintain their priorities as provided in this Interim Order until all DIP Obligations have been Paid in Full (and that all DIP Protections shall, notwithstanding such dismissal, remain binding on all parties in interest), and (ii) this Court shall retain jurisdiction, notwithstanding such dismissal, for the purposes of enforcing such DIP Protections and DIP Obligations.

(c) <u>Modification of Interim Order</u>.  Based on the findings set forth in this Interim Order and in accordance with section 364(e) of the Bankruptcy Code, which is applicable to the DIP Facility contemplated by this Interim Order and the DIP Loan Documents, in the event any or all of the provisions of this Interim Order are hereafter reversed, modified, vacated or stayed by a subsequent order of this Court or any other court, the DIP Secured Parties shall be entitled to the protections provided in section 364(e) of the Bankruptcy Code, and no such reversal, modification, vacatur or stay shall affect (i) the validity, priority or enforceability of any DIP Protections or DIP Obligations granted or incurred prior to the actual receipt of written notice by the DIP Agents of the effective date of such reversal, modification, vacatur or

stay or (ii) the validity or enforceability of any DIP Lien, DIP Superpriority Claim or any other DIP Protection or priority authorized or created hereby or pursuant to the DIP Loan Documents and this Interim Order with respect to any DIP Obligations. Notwithstanding any such reversal, modification, vacatur or stay, any use of DIP Collateral (including Cash Collateral) or any DIP Obligations and DIP Protections incurred or granted by the Debtors prior to the actual receipt of written notice by the DIP Administrative Agent of the effective date of such reversal, modification, vacatur or stay shall be governed in all respects by the original provisions of this Interim Order, and the DIP Secured Parties shall be entitled to all of the DIP Protections and all other rights, remedies, Liens, priorities, privileges, protections and benefits granted in section 364(e) of the Bankruptcy Code, this Interim Order and pursuant to the DIP Loan Documents with respect to all use of Cash Collateral and other DIP Collateral and all DIP Obligations.

(d)     <u>Survival of Interim Order</u>.  The provisions of this Interim Order and the DIP Loan Documents, any actions taken pursuant hereto or thereto, and all of the DIP Protections and all other rights, remedies, DIP Liens, DIP Super-Priority Claims, priorities, privileges, protections and benefits granted to any or all of the DIP Secured Parties shall survive, and shall not be modified, impaired or discharged by, the entry of any order confirming any plan of reorganization in any Case, converting any Case to a case under chapter 7, dismissing any of the Cases, withdrawing of the reference of any of the Cases or any Successor Case or providing for abstention from handling or retaining of jurisdiction of any of the Cases in this Court, or terminating the joint administration of these Cases or by any other act or omission.  The terms and provisions of this Interim Order, including all of the DIP Protections and all other rights, remedies, DIP Liens, DIP Super-Priority Claims, priorities, privileges, protections and benefits granted to any or all of the DIP Secured Parties, shall continue in full force and effect

notwithstanding the entry of any such order, and such DIP Protections shall continue in these proceedings and in any Successor Case, and shall maintain their respective priorities as provided by this Interim Order. The DIP Obligations shall not be discharged by the entry of an order confirming the Plan or any other such Chapter 11 plan, the Debtors having waived such discharge pursuant to section 1141(d)(4) of the Bankruptcy Code.

18. **Affiliate Payments; Inter-Debtor Borrowing**s. Except as otherwise permitted pursuant to the terms of the DIP Loan Documents, the DIP Loan Documents or as otherwise agreed in writing by the DIP Administrative Agent and the requisite other DIP Secured Parties under the DIP Loan Documents in their sole discretion, and subject to the remainder of this Paragraph, no Debtor shall make any loans, advances, distributions, transfers or other payments of any kind whatsoever to any other Debtor or any Affiliate. All intercompany claims arising from any permitted postpetition loans, advances, distributions, transfers or other payments from any Debtor to another Debtor shall constitute administrative expense claims against the estate of the applicable borrowing Debtor, and shall be junior and subordinate to the DIP Obligations and shall be subject to the DIP Liens and the DIP Super-Priority Claims.

19. **Other Rights and Obligations**.

(a) _Expenses_. As provided in, and subject to the limitations and exceptions set forth in, the DIP Loan Documents, the applicable Debtors will pay all reasonable fees, costs, expenses and other charges incurred by the respective DIP Agents (including, without limitation, the reasonable fees and disbursements of all counsel for the DIP Agents and any internal or third-party appraisers, consultants and auditors advising any DIP Agent) in connection with the preparation, execution, delivery, syndication and administration of the DIP Loan Documents, this Interim Order, any Final Order and any other agreements, instruments, pleadings or other

documents prepared or reviewed in connection with any of the foregoing, whether or not any or all of the transactions contemplated hereby or by the DIP Loan Documents are consummated. Payment of such fees, costs, expenses and other charges shall be approved and allowed pursuant to this Interim Order and shall not be subject to any further allowance by this Court. Professionals for the DIP Agents (collectively, the "**Lender Professionals**") shall not be required to comply with the U.S. Trustee fee guidelines or submit invoices to the Court, U.S. Trustee, the Creditors' Committee, the Equity Committee or any other party-in-interest absent further court order. Copies of invoices submitted to the Debtors by such Lender Professionals shall be forwarded by the Debtors to the U.S. Trustee, counsel for the Creditors' Committee, and such other parties as the Court may direct. The invoices shall be sufficiently detailed to enable a determination as to the reasonableness of such fees and expenses (without limiting the right of the various professionals to redact privileged, confidential or sensitive information). If the Debtors, U.S. Trustee or counsel for the Creditors' Committee object to the reasonableness of the fees and expenses of any of the Lender Professionals and cannot resolve such objection within ten (10) days of receipt of such invoices, the Debtors, U.S. Trustee or the Creditors' Committee, as the case may be, shall file and serve on such Lender Professionals an objection with the Court (the "**Fee Objection**") limited to the issue of reasonableness of such fees and expenses. The Debtors shall timely pay in accordance with the terms and conditions of this Interim Order the undisputed fees, costs and expenses reflected on any invoice to which a Fee Objection has been timely filed and shall pay the any such remaining fees, costs and expenses owed following a final resolution of the Fee Obligation by agreement or adjudication by the Court.

(b) <u>Binding Effect</u>. The provisions of this Interim Order, including all findings herein, and the DIP Loan Documents shall be binding upon all parties in interest in

these Cases, including, without limitation, the DIP Secured Parties, any Committee and the Debtors and their respective successors and assigns (including any chapter 7 or chapter 11 trustee hereinafter appointed or elected for the estate of any of the Debtors, an examiner appointed pursuant to section 1104 of the Bankruptcy Code or any other fiduciary or responsible person appointed as a legal representative of any of the Debtors or with respect to the property of the estate of any of the Debtors), whether in any of the Cases, in any Successor Cases, or upon dismissal of any such Case or Successor Case; provided, however, that the DIP Secured Parties shall have no obligation to permit the use of Cash Collateral or to extend any financing to any chapter 7 or chapter 11 trustee or other responsible person appointed for the estates of the Debtors in any Case or Successor Case.

(c)     No Waiver.  Neither the failure of the DIP Secured Parties to seek relief or otherwise exercise their respective rights and remedies under this Interim Order, the DIP Loan Documents or otherwise (or any delay in seeking or exercising same), shall constitute a waiver of any of such parties' rights hereunder, thereunder, or otherwise.  Except as expressly provided herein, nothing contained in this Interim Order (including, without limitation, the authorization of the use of any Cash Collateral) shall impair or modify any rights, claims or defenses available in law or equity to any DIP Secured Party, including, without limitation, rights of a party to a swap agreement, securities contract, commodity contract, forward contract or repurchase agreement with a Debtor to assert rights of setoff or other rights with respect thereto as permitted by law (or the right of a Debtor to contest such assertion).  Except as prohibited or limited by this Interim Order, the entry of this Interim Order is without prejudice to, and does not constitute a waiver of, expressly or implicitly, or otherwise impair the DIP Secured Parties under the Bankruptcy Code or under non-bankruptcy law, to (i) request conversion of the Cases to cases

under Chapter 7, dismissal of the Cases, or the appointment of a trustee in the Cases, (ii) propose, subject to the provisions of section 1121 of the Bankruptcy Code, any Chapter 11 plan or plans with respect to any of the Debtors, or (iii) exercise any of the rights, claims or privileges (whether legal, equitable or otherwise) of the DIP Secured Parties.

(d)  No Third Party Rights.  Except as explicitly provided for herein, this Interim Order does not create any rights for the benefit of any third party, creditor, equity holder or any direct, indirect, or incidental beneficiary.  In determining to make any loan or any other financial accommodation (whether under the DIP Credit Agreement, any other DIP Loan Documents or otherwise) or to permit the use of Cash Collateral or in exercising any rights or remedies as and when permitted pursuant to this Interim Order or the DIP Loan Documents, the DIP Secured Parties shall not (i) be deemed to be in control of the operations of the Debtors, (ii) owe any fiduciary duty to the Debtors, their respective creditors, shareholders or estates or (iii) subject only to the right of the Environmental Protection Agency to be heard at the Final Hearing, be deemed to be acting as a "responsible person" or "owner or operator" with respect to the operation or management of the Debtors, so long as the DIP Secured Parties' actions do not constitute, within the meaning of 42 U.S.C. §§ 9601(20)(F), actual participation in the management or operational affairs of a vessel or facility owned or operated by a Debtor, or otherwise cause liability to arise to the federal or statement government or the status of responsible person or managing agent to exist under applicable law (as such terms, or any similar terms, are used in the United States Comprehensive Environmental Response, Compensation and Liability Act 42 U.S.C. §§ 9601, *et seq*., as amended, or any similar federal or state statute).

(e)    <u>No Marshaling</u>.  The DIP Secured Parties shall not be subject to the equitable doctrine of "marshaling" or any other similar doctrine with respect to any of the DIP Collateral.

(f)    <u>Amendments</u>.  The Debtors are authorized and empowered, without further notice and hearing or approval of this Court, to amend, modify, supplement or waive any provision of the DIP Loan Documents in consultation with the Creditors' Committee and with the consent of the DIP Administrative Agent and the other requisite DIP Secured Parties in accordance with the DIP Loan Documents, in each case unless such amendment, modification, supplement or waiver (i) increases the interest rate (other than as a result of the imposition of the default rate), (ii) increases the aggregate lending commitments of all of the DIP Lenders in respect of the DIP Facility, or (iii) changes the Term Loan Maturity Date (as defined in the DIP Credit Agreement).  No waiver, modification, or amendment of any of the provisions hereof shall be effective unless set forth in writing, signed by on behalf of all the Debtors and the DIP Administrative Agent (after having obtained the approval of the requisite DIP Secured Parties as provided in the DIP Loan Documents) and, except as provided herein, approved by this Court.

(g)    <u>Inconsistency</u>.  In the event of any inconsistency between the terms and conditions of the DIP Loan Documents and of this Interim Order, the provisions of this Interim Order shall govern and control.

(h)    <u>Enforceability</u>.  This Interim Order shall constitute findings of fact and conclusions of law pursuant to the Bankruptcy Rule 7052 and shall take effect and be fully enforceable *nunc pro tunc* to the Closing Date (as defined in the DIP Credit Agreement) immediately upon execution hereof.  Notwithstanding Bankruptcy Rules 4001(a)(3), 6004(h), 6006(d), 7062 or 9024 or any other Bankruptcy Rule, or Rule 62(a) of the Federal Rules of Civil

Procedure, this Interim Order shall be immediately effective and enforceable upon its entry, and there shall be no stay of execution or effectiveness of this Interim Order.

(i)     Headings.  Paragraph headings used herein are for convenience only and are not to affect the construction of or to be taken into consideration in interpreting this Interim Order.

20.     **Reservation of Rights**.    Nothing in this Interim Order or the DIP Loan Documents shall permit the Debtors to violate § 959(b).    The United States objects to any provision of this Interim Order or the DIP Loan Documents providing for any Liens (including replacement liens) or superpriority claims with respect to actions, claims or settlements brought under or relying upon the Federal Debt Collection Procedures Act, or the proceeds of such actions, claims or settlements, and this Interim Order is without prejudice to all rights of the United States with respect to such objection, or the rights of the Debtors, any Committee, the DIP Agents, the other DIP Secured Parties, the Existing DIP Secured Parties, the Prepetition Secured Parties, or any other party-in-interest to challenge or otherwise contest such objection, and all rights of such parties are hereby fully preserved.  As to the United States, its agencies, departments or agents, nothing in this Interim Order or the DIP Loan Documents shall discharge, release or otherwise preclude any valid right of setoff or recoupment that any such entity may have.

21.     **Amendments to Cash Management Order**.  The Final Order Authorizing The Debtors To: (A) Continue (I) Using Their Existing Cash Management System, Bank Accounts And  Business Forms, And Paying Any Related Fees; (II) Transferring Funds Between The Debtors And Their Foreign Subsidiaries, (III) Use Of Electronic Debit, Wire Transfers And Automatic Clearing House Payments; (IV) Investing Excess Funds Pursuant To Section 345 Of

CH\1138322.15

The Bankruptcy Code; (B) Grant Postpetition Intercompany Claims Administrative Expense Priority Pursuant To Section 364, 503(B)(1) And 507(A)(2) Of The Bankruptcy Code; And (C) Continue Intercompany Arrangements In Accordance With Historical Practices entered by the Court on February 6, 2009 (the "**Cash Management Order**") is hereby amended as follows:

(a)     All references therein to "DIP Facility" are hereby amended to mean the DIP Facility as defined in this Interim Order or the Final Order, whichever is then in effect, and all references therein to "DIP Lenders" shall mean the DIP Lenders as defined in this Interim Order or the Final Order, whichever is then in effect.

(b)     Paragraph 6 of the Cash Management Order is hereby amended to delete the phrase "or the requirements of any order governing the use of the Prepetition Lenders' cash collateral."

(c)     Paragraph 7 of the Cash Management Order is hereby amended to delete the phrase "the Prepetition Lenders, the holders of Rolled Prepetition Obligations, as defined in the DIP Facility, and . . . ."

(d)     To the extent there is any inconsistency or conflict between the Cash Management Order, on the one hand, and any or all of the Replacement DIP Orders and the DIP Loan Documents, the terms of the Replacement DIP Orders and the DIP Loan Documents shall control, and the Cash Management Order is hereby so amended.

22.     **Final Hearing**.

(a)     The Final Hearing to consider entry of the Final Order and final approval of the DIP Facility is scheduled for _____, 2010, at _____ (prevailing Eastern time) at the United States Bankruptcy Court for the Southern District of New York.  The proposed Final Order shall be substantially the same as the Interim Order except that those provisions in the

Interim Order that are subject to the entry of the Final Order shall be included in the Final Order without such qualification. If no objections to the relief sought in the Final Hearing are filed and served in accordance with this Interim Order, no Final Hearing may be held, and a separate Final Order may be presented by the Debtors and entered by this Court.

(b)  Final Hearing Notice. On or before December __, 2009, the Debtors shall serve, by United States mail, first-class postage prepaid, (such service constituting adequate notice of the Final Hearing) (i) notice of the entry of this Interim Order and of the Final Hearing (the **"Final Hearing Notice"**) and (ii) a copy of this Interim Order, on the parties having been given notice of the Interim Hearing and to any other party that has filed a request for notices with this Court and to any Committee. The Final Hearing Notice shall state that any party in interest objecting to the entry of the proposed Final Order shall file written objections with the Clerk of the Bankruptcy Court no later than _____, 2010, which objections shall be served so that the same are received on or before such date by: (a) counsel for the Debtors, Kirkland & Ellis LLP, 601 Lexington Avenue, New York, NY 10022, Attention: Jonathan S. Henes and Leonard Klingbaum and Kirkland & Ellis LLP, 300 North LaSalle Street, Chicago, Illinois  60654, Attention: Patrick Nash; (b) counsel for the DIP Agents, Latham & Watkins LLP, 233 S. Wacker Drive, Suite 5800, Chicago, IL 60606; Attn: Richard A. Levy; (c) counsel to any Committee; (d) United States Attorney's Office for the Southern District of New York, 86 Chambers Street, 3rd Floor, New York, New York  10007; Attn: Matthew L. Schwartz & Tomoko Onozawa, AUSAs; and (e) the Office of the United States Trustee for the Southern District of New York, and shall be filed with the Clerk of the United States Bankruptcy Court for the Southern District of New York, in each case to allow actual receipt of the foregoing no later than _____ __, 2010, at 12:00 p.m. (prevailing Eastern time).

(c)  <u>Retention of Jurisdiction</u>.  The Bankruptcy Court has and will retain jurisdiction to enforce this Interim Order according to its terms.

Dated: December __, 2009
      New York, New York

                                    _____
                                    UNITED STATES BANKRUPTCY JUDGE

CH\1138322.15

**Exhibit A**

**13-Week Cash Flow Forecast**

**Tronox Incorporated**
**13 Week Cash Flow - Consolidated - USD (000s)**
**12/17/2009**

| Week | 11/30/2009 12/4/2009 November -1 | Actual -1 | Variance Bet/(Worse) | 12/7/2009 12/11/2009 December 0 | 12/14/2009 12/18/2009 December 1 | 12/21/2009 12/25/2009 December 2 | 12/28/2009 1/1/2010 December 3 | 1/4/2010 1/8/2010 January 4 | 1/11/2010 1/15/2010 January 5 | 1/18/2010 1/22/2010 January 6 | 1/25/2010 1/29/2010 January 7 | 2/1/2010 2/5/2010 February 8 | 2/8/2010 2/12/2010 February 9 | 2/15/2010 2/19/2010 February 10 | 2/22/2010 2/26/2010 February 11 | 3/1/2010 3/5/2010 March 12 | 3/8/2010 3/12/2010 March 13 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Total Inflows | 26,664 | 31,083 | 4,419 | 16,235 | 26,227 | 14,714 | 27,598 | 17,749 | 25,082 | 17,242 | 18,392 | 26,054 | 16,973 | 21,558 | 18,316 | 26,337 | 16,322 |
| Total Expenditures | (29,229) | (29,812) | (583) | (21,742) | (28,763) | (14,698) | (21,783) | (31,148) | (18,073) | (21,238) | (22,153) | (29,957) | (22,725) | (19,151) | (32,362) | (30,215) | (17,678) |
| Net Cash | $ (2,565) $ | 1,271 $ | 3,836 $ | (5,507) $ | (2,536) $ | 16 $ | 5,815 $ | (13,399) $ | 7,008 $ | (3,997) $ | (3,761) $ | (3,903) $ | (5,752) $ | 2,407 $ | (14,046) $ | (3,878) $ | (1,356) |
| Beginning Cash Balance[3] | $ 89,840 $ | 89,840 $ | - $ | 89,951 $ | 84,248 $ | 81,712 $ | 81,729 $ | 87,544 $ | 74,145 $ | 81,153 $ | 77,157 $ | 73,395 $ | 69,492 $ | 63,740 $ | 66,148 $ | 52,102 $ | 48,224 |
| Net Cash | (2,565) | 1,271 | 3,836 | (5,507) | (2,536) | 16 | 5,815 | (13,399) | 7,008 | (3,997) | (3,761) | (3,903) | (5,752) | 2,407 | (14,046) | (3,878) | (1,356) |
| Net Revolver/DIP Draw (Paydown) | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| FX Conversion Gain(Loss) | - | (132) | (132) | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Beginning of Week Wire Float Reversal | (1,224) | (1,224) | - | (195) | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Weekend Wire Float | - | 195 | 195 | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Ending Cash[1,2] | $ 86,051 $ | 89,951 $ | 3,899 $ | 84,248 $ | 81,712 $ | 81,729 $ | 87,544 $ | 74,145 $ | 81,153 $ | 77,157 $ | 73,395 $ | 69,492 $ | 63,740 $ | 66,148 $ | 52,102 $ | 48,224 $ | 46,869 |
| DIP Facility Beginning Balance | $ (10,000) $ | (10,000) $ | - $ | (10,000) $ | (10,000) $ | (10,000) $ | (10,000) $ | (10,000) $ | (10,000) $ | (10,000) $ | (10,000) $ | (10,000) $ | (10,000) $ | (10,000) $ | (10,000) $ | (10,000) $ | (10,000) |
| Net DIP Facility Paydown (Draw) | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| DIP Facility Ending Balance | $ (10,000) $ | (10,000) $ | - $ | (10,000) $ | (10,000) $ | (10,000) $ | (10,000) $ | (10,000) $ | (10,000) $ | (10,000) $ | (10,000) $ | (10,000) $ | (10,000) $ | (10,000) $ | (10,000) $ | (10,000) $ | (10,000) |

# EXHIBIT B

## Proposed Plan Agreement Order

# UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| In re: | ) |
|  | ) |
| TRONOX INCORPORATED, <u>et al.</u>,[1] | ) |
|  | ) |
| Debtors. | ) |
|  | ) |

Chapter 11

Case No. 09-10156 (ALG)

Jointly Administered

## ORDER AUTHORIZING TRONOX TO ENTER INTO
## PLAN SUPPORT AGREEMENT AND EQUITY COMMITMENT AGREEMENT

Upon the Emergency Motion of the above-captioned debtors (collectively, "Tronox") for Interim and Final Orders (A) Authorizing (I) Replacement Postpetition Secured Financing, (II) Authorizing Use of Cash Collateral, and (III) Authorizing Repayment of Existing Postpetition Financing and Prepetition Secured Financing; (B) Authorizing Entry Into Plan Support Agreement; (C) Authorizing Entry Into Equity Commitment Agreement; and (D) Scheduling a Final Hearing (the "Motion")[2]; and upon the statements made in support of the Motion at the hearing held on December 22, 2009; and it appearing that the relief requested is in the best interests of Tronox's estates, its creditors and other parties in interest; the Court having jurisdiction to consider the Motion and the relief requested therein pursuant to 28 U.S.C. §§ 157 and 1334; consideration of the Motion and the relief requested therein being a core proceeding pursuant to 28 U.S.C. § 157(b); venue being proper before this court pursuant to 28 U.S.C. §§ 1408 and 1409; notice of the Motion having been adequate and appropriate under the

---

[1] The debtors in these chapter 11 cases include: Tronox Luxembourg S.ar.l; Tronox Incorporated; Cimarron Corporation; Southwestern Refining Company, Inc.; Transworld Drilling Company; Triangle Refineries, Inc.; Triple S, Inc.; Triple S Environmental Management Corporation; Triple S Minerals Resources Corporation; Triple S Refining Corporation; Tronox LLC; Tronox Finance Corp.; Tronox Holdings, Inc.; Tronox Pigments (Savannah) Inc.; and Tronox Worldwide LLC.

[2] Capitalized terms used but not otherwise defined herein shall have the meanings set forth in the Motion.

circumstances; and after due deliberation and sufficient cause appearing therefor, it is hereby ORDERED

1.      The Motion is granted.

***Plan Support Agreement***

2.      Pursuant to sections 105(a) and 363(b) of the Bankruptcy Code, Tronox, the Creditors' Committee and the Bondholders (the "Parties") are authorized to execute, deliver and implement the Plan Support Agreement and all exhibits and attachments thereto, and to take any and all actions necessary and proper to implement the terms of the Plan Support Agreement.

3.      In accordance with the terms of the Plan Support Agreement, Tronox is authorized, but not directed, to cancel the Auction (as that term is defined in the Bidding Procedures Order).

4.      In accordance with the terms of the Plan Support Agreement, the Goldman Break-up Fee is approved and Tronox is authorized, but not directed, to pay the Goldman Break-up Fee; provided, however, that the Goldman Break-up Fee shall be paid solely from the proceeds of a Competing Transaction (as such term is defined in the Plan Support Agreement) or from funds of Tronox if Tronox extends the maturity date of the Existing DIP Facility.

5.      The entry into the Plan Support Agreement by the Parties, and the performance and fulfillment of their obligations thereunder, does not violate any law, including the Bankruptcy Code, and does not give rise to any claim or remedy against any of the Parties under section 1125(e) of the Bankruptcy Code, including the designation of the vote of any Party under section 1126(e) of the Bankruptcy Code, on account of entering into the Plan Support Agreement and the performance and fulfillment of their obligations thereunder.

*Equity Commitment Agreement*

6.      Pursuant to sections 105(a) and 363(b) of the Bankruptcy Code, Tronox and the Bondholders are authorized to execute, deliver and implement the Equity Commitment Agreement and all exhibits and attachments thereto, and to take any and all actions necessary and proper to implement the terms of the Equity Commitment Agreement.

7.      In accordance with the terms of the Equity Commitment Agreement, Tronox is authorized to pay the reasonable and documented (a) fees and out-of-pocket expenses of Milbank, Tweed, Hadley & McCloy LLP ("Milbank") as counsel to the Bondholders and (b) out-of-pocket expenses of Broadpoint Capital, Inc. ("Broadpoint") as financial advisor to the Bondholders; provided, however, that any such fees and expenses shall be paid only after circulation of a detailed invoice to Tronox and its counsel, counsel to the Creditors' Committee, counsel to the Equity Committee, counsel to Goldman and the Office of the United States Trustee (collectively, the "Notice Parties"), and the expiration of a 10-day period after such delivery in which any Notice Party may file an objection with the Bankruptcy Court with respect thereto. For the avoidance of doubt, Tronox shall not pay any fees to Broadpoint unless and until the transactions set forth in the Equity Commitment Agreement are consummated.

8.      Tronox is authorized to take all actions necessary to effectuate the relief granted pursuant to this Order in accordance with the Motion.

9.      Notwithstanding the possible applicability of Rules 6004(h), 7062 and 9014 of the Federal Rules of Bankruptcy Procedure or otherwise, the terms and conditions of this Order shall be immediately effective and enforceable upon its entry.

10.      The Court retains jurisdiction with respect to all matters arising from or related to the implementation of this Order.

New York, New York

Date: _____, 2009

_____

United States Bankruptcy Judge

K&E 16080831.

# EXHIBIT C

## Plan Support Agreement

# PLAN SUPPORT AGREEMENT

This PLAN SUPPORT AGREEMENT (the "Agreement") is made and entered into as of December 20, 2009 by and among the following parties:

(a)    Tronox Incorporated and its affiliated debtors and debtors in possession (collectively, "Tronox");

(b)    the Official Committee of Unsecured Creditors (the "Creditors' Committee");

(c)    the United States of America (the "United States"); *provided*, that the United States, by its execution and delivery of this Agreement, shall have no obligations hereunder except as explicitly set forth herein;

(d)    the undersigned holders (collectively, the "Noteholders") of 9.5% Unsecured Notes due December 1, 2012 (the "Notes"), issued pursuant to that certain indenture, dated as of November 21, 2005, by and among Tronox Worldwide LLC and Tronox Finance Corp. as issuers, Tronox Incorporated and certain domestic subsidiaries thereof as guarantors, and Wilmington Trust Bank, N.A. as trustee;

(e)    Michael E. Carroll, in his sole capacity as a member of Creditors' Committee and holder of a Tort Claim (as defined in the Term Sheet) who, with and through counsel, has been active in Term Sheet negotiations and has made the judgment that the treatment proposed for Tort Claims in the Term Sheet (assuming the treatment in the Term Sheet is consistent with his understanding of the treatment agreed to among the Parties) is fair and reasonable under the circumstances of the Tronox chapter 11 cases;

(f)    Rio Algom Mining, LLC, in its sole capacity as a member of the Creditors' Committee and holder of a non-governmental CERCLA Claim; and

(g)    the undersigned attorneys for certain parties, as representatives (the "Representatives") of such parties, *provided*, that the Representatives shall be obligated only with respect to Section 9 hereof.

Each party named above, with the exception of the Representatives, is a "Party", and collectively, the "Parties".

## RECITALS

**WHEREAS**, on January 12, 2009, Tronox commenced voluntary cases under chapter 11 of 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code") in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court");

**WHEREAS**, based on various factors, which Tronox has extensively considered, Tronox has determined that the consummation of a standalone reorganization through a chapter 11 plan is in the best interests of its estates and all stakeholders;

**WHEREAS**, the members of the Creditors' Committee, the United States and the Noteholders each hold a claim or claims against Tronox, as defined in section 101(5) of the Bankruptcy Code (each such claim, a "Claim");

**WHEREAS**, upon entry of the Interim DIP Order (as defined below) and satisfaction of the conditions precedent set forth in the DIP to Exit Credit Agreement (as defined below), Goldman Sachs Lending Partners LLC ("GS Lending Partners"), as sole lead arranger and joint bookrunner (in such capacities, the "Replacement Facility Arranger"), will provide, in accordance with the terms and conditions of that certain Senior Secured Super-Priority Debtor-in-Possession and Exit Credit and Guaranty Agreement, dated as of December 20, 2009 and attached hereto as Exhibit A (the "DIP to Exit Credit Agreement"), replacement senior secured debtor-in-possession financing that will convert into exit financing under, and upon the effectiveness of, the Plan (as defined below) (the "DIP to Exit Facility");

**WHEREAS**, the Noteholders and certain other entities have agreed to provide a new money investment to be provided in accordance with the terms and conditions of that certain Equity Commitment Agreement, dated as of December 20, 2009, and attached hereto as Exhibit B (the "Commitment Agreement");

**WHEREAS**, the Parties now desire Tronox to file, obtain confirmation of, and consummate a chapter 11 plan of reorganization in accordance with the terms and conditions set forth in the term sheet annexed hereto as Attachment 1, as such term sheet may be amended from time to time in accordance with the terms of this Agreement (the "Term Sheet", and such plan of reorganization, the "Plan");[1]

**WHEREAS**, the Parties have engaged in good faith negotiations with each other and with the objective of reaching an agreement with regard to the Plan and the Term Sheet;

**WHEREAS**, each Party has reviewed, or has had the opportunity to review, this Agreement and the Term Sheet with the assistance of professional legal advisors of its own choosing;

**WHEREAS**, each Party desires to support the Plan, to the extent consistent in all material respects with the Term Sheet; and

**WHEREAS**, subject to the execution of definitive documentation and appropriate approvals by the Bankruptcy Court of the Plan and the associated disclosure statement (as the same may be amended pursuant to this Agreement from time to time in accordance with this Agreement, the "Disclosure Statement"), each of which shall be consistent with the Term Sheet, the following sets forth the agreement between the Parties concerning their respective obligations.

**WHEREAS**, the Parties require that, as a condition of their willingness to execute this Agreement, the Debtors exercise their rights under the Asset and Equity Purchase

---

[1] Capitalized terms used but not otherwise defined herein shall have the meaning ascribed to them in the Term Sheet.

Agreement between Tronox Incorporated and certain of its affiliates, on the one hand, and Huntsman Pigments LLC, Huntsman Australia R&D Company Pty Ltd and Huntsman Corporation, on the other hand, dated as of August 28, 2009, not to pursue further the sale of substantially all of their operating assets.

**AGREEMENT**

**NOW THEREFORE**, in consideration of the promises and the mutual covenants and agreements set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties hereby agree as follows:

## 1. Term Sheet and Plan of Reorganization.

The Term Sheet is incorporated herein by reference and is made part of this Agreement as if fully set forth herein. The general terms and conditions of the Plan are set forth in the Term Sheet; *provided*, *however*, that the Term Sheet is supplemented by the terms and conditions of this Agreement. In the event of any inconsistencies between the terms of this Agreement and the Term Sheet, the terms of this Agreement shall govern.

## 2. Effectuating the Plan.

To implement the Plan, the Parties have agreed, on the terms and conditions set forth herein, that Tronox shall use reasonable best efforts to effectuate the Plan, and without limiting the foregoing, shall use its reasonable best efforts to take all actions necessary and appropriate to:

(a)  on or prior to December 31, 2009, and in any event concurrently with the filing of the DIP Motion and the Commitment Agreement Motion (each as defined below), file a motion with the Bankruptcy Court, seeking the entry of an order approving this Agreement and authorizing the Parties entering into, and performing under, this Agreement (the "PSA Motion");

(b)  on or prior to December 31, 2009, and in any event concurrently with the filing of the DIP Motion and the PSA Motion, file a motion with the Bankruptcy Court, seeking the entry of an order approving the Commitment Agreement and authorizing the parties thereto entering into, and performing under, the Commitment Agreement (the "Commitment Agreement Motion");

(c)  on or prior to December 31, 2009 and in any event concurrently with the filing of the PSA Motion and the Commitment Agreement Motion, file a motion (the "DIP Motion") with the Bankruptcy Court seeking (i) the entry of an interim order substantially in the form attached hereto as Exhibit C or otherwise in form and substance satisfactory to the Replacement Facility Arranger (the "Interim DIP Order") on or prior to January 10, 2010, and (ii) the entry of a final order (the "Final DIP Order" and together with the Interim DIP Order, collectively, the "DIP Orders") containing substantially the same terms as the Interim Order (except as otherwise expressly set forth in the Interim Order) or otherwise in form and substance satisfactory to the Replacement Facility Arranger, as expeditiously as practicable under the

Bankruptcy Code, the Federal Rules of Bankruptcy Procedure and the Bankruptcy Court's local rules (such federal and local rules, the "Bankruptcy Rules"), but in any event on or prior to January 10, 2010, which DIP Orders shall (i) authorize Tronox to enter into, and perform its obligations in respect of, the DIP to Exit Facility, (ii) approve the repayment of the indebtedness owing to the Existing Secured Creditors, and (iii) approve the liens, superpriority administrative claims and other protections provided to the Replacement Facility Arranger, the lenders under the DIP to Exit Facility (collectively, the "Replacement Lenders"), the escrow agent under the DIP to Exit Facility (the "Replacement Escrow Agent"), the lender counterparties to hedging agreements permitted under the DIP to Exit Credit Facility (the "Replacement Lender Hedging Parties") and the respective administrative, collateral, syndication and other agents for the Replacement Lenders under the DIP to Exit Credit Facility (collectively, the "Replacement Agents," and together with the Replacement Facility Arranger, the Replacement Lenders, the Replacement Escrow Agent and the Replacement Lender Hedging Parties, the "Replacement Lender Parties") (for the avoidance of doubt, the PSA Motion, the Commitment Agreement Motion, and the DIP Motion may be filed as a single motion, which may be approved through one or more order of the Bankruptcy Court);

(d)     move the Bankruptcy Court to enter an order approving the Disclosure Statement (the "Disclosure Statement Order") as expeditiously as practicable under the Bankruptcy Code and the Bankruptcy Rules and, in any event, have the Disclosure Statement Order entered on or prior to April 30, 2010 (or, in the event that Tronox extends the term of the Replacement DIP Facility past the initial six month term pursuant to the Facility Extension Option described below, on or about June 30, 2010);

(e)     solicit the requisite acceptances of the Plan in accordance with sections 1125 and 1126 of the Bankruptcy Code and the terms of the Disclosure Statement Order;

(f)     move the Bankruptcy Court to confirm the Plan as expeditiously as practicable under the Bankruptcy Code and the Bankruptcy Rules, and, in any event, have the order confirming the Plan entered on or prior to June 30, 2010 or, in the event a Facility Extension Notice has been delivered pursuant to the DIP to Exit Credit Agreement, August 31, 2010; and

(g)     consummate the Plan as expeditiously as practicable in accordance with its terms and the terms of this Agreement.

**3.    Commitments of the Parties to this Agreement.**

(a)     Support of Plan.

As long as a Termination Event (as defined herein) has not occurred, or has occurred but has been duly waived or cured in accordance with the terms hereof, each Party hereto agrees for itself, that it will:

i.      consent to and support the entry of the DIP Orders and Tronox entering into and performing under the DIP to Exit Facility

pursuant to the terms of the DIP to Exit Credit Agreement and the DIP Orders;

ii. promptly upon execution of this Agreement, negotiate in good faith to prepare the Definitive Restructuring Documentation, which shall contain provisions consistent with this Agreement and the Term Sheet and such other provisions as are mutually acceptable to the Parties;

iii. from and after the date hereof not directly or indirectly seek, solicit, support or vote in favor of, as applicable, any other plan, sale, proposal or offer of dissolution, winding up, liquidation, reorganization, merger or restructuring of Tronox that could reasonably be expected to prevent, delay or impede solicitation, confirmation or consummation of the Plan or any document filed with the Bankruptcy Court in furtherance of soliciting or confirming the Plan or consuming the transactions contemplated thereby;

iv. agree, if applicable, to permit disclosure in the Disclosure Statement and any filings by Tronox with the Securities and Exchange Commission of the contents of this Agreement;

v. following receipt of the Disclosure Statement and other related solicitation materials approved by the Bankruptcy Court, vote all Claims that it holds or controls, if any, in favor of the Plan by delivering its duly executed and timely completed ballot or ballots accepting the Plan to the balloting agent for the Plan, and it shall not thereafter withdraw or change such vote so long as the Plan and Disclosure Statement are not modified except in accordance with this Agreement;

vi. not object to or otherwise commence any proceeding or take any other action opposing any of the terms of this Agreement, the Disclosure Statement or the Plan; and

vii. in the case of the Creditors' Committee, recommend its members to vote in favor of the Plan.

(b) Transfers of Claims.

Each Noteholder may sell, assign, transfer, hypothecate or otherwise dispose of, directly or indirectly (each such transfer, a "<u>Transfer</u>"), all or any of its Claims (or any right related thereto and including any voting rights associated with such Claims, *provided*, that the transferee thereof (i) agrees in writing, prior to such Transfer, to assume the rights and obligations of the selling Party under this Agreement and (ii) promptly delivers such writing to Tronox (each such transferee becoming, upon the Transfer, a Party hereunder). Any sale,

transfer or assignment of a Claim that does not comply with the procedure set forth in the first sentence of this Subsection 3(b) shall be deemed void *ab initio*.

(c)     Representations of the Noteholders.

Each Noteholder represents, with respect to itself only, that, as of the date hereof:

i.     it is the owner and/or the investment advisor or manager for the owner of such Claims set forth opposite its name on <u>Schedule 1</u> hereto (collectively, the "<u>Relevant Claims</u>");

ii.     it has made no prior assignment, sale, participation, grant, conveyance, or other transfer of, and has not entered into any other agreement to assign, sell, participate, grant, or otherwise transfer, in whole or any part, any portion of its right, title or interest in the Relevant Claims; and

iii.     Except as otherwise set forth on its respective signature page, it has full power to vote the aggregate principal amount of the Relevant Claims.

## 4.    **Mutual Representations, Warranties, and Covenants.**

Each Party makes the following representations and warranties, solely with respect to itself, to each of the other Parties:

(a)     Enforceability.

Subject to the provisions of sections 1125 and 1126 of the Bankruptcy Code, and except as set forth herein, this Agreement is a legal, valid and binding obligation of such Party, enforceable against it in accordance with its terms, except as enforcement may be limited by applicable laws relating to or limiting creditors' rights generally or by equitable principles relating to enforceability.

(b)     No Consent or Approval.

Except as expressly provided in this Agreement, no consent or approval is required by any other entity for it to carry out the provisions of this Agreement; *provided*, *however*, that it is understood that under applicable statute or law, the ability of the United States to execute or enter into definitive agreements consistent with the Term Sheet may be subject to a notice period and an opportunity for public comment and approval from various officials.

(c)     Power and Authority.

It has all requisite power and authority to enter into this Agreement and to carry out the transactions contemplated by, and perform its respective obligations under, this Agreement and the Plan.

(d)     Authorization.

The execution and delivery of this Agreement and the performance of its obligations hereunder have been duly authorized by all necessary action on its part.

(e)     No Conflicts.

The execution, delivery and performance of this Agreement does not and shall not:  (a) violate any provision of law, rule or regulations applicable to it or any of its subsidiaries; (b) violate its certificate of incorporation, bylaws or other organizational documents or those of any of its subsidiaries; or (c) conflict with, result in a breach of or constitute (with due notice or lapse of time or both) a default under any material contractual obligation to which it or any of its subsidiaries is a party.

## 5.   **No Waiver of Participation and Preservation of Rights.**

This Agreement and the Plan are part of a proposed settlement of disputes among the Parties.  Without limiting the foregoing sentence in any way, if the transactions contemplated by this Agreement or otherwise set forth in the Plan are not consummated as provided herein, if a Tronox Termination Event or Agreement Termination Event occurs, or if this Agreement is otherwise terminated for any reason, the Parties each fully reserve any and all of their respective rights, remedies, claims and interests.

## 6.   **Acknowledgement.**

This Agreement and the Plan and the transactions contemplated herein and therein are the product of negotiations between the Parties and their respective representatives.  This Agreement is not and shall not be deemed to be a solicitation of votes for the acceptance of a plan of reorganization for the purposes of sections 1125 and 1126 of the Bankruptcy Code or otherwise.  Tronox will not solicit acceptances of the Plan from any holder of a Claim in any manner inconsistent with the Bankruptcy Code or applicable nonbankruptcy law.

## 7.   **Termination.**

(a)     This Agreement shall expire automatically without any further required action or notice upon the occurrence of (x) any Tronox Termination Event; provided, however, solely in the case of the occurrence of an event described in clauses (i) or (ii) of the definition of "Tronox Termination Event," that this Agreement shall not terminate pursuant to this clause (x) unless and until Noteholders representing more than thirty-three percent (33%) of the aggregate amount of all Noteholders' Relevant Claims are then in breach of any material covenant, representation, warranty or other provision set forth in clause (i) or (ii) of the definition of "Tronox Termination Event," or (y) any Agreement Termination Event, unless the occurrence of such Agreement Termination Event is waived in writing by Noteholders representing more than sixty-seven percent (67%) of the aggregate amount of all Noteholders' Relevant Claims.  Upon the expiration of this Agreement, any and all acceptances in favor of the Plan by the Noteholders prior to such expiration shall be deemed, for all purposes, to be null and void and shall not be considered or otherwise used in any manner by Tronox in connection with this Agreement.

(b)     Termination Events.

The term "<u>Tronox Termination Event</u>," wherever used in this Agreement, means any of the following events (whatever the reason for such Tronox Termination Event and whether it is voluntary or involuntary):

i.      (A) A Noteholder shall have breached any material covenant or provision of this Agreement; (B) Tronox shall have delivered written notice to the other Parties of any such Noteholder breach; and (C) any such breach shall have remained uncured by the breaching Noteholder for a period of five (5) business days from the receipt of such notice;

ii.     (A) Any representation or warranty in this Agreement made by a Noteholder shall have been untrue in any material respect when made or shall have become untrue in any material respect, (B) Tronox shall have delivered written notice to the other Parties of any such Noteholder breach, and (C) any such breach shall have remained uncured by the breaching Noteholder for a period of five (5) business days from the receipt of such notice;

iii.    There shall have been issued any order, decree, or ruling by any court or governmental body having jurisdiction restraining or enjoining the consummation of or rendering illegal the transactions contemplated by this Agreement.

The term "<u>Agreement Termination Event</u>," wherever used in this Agreement, means any of the following events (whatever the reason for such Agreement Termination Event and whether it is voluntary or involuntary):

i.      Any Party other than a Noteholder shall have breached any material covenant or provision of this Agreement, (B) any non-breaching Party shall have delivered written notice to the other Parties of any such breach, and (C) such breach shall have remained uncured by such breaching Party for a period of five (5) business days from the receipt of such notice;

ii.     (A) Any representation or warranty in this Agreement made by a Party other than a Noteholder shall have been untrue in any material respect when made or shall have become untrue in any material respect, (B) any non-breaching Party shall have delivered written notice to the other Parties of any such breach, and (C) such breach shall have remained uncured by such breaching Party for a period of five (5) business days from the receipt of such notice;

iii.    (A) Any material term or condition of any of the Definitive Restructuring Documentation shall be (whether due to an order of

the Bankruptcy Court or otherwise) materially different and adverse to any Party than as agreed by the Parties except to the extent such materially different and adverse term or condition is agreed by each such adversely affected Party, (B) any Party shall have delivered written notice to the other Parties of any such event, and (C) such event shall have remained uncured for a period of five (5) business days;

iv. There shall have been issued or reinstated any suspension order or similar order by a court or other governmental body of competent jurisdiction that adversely affects the benefits intended to be received by the Parties hereunder, or prevents Tronox from consummating the transactions contemplated by this Agreement, and (A) such proceeding or order was issued or reinstated at the request or with the acquiescence of Tronox or any of its affiliates or (B) in all other circumstances, such order shall not have been stayed, reversed, or vacated within fifteen (15) days after such issuance or reinstatement;

v. Unless Tronox, the Noteholders, and the Creditors' Committee agree otherwise:

   a. Tronox shall not have obtained an interim order from the Bankruptcy Court approving Tronox's entry into the Commitment Agreement and this Agreement on or before December 31, 2009;

   b. the governmental entities set forth on Schedule 1 shall not have executed the Environmental Settlement Documents on or prior to June 30, 2010;

   c. the Confirmation Order shall not have been entered by the Bankruptcy Court on or before June 30, 2010 or, in the event a Facility Extension Notice has been delivered pursuant to the DIP to Exit Credit Agreement, August 31, 2010; and

   d. the Plan and the transactions contemplated therein shall not have been consummated on or before June 30, 2010 or, in the event a Facility Extension Notice has been delivered pursuant to the DIP to Exit Credit Agreement, September 30, 2010;

vi. Upon the written consent of the Parties hereto;

vii. The Commitment Agreement shall have been terminated by any of the parties thereto pursuant to the terms thereof;

viii. The conditions to the consummation of the transactions set forth in the Commitment Agreement cannot, in the reasonable opinion of the Noteholders, be satisfied on or prior to June 30, 2010 or, in the event a Facility Extension Notice has been delivered pursuant to the DIP to Exit Credit Agreement, September 30, 2010.

ix. The Bankruptcy Court shall have granted relief that is inconsistent with the Term Sheet or the Plan and adverse, in any material respect, to any Party;

x. A trustee or examiner with enlarged powers shall have been appointed under sections 1104 or 1105 of the Bankruptcy Code for service in the Chapter 11 Cases; and

xi. One or more of the Chapter 11 Cases shall have been converted to a case under chapter 7 of the Bankruptcy Code or otherwise dismissed.

A Tronox Termination Event and an Agreement Termination Event shall each be a "Termination Event".

## 8. **Miscellaneous Terms.**

(a) Binding Obligation; Assignment.

**Binding Obligation**.  Subject to the provisions of sections 1125 and 1126 of the Bankruptcy Code, this Agreement is a legally valid and binding obligation of the Parties, enforceable in accordance with its terms, and shall inure to the benefit of the Parties and their representatives and the Replacement Lender Parties.  The Replacement Lender Parties shall be intended third party beneficiaries under this Agreement and shall be entitled to enforce the provisions hereof.  Nothing in this Agreement, express or implied, shall give to any entity, other than the Parties, the Replacement Lender Parties and their respective members, officers, directors, agents, financial advisors, attorneys, employees, partners, Affiliates, successors, assigns, heirs, executors, administrators and representatives, any benefit or any legal or equitable right, remedy or claim under this Agreement.  Notwithstanding the foregoing, or anything to the contrary in this Agreement, this Agreement shall be binding on the United States only insofar as set forth under the section "Scope of United States Obligations under Plan Support Agreement and Term Sheet" in the Term Sheet.

**Assignment.**  No rights or obligations of any Party under this Agreement may be assigned or transferred to any other entity except as provided in Section 3(c) hereof.

(b) Further Assurances.

The Parties agree to execute and deliver such other instruments and perform such acts, in addition to the matters herein specified, as may be reasonably appropriate or necessary, from time to time, to effectuate the agreements and understandings of the Parties, whether the same occurs before or after the date of this Agreement.

(c)     Headings.

The headings of all sections of this Agreement are inserted solely for the convenience of reference and are not a part of and are not intended to govern, limit or aid in the construction or interpretation of any term or provision hereof.

(d)     Governing Law.

THIS AGREEMENT IS TO BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK APPLICABLE TO CONTRACTS MADE AND TO BE PERFORMED IN SUCH STATE, WITHOUT GIVING EFFECT TO THE CHOICE OF LAWS PRINCIPLES THEREOF.  By its execution and delivery of this Agreement, each of the Parties hereto hereby irrevocably and unconditionally agrees for itself that any legal action, suit or proceeding with respect to any matter under or arising out of or in connection with this Agreement or for recognition or enforcement of any judgment rendered in any such action, suit or proceeding, shall be brought exclusively in the Bankruptcy Court. By execution and delivery of this Agreement, each of the Parties hereto hereby irrevocably accepts and submits itself to the exclusive jurisdiction of each such court, generally and unconditionally, with respect to any such action, suit or proceeding.

(e)     Specific Performance.

The Parties hereby acknowledge that the rights of the Parties under this Agreement are unique and that remedies at law for breach or threatened breach of any provision of this Agreement would be inadequate and, in recognition of this fact, agree that, in the event of a breach or threatened breach of the provisions of this Agreement, in addition to any remedies at law, the Parties shall, without posting any bond, be entitled to obtain equitable relief in the form of specific performance, a temporary restraining order, a temporary or permanent injunction or any other equitable remedy which may then be available and the Parties hereby waive any objection to the imposition of such relief.

(f)     Complete Agreement, Interpretation and Modification.

    i.     **Complete Agreement.**  This Agreement, the Plan, the Term Sheet, the Commitment Agreement and the other agreements, exhibits and other documents referenced herein and therein constitute the complete agreement between the Parties with respect to the subject matter hereof and supersede all prior agreements, oral or written, between or among the Parties with respect thereto.

    ii.     **Interpretation.**  This Agreement is the product of negotiation by and among the Parties.  Any Party enforcing or interpreting this Agreement shall interpret it in a neutral manner.  There shall be no presumption concerning whether to interpret this Agreement for or against any Party by reason of that Party having drafted this Agreement, or any portion thereof, or caused it or any portion thereof to be drafted.

iii. **Modification of this Agreement and the Plan.** The Plan and this Agreement (including the Term Sheet) may only be modified, altered, amended or supplemented, or otherwise deviated from by waiver, consent or otherwise, by an agreement in writing signed by (x) Tronox and each other Party hereto, and (y) to the extent any such modification, alteration, amendment, supplement or deviation is inconsistent with the terms of the Credit Documents (as defined in the DIP to Exit Credit Agreement) or adversely affects the interests, liens, rights, remedies, benefits or other protections of the Lenders under the Credit Documents or the DIP Orders or the credit risks under the Credit Documents, the Replacement Administrative Agent and the requisite Replacement Lenders; *provided*, *however*, that with respect to the Noteholders, the agreement of at least sixty-three percent (63%) of the aggregate amount of all Relevant Claims of the Noteholders shall be sufficient to bind all Noteholders; *provided*, *further*, *however*, that Tronox may make technical and non-material modifications to the Plan without the consent of the Parties.

(g) Conditions to Effectiveness.

This Agreement shall become effective upon the satisfaction of the following conditions precedent (unless waived by the Parties in their respective sole discretion):

i. Each Party hereto shall have duly executed and delivered a counterpart to this Agreement to each other Party hereto;

ii. The Bankruptcy Court shall have entered an order approving the terms of this Agreement and authorizing the Parties to perform their obligations hereunder; and

iii. Counsel to the Noteholders shall confirm in writing that the Noteholders hold Claims that collectively represent at least sixty-three percent (63%) in aggregate outstanding principal amount of the Notes as of the date this Agreement becomes effective.

iv. Upon execution of this Agreement and at the specific request of the Parties hereto, the Debtors shall not conduct the Auction (as that term is defined in the Order (A) Approving Bidding Procedures and Overbid Protections in Connection with the Sale of Substantially All of Tronox's Assets; (B) Approving the Form and Manner of Notice; (C) Scheduling an Auction and a Sale Hearing; and (D) Approving Procedures for Determining Cure Amounts, dated September 23, 2009) on December 21, 2009.

(h)     Execution of this Agreement.

This Agreement may be executed and delivered (by facsimile or otherwise) in any number of counterparts, each of which, when executed and delivered, shall be deemed an original, and all of which together shall constitute the same agreement.  Except as expressly provided in this Agreement, each individual executing this Agreement on behalf of a Party has been duly authorized and empowered to execute and deliver this Agreement on behalf of said Party.

(i)     Settlement Discussions.

This Agreement, the Plan and the Term Sheet are part of a proposed settlement of a dispute between the Parties.  Nothing herein shall be deemed an admission of any kind.  Pursuant to Federal Rule of Evidence 408 and any applicable state rules of evidence, this Agreement and all negotiations relating thereto shall not be admissible into evidence in any proceeding other than a proceeding to enforce the terms of this Agreement.

(j)     Consideration.

Tronox and the other Parties hereby acknowledge that no consideration, other than that specifically described herein and in the Plan and the Term Sheet, shall be due or paid to any Noteholder for its agreement to vote to accept the Plan in accordance with the terms and conditions of this Agreement, other than Tronox's representations, warranties and agreement to use its commercially reasonable best efforts to obtain approval of the Disclosure Statement and to seek to confirm and consummate the Plan.

(k)     Notices.

All notices hereunder shall be deemed given if in writing and delivered, if sent by facsimile, courier or by registered or certified mail (return receipt requested) to the following addresses and facsimile numbers (or at such other addresses or facsimile numbers as shall be specified by like notice):

    i.     If to Tronox, to:

Tronox Incorporated
3301 NW 150th Street
Oklahoma City, Oklahoma 73134
Attention:  Michael J. Foster, Esq., General Counsel

with copies (which shall not constitute notice) to:

Kirkland & Ellis LLP
601 Lexington Avenue
New York, New York 10022
Attention:  Jonathan S. Henes, Esq. and Patrick J. Nash, Jr., Esq.

        ii.        If to a Noteholder or a transferee thereof:

to the addresses or facsimile numbers set forth below following such Noteholder's signature (or as directed by any transferee thereof)

with a copy (which shall not constitute notice) to:

Milbank, Tweed, Hadley & McCloy LLP
One Chase Manhattan Plaza
New York, New York 10005
Attention: Thomas C. Janson

        iii.       If to the Creditors' Committee, to:

Paul, Weiss, Rifkind, Wharton & Garrison LLP
1285 Avenue of the Americas
New York, New York 10022
Attention: Brian Hermann, Esq.

        iv.       If to the United States, to:

United States Attorney's Office for the Southern District of New York
86 Chambers Street, 3rd Floor
New York, New York 10007
Attention: Matthew L. Schwartz & Tomoko Onozawa, AUSAs

Any notice given by delivery, mail or courier shall be effective when received. Any notice given by facsimile or email shall be effective upon oral or machine confirmation of transmission.

All notices delivered hereunder shall also be concurrently delivered to the Replacement Facility Arranger care of Richard A. Levy, Esq., Latham & Watkins LLP, 233 South Wacker Drive, Suite 5800, Chicago, Illinois 60606.

        (l)       Time of the Essence.

The Parties agree that time is of the essence with respect to each and every term and provision of this Agreement.

    **9.**    **Representatives.**

        (a)       Representation.

Each Representative acknowledges that it is the attorney or representative for the owner of such Claims set forth on its respective signature page (each a "Client").

(b)     Support of Plan.

As long as a Termination Event has not occurred, or has occurred but has been duly waived or cured in accordance with the terms hereof, each Representative agrees for itself that it shall use reasonable best efforts to recommend that its Client, or Clients, as the case may be (x) vote in favor of the plan; and (y) not object to or otherwise commence any proceeding or take any other action opposing any of the terms of this Agreement, the Disclosure Statement or the Plan.

**10.** **Substantial Contribution/Break-Up Fee and Transaction Expenses Reimbursement for Replacement Facility Arranger**.

(a)     The Parties hereby agree and acknowledge that Replacement Facility Arranger has made a "substantial contribution" (within the meaning of Section 503(b)(3)(D) of the Bankruptcy Code) in the bankruptcy cases of Tronox by, among other things, (x) engaging in legal, business and other due diligence, negotiation and documentation relating to the DIP to Exit Facility, (y) engaging in substantial syndication efforts with respect to the DIP to Exit Facility, and (z) executing and delivering a definitive DIP to Exit Credit Agreement, all of which enabled the Parties to pursue the Plan as a superior alternative to the sale of all or a substantial portion of Tronox's assets pursuant to the previously scheduled auction or otherwise.

(b)     As a result of such substantial contribution and demonstrable value provided by Replacement Facility Arranger to the Tronox estates and creditors, and in order to induce Replacement Facility Arranger to execute and deliver the DIP to Exit Credit Agreement by providing Replacement Facility Arranger with economic protection against the risk of Tronox, notwithstanding the terms of this Agreement, pursuing a Competing Transaction (as defined below), the Parties hereby agree that Replacement Facility Arranger shall be entitled, pursuant to Sections 363 and 503(b)(3)(D) of the Bankruptcy Code, to payment of (i) a fee in the amount of $8 million (representing approximately 1.88% of the principal amount of the DIP to Exit Facility) (the "Substantial Contribution/Break-Up Fee"), plus (ii) reimbursement for all of its reasonable costs and expenses incurred in connection with the transactions contemplated by this Agreement and the DIP to Exit Facility (including without limitation, the reasonable fees and expenses of its legal counsel, Latham & Watkins LLP, and any other professionals retained by Replacement Facility Arranger) (collectively, the "Transaction Expenses"), which Substantial Contribution/Break-Up Fee and Transaction Expenses shall be payable upon the closing of a Competing Transaction in the event (i) Replacement Facility Arranger is ready, willing and able to consummate the DIP to Exit Facility in accordance with and subject to the terms and conditions of the DIP to Exit Credit Agreement on or before December 24, 2009, and Tronox fails to consummate the DIP to Exit Facility by such date, and (ii) Tronox instead (x) consummates a debtor-in-possession financing transaction that is not arranged by the Replacement Facility Arranger, (y) extends the maturity date of the Existing DIP Facility or (z) consummates on or before December 31, 2010, or a transaction relating to the sale of all or a substantial portion of its assets (including, without limitation, the sale of its assets and businesses pursuant to Section 363 of the Bankruptcy Code) or the reorganization of Tronox other than pursuant to the Plan (any such transaction other than the transaction contemplated by the Plan, a "Competing Transaction").

(c) In furtherance of Tronox's payment obligations in respect of the Substantial Contribution/Break-Up Fee and Transaction Expenses, the Parties agree that Tronox shall file with the Bankruptcy Court on or before December 20, 2009, and use commercially reasonable efforts to schedule an expedited hearing thereon on or before December 22, 2009, and all Parties agree to use commercially reasonable efforts to support, a motion for the entry of an order, in form and substance reasonably satisfactory to the Replacement Facility Arranger ("Substantial Contribution/Break-Up Fee Approval Order"), authorizing payment in immediately available funds to Replacement Facility Arranger of the Substantial Contribution/Break-Up Fee and the Transaction Expenses in accordance with the terms and conditions of this Section. The Substantial Contribution/Break-Up Fee Approval Order may be incorporated into the order of the Bankruptcy Court approving Tronox's execution, delivery and performance of the Plan Support Agreement. That portion of the non-refundable work fees previously paid to Replacement Facility Arranger in connection with the DIP to Exit Facility that has not been used for reimbursement of Transaction Expenses shall be credited against any Substantial Contribution/Break-Up Fee that is due and payable.

(d) The provisions of this Section shall be immediately effective upon the execution and delivery of signed counterparts by each Party hereto, and each non-debtor Party shall be bound by the provisions of this Section regardless of whether the Bankruptcy Court enters the Substantial Contribution/Break-Up Fee Approval Order or whether Tronox is bound by the provisions of this Section or any other provisions of this Agreement prior to the entry of the Substantial Contribution/Break-Up Fee Approval Order, *provided, however*, that nothing in this section is intended to create a payment obligation for any Party other than Tronox.

(e) This Section is without prejudice to the right of any other Party to assert that it is entitled to a substantial contribution payment under Section 503(b)(3)(D) of the Bankruptcy Code, and if any such request is made by any such Party (other than the Replacement Facility Arranger pursuant to this Section), all Parties other than such requesting Party reserve their rights to oppose any such request.

[*REMAINDER OF PAGE INTENTIONALLY LEFT BLANK*]

## Attachment 1 to Plan Support Agreement

## Plan Term Sheet

**Tronox Incorporated**
**RESTRUCTURING PROPOSAL**

This term sheet ("Term Sheet") is annexed as Attachment 1 to the Plan Support Agreement, dated December 20, 2009 (the "Plan Support Agreement"), among Tronox Incorporated ("Tronox") and the other parties thereto, and sets forth the principal terms of a proposed restructuring (the "Restructuring") of Tronox and its affiliate debtor subsidiaries (together with Tronox, the "Debtors") in their pending chapter 11 bankruptcy cases (the "Chapter 11 Cases") in the Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court").

Capitalized terms used herein and not otherwise defined shall have the meanings given to such terms in the Plan Support Agreement.

| | |
|---|---|
| **Overview of the Restructuring:** | As described and defined below, and as set forth in the Plan Support Agreement, the Debtors will file a plan of reorganization with the Bankruptcy Court to implement the Restructuring, which plan of reorganization shall reflect the terms set forth in this Term Sheet and otherwise be in form and substance satisfactory to the Parties and, to the extent the terms and conditions of the Plan are inconsistent with the terms of the Credit Documents (as defined in the Credit Agreement) or adversely affect the interests, liens, rights, remedies, benefits or other protections of any or all of the DIP Administrative Agent, Collateral Agent (as defined in the Credit Agreement) and Lenders under the Credit Documents, in form and substance satisfactory to the DIP Administrative Agent under the Credit Agreement (the "DIP Administrative Agent", and such plan of reorganization, the "Plan"). |
| | Pursuant to the Plan, the Debtors will emerge from chapter 11 as a reorganized business through the consummation of a transfer, in accordance with sections 363 and 1123 of the Bankruptcy Code, of substantially all the assets of the Debtors and their respective subsidiaries (other than the Legacy Assets, as defined below, but including all cash and cash equivalents in the Debtors not to be expended in accordance with this Term Sheet), free and clear of all liens, claims and encumbrances, including Tort Claims and Environmental Claims (as such terms are defined below), except as otherwise specifically provided herein, to a newly formed Delaware corporation that will initially be a wholly-owned direct or indirect subsidiary of Tronox ("New Tronox"). Through the Rights Offering (as defined in the Commitment Agreement) and distribution under the Plan to holders of allowed unsecured claims against the Debtors, New Tronox will, following the Effective Date, be owned by the unsecured creditors of the Debtors and the Backstop Parties (as defined below). |
| | Pursuant to the Plan and the order confirming the Plan, New Tronox shall not be deemed to be a legal successor, alter ego or continuation of, or have merged with, the Debtors, Kerr-McGee Corporation, Anadarko Petroleum Corporation and their respective affiliates, subsidiaries and predecessors, and shall not have any liability whatsoever based on any theory of successor or vicarious liability of any kind or character, or based upon any theory or legal principle under or relating to antitrust, environmental, tort, successor or transferee liability law, except as set forth herein. |

**Replacement DIP Financing:**

*Entry into Replacement DIP Facility*

Pursuant to the terms of the Senior Secured Super-Priority Debtor-In-Possession and Exit Credit and Guaranty Agreement with Goldman Sachs Lending Partners LLC, as administrative agent and collateral agent, attached as <u>Exhibit A</u> hereto (the "<u>Credit Agreement</u>"), certain lenders party thereto have agreed, on the terms and subject to the conditions set forth in the Credit Agreement, to provide replacement debtor-in-possession financing to the Debtors (the "<u>Replacement DIP Facility</u>"). In accordance with the terms of the Credit Agreement, the Debtors shall file a motion seeking approval of the Debtors' entry into the Replacement DIP Facility, the Plan Support Agreement and the Commitment Agreement and seek entry of an interim order (the "<u>Financing Order</u>"), substantially in the form attached as <u>Exhibit B</u> hereto, approving the Debtors' entry into the Replacement DIP Facility, the Plan Support Agreement and the Commitment Agreement.

*Repayment of Existing DIP Facility and Prepetition Facility*

Upon the closing of the Replacement DIP Facility, the Debtors shall use the proceeds of the Replacement DIP Facility and cash on hand to promptly pay in full in cash: (i) all DIP Obligations (as defined in the Final DIP Order, dated February 6, 2009 [Dkt No. 151]), except as provided herein, owed to Credit Suisse, as administrative agent, JPMorgan Chase Bank, N.A., as collateral agent, and each lender in connection with that certain debtor-in-possession financing facility dated January 13, 2009 by and among Tronox and Worldwide LLC, as Borrowers, Credit Suisse Securities (USA) LLC as Sole Lead Arranger and Sole Bookrunner, Credit Suisse, as Administrative Agent, and JPMorgan Chase Bank, N.A., as Collateral Agent (the "<u>Existing DIP Facility</u>"); and (ii) all Prepetition Debt (as defined in the Final DIP Order), except as provided herein, owed to Credit Suisse, as administrative agent, and each lender under that certain secured credit facility dated November 28, 2006 by and among Tronox and Worldwide, as Borrowers, Lehman Brothers Inc. and Credit Suisse Securities (USA) LLC, as Joint Lead Arrangers and Bookrunners, ABN Amro, as Syndication Agent, JPMorgan Chase Bank, N.A. and Citicorp USA, Inc., as co-documentation agents, and Lehman Commercial Paper Inc., as Administrative Agent (the "<u>Prepetition Facility</u>"). Such payments shall be without prejudice to the civil action captioned *Official Committee of Unsecured Creditors of Tronox Incorporated et al., on behalf of Estates of Tronox Incorporated et al. v. Credit Suisse et al.* (Case No. 09-01388) (the "<u>Lender Litigation</u>") and without prejudice to the Creditors' Committee's right to seek disgorgement of such payment.[1] DIP Obligations and Prepetition Debt, as defined in the Final DIP Order, include the principal amount of the loans outstanding under the facilities, unpaid fees and expenses (including advisors' fees) incurred by the agent or any lender, and all accrued but unpaid interest as calculated under the facilities.

Notwithstanding the repayment of the Existing DIP Facility and the Prepetition

---

[1] In connection with the payment of the DIP Obligations and the Prepetition Debt, the Debtors, the Creditors' Committee and the lenders under the Existing DIP Facility and the Prepetition Facility have reached an agreement to resolve the Lender Litigation. The parties will be filing a motion under Bankruptcy Rule 9019 seeking approval of a settlement of the Lender Litigation that includes, among other things, a release of claims against the lenders under the Existing DIP Facility and the Prepetition Facility. The Debtors and the Creditors' Committee agree not to sue the holders of the 9.5% senior unsecured notes issued under the Indenture, dated November 28, 2005, between Tronox Worldwide LLC, as issuer, and Citibank N.A., as indenture trustee, from all liabilities related to the issuance of such notes.

Facility, until the Effective Date: (a) indemnities under the Existing DIP Facility and the Prepetition Facility shall continue in full force and effect and any such claims shall constitute superpriority administrative expenses junior to the superpriority administrative expenses granted in respect of the Replacement DIP Facility; and (b) any cash used to cash collateralize any DIP Letter of Credit or the Existing Letter of Credit (as defined in the Final DIP Order) shall be deposited in a separate collateral account (which account or accounts shall be subject to a perfected, unavoidable first priority lien senior to all other liens and not subject to any other liens including the liens securing the Replacement DIP Facility, *provided*, that the liens securing the Replacement DIP Facility shall extend to the Debtors' rights with respect to such cash collateralization arrangement and the payoff letters relating to the repayment of the Existing DIP Facility and Prepetition Facility shall provide that as and when any DIP Letter of Credit or Existing Letter of Credit (as such terms are defined in the Credit Agreement) terminates or expires, the administrative agent or collateral agent under the Existing DIP Facility and Prepetition Facility shall promptly return to the Debtors that portion of the cash collateral equal to 105% of the undrawn amount, if any, of such DIP Letter of Credit or Existing Letter of Credit) and shall not be available to be used by the Debtors, any Chapter 7 trustee, any estate representative or any other successor or assign of the Debtors or their estates so long as any such DIP Letter of Credit or Existing Letter of Credit is outstanding.

Tronox and its subsidiaries shall not enter into any agreement with respect to debtor-in-possession financing for the Debtors (other than the Replacement DIP Financing) without the approval of the Backstop Parties.

***Termination of Existing Sale Agreement and Cancellation of Auction***

The Parties (other than Tronox) require, as a condition of their willingness to support the Restructuring, that the Debtors not pursue further the sale of substantially all of their operating assets. Accordingly, upon execution of the Plan Support Agreement and at the specific request of the Parties (other than Tronox) thereto, the Debtors shall not conduct the Auction (as that term is defined in the Order (A) Approving Bidding Procedures and Overbid Protections in Connection with the Sale of Substantially All of Tronox's Assets; (B) Approving the Form and Manner of Notice; (C) Scheduling an Auction and a Sale Hearing; and (D) Approving Procedures for Determining Cure Amounts, dated September 23, 2009) on December 21, 2009. In addition, upon the closing of the Replacement DIP Facility, the Debtors shall terminate the Asset and Equity Purchase Agreement between Tronox Incorporated and certain of its affiliates, on the one hand, and Huntsman Pigments LLC, Huntsman Australia R&D Company Pty Ltd and Huntsman Corporation, on the other hand, dated as of August 28, 2009 (the "Existing Sale Agreement"), pursuant to Section 8(a)(vi) of the Existing Sale Agreement, and shall pay the break-up fee and reimbursable expenses to Huntsman Corporation in accordance with the terms of the Existing Sale Agreement. None of the parties to the Plan Support Agreement or the Commitment Agreement, their affiliates, or their or their affiliates' officers, directors, agents, partners, shareholders, members, advisors or other representatives shall incur any liability, directly or indirectly, to any person, including Huntsman Pigments LLC, Huntsman Australia R&D Company Pty Ltd, Huntsman Corporation or any of their affiliates, as a result of the negotiation or execution of this Term Sheet, the Plan Support Agreement, the Commitment Agreement or the transactions contemplated hereby and thereby or the consummation of such transactions.

| | |
|---|---|
| **Implementation of the Restructuring:** | The Restructuring shall be effected pursuant to the Plan and the definitive documentation for the Restructuring, including, the purchase and sale agreement relating to the transfer of the Assets to New Tronox, if any, the documentation for the Rights Offering, the Registration Rights Agreement (as defined in the Commitment Agreement), the Environmental Settlement Documents (as defined below) and such other documentation as is necessary or desirable in connection with the Restructuring (collectively, the "Definitive Restructuring Documentation"). Prior to filing the Plan, the Parties shall mutually agree upon the Definitive Restructuring Documentation, which shall reflect the terms and conditions set forth herein and such other terms and conditions as shall be acceptable to the Parties (and, to the extent the terms and conditions are inconsistent with the terms of the Credit Documents or adversely affect the interests, liens, rights, remedies, benefits or other protections of any or all of the DIP Administrative Agent, Collateral Agent and the Lenders under the Credit Documents, the DIP Administrative Agent). |
| | The Definitive Restructuring Documentation will include, among other things, various Environmental Settlement Documents concerning the resolution of Environmental Claims that shall be submitted for the approval of officials authorized on behalf of the Governmental Environmental Entities (as defined below) that have, or have asserted, Environmental Claims. The Environmental Settlement Documents shall then be submitted to the Bankruptcy Court for approval, after public notice and an opportunity for public comment if and to the extent required under applicable environmental law. |
| | The Debtors shall continuously consult with the legal and financial advisors of the other Parties, and shall not undertake any material action with respect to the Restructuring or otherwise without first consulting with such advisors. |
| **New Tronox; Transfer of Assets:** | On the Effective Date, the Debtors and their subsidiaries shall transfer, pursuant to sections 363, 1123 and any other applicable provision of the Bankruptcy Code, to New Tronox all assets of Tronox and its subsidiaries other than the Legacy Assets (the "Assets"), which Assets shall include (a) the real estate and facilities owned and operated by the Debtors in Hamilton, MS, and Oklahoma City, OK, (b) subject to the terms set forth below in the section entitled "Henderson, Nevada Plant", the leased facilities operated by the Debtors in Henderson, NV, (c) the wholly-owned Las Vegas area land, (d) the Debtors' ownership interests in Basic Management, Inc. and The Landwell Company, LP., (e) the interests in the Tiwest Joint Venture, and (f) the real estate and facilities owned and operated by Tronox in Botlek, the Netherlands. Notwithstanding anything to the contrary herein (other than the section entitled "Henderson, Nevada Plant"), New Tronox may be subject to liabilities under applicable laws to the Governmental Environmental Entities as the owner or operator of the Assets after the Effective Date, and the Confirmation Order shall explicitly so provide. |
| | "Legacy Assets" means those assets that are or may be subject to Tort Claims or Environmental Claims (other than any Assets), all Owned Sites (as defined below) and any such other assets as the Backstop Parties may determine, and shall include the Savannah, GA, Soda Springs, ID, Mobile, AL sites and the ownership interest of the Henderson, NV land and facility; *provided*, *however*, that the Debtors may, at their expense and in accordance with applicable health and safety requirements and under the supervision of the United States and the |

relevant State, remove certain equipment and other assets related to the operations from each of those sites and transfer such equipment and assets to alternate locations to be determined by New Tronox.

**Funding of New Tronox:**

*Exit Credit Facility*  On the Effective Date, the outstanding Replacement DIP Facility will convert into a senior secured and superpriority two tranche term facility (the "Exit Facility") in accordance with the terms of the Credit Agreement. As provided in, and subject to the provisions of, the Credit Agreement (including the repayment of the second tranche of the Exit Facility), Tronox shall have a right to obtain an asset-based loan facility *in lieu* of the second tranche of the Exit Facility. Such asset-based loan facility shall be acceptable to the Backstop Parties and the Creditors' Committee in all respects, and Tronox shall consult with the Backstop Parties' legal and financial advisors throughout the process of obtaining such facility.

*New Money Investment*  Pursuant to the terms of the Equity Commitment Agreement attached hereto as Exhibit C (the "Commitment Agreement"), the purchasers party to the Commitment Agreement (the "Backstop Parties") have agreed, on the terms and subject to the conditions set forth in the Commitment Agreement, to purchase shares of New Tronox common stock (the "New Tronox Common Stock") not otherwise purchased by Eligible Holders (as defined below) in the Rights Offering.

The shares of New Tronox Common Stock purchased pursuant to the Commitment Agreement and the exercise of rights to purchase New Tronox Common Stock pursuant to the Rights Offering, together with the shares of New Tronox Common Stock to be issued is payment of the commitment fee as set forth below in the section entitled "Rights Offering: Commitment Fee", shall represent, in the aggregate, 70% of the shares of New Tronox Common Stock to be outstanding on the Effective Date, on a fully-diluted basis, and shall be subject to dilution for shares of New Tronox Common Stock issued upon the exercise of options issued after the Effective Date under the management incentive plan described below.

*Use of Proceeds*  The proceeds from the Exit Facility and the purchase of New Tronox Common Stock pursuant to the Rights Offering and the Commitment Agreement shall be used by New Tronox to: (i) fund the Custodial Trusts and Anadarko Litigation Trust (as defined below); (ii) provide working capital to New Tronox after the Effective Date; and (iii) pay to the Debtors, in the form of a dividend to Tronox or as consideration for the assets to be transferred to New Tronox, cash sufficient for the Debtors to make distributions to creditors under the Plan in accordance with this Term Sheet.

**Rights Offering:**

*Right to Subscribe*   All Eligible Holders (as defined below) will have a right to participate in the Rights Offering on a *pro rata* basis based on their respective allowed claims with respect to the Debtors (subject to rounding and minimum investment requirements). The aggregate purchase price for the shares of New Tronox Common Stock issuable upon exercise of the Rights shall be $105 million. The Rights will only be transferable in connection with a transfer of the claim against the Debtors to which such Rights related.

"Eligible Holder" means any person or entity who is (i) a holder of an allowed unsecured claim against the Debtors (other than Environmental Claims or Tort Claims) in excess of $25,000 on a record date to be determined, and (ii) an institutional "accredited investor", as such term is defined in Rule 501(a) under the Securities Act of 1933, as amended.

*Backstop*   On the terms and subject to the conditions set forth in the Commitment Agreement, the Backstop Parties have agreed to provide a standby commitment to purchase shares of New Tronox Common Stock offered in the Rights Offering, but not otherwise subscribed for by the Eligible Holders.

*Commitment Fee*   In consideration for the backstop commitment set forth above, the Backstop Parties will receive a fee equal to 4.0% of their respective committed amount, payable in the form of additional shares of New Tronox Common Stock or cash, as set forth in the Commitment Agreement.

**Treatment of Claims against the Debtors:**   The Plan shall provide for the following treatment of claims filed against the Debtors in the Chapter 11 Cases and such other terms not inconsistent with this Term Sheet, as shall be acceptable to the Parties and, to the extent such terms are inconsistent with the terms of the Credit Documents or adversely affect the interests, liens, rights, remedies, benefits or other protections of any or all of the DIP Administrative Agent, Collateral Agent and the Lenders under the Credit Documents, the DIP Administrative Agent.

*Replacement DIP Facility Claims*   On the Effective Date, the Replacement DIP Facility shall convert into the Exit Facility and the lenders under the Replacement DIP Facility will become lenders thereunder in accordance with the terms of the Credit Agreement. All claims held by lenders on account of the Replacement DIP Facility will be assumed by New Tronox on the Effective Date in accordance with the terms of the Credit Agreement.

| | |
|---|---|
| *Administrative Claims* | Each holder of an allowed administrative claim (collectively, the "Administrative Claims") will receive payment in full in cash of the unpaid portion of its Administrative Claim on the Effective Date or as soon thereafter as practicable; *provided*, *however*, that any Environmental Claims asserted by federal, state, local, or tribal governmental units asserting claims or having regulatory authority or responsibilities with respect to environmental laws (the "Governmental Environmental Entities") as Administrative Claims with respect to the owned sites set forth on Exhibit D (the "Owned Sites") will not be paid in full in cash, but instead shall be addressed through the Custodial Trust Settlement Agreements (as defined below), and with respect to all non-owned sites set forth on Exhibit E (the "Other Sites") will not be paid in full in cash, but instead shall be addressed through the Environmental Settlement Agreements, and all other Environmental Claims asserted by any Governmental Environmental Entity as Administrative Claims shall be resolved under the Plan as set forth herein, without the payment of any consideration other than as specifically set forth herein in the section entitled "Governmental Environmental Claims". |
| *Priority Tax and Other Claims* | Allowed priority claims (the "Priority Claims") will be paid in full in cash on the Effective Date, or as soon thereafter as practicable. |
| *Other Secured Claims* | All other secured claims shall be paid in full on the Effective Date (or, if payment is not then due, shall be paid in accordance with its terms) or pursuant to such other terms as may be agreed to by the holder of such other secured claim, the Backstop Parties, the Creditor's Committee and the Debtors; *provided*, that the Environmental L/Cs (as defined below) shall be transferred to the Custodial Trusts and all other letters of credit that remain outstanding shall roll over on the Effective Date in accordance with the terms of the Credit Agreement. |
| *Intercompany Claims* | On the Effective Date, all claims held by a Debtor or its subsidiaries against another Debtor or its subsidiaries ("Intercompany Claims") shall be cancelled; *provided*, that Intercompany Claims, including Intercompany Claims held by, or against, Tronox Pigments International GmbH and Tronox Pigments GmbH and a Debtor or subsidiary, may be reinstated or transferred to New Tronox, as the case may be, at New Tronox's option. |
| *Tort Claims* | This section relates to the following categories of timely filed non-governmental proofs of claim against the Debtors (and also to certain future non-governmental claims against the Debtors as set forth at the end of this section), whether known or unknown, whether by contract, tort or statute, whether existing or hereinafter arising, and including all such claims relating to the Owned Sites, the Other Sites, the Legacy Assets, the Assets or any product to the extent manufactured by, or any other property that was owned, operated or used for disposal by, the Debtors prior to the Effective Date and not by New Tronox, as follows: (a) personal injury, wrongful death claims and property damage, remediation, and restoration claims, whether by contract, tort or statute, related to creosote, benzene or other chemical exposure or release, environmental contamination or related matters (collectively "Non-Asbestos Toxic Exposure Claims"); (b) claims relating to asbestos exposure or release and all other non-governmental claims related to asbestos exposure (the "Asbestos Claims"); and (c) 50% of all allowed non-governmental breach of contract, indemnification, contribution, reimbursement or cost recovery claims (including third party claims for contribution or direct costs under the Comprehensive Environmental Response, |

Compensation, and Liability Act ("CERCLA") or state CERCLA equivalents) (such allowed breach of contract, indemnification, contribution, reimbursement, or cost recovery claims are collectively referred to as "non-governmental CERCLA Claims"). The claims set forth in these sub-paragraphs (a), (b), and (c) are collectively referred to herein as the "Tort Claims".

All Tort Claims shall be satisfied exclusively from the following sources: (i) the Litigation Proceeds payable from the Anadarko Litigation to the holders of Tort Claims (see the Anadarko Litigation Trust as set forth below); (ii) the payment in cash of $7 million on the Effective Date (which, for the avoidance of doubt, is separate from and in addition to the $115 million Funded Environmental Amount (as defined below); and, (iii) all net proceeds from any insurance policies providing any coverage for the benefit of any holders of Tort Claims.

The funds generated from these sub-paragraphs (i), (ii), and (iii) shall be paid into a Tort Claims Trust; after payment of administrative expenses, all remaining funds in the Tort Claims Trust (the "Distributable Amount") shall be paid to the holders of Tort Claims as follows: (a) the holders of non-governmental CERCLA Claims shall collectively receive 12.5% of the Distributable Amount if the total collective valuation of the said non-governmental CERCLA Claims is equal to or greater than $100 million; if the total collective valuation of said non-governmental CERCLA Claims is less than $100 million then the 12.5% shall be proportionally reduced (for example, if the total collective valuation of the said non-governmental CERCLA Claims is $50 million, then the non-governmental CERCLA Claims shall receive 50% of 12.5%, or 6.25%, of the Distributable Amount); (b) 6.25% of the Distributable Amount shall be set aside for distributions to holders of Asbestos Claims and to be used to resolve claims of Future Tort Claimants (as defined below) or protect New Tronox from such claims, if any, the proper mechanism (acceptable to the Parties and the DIP Administrative Agent) for such resolution or such protection to be determined prior to the confirmation of the Plan; and (c) the holders of all other Tort Claims, namely the holders of Non-Asbestos Toxic Exposure Claims, shall receive the balance of the Distributable Amount. The timing and allocation of payment to the holders of non-governmental CERCLA Claims, to the Future Tort Claimants, to the holders of Asbestos Claims, and to the holders of Non-Asbestos Toxic Exposure Claims shall be pursuant to the terms of a Tort Claims Trust Distribution Agreement(s) to be prepared for the administration of all funds in the Tort Claims Trust. All Tort Claims shall be channeled to the Tort Claims Trust. New Tronox shall not be required to pay any fee or expense for the operation or administration of any trust or other arrangement established with respect to the determination, satisfaction, or resolution of any issues related to the Tort Claims (which fees and expenses shall be covered by the payments made to the Tort Claims Trust).

The Plan and Confirmation Order will specifically provide that the reorganized business and Assets are transferred to New Tronox pursuant to sections 363, 1123 and any other applicable provisions of the Bankruptcy Code, free and clear of any successor liability claims with respect to any claims or liabilities of any of the Debtors, except as specifically retained. A "Future Tort Claimant" is an entity that establishes that it holds a Tort Claim that did not arise prior to the Effective Date or was not discharged under the Plan. The Debtors shall use commercially reasonably efforts to obtain an insurance policy for New Tronox against claims of Future Tort Claimants satisfactory to the Parties and the DIP Administrative Agent.

**Governmental Environmental Claims**

All civil claims against, and other civil responsibilities, obligations or liabilities of, the Debtors relating to or arising under any environmental law, including, without limitation, restoration and remediation of environmental issues asserted by any Governmental Environmental Entity (collectively, the "Environmental Claims"), will be treated as set forth below in the section entitled "Additional Information about the Environmental Settlements" through the Custodial Trusts, the Custodial Trust Settlement Agreements and the Environmental Settlement Agreements or, to the extent not so treated, shall be discharged under the Plan to the maximum extent provided under sections 363, 1123 or other applicable provisions of the Bankruptcy Code, and New Tronox shall not be subject to any Environmental Claims to the maximum extent provided under sections 363, 1123 or other applicable provisions of the Bankruptcy Code. Notwithstanding anything to the contrary in this Term Sheet, nothing in the Plan or Confirmation Order shall release, nullify, or preclude any liability of New Tronox as the owner or operator of a property of New Tronox with respect to any properties owned or operated after the Effective Date (other than with respect to Henderson, NV as set forth in the section entitled "Henderson, Nevada Plant"), and the Confirmation Order shall explicitly so provide.

The Debtors will transfer to the Custodial Trusts and the Anadarko Litigation Trust, in the aggregate, (i) all rights to prosecute and recover the proceeds from the pending litigation with Anadarko Petroleum Corporation, Kerr-McGee Corporation and their respective past or present parents, subsidiaries, affiliates, predecessors, successors, directors, officers or representatives (other than New Tronox and its subsidiaries, controlled affiliates, directors, officers or representatives), including all such claims that have been, could have been or could be asserted in the civil action *Tronox Worldwide LLC & Tronox LLC v. Anadarko Petroleum Corporation et al.* (Case No. 09-01198) (the "Anadarko Litigation"), (ii) $115 million in cash (the "Funded Environmental Amount"), (iii) certain Letters of Credit and surety bonds issued pursuant to the Prepetition Facility or their cash equivalent, at the beneficiary's election (the "Environmental L/Cs"), as set forth on Exhibit F hereto; and (iv) to the extent applicable, available insurance policies and other rights to reimbursement or contribution for response actions (whether contractual or otherwise) held by the Debtors as of the date hereof. The Debtors and New Tronox shall use their reasonable best efforts to secure the consent of third parties, if necessary, to the transfer of any such insurance policies or rights to reimbursement or contribution. For the avoidance of doubt, the Funded Environmental Amount shall not change, including based on any changes in the funding raised by New Tronox, cash balances of New Tronox and its subsidiaries as of the Effective Date, allowed claims, or fees and expenses incurred prior to the Effective Date.

| | |
|---|---|
| *Pension Claims* | All pension obligations of the Debtors prior to the Effective Date shall be assumed by New Tronox, including the Tronox Incorporated Retirement Plan. |
| *Unsecured Claims* | On the Effective Date, the holders of allowed unsecured claims against the Debtors (which do not include Environmental Claims or Tort Claims, but which shall include 50% of all allowed non-governmental CERCLA Claims) will be distributed the shares of New Tronox Common Stock held by Tronox (representing in the aggregate 30% of the shares of New Tronox Common Stock to be outstanding on the Effective Date, subject to dilution on account of any management incentive stock or stock option plan). The New Tronox Common Stock shall be distributed to such unsecured creditors on a *pro rata* basis based on their respective allowed claims with respect to the Debtors. |

A "convenience class" consisting of allowed claims below $25,000 shall be created, which shall entitle holders of such allowed claims to elect to receive payment in cash on the Effective Date on account of and in full satisfaction of their claims in an amount equal to a percentage of their allowed claims acceptable to the Backstop Parties and the Creditors' Committee, to be funded by the Backstop Parties through the purchase of the shares of New Tronox Common Stock to which the electing holders belonging to the convenience class would otherwise be entitled, in lieu of receiving a distribution of New Tronox Common Stock.

For the avoidance of doubt, unsecured claims with respect to the Debtors filed by the United States or any other Governmental Environmental Entity, other than allowed claims under, or which relate to, any environmental law, shall be treated as unsecured claims subject to the treatment set forth in this paragraph. In consideration thereof, all unsecured claims against the Debtors shall be discharged and New Tronox and its subsidiaries and controlled affiliates shall have no responsibility, obligation or liability with respect thereto.

| | |
|---|---|
| *Equity Interests in Tronox* | No recovery.[2] |
| **Ongoing Remediation:** | Until the Effective Date, the Debtors shall continue performing ongoing environmental monitoring and response work with respect to the Owned Sites and the Other Sites consistent with current post-petition practice (it being understood that the Debtors remain responsible for any obligations associated with any emergencies or extraordinary events occurring after the date hereof and prior to the Effective Date). |
| **Settlement and Releases:** | Except with respect to Environmental Claims, which shall be treated as set forth herein, all distributions to be made pursuant to the Restructuring will be in full satisfaction of, and represent a settlement of, all disputes and claims, including but not limited to satisfaction of all lender intercreditor agreements and interests of and between the parties receiving such distributions, including, without limitation, any litigation claims, whether known or unknown, arising between or among such parties. Releases provided to officers and directors shall not include |

---

[2] Notwithstanding anything in the Term Sheet, the Parties agree that they will meet with the Equity Committee to discuss potential recovery to the existing equity holders. The Debtors and any other Party may discuss proposals with respect to, and engage in negotiations regarding, such recovery with the Equity Committee and the other Parties; *provided*, *however*, that the consent of all Parties shall be required before any such recovery is provided for under a plan.

any individual contractual obligations they may owe to the Debtors.

The Plan will contain customary releases, indemnifications, and exculpations for, among others, all current and former officers, directors, employees, advisors, attorneys, professionals, accountants, investment bankers, consultants, agents, and other representatives (including their respective officers, directors, employees, members, and professionals) of the Debtors, the Creditors' Committee and its members, the members of the Committee (as defined in the Commitment Agreement) and any other Backstop Party, the agents, arrangers and lenders under the Existing DIP Facility, the agents, arrangers and lenders under the Prepetition Facility, the agents and lenders under the Credit Agreement and their respective advisors, attorneys, accountants and other representatives from any claims and causes of action arising on or prior to the Effective Date, except for criminal liability, willful misconduct and bad faith, and *ultra vires* acts asserted by any governmental agency, or as otherwise set forth in the Plan.

Nothing in the Plan, the Custodial Trust Agreements, or the Environmental Agreements shall in any way release any claim against, or liability of, Kerr-McGee Corporation, Anadarko Petroleum Corporation, the defendants under the Lender Litigation, or their officers, directors, employees, advisors, attorneys, professionals, accountants, investment bankers, consultants, agents, and other representatives (including their respective officers, directors, employees, members, and professionals), whether such claims or liabilities be direct or indirect, fixed or contingent, including, but not limited to, the claims asserted in the Anadarko Litigation. For the avoidance of doubt, nothing shall in any way release any individuals who were former directors or officers of the Debtors or their subsidiaries and also were or currently are directors or officers of Kerr-McGee Corporation and/or Anadarko Petroleum Corporation, unless such individuals were directors or officers of the Debtors or their subsidiaries as of April 1, 2006. All releases, indemnifications and exculpations for certain parties shall be conditioned upon cooperation with the Litigation Trustee (as defined below).

Notwithstanding any other provision in the Plan, the Custodial Trust Agreements, or the Environmental Settlement Agreements, no party or claimant is releasing any claim or liability related to, underlying, or that is the subject of the Anadarko Litigation and such parties and claimants expressly agree that their sole basis of recovery against the Debtors or New Tronox with respect to these claims or liabilities shall be limited to the recoveries set forth in the Plan, Custodial Trust Agreements, and/or Environmental Settlement Agreements.

**Additional Information about the Environmental Settlements**

*Anadarko Litigation Trust*

On the Effective Date, the Debtors will establish a trust (the "<u>Anadarko Litigation Trust</u>") to hold its rights to the Anadarko Litigation. The United States and the Debtors, in consultation with certain representatives of holders of Tort Claims and certain other Governmental Environmental Entities, shall jointly appoint a trustee to administer the Anadarko Litigation Trust, with the United States having the right to approve any such trustee (the "<u>Litigation Trustee</u>"). The Anadarko Litigation Trust will be funded on the Effective Date by a portion (which, for the avoidance of doubt, can be $0) of the aggregate $115 million of cash representing the Funded Environmental Amount, in an amount to be determined by the United States. The agreement governing the Anadarko Litigation Trust shall provide that New Tronox shall have no responsibility, obligation or liability with respect to the Anadarko Litigation, other than to retain or transfer to the Litigation Trustee all books, records and documents relevant to the Anadarko Litigation and to cooperate fully with the Litigation Trustee.

Fees, costs and expenses incurred in connection with the administration of the Anadarko Litigation Trust and the prosecution of the Anadarko Litigation after the Effective Date, including, without limitation, fees and expenses incurred by professionals retained by the Litigation Trustee, shall be borne by the Anadarko Litigation Trust and New Tronox shall have no responsibility, obligation or liability with respect thereto. Professional fees and expenses may be paid in accordance with the terms of a special fee arrangement with the Anadarko Litigation Trust, which the United States shall have the sole right to approve in consultation with certain other Governmental Environmental Entities and certain representatives of holders of Tort Claims, which shall in no event be required to fund the Anadarko Litigation Trust. Without limiting the foregoing, the United States and certain representatives of the holders of Tort Claims shall discuss in good faith certain non-economic aspects of the Anadarko Litigation Trust, including governance.

The Litigation Trustee shall (a) pursue the Anadarko Litigation and (b) distribute any recovery as a result thereof (the "<u>Litigation Proceeds</u>") as follows: (i) 88% to the Governmental Environmental Entities in accordance with the Custodial Trust Settlement Agreements and Environmental Settlement Agreements, and (ii) 12% to the holders of Tort Claims, by delivery to the Tort Claims Trust. The United States shall have the right to approve or reject any proposed settlement of the Anadarko Litigation, after consultation with certain other Governmental Environmental Entities and certain representatives of holders of Tort Claims. Representatives of the United States, certain other Governmental Environmental Entities, and certain representatives of the holders of Tort Claims will have certain agreed rights concerning the pursuit of the Anadarko Litigation. In addition, the United States, separate from its participation in the Anadarko Litigation Trust, shall continue to enjoy the rights to participate in the Anadarko Litigation provided to it under the Order Approving Revised Stipulation and Order with Respect to Federal Debt Collection Procedures Act, signed August 20, 2009.

In addition, the United States shall negotiate with certain representatives of the holders of Tort Claims in good faith to find additional value from the Anadarko Litigation, a meaningful portion of which will inure to the benefit of holders of Tort Claims.

**Environmental Custodial Trusts**  On the Effective Date, the Debtors will establish one or more custodial trusts (the "Custodial Trusts") to transfer the Owned Sites to the Custodial Trusts, free and clear of all liens, claims and encumbrances other than any liability to governmental entities as provided in the applicable custodial trust agreements (collectively, the "Custodial Trust Agreements"). The Custodial Trusts shall conduct response action and restoration or fund response action and restoration of or related to the Owned Sites. Any property placed into a Custodial Trust may be sold or transferred with the approval of the United States and the State in which the property is located, and the proceeds shall be retained by the trust to be used as provided in the applicable Custodial Trust Agreement (a) for costs of administration of the applicable Custodial Trust, (b) to conduct any remaining response action and restoration relating to such property, or (c) to reimburse any Entity performing such response action or restoration. Thereafter any remaining proceeds shall be used as provided below.

The United States and the applicable Governmental Environmental Entities shall enter into environmental custodial trust settlement agreements for the Owned Sites (the "Custodial Trust Settlement Agreements"). The Custodial Trust Settlement Agreements shall be submitted for public notice and comment as required under federal environmental law and, where applicable, state environmental law of the state in which the applicable property is located. The agreements will determine how the Custodial Trusts will be operated by agreed-upon trustees and the role of the United States and the relevant State in approving funding of response action and restoration for the duration of the trusts. The Debtors and New Tronox shall have no responsibility or involvement with respect to the Custodial Trusts once they are established and funded in accordance with the provisions herein. Custodial Trust funding shall be held in trust in segregated trust accounts for each site and in an administrative account, all as provided for in the Custodial Trust Agreements. The relevant Governmental Environmental Entity and the Debtors will file any necessary pleading with the applicable district court seeking to modify the applicable Consent Decree or related document, if any, to conform to any applicable Custodial Trust Settlement Agreements and remove such Debtor as a party to the Consent Decree after the Effective Date.

Each Custodial Trust Settlement Agreement and each Environmental Settlement Agreement shall (i) have covenants not to sue or assert (or, for certain states, to the extent allowable under applicable state and federal law, releases of) any civil claims or civil causes of action against the Debtors, New Tronox and any successors in interest with respect to the Owned Sites (including pursuant to sections 106 and 107 of CERCLA) and (ii) provide that the Debtors, New Tronox and any successors in interest shall have protection from contribution actions or claims with respect to the Owned Sites (including pursuant to section 113 of CERCLA). Each such covenant and provision shall be similar to those in the recent Asarco LLC, et al. (Case No. 05-21207) bankruptcy as set forth in the related Amended Settlement Agreement regarding Miscellaneous Federal and State Environmental Sites and the Amended Consent Decree (the "Miscellaneous Settlement") and Settlement Agreement Establishing a Custodial

Trust for Certain Owned Sites in Alabama, Arizona, Arkansas, Colorado, Illinois, Indiana, New Mexico, Ohio, Oklahoma, Utah and Washington ("Multi-State Custodial Trust Agreement"), including in the sections entitled "Covenants Not To Sue" and "Contribution Protection", but excluding any provisions in paragraph 30 of the Miscellaneous Settlement or paragraph 12(i) of the Multi-State Custodial Trust Agreement.

The initial funding of the Custodial Trusts shall be the remaining portion of the aggregate $115 million of cash representing the Funded Environmental Amount, after the Anadarko Litigation Fund has been funded, if at all, to be funded on the Effective Date. Additional funding shall be as set forth above in the section entitled "Treatment of Claims against the Debtors: Environmental Claims". Funding shall be allocated among the site accounts as provided in the Custodial Trust Settlement Agreements.

Upon completion of response action and restoration and reimbursement of any costs therefore required for a site, any funds held for that site by a Custodial Trust shall be transferred (a) first, in accordance with instructions provided by the United States and the appropriate State, to any other Custodial Trust in that State with remaining response action and restoration to be performed related to the sites and a need for additional trust funding; (b) second, in accordance with instructions provided by the United States after consultation with the States, to other open and operating Custodial Trusts in other States with remaining response action and restoration to be performed related to the sites and a need for additional trust funding; and (c) third, to the Superfund established under CERCLA.

Certain Governmental Environmental Entities shall also enter into environmental settlement agreements (the "Environmental Settlement Agreements") with respect to the Other Sites. (For the avoidance of doubt, the Environmental Settlement Agreements and the Custodial Trust Settlement Agreements may be one form of agreement, which shall be satisfactory under this Term Sheet.) The Environmental Settlement Agreements shall provide for allowed claims and consideration, including funding from the Anadarko Litigation Proceeds and contribution sources, on terms to be determined by the Debtors and certain Governmental Environmental Entities, as set forth herein. The Environmental Settlement Agreements shall also provide for the retention by the United States of any Department of Energy reimbursement, or other funds subject to set-off, to be used at the direction of the United States. For the avoidance of doubt, the Governmental Environmental Entities shall not be entitled to additional recovery under the Plan as a result of the Environmental Settlement Agreements other than the distributions and treatment set forth above in the section entitled "Treatment of Claims against the Debtors: Environmental Claims". The Environmental Settlement Agreements shall be submitted for public notice and comment as required under federal environmental law and, where applicable, state environmental law of the state in which the applicable property is located. The relevant Governmental Environmental Entity and Debtor will file any necessary pleading with the applicable district court seeking to modify the applicable Consent Decree or related documents, if any, to conform to the applicable Environmental Settlement Agreements and remove such Debtor as a party to the Consent Decree after the Effective Date.

| | |
|---|---|
| **Scope of United States Obligations under Plan Support Agreement and Term Sheet** | Except as set forth in the last sentence of this paragraph, and notwithstanding anything else to the contrary in this Term Sheet or the Plan Support Agreement, (i) neither the Plan Support Agreement nor this Term Sheet shall impose any binding or enforceable obligations on the United States, and the terms of this Term Sheet shall not become binding and enforceable upon the United States unless and until the appropriate officials of the United States, on behalf of the United States, have executed and delivered the definitive Environmental Settlement Documents, after public notice and opportunity for public comment in accordance with applicable law and after the Bankruptcy Court has approved the definitive Environmental Settlement Documents, (ii) this Term Sheet may not be used or relied on by any party for any purpose other than as set forth in the last sentence of this paragraph, and (iii) this Term Sheet is not a permit, covenant not to sue, or release, and may not be used as a defense to any claim, action or proceeding.  Notwithstanding the foregoing, the United States agrees to use its reasonable efforts (1) to negotiate the forms of definitive Custodial Trust Agreements, Custodial Trust Settlement Agreements and Environmental Trust Settlement Agreements and any other related documents and agreements, including all exhibits, schedules, annexes and other attachments thereto (collectively, the "<u>Environmental Settlement Documents</u>") consistent with the terms of this Term Sheet, on or before February 28, 2010, (2) to initiate and diligently pursue both the public notice and comment proceedings and procedures in accordance with applicable law and any other action required by applicable law in order for the United States to be authorized to execute and deliver the definitive Environmental Settlement Documents, (3) to complete the public notice and comment proceedings and procedures by April 30, 2010, and (4) promptly after completion of the public notice and comment proceedings and procedures, to support, if appropriate after considering all public comments, the Debtors' filing of a motion to obtain Bankruptcy Court approval of, and the Bankruptcy Court's entry of an order approving, the definitive Environmental Settlement Documents.  For the avoidance of doubt, the foregoing "reasonable efforts" clause applies solely to the timing of the Environmental Settlement Agreement and Custodial Trust Agreement process, and does not bind the United States to actually enter into such agreements unless and until (1) officials with authority have approved the Environmental Settlement Agreements and Custodial Trust Agreements; (2) the required public notice and comment period with respect to such agreements has closed; (3) the United States and other relevant Governmental Environmental Entities have decided to proceed with such agreements, as modified, if at all, in response to comments received; (4) the other signatories to the Plan Support Agreement (and the DIP Administrative Agent) have consented to any such modifications having a material impact upon them; and (5) the Bankruptcy Court has approved such agreements, as so modified. |

**Governance:**

**Board of Directors**    The board of directors of New Tronox will initially consist of a number of individuals to be determined by the Backstop Parties and the Creditor's Committee. The initial board members shall be appointed by the Backstop Parties, and shall include the chief executive officer of New Tronox, and at least one of such directors (who shall be an "independent director" within the meaning of the rules of any stock exchange on which the shares of New Tronox Common Stock are listed (or if not so listed, would so qualify under the rules of the New York Stock Exchange)) shall be selected in consultation with the Creditors' Committee and with the consent of the Creditors' Committee, which consent shall not be unreasonably withheld, conditioned or delayed.

**Other**    Other governance arrangements to be determined, depending, in part, on whether New Tronox will be a public or private company on the Effective Date.[3]

**Conditions Precedent:**    The consummation of the Restructuring pursuant to the Plan will be subject to customary and appropriate conditions precedent, including but not limited to the following.

**Listing of Common Stock**    The Parties shall use commercially reasonable efforts to cause, on, or as soon as possible after, the Effective Date, the shares of New Tronox Common Stock to be listed on the NYSE or The NASDAQ Stock Market.

**Documentation**    All documentation prepared in connection with the Restructuring, including without limitation, the Plan, the Definitive Restructuring Documentation, and any documents, motions, pleadings, orders or the like prepared or filed in connection with the Chapter 11 Cases shall be in form and substance satisfactory to the Parties.

**Government Consent**    Any consent of the Governmental Environmental Entities necessary to effect the Environmental Settlement Agreements and Custodial Trust Settlement Agreements, including consent to modify or amend any Consent Decree as may be required thereunder, and any applicable public notice and comment proceedings and procedures or other regulatory approval requirements shall have been obtained, and the Environmental Settlement Agreements and Custodial Trust Settlement Agreements shall have been approved by the Bankruptcy Court on or prior to June 30, 2010.

The Debtors shall not object to, or seek to estimate, any Environmental Claims asserted by Governmental Environmental Entities that are party to any Environmental Settlement Agreements or Custodial Trust Settlement Agreements without the consent of the United States and the relevant claimant.

**Other Consents**    To the extent any consent or waiver is required to be obtained to effect the Restructuring (including the transfer of the Assets to New Tronox), such consent or waiver shall have been obtained or expired, such that New Tronox shall able, on the Effective Date, to take ownership of the Assets free and clear of all encumbrances.

---

[3] If New Tronox is not a public company on the Effective Date, a customary shareholders agreement will be entered into, and the Plan and the Confirmation Order will provide that all parties receiving shares of New Tronox Common Stock in the Rights Offering or under the Plan shall be bound by such shareholders agreement.

| | |
|---|---|
| ***Replacement DIP Facility*** | The Debtors shall have obtained Bankruptcy Court authorization to enter into the Replacement DIP Facility and shall not have obtained additional debtor-in-possession financing prior to the Effective Date. |
| ***Henderson, Nevada Plant*** | The Debtors and the applicable Custodial Trust shall have entered into sale/leaseback and access agreements relating to the Henderson, Nevada facility, each on terms satisfactory to the Backstop Parties and the Creditors' Committee and the relevant government agencies, which terms shall include significantly below market lease payments (but at least sufficient to pay for associated administrative expenses and property taxes), and shall specify that New Tronox is not responsible for costs of any environmental remedial action or restoration associated with the presence or releases of hazardous substances from or at any portion of the Henderson facility prior to the Effective Date and all areas affected by natural migration of such substances therefrom, except to the extent exacerbated by any act or omission of New Tronox after the Effective Date. |

New Tronox shall exercise due care at the Henderson facility with respect to existing contamination and shall comply with all applicable local, State and federal laws and regulations. Nothing in the previous sentence shall require New Tronox to clean up existing contamination in or under the ground that has not been exacerbated or aggravated by New Tronox or its successors, assignees, contractors, subcontractors, representatives, lessees or sublessees after the Effective Date. New Tronox recognizes that the implementation of response actions at the Henderson facility may interfere with New Tronox's use of the property, and may require closure or delay of its activities or a part thereof. New Tronox agrees to cooperate fully with the United States Environmental Protection Agency ("EPA") and the Nevada Department of Environmental Protection in the implementation of response actions at the Henderson facility and further agrees not to interfere with such response actions. The EPA, consistent with its responsibilities under applicable law, will use reasonable efforts to minimize any interference with New Tronox's operations by such entry and response at the Henderson facility.

The lease shall contain customary provisions relating to indemnity by a tenant with respect to the operation of the tenant at the leased property following the Effective Date. For the avoidance of doubt, New Tronox shall retain any liability as an operator of the Henderson facility, and shall be responsible for related response action, if any, to the extent such liability or responsibility relates to releases of hazardous substances from any portion of the Henderson facility due to any act or omission of New Tronox after the Effective Date.

| | |
|---|---|
| ***Available Funds*** | On the Effective Date, the aggregate amount of (i) available cash or cash equivalents for New Tronox (not including any restricted cash or cash equivalents) and (ii) undrawn amounts under the Exit Facility available to be drawn by New Tronox on such date, shall exceed $58,240,000, or such other lower amount as shall be agreed to by the Backstop Parties. |
| ***Non-governmental CERCLA Claims*** | On the Effective Date, the aggregate amount of allowed non-governmental CERCLA Claims shall not exceed $200 million; and there shall be no material unresolved non-governmental CERCLA Claims, which, individually or in the aggregate, after having been resolved, reasonably could cause the final aggregate amount of allowed non-governmental CERCLA Claims to exceed $200 million. |

**Other Features of the Restructuring:**

| | |
|---|---|
| *Dilution* | The New Tronox Common Stock issued in connection with the transactions to take place on or prior to the Effective Date, as set forth in this Term Sheet, will be subject to dilution by New Tronox Common Stock issued after the Effective Date, including upon issuance of New Tronox Common Stock pursuant to the management incentive plan set forth below. |
| *Management Incentive Plan and Employment* | Following the Effective Date, the board of directors of New Tronox will establish a management incentive plan that will provide for the issuance of certain equity-based awards exercisable for 5% of the New Tronox Common Stock, or such higher percentage as may be determined by the board of directors of New Tronox after the Effective Date, with a strike price at least equal to the Plan value. |
| | In addition, following the Effective Date the board of directors of New Tronox shall review the employment arrangements with the management of New Tronox and enter into appropriate arrangements with those persons who will serve as the management of New Tronox after the Effective Date. |
| *Charter Documents* | All charter documents of New Tronox will be satisfactory to the Backstop Parties and the Creditors' Committee. |
| *Retained Causes of Action* | All lawsuits, causes of action and claims held by the Debtors, including all tort actions where the Debtors are plaintiffs and all avoidance actions, but excluding the Anadarko Litigation, shall be included in the Assets and transferred to New Tronox on the Effective Date. |
| *Expenses* | Whether or not the transactions contemplated by this Term Sheet are consummated, the Debtors shall pay the reasonable and documented fees and out-of pocket expenses of the legal counsel and financial advisors to the Backstop Parties related to the Restructuring, *provided*, *however*, that the completion fee of $2 million contemplated by the Broadpoint Capital, Inc. engagement letter, which, notwithstanding anything set forth in such letter, shall only be payable upon consummation of the Restructuring. |
| *Tax Issues* | To be determined. |
| *Governing Law* | State of New York |

*Exhibits A, B and C to the Plan Term Sheet are attached to the Motion.*

## Exhibit D to Plan Term Sheet

Exhibit to list all domestic real property owned by the Debtors other than the Assets (as defined in the Term Sheet)

## Exhibit E to Plan Term Sheet

Exhibit to list, at minimum, all non-owned sites for which proofs of claim asserting Environmental Claims (as defined in the Term Sheet) have been filed

**<u>Exhibit F to Plan Term Sheet</u>**

*Environmental L/Cs*

| <u>Debtor</u> | <u>Issuing Bank</u> | <u>Beneficiary</u> | <u>Amount</u> |
|---|---|---|---|
| Cimarron Corporation | Bank One/JPM | US NRC | 3,600,000 |
| Tronox Worldwide LLC | JPMorgan | US EPA (Lakeview) | 500,000 |
| Tronox Incorporated | JPMorgan | Safeco Insurance Company (collateral for surety) | 24,275,000 |
| Tronox LLC | Bank One/JPM | City of West Chicago | 1,019,789 |
| Tronox Worldwide LLC | JPMorgan | Illinois Emergency Management Agency (West Chicago) | 24,797,247 |
| Tronox Worldwide LLC | JPMorgan | Safeco Insurance Company (collateral for surety) | 3,400,000 |

*Environmental Bonds/Sureties*

| <u>Debtor</u> | <u>Type</u> | <u>Obligee</u> | <u>Amount</u> |
|---|---|---|---|
| Kerr-McGee Refining Corporation | Encroachment permit bond | City of Louisville | 10,000 |
| Triple S Refining Corporation | Individual utility permit bond | Illinois Department of Transportation | 2,000 |
| Kerr-McGee Chemical Corporation | Financial guarantee | Elgin, Joliet and Eastern Railway | 5,600,000 |
| Tronox LLC | Financial guarantee | Illinois Department of Nuclear Safety | 15,000,000 |
| Kerr-McGee Refining Corporation | Right of way bond | City of Jacksonville, Fl. | 5,000 |
| Kerr-McGee Chemical LLC | Permit to drill ground water monitoring wells | City of Springfield, Mo. | 19,500 |

*Exhibits A, B and C to the Plan Support Agreement are attached to the Motion.*

## Schedule 1 to Plan Support Agreement

Illinois
North Carolina
Florida
Georgia
Louisiana
Missouri
Mississippi
Oklahoma
Nevada
Wisconsin
Texas
Indiana
New York
Ohio

IN WITNESS WHEREOF, the Parties have entered into this Agreement on the day and year first above written.

Tronox Incorporated

By _MICHAEL J. FOSTER_

Title _VICE PRESIDENT_

[Signature Page--Toro Support Agreement]

PREET BHARARA
United States Attorney for the
Southern District of New York
*Attorney for the United States of America*

By: _____

MATTHEW L. SCHWARTZ
Assistant United States Attorney
86 Chambers Street, 3rd Floor
New York, New York 10007
Tel. No.: (212) 637-1945
Fax No.: (212) 637-2750
E-mail: matthew.schwartz@usdoj.gov

THE OFFICIAL COMMITTEE OF
UNSECURED CREDITORS OF TRONOX
INCORPORATED, ET AL.

By: AEGON USA Investment
Management, LLC, solely in its capacity as
Chair of the Creditors' Committee and not
in its individual capacity,

By: _____

Title: Senior Vice President

Michael E. Carroll

By: _Michael E Carroll_

Title: _____

Rio Algom Mining LLC

By: _____

Title: VP & CFO _____

Transamerica Life Insurance Company

By: _____

Title: _____ Vice President _____

Transamerica Financial Life Insurance Company

By: _____

Title: _____Vice President_____

Monumental Life Insurance Company

By: _____

Title: _____Vice President_____

Fidelity Investments Canada ULC, As
Trustee Of The Fidelity Balanced ~~High~~
~~Income~~ Fund

By: _____

Title: _VP_ and _Fund_ _Treasurer_

[Signature Page Plan Support Agreement]

PAGE 1/15 * RCVD AT 12/18/2009 6:02:43 PM [Eastern Standard Time] * SVR:FAXBOSFM01WIN/0 * DNIS:8508477 * CSID: * DURATION (mm-ss):01-10

Fidelity Investments Canada ULC, As Trustee Of The Fidelity Canadian Asset Allocation Fund

By: _____

Title: _VP and Fund Treasurer_

[ Signature Page Plan Support Agreement]

Fidelity Investments Canada ULC, As
Trustee Of The Fidelity American High
Yield Fund

By: _____

Title: _VP and Fund Treasurer_

Fidelity Investments Canada ULC, as
investment manager of IG FI Canadian
Allocation Fund

By: _____

Title: VP and Fund Treasurer

[Signature Page Plan Support Agreement]

PAGE 4/15 * RCVD AT 12/18/2009 6:02:43 PM [Eastern Standard Time] * SVR:FAXBOSFM01WIN/0 * DNIS:8508477 * CSID: * DURATION (mm-ss):01-10

Pension Investment Committee of General Motors for General Motors Employees Domestic Group Pension Trust

By: Pyramis Global Advisors Trust Company, as Investment Manager under Power of Attorney

By: _Lynne M. Farrand_

Title: _Director_

Commonwealth of Massachusetts Pension Reserves Investment Management Board

By: Pyramis Global Advisors Trust Company, as Investment Manager under Power of Attorney

By: _Wynn M. Forrand_

Title: _Director_

Illinois Municipal Retirement Fund

By: Pyramis Gkbal Advisors Trust
Company, as Investment Manager under
Power             of           Attorney

By: _Lynn M. Farrand_

Title: ___Director___

---

Fidelity Management &
Research Company
on behalf of Fidelity Funds - US High Income

By: _____

Title: _____ J. Gregory Weiss
           Assistant Treasurer

[Signature Page Plan Support Agreement]

Fidelity Management &
Research Company
on behalf of Master Trust Bank of Japan Ltd. Re: Fidelity
US High Yield

By: _____

Title: ___  J. Gregory Wass
         Assistant Treasurer

[Signature Page Plan Support Agreement]

Fidelity Summer Street Trust: Fidelity
Capital & Income Fund

By: _____

Title: _____

Jeffrey Christian
Deputy Treasurer

*[Signature Page Plan Support Agreement]*

Fidelity Puritan Trust: Fidelity Puritan Fund

By: _____

Title: _____

Jeffrey Christian
Deputy Treasurer

[Signature Page Plan Support Agreement]

PAGE 11/15 * RCVD AT 12/18/2009 6:02:43 PM [Eastern Standard Time] * SVR:FAXBOSFM01WIN/0 * DNIS:8508477 * CSID: * DURATION (mm-ss):01-10

Fidelity Advisor Series I: Fidelity Advisor
High Income Advantage Fund

By: _____

Title: _____

        Jeffrey Christian
        Deputy Treasurer

*[Signature Page Plan Support Agreement]*

PAGE 12/15 * RCVD AT 12/18/2009 6:02:43 PM [Eastern Standard Time] * SVR:FAXBOSFM01WIN/0 * DNIS:8508477 * CSID: * DURATION (mm-ss):01-10

Variable Insurance Product Fund V: Strategic Income Portfolio

By: _____

Title: _____
Jeffrey Christian
Deputy Treasurer

Signature Page Plan Support Agreement]

Fidelity Advisor Series II: Fidelity Advisor
Strategic Income Fund

By: _____

Title: _____
Jeffrey Christian
Deputy Treasurer

Fidelity   School   Street   Trust:   Fidelity
Strategic Income Fund

By: _____

Title: _____   Jeffrey Christian
                    Deputy Treasurer

[Signature Page Plan Support Agreement]

Scoggin Capital Management, LP II

By:_____ By: S&E Partners, LP its: general partner

Name: By: Scoggin, Inc. its: general partner

Title: By: _____

Scoggin International Fund, Ltd.

By:_____ **Scoggin, LLC its; investment manager**
Name:              **By:** _____
Title:

Scoggin Worldwide Distressed Fund, Ltd.

**By: Old Bellows Partners LP its Investment Manager**
By:_____ **By: Old Bellows Associates LLC its General Partner**
Name:
Title:

Plainfield Special Situations Master Fund II
Limited

By: _~~~~~~~~~~~~~_

Title: ___Thomas X. Fritsch___
  Authorized Individual

OZ Master Fund, Ltd.

By: OZ Management LP, its Investment Manager
By: Och-Ziff Holding Corporation, its General Partner

By: _____
Name: Joel Frank
Title: Chief Financial Officer

Goldman Sachs & Co. Profit Sharing Master Trust

By: OZ Management II LP, its investment manager
By: Och-Ziff Holding II LLC, its General Partner
By: OZ Management LP, its Member
By: Och-Ziff Holding Corporation, its General Partner

By: _____
Name: Joel Frank
Title: Chief Financial Officer

Gordel Holdings Limited

By: OZ Management LP, its Investment Manager
By: Och-Ziff Holding Corporation, its General Partner

By: _____
Name: Joel Frank
Title: Chief Financial Officer

OZ Select Master Fund, Ltd.

By: OZ Management LP, its Investment Manager
By: Och-Ziff Holding Corporation, its General Partner

By: _____
Name: Joel M. Frank
Title: Chief Financial Officer

TRICADIA CAPITAL MANAGEMENT, LLC
solely as Investment Manager and not
individually

By: Julia Wyatt

Title: CFO

Plainfield OC Master Fund Limited

By: _____

Title: _____
        Thomas X. Fritsch
        Authorized Individual

Plainfield Liquid Strategies Master Fund Limited

By: _____

Title: _____ **Thomas X. Fritsch** _____
**Authorized Individual**

**CAI DISTRESSED DEBT OPPORTUNITY MASTER FUND, LTD**

By: _Herbert Seif

Title: _____

# EXHIBIT D

## Equity Commitment Agreement

# EQUITY COMMITMENT AGREEMENT

December 20, 2009

Ladies and Gentlemen:

Subject to the approval of this Equity Commitment Agreement (this "Agreement") by the Bankruptcy Court (as defined below), Tronox Incorporated, a Delaware corporation (as a debtor-in-possession and a reorganized debtor, as applicable, the "Company"), proposes to implement a plan of reorganization (the "Plan"), pursuant to which, *inter alia*, a newly formed, wholly-owned subsidiary of the Company ("New Tronox") will offer and sell shares of its new common stock, par value $0.01 per share (the "New Common Stock"), pursuant to a rights offering (the "Rights Offering") whereby each holder of Senior Notes (as defined below) and any other holder of an allowed unsecured claim against the Debtors (other than Environmental Claims) (each, a "Claim"), who is an institutional "accredited investor," as such term is defined in Rule 501(a) under the Securities Act of 1933, as amended (the "Securities Act"), and who holds a Claim in excess of $25,000 (each, an "Eligible Holder"), as of the date (the "Record Date") fixed by the Bankruptcy Court for the solicitation of acceptances and rejections of the Plan, shall be offered the right (each, a "Right") to purchase up to its *pro rata* share, based on the amount of such Claim (the "Holder Pro Rata Share"), of 10,096,154 shares of New Common Stock (each, a "Share", and collectively, the "Offered Shares") at a purchase price of $10.40 per Share (the "Purchase Price").  Terms not otherwise defined herein shall have the meaning ascribed to such terms in Attachment A.

WHEREAS, in order to facilitate the Rights Offering, pursuant to this Agreement, and subject to the terms, conditions and limitations set forth herein, each of the parties set forth on Schedule 1 hereto (collectively, the "Backstop Parties"), hereby severally (and not jointly or jointly and severally) commits to purchase on the effective date of the Plan (the "Effective Date"), and the Company commits to cause New Tronox to sell, for the Purchase Price per share, that percentage of the Unsubscribed Shares (as defined below) set forth opposite such Backstop Party's name on Schedule 1 (the "Commitment Percentage").  For purposes of this Agreement, "Unsubscribed Shares" shall mean the Offered Shares not purchased by Eligible Holders in the Rights Offering on or before the Expiration Time (as defined below).

WHEREAS, the Company will conduct the Rights Offering pursuant to the Plan, which shall include the terms set forth in the term sheet attached hereto as Exhibit A, (the "Term Sheet") and such other terms and conditions as (i) the Company, (ii) the Ad-Hoc Committee (the "Committee") of holders of the 9.5% senior unsecured notes (the "Senior Notes") issued under the Indenture, dated November 28, 2005, between Tronox Worldwide LLC, as issuer, and Citibank N.A., as indenture trustee, and any other Backstop Party, (iii) the United States of America (the "United States") and (iv) the official committee of unsecured creditors of Tronox (the "UCC") deem necessary or desirable and which terms shall not (a) adversely affect the obligations or rights of the Backstop Parties hereunder, (b) cause any representation or warranty contained herein to be incorrect or (c) be inconsistent with the terms of the Term Sheet, and which Rights Offering shall be approved by the Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") administering the Company's and certain of its

Subsidiaries' (collectively, the "Debtors") chapter 11 proceedings (the "Chapter 11 Cases") under the United States Bankruptcy Code, 11 U.S.C. §§ 101, et seq., (the "Bankruptcy Code").

WHEREAS, simultaneously with the delivery of this Agreement, (i) the Company, each of the Backstop Parties, the UCC and certain other parties have entered into the Plan Support Agreement, attached hereto as Exhibit B (the "Plan Support Agreement") and (ii) the Credit Agreement has been entered into.

NOW, THEREFORE, in consideration of the foregoing, and the representations, warranties and covenants set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged by the parties hereto, the Company and the Backstop Parties hereby agree as follows:

1.      The Rights Offering.  The Rights Offering will be conducted as follows:

(a)      Subject to the terms and conditions of this Agreement, the Company hereby undertakes to cause New Tronox to offer Shares for subscription by holders of Rights as set forth in this Agreement.

(b)      In connection with the Plan, the Company shall issue Rights to purchase 10,096,154 Shares in the aggregate.  Each Eligible Holder as of the Record Date will receive a Right to purchase up to its Holder Pro Rata Share of the Offered Shares at the Purchase Price per Share.  The ballot form(s) (the "Ballots") distributed to Eligible Holders in connection with the solicitation of acceptance of the Plan shall provide a means whereby each Eligible Holder may exercise its Right.  The Rights may be exercised during a period (the "Rights Exercise Period") specified in the Plan, which period will commence on the date the Ballots are distributed and will end at the Expiration Time.  For the purposes of this Agreement, the "Expiration Time" means 5:00 p.m., New York City time, on the 20th calendar day (or if such day is not a Business Day, the next Business Day) from and including the date the Ballots are distributed under the Plan, or such later date as the Company, subject to the approval of the Required Backstop Parties (as defined below), may specify in a notice provided to the Backstop Parties before 9:00 a.m., New York City time, on the Business Day before the then-effective Expiration Time.  For the purposes of this Agreement, "Business Day" means each Monday, Tuesday, Wednesday, Thursday and Friday that is not a day on which banking institutions in New York City are generally authorized or obligated by law or executive order to close.  Subject to the approval of this Agreement by the Bankruptcy Court, the Plan shall provide that in order to exercise a Right, each Eligible Holder, other than the Backstop Parties, shall, prior to the Expiration Time, (i) return a duly executed Ballot to the Subscription Agent (as defined below), which indicates the election of such Eligible Holder to purchase Shares and such Eligible Holder's vote to accept the Plan, and (ii) pay an amount equal to the full aggregate Purchase Price for the number of Shares elected to be purchased by such Eligible Holder by wire transfer of immediately available funds reasonably in advance of the date on which the hearing to confirm the Plan is scheduled to commence, but in no event no less than ten (10) Business Days prior to the Effective Date, to an escrow account established by the Company or New Tronox for the Rights Offering.

(c)      The Rights will not be transferrable, and can be exercised in part or in full.

(d)     New Tronox will issue the Shares to the Eligible Holders with respect to which Rights were validly exercised by such holder, upon the Effective Date. If the exercise of a Right would result in the issuance of a fractional share of New Common Stock, then the number of shares of New Common Stock to be issued in respect of such Right will be calculated to one decimal place and rounded down to the next lower whole share.

(e)     The Plan will provide that the Company, New Tronox or the Subscription Agent will give notice to each Eligible Holder with respect to which Rights were validly exercised by such holder, advising them of (i) the number of whole shares of New Common Stock that they are bound to purchase pursuant to the Rights Offering, and the aggregate Purchase Price thereof and (ii) the date or time after the notice by which a wire transfer of such aggregate Purchase Price must be received and (iii) wire transfer instructions for wiring such aggregate Purchase Price to the subscription agent for the Rights Offering (the "Subscription Agent") or another person designated by the Company or New Tronox.

(f)     If the Subscription Agent for any reason does not receive from an Eligible Holder both a timely and duly completed Ballot and timely payment of such holder's Purchase Price prior to the Expiration Time, the Plan shall provide that such Eligible Holder shall be deemed to have irrevocably relinquished and waived its right to participate in the Rights Offering.

(g)     The Company hereby agrees and undertakes to give or cause New Tronox to give, or instruct the Subscription Agent to give, the Backstop Parties, by electronic facsimile transmission or by electronic mail, a notice conforming to the requirements specified herein of either (i) the number of Unsubscribed Shares and the aggregate Purchase Price therefor (each, a "Purchase Notice") or (ii) in the absence of any Unsubscribed Shares, the fact that there are no Unsubscribed Shares and that the Backstop Commitment (as defined below) is terminated (each, a "Satisfaction Notice") as soon as practicable after the Expiration Time and, in any event, not less than seven (7) Business Days prior to the Effective Date (the date of transmission of confirmation of a Purchase Notice or a Satisfaction Notice, the "Determination Date").

(h)     The Company and New Tronox will prepare an offering memorandum for the Rights Offering, which offering memorandum shall be used for purposes of offering the Offered Shares pursuant to the Rights, and which shall be reasonably acceptable to the Required Backstop Parties in all material respects.

(i)     The Offered Shares will be issued without registration under the Securities Act in reliance upon the exemption from registration under the Securities Act provided by Section 4(2) of the Securities Act.

(j)     Notwithstanding anything to the contrary in this Agreement, in the event an Eligible Holder fails to vote to accept the Plan, or otherwise objects to the Plan or files with the Bankruptcy Court an objection, motion or any other type of writing without the consent of Required Backstop Parties, such Eligible Holder shall have no right to receive any Offered Shares pursuant to the Rights Offering or otherwise.

2.    The Backstop Commitment.

(a)    Subject to the conditions set forth in <u>Section 7</u>, each Backstop Party agrees, severally (and not jointly or jointly and severally), to subscribe for and purchase on the Effective Date, and the Company agrees to cause New Tronox to sell and issue, at the aggregate Purchase Price therefor, such Backstop Party's Commitment Percentage of Unsubscribed Shares as of the Expiration Time (the "<u>Backstop Commitment</u>").

(b)    Subject to the entry of a final, non-appealable Confirmation Order (as defined below) in accordance with the Term Sheet, New Tronox will pay to the Backstop Parties an aggregate backstop commitment fee of 403,846 shares of New Common Stock, representing four percent (4%) of the Offered Shares (the "<u>Backstop Fee</u>"), distributed in accordance with the Commitment Percentage, to compensate each such Backstop Party for the risk of its undertakings herein.  The Backstop Fee will be earned upon the execution of this Agreement, will be payable on the Effective Date, whether or not any Unsubscribed Shares are purchased pursuant to the Backstop Commitment and will be nonrefundable when paid.  Notwithstanding the foregoing, if the Effective Date should not occur and this Agreement is terminated in accordance with the provisions hereof, (i) the Backstop Fee shall be paid in cash on the date of such termination, if terminated by the Company, and within two (2) Business Days if terminated by the Backstop Parties, and shall be an amount equal to four percent (4%) of the Purchase Price of the Offered Shares (i.e., $4.2 million), and (ii) the full amount of the Backstop Fee and the Extension Fee (as defined below), if applicable, shall constitute administrative expenses of the Company under section 364(c)(1) of the Bankruptcy Code.  In addition to the Backstop Fee, the Backstop Parties shall be entitled to an extension fee (the "<u>Extension Fee</u>") equal to two percent (2%) of the Purchase Price of the Offered Shares (i.e., $2.1 million), in the event the Extension Event occurs.  The Extension Fee shall be payable in cash upon delivery of the notice with respect to the Extension Event.  The Backstop Parties agree that they shall not be entitled to any fee or payment other `than as provided in this <u>Section 2(b)</u> and <u>Section 2(c)</u> in connection with the Backstop Commitment or this Agreement and hereby irrevocably waive all rights to other fees and payments from any Debtor, any of their respective Affiliates or New Tronox in connection with the Backstop Commitment.

(c)    Subject to the procedures set forth in the work fee order (but not the fee and expense cap set forth therein), the Company will reimburse or pay, as the case may be, the reasonable and documented out-of-pocket expenses of the Backstop Parties, including the reasonable and documented fees and expenses of Broadpoint Capital, Inc., financial advisor to the Backstop Parties, as set forth in its engagement letter attached as <u>Exhibit D</u>, and Milbank, Tweed, Hadley & McCloy LLP, legal advisor to the Committee and the Backstop Parties and reasonable and documented fees and expenses of any other professionals reasonably retained by the Backstop Parties in connection with the transactions contemplated hereby (collectively, "<u>Transaction Expenses</u>"); *provided*, that the Company shall not be responsible for the fees or expenses of more than one financial advisor or more than one firm of counsel, together with appropriate local counsel to the Committee and the Backstop Parties.  Such reimbursement or payment shall be made by the Company within five (5) Business Days of presentation of an invoice approved by the Committee and/or the Backstop Parties, as the case may be, without Bankruptcy Court review or further Bankruptcy Court order (but subject to any conditions imposed by the Bankruptcy Court), whether or not the transactions contemplated hereby are

consummated, *provided*, *however*, that any payment of a fee to the Backstop Parties' financial advisor shall be conditioned upon the consummation of the transactions contemplated by this Agreement, in which case payment of such fee shall be made on the Effective Date. These obligations are in addition to, and do not limit, the Company's obligations under Section 8. The provision for the payment of the Transaction Expenses is an integral part of the transactions contemplated by this Agreement, and without this provision, the Backstop Parties would not have entered into this Agreement and shall constitute an administrative expense of the Company under section 364(c)(1) of the Bankruptcy Code.

(d)     As promptly as practicable, but in any event at least five (5) Business Days prior to the Effective Date, the Company will provide a Purchase Notice or a Satisfaction Notice to the Backstop Parties as provided above, setting forth a true and accurate determination of the aggregate number of Unsubscribed Shares, if any; *provided*, that on the Effective Date the Backstop Parties will purchase, and the Company will sell, only such number of Unsubscribed Shares as are listed in the Purchase Notice, without prejudice to the rights of the Backstop Parties to seek later an upward or downward adjustment if the number of Unsubscribed Shares in such Purchase Notice is inaccurate.

(e)     Delivery of the Unsubscribed Shares will be made by the Company to the accounts of the Backstop Parties (or to such other accounts as the Backstop Parties may designate in writing to the Company at least two Business Days prior to the Effective Date) at 9:00 a.m., New York City time, on the Effective Date against payment of the aggregate Purchase Price for the Unsubscribed Shares by wire transfer at least one (1) Business Day prior to the Effective Date of federal (same day) funds to the account specified by the Company to the Backstop Parties at least three (3) Business Days in advance.

(f)     All Unsubscribed Shares will be delivered with any and all issue, stamp, transfer or similar taxes or duties payable in connection with such delivery duly paid by the Company to the extent required under the Confirmation Order or applicable law.

(g)     The documents to be delivered on the Effective Date by or on behalf of the parties hereto and the Unsubscribed Shares will be delivered at the offices of Kirkland & Ellis LLP, 601 Lexington Avenue, New York, NY 10022, Attention: Andrew E. Nagel.

(h)     Notwithstanding anything to the contrary in this Agreement, the Backstop Parties, in their sole discretion, may designate in writing at least two (2) Business Days prior to the Effective Date that some or all of the Shares be issued in the name of, and delivered to, one or more of their affiliates or to any other person or entity and provide all information reasonably requested by the Company in connection therewith.

(i)     No Backstop Party shall have any liability for the Backstop Commitment of any other Backstop Party.

3.      Representations and Warranties of the Company.  The Company hereby represents and warrants to the Backstop Parties, on the date hereof (except as set forth in Section 3(s), below) and on the Effective Date, that the following statements are true and correct (it being understood and agreed that (i) none of the representations and warranties contained herein shall relate in any

way to the Legacy Assets, any liabilities related thereto and any other liabilities that, in each case, will not be acquired or assumed by New Tronox , and (ii) the representations and warranties made on the Effective Date are deemed to be made concurrently with the consummation of the transactions contemplated hereby):

(a)     Projections.  On and as of the date hereof, the projections of Tronox Worldwide LLC, a Delaware limited liability company ("Tronox Worldwide"), and its Subsidiaries for the period commencing with the date hereof through December 31, 2013 (the "Projections") are based on good faith estimates and assumptions made by the management of the Company; *provided*, that the Projections are not to be viewed as facts and that actual results during the period or periods covered by the Projections may differ from such Projections and that the differences may be material; *provided*, *further*, that as of the date hereof, management of Tronox Worldwide believed that the Projections were reasonable and attainable.

(b)     Organization; Requisite Power and Authority; Qualification.

(i)     Company and Subsidiaries.  Each of the Company and its Subsidiaries (A) is duly organized, validly existing and in good standing under the laws of its jurisdiction of organization as identified in Schedule 3(b), (B) has all requisite power and authority to own and operate its properties, to carry on its business as now conducted and as proposed to be conducted, and the Company, upon entry by the Bankruptcy Court of the ECA Order, has all requisite power and authority to enter into this Agreement and to carry out the transactions contemplated hereby, and (C) is qualified to do business and in good standing in every jurisdiction where its assets are located and wherever necessary to carry out its business and operations, except in jurisdictions where the failure to be so qualified or in good standing has not had, and could not be reasonably expected to have, a Material Adverse Effect.

(ii)     New Tronox.

(A)     On the date of the Rights Offering and on the Effective Date, New Tronox (1) will be duly organized, validly existing and in good standing under the laws of its jurisdiction of organization, (2) will have all requisite power and authority to own and operate its properties, to carry on its business as then conducted and as proposed to be conducted, and (3) will be qualified to do business and in good standing in every jurisdiction where its assets will be located and wherever necessary to carry out its business and operations.

(B)     Unless otherwise agreed to by the Required Backstop Parties, at the Effective Date, New Tronox shall have authorized for issuance 50,000,000 shares of New Common Stock and 1,000,000 shares of preferred stock, with a par value to be determined by the Required Backstop Parties.  At the Effective Date, after giving effect to the distributions under the Plan, the purchase of Shares pursuant to the Rights Offering and the purchase and issuance of Shares under this Agreement, there will be issued and outstanding 15,000,000 shares of New Common Stock.  Except as set forth in the preceding sentence, at the Effective Date (i) there will not be issued or outstanding any shares of capital stock of New Tronox, or any options, right, warrants, convertible or exchangeable securities or other instruments obligating New Tronox to issue, or Tronox to cause to be issued, any shares of capital stock of New Tronox and (ii) there will not be any contracts, agreements or other arrangements obligating New Tronox to issue, or

Tronox to cause to be issued, or entitling any person to purchase, any shares of capital stock of New Tronox.

(C)     On the Effective Date, except to the extent set forth in the Environmental Settlement Documents and the Plan, New Tronox shall have no liabilities or obligations under any environmental, health or safety laws arising out of or related to facts, events or circumstances occurring or in existence prior to the Effective Date other than such liabilities or obligations arising out of or related to the ownership or operation of the real property owned or leased by New Tronox.

(c)     Due Authorization.

(i)     Upon entry by the Bankruptcy Court of the ECA Order, the execution, delivery and performance of this Agreement have been duly authorized by all necessary corporate action on the part of the Company.

(ii)    The distribution of the Rights and issuance of the New Common Stock on the Effective Date will have been duly and validly authorized by all necessary corporate action of the Company or New Tronox, as applicable.

(iii)   Subject to entry of the Confirmation Order and the expiration, or waiver by the Bankruptcy Court, of the 14-day period set forth in Bankruptcy Rule 3020(e), on the Effective Date, the Debtors and New Tronox will have the requisite corporate or other entity power and authority to execute the Plan and to perform their obligations thereunder, and will have taken all necessary corporate other entity actions required for the due authorization, execution, delivery and performance by the Debtors and New Tronox of the Plan.

(d)     Binding Obligation.

(i)     Upon entry by the Bankruptcy Court of the ECA Order, this Agreement has been duly executed and delivered by the Company and, upon entry by the Bankruptcy Court of the ECA Order, is the legally valid and binding obligation of the Company, enforceable against the Company in accordance with its terms, except as may be limited by bankruptcy, insolvency, reorganization, moratorium or similar laws relating to or limiting creditors' rights generally or by equitable principles relating to enforceability.

(ii)    Subject to the approval of this Agreement by the Bankruptcy Court, the Shares, when issued and sold pursuant to the valid exercise of Rights or issued and sold to the Backstop Parties hereunder, will, when issued and delivered against payment therefor in the Rights Offering or to the Backstop Parties hereunder, be duly and validly issued, fully paid and non-assessable, and free and clear of all Liens, and shall not be subject to any pre-emptive or similar rights.

(iii)   The Plan will be duly and validly filed with the Bankruptcy Court by the Debtors and, upon the entry of the ECA Order and the expiration, or waiver by the Bankruptcy Court, of the 14-day period set forth in Bankruptcy Rule 3020(e), will constitute the valid and binding obligation of the Debtors and New Tronox, enforceable against the Debtors and New Tronox in accordance with its terms, subject to general equitable principles.

(e)    No Conflict.  Subject to the entry of the Confirmation Order and the expiration, or waiver by the Bankruptcy Court, of the 14-day period set forth in Bankruptcy Rules 6004(h) and 3020(e), as applicable, and except as set forth on Schedule 3(e), the distribution of the Rights, the issuance, sale and delivery of New Common Stock upon exercise of the Rights and the consummation of the Rights Offering by New Tronox and the execution and delivery (or, with respect to the Plan, the filing) by the Company of this Agreement and the Plan and compliance by the Debtors and New Tronox with all of the provisions hereof and thereof and the consummation of the transactions contemplated herein and therein do not and will not (i) violate (A) any provision of any law or any governmental rule or regulation applicable to the Company or any of its Subsidiaries (including New Tronox), (B) any of the Organizational Documents of the Company or any of its Subsidiaries (including New Tronox), or (C) any order, judgment or decree of any court or other agency of government binding on the Company or any of its Subsidiaries (including New Tronox); (ii) conflict with, result in a breach of or constitute (with due notice or lapse of time or both) a default under any Contractual Obligation of the Company or any of its Subsidiaries (including New Tronox); (iii) result in or require the creation or imposition of any Lien upon any of the properties or assets of the Company or any of its Subsidiaries (including New Tronox) (other than any Liens created under the Credit Agreement); or (iv) require any approval of stockholders, members or partners or any approval or consent of any Person under any Contractual Obligation of the Company or any of its Subsidiaries (including New Tronox), except for such approvals or consents which will be obtained on or before the Effective Date and which are set forth on Schedule 3(e), except in any such case described in subclause (i)(A), (i)(C) or (ii) as would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

(f)    Governmental Consents.    Upon entry by the Bankruptcy Court of the Confirmation Order, the consummation of the transactions contemplated by this Agreement do not and will not require any filing or registration with, consent or approval of, or notice to, or other action to, with or by, any Governmental Authority, except for (i) the entry of the Confirmation Order and the expiration, or waiver by the Bankruptcy Court, of the 14-day period set forth in Bankruptcy Rules 6004(h) and 3020(e), as applicable; (ii) filings with respect to and the expiration or termination of the waiting period under the Hart-Scott-Rodino Antitrust Improvements Act of 1976 (15 U.S.C. §§ 15c-15h, 18a) (as amended, the "HSR Act"), if applicable, (iii) such registrations, consents, approvals, notices or other actions as may be reasonably required under state securities or "blue sky" laws in connection with the purchase of Unsubscribed Shares by the Backstop Parties; and (iv) such registrations, consents, approvals, notices or other actions set forth on Schedule 3(f).

(g)    Historical Financial Statements.  The Historical Financial Statements (other than restatements due to environmental or tort liabilities) were prepared in conformity with GAAP and fairly present, in all material respects, the financial position, on a consolidated basis, of the Persons described in such financial statements as at the respective dates thereof and the results of operations and cash flows, on a consolidated basis, of the entities described therein for each of the periods then ended, subject, in the case of any such unaudited financial statements, to changes resulting from audit and normal year end adjustments.

(h)    No Registration Requirement.  Based in part upon the representations and warranties of the Backstop Parties set forth in Section 4(h), none of the offer or issuance of the

Rights, the offer or sale of the Shares pursuant to the exercise of any of the Rights or the offer or sale of the Shares to the Backstop Parties pursuant to this Agreement requires any registration of the Shares or the Rights under the Securities Act, any state securities or "blue sky" laws or any foreign securities laws.  No form of general solicitation or general advertising was used or will be used in connection with the offering or sale of the Rights or the Shares and none of the Company, any of its Subsidiaries, New Tronox, or anyone acting on its or their behalf has taken or will take any action that would render unavailable the exemption from registration provided by Section 4(2) of the Securities Act or otherwise subject the issuance or sale of the Rights or the Shares to the registration requirements of Section 5 of the Securities Act or to the registration requirements of any state securities or "blue sky" laws or any foreign securities laws (including, without limitation, offering the Rights or Shares for sale to, or soliciting any offer to buy any of the same from, any person or under any circumstances that would render such exemption unavailable).  None of the Company or its Subsidiaries (including New Tronox), nor any person acting on its or their behalf, has, directly or indirectly, made any offers or sales of any security or solicited any offers to buy any security, under circumstances that could cause this offering of the Unsubscribed Shares to be integrated with any other offerings by the Company or New Tronox for purposes of the Securities Act, nor will the Company or its affiliates take any action or steps that could cause the offering of the Shares to be integrated with other offerings.

(i)        No Material Adverse Effect.  Since September 30, 2008, other than the filing of the Chapter 11 Cases, no event, circumstance or change has occurred that has caused or evidences, or would reasonably be expected to result in, either in any case or in the aggregate, a Material Adverse Effect.

(j)        Compliance with Statutes, Etc.  Each of the Company and its Subsidiaries is in compliance with all applicable statutes, regulations and orders of, and all applicable restrictions imposed by, all Governmental Authorities, in respect of the conduct of its business and the ownership of its property, except such non-compliance that, individually or in the aggregate, would not reasonably be expected to result in a Material Adverse Effect.

(k)        No Defaults.  Neither the Company nor any of its Subsidiaries is in default in the performance, observance or fulfillment of any of the obligations, covenants or conditions contained in any of its Post-Petition Contractual Obligations other than as a result of the filing of the Chapter 11 Cases (and any payment default directly related to such filing), and no condition exists which, with the giving of notice or the lapse of time or both, would constitute such a default, except where the consequences, direct or indirect, of such default or defaults, if any, would not reasonably be expected to have a Material Adverse Effect.

(l)        Material Contracts.  Schedule 3(l) contains a true, correct and complete list of all the Material Contracts in effect on the date hereof, and except as described thereon, all such Material Contracts are in full force and effect and no Post-Petition defaults exist thereunder on the date hereof other than as a result of the filing of the Chapter 11 Cases (and any payment default directly related to such filing as of the date hereof).

(m)        Adverse Proceedings, Etc.  Except for the Chapter 11 Cases, there are no Adverse Proceedings, individually or in the aggregate, that would reasonably be expected to have a Material Adverse Effect.  Neither the Company nor any of its Subsidiaries (i) is in violation of

any applicable laws that, individually or in the aggregate, would reasonably be expected to have a Material Adverse Effect, or (ii) is subject to or in default with respect to any final judgments, writs, injunctions, decrees, rules or regulations of any court or any federal, state, municipal or other governmental department, commission, board, bureau, agency or instrumentality, domestic or foreign, that, individually or in the aggregate, would reasonably be expected to have a Material Adverse Effect.

(n)     Employee Matters.  Neither the Company nor any of its Subsidiaries is engaged in any unfair labor practice that would reasonably be expected to have a Material Adverse Effect. There is (i) no unfair labor practice complaint pending against the Company or any of its Subsidiaries, or to the best knowledge of the Company, threatened against any of them before the National Labor Relations Board and no grievance or arbitration proceeding arising out of or under any collective bargaining agreement that is so pending against the Company or any of its Subsidiaries or to the best knowledge of the Company, threatened against any of them, (ii) no strike or work stoppage in existence or threatened involving the Company or any of its Subsidiaries, and (iii) to the best knowledge of the Company, no union representation question existing with respect to the employees of the Company or any of its Subsidiaries and, to the best knowledge of the Company, no union organization activity that is taking place, except (with respect to any matter specified in clause (i), (ii) or (iii) above, either individually or in the aggregate) such as is not reasonably likely to have a Material Adverse Effect.

(o)     Properties.

(i)     Title.   Each of the Company and its Subsidiaries has, and upon consummation of the transactions contemplated hereby and by the Plan, at the Effective Date, New Tronox will have (A) good, sufficient and legal title to (in the case of fee interests in real property), (B) valid leasehold interests in (in the case of leasehold interests in real or personal property), (C) valid licensed rights in (in the case of licensed interests in Intellectual Property) and (D) good title to (in the case of all other personal property), all of their respective properties and assets reflected in their respective Historical Financial Statements (as restated) referred to in Section 3(g) and in the most recent financial statements delivered pursuant to Section 5(l), in each case, except for (x) assets disposed of since the date of such financial statements in the ordinary course of business and (y) the Legacy Assets.  All such properties and assets are free and clear of Liens other than Permitted Liens.

(ii)     Real Estate.   As of the date hereof, Schedule 3(o)(ii) contains a true, accurate and complete list of (A) all Real Estate Assets, and (B) all leases, subleases or assignments of leases (together with all amendments, modifications, supplements, renewals or extensions of any thereof) affecting each Real Estate Asset of the Company and its Subsidiaries, regardless of whether such Person is the landlord or tenant (whether directly or as an assignee or successor in interest) under such lease, sublease or assignment.  Each agreement listed in clause (B) of the immediately preceding sentence is in full force and effect, and the Company does not have knowledge of any default that has occurred and is continuing thereunder, and each such agreement constitutes the legally valid and binding obligation of the Company and its Subsidiaries, enforceable against such Person in accordance with its terms, except as enforcement may be limited by bankruptcy, insolvency, reorganization, moratorium or similar laws relating to or limiting creditors' rights generally or by equitable principles.

(p)     Investment Company Act.  The Company is not, and immediately after giving effect to the offering and sale of the New Common Stock and the application of the proceeds thereof, New Tronox will not be, an "investment company" or an entity "controlled" by an "investment company" within the meaning of the Investment Company Act of 1940, as amended, and the rules and regulations of the Commission thereunder.

(q)     Employee Benefit Plan.  The Company, each of its Subsidiaries and each of their respective ERISA Affiliates are in compliance with all applicable provisions and requirements of ERISA and the Internal Revenue Code and the regulations and published interpretations thereunder with respect to each Employee Benefit Plan, and have performed all their obligations under each Employee Benefit Plan.  Each Employee Benefit Plan which is intended to qualify under Section 401(a) of the Internal Revenue Code has received a favorable determination letter from the Internal Revenue Service indicating that such Employee Benefit Plan is so qualified and nothing has occurred subsequent to the issuance of such determination letter which would cause such Employee Benefit Plan to lose its qualified status.  No liability to the PBGC (other than required premium payments), the Internal Revenue Service, any Employee Benefit Plan or any trust established under Title IV of ERISA has been or is expected to be incurred by the Company, any of its Subsidiaries or any of their ERISA Affiliates.  No ERISA Event has occurred or is reasonably expected to occur.  Except to the extent required under Section 4980B of the Internal Revenue Code or similar state laws, no Employee Benefit Plan provides health or welfare benefits (through the purchase of insurance or otherwise) for any retired or former employee of the Company, any of its Subsidiaries or any of their respective ERISA Affiliates.  The present value of the aggregate benefit liabilities under each Pension Plan sponsored, maintained or contributed to by the Company, any of its Subsidiaries or any of their ERISA Affiliates (determined as of the end of the most recent plan year on the basis of the actuarial assumptions specified for funding purposes in the most recent actuarial valuation for such Pension Plan), did not exceed the aggregate current value of the assets of such Pension Plan.  As of the most recent valuation date for each Multiemployer Plan for which the actuarial report is available, the potential liability of the Company, its Subsidiaries and their respective ERISA Affiliates for a complete withdrawal from such Multiemployer Plan (within the meaning of Section 4203 of ERISA), when aggregated with such potential liability for a complete withdrawal from all Multiemployer Plans, based on information available pursuant to Section 4221(e) of ERISA is zero.  The Company, each of its Subsidiaries and each of their ERISA Affiliates have complied with the requirements of Section 515 of ERISA with respect to each Multiemployer Plan and are not in material "default" (as defined in Section 4219(c)(5) of ERISA) with respect to payments to a Multiemployer Plan.

(r)     Certain Fees.  Except as set forth on Schedule 3(r), no broker's or finder's fee or commission will be payable with respect to the transactions contemplated hereby, except as payable to the Backstop Parties.

(s)     New Sale Agreement Representations.  The representations and warranties set forth in the New Sale Agreement (as defined below) shall be deemed to be incorporated by reference in this Agreement as if set forth herein and to be made by the Company and the other Debtors, jointly and severally, as of the date of such New Sale Agreement and as of the Effective Date.

4.    <u>Representations and Warranties of the Backstop Parties</u>.  Each of the Backstop Parties, severally and not jointly, represents and warrants to, and agrees, with respect to itself only, with, the Company as set forth below.  Each representation, warranty and agreement is made as of the date hereof and as of the Effective Date:

(a)    <u>Organization</u>.  Such Backstop Party has been duly incorporated or formed, as the case may be, and is validly existing as a corporation, a limited partnership, a limited liability company or other business organization, as the case may be, in good standing under the laws of its jurisdiction of incorporation or organization.

(b)    <u>Corporate Power and Authority</u>.  Such Backstop Party has the requisite power and authority to enter into, execute and deliver this Agreement and to perform its obligations hereunder and has taken all necessary action required for the due authorization, execution, delivery and performance by it of this Agreement.

(c)    <u>Execution and Delivery</u>.  This Agreement has been duly and validly executed and delivered by such Backstop Party and constitutes its valid and binding obligation, enforceable against such Backstop Party in accordance with its terms, except as may be limited by bankruptcy, insolvency, reorganization, moratorium or similar laws relating to or limiting creditors' rights generally or by equitable principles relating to enforceability.

(d)    <u>No Conflicts</u>.  The execution, delivery, and performance by such Backstop Party of this Agreement do not and shall not (i) violate any provision of its certificate of incorporation or by-laws (or other organizational documents) or any law, rule, or regulation applicable to it or (ii) conflict with, result in a breach of, or constitute (with due notice or lapse of time or both) a default under any material contractual obligation to which it is a party or under its certificate of incorporation or by-laws (or other organizational documents).

(e)    <u>Legal Proceedings</u>.  No litigation or proceeding before any court, arbitrator, or administrative or governmental body is pending against it that could reasonably be expected to adversely affect such Backstop Party's ability to enter into this Agreement or perform its obligations hereunder.

(f)    <u>Consents and Approvals</u>.  No consent, approval, order, authorization, registration or qualification of or with any court or governmental agency or body having jurisdiction over such Backstop Party or such Backstop Party's affiliates, is required in connection with the execution and delivery of this Agreement or the consummation of the transactions contemplated hereby, except for any consent, approval, order or authorization required under the Bankruptcy Code.

(g)    <u>Sufficiency of Funds</u>.  Such Backstop Party has, or is the investment advisor or investment manager for entities that have, and on the Effective Date will have or is the investment advisor or investment manager for entities that will have, sufficient immediately available funds to make and complete the payment of the aggregate Purchase Price for its portion of the Unsubscribed Shares and the availability of such funds is not subject to the consent, approval or authorization of any third party.

(h)    Sophistication and Investment Intent.  Such Backstop Party has such knowledge, sophistication and experience in business and financial matters so as to be capable of evaluating the merits and risks of the prospective investment in the New Common Stock, and has so evaluated the merits and risks of such investment.  Such Backstop Party is, as of the date hereof and will be as of the Effective Date, an "accredited investor" within the meaning of Rule 501(a) under the Securities Act. Such Backstop Party understands and is able to bear any economic risks associated with such investment (including, without limitation, the complete loss of such investment).  Such Backstop Party is acquiring the New Common Stock in good faith solely for its own account or accounts managed by it, for investment and not with a view toward distribution in violation of the Securities Act.  Such Backstop Party acknowledges that the Company will rely upon the truth and accuracy of the foregoing as well as the other representations, warranties and other agreements of such Backstop Party in connection with the transactions described in this Agreement.  No Backstop Party has used or will use any form of general solicitation or general advertising in connection with the offering or sale of the Rights or the Shares.

(i)    Information.  Such Backstop Party acknowledges that it has been afforded the opportunity to ask questions and receive answers concerning the Company and to obtain additional information.  Notwithstanding the foregoing, nothing contained herein will operate to modify or limit in any respect the representations and warranties of the Company or to relieve the Company from any obligations to such Backstop Party for breach thereof or the making of misleading statements or the omission of material facts in violation of applicable law in connection with the transactions contemplated herein.

(j)    No Broker's Fees.  Such Backstop Party is not a party to any contract, agreement or understanding with any person (other than this Agreement and agreements with respect to professional fees and transaction fees as set forth in the Term Sheet) that would give rise to a valid claim against the Company or any of its Subsidiaries or the Backstop Parties for a brokerage commission, finder's fee or like payment in connection with the offering and sale of the Rights or the Shares.

(k)    Arm's Length.  Such Backstop Party acknowledges and agrees that the Company is acting solely in the capacity of an arm's length contractual counterparty to such Backstop Party with respect to the transactions contemplated hereby (including in connection with determining the terms of the Rights Offering).  Additionally, such Backstop Party is not relying on the Company for any legal, tax, investment, accounting or regulatory advice in any jurisdiction, except as specifically set forth in this Agreement.  Such Backstop Party shall consult with its own advisors concerning such matters and shall be responsible for making its own independent investigation and appraisal of the transactions contemplated hereby.

5.    Additional Covenants of the Company.  The Company agrees with the Backstop Parties:

(a)    Disclosure Statement and Plan.  The Company will prepare and file with the Bankruptcy Court the Plan (and a related disclosure statement (the "Disclosure Statement")) reflecting the terms and conditions set forth in the Term Sheet and in form and substance reasonably acceptable to the Required Backstop Parties and will use commercially reasonable efforts to seek Bankruptcy Court approval thereof under sections 1125 and 1129 of the

Bankruptcy Code. Prior to filing or disseminating any revision, supplement, modification or amendment to the Plan, the Disclosure Statement or any version of the Plan or the Disclosure Statement, the Company will provide counsel to the Backstop Parties a copy of such filing, revision, modification, supplement or amendment and a reasonable opportunity to review and comment on such documents prior to being filed or disseminated; *provided*, that such review and comment shall not constitute a presumption or other determination that the documents constitute (and comply with the definition of) either a Plan or a Disclosure Statement, as applicable. In addition, the Company will provide counsel to the Backstop Parties a copy of a draft of the Confirmation Order and a reasonable opportunity to review such draft prior to such order being filed with the Bankruptcy Court. The Company shall not make any revision, supplement, modification or amendment to the Plan or the Disclosure Statement that would change, in a manner that is adverse to the Backstop Parties, any of the terms set forth on the Term Sheet without the prior written consent of more than sixty-five percent (65%) of the Backstop Parties (by purchase obligation) (the "Required Backstop Parties"), and (ii) with respect to any change that adversely affects a Backstop Party in a manner different from the other Backstop Parties, the consent of such Backstop Party.

(b)     Rights Offering. The Company will cause New Tronox to effectuate the Rights Offering as provided herein and to use commercially reasonable efforts to seek entry of an order of the Bankruptcy Court, prior to the commencement of the Rights Offering, authorizing the Company, New Tronox and the other Debtors to conduct the Rights Offering pursuant to the securities exemption provisions set forth in section 4(2) of the Securities Act.

(c)     Notification. The Company will notify, or cause New Tronox or the Subscription Agent to notify, on each Friday during the Rights Exercise Period and on each Business Day during the five (5) Business Days prior to the Expiration Time (and any extensions thereto), or more frequently if reasonably requested by the Required Backstop Parties, each Backstop Party of the aggregate principal amount of Rights known by the Company, New Tronox or the Subscription Agent to have been exercised pursuant to the Rights Offering as of the close of business on the preceding Business Day or the most recent practicable time before such request, as the case may be.

(d)     Unsubscribed Shares. The Company will determine, or instruct New Tronox or the Subscription Agent to determine, the number of Unsubscribed Shares, if any, in good faith, and to provide, or instruct New Tronox or the Subscription Agent to provide a Purchase Notice or a Satisfaction Notice that reflects the principal amount of Unsubscribed Shares as so determined and to provide to the Backstop Parties, such written backup to the determination of the Unsubscribed Shares as a Backstop Party may reasonably request.

(e)     Use of Proceeds. The Company will cause New Tronox to apply the net proceeds from the sale of the New Common Stock as provided in the Term Sheet.

(f)     Registration Rights Agreement. The Company will file with the Bankruptcy Court as soon as practicable a form of a registration rights agreement in connection with the New Common Stock (the "Registration Rights Agreement") in form and substance reasonably acceptable to the Company, the Required Backstop Parties and the UCC. The Company and the Backstop Parties shall use commercially reasonable efforts to negotiate and execute, and seek

Bankruptcy Court approval of, the Registration Rights Agreement as promptly as practicable following the date hereof.

(g)     <u>Listing</u>. The Company and New Tronox will use commercially reasonable efforts to list the New Common Stock on the NYSE or The NASDAQ Stock Market as soon as reasonably practicable after the Effective Date.

(h)     <u>Stock Splits, Dividends, etc.</u> In the event of any stock split, stock dividend, stock combination or similar transaction affecting the number of issued and outstanding shares of New Common Stock prior to the Effective Date, the Purchase Price and the number of Unsubscribed Shares to be purchased hereunder will be proportionally adjusted to reflect the increase or decrease in the number of issued and outstanding shares of New Common Stock.

(i)     <u>HSR and Other Competition Law</u>. The Company and New Tronox use their commercially reasonable efforts to promptly prepare and file all necessary documentation and to effect all applications that are necessary or reasonably required under the HSR Act and similar laws of any relevant foreign jurisdiction, if any, so that (A) the applicable waiting period, if any, shall have expired or been terminated thereunder with respect to the issuance of Shares hereunder, and (B) all transactions contemplated hereby and pursuant to the Plan shall have been approved, if required, and not to take any action that is intended or reasonably likely to materially impede or delay the ability of the parties to obtain any necessary approvals reasonably required for the transactions contemplated by this Agreement.

(j)     <u>Form D and Blue Sky</u>. The Company will timely file, or to cause New Tronox to timely file, a Form D with the Commission with respect to the Unsubscribed Shares to the extent required under Regulation D of the Securities Act and to provide, upon request, a copy thereof to each Backstop Party. The Company shall, or shall cause New Tronox to, on or before the Effective Date, take such action as the Company shall reasonably determine is necessary in order to obtain an exemption for, or to qualify the Unsubscribed Shares for, sale to the Backstop Parties at the Effective Date pursuant to this Agreement under applicable securities and "blue sky" laws of the states of the United States (or to obtain an exemption from such qualification) and any applicable foreign jurisdictions, and shall provide evidence of any such action so taken to the Backstop Parties on or prior to the Effective Date. The Company shall make all timely filings and reports relating to the offer and sale of the Unsubscribed Shares required under applicable securities and "blue sky" laws of the states of the United States following the Effective Date. The Company shall pay all fees and expenses in connection with satisfying its obligations under this <u>Section 5(j)</u>.

(k)     <u>Reporting Status</u>. With a view to making available to the Backstop Parties and any of their successors the benefits of Rule 144 (or any similar rule or regulation of the Commission that may at any time permit the Backstop Parties to sell the Shares to the public without registration ("<u>Rule 144</u>")), promulgated under the Securities Act, for so long as any Shares remain outstanding and regardless of whether or not New Tronox has a class of securities registered under the Exchange Act, the Company shall: (1) keep adequate current public information available (as required by Rule 144); (2) file with the Commission in a timely manner all reports and other documents required of the Company under the Securities Act and the Exchange Act; (3) furnish to each Backstop Party and their successors, so long as such Backstop

Party owns Shares, promptly upon request, (A) a written statement by the Company, if true, that it has complied with the applicable reporting requirements of Rules 144, the Securities Act and the Exchange Act, (B) a copy of the most recent annual or quarterly report of the Company and copies of such other reports and documents so filed by the Company, and (C) such other information as may be reasonably requested to permit the Backstop Parties to sell such Shares pursuant to Rule 144 without registration.

(l)  Conduct of Business.

(i)  Except (x) as otherwise expressly contemplated by this Agreement, as expressly permitted under the Credit Agreement (without the obtaining of any consent or waiver thereunder), the Plan or the Term Sheet, (y) with the prior written consent of the Required Backstop Parties, or (z) as set forth on Schedule 5(l), from the date hereof until the Effective Date, the Company shall, and shall cause each if its Subsidiaries and Tiwest Pty Ltd, ACN 009 343 364, a Western Australia company ("Tiwest") (to the extent permitted in the Tiwest Joint Venture Documents) to, use their reasonable best efforts to operate the Company's, Tiwest's and their respective Subsidiaries' facilities and to conduct the business and the Tiwest Joint Venture in substantially the same manner as conducted by such entities prior to the date hereof, including by using their reasonable best efforts to (A) meet all material Post-Petition obligations relating to the business as they become due and (B) preserve intact its present business organization, material permits, and its relationships with its key customers and suppliers.

(ii)  Without limiting the generality of the foregoing, except (x) as otherwise expressly contemplated by this Agreement, as expressly permitted under the Credit Agreement (without the obtaining of any consent or waiver thereunder), the Plan or the Term Sheet, (y) with the prior written consent of the Required Backstop Parties, or (z) as set forth on Schedule 5(l), from the date hereof until the Effective Date, the Company shall not, and shall cause each of its Subsidiaries not to, do, and shall not approve or authorize Tiwest or the Tiwest Joint Venture to do, any of the following:

(A)  offer, issue, deliver, sell, pledge or otherwise encumber or subject to any lien (other than a Permitted Lien) the capital stock or other equity interests of the Company or any of its Subsidiaries, or Tiwest, or securities convertible into or exchangeable for, or any rights, warrants, options to acquire, any such shares of capital stock or other equity interest in any such entity;

(B)  acquire or agree to acquire by merging or consolidating with, or by purchasing a substantial equity interest in or a substantial portion of the assets of, or by any other manner, any business of another person;

(C)  sell, assign, license, transfer, convey, lease, encumber or subject to any lien (other than a Permitted Lien or any lien that will be released at or prior to the Effective Date) or otherwise dispose of any asset having a fair market value in excess of $100,000 individually or $500,000 in the aggregate, other than sales of inventory in the ordinary course of business;

(D)     (1) enter into, assume or reject or amend, restate, supplement, modify, waive or terminate any Material Contract, material permit or unexpired lease, (2) enter into any settlement of any demand, dispute, suit, cause of action, claim or proceeding relating to a Material Contract or (3) enter into any contract that would not be a Material Contract, that (a) is outside the ordinary course of business, (b) delays or is reasonably expected to delay the Effective Date, or (c) subjects the Company or any of its Subsidiaries, including the Tiwest Joint Venture Interests, to any material non-compete or other similar material restriction on the conduct of the business that would be binding following the Effective Date; *provided*, that any contracts entered into in the ordinary course of business in connection with the purchase or sale of raw materials, pigments, ore, chemicals or similar materials used in the operations of the Company or its Subsidiaries are excepted from this clause (D);

(E)     with respect to employees of the Company or any of its Subsidiaries, except as may be required by applicable laws or any benefit plan of the Company or any of its Subsidiaries, (1) grant any increase or acceleration in compensation or benefits, except in the ordinary course of business; (2) grant any increase in severance or termination pay (including the acceleration in the exercisability of any options or in the vesting of shares of common stock (or other property)), except in the ordinary course of business; (3) enter into any employment, deferred compensation, severance or termination agreement with or for the benefit of any such employee who is a management-level employee or anyone who upon hire, would become any such employee; or (4) terminate the employment of any such employee except due to cause, death, disability or as otherwise determined in the reasonable discretion of the Debtors exercising their business judgment, as consistent with the ordinary course of business;

(F)     (1) authorize or agree to any material changes in or to the current approved budget or business plan of the Tiwest Joint Venture, (2) encourage or recommend any material changes to the current approved budget or business plan of the Tiwest Joint Venture to the Tiwest Joint Venture Participants, and (3) act in any way other than in accordance, in all material respects, with the current approved budget or business plan of the Tiwest Joint Venture, in each case, as in effect from time to time;

(G)     (1) adopt or change any method of accounting (except as required by changes in generally accepted accounting principles in the United States), or (2) make, change or revoke any tax election, change any annual tax accounting period, file any amended tax return, enter into any closing agreement, settle any tax claim or assessment, surrender any right to claim a tax refund, consent to the extension or waiver of the limitations period applicable to any tax claim or assessment, or take or omit to take any other action if such action or omission would have a material and adverse effect on either New Tronox, the Company or its Subsidiaries (including Tiwest) after the Effective Date;

(H)     permit the Company or Tiwest or their respective Subsidiaries to commit to make any capital expenditures, which, in the aggregate, exceeds the capital expenditure restrictions set forth in Section 6.7(e) of the Credit Agreement;

(I)     adopt or propose any amendments to any the Company's or its Subsidiaries' certificate of incorporation, bylaws or other organizational or governing document or adopt or propose any amendment or modification to or agree to any material amendment or

modification to the Tiwest Joint Venture Documents; except, in each case, in furtherance of the Plan or the Restructuring (as defined in the term sheet), *provided*, *however*, that in no event shall such amendments or modifications, directly or indirectly, adversely affect the Backstop Parties;

(J)     incur, create, assume, guarantee or otherwise become liable for any obligation for borrowed money, purchase money indebtedness or any obligation of any other person or entity, whether or not evidenced by a note, bond, debenture, guarantee, indemnity, letter of credit or similar instrument, except for trade payables incurred in the ordinary course of business;

(K)     (1) declare, set aside or pay any dividends on, or make any other distributions in respect of, any of its capital stock (other than upstream dividends by a direct or indirect wholly-owned subsidiary of the Company to the Company or another Subsidiary of the Company), (2) split, combine or reclassify any of its capital stock or issue or authorize the issuance of any other securities in respect of, in lieu of or in substitution for shares of its capital stock or (3) purchase, redeem or otherwise acquire, except in connection with the Plan, any shares of capital stock of the Company or any other securities thereof or any rights, warrants or options to acquire any such shares or other securities; or

(L)     agree to take any of the foregoing actions.

(m)     <u>Access to Information</u>.  Subject to applicable law and confidentiality agreements between the relevant parties, the Company shall (and shall cause its Subsidiaries to) afford the Backstop Parties and their respective directors, officers, employees, investment bankers, attorneys, accountants and other advisors or representatives, reasonable access, throughout the period prior to the Effective Date, to its employees, properties, books, contracts and records and, during such period, the Company shall (and shall cause its Subsidiaries to) furnish promptly to the Backstop Parties all information concerning its business, properties and personnel as may reasonably be requested by any Backstop Party; *provided*, that the foregoing shall not require the Company (i) to permit any inspection, or to disclose any information, that in the reasonable judgment of the Company would cause the Debtors to violate any of their obligations with respect to confidentiality to a third party if the Debtors shall have used commercially reasonable efforts to obtain the consent of such third party to such inspection or disclosure, (ii) to disclose any privileged information of the Company or any of its Subsidiaries or (iii) to violate any laws; *provided*, *further*, that if the Company withholds any information pursuant to subclauses (i) through (iii) above, it shall notify the legal advisor, orally or in writing, of the Backstop Parties of such action, and shall describe for such advisor the nature of the information not disclosed and the reasons therefor.

(n)     <u>Financial Statements and Other Reports</u>.  Until the Effective Date, the Company shall provide to each Backstop Party the same information as it is required to deliver, pursuant to Section 5.1 of the Credit Agreement, to the Administrative Agent and Lenders under such agreement.

6.    Additional Covenants of the Backstop Parties.  Each of the Backstop Parties, severally and not jointly, agrees with the Company, with respect to itself only:

(a)    No Inconsistent Action.  To not file any pleading or take any other action in the Bankruptcy Court with respect to this Agreement, the Plan, the Disclosure Statement or the Confirmation Order of the consummation of the transactions contemplated hereby or thereby that is inconsistent in any material respect with this Agreement or the Company's efforts to obtain the entry of court orders consistent with this Agreement other than to enforce such Backstop Party's rights and remedies at law or equity, or to enforce the terms of the Term Sheet or this Agreement, *provided*, *however*, that nothing herein shall prevent any of the Backstop Parties to take any action in its capacity as a lender under the Replacement DIP Facility (as defined below).

(b)    Information.  To promptly provide the Company with such information as the Company reasonably requests regarding such Backstop Parties for inclusion in the Disclosure Statement.

(c)    HSR Act.  If required, to use reasonable best efforts to promptly prepare and file all necessary documentation and to effect all applications that are necessary or reasonably required under the HSR Act or similar laws in relevant foreign jurisdictions, so that the applicable waiting period shall have expired or been terminated thereunder with respect to the purchase of Shares hereunder, and not to take any action that is intended or reasonably likely to materially impede or delay the ability of the parties to obtain any necessary approvals required for the transactions contemplated by this Agreement.

7.    Conditions.

(a)    Conditions to the Obligations of Each Party.  The respective obligations of the Backstop Parties and the Company to effect the issuance and purchase of the Unsubscribed Shares pursuant to this Agreement on the Effective Date are subject to the following conditions:

(i)    Confirmation Order.  An order of the Bankruptcy Court confirming a Plan consistent with the Term Sheet and otherwise in form and substance acceptable to the Required Backstop Parties shall have been entered and such order shall be final and non-appealable (the "Confirmation Order"), shall not have been appealed within ten (14) days of entry or, if such order is appealed, shall not have been stayed pending appeal, and there shall not have been entered by any court of competent jurisdiction any reversal, modification or vacatur, in whole or in part, of the Confirmation Order.

(ii)    Conditions to Confirmation.  The conditions to confirmation and the conditions to the Effective Date of the Plan shall have been satisfied or waived in accordance with the Plan.

(iii)    Documentation.  The Company and the Backstop Parties shall have received all the documentation required to consummate the transactions contemplated hereby, and, in the case of the Backstop Parties, an officers' certificate of the Company certifying as to the effect of Section 7(b)(i) hereof and other documents and certificates as the Company and the Backstop Parties may reasonably require, each duly executed and in form and substance reasonably satisfactory to the Company and the Required Backstop Parties.

(iv)    <u>Rights Offering</u>.  The Expiration Time shall have occurred.

(v)    <u>No Restraint</u>.  No judgment, injunction, decree or other legal restraint shall prohibit the consummation of the Plan, the Rights Offering or the transactions contemplated by this Agreement.

(vi)    <u>HSR Act; Regulatory Approvals</u>.  If the purchase of Unsubscribed Shares by any Backstop Party pursuant to this Agreement is subject to the terms of the HSR Act or similar laws of any relevant foreign jurisdiction, the applicable waiting period shall have expired or been terminated thereunder with respect to such purchase.

(vii)    <u>No Legal Impediment to Issuance</u>.  No action shall have been taken and no statute, rule, regulation or order shall have been enacted, adopted or issued in each by any federal, state or foreign governmental or regulatory authority that, as of the Effective Date, prohibits the issuance or sale of the Rights or the New Common Stock pursuant to this Agreement; and no injunction or order of any federal, state or foreign court shall have been issued that, as of the Effective Date, prohibits the issuance or sale of the Rights or the New Common Stock pursuant to the Agreement.

(viii)    <u>Consents</u>.  All material governmental and third party notifications, filings, consents, waivers and approvals required in connection with the transfer of the Assets to New Tronox and the consummation of the Plan, including those set forth on <u>Schedules 3(e)</u> and <u>3(f)</u> attached hereto, shall have been made, obtained or waived.

(b)    <u>Conditions to the Obligations of the Backstop Parties</u>.  The obligation of the Backstop Parties to purchase the Unsubscribed Shares pursuant to this Agreement on the Effective Date are subject to the following conditions:

(i)    <u>Representations and Warranties and Covenants</u>.  The representations and warranties of the Company and the other Debtors set forth in this Agreement, including the representations incorporated by reference (disregarding all qualifications and exceptions contained therein regarding materiality or Material Adverse Effect) shall be true and correct on the date hereof or such other date as specifically stated herein and on the Effective Date as if made on such date, except, where the failure of such representations and warranties to be so true and correct, individually or in the aggregate, would not reasonably be expected to have a Material Adverse Effect.  The Company shall have complied in all material respects with all of its material obligations hereunder and under any other agreement entered into by the Company pursuant to the Plan.

(ii)    <u>No Material Adverse Effect</u>.  Since the date of this Agreement, no Material Adverse Effect shall have occurred and be continuing.

(iii)    <u>Approval of Plan</u>.  Except as otherwise approved in writing by the Required Backstop Parties, (A) the Plan (1) shall be consistent in all material respects with this Agreement and the Term Sheet, (2) shall provide for the release and exculpation of the Backstop Parties, their affiliates, representatives and advisors to the fullest extent permitted under applicable law, and (3) shall have conditions to confirmation and the Effective Date (and to what extent any such conditions can be waived and by whom) that are consistent with this Agreement

and the Term Sheet in all material respects; (B) the Disclosure Statement shall be consistent in all material respects with this Agreement and the Plan; (C) the Confirmation Order shall be consistent in all material respects with this Agreement and the Plan; and (D) any amendments or supplements to any of the foregoing shall be consistent in all material respects with this Agreement and the Plan. For the avoidance of doubt, any change to the type or amount of consideration payable to any holder of a Claim from that specifically set forth in the Term Sheet shall be considered to be materially inconsistent with the Term Sheet.

(iv)     Exit Facility.  On the Effective Date, the Debtor-in-Possession Facility to be provided under the Credit Agreement (the "Replacement DIP Facility") shall have converted into a senior secured and superpriority two tranche term facility (the "Exit Facility") in accordance with the terms of the Credit Agreement.  The Exit Facility shall provide for an aggregate principal loan amount, as of the Effective Date, of $425 million (or such other amount as is agreed to by the Required Backstop Parties).

(v)     Existing Sale Agreement.  The Asset and Equity Purchase Agreement between the Company and certain of its affiliates, on the one hand, and Huntsman Pigments LLC, Huntsman Australia R&D Company Pty Ltd and Huntsman Corporation, on the other hand, dated as of August 28, 2009 (as amended from time to time, the "Existing Sale Agreement"), shall have been terminated pursuant to the provisions of the Existing Sale Agreement.

(vi)     New Sale Agreement.  The Company and certain of its affiliates, on the one hand, and New Tronox, on the other hand, shall have entered into a Purchase and Sale Agreement (the "New Sale Agreement") with respect to the transfer to New Tronox of all assets of the Company and such Subsidiaries, other than the Legacy Assets, on terms consistent with the Term Sheet and otherwise reasonably acceptable to the Company and the Required Backstop Parties, and the transactions contemplated under such agreement shall have been consummated in accordance with the terms of such New Sale Agreement.

(vii)     Corporate Documents.  The Certificate of Incorporation and Bylaws of New Tronox shall be in form and substance reasonably acceptable to the Required Backstop Parties.

(viii)     Environmental Documentation.     The Environmental Settlement Agreements, Custodial Trust Agreements and Custodial Trust Settlement Agreements, and, in each case, all ancillary agreements thereto (including the sale/leaseback and access agreements between the Debtors and the applicable Custodial Trust relating to the Henderson, Nevada plant) shall have been entered into, shall be in form and substance reasonably satisfactory to the Company and the Required Backstop Parties.

(ix)     Other Documentation.  Except for documents described elsewhere in this Section 7(b), all other material documentation prepared in connection with the Plan, and any other material documents, motions, pleadings, orders or the like prepared or filed in connection with the Chapter 11 Cases shall be in form and substance satisfactory to the Company and the Required Backstop Parties.

(x)  Available Funds.  On the Effective Date, immediately after giving effect to the transactions contemplated hereby, New Tronox and its Subsidiaries shall have Excess Availability (after giving effect to any payments required to be paid in connection with the Restructuring, including fees payable under the Exit Facility and fees and expenses payable to legal and financial advisors) equal to or greater than $58,240,000, or such other lower amount as shall be agreed to by the Required Backstop Parties.

(xi)  Amount of Claims.  (A) The aggregate amount of Claims (other than non-governmental CERCLA Claims and Claims with respect to the Senior Notes) shall not exceed $80 million; (B) the aggregate amount of allowed non-governmental CERCLA Claims which are not Tort Claims, shall not exceed the lesser of (x) $100 million, and (y) fifty percent (50%) of the total amount of allowed non-governmental CERCLA Claims; and (C) there shall be no material unresolved non-governmental CERCLA Claims, which, individually or in the aggregate, after having been resolved, reasonably could cause the final aggregate amount of allowed non-governmental CERCLA Claims to exceed $200 million.

(xii)  Purchase Notice.  The Backstop Parties shall have received a Purchase Notice in accordance with Section 1(g), dated as of the Determination Date, stating the principal amount of Unsubscribed Shares to be purchased pursuant to the Backstop Commitment.

(xiii)  Fees.  The Backstop Fee, the Transaction Expenses and, if applicable, the Extension Fee, to the extent not previously paid or reimbursed, shall have been paid or reimbursed in full pursuant to the terms of this Agreement.

(xiv)  Inconsistent Transaction.  The Company shall not have made a public announcement, entered into an agreement, or filed any pleading or document with the Bankruptcy Court, evidencing its support or intention to support any Competing Transaction (as defined below).

(xv)  Registration Rights Agreement.  New Tronox shall have entered into the Registration Rights Agreement with the Backstop Parties in accordance with Section 5(f), in form and substance reasonably satisfactory to the Company and the Required Backstop Parties.

(xvi)  No Environmental Liability.  On the Effective Date, except to the extent set forth in the Environmental Settlement Documents and the Plan, New Tronox shall have no liabilities or obligations under any environmental, health or safety laws arising out of or related to facts, events or circumstances occurring or in existence prior to the Effective Date other than such liabilities or obligations arising out of or related to the ownership or operation of the real property owned or leased by New Tronox.

(c)  Conditions to the Obligations of the Company.  The obligation of the Company to effect the purchase of the Unsubscribed Shares pursuant to this Agreement on the Effective Date are subject to the following conditions:

(i)  Aggregate Purchase Price.  The Backstop Parties shall have delivered to the Company, as the total aggregate purchase price for the Unsubscribed Shares, an amount of readily available (same day) funds denominated in United States Dollars equal to the product obtained by multiplying (A) the Purchase Price (as it may be adjusted in accordance with the

terms hereof) and (B) the number of Unsubscribed Shares (as it may be adjusted in accordance with the terms hereof).

(ii)     <u>Representations and Warranties and Covenants</u>.  The representations and warranties of the Backstop Parties set forth in this Agreement shall be true and correct in all material respects on the date hereof and on the Effective Date as if made on such date.  The Backstop Parties shall have complied in all material respects with all of their respective obligations hereunder (and shall have complied in all respects with their payment obligations hereunder).

8.     <u>Indemnification</u>.

(a)     Whether or not the Rights Offering is consummated or this Agreement is terminated, the Company (in such capacity, the "<u>Indemnifying Party</u>") shall indemnify and hold harmless the Backstop Parties, their respective affiliates and their respective officers, directors, employees, agents and controlling persons (each, an "<u>Indemnified Person</u>") from and against any and all losses, claims, damages, liabilities and reasonable expenses, joint or several, to which any such Indemnified Person may become subject to the extent arising out of or in connection with any third party claim, challenge, litigation, investigation or proceeding with respect to this Agreement, the Rights Offering, the Backstop Commitment, or the transactions contemplated hereby or thereby, including without limitation, payment of the Backstop Fee or the Extension Fee, distribution of Rights, purchase and sale of New Common Stock in the Rights Offering and purchase and sale of Unsubscribed Shares pursuant to this Agreement, or any breach by the Company of this Agreement and to reimburse such Indemnified Persons for any reasonable legal or other reasonable out-of-pocket expenses as they are incurred in connection with investigating, responding to or defending any of the foregoing, provided that the foregoing indemnification will not, as to any Indemnified Person, apply to losses, claims, damages, liabilities or expenses to the extent that they are finally judicially determined to have resulted from any breach of this Agreement by such Indemnified Person or bad faith, gross negligence or willful misconduct on the part of such Indemnified Person.  If for any reason the foregoing indemnification is unavailable to any Indemnified Person or insufficient to hold it harmless, then the Indemnifying Party shall contribute to the amount paid or payable by such Indemnified Person as a result of such loss, claim, damage, liability or expense in such proportion as is appropriate to reflect not only the relative benefits received by the Indemnifying Party on the one hand and such Indemnified Person on the other hand but also the relative fault of the Indemnifying Party, on the one hand, and such Indemnified Person, on the other hand, as well as any relevant equitable considerations.  It is hereby agreed that the relative benefits to the Indemnifying Party on the one hand and all Indemnified Persons on the other hand shall be deemed to be in the same proportion as (i) the total value received or proposed to be received by the Company pursuant to the sale of New Common Stock contemplated by this Agreement bears to (ii) the aggregate fee paid or proposed to be paid to the Backstop Parties in connection with such sale.

(b)     Promptly after receipt by an Indemnified Person of notice of the commencement of any claim, litigation, investigation or proceeding relating to this Agreement, the Rights Offering, the Backstop Commitment, or any of the transactions contemplated hereby or thereby ("<u>Proceedings</u>"), such Indemnified Person will, if a claim is to be made hereunder against the Indemnifying Party in respect thereof, notify the Indemnifying Party in writing of the

commencement thereof; provided that the omission so to notify the Indemnifying Party will not relieve it from any liability that it may have hereunder except to the extent it has been materially prejudiced by such failure. In case any such Proceedings are brought against any Indemnified Person and it notifies the Indemnifying Party of the commencement thereof, the Indemnifying Party will be entitled to participate therein, and, to the extent that it may elect by written notice delivered to such Indemnified Person, to assume the defense thereof, with counsel reasonably satisfactory to such Indemnified Person, provided that if the defendants in any such Proceedings include both such Indemnified Person and the Indemnifying Party and such Indemnified Person shall have concluded that there may be legal defenses available to it that are different from or additional to those available to the Indemnifying Party, such Indemnified Persons shall have the right to select separate counsel to assert such legal defenses and to otherwise participate in the defense of such Proceedings on behalf of such Indemnified Person. Upon receipt of notice from the Indemnifying Party to such Indemnified Person of its election so to assume the defense of such Proceedings and approval by such Indemnified Person of counsel, the Indemnifying Party shall not be liable to such Indemnified Person for expenses incurred by such Indemnified Person in connection with the defense thereof (other than reasonable costs of investigation) unless (i) such Indemnified Person shall have employed separate counsel in connection with the assertion of legal defenses in accordance with the proviso to the next preceding sentence (it being understood, however, that the Indemnifying Party shall not be liable for the expenses of more than one separate counsel representing the Indemnified Persons who are parties to such Proceedings), (ii) the Indemnifying Party shall not have employed counsel reasonably satisfactory to such Indemnified Person to represent such Indemnified Person within a reasonable time after notice of commencement of the Proceedings or (iii) the Indemnifying Party shall have authorized in writing the employment of counsel for such Indemnified Person.

(c) The Indemnifying Party shall not be liable for any settlement of any Proceedings effected without its written consent (which consent shall not be unreasonably withheld). If any settlement of any Proceeding is consummated with the written consent of the Indemnifying Party or if there is a final judgment for the plaintiff in any such Proceedings, the Indemnifying Party agrees to indemnify and hold harmless each Indemnified Person from and against any and all losses, claims, damages, liabilities and expenses by reason of such settlement or judgment in accordance with, and subject to the limitations of, the provisions of this <u>Section 8</u>. The Indemnifying Party shall not, without the prior written consent of an Indemnified Person (which consent shall not be unreasonably withheld), effect any settlement of any pending or threatened Proceedings in respect of which indemnity has been sought hereunder by such Indemnified Person unless such settlement (a) includes an unconditional release of such Indemnified Person in form and substance reasonably satisfactory to such Indemnified Person from all liability on the claims that are the subject matter of such Proceedings and (b) does not include any statement as to or any admission of fault, culpability or a failure to act by or on behalf of any Indemnified Person.

9. <u>Acknowledgements and Agreements of the Company</u>. Notwithstanding anything herein to the contrary, the Company acknowledges and agrees that (a) the transactions contemplated hereby are arm's-length commercial transactions between the Company, New Tronox and the Debtors, on the one hand, and the Backstop Parties, on the other, (b) in connection therewith and with the processes leading to such transactions, each Backstop Party is acting solely as a principal and not the agent or fiduciary of New Tronox or the Company or the other Debtors or

their estates, (c) the Backstop Parties have not assumed advisory or fiduciary responsibilities in favor of New Tronox or the Company or the other Debtors or their estates with respect to such transactions or the processes leading thereto and (d) the Company and the other Debtors have consulted their own legal and financial advisors to the extent they deemed appropriate.

10.    Defaulting Backstop Party.

(a)    If any Backstop Party defaults on its obligation to purchase the Unsubscribed Shares that it has agreed to purchase hereunder, the non-defaulting Backstop Parties may in their discretion arrange for the purchase of such Unsubscribed Shares by other persons satisfactory to the Company (including such non-defaulting Backstop Parties) on the terms contained in this Agreement. As used in this Agreement, the term "Backstop Party" includes, for all purposes of this Agreement unless the context otherwise requires, any person not listed in Schedule 1 hereto that, pursuant to this Section 10, purchases the Unsubscribed Shares that a defaulting Backstop Party agreed but failed to purchase.

(b)    If, after giving effect to any arrangements for the purchase of the Unsubscribed Shares of a defaulting Backstop Party or Backstop Parties by the non-defaulting Backstop Parties as provided in paragraph (a) above, the Company shall not have initiated litigation against the defaulting Backstop Party or Backstop Parties seeking specific performance of their obligations under this Agreement and the aggregate principal amount of Unsubscribed Shares that remain unpurchased on the Effective Date exceeds $10.0 million, then this Agreement shall terminate without liability on the part of the non-defaulting Backstop Parties. Any termination of this Agreement pursuant to this Section 10 shall be without liability on the part of the Company, except that the Company will continue to be liable for the payment of expenses as set forth in Section 2(c) hereof, except with respect to the expenses of such defaulting Backstop Party, and except that the provisions of Section 8 hereof shall not terminate and shall remain in effect.

(c)    Nothing contained herein shall relieve a defaulting Backstop Party of any liability it may have to New Tronox or any non-defaulting Backstop Party for damages caused by its default.

11.    Survival of Representations and Warranties.  The representations and warranties made in this Agreement will survive for a period of two (2) years after the Effective Date, except that the representations and warranties made in Sections 3(a), 3(b), 3(c), 3(d), and 3(r) will survive the execution and delivery of this Agreement for the length of the applicable statute of limitations with respect thereto.

12.    Termination.

(a)    This Agreement shall automatically terminate, unless waived in writing by all Parties:

(i)    if terminated pursuant to Section 10;

(ii)    in the event the Plan Support Agreement shall have expired or been terminated by any of the parties thereto for any reason;

(iii)    in the event the Bankruptcy Court has failed to enter one or several orders approving this Agreement, the Plan Support Agreement and the Credit Agreement on or prior to December 31, 2009;

(iv)    in the event there is an Event of Default under the Credit Agreement which has not been cured within ten (10) days, or if any of the conditions precedent to conversion of the Replacement DIP Facility into the Exit Facility, as set forth in the Credit Agreement, is not possible to satisfy (without any modification or waiver thereto) on or prior to the initial Maturity Date or, in the event the Extension Event has occurred, the Final Date;

(v)    if (a) the terms of any final document to be approved by the Backstop Parties pursuant to this Agreement, the Plan Support Agreement or the Term Sheet does not reflect the economic terms set forth in, and otherwise conform in all material economic respects to, this Agreement, the Plan Support Agreement and the Term Sheet, (b) the Company has received written notice of such non-conformity, and (c) such non-conforming final document has not been amended to the satisfaction of each Backstop Party within ten (10) Business Days of the Company's receipt of the above notice.  For the avoidance of doubt, any change to the type or amount of consideration payable to any holder of a Claim from that specifically set forth in the Term Sheet shall be considered a change to the economic terms set forth therein; and

(vi)    if the Effective Date has not occurred on or prior to June 30, 2010 or, in the event the Extension Event has occurred, the Final Date.

(b)    The Required Backstop Parties may terminate this Agreement:

(i)    if the Company or any of the other Debtors has failed to meet any of the deadlines set forth in the Plan Support Agreement as in effect at the time;

(ii)    if, on or prior to February 28, 2010, the United States Department of Justice has not confirmed that the form of each Plan Support Document is acceptable, subject only to the required public notice requirements and entry of the Confirmation Order by the Bankruptcy Court;

(iii)    if, on or prior to April 30, 2010 (or, in the event the Extension Event has occurred, the initial Maturity Date), the Bankruptcy Court shall not have entered an order approving the Disclosure Statement;

(iv)    if the governmental entities set forth on <u>Schedule 12</u> shall not have executed the Environmental Settlement Documents on or prior to June 30, 2010 or, in the event the Extension Event has occurred, the Final Date;

(v)    if, on or prior to June 30, 2010, the applicable Plan Support Documents shall not have become the valid and binding obligations of each Environmental Claimant, enforceable against such Environmental Claimants in accordance with its respective terms, subject only to entry of the Confirmation Order by the Bankruptcy Court;

(vi)    if, or prior to the date that is five (5) Business Days prior to the initial Maturity Date (or, in the event the Extension Event has occurred, August 31, 2010 (or such

earlier date as the Credit Agreement shall have been terminated)), the Bankruptcy Court shall not have entered the Confirmation Order.

(vii)    if any of the conditions set forth in <u>Section 7</u> to be satisfied at or prior to the Effective Date becomes incapable of being satisfied on or prior to June 30, 2010 or, in the event the Extension Event has occurred, the Final Date;

(viii)    if the Company makes a public announcement that it intends to support or supports, or enters into an agreement to support, or files any pleading or document with the Bankruptcy Court indicating its intention to support, or supports, any Competing Transaction; or the Company enters into a Competing Transaction;

(ix)    if the Company has breached in any material respect its obligations under this Agreement or the Plan Support Agreement and such breach is not cured (to the extent curable) within ten (10) Business Days after the giving of written notice by any Backstop Party to the Company of such breach;

(x)    if the Plan, as confirmed by the Bankruptcy Court, is not consistent, in all material non-economic respects, with the Term Sheet;

(xi)    if the terms of the Plan and the exhibits and any supplements thereto not otherwise set forth on the Term Sheet, including any amendment or modification of any of the foregoing, shall not be in form and substance reasonably acceptable to the Required Backstop Parties;

(xii)    if an order converting the Chapter 11 Case of any of the Debtors to a case under chapter 7 of the Bankruptcy Code is entered by the Bankruptcy Court;

(xiii)    if the Debtors' exclusive right to file a chapter 11 plan pursuant to section 1121 of the Bankruptcy Code shall have been terminated for cause and not by statute;

(xiv)    if any court of competent jurisdiction or other competent governmental or regulatory authority issues a ruling, determination, or order making illegal or otherwise restricting, preventing or prohibiting the consummation of the Plan substantially on the terms set forth in the Term Sheet and in this Agreement, including an order of the Bankruptcy Court denying confirmation of the Plan, which ruling, determination or order (A) has been in effect for 30 days and (B) is not stayed;

(xv)    upon the entry of an order by the Bankruptcy Court appointing an examiner with enlarged powers relating to the operation of the material part of the business of the Debtors, taken as a whole (powers beyond those set forth in section 1106(a)(3) and (4) of the Bankruptcy Code) under section 1106(b) of the Bankruptcy Code, or the entry of an order by the Bankruptcy Court appointing a trustee under section 1104 of the Bankruptcy Code and, in either case, such order (A) has been in effect for 30 days and (B) is not stayed;

(xvi)    if the Bankruptcy Court shall enter an order approving a payment to any party (whether in cash or other property or whether as adequate protection, settlement of a dispute, or otherwise) that would be inconsistent with the treatment of such party under the Term

Sheet (other than any inconsistency that arises in connection with the Debtors' continuation of its claims reconciliation process, including fixing or settling claims made in the Chapter 11 Cases);

(xvii)  upon the entry of an order dismissing one or more of the Chapter 11 Cases;

(xviii) if any order required to be entered by the Bankruptcy Court under this Section 12 on a final basis shall not become a final order within a reasonable period of time; and

(xix)   if the Plan does not receive the requisite number of votes in favor of such Plan in number and amount in the class of claims in which the Eligible Holders' claims are placed.

(c)     The Company may terminate this Agreement in order to enter into a Superior Transaction or an agreement to support a Superior Transaction, subject to payment of the Commitment Fee as provided in Section 2(b), in cash, and the reimbursement of all expenses pursuant to Section 2(c), in each case prior to or contemporaneously with such termination.

(d)     Upon termination under this Section 12, the covenants and agreements made by the parties herein under Sections 2(b), 2(c), 9, 11 through 21 will survive indefinitely in accordance with their terms.

13.     Competing Transactions.  From the date of this Agreement to the Effective Date or earlier termination of this Agreement, the Company shall not make a public announcement that it intends to support or supports, enter into an agreement to support, or file any pleading or document with the Bankruptcy Court evidencing its intention to support, or otherwise knowingly support, any transaction inconsistent with this Agreement or the Plan, shall not file any plan that is not the Plan and shall not agree to, consent to, knowingly provide any support to, solicit, participate in the formulation of, or vote for any transaction or plan of reorganization other than the Plan (a "Competing Transaction").  Notwithstanding anything to the contrary herein, or in the Plan or any other agreement among the Company and the Backstop Parties, at any time prior to the date on which the Plan is confirmed by the Bankruptcy Court, if the Company has received a bona fide written proposal for a Competing Transaction that the board of directors of the Company determines in good faith is or could reasonably be expected to lead to a Superior Transaction and that the failure of the board to pursue such Competing Transaction could reasonably be expected to result in a breach of the board of directors' fiduciary duties under applicable law, then the Company may (a) furnish non-public information to, and engage in discussions and negotiations with, the person making such proposal and its representatives with respect to the Competing Transaction, and (b) terminate this Agreement pursuant to Section 12(d) in order to enter into a Superior Transaction or an agreement to support a Superior Transaction.  For purposes of this Agreement, a "Superior Transaction" shall be a Competing Transaction that the board of directors of the Company determines in good faith (x) would be in the best interests of the Company and its creditor constituencies and equity holders as a whole, including, but not limited to the Backstop Parties, and (y) would reasonably be expected to provide a superior recovery (but, with respect to any creditor constituent, not in excess of its claim) to each class of creditor constituencies and equity holders.  At all times, the Company shall be obligated to promptly deliver to the advisors for the Backstop Parties all written

communications delivered to or received by the Company or its advisors making or materially modifying any proposals with respect to any Competing Transaction, including, without limitation, copies of all expressions of interest, term sheets, letters of interest, offers, proposed agreements or otherwise, and shall periodically update (not less than once every week) the advisors for the Backstop Parties concerning such matters.

14. <u>Notices</u>. All notices and other communications in connection with this Agreement will be in writing and will be deemed given (and will be deemed to have been duly given upon receipt) if delivered personally, sent via electronic facsimile (with confirmation), mailed by registered or certified mail (return receipt requested) or delivered by an express courier (with confirmation) to the parties at the following addresses (or at such other address for a party as will be specified by like notice):

(a) If to Backstop Parties or any of the Backstop Parties, at their respective addresses set forth on the signature pages hereto, with a copy to:

> Milbank, Tweed, Hadley & McCloy LLP
> One Chase Manhattan Plaza
> New York, NY 10005
> Attn:  Thomas C. Janson, Esq.

(b) If to the Company, to:

> Tronox Incorporated
> 3301 NW 150th Street
> Oklahoma City, OK 73134
> Attn:  Michael J. Foster, Esq., General Counsel

> with a copy  (which shall not constitute notice) to:

> Kirkland & Ellis LLP
> 601 Lexington Avenue
> New York, NY 10022
> Attn:   Jonathan S. Henes, Esq.
>         Patrick J. Nash, Jr., Esq.

15. <u>Assignment; Third Party Beneficiaries</u>. Neither this Agreement nor any of the rights, interests or obligations under this Agreement will be assigned by any of the parties (whether by operation of law or otherwise) without the prior written consent of the other parties hereto. Notwithstanding the previous sentence, this Agreement, or any Backstop Party's obligations hereunder, may be assigned, delegated or transferred, in whole or in part, by an Backstop Party to any Affiliate (as defined in Rule 12b-2 under the Exchange Act) of such Backstop Party over which such Backstop Party or any of its Affiliates exercises investment authority, including, without limitation, with respect to voting and dispositive rights; *provided*, that any such assignee assumes the obligations of the Backstop Party hereunder and agrees in writing to be bound by the terms of this Agreement in the same manner as the Backstop Party. Notwithstanding the foregoing or any other provisions herein, no such assignment will relieve the assigning Backstop Party of its obligations hereunder if such assignee fails to perform such obligations. Except as

provided in <u>Section 8</u> with respect to the Indemnified Parties, this Agreement (including the documents and instruments referred to in this Agreement) is not intended to and does not confer upon any person other than the parties hereto any rights or remedies under this Agreement. Notwithstanding the foregoing or any other provisions herein to the contrary, a Backstop Party may not assign any of its rights or obligations under this Agreement, to the extent such assignment would affect the securities laws exemptions applicable to this transaction.

16.     <u>Prior Negotiations; Entire Agreement</u>.  This Agreement (including the exhibits hereto and the documents and instruments referred to in this Agreement, which are incorporated herein by reference and made part of this Agreement as if fully set forth herein) constitutes the entire agreement of the parties hereto and supersedes all prior agreements, arrangements or understandings, whether written or oral, among the parties hereto with respect to the subject matter of this Agreement, except that the parties hereto acknowledge that any confidentiality agreements heretofore executed between or among the parties hereto will continue in full force and effect.  In the event of any inconsistencies between the Term Sheet and the operative provisions of this Agreement, the operative terms of this Agreement shall prevail.

17.     <u>GOVERNING LAW; VENUE</u>.  THIS AGREEMENT WILL BE GOVERNED AND CONSTRUED IN ACCORDANCE WITH THE INTERNAL LAWS OF THE STATE OF NEW YORK, THE PARTIES HERETO HEREBY IRREVOCABLY SUBMITS TO THE JURISDICTION OF, AND VENUE IN, THE UNITED STATES BANKRUPTCY COURT FOR THE SOUTHERN DISTRICT OF NEW YORK AND WAIVES ANY OBJECTION BASED ON *FORUM NON CONVENIENS*.

18.     <u>Counterparts</u>.  This Agreement may be executed in any number of counterparts, all of which will be considered one and the same agreement and will become effective when counterparts have been signed by each of the parties and delivered to the other party (including via facsimile or other electronic transmission), it being understood that each party need not sign the same counterpart.

19.     <u>Waivers and Amendments</u>.  This Agreement may be amended, modified, superseded, cancelled, renewed or extended, and the terms and conditions of this Agreement may be waived, only by a written instrument signed by the parties hereto or, in the case of a waiver, by the party hereto waiving compliance, and subject, to the extent required, to the approval of the Bankruptcy Court.  No delay on the part of any party hereto in exercising any right, power or privilege pursuant to this Agreement will operate as a waiver thereof, nor will any waiver on the part of any party of any right, power or privilege pursuant to this Agreement, nor will any single or partial exercise of any right, power or privilege pursuant to this Agreement, preclude any other or further exercise thereof or the exercise of any other right, power or privilege pursuant to this Agreement.  The rights and remedies provided pursuant to this Agreement are cumulative and are not exclusive of any rights or remedies which any party hereto otherwise may have at law or in equity.

20.     <u>Headings</u>.  The headings in this Agreement are for reference purposes only and will not in any way affect the meaning or interpretation of this Agreement.

21.     <u>Specific Performance</u>.  The parties hereto acknowledge and agree that any breach of the terms of this Agreement would give rise to irreparable harm for which money damages would not be an adequate remedy, and, accordingly, the parties hereto agree that, in addition to any other remedies, each party hereto will be entitled to enforce the terms of this Agreement by a decree of specific performance without the necessity of proving the inadequacy of money damages as a remedy and without the necessity of posting bond.

*[Signature Page Follows]*

If the foregoing is in accordance with your understanding, please sign and return to us a counterpart hereof, and upon the acceptance hereof by you, this Agreement and such acceptance hereof will constitute a binding agreement between you and (subject to the approval of the Bankruptcy Court) the Company.

Very truly yours,

TRONOX INCORPORATED

By: _____

Name: MICHAEL J. FOSTON

Title: VICE PRESIDENT

*[Signature Page of Equity Commitment Agreement]*

If the foregoing is in accordance with your understanding, please sign and return to us a counterpart hereof, and upon the acceptance hereof by you, this Agreement and such acceptance hereof will constitute a binding agreement between you and (subject to the approval of the Bankruptcy Court) the Company.

Very truly yours,

TRONOX INCORPORATED

By: _____
       Name:
       Title:

Accepted as of the date hereof:

Transamerica Life Insurance Company
(Enter names of all Backstop Parties)

By: _____
       Name: James K. Schaeffer
       Title: Vice President

If the foregoing is in accordance with your understanding, please sign and return to us a counterpart hereof, and upon the acceptance hereof by you, this Agreement and such acceptance hereof will constitute a binding agreement between you and (subject to the approval of the Bankruptcy Court) the Company.

Very truly yours,

TRONOX INCORPORATED

By: _____
           Name:
           Title:

Accepted as of the date hereof:

Transamerica Financial Life Insurance Company
(Enter names of all Backstop Parties)

By: _____
      Name:  James K. Schaeffer
      Title:  Vice President

If the foregoing is in accordance with your understanding, please sign and return to us a counterpart hereof, and upon the acceptance hereof by you, this Agreement and such acceptance hereof will constitute a binding agreement between you and (subject to the approval of the Bankruptcy Court) the Company.

Very truly yours,

TRONOX INCORPORATED

By: _____
        Name:
        Title:

Accepted as of the date hereof:

Monumental Life Insurance Company
(Enter names of all Backstop Parties)

By: _____
   Name: James K. Schaeffer
   Title: Vice President

If th: foregoing is in accordance with your understanding, please sign and return to us a counterpart hereof, and upon the acceptance hereof by you, this Agreement and such acceptance hereof will constitute a binding agreement between you and (subject to the approval of the Bankruptcy Court) the Company.

Very truly yours,

TRONOX INCORPORATED

By: _____
       Name:
       Title:

Accepted as of the date hereof:

Fidelity Investment Canada ULC, as investment manager of IG FI Canadian Allocation Fund

By: _____
       Name: **Peter Bowen**
       Title: VP and Fund Treasurer

*[Signature Page of Equity Commitment Agreement]*

#4812-4036-0341

If the foregoing is in accordance with your understanding, please sign and return to us a counterpart hereof, and upon the acceptance hereof by you, this Agreement and such acceptance hereof will constitute a binding agreement between you and (subject to the approval of the Bankruptcy Court) the Company.

Very truly yours,

TRONOX INCORPORATED

By: _____
        Name:
        Title:

Accepted as of the date hereof:

Fidelity Investments Canada ULC, As Trustee Of The Fidelity American High Yield Fund

By: _____
     Name: Peter Bowen
     Title: VP and Fund Treasurer

*[Signature Page of Equity Commitment Agreement]*

#4812-6036-5341

If the foregoing is in accordance with your understanding, please sign and return to us a counterpart hereof, and upon the acceptance hereof by you, this Agreement and such acceptance hereof will constitute a binding agreement between you and (subject to the approval of the Bankruptcy Court) the Company.

Very truly yours,

TRONOX INCORPORATED

By: _____
 Name:
 Title:

Accepted as of the date hereof:

Fidelity Investments Canada ULC, As Trustee Of The Fidelity Canadian Asset Allocation Fund

By: _____
 Name: Peter Bowen
 Title: VP and Fund Treasurer

*[Signature Page of Equity Commitment Agreement]*

#4812-6036-5341

If the foregoing is in accordance with your understanding, please sign and return to us a counterpart hereof, and upon the acceptance hereof by you, this Agreement and such acceptance hereof will constitute a binding agreement between you and (subject to the approval of the Bankruptcy Court) the Company.

Very truly yours,

TRONOX INCORPORATED

By: _____
      Name:
      Title:

Accepted as of the date hereof:

Fidelity Investments Canada ULC, As Trustee Of The Fidelity Balanced ~~High Income~~ Fund

By: _____
      Name: Peter Bowen
      Title VP and Fund Treasurer

*[Signature Page of Equity Commitment Agreement]*

#4812-6036-6141

If the foregoing is in accordance with your understanding, please sign and return to us a counterpart hereof, and upon the acceptance hereof by you, this Agreement and such acceptance hereof will constitute a binding agreement between you and (subject to the approval of the Bankruptcy Court) the Company.

Very truly yours,

TRONOX INCORPORATED

By: _____
     Name:
     Title:

Accepted as of the date hereof:

Fidelity Management &
Research Company
on behalf of Fidelity Funds - US High Income

By: _____
    Name:
    Title:    J. Gregory Wass
            Assistant Treasurer

*[Signature Page of Equity Commitment Agreement]*

#4812-6025-6341

If the foregoing is in accordance with your understanding, please sign and return to us a counterpart hereof, and upon the acceptance hereof by you, this Agreement and such acceptance hereof will constitute a binding agreement between you and (subject to the approval of the Bankruptcy Court) the Company.

Very truly yours,

TRONOX INCORPORATED

By: _____

Name:

Title:

Accepted as of the date hereof:

Fidelity Management &
Research Company
on behalf of Master Trust Bank of Japan Ltd. Re: Fidelity US High Yield

By: _____

Name:

Title:          Gregory Wass
                Assistant Treasurer

*[Signature Page of Equity Commitment Agreement]*

#4815-6036-6341

If the foregoing is in accordance with your understanding, please sign and return to us a counterpart hereof, and upon the acceptance hereof by you, this Agreement and such acceptance hereof will constitute a binding agreement between you and (subject to the approval of the Bankruptcy Court) the Company.

Very truly yours,

TRONOX INCORPORATED

By: _____

     Name:

     Title:

Accepted as of the date hereof:

Pension Investment Committee of General Motors for General Motors Employees Domestic Group Pension Trust

By: Pyramis Global Advisors Trust Company, as Investment Manager under Power of Attorney

By: _____

     Name: Lynn T. Farrand

     Title: Director

#4812-6036-6341

If the foregoing is in accordance with your understanding, please sign and return to us a counterpart hereof, and upon the acceptance hereof by you, this Agreement and such acceptance hereof will constitute a binding agreement between you and (subject to the approval of the Bankruptcy Court) the Company.

Very truly yours,

TRONOX INCORPORATED

By: _____

Name:

Title:

Accepted as of the date hereof:

Commonwealth of Massachusetts Pension Reserves Investment Management Board

By: Pyramis Global Advisors Trust Company, as Investment Manager under Power of Attorney

By: _Lynn M. Farrand_____

Name: Lynn M. Farrand

Title: Director

*[Signature Page of Equity Commitment Agreement]*

#4812-0036-6341

If the foregoing is in accordance with your understanding, please sign and return to us a counterpart hereof, and upon the acceptance hereof by you, this Agreement and such acceptance hereof will constitute a binding agreement between you and (subject to the approval of the Bankruptcy Court) the Company.

Very truly yours,

TRONOX INCORPORATED

By: _____
     Name:
     Title:

Accepted as of the date hereof:

Illinois Municipal Retirement Fund

By: Pyramis Global Advisors Trust Company, as Investment Manager under Power of Attorney

By: _Lynn M. Farrand_
    Name: Lynn Y. Farrand
    Title: Director

*[Signature Page of Equity Commitment Agreement]*

#4812-0036-6141

If the foregoing is in accordance with your understanding, please sign and return to us a counterpart hereof, and upon the acceptance hereof by you, this Agreement and such acceptance hereof will constitute a binding agreement between you and (subject to the approval of the Bankruptcy Court) the Company.

Very truly yours,

TRONOX INCORPORATED

By: _____
     Name:
     Title:

Accepted as of the date hereof:

Fidelity Summer Street Trust: Fidelity Capital & Income Fund

By: _____
Name:
Title: DEPUTY TREASURER

   Jeffrey Christian
   Deputy Treasurer

*[Signature Page of Equity Commitment Agreement]*

#4812-6136-6341

If the foregoing is in accordance with your understanding, please sign and return to us a counterpart hereof, and upon the acceptance hereof by you, this Agreement and such acceptance hereof will constitute a binding agreement between you and (subject to the approval of the Bankruptcy Court) the Company.

Very truly yours,

TRONOX INCORPORATED

By: _____

Name:

Title:

Accepted as of the date hereof:

Fidelity Advisor Series I: Fidelity Advisor High Income Advantage Fund

By: _____

Name:

Title:

Jeffrey Christian
Deputy Treasurer

*[Signature Page of Equity Commitment Agreement]*

#4812-6036-6341

If the foregoing is in accordance with your understanding, please sign and return to us a counterpart hereof, and upon the acceptance hereof by you, this Agreement and such acceptance hereof will constitute a binding agreement between you and (subject to the approval of the Bankruptcy Court) the Company.

Very truly yours,

TRONOX INCORPORATED

By: _____
      Name:
      Title:

Accepted as of the date hereof:

Fidelity Puritan Trust: Fidelity Puritan Fund

By: _____
    Name:
    Title:

      Jeffrey Christian
      Deputy Treasurer

*[Signature Page of Equity Commitment Agreement]*

#4812-6036-6541

If the foregoing is in accordance with your understanding, please sign and return to us a counterpart hereof, and upon the acceptance hereof by you, this Agreement and such acceptance hereof will constitute a binding agreement between you and (subject to the approval of the Bankruptcy Court) the Company.

Very truly yours,

TRONOX INCORPORATED

By: _____

     Name:
     Title:

Accepted as of the date hereof:

Fidelity Advisor Series II: Fidelity Advisor Strategic Income Fund

By: _____

     Name:
     Title:

        effrey Christian
        Deputy Treasurer

*[Signature Page of Equity Commitment Agreement]*

#4812-6036-6141

If the foregoing is in accordance with your understanding, please sign and return to us a counterpart hereof, and upon the acceptance hereof by you, this Agreement and such acceptance hereof will constitute a binding agreement between you and (subject to the approval of the Bankruptcy Court) the Company.

Very truly yours,

TRONOX INCORPORATED

By: _____
      Name:
      Title:

Accepted as of the date hereof:

Fidelity School Street Trust: Fidelity Strategic Income Fund

By: _____
   Name:
   Title:     effrey Christian
           Deputy Treasurer

*[Signature Page of Equity Commitment Agreement]*

#4812-6036-6341

If the foregoing is in accordance with your understanding, please sign and return to us a counterpart hereof, and upon the acceptance hereof by you, this Agreement and such acceptance hereof will constitute a binding agreement between you and (subject to the approval of the Bankruptcy Court) the Company.

Very truly yours,

TRONOX INCORPORATED

By: _____
         Name:
         Title:

Accepted as of the date hereof:

Variable Insurance Product Fund V: Strategic Income Portfolio

By: _____
    Name:
    Title:        Jeffrey Christian
               Deputy Treasurer

*[Signature Page of Equity Commitment Agreement]*

#4812-6036-6141

If the foregoing is in accordance with your understanding, please sign and return to us a counterpart hereof, and upon the acceptance hereof by you, this Agreement and such acceptance hereof will constitute a binding agreement between you and (subject to the approval of the Bankruptcy Court) the Company.

Very truly yours,

TRONOX INCORPORATED

By: _____

Name:

Title:

Accepted as of the date hereof:

Scoggin Capital Management, LP II
By: S&E Partners, LP its: general partner
(Include names of all Backstop Parties)
By: Scoggin, Inc. its: general partner
By: _____

By: _____

Name:

Title:

If the foregoing is in accordance with your understanding, please sign and return to us a counterpart hereof, and upon the acceptance hereof by you, this Agreement and such acceptance hereof will constitute a binding agreement between you and (subject to the approval of the Bankruptcy Court) the Company.

Very truly yours,

TRONOX INCORPORATED

By: _____

Name:

Title:

Accepted as of the date hereof:
Scoggin International Fund, Ltd

Scoggin LLC its investment manager

By: _____

By: _____

Name:

Title:

If the foregoing is in accordance with your understanding, please sign and return to us a counterpart hereof, and upon the acceptance hereof by you, this Agreement and such acceptance hereof will constitute a binding agreement between you and (subject to the approval of the Bankruptcy Court) the Company.

Very truly yours,

TRONOX INCORPORATED

By: _____
        Name:
        Title:

Accepted as of the date hereof:
Scoggin Worldwide Fund, Ltd.

By: Old Bellows Partners LP its Investment Manager
By: Old Bellows Associates LLC its General Partner

By: _____
        Name:
        Title:

If the foregoing is in accordance with your understanding, please sign and return to us a counterpart hereof, and upon the acceptance hereof by you, this Agreement and such acceptance hereof will constitute a binding agreement between you and (subject to the approval of the Bankruptcy Court) the Company.

Very truly yours,

TRONOX INCORPORATED

By: _____
      Name:
      Title:

Accepted as of the date hereof:

Goldman Sachs & Co. Profit Sharing Master Trust

By: OZ Management II LP, its investment manager
By: Och-Ziff Holding II LLC, its General Partner
By: OZ Management LP, its Member
By: Och-Ziff Holding Corporation, its General Partner

By:_____
Name: Joel Frank
Title: Chief Financial Officer

If the foregoing is in accordance with your understanding, please sign and return to us a counterpart hereof, and upon the acceptance hereof by you, this Agreement and such acceptance hereof will constitute a binding agreement between you and (subject to the approval of the Bankruptcy Court) the Company.

Very truly yours,

TRONOX INCORPORATED

By: _____
      Name:
      Title:

Accepted as of the date hereof:

OZ Master Fund, Ltd.

By: OZ Management LP, its Investment Manager
By: Och-Ziff Holding Corporation, its General Partner

By: _____
Name: Joel Frank
Title:   Chief Financial Officer

If the foregoing is in accordance with your understanding, please sign and return to us a counterpart hereof, and upon the acceptance hereof by you, this Agreement and such acceptance hereof will constitute a binding agreement between you and (subject to the approval of the Bankruptcy Court) the Company.

Very truly yours,

TRONOX INCORPORATED

By: _____
       Name:
       Title:

Accepted as of the date hereof:

Gordel Holdings Limited

By: OZ Management LP, its Investment Manager
By: Och-Ziff Holding Corporation, its General Partner

By: _____
Name: Joel Frank
Title:  Chief Financial Officer

If the foregoing is in accordance with your understanding, please sign and return to us a counterpart hereof, and upon the acceptance hereof by you, this Agreement and such acceptance hereof will constitute a binding agreement between you and (subject to the approval of the Bankruptcy Court) the Company.

Very truly yours,

TRONOX INCORPORATED

By: _____
Name:
Title:

Accepted as of the date hereof:

OZ Select Master Fund, Ltd.

By:  OZ Management LP, its Investment Manager
By:  Och-Ziff Holding Corporation, its General Partner

By: _____
Name:  Joel M. Frank
Title:  Chief Financial Officer

If the foregoing is in accordance with your understanding, please sign and return to us a counterpart hereof, and upon the acceptance hereof by you, this Agreement and such acceptance hereof will constitute a binding agreement between you and (subject to the approval of the Bankruptcy Court) the Company.

Very truly yours,

TRONOX INCORPORATED

By: _____
     Name:
     Title:

Accepted as of the date hereof:

TRICADIA CAPITAL MANAGEMENT, LLC
solely as Investment Manager and not individually

By: _____
    Name: Julia Wyatt
    Title:  CFO

If the foregoing is in accordance with your understanding, please sign and return to us a counterpart hereof, and upon the acceptance hereof by you, this Agreement and such acceptance hereof will constitute a binding agreement between you and (subject to the approval of the Bankruptcy Court) the Company.

Very truly yours,

TRONOX INCORPORATED

By: _____
Name:
Title:

Accepted as of the date hereof:

Plainfield Special Situations Master Fund II Limited

By: _____
Name:
Title:      Thomas X. Fritsch
            Authorized Individual

If the foregoing is in accordance with your understanding, please sign and return to us a counterpart hereof, and upon the acceptance hereof by you, this Agreement and such acceptance hereof will constitute a binding agreement between you and (subject to the approval of the Bankruptcy Court) the Company.

Very truly yours,

TRONOX INCORPORATED

By: _____
Name:
Title:

Accepted as of the date hereof:


Plainfield OC Master Fund Limited


By: _____
Name:        Thomas X. Fritsch
Title:        Authorized Individual

If the foregoing is in accordance with your understanding, please sign and return to us a counterpart hereof, and upon the acceptance hereof by you, this Agreement and such acceptance hereof will constitute a binding agreement between you and (subject to the approval of the Bankruptcy Court) the Company.

Very truly yours,

TRONOX INCORPORATED

By: _____
      Name:
      Title:

Accepted as of the date hereof:

Plainfield Liquid Strategies Master Fund Limited

By: _____
   Name:    **Thomas X. Fritsch**
   Title:     **Authorized Individual**

If the foregoing is in accordance with your understanding, please sign and return to us a counterpart hereof, and upon the acceptance hereof by you, this Agreement and such acceptance hereof will constitute a binding agreement between you and (subject to the approval of the Bankruptcy Court) the Company.

Very truly yours,

TRONOX INCORPORATED

By: _____

Name:

Title:

Accepted as of the date hereof:

**CAI DISTRESSED DEBT OPPORTUNITY MASTER FUND, LTD**

By: _____

Name: Herbert Seif

Title:

Dec-19-2009 01:27pm    From-CITIGROUP A I    212 793-5420    T-245    P.003/003    F-218

**Certain Definitions**

The following terms used herein, including in the preamble, recitals, exhibits and schedules hereto, shall have the following meanings:

"Adverse Proceeding" means any action, suit, proceeding, hearing (in each case, whether administrative, judicial or otherwise), governmental investigation or arbitration (whether or not purportedly on behalf of the Company or any of its Subsidiaries) at law or in equity, or before or by any Governmental Authority, domestic or foreign (including any environmental claims), whether pending or, to the knowledge of the Company or any of its Subsidiaries, threatened against or affecting the Company or any of its Subsidiaries or any property of the Company or any of its Subsidiaries.

"Anadarko Litigation Trust" has the meaning set forth in the Term Sheet.

"Assets" has the meaning set forth in the Term Sheet.

"Available Cash" means, as of any date of determination, the sum of (a) the aggregate amount of unrestricted cash and cash equivalents included in the consolidated balance sheet of the relevant entity as of such date (excluding any proceeds in various escrow accounts and reinvestment accounts created or maintained pursuant to the Credit Agreement) that, in each case, are free and clear of all Liens (other than Permitted Liens); and (b) the aggregate amount of cash and cash equivalents included in the Working Capital Escrow Account created or maintained pursuant to the Credit Agreement as of such date.

"Contractual Obligation" means, as applied to any Person, any provision of any Security issued by that Person or of any indenture, mortgage, deed of trust, contract, undertaking, agreement or other instrument to which that Person is a party or by which it or any of its properties is bound or to which it or any of its properties is subject.

"Credit Agreement" means the Senior Secured Super-Priority Debtor-in-Possession and Exit Credit and Guaranty Agreement, dated as of December 20, 2009, and entered into by and among Tronox Worldwide LLC, the Company, certain Subsidiaries of Tronox Worldwide LLC, the Lenders party thereto from time to time, Goldman Sachs Lending Partners LLC, as sole lead arranger and sole bookrunner, Syndication Agent, Administrative Agent and as Collateral Agent, attached hereto as Exhibit C.

"Custodial Trust Agreements" has the meaning set forth in the Term Sheet.

"Custodial Trust Settlement Agreements" has the meaning set forth in the Term Sheet.

"ECA Order" means an order of the Bankruptcy Court approving this Agreement,

"Employee Benefit Plan" means any "employee benefit plan" as defined in Section 3(3) of ERISA (other than a Multiemployer Plan) which is or, within the last six years, was sponsored, maintained or contributed to by, or required to be contributed by, the Company, any of its Subsidiaries or, solely with respect to any Employee Benefit Plan covered under Title IV of ERISA, any of their respective ERISA Affiliates.

"Environmental Claims" has the meaning set forth in the Term Sheet.

"Environmental Claimant" means (i) the United States Department of Justice, (ii) each state or municipality (including any agency or instrumentality thereof) having or asserting any Environmental Claims against any Debtor that has timely filed a proof of claim in the Chapter 11 Cases and (iii) any Native American tribal government or intertribal organization having or asserting any Environmental Claims against any Debtor that has timely filed a proof of claim in the Chapter 11 Cases, in each case, including without limitation those Persons set forth on Schedule A1.

"Environmental Claim" has the meaning set forth in the Term Sheet.

"Environmental Settlement Agreements" has the meaning set forth in the Term Sheet.

"Environmental Settlement Documents" has the meaning set forth in the Term Sheet.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended from time to time, and any successor thereto.

"ERISA Affiliate" means, as applied to any Person, (i) any corporation which is a member of a controlled group of corporations within the meaning of Section 414(b) of the Internal Revenue Code of which that Person is a member; (ii) any trade or business (whether or not incorporated) which is a member of a group of trades or businesses under common control within the meaning of Section 414(c) of the Internal Revenue Code of which that Person is a member; and (iii) any member of an affiliated service group within the meaning of Section 414(m) or (o) of the Internal Revenue Code of which that Person, any corporation described in clause (i) above or any trade or business described in clause (ii) above is a member. Any former ERISA Affiliate of the Company or any of its Subsidiaries shall continue to be considered an ERISA Affiliate of the Company or any such Subsidiary within the meaning of this definition with respect to the period such entity was an ERISA Affiliate of the Company or such Subsidiary and with respect to liabilities arising after such period for which the Company or such Subsidiary could be liable under the Internal Revenue Code or ERISA.

"ERISA Event" means (i) a "reportable event" within the meaning of Section 4043 of ERISA and the regulations issued thereunder with respect to any Pension Plan (excluding those for which the provision for 30-day notice to the PBGC has been waived by regulation); (ii) the failure to meet the minimum funding standard of Section 412 of the Internal Revenue Code with respect to any Pension Plan (whether or not waived in accordance with Section 412(c) of the Internal Revenue Code) or the failure to

make by its due date a required installment under Section 430(j) of the Internal Revenue Code with respect to any Pension Plan or the failure to make any required contribution to a Multiemployer Plan; (iii) the provision by the administrator of any Pension Plan pursuant to Section 4041(a)(2) of ERISA of a notice of intent to terminate such plan in a distress termination described in Section 4041(c) of ERISA; (iv) the withdrawal by the Company, any of its Subsidiaries or any of their respective ERISA Affiliates from any Pension Plan with two or more contributing sponsors or the termination of any such Pension Plan resulting in liability to the Company, any of its Subsidiaries or any of their respective Affiliates pursuant to Section 4063 or 4064 of ERISA; (v) the institution by the PBGC of proceedings to terminate any Pension Plan, or the occurrence of any event or condition which might constitute grounds under ERISA for the termination of, or the appointment of a trustee to administer, any Pension Plan; (vi) the imposition of liability on the Company, any of its Subsidiaries or any of their respective ERISA Affiliates pursuant to Section 4062(e) or 4069 of ERISA or by reason of the application of Section 4212(c) of ERISA; (vii) the withdrawal of the Company, any of its Subsidiaries or any of their respective ERISA Affiliates in a complete or partial withdrawal (within the meaning of Sections 4203 and 4205 of ERISA) from any Multiemployer Plan if there is any potential liability therefore, or the receipt by the Company, any of its Subsidiaries or any of their respective ERISA Affiliates of notice from any Multiemployer Plan that it is in reorganization or insolvency pursuant to Section 4241 or 4245 of ERISA, or that it intends to terminate or has terminated under Section 4041A or 4042 of ERISA; (viii) the occurrence of an act or omission which could give rise to the imposition on the Company, any of its Subsidiaries or any of their respective ERISA Affiliates of fines, penalties, taxes or related charges under Chapter 43 of the Internal Revenue Code or under Section 409, Section 502(c), (i) or (l), or Section 4071 of ERISA in respect of any Employee Benefit Plan; (ix) the assertion of a material claim (other than routine claims for benefits) against any Employee Benefit Plan other than a Multiemployer Plan or the assets thereof, or against the Company, any of its Subsidiaries or any of their respective ERISA Affiliates in connection with any Employee Benefit Plan; (x) receipt from the Internal Revenue Service of notice of the failure of any Pension Plan (or any other Employee Benefit Plan intended to be qualified under Section 401(a) of the Internal Revenue Code) to qualify under Section 401(a) of the Internal Revenue Code, or the failure of any trust forming part of any Pension Plan to qualify for exemption from taxation under Section 501(a) of the Internal Revenue Code; or (xi) the imposition of a lien pursuant to Section 430(k) of the Internal Revenue Code or ERISA or a violation of Section 436 of the Internal Revenue Code.

"Excess Availability" means on any date of determination, the sum of (a) Available Cash; and (b) the aggregate commitments under the Exit Facility; less (i) any availability blocks and any reserves imposed thereunder by such Exit Facility and (ii) any outstanding loans and letter of credit obligations under the Exit Facility.

"Extension Event" means the provision by Tronox of a written notice to the Backstop Parties, prior to June 30, 2010, requesting the extension of the Backstop Commitment, provided, however, that (i) the Extension Fee is paid in cash, in immediately available funds, concurrently with the giving of notice, (ii) the Replacement DIP Facility has been extended in accordance with the terms of the Credit Agreement,

(iii) the conditions to the extension of the Replacement DIP Facility set forth in the Credit Agreement are satisfied (without any modification or waiver thereof), and (iv) there is no uncured breach of or default under this Agreement or the Plan Support Agreement.

"Exxaro Sands" has the meaning set forth in the definition of Tiwest Joint Venture.

"Fiscal Year" means the fiscal year of the Company and its Subsidiaries, ending on December 31 of each calendar year.

"Final Date" means September 30, 2010, or such earlier date that the Credit Agreement shall be terminated.

"GAAP" means, subject to the limitations on the application thereof set forth in Section 1.2 of the Credit Agreement, United States generally accepted accounting principles in effect as of the date of determination thereof.

"Governmental Authority" means any foreign, federal, state, provincial, local, national or other government, governmental department, commission, board, bureau, court, agency or instrumentality or political subdivision thereof or any entity, officer or examiner exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to any government or any court, in each case whether associated with a state of the United States, the United States, or a foreign entity or government.

"Historical Financial Statements" means (i) the audited financial statements of the Company and its Subsidiaries for the Fiscal Year ended December 31, 2007, (ii) the unaudited financial statements of the Company and its Subsidiaries for each of the fiscal quarters ended March 31, June 30 and September 30, 2008, and (iii) the Historical Monthly Statements, and in each case, certified by the chief financial officer, chief executive officer or chief restructuring officer of the Company, that they fairly present, in all material respects, the financial condition of the Company and its Subsidiaries as at the dates indicated and the results of their operations and their cash flows for the periods indicated.

"Historical Monthly Statements" means the unaudited financial statements of the Company and its Subsidiaries as of the most recent month ended after the date of the most recent audited financial statements and at least 30 days prior to the closing date of the Replacement DIP Facility, consisting of a balance sheet and the related consolidated statements of income, stockholders' equity and cash flows, for each month ended after December 31, 2008 and certified by the chief financial officer, chief executive officer or chief restructuring officer of the Company, that they fairly present, in all material respects, the financial condition of the Company and its Subsidiaries as at the dates indicated and the results of their operations and their cash flows for the periods indicated.

"Intellectual Property" shall mean, the collective reference to all rights, priorities and privileges relating to intellectual property, whether arising under the United

States, multinational or foreign laws or otherwise, including without limitation, copyrights, copyright licenses, patents, patent licenses, trademarks, trademark licenses, trade secrets, and trade secret licenses, and the right to sue or otherwise recover for any past, present and future infringement, dilution, misappropriation, or other violation or impairment thereof, including the right to receive all proceeds therefrom, including without limitation license fees, royalties, income, payments, claims, damages and proceeds of suit, now or hereafter due and/or payable with respect thereto.

"Internal Revenue Code" means the Internal Revenue Code of 1986, as amended to the date hereof and from time to time hereafter, and any successor statute.

"Legacy Assets" has the meaning set forth in the Term Sheet.

"Material Adverse Effect" means a material adverse effect on and/or material adverse developments with respect to (i) the business, operations, properties, assets or financial condition of (a) the Company and its Subsidiaries, or (b) New Tronox and its Subsidiaries, in each case taken as a whole (other than those events typically resulting from the filing of the Chapter 11 Cases, the announcement of the filing of the Chapter 11 Cases, those events typically resulting from the emergence from the Chapter 11 Cases, or any other events disclosed in the Company's filings with the SEC prior to or on November 17, 2009); or (ii) the ability of (a) the Company or any of its Subsidiaries or (b) New Tronox and its Subsidiaries, in each case taken as a whole, to fully and timely perform their obligations under this Agreement, the Plan and any other document contemplated hereby or thereby.

"Material Contract" means any contract or other arrangement to which the Company or any of its Subsidiaries is a party for which breach, nonperformance, cancellation or failure to renew could reasonably be expected to have a Material Adverse Effect.

"Maturity Date" has the meaning set forth in the Credit Agreement, but shall in no event be a date later than June 30, 2010 or, if the Extension Event has occurred, September 30, 2010.

"Multiemployer Plan" means any Employee Benefit Plan which is a "multiemployer plan" as defined in Section 3(37) of ERISA.

"non-governmental CERCLA Claims" means allowed non-governmental breach of contract, indemnification, contribution, reimbursement or cost recovery Claims (including third party Claims for contribution or direct costs under the Comprehensive Environmental Response, Compensation, and Liability Act or state equivalents, whether known or unknown, whether by contract, tort or statute, whether existing or hereinafter arising and including all such Claims relating to the Owned Sites, the Other Sites, the Legacy Assets, the Assets or any product to the extent manufactured by, or any other property that was owned, operated or used for disposal by, the Debtors prior to the Effective Date and not by New Tronox after the Effective Date.

"Organizational Documents" means (i) with respect to any corporation or company, its certificate, memorandum or articles of incorporation, organization or association, as amended, and its by-laws, as amended, (ii) with respect to any limited partnership, its certificate or declaration of limited partnership, as amended, and its partnership agreement, as amended, (iii) with respect to any general partnership, its partnership agreement, as amended, and (iv) with respect to any limited liability company, its articles of organization, as amended, and its operating agreement, as amended.  In the event any term or condition of this Agreement requires any Organizational Document to be certified by a secretary of state or similar governmental official, the reference to any such "Organizational Document" shall only be to a document of a type customarily certified by such governmental official.

"Other Sites" has the meaning set forth in the Term Sheet.

"Owned Sites" has the meaning set forth in the Term Sheet.

"PBGC" means the Pension Benefit Guaranty Corporation or any successor thereto.

"Pension Plan" means any Employee Benefit Plan, other than a Multiemployer Plan, which is subject to Section 412 of the Internal Revenue Code or Section 302 of ERISA.

"Permitted Liens" means:

(a)     Liens in favor of the secured parties under the Credit Agreement;

(b)     Liens for taxes not yet due or, if due, if obligations with respect to such taxes are being contested in good faith by appropriate proceedings and reserves in accordance with GAAP with respect thereto have been provided on the consolidated books of the Company;

(c)     statutory Liens of landlords, banks (and rights of set-off), of carriers, warehousemen, mechanics, repairmen, workmen and materialmen, and other Liens imposed by law (other than any such Lien imposed pursuant to Section 430(k) of the Internal Revenue Code or ERISA or a violation of Section 436 of the Internal Revenue Code), in each case incurred in the ordinary course of business (i) for amounts not yet overdue or (ii) for amounts that are overdue and that (in the case of any such amounts overdue for a period in excess of five days) are being contested in good faith by appropriate proceedings, so long as such reserves or other appropriate provisions, if any, as shall be required by GAAP shall have been made for any such contested amounts;

(d)     Liens incurred in the ordinary course of business in connection with workers' compensation, unemployment insurance and other types of social security, or to secure the performance of tenders, statutory obligations, surety and appeal bonds, bids, leases, government contracts, trade contracts, performance and return-of-money bonds and other similar obligations (exclusive of obligations for the payment of borrowed

money or other indebtedness), so long as no foreclosure, sale or similar proceedings have been commenced with respect to any portion of the secured assets on account thereof;

(e)        easements, rights-of-way, restrictions, encroachments, and other minor defects or irregularities in title, in each case which do not and will not interfere in any material respect with the ordinary conduct of the business of the Company or any of its Subsidiaries;

(f)        any interest or title of a lessor or sublessor under any lease of real estate permitted under the Credit Agreement;

(g)        Liens solely on any cash earnest money deposits made by the Company or any of its Subsidiaries in connection with any letter of intent or purchase agreement permitted under the Credit Agreement;

(h)        purported Liens evidenced by the filing of precautionary UCC financing statements relating solely to operating leases of personal property entered into in the ordinary course of business;

(i)        Liens in favor of customs and revenue authorities arising as a matter of law to secure payment of customs duties in connection with the importation of goods;

(j)        any zoning or similar law or right reserved to or vested in any governmental office or agency to control or regulate the use of any real property;

(k)        non-exclusive outbound licenses of patents, copyrights, trademarks and other Intellectual Property rights granted by the Company or any of its Subsidiaries in the ordinary course of business consistent with past practice;

(l)        Liens described in <u>Schedule 3(o)(i)</u>;

(m)        Liens consisting of customary rights of set-off for bankers liens on amounts on deposit at banks or other financial institutions, to the extent arising by operation of law or otherwise, incurred in the ordinary course of business;

(n)        judgment Liens in respect of judgments that do not constitute an Event of Default under the Credit Agreement;

(o)        Liens of a collection bank arising in the ordinary course of business under §4-208 of the Uniform Commercial Code in effect in the relevant jurisdiction; and

(p)        Liens otherwise permitted under the Credit Agreement.

"<u>Person</u>" means and includes natural persons, corporations, limited partnerships, general partnerships, limited liability companies, limited liability partnerships, joint stock companies, joint ventures, associations, companies, trusts, banks,

trust companies, land trusts, business trusts or other organizations, whether or not legal entities, and Governmental Authorities.

"Plan Support Documents" means, collectively, the Custodial Trust Agreements, the Custodial Trust Settlement Agreements, the agreement forming the Anadarko Litigation Trust and any other definitive documentation related to the Plan.

"Post-Petition" means the time period beginning immediately upon the filing of the Chapter 11 Cases.

"Real Estate Asset" means, at any time of determination, any interest (fee, leasehold or otherwise) then owned by the Company or any of its Subsidiaries in any real property.

"Securities" means any stock, shares, partnership interests, voting trust certificates, certificates of interest or participation in any profit-sharing agreement or arrangement, options, warrants, bonds, debentures, notes, or other evidences of indebtedness, secured or unsecured, convertible, subordinated or otherwise, or in general any instruments commonly known as "securities" or any certificates of interest, shares or participations in temporary or interim certificates for the purchase or acquisition of, or any right to subscribe to, purchase or acquire, any of the foregoing.

"Subsidiary" means with respect to any Person, any corporation, partnership, limited liability company, association, joint venture or other business entity of which more than 50% of the total voting power of shares of stock or other ownership interests entitled (without regard to the occurrence of any contingency) to vote in the election of the Person or Persons (whether directors, managers, trustees or other Persons performing similar functions) having the power to direct or cause the direction of the management and policies thereof is at the time owned or controlled, directly or indirectly, by that Person or one or more of the other Subsidiaries of that Person or a combination thereof; *provided*, that in determining the percentage of ownership interests of any Person controlled by another Person, no ownership interest in the nature of a "qualifying share" of the former Person shall be deemed to be outstanding.

"Tiwest" means Tiwest Pty Ltd, CAN 009343364, a Western Australia company.

"Tiwest Joint Venture" means the joint venture arrangement governed by (a) that certain Cooljarloo Mining Joint Venture Agreement, dated as of November 3, 1988, by and among Yalgoo Minerals Pty. Ltd. ("Yalgoo"), Tronox Australia and the other parties thereto, as amended by that certain Amending Deed to the Cooljarloo Mining Joint Venture Agreement, dated as of March 26, 1991, by and among Yalgoo, Tronox Australia and the other parties thereto; (b) that certain Processing Joint Venture Agreement, dated as of November 3, 1988, by and among Yalgoo, Tronox Australia and the other parties thereto, as amended by that certain Amending Deed to the Processing Joint Venture Agreement, dated as of March 26, 1991, by and among Yalgoo, Tronox Australia and the other parties thereto as further amended by the Supplemental Deed to

Processing Joint Venture Agreement, dated June 30, 2008, by and among Yalgoo, Tronox Australia, Exxaro Australia Sands Pty Ltd ("Exxaro Sands") and the other parties; (c) that certain Jurien Exploration Joint Venture Agreement, dated as of March 9, 1989, by and among Exxaro Sands, Tific Pty Ltd ("Tific"), Tronox Australia and the other parties thereto; (d) that certain Co operation Deed, dated as of November 3, 1988, by and among Exxaro Sands, Tronox Australia and the other parties thereto; (e) that certain Operations Management Agreement, dated as of December 16, 1988, by and among Yalgoo, Tronox Australia and the other parties thereto, as amended by that certain Supplemental Deed to the Operations Management Agreement dated as of July 23, 2008 by and among Yalgoo, Tronox Australia and the other parties thereto; (f) that certain Development Agreement, dated March 25, 2008, by and among Tronox LLC, Tronox Australia, Yalgoo, Exxaro Sands and other parties thereto; (g) that certain Mineral Sands (Cooljarloo) Mining and Processing Agreement, dated November 8, 1988 by and among the State of Western Australia Yalgoo Tronox Australia and other parties thereto; (h) those certain other documents, agreements and amendments entered into from time and time in connection with any of the foregoing agreements; pursuant to which agreements the parties operate a chloride process titanium dioxide plant located in Kwinana, Western Australia, a mining venture in Cooljarloo, Western Australia, and a mineral separation plant and a synthetic rutile processing facility in Muchea, Western Australia; (i) those certain other documents relating to or concerning exploration ventures at Jurien, Dongara and elsewhere in Western Australia; (j) those certain other documents relating to or concerning an office building in Bentley, Western Australia for the purpose of providing certain corporate services; (k) that certain Bunbury Port Authority Lease of Port Facilities Bunbury, dated October 1, 2004, by and between Bunbury Port Authority and Tiwest; and (1) that certain Russell Park, Henderson Warehouse Lease, dated November 3,2007, by and between ISPT Pty Ltd and Tiwest.

"Tiwest Joint Venture Documents" means the documents and agreements referred to in the definition "Tiwest Joint Venture", together with all documents and agreements entered into from time to time in connection with the Tiwest Joint Venture and either referred to in any of those agreements or otherwise relating or ancillary to the Tiwest Joint Venture.

"Tiwest Joint Venture Interests" means all of Tronox Australia's rights, title and interest in, to and under the Tiwest Joint Venture, including the Tiwest Shares.

"Tiwest Joint Venture Participants" means Yalgoo, Senbar Holdings Pty Limited, a Western Australian corporation, Synthetic Rutile Holdings Pty Limited, Western Australian corporation, Pigment Holdings Pty Limited, a Western Australian corporation and Tific, a Western Australian corporation.

"Tiwest Shares" means 50 B and 50 D ordinary fully paid shares in the capital of Tiwest, representing fifty percent of all of the ordinary fully paid issued shares in the capital of Tiwest.

"Tort Claims" has the meaning set forth in the Term Sheet.

"Tronox Australia" means Tronox Western Australia Pty Ltd (ACN 009 331 195), a Western Australia company.

"Yalgoo" has the meaning set forth in the definition of Tiwest Joint Venture.

*Exhibits A, B and C to the Equity Commitment Agreement are attached to the Motion.*

*Exhibit D to the Equity Commitment Agreement is omitted.*

# EXHIBIT E

## Replacement DIP Agreement

**SENIOR SECURED SUPER-PRIORITY DEBTOR-IN-POSSESSION AND EXIT CREDIT AND GUARANTY AGREEMENT**

**dated as of December __, 2009**

**among**

**TRONOX INCORPORATED,**

**TRONOX WORLDWIDE LLC,**

**CERTAIN SUBSIDIARIES OF TRONOX WORLDWIDE LLC,**
as Guarantors,

**VARIOUS LENDERS,**

**GOLDMAN SACHS LENDING PARTNERS LLC,**
as Sole Lead Arranger and Sole Bookrunner,

**GOLDMAN SACHS LENDING PARTNERS LLC,**
as Syndication Agent,

**and**

**GOLDMAN SACHS LENDING PARTNERS LLC,**
as Administrative Agent and Collateral Agent

---

**$425,000,000 Senior Secured Super-Priority
Debtor-In-Possession and Exit Credit Facilities**

---

# TABLE OF CONTENTS

SECTION 1. DEFINITIONS AND INTERPRETATION ........................................................... 2
    1.1. Definitions ........................................................................................................2
    1.2. Accounting Terms ..........................................................................................48
    1.3. Interpretation, Etc. .........................................................................................48

SECTION 2. LOANS ........................................................................................................ 48
    2.1. Term Loans .....................................................................................................48
    2.2. [Intentionally Omitted]...................................................................................49
    2.3. Use of Proceeds...............................................................................................49
    2.4. Evidence of Debt; Register; Lenders' Books and Records; Notes .................50
    2.5. Interest on Loans.............................................................................................51
    2.6. Conversion/Continuation................................................................................52
    2.7. Default Interest................................................................................................52
    2.8. Fees; Call Premium.........................................................................................53
    2.9. Scheduled Payments .......................................................................................54
    2.10. Voluntary Prepayments.................................................................................54
    2.11. Mandatory Prepayments................................................................................55
    2.12. Application of Prepayments...........................................................................58
    2.13. General Provisions Regarding Payments ......................................................58
    2.14. Ratable Sharing..............................................................................................59
    2.15. Making or Maintaining Eurodollar Rate Loans ............................................60
    2.16. Increased Costs; Capital Adequacy ...............................................................62
    2.17. Taxes; Withholding, Etc.................................................................................63
    2.18. Obligation to Mitigate...................................................................................66
    2.19. Defaulting Lenders ........................................................................................66
    2.20. Removal or Replacement of a Lender ............................................................67
    2.21. Super Priority Nature of Obligations and Lenders' Liens.............................68
    2.22. Payment of Obligations.................................................................................69
    2.23. No Discharge; Survival of Claims .................................................................69
    2.24. Release............................................................................................................69
    2.25. Waiver of any Priming Rights and Non-Consensual Use of Cash
           Collateral..................................................................................................70
    2.26. Working Capital Escrow Account, Settlement Escrow Account and
           Reinvestment Accounts. ...........................................................................70

SECTION 3. CONDITIONS PRECEDENT ........................................................................ 71
    3.1. Closing Date....................................................................................................71
    3.2. Conditions to Withdrawals from Working Capital Escrow Account
           and Settlement Escrow Account. ..............................................................75
    3.3. Six-Month Extension Option ..........................................................................77
    3.4. Exit Facility Option.........................................................................................78
    3.5. Conditions to Exit Facility Option..................................................................78
    3.6. Conversion to Exit Facility .............................................................................84

SECTION 4. REPRESENTATIONS AND WARRANTIES ......................................................... 85
    **4.1. Organization; Requisite Power and Authority; Qualification**............................85
    **4.2. Equity Interests and Ownership**...............................................................................85
    **4.3. Due Authorization**......................................................................................................86
    **4.4. No Conflict**...................................................................................................................86
    **4.5. Governmental Consents**...........................................................................................86
    **4.6. Binding Obligation**......................................................................................................86
    **4.7. Historical Financial Statements**..............................................................................87
    **4.8. Projections**...................................................................................................................87
    **4.9. No Material Adverse Effect**.......................................................................................87
    **4.10. Adverse Proceedings, Etc.**......................................................................................87
    **4.11. Payment of Taxes**......................................................................................................87
    **4.12. Properties**..................................................................................................................88
    **4.13. Environmental Matters**...........................................................................................88
    **4.14. No Defaults**................................................................................................................90
    **4.15. Material Contracts**...................................................................................................90
    **4.16. Governmental Regulation**......................................................................................90
    **4.17. Margin Stock**............................................................................................................90
    **4.18. Employee Matters**...................................................................................................90
    **4.19. Employee Benefit Plan**............................................................................................90
    **4.20. Certain Fees**..............................................................................................................91
    **4.21. Solvency**....................................................................................................................91
    **4.22. Compliance with Statutes, Etc.**.............................................................................91
    **4.23. Disclosure**.................................................................................................................92
    **4.24. Reorganization Matters; Secured, Super-Priority Obligations**........................92
    **4.25. PATRIOT Act**............................................................................................................93

SECTION 5. AFFIRMATIVE COVENANTS.......................................................................... 93
    **5.1. Financial Statements and Other Reports** ..............................................................94
    **5.2. Existence**......................................................................................................................99
    **5.3. Payment of Taxes and Claims**.................................................................................99
    **5.4. Maintenance of Properties**.....................................................................................100
    **5.5. Insurance**...................................................................................................................100
    **5.6. Books and Records; Inspections**............................................................................100
    **5.7. Lenders Meetings**....................................................................................................100
    **5.8. Compliance with Laws**...........................................................................................101
    **5.9. Environmental**.........................................................................................................101
    **5.10. Subsidiaries**............................................................................................................103
    **5.11. Additional Material Real Estate Assets** ..............................................................103
    **5.12. Further Assurances**...............................................................................................103
    **5.13. Cash Management**.................................................................................................104
    **5.14. Plan Support Agreement**.......................................................................................104
    **5.15. Plan of Reorganization.**........................................................................................104
    **5.16. Consultant**..............................................................................................................105
    **5.17. Adverse Motions**....................................................................................................105
    **5.18. Post-Closing Covenants.**.......................................................................................105
    **5.19. Maintenance of Ratings**........................................................................................105

**5.20. Sale Covenant.** ..................................................................................105

**5.21. Excess Working Capital.** ........................................................................106

SECTION 6. NEGATIVE COVENANTS ........................................................... 106

**6.1. Indebtedness** ......................................................................................106

**6.2. Liens** ...............................................................................................110

**6.3. No Further Negative Pledges** ..................................................................112

**6.4. Restricted Junior Payments** ...................................................................112

**6.5. Restrictions on Subsidiary Distributions** ..................................................113

**6.6. Investments** .......................................................................................113

**6.7. Financial Covenants** ............................................................................114

**6.8. Fundamental Changes; Disposition of Assets; Acquisitions** ...........................117

**6.9. Disposal of Subsidiary Interests** .............................................................119

**6.10. Sales and Lease-Backs** ........................................................................119

**6.11. Transactions with Shareholders and Affiliates** ..........................................120

**6.12. Conduct of Business** ...........................................................................120

**6.13. Permitted Activities of Holdings** ...........................................................120

**6.14. Amendments or Waivers of Organizational Documents, Additional Facility Credit Documents, Approved Budget** ...............................121

**6.15. Amendments or Waivers of with respect to Certain Indebtedness** .................121

**6.16. Fiscal Year** .......................................................................................121

**6.17. Chapter 11 Claims** .............................................................................121

**6.18. Critical Vendor and Other Payments** .....................................................121

**6.19. Kwinana Investment.** ...........................................................................122

SECTION 7. GUARANTY ............................................................................... 122

**7.1. Guaranty of the Obligations** .................................................................122

**7.2. Contribution by Guarantors** .................................................................122

**7.3. Payment by Guarantors** .......................................................................123

**7.4. Liability of Guarantors Absolute** ...........................................................123

**7.5. Waivers by Guarantors** ........................................................................125

**7.6. Guarantors' Rights of Subrogation, Contribution, Etc.** .............................126

**7.7. Subordination of Other Obligations** ......................................................127

**7.8. Continuing Guaranty** ..........................................................................127

**7.9. Authority of Guarantors or Borrower** .....................................................127

**7.10. Financial Condition of Borrower** ..........................................................127

**7.11. Bankruptcy, Etc.** ...............................................................................127

**7.12. Discharge of Guaranty Upon Sale of Guarantor** .....................................128

SECTION 8. EVENTS OF DEFAULT ............................................................... 128

**8.1. Events of Default** ...............................................................................128

**8.2. Carve-Out Events** ...............................................................................133

SECTION 9. AGENTS ..................................................................................... 134

**9.1. Appointment of Agents** .......................................................................134

**9.2. Powers and Duties** ..............................................................................134

**9.3. General Immunity** ...............................................................................135

**9.4. Agents Entitled to Act as Lender** ........................................................136

**9.5. Lenders' Representations, Warranties and Acknowledgment** ..................136

**9.6. Right to Indemnity** ...........................................................................138

**9.7. Successor Administrative Agent and Collateral Agent** ..........................138

**9.8. Collateral Documents and Guaranty** ..................................................140

**9.9. Withholding Taxes.** ...........................................................................141

SECTION 10. MISCELLANEOUS .................................................................. 142

**10.1. Notices** ...........................................................................................142

**10.2. Expenses** ........................................................................................143

**10.3. Indemnity** ......................................................................................144

**10.4. Set-Off** ..........................................................................................145

**10.5. Amendments and Waivers** .................................................................145

**10.6. Successors and Assigns; Participations** ...............................................147

**10.7. Certain Undertakings with Respect to Securitization Subsidiaries.** ...........150

**10.8. Independence of Covenants** ..............................................................151

**10.9. Survival of Representations, Warranties and Agreements** .........................151

**10.10. No Waiver; Remedies Cumulative** ....................................................151

**10.11. Marshalling; Payments Set Aside** ......................................................151

**10.12. Severability** ..................................................................................152

**10.13. Obligations Several; Independent Nature of Lenders' Rights** ...................152

**10.14. Headings** ......................................................................................152

**10.15. APPLICABLE LAW** .......................................................................152

**10.16. CONSENT TO JURISDICTION** .......................................................152

**10.17. WAIVER OF JURY TRIAL** .............................................................153

**10.18. Confidentiality** ..............................................................................154

**10.19. Usury Savings Clause** .....................................................................155

**10.20. Counterparts** ................................................................................155

**10.21. Effectiveness; Entire Agreement** .......................................................155

**10.22. PATRIOT Act** ...............................................................................156

**10.23. Electronic Execution of Assignments** .................................................156

**10.24. No Fiduciary Duty.** ........................................................................156

**10.25. Parties Including Trustees; Bankruptcy Court Proceedings** ....................156

**10.26. Conflict Between this Agreement and the Orders** ..................................157

**APPENDICES:**    A-1    Tranche B-1 Term Loan Commitments
                       A-2    Tranche B-2 Term Loan Commitments
                       B      Notice Addresses

**SCHEDULES:**    1.1(a)  Environmental Claimants
                      1.1(b)  Non-Core Real Estate Assets
                      1.1(c)  Products
                      3.5(i)  Certain Consents
                      3.5(v)  Mortgaged Property
                      4.1     Jurisdictions of Organization and Qualification
                      4.2     Equity Interests and Ownership
                      4.12    Real Estate Assets
                      4.13    Environmental Matters
                      4.15    Material Contracts
                      4.20    Certain Fees
                      6.1     Certain Indebtedness
                      6.2     Certain Liens
                      6.3     Certain Negative Pledges
                      6.5     Certain Restrictions on Subsidiary Distributions
                      6.6     Certain Investments
                      6.11    Certain Affiliate Transactions

**EXHIBITS:**    A-1    Funding Notice
                      A-2    Conversion/Continuation Notice
                      B-1    Tranche B-1 Term Loan Note
                      B-2    Tranche B-2 Term Loan Note
                      C      Compliance Certificate
                      D      Assignment Agreement
                      E      Certificate re Non-Bank Status
                      F-1    Closing Date Certificate
                      F-2    Solvency Certificate
                      G      Counterpart Agreement
                      H      Pledge and Security Agreement
                      I       Mortgage
                      J       Landlord Waiver and Consent Agreement
                      K      Intercompany Note
                      L       Plan Support Agreement
                      M     Approved Budget
                      N      Interim Order
                      O      Initial Cash Flow Forecast
                      P       Variance Report
                      Q      Cash Management Order
                      R      Settlement Account Escrow Agreement

S       Working Capital Account Escrow Agreement

This **SENIOR SECURED SUPER-PRIORITY DEBTOR-IN-POSSESSION AND EXIT CREDIT AND GUARANTY AGREEMENT**, dated as of December ___, 2009, is entered into by and among **TRONOX WORLDWIDE LLC**, a Delaware limited liability company (or such entity that becomes Borrower hereunder pursuant to Section 3.6 herein, as applicable, the "**Borrower**"), **TRONOX INCORPORATED**, a Delaware corporation ("**Holdings**"), **CERTAIN SUBSIDIARIES OF BORROWER**, as Guarantors, the Lenders party hereto from time to time, **GOLDMAN SACHS WORLDWIDE LENDING PARTNERS LLC** ("**GS Lending Partners**"), as sole lead arranger and sole bookrunner (in such capacity, the "**Arranger**"), **GS LENDING PARTNERS**, as Syndication Agent (in such capacity, "**Syndication Agent**"), **GS LENDING PARTNERS**, as Administrative Agent (together with its permitted successor in such capacity, "**Administrative Agent**") and as Collateral Agent (together with its permitted successor in such capacity, "**Collateral Agent**").

## RECITALS:

**WHEREAS,** capitalized terms used in these Recitals shall have the respective meanings set forth for such terms in Section 1.1 hereof;

**WHEREAS**, on January 12, 2009 (the "**Petition Date**"), Borrower, certain of Borrower's existing Domestic Subsidiaries and Tronox Luxembourg S.ar.l., a Subsidiary of Borrower organized under the laws of Luxembourg ("**Tronox Luxembourg**") commenced Chapter 11 Cases, which were administratively consolidated as Chapter 11 Case No. 09-10156 (each, a "**Chapter 11 Case**" and collectively, the "**Chapter 11 Cases**"), by filing separate voluntary petitions for reorganization under the Bankruptcy Code with the United States Bankruptcy Court for the Southern District of New York (the "**Bankruptcy Court**"). Borrower, its Domestic Subsidiaries and Tronox Luxembourg continue to operate their businesses and manage their properties as debtors and debtors-in-possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code;

**WHEREAS**, prior to the Petition Date, Borrower obtained a senior secured credit facility in an aggregate amount of $450,000,000 pursuant to a Credit Agreement, dated as of November 28, 2005, among Borrower, Holdings, the lenders from time to time party thereto and Credit Suisse AG (f/k/a Credit Suisse) ("**Credit Suisse**"), as successor administrative agent thereunder (as amended, restated, supplemented or otherwise modified from time to time, the "**Pre-Petition Credit Agreement**");

**WHEREAS**, in connection with the filing of the Chapter 11 Cases, Borrower obtained a senior secured super-priority credit facility in an aggregate amount of $125,000,000 pursuant to a Credit Agreement, dated as of January 12, 2009, as amended by the First Amendment to Credit Agreement, dated as of March 12, 2007, as further amended by the Second Amendment to Credit Agreement, dated as of February 8, 2008, and as further amended by Third Amendment to Credit Agreement, dated as of July 17, 2008 (as further amended, restated, supplemented or otherwise modified from time to time, the "**Existing DIP Credit Agreement**"), among Borrower, Holdings, the lenders party thereto from time to time, Credit Suisse, as successor administrative

agent thereunder (in its capacity as administrative agent for the Pre-Petition and Post-Petition secured lenders, the "**Existing DIP Agent**"), and JPMorgan Chase Bank, N.A., as collateral agent thereunder;

**WHEREAS**, Lenders have agreed to provide a senior secured super-priority term loan facility to Borrower that is convertible on the Exit Facility Conversion Date to a secured exit facility upon the satisfaction (or waiver) of certain conditions, consisting of $335,000,000 aggregate principal amount of Tranche B-1 Term Loans and $90,000,000 aggregate principal amount of Tranche B-2 Term Loans;

**WHEREAS**, the proceeds of the Tranche B-1 Term Loans will be used, (i) to pay transaction costs, fees and expenses incurred in connection with the transactions contemplated under this Agreement and the other Credit Documents, including payment of Committees' fees and expenses, (ii) to repay the Existing Indebtedness of the Credit Parties in full, (iii) to cash collateralize, to the extent required, all of the letters of credit outstanding under the Existing Indebtedness, (iv) to fund one or more Custodial Trusts (directly or indirectly by first funding the Settlement Escrow Account) and (v) for general corporate and working capital purposes, and the proceeds of the Tranche B-2 Term Loans will be used (i) to fund the Working Capital Escrow Account and (ii) for general corporate and working capital purposes of Borrower and its Subsidiaries, in each case, in accordance with Section 2.3 hereof;

**WHEREAS,** Borrower has agreed to secure all of its Obligations by granting to Collateral Agent, for the benefit of Secured Parties, First Priority Liens on substantially all of its assets, including a pledge of all of the Equity Interests of each of its Domestic Subsidiaries and 65% of all the Equity Interests of each of its first tier Foreign Subsidiaries, subject to the terms of the Interim Order and Final Order;

**WHEREAS,** Guarantors have agreed to guarantee the obligations of Borrower hereunder and to secure their respective Obligations by granting to Collateral Agent, for the benefit of Secured Parties, a First Priority Lien on substantially all of their respective assets, including a pledge of all of the Equity Interests of each of their respective Domestic Subsidiaries (including Borrower) and 65% of all the Equity Interests of each of their respective first tier Foreign Subsidiaries, subject to the terms of the Interim Order and Final Order; and

**WHEREAS**, the Lenders have agreed to grant an option to Borrower to cause the DIP Facility to be converted to the Exit Facility on the effective date of the Plan of Reorganization subject to certain terms and conditions set forth herein.

**NOW, THEREFORE,** in consideration of the premises and the agreements, provisions and covenants herein contained, the parties hereto agree as follows:


### SECTION 1.  DEFINITIONS AND INTERPRETATION

**1.1.  Definitions.**  The following terms used herein, including in the preamble, recitals, exhibits and schedules hereto, shall have the following meanings:

"**ABL Collateral**" means all now owned or hereafter acquired:

(i) "accounts" and "payment intangibles," other than "payment intangibles" (in each case, as defined in Article 9 of the UCC) which constitute identifiable proceeds of Collateral which is not ABL Collateral;

(ii) "deposit accounts" (as defined in Article 9 of the UCC), "securities accounts" (as defined in Article 8 of the UCC), including all monies, "uncertificated securities," and "securities entitlements" (as defined in Article 8 of the UCC) contained therein (including all cash, marketable securities and other funds held in or on deposit in either of the foregoing), "instruments" (as defined in Article 9 of the UCC), including intercompany notes of Subsidiaries, and "chattel paper" (as defined in Article 9 of the UCC);

(iii) general intangibles pertaining to the other items of property included within clauses (i), (ii), (iv) and (v) of this definition of ABL Collateral, including, without limitation, all contingent rights with respect to warranties on accounts which are not yet "payment intangibles" (as defined in Article 9 of the UCC);

(iv) "records" (as defined in Article 9 of the UCC), "supporting obligations" (as defined in Article 9 of the UCC) and related "letters of credit" (as defined in Article 5 of the UCC), commercial tort claims or other claims and causes of action, in each case, to the extent related primarily to any of the foregoing and clause (v) below;

(v) all "inventory" (as defined in Article 9 of the UCC), including inventory, merchandise, goods and other personal property that are held for sale or lease or are furnished or are to be furnished under a contract of service, or that constitute raw materials, work in process, finished goods, returned goods, or materials or supplies of any kind used or consumed or to be used or consumed in the processing, production, packaging, promotion, delivery or shipping of the same, including all supplies and embedded software; and

(vi) substitutions, replacements, accessions, products and proceeds (including, without limitation, insurance proceeds, licenses, royalties, income, payments, claims, damages and proceeds of suit) of any or all of the foregoing;

provided that for the avoidance of doubt, the ABL Collateral shall not include the Settlement Escrow Account, the Working Capital Escrow Account, the Reinvestment Accounts or any Intellectual Property (other than a royalty free license to use any and all Intellectual Property as necessary to collect all "accounts" or sell "inventory" or other amounts owing with respect to ABL Collateral at any time in connection with enforcement).

"**Acceptable Sale Transaction**" as defined in Section 5.20.

"**Accession and Novation Agreement**" as defined in Section 3.6(a).

"**Ad Hoc Committee**" means the ad hoc committee of unsecured holders of Senior Notes.

"**Additional Facility Credit Documents**" means, collectively, the Replacement Facility Credit Documents and the Alternative Facility Credit Documents.

"**Adjusted Eurodollar Rate**" means, for any Interest Rate Determination Date with respect to an Interest Period for a Eurodollar Rate Loan, the rate per annum obtained by dividing (and rounding upward to the next whole multiple of 1/100 of 1%) (i) (a) the rate per annum (rounded to the nearest 1/100 of 1%) equal to the rate determined by Administrative Agent to be the offered rate which appears on the page of the Reuters Screen which displays an average British Bankers Association Interest Settlement Rate (such page currently being LIBOR01 page) for deposits (for delivery on the first day of such period) with a term equivalent to such period in Dollars, determined as of approximately 11:00 a.m. (London, England time) on such Interest Rate Determination Date, or (b) in the event the rate referenced in the preceding clause (a) does not appear on such page or service or if such page or service shall cease to be available, the rate per annum (rounded to the nearest 1/100 of 1%) equal to the rate determined by Administrative Agent to be the offered rate on such other page or other service which displays an average British Bankers Association Interest Settlement Rate for deposits (for delivery on the first day of such period) with a term equivalent to such period in Dollars, determined as of approximately 11:00 a.m. (London, England time) on such Interest Rate Determination Date, or (c) in the event the rates referenced in the preceding clauses (a) and (b) are not available, the rate per annum (rounded to the nearest 1/100 of 1%) equal to the offered quotation rate to first class banks in the London interbank market by GS Lending Partners or an Affiliate thereof for deposits (for delivery on the first day of the relevant period) in Dollars of amounts in same day funds comparable to the principal amount of the applicable Term Loan of Administrative Agent, in its capacity as a Lender, for which the Adjusted Eurodollar Rate is then being determined with maturities comparable to such period as of approximately 11:00 a.m. (London, England time) on such Interest Rate Determination Date, by (ii) an amount equal to (a) one <u>minus</u> (b) the Applicable Reserve Requirement; <u>provided</u>, however, that notwithstanding the foregoing, the Adjusted Eurodollar Rate shall at no time be less than 2.0% per annum.

"**Administrative Agent**" as defined in the preamble hereto.

"**Adverse Proceeding**" means any action, suit, proceeding, hearing (in each case, whether administrative, judicial or otherwise), governmental investigation or arbitration (whether or not purportedly on behalf of Holdings or any of its Subsidiaries) at law or in equity, or before or by any Governmental Authority, domestic or foreign (including any Environmental Claims), whether pending or, to the knowledge of Holdings or any of its Subsidiaries, threatened against or affecting Holdings or any of its Subsidiaries or any property of Holdings or any of its Subsidiaries.

"**Affected Lender**" as defined in Section 2.15(b).

"**Affected Loans**" as defined in Section 2.15(b).

"**Affiliate**" means (i) as applied to any Person, any other Person directly or indirectly controlling, controlled by, or under common control with, that Person and (ii) solely with respect to the "Eligible Assignee" definition, any Person that directly or indirectly owns more than 15% of the aggregate principal amount of the Senior Notes. For the purposes of this definition, "control" (including, with correlative meanings, the terms "controlling", "controlled by" and "under common control with"), as applied to any Person, means the possession, directly or indirectly, of the power (i) to vote 10% or more (or solely with respect to the "Eligible Assignee" definition, 15% or more) of the Securities having ordinary voting power for the election of directors of such Person or (ii) to direct or cause the direction of the management and policies of that Person, whether through the ownership of voting securities or by contract or otherwise.

"**Affiliated Lender**" means (i) any Lender, together with its Affiliates, that possesses, directly or indirectly, the power (a) to vote 15% or more of the Securities having ordinary voting power for the election of directors of Holdings or (b) to direct or cause the direction of the management and policies of Holdings, whether through the ownership of voting securities or by contract or otherwise; and (ii) any Lender, together with its Affiliates, that directly or indirectly owns more than 15% of the aggregate principal amount of the Senior Notes, it being understood that so long as such Person is an Affiliated Lender it shall have no right (A) to consent to any amendment, modification, waiver, consent or other such action with respect to any of the terms of this Agreement or any other Credit Document, (B) to require any Agent or other Lender to undertake any action (or refrain from taking any action) with respect to this Agreement or any other Credit Document, (C) otherwise vote on any matter related to this Agreement or any other Credit Document, (D) attend any meeting with any Agent or Lender or receive any information from any Agent or Lender or (E) make or bring any claim, in its capacity as Lender, against the Agent or any Lender with respect to the duties and obligations of such Persons under the Credit Documents, but no amendment, modification or waiver shall deprive any Affiliated Lender of its share of any payments which the Lenders are entitled to share on a pro rata basis hereunder.

"**Agent**" means each of (a) Administrative Agent, (b) Syndication Agent, (c) Collateral Agent, (d) each Arranger and (e) any other Person appointed under the Credit Documents to serve in an agent or similar capacity.

"**Agent Affiliates**" as defined in Section 10.1(b).

"**Aggregate Amounts Due**" as defined in Section 2.14.

"**Aggregate Payments**" as defined in Section 7.2.

"**Agreement**" means this Credit and Guaranty Agreement, dated as of December ___, 2009, as it may be amended, restated, supplemented or otherwise modified from time to time.

"**Alternative Facility**" means any revolving credit facility, working capital facility, Permitted Securitization or accounts receivable facility (including letters of credit and

reimbursement obligations with respect thereto and Interest Rate Agreements and/or Currency Agreements secured thereunder) incurred by any Foreign Subsidiary (or Securitization Subsidiary) of Borrower and secured by Alternative Facility Liens that are permitted to be incurred hereunder; provided, that (i) on or before the date on which such Indebtedness is incurred by any Foreign Subsidiary, such Indebtedness is designated by Borrower, in a certificate of an Authorized Officer delivered to Administrative Agent, as "Alternative Facility Debt" and (ii) no Credit Party has guaranteed or otherwise directly or indirectly provided credit support with respect to such Alternative Facility.

"**Alternative Facility Agent**" means any collateral agent or similar representative of the secured parties under any Alternative Facility.

"**Alternative Facility Credit Documents**" means, collectively, the definitive loan documentation governing any Alternative Facility.

"**Alternative Facility Liens**" means Liens granted to an Alternative Facility Agent under any Alternative Facility, at any time, upon the current assets (including assets similar to those described in the definition of "ABL Collateral") of any Foreign Subsidiary of Borrower.

"**Anadarko Litigation**" means (i) the litigation known as *Tronox Incorporated et al. v. Anadarko Petroleum Corporation et al.*, Case No. 09-1198 (ALG), and all related Environmental Claims, claims, actions, appeals, judgments, decisions, orders, awards, decrees or equitable relief of every kind, nature or description or (ii) any other Environmental Claim asserted by Anadarko Petroleum Corporation, Kerr-McGee Corporation and their respective past or present parents, Subsidiaries, Affiliates, predecessors, successors, directors, officers or representatives (collectively "**Anadarko Parties**") against a Credit Party or by a Credit Party against the Anadarko Parties that (A) relates to any Environmental Legacy Liabilities or (B) is otherwise related to environmental matters, in either case (A) or (B) associated with the creation and formation of Borrower as a spin-off from Kerr-McGee Corporation.

"**Applicable Margin**" means (i) in the case of any Loan that is a Base Rate Loan, a rate equal to 6.00% per annum or (ii) in the case of any Loan that is a Eurodollar Rate Loan, a rate equal to 7.00% per annum.

"**Applicable Reserve Requirement**" means, at any time, for any Eurodollar Rate Loan, the maximum rate, expressed as a decimal, at which reserves (including any basic marginal, special, supplemental, emergency or other reserves) are required to be maintained with respect thereto against "Eurocurrency liabilities" (as such term is defined in Regulation D) under regulations issued from time to time by the Board of Governors or other applicable banking regulator. Without limiting the effect of the foregoing, the Applicable Reserve Requirement shall reflect any other reserves required to be maintained by such member banks with respect to (i) any category of liabilities which includes deposits by reference to which the applicable Adjusted Eurodollar Rate or any other interest rate of a Loan is to be determined, or (ii) any category of extensions of credit or other assets which include Eurodollar Rate Loans. A Eurodollar Rate Loan shall be deemed to constitute Eurocurrency liabilities and as such shall be deemed subject to reserve requirements without benefits of credit for proration, exceptions or offsets that may be available from time to time to the applicable Lender. The rate of interest on

Eurodollar Rate Loans shall be adjusted automatically on and as of the effective date of any change in the Applicable Reserve Requirement.

"**Approved Budget**" means the Initial Approved Budget, as it may be amended, supplemented or otherwise modified in accordance with Section 6.14 or Section 3.3(d), as applicable.

"**Approved Electronic Communications**" means any notice, demand, communication, information, document or other material that any Credit Party provides to Administrative Agent pursuant to any Credit Document or the transactions contemplated therein which is distributed to Agents or Lenders by means of electronic communications pursuant to Section 10.1(b).

"**Arranger**" as defined in the preamble hereto.

"**Asset Sale**" means a sale, lease or sub-lease (as lessor or sublessor), sale and leaseback, assignment, conveyance, exclusive license (as licensor or sublicensor), transfer or other disposition to, or any exchange of property with, any Person (other than Borrower or any Guarantor Subsidiary, by a Foreign Subsidiary to a Foreign Subsidiary or by a Foreign Subsidiary to a Guarantor or Borrower), in one transaction or a series of transactions, of all or any part of Holdings' or any of its Subsidiaries' businesses, assets or properties of any kind, whether real, personal, or mixed and whether tangible or intangible, whether now owned or hereafter acquired, created, leased or licensed, including the Equity Interests of any of Holdings' Subsidiaries, other than (i) inventory (or other assets) sold, leased or licensed out in the ordinary course of business (excluding any such sales, leases or licenses out by operations or divisions discontinued or to be discontinued), (ii) non-exclusive licenses of Intellectual Property in the ordinary course of business consistent with past practice, (iii) transfers of property contemplated by the Plan of Reorganization, (iv) sales of Securitization Assets to one or more Securitization Subsidiaries in connection with a Permitted Securitization and (v) the disposition of Cash and Cash Equivalents in the ordinary course of business. For the avoidance of doubt, a grant or pledge by any Credit Party or Foreign Subsidiary of a security interest in such Person's assets shall not constitute an Asset Sale.

"**Asset Sale Proceeds Reinvestment Account**" means (a) prior to the Exit Facility Conversion Date, an Escrow Account and (b) on and after the Exit Facility Conversion Date, a Deposit Account maintained by Borrower with a financial institution selected by Administrative Agent, which Deposit Account is subject to a Control Agreement, and which Escrow Account or Deposit Account, as applicable, shall have no amounts on deposit therein other than with respect to any Net Asset Sale Proceeds required to be deposited therein pursuant to Section 2.11(a); provided that, without the prior written consent of Administrative Agent, Borrower shall not be permitted to withdraw or transfer any amounts on deposit in such Asset Sale Proceeds Reinvestment Account other than in accordance with Section 2.11(a).

"**Assignment Agreement**" means an Assignment and Assumption Agreement substantially in the form of Exhibit D with such amendments or modifications as may be approved by Administrative Agent.

"**Assignment Effective Date**" as defined in Section 10.6(b).

"**Australian Subsidiary**" as defined in Section 6.19(b).

"**Authorized Officer**" means, as applied to any Person, any individual holding the position of chairman of the board (if an officer), chief executive officer, president, vice president (or the equivalent thereof), chief financial officer or treasurer of such Person; provided that the secretary or assistant secretary of such Person shall have delivered an incumbency certificate to Administrative Agent as to the authority of such Authorized Officer.

"**Available Cash**" means, as of any date of determination, the sum of (a) the aggregate amount of unrestricted Cash and Cash Equivalents included in the consolidated balance sheet of the Credit Parties as of such date (excluding any proceeds in the Working Capital Escrow Account, Settlement Escrow Account and the Reinvestment Accounts) that, in each case, are free and clear of all Liens (other than Liens in favor of Administrative Agent, the Replacement Facility Agent, any Alternative Facility Agent and Liens permitted pursuant to Section 6.2(b), (c), (d), (i) and (j)); provided that for purposes of Section 6.19, Available Cash shall also include (i) the aggregate amount of unrestricted Cash and Cash Equivalents included in the consolidated balance sheet of the wholly-owned Foreign Subsidiaries of Borrower as of such date and (ii) the aggregate amount of unrestricted Cash and Cash Equivalents included in the consolidated balance sheet of Tronox Western Australia Pty Ltd. and Tronox Pigments Ltd. as of such date, in each case, that are free and clear of all Liens (other than Liens in favor of Administrative Agent, the Replacement Facility Agent and any Alternative Facility Agent and Liens permitted pursuant to Section 6.2(b), (c), (d), (i) and (j)) and obligations owing pursuant to the TiWest Joint Venture Agreements or otherwise owing to a joint venturer; and

(b) the aggregate amount of Cash and Cash Equivalents included in the Working Capital Escrow Account as of such date.

"**Bankruptcy Code**" means Title 11 of the United States Code entitled "Bankruptcy", as applicable to the Chapter 11 Cases, as now and hereafter in effect, or any applicable successor statute.

"**Bankruptcy Court**" as defined in the recitals hereto.

"**Base Rate**" means, for any day, a rate per annum equal to the greater of (i) the Prime Rate in effect on such day and (ii) the Federal Funds Effective Rate in effect on such day plus ½ of 1%. Any change in the Base Rate due to a change in the Prime Rate or the Federal Funds Effective Rate shall be effective on the effective day of such change in the Prime Rate or the Federal Funds Effective Rate, respectively; provided, however, that notwithstanding the foregoing, the Base Rate shall at no time be less than 3.0% per annum. On any day that Base Rate Loans are outstanding, in no event shall the Base Rate be less than the sum of (i) the Adjusted Eurodollar Rate (after giving effect to any Adjusted Eurodollar Rate "floor") that would be payable on such day for a Eurodollar Rate Loan with a one-month interest period plus (ii) the difference between the Applicable Margin for Eurodollar Rate Loans and the Applicable Margin for Base Rate Loans.

"**Base Rate Loan**" means a Loan bearing interest at a rate determined by reference to the Base Rate.

"**Beneficiary**" means each Agent, Lender and Lender Counterparty.

"**Board of Governors**" means the Board of Governors of the United States Federal Reserve System, or any successor thereto.

"**Borrower**" as defined in the preamble hereto; <u>provided</u>, <u>however</u>, that (a) prior to the Exit Facility Conversion Date, "Borrower" shall refer solely to Tronox Worldwide LLC, as debtor-in-possession, and (b) on and after the Exit Facility Conversion Date, "Borrower" shall refer solely to the reorganized Tronox Worldwide LLC, or such other Person, if any, that becomes Borrower under the Exit Facility pursuant to Section 3.6.

"**Borrowing Base**" means, on any date of determination, to the extent the Replacement Revolving Facility or any Alternative Facility contains a borrowing base (or similar borrowing limitation), the borrowing base under the Replacement Revolving Facility or such Alternative Facility.

"**Business**" means (i) worldwide, the business of developing, researching, processing, manufacturing, distributing, marketing and selling the Products and (ii) in Australia, the business of mining of, and exploration for, raw materials required to product the Products.

"**Business Day**" means (i) any day excluding Saturday, Sunday and any day which is a legal holiday under the laws of the State of New York or is a day on which banking institutions located in such state are authorized or required by law or other governmental action to close and (ii) with respect to all notices, determinations, fundings and payments in connection with the Adjusted Eurodollar Rate or any Eurodollar Rate Loans, the term "**Business Day**" means any day which is a Business Day described in clause (i) and which is also a day for trading by and between banks in Dollar deposits in the London interbank market.

"**Capital Lease**" means, as applied to any Person, any lease of any property (whether real, personal or mixed) by that Person as lessee that, in conformity with GAAP, is or should be accounted for as a capital lease on the balance sheet of that Person.

"**Carry Over Amount**" as defined in Section 6.7(e).

"**Carve-Out**" as defined in the Interim Order or the Final Order, as then in effect; <u>provided</u>, <u>however</u>, that if at any time that any Credit Party is a party to a Replacement Revolving Facility, not more than a pro rata share of the Carve-Out (obtained by dividing (a) the Tranche B-1 Term Loan Exposure and the Tranche B-2 Term Loan Exposure by (b) the Tranche B-1 Term Loan Exposure, the Tranche Term Loan B-2 Exposure and the exposure under the Replacement Revolving Facility) may be funded from proceeds of the Term Priority Collateral.

"**Carve-Out Account**" means a segregated cash collateral account to be established at, and maintained with, the Collateral Agent.

"**Carve-Out Cap**" means $5,000,000.

"**Carve-Out Event**" as defined in Section 8.2.

"**Carve-Out Event Notice**" means a written notice delivered by Administrative Agent to Borrower and its lead counsel, the U.S. Trustee, and lead counsel to each of the Committees expressly stating that the Carve-Out Cap is invoked, which notice may be delivered following the commencement of enforcement of rights under the Loan Document.

"**Cash**" means money, currency or a credit balance in any demand or Deposit Account.

"**Cash Collateral**" as defined in the Interim Order or the Final Order, as then in effect.

"**Cash Equivalents**" means, as at any date of determination, any of the following: (i) marketable securities (a) issued or directly and unconditionally guaranteed as to interest and principal by the United States Government or (b) issued by any agency of the United States the obligations of which are backed by the full faith and credit of the United States, in each case maturing within one year after such date; (ii) marketable direct obligations issued by any state of the United States of America or any political subdivision of any such state or any public instrumentality thereof, in each case maturing within one year after such date and having, at the time of the acquisition thereof, a rating of at least A-1 from S&P or at least P-1 from Moody's; (iii) commercial paper maturing no more than six months from the date of creation thereof and having, at the time of the acquisition thereof, a rating of at least A-1 from S&P or at least P-1 from Moody's; (iv) certificates of deposit or bankers' acceptances (or, in the case of Foreign Subsidiaries, the foreign equivalent thereof) maturing within six months after such date and issued or accepted by any Lender or by any commercial bank organized under the laws of the United States of America or any state thereof or the District of Columbia that (a) is at least "adequately capitalized" (as defined in the regulations of its primary Federal banking regulatory) and (b) has Tier 1 capital (as defined in such regulations) of not less than $500,000,000; and (v) shares of any money market mutual fund that (a) has substantially all of its assets invested continuously in the types of investments referred to in clauses (i) and (ii) above, (b) has net assets of not less than $3,000,000,000, and (c) has the highest rating obtainable from either S&P or Moody's; provided, that, in the case of any Investment by a Foreign Subsidiary, "Cash Equivalents" shall also include: (i) direct obligations of the sovereign nation (or any agency thereof) in which such Foreign Subsidiary is organized and is conducting business or in obligations fully and unconditionally guaranteed by such sovereign nation (or any agency thereof) and (ii) investments of the type and maturity described in clauses (i) through (v) above of foreign obligors, which Investments or obligors (or the parents of such obligors) have ratings described in such clauses or equivalent ratings from comparable foreign rating agencies.

"**Cash Flow Forecast**" as defined in Section 5.1(e).

"**Cash Management Order**" means that certain order issued by the Bankruptcy Court on February 6, 2009 and attached hereto as Exhibit Q.

"**Certificate re Non-Bank Status**" means a certificate substantially in the form of Exhibit E.

"**Change of Control**" means, at any time after the date hereof, (i) any Person or "group" (within the meaning of Rules 13d-3 and 13d-5 under the Exchange Act) other than the Permitted Holders (a) shall have acquired beneficial ownership or control of 35% or more on a fully diluted basis of the voting and/or economic interest in the Equity Interests of Holdings or (b) shall have obtained the power (whether or not exercised) to elect a majority of the members of the board of directors (or similar governing body) of Holdings; (ii) Holdings shall cease to beneficially own and control 100% on a fully diluted basis of the economic and voting interest in the Equity Interests of Borrower; (iii) the majority of the seats (other than vacant seats) on the board of directors (or similar governing body) of Holdings cease to be occupied by Persons who either (a) were members of the board of directors of Holdings on the Closing Date or (b) were nominated for election by the board of directors of Holdings, a majority of whom were directors on the Closing Date or whose election or nomination for election was previously approved by a majority of such directors; or (iv) any "change of control" or similar event under the Replacement Revolving Facility shall occur. For avoidance of doubt, no Change of Control shall be deemed to have occurred solely by virtue of the consummation of the transactions contemplated by the Plan of Reorganization or any change of the composition of the board of directors (or similar governing body) in connection with the issuance of the New Money Investment and any such directors shall be deemed to have been directors on the Closing Date for purposes of this definition.

"**Chapter 11 Case**" and "**Chapter 11 Cases**" as defined in the recitals hereto.

"**Claim**" has the meaning specified in Section 101(5) of the Bankruptcy Code.

"**Class**" means (i) with respect to Lenders, each of the following classes of Lenders: (a) Lenders having Tranche B-1 Term Loan Exposure and (b) Lenders having Tranche B-2 Term Loan Exposure and (ii) with respect to Loans, each of the following classes of Loans: (a) Tranche B-1 Term Loans and (b) Tranche B-2 Term Loans.

"**Closing Date**" means the date on which the Loans are made, which occurred on December __, 2009.

"**Closing Date Certificate**" means a Closing Date Certificate substantially in the form of Exhibit F-1.

"**Collateral**" means, collectively, all of the real, personal and mixed property (including Equity Interests) in which Liens are purported to be granted pursuant to the Collateral Documents as security for the Obligations.

"**Collateral Agent**" as defined in the preamble hereto.

"**Collateral Documents**" means the Pledge and Security Agreement, the Replacement Revolving Intercreditor Agreement, if any, the Mortgages, the Intellectual Property Security Agreements, the Settlement Account Escrow Agreement, the Working Capital Account Escrow Agreement, the Reinvestment Account Escrow Agreements, the Landlord Personal Property Collateral Access Agreements, if any, and prior to the Exit Facility Conversion Date, the Interim Order or the Final Order, whichever is then in effect, and all other instruments, documents and agreements delivered by or on behalf or at the request of any Credit Party

pursuant to this Agreement or any of the other Credit Documents in order to grant to, or perfect in favor of, Collateral Agent, for the benefit of Secured Parties, a Lien on any real, personal or mixed property of that Credit Party as security for the Obligations.

"**Collateral Questionnaire**" means a certificate in form reasonably satisfactory to Collateral Agent that provides information with respect to the personal or mixed property of each Credit Party.

"**Commitment**" means any Tranche B-1 Term Loan Commitment or Tranche B-2 Term Loan Commitment.

"**Committees**" means collectively, (a) the Unsecured Creditors Committee, (b) any other statutory committee appointed in the Chapter 11 Cases, and (c) the Ad Hoc Committee, and each of such Committees shall be referred to herein as a "Committee".

"**Commodity Hedging Agreements**" means, whether physically or financially settled, any agreement providing for swaps, futures or forwards, natural gas purchase or sale agreements, and options and any other similar derivative agreements (such as and including written puts), each with respect to, or involving the purchase, sale, or hedge of any natural gas price or price indices for any such commodities.

"**Compliance Certificate**" means a Compliance Certificate substantially in the form of Exhibit C.

"**Confidential Information Memorandum**" as defined in Section 9.3(a).

"**Confirmation Order**" means an order of the Bankruptcy Court, in form and substance satisfactory to Administrative Agent and Requisite Lenders, confirming the Plan of Reorganization and approving the Plan of Reorganization-related solicitation procedures.

"**Consolidated Adjusted EBITDAR**" means, for any period, an amount determined for Holdings and its Subsidiaries on a consolidated basis equal to:

(i) Consolidated Net Income, plus, to the extent reducing Consolidated Net Income, the sum, without duplication, of amounts for (a) consolidated interest expense, (b) provisions for taxes based on income, (c) total depreciation expense, (d) total amortization expense, (e) Restructuring Costs in an aggregate amount not to exceed (x) with respect to the period commencing on the Closing Date and ending on the Exit Facility Conversion Date, $40,000,000 and (y) thereafter, $10,000,000, (f) any unusual or non-recurring expenses or losses in an amount not to exceed $5,000,000 from the Closing Date to the date of determination, (g) non-cash charges reducing Consolidated Net Income (excluding any additions to bad debt reserves or bad debt expense and any such non-Cash charge to the extent that it represents an accrual or reserve for potential Cash charge in any future period or amortization of a prepaid Cash charge that was paid in a prior period, but including for such period (1) write-downs of property, plant and equipment and other assets, (2) impairment of intangible assets, (3) loss resulting from cumulative effect of change in accounting principle, (4) compensation charges arising from stock options, restricted stock grants or other equity incentive programs, (5) net foreign currency reevaluation of intercompany indebtedness and remeasurement losses or gains

on the balance sheet of Holdings, Borrower and its Subsidiaries, (6) loss on sale of accounts receivable under asset securitization programs (to the extent comparable to interest expense) and (7) provisions for asset retirement obligations), (h) Transaction Costs, (i) provision for environmental restoration and Remedial Action (net of reimbursements) for continuing operations to the extent representing an accrual of or a reserve for future Cash expenses, (j) the termination fee and related expenses payable pursuant to that certain Asset and Equity Purchase Agreement, dated as of August 28, 2009, among Holdings and certain of its Subsidiaries and Huntsman Corporation and certain of its Subsidiaries, (k) net non-cash mark-to-market charges relating to future hedging contracts and (l) net cash expenditures in respect of discontinued operations in an aggregate amount not to exceed $5,000,000 with respect to the period commencing on the Closing Date and ending on the Exit Facility Conversion Date.

minus, (ii) without duplication and to the extent included in the statement of such Consolidated Net Income for such period, the sum of (A) interest income (except to the extent deducted in determining Consolidated Interest Expense), (B) other non-Cash gains increasing Consolidated Net Income for such period (excluding any such non-Cash gain to the extent it represents the reversal of an accrual or reserve for potential Cash gain in any prior period); provided that any Cash received with respect to any non-Cash items of income (other than any extraordinary gains) for any prior period shall be added in computing Consolidated Adjusted EBITDAR for the period in which such Cash is received, (C) any unusual or non-recurring income or gains (including, whether or not otherwise includable as a separate item in the statement of such Consolidated Net Income for such period, gains on the sale of assets outside of the ordinary course of business), (D) any other non-cash income arising from the cumulative effect of changes in accounting principle and income tax benefit, and (E) after the Exit Facility Conversion Date, provision for environmental restoration and Remedial Action for continuing operations added back pursuant to clause (i) of this definition to the extent actually paid in Cash.

For the purposes of this definition, Consolidated Adjusted EBITDAR of Holdings and its Subsidiaries for the eleven months ended prior to the Closing Date shall be deemed to be the amounts set forth below; provided, that if Holdings and its Subsidiaries adjust or restate (other than restatements resulting solely from a change in GAAP after the Closing Date) the Consolidated Adjusted EBITDAR amounts set forth below at any time after the Closing Date, Consolidated Adjusted EBITDAR for such period shall be the restated Consolidated Adjusted EBITDAR amounts.

| Month Ending | Consolidated Adjusted EBITDAR |
|---|---|
| January 31, 2009 | $12,107,600 |
| February 28, 2009 | $6,725,700 |
| March 31, 2009 | $1,307,000 |
| April 30, 2009 | $3,803,245 |
| May 31, 2009 | $6,364,913 |
| June 30, 2009 | $13,079,098 |
| July 31, 2009 | $12,432,595 |
| August 31, 2009 | $16,090,424 |
| September 30, 2009 | $15,506,564 |

| October 31, 2009 | $17,284,854 |
| November 30, 2009 | $13,520,210 |

"**Consolidated Capital Expenditures**" means, for any period, the aggregate of all expenditures of Holdings and its Subsidiaries during such period determined on a consolidated basis that, in accordance with GAAP, are included in "purchase of property and equipment" or similar items, or which should otherwise be capitalized, reflected in the consolidated statement of cash flows of Holdings and its Subsidiaries; provided that Consolidated Capital Expenditures shall not include (i) any expenditures for replacements and substitutions for fixed assets, capital assets or equipment to the extent made with Net Insurance/Condemnation Proceeds invested pursuant to Section 2.11(b) or with Net Asset Sale Proceeds invested pursuant to Section 2.11(a), (ii) the Kwinana Investment, (iii) any expenditures that are accounted for as capital expenditures of such Person and that actually are paid for by a third party (excluding Holdings, Borrower or any Subsidiary thereof) and for which neither Holdings, Borrower nor any Subsidiary has provided or is required to provide or incur, directly or indirectly, any consideration or obligation to such third party or any other Person (whether before, during or after such period), (iv) the purchase price of any Permitted Acquisition, and (v) any expenditures which are made with the aggregate amount of net cash proceeds received by Holdings from the sale or issuance of Equity Interests (other than Disqualified Equity Interests and in connection with an initial public offering of Holdings or any of its Subsidiaries or Affiliates); provided that, at the time of such capital expenditure using the net cash proceeds from the sale or issuance of Equity Interests, Borrower shall deliver a certificate of an Authorized Officer stating that all or a portion of such capital expenditure is being made from the proceeds of such sale or issuances.

"**Consolidated Current Assets**" means, as at any date of determination, the total assets of a Person and its Subsidiaries (excluding any Securitization Subsidiary) on a consolidated basis that may properly be classified as current assets in conformity with GAAP, excluding Cash and Cash Equivalents.

"**Consolidated Current Liabilities**" means, as at any date of determination, the total liabilities of a Person and its Subsidiaries (excluding any Securitization Subsidiary) on a consolidated basis that may properly be classified as current liabilities in conformity with GAAP, excluding the current portion of long term debt.

"**Consolidated Excess Cash Flow**" means, for any period, an amount (if positive) equal to:

(i) the sum, without duplication, of the amounts for such period of (a) Consolidated Net Income, plus, (b) to the extent reducing Consolidated Net Income, the sum, without duplication, of amounts for non-Cash charges reducing Consolidated Net Income, including for depreciation and amortization (excluding any such non-Cash charge to the extent that it represents (x) an accrual or reserve for potential Cash charge in any future period or amortization of a prepaid Cash charge that was paid in a prior period or (y) an adjustment for fresh start accounting), plus (c) the Consolidated Working Capital Adjustment, minus

(ii) the sum, without duplication, of (a) the amounts for such period paid from Internally Generated Cash of (1) scheduled repayments of Indebtedness for borrowed money (excluding repayments of outstanding loans under any Replacement Revolving Facility or Alternative Facility except to the extent the commitments thereunder are permanently reduced in connection with such repayments) and scheduled repayments of obligations under Capital Leases (excluding any interest expense portion thereof), and (2) Consolidated Capital Expenditures, plus (b) other non-Cash gains increasing Consolidated Net Income for such period (excluding any such non-Cash gain to the extent it represents (x) the reversal of an accrual or reserve for potential Cash gain in any prior period or (y) an adjustment for fresh start accounting); minus

(iii) any voluntary repayment of the Loans.

As used in clause (ii) of this definition, "scheduled repayments of Indebtedness" do not include mandatory prepayments or voluntary prepayments.

"**Consolidated Fixed Charges**" means, for any period, the sum, without duplication, of the amounts determined for Holdings and its Subsidiaries on a consolidated basis equal to (i) Consolidated Interest Expense, (ii) scheduled payments of principal on Consolidated Total Debt, (iii) Consolidated Capital Expenditures and (iv) the portion of taxes based on income actually paid in Cash and provisions for Cash income taxes; provided that as of each date of determination on and prior to December 31, 2010, Consolidated Fixed Charges shall be calculated for the period from the Closing Date to the date of determination divided by the number of days in such period and multiplied by 365.

"**Consolidated Interest Expense**" means, for any period, total interest expense (including that portion attributable to Capital Leases in accordance with GAAP and capitalized interest) of Holdings and its Subsidiaries on a consolidated basis with respect to all outstanding Indebtedness of Holdings and its Subsidiaries, including all commissions, discounts and other fees and charges owed with respect to letters of credit and net costs under Interest Rate Agreements, but excluding, however, any amount not payable in Cash and any amounts referred to in Section 2.8(a), (b), (c), (d), (f) or (g); provided that as of each date of determination on and prior to December 31, 2010, Consolidated Interest Expense shall be calculated for the period from the Closing Date to the date of determination divided by the number of days in such period and multiplied by 365. For avoidance of doubt, Consolidated Interest Expense shall exclude interest charges on tax assessments and trade payables.

"**Consolidated Net Income**" means, for any period, (i) the net income (or loss) of Holdings and its Subsidiaries on a consolidated basis for such period taken as a single accounting period determined in conformity with GAAP, minus (ii) (a) the income (or loss) of any Person (other than a Subsidiary of Holdings) in which any other Person (other than Holdings or any of its Subsidiaries) has a joint interest, except to the extent of the amount of dividends or other distributions actually paid to Holdings or any of its Subsidiaries by such Person during such period, (b) the income (or loss) of any Person accrued prior to the date it becomes a Subsidiary of Holdings or is merged into or consolidated with Holdings or any of its Subsidiaries or that Person's assets are acquired by Holdings or any of its Subsidiaries, (c) the income of any Subsidiary of Holdings to the extent that the declaration or payment of dividends or similar distributions by that Subsidiary of that income is not at the time permitted by operation of the

terms of its charter or any agreement, instrument, judgment, decree, order, statute, rule or governmental regulation applicable to that Subsidiary, (d) any after-tax gains or losses attributable to Asset Sales or returned surplus assets of any Pension Plan, and (e) (to the extent not included in clauses (a) through (d) above) any net extraordinary gains or net extraordinary losses (in each case, other than Restructuring Costs).

"**Consolidated Total Debt**" means, as at any date of determination, the aggregate stated balance sheet amount of all Indebtedness of Holdings and its Subsidiaries (including the principal amount of all outstanding Indebtedness of all Securitization Subsidiaries) (or, if higher, the par value or stated face amount of all such Indebtedness (other than zero coupon Indebtedness) determined on a consolidated basis in accordance with GAAP, but excluding undrawn letters of credit (to the extent included in such balance sheet amount) and guaranties (to the extent a demand for payment has not been made), in each case, to the extent permitted by this Agreement.

"**Consolidated Working Capital**" means, as at any date of determination, the result of (a) Consolidated Current Assets of Holdings and its Subsidiaries minus (b) Consolidated Current Liabilities of Holdings and its Subsidiaries.

"**Consolidated Working Capital Adjustment**" means, for any period on a consolidated basis, the amount (which may be a negative number) by which Consolidated Working Capital as of the beginning of such period exceeds (or is less than) Consolidated Working Capital as of the end of such period. In calculating the Consolidated Working Capital Adjustment there shall be excluded (x) the effect of reclassification during such period of current assets to long term assets and current liabilities to long term liabilities and the effect of any Permitted Acquisition during such period; provided that there shall be included with respect to any Permitted Acquisition during such period an amount (which may be a negative number) by which the Consolidated Working Capital acquired in such Permitted Acquisition as at the time of such acquisition exceeds (or is less than) Consolidated Working Capital at the end of such period and (y) adjustments for fresh start accounting.

"**Consultant**" as defined in Section 5.16.

"**Contractual Obligation**" means, as applied to any Person, any provision of any Security issued by that Person or of any indenture, mortgage, deed of trust, contract, undertaking, agreement or other instrument to which that Person is a party or by which it or any of its properties is bound or to which it or any of its properties is subject.

"**Contributing Guarantors**" as defined in Section 7.2.

"**Control Agreement**" means, with respect to any Deposit Account, including any Reinvestment Account, any Securities Account (as defined in the Pledge and Security Agreement), and any Commodity Account (as defined in the Pledge and Security Agreement), an agreement, in form and substance reasonably satisfactory to Administrative Agent, among the Collateral Agent and/or the financial institution at which such Deposit Account is maintained or with which such entitlement or contract is carried and each applicable Credit Party effective to

grant "control" (as defined under the UCC) of such Deposit Account, Reinvestment Accounts, Securities Account or Commodity Account to the Collateral Agent.

"**Conversion/Continuation Date**" means the effective date of a continuation or conversion, as the case may be, as set forth in the applicable Conversion/Continuation Notice.

"**Conversion/Continuation Notice**" means a Conversion/Continuation Notice substantially in the form of Exhibit A-2.

"**Conversion Fees**" as defined in Section 2.8(d).

"**Counterpart Agreement**" means a Counterpart Agreement delivered by a Credit Party pursuant to Section 5.10 substantially in the form of Exhibit G with such amendments or modifications as may be reasonably acceptable to Administrative Agent.

"**Counterparty**" means a party to a Commodity Hedging Agreement that is not any of Holdings, Borrower or its Subsidiaries.

"**Credit Document**" means any of this Agreement, the Notes, if any, the Collateral Documents and all other documents, certificates, instruments or agreements executed and delivered by or on behalf or at the request of a Credit Party for the benefit of any Agent or any Lender in connection herewith on or after the date hereof.

"**Credit Facility**" means the DIP Facility and, on and after the Exit Facility Conversion Date, the Exit Facility, as applicable.

"**Credit Party**" means each Person (other than any Securitization Subsidiary, any Agent or any Lender or any other representative thereof) from time to time party to a Credit Document.

"**Credit Suisse**" as defined in the preamble hereto.

"**Currency Agreement**" means any foreign exchange contract, currency swap agreement, futures contract, option contract, synthetic cap or other similar agreement or arrangement, each of which is for the purpose of hedging the Australian Dollar and Euro (and any other currency as may otherwise be agreed to by Administrative Agent) foreign currency risk associated with Holdings' and its Subsidiaries' operations and not for speculative purposes.

"**Custodial Trusts**" means one or more custodial trusts to be created in connection with environmental and/or tort claims filed by the Credit Parties, Environmental Claimants or other Persons in the Chapter 11 Cases as contemplated by the Plan Support Agreement.

"**Default**" means a condition or event that, after notice or lapse of time or both, would constitute an Event of Default.

"**Default Period**" means, with respect to any Insolvency Defaulting Lender, the period commencing on the date such Lender became an Insolvency Defaulting Lender and

ending on the earliest of the following dates: (i) the date on which all the Obligations are declared or become immediately due and payable and (ii) the date that such Insolvency Defaulting Lender ceases to hold any portion of the Loans.

"**Deposit Account**" means a demand, time, savings, passbook or like account with a bank, savings and loan association, credit union or like organization, other than an account evidenced by a negotiable certificate of deposit.

"**DIP Facility**" means, prior to the Exit Facility Conversion Date, the credit facilities provided by the Lenders pursuant to this Agreement.

"**Discharged Rights and Obligations**" as defined in Section 3.6(a)(i).

"**Disclosure Statement**" means, with respect to the Plan of Reorganization, a related disclosure statement in form and substance satisfactory to Administrative Agent, together with any amendments, supplements or other modifications thereto reasonably acceptable to Administrative Agent.

"**Disqualified Equity Interests**" means any Equity Interest which, by its terms (or by the terms of any security or other Equity Interests into which it is convertible or for which it is exchangeable), or upon the happening of any event or condition (i) matures or is mandatorily redeemable (other than solely for Equity Interests which are not otherwise Disqualified Equity Interests), pursuant to a sinking fund obligation or otherwise, (ii) is redeemable at the option of the holder thereof (other than solely for Equity Interests which are not otherwise Disqualified Equity Interests), in whole or in part, (iii) provides for the scheduled payments or dividends in Cash, or (iv) is or becomes convertible into or exchangeable for Indebtedness or any other Equity Interests that would constitute Disqualified Equity Interests, in each case, prior to the date that is 91 days after the Maturity Date, except, in the case of clauses (i) and (ii), if as a result of a change of control or asset sale, so long as any rights of the holders thereof upon the occurrence of such a change of control or asset sale event are subject to the prior payment in full of all Obligations.

"**DOJ**" means the United States Department of Justice.

"**Dollars**" and the sign "**$**" mean the lawful money of the United States of America.

"**Domestic Subsidiary**" means any Subsidiary organized under the laws of the United States of America, any State thereof or the District of Columbia.

"**Duration Fees**" as defined in Section 2.8(b).

"**Eligible Assignee**" means any Person other than a natural Person that is (i) a Lender, an Affiliate of any Lender or a Related Fund (any two or more Related Funds being treated as a single Eligible Assignee for all purposes hereof), or (ii) a commercial bank, insurance company, investment or mutual fund or other entity that is an "accredited investor" (as defined in Regulation D under the Securities Act) and which extends credit or buys loans in the ordinary course of business; underline_provided, neither (i) any Credit Party nor any Affiliate thereof (other

than an Affiliated Lender) shall be an Eligible Assignee nor (ii) any competitor of Borrower and its Subsidiaries identified to Administrative Agent by an Authorized Officer of Borrower in writing on or prior to the Closing Date.

"**Eligible Commodity Hedging Agreement**" means any Commodity Hedging Agreement entered into by any Credit Party with respect to natural gas which, at the time such Commodity Hedging Agreement is entered into, (a) is structured such that the Counterparty's exposure, when combined with all other Commodity Hedging Agreements outstanding with such Counterparty, is expected to respond to broad changes in commodity prices in the same direction as the value of the underlying commodities, services or other property or assets that are subject to such Commodity Hedging Agreements and (b) has a term that shall not extend more than two years from the date such Commodity Hedging Agreement is entered into.

"**Employee Benefit Plan**" means any "employee benefit plan" as defined in Section 3(3) of ERISA (other than a Multiemployer Plan) which is or, within the last six years, was sponsored, maintained or contributed to by, or required to be contributed by, Holdings, any of its Subsidiaries or, solely with respect to any Employee Benefit Plan covered under Title IV of ERISA, any of their respective ERISA Affiliates.

"**Environment**" means ambient air, indoor air, surface water and groundwater (including potable water, navigable water and wetlands), the land surface or subsurface strata, natural resources or as otherwise defined in any Environmental Law.

"**Environmental Claim**" means any notice of violation, claim, action, suit, proceeding, demand, abatement order or other legally binding order or directive (conditional or otherwise) by any Governmental Authority or any other Person arising (i) pursuant to or in connection with any actual or alleged violation of any Environmental Law; (ii) in connection with any Hazardous Material (including any actual or alleged presence, Release or exposure related thereto) or any actual or alleged Environmental Liability; or (iii) in connection with any actual or alleged damage, injury, threat or harm to human health and safety, natural resources or the Environment arising from any Hazardous Material or related to any Environmental Law.

"**Environmental Claimant**" means (i) the DOJ, (ii) each state or municipality (including any agency or instrumentality thereof) having or asserting any Environmental Claims against any Credit Party that has timely filed a proof of claim in the Chapter 11 Cases and (iii) any Native American tribal government or intertribal organization having or asserting any Environmental Claims against any Credit Party that has timely filed a proof of claim in the Chapter 11 Cases, in each case, including without limitation those Persons set forth on Schedule 1.1(a).

"**Environmental Laws**" means any and all foreign, domestic, federal, state or local laws, statutes, ordinances, codes, orders, rules, regulations, judgments, decrees, directives, legally binding judicial and administrative orders, common law (at law or in equity), or any other requirements of Governmental Authorities, in each case having the force or effect of law, imposing liability or standards of conduct relating to (i) environmental matters, including pollution, preservation, remediation or the protection of the environment or natural resources, or the emission of greenhouse gases; (ii) the generation, use, treatment, storage, transportation or

disposal of, or exposure to, Hazardous Materials; or (iii) occupational safety and health or the protection of human, plant or animal health or welfare from environmental hazards.

"**Environmental Legacy Liabilities**" means any and all Environmental Claims or Environmental Liabilities, whether now existing or hereinafter arising, in each case, related to (a) any actual or alleged exposure to Hazardous Materials (including asbestos, benzene or creosote) that occurred on or prior to the Petition Date or otherwise related to products manufactured, or environmental contamination caused, on or prior to the Petition Date other than in connection with the operation of the Facilities, (b) the presence or Release of Hazardous Materials at, on, under or from any real property other than the Facilities, including any Environmental Legacy Property, on or prior to the Petition Date or (c) the Henderson Legacy Contamination.

"**Environmental Legacy Property**" means any real property, other than the Facilities, that (a) was owned, operated or leased, or to which Hazardous Materials were sent for disposal, on or prior to the Petition Date by Holdings or any of its Subsidiaries or any of their respective predecessors or Affiliates, (b) was owned, operated or leased by Holdings or any of its Subsidiaries or any of their respective predecessors or Affiliates prior to the creation and formation of Borrower as a spin-off from Kerr-McGee Corporation, or (c) is owned, operated or leased by Holdings or any of its Subsidiaries or any of their respective Affiliates and is located in Henderson, Nevada.

"**Environmental Liabilities**" means any direct, indirect, pending or threatened liability, claim, loss, damage, punitive damage, consequential damage, criminal liability, fine, penalty, interest, cost, expense, deficiency, obligation or responsibility, whether known or unknown, arising under or relating to any Environmental Laws, or Remedial Actions, or any Release or threatened Release of, or exposure to, Hazardous Materials, including costs and liabilities for any Remedial Action, personal injury, property damage, natural resource damages, court costs, and fees, disbursements and expenses of counsel, experts and consultants and costs of investigations and feasibility studies.

"**Equity Commitment Agreement**" means that certain Equity Commitment Agreement, dated as of December 20, 2009, among Holdings and certain members of the Ad Hoc Committee party thereto, as it may be amended, restated, supplemented or otherwise modified from time to time in accordance with the terms thereof.

"**Equity Interests**" means any and all shares, interests, participations or other equivalents (however designated) of capital stock of a corporation, any and all equivalent ownership interests in a Person (other than a corporation), including partnership interests and membership interests, and any and all warrants, rights or options to purchase or other arrangements or rights to acquire any of the foregoing.

"**ERISA**" means the Employee Retirement Income Security Act of 1974, as amended from time to time, and any successor thereto.

"**ERISA Affiliate**" means, as applied to any Person, (i) any corporation which is a member of a controlled group of corporations within the meaning of Section 414(b) of the

Internal Revenue Code of which that Person is a member; (ii) any trade or business (whether or not incorporated) which is a member of a group of trades or businesses under common control within the meaning of Section 414(c) of the Internal Revenue Code of which that Person is a member; and (iii) any member of an affiliated service group within the meaning of Section 414(m) or (o) of the Internal Revenue Code of which that Person, any corporation described in clause (i) above or any trade or business described in clause (ii) above is a member. Any former ERISA Affiliate of Holdings or any of its Subsidiaries shall continue to be considered an ERISA Affiliate of Holdings or any such Subsidiary within the meaning of this definition with respect to the period such entity was an ERISA Affiliate of Holdings or such Subsidiary and with respect to liabilities arising after such period for which Holdings or such Subsidiary could be liable under the Internal Revenue Code or ERISA.

"**ERISA Event**" means (i) a "reportable event" within the meaning of Section 4043 of ERISA and the regulations issued thereunder with respect to any Pension Plan (excluding those for which the provision for 30-day notice to the PBGC has been waived by regulation); (ii) the failure to meet the minimum funding standard of Section 412 of the Internal Revenue Code with respect to any Pension Plan (whether or not waived in accordance with Section 412(c) of the Internal Revenue Code) or the failure to make by its due date a required installment under Section 430(j) of the Internal Revenue Code with respect to any Pension Plan or the failure to make any required contribution to a Multiemployer Plan; (iii) the provision by the administrator of any Pension Plan pursuant to Section 4041(a)(2) of ERISA of a notice of intent to terminate such plan in a distress termination described in Section 4041(c) of ERISA; (iv) the withdrawal by Holdings, any of its Subsidiaries or any of their respective ERISA Affiliates from any Pension Plan with two or more contributing sponsors or the termination of any such Pension Plan resulting in liability to Holdings, any of its Subsidiaries or any of their respective Affiliates pursuant to Section 4063 or 4064 of ERISA; (v) the institution by the PBGC of proceedings to terminate any Pension Plan, or the occurrence of any event or condition which might constitute grounds under ERISA for the termination of, or the appointment of a trustee to administer, any Pension Plan; (vi) the imposition of liability on Holdings, any of its Subsidiaries or any of their respective ERISA Affiliates pursuant to Section 4062(e) or 4069 of ERISA or by reason of the application of Section 4212(c) of ERISA; (vii) the withdrawal of Holdings, any of its Subsidiaries or any of their respective ERISA Affiliates in a complete or partial withdrawal (within the meaning of Sections 4203 and 4205 of ERISA) from any Multiemployer Plan if there is any potential liability therefore, or the receipt by Holdings, any of its Subsidiaries or any of their respective ERISA Affiliates of notice from any Multiemployer Plan that it is in reorganization or insolvency pursuant to Section 4241 or 4245 of ERISA, or that it intends to terminate or has terminated under Section 4041A or 4042 of ERISA; (viii) the occurrence of an act or omission which could give rise to the imposition on Holdings, any of its Subsidiaries or any of their respective ERISA Affiliates of fines, penalties, taxes or related charges under Chapter 43 of the Internal Revenue Code or under Section 409, Section 502(c), (i) or (l), or Section 4071 of ERISA in respect of any Employee Benefit Plan; (ix) the assertion of a material claim (other than routine claims for benefits) against any Employee Benefit Plan other than a Multiemployer Plan or the assets thereof, or against Holdings, any of its Subsidiaries or any of their respective ERISA Affiliates in connection with any Employee Benefit Plan; (x) receipt from the Internal Revenue Service of notice of the failure of any Pension Plan (or any other Employee Benefit Plan intended to be qualified under Section 401(a) of the Internal Revenue Code) to qualify under Section 401(a) of the Internal Revenue Code, or the failure of any trust

forming part of any Pension Plan to qualify for exemption from taxation under Section 501(a) of the Internal Revenue Code; or (xi) the imposition of a lien pursuant to Section 430(k) of the Internal Revenue Code or ERISA or a violation of Section 436 of the Internal Revenue Code.

"**Escrow Account**" means a segregated escrow account maintained in the name of Administrative Agent by the Escrow Agent, which escrow account shall be maintained in accordance with an Escrow Agreement.

"**Escrow Agent**" means Goldman Sachs Bank USA or such other financial institution as Administrative Agent shall approve in its sole discretion.

"**Escrow Agreement**" means an escrow agreement providing for terms and conditions acceptable to Administrative Agent in its sole discretion pursuant to which an Escrow Account is maintained for the benefit of Administrative Agent.

"**Eurodollar Rate Loan**" means a Loan bearing interest at a rate determined by reference to the Adjusted Eurodollar Rate.

"**Event of Default**" means each of the conditions or events set forth in Section 8.1.

"**Excess Availability**" means on any date of determination,

(i) at any time that neither the Replacement Revolving Facility nor any Alternative Facility is outstanding, Available Cash; and

(ii) at any time that the Replacement Revolving Facility or any Alternative Facility is outstanding, the sum of:

> (a) Available Cash; and

> (b) (x) if the Replacement Revolving Facility or such Alternative Facility contains a Borrowing Base, the lesser of (A) the aggregate commitments under the Replacement Revolving Facility and the aggregate commitments under such Alternative Facility; and (B) the Borrowing Base under the Replacement Revolving Facility or such Alternative Facility, in each case; or (y) if the Replacement Revolving Facility or such Alternative Facility does not contain a Borrowing Base, the aggregate commitments under the Replacement Revolving Facility and the aggregate commitments under such Alternative Facility; in each case, less (i) any availability blocks and any reserves imposed thereunder by such Replacement Facility Agent and such Alternative Facility and (ii) any outstanding loans and letter of credit obligations under the Replacement Revolving Facility or an Alternative Facility.

"**Exchange Act**" means the Securities Exchange Act of 1934, as amended from time to time, and any successor statute.

"**Excluded Real Estate Asset**" means any real property owned, operated or used by Holdings or any of its Subsidiaries or any of their Affiliates on or prior to the Petition Date that (a) is not, as of the Petition Date, used in connection with the Business (excluding the Non-Core Real Estate Assets), (b) is located in Soda Springs, Idaho, Henderson, Nevada or Savannah, Georgia (excluding the Non-Core Real Estate Assets) or (c) in the case of any leased real property, real property subject to any lease that has been rejected or will be rejected pursuant to Section 365 of the Bankruptcy Code on or before the consummation of the Plan of Reorganization.

"**Existing Credit Parties**" as defined in Section 3.6(a).

"**Existing DIP Agent**" as defined in the recitals hereto.

"**Existing DIP Credit Agreement**" as defined in the recitals hereto.

"**Existing Indebtedness**" means all Indebtedness and other obligations (other than contingent obligations) outstanding under (i) the Pre-Petition Credit Agreement and (ii) the Existing DIP Credit Agreement.

"**Exit Facility**" means, on or after the Exit Facility Conversion Date, the credit facilities provided by the Lenders pursuant to this Agreement.

"**Exit Facility Conversion Date**" means the first date on which the Plan of Reorganization becomes effective, the Exit Facilities Option has been exercised and the conditions to the effectiveness of the Exit Facility as set forth in Section 3.5 are satisfied.

"**Exit Facility Option**" as defined in Section 3.4.

"**Extension Fees**" as defined in Section 2.8(c).

"**Exxaro Sands**" means Exxaro Australia Sands Pty Ltd, a company incorporated under the laws of Western Australia.

"**Facility**" means any real property (including all buildings, fixtures or other improvements located thereon) owned, leased, operated or used by Holdings or any of its Subsidiaries or any of their Affiliates on or after the Petition Date, other than the Excluded Real Estate Assets.

"**Facility Extension Notice**" has the meaning specified in Section 3.3(a).

"**Facility Extension Option**" has the meaning specified in Section 3.3.

"**Fair Market Value**" means the current value that would be attributed to the Securitization Assets by an independent and unaffiliated third party purchasing the Securitization Assets in an arms-length sale transaction, as determined in good faith by the board of directors of Borrower.

"**Fair Share**" as defined in Section 7.2.

"**Fair Share Contribution Amount**" as defined in Section 7.2.

"**Federal Funds Effective Rate**" means for any day, the rate per annum (expressed, as a decimal, rounded upwards, if necessary, to the next higher 1/100 of 1%) equal to the weighted average of the rates on overnight Federal funds transactions with members of the Federal Reserve System arranged by Federal funds brokers on such day, as published by the Federal Reserve Bank of New York on the Business Day next succeeding such day; provided, (i) if such day is not a Business Day, the Federal Funds Effective Rate for such day shall be such rate on such transactions on the next preceding Business Day as so published on the next succeeding Business Day, and (ii) if no such rate is so published on such next succeeding Business Day, the Federal Funds Effective Rate for such day shall be the average rate charged to Administrative Agent on such day on such transactions as determined by Administrative Agent.

"**Final Order**" means, collectively, an order (in substantially the form of the Interim Order with only such modifications as are satisfactory in form and substance to Administrative Agent (in its sole discretion)) of the Bankruptcy Court pursuant to Section 364 of the Bankruptcy Code entered in the Chapter 11 Cases, approving, on a final basis, this Agreement and the other Credit Documents, as to which no stay has been entered and which has not been reversed, vacated or overturned, and which has not been amended, supplemented or otherwise modified in any respect adverse to the Lenders without the prior written consent of Administrative Agent and from which no appeal or motion to reconsider has been timely filed, or if timely filed, such appeal or motion to reconsider has been dismissed or denied unless Administrative Agent and Requisite Lenders waives such requirement in writing.

"**Financial Officer Certification**" means, with respect to the financial statements for which such certification is required, the certification of the chief financial officer, chief executive officer or chief restructuring officer of Holdings that such financial statements fairly present, in all material respects, the financial condition of Holdings and its Subsidiaries as at the dates indicated and the results of their operations and their cash flows for the periods indicated, subject to changes resulting from audit and normal year-end adjustments.

"**Financial Plan**" as defined in Section 5.1(k).

"**First Priority**" means, with respect to any Lien purported to be created in any Collateral pursuant to any Collateral Document, that (i) such Lien is senior to all other Liens with respect to all Collateral other than, at any time a Credit Party is party to a Replacement Revolving Facility, the ABL Collateral and such Collateral is not subject to any junior Liens other than Permitted Liens, and (ii) at any time a Credit Party is party to a Replacement Revolving Facility, such Lien is junior only to the Liens of the secured parties under such Replacement Revolving Facility with respect to the ABL Collateral, but only to the extent and on the terms set forth in the Replacement Revolving Intercreditor Agreement, and is senior to all other Liens and such Collateral is not subject to any junior Liens other than Permitted Liens.

"**Fiscal Quarter**" means a fiscal quarter of any Fiscal Year.

"**Fiscal Year**" means the fiscal year of Holdings and its Subsidiaries ending on December 31 of each calendar year.

"**Fixed Charge Coverage Ratio**" means the ratio as of the last day of any month of (i) Consolidated Adjusted EBITDAR for the 12-month period ending on the last day of such month then ending, to (ii) Consolidated Fixed Charges for such 12-month period ending on the last day of such month.

"**Flood Hazard Property**" means any Real Estate Asset subject to a mortgage in favor of Collateral Agent, for the benefit of Secured Parties, and located in an area designated by the Federal Emergency Management Agency as having special flood or mud slide hazards.

"**Foreign Subsidiary**" means any Subsidiary that is not a Domestic Subsidiary.

"**Funding Guarantors**" as defined in Section 7.2.

"**Funding Notice**" means a notice substantially in the form of Exhibit A-1.

"**GAAP**" means, subject to the limitations on the application thereof set forth in Section 1.2, United States generally accepted accounting principles in effect as of the date of determination thereof.

"**Governmental Authority**" means any foreign, federal, state, provincial, local, national or other government, governmental department, commission, board, bureau, court, agency or instrumentality or political subdivision thereof or any entity, officer or examiner exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to any government or any court, in each case whether associated with a state of the United States, the United States, or a foreign entity or government.

"**Governmental Authorization**" means any permit, license, authorization, plan, directive, certification, registration, approval, consent order or consent decree of or from any Governmental Authority.

"**Grantor**" as defined in the Pledge and Security Agreement.

"**GS Lending Partners**" as defined in the preamble hereto.

"**Guaranteed Obligations**" as defined in Section 7.1.

"**Guarantor**" means each of Holdings and each Domestic Subsidiary of Holdings (other than (a) Borrower, (b) so long as all of its assets are contemplated to be transferred to one or more Custodial Trusts pursuant to the Plan, Tronox Pigments (Savannah) Inc., a Georgia corporation, (c) so long as it owns or possesses no material assets, Tronox Finance LLC, (d) until such time as it shall become a wholly-owned Subsidiary of Borrower, Triple S Environmental Management Corp., and (e) any Securitization Subsidiary), in each case as a debtor-in-possession; provided, however, that on and after the Exit Facility Conversion Date, "Guarantor" shall refer solely to each of the reorganized Holdings and each reorganized Domestic Subsidiary of Holdings (other than the reorganized Borrower) or such other Person that becomes a guarantor with respect to the Exit Facility pursuant to Section 3.6.

"**Guarantor Subsidiary**" means each Guarantor other than Holdings.

"**Guaranty**" means the guaranty of each Guarantor set forth in Section 7.

"**Hazardous Materials**" means any chemical, pollutant, radioactive material or waste, contaminant, waste, material or substance which is prohibited, limited or regulated by any Environmental Laws.

"**Hedge Agreement**" means an Interest Rate Agreement or a Currency Agreement entered into with a Lender Counterparty.

"**Henderson Legacy Contamination**" means the presence or Release of Hazardous Materials at, on or under or emanating from the owned Real Estate Asset located in Henderson, Nevada or other real property currently or previously owned, operated or leased by Holdings or any of its Subsidiaries or any of their respective predecessors or Affiliates prior to the Petition Date located in Henderson, Nevada, including all soil and groundwater contamination present as of the Petition Date or resulting from any leaching, seeping, migration or other expansion of any such contamination after the Petition Date.

"**Henderson Sale-Leaseback**" as defined in Section 5.9(d).

"**Highest Lawful Rate**" means the maximum lawful interest rate, if any, that at any time or from time to time may be contracted for, charged, or received under the laws applicable to any Lender which are presently in effect or, to the extent allowed by law, under such applicable laws which may hereafter be in effect and which allow a higher maximum nonusurious interest rate than applicable laws now allow.

"**Historical Financial Statements**" means as of the Closing Date, (i) the audited financial statements of Holdings and its Subsidiaries for the Fiscal Year ended December 31, 2007, (ii) the unaudited financial statements of Holdings and its Subsidiaries for each of the Fiscal Quarters ended March 31, June 30 and September 30, 2008, and (iii) the Historical Monthly Statements, and in each case, certified by the chief financial officer, chief executive officer or chief restructuring officer of Holdings that they fairly present, in all material respects, the financial condition of Holdings and its Subsidiaries as at the dates indicated and the results of their operations and their cash flows for the periods indicated.

"**Historical Monthly Statements**" means the unaudited financial statements of Holdings and its Subsidiaries as of the most recent month ended after the date of the most recent audited financial statements and at least 30 days prior to the Closing Date, consisting of a balance sheet and the related consolidated statements of income, stockholders' equity and cash flows, for each month ended after December 31, 2008 and certified by the chief financial officer, chief executive officer or chief restructuring officer of Holdings that they fairly present, in all material respects, the financial condition of Holdings and its Subsidiaries as at the dates indicated and the results of their operations and their cash flows for the periods indicated.

"**Holdings**" as defined in the preamble hereto.

"**IFRS**" means International Financial Reporting Standards as in effect from time to time which are adopted by the International Accounting Standards Board.

"**Increased-Cost Lender**" as defined in Section 2.20.

"**Indebtedness**" means, as applied to any Person, without duplication, (i) all indebtedness for borrowed money; (ii) that portion of obligations with respect to Capital Leases that is properly classified as a liability on a balance sheet in conformity with GAAP; (iii) notes payable and drafts accepted representing extensions of credit whether or not representing obligations for borrowed money; (iv) any obligation owed for all or any part of the deferred purchase price of property or services, including any earn-out obligations (excluding any such obligations incurred under ERISA), which purchase price is (a) due more than six months from the date of incurrence of the obligation in respect thereof or (b) evidenced by a note or similar written instrument; (v) all indebtedness secured by any Lien on any property or asset owned or held by that Person regardless of whether the indebtedness secured thereby shall have been assumed by that Person or is nonrecourse to the credit of that Person; (vi) the face amount of any letter of credit issued for the account of that Person or as to which that Person is otherwise liable for reimbursement of drawings; (vii) Disqualified Equity Interests, (viii) the direct or indirect guaranty, endorsement (otherwise than for collection or deposit in the ordinary course of business), co-making, discounting with recourse or sale with recourse by such Person of the obligation of another; (ix) any obligation of such Person the primary purpose or intent of which is to provide assurance to an obligee that the indebtedness of the obligor thereof will be paid or discharged, or any agreement relating thereto will be complied with, or the holders thereof will be protected (in whole or in part) against loss in respect thereof; (x) any liability of such Person for an obligation of another through any agreement (contingent or otherwise) (a) to purchase, repurchase or otherwise acquire such obligation or any security therefor, or to provide funds for the payment or discharge of such obligation (whether in the form of loans, advances, stock purchases, capital contributions or otherwise) or (b) to maintain the solvency or any balance sheet item, level of income or financial condition of another if, in the case of any agreement described under subclauses (a) or (b) of this clause (x), the primary purpose or intent thereof is as described in clause (ix) above; and (xi) all obligations of such Person in respect of any exchange traded or over the counter derivative transaction, including under any Interest Rate Agreement or Currency Agreement, in each case, whether entered into for hedging or speculative purposes or otherwise; <u>provided</u>, in no event shall obligations under any Hedge Agreement be deemed "Indebtedness" for any purpose under Section 6.7 unless such obligations relate to a derivatives transaction which has been terminated.

"**Indemnified Liabilities**" means, collectively, any and all liabilities (including Environmental Liabilities), obligations, losses, damages (including natural resource damages), penalties, claims (including Environmental Claims), actions, judgments, suits, costs (including the costs of any investigation, study, sampling, testing, abatement, cleanup, removal, remediation or other Remedial Action required under Environmental Law or otherwise reasonably necessary to remove, remediate, clean up or abate, or otherwise related to the presence or Release of, any Hazardous Materials), expenses and disbursements of any kind or nature whatsoever (including the reasonable fees and disbursements of counsel for Indemnitees in connection with any investigative, administrative or judicial proceeding or hearing commenced or threatened by any Person, whether or not any such Indemnitee shall be designated as a party or a potential party thereto, and any fees or expenses incurred by Indemnitees in enforcing this indemnity), whether direct, indirect, special or consequential and whether based on any federal, state or foreign laws, statutes, rules or regulations (including securities and commercial laws, statutes, rules or

regulations and Environmental Laws), on common law or equitable cause or on contract or otherwise, that may be imposed on, incurred by, or asserted against any such Indemnitee, in any manner relating to or arising out of (i) this Agreement or the other Credit Documents or the transactions contemplated hereby or thereby (including the Lenders' agreement to make the Term Loans, the syndication of the credit facilities provided for herein or the use or intended use of the proceeds thereof, or any enforcement of any of the Credit Documents (including any sale of, collection from, or other realization upon any of the Collateral or the enforcement of the Guaranty)); (ii) any fee letter, work fee or syndication letter delivered by any Agent or any Lender to Borrower with respect to the transactions contemplated by this Agreement; (iii) any Environmental Claim or Environmental Liability relating to or arising from, directly or indirectly, any past or present activity, operation, land ownership, or practice of Holdings or any of its Subsidiaries; or (iv) any Environmental Legacy Liability.

"**Indemnitee**" as defined in Section 10.3.

"**Information**" as defined in Section 9.3(a).

"**Initial Approved Budget**" as defined in Section 3.1(t).

"**Initial Cash Flow Forecast**" as defined in Section 3.1(u).

"**Initial Facility Extension Date**" means the date on which the initial Facility Extension Option has been exercised and the conditions to the effectiveness of the Facility Extension Option as set forth in Section 3.3 are satisfied.

"**Insolvency Defaulting Lender**" means any Lender who (i) has been adjudicated as, or determined by any Governmental Authority having regulatory authority over such Person or its assets to be, insolvent, (ii) becomes the subject of an insolvency, bankruptcy, dissolution, liquidation or reorganization proceeding, or (iii) becomes the subject of an appointment of a receiver, intervenor or conservator under the Bankruptcy Code or under any other applicable bankruptcy, insolvency or similar law now or hereafter in effect; provided that a Lender shall not be an Insolvency Defaulting Lender solely by virtue of the ownership or acquisition by a Governmental Authority or an instrumentality thereof of any Equity Interest in such Lender or a parent company thereof.

"**Installment**" as defined in Section 2.9.

"**Insurance/Condemnation Proceeds Reinvestment Account**" means (a) prior to the Exit Facility Conversion Date, an Escrow Account and (b) on and after the Exit Facility Conversion Date, a Deposit Account maintained by Borrower with a financial institution selected by Administrative Agent, which Deposit Account is subject to a Control Agreement, and which Escrow Account or Deposit Account, as applicable, shall have no amounts on deposit therein other than with respect to any Net Insurance/Condemnation Proceeds required to be deposited therein pursuant to Section 2.11(b); provided that, without the prior written consent of Administrative Agent, Borrower shall not be permitted to withdraw or transfer any amounts on deposit in such Insurance/Condemnation Proceeds Reinvestment Account other than in accordance with Section 2.11(b).

"**Intellectual Property**" as defined in the Pledge and Security Agreement.

"**Intellectual Property Security Agreements**" as defined in the Pledge and Security Agreement.

"**Intercompany Note**" means a promissory note substantially in the form of Exhibit K evidencing Indebtedness owed among Credit Parties and their Subsidiaries.

"**Interest Coverage Ratio**" means the ratio as of the last day of any Fiscal Quarter of (i) Consolidated Adjusted EBITDAR for the four-Fiscal Quarter period then ended to (ii) Consolidated Interest Expense for such four-Fiscal Quarter period.

"**Interest Payment Date**" means with respect to (a) any Loan that is a Base Rate Loan, (i) prior to the Exit Facility Conversion Date, the last day of each month, commencing on the first such date to occur after the Closing Date, and (ii) on and after the Exit Facility Conversion Date, each March 31, June 30, September 30 and December 31 of each year, commencing on the first such date to occur after the Exit Facility Conversion Date, and in each case the final maturity date of such Loan; and (b) any Loan that is a Eurodollar Rate Loan, the last day of each Interest Period applicable to such Loan; <u>provided</u>, in the case of each Interest Period of longer than (i) one month, at any time prior to the Exit Facility Conversion Date, "Interest Payment Date" shall also include each date that is one month, or an integral multiple thereof, after the commencement of such Interest Period and (ii) three months, at any time on or after the Exit Facility Conversion Date, "Interest Payment Date" shall also include each date that is three months, or an integral multiple thereof, after the commencement of such Interest Period.

"**Interest Period**" means, in connection with a Eurodollar Rate Loan, an interest period of one-, two- or three-months, or, at any time on or after the Exit Facility Conversion Date, six-months, in each case, as selected by Borrower in the applicable Funding Notice or Conversion/Continuation Notice, (i) initially, commencing on the Closing Date or on the Conversion/Continuation Date thereof, as the case may be; and (ii) thereafter, commencing on the day on which the immediately preceding Interest Period expires; <u>provided</u>, (a) if an Interest Period would otherwise expire on a day that is not a Business Day, such Interest Period shall expire on the next succeeding Business Day unless no further Business Day occurs in such month, in which case such Interest Period shall expire on the immediately preceding Business Day; (b) any Interest Period that begins on the last Business Day of a calendar month (or on a day for which there is no numerically corresponding day in the calendar month at the end of such Interest Period) shall, subject to clause (c), of this definition, end on the last Business Day of a calendar month; and (c) no Interest Period with respect to any portion of the Loans shall extend beyond the Maturity Date.

"**Interest Rate Agreement**" means any interest rate swap agreement, interest rate cap agreement, interest rate collar agreement, interest rate hedging agreement  or other similar agreement or arrangement, each of which is for the purpose of hedging the interest rate exposure associated with Holdings' and its Subsidiaries' operations and not for speculative purposes.

"**Interest Rate Determination Date**" means, with respect to any Interest Period, the date that is two Business Days prior to the first day of such Interest Period.

"**Interim Order**" as defined in Section 3.1(v)(i).

"**Internal Revenue Code**" means the Internal Revenue Code of 1986, as amended to the date hereof and from time to time hereafter, and any successor statute.

"**Internally Generated Cash**" means, with respect to any period, any Cash of Holdings or any Subsidiary generated during such period, excluding Net Asset Sale Proceeds, Net Insurance/Condemnation Proceeds and any Cash that is generated from an incurrence of Indebtedness, an issuance of Equity Interests or a capital contribution.

"**Investment**" means (i) any direct or indirect purchase or other acquisition by Holdings or any of its Subsidiaries of, or of a beneficial interest in, any of the Securities of any other Person (other than a Guarantor Subsidiary); (ii) any direct or indirect redemption, retirement, purchase or other acquisition for value, by any Subsidiary of Holdings from any Person (other than Holdings or any Guarantor Subsidiary), of any Equity Interests of such Person; (iii) any direct or indirect loan, advance (other than advances to employees for moving, entertainment and travel expenses, drawing accounts and similar expenditures in the ordinary course of business) or capital contributions by Holdings or any of its Subsidiaries to any other Person (other than Holdings or any Guarantor Subsidiary), including all indebtedness and accounts receivable from that other Person that are not current assets or did not arise from sales to that other Person in the ordinary course of business and (iv) all investments consisting of any exchange traded or over the counter derivative transaction, including any Interest Rate Agreement and Currency Agreement, whether entered into for hedging or speculative purposes or otherwise. The amount of any Investment of the type described in clauses (i), (ii) and (iii) shall be the original cost of such Investment plus the cost of all additions thereto, without any adjustments for increases or decreases in value, or write-ups, write-downs or write-offs with respect to such Investment.

"**Joint Venture**" means a joint venture, partnership or other similar arrangement, whether in corporate, partnership or other legal form; provided, in no event shall any corporate Subsidiary of any Person be considered to be a Joint Venture to which such Person is a party.

"**Kwinana Investment**" means the payments from Tronox Australia to Exxaro Sands pursuant to that certain development agreement, dated as of March 25, 2008, among Exxaro Sands, Tronox Australia, Yalgoo, Tronox LLC, Synthetic Rutile Holdings Pty Ltd and Pigment Holdings Pty Ltd (for purposes of this definition, the "**Development Agreement**") in order to make any payment to obtain the proportional interest in the expansion pursuant to the terms of the Development Agreement.

"**Landlord Consent and Estoppel**" means, with respect to any Leasehold Property, a letter, certificate or other instrument in writing from the lessor under the related lease, pursuant to which, among other things, the landlord consents to the granting of a Mortgage on such Leasehold Property by the Credit Party tenant, such Landlord Consent and Estoppel to be in form and substance reasonably acceptable to Collateral Agent in its reasonable discretion, but in any event sufficient for Collateral Agent to obtain a Title Policy with respect to such Mortgage.

"**Landlord Personal Property Collateral Access Agreement**" means a Landlord Waiver and Consent Agreement substantially in the form of Exhibit J with such amendments or modifications as may be reasonably acceptable to Collateral Agent.

"**Leasehold Property**" means any leasehold interest of any Credit Party as lessee under any lease of real property, other than any such leasehold interest designated from time to time by Collateral Agent in its sole discretion as not being required to be included in the Collateral.

"**Lender**" means each financial institution listed on the signature pages hereto as a Lender, and any other Person that becomes a party hereto pursuant to an Assignment Agreement.

"**Lender Counterparty**" means, after the Exit Facility Conversion Date, each Lender, each Agent and each of their respective Affiliates counterparty to a Hedge Agreement (including any Person who is an Agent or a Lender (and any Affiliate thereof) as of the Closing Date but subsequently, whether before or after entering into a Hedge Agreement, ceases to be an Agent or a Lender, as the case may be).

"**Leverage Ratio**" means the ratio as of the last day of any Fiscal Quarter of (i) Consolidated Total Debt as of such day (excluding any proceeds on deposit in the Working Capital Escrow Account on such day) to (ii) Consolidated Adjusted EBITDAR for the four-Fiscal Quarter period ending on such date.

"**Lien**" means (i) any lien, mortgage, pledge, assignment, security interest, charge or encumbrance of any kind (including any agreement to give any of the foregoing, any conditional sale or other title retention agreement, and any lease or license in the nature thereof) and any option, trust or other preferential arrangement having the practical effect of any of the foregoing and (ii) in the case of Securities, any purchase option, call or similar right of a third party with respect to such Securities.

"**Loan**" means a Tranche B-1 Term Loan and a Tranche B-2 Term Loan.

"**Margin Stock**" as defined in Regulation U of the Board of Governors as in effect from time to time.

"**Material Adverse Effect**" means a material adverse effect on and/or material adverse developments with respect to (i) the business, operations, properties, assets or financial condition of Holdings and its Subsidiaries taken as a whole (other than those events typically resulting from the filing of the Chapter 11 Cases, the announcement of the filing of the Chapter 11 Cases, those events typically resulting from the emergence from the Chapter 11 Cases, or any other events disclosed in Holdings' filings with the SEC prior to or on November 17, 2009); (ii) the ability of the Credit Parties, taken as a whole, to fully and timely perform their Obligations; (iii) the legality, validity, binding effect or enforceability against a Credit Party of a Credit Document to which it is a party; or (iv) the rights, remedies and benefits available to, or conferred upon, any Agent and any Lender or any Secured Party under any Credit Document.

"**Material Contract**" means any contract or other arrangement to which Holdings or any of its Subsidiaries is a party (other than the Credit Documents and any Additional Facility Credit Documents) for which breach, nonperformance, cancellation or failure to renew could reasonably be expected to have a Material Adverse Effect.

"**Material Real Estate Asset**" means (i) (a) any fee-owned Real Estate Asset having a fair market value in excess of $2,000,000 as of the date of the acquisition thereof and (b) all Leasehold Properties other than those with respect to which the aggregate payments under the term of the lease are less than $1,000,000 per annum or (ii) any Real Estate Asset that Requisite Lenders acting reasonably have determined is material to the business, operations, properties, assets, condition (financial or otherwise) or prospects of Holdings or any Subsidiary thereof, including Borrower.

"**Maturity Date**" means the earliest of (i) the date that is six months after the Closing Date, which date (x) may be extended to September __, 2010 (such date being three months after the initial Maturity Date) or December __, 2010 (such date being six months after the initial Maturity Date), as applicable, upon exercise of the Facility Extension Option pursuant to Section 3.3 and (y) may be further extended to the third anniversary of the Exit Facility Conversion Date upon exercise of the Exit Facility Option pursuant to Section 3.4, (ii) the date on which all Loans shall become due and payable in full hereunder, whether by acceleration or otherwise, and (iii) with respect to the DIP Facility only, the effective date of any plan of reorganization confirmed by the Bankruptcy Court in any Chapter 11 Case other than the Plan of Reorganization.

"**Moody's**" means Moody's Investor Services, Inc.

"**Mortgage**" means a Mortgage substantially in the form of Exhibit I, as it may be amended, restated, supplemented or otherwise modified from time to time in accordance with the terms thereof.

"**Mortgaged Property**" as defined in Section 3.5(v)(i)

"**Multiemployer Plan**" means any Employee Benefit Plan which is a "multiemployer plan" as defined in Section 3(37) of ERISA.

"**NAIC**" means The National Association of Insurance Commissioners, and any successor thereto.

"**Narrative Report**" means, with respect to the financial statements for which such narrative report is required, a narrative report describing the operations of Holdings and its Subsidiaries in the form prepared for presentation to senior management thereof for the applicable month, Fiscal Quarter or Fiscal Year and for the period from the beginning of the then current Fiscal Year to the end of such period to which such financial statements relate.

"**Net Asset Sale Proceeds**" means, with respect to any Asset Sale, an amount equal to: (i) Cash payments (including (x) any Cash received by way of deferred payment pursuant to, or by monetization of, a note receivable (including by way of milestone payment) or otherwise, but only as and when so received and (y) any dividend or other distribution received

by a Credit Party in connection with the sale or disposition of a Non-Core Real Estate Asset by the Joint Venture that owns such Non-Core Real Estate Asset) received by Holdings or any of its Subsidiaries from such Asset Sale, minus (ii) any bona fide direct costs incurred in connection with such Asset Sale (but exclusive of the fees and expenses of the Committees incurred prior to the Exit Facility Conversion Date), including (a) income or gains taxes payable by the seller as a result of any gain recognized in connection with such Asset Sale, (b) payment of the outstanding principal amount of, premium or penalty, if any, and interest on any Indebtedness (other than the Loans) that is secured by (x) at any time prior to the Exit Facility Conversion Date, a Lien senior to the Liens securing the DIP Facility or a Lien on assets not constituting Collateral or (y) at any time on or after the Exit Facility Conversion Date, any Lien, in each case, on the stock or assets in question and that is required to be repaid under the terms thereof as a result of such Asset Sale or a Lien on assets not constituting Collateral and (c) a reasonable reserve for any indemnification payments (fixed or contingent) attributable to seller's indemnities and representations and warranties to purchaser in respect of such Asset Sale undertaken by Holdings or any of its Subsidiaries in connection with such Asset Sale; provided that upon release of any such reserve, the amount released shall be considered Net Asset Sale Proceeds.

"**Net Insurance/Condemnation Proceeds**" means an amount equal to: (i) any Cash payments or proceeds received by Holdings or any of its Subsidiaries (a) under any casualty insurance policy in respect of a covered loss thereunder or (b) as a result of the taking of any assets of Holdings or any of its Subsidiaries by any Person pursuant to the power of eminent domain, condemnation or otherwise, or pursuant to a sale of any such assets to a purchaser with such power under threat of such a taking, minus (ii) (a) any actual and reasonable costs incurred by Holdings or any of its Subsidiaries in connection with the adjustment or settlement of any claims of Holdings or such Subsidiary in respect thereof, and (b) any bona fide direct costs incurred in connection with any sale of such assets as referred to in clause (i)(b) of this definition, including income taxes payable as a result of any gain recognized in connection therewith; provided, however, that clauses (ii)(a) and (b) shall exclude any fees and expenses of the Committees incurred prior to the Exit Facility Conversion Date.

"**Net Mark-to-Market Exposure**" of a Person means, as of any date of determination, the excess (if any) of all unrealized losses over all unrealized profits of such Person arising from Hedge Agreements or other Indebtedness of the type described in clause (xi) of the definition thereof. As used in this definition, "unrealized losses" means the fair market value of the cost to such Person of replacing such Hedge Agreement or such other Indebtedness as of the date of determination (assuming the Hedge Agreement or such other Indebtedness were to be terminated as of that date), and "unrealized profits" means the fair market value of the gain to such Person of replacing such Hedge Agreement or such other Indebtedness as of the date of determination (assuming such Hedge Agreement or such other Indebtedness were to be terminated as of that date).

"**New Credit Parties**" as defined in Section 3.6.

"**New Money Investment**" means the proceeds, in an amount no less than $105,000,000, of (i) the rights offering of the reorganized Holdings in respect of its common stock and (ii), to the extent applicable, the commitment by certain Unsecured Claim Holders to fund and/or backstop the funding of such rights offering, which rights offering shall be in form

and substance (including, without limitation, the terms of the subscription by and/or backstop of, the applicable Unsecured Claim Holders) satisfactory to Administrative Agent in its sole discretion.

"**Non-Consenting Lender**" as defined in Section 2.20.

"**Non-Core Real Estate Assets**" means the surplus real estate held by Tronox LLC in Henderson, Nevada as set forth on Schedule 1.1(b) and the equity interests held by Tronox LLC in Basic Management, Inc. and its Subsidiaries, including, without limitation, the Landwell Company, LP.

"**Non-Public Information**" means information which has not been disseminated in a manner making it available to investors generally, within the meaning of Regulation FD.

"**Non-US Lender**" as defined in Section 2.17(c).

"**Note**" means a Tranche B-1 Term Loan Note or a Tranche B-2 Term Loan Note.

"**Notice**" means a Funding Notice, a Withdrawal Certificate or a Conversion/ Continuation Notice.

"**Obligations**" means all obligations of every nature of each Credit Party, including obligations from time to time owed to Agents (including former Agents), the Arranger, Lenders or any of them under any Credit Document and, after the Exit Facility Conversion Date, Lender Counterparties under any Hedge Agreement, whether for principal, interest (including interest which, but for the filing of a petition in bankruptcy with respect to such Credit Party, would have accrued on any Obligation, whether or not a claim is allowed against such Credit Party for such interest in the related bankruptcy proceeding), payments for early termination of Hedge Agreements, fees, expenses, indemnification or otherwise, including all such Obligations as may be novated in accordance with Section 3.6.

"**Obligee Guarantor**" as defined in Section 7.7.

"**Organizational Documents**" means (i) with respect to any corporation or company, its certificate, memorandum or articles of incorporation, organization or association, as amended, and its by-laws, as amended, (ii) with respect to any limited partnership, its certificate or declaration of limited partnership, as amended, and its partnership agreement, as amended, (iii) with respect to any general partnership, its partnership agreement, as amended, and (iv) with respect to any limited liability company, its articles of organization, as amended, and its operating agreement, as amended. In the event any term or condition of this Agreement or any other Credit Document requires any Organizational Document to be certified by a secretary of state or similar governmental official, the reference to any such "Organizational Document" shall only be to a document of a type customarily certified by such governmental official.

"**Other Taxes**" means any and all present or future stamp or documentary Taxes or any other excise or property Taxes, charges or similar levies (and interest, fines, penalties and additions related thereto) arising from any payment made hereunder or from the execution,

delivery or enforcement of, or otherwise with respect to, this Agreement or any other Credit Document.

"**PATRIOT Act**" as defined in Section 3.1(p).

"**PBGC**" means the Pension Benefit Guaranty Corporation or any successor thereto.

"**Pension Plan**" means any Employee Benefit Plan, other than a Multiemployer Plan, which is subject to Section 412 of the Internal Revenue Code or Section 302 of ERISA.

"**Permitted Acquisition**" means any acquisition at any time by Borrower or any of its wholly-owned Subsidiaries, whether by purchase, merger or otherwise, of all or substantially all of the assets of, all of the Equity Interests of, or a business line or unit or a division of, any Person; provided,

(i) immediately prior to, and after giving effect thereto, no Default or Event of Default shall have occurred and be continuing or would result therefrom;

(ii) all transactions in connection therewith shall be consummated, in all material respects, in accordance with all applicable laws and in conformity with all applicable Governmental Authorizations;

(iii) in the case of the acquisition of Equity Interests, all of the Equity Interests (except for any such Securities in the nature of directors' qualifying shares required pursuant to applicable law) acquired or otherwise issued by such Person or any newly formed Subsidiary of Borrower in connection with such acquisition shall be owned 100% by Borrower or a Guarantor Subsidiary thereof, and Borrower shall have taken, or caused to be taken, as of the date such Person becomes a Subsidiary of Borrower, each of the actions set forth in Sections 5.10 and/or 5.11, as applicable;

(iv) Holdings and its Subsidiaries shall be in compliance with the financial covenants set forth in Section 6.7 on a pro forma basis after giving effect to such acquisition as of the last day of the Fiscal Quarter most recently ended (as determined in accordance with Section 6.7(f));

(v) if such acquisition is for an aggregate cash purchase price amount in excess of $5,000,000, Borrower shall have delivered to Administrative Agent (A) at least 5 Business Days prior to such proposed acquisition, (i) a Compliance Certificate evidencing compliance with Section 6.7 as required under clause (iv) above and (ii) all other relevant financial information with respect to such acquired assets, including the aggregate consideration for such acquisition and any other information required to demonstrate compliance with Section 6.7 and (B) promptly upon request by Administrative Agent, (i) a copy of the purchase agreement related to the proposed Permitted Acquisition (and any related documents reasonably requested by Administrative Agent) and (ii) quarterly and annual financial statements of the Person whose Equity Interests or assets are being acquired for the twelve (12) month period

immediately prior to such proposed Permitted Acquisition, including any audited financial statements that are available;

        (vi)    any Person or assets or division as acquired in accordance herewith shall be in same business or lines of business in which Borrower and/or its Subsidiaries are engaged as of the Closing Date or similar or related businesses;

        (vii)    if such Person shall have generated positive cash flow for the four-Fiscal-Quarter period most recently ended prior to the date of such acquisition, Holdings shall demonstrate a pro forma Leverage Ratio, after giving effect to such acquisition, of at least .25% less than the then-applicable Leverage Ratio permitted as of the last day of the immediately preceding Fiscal Quarter pursuant to Section 6.7 and otherwise, Holdings shall demonstrate a pro forma Leverage Ratio, after giving effect to such acquisition, of at least .50% less than the then-applicable Leverage Ratio permitted as of the last day of the immediately preceding Fiscal Quarter pursuant to Section 6.7; and

        (viii)    if such acquisition is for an aggregate cash purchase price amount in excess of $10,000,000, Administrative Agent shall have received satisfactory evidence that Excess Availability of Holdings and its Subsidiaries as of the date of consummation of such acquisition (after giving effect to any payments required in connection with the consummation of such acquisition) is equal to or greater than $40,000,000.

"**Permitted Holders**" means Plainfield Special Situations Master Fund II Limited, Plainfield OC Master Fund Limited, Plainfield Liquid Strategies Master Fund Limited, Scoggin Capital Management LP II, Scoggin International Fund, LTD, Scoggin Worldwide Fund, Ltd, MacKay Shields LLC, Tricadia Capital Management, LLC, CAI, LLC, Och Ziff Capital Investments, L.L.C. and Fidelity Management & Research Company.

"**Permitted Liens**" means each of the Liens permitted pursuant to Section 6.2.

"**Permitted Reinvestment Period**" means (x) in the case of Net Asset Sale Proceeds received prior to the Exit Facility Conversion Date, the twelve-month period following the Exit Facility Conversion Date and (y), in the case of Net Asset Sale Proceeds received on or after the Exit Facility Conversion Date, the twelve (12) month-period following receipt thereof.

"**Permitted Securitization**" means a Securitization that complies with the following criteria: (i) the cash portion of the initial purchase price paid by the Securitization Subsidiary to Holdings and its Subsidiaries at closing for the Securitization Assets is at least 80% of the Fair Market Value of the Securitization Assets at such time, (ii) the aggregate Investment by Holdings or any of its Subsidiaries in the Securitization Subsidiary does not exceed the customary investment required in the securitization market and (iii) the Seller's Retained Interest and all proceeds thereof shall constitute Collateral (to the extent such interest is required to be Collateral hereunder) and all necessary steps to perfect a security interest in such Seller's Retained Interest for the benefit of the Secured Parties are taken by Holdings and its Subsidiaries.  For the avoidance of doubt, if such Securitization is entered into by a Foreign Subsidiary of Borrower, Seller's Retained Interest shall not be required to be Collateral.

"**Permitted Seller Notes**" means any promissory note issued by Borrower or any of its Subsidiaries to a seller in any Permitted Acquisition constituting part of the purchase price thereof (or to a third party lender in connection with any Permitted Acquisition); <u>provided</u> that such Indebtedness (i) is on market terms, (ii) is unsecured, (iii) is expressly subordinated to the prior payment in full in cash of Obligations on customary terms and conditions reasonably satisfactory to Administrative Agent and (iv) has a scheduled maturity of at least six months beyond the scheduled maturity of the Loans.

"**Person**" means and includes natural persons, corporations, limited partnerships, general partnerships, limited liability companies, limited liability partnerships, joint stock companies, Joint Ventures, associations, companies, trusts, banks, trust companies, land trusts, business trusts or other organizations, whether or not legal entities, and Governmental Authorities.

"**Petition Date**" as defined in the recitals hereto.

"**Plan of Reorganization**" means a Chapter 11 plan of reorganization in the Chapter 11 Cases, together with all exhibits, schedules, annexes, supplements and other attachments thereto, in each case, consistent with the terms of the Plan Support Agreement and containing such other terms that either (x) are not inconsistent with, or do not conflict with, the terms of the Credit Documents, the Interim Order or the Final Order and do not adversely affect the Lenders' interests, Liens, rights, remedies, benefits or other protections under the Credit Documents, Interim Order or Final Order or (y) are acceptable to Administrative Agent in its sole discretion.

"**Plan Support Agreement**" means that certain Plan Support Agreement, dated as of December 18, 2009, by and among Holdings, the Unsecured Creditors Committee, the United States of America and certain holders of Senior Notes party thereto, in the form attached hereto as Exhibit L, together with all exhibits, supplements, annexes, schedules and any other attachments thereto, in each case as amended, restated, supplemented or otherwise modified from time to time pursuant to the terms of the Plan Support Agreement.

"**Plan Support Documents**" means, collectively, the custodial trust agreements, the custodial trust settlement agreements, the environmental agreements and any other definitive documentation related to the Plan of Reorganization, in each case as amended, restated, supplemented or otherwise modified from time to time pursuant to the terms of this Agreement.

"**Platform**" as defined in Section 5.1(q).

"**Pledge and Security Agreement**" means the Pledge and Security Agreement to be executed by Borrower and each Guarantor substantially in the form of Exhibit H, as it may be amended, restated, supplemented or otherwise modified from time to time in accordance with the terms thereof.

"**Post-Petition**" means the time period beginning immediately upon the filing of the Chapter 11 Cases.

"**Pre-Petition**" means the time period prior to the filing of the Chapter 11 Cases.

"**Pre-Petition Credit Agreement**" as defined in the recitals hereto.

"**Prime Rate**" means the rate of interest quoted in the print edition of *The Wall Street Journal*, Money Rates Section as the Prime Rate (currently defined as the base rate on corporate loans posted by at least 75% of the nation's thirty (30) largest banks), as in effect from time to time. The Prime Rate is a reference rate and does not necessarily represent the lowest or best rate actually charged to any customer. Agent or any other Lender may make commercial loans or other loans at rates of interest at, above or below the Prime Rate.

"**Principal Office**" means, for Administrative Agent, such Person's "Principal Office" as set forth on Appendix B, or such other office or office of a third party or sub-agent, as appropriate, as such Person may from time to time designate in writing to Borrower, Administrative Agent and each Lender.

"**Products**" means the products developed, researched, manufactured (including mining and exploring for raw materials for manufacture), distributed, marketed or sold by the Business, including those set forth on Schedule 1.1(c).

"**Professional Fees**" means all accrued, but unpaid professional fees, costs expenses and disbursements incurred by the Credit Parties and the Committees.

"**Pro Rata Share**" means (i) with respect to all payments, computations and other matters relating to the Tranche B-1 Term Loan of any Lender, the percentage obtained by dividing (a) the Tranche B-1 Term Loan Exposure of that Lender by (b) the aggregate Tranche B-1 Term Loan Exposure of all Lenders; and (ii) with respect to all payments, computations and other matters relating to the Tranche B-2 Term Loan of any Lender, the percentage obtained by dividing (a) the Tranche B-2 Term Loan Exposure of that Lender by (b) the aggregate Tranche B-2 Term Loan Exposure of all Lenders. For all other purposes with respect to each Lender, "Pro Rata Share" means the percentage obtained by dividing (A) an amount equal to the sum of the Tranche B-1 Term Loan Exposure and Tranche B-2 Term Loan Exposure of such Lender, by (B) an amount equal to the sum of the aggregate Tranche B-1 Term Loan Exposure and the aggregate Tranche B-2 Term Loan Exposure of all Lenders.

"**Projections**" as defined in Section 4.8.

"**Public Lenders**" means Lenders that do not wish to receive material non-public information with respect to Holdings, its Subsidiaries or their securities.

"**Real Estate Asset**" means, at any time of determination, any interest (fee, leasehold or otherwise) then owned by any Credit Party in any real property.

"**Record Document**" means, with respect to any Leasehold Property, (i) the lease evidencing such Leasehold Property or a memorandum thereof, executed and acknowledged by the owner of the affected real property, as lessor, or (ii) if such Leasehold Property was acquired or subleased from the holder of a Recorded Leasehold Interest, the applicable assignment or sublease document, executed and acknowledged by such holder, in each case in form sufficient to give such constructive notice upon recordation and otherwise in form reasonably satisfactory to Collateral Agent.

"**Recorded Leasehold Interest**" means a Leasehold Property with respect to which a Record Document has been recorded in all places necessary or desirable, in Collateral Agent's reasonable judgment, to give constructive notice of such Leasehold Property to third-party purchasers and encumbrances of the affected real property.

"**Register**" as defined in Section 2.4(b).

"**Regulation D**" means Regulation D of the Board of Governors, as in effect from time to time.

"**Regulation FD**" means Regulation FD as promulgated by the U.S. Securities and Exchange Commission under the Securities Act and Exchange Act as in effect from time to time.

"**Reinvestment Accounts**" means, collectively, the Asset Sale Proceeds Reinvestment Account and the Insurance/Condemnation Proceeds Reinvestment Account.

"**Reinvestment Account Escrow Agreement**" means an Escrow Agreement pursuant to which the Asset Sale Proceeds Account or the Insurance/Condemnation Proceeds Account, as applicable, is maintained prior to the Exit Facility Conversion Date, as it may be amended, restated, supplemented or otherwise modified from time to time in accordance with the terms thereof.

"**Related Fund**" means, with respect to any Lender that is an investment fund, any other investment fund that invests in commercial loans and that is managed or advised by the same investment advisor as such Lender or by an Affiliate of such investment advisor.

"**Release**" means any release, spill, emission, leaking, pumping, pouring, injection, escaping, deposit, disposal, discharge, dispersal, dumping, leaching or migration of any Hazardous Material into the Environment (including the abandonment or disposal of any barrels, containers or other closed receptacles containing any Hazardous Material), including the migration of any Hazardous Material through the air, soil, surface water or groundwater.

"**Released Parties**" as defined in Section 2.24.

"**Releasing Parties**" as defined in Section 2.24.

"**Remedial Action**" means (a) "response" as such term is defined in CERCLA, 42 U.S.C. § 9601(24), and (b) all other actions required pursuant to any Environmental Law or by any Governmental Authority, voluntarily undertaken or otherwise reasonably necessary to (i) clean up, investigate, sample, evaluate, monitor, remediate, remove, correct, contain, treat, abate or in any other way address any Hazardous Material; (ii) prevent the Release or threat of Release, or minimize the further Release or migration, of any Hazardous Material; or (iii) perform studies and investigations in connection with, or as a precondition to, or to determine the necessity of the activities described in, clauses (i) or (ii) above.

"**Replacement Facility Agent**" means any collateral agent or similar representative of the secured parties under any Replacement Revolving Facility.

"**Replacement Facility Credit Documents**" means, collectively, the definitive loan documentation governing the Replacement Revolving Facility.

"**Replacement Lender**" as defined in Section 2.20.

"**Replacement Revolving Facility**" means an asset-based or cash flow revolving credit facility (including letters of credit and reimbursement obligations with respect thereto and any Interest Rate Agreements or Currency Agreements secured thereunder) incurred by Borrower or any Guarantor or a Permitted Securitization incurred by a Securitization Subsidiary, in each case secured by Replacement Revolving Liens that are permitted to be incurred hereunder; provided, that on or before the date on which such Indebtedness is incurred:

> (a)    such Indebtedness is designated by Borrower, in a certificate of an Authorized Officer delivered to the Collateral Agent, as "Replacement Revolving Facility"; and

> (b)    the collateral agent or other representative with respect to such Indebtedness, the Collateral Agent, Borrower and each applicable Guarantor, has duly executed and delivered a Replacement Revolving Intercreditor Agreement.

"**Replacement Revolving Intercreditor Agreement**" means an intercreditor agreement entered into by the Collateral Agent in connection with the Replacement Revolving Facility, if any, in form and substance reasonably satisfactory to Administrative Agent and Collateral Agent, the applicable Credit Parties party to the subject Replacement Revolving Facility and the Replacement Facility Agent for such Replacement Revolving Facility, as amended, supplemented, modified, restated, renewed or replaced (whether upon or after termination or otherwise), in whole or in part from time to time; provided that in no event shall the Replacement Revolving Intercreditor Agreement provide for the priority of Liens other than in the manner set forth in the definition of "Replacement Revolving Liens" without the consent of the Requisite Lenders.

"**Replacement Revolving Liens**" means Liens granted to the Replacement Facility Agent under the Replacement Revolving Facility, at any time, upon (i) ABL Collateral of Borrower or any Guarantor and (ii) if requested by the Replacement Facility Agent, Collateral other than ABL Collateral, which Liens in the case of this clause (ii) are junior in priority to the Liens on such Collateral purported to be granted pursuant to the Collateral Documents to the Collateral Agent.

"**Requested Settlement Account Withdrawal Date**" as defined in Section 3.2(b).

"**Requested Working Capital Withdrawal Date**" as defined in Section 3.2(a).

"**Requisite Class Lenders**" means, at any time of determination:

(i) for the Class of Lenders having Tranche B-1 Term Loan Exposure, Lenders holding more than 50% of the aggregate Tranche B-1 Term Loan Exposure of all Lenders; provided that each Affiliated Lender is automatically deemed to have voted any Tranche B-1

Term Loan Exposure held by such Affiliated Lender in favor of any amendment, waiver, consent or other modification pro rata according to the aggregate Tranche B-1 Term Loan Exposure of all Lenders holding Tranche B-1 Term Loan Exposure (other than Affiliated Lenders) that have voted in favor of such amendment, waiver, consent or other modification; and

(ii) for the Class of Lenders having Tranche B-2 Term Loan Exposure, Lenders holding more than 50% of the aggregate Tranche B-2 Term Loan Exposure of all Lenders; provided that each Affiliated Lender is automatically deemed to have voted any Tranche B-2 Term Loan Exposure held by such Affiliated Lender in favor of any amendment, waiver, consent or other modification pro rata according to the aggregate Tranche B-2 Term Loan Exposure of all Lenders holding Tranche B-2 Term Loan Exposure (other than Affiliated Lenders) that have voted in favor of such amendment, waiver, consent or other modification.

"**Requisite Lenders**" means one or more Lenders having or holding Tranche B-1 Term Loan Exposure and/or Tranche B-2 Term Loan Exposure representing more than 50% of the sum of (i) aggregate Tranche B-1 Term Loan Exposure of all Lenders and (ii) aggregate Tranche B-2 Term Loan Exposure of all Lenders; provided that each Affiliated Lender is automatically deemed to have voted any Tranche B-1 Term Loan Exposure and/or Tranche B-2 Term Loan Exposure held by such Affiliated Lender in favor of any amendment, waiver, consent or other modification pro rata according to the aggregate Tranche B-1 Term Loan Exposure and/or Tranche B-2 Term Loan Exposure of all Lenders holding Tranche B-1 Term Loan Exposure and/or Tranche B-2 Term Loan Exposure (other than Affiliated Lenders) that have voted in favor of such amendment, waiver, consent or other modification.

"**Restricted Junior Payment**" means (i) any dividend or other distribution, direct or indirect, on account of any shares of any class of stock of Holdings, Borrower or any of their respective Subsidiaries (or any direct or indirect parent of Borrower or Holdings) now or hereafter outstanding, except a dividend payable solely in shares of that class of stock to the holders of that class; (ii) any redemption, retirement, sinking fund or similar payment, purchase or other acquisition for value, direct or indirect, of any shares of any class of stock of Holdings or Borrower or any of their respective Subsidiaries (or any direct or indirect parent thereof) now or hereafter outstanding; (iii) any payment made to retire, or to obtain the surrender of, any outstanding warrants, options or other rights to acquire shares of any class of stock of Holdings, Borrower or any of their respective Subsidiaries (or any direct or indirect parent of Borrower or Holdings) now or hereafter outstanding; (iv) any management or similar fees payable to any equityholders; and (v) any payment or prepayment of principal of, premium, if any, or interest on, or redemption, purchase, retirement, defeasance (including in-substance or legal defeasance), sinking fund or similar payment with respect to, the Senior Notes and the Permitted Seller Notes.

"**Restructuring Costs**" means any and all of (i) costs and expenses in respect of the termination or settlement of executory contracts, (ii) other non-Cash charges in respect of other Pre-Petition obligations, (iii) professional costs, fees and expenses incurred by Holdings, Borrower or its Subsidiaries in connection with the Chapter 11 Cases, (iv) fees, costs and expenses in connection with any plant shutdown, (v) severance costs incurred in connection with any workforce reduction and (vi) fees, costs and expenses with respect to any management incentive, employee retention or similar plans to the extent approved by the Bankruptcy Court, in each case solely to the extent incurred prior to the Exit Facility Conversion Date.

"**S&P**" means Standard & Poor's, a Division of The McGraw-Hill Companies, Inc.

"**Sale Order**" as defined in Section 5.20.

"**Secured Parties**" has the meaning assigned to that term in the Pledge and Security Agreement.

"**Securities**" means any stock, shares, partnership interests, voting trust certificates, certificates of interest or participation in any profit-sharing agreement or arrangement, options, warrants, bonds, debentures, notes, or other evidences of indebtedness, secured or unsecured, convertible, subordinated or otherwise, or in general any instruments commonly known as "securities" or any certificates of interest, shares or participations in temporary or interim certificates for the purchase or acquisition of, or any right to subscribe to, purchase or acquire, any of the foregoing.

"**Securities Act**" means the Securities Act of 1933, as amended from time to time, and any successor statute.

"**Securitization**" means any transaction or series of transactions entered into by a Subsidiary of Borrower pursuant to which such Subsidiary sells, conveys, assigns, grants an interest in or otherwise transfers to a Securitization Subsidiary, Securitization Assets (and/or grants a security interest in such Securitization Assets transferred or purported to be transferred to such Securitization Subsidiary), and which Securitization Subsidiary finances the acquisition of such Securitization Assets with the cash proceeds of Indebtedness permitted to be incurred by such Securitization Subsidiary or the realization of proceeds from the Securitization Assets in the ordinary course of business, or any similar arrangement with respect to the monetization of receivables reasonably acceptable to Administrative Agent, it being understood that a Securitization may involve periodic transfers or pledges of accounts receivable in which new Securitization Assets, or interests therein, are transferred or pledged upon collection of previously transferred or pledged Securitization Assets, or interests therein, underlined_provided that any such transactions shall otherwise comply with the requirements of this Agreement relating to Securitizations.

"**Securitization Assets**" means any accounts receivable owed to a Subsidiary of Borrower (whether now existing or arising or acquired in the future) arising in the ordinary course of business from the sale of goods or services, all collateral securing such accounts receivable, all contracts and contract rights and all guarantees or other obligations in respect of such accounts receivable, all proceeds of such accounts receivable and other assets (including contract rights) which are of the type customarily transferred or in respect of which security interests are customarily granted in connection with securitizations of accounts receivable and which are sold, transferred or otherwise conveyed by such Subsidiary to a Securitization Subsidiary.

"**Securitization Subsidiary**" means a Subsidiary of Borrower that engages in no activities other than in connection with the financing of accounts receivable and that is designated by the board of directors (or similar governing body) of Holdings (as provided below)

as a Securitization Subsidiary and: (1) has no Indebtedness or other Obligations (contingent or otherwise) that: (a) are guaranteed by Holdings, Borrower or any of its Subsidiaries; (b) are recourse to or obligate Holdings, Borrower or any of its Subsidiaries in any way or create a Lien on, or otherwise encumber or restrict, the Collateral in any way; or (c) subjects any property or assets of Holdings, Borrower or any of its Subsidiaries, directly or indirectly, contingently or otherwise, to the satisfaction thereof; (2) has no contract, agreement, arrangement or undertaking (except in connection with a Permitted Securitization) with Holdings, Borrower or any of its Subsidiaries other than on terms no less favorable to Holdings, Borrower or such Subsidiaries than those that might be obtained at the time from Persons that are not Affiliates of Borrower, other than fees payable in the ordinary course of business in connection with servicing accounts receivables; (3) neither Holdings, Borrower nor any of its Subsidiaries has any obligation to maintain or preserve the Securitization Subsidiary's financial condition or cause the Securitization Subsidiaries to achieve certain levels of operating results and (4) does not commingle its funds or assets with those of Borrower or any other Credit Party, in each case, other than Standard Securitization Undertakings. Any such designation by the board of directors (or similar governing body) of Holdings will be evidenced to Administrative Agent by filing with Administrative Agent a certified copy of the resolution of the board of directors (or similar governing body) of Holdings giving effect to such designation and an officers' certificate certifying, to such officer's knowledge and belief after consulting with counsel, that such designation complied with the foregoing conditions.

"**Seller's Retained Interest**" means the debt or equity interests held by a Subsidiary of Borrower in a Securitization Subsidiary to which Securitization Assets have been transferred, including any such debt or equity received as consideration for or as a portion of the purchase price for the Securitization Assets transferred, or any other instrument through which a Subsidiary of Borrower has rights to or receives distributions in respect of any residual or excess interest in the Securitization Assets.

"**Senior Note Indenture**" means the Senior Note Indenture entered into by Borrower and Tronox Finance Corp., a Delaware corporation, in connection with the issuance of Senior Notes, as the same may be amended, restated, supplemented, replaced or otherwise modified from time to time in accordance with Section 6.15.

"**Senior Notes**" means the 9.5% senior unsecured notes of Borrower and Tronox Finance Corp., a Delaware corporation, due November 28, 2012 issued from time to time pursuant to the Senior Note Indenture.

"**Settlement Account Escrow Agreement**" means the Escrow and Security Agreement (Settlement) substantially in the form of Exhibit R or otherwise on terms and conditions satisfactory to Administrative Agent in its sole discretion, as it may be amended, restated, supplemented or otherwise modified from time to time in accordance with the terms thereof.

"**Settlement Account Withdrawal**" as defined in Section 3.2(b).

"**Settlement Escrow Account**" means an Escrow Account maintained in accordance with the Settlement Account Escrow Agreement which shall have no amounts on

deposit therein other than with respect to the proceeds of the Tranche B-1 Term Loans required to be deposited therein pursuant to Section 3.1(x) and which proceeds shall be available solely to fund a portion of the Custodial Trusts on the Exit Facility Conversion Date.

"**Solvency Certificate**" means a Solvency Certificate of the chief financial officer, if any (or alternatively chief executive officer or chief restructuring officer) of Holdings substantially in the form of Exhibit F-2.

"**Solvent**" means, with respect to a Person, that as of the date of determination, both (i) (a) the sum of such Person's debt (including contingent liabilities) does not exceed the present fair saleable value of such Person's present assets; (b) such Person's capital is not unreasonably small in relation to its business as contemplated on the Exit Facility Conversion Date and reflected in the Projections; and (c) such Person has not incurred and does not intend to incur, or believe (nor should it reasonably believe) that it will incur, debts beyond its ability to pay such debts as they become due (whether at maturity or otherwise); and (ii) such Person is "solvent" within the meaning given that term and similar terms under the Bankruptcy Code and applicable laws relating to fraudulent transfers and conveyances. For purposes of this definition, the amount of any contingent liability at any time shall be computed as the amount that, in light of all of the facts and circumstances existing at such time, represents the amount that can reasonably be expected to become an actual or matured liability (irrespective of whether such contingent liabilities meet the criteria for accrual under Statement of Financial Accounting Standard No. 5).

"**Standard Securitization Undertakings**" means representations, warranties, covenants, repurchase obligations and indemnities entered into by Holdings, Borrower or any of its Subsidiaries which are customary for a seller or servicer of assets transferred in connection with a Securitization.

"**Subject Transaction**" as defined in Section 6.7(f).

"**Subsequent Facility Extension Date**" means the date on which the subsequent Facility Extension Option has been exercised and the conditions to the effectiveness of the Facility Extension Option as set forth in Section 3.4 are satisfied.

"**Subsidiary**" means with respect to any Person, any corporation, partnership, limited liability company, association, joint venture or other business entity of which more than 50% of the total voting power of shares of stock or other ownership interests entitled (without regard to the occurrence of any contingency) to vote in the election of the Person or Persons (whether directors, managers, trustees or other Persons performing similar functions) having the power to direct or cause the direction of the management and policies thereof is at the time owned or controlled, directly or indirectly, by that Person or one or more of the other Subsidiaries of that Person or a combination thereof; provided, in determining the percentage of ownership interests of any Person controlled by another Person, no ownership interest in the nature of a "qualifying share" of the former Person shall be deemed to be outstanding.

"**Syndication Agent**" as defined in the preamble hereto.

"**Tax**" means any present or future tax, levy, impost, duty, assessment, charge, fee, deduction or withholding of any nature and whatever called, by whomsoever, on whomsoever and wherever imposed, levied, collected, withheld or assessed; provided, "Tax on the overall net income" of a Person shall be construed as a reference to a tax imposed by the jurisdiction in which that Person is organized or in which that Person's applicable principal office (and/or, in the case of a Lender, its lending office) is located or in which that Person (and/or, in the case of a Lender, its lending office) is deemed to be doing business on all or part of the net income, profits or gains (whether worldwide, or only insofar as such income, profits or gains are considered to arise in or to relate to a particular jurisdiction, or otherwise) of that Person (and/or, in the case of a Lender, its applicable lending office).

"**Term Priority Collateral**" means Collateral other than the ABL Collateral.

"**Terminated Lender**" as defined in Section 2.20.

"**Title Policy**" as defined in Section 3.5(v)(iv).

"**Tiwest Joint Venture**" means the joint venture arrangement governed by the Tiwest Joint Venture Agreements.

"**Tiwest Joint Venture Agreements**" means, collectively, (a) that certain Cooljarloo Mining Joint Venture Agreement, dated as of November 3, 1988, by and among Yalgoo, Tronox Australia and the other parties thereto, as amended by that certain Amending Deed to the Cooljarloo Mining Joint Venture Agreement, dated as of March 26, 1991, by and among Yalgoo, Tronox Australia and the other parties thereto; (b) that certain Processing Joint Venture Agreement, dated as of November 3, 1988, by and among Yalgoo, Tronox Australia and the other parties thereto, as amended by that certain Amending Deed to the Processing Joint Venture Agreement, dated as of March 26, 1991, by and among Yalgoo, Tronox Australia and the other parties thereto as further amended by the Supplemental Deed to Processing Joint Venture Agreement, dated June 30, 2008, by and among Yalgoo, Tronox Australia, Exxaro Sands and the other parties; (c) that certain Jurien Exploration Joint Venture Agreement, dated as of March 9, 1989, by and among Exxaro Sands, Tific Pty Ltd, Tronox Australia and the other parties thereto; (d) that certain Co-Operation Deed, dated as of November 3, 1988, by and among Exxaro Sands, Tronox Australia and the other parties thereto; (e) that certain Operations Management Agreement, dated as of December 16, 1988, as amended by that certain Supplemental Deed to the Operations Management Agreement, dated as of July 23, 2008, by and among Yalgoo, Tronox Australia and the other parties thereto; (f) that certain Development Agreement, dated March 25, 2008, by and among Tronox LLC, Tronox Australia, Yalgoo, Exxaro Sands and other parties thereto; (g) that certain Mineral Sands (Cooljarloo) Mining and Processing Agreement, dated November 8, 1988, by and among the State of Western Australia, Yalgoo, Tronox Australia, and the other parties thereto and (h) any other agreements related thereto.

"**Tranche B-1 Term Loan**" means a Tranche B-1 Term Loan made by a Lender to Borrower pursuant to Section 2.1(a)(i).

"**Tranche B-1 Term Loan Commitment**" means the commitment of a Lender to make or otherwise fund a Tranche B-1 Term Loan and "**Tranche B-1 Term Loan Commitments**" means such commitments of all Lenders in the aggregate. The amount of each Lender's Tranche B-1 Term Loan Commitment, if any, is set forth on Appendix A-1 or in the applicable Assignment Agreement, subject to any adjustment or reduction pursuant to the terms and conditions hereof. The aggregate amount of the Tranche B-1 Term Loan Commitments as of the Closing Date is $335,000,000.

"**Tranche B-1 Term Loan Exposure**" means, with respect to any Lender, as of any date of determination, the outstanding principal amount of the Tranche B-1 Term Loans of such Lender; provided, at any time prior to the making of the Tranche B-1 Term Loans, the Tranche B-1 Term Loan Exposure of any Lender shall be equal to such Lender's Tranche B-1 Term Loan Commitment.

"**Tranche B-1 Term Loan Note**" means a promissory note in the form of Exhibit B-1, as it may be amended, restated, supplemented or otherwise modified from time to time.

"**Tranche B-2 Term Loan**" means a Tranche B-2 Term Loan made by a Lender to Borrower pursuant to Section 2.1(a)(ii).

"**Tranche B-2 Term Loan Commitment**" means the commitment of a Lender to make or otherwise fund a Tranche B-2 Term Loan and "Tranche B-2 Term Loan Commitments" means such commitments of all Lenders in the aggregate. The amount of each Lender's Tranche B-2 Term Loan Commitment, if any, is set forth on Appendix A-2 or in the applicable Assignment and Assumption Agreement, subject to any adjustment or reduction pursuant to the terms and conditions hereof. The aggregate amount of the Tranche B-2 Term Loan Commitments as of the Closing Date is $90,000,000.

"**Tranche B-2 Term Loan Exposure**" means, with respect to any Lender, as of any date of determination, the outstanding principal amount of the Tranche B-2 Term Loans of such Lender; provided, at any time prior to the making of the Tranche B-2 Term Loans, the Tranche B-2 Term Loan Exposure of any Lender shall be equal to such Lender's Tranche B-2 Term Loan Commitment.

"**Tranche B-2 Term Loan Note**" means a promissory note in the form of Exhibit B-2, as it may be amended, supplemented, restated or otherwise modified from time to time.

"**Transaction Costs**" means the fees, costs and expenses payable by Holdings, Borrower or any of Borrower's Subsidiaries in connection with the transactions contemplated by the Credit Documents or any Additional Credit Facility Documents, including any success or transaction fees payable by Holdings to its advisors and to the advisors engaged by or on behalf of the Committees.

"**Transactions**" means, collectively, (i) the refinancing of the Existing Indebtedness, (ii) the entering into of the Credit Documents and (iii) the entering into of the Plan Support Agreement.

"**Tronox Australia**" means Tronox Western Australia Pty Ltd, a company incorporated under the laws of Western Australia.

"**Tronox Luxembourg**" as defined in the recitals hereto.

"**Trust Payments**" means the cash payments required to be made to the Custodial Trusts in accordance with the Plan Support Agreement.

"**Type of Loan**" means either a Base Rate Loan or a Eurodollar Rate Loan.

"**UCC**" means the Uniform Commercial Code (or any similar or equivalent legislation) as in effect in any applicable jurisdiction.

"**UCC Litigation**" means the litigation known as *Official Committee of Unsecured Creditors of Tronox incorporated et al., on behalf of Estates of Tronox Incorporated et al v. Credit Suisse et al.* (Case No. 09-01388).

"**Unsecured Claim Holders**" means holders of unsecured claims of the Credit Parties that are members of the Ad Hoc Committee appointed in the Chapter 11 Cases.

"**Unsecured Creditors Committee**" means the official committee of unsecured creditors appointed in the Chapter 11 Cases.

"**U.S. Lender**" as defined in Section 2.17(c).

"**Variance Report**" as defined in Section 5.1(e).

"**Verve Sale-Leaseback**" means any sale-leaseback of the Verve co-generation facility located in Western Australia.

"**Withdrawal Certificate**" means a certificate in the form attached to the Working Capital Account Escrow Agreement or the Settlement Account Escrow Agreement, as applicable.

"**Working Capital Account Escrow Agreement**" means the Escrow and Security Agreement (Working Capital) substantially in the form of Exhibit S or otherwise on terms and conditions satisfactory to Administrative Agent in its sole discretion, as it may be amended, restated, supplemented or otherwise modified from time to time in accordance with the terms thereof.

"**Working Capital Escrow Account**" means an Escrow Account maintained in accordance with the Working Capital Account Escrow Agreement which shall have no amounts on deposit therein other than with respect to the proceeds of the Tranche B-2 Term Loans required to be deposited therein pursuant to Section 3.1(x); provided that, without the prior written consent of Administrative Agent, Borrower shall not be permitted to withdraw or transfer any amounts on deposit in such Working Capital Escrow Account other than in accordance with Section 3.1(x).

"**Working Capital Escrow Amount**" means $90,000,000, subject to any adjustment or reduction pursuant to the terms and conditions hereof.

"**Working Capital Withdrawal**" as defined in Section 3.2(a).

"**Yalgoo**" means Yalgoo Minerals Pty. Ltd., a company organized under the laws of Western Australia.

## 1.2. Accounting Terms.

(a) Except as otherwise expressly provided herein, all accounting terms not otherwise defined herein shall have the meanings assigned to them in conformity with GAAP. Financial statements and other information required to be delivered by Holdings to Lenders pursuant to Section 5.1(a), 5.1(b) and 5.1(c) shall be prepared in accordance with GAAP as in effect at the time of such preparation (and delivered together with the reconciliation statements provided for in Section 5.1(e), if applicable). Subject to the foregoing, calculations in connection with the definitions, covenants and other provisions hereof shall utilize accounting principles and policies in conformity with those used to prepare the Historical Financial Statements.

(b) If at any time any change in GAAP or adoption of fresh-start accounting would affect the computation of any financial ratio or requirement set forth in this Agreement and either Borrower or Requisite Lenders shall so request, Administrative Agent and Borrower shall negotiate in good faith to amend such ratio or requirement to preserve the original intent thereof in light of such change in GAAP (subject to the approval of Requisite Lenders); provided that, until so amended, (i) such ratio or requirement shall continue to be computed in accordance with GAAP, as applicable, prior to such change therein and (ii) Borrower shall provide the reconciliation statements required by Section 5.1(g).

**1.3. Interpretation, Etc.** Any of the terms defined herein may, unless the context otherwise requires, be used in the singular or the plural, depending on the reference. References herein to any Section, Appendix, Schedule or Exhibit shall be to a Section, an Appendix, a Schedule or an Exhibit, as the case may be, hereof unless otherwise specifically provided. The use herein of the word "include" or "including", when following any general statement, term or matter, shall not be construed to limit such statement, term or matter to the specific items or matters set forth immediately following such word or to similar items or matters, whether or not non-limiting language (such as "without limitation" or "but not limited to" or words of similar import) is used with reference thereto, but rather shall be deemed to refer to all other items or matters that fall within the broadest possible scope of such general statement, term or matter. The terms lease and license shall include sub-lease and sub-license, as applicable.

## SECTION 2. LOANS

## 2.1. Term Loans.

(a) <u>Loan Commitments</u>. Subject to the terms and conditions hereof:

(i) each Lender holding a Tranche B-1 Term Loan Commitment severally agrees to make, on the Closing Date, a Tranche B-1 Term Loan to Borrower in an amount equal to such Lender's Tranche B-1 Term Loan Commitment; and

(ii) each Lender holding a Tranche B-2 Term Loan Commitment severally agrees to make, on the Closing Date, a Tranche B-2 Term Loan to Borrower in an amount equal to such Lender's Tranche B-2 Term Loan Commitment.

Borrower may make only one borrowing under each of the Tranche B-1 Term Loan Commitment and Tranche B-2 Term Loan Commitment which shall be on the Closing Date. Any amount borrowed under this Section 2.1 and subsequently repaid or prepaid may not be reborrowed. Subject to Sections 2.10 and 2.11, all amounts owed hereunder with respect to the Loans shall be paid in full no later than the Maturity Date. Each Lender's Commitment shall terminate immediately and without further action on the Closing Date after giving effect to the funding of such Lender's Commitment on such date.

(b) Borrowing Mechanics for Loans. Borrower shall deliver to Administrative Agent a fully executed Funding Notice no later than one Business Day prior to the Closing Date or such shorter period of time acceptable to Administrative Agent. Promptly upon receipt by Administrative Agent of such Funding Notice, Administrative Agent shall notify each Lender of the proposed borrowing.

**2.2. [Intentionally Omitted].**

**2.3. Use of Proceeds**. The proceeds of the Tranche B-1 Term Loans made on the Closing Date shall be applied by Borrower (A) in an aggregate principal amount of $300,000,000 (i) to pay transaction costs, fees and expenses incurred in connection with this Agreement and the transactions contemplated hereby, including payment of the Committees' fees and expenses, (ii) to repay the Existing Indebtedness of the Credit Parties in full, (iii) to cash collateralize all of the letters of credit under the Existing Indebtedness and (iv) for general corporate and working capital purposes, and (B) in an aggregate principal amount of $35,000,000 (i) to fund one or more Custodial Accounts (directly or indirectly by first funding the Settlement Escrow Account) and (ii) on and after the Exit Facility Conversion Date, for general corporate and working capital purposes in accordance with Section 3.2 (and to repay the Tranche B-1 Term Loans on the Maturity Date as described in Section 2.26). The proceeds of the Tranche B-2 Term Loans made on the Closing Date shall be applied by Borrower on the Closing Date to fund the Working Capital Escrow Account in an aggregate principal amount of $90,000,000 to provide for the general corporate and working capital purposes of Borrower and its Subsidiaries in accordance with Section 3.2 (and to repay the Tranche B-2 Term Loans on the Maturity Date as described in Section 2.26). No portion of the proceeds of the Loans shall be used (x) in any manner that causes or might cause the borrowing of the Loans or the application of such proceeds to violate Regulation T, Regulation U or Regulation X of the Board of Governors or any other regulation thereof or to violate the Exchange Act or (y) to collateralize or secure Borrower's Hedging Agreements or any other hedging arrangements. Nothing herein shall in any way prejudice or prevent any Agent or the Lenders from objecting, for any reason, to any requests, motions, or applications made in the Bankruptcy Court, including any application of final allowances of compensation for services rendered or reimbursement of expenses incurred under Sections

105(a), 330 or 331 of the Bankruptcy Code, by any party in interest. Borrower and its Subsidiaries shall not use the proceeds of the Loans (i) for any purpose that is prohibited under the Bankruptcy Code or by the Interim or Final Order, which ever is then in effect, or (ii) to commence or prosecute or join in any action against any Agent or Lender seeking (x) to avoid, subordinate or recharacterize the Obligations or any of the Collateral Agent's Liens, (y) any monetary, injunctive or other affirmative relief against any Agent or Lender or their Collateral in connection with the Credit Documents, or (z) to prevent or restrict the exercise by any Agent or Lender of any of their respective rights or remedies under the Credit Documents.

### 2.4. Evidence of Debt; Register; Lenders' Books and Records; Notes.

(a) Lenders' Evidence of Debt. Each Lender shall maintain on its internal records an account or accounts evidencing the Obligations of Borrower to such Lender, including the amounts of the Loans made by it and each repayment and prepayment in respect thereof. Any such recordation shall be conclusive and binding on Borrower, absent manifest error; provided, that the failure to make any such recordation, or any error in such recordation, shall not affect any Borrower's Obligations in respect of any applicable Loans; and provided further, in the event of any inconsistency between the Register and any Lender's records, the recordations in the Register shall govern.

(b) Register. Administrative Agent (or its agent or sub-agent appointed by it) shall maintain at its Principal Office a register for the recordation of the names and addresses of Lenders and the Loans of each Lender from time to time (the "**Register**"). The Register shall be available for inspection by Borrower or any Lender (with respect to any entry relating to such Lender's Loans) at any reasonable time and from time to time upon reasonable prior notice. Administrative Agent shall record, or shall cause to be recorded, in the Register the Loans in accordance with the provisions of Section 10.6, and each repayment or prepayment in respect of the principal amount of the Loans, and any such recordation shall be conclusive and binding on Borrower and each Lender, absent manifest error; provided, failure to make any such recordation, or any error in such recordation, shall not affect any Borrower's Obligations in respect of any Loan. Borrower hereby designates Administrative Agent to serve as Borrower's agent solely for purposes of maintaining the Register as provided in this Section 2.4, and Borrower hereby agrees that, to the extent Administrative Agent serves in such capacity, Administrative Agent and its officers, directors, employees, agents, sub-agents and affiliates shall constitute "Indemnitees."

(c) Notes. If so requested by any Lender by written notice to Borrower (with a copy to Administrative Agent) at least two Business Days prior to the Closing Date or at any time thereafter, Borrower shall execute and deliver to such Lender (and/or, if applicable and if so specified in such notice, to any Person who is an assignee of such Lender pursuant to Section 10.6) on the Closing Date (or, if such notice is delivered after the Closing Date, promptly after Borrower's receipt of such notice) a Note or Notes to evidence such Lender's Loan, payable to such Lender or its registered assigns.

**2.5. Interest on Loans.**

(a) Except as otherwise set forth herein, each Loan shall bear interest on the unpaid principal amount thereof from the date made through repayment (whether by acceleration or otherwise) thereof as follows:

(1) if a Base Rate Loan, at the Base Rate plus the Applicable Margin; or

(2) if a Eurodollar Rate Loan, at the Adjusted Eurodollar Rate plus the Applicable Margin.

(b) The basis for determining the rate of interest with respect to any Loan, and the Interest Period with respect to any Eurodollar Rate Loan, shall be selected by Borrower and notified to Administrative Agent and Lenders pursuant to a Funding Notice or Conversion/Continuation Notice, as the case may be. If on any day a Loan is outstanding with respect to which a Funding Notice or Conversion/Continuation Notice has not been delivered to Administrative Agent in accordance with the terms hereof specifying the applicable basis for determining the rate of interest, then for that day such Loan shall be a Base Rate Loan.

(c) In connection with Eurodollar Rate Loans there shall be no more than five (5) Interest Periods outstanding at any time. In the event Borrower fails to specify between a Base Rate Loan or a Eurodollar Rate Loan in the applicable Funding Notice or the applicable Conversion/Continuation Notice, such Loan (if outstanding as a Eurodollar Rate Loan) will be automatically converted into a Base Rate Loan on the last day of the then-current Interest Period for such Loan (or if outstanding as a Base Rate Loan will remain as, or (if not then outstanding) will be made as, a Base Rate Loan). In the event Borrower fails to specify an Interest Period for any Eurodollar Rate Loan in the applicable Funding Notice or the applicable Conversion/Continuation Notice, Borrower shall be deemed to have selected an Interest Period of one month. As soon as practicable after 10:00 a.m. (New York City time) on each Interest Rate Determination Date, Administrative Agent shall determine (which determination shall, absent manifest error, be final, conclusive and binding upon all parties) the interest rate that shall apply to the Eurodollar Rate Loans for which an interest rate is then being determined for the applicable Interest Period and shall promptly give notice thereof (in writing or by telephone confirmed in writing) to Borrower and each Lender.

(d) Interest payable pursuant to Section 2.5(a) shall be computed (i) in the case of Base Rate Loans on the basis of a 365-day or 366-day year, as the case may be, and (ii) in the case of Eurodollar Rate Loans, on the basis of a 360-day year, in each case for the actual number of days elapsed in the period during which it accrues. In computing interest on any Loan, the date of the making of such Loan or the first day of an Interest Period applicable to such Loan or, with respect to a Loan, the last Interest Payment Date with respect to such Loan or, with respect to a Base Rate Loan being converted from a Eurodollar Rate Loan, the date of conversion of such Eurodollar Rate Loan to such Base Rate Loan, as the case may be, shall be included, and the date of payment of such Loan or the expiration date of an Interest Period applicable to such Loan or, with respect to a Base Rate Loan being converted to a Eurodollar Rate Loan, the date of conversion of such Base Rate Loan to such Eurodollar Rate Loan, as the

case may be, shall be excluded; <u>provided</u>, if a Loan is repaid on the same day on which it is made, one day's interest shall be paid on that Loan.

(e)  Except as otherwise set forth herein, interest on each Loan (i) shall accrue on a daily basis and shall be payable in arrears on each Interest Payment Date with respect to interest accrued on and to each such payment date; (ii) shall accrue on a daily basis and shall be payable in arrears upon any prepayment of that Loan, whether voluntary or mandatory, to the extent accrued on the amount being prepaid; and (iii) shall accrue on a daily basis and shall be payable in arrears at maturity of the Loans, including final maturity of the Loans; <u>provided</u>, however, with respect to any voluntary prepayment of a Base Rate Loan, accrued interest shall instead be payable on the applicable Interest Payment Date.

### 2.6.  Conversion/Continuation.

(a)  Subject to Section 2.15 and so long as no Default or Event of Default shall have occurred and then be continuing, Borrower shall have the option:

(i)  to convert at any time all or any part of any Loan equal to $5,000,000 and integral multiples of $1,000,000 in excess of that amount from one Type of Loan to another Type of Loan; <u>provided</u>, a Eurodollar Rate Loan may only be converted on the expiration of the Interest Period applicable to such Eurodollar Rate Loan unless Borrower shall pay all amounts due  under Section 2.15 in connection with any such conversion; or

(ii)  upon the expiration of any Interest Period applicable to any Eurodollar Rate Loan, to continue all or any portion of such Loan equal to $5,000,000 and integral multiples of $1,000,000 in excess of that amount as a Eurodollar Rate Loan.

(b)  Subject to Section 3.2(c), Borrower shall deliver a Conversion/Continuation Notice to Administrative Agent no later than 10:00 a.m. (New York City time) at least one Business Day in advance of the proposed conversion date (in the case of a conversion to a Base Rate Loan) and at least three Business Days in advance of the proposed conversion/continuation date (in the case of a conversion to, or a continuation of, a Eurodollar Rate Loan).  Except as otherwise provided herein, a Conversion/Continuation Notice for conversion to, or continuation of, any Eurodollar Rate Loans shall be irrevocable on and after the related Interest Rate Determination Date, and Borrower shall be bound to effect a conversion or continuation in accordance therewith.

### 2.7.  Default Interest.  Upon the occurrence and during the continuance of an Event of Default, and without further notice, motion or application to, hearing before, or order from the Bankruptcy Court, the principal amount of all Loans outstanding and, to the extent permitted by applicable law, any interest payments on the Loans or any fees or other amounts owed hereunder, shall thereafter bear interest (including post-petition interest in any proceeding under the Bankruptcy Code or other applicable bankruptcy laws) payable on demand at a rate that is 2% per annum in excess of the interest rate otherwise payable hereunder with respect to the applicable Loans (or, in the case of any such fees and other amounts, at a rate which is 2% per annum in excess of the interest rate otherwise payable hereunder for Base Rate Loans); <u>provided</u>, in the case of Eurodollar Rate Loans, upon the expiration of the Interest Period in

effect at the time any such increase in interest rate is effective such Eurodollar Rate Loans shall thereupon become Base Rate Loans and shall thereafter bear interest payable upon demand at a rate which is 2% per annum in excess of the interest rate otherwise payable hereunder for Base Rate Loans. Payment or acceptance of the increased rates of interest provided for in this Section 2.7 is not a permitted alternative to timely payment and shall not constitute a waiver of any Event of Default or otherwise prejudice or limit any rights or remedies of Administrative Agent or any Lender.

### 2.8. Fees; Call Premium.

(a)  Borrower agrees to pay on the Closing Date to each Lender party to this Agreement on the Closing Date, as fee compensation for the funding of such Lender's Loan, (A) a closing fee in an amount equal to 4.0% of the stated principal amount of such Lender's Tranche B-1 Term Loan, payable to such Lender from the proceeds of its Tranche B-1 Term Loan as and when funded on the Closing Date and (B) a closing fee in an amount equal to 2.0% of the stated principal amount of such Lender's Tranche B-2 Term Loan, payable to such Lender from the proceeds of its Tranche B-2 Term Loan as and when funded on the Closing Date. Such closing fees will be in all respects fully earned, due and payable on the Closing Date and non-refundable and non-creditable thereafter.

(b)  Borrower agrees to pay on the earlier of (x) the six-month anniversary of the Exit Facility Conversion Date and (y) March 31, 2011, duration fees (collectively, the "**Duration Fees**") to each Lender in an amount equal to 3.0% of the aggregate outstanding principal balance of such Lender's Tranche B-2 Term Loans. Such Duration Fees will be in all respects fully earned, due and payable on such date and non-refundable and non-creditable thereafter.

(c)  (i) On or before the Initial Facility Extension Date, Borrower shall pay to Administrative Agent for the account of the Lenders an extension fee equal to 0.5% of the aggregate outstanding principal balance of the Loans immediately prior to giving effect to the Initial Facility Extension Option and (ii) on or before the Subsequent Facility Extension Date, Borrower shall pay to Administrative Agent for the account of the Lenders an extension fee equal to 0.5% of the aggregate outstanding principal balance of the Loans immediately prior to giving effect to the subsequent Facility Extension Option (collectively, the "**Extension Fees**"), in each case to be allocated by Administrative Agent to the Lenders in accordance with their respective Pro Rata Share.

(d)  On the Exit Facility Conversion Date, Borrower shall pay to Administrative Agent for the account of the Lenders a conversion fee equal to (i) 2.0% of the aggregate outstanding principal amount of the Tranche B-1 Term Loans on the date thereof and (ii) 1.0% of the aggregate outstanding principal amount of the Tranche B-2 Term Loans on the date thereof (collectively, the "**Conversion Fees**"), in each case, to be allocated by Administrative Agent to the Lenders in accordance with their respective Pro Rata Share. Such Conversion Fees will be in all respects fully earned, due and payable on the Exit Facility Conversion Date and non-refundable and non-creditable thereafter.

(e) All fees referred to in Section 2.8(b), (c) and (d) shall be paid to Administrative Agent at its Principal Office and upon receipt, Administrative Agent shall promptly distribute to each Lender its Pro Rata Share thereof.

(f) In the event all or any portion of the Loans are repaid for any reason (other than any repayments pursuant to Section 2.9 or Section 2.11(b), (e) or (f)) (or repriced or effectively refinanced through any amendment of this Agreement) after the Exit Facility Conversion Date, such repayments or repricings will be made at (i) 102.0% of the principal amount of the Loans repaid or repriced if such repayment or repricing occurs on or prior to the date that is twelve months after the Exit Facility Conversion Date, (ii) 101.0% of the principal amount of the Loans repaid or repriced if such repayment or repricing occurs on or after the date that is twelve months after the Exit Facility Conversion Date, but on or prior to the date that is twenty-four months after the Exit Facility Conversion Date, and (iii) at par thereafter; <u>provided</u>, that notwithstanding the foregoing, in the event that all or any portion of the Tranche B-2 Term Loans are repaid for any reason prior to the date that is six-months after the Exit Facility Conversion Date, such repayment or repricing shall be made at par.

(g) In addition to any of the foregoing fees, Borrower agrees to pay to Agents such other fees in the amounts and at the times separately agreed upon.

**2.9. Scheduled Payments.** Prior to the Exit Facility Conversion Date, the principal amount of the outstanding Tranche B-1 Term Loans, together with all other amounts owed hereunder with respect thereto, shall be paid in full no later than the Maturity Date. The principal amount of the outstanding Tranche B-2 Term Loans, together with all other amounts owed hereunder with respect thereto, shall be paid in full no later than the Maturity Date. Following the Exit Facility Conversion Date, the principal amounts of the Tranche B-1 Term Loans shall be repaid in consecutive quarterly installments of 0.25% of the principal amount of such Tranche B-1 Loans with the remaining principal amount of the outstanding Tranche B-1 Loans, together with all other amounts owed hereunder with respect thereto to be paid in full no later than the Maturity Date. Notwithstanding the foregoing, each scheduled payment of the principal amount of the Tranche B-1 Term Loans and Tranche B-2 Term Loans, including on the Maturity Date (each such payment, an "**Installment**") shall be reduced in connection with any voluntary or mandatory prepayments of the Loans in accordance with Sections 2.10, 2.11 and 2.12, as applicable.

**2.10. Voluntary Prepayments.**

(a) Any time and from time to time:

(i) with respect to Base Rate Loans, Borrower may prepay any such Loans on any Business Day in whole or in part, in an aggregate minimum amount of $1,000,000 and integral multiples of $1,000,000 in excess of that amount; and

(ii) with respect to Eurodollar Rate Loans, Borrower may prepay any such Loans on any Business Day in whole or in part in an aggregate minimum amount of $1,000,000 and integral multiples of $1,000,000 in excess of that amount.

(b)   All such prepayments shall be made:

(i)      upon not less than one Business Day's prior written or telephonic notice in the case of Base Rate Loans; and

(ii)     upon not less than three Business Days' prior written or telephonic notice in the case of Eurodollar Rate Loans;

in each case given to Administrative Agent by 12:00 p.m. (New York City time) on the date required and, if given by telephone, promptly confirmed by delivery of written notice thereof to Administrative Agent (and Administrative Agent will promptly transmit such original notice for Loans by telefacsimile or telephone to each Lender). Upon the giving of any such notice, the principal amount of the Loans specified in such notice shall become due and payable on the prepayment date specified therein. Any such voluntary prepayment shall be applied as specified in Section 2.12(a).

## 2.11.   Mandatory Prepayments.

(a)   <u>Asset Sales</u>.  No later than the first Business Day following the date of receipt by Holdings or any of its Subsidiaries of any Net Asset Sale Proceeds, Borrower shall prepay the Loans as set forth in Section 2.12(b) in an aggregate amount equal to such Net Asset Sale Proceeds; <u>provided</u>, that (i) no prepayment shall be required pursuant to this Section 2.11(a) in respect of such Net Asset Sale Proceeds (other than with respect to the Net Asset Sale Proceeds of the sale of any Non-Core Real Estate Assets) in an aggregate amount not to exceed $35,000,000 from the Closing Date through the applicable date of determination so long as Holdings shall have delivered to Administrative Agent no later than the first Business Day following the date of receipt of such Net Asset Sale Proceeds a certificate of an Authorized Officer certifying that (x) no Default or Event of Default has occurred and is continuing, and (y) Holdings and its Subsidiaries intend to reinvest (or commit in writing to reinvest) such Net Asset Sale Proceeds in useful assets of Borrower and its Subsidiaries during the Permitted Reinvestment Period and (ii) no prepayment shall be required pursuant to this Section 2.11(a) in respect of the Net Asset Sale Proceeds of the sale of the Non-Core Real Estate Assets in an amount not to exceed $50,000,000 from the Closing Date through the applicable date of determination, so long as Holdings shall have delivered to Administrative Agent no later than the first Business Day following the date of receipt of such Net Asset Sale Proceeds a certificate of an Authorized Officer certifying that (x) no Default or Event of Default has occurred and is continuing, and (y) Holdings and its Subsidiaries intend to reinvest (or commit in writing to reinvest) such Net Asset Sale Proceeds in the business of Borrower and its Subsidiaries during the Permitted Reinvestment Period; <u>provided further</u>, (i) all such Net Asset Sale Proceeds shall be held in the Asset Sale Proceeds Reinvestment Account pending reinvestment in accordance with this Section 2.11(a) until the earlier of (x) the expiration of the applicable Permitted Reinvestment Period or, solely to the extent that such Net Asset Sale Proceeds have been committed in writing to be invested during such Permitted Reinvestment Period, ninety days after the expiration of such Permitted Reinvestment Period, and (y) the Maturity Date and (ii) on and after the delivery by Administrative Agent of a Carve-Out Event Notice in accordance with Section 8.2, all such Net Asset Sale Proceeds (up to the amount of the Carve-Out Cap) shall be deposited into the Carve-Out Account and shall

be reserved for payment of amounts due and owing to Committees in accordance with Section 8.2; provided, however, that any Net Asset Sale Proceeds received by a Foreign Subsidiary of Borrower from a sale or other disposition of property or assets otherwise permitted under the Credit Documents shall be excluded from this prepayment obligation to the extent applicable law or regulation prohibits transfer of such proceeds to Borrower or a Guarantor or such transfer would render such Foreign Subsidiary insolvent or reasonably likely to become insolvent or result in an adverse tax consequence.

(b)  Insurance/Condemnation Proceeds.  No later than the first Business Day following the date of receipt by Holdings or any of its Subsidiaries, or Administrative Agent as loss payee, of any Net Insurance/Condemnation Proceeds, Borrower shall prepay the Loans as set forth in Section 2.12(b) in an aggregate amount equal to such Net Insurance/Condemnation Proceeds; provided, that no prepayment shall be required pursuant to this Section 2.11(b), so long as Holdings shall have delivered to Administrative Agent no later than the first Business Day following the date of receipt of such Net Insurance/Condemnation Proceeds a certificate of an Authorized Officer certifying that (A) no Default or Event of Default has occurred and is continuing, and (B) Holdings and its Subsidiaries intend to reinvest such Net Insurance/Condemnation Proceeds in the Collateral of Borrower and its Subsidiaries during the Permitted Reinvestment Period; provided further, all such Net Insurance/Condemnation Proceeds shall be held in the Insurance/Condemnation Proceeds Reinvestment Account pending reinvestment in accordance with this Section 2.11(b) until the earlier of (x) the expiration of the applicable Permitted Reinvestment Period and (y) the Maturity Date; provided, however, that any Net Insurance/Condemnation Proceeds received by a Foreign Subsidiary of Borrower shall be excluded from this prepayment obligation to the extent applicable law or regulation prohibits transfer of such proceeds to Borrower or a Guarantor or such transfer would render such Foreign Subsidiary insolvent or reasonably likely to become insolvent or result in an adverse tax consequence.

(c)  Issuance of Equity Securities.  On the date of receipt by Holdings of any Cash proceeds from a capital contribution to, or the issuance of any Equity Interests of, Holdings or any of its Subsidiaries (other than (i) pursuant to any employee stock or stock option compensation plan, (ii) on the Exit Facility Conversion Date, the issuance of Equity Interests in connection with the New Money Investment pursuant to the Plan of Reorganization, and (iii) any issuance of Equity Interests in connection with Permitted Acquisitions and Consolidated Capital Expenditures, excluding any issuance constituting an initial public offering of the Equity Interests of Holdings or any of its Subsidiaries or Affiliates), Borrower shall prepay the Loans in an aggregate amount equal to 100% of such proceeds, net of underwriting discounts and commissions and other reasonable costs and expenses associated therewith, including reasonable legal fees and expenses; provided, on and after the Exit Facility Conversion Date, during any period in which the Leverage Ratio (determined for any such period by reference to the Compliance Certificate delivered pursuant to Section 5.1(d) calculating the Leverage Ratio as of the last day of the most recently ended Fiscal Quarter) shall be (x) 2.50:1.00 or less, Borrower shall only be required to make the prepayments otherwise required hereby in an amount equal to 75% of such net proceeds and (y) 2.00:1.00 or less, Borrower shall only be required to may the prepayments otherwise required hereby in an amount equal to 50% of such net proceeds.

(d)  Issuance of Debt.

(i)  Subject to clause (ii) below, on the first Business Day following receipt by Holdings or any of its Subsidiaries of any Cash proceeds from the incurrence of any Indebtedness of Holdings or any of its Subsidiaries (other than with respect to any Indebtedness permitted to be incurred pursuant to Section 6.1), Borrower shall prepay the Loans as set forth in Section 2.12(b) in an aggregate amount equal to 100% of such proceeds, net of underwriting discounts and commissions and other reasonable costs and expenses associated therewith, including reasonable legal fees and expenses.

(ii)  On the first Business Day following the incurrence of commitments under any Replacement Revolving Facility or Alternative Facility, Borrower shall prepay the Tranche B-2 Term Loans in an aggregate amount equal to (x) 100% of the available amount of such commitments in the case of the Replacement Revolving Facility and (y) 100% of the available amount of such commitments in excess of $15,000,000 (or, in the case of a Foreign Subsidiary of Borrower, the foreign currency equivalent of US$15,000,000) in the case of the Alternative Facilities.

(e)  Consolidated Excess Cash Flow.  In the event that there shall be Consolidated Excess Cash Flow for any Fiscal Year ending after the Exit Facility Conversion Date (with respect to the Fiscal Year ended December 31, 2010, Consolidated Excess Cash Flow shall be computed for the period from the Exit Facility Conversion Date to December 31, 2010), Borrower shall, no later than ninety days after the end of such Fiscal Year, prepay the Loans as set forth in Section 2.12(b) in an aggregate amount equal to 75% of such Consolidated Excess Cash Flow; provided, that if, as of the last day of the most recently ended Fiscal Year, the Leverage Ratio (determined for any such period by reference to the Compliance Certificate delivered pursuant to Section 5.1(d) calculating the Leverage Ratio as of the last day of such Fiscal Year) shall be (x) 2.50:1.00 or less, Borrower shall only be required to make the prepayments otherwise required hereby in an amount equal to 50% of such Consolidated Excess Cash Flow or (y) 2.00:1.00 or less, Borrower shall only be required to make the prepayments otherwise required hereby in an amount equal to 25% of such Consolidated Excess Cash Flow.

(f)  Prepayment Certificate.  Concurrently with any prepayment of the Loans pursuant to Sections 2.11(a) through 2.11(e), Borrower shall deliver to Administrative Agent a certificate of an Authorized Officer demonstrating the calculation of the amount of the applicable net proceeds or Consolidated Excess Cash Flow, as the case may be.  In the event that Borrower shall subsequently determine that the actual amount received exceeded the amount set forth in such certificate, Borrower shall promptly make an additional prepayment of the Loans in an amount equal to such excess, and Borrower shall concurrently therewith deliver to Administrative Agent a certificate of an Authorized Officer demonstrating the derivation of such excess.

(g)  Replacement Revolving Facility; Alternative Facility.  Notwithstanding anything to the contrary in Sections 2.11(a) and 2.11(b), if the Replacement Revolving Facility or any Alternative Facility has been incurred, to the extent a prepayment is required under the Replacement Revolving Facility and any such Alternative Facility due to any Net Asset Sale

Proceeds or Net Insurance/Condemnation Proceeds constituting the proceeds of ABL Collateral, no prepayment shall be required under Sections 2.11(a) and 2.11(b).

## 2.12. Application of Prepayments.

(a)  <u>Application of Voluntary Prepayments by Type of Loans</u>. Any prepayment of any Loan pursuant to Section 2.10 shall be applied as specified by Borrower in the applicable notice of prepayment; <u>provided</u>, in the event Borrower fails to specify the Loans to which any such prepayment shall be applied, such prepayment shall be applied to prepay the Tranche B-1 Term Loans and Tranche B-2 Term Loans on a pro rata basis (in accordance with the respective outstanding principal amounts thereof); and further applied on a pro rata basis to reduce the scheduled remaining Installments of principal of the Tranche B-1 Term Loans and Tranche B-2 Term Loans.

(b)  <u>Application of Mandatory Prepayments by Type of Loans</u>.  Any amount required to be prepaid pursuant to Sections 2.11(a) through 2.11(e) above (other than Section 2.11(d)(ii)), shall be applied to prepay Tranche B-1 Term Loans and Tranche B-2 Term Loans on a pro rata basis (in accordance with the respective outstanding principal amounts thereof) and, after the Exit Facility Conversion Date, further applied on a pro rata basis to the remaining scheduled Installments of principal on such Loans.  Any amount required to be prepaid pursuant to Section 2.11(d)(ii) above shall be applied to prepay Tranche B-2 Term Loans.

(c)  <u>Application of Prepayments of Loans to Base Rate Loans and Eurodollar Rate Loans</u>.  Any prepayment of Loans shall be applied first to Base Rate Loans to the full extent thereof before application to Eurodollar Rate Loans, in each case in a manner which minimizes the amount of any payments required to be made by Borrower pursuant to Section 2.15(c).

## 2.13. General Provisions Regarding Payments.

(a)  All payments by Borrower of principal, interest, fees and other Obligations shall be made in Dollars in same day funds, without defense, recoupment, setoff or counterclaim, free of any restriction or condition, and delivered to Administrative Agent not later than 12:00 p.m. (New York City time) on the date due at the Principal Office of Administrative Agent for the account of Lenders; for purposes of computing interest and fees, funds received by Administrative Agent after that time on such due date shall be deemed to have been paid by Borrower on the next succeeding Business Day.

(b)  All payments in respect of the principal amount of any Loan shall be accompanied by payment of accrued interest on the principal amount being repaid or prepaid, and all such payments (and, in any event, any payments in respect of any Loan on a date when interest is due and payable with respect to such Loan) shall be applied to the payment of interest then due and payable before application to principal.

(c)  Administrative Agent (or its agent or sub-agent appointed by it) shall promptly distribute to each Lender at such address as such Lender shall indicate in writing, such Lender's applicable Pro Rata Share of all payments and prepayments of principal and

interest due hereunder, together with all other amounts due thereto, including all fees payable with respect thereto, to the extent received by Administrative Agent.

(d) Notwithstanding the foregoing provisions hereof, if any Conversion/ Continuation Notice is withdrawn as to any Affected Lender or if any Affected Lender makes Base Rate Loans in lieu of its Pro Rata Share of any Eurodollar Rate Loans, Administrative Agent shall give effect thereto in apportioning payments received thereafter.

(e) Whenever any payment to be made hereunder with respect to any Loan shall be stated to be due on a day that is not a Business Day, such payment shall be made on the next succeeding Business Day.

(f) Administrative Agent shall deem any payment by or on behalf of Borrower hereunder that is not made in same day funds prior to 12:00 p.m. (New York City time) to be a non-conforming payment. Any such payment shall not be deemed to have been received by Administrative Agent until the later of (i) the time such funds become available funds, and (ii) the applicable next Business Day. Administrative Agent shall give prompt telephonic notice to Borrower and each applicable Lender (confirmed in writing) if any payment is non-conforming. Any non-conforming payment may constitute or become a Default or Event of Default in accordance with the terms of Section 8.1(a). Interest shall continue to accrue on any principal as to which a non-conforming payment is made until such funds become available funds (but in no event less than the period from the date of such payment to the next succeeding applicable Business Day) at the rate determined pursuant to Section 2.7 from the date such amount was due and payable until the date such amount is paid in full.

(g) If an Event of Default shall have occurred and not otherwise been waived, and the maturity of the Obligations shall have been accelerated pursuant to Section 8.1, all payments or proceeds received by Agents in respect of any of the Obligations, shall be applied in accordance with the application arrangements described in Section 9.2 of the Pledge and Security Agreement.

**2.14. Ratable Sharing.** Except as otherwise provided herein, Lenders hereby agree among themselves that if any of them shall, whether by voluntary payment (other than a voluntary prepayment of Loans made and applied in accordance with the terms hereof), through the exercise of any right of set-off, consolidation or banker's lien, by counterclaim or cross action or by the enforcement of any right under the Credit Documents or otherwise, or as adequate protection of a deposit treated as cash collateral under the Bankruptcy Code, including with respect to the Chapter 11 Cases, receive payment or reduction of a proportion of the aggregate amount of principal, interest, fees and other amounts then due and owing to such Lender hereunder or under the other Credit Documents (collectively, the "**Aggregate Amounts Due**" to such Lender) which is greater than the proportion received by any other Lender in respect of the Aggregate Amounts Due to such other Lender, then the Lender receiving such proportionately greater payment shall (a) notify Administrative Agent and each other Lender of the receipt of such payment and (b) apply a portion of such payment to purchase participations (which it shall be deemed to have purchased from each seller of a participation simultaneously upon the receipt by such seller of its portion of such payment) in the Aggregate Amounts Due to the other Lenders so that all such recoveries of Aggregate Amounts Due shall be shared by all

Lenders in proportion to the Aggregate Amounts Due to them; provided, if all or part of such proportionately greater payment received by such purchasing Lender is thereafter recovered from such Lender upon the bankruptcy or reorganization of Borrower or otherwise, those purchases shall be rescinded and the purchase prices paid for such participations shall be returned to such purchasing Lender ratably to the extent of such recovery, but without interest. Borrower expressly consents to the foregoing arrangement and agrees that any holder of a participation so purchased may exercise any and all rights of banker's lien, consolidation, set-off or counterclaim with respect to any and all monies owing by Borrower to that holder with respect thereto as fully as if that holder were owed the amount of the participation held by that holder. The provisions of this Section 2.14 shall not be construed to apply to (a) any payment made by Borrower pursuant to and in accordance with the express terms of this Agreement or (b) any payment obtained by any Lender as consideration for the assignment or sale of a participation in any of its Loans or other Obligations owed to it.

### 2.15. Making or Maintaining Eurodollar Rate Loans.

(a) <u>Inability to Determine Applicable Interest Rate</u>. In the event that Administrative Agent shall have determined (which determination shall be final and conclusive and binding upon all parties hereto), on any Interest Rate Determination Date with respect to any Eurodollar Rate Loans, that by reason of circumstances affecting the London interbank market adequate and fair means do not exist for ascertaining the interest rate applicable to such Loans on the basis provided for in the definition of Adjusted Eurodollar Rate, Administrative Agent shall on such date give notice (by telefacsimile or by telephone confirmed in writing) to Borrower and each Lender of such determination, whereupon (i) no Loans may be made as, or converted to, Eurodollar Rate Loans until such time as Administrative Agent notifies Borrower and Lenders that the circumstances giving rise to such notice no longer exist, and (ii) any Funding Notice or Conversion/Continuation Notice given by Borrower with respect to the Loans in respect of which such determination was made shall be deemed to be rescinded by Borrower.

(b) <u>Illegality or Impracticability of Eurodollar Rate Loans</u>. In the event that on any date any Lender shall have determined (which determination shall be final and conclusive and binding upon all parties hereto) that the making, maintaining or continuation of its Eurodollar Rate Loans (i) has become unlawful as a result of compliance by such Lender in good faith with any law, treaty, governmental rule, regulation, guideline or order (or would conflict with any such treaty, governmental rule, regulation, guideline or order not having the force of law even though the failure to comply therewith would not be unlawful), or (ii) has become impracticable, as a result of contingencies occurring after the date hereof which materially and adversely affect the London interbank market or the position of such Lender in that market, then, and in any such event, such Lender shall be an "**Affected Lender**" and it shall on that day give notice (by e-mail or by telephone confirmed in writing) to Borrower and Administrative Agent of such determination (which notice Administrative Agent shall promptly transmit to each other Lender). If Administrative Agent receives a notice from (x) any Lender pursuant to clause (i) of the preceding sentence or (y) a notice from Lenders constituting Requisite Lenders pursuant to clause (ii) of the preceding sentence, then (1) the obligation of the Lenders (or, in the case of any notice pursuant to clause (i) of the preceding sentence, such Lender) to make Loans as, or to convert Loans to, Eurodollar Rate Loans shall

be suspended until such notice shall be withdrawn by each Affected Lender, (2) to the extent such determination by the Affected Lender relates to a Eurodollar Rate Loan then being requested by Borrower pursuant to a Funding Notice or a Conversion/Continuation Notice, the Lenders (or in the case of any notice pursuant to clause (i) of the preceding sentence, such Lender) shall make such Loan as (or continue such Loan as or convert such Loan to, as the case may be) a Base Rate Loan, (3) the Lenders' (or in the case of any notice pursuant to clause (i) of the preceding sentence, such Lender's) obligations to maintain their respective outstanding Eurodollar Rate Loans (the "**Affected Loans**") shall be terminated at the earlier to occur of the expiration of the Interest Period then in effect with respect to the Affected Loans or when required by law, and (4) the Affected Loans shall automatically convert into Base Rate Loans on the date of such termination. Notwithstanding the foregoing, to the extent a determination by an Affected Lender as described above relates to a Eurodollar Rate Loan then being requested by Borrower pursuant to a Funding Notice or a Conversion/Continuation Notice, Borrower shall have the option, subject to the provisions of Section 2.15(c), to rescind such Funding Notice or Conversion/Continuation Notice as to all Lenders by giving written or telephonic notice (promptly confirmed by delivery of written notice thereof) to Administrative Agent of such rescission on the date on which the Affected Lender gives notice of its determination as described above (which notice of rescission Administrative Agent shall promptly transmit to each other Lender).

(c) <u>Compensation for Breakage or Non-Commencement of Interest Periods</u>. Borrower shall compensate each Lender, upon written request by such Lender (which request shall set forth the basis for requesting such amounts), for all reasonable losses, expenses and liabilities (including any interest paid or payable by such Lender to Lenders of funds borrowed by it to make or carry its Eurodollar Rate Loans and any loss, expense or liability sustained by such Lender in connection with the liquidation or re-employment of such funds but excluding loss of anticipated profits) which such Lender may sustain: (i) if for any reason (other than a default by such Lender) a borrowing of any Eurodollar Rate Loan does not occur on a date specified therefor in a Funding Notice or a telephonic request for borrowing, or a conversion to or continuation of any Eurodollar Rate Loan does not occur on a date specified therefor in a Conversion/Continuation Notice or a telephonic request for conversion or continuation; (ii) if any prepayment or other principal payment of, or any conversion of, any of its Eurodollar Rate Loans occurs on a date prior to the last day of an Interest Period applicable to that Loan; or (iii) if any prepayment of any of its Eurodollar Rate Loans is not made on any date specified in a notice of prepayment given by Borrower.

(d) <u>Booking of Eurodollar Rate Loans</u>. Any Lender may make, carry or transfer Eurodollar Rate Loans at, to, or for the account of any of its branch offices or the office of an Affiliate of such Lender.

(e) <u>Assumptions Concerning Funding of Eurodollar Rate Loans</u>. Calculation of all amounts payable to a Lender under this Section 2.15 and under Section 2.16 shall be made as though such Lender had actually funded each of its relevant Eurodollar Rate Loans through the purchase of a Eurodollar deposit bearing interest at the rate obtained pursuant to clause (i) of the definition of Adjusted Eurodollar Rate in an amount equal to the amount of such Eurodollar Rate Loan and having a maturity comparable to the relevant Interest Period and through the transfer of such Eurodollar deposit from an offshore office of such Lender to a

domestic office of such Lender in the United States of America; <u>provided</u>, <u>however</u>, each Lender may fund each of its Eurodollar Rate Loans in any manner it sees fit and the foregoing assumptions shall be utilized only for the purposes of calculating amounts payable under this Section 2.15 and under Section 2.16.

## 2.16. Increased Costs; Capital Adequacy.

(a) <u>Compensation For Increased Costs and Taxes</u>. Subject to the provisions of Section 2.17 (which shall be controlling with respect to the matters covered thereby), in the event that any Lender shall determine (which determination shall, absent manifest error, be final and conclusive and binding upon all parties hereto) that any law, treaty or governmental rule, regulation or order, or any change therein or in the interpretation, administration or application thereof (including the introduction of any new law, treaty or governmental rule, regulation or order), or any determination of a court or governmental authority, in each case that becomes effective after the date hereof, or compliance by such Lender with any guideline, request or directive issued or made after the date hereof by any central bank or other governmental or quasi-governmental authority (whether or not having the force of law): (i) subjects such Lender (or its applicable lending office) to any additional Tax (other than any Tax on the overall net income of such Lender) with respect to this Agreement or any of the other Credit Documents or any of its obligations hereunder or thereunder or any payments to such Lender (or its applicable lending office) of principal, interest, fees or any other amount payable hereunder; (ii) imposes, modifies or holds applicable any reserve (including any marginal, emergency, supplemental, special or other reserve), special deposit, compulsory loan, FDIC insurance or similar requirement against assets held by, or deposits or other liabilities in or for the account of, or advances or loans by, or other credit extended by, or any other acquisition of funds by, any office of such Lender (other than any such reserve or other requirements with respect to Eurodollar Rate Loans that are reflected in the definition of Adjusted Eurodollar Rate); or (iii) imposes any other condition (other than with respect to a Tax matter) on or affecting such Lender (or its applicable lending office) or its obligations hereunder or the London interbank market; and the result of any of the foregoing is to increase the cost to such Lender of agreeing to make, making or maintaining Loans hereunder or to reduce any amount received or receivable by such Lender (or its applicable lending office) with respect thereto; then, in any such case, Borrower shall promptly pay to such Lender, upon receipt of the statement referred to in the next sentence, such additional amount or amounts (in the form of an increased rate of, or a different method of calculating, interest or otherwise as such Lender in its sole discretion shall determine) as may be necessary to compensate such Lender for any such increased cost or reduction in amounts received or receivable hereunder. Such Lender shall deliver to Borrower (with a copy to Administrative Agent) a written statement, setting forth in reasonable detail the basis for calculating the additional amounts owed to such Lender under this Section 2.16(a), which statement shall be conclusive and binding upon all parties hereto absent manifest error.

(b) <u>Capital Adequacy Adjustment</u>. In the event that any Lender shall have determined that the adoption, effectiveness, phase-in or applicability after the Closing Date of any law, rule or regulation (or any provision thereof) regarding capital adequacy, or any change therein or in the interpretation or administration thereof by any Governmental Authority, central bank or comparable agency charged with the interpretation or administration

thereof, or compliance by any Lender (or its applicable lending office) with any guideline, request or directive regarding capital adequacy (whether or not having the force of law) of any such Governmental Authority, central bank or comparable agency, has or would have the effect of reducing the rate of return on the capital of such Lender or any corporation controlling such Lender as a consequence of, or with reference to, such Lender's Loans, or other obligations hereunder with respect to the Loans to a level below that which such Lender or such controlling corporation could have achieved but for such adoption, effectiveness, phase-in, applicability, change or compliance (taking into consideration the policies of such Lender or such controlling corporation with regard to capital adequacy), then from time to time, within five Business Days after receipt by Borrower from such Lender of the statement referred to in the next sentence, Borrower shall pay to such Lender such additional amount or amounts as will compensate such Lender or such controlling corporation on an after-tax basis for such reduction. Such Lender shall deliver to Borrower (with a copy to Administrative Agent) a written statement, setting forth in reasonable detail the basis for calculating the additional amounts owed to Lender under this Section 2.16(b), which statement shall be conclusive and binding upon all parties hereto absent manifest error.

## 2.17. Taxes; Withholding, Etc.

(a) <u>Payments to Be Free and Clear</u>. All sums payable by or on behalf of any Credit Party hereunder and under the other Credit Documents shall (except to the extent required by law) be paid free and clear of, and without any deduction or withholding on account of, any Tax (other than a Tax on the overall net income of any Lender) imposed, levied, collected, withheld or assessed by or within the United States of America or any political subdivision in or of the United States of America or any other jurisdiction from or to which a payment is made by or on behalf of any Credit Party or by any federation or organization of which the United States of America or any such jurisdiction is a member at the time of payment.

(b) <u>Withholding of Taxes</u>. If any Credit Party or any other Person is required by law to make any deduction or withholding on account of any such Tax from any sum paid or payable by any Credit Party to Administrative Agent or any Lender under any of the Credit Documents: (i) Borrower shall notify Administrative Agent of any such requirement or any change in any such requirement as soon as Borrower becomes aware of it; (ii) Borrower shall pay any such Tax before the date on which penalties attach thereto, such payment to be made (if the liability to pay is imposed on any Credit Party) for its own account or (if that liability is imposed on Administrative Agent or such Lender, as the case may be) on behalf of and in the name of Administrative Agent or such Lender; (iii) the sum payable by such Credit Party in respect of which the relevant deduction, withholding or payment is required shall be increased to the extent necessary to ensure that, after the making of that deduction, withholding or payment, Administrative Agent or such Lender, as the case may be, receives on the due date a net sum equal to what it would have received had no such deduction, withholding or payment been required or made; and (iv) within thirty days after paying any sum from which it is required by law to make any deduction or withholding, and within thirty days after the due date of payment of any Tax which it is required by clause (ii) above to pay, Borrower shall deliver to Administrative Agent evidence satisfactory to the other affected parties of such deduction, withholding or payment and of the remittance thereof to the relevant taxing or other authority;

provided, no such additional amount shall be required to be paid to any Lender (other than a Lender that becomes a Lender pursuant to Section 2.20) under clause (iii) above except to the extent that any change after the date hereof (in the case of each Lender listed on the signature pages hereof on the Closing Date) or after the effective date of the Assignment Agreement pursuant to which such Lender became a Lender (in the case of each other Lender) in any such requirement for a deduction, withholding or payment as is mentioned therein shall result in an increase in the rate of such deduction, withholding or payment from that in effect at the date hereof or at the date of such Assignment Agreement, as the case may be, in respect of payments to such Lender; provided, further, that additional amounts shall be payable to a Lender to the extent such Lender's assignor was entitled to receive such additional amounts; provided, further, no such additional amount shall be required to be paid to any Credit Party that fails to comply with any applicable certification, documentation, information or other reporting or information solicitation requirements concerning the nationality, residence, identity, ownership or connection with the United States of any Person having a direct or indirect interest in a Note (or any similar or related requirements under applicable law), if compliance with any such requirement is a precondition to relief or exemption from such tax, assessment or other governmental charge under the provisions of the Foreign Tax Compliance Act of 2009, S. 1934 and H.R. 3933, 111th Congress, as such proposed legislation may ultimately be enacted into law (or under substantially similar provisions under other legislation).

(c) Evidence of Exemption From U.S. Withholding Tax. Each Lender that is not a United States Person (as such term is defined in Section 7701(a)(30) of the Internal Revenue Code) for U.S. federal income tax purposes (a "**Non-US Lender**") shall deliver to Administrative Agent for transmission to Borrower, on or prior to the Closing Date (in the case of each Lender listed on the signature pages hereof on the Closing Date) or on or prior to the date of the Assignment Agreement pursuant to which it becomes a Lender (in the case of each other Lender), and at such other times as may be necessary in the determination of Borrower or Administrative Agent (each in the reasonable exercise of its discretion), (i) two original copies of Internal Revenue Service Form W-8BEN, W-8ECI and/or W-8IMY (or, in each case, any successor forms), properly completed and duly executed by such Lender, and such other documentation required under the Internal Revenue Code and reasonably requested by Borrower to establish that such Lender is not subject to deduction or withholding of United States federal income tax with respect to any payments to such Lender of principal, interest, fees or other amounts payable under any of the Credit Documents, or (ii) if such Lender is not a "bank" or other Person described in Section 881(c)(3) of the Internal Revenue Code, a Certificate re Non-Bank Status together with two original copies of Internal Revenue Service Form W-8BEN (or any successor form), properly completed and duly executed by such Lender, and such other documentation required under the Internal Revenue Code and reasonably requested by Borrower to establish that such Lender is not subject to deduction or withholding of United States federal income tax with respect to any payments to such Lender of interest payable under any of the Credit Documents. Each Lender that is a United States person (as such term is defined in Section 7701(a)(30) of the Internal Revenue Code) for United States federal income tax purposes (a "**U.S. Lender**") and is not an exempt recipient within the meaning of Treasury Regulation Section 1.6049-4(c) shall deliver to Administrative Agent and Borrower on or prior to the Closing Date (or, if later, on or prior to the date on which such Lender becomes a party to this Agreement) two original copies of Internal Revenue

Service Form W-9 (or any successor form), properly completed and duly executed by such Lender, certifying that such U.S. Lender is entitled to an exemption from United States backup withholding tax, or otherwise prove that it is entitled to such an exemption. Each Lender required to deliver any forms, certificates or other evidence with respect to United States federal income tax withholding matters pursuant to this Section 2.17(c) hereby agrees, from time to time after the initial delivery by such Lender of such forms, certificates or other evidence, whenever a lapse in time or change in circumstances renders such forms, certificates or other evidence obsolete or inaccurate in any material respect, that such Lender shall promptly deliver to Administrative Agent for transmission to Borrower two new original copies of Internal Revenue Service Form W-8BEN, W-8ECI and/or W-8IMY (or, in each case, any successor form), or a Certificate re Non-Bank Status and two original copies of Internal Revenue Service Form W-8BEN (or any successor form), as the case may be, properly completed and duly executed by such Lender, and such other documentation required under the Internal Revenue Code and reasonably requested by Borrower to confirm or establish that such Lender is not subject to deduction or withholding of United States federal income tax with respect to payments to such Lender under the Credit Documents, or notify Administrative Agent and Borrower of its inability to deliver any such forms, certificates or other evidence. Borrower shall not be required to pay any additional amount to any Non-US Lender under Section 2.17(b)(iii) if such Lender shall have failed (1) to deliver the forms, certificates or other evidence referred to in the first sentence of this Section 2.17(c), or (2) to notify Administrative Agent and Borrower of its inability to deliver any such forms, certificates or other evidence, as the case may be; provided, if such Lender shall have satisfied the requirements of the first sentence of this Section 2.17(c) on the Closing Date or on the date of the Assignment Agreement pursuant to which it became a Lender, as applicable, nothing in this last sentence of Section 2.17(c) shall relieve Borrower of its obligation to pay any additional amounts pursuant this Section 2.17 in the event that, as a result of any change in any applicable law, treaty or governmental rule, regulation or order, or any change in the interpretation, administration or application thereof, such Lender is no longer properly entitled to deliver forms, certificates or other evidence at a subsequent date establishing the fact that such Lender is not subject to withholding as described herein.

(d) Refunds. If Administrative Agent or a Lender determines, in its sole discretion, that it has received a refund of any Taxes as to which it has been indemnified by Borrower or with respect to which Borrower has paid additional amounts pursuant to this Section, it shall pay over such refund to Borrower (but only to the extent of indemnity payments made, or additional amounts paid, by Borrower under this Section 2.17(d) with respect to the Taxes giving rise to such refund), net of all out-of-pocket expenses of Administrative Agent or such Lender and without interest (other than any interest paid by the relevant Governmental Authority with respect to such refund); provided that Borrower, upon the request of Administrative Agent or such Lender, agrees to repay the amount paid over to Borrower (plus any penalties, interest or other charges imposed by the relevant Governmental Authority) to Administrative Agent or such Lender in the event Administrative Agent or such Lender is required to repay such refund to such Governmental Authority. This Section 2.17(d) shall not be construed to require Administrative Agent or any Lender to make available its tax returns (or any other information relating to its taxes which it deems confidential) to Borrower or any other Person.

(e)  Without limiting the provisions of Section 2.17(b), Borrower shall timely pay all Other Taxes to the relevant Governmental Authorities in accordance with applicable law and  shall deliver to Administrative Agent official receipts or other evidence of such payment reasonably satisfactory to Administrative Agent in respect of any Other Taxes payable hereunder promptly after payment of such Other Taxes.

(f)  Borrower shall indemnify Administrative Agent and any Lender for the full amount of Taxes for which additional amounts are required to be paid pursuant to Section 2.17(b) and Other Taxes, in each case arising in connection with payments made under this Agreement or any other Credit Document (including any such Taxes or Other Taxes imposed or asserted on or attributable to amounts payable under this Section 2.17) paid by Administrative Agent or Lender or any of their respective Affiliates and any reasonable expenses arising therefrom or with respect thereto, whether or not such Taxes or Other Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority. Such payment shall be due within thirty (30) days of such Credit Party's receipt of such certificate.

**2.18.  Obligation to Mitigate.**  Each Lender agrees that, as promptly as practicable after the officer of such Lender responsible for administering its Loans becomes aware of the occurrence of an event or the existence of a condition that would cause such Lender to become an Affected Lender or that would entitle such Lender to receive payments under Section 2.15, 2.16 or 2.17, it will, to the extent not inconsistent with the internal policies of such Lender and any applicable legal or regulatory restrictions, use reasonable efforts to (a) make, issue, fund or maintain its Loans, including any Affected Loans, through another office of such Lender, or (b) take such other measures as such Lender may deem reasonable, if as a result thereof the circumstances which would cause such Lender to be an Affected Lender would cease to exist or the additional amounts which would otherwise be required to be paid to such Lender pursuant to Section 2.15, 2.16 or 2.17 would be materially reduced and if, as determined by such Lender in its sole discretion, the making, funding or maintaining of such Loans through such other office or in accordance with such other measures, as the case may be, would not otherwise adversely affect such Loans or the interests of such Lender; provided, such Lender will not be obligated to utilize such other office pursuant to this Section 2.18 unless Borrower agrees to pay all incremental expenses incurred by such Lender as a result of utilizing such other office as described above.  A certificate as to the amount of any such expenses payable by Borrower pursuant to this Section 2.18 (setting forth in reasonable detail the basis for requesting such amount) submitted by such Lender to Borrower (with a copy to Administrative Agent) shall be conclusive absent manifest error.

**2.19.  Defaulting Lenders.**  Anything contained herein to the contrary notwithstanding, in the event that any Lender becomes an Insolvency Defaulting Lender, then during any Default Period with respect to such Insolvency Defaulting Lender, such Insolvency Defaulting Lender shall be deemed not to be a "Lender" for purposes of any amendment, waiver or consent with respect to any provision of the Credit Documents that requires the approval of Requisite Lenders. During any Default Period with respect to an Insolvency Defaulting Lender, any amounts that would otherwise be payable to such Insolvency Defaulting Lender under the Credit Documents (including, without limitation, voluntary and mandatory prepayments and fees) may, in lieu of being distributed to such Insolvency Defaulting Lender, at the written direction of Borrower to Administrative Agent, be retained by Administrative Agent to collateralize indemnification and

reimbursement obligations of such Insolvency Defaulting Lender in an amount reasonably determined by Administrative Agent.  Performance by Borrower of its obligations hereunder and the other Credit Documents shall not be excused or otherwise modified as a result of any Lender becoming an Insolvency Defaulting Lender or the operation of this Section 2.19.  The rights and remedies against an Insolvency Defaulting Lender under this Section 2.19 are in addition to other rights and remedies which Borrower may have against such Insolvency Defaulting Lender as a result of it becoming an Insolvency Defaulting Lender and which Administrative Agent or any Lender may have against such Insolvency Defaulting Lender with respect thereto. Administrative Agent shall not be required to ascertain or inquire as to the existence of any Insolvency Defaulting Lender.

   **2.20. Removal or Replacement of a Lender.** Anything contained herein to the contrary notwithstanding, in the event that: (a) (i) any Lender (an "**Increased-Cost Lender**") shall give notice to Borrower that such Lender is an Affected Lender or that such Lender is entitled to receive payments under Section 2.15, 2.16 or 2.17, (ii) the circumstances which have caused such Lender to be an Affected Lender or which entitle such Lender to receive such payments shall remain in effect, and (iii) such Lender shall fail to withdraw such notice within five Business Days after Borrower's request for such withdrawal; or (b)(i) any Lender shall become an Insolvency Defaulting Lender, (ii) the Default Period for such Insolvency Defaulting Lender shall remain in effect, and (iii) such Insolvency Defaulting Lender shall fail to cure the default as a result of which it has become a Insolvency Defaulting Lender within five Business Days after Borrower's request that it cure such default; or (c) in connection with any proposed amendment, modification, termination, waiver or consent with respect to any of the provisions hereof as contemplated by Section 10.5(b), the consent of Requisite Lenders shall have been obtained but the consent of one or more of such other Lenders (each a "**Non-Consenting Lender**") whose consent is required shall not have been obtained; then, with respect to each such Increased-Cost Lender, Insolvency Defaulting Lender or Non-Consenting Lender (the "**Terminated Lender**"), Borrower may, by giving written notice to Administrative Agent and any Terminated Lender of its election to do so, elect to cause such Terminated Lender (and such Terminated Lender hereby irrevocably agrees) to assign its outstanding Loans, if any, in full to one or more Eligible Assignees (each a "**Replacement Lender**") in accordance with the provisions of Section 10.6 and Borrower shall pay the fees, if any, payable thereunder in connection with any such assignment from a Terminated Lender; <u>provided</u>, (1) on the date of such assignment, the Replacement Lender shall pay to Terminated Lender an amount equal to the sum of (A) an amount equal to the principal of, and all accrued interest on, all outstanding Loans of the Terminated Lender, (B) an amount equal to all unreimbursed drawings that have been funded by such Terminated Lender, together with all then unpaid interest with respect thereto at such time and (C) an amount equal to all accrued, but theretofore unpaid fees owing to such Terminated Lender pursuant to Section 2.8; (2) on the date of such assignment, Borrower shall pay any amounts payable to such Terminated Lender pursuant to Section 2.15(c), 2.16 or 2.17; or otherwise as if it were a prepayment (including for purposes of Section 2.8(f)) and (3) in the event such Terminated Lender is a Non-Consenting Lender, each Replacement Lender shall consent, at the time of such assignment, to each matter in respect of which such Terminated Lender was a Non-Consenting Lender.  Upon the prepayment of all amounts owing to any Terminated Lender, if any, such Terminated Lender shall no longer constitute a "Lender" for purposes hereof; <u>provided</u>, any rights of such Terminated Lender to indemnification hereunder shall survive as to such Terminated Lender.  Each Lender agrees that if Borrower exercises its

option hereunder to cause an assignment by such Lender as a Non-Consenting Lender or Terminated Lender, such Lender shall, promptly after receipt of written notice of such election, execute and deliver all documentation necessary to effectuate such assignment in accordance with Section 10.6. In the event that a Lender does not comply with the requirements of the immediately preceding sentence within one Business Day after receipt of such notice, each Lender hereby authorizes and directs Administrative Agent to execute and deliver such documentation as may be required to give effect to an assignment in accordance with Section 10.6 on behalf of a Non-Consenting Lender or Terminated Lender and any such documentation so executed by Administrative Agent shall be effective for purposes of documenting an assignment pursuant to Section 10.6.

**2.21. Super Priority Nature of Obligations and Lenders' Liens.** At all times prior to the Exit Facility Conversion Date:

(a) The priority of Secured Parties' Liens on the Collateral owned by Credit Parties shall be set forth in the Interim Order and Final Order, whichever is then in effect.

(b) All Obligations shall constitute administrative expenses of Credit Parties in the Chapter 11 Cases, with administrative priority and senior secured status under Sections 364(c)(1), 364(c)(2), 364(c)(3) and 364(d)(1) of the Bankruptcy Code, all as set forth in, and qualified entirely by, the Interim Order and the Final Order. Subject to the Carve-Out, such administrative claim shall have priority over all other costs and expenses of the kinds specified in, or ordered pursuant to, Sections 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 546(c), 726, 1114 or any other provision of the Bankruptcy Code or otherwise, and shall at all times be senior to the rights of Credit Parties, the estates of Credit Parties, and any successor trustee or estate representative in the Chapter 11 Cases or any subsequent proceeding or case under the Bankruptcy Code; provided, that such super-priority administrative claim shall be pari passu with the super-priority administrative claim of the Replacement Facility Agent pursuant to the Replacement Revolving Facility, if any. The Liens granted to Secured Parties on the Collateral owned by Credit Parties, and the priorities accorded to the Obligations shall have the priority and senior secured status afforded by Sections 364(c)(1), 364(c)(2), 364(c)(3) and 364(d)(1) of the Bankruptcy Code (all as more fully set forth in the Interim Order and Final Order, whichever is then in effect) senior to all claims and interests other than the Carve-Out and to the extent provided in any Replacement Revolving Intercreditor Agreement, the ABL Liens securing the Obligations (as defined in the Replacement Revolving Facility as in effect on the date hereof or as amended in accordance with any Replacement Revolving Intercreditor Agreement) and as otherwise provided in the Interim Order and the Final Order.

(c) The Secured Parties' Liens on the Collateral owned by Credit Parties and Secured Parties' respective administrative claims under Sections 364(c)(1), 364(c)(2), 364(c)(3) and 364(d)(1) of the Bankruptcy Code afforded the Obligations shall also have priority over any claims arising under Section 506(c) of the Bankruptcy Code subject and subordinate only to the Carve-Out and to the extent provided in any Replacement Revolving Intercreditor Agreement, the Liens securing the Obligations (as defined in the Replacement Revolving Facility as in effect on the date hereof or as amended in accordance with any Replacement Revolving Intercreditor Agreement). Except as set forth herein, any Replacement Revolving Intercreditor Agreement or in the Interim Order and Final Order, whichever is then

in effect, no other claim having a priority superior or pari passu to that granted to Secured Parties by the Interim Order and Final Order, whichever is then in effect, shall be granted or approved while any Obligations under this Agreement remain outstanding. Except for the Carve-Out, no costs or expenses of administration shall be imposed against Administrative Agent, Lenders, any other Secured Party or any of the Collateral under Sections 105 or 506(c) of the Bankruptcy Code, or otherwise, and each of the Credit Parties hereby waives for itself and on behalf of its estate in bankruptcy, any and all rights under Sections 105 or 506(c) of the Bankruptcy Code, or otherwise, to assert or impose or seek to assert or impose, any such costs or expenses of administration against Administrative Agent, the Lenders or any other Secured Party.

**2.22. Payment of Obligations.** Upon the maturity (whether by acceleration or otherwise) of any of the Obligations under this Agreement or any of the other Credit Documents, the Agents and Lenders shall be entitled to immediate payment of such Obligations without further application to or order of the Bankruptcy Court.

**2.23. No Discharge; Survival of Claims.** Holdings and Borrower, on behalf of itself and its Subsidiaries, agree that (a) the Obligations hereunder shall not be discharged by the entry of the Confirmation Order or any other order confirming any plan of reorganization of any or all of Holdings, Borrower and their respective Subsidiaries (and each of Holdings and Borrower, on behalf of itself and its Subsidiaries, pursuant to Section 1141(d)(4) of the Bankruptcy Code, hereby waives any such discharge) and (b) the super-priority administrative claim granted to the Agents and Lenders pursuant to the Interim Order and Final Order and described therein and the Liens granted to the Agents pursuant to the Interim Order and Final Order and described therein shall not be affected in any manner by the entry of the Confirmation Order any other order confirming any plan of reorganization of any or all of Holdings, Borrower and their respective Subsidiaries.

**2.24. Release.** Subject to and qualified entirely by the Interim Order or Final Order, as applicable, Holdings and Borrower, on behalf of itself and its Subsidiaries, hereby acknowledges that neither Holdings, Borrower nor any of its Subsidiaries has any defense, counterclaim, offset, recoupment, cross-complaint, claim or demand of any kind or nature whatsoever that can be asserted to reduce or eliminate all or any part of the Credit Parties' liability to repay the Secured Parties as provided in this Agreement or to seek affirmative relief or damages of any kind or nature from any Secured Party, solely in its capacity as a Secured Party. Borrower, in its own right and with respect to its Subsidiaries and the Credit Parties' bankruptcy estates, and on behalf of all their respective successors, assigns, Subsidiaries and any Affiliates and any Person acting for and on behalf of, or claiming through them, (collectively, the "**Releasing Parties**"), hereby fully, finally and forever release and discharge each Secured Party and all of each Secured Party's past and present officers, directors, servants, agents, attorneys, assigns, heirs, parents, subsidiaries, and each Person acting for or on behalf of any of them (collectively, the "**Released Parties**") of and from any and all past, present and future actions, causes of action, demands, suits, claims, liabilities, Liens, lawsuits, adverse consequences, amounts paid in settlement, costs, damages, debts, deficiencies, diminution in value, disbursements, expenses, losses and other obligations of any kind or nature whatsoever, whether in law, equity or otherwise (including, without limitation, those arising under Sections 541 through 550 of the Bankruptcy Code and interest or other carrying costs, penalties, legal,

accounting and other professional fees and expenses, and incidental, consequential and punitive damages payable to third parties), whether known or unknown, fixed or contingent, direct, indirect, or derivative, asserted or unasserted, foreseen or unforeseen, suspected or unsuspected, now existing, heretofore existing or which may heretofore accrue against any of the Released Parties, whether held in a personal or representative capacity, and which are based on any act, fact, event or omission or other matter, cause or thing occurring at or from any time prior to and including the date hereof in any way, directly or indirectly arising out of, connected with or relating to this Agreement, the other Credit Documents, the Plan Support Agreement, the Interim Order, the Final Order, the Disclosure Statement or the Plan of Reorganization and the transactions contemplated hereby and thereby, and all other agreements, certificates, instruments and other documents and statements (whether written or oral) related to any of the foregoing.

**2.25. Waiver of any Priming Rights and Non-Consensual Use of Cash Collateral.** Upon the Closing Date, and on behalf of themselves and their estates, and for so long as any Obligations shall be outstanding, each of Holdings and Borrower, on behalf of itself and its Subsidiaries, hereby irrevocably waives (i) any right, pursuant to Sections 364(c) or 364(d) of the Bankruptcy Code or otherwise, to grant, or to seek Bankruptcy Court approval of the granting of, any Lien of equal or greater priority than the Liens securing the Obligations, or to grant, or to seek Bankruptcy Court approval of the granting of, a claim of equal or greater priority than the Obligations, except as permitted hereunder and under the Interim Order and Final Order, and (ii) except as provided herein and in the Interim Order or Final Order, any right, pursuant to Section 363 of the Bankruptcy Code or otherwise, to use, or to seek Bankruptcy Court approval of the use of, Collateral proceeds or any other cash collateral (as defined in the Bankruptcy Code) in any manner not permitted by the Credit Documents or otherwise without the consent of Administrative Agent.

**2.26. Working Capital Escrow Account, Settlement Escrow Account and Reinvestment Accounts**.

(a) On the Closing Date, GS Lending Partners, in its capacity as Administrative Agent, at Borrower's express request and instruction (which request and instruction are evidenced by this Agreement) shall apply the Working Capital Escrow Amount to the Working Capital Escrow Account from the proceeds of the Tranche B-2 Term Loans and $35,000,000 to the Settlement Escrow Account from the proceeds of the Tranche B-1 Term Loans.

(b) The proceeds in the Working Capital Escrow Account shall be released for general corporate and working capital purposes of Borrower and its Subsidiaries in accordance with Section 3.2. The proceeds in the Working Capital Escrow Account, and any other voluntary prepayments of the Tranche B-2 Term Loans, may be applied to prepay in full the Tranche B-2 Term Loans in accordance with the Section 2.12 (and any such prepayment of the Tranche B-2 Term Loans shall result in an automatic and corresponding reduction of the Working Capital Escrow Amount for all purposes hereof, without any further action on the part of Borrower). The proceeds in the Settlement Escrow Account shall be released on the Exit Facility Conversion Date and applied, as specified by Borrower in writing in advance of the Exit Facility Conversion Date, (i) to fund a portion of the Custodial Trusts on the Exit Facility

Conversion Date and (ii) for general corporate and working capital purposes on and after the Exit Facility Conversion Date.

(c) If the Maturity Date occurs prior to the Exit Facility Conversion Date, all proceeds in the Settlement Escrow Account on the Maturity Date shall be used to repay the Tranche B-1 Term Loans in full and, to the extent any amounts remain after application to the Tranche B-1 Term Loans, then to the Tranche B-2 Term Loans. All proceeds in the Working Capital Escrow Account on the Maturity Date shall be used to repay the Tranche B-2 Term Loans and, to the extent any amounts remain after application to the Tranche B-2 Term Loans, then to the Tranche B-1 Term Loans.


## SECTION 3.   CONDITIONS PRECEDENT

**3.1.   Closing Date.**  The obligation of each Lender to make a Loan on the Closing Date is subject to the satisfaction, or waiver in accordance with Section 10.5, of the following conditions on or before the Closing Date:

(a) Credit Documents.  Administrative Agent shall have received sufficient copies of each Credit Document (other than the Collateral Documents to be delivered after the Closing Date pursuant to Section 3.1(g)(ii) and Section 3.5) as Administrative Agent shall request, originally executed and delivered by each applicable Credit Party.  Administrative Agent and Collateral Agent shall be satisfied, each in their sole discretion, with the form and substance of the Schedules and Exhibits hereto.

(b) Organizational Documents; Incumbency.  Administrative Agent shall have received, in respect of each Credit Party, (i) sufficient copies of each Organizational Document as Administrative Agent shall request, and, to the extent applicable, certified as of the Closing Date or a recent date prior thereto by the appropriate Governmental Authority; (ii) signature and incumbency certificates of the officers of such Credit Party; (iii) resolutions of the board of directors (or similar governing body) of such Credit Party approving and authorizing the execution, delivery and performance of this Agreement and the other Credit Documents to which it is a party or by which it or its assets may be bound as of the Closing Date, certified as of the Closing Date by its secretary or an assistant secretary as being in full force and effect without modification or amendment; (iv) a good standing certificate from the applicable Governmental Authority of such Credit Party's jurisdiction of incorporation, organization or formation dated the Closing Date or a recent date prior thereto; and (v) such other documents as Administrative Agent may reasonably request.

(c) Organizational and Capital Structure.  The organizational structure and capital structure of Holdings and its Subsidiaries shall be as set forth on Schedule 4.1.

(d) Closing Date.  Borrower shall have satisfied the conditions precedent in this Section 3.1, and the Lenders shall have made the Loans, on or before 5 p.m. (New York time) on December 24, 2009.

(e)  Existing Indebtedness.  Administrative Agent shall be satisfied, in its sole discretion, that:

(i)  on the Closing Date, Holdings, Borrower and its Subsidiaries shall have (i) repaid in full all Existing Indebtedness, (ii) terminated any commitments to lend or make other extensions of credit thereunder, (iii) delivered to Administrative Agent all documents or instruments necessary to release all Liens securing Existing Indebtedness or other obligations of Holdings, Borrower and its Subsidiaries thereunder being repaid on the Closing Date and (iv) made arrangements satisfactory to Administrative Agent with respect to the cancellation or cash collateralization of any letters of credit outstanding thereunder; and

(ii)  all Indebtedness of Holdings, Borrower and its Subsidiaries (other than the Existing Indebtedness and the Loans) and any Liens securing the same that are outstanding immediately prior to the Closing Date shall not exceed the amounts set forth on Schedule 6.1**.**

(f)  Governmental Authorizations and Consents.  Each Credit Party shall have obtained all Governmental Authorizations and all consents of other Persons, in each case that are necessary or advisable in connection with the transactions contemplated by the Credit Documents and each of the foregoing shall be in full force and effect and in form and substance reasonably satisfactory to Administrative Agent.  All applicable waiting periods shall have expired without any action being taken or threatened by any competent authority which would restrain, prevent or otherwise impose adverse conditions on the transactions contemplated by the Credit Documents or the financing thereof and no action, request for stay, petition for review or rehearing, reconsideration, or appeal with respect to any of the foregoing shall be pending, and the time for any applicable agency to take action to set aside its consent on its own motion shall have expired.

(g)  Personal Property Collateral.  In order to create in favor of Collateral Agent, for the benefit of Secured Parties, or to evidence such creation, a valid, perfected First Priority security interest in the personal property Collateral in the United States, each Credit Party shall have delivered to Collateral Agent:

(i)  evidence satisfactory to Collateral Agent of the compliance by each Credit Party of their obligations under the Pledge and Security Agreement and the other Collateral Documents (including their obligations to authorize UCC financing statements, and execute and deliver originals of securities, instruments and chattel paper and any agreements governing deposit and/or securities accounts as provided therein); including (A) the results of a recent search, by a Person satisfactory to Collateral Agent, of all effective UCC financing statements (or equivalent filings) made with respect to any personal or mixed property of any Credit Party in the appropriate jurisdictions, together with copies of all such filings disclosed by such search, and (B) UCC termination statements (or similar documents) duly authorized and, if applicable, executed by all applicable Persons for filing in all applicable jurisdictions as may be necessary to terminate any effective UCC financing statements (or equivalent filings) disclosed in such search (other than any such financing statements in respect of Permitted Liens);

(ii)   the certificates evidencing all of the issued and outstanding Equity Interests owned by the Credit Parties and pledged pursuant to the Pledge and Security Agreement, which certificates shall be accompanied by undated instruments of transfer duly executed in blank, and such other instruments and documents as shall be necessary or, in the reasonable opinion of Administrative Agent, desirable under applicable law to perfect (subject to certain Permitted Liens) the First Priority security interest of the Collateral Agent in such Equity Interests; provided that, to the extent the terms of the Interim Order provide for a perfected security interest in such Equity Interests, the Credit Parties shall be permitted to deliver such certificates to Administrative Agent within 10 Business Days after the Closing Date or such longer period as may be agreed to by Administrative Agent, but in any event, no longer than 15 Business Days after the Closing Date;

(iii)   evidence that each Credit Party shall have taken or caused to be taken any other action, executed and delivered or caused to be executed and delivered any other agreement, document and instrument and made or caused to be made any other filing and recording (other than as set forth herein), including UCC financing statements, reasonably required by Collateral Agent; and

(iv)   evidence satisfactory to Collateral Agent that Borrower has retained, at its sole cost and expense, a service provider acceptable to Collateral Agent for the tracking of all UCC financing statements of Borrower and the Guarantors and that will provide notification to Collateral Agent of, among other things, the upcoming lapse or expiration thereof.

(h)   <u>Financial Statements; Projections</u>.   Administrative Agent shall have received from Holdings (i) the Historical Monthly Statements, (ii) pro forma consolidated balance sheets of Holdings and its Subsidiaries as at the Closing Date, and reflecting the consummation of the Transaction, the related financings and the other transactions contemplated by the Credit Documents to occur on or prior to the Closing Date, which pro forma financial statements shall be in form and substance satisfactory to Administrative Agent, and (iii) the Projections.

(i)   <u>Opinion of Counsel to Credit Parties</u>.   Agents and Lenders and their respective counsel shall have received originally executed copies of the favorable written opinion of Kirkland & Ellis LLP, counsel for Credit Parties, dated as of the Closing Date, in form and substance reasonably satisfactory to Administrative Agent (and each Credit Party hereby instructs such counsel to deliver such opinions to Agents and Lenders).

(j)   <u>Fees</u>.   Borrower shall have paid to each Agent the fees payable on or before the Closing Date referred to in Section 2.8(a) and (g) and all expenses payable pursuant to Section 10.2 which have accrued to the Closing Date.

(k)   <u>Closing Date Certificate</u>.   Holdings and Borrower shall have delivered to Administrative Agent an originally executed Closing Date Certificate, together with all attachments thereto.

(l) <u>No Litigation</u>.  Other than the Chapter 11 Cases and the UCC Litigation, there shall not exist any action, suit, investigation, litigation, proceeding, hearing or other legal or regulatory developments, pending or threatened in any court or before any arbitrator or Governmental Authority with respect to the Existing Indebtedness, the DIP Facility or that, in the reasonable opinion of Administrative Agent, singly or in the aggregate, materially impairs the Transaction, the financing thereof or any of the other transactions contemplated by the Credit Documents or that could have a Material Adverse Effect.

(m) <u>Completion of Proceedings</u>.  All partnership, corporate and other proceedings taken or to be taken in connection with the transactions contemplated hereby and all documents incidental thereto not previously found acceptable by Administrative Agent and its counsel shall be satisfactory in form and substance to Administrative Agent and such counsel, and Administrative Agent and such counsel shall have received all such counterpart originals or certified copies of such documents as Administrative Agent may reasonably request.

(n) <u>Letter of Direction</u>.  Administrative Agent shall have received a duly executed letter of direction from Borrower addressed to Administrative Agent, on behalf of itself and Lenders, directing the disbursement on the Closing Date of the proceeds of the Tranche B-1 Term Loans made on such date.

(o) <u>Minimum EBITDAR</u>.  The pro forma financial statements delivered to the Lender pursuant to Section 3.1(h)(ii) shall show pro forma Consolidated Adjusted EBITDAR of Holdings and its Subsidiaries after giving effect to the Transactions (calculated with such additional adjustments that Administrative Agent agrees are appropriate) for the twelve-month period ended October 31, 2009, and for the latest twelve-month period for which financial statements are available, of not less than $115,000,000.

(p) <u>Patriot Act</u>. At least 10 days prior to the Closing Date, the Lenders shall have received all documentation and other information required by bank regulatory authorities under applicable "know-your-customer" and anti-money laundering rules and regulations, including the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act (Title III of Pub. L. 107-56 (signed into law October 26, 2001) the "**PATRIOT Act**").

(q) <u>Funding Notice</u>. Administrative Agent shall have received a fully executed and delivered Funding Notice no later than one Business Day prior to the Closing Date or such shorter period of time acceptable to Administrative Agent.

(r) <u>No Default</u>. As of the Closing Date, no event shall have occurred and be continuing or would result from the consummation of the Transactions that would constitute an Event of Default or a Default.

(s) <u>Plan Support Agreement</u>. The Plan Support Agreement shall have been duly executed and delivered by the parties thereto, shall be in full force and effect and shall not have been amended, supplemented or otherwise modified without the prior written consent of Administrative Agent except in accordance with the provisions thereof.

(t)  Initial Approved Budget.  Administrative Agent shall have received an initial cash flow budget for a period from the Closing Date to the Maturity Date (as in effect on the Closing Date) substantially in the form of Exhibit M attached hereto (the "**Initial Approved Budget**") or otherwise in form and substance satisfactory to Administrative Agent.

(u)  Cash Flow Forecast.  Administrative Agent shall have received an initial statement of sources and uses of Cash of Borrower and its Subsidiaries from the first day of the week in which the Closing Date occurs through the last day of the week that is 13 weeks thereafter substantially in the form of Exhibit O or otherwise in form and substance satisfactory to Administrative Agent (the "**Initial Cash Flow Forecast**").

(v)  Interim Order and Other Bankruptcy Court Filings  Administrative Agent shall have received a signed copy of an order of the Bankruptcy Court in substantially the form attached hereto as Exhibit N or with such changes as shall be satisfactory to Administrative Agent in its sole discretion (the "**Interim Order**"), which shall have been duly entered on the docket, and the Interim Order shall be in full force and effect on or before 11:59 p.m. (New York time) on December 22, 2009, and shall not have been vacated, reversed, modified, amended or stayed without the written consent of Requisite Lenders and, if the Interim Order is the subject of a pending appeal in any respect, neither the making of the Loans nor the performance by the Credit Parties of their respective obligations under the Credit Documents shall be the subject of a presently effective stay pending appeal.

(w)  Excess Availability.  Administrative Agent shall have received satisfactory evidence that as of the Closing Date, and after giving effect to all payments to be made upon consummation of the Transactions, that Excess Availability of Holdings and its Subsidiaries is equal to or greater than $70,000,000.

(x)  Escrow Accounts.  Borrower shall have (i) established the Settlement Escrow Account with proceeds from the Tranche B-1 Term Loans in an aggregate principal amount of $35,000,000 and entered into the Settlement Account Escrow Agreement and (ii) the established Working Capital Escrow Account with proceeds from the Tranche B-2 Term Loans in an aggregate principal amount of $90,000,000 and entered into the Working Capital Account Escrow Agreement.

**3.2.  Conditions to Withdrawals from Working Capital Escrow Account and Settlement Escrow Account**.

(a)  Conditions Precedent to Withdrawal from Working Capital Escrow Account.  Borrower shall have the right to make withdrawals from the Working Capital Escrow Account (a "**Working Capital Withdrawal**") for the working capital and general corporate purposes of Borrower and its Subsidiaries in the manner set forth in the Working Capital Escrow Agreement (unless otherwise agreed to by Borrower and Administrative Agent) and Administrative Agent shall direct the Escrow Agent to make such Working Capital Withdrawal, subject to the satisfaction of the following conditions precedent on or prior to the date of each such proposed withdrawal (such date, the "**Requested Working Capital Withdrawal Date**"):

(i)   Administrative Agent shall have received a fully executed Withdrawal Certificate signed by an Authorized Officer of Borrower no later than 12:00 p.m. (New York City time) at least one Business Day prior to the Requested Working Capital Withdrawal Date and Borrower shall use commercially reasonable efforts to promptly confirm by telephone Administrative Agent's receipt of such Withdrawal Certificate; and

(ii)   Administrative Agent shall have received a fully executed certificate of an Authorized Officer certifying that:

(A) the ratio of (x) the net (after reserves maintained in conformity with GAAP) book value of accounts receivable and inventory of the Credit Parties as of the date of the most recent monthly financial statements delivered by Holdings to Lenders pursuant to Section 5.1(a)  to (y) the difference between the Working Capital Escrow Amount and the aggregate principal amount of the Working Capital Escrow Account as of the Requested Working Capital Withdrawal Date after giving effect to such Working Capital Withdrawal shall be no less than 1.50:1.00;

(B) after giving pro forma effect to the intended application of proceeds of the Working Capital Withdrawal to be made on the Requested Working Capital Withdrawal Date, the aggregate Cash and Cash Equivalents of the Credit Parties (excluding proceeds in the Working Capital Escrow Account, the Settlement Escrow Account and the Reinvestment Accounts) shall not exceed $15,000,000; and

(C)   as of such Requested Working Capital Withdrawal Date, no event shall have occurred and be continuing or would result from the consummation of such Working Capital Withdrawal (and the use of proceeds thereof) that would constitute an Event of Default or a Default.

(b)   Conditions Precedent to Withdrawal from Settlement Escrow Account. Borrower shall have the right to make withdrawals from the Settlement Escrow Account (a "**Settlement Account Withdrawal**") in order to fund one or more Custodial Accounts and for general corporate and working capital purposes after the Exit Facility Conversion Date in the manner set forth in the Settlement Escrow Agreement (unless otherwise agreed to by Borrower and Administrative Agent) and Administrative Agent shall direct the Escrow Agent to make such Settlement Amount Withdrawal, subject to the satisfaction of the following conditions precedent on or prior to the date of each such proposed withdrawal (such date, the "**Requested Settlement Account Withdrawal Date**"):

(i)   Administrative Agent shall have received a fully executed Withdrawal Certificate signed by an Authorized Officer of Borrower no later than 12:00 p.m. (New York City time) at least one Business Day prior to the Requested Settlement Account Withdrawal Date and Borrower shall use commercially reasonable efforts to promptly confirm by telephone Administrative Agent's receipt of such Withdrawal Certificate; and

(ii)   Administrative Agent shall have received a fully executed certificate of an Authorized Officer certifying that as of such Requested Settlement Account Withdrawal Date, no event shall have occurred and be continuing or would result from

the consummation of such Settlement Account Withdrawal (and the use of proceeds thereof) that would constitute an Event of Default or a Default.

(c)  Notices.  Any Notice shall be executed by an Authorized Officer in a writing delivered to Administrative Agent.  In lieu of delivering a Notice, Borrower may give Administrative Agent telephonic notice by the required time of any proposed Working Capital Withdrawal, Settlement Account Withdrawal or conversion/continuation, as the case may be; provided each such notice shall be promptly confirmed in writing by delivery of the applicable Notice to Administrative Agent on or before the close of business on the date that the telephonic notice is given.  In the event of a discrepancy between the telephone notice and the written Notice, the written Notice shall govern.  In the case of any Notice that is irrevocable once given, if Borrower provides telephonic notice in lieu thereof, such telephone notice shall also be irrevocable once given.  Neither Administrative Agent nor any Lender shall incur any liability to Borrower in acting upon any telephonic notice referred to above that Administrative Agent believes in good faith to have been given by a duly authorized officer or other person authorized on behalf of Borrower or for otherwise acting in good faith.

**3.3.  Six-Month Extension Option.**  Borrower may request on no more than two occasions the extension of the Maturity Date, in each case for a single period of up to three (3) months (the "**Facility Extension Option**") subject to, and the Maturity Date shall be so extended without need for any application to or order from the Bankruptcy Court or any other further action upon satisfaction of, the following conditions precedent, as of the Maturity Date in effect at such time:

(a)  Borrower shall provide written notice to Administrative Agent of its intention to exercise the Facility Extension Option no later than 30 days prior to the Maturity Date in effect at such time (a "**Facility Extension Notice**");

(b)  Borrower shall have paid to Administrative Agent, for the account of Administrative Agent and the Lenders, as applicable, all properly documented fees and expenses (including reasonable fees and expenses of counsel payable hereunder) due and payable on or before the Maturity Date then in effect (including all Conversion Fees referred to in Section 2.8(d));

(c)  Administrative Agent shall have received satisfactory evidence that Excess Availability of Holdings and its Subsidiaries as of the Maturity Date then in effect (after giving effect to any payments required in connection with the exercise of the Facility Extension Option) is equal to or greater than $45,000,000;

(d)  if Borrower desires to modify the Approved Budget for all or any portion of any requested three-month extension period, then no less than 10 Business Days prior to the Maturity Date then in effect, Borrower shall have provided to Administrative Agent a supplement to the Approved Budget covering such requested three-month extension period, on a month-by-month basis, in form and substance reasonably satisfactory to Administrative Agent in its sole discretion;

(e)   Borrower shall be in compliance (x) on a pro forma basis after giving effect to the Facility Extension Option, with the minimum Consolidated Adjusted EBITDAR requirement set forth in Section 6.7(c) below for the most recently ended month (ended at least 30 days prior to the Maturity Date then in effect) and (y) with the Approved Budget;

(f)   as of the Maturity Date then in effect, no Default or Event of Default shall have occurred and be continuing; and

(g)   the Bankruptcy Court shall have entered an order approving the Disclosure Statement and, in the case of the second extension period, the Bankruptcy Court shall have entered the Confirmation Order.

Administrative Agent shall notify Borrower and the Lenders upon the effectiveness of the Facility Extension Option (provided, that such notice shall not be required in order for the Facility Extension Option to become effective).

**3.4.   Exit Facility Option.**   The Lenders hereby grant Borrower the option (the **"Exit Facility Option"**) to cause the DIP Facility to be converted to an Exit Facility in accordance with Section 3.6 upon the effective date of the Plan of Reorganization, such option being subject to the conditions of Section 3.5 of this Agreement.

**3.5.   Conditions to Exit Facility Option.**   On or prior to the Exit Facility Conversion Date, the obligations of each Lender to continue to make or hold Loans and to extend the maturity thereof beyond the Maturity Date then in effect are subject to the satisfaction, or waiver in accordance with Section 10.5, of the following conditions on or before the Exit Facility Conversion Date:

(a)   the Exit Facility Conversion Date shall occur not later than the Maturity Date as in effect immediately prior to the exercise by Borrower of the Exit Facility Option;

(b)   Collateral Agent shall have received:

(i)      a completed Collateral Questionnaire dated the Exit Facility Conversion Date and executed by an Authorized Officer of each Credit Party, together with all attachments contemplated thereby, including (A) the results of a recent search, by a Person satisfactory to Collateral Agent, of all effective UCC financing statements (or equivalent filings) made with respect to any personal or mixed property of any Credit Party in the jurisdictions specified in the Collateral Questionnaire, together with copies of all such filings disclosed by such search, and (B) UCC termination statements (or similar documents) duly authorized and, if applicable, executed by all applicable Persons for filing in all applicable jurisdictions as may be necessary to terminate any effective UCC financing statements (or equivalent filings) disclosed in such search (other than any such financing statements in respect of Permitted Liens);

(ii)      with respect to any New Credit Parties, and otherwise to the extent not previously provided in connection with the DIP Facility, opinions of counsel (which counsel shall be reasonably satisfactory to Collateral Agent) with respect to the creation and perfection of the security interests in favor of Collateral Agent in such Collateral and

such other matters governed by the laws of each jurisdiction in which any Credit Party or any personal property Collateral is located as Collateral Agent may reasonably request, in each case substantially similar to those delivered on the Closing Date with such changes as the Collateral Agent or Administrative Agent may reasonably require;

(iii)    with respect to any New Credit Parties, and otherwise to the extent not previously provided in connection with the DIP Facility, the certificates evidencing all of the issued and outstanding Equity Interests owned by the Credit Parties and pledged pursuant to the Pledge and Security Agreement, which certificates shall be accompanied by undated instruments of transfer duly executed in blank, and such other instruments and documents as shall be necessary or, in the reasonable opinion of Administrative Agent, desirable under applicable law to perfect (subject to certain Permitted Liens) the First Priority security interest of the Collateral Agent in such Equity Interests; and

(iv)    evidence that each Credit Party shall have taken or caused to be taken any other action, executed and delivered or caused to be executed and delivered any other agreement, document and instrument and made or caused to be made any other filing and recording (other than as set forth herein), including UCC financing statements, reasonably required by Collateral Agent to the extent necessary to maintain or cause the perfection of the Liens granted under the Loan Documents (to the extent required thereunder).

(c)    Collateral Agent shall have received endorsements from Borrower's insurance broker naming the Collateral Agent, for the benefit of Secured Parties, as additional insured and loss payee thereunder to the extent required under Section 5.5.

(d)    All partnership, corporate and other proceedings taken or to be taken in connection with the transactions contemplated hereby and all documents incidental thereto not previously delivered and found acceptable by Administrative Agent and its counsel shall be reasonably satisfactory in form and substance to Administrative Agent and such counsel, and Administrative Agent and such counsel shall have received all such counterpart originals or certified copies of such documents as Administrative Agent may reasonably request.

(e)    Borrower shall have paid to Administrative Agent, for the account of Administrative Agent and the Lenders, as applicable, all properly documented fees and expenses (including reasonable fees and expenses of counsel payable hereunder) due and payable on or before the Exit Facility Conversion Date (including all Conversion Fees referred to in Section 2.8(d)).

(f)    (i) The Bankruptcy Court shall have entered the Confirmation Order and (x) the time to appeal the Confirmation Order or to seek review, rehearing or certiorari with respect to the Confirmation Order must have expired, (y) unless otherwise waived by Administrative Agent, no appeal or petition for review, rehearing or certiorari with respect to the Confirmation Order may be pending, and (z) the Confirmation Order must otherwise be in full force and effect, and shall not have been vacated, reversed, modified, amended or stayed in any respect that, in the good faith judgment of Administrative Agent, is adverse to any or all of Administrative Agent, the Collateral Agent and the Lenders without the written consent of

Administrative Agent, (ii) the Plan of Reorganization and all documents filed in connection therewith (x) shall be in form and substance consistent with the terms of the Plan Support Agreement and containing such other terms that either (A) are not inconsistent with, or do not conflict with, the terms of the Credit Documents, the Interim Order or the Final Order and do not adversely affect the Lenders' interests, Liens, rights, remedies, benefits or other protections under the Credit Documents, or (B) are acceptable to Administrative Agent in its sole discretion, (y) shall have become effective in accordance with its terms, and (z) shall not have been modified, altered, amended or otherwise changed or supplemented in any respect that, in the good faith judgment of Administrative Agent, is adverse to any or all of Administrative Agent, the Collateral Agent and the Lenders without the written consent of Administrative Agent, (iii) all conditions precedent to the effectiveness of the Plan of Reorganization (other than the conversion of the DIP Facility to the Exit Facility pursuant hereto) shall have been satisfied or shall be satisfied substantially simultaneously with the conversion of the DIP Facility to the Exit Facility or waived (with the prior written consent of Administrative Agent if in the good faith judgment of Administrative Agent such waiver is adverse to any or all of Administrative Agent, the Collateral Agent and the Lenders), and (iv) the transactions contemplated by the Plan of Reorganization and the Confirmation Order to occur on the effective date of the Plan of Reorganization and the Confirmation Order shall be consummated on the effective date of the Plan of Reorganization (and pursuant to the Plan of Reorganization, the Existing Credit Parties and the New Credit Parties and their respective property shall have been discharged from, and have no further liability with respect to, Claims and Liens against the Existing Credit Parties (including, without limitation, with respect to Environmental Claimants, Environmental Legacy Liabilities and other Environmental Claims) provided in the Plan of Reorganization) and substantially simultaneously with the occurrence of the Exit Facility Conversion Date.

(g)   Administrative Agent shall have received a pro forma consolidated balance sheet and any other applicable financial statements of Borrower and its Subsidiaries as of the last month and Fiscal Quarter ended prior to the Exit Facility Conversion Date for which financial statements are available, together with a Financial Officer Certification of Borrower certifying that such balance sheet and other financial statements accurately present the financial position of Borrower and its Subsidiaries, in accordance with GAAP, as of such date subject to changes resulting from fresh-start accounting and normal year-end adjustments.

(h)   Lenders and their respective counsel shall have received originally executed copies of the favorable written opinions (substantially similar to those delivered on the Closing Date with such changes as Administrative Agent may reasonably require) of Kirkland & Ellis LLP, counsel for Credit Parties, dated as of the Exit Facility Conversion Date (and each Credit Party hereby instructs such counsel to deliver such opinions to Administrative Agent and the Lenders).

(i)   Each entity proposed to be a Credit Party subsequent to the Exit Facility Conversion Date shall have obtained (i) all Governmental Authorizations and all consents of other Persons, in each case that are necessary in connection with the transactions contemplated by the Credit Documents, except for those consents and Governmental Authorizations the failure of which to so obtain would not reasonably be expected to have a Material Adverse Effect and (ii) those consents set forth on Schedule 3.5(i), and each of the foregoing shall be in

full force and effect and in form and substance reasonably satisfactory to Administrative Agent. No change in law or regulation shall be applicable in the reasonable judgment of Administrative Agent that would restrain, prevent or otherwise impose materially adverse conditions on the transactions contemplated by the Credit Documents or the financing thereof. All applicable waiting periods shall have expired without any action being taken or threatened by any competent authority would restrain, prevent or otherwise impose materially adverse conditions on the transactions contemplated by the Credit Documents or the financing thereof and no action, request for stay, petition for review or rehearing, reconsideration, or appeal with respect to any of the foregoing shall be pending, and the time for any applicable agency to take action to set aside its consent on its own motion shall have expired.

(j) The Credit Facility, after giving effect to the Exit Facility Conversion Date, shall have been assigned (a) a public corporate family rating from Moody's, (b) a public corporate credit rating from S&P and (c) a public credit rating for the Exit Facility from each of Moody's and S&P.

(k) Borrower shall have given, and the Lenders shall have received, not less than ten Business Days' prior written notice of the exercise of the Exit Facility Option.

(l) Administrative Agent shall have received a Solvency Certificate from the chief financial officer, if any (or alternatively chief executive officer or chief restructuring officer) of Holdings, on a pro forma basis after giving effect to the confirmation of the Plan of Reorganization, the consummation of the transactions contemplated thereby and the occurrence of the Exit Facility Conversion Date.

(m) Borrower shall be in compliance with (x) the financial covenants set forth in Section 6.7(b) and (d) as of the most recent Fiscal Quarter-end for which financial statements are available prior to the Exit Facility Conversion Date and (y) the minimum EBITDAR covenant set forth in Section 6.7(c) as of the most recent month-end for which financial statements are available prior to the Exit Facility Conversion Date

(n) Administrative Agent shall have received the Accession and Novation Agreement, executed and delivered in accordance with Section 3.6(a).

(o) As of the Exit Facility Conversion Date, the representations and warranties contained herein and in the other Credit Documents shall be true and correct in all material respects on and as of the Exit Facility Conversion Date to the same extent as though made on and as of such date, except to the extent such representations and warranties specifically relate to an earlier date, in which case such representations and warranties shall have been true and correct in all material respects on and as of such earlier date.

(p) As of the Exit Facility Conversion Date, no event shall have occurred and be continuing or would result from the exercise by Borrower of the Exit Facility Option that would constitute an Event of Default or a Default.

(q) Administrative Agent shall have received satisfactory evidence that Excess Availability of Holdings and its Subsidiaries as of the Exit Facility Conversion Date (after

giving effect to any payments required in connection with the consummation of the Plan of Reorganization and the Exit Facility Conversion Date) is equal to or greater than $58,000,000.

(r) [Intentionally Omitted]

(s) Concurrently with the consummation of the Plan of Reorganization, (a) all pre-existing Indebtedness of the Credit Parties (other than the Term Loans and the Indebtedness and other obligations outstanding under the Replacement Revolving Facility or any Alternative Facility) shall have been satisfied or otherwise treated in the manner specified in the Plan of Reorganization, and all Liens and security interests related thereto, to the extent required by the Plan of Reorganization, shall have been terminated or released, (b) the respective Indebtedness of the Credit Parties and any Liens securing same that are outstanding immediately after the consummation of the Plan of Reorganization shall not exceed the amount contemplated by the Plan of Reorganization, (c) no default shall have occurred and be continuing under the Replacement Revolving Facility immediately prior to the Exit Facility Conversion Date, and (d) there shall not occur as a result of, and after giving effect to, the Exit Facility Option and the Revolving Exit Facility Option, a default (or any event which with the giving of notice or lapse of time or both will be a default) under any of the reorganized Credit Parties' debt instruments and other material agreements.

(t) Holdings shall have (i) received the net proceeds of the New Money Investment, the gross amount of which shall be no less than $105,000,000, and such New Money Investment shall otherwise be in form and substance reasonably satisfactory to Administrative Agent and (ii) contributed the same to Borrower as cash common equity, and the net proceeds thereof shall be used to fund, in part, the Trust Payments. Administrative Agent shall be satisfied in its sole discretion that the reorganized Credit Parties shall have the funds necessary to make the Trust Payments in full on the effective date of the Plan of Reorganization (and all sources of such funds shall be in an amount and in form and substance satisfactory to Administrative Agent, in its sole discretion) and such funds shall be used to fund, together with the New Money Investment, the Trust Payments in full.

(u) All Environmental Claimants (whether or not signatory to the Plan Support Agreement) shall have voted to accept the Plan of Reorganization and shall have checked the box contained in the Plan of Reorganization ballot or signed a settlement or other agreement, in each case, setting forth and confirming their respective agreements to release and covenant not to sue the reorganized Credit Parties (and any other Credit Parties under the Exit Facility) from and against any liability in respect of any Environmental Claims (on the terms and conditions set forth in the Plan Support Agreement and otherwise in form and substance reasonably acceptable to Administrative Agent).

(v) In order to create in favor of Collateral Agent, for the benefit of the Secured Parties, a valid and, subject to any filing and/or recording referred to herein, perfected First Priority security interest in certain Real Estate Assets, Collateral Agent shall have received from Borrower and each applicable Guarantor:

(i)   fully executed and notarized Mortgages, in proper form for recording in all appropriate places in all applicable jurisdictions, encumbering each Real Estate Asset listed in Schedule 3.5(v) (each, a "**Mortgaged Property**");

(ii)   an opinion of counsel (which counsel shall be reasonably satisfactory to Collateral Agent) in each state in which a Mortgaged Property is located with respect to the enforceability of Mortgages to be recorded in such state and such other matters as Collateral Agent may reasonably request, in each case in form and substance reasonably satisfactory to Collateral Agent;

(iii)   to the extent available after the use of commercially reasonable efforts by the Credit Parties, in the case of each Leasehold Property that is a Material Real Estate Asset, (1) a Landlord Consent and Estoppel and (2) evidence that such Leasehold Property is a Recorded Leasehold Interest;

(iv)   (A) ALTA mortgagee title insurance policies with all endorsements requested by Collateral Agent or unconditional commitments therefor issued by one or more title companies reasonably satisfactory to Collateral Agent with respect to each Mortgaged Property (each, a "**Title Policy**"), in amounts not less than the fair market value of each Mortgaged Property, together with a title report issued by a title company with respect thereto, dated not more than thirty days prior to the Closing Date and copies of all recorded documents listed as exceptions to title or otherwise referred to therein, each in form and substance reasonably satisfactory to Collateral Agent and (B) evidence satisfactory to Collateral Agent that such Credit Party has paid to the title company or to the appropriate governmental authorities all expenses and premiums of the title company and all other sums required in connection with the issuance of each Title Policy and all recording and stamp taxes (including mortgage recording and intangible taxes) payable in connection with recording the Mortgages for each Mortgaged Property in the appropriate real estate records;

(v)   flood certifications with respect to all Mortgaged Properties and evidence of flood insurance with respect to each Flood Hazard Property that is located in a community that participates in the National Flood Insurance Program, in each case in compliance with any applicable regulations of the Board of Governors, in form and substance reasonably satisfactory to Collateral Agent; and

(vi)   ALTA surveys of all Mortgaged Properties which are not Leasehold Properties, certified to Collateral Agent.

(w)   Administrative Agent shall have received from Borrower and each applicable Guarantor fully executed and notarized Intellectual Property Security Agreements, in proper form for filing or recording in the U.S. Patent and Trademark Office and/or the U.S. Copyright Office, as applicable memorializing and recording the Lien on the U.S. Intellectual Property owned by any Credit Party and listed in Schedule 5.2 to the Pledge and Security Agreement**.**

(x)   Borrower shall have caused the depositary institution maintaining each Deposit Account (other than (x) payroll accounts and (y) accounts holding Cash and Cash Equivalents of no more than $2,500,000 as of the close of business on each Business Day) to enter into a customary Control Agreement in form reasonably satisfactory to Administrative Agent, pursuant to which such institution shall agree to comply with Administrative Agent's instructions with respect to the disposition of funds in such Deposit Account upon the occurrence and during the continuance of an Event of Default.

**3.6.   Conversion to Exit Facility.**  (a)   Pursuant to the Plan of Reorganization and upon the effective date thereof, the reorganized Borrower and the reorganized Guarantors and/or certain other newly-formed entities (the "**New Credit Parties**") which are reasonably acceptable to Administrative Agent shall have purchased or otherwise acquired substantially all of the Facilities and other related operating assets (other than property subject to the Environmental Legacy Liabilities, except for the Facility located in Henderson, Nevada) of Borrower and the Guarantors (the Persons in such capacities as of the time immediately prior to the Exit Facility Conversion Date, the "**Existing Credit Parties**").  In the event that Borrower exercises the Exit Facility Option and upon (i) the execution and delivery by the New Credit Parties and the Existing Credit Parties of an accession, assumption and novation agreement in form and substance reasonably satisfactory to Administrative Agent (the "**Accession and Novation Agreement**") and (ii) the satisfaction (or waiver in accordance with the terms of this Agreement) of the other conditions precedent set forth in Section 3.5:

(i)   each of (x) the Existing Credit Parties and (y) Administrative Agent, the Collateral Agent and the Lenders shall be released from further obligations towards one another under this Agreement and the other Credit Documents and their respective rights against one another shall be cancelled (being the "**Discharged Rights and Obligations**");

(ii)   each of (x) the New Credit Parties and (y) Administrative Agent, the Collateral Agent and the Lenders shall, by novation, assume obligations towards one another and/or acquire rights against one another which differ from the Discharged Rights and Obligations only insofar as that each New Credit Party and Administrative Agent, the Collateral Agent and the Lenders shall have assumed and/or acquired the same respective obligations and rights in place of each Existing Credit Party (in each case as either Borrower or Guarantor, as specified in the Accession and Novation Agreement) and Administrative Agent, the Collateral Agent and the Lenders; and each New Credit Party shall become a party hereto as the "**Borrower**" or as a "**Guarantor**", as applicable;

(iii)   Administrative Agent, the Collateral Agent and the Lenders shall retain the same rights and obligations among themselves as they would have had the New Credit Parties at all times been Existing Credit Parties; and

(iv)   on and following the Exit Facility Conversion Date the defined terms "**Borrower**", "**Guarantor**" and **"Credit Parties"** shall be construed to refer to each applicable New Credit Party, in accordance with the provisions of this Section 3.6(a).

(b)     Each of the Existing Credit Parties, the New Credit Parties, Administrative Agent, the Collateral Agent and the Lenders shall take such actions and execute and deliver such agreements, instruments or other documents (at the sole joint and several cost and expense of the Existing Credit Parties and the New Credit Parties) as Administrative Agent may reasonably request and solely as are necessary to give effect to the provisions of this Section 3.6 including amending or amending and restating this Agreement to remove those provisions that apply solely to the period prior to the Exit Facility Conversion Date; provided, however that the consent of, or other action by, any of the Lenders or Agents is not a condition precedent to the effectiveness of the Accession and Novation Agreement and the provisions of Section 3.6(a).

## SECTION 4.   REPRESENTATIONS AND WARRANTIES

In order to induce Agents and Lenders to enter into this Agreement and to make each Loan to be made thereby, each Credit Party represents and warrants to each Agent and Lender, on the Closing Date, the Exit Facility Conversion Date, the Initial Facility Extension Date and the Subsequent Facility Extension Date, that the following statements are true and correct (it being understood and agreed that the representations and warranties made on the Closing Date are deemed to be made concurrently with the consummation of the Transactions contemplated hereby):

**4.1.   Organization; Requisite Power and Authority; Qualification.**   Each of Holdings and its Subsidiaries (a) is duly organized, validly existing and in good standing under the laws of its jurisdiction of organization as identified in Schedule 4.1, (b) has all requisite power and authority to own and operate its properties, to carry on its business as now conducted and as proposed to be conducted, upon entry by the Bankruptcy Court of the Interim Order, to enter into the Credit Documents to which it is a party and to carry out the transactions contemplated thereby, and (c) is qualified to do business and in good standing (or with respect to Foreign Subsidiaries, to the extent such concept is applicable in the relevant jurisdiction) in every jurisdiction where its assets are located and wherever necessary to carry out its business and operations, except in jurisdictions where the failure to be so qualified or in good standing has not had, and could not be reasonably expected to have, a Material Adverse Effect.

**4.2.   Equity Interests and Ownership.**   The Equity Interests of each of Holdings and its Subsidiaries has been duly authorized and validly issued and is fully paid and non-assessable.   Except as set forth on Schedule 4.2, as of the date hereof, there is no existing option, warrant, call, right, commitment or other agreement to which Holdings or any of its Subsidiaries is a party requiring, and there is no membership interest or other Equity Interests of Holdings or any of its Subsidiaries outstanding which upon conversion or exchange would require, the issuance by Holdings or any of its Subsidiaries of any additional membership interests or other Equity Interests of Holdings or any of its Subsidiaries or other Securities convertible into, exchangeable for or evidencing the right to subscribe for or purchase, a membership interest or other Equity Interests of Holdings or any of its Subsidiaries. Schedule 4.2 correctly sets forth the ownership interest of Holdings and each of its Subsidiaries in their respective Subsidiaries as of the Closing Date.

**4.3. Due Authorization.** (A) On the Closing Date, upon entry by the Bankruptcy Court of the Interim Order, the execution, delivery and performance of the Credit Documents have been duly authorized by all necessary action on the part of each Credit Party that is a party thereto and (B) on the Exit Facility Conversion Date, upon entry of the Bankruptcy Court of the Confirmation Order, the execution, delivery and performance of any Credit Documents entered into on such date, have been duly authorized by all necessary action on the part of each Credit Party that is a party thereto.

**4.4. No Conflict.** (A) On the Closing Date, upon entry by the Bankruptcy Court of the Interim Order, and (B) on the Exit Facility Conversion Date, upon entry by the Bankruptcy Court of the Confirmation Order, in each case, the execution, delivery and performance by Credit Parties of the Credit Documents entered into on such date and to which such Credit Parties are parties and the consummation of the transactions contemplated by such Credit Documents do not and will not (a) violate (i) any provision of any law or any governmental rule or regulation applicable to Holdings or any of its Subsidiaries, (ii) any of the Organizational Documents of Holdings or any of its Subsidiaries, or (iii) any order, judgment or decree of any court or other agency of government binding on Holdings or any of its Subsidiaries; (b) conflict with, result in a breach of or constitute (with due notice or lapse of time or both) a default under any Contractual Obligation of Holdings or any of its Subsidiaries; (c) result in or require the creation or imposition of any Lien upon any of the properties or assets of Holdings or any of its Subsidiaries (other than any Liens created under any of the Credit Documents in favor of Collateral Agent, on behalf of the Secured Parties and any Liens created under any Additional Facility Credit Documents in favor of the Replacement Facility Agent or any Alternative Facility Agent, as the case may be); or (d) require any approval of stockholders, members or partners or any approval or consent of any Person under any Contractual Obligation of Holdings or any of its Subsidiaries, except for such approvals or consents which will be obtained on or before the Closing Date and disclosed in writing to Lenders.

**4.5. Governmental Consents.** (A) On the Closing Date, upon entry by the Bankruptcy Court of the Interim Order, and (B) on the Exit Facility Conversion Date, upon entry by the Bankruptcy Court of the Confirmation Order, in each case, the execution, delivery and performance by Credit Parties of the Credit Documents entered into on such date and to which such Credit Parties are parties and the consummation of the transactions contemplated by such Credit Documents do not and will not require any registration with, consent or approval of, or notice to, or other action to, with or by, any Governmental Authority except for entry by the Bankruptcy Court of the Interim Order and except for filings and recordings with respect to the Collateral to be made, or otherwise delivered to Collateral Agent for filing and/or recordation, as of the Closing Date.

**4.6. Binding Obligation.** (A) On the Closing Date, upon entry by the Bankruptcy Court of the Interim Order, and (B) on the Exit Facility Conversion Date, upon entry by the Bankruptcy Court of the Confirmation Order, in each case, each Credit Document entered into on such date has been duly executed and delivered by each Credit Party that is a party thereto and, upon entry by the Bankruptcy Court of the Interim Order, is the legally valid and binding obligation of such Credit Party, enforceable against such Credit Party in accordance with its respective terms, except as may be limited by bankruptcy, insolvency, reorganization,

moratorium or similar laws relating to or limiting creditors' rights generally or by equitable principles relating to enforceability.

**4.7. Historical Financial Statements.** The Historical Financial Statements (other than restatements due to environmental or tort liabilities) were prepared in conformity with GAAP and fairly present, in all material respects, the financial position, on a consolidated basis, of the Persons described in such financial statements as at the respective dates thereof and the results of operations and cash flows, on a consolidated basis, of the entities described therein for each of the periods then ended, subject, in the case of any such unaudited financial statements, to changes resulting from audit and normal year-end adjustments.

**4.8. Projections.** On and as of the Closing Date, the projections of Borrower and its Subsidiaries for the period commencing with the Closing Date through December 31, 2013 (the "**Projections**") are based on good faith estimates and assumptions made by the management of Holdings; provided, the Projections are not to be viewed as facts and that actual results during the period or periods covered by the Projections may differ from such Projections and that the differences may be material; provided further, as of the Closing Date, management of Borrower believed that the Projections were reasonable and attainable.

**4.9. No Material Adverse Effect.** Since September 30, 2008, other than the filing of the Chapter 11 Cases, no event, circumstance or change has occurred that has caused or evidences, or could reasonably be expected to result in, either in any case or in the aggregate, a Material Adverse Effect.

**4.10. Adverse Proceedings, Etc.** Except for the Chapter 11 Cases, there are no Adverse Proceedings, individually or in the aggregate, that could reasonably be expected to have a Material Adverse Effect. Neither Holdings nor any of its Subsidiaries (a) is in violation of any applicable laws that, individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect, or (b) is subject to or in default with respect to any final judgments, writs, injunctions, decrees, rules or regulations of any court or any federal, state, municipal or other governmental department, commission, board, bureau, agency or instrumentality, domestic or foreign, that, individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect.

**4.11. Payment of Taxes.** Except as otherwise permitted under Section 5.3, all Post-Petition tax returns and reports of Holdings and its Subsidiaries required to be filed by any of them have been timely filed, and all Post-Petition taxes shown on such tax returns to be due and payable and all assessments, fees and other governmental charges upon Holdings and its Subsidiaries and upon their respective properties, assets, income, businesses and franchises which are due and payable have been paid when due and payable. Holdings knows of no proposed tax assessment against Holdings or any of its Subsidiaries which is not being actively contested by Holdings or such Subsidiary in good faith and by appropriate proceedings; provided, such reserves or other appropriate provisions, if any, as shall be required in conformity with GAAP shall have been made or provided therefor.

### 4.12. Properties.

(a) <u>Title</u>. Each of Holdings and its Subsidiaries has (i) good and legal title to (in the case of fee interests in real property), (ii) valid leasehold interests in (in the case of leasehold interests in real or personal property), (iii) valid licensed or other rights in (in the case of licensed or other interests in Intellectual Property) and (iv) good title to (in the case of all other personal property), all of their respective properties and assets reflected in their respective Historical Financial Statements (as restated) referred to in Section 4.7 and in the most recent financial statements delivered pursuant to Section 5.1, in each case except for assets disposed of since the date of such financial statements in the ordinary course of business or as otherwise permitted under Section 6.8. Except as permitted by this Agreement, all such properties and assets are free and clear of Liens other than Permitted Liens.

(b) <u>Real Estate</u>. As of the Closing Date, Schedule 4.12 contains a true, accurate and complete list of (i) all Real Estate Assets, and (ii) all leases, subleases or assignments of leases (together with all amendments, modifications, supplements, renewals or extensions of any thereof) affecting each Real Estate Asset of any Credit Party, regardless of whether such Credit Party is the landlord or tenant (whether directly or as an assignee or successor in interest) under such lease, sublease or assignment. Each agreement listed in clause (ii) of the immediately preceding sentence is in full force and effect and Holdings does not have knowledge of any default that has occurred and is continuing thereunder, and each such agreement constitutes the legally valid and binding obligation of each applicable Credit Party, enforceable against such Credit Party in accordance with its terms, except as enforcement may be limited by bankruptcy, insolvency, reorganization, moratorium or similar laws relating to or limiting creditors' rights generally or by equitable principles.

### 4.13. Environmental Matters. Except as set forth on Schedule 4.13 hereto:

(a) <u>Current Operations</u>. Other than with respect to either Environmental Legacy Liabilities or exceptions that could not reasonably be expected to either (x) result in liability in excess of $20,000,000 or (y) individually or in the aggregate, have a Material Adverse Effect:

(i) Holdings and its Subsidiaries (A) are and have been in compliance with all applicable Environmental Laws, and (B) have obtained, and maintained in full force and effect, all Governmental Authorizations arising under Environmental Laws that are necessary for the conduct of the Business and the Tiwest Joint Venture in compliance with Environmental Laws;

(ii) neither Holdings nor any of its Subsidiaries have received any unresolved written notice, report or other written communication regarding any actual or alleged material violation of Environmental Laws or any unresolved actual or alleged Environmental Liabilities relating to the Business, the Facilities or the Tiwest Joint Venture;

(iii) no Release affecting the Business, any Facility or the Tiwest Joint Venture has occurred or is occurring at or from any of the Facilities or by Holdings or

any of its Subsidiaries on any other property that requires notice to any Governmental Authority, any form of Remedial Action under applicable Environmental Law, or that could reasonably be expected to form the basis of an Environmental Claim;

(iv)   neither Holdings nor any of its Subsidiaries has by law or contract agreed to, assumed or retained any material Environmental Liability or responsibility for any Environmental Claim, including under any lease, purchase agreement, sale agreement, joint venture agreement or other binding corporate or real estate document or agreement related to the Business, the Facilities or the Tiwest Joint Venture; and

(v)   there are no pending or, to the knowledge of Holdings and Borrower, threatened Environmental Claims related to the Business, the Facilities or the Tiwest Joint Venture and, to the knowledge of Holdings and Borrower, there are no violations of Environmental Law or Releases that could reasonably be expected to form the basis of any such Environmental Claim; and

(vi)   the Products are being, or have been, pre-registered and registered within the meaning of the Regulation (EC) No. 1907/2006 concerning the Registration, Evaluation, Authorisation and Restriction of Chemicals of the European Union and all rules and regulations promulgated thereunder, and do and will comply with all statutory and EC requirements and regulations relating to the Products or to the sale of the Products in the European Union.

(b)   Environmental Legacy Liabilities.

(i)   Neither Holdings nor any of its Subsidiaries is subject to any Environmental Legacy Liabilities, except for any such Environmental Legacy Liabilities that could not reasonably be expected to after entry by the Bankruptcy Court of the Final Order (A) result in liability in excess of $20,000,000, or (B) individually or in the aggregate, have a Material Adverse Effect.

(ii)   Neither Holdings nor any of its Subsidiaries has Released any Hazardous Materials in a manner, location or quantity that could reasonably be expected to commingle with, or to exacerbate, any Henderson Legacy Contamination, except for such Release that would not reasonably be expected to, individually or in the aggregate, have a Material Adverse Effect.

(c)   Holdings has provided Administrative Agent, or its agents or consultants, with access to all significant environmental reports, data (including in relation to energy consumption, energy generation and emissions of greenhouse gases to the extent such data exists), documents, studies, analyses, investigations, audits and reviews in the possession or control of, or otherwise reasonably available to, Holdings or its Subsidiaries as necessary to reasonably disclose to any material Environmental Liabilities with respect to any Facility.

(d)   No material Lien has been recorded or, to the knowledge of Holdings and Borrower, threatened by any Governmental Authority under any Environmental Law with respect to any Facility.

This Section 4.13 contains the sole and exclusive representations and warranties of Holdings with respect to any environmental, health or safety matters, including without limitation any arising under any Environmental Laws.

**4.14. No Defaults.** Neither Holdings nor any of its Subsidiaries is in default in the performance, observance or fulfillment of any of the obligations, covenants or conditions contained in any of its Post-Petition Contractual Obligations other than as a result of the filing of the Chapter 11 Cases (and any payment default directly related to such filing), and no condition exists which, with the giving of notice or the lapse of time or both, could constitute such a default, except where the consequences, direct or indirect, of such default or defaults, if any, could not reasonably be expected to have a Material Adverse Effect.

**4.15. Material Contracts.** Schedule 4.15 contains a true, correct and complete list of all the Material Contracts in effect on the Closing Date, and as of the Closing Date, except as described on Schedule 4.15, all such Material Contracts are in full force and effect and no Post-Petition defaults currently exist thereunder other than as a result of the filing of the Chapter 11 Cases (and any payment default directly related to such filing as of the Closing Date).

**4.16. Governmental Regulation.** Neither Holdings nor any of its Subsidiaries is subject to regulation under the Federal Power Act or the Investment Company Act of 1940 or under any other federal or state statute or regulation which may limit its ability to incur Indebtedness or which may otherwise render all or any portion of the Obligations unenforceable. Neither Holdings nor any of its Subsidiaries is a "registered investment company" or a company "controlled" by a "registered investment company" or a "principal underwriter" of a "registered investment company" as such terms are defined in the Investment Company Act of 1940.

**4.17. Margin Stock.** Neither Holdings nor any of its Subsidiaries owns any Margin Stock.

**4.18. Employee Matters.** Neither Holdings nor any of its Subsidiaries is engaged in any unfair labor practice that could reasonably be expected to have a Material Adverse Effect. There is (a) no unfair labor practice complaint pending against Holdings or any of its Subsidiaries, or to the best knowledge of Holdings and Borrower, threatened against any of them before the National Labor Relations Board and no grievance or arbitration proceeding arising out of or under any collective bargaining agreement that is so pending against Holdings or any of its Subsidiaries or to the best knowledge of Holdings and Borrower, threatened against any of them, (b) no strike or work stoppage in existence or threatened involving Holdings or any of its Subsidiaries, and (c) to the best knowledge of Holdings and Borrower, no union representation question existing with respect to the employees of Holdings or any of its Subsidiaries and, to the best knowledge of Holdings and Borrower, no union organization activity that is taking place, except (with respect to any matter specified in clause (a), (b) or (c) above, either individually or in the aggregate) such as is not reasonably likely to have a Material Adverse Effect.

**4.19. Employee Benefit Plan.** Except as would not reasonably be expected to have a Material Adverse Effect Holdings, each of its Subsidiaries and, with respect to a Pension Plan, each of their respective ERISA Affiliates are in compliance with all applicable provisions and requirements of ERISA and the Internal Revenue Code and the regulations and published

interpretations thereunder with respect to each Employee Benefit Plan, and have performed all their obligations under each Employee Benefit Plan. Each Employee Benefit Plan which is intended to qualify under Section 401(a) of the Internal Revenue Code has received a favorable determination letter from the Internal Revenue Service indicating that such Employee Benefit Plan is so qualified and nothing has occurred subsequent to the issuance of such determination letter which would cause such Employee Benefit Plan to lose its qualified status or is within the filing period set forth under Revenue Procedure 2007-44. Except as would not reasonably be expected to have  Material Adverse Effect, no liability to the PBGC (other than required premium payments and required minimum funding contributions), the Internal Revenue Service, any Employee Benefit Plan or any trust established under Title IV of ERISA has been or is expected to be incurred by Holdings, any of its Subsidiaries or any of their ERISA Affiliates. Except as would not reasonably be expected to have a Material Adverse Effect, no ERISA Event has occurred or is reasonably expected to occur.  Except to the extent required under Section 4980B of the Internal Revenue Code or similar state laws, no Employee Benefit Plan provides health or welfare benefits (through the purchase of insurance or otherwise) for any retired or former employee of Holdings or any of its Subsidiaries in an amount that would exceed an accumulated post-retirement benefit obligation of $27,000,000 as of December 31, 2008 and valued using the assumptions and methods under FAS 106.  The present value of the aggregate benefit liabilities under the Pension Plans sponsored, maintained or contributed to by Holdings, any of its Subsidiaries or any of their ERISA Affiliates (determined as of the end of the most recent plan year on the basis of the actuarial assumptions specified for the purpose of the adjusted funding target attainment percentage certification in the most recent actuarial valuation for such Pension Plan), did not exceed the aggregate current value of the assets of such Pension Plans by more than $100,000,000. To the knowledge of Holdings and each Subsidiary of Holdings, as of the most recent valuation date for each Multiemployer Plan for which the actuarial report is available, the potential liability of Holdings, its Subsidiaries and their respective ERISA Affiliates for a complete withdrawal from such Multiemployer Plan (within the meaning of Section 4203 of ERISA), when aggregated with such potential liability for a complete withdrawal from all Multiemployer Plans, based on information available pursuant to Section 4221(e) of ERISA is zero.  Holdings, each of its Subsidiaries and each of their ERISA Affiliates have complied with the requirements of Section 515 of ERISA with respect to each Multiemployer Plan and are not in material "default" (as defined in Section 4219(c)(5) of ERISA) with respect to payments to a Multiemployer Plan.

**4.20.  Certain Fees.**  Except as set forth on Schedule 4.20, no broker's or finder's fee or commission will be payable with respect to the transactions contemplated hereby, except as payable to Agents and Lenders.

**4.21.  Solvency**.  On the Exit Facility Conversion Date, the Credit Parties taken as a whole are and, upon the incurrence of any Obligation by any Credit Party on any date on or after the Exit Facility Conversion Date on which this representation and warranty is made, will be Solvent.

**4.22.  Compliance with Statutes, Etc.**  Each of Holdings and its Subsidiaries is in material compliance with all applicable statutes, regulations and orders of, and all applicable restrictions imposed by, all Governmental Authorities, in respect of the conduct of its business

and the ownership of its property, except such non-compliance that, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect.

**4.23. Disclosure.** No representation or warranty of any Credit Party contained in any Credit Document or in any other documents, certificates or written statements furnished to Agent or Lender by or on behalf of Holdings or any of its Subsidiaries for use in connection with the transactions contemplated hereby contains any untrue statement of a material fact or omits to state a material fact (known to Holdings or Borrower, in the case of any document not furnished by either of them) necessary in order to make the statements contained herein or therein not misleading in light of the circumstances in which the same were made. Any projections and pro forma financial information contained in such materials are based upon good faith estimates and assumptions believed by Holdings or Borrower to be reasonable at the time made, it being recognized by Lenders that such projections as to future events are not to be viewed as facts and that actual results during the period or periods covered by any such projections may differ from the projected results.

**4.24. Reorganization Matters; Secured, Super-Priority Obligations.** On and after the Closing Date and until the Exit Facility Conversion Date:

(a) The Chapter 11 Cases were commenced on the Petition Date in accordance with applicable law and proper notice has been given of (x) the motion seeking approval of the Credit Documents and the Interim Order and Final Order, (y) the hearing for the approval of the Interim Order, and (z) promptly after the scheduling thereof, the hearing for the approval of the Final Order.

(b) The provisions of the Credit Documents and the Interim Order (with respect to the period prior to entry of the Final Order) or the Final Order (with respect to the period on and after entry of the Final Order), as the case may be, are effective to create in favor of the Collateral Agent, for the benefit of the Secured Parties, legal, valid and perfected Liens on and security interests in all right, title and interest in the Collateral, having the priority provided for herein and in the Interim Order (with respect to the period prior to entry of the Final Order) or the Final Order (with respect to the period on and after entry of the Final Order), as the case may be, and enforceable against the Credit Parties.

(c) Pursuant to subclause (c)(2) of Section 364 of the Bankruptcy Code and the Interim Order (with respect to the period prior to entry of the Final Order) or the Final Order (with respect to the period on and after entry of the Final Order), as the case may be, all Obligations are secured by a perfected First Priority Lien on all unencumbered Collateral.

(d) Pursuant to subclause (c)(3) of Section 364 of the Bankruptcy Code and the Interim Order (with respect to the period prior to entry of the Final Order) or the Final Order (with respect to the period on and after entry of the Final Order), as the case may be, all Obligations are secured by a junior Lien on all Collateral (x) that is subject to valid, perfected and unavoidable Liens in existence as of the Petition Date or (y) that is subject to valid Liens in existence on the Petition Date that are perfected subsequent to the Petition Date as permitted by Section 546(b) of the Bankruptcy Code, in each case, solely to the extent such Liens were

senior to the Liens securing the Existing Indebtedness, after giving effect to any intercreditor or subordination agreements.

(e) Pursuant to subclause (d) of Section 364 of the Bankruptcy Code and the Interim Order (with respect to the period prior to entry of the Final Order) or the Final Order (with respect to the period on and after entry of the Final Order), as the case may be, all Obligations are secured by a senior priming Lien on all Collateral that is senior to (x) all Liens securing the Existing Indebtedness (which Liens are required to be released on the Closing Date) and (y) all Liens that are junior to the Liens securing the Existing Indebtedness, after giving effect to any intercreditor or subordination agreements.

(f) Pursuant to clause (c)(1) of Section 364 of the Bankruptcy Code, the Interim Order and the Final Order, all Obligations and all other obligations of the Credit Parties under the Credit Documents at all times shall constitute allowed super-priority administrative expense claims in the Chapter 11 Cases having priority over all other costs and expenses of the kinds specified in, or ordered pursuant to, Sections 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 546(c), 726, 1114 or any other provision of the Bankruptcy Code or otherwise, and shall at all times be senior to the rights of Credit Parties, the estates of Credit Parties, and any successor trustee or estate representative in the Chapter 11 Cases or any subsequent proceeding or case under the Bankruptcy Code, subject only to the Carve-Out; provided, that such super-priority administrative claim shall be pari passu with the super-priority administrative claim of the Replacement Facility Agent pursuant to the Replacement Facility Credit Documents.

(g) The Interim Order (with respect to the period prior to entry of the Final Order) or the Final Order (with respect to the period on and after entry of the Final Order), as the case may be, and the transactions contemplated hereby and thereby, are in full force and effect and have not been vacated, reversed, modified, amended or stayed without the prior written consent of Administrative Agent and Requisite Lenders.

**4.25. PATRIOT Act.** To the extent applicable, each Credit Party is in compliance, in all material respects, with (i) the Trading with the Enemy Act, as amended, and each of the foreign assets control regulations of the United States Treasury Department (31 CFR, Subtitle B, Chapter V, as amended) and any other enabling legislation or executive order relating thereto, and (ii) the PATRIOT Act. No part of the proceeds of the Term Loans will be used, directly or indirectly, for any payments to any governmental official or employee, political party, official of a political party, candidate for political office, or anyone else acting in an official capacity, in order to obtain, retain or direct business or obtain any improper advantage, in violation of the United States Foreign Corrupt Practices Act of 1977, as amended.


# SECTION 5.  AFFIRMATIVE COVENANTS

Each Credit Party covenants and agrees that, until payment in full of all Obligations, each Credit Party shall perform, and shall cause each of its Subsidiaries to perform (including, with respect to Section 5.3 and Section 5.6, any Securitization Subsidiary), all covenants in this Section 5.

**5.1. Financial Statements and Other Reports.**  Holdings will deliver to Administrative Agent and Lenders:

(a)  <u>Monthly Reports</u>.  As soon as available, and in any event within 30 days after the end of each month ending after the Closing Date, except for the last month of each Fiscal Quarter and of each Fiscal Year, commencing with the month in which the Closing Date occurs, (i) the consolidated balance sheet of Holdings and its Subsidiaries as at the end of such month and the related consolidated statements of income, stockholders' equity and cash flows of Holdings and its Subsidiaries for such month and for the period from the beginning of the then current Fiscal Year to the end of such month, setting forth in each case in comparative form (to the extent such comparison is capable of being produced) the corresponding figures for the corresponding periods of the previous Fiscal Year, commencing with the first month for which such corresponding figures are available, and the corresponding figures from the Projections or Financial Plan for the current Fiscal Year, as applicable, to the extent prepared on a monthly basis, all in reasonable detail, together with a Financial Officer Certification and a Narrative Report with respect thereto and (ii) reports with respect to non-ordinary course asset sales, facility closures and other matters reasonably requested by the Lenders;

(b)  <u>Quarterly Financial Statements</u>.  As soon as available, and in any event within 45 days after the end of each Fiscal Quarter of each Fiscal Year, commencing with the Fiscal Quarter in which the Closing Date occurs, the consolidated balance sheets of Holdings and its Subsidiaries as at the end of such Fiscal Quarter and the related consolidated statements of income, stockholders' equity and cash flows of Holdings and its Subsidiaries for such Fiscal Quarter and for the period from the beginning of the then current Fiscal Year to the end of such Fiscal Quarter, setting forth in each case in comparative form (to the extent such comparison is capable of being produced) the corresponding figures for the corresponding periods of the previous Fiscal Year, commencing with the first Fiscal Quarter for which such corresponding figures are available, and the corresponding figures from the Projections or the Financial Plan for the current Fiscal Year, as applicable, all in reasonable detail, together with a Financial Officer Certification and a Narrative Report with respect thereto;

(c)  <u>Annual Financial Statements</u>.  As soon as available, and in any event within 90 days after the end of each Fiscal Year (except to the extent not available with respect to periods prior to the Exit Facility Conversion Date), commencing with the Fiscal Year in which the Closing Date occurs, (i) the consolidated balance sheets of Holdings and its Subsidiaries as at the end of such Fiscal Year and the related consolidated statements of income, stockholders' equity and cash flows of Holdings and its Subsidiaries for such Fiscal Year, setting forth in each case in comparative form (to the extent such comparison is capable of being produced) the corresponding figures for the previous Fiscal Year, commencing with the first Fiscal Year for which such corresponding figures are available, and the corresponding figures from the Projections or the Financial Plan for the Fiscal Year covered by such financial statements, as applicable, in reasonable detail, together with a Financial Officer Certification and a Narrative Report with respect thereto; and (ii) with respect to such consolidated financial statements a report thereon of Ernst & Young or other independent certified public accountants of recognized national standing selected by Holdings, and reasonably satisfactory to Administrative Agent (which report and/or the accompanying financial statements shall be unqualified as to going concern and scope of audit, and shall state that such consolidated

financial statements fairly present, in all material respects, the consolidated financial position of Holdings and its Subsidiaries as at the dates indicated and the results of their operations and their cash flows for the periods indicated in conformity with GAAP applied on a basis consistent with prior years (except as otherwise disclosed in such financial statements) and that the examination by such accountants in connection with such consolidated financial statements has been made in accordance with generally accepted auditing standards) together with a written statement by such independent certified public accountants stating (1) that their audit examination has included a review of the terms of Section 6.7 of this Agreement and the related definitions, (2) to the extent the accountants agree to so provide, whether, in connection therewith, any condition or event that constitutes a Default or an Event of Default under Section 6.7 has come to their attention and, if such a condition or event has come to their attention, specifying the nature and period of existence thereof, and (3) that nothing has come to their attention that causes them to believe that the information contained in any Compliance Certificate is not correct or that the matters set forth in such Compliance Certificate are not stated in accordance with the terms hereof;

(d) <u>Compliance Certificate</u>. Together with each delivery of financial statements of Holdings and its Subsidiaries pursuant to Sections 5.1(a), 5.1(b) and 5.1(c), a duly executed and completed Compliance Certificate; <u>provided</u> that Holdings shall not be required to provide a Compliance Certificate together with the financial statements delivered pursuant to Section 5.1(a) following the Exit Facility Conversion Date;

(e) <u>Cash Flow Forecast and Variance Report</u>. Prior to the Exit Facility Conversion Date, not later than 7:00 P.M. New York City time on the Thursday of each week (or if such day is not a Business Day, the next succeeding Business Day) commencing after the delivery of the Initial Cash Flow Forecast, (i) a supplement to the Initial Cash Flow Forecast extending the Initial Cash Flow Forecast for an additional week (each, a "**Cash Flow Forecast**") and (ii) a comparison of each line item set forth in the most recent Cash Flow Forecast for the week most recently ended on a Wednesday against the actual performance for such week with respect to each line item, including actual cash receipts, disbursements and total available liquidity and borrowing availability (and on a cumulative basis from the Closing Date to the date of such report), in the form attached as Exhibit P or otherwise in form and substance satisfactory to Administrative Agent (a "**Variance Report**"), in each case with written explanations of material variances, in form and substance reasonably satisfactory to Administrative Agent and certified by the chief financial officer, if any (or alternatively chief executive officer or chief restructuring officer) of Holdings that such Cash Flow Forecast and Variance Report have been prepared in good faith and based upon assumptions believed to be reasonable at the time when prepared;

(f) <u>Approved Budget</u>. Prior to the Exit Facility Conversion Date, at Borrower's election, proposed updates to the most recent Approved Budget; <u>provided</u>, that the Credit Parties shall continue to be subject to and governed by the terms of the Approved Budget then in effect;

(g) <u>Statements of Reconciliation after Change in Accounting Principles</u>. If, as a result of any change in accounting principles and policies from those used in the preparation of the Historical Financial Statements, the consolidated financial statements of Holdings and its

Subsidiaries delivered pursuant to Section 5.1(b) or 5.1(c) will differ in any material respect from the consolidated financial statements that would have been delivered pursuant to such subdivisions had no such change in accounting principles and policies been made, then (unless, in the case of "fresh start" accounting changes contemplated to occur on the Exit Facility Conversion Date there is no adverse impact to Consolidated Adjusted EBITDAR), together with the first delivery of such financial statements after such change, one or more statements of reconciliation for all such prior financial statements in form and substance satisfactory to Administrative Agent;

(h) <u>Notice of Default</u>. Promptly upon any officer of Holdings or Borrower obtaining knowledge (i) of any condition or event that constitutes or will constitute with the passage of time a Default or an Event of Default or that notice has been given to Holdings or Borrower with respect thereto; (ii) that any Person has given any notice to Holdings or any of its Subsidiaries or taken any other action with respect to any event or condition set forth in Section 8.1(m); or (iii) of the occurrence of any event or change that has caused or evidences, either in any case or in the aggregate, a Material Adverse Effect, a certificate of an Authorized Officer specifying the nature and period of existence of such condition, event or change, or specifying the notice given and action taken by any such Person and the nature of such claimed Event of Default, Default, default, event or condition, and what action Borrower has taken, is taking and proposes to take with respect thereto;

(i) <u>Notice of Litigation</u>. Promptly upon any officer of Holdings or Borrower obtaining knowledge of (i) any Adverse Proceeding not previously disclosed in writing by Borrower to Lenders, or (ii) any development in any Adverse Proceeding that, in the case of either clause (i) or (ii) could be reasonably expected to have a Material Adverse Effect, or seeks to enjoin or otherwise prevent the consummation of, or to recover any damages or obtain relief as a result of, the transactions contemplated hereby, written notice thereof together with such other information as may be reasonably available to Holdings or Borrower to enable Lenders and their counsel to evaluate such matters;

(j) <u>ERISA</u>. (i) Promptly upon becoming aware of the occurrence of or forthcoming occurrence of any ERISA Event, a written notice specifying the nature thereof, what action Holdings, any of its Subsidiaries or any of their respective ERISA Affiliates has taken, is taking or proposes to take with respect thereto and, when known, any action taken or threatened by the Internal Revenue Service, the Department of Labor or the PBGC with respect thereto; and (ii) with reasonable promptness, copies of (1) each Schedule SB (Actuarial Information) to the annual report (Form 5500 Series) filed by Holdings, any of its Subsidiaries or any of their respective ERISA Affiliates with the Internal Revenue Service with respect to each Pension Plan; (2) all notices received by Holdings, any of its Subsidiaries or any of their respective ERISA Affiliates from a Multiemployer Plan sponsor concerning an ERISA Event; and (3) copies of such other documents or governmental reports or filings relating to any Employee Benefit Plan as Administrative Agent shall reasonably request;

(k) <u>Financial Plan</u>. On and after the Exit Facility Conversion Date, as soon as practicable and in any event no later than thirty days after the beginning of each Fiscal Year, a consolidated plan and financial forecast for such Fiscal Year and each Fiscal Year (or portion thereof) through the final maturity date of the Loans (a "**Financial Plan**"), including (i) a

forecasted consolidated balance sheet and forecasted consolidated statements of income and cash flows of Holdings and its Subsidiaries for each such Fiscal Year, and an explanation of the assumptions on which such forecasts are based and (ii) forecasted consolidated statements of income and cash flows of Holdings and its Subsidiaries for each month of such Fiscal Year and each Fiscal Quarter of each other Fiscal Year;

(l) <u>Insurance Report</u>. As soon as practicable and in any event within 90 days after the end of each Fiscal Year, a certificate from Borrower's insurance broker(s) in form and substance satisfactory to Administrative Agent outlining all material insurance coverage maintained as of the date of such certificate by Holdings and its Subsidiaries;

(m) <u>Notice Regarding Material Contracts</u>. Promptly, and in any event within ten Business Days (i) after any Material Contract of Holdings or any of its Subsidiaries is terminated or amended in a manner that is materially adverse to Holdings or such Subsidiary, as the case may be, or (ii) any new Material Contract is entered into, a written statement describing such event, with copies of such material amendments or new contracts, delivered to Administrative Agent (to the extent such delivery is permitted by the terms of any such Material Contract, <u>provided</u>, no such prohibition on delivery shall be effective if it were bargained for by Holdings or its applicable Subsidiary with the intent of avoiding compliance with this Section 5.1(m)), and an explanation of any actions being taken with respect thereto;

(n) <u>Information Regarding Collateral</u>. (a) Borrower will furnish to Collateral Agent prompt written notice of any change (i) in any Credit Party's corporate name, (ii) in any Credit Party's identity or corporate structure, (iii) in any Credit Party's jurisdiction of organization or (iv) in any Credit Party's Federal Taxpayer Identification Number or state organizational identification number. Borrower agrees not to effect or permit any change referred to in the preceding sentence unless all filings have been made under the Uniform Commercial Code or otherwise that are required in order for Collateral Agent to continue at all times following such change to have a valid, legal and perfected security interest in all the Collateral as contemplated in the Collateral Documents. Borrower also agrees promptly to notify Collateral Agent if any material portion of the Collateral is damaged or destroyed or otherwise impaired or adversely affected;

(o) <u>Annual Collateral Verification</u>. Within 120 days after the end of each Fiscal Year, commencing with the Fiscal Year ended December 31, 2010, Borrower shall deliver to Collateral Agent a certificate of its Authorized Officer (i) either confirming that there has been no change in the information set forth in the most recent certificate delivered pursuant to this Section and/or identifying such changes and (ii) certifying that all Uniform Commercial Code financing statements (including fixtures filings, as applicable) and all supplemental Intellectual Property Security Agreements or other appropriate filings, recordings or registrations, have been filed of record in each governmental, municipal or other appropriate office in each jurisdiction identified pursuant to clause (n) above (or in the most recent certificate delivered pursuant to this Section 5.1(o)) to the extent necessary to effect, protect and perfect the security interests under the Collateral Documents (to the extent perfection may be achieved by the foregoing filings) for a period of not less than 18 months after the date of such certificate (except as noted therein with respect to any continuation statements to be filed within such period);

(p)  Other Information.  (A) Promptly upon their becoming available, copies of (i) all financial statements, reports, notices and proxy statements sent or made available generally by Holdings to its security holders acting in such capacity or by any Subsidiary of Holdings to its security holders, (ii) all regular and periodic reports and all registration statements and prospectuses, if any, filed by Holdings or any of its Subsidiaries with any securities exchange or with the Securities and Exchange Commission or any other Governmental Authority, (iii) all press releases and other statements made available generally by Holdings or any of its Subsidiaries to the public concerning material developments in the business of Holdings or any of its Subsidiaries, (iv) all pleadings, motions, applications and judicial information filed by or on behalf of Credit Parties with the Bankruptcy Court or provided to the U.S. Trustee (or any monitor or interim receiver, if any, appointed in any Chapter 11 Case) or the Committee, at the time such document is filed with the Bankruptcy Court, or provided by or to the U.S. Trustee or the Committee, (v) all proposed orders and pleadings related to this Agreement or any Replacement Facility Credit Document, which shall be in form and substance reasonably satisfactory to Administrative Agent, any plan of reorganization or liquidation and/or any disclosure statement related to such plan and all documents filed with the Bankruptcy Court of distributed to any Committee, and (B) such other information and data with respect to Holdings or any of its Subsidiaries as from time to time may be reasonably requested by Administrative Agent or any Lender including, without limitation, with respect to (x) the Anadarko Litigation and (y) negotiations with respect to the Plan Support Agreement;

(q)  Certification of Public Information.  Holdings, Borrower and each Lender acknowledge that certain of the Lenders may be Public Lenders and, if documents or notices required to be delivered pursuant to this Section 5.1 or otherwise are being distributed through IntraLinks/IntraAgency, SyndTrak or another relevant website or other information platform (the "**Platform**"), any document or notice that Holdings or Borrower has indicated contains Non-Public Information shall not be posted on that portion of the Platform designated for such Public Lenders.  Each of Holdings and Borrower agrees to clearly designate all information provided to Administrative Agent by or on behalf of Holdings or Borrower which is suitable to make available to Public Lenders.  If Holdings or Borrower has not indicated whether a document or notice delivered pursuant to this Section 5.1 contains Non-Public Information, Administrative Agent reserves the right to post such document or notice solely on that portion of the Platform designated for Lenders who wish to receive material non-public information with respect to Holdings, its Subsidiaries and their securities;

(r)  Replacement Revolving Facility.  Concurrently with the delivery thereof, Holdings and Borrower shall deliver copies of all reports and other information provided to the agents and lenders under the Replacement Revolving Facility and shall provide notice of all conference calls and meetings of the Credit Parties and the lenders under such Replacement Revolving Facility to the extent not prohibited by the Replacement Facility Agent or any such lenders;

(s)  Chapter 11 Cases.  As soon as practicable in advance of filing with the Bankruptcy Court, the Credit Parties shall provide to Administrative Agent and each Lender copies of all pleadings, notices, orders, agreements, and all other documents served, filed or entered, as the case may be, in connection with, or in relation to, the Chapter 11 Cases, the

Credit Documents, or any Additional Facility Credit Documents, or in each case, the transactions contemplated thereunder. Borrower shall give, on a timely basis as specified in the Interim Order or the Final Order, as applicable, all notices required to be given to all parties specified in the Interim Order or Final Order, as applicable; and

(t) Environmental and Litigation Matters. Holdings will deliver to Administrative Agent and Lenders (A) within thirty (30) days after the last day of each Fiscal Quarter until the second Fiscal Quarter following entry by the Bankruptcy Court of the Final Order written reports describing in reasonable detail the status of (including any significant developments since the date of the prior report) (1) the Anadarko Litigation, (2) the Plan Support Agreement with respect to Environmental Claims or Environmental Liabilities, and (3) the Environmental Legacy Liabilities and any related Remedial Actions, and (B) with reasonable promptness, any material documents reasonably requested in writing by Administrative Agent related to the Anadarko Litigation, the Plan Support Agreement with respect to Environmental Claims or Environmental Liabilities and Environmental Legacy Liabilities and that are in the possession or control of, or otherwise reasonably available to, Holdings or its Subsidiaries, in each case, to the extent such delivery would not breach attorney-client privilege.

**5.2. Existence.** Except as otherwise permitted under Section 6.8 or as contemplated by the Plan of Reorganization, each Credit Party will, and will cause each of its Subsidiaries to, at all times preserve and keep in full force and effect its existence and all rights and franchises, licenses and permits material to its business; provided, no Credit Party (other than Borrower with respect to existence) or any of its Subsidiaries shall be required to preserve any such existence, right or franchise, licenses and permits if such Person's board of directors (or similar governing body) shall determine that the preservation thereof is no longer desirable in the conduct of the business of such Person, and that the loss thereof is not disadvantageous in any material respect to such Person or to Lenders.

**5.3. Payment of Taxes and Claims.** To the extent permitted by the Bankruptcy Code or otherwise provided by the Bankruptcy Court, each Credit Party will, and will cause each of its Subsidiaries (including any Securitization Subsidiary) to, pay all Post-Petition Taxes imposed upon it or any of its properties or assets or in respect of any of its income, businesses or franchises before any penalty or fine accrues thereon, and all Post-Petition claims (including claims for labor, services, materials and supplies) for sums that have become due and payable and that by law have or may become a Lien upon any of its properties or assets, prior to the time when any penalty or fine shall be incurred with respect thereto; provided, no such Post-Petition Tax or Post-Petition claim need be paid if it is being contested in good faith by appropriate proceedings promptly instituted and diligently conducted, so long as (a) adequate reserve or other appropriate provision, as shall be required in conformity with GAAP shall have been made therefor, and (b) in the case of a Tax or claim which has or may become a Lien against any of the Collateral, such contest proceedings conclusively operate to stay the sale of any portion of the Collateral to satisfy such Tax or claim. No Credit Party will, nor will it permit any of its Subsidiaries to, file or consent to the filing of any consolidated income tax return with any Person (other than Holdings or any of its Subsidiaries).

**5.4. Maintenance of Properties.** Each Credit Party will, and will cause each of its Subsidiaries to, maintain or cause to be maintained in good repair, working order and condition, ordinary wear and tear excepted, all material tangible properties used or useful in the business of Holdings and its Subsidiaries and from time to time will make or cause to be made all appropriate repairs, renewals and replacements thereof.

**5.5. Insurance.** Holdings will maintain or cause to be maintained, with financially sound and reputable insurers, such public liability insurance, third party property damage insurance, business interruption insurance and casualty insurance with respect to liabilities, losses or damage in respect of the assets, properties and businesses of Holdings and its Subsidiaries as may customarily be carried or maintained under similar circumstances by Persons of established reputation engaged in similar businesses, in each case in such amounts (giving effect to self-insurance), with such deductibles, covering such risks and otherwise on such terms and conditions as shall be customary for such Persons. Without limiting the generality of the foregoing, Holdings will maintain or cause to be maintained (a) flood insurance with respect to each Flood Hazard Property that is located in a community that participates in the National Flood Insurance Program, in each case in compliance with any applicable regulations of the Board of Governors of the Federal Reserve System, and (b) replacement value casualty insurance on the Collateral under such policies of insurance, with such insurance companies, in such amounts, with such deductibles, and covering such risks as are at all times carried or maintained under similar circumstances by Persons of established reputation engaged in similar businesses. Each such policy of insurance shall (i) name Collateral Agent, on behalf of the Secured Parties, as an additional insured thereunder as its interests may appear, (ii) in the case of each casualty insurance policy, contain a loss payable clause or endorsement, satisfactory in form and substance to Collateral Agent, that names Collateral Agent, on behalf of the Secured Parties, as the loss payee thereunder and provide for at least thirty days' prior written notice to Collateral Agent of any modification or cancellation of such policy.

**5.6. Books and Records; Inspections.** Each Credit Party will, and will cause each of its Subsidiaries (including any Securitization Subsidiary) to, keep proper books of record and accounts in which full, true and correct entries in conformity in all material respects with GAAP shall be made of all dealings and transactions in relation to its business and activities. Each Credit Party will, and will cause each of its Subsidiaries (including any Securitization Subsidiary) to, permit any authorized representatives designated by any Lender to visit and inspect any of the properties of any Credit Party and any of its respective Subsidiaries (including any Securitization Subsidiary), to inspect, copy and take extracts from its and their financial and accounting records, and to discuss its and their affairs, finances and accounts with its and their officers and independent public accountants, all upon reasonable notice and at such reasonable times during normal business hours and as often as may reasonably be requested.

**5.7. Lenders Meetings.**

(a) Holdings and Borrower will, upon the request of Administrative Agent or Requisite Lenders, participate in a meeting of Administrative Agent and Lenders once each Fiscal Year to be held at Borrower's corporate offices (or at such other location as may be agreed to by Borrower and Administrative Agent) at such time as may be agreed to by Borrower and Administrative Agent.

(b)  Borrower shall cause Administrative Agent and the Lenders to be permitted to participate in all conference calls and meetings of the Credit Parties and the lenders under the Replacement Revolving Facility to the extent not prohibited by the Replacement Facility Agent or any of such lenders.

**5.8.  Compliance with Laws.**  Each Credit Party will comply, and shall cause each of its Subsidiaries and all other Persons, if any, on or occupying any Facilities to comply, with the requirements of all applicable laws, rules, regulations and orders of any Governmental Authority (except with respect to Environmental Laws which are covered in Section 5.9), noncompliance with which could reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

**5.9.  Environmental.**

(a)  <u>Environmental Disclosure</u>.  Holdings will deliver to Administrative Agent and Lenders:

(i)  promptly upon the occurrence thereof, written notice describing in reasonable detail (1) any Release of Hazardous Materials that could reasonably be expected to require a Remedial Action or give rise to Environmental Liabilities or Environmental Claims that could reasonably be expected to either result in liability in excess of $20,000,000 or, individually or in the aggregate, have a Material Adverse Effect, (2) any Environmental Claim brought against Holdings or any of its Subsidiaries that could reasonably be expected to either result in liability in excess of $20,000,000 or, individually or in the aggregate, have a Material Adverse Effect, including any Environmental Claims related to the Release or presence of, or exposure to, any Hazardous Materials, and (3) Holdings' or Borrower's discovery of any occurrence or condition on any real property adjoining or in the vicinity of any Facility that could cause such Facility or any part thereof to be subject to any material restrictions on the ownership, occupancy, transferability or use thereof under any Environmental Laws that could either result in liability in excess of $20,000,000 or, individually or in the aggregate, have a Material Adverse Effect;

(ii)  as soon as practicable following the sending or receipt thereof by Holdings or any of its Subsidiaries, a copy of any and all written communications with any Governmental Authority or other Person with respect to (1) any Environmental Claims that could reasonably be expected to either result in liability in excess of $20,000,000 or, individually or in the aggregate, have a Material Adverse Effect, (2) any Release of Hazardous Materials that could reasonably be expected to either result in liability in excess of $20,000,000 or, individually or in the aggregate, have a Material Adverse Effect, and (3) any request for information from any Governmental Authority that suggests such Governmental Authority is investigating whether Holdings or any of its Subsidiaries may be potentially responsible for any Release of Hazardous Materials that could reasonably be expected to either result in liability in excess of $20,000,000 or, individually or in the aggregate, have a Material Adverse Effect;

(iii) prompt written notice describing in reasonable detail (1) any proposed acquisition of stock, assets, or property by Holdings or any of its Subsidiaries that could reasonably be expected to expose Holdings or any of its Subsidiaries to, or result in, Environmental Liability or Environmental Claims that could reasonably be expected to either result in liability in excess of $20,000,000 or have, individually or in the aggregate, a Material Adverse Effect and (2) any proposed action to be taken by Holdings or any of its Subsidiaries to modify current operations in a manner that could reasonably be expected to subject Holdings or any of its Subsidiaries to any additional material Environmental Liabilities or other material obligations or requirements under any Environmental Laws or affect the ability of Holdings or any of its Subsidiaries to maintain in full force and effect all material Governmental Authorizations required under any Environmental Laws for their respective operations which in case could either result in liability in excess of $20,000,000 or, could reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect; and

(iv) with reasonable promptness, such other documents and information as from time to time may be reasonably requested in writing by Administrative Agent in relation to any matters disclosed pursuant to this Section 5.9(a).

(b) Remedial Action. Each Credit Party shall promptly take, and shall cause each of its Subsidiaries to promptly take, any and all actions necessary to (i) cure any violation of applicable Environmental Laws by such Credit Party or any of its Subsidiaries that could reasonably be expected to either result in liability in excess of $20,000,000 or have, individually or in the aggregate, a Material Adverse Effect, (ii) conduct any Remedial Action that may be required pursuant to applicable Environmental Laws by such Credit Party or any of its Subsidiaries (including, prior to entry by the Bankruptcy Court of the Final Order, with respect to any Environmental Legacy Liabilities) that could reasonably be expected to either result in liability in excess of $20,000,000 or have, individually or in the aggregate, a Material Adverse Effect, and (iii) make an appropriate response to any Environmental Claim against such Credit Party or any of its Subsidiaries and discharge any obligations it may have to any Person thereunder where failure to do so could reasonably be expected to either result in liability in excess of $20,000,000 or have, individually or in the aggregate, a Material Adverse Effect.

(c) Environmental Compliance. Each Credit Party shall, and shall cause each of its Subsidiaries promptly to, use and operate all of its Facilities in compliance with all Environmental Laws, obtain and maintain in full force and effect all necessary Governmental Authorizations required pursuant to any Environmental Laws, and conduct all Remedial Actions required by, and in accordance with, applicable Environmental Laws except for any failures to comply, obtain, maintain or conduct in each case except where the failure to comply would not reasonably be expected to either result in liability in excess of $20,000,000 or, individually or in the aggregate, have a Material Adverse Effect.

(d) Henderson Sale-Leaseback. Each Credit Party shall, and shall cause each of its Subsidiaries to, use its reasonable best efforts to, pursuant to the terms of the Plan Support Agreement, (A) transfer title to any owned Real Estate Asset located in Henderson, Nevada to another Person (excluding the Non-Core Real Estate Assets), (B) not retain any liability or

responsibility with respect to the Henderson Legacy Contamination following entry by the Bankruptcy Court of the Final Order (excluding the Non-Core Real Estate Assets) and (C) lease only that portion of such property as reasonably necessary to conduct the Business following entry by the Bankruptcy Court of the Final Order (excluding the Non-Core Real Estate Assets) (collectively, the "**Henderson Sale-Leaseback**").

**5.10. Subsidiaries**. In the event that any Person becomes a Domestic Subsidiary of Borrower (other than any Securitization Subsidiary), Borrower shall (a) promptly cause such Domestic Subsidiary to become a Guarantor hereunder and a Grantor under the Pledge and Security Agreement by executing and delivering to Administrative Agent and Collateral Agent a Counterpart Agreement, and (b) take all such actions and execute and deliver, or cause to be executed and delivered, all such documents, instruments, agreements, and certificates reasonably requested by Collateral Agent, including those which are similar to those described in Sections 3.1(b), 3.1(g), 3.1(i) and 3.5(v). In the event that any Person becomes a Foreign Subsidiary of Borrower, and the ownership interests of such Foreign Subsidiary are owned by Borrower or by any Domestic Subsidiary thereof, Borrower shall, or shall cause such Domestic Subsidiary to, deliver, all such documents, instruments, agreements, and certificates as are similar to those described in Sections 3.1(b), and Borrower shall take, or shall cause such Domestic Subsidiary to take, all of the actions referred to in Section 3.1(g)(i) necessary to grant and to perfect a First Priority Lien in favor of Collateral Agent, for the benefit of Secured Parties, under the Pledge and Security Agreement in 65% of such ownership interests. With respect to each such Subsidiary, Borrower shall promptly send to Administrative Agent written notice setting forth with respect to such Person (i) the date on which such Person became a Subsidiary of Borrower, and (ii) all of the data required to be set forth in Schedules 4.1 and 4.2 with respect to all Subsidiaries of Borrower; and such written notice shall be deemed to supplement Schedule 4.1 and 4.2 for all purposes hereof.

**5.11. Additional Material Real Estate Assets.** At any time after the Exit Facility Conversion Date, in the event that any Credit Party acquires a Material Real Estate Asset, or a Real Estate Asset owned or leased on the Exit Facility Conversion Date becomes a Material Real Estate Asset, other than the Mortgaged Properties, and such interest has not otherwise been made subject to the Lien of the Collateral Documents in favor of Collateral Agent, for the benefit of Secured Parties, then such Credit Party shall promptly take all such actions and execute and deliver, or cause to be executed and delivered, all such mortgages, documents, instruments, agreements, opinions and certificates, including those which are similar to those described in Sections 3.1(g) and Section 3.5(v) with respect to each such Material Real Estate Asset that Collateral Agent shall reasonably request to create in favor of Collateral Agent, for the benefit of Secured Parties, a valid and, subject to any filing and/or recording referred to herein, perfected First Priority security interest in such Material Real Estate Assets. In addition to the foregoing, at any time after the Exit Facility Conversion Date, Borrower shall, at the request of Collateral Agent, deliver, from time to time, to Collateral Agent, such appraisals as are required by law or regulation of Real Estate Assets with respect to which Collateral Agent has been granted a Lien.

**5.12. Further Assurances.** At any time or from time to time upon the request of Administrative Agent, each Credit Party will, at its expense, promptly execute, acknowledge and deliver such further documents and do such other acts and things as Administrative Agent or Collateral Agent may reasonably request in order to effect fully the purposes of the Credit

Documents. In furtherance and not in limitation of the foregoing, each Credit Party shall take such actions as Administrative Agent or Collateral Agent may reasonably request from time to time to ensure that the Obligations are guarantied by the Guarantors and are secured by the Collateral including all of the outstanding Equity Interests of Borrower and its Subsidiaries (subject to limitations contained in the Credit Documents with respect to Foreign Subsidiaries).

**5.13. Cash Management**.

(a) Holdings and its Domestic Subsidiaries shall establish and maintain cash management systems in accordance with the Interim Order (with respect to period prior to the entry of the Final Order) and the Final Order (with respect to the period on and after entry of the Final Order), as the case may be, and otherwise acceptable to Administrative Agent, and shall comply with the terms of the Cash Management Order except with respect to non-material changes to such cash management system as may be required in the ordinary course of business.

(b) At any time that the Replacement Revolving Facility is outstanding, proceeds of the Term Priority Collateral shall not be commingled with proceeds of the ABL Collateral.

**5.14. Plan Support Agreement.** Until entry of the Confirmation Order approving the Plan of Reorganization by the Bankruptcy Court, the Credit Parties shall (a) comply in all material respects with the terms of the Plan Support Agreement and (b) not take all action that would create a Termination Event under, and as defined in, the Plan Support Agreement.

**5.15. Plan of Reorganization.**

(a) The Credit Parties shall use commercially reasonable efforts during the pendency of the Chapter 11 Cases to obtain Bankruptcy Court approval of, and/or confirmation of, and/or consummate, as the case may be, the Plan of Reorganization and related Disclosure Statement.

(b) Notwithstanding anything to the contrary set forth in clause (a) above, the Credit Parties shall have obtained Bankruptcy Court approval of the Disclosure Statement and Confirmation Order and ensured that the following actions have been taken with respect to the Plan Support Documents in accordance with the following schedule:

(i) on or prior to February 28, 2010, the DOJ shall have confirmed that the form of each Plan Support Document is acceptable, subject only to the required public notice requirements and entry of the Confirmation Order by the Bankruptcy Court;

(ii) on or prior to June 30, 2010, the applicable Plan Support Documents shall have become the valid and binding obligations of each Environmental Claimant party thereto, enforceable against such Environmental Claimant in accordance with its respective terms, subject only to entry of the Confirmation Order by the Bankruptcy Court;

(iii)  on or prior to April 30, 2010 (or in the event that Borrower has delivered a Facility Extension Notice, the initial Maturity Date), the Bankruptcy Court shall have entered an order, in form and substance reasonably satisfactory to Administrative Agent, approving the Disclosure Statement; and

(iv)  on or prior to June __, 2010 (such date being 5 Business Days prior to the initial Maturity Date) (or in the event that Borrower has delivered a Facility Extension Notice, August 31, 2010), the Bankruptcy Court shall have entered the Confirmation Order.

**5.16.  Consultant.**  Until the Exit Facility Conversion Date, Borrower and Holdings shall, and shall cause their respective Subsidiaries to, (a) grant Administrative Agent (and its counsel), the Lenders, and consultants and advisors to Administrative Agent and/or the Lenders (the "**Consultant**") with access to information (including historical information) and personnel, including, without limitation, regularly scheduled meetings with senior management and other company advisors, and (b) grant the Consultant access to all other information reasonably requested by the Consultant.

**5.17.  Adverse Motions.**  The Credit Parties shall promptly and diligently oppose all motions or other pleadings filed by persons in the Bankruptcy Court that seek to (1) lift the stay on the Collateral (other than motions filed by Administrative Agent and the Lenders relating to this Agreement or the transactions contemplated hereby and by the Replacement Facility Agent or the Alternative Facility Agent to the extent permitted in any Replacement Revolving Intercreditor Agreement and other than with respect to Collateral the value of which is not material to the Credit Parties), (2) terminate the exclusive ability of the Credit Parties to file a plan of reorganization, and (3) all other motions filed by Persons in the Bankruptcy Court that, if granted, could reasonably be expected to have a Material Adverse Effect on Administrative Agent or any Lender (in their capacity as such) or any material portion of the Collateral.

**5.18.  Post-Closing Covenants.**  Prior to receipt of any Net Asset Sale Proceeds or Net Insurance/Condemnation Proceeds permitted to be reinvested in accordance with Section 2.11(a) or 2.11(b), as applicable, Borrower shall establish the Reinvestment Accounts.

**5.19.  Maintenance of Ratings.**  At all times on and after the Exit Facility Conversion Date, Borrower shall use commercially reasonable efforts to maintain (a) a public corporate family rating from Moody's, (b) a public corporate credit rating from S&P and (c) a public credit rating for the Exit Facility from each of Moody's and S&P.

**5.20.  Sale Covenant.**  Upon the written request of Administrative Agent (acting at the direction of the Requisite Lenders in their respective sole discretion) after the earlier to occur of (A) five Business Days after a breach of any of the covenants contained in Section 5.15(a) or Section 5.15(b)(i), (ii), (iii) or (iv), (B) five Business Days after the termination of the Plan Support Agreement or (C) five Business Days after the occurrence of any Event of Default under Section 8.1(a)(i), (n), (o)(vii), (o)(x) or (o)(xiii)(x) or (o)(xiii)(y) (but, in the case of Section 8.1(o)(xiii)(y), only with respect to a material breach of the Plan Support Agreement), the Credit Parties shall (unless such breach or Event of Default shall have been cured) at all times prior to the Maturity Date use commercially reasonable efforts (i) to market the sale of the Credit Parties'

respective assets and businesses on terms and conditions acceptable to Administrative Agent and Requisite Lenders (in their sole discretion if such sale will not pay the Obligations in full in cash on the closing date thereof, or in their reasonable discretion if such sale will pay the Obligations in full in cash on the closing date thereof) (any such sale transaction or series of sale transactions that are acceptable to Administrative Agent and the Requisite Lenders as provided above, collectively, an "**Acceptable Sale Transaction**"), and pursuant to sale procedures acceptable to Administrative Agent in its reasonable discretion, (ii) seek the entry of an order of the Bankruptcy Court, in form and substance satisfactory to Administrative Agent in its sole discretion, approving the bidding procedures, in form and substance satisfactory to Administrative Agent in its reasonable discretion, for the sale of the Credit Parties' respective assets and businesses, (iii) negotiate and prepare the documentation of any Acceptable Sale Transaction, which documentation shall be in form and substance, acceptable to Administrative Agent in its sole discretion, (iv) seek the entry of an order of the Bankruptcy Court, in form and substance, satisfactory to Administrative Agent in its reasonable discretion (the "**Sale Order**"), approving an Acceptable Sale Transaction, subject to higher and better offers that either would repay in full in cash the Obligations or are as otherwise acceptable to Administrative Agent and the Requisite Lenders in their respective sole discretion, and (v) after obtaining the entry of the Sale Order, consummate the Acceptable Sale Transaction as soon as practicable but in no event later than the Maturity Date, and, subject to any Replacement Revolving Intercreditor Agreement, remit to Administrative Agent all proceeds from the Acceptable Sale Transaction for application to the Obligations.

**5.21. Excess Working Capital**.  On Friday of each week (or if such day is not a Business Day, the following Business Day), until the repayment in full of all Tranche B-2 Term Loan and all Obligations related thereto, (i) Borrower shall make a payment to the Working Capital Escrow Account in an amount (if a positive number) by which (i) the aggregate amount of unrestricted Cash and Cash Equivalents of the Credit Parties on such date that are free and clear of all Liens, other than Liens in favor of Administrative Agent (excluding any proceeds in the Working Capital Escrow Account, the Settlement Escrow Account and the Reinvestment Accounts) and the Liens permitted pursuant to Section 6.2(b), (c), (d), (i) and (j) <u>exceeds</u> (ii) the sum of (x) $15,000,000 <u>plus</u> (y) the anticipated working capital needs of Borrower and its Subsidiaries for the next Business Day; <u>provided</u>, that (i) Borrower shall not be required to make such payment at any time the proceeds in the Working Capital Escrow Account exceed the Working Capital Escrow Amount; and (ii) an Authorized Officer of Borrower shall deliver to Administrative Agent a certificate demonstrating compliance with this Section 5.21.


# SECTION 6.  NEGATIVE COVENANTS

Each Credit Party covenants and agrees that, until payment in full of all Obligations, such Credit Party shall perform, and shall cause each of its Subsidiaries to perform, all covenants in this Section 6.

**6.1. Indebtedness.**  No Credit Party shall, nor shall it permit any of its Subsidiaries to, directly or indirectly, create, incur, assume or guaranty, or otherwise become or remain directly or indirectly liable with respect to any Indebtedness, except:

(a)   the Obligations;

(b)   Indebtedness in respect of Investments permitted under Sections 6.6(b), (e) and (f) and Section 6.19(b); provided, (i) all such Indebtedness shall be evidenced by the Intercompany Note, and, if owed to a Credit Party, shall be subject to a First Priority Lien pursuant to the Pledge and Security Agreement, (ii) all such Indebtedness shall be unsecured and subordinated in right of payment to the payment in full of the Obligations pursuant to the terms of the Intercompany Note and (iii) any payment by any such Guarantor Subsidiary under any guaranty of the Obligations shall result in a pro tanto reduction of the amount of any Indebtedness owed by such Subsidiary to Borrower or to any of its Subsidiaries for whose benefit such payment is made;

(c)   prior to the Exit Facility Conversion Date, Indebtedness in respect of the Senior Notes;

(d)   Indebtedness incurred by Holdings or any of its Subsidiaries arising from agreements providing for indemnification, adjustment of purchase price or similar obligations, or from guaranties or letters of credit, surety bonds or performance bonds securing the performance of Borrower or any such Subsidiary pursuant to such agreements in connection with Permitted Acquisitions or permitted dispositions of any business, assets or Subsidiary of Holdings or any of its Subsidiaries;

(e)   Indebtedness which may be deemed to exist pursuant to any guaranties, performance, surety, statutory, appeal or similar obligations incurred in the ordinary course of business;

(f)   Indebtedness in respect of netting services, overdraft protections and otherwise in connection with deposit accounts;

(g)   on and after the Exit Facility Conversion Date, guaranties in the ordinary course of business of the obligations of suppliers, customers, franchisees and licensees of Borrower and its Subsidiaries;

(h)   on and after the Exit Facility Conversion Date, (i) guaranties by Borrower of Indebtedness of a Guarantor Subsidiary, (ii) guaranties by a Guarantor Subsidiary of Indebtedness of Borrower or another Guarantor Subsidiary or (iii) guaranties by a Foreign Subsidiary of Indebtedness of another Foreign Subsidiary, in each case, with respect to Indebtedness otherwise permitted to be incurred pursuant to this Section 6.1; provided, that if the Indebtedness that is being guarantied is unsecured and/or subordinated to the Obligations, the guaranty shall also be unsecured and/or subordinated to the Obligations;

(i)   Indebtedness described in Schedule 6.1, but not any extensions, renewals or replacements of such Indebtedness (it being understood that the principal amount of such Indebtedness may increase or decrease as a result of a change to the applicable currency rate then in effect) except, on and after the Exit Facility Conversion Date,  (i) renewals and extensions expressly provided for in the agreements evidencing any such Indebtedness as the same are in effect on the date of this Agreement and (ii) refinancings and extensions of any such Indebtedness if the terms and conditions thereof are not materially less favorable to the

obligor thereon or to Lenders than the Indebtedness being refinanced or extended, and the average life to maturity thereof is greater than or equal to that of the Indebtedness being refinanced or extended; <u>provided</u>, such Indebtedness permitted under the immediately preceding clause (i) or (ii) above shall not (A) include Indebtedness of an obligor that was not an obligor with respect to the Indebtedness being extended, renewed or refinanced, (B) exceed in a principal amount the Indebtedness, plus capitalized interest thereon, OID and related fees, being renewed, extended or refinanced or (C) be incurred, created or assumed if any Default or Event of Default has occurred and is continuing or would result therefrom;

(j)  Indebtedness of Borrower or its Subsidiaries with respect to Capital Leases in an aggregate amount not to exceed (i) at any time prior to the Exit Facility Conversion Date, $5,000,000 and (ii) at any time thereafter, $7,500,000;

(k)  purchase money Indebtedness of Borrower or its Subsidiaries in an aggregate amount not to exceed $20,000,000 at any time; <u>provided</u>, any such Indebtedness (i) shall be secured only by the asset acquired after the Petition Date in connection with the incurrence of such Indebtedness, and (ii) shall constitute not less than 75% of the aggregate consideration paid with respect to such asset;

(l)  Indebtedness of one or more Credit Parties in respect of the Replacement Revolving Facility and Indebtedness of one or more Foreign Subsidiaries of Borrower in respect of one or more Alternative Facilities with one or more third parties in an aggregate principal amount outstanding not to exceed $125,000,000 at any time; <u>provided</u> that,

(i) in respect of the Replacement Revolving Facility, the Credit Parties, the Collateral Agent and the Replacement Facility Agent shall enter into a Replacement Revolving Intercreditor Agreement and such Replacement Revolving Intercreditor Agreement shall be in full force and effect so long as any such Indebtedness remains outstanding;

(ii) the terms and provisions of the Replacement Revolving Facility and any Alternative Facility shall be reasonably acceptable to Administrative Agent; and

(iii)  (A) the initial drawing under the Replacement Revolving Facility, which shall be made concurrently with the effectiveness of such Replacement Revolving Facility, shall be used to repay in full all outstanding Tranche B-2 Term Loans pursuant to Section 2.11(d)(ii) and (B) the initial drawings under one or more Alternative Facilities, which in each case shall be made concurrently with the effectiveness of such Alternative Facility, shall be used to repay, in whole or in part, outstanding Tranche B-2 Term Loans in accordance with Section 2.11(d)(ii); <u>provided further</u>, that Borrower shall not be required to repay the Tranche B-2 Term Loans pursuant to the foregoing clause (B) to the extent the aggregate maximum committed amount of the Alternative Facilities is less than or equal to $15,000,000;

(m)  Indebtedness in the form of deferred cash payment obligations undertaken pursuant to the Plan of Reorganization to Pre-Petition unsecured creditors with respect to their Claims;

(n)   the financing of insurance premiums in customary amounts consistent with past practices;

(o)   Indebtedness with respect to Standard Securitization Undertakings;

(p)   Indebtedness of the Subsidiaries of Borrower organized in Germany with respect to German Old Age Part Time Workers Act (*Altersteilzeitgesetz*) in an aggregate principal amount not exceeding the U.S. dollar equivalent of €3,000,000;

(q)   (i) letters of credit issued for the account of Borrower or any of its Subsidiaries that are outstanding on the Closing Date (and renewals, extensions and replacements thereof) and (ii) other letters of credit issued for the account of Borrower or any of its Subsidiaries in an aggregate principal face amount not to exceed $10,000,000 at any time;

(r)   on and after the Exit Facility Conversion Date, other unsecured Indebtedness of Borrower and its Subsidiaries in an aggregate amount not to exceed $15,000,000 at any time;

(s)   to the extent constituting Indebtedness, the Henderson Sale-Leaseback and the Verve Sale-Leaseback;

(t)   on and after the Exit Facility Conversion Date, Indebtedness under Eligible Commodity Hedging Agreements, Interest Rate Agreements and Currency Agreements; provided, that such Eligible Commodity Hedging Agreements shall be unsecured;

(u)   on and after the Exit Facility Conversion Date, Permitted Seller Notes in an aggregate amount not to exceed $75,000,000 at any time;

(v)   Indebtedness constituting operating leases which have been recharacterized as Capital Leases in accordance with GAAP or IFRS; and

(w)   Indebtedness of a Person at the time such Person becomes a Subsidiary of Borrower, or is merged or consolidated with or into Borrower or any of its Subsidiaries in a transaction otherwise permitted under this Agreement, in an aggregate principal amount not to exceed $10,000,000 at any time outstanding for all Indebtedness incurred pursuant to this clause (w), and extensions, renewals, refinancing, refunding and replacements of any such Indebtedness that do not increase the outstanding principal amount thereof (other than any such increase not exceeding the amount of any fees, premium, if any, and financing costs relating to such refinancing); provided that (i) such Indebtedness (other than any such extension, renewal, refinancing, refunding or replacement) exists at the time such Person becomes a Subsidiary and is not created in contemplation of such event, (ii) other than guaranties permitted by paragraph (h) of this Section 6.1, neither Holdings, Borrower or any Subsidiaries shall be liable for such Indebtedness and (iii) Holdings is in compliance, on a pro forma basis after giving effect to the incurrence of such Indebtedness and the use of proceeds thereof, with the covenants contained in Section 6.7 (as determined in accordance with Section 6.7(f)).

From and after the Exit Facility Conversion Date, the foregoing exceptions in clauses (a) through (w) above shall not include any Pre-Petition Indebtedness of Domestic Subsidiaries except to the extent expressly provided in the Plan of Reorganization.

      **6.2. Liens.** No Credit Party shall, nor shall it permit any of its Subsidiaries to, directly or indirectly, create, incur, assume or permit to exist any Lien on or with respect to any property or asset of any kind (including any document or instrument in respect of goods or accounts receivable) of Holdings or any of its Subsidiaries, whether now owned or hereafter acquired, created or licensed, or any income, profits or royalties therefrom, or file or permit the filing of, or permit to remain in effect, any financing statement or other similar notice of any Lien with respect to any such property, asset, income, profits or royalties under the UCC of any State or under any similar recording or notice statute or under any applicable intellectual property laws, rules or procedures, except:

      (a) Liens in favor of Collateral Agent for the benefit of Secured Parties granted pursuant to any Credit Document and other Liens created under the Interim Order and Final Order, as then in effect;

      (b) Liens for Taxes not yet due or, if due, if obligations with respect to such Taxes are being contested in good faith by appropriate proceedings and reserves in accordance with GAAP with respect thereto have been provided on the consolidated books of Holdings;

      (c) statutory Liens of landlords, banks (and rights of set-off), of carriers, warehousemen, mechanics, repairmen, workmen and materialmen, and other Liens imposed by law (other than any such Lien imposed pursuant to Section 430(k) of the Internal Revenue Code or ERISA or a violation of Section 436 of the Internal Revenue Code), in each case incurred in the ordinary course of business (i) for amounts not yet overdue or (ii) for amounts that are overdue and that (in the case of any such amounts overdue for a period in excess of five days) are being contested in good faith by appropriate proceedings, so long as such reserves or other appropriate provisions, if any, as shall be required by GAAP shall have been made for any such contested amounts;

      (d) Liens incurred in the ordinary course of business in connection with workers' compensation, unemployment insurance and other types of social security, or to secure the performance of tenders, statutory obligations, surety and appeal bonds, bids, leases, government contracts, trade contracts, performance and return-of-money bonds and other similar obligations (exclusive of obligations for the payment of borrowed money or other Indebtedness), so long as no foreclosure, sale or similar proceedings have been commenced with respect to any portion of the Collateral on account thereof;

      (e) easements, rights-of-way, restrictions, encroachments, and other minor defects or irregularities in title, in each case which do not and will not interfere in any material respect with the ordinary conduct of the business of Holdings or any of its Subsidiaries;

      (f) any interest or title of a lessor or sublessor under any lease of real estate permitted hereunder;

(g)   Liens solely on any cash earnest money deposits made by Holdings or any of its Subsidiaries in connection with any letter of intent or purchase agreement permitted hereunder;

(h)   purported Liens evidenced by the filing of precautionary UCC financing statements relating solely to operating leases of personal property entered into in the ordinary course of business;

(i)   Liens in favor of customs and revenue authorities arising as a matter of law to secure payment of customs duties in connection with the importation of goods;

(j)   any zoning or similar law or right reserved to or vested in any governmental office or agency to control or regulate the use of any real property;

(k)   non-exclusive outbound licenses of patents, copyrights, trademarks and other Intellectual Property rights granted by Holdings or any of its Subsidiaries in the ordinary course of business consistent with past practice;

(l)   Liens described in Schedule 6.2;

(m)   Liens securing Indebtedness permitted pursuant to Section 6.1(j) and (k); provided, any such Lien shall encumber only the asset acquired with the proceeds of such Indebtedness;

(n)   (i) Liens on (x) the ABL Collateral of Borrower or any Guarantor securing obligations under the Replacement Revolving Facility and (y) if requested by the Replacement Facility Agent, Collateral other than ABL Collateral, which Liens in the case of this clause (y) are junior in priority to the Liens on such Collateral purported to be granted pursuant to the Collateral Documents to the Collateral Agent, in each case, under the terms provided in the Replacement Revolving Intercreditor Agreement and (ii) Alternative Facility Liens;

(o)   the Carve-Out;

(p)   Liens on insurance policies and the proceeds thereof securing the financing of premiums with respect thereto as provided in Section 6.1(n);

(q)   Liens consisting of customary rights of set-off for bankers liens on amounts on deposit at banks or other financial institutions, to the extent arising by operation of law or otherwise, incurred in the ordinary course of business;

(r)   judgment Liens in respect of judgments that do not constitute an Event of Default under Section 8.1(h) hereof;

(s)   Liens of a collection bank arising in the ordinary course of business under §4-208 of the Uniform Commercial Code in effect in the relevant jurisdiction;

(t) Liens on Cash and Cash Equivalents arising in connection with the cash collateralization of letters of credit in an amount not to exceed 105% of the aggregate face amount of the letters of credit permitted pursuant to Section 6.1(q);

(u) after the Exit Facility Conversion Date, other Liens on assets other than the Collateral, or other Liens subordinated to the Liens of the Collateral Agent under this Agreement and any Replacement Revolving Liens, securing Indebtedness in an aggregate amount not to exceed $10,000,000 at any time outstanding; and

(v) Liens on assets of the Subsidiaries of Borrower organized in Germany securing Indebtedness permitted by Section 6.1(p).

From and after the Exit Facility Conversion Date, the foregoing exceptions in clauses (a) through (v) above shall not include any Pre-Petition Liens except to the extent expressly provided in the Plan of Reorganization.

**6.3. No Further Negative Pledges.** Except with respect to (a) specific property encumbered to secure payment of particular Indebtedness or to be sold pursuant to an executed agreement with respect to a permitted Asset Sale, (b) restrictions by reason of customary provisions restricting assignments, subletting or other transfers contained in leases, licenses and similar agreements entered into in the ordinary course of business (provided that such restrictions are limited to the property or assets secured by such Liens or the property or assets subject to such leases, licenses or similar agreements, as the case may be), (c) prior to the Exit Facility Conversion Date, each of the Senior Notes, (d) any Alternative Facility and, subject to any Replacement Revolving Intercreditor Agreement, the Replacement Revolving Facility, (e) restrictions identified on Schedule 6.3, and (f) restrictions in any Pre-Petition agreement that are unenforceable during the pendency of the Chapter 11 Cases, no Credit Party nor any of its Subsidiaries shall enter into any agreement prohibiting the creation or assumption of any Lien upon any of its properties or assets, whether now owned or hereafter acquired, to secure the Obligations.

**6.4. Restricted Junior Payments.** No Credit Party shall, nor shall it permit any of its Subsidiaries through any manner or means or through any other Person to, directly or indirectly, declare, order, pay, make or set apart, or agree to declare, order, pay, make or set apart, any sum for any Restricted Junior Payment except that (a) any Subsidiary of Borrower may declare and pay dividends or make other distributions ratably to its equity holders, (b) any Credit Party may make Restricted Junior Payments to the extent permitted or required by the Plan of Reorganization, (c) Borrower may make Restricted Junior Payments to Holdings, to the extent necessary to permit Holdings (i) to pay general administrative costs and expenses, legal and accounting fees and other general corporate and overhead expenses incurred by Holdings in the ordinary course of business, (ii) pay franchise taxes and other tax obligations or fees required in each case to maintain its corporate existence, (iii) pay Taxes which are due and payable by Holdings as part of a consolidated group or due to ownership of any interests in Subsidiaries that are not treated as corporations for applicable tax purposes, in each case, to the extent such Taxes are not attributable to Borrower and Subsidiaries of Borrower, (iv) pay auditing fees and expenses, (v) pay directors fees, expenses and indemnities owing to directors of Holdings and (vi) pay fees and expenses incurred in connection with an initial public offering but, prior to the

Exit Facility Conversion Date, only to the extent permitted by, and up to the amount set forth in, the Approved Budget and (d) Borrower may make regularly scheduled payments of interest in respect of the Permitted Seller Notes in accordance with the terms of, and only to the extent required by, the agreement pursuant to which such Permitted Seller Note was issued.

**6.5. Restrictions on Subsidiary Distributions.** Except as provided herein, or the Interim Order, Final Order or the Confirmation Order, or as required by the Bankruptcy Code, no Credit Party shall, nor shall it permit any of its Subsidiaries to, create or otherwise cause or suffer to exist or become effective any consensual encumbrance or restriction of any kind on the ability of any Subsidiary of Borrower to (a) pay dividends or make any other distributions on any of such Subsidiary's Equity Interests owned by Borrower or any other Subsidiary of Borrower, (b) repay or prepay any Indebtedness owed by such Subsidiary to Borrower or any other Subsidiary of Borrower, (c) make loans or advances to Borrower or any other Subsidiary of Borrower, or (d) transfer, lease or license any of its property or assets to Borrower or any other Subsidiary of Borrower other than restrictions (i) in agreements evidencing Indebtedness permitted by (x) Section 6.1(k) that impose restrictions on the property so acquired, (y) Section 6.1(c) and (z) Section 6.1(l), (ii) by reason of customary provisions restricting assignments, subletting or other transfers contained in leases, licenses, joint venture agreements and similar agreements entered into in the ordinary course of business, (iii) that are or were created by virtue of any transfer of, agreement to transfer or option or right with respect to any property, assets or Equity Interests not otherwise prohibited under this Agreement or (iv) described on Schedule 6.5.

**6.6. Investments.** No Credit Party shall, nor shall it permit any of its Subsidiaries to, directly or indirectly, make or own any Investment in any Person, including any Joint Venture, except:

(a) Investments in Cash and Cash Equivalents;

(b) Investments owned as of the Closing Date and any renewals, replacements, refinancing or refundings thereof, in any Subsidiary of Borrower and Investments made after the Closing Date in Borrower and any wholly-owned Guarantor Subsidiary of Borrower; provided, that any renewal, replacement, refinancing or refunding of intercompany loans by a Credit Party made to a Foreign Subsidiary of Borrower shall be evidenced by the Intercompany Note,

(c) Investments (i) in any Securities received in satisfaction or partial satisfaction thereof from financially troubled account debtors and (ii) deposits, prepayments and other credits to suppliers made in the ordinary course of business consistent with the past practices of Holdings and its Subsidiaries;

(d) loans or advances (A) made (x) by Borrower or any Guarantor Subsidiary to Borrower or any Guarantor Subsidiary and (y) by any Subsidiary to Borrower or any Guarantor Subsidiary, and (B) made by any Foreign Subsidiary to any other Foreign Subsidiary;

(e) intercompany loans made by Borrower or any Guarantor Subsidiary to any Foreign Subsidiary in an aggregate amount not to exceed $15,000,000 at any time outstanding; provided, (i) all such intercompany loans shall be evidenced by the Intercompany Note, and shall be subject to a perfected First Priority Lien pursuant to the Pledge and Security Agreement and (ii) any such intercompany loan shall be renewed, replaced, refinanced or refunded so long as such intercompany loan continues to be evidenced by an Intercompany Note;

(f) other Investments (which may consist of intercompany loans, equity contributions or other Investments) made by Borrower or any Guarantor Subsidiary to any Foreign Subsidiary in an aggregate amount not to exceed $7,500,000 at any time outstanding;

(g) loans and advances to employees of Holdings and its Subsidiaries made in connection with Borrower's credit card program as in effect on the Closing Date in an aggregate principal amount not to exceed $1,000,000 at any time outstanding and made in the ordinary course of business; provided that no payments shall be made on any such loans or advances unless such payment is being made to Borrower or any Guarantor Subsidiaries;

(h) Permitted Acquisitions permitted pursuant to Section 6.8;

(i) Investments described in Schedule 6.6;

(j) Investments in a Securitization Subsidiary made in connection with an Alternative Facility to the extent permitted under Section 6.1(l);

(k) on and after the Exit Facility Conversion Date, Hedge Agreements which constitute Investments and obligations under Eligible Commodity Hedging Agreements; provided that Administrative Agent shall have received a certificate of an Authorized Officer of Holdings notifying Administrative Agent of the entry into any such Hedge Agreement;

(l) the Kwinana Investment made in accordance with Section 6.19;

(m) Investments received in connection with the bankruptcy or reorganization of, or settlement of delinquent accounts and disputes with, customers and suppliers, in each case in the ordinary course of business; and

(n) on or after the Exit Facility Conversion Date, other Investments in an aggregate amount (plus the amount of any distributions on, proceeds of, or other returns thereon) not to exceed $15,000,000 during the period from the Exit Facility Conversion Date until the Maturity Date.

Notwithstanding the foregoing, in no event shall any Credit Party make any Investment which results in or facilitates in any manner any Restricted Junior Payment not otherwise permitted under the terms of Section 6.4.

### 6.7. Financial Covenants.

(a)  Fixed Charge Coverage Ratio.  Prior to the Exit Facility Conversion Date, Holdings shall not permit the Fixed Charge Coverage Ratio as of the last day of any calendar month, beginning with the calendar month ending January 31, 2010, to be less than the correlative ratio indicated:

| Calendar Month Ending | Fixed Charge Coverage Ratio |
|---|---|
| 1/31/2010 | 1.20:1.00 |
| 2/28/2010 through 3/31/2010 | 1.15:1.00 |
| 4/30/2010 | 1.10:1.00 |
| 5/31/2010 through 9/30/2010 | 1.05:1.00 |
| 10/31/2010 and thereafter | 1.00:1.00 |

(b)  Leverage Ratio.  On and after the Exit Facility Conversion Date, Holdings shall not permit the Leverage Ratio as of the last day of any Fiscal Quarter, beginning with the first Fiscal Quarter ending after the Exit Facility Conversion Date, to exceed the correlative ratio indicated:

| Fiscal Quarter Ending | Total Leverage Ratio |
|---|---|
| 3/31/2010 through 12/31/2010 | 4.00:1.00 |
| 3/31/2011 and 12/31/2011 | 3.75:1.00 |
| 3/31/2012 and 12/31/2012 | 3.50:1.00 |
| 3/30/2013 and thereafter | 3.25:1.00 |

(c)  Consolidated Adjusted EBITDAR.  Prior to the Exit Facility Conversion Date, Holdings shall not permit Consolidated Adjusted EBITDAR, as at the end of any calendar month, beginning with the calendar month ending January 31, 2010, for the trailing twelve-month period then ended to be less than the correlative amount indicated; provided,

*however*, that Holdings shall not be required to comply with such covenant at any time after the last day of the first month ending after the Exit Facility Conversion Date:

| Calendar Month Ending | Consolidated Adjusted EBITDAR |
|---|---|
| 1/31/2010 | $110,000,000 |
| 2/28/2010 | $110,000,000 |
| 3/31/2010 | $115,000,000 |
| 4/30/2010 | $120,000,000 |
| 5/31/2010 | $120,000,000 |
| 6/30/2010 | $120,000,000 |
| 7/31/2010 | $115,000,000 |
| 8/31/2010 | $105,000,000 |
| 9/30/2010 | $105,000,000 |
| 10/31/2010 and thereafter | $100,000,000 |

(d) Interest Coverage Ratio. On and after the Exit Facility Conversion Date, Holdings shall not permit the Interest Coverage Ratio as of the last day of any Fiscal Quarter, beginning with the first Fiscal Quarter ending after the Exit Facility Conversion Date, to be less than the correlative ratio indicated:

| Fiscal Quarter Ending | Interest Coverage Ratio |
|---|---|
| 3/31/2010 through 12/31/2010 | 1.75:1.00 |
| 3/31/2011 and thereafter | 2.00:1.00 |

(e) <u>Maximum Consolidated Capital Expenditures</u>. Holdings shall not, and shall not permit its Subsidiaries to, make or incur Consolidated Capital Expenditures, in any Fiscal Year, in an aggregate amount for Holdings and its Subsidiaries in excess of $55,000,000; <u>provided</u>, that such amount for any Fiscal Year shall be increased by an amount equal to the excess, if any, of such amount for the immediately preceding Fiscal Year over the actual amount of Consolidated Capital Expenditures expended for such previous Fiscal Year (the "**Carry Over Amount**"); <u>provided</u>, that the Carry Over Amount shall not be greater than $15,000,000 in any Fiscal Year; <u>provided</u>, <u>further,</u> that any such Carry Over Amount shall be used in the immediately following Fiscal Year before the amount scheduled for such following Fiscal Year has been expended.

(f) <u>Certain Calculations</u>. With respect to any period during which a Permitted Acquisition or an Asset Sale has occurred (each, a "**Subject Transaction**"), for purposes of determining compliance with the financial covenants set forth in this Section 6.7, Consolidated Adjusted EBITDAR and the components of Consolidated Interest Expense and Consolidated Fixed Charges shall be calculated with respect to such period on a pro forma basis (including pro forma adjustments arising out of events which are directly attributable to a specific transaction, are factually supportable and are expected to have a continuing impact, in each case determined on a basis consistent with Article 11 of Regulation S-X promulgated under the Securities Act and as interpreted by the staff of the Securities and Exchange Commission, which would include cost savings resulting from head count reduction, closure of facilities and similar restructuring charges, which pro forma adjustments shall be certified by the chief financial officer, if any (or alternatively chief executive officer or chief restructuring officer) of Holdings) using the historical financial statements of any business so acquired or to be acquired or sold or to be sold and the consolidated financial statements of Holdings and its Subsidiaries which shall be reformulated as if such Subject Transaction, and any Indebtedness incurred or repaid in connection therewith, had been consummated or incurred or repaid at the beginning of such period (and assuming that such Indebtedness bears interest during any portion of the applicable measurement period prior to the relevant acquisition at the weighted average of the interest rates applicable to outstanding Loans incurred during such period).

**6.8. Fundamental Changes; Disposition of Assets; Acquisitions.** No Credit Party shall, nor shall it permit any of its Subsidiaries to, enter into any transaction of merger or consolidation, or liquidate, wind-up or dissolve itself (or suffer any liquidation or dissolution), or convey, sell, lease or license, exchange, transfer or otherwise dispose of, in one transaction or a series of transactions, all or any part of its business, assets or property of any kind whatsoever, whether real, personal or mixed and whether tangible or intangible, whether now owned or hereafter acquired, created, leased or licensed, or acquire by purchase or otherwise (other than purchases or other acquisitions of inventory, materials and equipment and capital expenditures in the ordinary course of business) the business, property or fixed assets of, or stock or other evidence of beneficial ownership of, any Person or any division or line of business or other business unit of any Person, except:

(a) (1) any Subsidiary of Borrower may be merged with or into Borrower or any Guarantor Subsidiary, or be liquidated, wound up or dissolved, or all or any part of its

business, property or assets may be conveyed, sold, leased, transferred or otherwise disposed of, in one transaction or a series of transactions, to Borrower or any Guarantor Subsidiary; provided, in the case of such a merger, Borrower or such Guarantor Subsidiary, as applicable shall be the continuing or surviving Person and (2) any non-Guarantor Subsidiary may be merged with or into any other non-Guarantor Subsidiary, or be liquidated, wound up or dissolved, or all or part of its assets may be conveyed, sold, leased, transferred or otherwise disposed of, in on transaction or a series of transactions, to any other non-Guarantor Subsidiary;

(b)    sales or other dispositions of assets that do not constitute Asset Sales;

(c)    (i) Asset Sales consisting of sales of Securitization Assets to one or more Securitization Subsidiaries in connection with a Permitted Securitization and (ii) Asset Sales (exclusive of those referenced in the preceding clause (i)), the proceeds of which are less than $75,000,000 from the Closing Date until the date of determination; provided (1) the consideration received for such assets shall be in an amount at least equal to the fair market value thereof (determined in good faith by the board of directors of Holdings (or similar governing body)), (2) no less than 100% thereof shall be paid in Cash, and (3) the Net Asset Sale Proceeds thereof shall be applied as required by Section 2.11(a);

(d)    sales or other dispositions of the Non-Core Real Estate Assets; provided (1) the consideration received for such assets shall be in an amount at least equal to the fair market value thereof (determined in good faith by the board of directors of Borrower (or similar governing body)), (2) no less than 100% thereof shall be paid in Cash, and (3) the Net Asset Sale Proceeds thereof shall be applied as required by Section 2.11(a);

(e)    disposals of obsolete, worn out or surplus property;

(f)    any license of Intellectual Property in the ordinary course of business consistent with past practice, or abandonment or disposition in the ordinary course of business consistent with past practice, of Intellectual Property no longer material to the conduct of the business of Borrower and its Subsidiaries;

(g)    the discount, write-off or sale of overdue accounts receivables, in each case in the ordinary course of business;

(h)    (i) prior to the Exit Facility Conversion Date, Permitted Acquisitions, the cash purchase price for which constitutes less than $10,000,000 in the aggregate from the Closing Date to the date of determination; provided, in respect of acquisition targets not domiciled within the United States, the consideration for such Persons or assets shall not exceed more than $2,500,000 in the aggregate from the Closing Date to the date of determination; and

(ii) on and after the Exit Facility Conversion Date, the following Permitted Acquisitions (it being understood that a Permitted Acquisition may be made using any combination of clauses (A) through (C) below, as determined by the Borrower):

(A)  Permitted Acquisitions, the cash purchase price for which constitutes (x) less than $20,000,000 with respect to each individual acquisition, and (y) less than $40,000,000 in the aggregate from the Exit Facility Conversion Date to the date of determination; provided, in respect of acquisition targets not domiciled within the United States, the consideration for such Persons or assets shall not exceed more than $2,500,000 in the aggregate from the Closing Date to the date of determination;

(B)  any Permitted Acquisition; provided that the pro forma Leverage Ratio (determined for any such period by reference to the Compliance Certificate delivered pursuant to Section 5.1(d) calculating the Leverage Ratio as of the last day of the most recently ended Fiscal Quarter prior to the consummation of such acquisition) shall be less than 2.00:1.00; and

(C)  any Permitted Acquisition, which is made with the aggregate amount of net cash proceeds received by Holdings from the sale or issuance of Equity Interests (other than Disqualified Equity Interests and in connection with an initial public offering of Holdings or any of its Subsidiaries or Affiliates); provided that, at the time of such acquisition using the net cash proceeds from the sale or issuance of Equity Interests, the Borrower shall deliver a certificate of an Authorized Officer stating all or a portion of such acquisition is being made from equity proceeds;

(i)  Investments made in accordance with Section 6.6;

(j)  transactions contemplated by the Plan of Reorganization;

(k)  the sale or disposition of owned Real Estate Assets (i) located in Henderson, Nevada pursuant to the Henderson Sale-Leaseback or (ii) pursuant to the Verve Sale-Leaseback; and

(l)  the subordination of the Liens on the ABL Collateral securing the Replacement Revolving Facility to the extent required by the Replacement Revolving Intercreditor Agreement.

**6.9.  Disposal of Subsidiary Interests.**  Except for any sale of all of its interests in the Equity Interests of any of its Subsidiaries in compliance with the provisions of Section 6.8, no Credit Party shall, nor shall it permit any of its Subsidiaries to, (a) directly or indirectly sell, assign, pledge or otherwise encumber or dispose of any Equity Interests of any of its Subsidiaries, except to qualify directors if required by applicable law; or (b) permit any of its Subsidiaries directly or indirectly to sell, assign, pledge or otherwise encumber or dispose of any Equity Interests of any of its Subsidiaries, except to another Credit Party (subject to the restrictions on such disposition otherwise imposed hereunder), or to qualify directors if required by applicable law.

**6.10.  Sales and Lease-Backs.**  No Credit Party shall, nor shall it permit any of its Subsidiaries to, directly or indirectly, become or remain liable as lessee or as a guarantor or other surety with respect to any lease of any property (whether real, personal or mixed), whether now

owned or hereafter acquired, which such Credit Party (a) has sold or transferred or is to sell or to transfer to any other Person (other than Holdings or any of its Subsidiaries), or (b) intends to use for substantially the same purpose as any other property which has been or is to be sold or transferred by such Credit Party to any Person (other than Holdings or any of its Subsidiaries) in connection with such lease, other than the Henderson Sale-Leaseback and the Verve Sale-Leaseback.

**6.11. Transactions with Shareholders and Affiliates.** No Credit Party shall, nor shall it permit any of its Subsidiaries to, directly or indirectly, enter into or permit to exist any transaction (including the purchase, sale, lease or exchange of any property or the rendering of any service) with any Affiliate of Holdings on terms that are less favorable to Holdings or that Subsidiary, as the case may be, than those that might be obtained at the time from a Person who is not such a holder or Affiliate; <u>provided</u>, the foregoing restriction shall not apply to (a) any transaction between Borrower and any Guarantor Subsidiary; (b) reasonable and customary fees paid to members of the board of directors (or similar governing body) of Holdings and its Subsidiaries; (c) compensation arrangements for officers and other employees of Holdings and its Subsidiaries entered into in the ordinary course of business or pursuant to the Plan of Reorganization; (d) transactions described in Schedule 6.11; (e) transactions with one or more Securitization Subsidiaries in connection with a Permitted Securitization; (f) the Kwinana Investment; (g) Restricted Junior Payments permitted pursuant to Section 6.4; (h) Investments permitted pursuant to Section 6.6; and (i) transactions contemplated by the Plan of Reorganization.

**6.12. Conduct of Business.** From and after the Closing Date, no Credit Party shall, nor shall it permit any of its Subsidiaries to, engage in any business other than (i) the businesses engaged in by such Credit Party on the Closing Date and similar or related businesses and (ii) such other lines of business as may be consented to by Requisite Lenders.

**6.13. Permitted Activities of Holdings.** Holdings shall not (a) incur, directly or indirectly, any Indebtedness or any other obligation or liability whatsoever other than the Indebtedness and obligations under the Plan of Reorganization, this Agreement, the other Credit Documents and any Additional Facility Credit Documents; (b) create or suffer to exist any Lien upon any property or assets now owned or hereafter acquired, created, leased or licensed by it other than the Liens created under the Collateral Documents to which it is a party or permitted pursuant to Section 6.2; (c) engage in any business or activity or own any assets other than (i) holding 100% of the Equity Interests of Borrower, (ii) performing its obligations and activities incidental thereto under the Credit Documents, and to the extent not inconsistent therewith, any Replacement Facility Credit Documents; (iii) performing its obligations and activities incidental to the consummation of the transactions contemplated by the Plan of Reorganization or in connection with the issuance of the New Money Investment; and (iv) making Restricted Junior Payments and Investments to the extent permitted by this Agreement; (d) consolidate with or merge with or into, or convey, transfer, lease or license all or substantially all its assets to, any Person; (e) sell or otherwise dispose of any Equity Interests of any of its Subsidiaries; (f) create or acquire any Subsidiary or make or own any Investment in any Person other than Borrower; or (g) fail to hold itself out to the public as a legal entity separate and distinct from all other Persons.

**6.14. Amendments or Waivers of Organizational Documents, Additional Facility Credit Documents, Approved Budget.**   Except as set forth in Section 6.15 or otherwise pursuant to the Plan of Reorganization, no Credit Party shall, nor shall it permit any of its Subsidiaries to, (i) agree to any material amendment, restatement, supplement or other modification to, or waiver of, any of its Organizational Documents that would adversely affect the Lenders or their rights after the Closing Date without obtaining the prior written consent of Requisite Lenders to such amendment, restatement, supplement or other modification or waiver, (ii) agree to any amendment, restatement, supplement or other modification to, or waiver of, or make any payment consistent with an amendment thereof or change thereto, (x) any Revolving Facility Credit Document other than as permitted under any Replacement Revolving Intercreditor Agreement or (y) any Alternative Facility Credit Document that would adversely affect the Lenders or their rights after the Closing Date without obtaining the prior written consent of Requisite Lenders to such amendment, restatement, supplement or other modification or waiver, or (iii) agree to any amendment, supplement or other modification to, or waiver of, the Approved Budget without obtaining the prior written approval of Administrative Agent in its sole discretion.

**6.15. Amendments or Waivers of with respect to Certain Indebtedness.** Except pursuant to the Plan of Reorganization, no Credit Party shall, nor shall it permit any of its Subsidiaries to, amend or otherwise change the terms of the Senior Notes, or make any payment consistent with an amendment thereof or change thereto, if the effect of such amendment or change is to increase the interest rate on such Senior Notes, change (to earlier dates) any dates upon which payments of principal or interest are due thereon, change any event of default or condition to an event of default with respect thereto (other than to eliminate any such event of default or increase any grace period related thereto), change the redemption, prepayment or defeasance provisions thereof, or if the effect of such amendment or change, together with all other amendments or changes made, is to increase materially the obligations of the obligor thereunder or to confer any additional rights on the holders of such Senior Notes (or a trustee or other representative on their behalf) which would be adverse to any Credit Party or Lenders.

**6.16. Fiscal Year.** No Credit Party shall, nor shall it permit any of its Subsidiaries to change its Fiscal Year-end from December 31.

**6.17. Chapter 11 Claims.** Prior to the Exit Facility Conversion Date, no Credit Party shall, nor shall it permit any of its Subsidiaries to, create, assume, suffer to exist or permit any other super-priority administrative claim which is pari passu with or senior to the claims of Secured Parties against the Credit Parties, except as set forth in the Interim Order and Final Order, as then in effect, or, with respect to any Replacement Revolving Facility, as set forth in an order of the Bankruptcy Court with respect thereto.

**6.18. Critical Vendor and Other Payments.** No Credit Party shall make (i) any Pre-Petition "critical vendor" payments or other payments on account of any creditor's Pre-Petition unsecured claims, (ii) payments on account of claims or expenses arising under Section 503(b)(9) of the Bankruptcy Code, (iii) payments in respect of a reclamation program or (iv) payments under any management incentive plan or on account of claims or expenses arising under Section 503(c) of the Bankruptcy Code, except in each case in amounts and on terms and

conditions that (a) are approved by order of the Bankruptcy Court and (b) are expressly permitted by any Approved Budget.

### 6.19. Kwinana Investment.

(a) Borrower shall not, and shall not permit its Subsidiaries to, make the Kwinana Investment until after the Exit Facility Conversion Date and at such time as (i) the pro forma Leverage Ratio (determined for any such period by reference to the Compliance Certificate delivered pursuant to Section 5.1(d) calculating the Leverage Ratio as of the last day of the most recently ended Fiscal Quarter prior to the making of such investment) shall be 2.75:1.00 or less, and (ii) Administrative Agent shall have received satisfactory evidence that the Excess Availability of Holdings and its Subsidiaries at such time is equal to or greater than $40,000,000 after giving effect to such investment and any payments related thereto.

(b) Borrower shall use commercially reasonable efforts to utilize the Cash and Cash Equivalents of a Foreign Subsidiary of Borrower organized in Australia ("**Australian Subsidiary**") and/or obtain an Alternative Facility of an Australian Subsidiary (or other commercially viable financing of such Foreign Subsidiary) in order to make such Kwinana Investment or otherwise fund such Kwinana Investment by such Australian Subsidiary. In the event that, after utilizing commercially reasonable efforts as required by the foregoing sentence, it is necessary for Borrower to fund the Kwinana Investment by making an Investment in such Australian Subsidiary (and otherwise permitted hereunder), such Kwinana Investment shall take the form of Indebtedness evidenced by an Intercompany Note, and shall be subject to a perfected First Priority Lien pursuant to the Pledge and Security Agreement.

### SECTION 7. GUARANTY

**7.1. Guaranty of the Obligations.** Subject to the provisions of Section 7.2, Guarantors jointly and severally hereby irrevocably and unconditionally guaranty to Administrative Agent for the ratable benefit of the Beneficiaries the due and punctual payment in full of all Obligations when the same shall become due, whether at stated maturity, by required prepayment, declaration, acceleration, demand or otherwise (including amounts that would become due but for the operation of the automatic stay under Section 362(a) of the Bankruptcy Code, 11 U.S.C. § 362(a)) (collectively, the "**Guaranteed Obligations**").

**7.2. Contribution by Guarantors.** All Guarantors desire to allocate among themselves (collectively, the "**Contributing Guarantors**"), in a fair and equitable manner, their obligations arising under this Guaranty. Accordingly, in the event any payment or distribution is made on any date by a Guarantor (a "**Funding Guarantor**") under this Guaranty such that its Aggregate Payments exceeds its Fair Share as of such date, such Funding Guarantor shall be entitled to a contribution from each of the other Contributing Guarantors in an amount sufficient to cause each Contributing Guarantor's Aggregate Payments to equal its Fair Share as of such date. "**Fair Share**" means, with respect to a Contributing Guarantor as of any date of determination, an amount equal to (a) the ratio of (i) the Fair Share Contribution Amount with respect to such Contributing Guarantor to (ii) the aggregate of the Fair Share Contribution

Amounts with respect to all Contributing Guarantors multiplied by (b) the aggregate amount paid or distributed on or before such date by all Funding Guarantors under this Guaranty in respect of the obligations Guaranteed. "**Fair Share Contribution Amount**" means, with respect to a Contributing Guarantor as of any date of determination, the maximum aggregate amount of the obligations of such Contributing Guarantor under this Guaranty that would not render its obligations hereunder or thereunder subject to avoidance as a fraudulent transfer or conveyance under Section 548 of Title 11 of the United States Code or any comparable applicable provisions of state law; provided, solely for purposes of calculating the "**Fair Share Contribution Amount**" with respect to any Contributing Guarantor for purposes of this Section 7.2, any assets or liabilities of such Contributing Guarantor arising by virtue of any rights to subrogation, reimbursement or indemnification or any rights to or obligations of contribution hereunder shall not be considered as assets or liabilities of such Contributing Guarantor. "**Aggregate Payments**" means, with respect to a Contributing Guarantor as of any date of determination, an amount equal to (1) the aggregate amount of all payments and distributions made on or before such date by such Contributing Guarantor in respect of this Guaranty (including in respect of this Section 7.2), minus (2) the aggregate amount of all payments received on or before such date by such Contributing Guarantor from the other Contributing Guarantors as contributions under this Section 7.2. The amounts payable as contributions hereunder shall be determined as of the date on which the related payment or distribution is made by the applicable Funding Guarantor. The allocation among Contributing Guarantors of their obligations as set forth in this Section 7.2 shall not be construed in any way to limit the liability of any Contributing Guarantor hereunder. Each Guarantor is a third party beneficiary to the contribution agreement set forth in this Section 7.2.

**7.3. Payment by Guarantors.** Subject to Section 7.2, Guarantors hereby jointly and severally agree, in furtherance of the foregoing and not in limitation of any other right which any Beneficiary may have at law or in equity against any Guarantor by virtue hereof, that upon the failure of Borrower to pay any of the Guaranteed Obligations when and as the same shall become due, whether at stated maturity, by required prepayment, declaration, acceleration, demand or otherwise (including amounts that would become due but for the operation of the automatic stay under Section 362(a) of the Bankruptcy Code, 11 U.S.C. § 362(a)), Guarantors will upon demand pay, or cause to be paid, in Cash, to Administrative Agent for the ratable benefit of Beneficiaries, an amount equal to the sum of the unpaid principal amount of all Guaranteed Obligations then due as aforesaid, accrued and unpaid interest on such Guaranteed Obligations (including interest which, but for Borrower's becoming the subject of a case under the Bankruptcy Code, would have accrued on such Guaranteed Obligations, whether or not a claim is allowed against Borrower for such interest in the related bankruptcy case) and all other Guaranteed Obligations then owed to Beneficiaries as aforesaid.

**7.4. Liability of Guarantors Absolute.** Each Guarantor agrees that its obligations hereunder are irrevocable, absolute, independent and unconditional and shall not be affected by any circumstance which constitutes a legal or equitable discharge of a guarantor or surety other than payment in full of the Guaranteed Obligations. In furtherance of the foregoing and without limiting the generality thereof, each Guarantor agrees as follows:

(a) this Guaranty is a guaranty of payment when due and not of collectability. This Guaranty is a primary obligation of each Guarantor and not merely a contract of surety;

(b) subject to any Replacement Revolving Intercreditor Agreement, Administrative Agent may enforce this Guaranty upon the occurrence of an Event of Default notwithstanding the existence of any dispute between Borrower and any Beneficiary with respect to the existence of such Event of Default;

(c) the obligations of each Guarantor hereunder are independent of the obligations of Borrower and the obligations of any other guarantor (including any other Guarantor) of the obligations of Borrower, and a separate action or actions may be brought and prosecuted against such Guarantor whether or not any action is brought against Borrower or any of such other guarantors and whether or not Borrower is joined in any such action or actions;

(d) payment by any Guarantor of a portion, but not all, of the Guaranteed Obligations shall in no way limit, affect, modify or abridge any Guarantor's liability for any portion of the Guaranteed Obligations which has not been paid. Without limiting the generality of the foregoing, if Administrative Agent is awarded a judgment in any suit brought to enforce any Guarantor's covenant to pay a portion of the Guaranteed Obligations, such judgment shall not be deemed to release such Guarantor from its covenant to pay the portion of the Guaranteed Obligations that is not the subject of such suit, and such judgment shall not, except to the extent satisfied by such Guarantor, limit, affect, modify or abridge any other Guarantor's liability hereunder in respect of the Guaranteed Obligations;

(e) any Beneficiary, upon such terms as it deems appropriate, without notice or demand and without affecting the validity or enforceability hereof or giving rise to any reduction, limitation, impairment, discharge or termination of any Guarantor's liability hereunder, from time to time may (i) renew, extend, accelerate, increase the rate of interest on, or otherwise change the time, place, manner or terms of payment of the Guaranteed Obligations; (ii) settle, compromise, release or discharge, or accept or refuse any offer of performance with respect to, or substitutions for, the Guaranteed Obligations or any agreement relating thereto and/or subordinate the payment of the same to the payment of any other obligations; (iii) request and accept other guaranties of the Guaranteed Obligations and take and hold security for the payment hereof or the Guaranteed Obligations; (iv) release, surrender, exchange, substitute, compromise, settle, rescind, waive, alter, subordinate or modify, with or without consideration, any security for payment of the Guaranteed Obligations, any other guaranties of the Guaranteed Obligations, or any other obligation of any Person (including any other Guarantor) with respect to the Guaranteed Obligations; (v) enforce and apply any security now or hereafter held by or for the benefit of such Beneficiary in respect hereof or the Guaranteed Obligations and direct the order or manner of sale thereof, or exercise any other right or remedy that such Beneficiary may have against any such security, in each case as such Beneficiary in its discretion may determine consistent herewith or the applicable Hedge Agreement and any applicable security agreement, including foreclosure on any such security pursuant to one or more judicial or nonjudicial sales, whether or not every aspect of any such sale is commercially reasonable, and even though such action operates to impair or extinguish any right of reimbursement or subrogation or other right or remedy of any Guarantor against any other Credit Party or any security for the Guaranteed Obligations; and (vi) exercise any other rights available to it under the Credit Documents or any Hedge Agreements; and

(f)  this Guaranty and the obligations of Guarantors hereunder shall be valid and enforceable and shall not be subject to any reduction, limitation, impairment, discharge or termination for any reason (other than payment in full of the Guaranteed Obligations), including the occurrence of any of the following, whether or not any Guarantor shall have had notice or knowledge of any of them: (i) any failure or omission to assert or enforce or agreement or election not to assert or enforce, or the stay or enjoining, by order of court, by operation of law or otherwise, of the exercise or enforcement of, any claim or demand or any right, power or remedy (whether arising under the Credit Documents or any Hedge Agreements, at law, in equity or otherwise) with respect to the Guaranteed Obligations or any agreement relating thereto, or with respect to any other guaranty of or security for the payment of the Guaranteed Obligations; (ii) any rescission, waiver, amendment or modification of, or any consent to departure from, any of the terms or provisions (including provisions relating to events of default) hereof, any of the other Credit Documents, any of the Hedge Agreements or any agreement or instrument executed pursuant thereto, or of any other guaranty or security for the Guaranteed Obligations, in each case whether or not in accordance with the terms hereof or such Credit Document, such Hedge Agreement or any agreement relating to such other guaranty or security; (iii) the Guaranteed Obligations, or any agreement relating thereto, at any time being found to be illegal, invalid or unenforceable in any respect; (iv) the application of payments received from any source (other than payments received pursuant to the other Credit Documents or any of the Hedge Agreements or from the proceeds of any security for the Guaranteed Obligations, except to the extent such security also serves as collateral for indebtedness other than the Guaranteed Obligations) to the payment of indebtedness other than the Guaranteed Obligations, even though any Beneficiary might have elected to apply such payment to any part or all of the Guaranteed Obligations; (v) any Beneficiary's consent to the change, reorganization or termination of the corporate structure or existence of Holdings or any of its Subsidiaries and to any corresponding restructuring of the Guaranteed Obligations; (vi) any failure to perfect or continue perfection of a security interest in any collateral which secures any of the Guaranteed Obligations; (vii) any defenses, set-offs or counterclaims which Borrower may allege or assert against any Beneficiary in respect of the Guaranteed Obligations, including failure of consideration, breach of warranty, payment, statute of frauds, statute of limitations, accord and satisfaction and usury; and (viii) any other act or thing or omission, or delay to do any other act or thing, which may or might in any manner or to any extent vary the risk of any Guarantor as an obligor in respect of the Guaranteed Obligations.

**7.5.  Waivers by Guarantors.**  Each Guarantor hereby waives, for the benefit of Beneficiaries: (a) any right to require any Beneficiary, as a condition of payment or performance by such Guarantor, to (i) proceed against Borrower, any other guarantor (including any other Guarantor) of the Guaranteed Obligations or any other Person, (ii) proceed against or exhaust any security held from Borrower, any such other guarantor or any other Person, (iii) proceed against or have resort to any balance of any Deposit Account or credit on the books of any Beneficiary in favor of any Credit Party or any other Person, or (iv) pursue any other remedy in the power of any Beneficiary whatsoever; (b) any defense arising by reason of the incapacity, lack of authority or any disability or other defense of Borrower or any other Guarantor including any defense based on or arising out of the lack of validity or the unenforceability of the Guaranteed Obligations or any agreement or instrument relating thereto or by reason of the cessation of the liability of Borrower or any other Guarantor from any cause other than payment in full of the Guaranteed Obligations; (c) any defense based upon any statute or rule of law

which provides that the obligation of a surety must be neither larger in amount nor in other respects more burdensome than that of the principal; (d) any defense based upon any Beneficiary's errors or omissions in the administration of the Guaranteed Obligations, except behavior which amounts to bad faith; (e) (i) any principles or provisions of law, statutory or otherwise, which are or might be in conflict with the terms hereof and any legal or equitable discharge of such Guarantor's obligations hereunder, (ii) the benefit of any statute of limitations affecting such Guarantor's liability hereunder or the enforcement hereof, (iii) any rights to set-offs, recoupments and counterclaims, and (iv) promptness, diligence and any requirement that any Beneficiary protect, secure, perfect or insure any security interest or lien or any property subject thereto; (f) notices, demands, presentments, protests, notices of protest, notices of dishonor and notices of any action or inaction, including acceptance hereof, notices of default hereunder, the Hedge Agreements or any agreement or instrument related thereto, notices of any renewal, extension or modification of the Guaranteed Obligations or any agreement related thereto, notices of any extension of credit to Borrower and notices of any of the matters referred to in Section 7.4 and any right to consent to any thereof; and (g) any defenses or benefits that may be derived from or afforded by law which limit the liability of or exonerate guarantors or sureties, or which may conflict with the terms hereof.

**7.6. Guarantors' Rights of Subrogation, Contribution, Etc.** Until the Guaranteed Obligations shall have been indefeasibly paid in full, each Guarantor hereby waives any claim, right or remedy, direct or indirect, that such Guarantor now has or may hereafter have against Borrower or any other Guarantor or any of its assets in connection with this Guaranty or the performance by such Guarantor of its obligations hereunder, in each case whether such claim, right or remedy arises in equity, under contract, by statute, under common law or otherwise and including (a) any right of subrogation, reimbursement or indemnification that such Guarantor now has or may hereafter have against Borrower with respect to the Guaranteed Obligations, (b) any right to enforce, or to participate in, any claim, right or remedy that any Beneficiary now has or may hereafter have against Borrower, and (c) any benefit of, and any right to participate in, any collateral or security now or hereafter held by any Beneficiary. In addition, until the Guaranteed Obligations shall have been indefeasibly paid in full, each Guarantor shall withhold exercise of any right of contribution such Guarantor may have against any other guarantor (including any other Guarantor) of the Guaranteed Obligations, including any such right of contribution as contemplated by Section 7.2. Each Guarantor further agrees that, to the extent the waiver or agreement to withhold the exercise of its rights of subrogation, reimbursement, indemnification and contribution as set forth herein is found by a court of competent jurisdiction to be void or voidable for any reason, any rights of subrogation, reimbursement or indemnification such Guarantor may have against Borrower or against any collateral or security, and any rights of contribution such Guarantor may have against any such other guarantor, shall be junior and subordinate to any rights any Beneficiary may have against Borrower, to all right, title and interest any Beneficiary may have in any such collateral or security, and to any right any Beneficiary may have against such other guarantor. If any amount shall be paid to any Guarantor on account of any such subrogation, reimbursement, indemnification or contribution rights at any time when all Guaranteed Obligations shall not have been finally and indefeasibly paid in full, such amount shall be held in trust for Administrative Agent on behalf of Beneficiaries and shall forthwith be paid over to Administrative Agent for the benefit of Beneficiaries to be credited and applied against the Guaranteed Obligations, whether matured or unmatured, in accordance with the terms hereof.

**7.7. Subordination of Other Obligations.** Any Indebtedness of Borrower or any Guarantor now or hereafter held by any Guarantor (the "**Obligee Guarantor**") is hereby subordinated in right of payment to the Guaranteed Obligations, and any such Indebtedness collected or received by the Obligee Guarantor after an Event of Default has occurred and is continuing shall be held in trust for Administrative Agent on behalf of Beneficiaries and shall forthwith be paid over to Administrative Agent for the benefit of Beneficiaries to be credited and applied against the Guaranteed Obligations but without affecting, impairing or limiting in any manner the liability of the Obligee Guarantor under any other provision hereof.

**7.8. Continuing Guaranty.** This Guaranty is a continuing guaranty and shall remain in effect until all of the Guaranteed Obligations shall have been paid in full. Each Guarantor hereby irrevocably waives any right to revoke this Guaranty as to future transactions giving rise to any Guaranteed Obligations.

**7.9. Authority of Guarantors or Borrower.** It is not necessary for any Beneficiary to inquire into the capacity or powers of any Guarantor or Borrower or the officers, directors or any agents acting or purporting to act on behalf of any of them.

**7.10. Financial Condition of Borrower.** Any Loan may be continued from time to time, and any Hedge Agreements may be entered into from time to time, in each case without notice to or authorization from any Guarantor regardless of the financial or other condition of Borrower at the time of any such grant or continuation or at the time such Hedge Agreement is entered into, as the case may be. No Beneficiary shall have any obligation to disclose or discuss with any Guarantor its assessment, or any Guarantor's assessment, of the financial condition of Borrower. Each Guarantor has adequate means to obtain information from Borrower on a continuing basis concerning the financial condition of Borrower and its ability to perform its obligations under the Credit Documents and the Hedge Agreements, and each Guarantor assumes the responsibility for being and keeping informed of the financial condition of Borrower and of all circumstances bearing upon the risk of nonpayment of the Guaranteed Obligations. Each Guarantor hereby waives and relinquishes any duty on the part of any Beneficiary to disclose any matter, fact or thing relating to the business, operations or conditions of Borrower now known or hereafter known by any Beneficiary.

**7.11. Bankruptcy, Etc.** (a) So long as any Guaranteed Obligations remain outstanding, no Guarantor shall, without the prior written consent of Administrative Agent acting pursuant to the instructions of Requisite Lenders, commence or join with any other Person in commencing any bankruptcy, reorganization or insolvency case or proceeding (other than the Chapter 11 Cases) of or against Borrower or any other Guarantor. The obligations of Guarantors hereunder shall not be reduced, limited, impaired, discharged, deferred, suspended or terminated by any case or proceeding, voluntary or involuntary, involving the bankruptcy, insolvency, receivership, reorganization, liquidation or arrangement of Borrower or any other Guarantor or by any defense which Borrower or any other Guarantor may have by reason of the order, decree or decision of any court or administrative body resulting from any such proceeding.

(b) Each Guarantor acknowledges and agrees that any interest on any portion of the Guaranteed Obligations which accrues after the commencement of any case or proceeding referred to in clause (a) above (or, if interest on any portion of the Guaranteed

Obligations ceases to accrue by operation of law by reason of the commencement of such case or proceeding, such interest as would have accrued on such portion of the Guaranteed Obligations if such case or proceeding had not been commenced) shall be included in the Guaranteed Obligations because it is the intention of Guarantors and Beneficiaries that the Guaranteed Obligations which are guaranteed by Guarantors pursuant hereto should be determined without regard to any rule of law or order which may relieve Borrower of any portion of such Guaranteed Obligations. Guarantors will permit any trustee in bankruptcy, receiver, debtor in possession, assignee for the benefit of creditors or similar Person to pay Administrative Agent, or allow the claim of Administrative Agent in respect of, any such interest accruing after the date on which such case or proceeding is commenced.

(c) In the event that all or any portion of the Guaranteed Obligations are paid by Borrower, the obligations of Guarantors hereunder shall continue and remain in full force and effect or be reinstated, as the case may be, in the event that all or any part of such payment(s) are rescinded or recovered directly or indirectly from any Beneficiary as a preference, fraudulent transfer or otherwise, and any such payments which are so rescinded or recovered shall constitute Guaranteed Obligations for all purposes hereunder.

**7.12. Discharge of Guaranty Upon Sale of Guarantor.** If all of the Equity Interests of any Guarantor or any of its successors in interest hereunder shall be sold or otherwise disposed of (including by merger or consolidation) in accordance with the terms and conditions hereof, the Guaranty of such Guarantor or such successor in interest, as the case may be, hereunder shall automatically be discharged and released without any further action by any Beneficiary or any other Person effective as of the time of such Asset Sale.


**SECTION 8. EVENTS OF DEFAULT**

**8.1. Events of Default.** If any one or more of the following conditions or events shall occur:

(a) <u>Failure to Make Payments When Due</u>. Failure by Borrower to pay (i) when due any installment of principal of any Loan, whether at stated maturity, by acceleration, by notice of voluntary prepayment, by mandatory prepayment or otherwise; or (ii) any interest on any Loan or any fee or any other amount due hereunder within three days after the date due; or

(b) <u>Breach of Certain Covenants</u>. Failure of any Credit Party to perform or comply with any term or condition contained in Section 2.3, Sections 5.1(a), 5.1(b), 5.1(c), 5.1(d), 5.1(e), 5.1(f), 5.1(h)(i) or 5.1(s), Section 5.2, Section 5.9, Section 5.14, Section 5.15, Section 5.17, Section 5.18, Section 5.20, Section 5.21 or Section 6; or

(c) <u>Breach of Representations, Etc.</u> Any representation, warranty, certification or other statement made or deemed made by any Credit Party in any Credit Document or in any statement or certificate at any time given by any Credit Party or any of its Subsidiaries in writing pursuant hereto or thereto or in connection herewith or therewith shall be false in any material respect as of the date made or deemed made; or

(d)  <u>Other Defaults Under Credit Documents</u>.  Any Credit Party shall default in the performance of or compliance with any term contained herein or any of the other Credit Documents, other than any such term referred to in any other Section of this Section 8.1, and such default shall not have been remedied or waived within thirty days after the earlier of (i) an officer of such Credit Party becoming aware of such default or (ii) receipt by Borrower of notice from Administrative Agent or any Lender of such default; or

(e)  <u>Material Contracts</u>. Prior to the Exit Facility Conversion Date, except for defaults occasioned by the filing of the Chapter 11 Cases and defaults resulting from obligations with respect to which the Bankruptcy Code prohibits any Credit Party from complying or permits any Credit Party not to comply, a material default or breach occurs under any Post-Petition Material Contract.

(f)  <u>Involuntary Bankruptcy, Appointment of Receiver, Etc.</u> Other than the Chapter 11 Cases, (i) a court of competent jurisdiction shall enter a decree or order for relief in respect of Holdings or any of its Subsidiaries in an involuntary case under the Bankruptcy Code or under any other applicable bankruptcy, insolvency or similar law now or hereafter in effect, which decree or order is not stayed; or any other similar relief shall be granted under any applicable federal or state law; or (ii) an involuntary case shall be commenced against Holdings or any of its Subsidiaries under the Bankruptcy Code or under any other applicable bankruptcy, insolvency or similar law now or hereafter in effect; or a decree or order of a court having jurisdiction in the premises for the appointment of a receiver, liquidator, sequestrator, trustee, custodian or other officer having similar powers over Holdings or any of its Subsidiaries, or over all or a substantial part of its property, shall have been entered; or there shall have occurred the involuntary appointment of an interim receiver, trustee or other custodian of Holdings or any of its Subsidiaries for all or a substantial part of its property; or a warrant of attachment, execution or similar process shall have been issued against any substantial part of the property of Holdings or any of its Subsidiaries, and any such event described in this clause (ii) shall continue for sixty days without having been dismissed, bonded or discharged; or

(g)  <u>Voluntary Bankruptcy, Appointment of Receiver, Etc</u>. Other than the Chapter 11 Cases, (i) Holdings or any of its Subsidiaries shall have an order for relief entered with respect to it or shall commence a voluntary case under the Bankruptcy Code or under any other applicable bankruptcy, insolvency or similar law now or hereafter in effect, or shall consent to the entry of an order for relief in an involuntary case, or to the conversion of an involuntary case to a voluntary case, under any such law, or shall consent to the appointment of or taking possession by a receiver, trustee or other custodian for all or a substantial part of its property; or Holdings or any of its Subsidiaries shall make any assignment for the benefit of creditors; or (ii) Holdings or any of its Subsidiaries shall be unable, or shall fail generally, or shall admit in writing its inability, to pay its debts as such debts become due; or the board of directors (or similar governing body) of Holdings or any of its Subsidiaries (or any committee thereof) shall adopt any resolution or otherwise authorize any action to approve any of the actions referred to herein or in Section 8.1(f); or

(h)  <u>Judgments and Attachments</u>.  Any money judgment, writ or warrant of attachment or similar process individually or in the aggregate in excess of (x) prior to the Exit

Facility Conversion Date, $2,500,000 and (y) on or after the Exit Facility Conversion Date, $10,000,000 (in each case, to the extent not adequately covered by insurance as to which a solvent and unaffiliated insurance company has acknowledged coverage) shall be entered or filed against Holdings or any of its Subsidiaries or any of their respective assets and shall remain undischarged, unvacated, unbonded or unstayed for a period of sixty days (or in any event later than five days prior to the date of any proposed sale thereunder); or

(i)  Dissolution.  Any order, judgment or decree shall be entered against any Credit Party decreeing the dissolution or split up of such Credit Party and such order shall remain undischarged or unstayed for a period in excess of thirty days; or

(j)  Employee Benefit Plans.  (i) There shall occur one or more ERISA Events which individually or in the aggregate results in or might reasonably be expected to result in liability of Holdings, any of its Subsidiaries or any of their respective ERISA Affiliates in excess of an amount that would reasonably be expected to have a Material Adverse Effect; or (ii) there exists any fact or circumstance that reasonably could be expected to result in the imposition of a Lien or security interest pursuant to Section 430(k) of the Internal Revenue Code or ERISA or a non-ministerial violation of Section 436 of the Internal Revenue Code; or

(k)  Change of Control.  A Change of Control shall occur; or

(l)  Guaranties, Collateral Documents and other Credit Documents.  At any time after the execution and delivery thereof, (i) the Guaranty for any reason, other than the satisfaction in full of all Obligations, shall cease to be in full force and effect (other than in accordance with its terms) or shall be declared to be null and void or any Guarantor shall repudiate its obligations thereunder, (ii) this Agreement or any Collateral Document ceases to be in full force and effect (other than by reason of a release of Collateral in accordance with the terms hereof or thereof or the satisfaction in full of the Obligations in accordance with the terms hereof) or shall be declared null and void, or Collateral Agent shall not have or shall cease to have a valid and perfected Lien (if any to the extent perfection may be achieved by the filing of Uniform commercial Code financing statements and the entry of the Interim Order or Final Order, as the case may be) in any Collateral purported to be covered by the Collateral Documents with the priority required by the relevant Collateral Document, in each case for any reason other than the failure of Collateral Agent or any Secured Party to take any action within its control, or (iii) any Credit Party shall contest the validity or enforceability of any Credit Document in writing or deny in writing that it has any further liability, including with respect to future advances by Lenders, under any Credit Document to which it is a party or shall contest the validity or perfection of any Lien in any Collateral purported to be covered by the Collateral Documents; or

(m)  Defaults in Other Agreements.

(i)  Prior to the Exit Facility Conversion Date, except for defaults occasioned by the filing of the Chapter 11 Cases and defaults resulting from obligations with respect to which the Bankruptcy Code prohibits any Credit Party from complying or permits any Credit Party not to comply, a default or breach occurs under any agreement, document or instrument entered into either (x) Pre-Petition and which is assumed after

the Petition Date or is not subject to the automatic stay provisions of Section 362 of the Bankruptcy Code, or (y) Post-Petition, to which any Credit Party is a party that is not cured within any applicable grace period therefor, and such default or breach (i) involves the failure to make any payment when due in respect of any Indebtedness (other than the Obligations) of any Credit Party in excess of $2,500,000 in the aggregate, or (ii) causes such Indebtedness, or permits any holder of such Indebtedness or a trustee to cause such Indebtedness, to become due prior to its stated maturity or prior to its regularly scheduled dates of payment; or

(ii) (A) On or after the Exit Facility Conversion Date, failure of any Credit Party or any of their respective Subsidiaries to pay when due any principal of or interest on or any other amount, including any payment in settlement, payable in respect of one or more items of Indebtedness (other than Indebtedness referred to in Section 8.1(a)) in an aggregate principal amount (or Net Mark-to-Market Exposure) of $10,000,000 or more, in each case beyond the grace period, if any, provided therefor; or (B) breach or default by any Credit Party with respect to any other material term of (1) one or more items of Indebtedness in the individual or aggregate principal amounts (or Net Mark-to-Market Exposure) referred to in clause (A) above or (2) any loan agreement, mortgage, indenture or other agreement relating to such item(s) of Indebtedness, in each case beyond the grace period, if any, provided therefor, if the effect of such breach or default is to cause, or to permit the holder or holders of that Indebtedness (or a trustee on behalf of such holder or holders), to cause, that Indebtedness to become or be declared due and payable (or subject to a compulsory repurchase or redeemable) prior to its stated maturity or the stated maturity of any underlying obligation, as the case may be; or

(n) <u>New Money Investment</u>. The expiration or termination of the Equity Commitment Agreement shall occur or the commitment of the members of the Ad Hoc Committee to fund the New Money Investment on the Exit Facility Conversion Date shall otherwise terminate or expire; or

(o) <u>The Chapter 11 Cases</u>. Prior to the Exit Facility Conversion Date:

(i) entry of an order or filing of a motion by any Credit Party, or any Credit Party supporting the entry of an order or filing of a motion, (A) authorizing, approving, granting or seeking additional Post-Petition financing under Section 364(c) or (d) of the Bankruptcy Code other than Indebtedness permitted under this Agreement or as provided in the Interim Order and/or Final Order, (ii) granting any Lien upon or affecting any Collateral other than Liens permitted under this Agreement, (C) entry of an order dismissing, or any Credit Party seeking the dismissal of, any of the Chapter 11 Cases or converting any of the Chapter 11 Cases to a Chapter 7 case, (D) appointing a Chapter 11 trustee or an examiner in any of the Chapter 11 Cases having enlarged powers (beyond those set forth under Sections 1106(a)(3) and (4) of the Bankruptcy Code), (E) granting, any other super-priority Claim senior to or pari passu with the super-priority Claims of Administrative Agent and Lenders (except in favor of the Replacement Facility Agent and secured parties under the Replacement Revolving Facility), (F) modifying the Additional Facility Credit Documents in any manner materially adverse to the Agents and the Lenders, (G) authorizing or approving any other action materially adverse to the

Secured Parties or their rights and remedies or their interest in any material portion of the Collateral, (H) granting relief from the automatic stay to permit any secured creditor (other than the Secured Parties) to enforce or otherwise take action with respect to any material Collateral, or (I) permitting the use of cash collateral without the prior written consent of Administrative Agent, except as set forth in the Interim Order or Final Order, whichever is then in effect; or

(ii)  the payment by any Credit Party of any Pre-Petition Claim without the prior written consent of Administrative Agent other than the Pre-Petition Facilities on the Closing Date or unless such payment is otherwise permitted; or

(iii)  the commencement of any action against any of the Secured Parties (solely in their capacities as such under the Credit Documents) by or on behalf of any Credit Party or any of its Affiliates, officers or employees; or

(iv)  the Interim Order (prior to entry of the Final Order) shall cease to be in full force and effect or shall have been reversed, modified, amended, stayed, vacated or subject to a stay pending appeal, in the case of any modification or amendment, without the prior written consent of Administrative Agent and Requisite Lenders; or

(v)  the Final Order shall not have been entered by the Bankruptcy Court on or before the date that is 45 days after the entry of the Interim Order; or

(vi)  the Final Order shall cease to be in full force and effect or shall have been reversed, modified, amended, stayed, vacated or subject to stay pending appeal, in the case of any modification or amendment, without the prior written consent of Administrative Agent and Requisite Lenders; or

(vii)  after entry thereof, the Confirmation Order shall cease to be in full force and effect or shall have been reversed, modified, amended, stayed, vacated or subject to stay pending appeal, in the case of any modification or amendment that is adverse to the Lenders (as determined in the good faith judgment of Administrative Agent and Requisite Lenders), without the prior written consent of Administrative Agent and Requisite Lenders; or

(viii)  breach by any Credit Party of any provisions of the Interim Order or the Final Order or, upon entry of the Confirmation Order, the Confirmation Order; or

(ix)  the allowance of any claim under Section 506(c) of the Bankruptcy Code or otherwise against any or all of the Secured Parties and the Collateral, or against any or all of Administrative Agent, the Lenders or the Collateral securing the Obligations; or

(x)  the filing of any plan of reorganization or related disclosure statement other than the Plan of Reorganization and the Disclosure Statement, or the filing of any direct or indirect amendment to the Plan of Reorganization or the Disclosure Statement, or the entry of an order confirming any such plan of reorganization (other than the Plan of Reorganization) or approving any such disclosure statement (other than the Disclosure

Statement) or approving any such amendment to the Plan of Reorganization or Disclosure Statement, in each case without the prior written consent of Administrative Agent and Requisite Lenders, to the extent such plan, disclosure statement or amendment would, if approved, permit the Credit Parties to satisfy the Obligations other than in Cash in full on the Maturity Date; or

(xi)   any termination or modification of the exclusivity periods set forth in Section 1121 of the Bankruptcy Code, or

(xii)   there shall arise, (x) any claim having priority over any or all administrative expenses of the kind specified in clause (b) of Section 503 or clause (b) of Section 507 of the Bankruptcy Code (other than the Carve-Out) or (y) any Lien on the Collateral having a priority senior to or pari passu with the Liens and security interests granted herein, except as expressly provided herein, in the Interim Order or the Final Order, whichever is then in effect; or

(xiii)   (x) the Plan Support Agreement shall be terminated by any party thereto or shall otherwise cease to be in full force and effect, or shall have been amended, supplemented or otherwise modified in any manner that in the good faith judgment of Administrative Agent and Requisite Lenders adversely affects the interests, rights or remedies of any or all of the Agents, the Arranger and the Lenders, or (y) any party to the Plan Support Agreement shall have breached the Plan Support Agreement in any manner that in the good faith judgment of Administrative Agent and Requisite Lenders adversely affects the interests, rights or remedies of any or all of the Agents, the Arranger and the Lenders,

**THEN**, subject to any notice requirements in the Interim Order or Final Order, as applicable (1) upon the occurrence of any Event of Default described in Section 8.1(f) or 8.1(g), automatically, and (2) upon the occurrence and during the continuance of any other Event of Default, at the request of (or with the consent of) Requisite Lenders, upon notice to Borrower by Administrative Agent, (A) each of the following shall immediately become due and payable, in each case without presentment, demand, protest or other requirements of any kind, all of which are hereby expressly waived by each Credit Party: (I) the unpaid principal amount of and accrued interest on the Loans and (II) all other Obligations; and (B) Administrative Agent may cause Collateral Agent to enforce any and all Liens and security interests created pursuant to Collateral Documents.

**8.2.   Carve-Out Events.**   Upon the commencement of enforcement of remedies by Administrative Agent and Requisite Lenders under the Credit Documents, following an Event of Default, and delivery by Administrative Agent of a Carve-Out Event Notice, the obligation of the Credit Parties to pay Professional Fees incurred for periods on and after delivery of such Carve-Out Event Notice in excess of the Carve-Out Cap shall automatically terminate (a **"Carve-Out Event"**) and after the first Business Day following delivery by Administrative Agent of the Carve-Out Event Notice, to the extent allowed at any time, whether by Interim Order, Final Order, procedural order or otherwise, Borrower may pay Professional Fees incurred by the Credit Parties and the Unsecured Creditors Committee on and after delivery of such Carve-Out Event Notice, but any such Professional Fees incurred after the first Business Day following

delivery of such Carve-Out Event Notice shall not exceed the Carve-Out Cap, and the Carve-Out shall not be available for the Professional Fees of the Ad Hoc Committee incurred after the first Business Day following delivery by Administrative Agent of the Carve-Out Event Notice; <u>provided</u> that so long as the Carve-Out Event Notice has not been delivered or with respect to Professional Fees incurred prior to the delivery of the Carve-Out Notice (or if such Carve-Out Notice has been rescinded), the Credit Parties shall be permitted to pay, as the same may become due and payable, Professional Fees (including of the Ad Hoc Committee) allowed and payable under 11 U.S.C. §330 and §331, and the same shall not reduce the Carve-Out Cap. Notwithstanding anything to the contrary herein shall be construed to impair the ability of any party to object to the fees and expenses of Committees.

## SECTION 9.  AGENTS

**9.1. Appointment of Agents.**  GS Lending Partners is hereby appointed Syndication Agent hereunder, and each Lender hereby authorizes GS Lending Partners to act as Syndication Agent in accordance with the terms hereof and the other Credit Documents.  GS Lending Partners is hereby appointed Administrative Agent and Collateral Agent hereunder and under the other Credit Documents and each Lender hereby authorizes GS Lending Partners to act as Administrative Agent and Collateral Agent in accordance with the terms hereof and the other Credit Documents.  Each Agent hereby agrees to act in its capacity as such upon the express conditions contained herein and the other Credit Documents, as applicable.  The provisions of this Section 9 are solely for the benefit of Agents and Lenders and no Credit Party shall have any rights as a third party beneficiary of any of the provisions thereof.  In performing its functions and duties hereunder, each Agent shall act solely as an agent of Lenders and does not assume and shall not be deemed to have assumed any obligation towards or relationship of agency or trust with or for Holdings or any of its Subsidiaries.  Syndication Agent, without consent of or notice to any party hereto, may assign any and all of its rights or obligations hereunder to any of its Affiliates.  As of the Closing Date, GS Lending Partners, in its capacity as Syndication Agent, shall not have any obligations but shall be entitled to all benefits of this Section 9.   Each of Syndication Agent and any Agent described in clause (e) of the definition thereof may resign from such role at any time, with immediate effect, by giving prior written notice thereof to Administrative Agent and Borrower.

**9.2.  Powers and Duties.**  Each Lender irrevocably authorizes each Agent to take such action on such Lender's behalf and to exercise such powers, rights and remedies hereunder and under the other Credit Documents as are specifically delegated or granted to such Agent by the terms hereof and thereof, together with such powers, rights and remedies as are reasonably incidental thereto.  Each Agent shall have only those duties and responsibilities that are expressly specified herein and the other Credit Documents.  Each Agent may exercise such powers, rights and remedies and perform such duties by or through its agents or employees.  No Agent shall have, by reason hereof or any of the other Credit Documents, a fiduciary relationship in respect of any Lender; and nothing herein or any of the other Credit Documents, expressed or implied, is intended to or shall be so construed as to impose upon any Agent any obligations in respect hereof or any of the other Credit Documents except as expressly set forth herein or therein.

### 9.3. General Immunity.

(a) <u>No Responsibility for Certain Matters</u>. No Agent shall be responsible to any Lender for the execution, effectiveness, genuineness, validity, enforceability, collectability or sufficiency hereof or any other Credit Document or for any representations, warranties, recitals or statements made herein or therein or made in any written or oral statements or in any financial or other statements, instruments, reports or certificates or any other documents furnished or made by any Agent to Lenders or by or on behalf of any Credit Party to any Agent or any Lender in connection with the Credit Documents and the transactions contemplated thereby or for the financial condition or business affairs of any Credit Party or any other Person liable for the payment of any Obligations, nor shall any Agent be required to ascertain or inquire as to the performance or observance of any of the terms, conditions, provisions, covenants or agreements contained in any of the Credit Documents or as to the use of the proceeds of the Loans or as to the existence or possible existence of any Event of Default or Default or to make any disclosures with respect to the foregoing. Anything contained herein to the contrary notwithstanding, Administrative Agent shall not have any liability arising from confirmations of the amount of outstanding Loans or the component amounts thereof. Borrower acknowledges that prior to the Closing Date, it assisted GS Lending Partners, in its capacity as Arranger (with "left" side designation), in connection with the syndication of the Facilities, including, without limitation preparing (i) one or more information packages regarding the business, operations, financial projections and prospects of Holdings and its Subsidiaries (collectively, the **"Confidential Information Memorandum"**), (ii) the Initial Cash Flow Forecast, (ii) the Initial Approved Budget, and (iii) all information relating to the transactions contemplated hereunder prepared by or on behalf of Holdings and its Subsidiaries deemed reasonably necessary by GS Lending Partners to complete the syndication of the Facilities. Borrower acknowledges that it is solely responsible for the contents of any such Confidential Information Memorandum, the Initial Cash Flow Forecast, the Initial Approved Budget and all other information, documentation or materials delivered to GS Lending Partners by or on behalf of Holdings and its Subsidiaries in connection therewith (collectively, the **"Information"**) and acknowledges that GS Lending Partners will be using and relying upon the Information without independent verification thereof.

(b) <u>Exculpatory Provisions</u>. No Agent nor any of its officers, partners, directors, employees or agents shall be liable to Lenders for any action taken or omitted by any Agent under or in connection with any of the Credit Documents except to the extent caused by such Agent's gross negligence or willful misconduct, as determined by a final, non-appealable judgment of a court of competent jurisdiction. Each Agent shall be entitled to refrain from any act or the taking of any action (including the failure to take an action) in connection herewith or any of the other Credit Documents or from the exercise of any power, discretion or authority vested in it hereunder or thereunder unless and until such Agent shall have received instructions in respect thereof from Requisite Lenders (or such other Lenders as may be required to give such instructions under Section 10.5) and, upon receipt of such instructions from Requisite Lenders (or such other Lenders, as the case may be), such Agent shall be entitled to act or (where so instructed) refrain from acting, or to exercise such power, discretion or authority, in accordance with such instructions. Without prejudice to the generality of the foregoing, (i) each Agent shall be entitled to rely, and shall be fully protected in relying, upon any communication, instrument or document believed by it to be genuine and correct and to

have been signed or sent by the proper Person or Persons, and shall be entitled to rely and shall be protected in relying on opinions and judgments of attorneys (who may be attorneys for Holdings and its Subsidiaries), accountants, experts and other professional advisors selected by it; and (ii) no Lender shall have any right of action whatsoever against any Agent as a result of such Agent acting or (where so instructed) refraining from acting hereunder or any of the other Credit Documents in accordance with the instructions of Requisite Lenders (or such other Lenders as may be required to give such instructions under Section 10.5).

(c) <u>Delegation of Duties</u>. Administrative Agent may perform any and all of its duties and exercise its rights and powers under this Agreement or under any other Credit Document by or through any one or more sub-agents appointed by Administrative Agent. Administrative Agent and any such sub-agent may perform any and all of its duties and exercise its rights and powers by or through their respective Affiliates. The exculpatory, indemnification and other provisions of this Section 9.3 and of Section 9.6 shall apply to any the Affiliates of Administrative Agent and shall apply to their respective activities in connection with the syndication of the credit facilities provided for herein as well as activities as Administrative Agent. All of the rights, benefits, and privileges (including the exculpatory and indemnification provisions) of this Section 9.3 and of Section 9.6 shall apply to any such sub-agent and to the Affiliates of any such sub-agent, and shall apply to their respective activities as sub-agent as if such sub-agent and Affiliates were named herein. Notwithstanding anything herein to the contrary, with respect to each sub-agent appointed by Administrative Agent, (i) such sub-agent shall be a third party beneficiary under this Agreement with respect to all such rights, benefits and privileges (including exculpatory rights and rights to indemnification) and shall have all of the rights and benefits of a third party beneficiary, including an independent right of action to enforce such rights, benefits and privileges (including exculpatory rights and rights to indemnification) directly, without the consent or joinder of any other Person, against any or all of Credit Parties and the Lenders, (ii) such rights, benefits and privileges (including exculpatory rights and rights to indemnification) shall not be modified or amended without the consent of such sub-agent, and (iii) such sub-agent shall only have obligations to Administrative Agent and not to any Credit Party, Lender or any other Person and no Credit Party, Lender or any other Person shall have any rights, directly or indirectly, as a third party beneficiary or otherwise, against such sub-agent.

**9.4. Agents Entitled to Act as Lender.** The agency hereby created shall in no way impair or affect any of the rights and powers of, or impose any duties or obligations upon, any Agent in its individual capacity as a Lender hereunder. With respect to its participation in the Loans, each Agent shall have the same rights and powers hereunder as any other Lender and may exercise the same as if it were not performing the duties and functions delegated to it hereunder, and the term "Lender" shall, unless the context clearly otherwise indicates, include each Agent in its individual capacity. Any Agent and its Affiliates may accept deposits from, lend money to, own securities of, and generally engage in any kind of banking, trust, financial advisory or other business with Holdings or any of its Affiliates as if it were not performing the duties specified herein, and may accept fees and other consideration from Borrower for services in connection herewith and otherwise without having to account for the same to Lenders.

**9.5. Lenders' Representations, Warranties and Acknowledgment.**

(a) Each Lender represents and warrants that it has made its own independent investigation of the financial condition and affairs of Holdings and its Subsidiaries in connection with Loans hereunder and that it has made and shall continue to make its own appraisal of the creditworthiness of Holdings and its Subsidiaries. No Agent shall have any duty or responsibility, either initially or on a continuing basis, to make any such investigation or any such appraisal on behalf of Lenders or to provide any Lender with any credit or other information with respect thereto, whether coming into its possession before the making of the Loans or at any time or times thereafter, and no Agent shall have any responsibility with respect to the accuracy of or the completeness of any information provided to Lenders.

(b) Each Lender, by delivering its signature page to this Agreement or an Assignment Agreement and funding its Loans on the Closing Date shall be deemed to have acknowledged receipt of, and consented to and approved, each Credit Document and each other document required to be approved by any Agent, Requisite Lenders or Lenders, as applicable, on the Closing Date. Notwithstanding anything herein to the contrary, each Lender also acknowledges that the Lien and security interest granted to the Collateral Agent pursuant to the Pledge and Security Agreement and the exercise of any right or remedy by the Collateral Agent thereunder or under any other Collateral Document are subject to the provisions of any Replacement Revolving Intercreditor Agreement. In the event of a conflict between the terms of any Replacement Revolving Intercreditor Agreement (on the one hand), this Agreement or any Collateral Documents (on the other hand), the terms of any Replacement Revolving Intercreditor Agreement shall govern and control.

(c) In connection with any assignment to or by an Affiliated Lender pursuant to this Agreement, such Affiliated Lender shall make representations and warranties to Administrative Agent and the Lenders that, as of the effective date of such assignment, it is not in possession of any information regarding any Credit Party, its assets, its ability to perform its Obligations or any other matter that may be material to a decision by any Lender to enter into any Assignment and Acceptance, or participate in any of the transactions contemplated thereby, that has not previously been disclosed to Administrative Agent and the Lenders. Each Lender acknowledges that Affiliated Lenders are Eligible Assignees hereunder and may purchase Loans hereunder from Lenders from time to time, subject to the restrictions set forth in the definition of Affiliated Lender.

(d) Each Lender agrees that at any time, it possesses, directly or indirectly, the power (i) to vote 15% or more of the Securities having ordinary voting power for the election of directors of Holdings or (ii) to direct or cause the direction of the management and policies of Holdings, whether through the ownership of voting securities or by contract or otherwise, such Lender will be deemed an "Affiliated Lender" for all purposes under this Agreement. Without limiting the generality of the foregoing, each Lender acknowledges and agrees that so long as it qualifies as an Affiliated Lender, it will not be able (a) to consent to any amendment, modification, waiver, consent or other such action with respect to any of the terms of this Agreement or any other Credit Document, (b) to require any Agent or other Lender to undertake any action (or refrain from taking any action) with respect to this Agreement or any other Credit Document, (c) otherwise vote on any matter related to this Agreement or any other Credit Document, (d) attend any meeting with any Agent or Lender or receive any information from any Agent or Lender or (e) make or bring any claim, in its capacity as Lender, against the

Agent or any Lender with respect to the duties and obligations of such Persons under the Credit Documents, but no amendment, modification or waiver shall deprive any Affiliated Lender of its share of any payments which the Lenders are entitled to share on a pro rata basis hereunder.

**9.6.  Right to Indemnity.**  Each Lender, in proportion to its Pro Rata Share, severally agrees to indemnify each Agent, to the extent that such Agent shall not have been reimbursed by any Credit Party, for and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses (including counsel fees and disbursements) or disbursements of any kind or nature whatsoever which may be imposed on, incurred by or asserted against such Agent (i) in exercising its powers, rights and remedies or performing its duties hereunder or under the other Credit Documents or otherwise in its capacity as such Agent in any way relating to or arising out of this Agreement or the other Credit Documents and (ii) in connection with (A) the obtaining of approval of the Credit Documents by the Bankruptcy Court and (B) the preparation and review of pleadings, documents and reports related to any Chapter 11 Case and any subsequent case under Chapter 7 of the Bankruptcy Code, attendance at meetings, court hearings or conferences related to any Chapter 11 Case and any subsequent case under Chapter 7 of the Bankruptcy Code, and general monitoring of any Chapter 11 Case and any subsequent case under Chapter 7 of the Bankruptcy Code; provided, no Lender shall be liable for any portion of such liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements resulting from such Agent's gross negligence or willful misconduct, as determined by a final, non-appealable judgment of a court of competent jurisdiction.  If any indemnity furnished to any Agent for any purpose shall, in the opinion of such Agent, be insufficient or become impaired, such Agent may call for additional indemnity and cease, or not commence, to do the acts indemnified against until such additional indemnity is furnished; provided, in no event shall this sentence require any Lender to indemnify any Agent against any liability, obligation, loss, damage, penalty, action, judgment, suit, cost, expense or disbursement in excess of such Lender's Pro Rata Share thereof; and provided further, this sentence shall not be deemed to require any Lender to indemnify any Agent against any liability, obligation, loss, damage, penalty, action, judgment, suit, cost, expense or disbursement described in the proviso in the immediately preceding sentence.

**9.7.  Successor Administrative Agent and Collateral Agent.**  (a)  Administrative Agent shall have the right to resign at any time by giving prior written notice thereof to Lenders and Borrower and Administrative Agent may be removed at any time with or without cause by an instrument or concurrent instruments in writing delivered to Borrower and Administrative Agent and signed by Requisite Lenders.  Administrative Agent shall have the right to appoint a financial institution to act as Administrative Agent and/or Collateral Agent hereunder, subject to the reasonable satisfaction of Borrower and Requisite Lenders, and Administrative Agent's resignation shall become effective on the earliest of (i) 30 days after delivery of the notice of resignation, (ii) the acceptance of such successor Administrative Agent by Borrower and Requisite Lenders or (iii) such other date, if any, agreed to by Requisite Lenders.  Upon any such notice of resignation or any such removal, if a successor Administrative Agent has not already been appointed by the retiring Administrative Agent, Requisite Lenders shall have the right, upon five Business Days' notice to Borrower, to appoint a successor Administrative Agent.  If neither Requisite Lenders nor Administrative Agent have appointed a successor Administrative Agent, Requisite Lenders shall be deemed to have succeeded to and become vested with all the rights, powers, privileges and duties of the retiring Administrative Agent; provided that, until a

successor Administrative Agent is so appointed by Requisite Lenders or Administrative Agent, any collateral security held by Administrative Agent in its role as Collateral Agent on behalf of the Lenders under any of the Collateral Documents shall continue to be held by the retiring Collateral Agent as nominee until such time as a successor Collateral Agent is appointed. Upon the acceptance of any appointment as Administrative Agent hereunder by a successor Administrative Agent, that successor Administrative Agent shall thereupon succeed to and become vested with all the rights, powers, privileges and duties of the retiring or removed Administrative Agent and the retiring or removed Administrative Agent shall promptly (i) transfer to such successor Administrative Agent all sums, Securities and other items of Collateral held under the Collateral Documents, together with all records and other documents necessary or appropriate in connection with the performance of the duties of the successor Administrative Agent under the Credit Documents, and (ii) execute and deliver to such successor Administrative Agent such amendments to financing statements, and take such other actions, as may be necessary or appropriate in connection with the assignment to such successor Administrative Agent of the security interests created under the Collateral Documents, whereupon such retiring or removed Administrative Agent shall be discharged from its duties and obligations hereunder. Except as provided above, any resignation or removal of GS Lending Partners or its successor as Administrative Agent pursuant to this Section shall also constitute the resignation or removal of GS Lending Partners or its successor as Collateral Agent. After any retiring or removed Administrative Agent's resignation or removal hereunder as Administrative Agent, the provisions of this Section 9 shall inure to its benefit as to any actions taken or omitted to be taken by it while it was Administrative Agent hereunder. Any successor Administrative Agent appointed pursuant to this Section shall, upon its acceptance of such appointment, become the successor Collateral Agent for all purposes hereunder.

(b) In addition to the foregoing, Collateral Agent may resign at any time by giving prior written notice thereof to Lenders and the Grantors, and Collateral Agent may be removed at any time with or without cause by an instrument or concurrent instruments in writing delivered to the Grantors and Collateral Agent signed by Requisite Lenders. Administrative Agent shall have the right to appoint a financial institution as Collateral Agent hereunder, subject to the reasonable satisfaction of Borrower and Requisite Lenders and Collateral Agent's resignation shall become effective on the earliest of (i) 30 days after delivery of the notice of resignation, (ii) the acceptance of such successor Collateral Agent by Borrower and Requisite Lenders or (iii) such other date, if any, agreed to by Requisite Lenders. Upon any such notice of resignation or any such removal, Requisite Lenders shall have the right, upon five Business Days' notice to Administrative Agent, to appoint a successor Collateral Agent. Until a successor Collateral Agent is so appointed by Requisite Lenders or Administrative Agent, any collateral security held by Collateral Agent on behalf of the Lenders under any of the Credit Documents shall continue to be held by the retiring Collateral Agent as nominee until such time as a successor Collateral Agent is appointed. Upon the acceptance of any appointment as Collateral Agent hereunder by a successor Collateral Agent, that successor Collateral Agent shall thereupon succeed to and become vested with all the rights, powers, privileges and duties of the retiring or removed Collateral Agent under this Agreement and the Collateral Documents, and the retiring or removed Collateral Agent under this Agreement shall promptly (i) transfer to such successor Collateral Agent all sums, Securities and other items of Collateral held hereunder or under the Collateral Documents, together with all records and other documents necessary or appropriate in connection with the performance of the duties of

the successor Collateral Agent under this Agreement and the Collateral Documents, and (ii) execute and deliver to such successor Collateral Agent or otherwise authorize the filing of such amendments to financing statements, and take such other actions, as may be necessary or appropriate in connection with the assignment to such successor Collateral Agent of the security interests created under the Collateral Documents, whereupon such retiring or removed Collateral Agent shall be discharged from its duties and obligations under this Agreement and the Collateral Documents. After any retiring or removed Collateral Agent's resignation or removal hereunder as the Collateral Agent, the provisions of this Agreement and the Collateral Documents shall inure to its benefit as to any actions taken or omitted to be taken by it under this Agreement or the Collateral Documents while it was the Collateral Agent hereunder.

### 9.8. Collateral Documents and Guaranty.

(a) <u>Agents under Collateral Documents and Guaranty</u>. Each Secured Party hereby further authorizes Administrative Agent or Collateral Agent, as applicable, on behalf of and for the benefit of Secured Parties, to be the agent for and representative of Secured Parties with respect to the Guaranty, the Collateral, any Replacement Revolving Intercreditor Agreement and the other Collateral Documents; provided that neither Administrative Agent nor Collateral Agent shall owe any fiduciary duty, duty of loyalty, duty of care, duty of disclosure or any other obligation whatsoever to any holder of Obligations with respect to any Hedge Agreement. Subject to Section 10.5, without further written consent or authorization from any Secured Party, Administrative Agent or Collateral Agent, as applicable may execute any documents or instruments necessary to (i) in connection with a sale or disposition of assets permitted by this Agreement, release any Lien encumbering any item of Collateral that is the subject of such sale or other disposition of assets or to which Requisite Lenders (or such other Lenders as may be required to give such consent under Section 10.5) have otherwise consented, (ii) subordinate the Collateral Agent's Liens on the ABL Collateral in connection with the incurrence of the Replacement Revolving Facility, or (iii) release any Guarantor from the Guaranty pursuant to Section 7.12 or with respect to which Requisite Lenders (or such other Lenders as may be required to give such consent under Section 10.5) have otherwise consented. Each Secured Party understands, acknowledges and agrees that arrangements may be put in place whereby the ABL Collateral may be sold pursuant to a Replacement Revolving Facility, which arrangements, if in existence, shall be subject to terms and conditions of a Replacement Revolving Intercreditor Agreement. The terms of each Replacement Revolving Intercreditor Agreement may provide, in the event of any conflict between the terms of such Replacement Revolving Intercreditor Agreement and any of the Credit Documents, the provisions of such Replacement Revolving Intercreditor Agreement shall govern and control. Each Secured Party authorizes and instructs Administrative Agent and Collateral Agent to enter into the Replacement Revolving Intercreditor Agreement on behalf of the Secured Parties in accordance with this Agreement and to take all actions (and execute all documents) required (or deemed advisable) by it in accordance with the terms of such Replacement Revolving Intercreditor Agreement.

(b) <u>Right to Realize on Collateral and Enforce Guaranty</u>. Anything contained in any of the Credit Documents to the contrary notwithstanding, Borrower, Administrative Agent, Collateral Agent and each Secured Party hereby agree that (i) no Secured Party shall have any right individually to realize upon any of the Collateral or to enforce the Guaranty, it

being understood and agreed that all powers, rights and remedies hereunder may be exercised solely by Administrative Agent, on behalf of the Secured Parties in accordance with the terms hereof and all powers, rights and remedies under the Collateral Documents may be exercised solely by Collateral Agent, and (ii) in the event of a foreclosure by Collateral Agent on any of the Collateral pursuant to a public or private sale or other disposition, Collateral Agent or any Lender may be the purchaser or licensor of any or all of such Collateral at any such sale or other disposition and Collateral Agent, as agent for and representative of Secured Parties (but not any Lender or Lenders in its or their respective individual capacities unless Requisite Lenders shall otherwise agree in writing) shall be entitled, for the purpose of bidding and making settlement or payment of the purchase price for all or any portion of the Collateral sold at any such public sale, to use and apply any of the Obligations as a credit on account of the purchase price for any collateral payable by Collateral Agent at such sale or other disposition.

(c) <u>Rights under Hedge Agreements</u>. No Hedge Agreement will create (or be deemed to create) in favor of any Lender Counterparty that is a party thereto any rights in connection with the management or release of any Collateral or of the obligations of any Guarantor under the Credit Documents except as expressly provided in Section 10.5(c)(ii) of this Agreement and Section 9.2 of the Pledge and Security Agreement. By accepting the benefits of the Collateral, such Lender Counterparty shall be deemed to have appointed Collateral Agent as its agent and agreed to be bound by the Credit Documents as a Secured Party, subject to the limitations set forth in this clause (c).

(d) <u>Release of Collateral and Guarantees, Termination of Credit Documents</u>. Notwithstanding anything to the contrary contained herein or any other Credit Document, when all Obligations (other than obligations in respect of any Hedge Agreement) have been paid in full, upon request of Borrower, Administrative Agent shall (without notice to, or vote or consent of, any Lender, or any affiliate of any Lender that is a party to any Hedge Agreement) take such actions as shall be required to release its security interest in all Collateral, and to release all guarantee obligations provided for in any Credit Document, whether or not on the date of such release there may be outstanding Obligations in respect of Hedge Agreements. Any such release of guarantee obligations shall be deemed subject to the provision that such guarantee obligations shall be reinstated if after such release any portion of any payment in respect of the Obligations guaranteed thereby shall be rescinded or must otherwise be restored or returned upon the insolvency, bankruptcy, dissolution, liquidation or reorganization of Borrower or any Guarantor, or upon or as a result of the appointment of a receiver, intervenor or conservator of, or trustee or similar officer for, Borrower or any Guarantor or any substantial part of its property, or otherwise, all as though such payment had not been made.

**9.9. Withholding Taxes.** To the extent required by any applicable law, Administrative Agent may withhold from any payment to any Lender an amount equivalent to any applicable withholding tax. If the Internal Revenue Service or any other Governmental Authority asserts a claim that Administrative Agent did not properly withhold tax from amounts paid to or for the account of any Lender because the appropriate form was not delivered or was not properly executed or because such Lender failed to notify Administrative Agent of a change in circumstance which rendered the exemption from, or reduction of, withholding tax ineffective or for any other reason, such Lender shall indemnify Administrative Agent fully for all amounts

paid, directly or indirectly, by Administrative Agent as tax or otherwise, including any penalties or interest and together with all expenses (including legal expenses, allocated internal costs and out-of-pocket expenses) incurred.

## SECTION 10.  MISCELLANEOUS

### 10.1.  Notices.

(a)  <u>Notices Generally</u>.  Any notice or other communication herein required or permitted to be given to a Credit Party, Syndication Agent, Collateral Agent or Administrative Agent, shall be sent to such Person's address as set forth on Appendix B or in the other relevant Credit Document, and in the case of any Lender, the address as indicated on Appendix B or otherwise indicated to Administrative Agent in writing.  Except as otherwise set forth in paragraph (b) below, each notice hereunder shall be in writing and may be personally served or sent by telefacsimile (except for any notices sent to Administrative Agent) or United States mail or courier service and shall be deemed to have been given when delivered in person or by courier service and signed for against receipt thereof, upon receipt of telefacsimile, or three Business Days after depositing it in the United States mail with postage prepaid and properly addressed; <u>provided</u>, no notice to any Agent shall be effective until received by such Agent; <u>provided</u> <u>further</u>, any such notice or other communication shall at the request of Administrative Agent be provided to any sub-agent appointed pursuant to Section 9.3(c) hereto as designated by Administrative Agent from time to time.

(b)  <u>Electronic Communications</u>.

(i)  Notices and other communications to Lenders hereunder may be delivered or furnished by electronic communication (including e-mail and Internet or intranet websites, including the Platform) pursuant to procedures approved by Administrative Agent, <u>provided</u> that the foregoing shall not apply to notices to any Lender pursuant to Section 2 if such Lender, as applicable, has notified Administrative Agent that it is incapable of receiving notices under such Section by electronic communication.  Administrative Agent or Borrower may, in its discretion, agree to accept notices and other communications to it hereunder by electronic communications pursuant to procedures approved by it, <u>provided</u> that approval of such procedures may be limited to particular notices or communications.  Unless Administrative Agent otherwise prescribes, (i) notices and other communications sent to an e-mail address shall be deemed received upon the sender's receipt of an acknowledgement from the intended recipient (such as by the "return receipt requested" function, as available, return e-mail or other written acknowledgement), <u>provided</u> that if such notice or other communication is not sent during the normal business hours of the recipient, such notice or communication shall be deemed to have been sent at the opening of business on the next Business Day for the recipient, and (ii) notices or communications posted to an Internet or intranet website shall be deemed received upon the deemed receipt by the intended recipient at its e-mail address as described in the foregoing clause (i) of notification that such notice or communication is available and identifying the website address therefor.

(ii) Each Credit Party understands that the distribution of material through an electronic medium is not necessarily secure and that there are confidentiality and other risks associated with such distribution and agrees and assumes the risks associated with such electronic distribution, except to the extent caused by the willful misconduct or gross negligence of Administrative Agent, as determined by a final, non-appealable judgment of a court of competent jurisdiction.

(iii) The Platform and any Approved Electronic Communications are provided "as is" and "as available".  None of the Agents nor any of their respective officers, directors, employees, agents, advisors or representatives (the "**Agent Affiliates**") warrant the accuracy, adequacy, or completeness of the Approved Electronic Communications or the Platform and each expressly disclaims liability for errors or omissions in the Platform and the Approved Electronic Communications.  No warranty of any kind, express, implied or statutory, including any warranty of merchantability, fitness for a particular purpose, non-infringement of third party rights or freedom from viruses or other code defects is made by the Agent Affiliates in connection with the Platform or the Approved Electronic Communications.

(iv) Each Credit Party, each Lender and each Agent agrees that Administrative Agent may, but shall not be obligated to, store any Approved Electronic Communications on the Platform in accordance with Administrative Agent's customary document retention procedures and policies.

(v) Any notice of Default or Event of Default may be provided by telephone if confirmed promptly thereafter by delivery of written notice thereof.

(c) Private Side Information Contacts.  Each Public Lender agrees to cause at least one individual at or on behalf of such Public Lender to at all times have selected the "Private Side Information" or similar designation on the content declaration screen of the Platform in order to enable such Public Lender or its delegate, in accordance with such Public Lender's compliance procedures and applicable law, including United States federal and state securities laws, to make reference to information that is not made available through the "Public Side Information" portion of the Platform and that may contain Non-Public Information with respect to Holdings, its Subsidiaries or their securities for purposes of United States federal or state securities laws.

**10.2.  Expenses.**  Whether or not the transactions contemplated hereby shall be consummated, Borrower agrees to pay promptly (a) all documented, actual and reasonable costs and expenses incurred in connection with the negotiation, preparation and execution of the Credit Documents and any consents, amendments, waivers or other modifications thereto; (b) all the costs of furnishing all opinions by counsel for Borrower and the other Credit Parties; (c) the reasonable, documented fees, expenses and disbursements of counsel to Agents (in each case including allocated costs of internal counsel) in connection with the negotiation, preparation, execution and administration of the Credit Documents and any consents, amendments, waivers or other modifications thereto and any other documents or matters requested by Borrower; (d) all the actual costs and reasonable expenses of creating, perfecting, recording, maintaining and preserving Liens in favor of Collateral Agent, for the benefit of Secured Parties, including filing

and recording fees, expenses and taxes, stamp or documentary taxes, search fees, title insurance premiums and reasonable fees, expenses and disbursements of counsel to each Agent and of counsel providing any opinions that any Agent or Requisite Lenders may request in respect of the Collateral or the Liens created pursuant to the Collateral Documents; (e) all the actual and reasonable costs, fees, expenses and disbursements of any auditors, accountants, consultants or appraisers; (f) all the actual and reasonable costs and expenses (including the reasonable, documented fees, expenses and disbursements of any appraisers, consultants, advisors and agents employed or retained by Collateral Agent and its counsel) in connection with the custody or preservation of any of the Collateral; (g) all other actual and reasonable costs and expenses incurred by each Agent in connection with the syndication of the Loans and Commitments and the transactions contemplated by the Credit Documents and any consents, amendments, waivers or other modifications thereto and (h) after the occurrence of a Default or an Event of Default, all costs and expenses, including reasonable attorneys' fees (including allocated costs of internal counsel) and costs of settlement, incurred by any Agent and Lenders in enforcing any Obligations of or in collecting any payments due from any Credit Party hereunder or under the other Credit Documents by reason of such Default or Event of Default (including in connection with the sale, lease or license of, collection from, or other realization upon any of the Collateral or the enforcement of the Guaranty) or in connection with any refinancing or restructuring of the credit arrangements provided hereunder in the nature of a "work-out" or pursuant to any insolvency or bankruptcy cases or proceedings.

### 10.3. Indemnity.

(a)     In addition to the payment of expenses pursuant to Section 10.2, whether or not the transactions contemplated hereby shall be consummated, each Credit Party agrees to defend (subject to Indemnitees' selection of counsel), indemnify, pay and hold harmless, each Agent and Lender and the officers, partners, members, directors, trustees, advisors, employees, agents, sub-agents and Affiliates of each Agent and each Lender (each, an "**Indemnitee**"), from and against any and all Indemnified Liabilities; provided, no Credit Party shall have any obligation to any Indemnitee hereunder with respect to any Indemnified Liabilities to the extent such Indemnified Liabilities arise from the gross negligence or willful misconduct of that Indemnitee, in each case, as determined by a final, non-appealable judgment of a court of competent jurisdiction.  To the extent that the undertakings to defend, indemnify, pay and hold harmless set forth in this Section 10.3 may be unenforceable in whole or in part because they are violative of any law or public policy, the applicable Credit Party shall contribute the maximum portion that it is permitted to pay and satisfy under applicable law to the payment and satisfaction of all Indemnified Liabilities incurred by Indemnitees or any of them.

(b)     To the extent permitted by applicable law, no Credit Party shall assert, and each Credit Party hereby waives, any claim against each Lender, each Agent, the Arranger and their respective Affiliates, directors, employees, attorneys, agents or sub-agents, on any theory of liability, for special, indirect, consequential or punitive damages  (as opposed to direct or actual damages) (whether or not the claim therefor is based on contract, tort or duty imposed by any applicable legal requirement) arising out of, in connection with, as a result of, or in any way related to, this Agreement or any Credit Document or any agreement or instrument contemplated hereby or thereby or referred to herein or therein, the transactions contemplated hereby or thereby, any Loan or the use of the proceeds thereof or any act or omission or event

occurring in connection therewith, and Holdings and Borrower hereby waives, releases and agrees not to sue upon any such claim or any such damages, whether or not accrued and whether or not known or suspected to exist in its favor.

(c)  The indemnification pursuant to this Section 10.3 shall expressly survive the effective date of the Plan of Reorganization or any other plan of reorganization confirmed by the Bankruptcy Court.

**10.4.  Set-Off.**  Subject to any notice requirements in the Interim Order (with respect to the period prior to the entry of the Final Order) or the Final Order (with respect to the period on and after entry of the Final Order), in addition to any rights now or hereafter granted under applicable law and not by way of limitation of any such rights, upon the occurrence of any Event of Default each Lender is hereby authorized, in each case notwithstanding the provisions of Section 362 of the Bankruptcy Code, and without any application, motion or notice to, hearing before, or order from, the Bankruptcy Court, by each Credit Party at any time or from time to time subject to the consent of Administrative Agent (such consent not to be unreasonably withheld or delayed), without notice to any Credit Party or to any other Person (other than Administrative Agent), any such notice being hereby expressly waived, to set off and to appropriate and to apply any and all deposits (general or special, including Indebtedness evidenced by certificates of deposit, whether matured or unmatured, but not including trust accounts) and any other Indebtedness at any time held or owing by such Lender to or for the credit or the account of any Credit Party against and on account of the obligations and liabilities of any Credit Party to such Lender, and participations therein and under the other Credit Documents, including all claims of any nature or description arising out of or connected hereto, and participations therein or with any other Credit Document, irrespective of whether or not (a) such Lender shall have made any demand hereunder or (b) the principal of or the interest on the Loans or any amounts in respect of any other amounts due hereunder shall have become due and payable pursuant to Section 2 and although such obligations and liabilities, or any of them, may be contingent or unmatured.

**10.5.  Amendments and Waivers.**

(a)  <u>Requisite Lenders' Consent</u>.  Subject to the additional requirements of Sections 10.5(b) and 10.5(c), no amendment, modification, termination or waiver of any provision of the Credit Documents, or consent to any departure by any Credit Party therefrom, shall in any event be effective without the written concurrence of Requisite Lenders; <u>provided</u> that Administrative Agent may, with the consent of Borrower only, amend, modify or supplement this Agreement to cure any ambiguity, omission, defect or inconsistency, so long as such amendment, modification or supplement does not adversely affect the rights of any Lender.

(b)  <u>Affected Lenders' Consent</u>.  Without the written consent of each Lender that would be directly affected thereby, no amendment, modification, termination, or consent shall be effective if the effect thereof would:

(i)  extend the scheduled final maturity of any Loan or Note;

(ii)  waive, reduce or postpone any scheduled repayment (but not prepayment);

(iii)  reduce the rate of interest on any Loan (other than any waiver of any increase in the interest rate applicable to any Loan pursuant to Section 2.7) or any fee or any premium payable hereunder;

(iv)  extend the time for payment of any such interest or fees;

(v)  reduce the principal amount of any Loan;

(vi)  amend, modify, terminate or waive any provision of this Section 10.5(b), Section 10.5(c) or any other provision of this Agreement that expressly provides that the consent of all Lenders is required;

(vii)  amend the definition of "**Requisite Lenders**" or "**Pro Rata Share**"; provided, with the consent of Requisite Lenders, additional extensions of credit pursuant hereto may be included in the determination of "**Requisite Lenders**" or "**Pro Rata Share**" on substantially the same basis as the Tranche B-1 Term Loan Commitments, the Tranche B-1 Term Loans, the Tranche B-2 Term Loan Commitments and the Tranche B-2 Term Loans are included on the Closing Date;

(viii)  release all or substantially all of the Collateral or all or substantially all of the Guarantors from the Guaranty except as expressly provided in the Credit Documents; or

(ix)  except in connection with assignments and transfers to a New Credit Party as contemplated under Section 3.6(a) made upon the consummation of the Plan of Reorganization, consent to the assignment or transfer by any Credit Party of any of its rights and obligations under any Credit Document;

provided that, for the avoidance of doubt, all Lenders shall be deemed directly affected thereby with respect to any amendment described in clauses (vi), (vii), (viii) and (ix).

(c)  Other Consents.  No amendment, modification, termination or waiver of any provision of the Credit Documents, or consent to any departure by any Credit Party therefrom, shall:

(i)  [Intentionally Omitted];

(ii)  amend, modify or waive this Agreement or the Pledge and Security Agreement so as to alter the ratable treatment of Obligations arising under the Credit Documents and Obligations arising under Hedge Agreements or the definition of "**Lender Counterparty**," "**Hedge Agreement**," "**Obligations**," or "**Secured Obligations**" (as defined in any applicable Collateral Document (other than any Replacement Revolving Intercreditor Agreement)) in each case in a manner adverse to any Lender Counterparty with Obligations then outstanding without the written consent of any such Lender Counterparty;

(iii) amend the definition of "**Requisite Class Lenders**" without the consent of Requisite Class Lenders of each Class; provided, with the consent of Requisite Lenders, additional extensions of credit pursuant hereto may be included in the determination of such "**Requisite Class Lenders**" on substantially the same basis as the Commitments and the Loans are included on the Closing Date;

(iv) alter the required application of any repayments or prepayments as between Classes pursuant to Section 2.12 without the consent of Requisite Class Lenders of each Class which is being allocated a lesser repayment or prepayment as a result thereof; provided, Requisite Lenders may waive, in whole or in part, any prepayment so long as the application, as between Classes, of any portion of such prepayment which is still required to be made is not altered; or

(v) amend, modify, terminate or waive any provision of Section 9 as the same applies to any Agent, or any other provision hereof as the same applies to the rights or obligations of any Agent, in each case without the consent of such Agent.

(d) Execution of Amendments, Etc. Administrative Agent may, but shall have no obligation to, with the concurrence of any Lender, execute amendments, modifications, waivers or consents on behalf of such Lender. Any waiver or consent shall be effective only in the specific instance and for the specific purpose for which it was given. No notice to or demand on any Credit Party in any case shall entitle any Credit Party to any other or further notice or demand in similar or other circumstances. Any amendment, modification, termination, waiver or consent effected in accordance with this Section 10.5 shall be binding upon each Lender at the time outstanding, each future Lender and, if signed by a Credit Party, on such Credit Party.

(e) Amendment and Restatement. In connection with the exercise of the Exit Facilities Option, to facilitate reference to the provisions of this Agreement, each Lender executing this Agreement hereby authorizes Administrative Agent, on its behalf, to enter into an amendment and restatement of this Agreement on or about the Exit Facility Conversion Date, at Administrative Agent's option in order to delete provisions relating to the DIP Facility and in connection with the incurrence of the Replacement Revolving Facility, to facilitate reference to the provisions of this Agreement, each Lender executing this Agreement hereby authorizes Administrative Agent, on its behalf, to enter into an amendment and restatement of this Agreement on or about the date of incurrence of the Replacement Revolving Facility, at Administrative Agent's option in order to make more specific the references to the Replacement Revolving Facility; provided that in each case, any such amendment and restatement shall be distributed to each Lender.

## 10.6. Successors and Assigns; Participations.

(a) Generally. This Agreement shall be binding upon the parties hereto and their respective successors and assigns and shall inure to the benefit of the parties hereto and the successors and assigns of Lenders. No Credit Party's rights or obligations hereunder nor any interest therein may be assigned or delegated by any Credit Party without the prior written consent of all Lenders except as set forth in Section 3.6(a). Nothing in this Agreement,

expressed or implied, shall be construed to confer upon any Person (other than the parties hereto, their respective successors and assigns permitted hereby and, to the extent expressly contemplated hereby, Affiliates of each of the Agents and Lenders and other Indemnitees) any legal or equitable right, remedy or claim under or by reason of this Agreement.

(b) <u>Register</u>. Borrower, Administrative Agent and Lenders shall deem and treat the Persons listed as Lenders in the Register as the holders and owners of the corresponding Commitments and Loans listed therein for all purposes hereof, and no assignment or transfer of any such Commitment or Loan shall be effective, in each case, unless and until recorded in the Register following receipt of a fully executed Assignment Agreement effecting the assignment or transfer thereof, together with the required forms and certificates regarding tax matters and any fees payable in connection with such assignment, in each case, as provided in Section 10.6(d). Each assignment shall be recorded in the Register promptly following receipt by Administrative Agent of the fully executed Assignment Agreement and all other necessary documents and approvals, prompt notice thereof shall be provided to Borrower and a copy of such Assignment Agreement shall be maintained, as applicable. The date of such recordation of a transfer shall be referred to herein as the "**Assignment Effective Date.**" Any request, authority or consent of any Person who, at the time of making such request or giving such authority or consent, is listed in the Register as a Lender shall be conclusive and binding on any subsequent holder, assignee or transferee of the corresponding Commitments or Loans.

(c) <u>Right to Assign</u>. Each Lender shall have the right at any time to sell, assign or transfer all or a portion of its rights and obligations under this Agreement, including all or a portion of its Commitment or Loans owing to it or other Obligations subject to Section 9.5(c) (<u>provided</u>, <u>however</u>, that pro rata assignments shall not be required and each assignment shall be of a uniform, and not varying, percentage of all rights and obligations under and in respect of any applicable Loan and any related Commitments):

(i) to any Person meeting the criteria of clause (i) of the definition of the term of "Eligible Assignee" upon the giving of notice to Borrower and Administrative Agent; and

(ii) to any Person meeting the criteria of clause (ii) of the definition of the term of "Eligible Assignee" upon giving of notice to Borrower and Administrative Agent; <u>provided</u>, <u>further</u> each such assignment pursuant to this Section 10.6(c)(ii) shall be in an aggregate amount of not less than $1,000,000 (or such lesser amount as may be agreed to by Borrower and Administrative Agent or as shall constitute the aggregate amount of the Loan of the assigning Lender) with respect to the assignment of Loans.

(d) <u>Mechanics</u>. Assignments and assumptions of Loans and Loan Commitments by Lenders shall be effected by manual execution and delivery to Administrative Agent of an Assignment Agreement. Assignments made pursuant to the foregoing provision shall be effective as of the Assignment Effective Date. In connection with all assignments there shall be delivered to Administrative Agent such forms, certificates or other evidence, if any, with respect to United States federal income tax withholding matters as

the assignee under such Assignment Agreement may be required to deliver pursuant to Section 2.17(c).

(e) <u>Representations and Warranties of Assignee</u>.  Each Lender, upon execution and delivery hereof or upon succeeding to an interest in the Commitments and Loans, as the case may be, represents and warrants as of the Closing Date or as of the Assignment Effective Date that (i) it is an Eligible Assignee; (ii) it has experience and expertise in the making of or investing in commitments or loans such as the applicable Commitments or Loans, as the case may be; and (iii) it will make or invest in, as the case may be, its Commitments or Loans for its own account in the ordinary course and without a view to distribution of such Commitments or Loans within the meaning of the Securities Act or the Exchange Act or other federal securities laws (it being understood that, subject to the provisions of this Section 10.6, the disposition of such Commitments or Loans or any interests therein shall at all times remain within its exclusive control).

(f) <u>Effect of Assignment</u>.  Subject to the terms and conditions of this Section 10.6, as of the "Assignment Effective Date" (i) the assignee thereunder shall have the rights and obligations of a "Lender" hereunder to the extent of its interest in the Loans and Commitments as reflected in the Register and shall thereafter be a party hereto and a "Lender" for all purposes hereof; (ii) the assigning Lender thereunder shall, to the extent that rights and obligations hereunder have been assigned to the assignee, relinquish its rights (other than any rights which survive the termination hereof under Section 10.9) and be released from its obligations hereunder (and, in the case of an assignment covering all or the remaining portion of an assigning Lender's rights and obligations hereunder, such Lender shall cease to be a party hereto on the Assignment Effective Date; <u>provided</u>, anything contained in any of the Credit Documents to the contrary notwithstanding, such assigning Lender shall continue to be entitled to the benefit of all indemnities hereunder as specified herein with respect to matters arising out of the prior involvement of such assigning Lender as a Lender hereunder); and (iii) if any such assignment occurs after the issuance of any Note hereunder, the assigning Lender shall, upon the effectiveness of such assignment or as promptly thereafter as practicable, surrender its applicable Notes to Administrative Agent for cancellation, and thereupon Borrower shall issue and deliver new Notes, if so requested by the assignee and/or assigning Lender, to such assignee and/or to such assigning Lender, with appropriate insertions, to reflect the new outstanding Loans of the assignee and/or the assigning Lender.

(g) <u>Participations</u>.

(i)  Each Lender shall have the right at any time to sell one or more participations to any Person (other than Holdings, any of its Subsidiaries or any of its Affiliates) in all or any part of its Commitments, Loans or in any other Obligation.

(ii)  The holder of any such participation, other than an Affiliate of the Lender granting such participation, shall not be entitled to require such Lender to take or omit to take any action hereunder except with respect to any amendment, modification or waiver that would (A) extend the final scheduled maturity of any Loan or Note in which such participant is participating, or reduce the rate or extend the time of payment of interest or fees thereon (except in connection with a waiver of applicability of any

post-default increase in interest rates) or reduce the principal amount thereof, or increase the amount of the participant's participation over the amount thereof then in effect (it being understood that a waiver of any Default or Event of Default or of a mandatory reduction in the Commitment shall not constitute a change in the terms of such participation, and that an increase in any Commitment or Loan shall be permitted without the consent of any participant if the participant's participation is not increased as a result thereof), (B) consent to the assignment or transfer by any Credit Party of any of its rights and obligations under this Agreement or (C) release all or substantially all of the Collateral under the Collateral Documents or all or substantially all of the Guarantors from the Guaranty (in each case, except as expressly provided in the Credit Documents) supporting the Loans hereunder in which such participant is participating.

(iii)     Borrower agrees that each participant shall be entitled to the benefits of Sections 2.15(c), 2.16 and 2.17 to the same extent as if it were a Lender and had acquired its interest by assignment pursuant to paragraph (c) of this Section; provided, (x) a participant shall not be entitled to receive any greater payment under Section 2.16 or 2.17 than the applicable Lender would have been entitled to receive with respect to the participation sold to such participant, unless the sale of the participation to such participant is made with Borrower's prior written consent and (y) a participant that would be a Non-US Lender if it were a Lender shall not be entitled to the benefits of Section 2.17 unless Borrower is notified of the participation sold to such participant and such participant agrees, for the benefit of Borrower, to comply with Section 2.17 as though it were a Lender; provided further that, except as specifically set forth in clauses (x) and (y) of this sentence, nothing herein shall require any notice to Borrower or any other Person in connection with the sale of any participation.  To the extent permitted by law, each participant also shall be entitled to the benefits of Section 10.4 as though it were a Lender, provided such Participant agrees to be subject to Section 2.14 as though it were a Lender.

(h)     Certain Other Assignments and Participations.  In addition to any other assignment or participation permitted pursuant to this Section 10.6 any Lender may assign, pledge and/or grant a security interest in all or any portion of its Loans, the other Obligations owed by or to such Lender, and its Notes, if any, to secure obligations of such Lender including any Federal Reserve Bank as collateral security pursuant to Regulation A of the Board of Governors and any operating circular issued by such Federal Reserve Bank; provided, that no Lender, as between Borrower and such Lender, shall be relieved of any of its obligations hereunder as a result of any such assignment and pledge, and provided further, that in no event shall the applicable Federal Reserve Bank, pledgee or trustee, be considered to be a "Lender" or be entitled to require the assigning Lender to take or omit to take any action hereunder.

**10.7.   Certain Undertakings with Respect to Securitization Subsidiaries.**  Each of the Lenders and the Agents agrees that, prior to the date that is one year and one day after the payment in full of all the obligations of the Securitization Subsidiary in connection with and under a Securitization, (i) the Secured Parties shall not be entitled, whether before or after the occurrence of any Event of Default, to (A) institute against, or join any other Person in instituting against, any Securitization Subsidiary any bankruptcy, reorganization, arrangement, insolvency

or liquidation proceeding under the laws of the United States or any State thereof, (B) transfer and register the Equity Interests of any Securitization Subsidiary or any other instrument evidencing any Seller's Retained Interest in the name of a Secured Party or any designee or nominee thereof, (C) foreclose such security interest regardless of the bankruptcy or insolvency of Borrower or any of its Subsidiaries, (D) exercise any voting rights granted or appurtenant to such capital stock of any Securitization Subsidiary or any other instrument evidencing any Seller's Retained Interest or (E) enforce any right that the holder of any such Equity Interest of any Securitization Subsidiary or any other instrument evidencing any Seller's Retained Interest might otherwise have to liquidate, consolidate, combine, collapse or disregard the entity status of such Securitization Subsidiary and (ii) the Secured Parties hereby waive and release any right to require (A) that any Securitization Subsidiary be in any manner merged, combined, collapsed or consolidated with or into Borrower or any of its Subsidiaries, including by way of substantive consolidation in a bankruptcy case or (B) that the status of any Securitization Subsidiary as a separate entity be in any respect disregarded. Each of the Lenders, the Agents and the Arranger agrees and acknowledges that the agent acting on behalf of the holders of securitization indebtedness of the Securitization Subsidiary is an express third party beneficiary with respect to this Section 10.7 and such agent shall have the right to enforce compliance by the Secured Parties, the Lenders, the Agents, and the Arranger with this Section 10.7.

**10.8. Independence of Covenants.** All covenants hereunder shall be given independent effect so that if a particular action or condition is not permitted by any of such covenants, the fact that it would be permitted by an exception to, or would otherwise be within the limitations of, another covenant shall not avoid the occurrence of a Default or an Event of Default if such action is taken or condition exists.

**10.9. Survival of Representations, Warranties and Agreements.** All representations, warranties and agreements made herein shall survive the execution and delivery hereof and the making of the Loans. Notwithstanding anything herein or implied by law to the contrary, the agreements of each Credit Party set forth in Sections 2.15(c), 2.16, 2.17, 10.2, 10.3 and 10.4 and the agreements of Lenders set forth in Sections 2.14, 9.3(b) and 9.6 shall survive the payment of the Loans.

**10.10. No Waiver; Remedies Cumulative.** No failure or delay on the part of any Agent or any Lender in the exercise of any power, right or privilege hereunder or under any other Credit Document shall impair such power, right or privilege or be construed to be a waiver of any default or acquiescence therein, nor shall any single or partial exercise of any such power, right or privilege preclude other or further exercise thereof or of any other power, right or privilege. The rights, powers and remedies given to each Agent and each Lender hereby are cumulative and shall be in addition to and independent of all rights, powers and remedies existing by virtue of any statute or rule of law or in any of the other Credit Documents or any of the Hedge Agreements. Any forbearance or failure to exercise, and any delay in exercising, any right, power or remedy hereunder shall not impair any such right, power or remedy or be construed to be a waiver thereof, nor shall it preclude the further exercise of any such right, power or remedy.

**10.11. Marshalling; Payments Set Aside.** Neither any Agent nor any Lender shall be under any obligation to marshal any assets in favor of any Credit Party or any other

Person or against or in payment of any or all of the Obligations. To the extent that any Credit Party makes a payment or payments to Administrative Agent or Lenders (or to Administrative Agent, on behalf of Lenders), or any Agent or Lender enforces any security interests or exercises any right of setoff, and such payment or payments or the proceeds of such enforcement or setoff or any part thereof are subsequently invalidated, declared to be fraudulent or preferential, set aside and/or required to be repaid to a trustee, receiver or any other party under any bankruptcy law, any other state or federal law, common law or any equitable cause, then, to the extent of such recovery, the obligation or part thereof originally intended to be satisfied, and all Liens, rights and remedies therefor or related thereto, shall be revived and continued in full force and effect as if such payment or payments had not been made or such enforcement or setoff had not occurred.

**10.12. Severability.** In case any provision in or obligation hereunder or under any other Credit Document shall be invalid, illegal or unenforceable in any jurisdiction, the validity, legality and enforceability of the remaining provisions or obligations, or of such provision or obligation in any other jurisdiction, shall not in any way be affected or impaired thereby.

**10.13. Obligations Several; Independent Nature of Lenders' Rights.** The obligations of Lenders hereunder are several and no Lender shall be responsible for the obligations or Commitment of any other Lender hereunder. Nothing contained herein or in any other Credit Document, and no action taken by Lenders pursuant hereto or thereto, shall be deemed to constitute Lenders as a partnership, an association, a joint venture or any other kind of entity. The amounts payable at any time hereunder to each Lender shall be a separate and independent debt, and each Lender shall be entitled to protect and enforce its rights arising out hereof and it shall not be necessary for any other Lender to be joined as an additional party in any proceeding for such purpose.

**10.14. Headings.** Section headings herein are included herein for convenience of reference only and shall not constitute a part hereof for any other purpose or be given any substantive effect.

**10.15. APPLICABLE LAW. TO THE EXTENT NOT GOVERNED BY THE PROVISIONS OF THE BANKRUPTCY CODE, THIS AGREEMENT AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES HEREUNDER SHALL BE GOVERNED BY, AND SHALL BE CONSTRUED AND ENFORCED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK WITHOUT REGARD TO CONFLICT OF LAWS PRINCIPLES THEREOF.**

**10.16. CONSENT TO JURISDICTION. AT ALL TIMES PRIOR TO THE EXIT FACILITY CONVERSION DATE, ALL PARTIES HERETO SUBMIT TO THE NON-EXCLUSIVE JURISDICTION AND VENUE OF THE BANKRUPTCY COURT, OR IN THE EVENT THAT THE BANKRUPTCY COURT DOES NOT HAVE OR DOES NOT EXERCISE JURISDICTION, THEN IN ANY FEDERAL OR STATE COURT OF COMPETENT JURISDICTION IN THE STATE, COUNTY AND CITY OF NEW YORK. SUBJECT TO THE IMMEDIATELY PRECEDING SENTENCE AND CLAUSE (E) OF THE FOLLOWING SENTENCE, ALL JUDICIAL PROCEEDINGS BROUGHT AGAINST ANY PARTY ARISING OUT OF OR RELATING HERETO OR ANY**

OTHER CREDIT DOCUMENT, OR ANY OF THE OBLIGATIONS, SHALL BE BROUGHT IN ANY STATE OR FEDERAL COURT OF COMPETENT JURISDICTION IN THE STATE, COUNTY AND CITY OF NEW YORK PURSUANT TO AND IN ACCORDANCE WITH THE IMMEDIATELY SUCCEEDING SENTENCE. BY EXECUTING AND DELIVERING THIS AGREEMENT, EACH CREDIT PARTY, FOR ITSELF AND IN CONNECTION WITH ITS PROPERTIES, IRREVOCABLY (A) ACCEPTS GENERALLY AND UNCONDITIONALLY, AT ALL TIMES ON AND AFTER THE EXIT FACILITY CONVERSION DATE, THE EXCLUSIVE JURISDICTION AND VENUE OF SUCH COURTS; (B) WAIVES ANY DEFENSE OF FORUM NON CONVENIENS; (C) AGREES THAT SERVICE OF ALL PROCESS IN ANY SUCH PROCEEDING IN THE BANKRUPTCY COURT OR ANY OTHER SUCH COURT MAY BE MADE BY REGISTERED OR CERTIFIED MAIL, RETURN RECEIPT REQUESTED, TO THE APPLICABLE CREDIT PARTY AT ITS ADDRESS PROVIDED IN ACCORDANCE WITH SECTION 10.1; (D) AGREES THAT SERVICE AS PROVIDED IN CLAUSE (C) ABOVE IS SUFFICIENT TO CONFER PERSONAL JURISDICTION OVER THE APPLICABLE CREDIT PARTY IN ANY SUCH PROCEEDING IN ANY SUCH COURT, AND OTHERWISE CONSTITUTES EFFECTIVE AND BINDING SERVICE IN EVERY RESPECT; AND (E) AGREES THAT AGENTS AND LENDERS RETAIN THE RIGHT TO SERVE PROCESS IN ANY OTHER MANNER PERMITTED BY LAW OR TO BRING PROCEEDINGS AGAINST ANY CREDIT PARTY IN THE COURTS OF ANY OTHER JURISDICTION IN CONNECTION WITH THE EXERCISE OF ANY RIGHTS UNDER ANY COLLATERAL DOCUMENT OR THE ENFORCEMENT OF ANY JUDGMENT.

10.17. WAIVER OF JURY TRIAL. EACH OF THE PARTIES HERETO HEREBY AGREES TO WAIVE ITS RESPECTIVE RIGHTS TO A JURY TRIAL OF ANY CLAIM OR CAUSE OF ACTION BASED UPON OR ARISING HEREUNDER OR UNDER ANY OF THE OTHER CREDIT DOCUMENTS OR ANY DEALINGS BETWEEN THEM RELATING TO THE SUBJECT MATTER OF THIS LOAN TRANSACTION OR THE LENDER/BORROWER RELATIONSHIP THAT IS BEING ESTABLISHED. THE SCOPE OF THIS WAIVER IS INTENDED TO BE ALL-ENCOMPASSING OF ANY AND ALL DISPUTES THAT MAY BE FILED IN ANY COURT AND THAT RELATE TO THE SUBJECT MATTER OF THIS TRANSACTION, INCLUDING CONTRACT CLAIMS, TORT CLAIMS, BREACH OF DUTY CLAIMS AND ALL OTHER COMMON LAW AND STATUTORY CLAIMS. EACH PARTY HERETO ACKNOWLEDGES THAT THIS WAIVER IS A MATERIAL INDUCEMENT TO ENTER INTO A BUSINESS RELATIONSHIP, THAT EACH HAS ALREADY RELIED ON THIS WAIVER IN ENTERING INTO THIS AGREEMENT, AND THAT EACH WILL CONTINUE TO RELY ON THIS WAIVER IN ITS RELATED FUTURE DEALINGS. EACH PARTY HERETO FURTHER WARRANTS AND REPRESENTS THAT IT HAS REVIEWED THIS WAIVER WITH ITS LEGAL COUNSEL AND THAT IT KNOWINGLY AND VOLUNTARILY WAIVES ITS JURY TRIAL RIGHTS FOLLOWING CONSULTATION WITH LEGAL COUNSEL. THIS WAIVER IS IRREVOCABLE, MEANING THAT IT MAY NOT BE MODIFIED EITHER ORALLY OR IN WRITING (OTHER THAN BY A MUTUAL WRITTEN WAIVER SPECIFICALLY REFERRING TO THIS SECTION 10.17 AND EXECUTED BY EACH OF THE PARTIES HERETO), AND THIS WAIVER SHALL APPLY TO

ANY SUBSEQUENT AMENDMENTS, RENEWALS, SUPPLEMENTS OR MODIFICATIONS HERETO OR ANY OF THE OTHER CREDIT DOCUMENTS OR TO ANY OTHER DOCUMENTS OR AGREEMENTS RELATING TO THE LOANS MADE HEREUNDER.  IN THE EVENT OF LITIGATION, THIS AGREEMENT MAY BE FILED AS A WRITTEN CONSENT TO A TRIAL BY THE COURT.

**10.18.  Confidentiality.**  Each Agent and each Lender shall hold all non-public information regarding Borrower and its Subsidiaries and their businesses identified as such by Borrower and obtained by such Agent or such Lender pursuant to the requirements hereof in accordance with such Agent's and such Lender's customary procedures for handling confidential information of such nature, it being understood and agreed by Borrower that, in any event, Administrative Agent may disclose such information to the Lenders and each Agent and each Lender may make (i) disclosures of such information to Affiliates of such Lender or Agent and to their respective agents and advisors (and to other Persons authorized by a Lender or Agent to organize, present or disseminate such information in connection with disclosures otherwise made in accordance with this Section 10.18), (ii) disclosures of such information reasonably required by any bona fide or potential assignee, transferee or participant in connection with the contemplated assignment, transfer or participation of Loans or any participations therein or by any direct or indirect contractual counterparties (or the professional advisors thereto) to any swap or derivative transaction relating to Borrower and its obligations (provided, such assignees, transferees, participants, counterparties and advisors are advised of and agree to be bound by either the provisions of this Section 10.18 or other provisions at least as restrictive as this Section 10.18), (iii) disclosure to any rating agency when required by it, provided that, prior to any disclosure, such rating agency shall undertake in writing to preserve the confidentiality of any confidential information relating to Credit Parties received by it from any Agent or any Lender, (iv) disclosures in connection with the exercise of any remedies hereunder or under any other Credit Document and (v) disclosures required or requested by any governmental agency or representative thereof or by the NAIC or pursuant to legal or judicial process; provided, unless specifically prohibited by applicable law or court order, each Lender and each Agent shall make reasonable efforts to notify Borrower in writing of any request by any governmental agency or representative thereof (other than any such request in connection with any examination of the financial condition or other routine examination of such Lender by such governmental agency) for disclosure of any such non-public information prior to disclosure of such information.  In addition, each Agent and each Lender may disclose the existence of this Agreement and the information about this Agreement to market data collectors, similar services providers to the lending industry, and service providers to the Agents and the Lenders in connection with the administration and management of this Agreement and the other Credit Documents. Notwithstanding anything to the contrary set forth herein, each party (and each of their respective employees, representatives or other agents) may disclose to any and all persons without limitation of any kind, the tax treatment and tax structure of the transactions contemplated by this Agreement and all materials of any kind (including opinions and other tax analyses) that are provided to any such party relating to such tax treatment and tax structure. However, any information relating to the tax treatment or tax structure shall remain subject to the confidentiality provisions hereof (and the foregoing sentence shall not apply) to the extent reasonably necessary to enable the parties hereto, their respective Affiliates, and their and their respective Affiliates' directors and employees to comply with applicable securities laws.  For this purpose, "tax structure" means any facts relevant to the federal income tax treatment of the

transactions contemplated by this Agreement but does not include information relating to the identity of any of the parties hereto or any of their respective Affiliates.

**10.19.  Usury Savings Clause.**  Notwithstanding any other provision herein, the aggregate interest rate charged with respect to any of the Obligations, including all charges or fees in connection therewith deemed in the nature of interest under applicable law shall not exceed the Highest Lawful Rate.  If the rate of interest (determined without regard to the preceding sentence) under this Agreement at any time exceeds the Highest Lawful Rate, the outstanding amount of the Loans made hereunder shall bear interest at the Highest Lawful Rate until the total amount of interest due hereunder equals the amount of interest which would have been due hereunder if the stated rates of interest set forth in this Agreement had at all times been in effect.  In addition, if when the Loans made hereunder are repaid in full the total interest due hereunder (taking into account the increase provided for above) is less than the total amount of interest which would have been due hereunder if the stated rates of interest set forth in this Agreement had at all times been in effect, then to the extent permitted by law, Borrower shall pay to Administrative Agent an amount equal to the difference between the amount of interest paid and the amount of interest which would have been paid if the Highest Lawful Rate had at all times been in effect.  Notwithstanding the foregoing, it is the intention of Lenders and Borrower to conform strictly to any applicable usury laws.  Accordingly, if any Lender contracts for, charges, or receives any consideration which constitutes interest in excess of the Highest Lawful Rate, then any such excess shall be cancelled automatically and, if previously paid, shall at such Lender's option be applied to the outstanding amount of the Loans made hereunder or be refunded to Borrower.

**10.20.  Counterparts.**  This Agreement may be executed in any number of counterparts, each of which when so executed and delivered shall be deemed an original, but all such counterparts together shall constitute but one and the same instrument.

**10.21.  Effectiveness; Entire Agreement.**  This Agreement shall become effective upon the execution of a counterpart hereof by each of the parties hereto and receipt by Borrower and Administrative Agent of written notification of such execution and authorization of delivery thereof; <u>provided</u> that the Borrower shall have executed a counterpart hereof on or before 5 p.m. (New York time) on December 24, 2009.  The Credit Documents embody the entire agreement of the parties and supersede all prior agreements and understandings relating to the subject matter hereof and any prior letter of interest, fee letter, confidentiality and similar agreements involving any Credit Party, any Agent, any Lender and any of their respective Affiliates relating to a financing of substantially similar form, purpose or effect.  In the event of any conflict between this Agreement and any other Credit Document, the terms of this Agreement shall govern (unless such terms of such other Credit Documents are necessary to comply with applicable Requirements of Law, in which case such terms shall govern to the extent necessary to comply therewith).  NOTWITHSTANDING THE FOREGOING, IF ANY PROVISION IN THIS AGREEMENT OR ANY OTHER CREDIT DOCUMENT CONFLICTS WITH ANY PROVISION IN THE INTERIM ORDER (WITH RESPECT TO THE PERIOD PRIOR TO THE ENTRY OF THE FINAL ORDER) OR THE FINAL ORDER (WITH RESPECT TO THE PERIOD ON AND AFTER ENTRY OF THE FINAL ORDER), THE PROVISION IN THE INTERIM ORDER OR THE FINAL ORDER, AS THE CASE MAY BE, SHALL GOVERN AND CONTROL.

**10.22.  PATRIOT Act.**  Each Lender and Administrative Agent (for itself and not on behalf of any Lender) hereby notifies each Credit Party that pursuant to the requirements of the PATRIOT Act, it is required to obtain, verify and record information that identifies each Credit Party, which information includes the name and address of each Credit Party and other information that will allow such Lender or Administrative Agent, as applicable, to identify such Credit Party in accordance with the PATRIOT Act.

**10.23.  Electronic Execution of Assignments.**  The words "execution," "signed," "signature," and words of like import in any Assignment Agreement shall be deemed to include electronic signatures or the keeping of records in electronic form, each of which shall be of the same legal effect, validity or enforceability as a manually executed signature or the use of a paper-based recordkeeping system, as the case may be, to the extent and as provided for in any applicable law, including the Federal Electronic Signatures in Global and National Commerce Act, the New York State Electronic Signatures and Records Act, or any other similar state laws based on the Uniform Electronic Transactions Act.

**10.24.  No Fiduciary Duty.**  Each Agent, each Lender and their Affiliates (collectively, solely for purposes of this paragraph, the "**Lenders**"), may have economic interests that conflict with those of the Credit Parties, their stockholders and/or their affiliates.  Each Credit Party agrees that nothing in the Credit Documents or otherwise will be deemed to create an advisory, fiduciary or agency relationship or fiduciary or other implied duty between any Lender, on the one hand, and such Credit Party, its stockholders or its affiliates, on the other.  The Credit Parties acknowledge and agree that (i) the transactions contemplated by the Credit Documents (including the exercise of rights and remedies hereunder and thereunder) are arm's-length commercial transactions between the Lenders, on the one hand, and the Credit Parties, on the other, and (ii) in connection therewith and with the process leading thereto, (x) no Lender has assumed an advisory or fiduciary responsibility in favor of any Credit Party, its stockholders or its affiliates with respect to the transactions contemplated hereby (or the exercise of rights or remedies with respect thereto) or the process leading thereto (irrespective of whether any Lender has advised, is currently advising or will advise any Credit Party, its stockholders or its Affiliates on other matters) or any other obligation to any Credit Party except the obligations expressly set forth in the Credit Documents and (y) each Lender is acting solely as principal and not as the agent or fiduciary of any Credit Party, its management, stockholders, creditors or any other Person.  Each Credit Party acknowledges and agrees that it has consulted its own legal and financial advisors to the extent it deemed appropriate and that it is responsible for making its own independent judgment with respect to such transactions and the process leading thereto.  Each Credit Party agrees that it will not claim that any Lender has rendered advisory services of any nature or respect, or owes a fiduciary or similar duty to such Credit Party, in connection with such transaction or the process leading thereto.

**10.25.  Parties Including Trustees; Bankruptcy Court Proceedings.**  This Agreement, the other Credit Documents, and all Liens and other rights and privileges created hereby or pursuant hereto or to any other Credit Document shall be binding upon each Credit Party, the estate of each Credit Party, and any trustee, other estate representative or any successor in interest of any Credit Party in any Chapter 11 Case or any subsequent case commenced under Chapter 7 of the Bankruptcy Code.  This Agreement and the other Credit Documents shall be binding upon, and inure to the benefit of, the successors of the Agents and the Lenders and their

respective assigns, transferees and endorsees.  The Liens created by this Agreement and the other Credit Documents shall be and remain valid and perfected in the event of the substantive consolidation or conversion of any Chapter 11 Case or any other bankruptcy case of any Credit Party to a case under Chapter 7 of the Bankruptcy Code or in the event of dismissal of any Chapter 11 Case or the release of any Collateral from the jurisdiction of the Bankruptcy Court for any reason, without the necessity that any Agent file financing statements or otherwise perfect its Liens under applicable law.  No Credit Party may assign, transfer, hypothecate or otherwise convey its rights, benefits, obligations or duties hereunder or under any of the other Credit Documents without the prior express written consent of the Agents and the Lenders except as set forth in Section 3.6(a).  Any such purported assignment, transfer, hypothecation or other conveyance by any Credit Party without the prior express written consent of the Agents and the Lenders shall be void.  The terms and provisions of this Agreement are for the purpose of defining the relative rights and obligations of each Credit Party, the Agents and Lenders with respect to the transactions contemplated hereby and no Person shall be a third party beneficiary of any of the terms and provisions of this Agreement or any of the other Credit Documents.

      **10.26.  Conflict Between this Agreement and the Orders.**  In the event of any inconsistency between the provisions of this Agreement and the Interim Order or Final Order, as applicable, the provisions of the Interim Order or Final Order, as applicable, shall prevail.

[Remainder of page intentionally left blank]

**IN WITNESS WHEREOF**, the parties hereto have caused this Agreement to be duly executed and delivered by their respective officers thereunto duly authorized as of the date first written above.

**TRONOX WORLDWIDE LLC**

By: _____
Name:
Title:

**TRONOX INCORPORATED**

By: _____
Name:
Title:

By: _____
Name:
Title:

**TRONOX FINANCE CORP.**
**CIMARRON CORPORATION**
**TRIPLE S REFINING CORPORATION**
**SOUTHWESTERN REFINING COMPANY, INC.**
**TRIANGLE REFINERIES, INC.**
**TRANSWORLD DRILLING COMPANY**
**TRIPLE S MINERALS RESOURCES CORP.**
**TRIPLE S, INC.**
**TRONOX LLC**
**TRONOX HOLDINGS, INC.**

By: _____
Name:
Title:

**GOLDMAN SACHS LENDING PARTNERS LLC,**
as Administrative Agent, Collateral Agent and a
Lender

By: _____
Authorized Signatory

**Tranche B-1 Term Loan Commitments**

| Lender | Tranche B-1 Term Loan Commitment | Pro Rata Share |
|---|---|---|
| GOLDMAN SACHS LENDING PARTNERS LLC | **$335,000,000.00** | **100%** |
| **Total** | **$335,000,000.00** | **100%** |

**Tranche B-2 Term Loan Commitments**

| Lender | Tranche B-2 Term Loan Commitment | Pro Rata Share |
|---|---|---|
| GOLDMAN SACHS LENDING PARTNERS LLC | $90,000,000.00 | 100% |
| Total | $90,000,000.00 | 100% |

**APPENDIX B
TO CREDIT AND GUARANTY AGREEMENT**

**Notice Addresses**

TRONOX INCORPORATED (and its Subsidiaries)

TRONOX INCORPORATED
3301 N.W. 150th Street
Oklahoma City, OK 73134
Attention:  General Counsel

in each case, with a copy to:

Kirkland & Ellis LLP
601 Lexington Avenue
New York, NY 10022
Attention:  Leonard Klingbaum
Facsimile:  212-446-6460

GOLDMAN SACHS LENDING PARTNERS LLC,
Administrative Agent's Principal Office and as Lender:

GOLDMAN SACHS LENDING PARTNERS LLC
c/o Goldman, Sachs & Co.
30 Hudson Street, 36th Floor
Jersey City, NJ 07302
Attention: SBD Operations
Attention:  Andrew Caditz
Email: gsd.link@gs.com  and  ficc-sbdagency-nydallas@ny.email.gs.com

with a copy to:

GOLDMAN SACHS LENDING PARTNERS LLC
as Administrative Agent, Collateral Agent,
1 New York Plaza
New York, New York  10004
Facsimile: 212-902-3000
Attention:      Elizabeth Fischer
                Douglas Tansey


and

Latham & Watkins LLP
885 Third Avenue
New York, NY 10022
Attention:  Lauren Hanrahan
Facsimile:  212-751-4864

## EXHIBIT F

## Plan Term Sheet Summary Chart

# Proposed Recoveries and Distributions as Set Forth in the Term Sheet

