Hearing Date: **November 17, 2010 at 11:00 a.m. (ET)**

Richard M. Cieri
Jonathan S. Henes
Patrick J. Nash, Jr. (admitted *pro hac vice*)
Nicole L. Greenblatt
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, New York  10022
Telephone:     (212) 446-4800
Facsimile:     (212) 446-4900

*Counsel to the Debtors and Debtors in Possession*

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| TRONOX INCORPORATED, *et al.*,[1] | ) | Case No. 09-10156 (ALG) |
| | ) | |
| Debtors. | ) | Jointly Administered |
| | ) | |

---

## TRONOX'S MEMORANDUM OF LAW (I) IN SUPPORT OF CONFIRMATION OF FIRST AMENDED JOINT PLAN OF REORGANIZATION OF TRONOX INCORPORATED, *ET AL.* PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE AND (II) IN RESPONSE TO OBJECTIONS THERETO

---

[1]   The debtors in these cases include:  Tronox Luxembourg S.ar.l; Tronox Incorporated; Cimarron Corporation; Southwestern Refining Company, Inc.; Transworld Drilling Company; Triangle Refineries, Inc.; Triple S, Inc.; Triple S Environmental Management Corporation; Triple S Minerals Resources Corporation; Triple S Refining Corporation; Tronox LLC; Tronox Finance Corp.; Tronox Holdings, Inc.; Tronox Pigments (Savannah) Inc.; and Tronox Worldwide LLC.

## Table of Contents

PRELIMINARY STATEMENT ...................................................................................1

BACKGROUND ........................................................................................................5

    I.    Procedural History ...............................................................................5

    II.    Voting Status........................................................................................7

ARGUMENT..............................................................................................................8

    I.    The Plan Satisfies Each Requirement for Confirmation.........................................8

        A.    The Plan Complies with the Applicable Provisions of the Bankruptcy Code (11 U.S.C. § 1129(a)(1))...................................................8

            i.    The Plan Satisfies the Classification Requirements of 11 U.S.C. § 1122..................................................................9

            ii.    The Plan Satisfies the Seven Mandatory Plan Requirements of 11 U.S.C. §§ 1123 (a)(1)-(a)(7).................................................12

        B.    Tronox, as Plan Proponent, Has Complied with the Applicable Provisions of the Bankruptcy Code (11 U.S.C. § 1129(a)(2))...................13

            i.    Tronox Has Complied with the Disclosure Statement and Solicitation Requirements of 11 U.S.C. § 1125............................14

            ii.    Tronox Has Complied with the Plan Acceptance Requirements of 11 U.S.C. § 1126. .................................................15

        C.    The Plan Was Proposed in Good Faith and not by any Means Forbidden by Law (11 U.S.C. § 1129(a)(3)). .............................................16

        D.    The Plan Provides for Bankruptcy Court Approval of Certain Administrative Payments (11 U.S.C. § 1129(a)(4)). ................................18

            i.    The Management Compensation Programs Are Appropriate and Permissible and Should Be Approved....................................20

            ii.    Payments under the Management Compensation Programs Do Not  Implicate Section 503(c) of the Bankruptcy Code...........23

i

E.      Tronox Has Properly Disclosed Post-Emergence Directors and Officers and their Appointment Is Consistent with Public Policy (11 U.S.C. § 1129(a)(5)). ..............................................................24

F.      The Plan Does Not Require Governmental Regulatory Approval of Rate Changes (11 U.S.C. § 1129(a)(6)). ......................................26

G.      The Plan Is in the Best Interests of Creditors and Holders of Equity Interests (11 U.S.C. § 1129(a)(7)). ............................................26

H.      Acceptance by Impaired Classes (11 U.S.C. § 1129(a)(8)). ......................28

I.      The Plan Complies with Statutorily-Mandated Treatment of Administrative and Priority Tax Claims (11 U.S.C. § 1129(a)(9)). ..........29

J.      The Plan Was Accepted by at Least One Impaired Class (11 U.S.C. § 1129(a)(10)). .............................................................30

K.      The Plan Is Feasible (11 U.S.C. § 1129(a)(11)). .......................................31

        i.      The Plan Settles Tronox's Legacy Liabilities and Proposes a Sound and Adequate Post-Emergence Capital Structure. ...........33

        ii.     The Plan Was Scrutinized and Validated by Key Stakeholders. ................................................................34

L.      The Plan Provides for the Payment of All Fees under 28 U.S.C. § 1930 (11 U.S.C. § 1129(a)(12)). ...............................................35

M.      The Plan Provides for the Payment of Retiree Benefits (11 U.S.C. § 1129(a)(13)). .............................................................35

N.      The Plan Satisfies the "Cram Down" Requirements of 11 U.S.C. § 1129(b). ................................................................36

        i.      The Plan Does Not Discriminate Unfairly. ....................................37

        ii.     The Plan Is Fair and Equitable. ......................................................38

O.      The Principal Purpose of the Plan is not Avoidance of Taxes (11 U.S.C. § 1129(d)). ......................................................40

II.     The Discretionary Contents of the Plan Are Appropriate and Should Be Approved. ................................................................40

        A.      The Global Settlement Should Be Approved. ...........................................41

ii

i.  Key Terms of the Global Settlement. ...........................................42

ii.  The Global Settlement Is the Linchpin of the Plan........................44

iii.  Process and Formulation of the Global Settlement........................46

iv.  The Global Settlement Satisfies the Iridium Factors. ....................48

B.  The Plan Settlement of Claims and Controversies Is Fair and Equitable and Should Be Approved...........................................................53

C.  The Plan's Release, Injunction and Exculpation Provisions Are Appropriate and Should Be Approved.......................................................53

i.  The Tronox Releases....................................................................54

ii.  Third Party Releases ...................................................................56

iii.  Injunction ...................................................................................63

iv.  Exculpation ................................................................................64

III.  The Court Should Overrule the Remaining Objections. ........................................68

A.  This Court Should Overrule Anadarko's Objections to the Tort Claims Trust Agreement and Tort Claims Trust Distribution Procedures.....................................................................................68

B.  The Plan Should Be Confirmed Notwithstanding Any Remaining Objections. ..............................................................................70

CONCLUSION...............................................................................................................71

iii

# TABLE OF AUTHORITIES

## CASES

*Aetna Cas. & Sur. Co. v. Clerk U.S. Bankr. Ct., New York, N.Y.* (*In re Chateaugay Corp.*),
89 F.3d 942 (2d Cir. 1996) ................................................................................................. 9

*Boston Post Rd. Ltd. P'ship v. FDIC* (*In re Boston Post Rd. Ltd. P'ship*),
21 F.3d 477 (2d Cir. 1994) ............................................................................................ 9, 36

*Captran Creditors' Tr. v. McConnell* (*In re Captran Creditors' Trust*),
128 B.R. 469 (M.D. Fla. 1991) ......................................................................................... 64

*Frito-Lay, Inc., v. LTV Steel Co., Inc.* (*In re Chateaugay Corp.*),
10 F.3d 944 (2d Cir. 1993) ............................................................................................ 9, 12

*Heartland Fed. Sav. & Loan Ass'n v. Briscoe Enters., Ltd. II* (*In re Briscoe Enters., Ltd. II*),
994 F.2d 1160 (5th Cir. 1993) ....................................................................................... 8, 31

*In re 203 N. LaSalle St. Ltd. P'ship*,
190 B.R. 567 (Bankr. N.D. Ill. 1995) ...................................................................... 37, 38, 51

*In re 500 Fifth Ave. Assocs.*,
148 B.R. 1010 (Bankr. S.D.N.Y. 1993) ........................................................................ 9, 11

*In re Adelphia Commc'ns.*,
368 B.R. 140 (Bankr. S.D.N.Y. 2007) ...................................................................... passim

*In re AG Consultants Grain Div., Inc.*,
77 B.R. 665 (Bankr. N.D. Ind. 1987) ................................................................................ 24

*In re Airway Indus., Inc.*,
354 B.R. 82 (Bankr. W.D. Pa. 2006) ................................................................................ 23

*In re Am. Solar King Corp.*,
90 B.R. 808 (Bankr. W.D. Tex. 1988) ............................................................................... 24

*In re Apex Oil*,
118 B.R. 683 (Bankr. E.D. Mo. 1990) .............................................................................. 25

*In re Aztec Co.*,
107 B.R. 585 (Bankr. M.D. Tenn. 1989) ........................................................................... 37

*In re Bally Total Fitness of Greater N.Y., Inc.*,
    No. 07-12395, 2007 WL 2779438 (Bankr. S.D.N.Y. Sept. 17, 2007)................ 7, 9, 54, 63

*In re Best Prods. Co.*,
    168 B.R. 35 (Bankr. S.D.N.Y. 1994) ............................................................... 47

*In re Beyond.com Corp.*,
    289 B.R. 138 (Bankr. N.D. Cal. 2003) ........................................................... 25

*In re Buttonwood Partners, Ltd.*,
    111 B.R. 57 (Bankr. S.D.N.Y. 1990).............................................................. 37

*In re Calpine Corp.*,
    No. 05-60200 (Bankr. S.D.N.Y. Dec. 19, 2007)................................... 54, 63, 64

*In re Cellular Info. Sys., Inc.*,
    171 B.R. 926 (Bankr. S.D.N.Y. 1994) ........................................................... 16

*In re Charter Commc'ns*,
    419 B.R. 221 (Bankr. S.D.N.Y. 2009) ................................................... passim

*In re DBSD N. Am., Inc.*,
    419 B.R. 179 (Bankr. S.D.N.Y. 2009) ..................................................... 54, 63

*In re DJK Residential LLC*,
    No. 08-10375 (Bankr. S.D.N.Y. May 7, 2008)..................................... 54, 61, 63

*In re Dreier LLP*,
    429 B.R. 112 (Bankr. S.D.N.Y. 2010) ........................................................... 57

*In re Drexel Burnham Lambert Group, Inc.*,
    138 B.R. 723 (Bankr. S.D.N.Y. 1992) ................................................... passim

*In re Eagle Bus Mfg., Inc.*,
    134 B.R. 584 (Bankr. S.D. Tex. 1991) ........................................................... 24

*In re Eddington Thread Mfg. Co.*,
    181 B.R. 826 (Bankr. E.D. Pa. 1995) ............................................................ 31

*In re El Charro, Inc.*,
    No. 05-60294, 2007 WL 2174911 (Bankr. D. Kan. July 26, 2007) .................................. 8

*In re Elsinore Shore Assocs.*,
    91 B.R. 238 (Bankr. D.N.J. 1988) ................................................................. 18

*In re EnviroSolutions of New York, LLC*,
  Case No. 10-11236 (SMB) (Bankr. S.D.N.Y. July 22, 2010) ......................................... 66

*In re Freymiller Trucking, Inc.*,
  190 B.R. 913 (Bankr. W.D. Okla. 1996) ......................................................................... 37

*In re Gen. Growth Properties, Inc.*,
  Case No. 09-11977 (ALG) (Bankr. S.D.N.Y.  Dec. 15, 2009) ........................................ 66

*In re Granite Broad. Corp.*,
  369 B.R. 120 (Bankr. S.D.N.Y. 2007) ....................................................................... 38, 43

*In re Heritage Org., L.L.C.*,
  375 B.R. 230 (Bankr. N.D. Tex. 2007) ............................................................................. 9

*In re Homestead Partners, Ltd.*,
  197 B.R. 706 (Bankr. N.D. Ga. 1996) ............................................................................. 65

*In re Ionosphere Clubs, Inc.*,
  98 B.R. 174 (Bankr. S.D.N.Y. 1989) ................................................................................. 9

*In re Iridium Operating LLC*,
  478 F.3d 452 (2d Cir. 2007) ............................................................................................ 48

*In re Jartran, Inc.*,
  44 B.R. 331 (Bankr. N.D. Ill. 1984) ................................................................................ 65

*In re Jersey City Med. Ctr.*,
  817 F.2d 1055 (3d Cir. 1987) ............................................................................................ 9

*In re Johns-Manville Corp.*,
  68 B.R. 618 (Bankr. S.D.N.Y. 1986) ...................................................................... passim

*In re Journal Register Co.*,
  407 B.R. 520 (Bankr. S.D.N.Y. 2009) ................................................................... passim

*In re Kaiser Aluminum Corp.*,
  No. 02-10429, 2006 WL 616243 (Bankr. D. Del. Feb. 6, 2006) ....................................... 9

*In re Mirant Corp.*,
  No. 03-46590, 2007 WL 1258932 (Bankr. N.D. Texas, April 27, 2007) ........................... 9

*In re One Times Square Assocs. Ltd. P'ship*,
  159 B.R. 695 (Bankr. S.D.N.Y. 1993) ............................................................................. 11

vi

*In re Oneida Ltd.*,
    351 B.R. 79 (Bankr. S.D.N.Y. 2006) ................................................................................ 54

*In re Prudential Energy Co.*,
    58 B.R. 857 (Bankr. S.D.N.Y. 1986) ................................................................................ 31

*In re Pub. Serv. Co.*,
    88 B.R. 521 (Bankr. D.N.H. 1988) ................................................................................... 65

*In re PWS Holding Corp.*,
    228 F.3d 224 (3d Cir. 2000) ....................................................................................... 64, 65

*In re Repurchase Corp.*,
    332 B.R. 336 (Bankr. N.D. Ill. 2005) ............................................................................... 31

*In re Simplot*,
    No. 06-00002, 2007 WL 2479664 (Bankr. D. Idaho Aug. 28, 2007) ................................. 8

*In re Spiegel, Inc.*,
    No. 03-11540, 2005 WL 1278094 (Bankr. S.D.N.Y. May 25, 2005) ........................ 52, 54

*In re Stratford Assocs. Ltd. P'ship*,
    145 B.R. 689 (Bankr. D. Kan. 1992) ................................................................................ 25

*In re Sylvan I-30 Enters.*,
    No. 05-86708, 2006 WL 2539718 (Bankr. N.D. Tex. Sept. 1, 2006) ................................. 8

*In re TCI 2 Holdings, LLC*,
    428 B.R. 117 (Bankr. D.N.J. 2010) .................................................................................. 44

*In re Texaco, Inc.*,
    84 B.R. 893 (Bankr. S.D.N.Y. 1988) ................................................................... 16, 31, 48

*In re Tower Auto., Inc.*,
    No. 05-10578 (Bankr. S.D.N.Y. July 9, 2007) ................................................................. 54

*In re Toy & Sports Warehouse, Inc.*,
    37 B.R. 141 (Bankr. S.D.N.Y. 1984) ................................................................... 13, 16, 25

*In re Truvo USA LLC*,
    Case No. 10-13513 (AJG) (Bankr. S.D.N.Y. Oct. 26, 2010) ........................................... 66

*In re Uno Restaurant Holdings Corp.*,
    Case No. 10-10209 (MG) (Bankr. S.D.N.Y. July 6, 2010) .............................................. 66

vii

*In re Winn-Dixie Stores, Inc.*,
  356 B.R. 239 (Bankr. M.D. Fla. 2006) ............................................................ 65

*In re WorldCom, Inc.*,
  No. 02-13533, 2003 Bankr. LEXIS 1401
  (Bankr. S.D.N.Y. Oct. 31, 2003) ................................................... 17, 31, 37, 65

*In re Zenith Elecs. Corp.*,
  241 B.R. 92 (Bankr. D. Del. 1999) ............................................................ 36, 65

*John Hancock Mut. Life Ins. Co. v. Route 37 Bus. Park Assocs.*,
  987 F.2d 154 (3d Cir. 1993) ............................................................................ 36

*Kane v. Johns-Manville Corp.* (*In re Johns-Manville Corp.*),
  843 F.2d 636 (2d Cir. 1988) ................................................................. 8, 13, 22

*Liberty Nat'l Enters. v. Ambanc La Mesa Ltd. P'ship* (*In re Ambanc La Mesa Ltd. P'ship*),
  115 F.3d 650 (9th Cir. 1997) .......................................................................... 36

*Mabey v. Sw. Elec. Power Co.* (*In re Cajun Elec. Power Coop., Inc.*),
  150 F.3d 503 (5th Cir. 1998) .......................................................................... 21

*Momentum Mfg. Corp. v. Employee Creditors Comm.* (*In re Momentum Mfg. Corp.*),
  25 F.3d 1132 (2d Cir. 1994) ........................................................................... 14

*NLRB v. Bildisco & Bildisco*,
  465 U.S. 513 (1984) ....................................................................................... 17

*Pepper v. Litton*,
  308 U.S. 295 (1939) ....................................................................................... 20

*Prot. Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*,
  390 U.S. 414 (1968) ....................................................................................... 47

*Resolution Trust Corp. v. Best Prods. Co.* (*In re Best Prods. Co.*),
  68 F.3d 26 (2d Cir. 1995) ............................................................................... 43

*Rosenberg v. XO Comm'cns, Inc.* (*In re XO Comm'cns, Inc.*),
  330 B.R. 394 (Bankr. S.D.N.Y. 2005) ............................................................ 56

*Teamsters Nat'l Freight Indus. Negotiating Comm. v. U.S. Truck Co.* (*In re U.S. Truck Co.*),
  800 F.2d 581 (6th Cir. 1986) .......................................................................... 31

K&E 17933465

*The Mut. Life Ins. Co. of N.Y. v. Patrician St. Joseph Partners Ltd. P'ship* (*In re
    Patrician St. Joseph Partners Ltd. P'ship*),
    169 B.R. 669 (Bankr. D. Ariz. 1994)............................................................................... 31

*Upstream Energy Servs. v. Enron Corp.* (*In re Enron Corp.*),
    326 B.R. 497 (S.D.N.Y. 2005)............................................................................... 64, 65

## STATUTES

11 U.S.C. § 101(31) ............................................................................................... 23

11 U.S.C. § 1103 ............................................................................................... 19, 64

11 U.S.C. § 1114 ............................................................................................... 35

11 U.S.C. § 1122 ............................................................................................... 8, 9, 22

11 U.S.C. § 1123 ............................................................................................... 8, 22

11 U.S.C. § 1123(a) ............................................................................................... 12, 13

11 U.S.C. § 1123(a)(1) ............................................................................................... 12

11 U.S.C. § 1123(a)(2) ............................................................................................... 12

11 U.S.C. § 1123(a)(3) ............................................................................................... 12

11 U.S.C. § 1123(a)(4) ............................................................................................... 12

11 U.S.C. § 1123(a)(5) ............................................................................................... 12

11 U.S.C. § 1123(a)(6) ............................................................................................... 12

11 U.S.C. § 1123(a)(7) ............................................................................................... 12

11 U.S.C. § 1123(b) ............................................................................................... 39, 47

11 U.S.C. § 1123(b)(3) ............................................................................................... 54

11 U.S.C. § 1123(b)(3)(A) ............................................................................................... 52, 54

11 U.S.C. § 1123(b)(3)(B) ............................................................................................... 39

11 U.S.C. § 1123(b)(5) ............................................................................................... 40

11 U.S.C. § 1123(b)(6) ............................................................................................... 40

11 U.S.C. § 1125 ................................................................................................................. 8, 13, 14

11 U.S.C. § 1125(b) ..................................................................................................................... 14

11 U.S.C. § 1126 ......................................................................................................... 8, 13, 14, 15

11 U.S.C. § 1126(c) .......................................................................................................... 15, 27, 28

11 U.S.C. § 1126(d) ............................................................................................................... 15, 28

11 U.S.C. § 1126(e) ..................................................................................................................... 15

11 U.S.C. § 1126(f) ............................................................................................................... 15, 28

11 U.S.C. § 1126(g) ..................................................................................................................... 28

11 U.S.C. § 1129 .................................................................................................................. 1, 7, 8, 21

11 U.S.C. § 1129(a) ............................................................................................................... 16, 36

11 U.S.C. § 1129(a)(1) ............................................................................................................. 8, 22

11 U.S.C. § 1129(a)(10) ............................................................................................................... 30

11 U.S.C. § 1129(a)(11) ......................................................................................................... 30, 34

11 U.S.C. § 1129(a)(12) ......................................................................................................... 34, 35

11 U.S.C. § 1129(a)(13) ......................................................................................................... 35, 36

11 U.S.C. § 1129(a)(2) ................................................................................................................. 13

11 U.S.C. § 1129(a)(3) ..................................................................................................... 16, 17, 64

11 U.S.C. § 1129(a)(4) ............................................................................................... 18, 21, 22, 23

11 U.S.C. § 1129(a)(5) ..................................................................................................... 23, 24, 25

11 U.S.C. § 1129(a)(5)(A) ............................................................................................................ 23

11 U.S.C. § 1129(a)(5)(A)(i) ........................................................................................................ 24

11 U.S.C. § 1129(a)(5)(A)(ii) ................................................................................................. 24, 25

11 U.S.C. § 1129(a)(5)(B) ...................................................................................................... 23, 25

11 U.S.C. § 1129(a)(6) ................................................................................................................. 25

x

11 U.S.C. § 1129(a)(7).................................................................................................. 26, 27

11 U.S.C. § 1129(a)(7)(A) .................................................................................................. 26

11 U.S.C. § 1129(a)(8).................................................................................. 27, 28, 30, 36

11 U.S.C. § 1129(a)(9).......................................................................................................... 29

11 U.S.C. § 1129(a)(9)(C) .................................................................................................. 29

11 U.S.C. § 1129(b) .......................................................................................... 7, 28, 36, 37

11 U.S.C. § 1129(b)(1) ........................................................................................................ 37

11 U.S.C. § 1129(b)(2)(B)(ii) ............................................................................................ 38

11 U.S.C. § 1129(b)(2)(C) .................................................................................................. 38

11 U.S.C. § 1129(b)(2)(C)(ii) ............................................................................................ 38

11 U.S.C. § 1129(d) .............................................................................................................. 39

11 U.S.C. § 503(b)(3)(1) – (4) .......................................................................................... 19

11 U.S.C. § 503(b)(4) .......................................................................................................... 19

11 U.S.C. § 503(c) .......................................................................................................... 22, 23

11 U.S.C. § 507(a) .......................................................................................................... 10, 29

11 U.S.C. §§ 327-331 .......................................................................................................... 19

28 U.S.C. § 157(b)(2)(O)...................................................................................................... 50

28 U.S.C. § 1930.................................................................................................................... 34

28 U.S.C. § 1930(a)(6).......................................................................................................... 34

31 U.S.C. § 3717.................................................................................................................... 34

## **OTHER AUTHORITIES**

7 Collier on Bankruptcy ¶ 1129.03[4] ............................................................................ 21

## **RULES**

Bankruptcy Rule 3017 .......................................................................................................... 13

K&E 17933465

Bankruptcy Rule 3018 ............................................................................................................. 13

Bankruptcy Rule 9019 .................................................................................................. 47, 52, 54

K&E 17933465

The above-captioned debtors and debtors in possession (collectively, "**Tronox**" or the "**Debtors**") submit this memorandum of law in support of confirmation of the *First Amended Joint Plan of Reorganization of Tronox Incorporated* et al. *Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 2402] (as modified, amended or supplemented from time to time, the "**Plan**"),[2] pursuant to section 1129 of title 11 of the United States Code (the "**Bankruptcy Code**").  Tronox respectfully states as follows:

## PRELIMINARY STATEMENT

The Plan — the culmination of Tronox's extraordinary reorganization efforts — is the product of hard fought, good faith, arm's-length negotiations among Tronox and *all* of its key stakeholders.  The Plan resolves (with fair and adequate funding) Tronox's massive legacy liabilities and enables Tronox to emerge from chapter 11 well-positioned to compete in the titanium dioxide business.  The Plan satisfies each of the requirements for confirmation set forth in the Bankruptcy Code and accomplishes exactly what the chapter 11 process was designed to foster — preserving Tronox as a going concern enterprise and maximizing value for stakeholders.  The Plan should be confirmed.

These Chapter 11 Cases are highly complex.  Tronox commenced these Chapter 11 Cases as an undercapitalized, liability-laden and heavily-indebted single-product company in a highly cyclical industry, primarily to address the unsustainable costs associated with the massive legacy environmental, tort and other liabilities it incurred in connection with its spinoff from former parent Kerr-McGee Corporation (now Anadarko), which transaction is the subject of the pending Anadarko Litigation — potentially one of the estates' most valuable assets.  These "legacy liabilities" are the subject of *thousands* of proofs of claim asserting *billions* of dollars in Claims

---

[2]    Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Plan.

against these estates, filed on behalf of multiple federal, state, local, tribal and quasi-governmental agencies and innumerable tort claimants. These Claims, estimated by Tronox to range collectively from approximately $2 to $6 billion, can only be resolved through settlement or an extensive, costly and complex estimation process. In addition to the legacy liabilities, Tronox faces other General Unsecured Claims of no less than $500 million asserted by, among others, its organized group of senior noteholders, general trade creditors and private party environmental claimants (whose claims largely relate to shared responsibility for legacy environmental contamination). Despite the significant Claims against these estates and the extraordinary number of parties involved, Tronox never lost sight of its restructuring objectives: to resolve its legacy liabilities, provide fair and equitable treatment to all other unsecured creditors, and to secure the appropriate forms and levels of financing to support a legacy settlement and the go-forward needs of its business.

The Plan embodies the terms of a global settlement achieved through extensive negotiations among multiple, sophisticated constituencies with conflicting and, in some instances, seemingly irreconcilable interests — all of whom have made material concessions to support a fair, equitable and feasible Plan that allocates the limited sources of Tronox's distributable value among Tronox's stakeholders in accordance with their preferences. Notwithstanding many obstacles along the way (as reflected on the record of these Chapter 11 Cases), the settlement embodied in the Plan resolves with finality a myriad of complex issues that threatened to mire Tronox in months, if not years, of protracted litigation, including with respect to claims estimation and the sources and amount of distributable value. Among other things, the settlement:

- resolves Tronox's legacy liabilities through the allocation of more than $300 million in cash settlement payments and 100% of any proceeds from the

Anadarko Litigation to the applicable trusts and/or environmental agencies that will be responsible for satisfying the settled Environmental and Tort Claims,

- secures $185 million in equity financing to fund the legacy settlement payments through the sale of nearly 50% of the equity in Reorganized Tronox, which sale is being conducted through a Rights Offering open to all of Tronox's general unsecured creditors and backstopped by a group of its unsecured noteholders;

- allocates the remaining equity in Reorganized Tronox among Tronox's unsecured creditors; and

- provides for Tronox to emerge from chapter 11 with no more than approximately $470 million in funded debt borrowed under (a) a $425 million senior secured term loan facility and (b) an asset based revolving credit facility with commitments of $125 million, each on favorable market terms, leaving Tronox well-capitalized and positioned for growth.

Moreover, as a result of further settlement discussions with the Equity Committee and to avoid the cost of unnecessary litigation, the Plan (as proposed to be modified) provides for an improved recovery to Tronox's existing shareholders, who will receive their pro rata share of two tranches of "New Warrants" to purchase a combined total of 7.5% of the equity in the reorganized business in the event of improvements in total enterprise value. It is only through extraordinary efforts and extensive and transparent negotiations with all stakeholders that Tronox has been able to settle the numerous and complex issues resolved through the Plan and to reach near-unanimous consent on the Plan.[3]

The progress made in these Chapter 11 Cases cannot be overstated. When Tronox filed for chapter 11 at the height of the financial crisis in January 2009, financing was virtually nonexistent and the only debtor-in-possession financing available at that time required Tronox to conduct a sale process, which nearly resulted in the sale of the company at a value that likely

---

[3] Indeed, the only parties who have challenged confirmation are Anadarko the Lead Plaintiffs and certain potential Class 6 creditors, who required time to assess the Environmental Claims Settlement Agreement. Tronox is working effectively with these parties and has reached agreements in principle to resolve several of their objections. To the extent the parties cannot resolve the objections consensually, Tronox submits that none of the objections raises issues that would preclude Confirmation of the Plan.

3

would have resulted in little or no recovery for unsecured creditors.  Nearly one year later, and following several significant developments in these chapter 11 cases, Tronox stands poised to emerge as a responsibly restructured business with a Plan that ensures adequate funding for the legacy liabilities being left behind and gives general unsecured creditors (and holders of equity interests) a stake in the future of the reorganized business.  Most importantly, by securing the critical benefits of the settlements embodied in the Plan, the Plan protects Tronox's nearly 1,000 employees worldwide and ensures the company's continued ability to operate in the chemicals industry.

As set forth in detail below, Tronox respectfully submits that the Plan is consistent with Tronox's fiduciary duties and the policy and statutory framework of the Bankruptcy Code and should be confirmed.

K&E 17933465

**BACKGROUND**

I.      **Procedural History**

1.      On July 7, 2010, prior to the expiration of its exclusive filing period under the Bankruptcy Code, Tronox filed the initial version of its proposed Plan and the *Disclosure Statement Regarding the Joint Plan of Reorganization of Tronox Incorporated* et al. *Pursuant to Chapter 11 of the Bankruptcy Code* (as modified, amended or supplemented from time to time, the "**Disclosure Statement**") [Docket Nos. 1706 and 1707].  Following extensive negotiations with its constituents, on September 1, 2010, Tronox filed its proposed first amended Plan [Docket No. 1947] and related Disclosure Statement [Docket No. 1948].[4]  On September 24, 2010, Tronox filed a further revised proposed first amended Plan [Docket No. 2158] and related Disclosure Statement [Docket No. 2159], and a hearing on approval of the Disclosure Statement commenced on September 23, 2010.

2.      On September 30, 2010, the Court entered the *Amended Order (I) Approving the Disclosure Statement; (II) Establishing a Record Date for Voting on the Plan of Reorganization; (III) Approving Solicitation Packages and Procedures for the Distribution Thereof; (IV) Approving the Forms of Ballots; (V) Establishing Procedures for Voting on the Plan; and (VI) Establishing Notice and Objection Procedures for Confirmation of the Plan* [Docket No. 2187] (the "**Solicitation Procedures Order**").  On October 1, 2010, Tronox filed the solicitation versions of the Plan and Disclosure Statement [Docket No. 2196], and on October 4, 2010, Tronox began solicitation of votes on the Plan.

---

[4]     Subsequently, Tronox filed amended versions of the first amended Plan and Disclosure Statement on September 21, 2010 [Docket Nos. 2124 and 2125] and September 22, 2010 [Docket Nos. 2148 and 2149].

5

3.     On October 29, 2010, Tronox filed the *Plan Supplement for the First Amended Joint Plan of Tronox Incorporated Et Al. Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 2343], which was subsequently supplemented on November 9, 2010 [Docket No. 2441] (collectively, the "**Plan Supplement**").

4.     On November 5, 2010, Tronox filed a further revised first amended Plan to incorporate the terms of a settlement agreement with the Equity Committee and a related motion requesting Court approval of certain immaterial Plan modifications without the need for further solicitation of votes on the Plan [Docket No. 2404].[5]  As Tronox continues to work toward resolution of objections, certain additional modifications to the Plan may be stated and explained on the record of the hearing to consider confirmation of the Plan (the "**Confirmation Hearing**") or reflected in the proposed Confirmation Order.

5.     The deadline for all Holders of Claims and Equity Interests entitled to vote on the Plan to cast their ballots was November 5, 2010 at 5:00 p.m. (Pacific Time) (the "**Voting Deadline**"), which deadline was extended to November 12, 2010 for Holders of Claims in Classes 5 and 6 to allow such creditors additional time to consider the Environmental Claims Settlement Agreement filed on November 9, 2010.  The deadline to file objections to the Plan was November 5, 2010 at 4:00 p.m. (Eastern Time).  The Confirmation Hearing is scheduled to commence on November 17, 2010 at 11:00 a.m. (Eastern Time).

6.     In support hereof, Tronox is filing (a) the voting certifications and reports of the Court-appointed Notice and Claims Agent, Kurtzman Carson Consultants LLC (the "**Voting Certification**"), (b) the *Declaration of Dennis L. Wanlass in Support of Confirmation of the First Amended Joint Plan of Reorganization of Tronox Incorporated* et al. *Pursuant to Chapter*

---

5    The deadline for parties in interest to object to any of the proposed modifications to the Plan is 4:00 p.m (ET) on November 16, 2010.

11 of the Bankruptcy Code (the "**Wanlass Declaration**"), (c) the *Declaration of Todd R. Snyder in Support of Confirmation of the First Amended Joint Plan of Reorganization of Tronox Incorporated* et al. *Pursuant to Chapter 11 of the Bankruptcy Code* (the "**Snyder Declaration**") and (d) the *Declaration of Gary Barton in Support of Confirmation of the First Amended Joint Plan of Reorganization of Tronox Incorporated* et al. *Pursuant to Chapter 11 of the Bankruptcy Code* (the "**Barton Declaration**").

II.    **Voting Status**

7.    As set forth in greater detail in the Voting Certification, the Plan was overwhelmingly accepted by the creditor Classes entitled to vote on the Plan, as follows:

| Class | Ballots Voting to Accept | | Result |
| --- | --- | --- | --- |
| | % Number | % Amount | |
| Class 3: General Unsecured Claims | 98.33% | 96.59% | Voted to Accept |
| Class 4: Tort Claims | 96.76% | 96.76% | Voted to Accept |
| Class 5: Environmental Claims | 100% | 100% | Voted to Accept |
| Class 6: Indirect Environmental Claims | 75.0% | 99.8% | Voted to Accept |
| Class 7: Convenience Claims | 95.65% | 93.89% | Voted to Accept |
| Class 8: Equity Interests in Tronox Incorporated | N/A | 14.63% | Voted to Reject |

8.    Holders of Class 8 Equity Interests in Tronox Incorporated are the only Class that voted to reject the Plan (the "**Rejecting Class**").  In any event, and as discussed below, Tronox will satisfy the "cram down" requirements under section 1129(b) of the Bankruptcy Code with respect to the Rejecting Class.

9.    Importantly, however, on November 3, 2010 — just two days before the Voting Deadline and after most of the class votes were already cast, Tronox and the Equity Committee announced that they had reached a settlement regarding the treatment of Class 8 Equity Interests

7

under the Plan.  As a result of (and as part of) the settlement, the recoveries to Class 8 Equity

Interests have improved, and the Equity Committee has agreed to support the Plan.

## ARGUMENT

10.    In this memorandum, Tronox presents its "case in chief" that the Plan should be

confirmed because it satisfies section 1129 of the Bankruptcy Code, while also addressing each

of the substantive issues raised in the various objections to Confirmation.[6]

## I.    The Plan Satisfies Each Requirement for Confirmation.

11.    To confirm the Plan, the Court must find that Tronox has satisfied the provisions

of section 1129 of the Bankruptcy Code by a preponderance of the evidence.[7]   Tronox

respectfully submits that the Plan complies with all relevant sections of the Bankruptcy Code,

including sections 1122, 1123, 1125, 1126 and 1129 thereof, the Bankruptcy Rules and

applicable non-bankruptcy law.  This memorandum addresses each requirement individually, as

well as the permissive elements of the Plan, including the settlements incorporated therein.

### A.    The Plan Complies with the Applicable Provisions of the Bankruptcy Code (11 U.S.C. § 1129(a)(1)).

12.    Section 1129(a)(1) of the Bankruptcy Code requires that a plan of reorganization

comply with the applicable provisions of the Bankruptcy Code, including, principally, rules

---

[6]    For the convenience of the Court, attached hereto as Exhibit A is a chart summarizing the objections to the Plan and reflecting whether and to what extent such objections have been or are intended to be resolved.

[7]    *See In re Bally Total Fitness of Greater N.Y., Inc.*, No. 07-12395, 2007 WL 2779438, at *3 (Bankr. S.D.N.Y. Sept. 17, 2007) ("The Debtors, as proponents of the plan, have the burden of proving the satisfaction of the elements of Sections 1129(a) and (b) of the Bankruptcy Code by a preponderance of the evidence."); *see also Heartland Fed. Sav. & Loan Ass'n v. Briscoe Enters., Ltd. II (In re Briscoe Enters., Ltd. II)*, 994 F.2d 1160, 1165 (5th Cir. 1993) ("[t]he combination of legislative silence, Supreme Court holdings, and the structure of the [Bankruptcy] Code leads this Court to conclude that preponderance of the evidence is the debtor's appropriate standard of proof both under § 1129(a) and in a cramdown") (footnote omitted); *In re El Charro, Inc.*, No. 05-60294, 2007 WL 2174911, at *4 n.4 (Bankr. D. Kan. July 26, 2007) (preponderance of evidence applies to valuation and every element governing confirmation); *In re Sylvan I-30 Enters.*, No. 05-86708, 2006 WL 2539718, at *6 (Bankr. N.D. Tex. Sept. 1, 2006) (applying preponderance of evidence standard to confirmation in context of feasibility).

8

governing classification of claims and interests and the contents of a plan of reorganization.[8]

Accordingly, determining whether the Plan complies with section 1129(a)(1) of the Bankruptcy

Code requires applying sections 1122 and 1123 of the Bankruptcy Code. As explained below,

the Plan complies with sections 1122 and 1123 of the Bankruptcy Code in all respects.

### i.    The Plan Satisfies the Classification Requirements of 11 U.S.C. § 1122.

13.    The classification requirements of section 1122 provide:

(a)    Except as provided in subsection (b) of this section, a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests of such class.

(b)    A plan may designate a separate class of claims consisting only of every unsecured claim that is less than or reduced to an amount that the court approves as reasonable and necessary for administrative convenience.

14.    The Second Circuit has recognized that, under section 1122 of the Bankruptcy

Code, plan proponents have significant flexibility to place similar claims into different classes,

provided there is a rational basis to do so.[9] Courts have identified grounds justifying separate

---

[8]    *See Kane v. Johns-Manville Corp.* (*In re Johns-Manville Corp.*), 843 F.2d 636, 648-49 (2d Cir. 1988) (suggesting that Congress intended the phrase "'applicable provisions' in [section 1129(a)(1)] to mean provisions of Chapter 11 . . . such as section 1122 . . . ."); *In re Drexel Burnham Lambert Group, Inc.*, 138 B.R. 723, 757 (Bankr. S.D.N.Y. 1992) (noting that "[t]he legislative history of § 1129(a)(1) explains that this provision embodies the requirements of §§ 1122 and 1123, respectively, governing classification of claims and the contents of the Plan") (citations omitted); *see also In re Simplot*, No. 06-00002, 2007 WL 2479664, at *14 (Bankr. D. Idaho Aug. 28, 2007) (noting that the objective of 1129(a)(1) is to assure compliance with the sections of the Bankruptcy Code governing classification and the contents of a plan reorganization); S. Rep. No. 989, 95th Cong., 2d Sess. 126 (1978); H.R. Rep. No. 595, 95th Cong., lst Sess. 412 (1977).

[9]    *See Boston Post Rd. Ltd. P'ship v. FDIC* (*In re Boston Post Rd. Ltd. P'ship*), 21 F.3d 477, 483 (2d Cir. 1994) (finding that courts cannot prohibit separate classification of substantially similar claims); *Frito-Lay, Inc., v. LTV Steel Co., Inc.* (*In re Chateaugay Corp.*), 10 F.3d 944, 956-57 (2d Cir. 1993) (finding separate classification appropriate because classification scheme had a rational basis; separate classification based on bankruptcy court-approved settlement); *In re 500 Fifth Ave. Assocs.*, 148 B.R. 1010, 1018 (Bankr. S.D.N.Y. 1993) (although discretion is not unlimited, "the proponent of a plan of reorganization has considerable discretion to classify claims and interests according to the facts and circumstances of the case . . . ."); *Drexel*, 138 B.R. at 757 ("Courts have found that the Bankruptcy Code only prohibits the identical classification of dissimilar claims. It does not require that similar classes be grouped together . . . .") (citation omitted); *In re Ionosphere Clubs, Inc.*, 98 B.R. 174, 177-78 (Bankr. S.D.N.Y. 1989) ("[A] debtor may place claimants of the

9

classification, including: (a) where members of a class possess different legal rights;[10] and (b) where there are good business reasons for separate classification.[11]

15.    The Plan's classification of Claims and Equity Interests into eight different Classes satisfies the flexible requirements of section 1122 of the Bankruptcy Code because each Class differs from the others in a legal or factual nature or based on other relevant and objective criteria. Described generally, the Plan's classification scheme follows Tronox's capital structure and otherwise classifies certain Unsecured Claims separately to effectuate the terms of the global settlement among Tronox's "legacy" and "operating" creditors (and those that fall in between).

16.    Beginning with the obvious, the Plan separately classifies Claims in Class 1 to reflect the priority of such Claims under section 507(a) of the Bankruptcy Code and separately classifies Secured Claims in Class 2 based on their distinct legal nature. The Plan separately classifies Convenience Claims in Class 7 for administrative convenience. Finally, Class 8 contains Equity Interests in Tronox Incorporated and thus such Equity Interests are separately classified.

17.    Class 3 contains all Unsecured Claims related to Tronox's current business operations, including the Unsecured Notes Claims and general trade claims who will receive on

---

same rank in different classes and thereby provide different treatment for each respective class."); *see also In re Jersey City Med. Ctr.*, 817 F.2d 1055, 1060-61 (3d Cir. 1987) (recognizing that separate classes of claims must be reasonable and allowing a plan proponent to group similar claims in different classes); *In re Heritage Org., L.L.C.*, 375 B.R. 230, 303 (Bankr. N.D. Tex. 2007) ("the only express prohibition on separate classification is that it may not be done to gerrymander an affirmative vote on a reorganization plan.").

[10]    *See Drexel*, 138 B.R. at 715; *see also Heritage*, 375 B.R. at 299 n.86 (finding that if creditors had different legal rights under equitable subordination, then separate classification would be appropriate); *In re Mirant Corp.*, No. 03-46590, 2007 WL 1258932, at *7 (Bankr. N.D. Texas, April 27, 2007) (permitting separate classification because holders of claims had different legal interests in the debtor's estate); *In re Kaiser Aluminum Corp.*, No. 02-10429, 2006 WL 616243, at *5 (Bankr. D. Del. Feb. 6, 2006) (permitting classification scheme after consideration of creditors' legal rights).

[11]    *See Aetna Cas. & Sur. Co. v. Clerk U.S. Bankr. Ct., New York, N.Y.* (*In re Chateaugay Corp.*), 89 F.3d 942, 949 (2d Cir. 1996) (finding that debtor must have a legitimate business reason supported by credible proof to justify separate classification of unsecured claims); *Bally Total Fitness*, 2007 WL 2779438, at *3 (same).

10

account of their Claims equity in Tronox's future operating business.  Class 4 consists of Tort

Claims, which arise from injury to person or property, and which are being channeled to a trust

under the Plan.  The Environmental Claims in Class 5 comprise civil claims, including certain

administrative expense claims and/or nondischargeable obligations asserted by Government

Environmental Entities that must be independently classified for purposes of treatment in

accordance with the Environmental Claims Settlement Agreement (and to facilitate the

immediate cash distributions required by the Government Environmental Entities that will be

responsible for ongoing and future remediation at thousands of sites throughout the country

while those claimants await the outcome of the Anadarko Litigation).  Indirect Environmental

Claims in Class 6 include Claims of private (non-governmental) parties that may share

responsibility for environmental remediation at various sites (as a legacy or current

owner/operator).  The Creditors' Committee, whose members include a creditor that holds an

Indirect Environmental Claim, negotiated for the Class to split recoveries between the

consideration allocated to Classes 3 and 4.

18.    Each of the Claims or Equity Interests in a particular Class under the Plan is

substantially similar to the other Claims or Equity Interests in such Class, and the classification

structure is necessary to implement certain aspects of the Plan, including the global settlement.

In each instance of separate classification, the Plan classifies Claims and Equity Interests based

upon their different rights and attributes.  As such, valid business, factual and legal reasons exist

for classifying separately the various Classes of Claims and Equity Interests created under the

Plan, establishing a legitimate basis for the classification scheme under the Plan that "does not

offend one's sensibility of due process and fair play."[12]

---

[12]  *In re Adelphia Commc'ns.*, 368 B.R. 140, 246-7 (Bankr. S.D.N.Y. 2007) (the "**Adelphia Confirmation Decision**") (quoting *In re One Times Square Assocs. Ltd. P'ship*, 159 B.R. 695, 703 (Bankr. S.D.N.Y. 1993)).

19.     Certain holders of Claims in Class 6 have objected to the separate classification of Class 6 Claims from unsecured claims in Classes 3, 4 and 5.  As noted above, however, courts have granted debtors substantial latitude in classifying claims, so long as classes are not created to gerrymander votes.[13]   Here, Class 6 Claims are classified separately because they are of a different nature from other unsecured claims, including those in Classes 3, 4 and 5.

20.     Moreover, given the near-unanimous support for the Plan, there is no evidence that the classification structure was designed to gerrymander the Classes to create an Impaired consenting Class.  To the contrary, the classification scheme facilitiates a heavily negotiated distribution to a class of creditors represented by sophisticated counsel and who have voted to accept the Plan.  Accordingly, Tronox submits that the Plan fully complies with and satisfies the requirements of section 1122 of the Bankruptcy Code.

### ii.     The Plan Satisfies the Seven Mandatory Plan Requirements of 11 U.S.C. §§ 1123 (a)(1)-(a)(7).

21.     The Plan meets the seven mandatory requirements of section 1123(a) as follows:[14]

(1)     as required by section 1123(a)(1) of the Bankruptcy Code, Article III designates Classes of Claims and Equity Interests;

(2)     as required by section 1123(a)(2) of the Bankruptcy Code, Article III.B specifies which Classes of Claims are Unimpaired under the Plan;

(3)     as required by section 1123(a)(3) of the Bankruptcy Code, Article III.B specifies the treatment of each Class of Claims and Equity Interests that is Impaired under the Plan;

(4)     as required by section 1123(a)(4) of the Bankruptcy Code, Article III.B provides the same treatment for each Claim or Equity Interest within a particular Class (unless the Holder

---

13   *See Chateaugay*, 10 F.3d at 956-67; *500 Fifth Ave. Assocs.*, 148 B.R. at 1018.

14   *See* 11 U.S.C. §1123(a)(1).

of a particular Claim agrees to less favorable treatment of such particular Claim);

(5)     as required by section 1123(a)(5) of the Bankruptcy Code, the provisions of Article IV of the Plan provide adequate means for the Plan's implementation;[15]

(6)     as required by section 1123(a)(6) of the Bankruptcy Code, Article IV.K of the Plan provides that the new certificates of incorporation for Reorganized Tronox shall prohibit the issuance of non-voting equity securities; and

(7)     as required by section 1123(a)(7) of the Bankruptcy Code, Article IV.L of the Plan properly and adequately discloses or otherwise identifies the manner by which the individuals proposed to serve as the officers and directors of Reorganized Tronox will be selected, consistent with the interests of Holders of Claims and Equity Interests and with public policy.

22.     Accordingly, the Plan satisfies the mandatory plan requirements set forth in section 1123(a) of the Bankruptcy Code.

**B.    Tronox, as Plan Proponent, Has Complied with the Applicable Provisions of the Bankruptcy Code (11 U.S.C. § 1129(a)(2)).**

23.     Tronox has satisfied section 1129(a)(2) of the Bankruptcy Code, which requires that the proponent of a plan of reorganization comply with the applicable provisions of the Bankruptcy Code. The legislative history to section 1129(a)(2) of the Bankruptcy Code reflects that this provision is intended to encompass the disclosure and solicitation requirements set forth in section 1125 of the Bankruptcy Code and the plan acceptance requirements set forth in section

---

[15] Article IV of the Plan provides for, among other things: the general settlement of Claims and Equity Interests pursuant to the Plan; the Environmental Claims Settlement Agreement, including the funding of the Environmental Response Trusts and the lease agreement relating to the Henderson Facility; the Tort Claims Trust; the Anadarko Litigation Trust; the Exit Financing and the Rights Offering; the authorization and issuance of new equity consisting of New Common Stock and New Warrants; the filing of new certificates of incorporation for Reorganized Tronox and the amendment of each Tronox Debtor's bylaws; the appointment of officers and directors of Reorganized Tronox; the exemption from certain taxes of any transfers pursuant to the Plan, including the issuance of securities in Reorganized Tronox; and the maintenance of Causes of Action and the preservation of all Causes of Action not expressly settled or released.

1126 of the Bankruptcy Code.[16]  Tronox has complied with these provisions, including sections

1125 and 1126 of the Bankruptcy Code, as well as Bankruptcy Rules 3017 and 3018, by

distributing the Disclosure Statement and soliciting acceptances of the Plan through its Notice

and Claims Agent pursuant to the Solicitation Procedures Order.

> ### i.    Tronox Has Complied with the Disclosure Statement and Solicitation Requirements of 11 U.S.C. § 1125.

24.    Section 1125 of the Bankruptcy Code prohibits the solicitation of acceptances or

rejections of a plan of reorganization "unless, at the time of or before such solicitation, there is

transmitted to such holder the plan or a summary of the plan, and a written disclosure statement

approved, after notice and a hearing, by the court as containing adequate information."[17]  The

purpose of section 1125 of the Bankruptcy Code is to ensure that parties in interest are fully

informed regarding the condition of the debtor, the means for implementation of the plan and

related transactions and the treatment of all classes of claims and interests, all so they may make

an informed decision whether to approve or reject the plan.[18]

25.    Tronox has satisfied section 1125 of the Bankruptcy Code.  Before Tronox began

soliciting votes on the Plan, the Court approved the Disclosure Statement, as containing adequate

information, and the procedures for soliciting and tabulating the votes on, and for objecting to,

---

[16]  *In re Johns-Manville Corp.*, 68 B.R. 618, 630 (Bankr. S.D.N.Y. 1986), *aff'd in part, rev'd in part on other grounds*, 78 B.R. 407 (S.D.N.Y. 1987), *aff'd, Kane v. Johns-Manville Corp.* (*In re Johns-Manville Corp.*), 843 F.2d 636 (2d Cir. 1988) ("Objections to confirmation raised under § 1129(a)(2) generally involve the alleged failure of the plan proponent to comply with § 1125 and § 1126 of the [Bankruptcy] Code.") (citations omitted); *In re Toy & Sports Warehouse, Inc.*, 37 B.R. 141, 149 (Bankr. S.D.N.Y. 1984) (stating that to comply with section 1129(a)(2), "the proponent must comply with the ban on post-petition solicitation of the plan unaccompanied by a written disclosure statement approved by the court in accordance with [Bankruptcy] Code §§ 1125 and 1126.") (citation omitted); *see also* H.R. Rep. No. 95-595, at 412 (1977); S. Rep. No. 95-989, at 126 (1978) ("Paragraph (2) [of section 1129(a)] requires that the proponent of the plan comply with the applicable provisions of chapter 11, such as section 1125 regarding disclosure.").

[17]  11 U.S.C. § 1125(b).

[18]  *See Momentum Mfg. Corp. v. Employee Creditors Comm.* (*In re Momentum Mfg. Corp.*), 25 F.3d 1132, 1136 (2d Cir. 1994) (finding that section 1125 of the Bankruptcy Code obliges a Debtor to engage in full and fair disclosure that would enable a hypothetical reasonable investor to make an informed judgment about the plan).

the Plan.[19]  The Solicitation Procedures Order specifies in great detail the content of the various

solicitation materials that Tronox provided to holders of Claims and Equity Interests and the

timing and method of delivery of the solicitation materials.[20]  As detailed further in the Voting

Certification, through its Notice and Claims Agent, Tronox complied in all respects with the

content and delivery requirements of Tronox's solicitation procedures as outlined in the

Solicitation Procedures Order.

> **ii.    Tronox Has Complied with the Plan Acceptance Requirements of 11 U.S.C. § 1126.**

26.    Section 1126 of the Bankruptcy Code provides that only holders of allowed

claims and equity interests in impaired classes that will receive or retain property under a plan on

account of such claims or equity interests may vote to accept or reject a plan.[21]

27.    As set forth in the Plan, the Disclosure Statement, the Solicitation Procedures

Order, and the Voting Certification, Classes 1 and 2 are Unimpaired under the Plan.  Pursuant to

section 1126(f) of the Bankruptcy Code, holders of Claims in the Unimpaired Classes are not

entitled to vote on the Plan and are conclusively presumed to have accepted the Plan.

28.    Tronox solicited acceptances and rejections of the Plan from holders of all

Allowed Claims and Equity Interests in each Impaired Class entitled to receive distributions

under the Plan:  Classes 3, 4, 5, 6, 7 and 8.[22]  Sections 1126(c) and (d) of the Bankruptcy Code

specify the requirements for acceptance of a plan by a class of claims and interests.  Specifically,

sections 1126(c) and (d) provide:

---

19    *See* Solicitation Procedures Order.

20    *See* Solicitation Procedures Order.

21    11 U.S.C. § 1126.

22    *See* Plan, Art. III.B.

15

(c)    A class of claims has accepted a plan if such plan has been accepted by creditors, other than any entity designated under subsection (e) of [section 1126], that hold at least two-thirds in amount and more than one-half in number of the allowed claims of such class held by creditors, other than any entity designated under subsection (e) of [section 1126], that have accepted or rejected such plan.[23]

(d)    A class of interests has accepted a plan if such plan has been accepted by holders of such interests, other than any entity designated under subsection (e) of [section 1126], that hold at least two-thirds in amount of the allowed interests of such class held by holders of such interest, other than any entity designated under subsection (e) of [section 1126], that have accepted or rejected such plan.[24]

29.    The Voting Certification details the results of the voting process in accordance with section 1126 of the Bankruptcy Code.  Class 8 Equity Interests were the only Rejecting Class.

30.    As noted above, on November 3, 2010, Tronox and the Equity Committee announced that they had reached a settlement that improved recoveries to existing shareholders and secured the support of the Equity Committee for the Plan.  Nevertheless, because Class 8 Equity Interests have voted to reject the Plan, Tronox will demonstrate herein and at the Confirmation Hearing that the Plan satisfies the requirements of section 1129(b) of the Bankruptcy Code to "cram down" Class 8.

**C.    The Plan Was Proposed in Good Faith and not by any Means Forbidden by Law (11 U.S.C. § 1129(a)(3)).**

31.    Section 1129(a) of the Bankruptcy Code compels a bankruptcy court to reject a plan if it is not proposed in "good faith" or is "forbidden by law."[25]  The Second Circuit has

---

[23]   11 U.S.C. § 1126(c).

[24]   11 U.S.C. §§ 1126(d).

[25]   11 U.S.C. § 1129(a)(3).

16

construed the good faith standard as requiring a showing that "the plan was proposed with 'honesty and good intentions' and 'with a basis for expecting that the reorganization can be effected.'"[26]  Additionally, courts generally hold that "good faith" should be evaluated in light of the totality of the circumstances surrounding confirmation.[27]  The bankruptcy judge is in the best position to assess the good faith of the parties' proposals.[28]

32.    One court has described the goals and policies associated with the "good faith" requirement of section 1129(a)(3) of the Bankruptcy Code as follows:

> The primary goal of chapter 11 is to promote the rehabilitation of the debtor. Congress has recognized that the continuation of the operation of a debtor's business as a viable entity benefits the national economy through the preservation of jobs and continued production of goods and services.  The Supreme Court similarly has recognized that "[t]he fundamental purpose of reorganization is to prevent a debtor from going into liquidation, with an attendant loss of jobs and possible misuse of economic resources."[29]

33.    Here, Tronox has proposed the Plan with honesty, good intentions and a desire to effectuate a full, fair and feasible restructuring of its liabilities while maximizing value for the benefit of all stakeholders, including the environmental agencies that will be responsible for protecting the public interest in overseeing environmental remediation at hundreds of contaminated sites around the country.  The Plan is the product of extensive arm's-length negotiations among Tronox, the Creditors' Committee, the *ad hoc* committee of certain holders of the Unsecured Notes (the "**Ad Hoc Noteholders' Committee**"), the United States, the

---

26  *Johns-Manville*, 843 F.2d at 649 (citations omitted); *In re Texaco, Inc.*, 84 B.R. 893, 901-907 (Bankr. S.D.N.Y. 1988), *appeal dismissed*, 92 B.R. 38 (S.D.N.Y. 1998) ("[I]n the context of a Chapter 11 reorganization . . . a plan is considered proposed in good faith if there is a likelihood that the plan will achieve a result consistent with the standards prescribed under the Code.") (citations and quotations omitted).

27  *In re Cellular Info. Sys., Inc.*, 171 B.R. 926, 945 (Bankr. S.D.N.Y. 1994) (citing cases).

28  *Adelphia Confirmation Decision*, 368 B.R. at 247; *Toy & Sports Warehouse*, 37 B.R. at 149.

29  *In re WorldCom, Inc.*, No. 02-13533, 2003 Bankr. LEXIS 1401, at *152 (Bankr. S.D.N.Y. Oct. 31, 2003) (quoting *NLRB v. Bildisco & Bildisco*, 465 U.S. 513, 528 (1984)).

K&E 17933465

Nevada Parties and other Government Environmental Entities.  These negotiations were difficult and sometimes contentious, and the Plan reflects a series of compromises that do not provide for a perfect outcome for any of Tronox's constituents, but represent a good faith effort to provide the highest available recoveries to the various stakeholders under the totality of the circumstances.

34.    Indeed, throughout these Chapter 11 Cases, Tronox (including its board and its management team) has upheld its fiduciary duties to stakeholders and protected the interests of all constituents with an even hand.  Importantly, the Plan is supported by every major stakeholder, including the parties listed above and the Equity Committee.  Accordingly, Tronox submits that the Plan was proposed in good faith and satisfies all of the requirements of section 1129(a)(3) of the Bankruptcy Code.

### D.    The Plan Provides for Bankruptcy Court Approval of Certain Administrative Payments (11 U.S.C. § 1129(a)(4)).

35.    Section 1129(a)(4) of the Bankruptcy Code requires that certain professional fees and expenses paid by the plan proponent, by the debtor, or by a person issuing securities or acquiring property under the Plan, be subject to approval of the Court as reasonable.[30]  Here, the Plan mandates that all payments made or to be made by Tronox for services or for costs or expenses in connection with these Chapter 11 Cases before the Effective Date, including all Professional Fee Claims, have been approved by, or are subject to the approval of the Bankruptcy Court as reasonable.  The Plan defines Professional Fee Claims as "all Administrative Claims for the compensation of Professionals and the reimbursement of expenses

---

[30]    *See, e.g.*, *In re Journal Register Co.*, 407 B.R. 520, 537 (Bankr. S.D.N.Y. 2009) (Gropper, J.); *Drexel*, 138 B.R. at 760; *In re Elsinore Shore Assocs.*, 91 B.R. 238, 268 (Bankr. D.N.J. 1988) (holding that requirements of section 1129(a)(4) were satisfied where the plan provided for payment of only "allowed" administrative expenses).

18

incurred by such Professionals through the Confirmation Date."[31]   In particular, the Plan

provides that Reorganized Tronox will pay only the allowed amounts of Professional Fee Claims

as determined by Final Order of the Bankruptcy Court "[a]fter notice and a hearing in

accordance with the procedures established by the Bankruptcy Code and prior orders of the

Bankruptcy Court in the Chapter 11 Cases." [32]   Additionally, the Plan provides that after the

Confirmation Date, Tronox or Reorganized Tronox may, in the ordinary course of business, pay

in Cash the reasonable legal, professional, or other fees and expenses related to implementation

and Consummation of the Plan and Professionals shall not have to comply with sections 327

through 331 and 1103 of the Bankruptcy Code in seeking retention or compensation for services

rendered after the Confirmation Date.[33]

36.    The Plan also contemplates the payment of certain Allowed Administrative

Claims to legal counsel and financial advisors for certain creditors who were instrumental in

developing the Plan.  Specifically, the Plan provides that Tronox will pay $3,000,000 as an

Allowed Administrative Claim to the Government Environmental Entities in full and final

satisfaction of (a) certain response costs and (b) all fees and expenses incurred by such entities,

including the fees and expenses of legal or financial advisors.  Tronox also has agreed to pay the

fees and expenses of the Backstop Parties' legal counsel and financial advisors that accrued

during the Chapter 11 Cases, as set forth in the Equity Commitment Agreement.[34]   Additionally,

the Plan contemplates paying all reasonable and documented fees and expenses of counsel to

Creditors' Committee member Michael E. Carroll, up to a maximum of $200,000, in

---

[31]   Plan, Art. I.A.128.

[32]   Plan, Art. II.A.2.

[33]   *Id.*

[34]   *See Order Authorizing Tronox to Enter Into (I) A Plan Support Agreement And (II) An Equity Commitment Agreement, And To Pay Certain Fees In Connection Therewith* [Docket No. 2072]; *see also* Plan, Art. XII.E.

19

consideration of his substantial contribution to the formulation and development of the Plan. Moreover, the Plan provides that Tronox will pay the reasonable and documented expenses of the Indenture Trustee in full in Cash as an Allowed Administrative Claim, in an amount not to exceed $550,000. Absent agreement on these arrangements, these parties would have the right to assert a substantial contribution claim pursuant to section 503(b)(4) of the Bankruptcy Code on account of their individual and collective contributions to the success of the Chapter 11 Cases.[35]

### i. The Management Compensation Programs Are Appropriate and Permissible and Should Be Approved.

37.    Article V.I of the Plan contemplates the adoption of two management compensation programs: the Management Equity Plan and the Management 2010 Bonus Plan (collectively, the "**Management Compensation Programs**"). These plans — which are both post-emergence management compensation plans — were developed by Tronox, in consultation with its advisors (including an external compensation consultant), and the terms, conditions and payment structures were extensively negotiated with the Creditors' Committee and the Ad Hoc Noteholders' Committee on behalf of the future owners of Tronox, its unsecured creditors. Information related to the Management Compensation Programs initially was disclosed in both the original and solicitation versions of the Plan and Disclosure Statements filed on September 1 and October 1, 2010, respectively. Thereafter, the parameters of the Management Equity Plan were described in the Plan Modification Motion filed on November 5, 2010, and the detailed terms of the Management 2010 Bonus Plan are set forth in the Second Supplement to the Plan

---

[35]  *See* 11 U.S.C. § 503(b)(3)(1) – (4).

K&E 17933465

Supplement, which was filed on November 12, 2010 [Docket No. 2480].[36]  The Management

Compensation Programs are not the subject of any objection to confirmation filed with the Court.

38.    Indeed, because these are post-Effective Date compensation and benefit plans,

they are included in the Plan for the primary purpose of disclosure.[37]  Nevertheless, because the

Plan provides for the adoption of the Management Compensation Programs as of the Effective

Date, Tronox believes it is appropriate to address the programs in connection with Confirmation

of the Plan.  If any legal standard applies to such programs, it must be found in section 1129 of

the Bankruptcy Code — *i.e.*, if a plan of reorganization is confirmable after giving effect to the

payments made under the compensation programs, then the plan should be confirmed.

39.    Section 1129(a)(4) of the Bankruptcy Code requires that "any payment made or to

be made by the proponent, by the debtor … for services or for costs and expenses in or in

connection with the case, or in connection with the plan and incident to the case, has been

approved by, or is subject to approval of, the court as reasonable."[38]  "The requirements under

section 1129(a)(4)  of the Bankruptcy Code are two-fold.  First, there must be disclosure.

Second, the court must approve the reasonableness of the payment."[39]

---

36  Further details regarding the Management Equity Plan will be included in a further supplement to the Plan
Supplement, which will be filed before the Confirmation Hearing.

37  Plan provisions that effectively implement post-bankruptcy programs or plans using non-estate resources,
including post-Effective Date management incentive plans such as those included in the Plan, are considered
more of a "technicality" (*i.e.*, a mechanism to implement rather than a term implementing), for example, by
providing for the issuance of common stock in connection with a post-emergence equity plan.  As such, the
presence of such provisions in a chapter 11 plan generally does not provide grounds for denial of confirmation
of such plan.  *See Journal Register*, 407 B.R. at 533 ("the Second Circuit has cautioned that a plan should not
be denied confirmation because of a 'technicality' or 'harmless error'); *Johns-Manville Corp*., 843 F.2d at 648
(it is a "well established principle that relief under the bankruptcy laws is not to be withheld because of
technicalities") (citing *Pepper v. Litton*, 308 U.S. 295 (1939)).

38  *See* 11 U.S.C. § 1129(a)(4).

39  *See* 7 Collier on Bankruptcy ¶ 1129.03[4].

K&E 17933465

40.     The determination whether a payment is reasonable under section 1129(a)(4) of the Bankruptcy Code requires an analysis of reasonableness based on the facts and circumstances of the payments. As one Court noted, the issue of reasonableness:

> will clearly vary from case to case and, among other things, will hinge to some degree upon who makes the payments at issue, who receives those payments, and whether the payments are made from assets of the estate. In the typical case, payments that are not payable from, or reimbursable by, the bankruptcy estate should not engender anything like the judicial scrutiny devoted to those that are not payable out of the bankruptcy estate.[40]

41.     As set forth above, payments due under the Management Compensation Programs will be paid after the Effective Date from assets (*i.e.*, cash and equity value) that will be owned by unsecured creditors in Class 3 and Class 6. The existence of the programs has been disclosed since the filing of the Plan, which gave Holders of Class 3 and Class 6 Claims (the creditors affected by the programs) an opportunity to factor the payments into their decision whether to accept the Plan, and the material terms of the programs were described in the Plan Supplement. These programs were designed with the input and involvement of Towers Watson, Tronox's compensation consultant, and were heavily negotiated by the Creditors' Committee and the Ad Hoc Noteholders' Committee, who represent the interests of the future owners of Reorganized Tronox, and who have determined that the Management Compensation Programs appropriately incentivize management and align its interests with that of the stakeholders. Accordingly, the payments to be made under the Management Compensation Programs comply with section 1129(a)(4) of the Bankruptcy Code.

---

[40] *Journal Register*, 407 B.R. at 537-38, quoting *Mabey v. Sw. Elec. Power Co. (In re Cajun Elec. Power Coop., Inc.)*, 150 F.3d 503, 517 (5th Cir. 1998), cert. denied, 526 U.S. 1144 (1999).

ii.    **Payments under the Management Compensation Programs Do Not Implicate Section 503(c) of the Bankruptcy Code.**

42.    Section 1129(a)(1) of the Bankruptcy Code requires that a plan of reorganization comply with all applicable provisions of the Bankruptcy Code.  Section 1129(a)(1) of the Bankruptcy Code does not, however, implicate section 503(c) of the Bankruptcy Code, which addresses the payment of retention incentives or severance to insiders, and bonuses granted to other employees, as administrative expenses of the bankruptcy estate.  As this Court has noted, the legislative history of section 1129(a)(1) of the Bankruptcy Code suggests that the term "applicable provisions" means "the applicable provisions of chapter 11, such as sections 1122 and 1123 of the Bankruptcy Code, governing classification and the contents of [a] plan."[41]

43.    Even though no payments will be made out of estate assets because all obligations under the Management Compensation Programs are due post-Effective Date, "by including the [management compensation plans] in their plan of reorganization, the Debtors have subjected the [management compensation plans] to the heightened disclosure, notice and hearing requirements of the Plan confirmation process, and have given affected parties the opportunity to vote on it."[42]  In fact, no objections to the Management Compensation Programs were received.  Moreover, similar to the situation in *Journal Register*, Tronox's Class 3 and Class 6 creditors, who as Tronox's new owners "will bear the financial burden of the [management compensation plans], have overwhelmingly accepted the [] Plan, and the recoveries of unsecured creditors … are ***not***

---

[41]    *See Journal Register*, 407 B.R. at 535   (noting that the legislative history of section 1129(a)(1) of the Bankruptcy Code suggests that the applicability of such section is limited to sections 1122 and 1123 of the Bankruptcy Code, and quoting S. Rep. No. 989, 9th Cong., 2d Sess. 126 (1978), *reprinted in* 1978 U.S.S.C.A.N. 5787; H.R. Rep. No. 595, 9th Cong., 2d Sess. 412 (1977), *reprinted in* 1978 U.S.S.C.A.N. 5787).  *See also Kane v. Johns-Manville Corp. (In re Johns-Manville Corp.)*, 843 F.2d 636, 649 (2d Cir. 1988) ("It is doubtful that violations of the Code provisions unrelated to the form and content of a plan, such as voting procedures, implicate subsection 1129(a)(1) at all.").

[42]    *Journal Register*, 407 B.R. at 536-37.

K&E 17933465

affected by the [management compensation programs]."[43]    Accordingly, the payments to be
made under the Management Compensation Programs comply with section 1129(a)(4) of the
Bankruptcy Code.

### E.    Tronox Has Properly Disclosed Post-Emergence Directors and Officers and their Appointment Is Consistent with Public Policy (11 U.S.C. § 1129(a)(5)).

44.    Section 1129(a)(5)(A) of the Bankruptcy Code requires that, before Confirmation,
the proponent of a plan must disclose the identities and affiliations of the proposed officers and
directors of the reorganized debtors and that the appointment or continuance of such officers and
directors be consistent with the interests of creditors and equity security holders and with public
policy.[44]  In addition, section 1129(a)(5)(B) of the Bankruptcy Code requires a plan proponent to
disclose the identity of any "insider" (as defined by 11 U.S.C. § 101(31)) to be employed or
retained by the reorganized debtor and the "nature of any compensation for such insider."[45]
Courts have also found that where post-confirmation officers or directors have not been selected
and identified pre-confirmation, the disclosure of the identities of known officers and directors
and the manner in which additional individuals will be selected may be sufficient to satisfy the
requirements of section 1129(a)(5).[46]

---

[43]    *Id.* at 537 (emphasis added); *see also In re Airway Indus., Inc.*, 354 B.R. 82, 86 (Bankr. W.D. Pa. 2006) (finding section 503(c) of the Bankruptcy Code inapplicable where, among other things, a bonus plan was funded with non-estate assets and had no effect on the objecting creditors' recoveries).

[44]    11 U.S.C. § 1129(a)(5)(A).

[45]    *Id.* § 1129(a)(5)(B).

[46]    *See, e.g.*, *In re Charter Commc'ns*, 419 B.R. 221, 260 n.30 (Bankr. S.D.N.Y. 2009) ("To the extent the Plan's satisfaction of 11 U.S.C. § 1129(a)(5) remains at issue, the Court concludes that this confirmation standard is satisfied. It is undisputed that two out of the eleven seats on the Debtors' board of directors remain vacant. Although section 1129(a)(5) requires the plan to identify all directors of the reorganized entity, that provision is satisfied by the Debtors' disclosure at this time of the identities of the known directors.") (internal citation omitted) (citing *In re Am. Solar King Corp.*, 90 B.R. 808, 815 (Bankr. W.D. Tex. 1988) ("The debtor's inability to specifically identify future board members does not mean that the debtor has fallen short of the requirement imposed [in subsection (a)(5)(A)(i)]…."); *In re AG Consultants Grain Div., Inc.*, 77 B.R. 665, 669 (Bankr. N.D. Ind. 1987) (holding that the debtor complied with section 1129(a)(5) despite the fact that it did not specifically reveal identity and affiliation of any individuals who would serve after confirmation); *In re Eagle*

45.     The Plan satisfies section 1129(a)(5)(A)(i) of the Bankruptcy Code because Tronox will disclose in the Plan Supplement the identities and affiliations of any known members of the New Board of Reorganized Tronox Incorporated.    Similarly, the Plan contemplates that the existing officers of Tronox will remain in place in their current capacities as officers of Reorganized Tronox, subject to the ordinary rights and powers of the board of directors to remove or replace them in accordance with Tronox's organizational documents and the terms of the New Management Agreements.[47]

46.     The Plan complies with section 1129(a)(5)(A)(ii) of the Bankruptcy Code because the individuals who will serve as directors and officers of Reorganized Tronox, and the process by which they will be selected, ensures that Tronox will be in "good hands" after emergence.    As described in the Disclosure Statement and demonstrated by Tronox's recent financial performance (including during chapter 11), the members of current management contemplated to remain in their respective positions post-emergence are competent, have relevant, deep-rooted and solid business and industry experience, and together with the New Board will provide both continuity and fresh insights into running the reorganized business.    Therefore, the requirements of section 1129(a)(5)(A)(ii) of the Bankruptcy Code are satisfied.[48]

---

*Bus Mfg., Inc.*, 134 B.R. 584, 599 (Bankr. S.D. Tex. 1991) (finding sufficient disclosure of officer and director identities "to the extent known as of the Hearing."), *aff'd*, 158 B.R. 42 (S.D. Tex. 1993).

[47]  Plan, Art. IV.L.

[48]  This requirement to ensure that Reorganized Tronox is in "good hands" is applied by courts to mean that the proposed directors and officers should have experience in the debtor's business and industry, experience in financial and management matters, and their appointment should not "perpetuate incompetence, lack of discretion, inexperience, or affiliations with groups inimical to the best interests of the debtor."  *See In re Beyond.com Corp.*, 289 B.R. 138, 145 (Bankr. N.D. Cal. 2003).  Notably, Tronox, the Creditors' Committee and the Ad Hoc Noteholders' Committee believe control of Reorganized Tronox by the proposed individuals will be beneficial.  *See also Drexel*, 138 B.R. at 760; *In re Stratford Assocs. Ltd. P'ship*, 145 B.R. 689, 696 (Bankr. D. Kan. 1992); *In re Apex Oil*, 118 B.R. 683, 704-05 (Bankr. E.D. Mo. 1990); *In re Toy & Sports Warehouse*, 37 B.R. at 149.  The public policy requirement gives courts the ability to disapprove plans in which proposed management has demonstrated incompetence or bad faith.

25

47.    Finally, the Plan satisfies section 1129(a)(5)(B) of the Bankruptcy Code because Tronox has (or will have) disclosed on notice prior to the Confirmation Hearing, to the extent known, the identities and affiliations of insiders to be employed or retained by Reorganized Tronox as directors and officers, and the nature and amount of their compensation.  Accordingly, Tronox has satisfied the requirements of section 1129(a)(5) of the Bankruptcy Code.

**F.    The Plan Does Not Require Governmental Regulatory Approval of Rate Changes (11 U.S.C. § 1129(a)(6)).**

48.    Section 1129(a)(6) of the Bankruptcy Code permits confirmation only if any regulatory commission that will have jurisdiction over the debtor after confirmation has approved any rate change provided for in the plan.[49]  The Plan does not provide for any rate changes; section 1129(a)(6) of the Bankruptcy Code is therefore inapplicable here.

**G.    The Plan Is in the Best Interests of Creditors and Holders of Equity Interests (11 U.S.C. § 1129(a)(7)).**

49.    The so-called "best interests of creditors" test of section 1129(a)(7) of the Bankruptcy Code requires that, with respect to each impaired class of claims or interests, each individual holder of a claim or interest has either accepted the plan or will receive or retain property having a present value, as of the effective date of the plan, of not less than what such holder would receive if the debtor were liquidated under chapter 7 of the Bankruptcy Code at that time.[50]  Put differently, the best interests test is satisfied where the estimated recoveries for a debtor's stakeholders in a hypothetical chapter 7 liquidation are less than or equal to the estimated recoveries for a holder of an impaired claim or interest under the debtor's plan of

---

[49]  11 U.S.C. § 1129(a)(6).

[50]  11 U.S.C. §1129(a)(7); *Adelphia Confirmation Decision*, 368 B.R. at 251.

K&E 17933465

reorganization that rejects the plan.[51]  By its express terms, section 1129(a)(7) of the Bankruptcy Code does not apply to Unimpaired Classes under the Plan, and the best interests test is satisfied to the extent each holder of an Impaired Class of Claims or Equity Interests has voted to accept the Plan.[52]

50.    As set forth in the Barton Declaration, the Plan satisfies the best interests test with respect to holders of Claims and Equity Interests that did not accept the Plan because it provides such parties with greater recoveries than they would receive in a hypothetical chapter 7 liquidation.

51.    The following table provides an overview of recoveries to holders of Claims and Equity Interests under the Liquidation Analysis[53] on an aggregate basis:

| Class | Estimated Aggregate Claims[54] | Estimated Recovery | |
|---|---|---|---|
| | | Plan | Liquidation |
| Class 1 – Priority Non-Tax Claims | $1 million | 100% | 74% |
| Class 2 – Secured Claims | $1 million | 100% | 100% |
| Class 3 – General Unsecured Claims | $445.6 million | 78 – 100% | 0% |
| Class 4 –Tort Claims | $500 million - $1 billion | At least $16.5 million + Unknown | 0% |

---

[51]  *Adelphia Confirmation Decision*, 368 B.R. at 252  ("In determining whether the best interests standard is met, the court must measure what is to be received by rejecting creditors in the impaired classes under the plan against what would be received by them in the event of liquidation under chapter 7.").

[52]  11 U.S.C. § 1129(a)(7)(A).

[53]  Disclosure Statement, Ex. E.

[54]  In preparing the Liquidation Analysis, Tronox and Alvarez & Marsal North America, LLC estimated an amount of Allowed Claims for each Class of claimants based upon a review of Tronox's scheduled Claims and Claims filed and liquidated in the chapter 11 proceeding as of the date of the Liquidation Analysis.  The only additional Claims estimated and added to the Liquidation Analysis were for post-petition accounts payable obligations (i.e., chapter 11 Administrative Claims).  The estimate of all Allowed Claims in the Liquidation Analysis is based on either the face value of Claims filed (which amounts could include unliquidated Claims), or management-estimated values of Claims to be liquidated.

K&E 17933465

| Class | Estimated Aggregate Claims[54] | Estimated Recovery | |
| | | Plan | Liquidation |
|---|---|---|---|
| Class 5 – Environmental Claims | $1.4 - 5.2 billion | At least $320 million + Unknown | — |
| Class 6 – Indirect Environmental Claims | $50 million | 78 – 100% on 50% of Claim + Unknown | 0% |
| Class 7 – Convenience Claims | $25,000 | 89% | 0% |
| Class 8 –Equity Interests in Tronox Incorporated | N/A | $9.1 – 28.8 million[55] | 0% |

52.    The Liquidation Analysis plainly establishes that all holders of Claims or Equity Interests will receive or retain property valued, as of the Effective Date, at an amount greater than or equal to the value of what they would receive if Tronox was liquidated under chapter 7. Indeed, under a hypothetical chapter 7 liquidation, unsecured creditors and shareholders would receive *no* recovery.   Accordingly, Tronox submits the Plan satisfies the requirements of section 1129(a)(7) of the Bankruptcy Code.

**H.    Acceptance by Impaired Classes (11 U.S.C. § 1129(a)(8)).**

53.    Section 1129(a)(8) of the Bankruptcy Code requires that each class of claims or interests must either accept the plan or be unimpaired thereby.[56]  Pursuant to section 1126(c) of the Bankruptcy Code, a class of *claims* accepts a plan if holders of at least two-thirds in amount and more than one-half in number of the allowed claims in that class vote to accept the plan.[57] Pursuant to section 1126(d) of the Bankruptcy Code, a class of *interests* accepts a plan if holders of at least two-thirds in amount of the allowed interests in that class vote to accept the plan.[58]  A class that is not impaired under a plan, and each holder of a claim or interest in such a class, is

---

[55]  This range of values for the New Warrant package is based on various assumptions on valuation and volatility, which were the subject of disputes among the parties.

[56]  11 U.S.C. § 1129(a)(8).

[57]  *Id.* § 1126(c).

[58]  *Id.* § 1126(d).

28

conclusively presumed to have accepted the plan.[59]  On the other hand, a class is deemed to have rejected a plan if the plan provides that the claims or interests of that class do not receive or retain any property under the plan on account of such claims or interests.[60]

54.    As set forth above and as evidenced in the Voting Certification, all of the Impaired creditor Classes have voted overwhelmingly to accept the Plan.[61]  Class 8 Equity Interests was the only voting Class that did not vote to accept the Plan.[62]  Thus, section 1129(a)(8) of the Bankruptcy Code has not been satisfied.  Nevertheless, as discussed more fully below, Tronox meets the requirements of sections 1129(b) of the Bankruptcy Code to "cram down" the Rejecting Class.

## I.    The Plan Complies with Statutorily-Mandated Treatment of Administrative and Priority Tax Claims (11 U.S.C. § 1129(a)(9)).

55.    Section 1129(a)(9) of the Bankruptcy Code requires that claims entitled to priority under section 507(a) of the Bankruptcy Code be paid in full in cash, unless the holder thereof agrees to a different treatment with respect to such claims.[63]  In accordance therewith, the Plan generally provides that:

> (a)    unless otherwise agreed to by the Holder of a General Administrative Claim and Tronox (with the consent of the Creditors' Committee and the Required Backstop Parties or Reorganized Tronox, as applicable), Allowed General Administrative Claims will receive Cash: (i) on the Effective Date; (ii) if not then Allowed, 30 days after the date such

---

[59]  *Id.* § 1126(f); *see In re Drexel Burnham Lambert Grp., Inc.*, 960 F.2d 285, 290 (2d Cir. 1992) (noting that an unimpaired class is presumed to have accepted the plan); *see also* S. Rep. No. 989, 95th Cong. 2d Sess. 123 (1978) (section 1126(f) of the Bankruptcy Code "provides that no acceptances are required from any class whose claims or interests are unimpaired under the Plan or in the order confirming the Plan.").

[60]  11 U.S.C. § 1126(g).

[61]  *See* Section II above; Voting Certification.

[62]  Shortly before the Voting Deadline, Tronox and the Equity Committee announced that they had settled their Plan disputes.  The Equity Committee (representing the interests of all shareholders) now supports the Plan and recoveries to Holders of Equity Interests.

[63]  11 U.S.C. §1129(a)(9).

General Administrative Claim becomes Allowed, or as soon thereafter as reasonably practicable; or (iii) in the ordinary course of business, if the Allowed General Administrative Claim is based on a liability incurred by Tronox in the ordinary course of business during the Postpetition Period;[64] and

(b)  except to the extent that a Holder of an Allowed Priority Tax Claim agrees to a less favorable treatment, Allowed Priority Tax Claims shall be paid in full in Cash on the Effective Date, or as soon thereafter as practicable, provided, however, that Tronox or Reorganized Tronox shall be authorized, at its option, and in lieu of payment in full in Cash of an Allowed Priority Tax Claim, to make deferred Cash payments on account thereof in the manner and to the extent permitted under section 1129(a)(9)(C) of the Bankruptcy Code.[65]

56.    Accordingly, Tronox submits that the Plan fully complies with and satisfies all of the requirements of section 1129(a)(9) of the Bankruptcy Code.[66]

**J.    The Plan Was Accepted by at Least One Impaired Class (11 U.S.C. § 1129(a)(10)).**

57.    Section 1129(a)(10) of the Bankruptcy Code is an alternative requirement to section 1129(a)(8) of the Bankruptcy Code's requirement that each class of claims or interests must either accept a plan or be unimpaired thereunder.  Section 1129(a)(10) of the Bankruptcy Code provides that, if a class of claims is impaired under a plan, at least one impaired class of claims must accept the plan, excluding acceptance by any insider.[67]

---

[64]  Plan, Art. II.A.1.

[65]  Plan, Art. II.C.

[66]  Despite the Plan's provision for payment in full in Cash for all Allowed General Administrative Claims on the Effective Date or, if not Allowed on the Effective Date, 30 days after a final order or as soon thereafter as is practicable, Bowie Central Appraisal District ("**Bowie CAD**") has objected to Plan confirmation on the basis that it is entitled to retain certain property tax liens until all taxes, penalties and interest protected by those liens have been paid.  [Docket No. 2274].  Tronox has included new language in the proposed confirmation order that it believes resolves the concerns of Bowie CAD.

[67]  11 U.S.C. § 1129(a)(10).  This is a per plan requirement, not a per debtor requirement.  *See, e.g., Charter*, 419 B.R. at 266 ("[I]t is appropriate to test compliance with section 1129(a)(10) on a per-plan basis, not, as [objecting parties] argue, on a per-debtor basis."); *In re Enron Corp.*, No. 01-16034 (Bankr. S.D.N.Y. July 15, 2004) (order confirming joint chapter 11 plan where each debtor did not have an impaired accepting class); *In re SGPA, Inc.*, No. 01-02609 (Bankr. M.D. Pa. Sept. 28, 2001) (joint chapter 11 plan of reorganization

58.     Here, all five Impaired Classes of Claims overwhelmingly voted to accept the

Plan.[68]  Therefore, the Plan satisfies the requirements of section 1129(a)(10) of the Bankruptcy

Code.

### K.     The Plan Is Feasible (11 U.S.C. § 1129(a)(11)).

59.     Section 1129(a)(11) of the Bankruptcy Code requires that a plan be feasible to be

confirmed.  Specifically, the Court must determine, in relevant part, that:

> [c]onfirmation of the plan is not likely to be followed by the liquidation, or the
> need for further financial reorganization, of the debtor or any successor to the
> debtor under the plan, unless such liquidation or reorganization is proposed in the
> plan.[69]

60.     To demonstrate that a plan is feasible, it is not necessary that success be

guaranteed; the standard is rather that a debtor must demonstrate a reasonable assurance that

consummation of the plan will not likely be followed by a further need for financial

reorganization.[70]  In evaluating feasibility, courts have identified the following probative factors:

- the prospective earnings of the business or its earning power;

- the soundness and adequacy of the capital structure and working capital for the
  business which the debtor will engage in post-confirmation;

- the prospective availability of credit;

---

complied with section 1129(a)(10)  because at least one class of impaired creditors accepted the plan,
notwithstanding the fact that each debtor entity did not have an accepting impaired class).

[68]   *See* Voting Certification.

[69]   11 U.S.C. § 1129(a)(11).

[70]   *See Johns-Manville*, 843 F.2d at 649 ("[T]he feasibility standard is whether the plan offers a reasonable
assurance of success. Success need not be guaranteed."); *see also Briscoe*, 994 F.2d at 1166 ("Only a reasonable
assurance of commercial viability is required.") (citation omitted); *In re Eddington Thread Mfg. Co.*, 181 B.R.
826, 832-33 (Bankr. E.D. Pa. 1995) (finding plan is feasible "so long as there is a reasonable prospect for
success and a reasonable assurance that the proponents can comply with the terms of the plan."); *The Mut. Life
Ins. Co. of N.Y. v. Patrician St. Joseph Partners Ltd. P'ship* (*In re Patrician St. Joseph Partners Ltd. P'ship*),
169 B.R. 669, 674 (Bankr. D. Ariz. 1994) ("A plan meets this feasibility standard if the plan offers a reasonable
prospect of success and is workable") (citation omitted).

31

- whether the debtor will have the ability to meet its requirements for capital expenditures;

- economic and market conditions;

- the ability of management, and the likelihood that the same management will continue; and

- any other related matter which determines the prospects of a sufficiently successful operation to enable performance of the provisions of the plan.[71]

61.     As set forth in the Wanlass Declaration, an analysis of these factors in the context of these Chapter 11 Cases strongly indicates that the Plan is feasible and no parties in interest have challenged Confirmation on that ground.  Indeed, the Plan settles Tronox's massive legacy environmental and tort liabilities and enables Tronox to emerge from chapter 11 sufficiently capitalized and free of such liabilities.

62.     Tronox, together with its creditor constituents — the future owners of the reorganized business — have thoroughly analyzed Tronox's ability to meet its obligations under the Plan post-confirmation and submit that Confirmation of the Plan is not likely to be followed by liquidation or the need for further reorganization.  Indeed, the best evidence of the Plan's feasibility is the $185 million equity investment to be made thereunder.  As also described in the Wanlass Declaration, Tronox has reliable sources of liquidity and has secured valuable exit financing commitments, all of which were considered and taken into account in the preparation of financial projections for the calendar years 2010 through 2013, as described in Exhibit C to the Disclosure Statement.  These financial projections evidence that Reorganized Tronox will be able to meet its obligations under the Plan while maintaining sufficient liquidity and capital resources.

---

[71]  *See, e.g.*, *WorldCom*, 2003 WL 23861928, at *58; *Texaco*, 84 B.R. at 910; *In re Prudential Energy Co.*, 58 B.R. 857, 862-63 (Bankr. S.D.N.Y. 1986); *see also Teamsters Nat'l Freight Indus. Negotiating Comm. v. U.S. Truck Co.* (*In re U.S. Truck Co.*), 800 F.2d 581, 589 (6th Cir. 1986); *In re Repurchase Corp.*, 332 B.R. 336, 342 (Bankr. N.D. Ill. 2005).

K&E 17933465

### i.    The Plan Settles Tronox's Legacy Liabilities and Proposes a Sound and Adequate Post-Emergence Capital Structure.

63.    The most significant objective of the Chapter 11 Cases, as effectuated through the Plan, is to restructure Tronox's liabilities.    Since the spinoff from Kerr-McGee, Tronox's operations have been hindered by the liabilities underlying the Environmental and Tort Claims. In the Chapter 11 Cases, federal, state, local, tribal and quasi-governmental agencies filed more than 120 proofs of claim against Tronox asserting up to $10.5 billion in liabilities plus additional undetermined amounts.    In addition to massive General Unsecured Claims, the Government Environmental Entities have asserted various Priority and/or Administrative Claims, which have been estimated by Tronox in the range of $300 to $500 million.    Moreover, the Government Environmental Entities have asserted certain remedial and other cleanup obligations against Tronox that likely are not dischargeable.    Similarly, approximately 11,500 Tort Claims were filed asserting up to $2 billion in liabilities.

64.    The global settlement embodied in the Plan resolves Tronox's legacy Environmental Claims (of the Government Environmental Entities) and Tort Claims, which will be satisfied from the substantial consideration being allocated to specified agencies and/or trusts, thereby protecting Tronox's reorganized businesses.    Specifically, in exchange for the consideration received pursuant to the Plan, the holders of Environmental Claims will provide Tronox and Reorganized Tronox with a discharge and/or covenants not to sue with respect to Tronox's liability for the Environmental Claims after the Effective Date, to the extent provided in the Environmental Claims Settlement Agreement.    Similarly, the Plan provides for the creation and funding of a Tort Claims Trust, which will be the sole source of distributions to holders of Tort Claims.

33

65.    At the same time, the Plan ensures that Reorganized Tronox is well-positioned to manage its ongoing debt post-emergence.  Through the Rights Offering, the Plan raises most of the settlement Cash through equity financing.  The Plan also provides that Tronox will have no more than approximately $470 million of funded debt borrowed under (a) a $425 million senior secured term loan facility (either under an amended Replacement DIP Facility having converted into exit financing according to its terms, or under a new credit facility); and (b) an asset-based revolving credit facility with commitments of $125 million (including $28 million face amount in issued letters of credit) (collectively, the "**Exit Financing**").

66.    Tronox has secured valuable financing commitments that will ensure it has sufficient liquidity and access to available working capital and letters of credit for no less than the next four years, subject to the terms of the credit agreements.  Tronox submits that elimination of its legacy liabilities and the right sizing of its capital structure will position Reorganized Tronox to compete on a level playing field with other titanium dioxide producers.

### ii.    The Plan Was Scrutinized and Validated by Key Stakeholders.

67.    The Plan also is the product of extensive negotiations and discussions among Tronox and its key stakeholders, who have scrutinized the Plan and the financial projections in connection developing the Plan.  In fact, for nearly two years, Tronox, the Government Environmental Entities, the Creditors' Committee, the Ad Hoc Noteholders' Committee, the agent for the Replacement DIP Facility, and the Equity Committee have negotiated to resolve Tronox's legacy liabilities and to provide funding for such settlement.  These negotiations took place over many months, through numerous meetings, the exchange of multiple term sheets or settlement proposals and regular correspondence and conference calls among the parties and their legal and financial advisors.  During this process, Tronox's stakeholders extensively

34

reviewed the financial projections and the business plan, which ultimately resulted in the terms

incorporated into the Plan — including with respect to debt capacity.

68.       As a result of the global settlement, there has been widespread and extensive

review of the Plan by multiple parties with competing interests, many of whom represent

constituents that directly benefit from Reorganized Tronox's emergence from these Chapter 11

Cases as a healthy entity that can meet its obligations to creditors and drive value for post-

emergence shareholders.   That these stakeholders have all agreed to support the Plan is a

testament to the feasibility of the Plan and to its likelihood of success.

69.       For all of the foregoing reasons, Tronox submits the Plan satisfies the feasibility

requirement of section 1129(a)(11) of the Bankruptcy Code.

**L.        The Plan Provides for the Payment of All Fees under 28 U.S.C. § 1930 (11
            U.S.C. § 1129(a)(12)).**

70.       Section 1129(a)(12) of the Bankruptcy Code requires the payment of all fees

payable under 28 U.S.C. § 1930.[72]   The Plan provides that Tronox will pay all United States

Trustee quarterly fees under 28 U.S.C. § 1930(a)(6), plus any interest due and payable under 31

U.S.C. § 3717 on all disbursements, including Plan payments and disbursements in and outside

the ordinary course of Tronox's businesses, for each quarter (including any fraction thereof) until

the Chapter 11 Cases are converted, dismissed or closed, whichever occurs first.[73]   The Plan thus

complies with the requirements of section 1129(a)(12) of the Bankruptcy Code.

**M.       The Plan Provides for the Payment of Retiree Benefits (11 U.S.C. §
            1129(a)(13)).**

71.       Section 1129(a)(13) of the Bankruptcy Code requires that all retiree benefits

continue to be paid post-confirmation at any levels established in accordance with section 1114

---

[72]   11 U.S.C. § 1129(a)(12).

[73]   Plan, Art. II.D.

35

of the Bankruptcy Code.[74]  The Plan provides that on and after the Effective Date, all retiree benefits (as that term is defined in section 1114 of the Bankruptcy Code), if any, will continue to be paid in accordance with the terms of the Plan, the underlying employee benefit plan documents (as may be amended or terminated at the discretion of Reorganized Tronox) and applicable law.[75]  In addition, pursuant to the Plan, Tronox will continue to honor all obligations related to the Pension Plan in accordance with its terms.[76]  Tronox also will continue to provide employees with a defined contribution (401(k)) Savings Investment Plan into which employees' contributions and matching company contributions are paid.[77]

72.    Tronox, however, will terminate the Tronox Incorporated Defined Benefit Restoration Plan and associated trust prior to the Effective Date.[78]  The Tronox Incorporated Defined Contribution Savings Restoration Plan will continue in effect.[79]    Additionally, Reorganized Tronox reserves the right to amend or terminate any of its employee benefit plans at any time and for any reason.[80]

73.    The Plan thus satisfies the requirements of section 1129(a)(13) of the Bankruptcy Code.

**N.    The Plan Satisfies the "Cram Down" Requirements of 11 U.S.C. § 1129(b).**

74.    Section 1129(b) of the Bankruptcy Code provides that if a chapter 11 plan satisfies all applicable requirements of section 1129(a) other than section 1129(a)(8)'s

---

[74]  11 U.S.C. § 1129(a)(13).

[75]  Plan, Art. IV.I

[76]  *Id.*

[77]  *Id.*

[78]  *Id.*

[79]  *Id.*

[80]  *Id.*

K&E 17933465

requirement that all impaired classes accept the plan, the plan may be confirmed so long as it does not discriminate unfairly and it is fair and equitable with respect to each class of claims and interests that is impaired and has not accepted the plan.[81]

75.    As discussed above, all Impaired creditor Classes have voted to accept the Plan. Only Class 8 Equity Interests have voted to reject the Plan, which implicates section 1129(b) of the Bankruptcy Code.

### i.    The Plan Does Not Discriminate Unfairly.

76.    The Bankruptcy Code does not set forth any one standard for determining if a plan discriminates unfairly against impaired, rejecting classes.[82]    Rather, courts typically examine the facts and circumstances of the particular case to determine whether "unfair discrimination" exists.[83]    At a minimum, however, the unfair discrimination standard prevents creditors and interest holders with similar legal rights from receiving materially different

---

[81]  11 U.S.C. § 1129(b)(1).  *See also Boston Post*, 21 F.3d at 480 ("[i]f the debtor chooses to utilize the cramdown procedure (having failed to secure the vote of all the impaired classes), the plan must meet all of the statutory requirements enumerated in § 1129(b) (essentially that the plan is fair and equitable and does not discriminate unfairly against any impaired claims)"); *In re Zenith Elecs. Corp.*, 241 B.R. 92, 105 (Bankr. D. Del. 1999) (explaining that "[w]here a class of creditors or shareholders has not accepted a plan of reorganization, the court shall nonetheless confirm the plan if it 'does not discriminate unfairly and is fair and equitable.'"); *see also Liberty Nat'l Enters. v. Ambanc La Mesa Ltd. P'ship* (*In re Ambanc La Mesa Ltd. P'ship*), 115 F.3d 650, 653 (9th Cir. 1997) ("the [p]lan [must satisfy] the 'cramdown' alternative . . . in 11 U.S.C. § 1129(b), which requires that the [p]lan 'does not discriminate unfairly' against and 'is fair and equitable' towards each impaired class that has not accepted the [p]lan."); *John Hancock Mut. Life Ins. Co. v. Route 37 Bus. Park Assocs.*, 987 F.2d 154, 157 n.5 (3d Cir. 1993) (the plan "must not 'discriminate unfairly' against and must be 'fair and equitable' with respect to all impaired classes that do not approve the plan").

[82]  *See Johns-Manville*, 68 B.R. at 636 ("The language and legislative history of the statute provides little guidance in applying the 'unfair discrimination' standard . . . ."); *In re 203 N. LaSalle St. Ltd. P'ship*, 190 B.R. 567, 585 (Bankr. N.D. Ill. 1995) (noting "the lack of any clear standard for determining the fairness of a discrimination in the treatment of classes under a Chapter 11 plan" and that "the limits of fairness in this context have not been established.").

[83]  *See In re Freymiller Trucking, Inc.*, 190 B.R. 913, 916 (Bankr. W.D. Okla. 1996) (holding that a determination of unfair discrimination requires a court to "consider all aspects of the case and the totality of all the circumstances."); *In re Aztec Co.*, 107 B.R. 585, 589 (Bankr. M.D. Tenn. 1989) (noting that courts "have recognized the need to consider the facts and circumstances of each case to give meaning to the proscription against unfair discrimination.").

09-10156-mew    Doc 2482    Filed 11/13/10    Entered 11/13/10 02:27:47    Main Document
Pg 51 of 97

treatment under a proposed plan without compelling justifications for doing so.[84]  Courts in the

Second Circuit have ruled that "[u]nder section 1129(b) of the Bankruptcy Code, a plan unfairly

discriminates where similarly situated classes are treated differently without a reasonable basis

for the disparate treatment."[85]

77.    Here, the Plan's treatment of Holders of Class 8 Equity Interests is proper because

no similar class of interests exists, so the Plan does not unfairly discriminate with respect to

Class 8.

78.    Although certain objectors have asserted that Class 6 Claims are treated

disparately under the Plan, Class 6 has voted to accept the Plan, and section 1129(b)(1) of the

Bankruptcy Code is, therefore, not implicated.  In any event, the treatment of Class 6 is not

materially different from the treatment of other unsecured claims under the Plan, and is justfied

by the nature of the Class 6 Claims and the global settlement embodied in the Plan, which for the

reasons set forth herein is fair and reasonable and in the best interests of all stakeholders.

Therefore, Holders of Class 6 Claims are treated fairly and equitably.

### ii.    The Plan Is Fair and Equitable.

79.    Sections 1129(b)(2)(B)(ii) and 1129(b)(2)(C)(ii) of the Bankruptcy Code set forth

the so-called "absolute priority rule."  This central tenet of bankruptcy law requires that if the

holders of claims or interests in a particular class receive less than full value for their claims or

interests, no holders of claims or interests in a junior class may receive any property under the

---

84    *See WorldCom*, 2003 WL 23861928, at *59 (requiring a reasonable basis to justify disparate treatment).

85    *Id.  See also In re Buttonwood Partners, Ltd.*, 111 B.R. 57, 63 (Bankr. S.D.N.Y. 1990) (courts assess whether "(i) there is a reasonable basis for discriminating, (ii) the debtor cannot consummate the plan without discrimination, (iii) the discrimination is proposed in good faith, and (iv) the degree of discrimination is in direct proportion to its rationale," but also noting that the second prong assessing whether the debtor cannot consummate the plan without discrimination, is not dispositive of the question of unfair discrimination).

K&E 17933465

plan.[86]  The corollary of the absolute priority rule is that if the holders of claims or interests in a

particular class receive less than full value for their claims or interests, then senior classes cannot

receive more than a 100% recovery for their claims or interests.[87]

80.    The Plan's treatment of Class 8 Equity Interests satisfies the absolute priority rule.

Section 1129(b)(2)(C) of the Bankruptcy Code provides that a plan satisfies the absolute priority

rule with respect to a class of interests where:

> (i) the plan provides that each holder of an interest of such class
> receive or retain on account of such interest property of a value, as
> of the effective date of the plan, equal to the greatest of the allowed
> amount of any fixed liquidation preference to which such holder is
> entitled, any fixed redemption price to which such holder is
> entitled, or the value of such interest; or

> (ii) the holder of any interest that is junior to the interests of such
> class will not receive or retain under the plan on account of such
> junior interest any property.[88]

81.    Here, there is no value in the Equity Interests because Tronox is hopelessly

insolvent based upon the massive Claims against Tronox's estates, including the Environmental

Claims and Tort Claims.  Further, there is no Class junior to Class 8 that is receiving or retaining

any property on account of such interest under the Plan.  Likewise, no holders of Claims in

senior Classes will receive more than 100% of their Allowed Claims (including postpetition

interest) on account of such Claims.

---

[86]  11 U.S.C. § 1129(b)(2)(B)(ii), (C)(ii); *see also 203 N. LaSalle St.*, 526 U.S. at 441-42.

[87]  *See In re Granite Broad. Corp.*, 369 B.R. 120, 140 (Bankr. S.D.N.Y. 2007) ("There is no dispute that a class of
creditors cannot receive more than full consideration for its claims, and that excess value must be allocated to
junior classes of debt or equity, as the case may be.").

[88]  11 U.S.C. §1129(b)(2)(C).

K&E 17933465

O.    **The Principal Purpose of the Plan is not Avoidance of Taxes (11 U.S.C. § 1129(d)).**

82.    Section 1129(d) of the Bankruptcy Code states "the court may not confirm a plan if the principal purpose of the plan is the avoidance of taxes or the avoidance of the application of section 5 of the Securities Act of 1933."[89]  The purpose of the Plan is not to avoid taxes or the application of section 5 of the Securities Act of 1933.   Moreover, no Governmental Unit, or any other party, has thus far raised any objection to the Plan on these grounds, and Tronox does not anticipate any such objections will be filed, particularly as all tax Claims will be paid in full pursuant to the Plan.  Tronox therefore submits that the Plan satisfies the requirements of section 1129(d) of the Bankruptcy Code.

II.    **The Discretionary Contents of the Plan Are Appropriate and Should Be Approved.**

83.    Section 1123(b) of the Bankruptcy Code identifies additional provisions that may be included in a chapter 11 plan.  For example, a plan may impair or leave unimpaired any class of claims or interests and provide for the assumption or rejection of executory contracts and unexpired leases.  A plan also may provide for (a) "the settlement or adjustment of any claim or interest belonging to the debtor or to the estate" or (b) "the retention and enforcement by the debtor, by the trustee, or by a representative of the estate appointed for such purpose, of any such claim or interest."[90]   Lastly, a plan may "modify the rights of holders of secured claims . . . or . . . unsecured claims, or leave unaffected the rights of holders of any class of claims" and may "include any other appropriate provision not inconsistent with the applicable provisions of [the Bankruptcy Code]."[91]

---

[89]   11 U.S.C. § 1129(d).

[90]   *Id.* § 1123(b)(3)(A)-(B).

[91]   *Id.* § 1123(b)(5)-(6).

K&E 17933465

84.    The Plan includes certain such additional provisions.  For example, the Plan provides that certain Classes of Claims and Equity Interests are Impaired while leaving others Unimpaired.[92]    The Plan also proposes treatment for Executory Contracts and Unexpired Leases.[93]    Furthermore, and most significantly, the Plan is premised upon and incorporates a global settlement among Tronox's creditor stakeholders with respect to key issues related to the Plan and the allocation of distributable value among stakeholders (the "**Global Creditor Settlement**"), and also incorporates a settlement among Tronox, its creditor stakeholders and the Equity Committee pursuant to which existing shareholders are able to receive recoveries under the Plan as a gift (the "**Equity Committee Settlement**," and together with the Global Creditor Settlement, the "**Global Settlement**").[94]    Finally, and as a critical component of the settlements embodied in the Plan, the Plan seeks to implement release, exculpation and injunction provisions.[95]    As discussed in further detail below, the Global Settlement and the proposed release, exculpation and injunction provisions are fair and equitable and are in the best interests of Tronox and all parties in interest in these Chapter 11 Cases.

### A.    The Global Settlement Should Be Approved.

85.    The Global Creditor Settlement forms the basis for, and is *the* essential component of, the Plan.  Tronox pursued the Global Creditor Settlement to reach a consensual resolution of numerous litigable issues in the Chapter 11 Cases to effectuate a reorganization and exit chapter 11 with a viable business.  Similarly, the Equity Committee Settlement resolves costly and unnecessary litigation that threatened to delay confirmation and consummation of the

---

92    The following Classes are Impaired:  3, 4, 5, 6, 7 and 8.  Plan, Art. III.

93    *Id.*, Art. V.

94    *Id.*, Art. III.B.8; Art. IV.

95    *Id.* Art. VIII.

41

Plan and the timing of recoveries to stakeholders.  Together, the Global Settlement effectuates the primary policy objectives of chapter 11, by fairly treating Tronox's stakeholders and ensuring a "fresh start" for the reorganized business and, therefore, should be approved.  Set forth below are (a) the key terms of the Global Settlement, (b) an explanation of the context and need for the Global Settlement and why it is the linchpin of the Plan, (c) a description of the process of negotiating and formulating the Global Settlement and the fairness thereof and (d) a demonstration that the Global Settlement satisfies the "*Iridium* factors" used by courts in the Second Circuit to evaluate the appropriateness of proposed settlements.

### i.      Key Terms of the Global Settlement.

86.      The Global Settlement maximizes value and recoveries to Tronox's stakeholders and fairly allocates sources of distributable value among them based on the size and priorities of their claims and according to their recovery preferences.  The complexity and delicacy of the Global Settlement cannot be overstated, and is evidenced by the extensive efforts of all parties in interest in reaching a series of compromises that ensures a "fresh start" for the go-forward business, while simultaneously providing significant funding for the trusts and/or governmental agencies that will be responsible for serving the public interest through ongoing environmental remediation at sites throughout the country.  The complexity and delicacy of the Global Settlement cannot be overstated, and each component is necessary to the settling parties.  Without each and every aspect of the Global Settlement, Tronox's restructuring goals would be unobtainable and the Plan, as formulated, would not be confirmable or feasible.  Among other things, the Global Settlement:[96]

---

[96]  This description of the Global Settlement and the consideration provided thereunder is a summary only.  To the extent this summary and the descriptions of the consideration set forth in the Plan or the Environmental Claims Settlement Agreement are inconsistent, the terms of the Plan or the Environmental Claims Settlement Agreement, as applicable, shall control in all respects.

K&E 17933465

- Enabled Tronox to formulate and propose the Plan;

- Preserves the going concern value of Tronox's existing operating businesses by securing discharges and/or releases and/or covenants not to sue with respect to legacy environmental and tort liabilities from the applicable trusts and/or responsible agencies;

- Resolves Tronox's legacy liabilities for Environmental and Tort Claims by providing for more than $285 million in cash settlement payments to the environmental and tort trusts that will be responsible for addressing Tronox's obligations for the legacy liabilities, and allocates to those legacy creditors all of Tronox's rights and interests in Tronox's fraudulent transfer action against Kerr-McGee and Anadarko;

- Secures $185 million in new money required to fund the settlement payments to legacy creditors by providing for the sale of approximately 49% of the equity in the reorganized business through a market-tested rights offering backstopped by a group of Tronox's noteholders;[97]

- Allocates the equity in Reorganized Tronox among unsecured creditors of the operating businesses.  Specifically, unsecured creditors will have their claims converted into approximately 51% of the equity in the reorganized business (subject to dilution by shares to be issued in connection with a management equity plan and warrants for existing equity) and have been given rights to purchase their pro rata share of the 49% of the stock being sold through the rights offering.  By opening the Rights Offering to all of Tronox's Class 3 and Class 6 creditors rather than only to the noteholder Backstop Parties, the Plan fairly provides creditors with the opportunity to purchase a larger stake in the reorganized entity than they would receive on account of their Claims, but only to the extent they contribute to the capital raise necessary to effectuate the reorganization.

- Third party (private party) environmental claimants will have their Claims split to share half in the recoveries going to general unsecured creditors and half in the recoveries going to tort claimants; and

- Although no creditor is recovering in full on account of its Claims, for settlement purposes, provides the New Warrants to existing stockholders, which will allow

---

[97] Specifically, 45.5% of the equity in Reorganized Tronox will be sold in the $185 million Rights Offering; an additional 3.6% of the equity in the reorganized business will be paid to the noteholder Backstop Parties as a backstop fee.  Both the percentage and cost of the equity necessary to raise the $185 million were determined through a competitive process that culminated before the Bankruptcy Court in connection with motions filed by Tronox and the Equity Committee to approve backstop commitments for their competing plans.  No third party has come forward to provide the new money on better terms or to provide cash sufficient to pay creditors in full. The market has spoken and there is no alternative, third-party source of financing available on better terms.

them to share in the ownership of Reorganized Tronox to the extent justified by movement in Reorganized Tronox's total enterprise value.

87.     As described in detail below, the Global Settlement's resolution of Tronox's legacy and other liabilities and its allocation of Tronox's distributable value among stakeholders is more than fair and the Global Settlement, therefore, falls well above the lowest point in the range of reasonableness.[98]

### ii.    The Global Settlement Is the Linchpin of the Plan.

88.     To understand the purpose and benefits of the Global Settlement embodied in the Plan, it is helpful to understand the context of these Chapter 11 Cases.  Simply put, there is no Plan without the Global Settlement because of several incontrovertible facts:

- *First*, Tronox is hopelessly insolvent.  The billions of dollars in Claims against the estates far exceed the value of the assets available for distribution.  Even assuming a total enterprise value for Reorganized Tronox of $1.3 billion (the high end of the valuation range set forth in the Equity Committee's original proposed plan), Tronox does not have sufficient value to satisfy all of its creditor Claims.[99]  Tronox's estates face more than $1 billion in undisputed super-priority debtor-in-possession financing claims, administrative expenses and General Unsecured Claims *before* taking into account any of the legacy Environmental and Tort Claims, which have been asserted in amounts in excess of $10 billion.  (Tronox Disclosure Stmt. [Ex. B. to Docket No. 2196] at 7-8, 30.)[100]  While Tronox is pursuing fraudulent transfer claims against its former parent, discovery is still ongoing and any potential recovery is speculative.[101]

---

[98]  *See Resolution Trust Corp. v. Best Prods. Co. (In re Best Prods. Co.)*, 68 F.3d 26, 33 (2d Cir. 1995) (to be approved pursuant to Bankruptcy Rule 9019, a settlement merely has to be "within the range of reasonableness").

[99]  Notably, the market has placed a significantly lower enterprise value on Tronox than $1.3 billion, both during its 2009 sale process and in connection with two separate rights offering processes.  The highest value at which any market participant was willing to invest in Tronox was $875 million.  *See In re Granite Broadcasting Corp.*, 369 B.R. 120, 140 (Bankr. S.D.N.Y. 2007) (Gropper, J.) ("People who must back their beliefs with their purses are more likely to assess the value of the [asset] accurately than are people who simply seek to make an argument.") (citation omitted).

[100]  By running simple math, the only way Tronox could be viewed as solvent at a high-end $1.3 billion total enterprise value is if the Environmental and Tort Claims and 50% of the Indirect Environmental Claims total less than approximately $300 million, which is simply not the case.

[101]  *See In re TCI 2 Holdings, LLC*, 428 B.R. 117, 161 (Bankr. D.N.J. 2010) (holding that the omission of a litigation claim "from the analysis of the debtors' [total enterprise value] is justified" despite the parties' "high hopes for the ultimate outcome of the… litigation").

44

- *Second*, Tronox cannot reorganize as a viable, financeable entity without reaching a settlement with its legacy creditors. Quite simply, there is no "good company" around which to reorganize absent the settlement. Tronox's environmental liabilities, estimated by the company to be between $1.4 and $5.2 billion, include certain *non-dischargeable* obligations with respect to sites Tronox currently owns and operates as well as administrative priority expenses (estimated by the company to range from $300-$500 million). These liabilities *cannot* be compromised without the consent of the environmental creditors. Because Tronox cannot secure exit financing without resolving these environmental liabilities (*i.e.* - Tronox's ability to convert its debtor-in-possession financing into exit financing is expressly conditioned on obtaining an environmental settlement), there is no going-concern plan without a government settlement.

- *Third*, Tronox cannot reorganize without a substantial equity infusion. Understandably, the governmental claimants will not settle without ensuring that significant *cash* will be available to the trusts and/or governmental agencies that will become responsible for significant ongoing remediation obligations and other liabilities at approximately 2,800 sites that are either transferred under or covered by the environmental claims settlement agreement. To raise the new money necessary to achieve such a legacy creditor settlement, Tronox must sell equity in the reorganized business.[102]

89.     Given these realities, Tronox engaged its existing stakeholders in exhaustive negotiations to attempt to reach a global creditor settlement. In connection with those negotiations, the stakeholders (all of whom were represented by sophisticated financial and legal advisors) evaluated the amount, size and nature of the asserted Claims against Tronox and the sources of distributable value available to satisfy such Claims, and reached the same conclusion: the only way for Tronox to emerge from chapter 11 is through the inter-creditor settlement embodied in the Plan, which fairly allocates Tronox's value among its creditors, who are its rightful owners, and secures the debt and equity financing that enables Tronox to reorganize.[103]

---

[102] The need for a new money investment is apparent from the record of these chapter 11 cases. *See* Equity Committee Motion to Approve Equity Commitment Agreement [Docket No. 2025] at 3 ("Similar to the Debtors' Amended Plan, the Equity Committee Plan depends on the infusion of $185 million in new equity financing to be raised through a rights offering…"]; 9/23/10 H'rg Tr. [Docket No. 2197] at 31:2-6 ("And the debtors have said, and I don't think anybody disagrees, that this is a plan process that requires more than the exit financing that can be found out in the credit markets today, and it does require a backstopped rights offering.").

[103] The settlement also reflects the conclusion reached by Tronox and its creditors that protracted litigation related to estimation of complex environmental claims and/or the precise amount of distributable value was not in the best interests of Tronox or its creditors. If the parties spent months or years litigating these issues, value in Tronox's operating businesses likely would evaporate. Moreover, certain of these matters are the subject of expert reports in the pending Anadarko litigation that are due beginning in Spring 2011.

45

90.    Indeed, throughout these Chapter 11 Cases, Tronox has emphasized that it could not propose and confirm a standalone plan of reorganization (as opposed to an asset sale and liquidating plan) absent a settlement of its legacy environmental and tort liabilities.  Without the Global Settlement, Tronox would not be able to secure the debt and equity financing it needs to fund both the settlement and its businesses post-emergence.  As such, the alternatives to the Global Settlement are dire.  First, Tronox would be required to sell its assets, as the Replacement DIP Agreement requires a sale process if the Plan (including the Global Settlement) never becomes effective.[104]    Tronox would then need to engage in costly and time consuming proceedings to liquidate or estimate the Environmental Claims and the Tort Claims.  Such a process could take months or years and would need to conclude prior to Tronox making any distributions to creditors.  Faced with such a scenario, Tronox, the Creditors' Committee, the United States, the Nevada Parties and the Ad Hoc Noteholders' Committee negotiated for more than a year before finalizing the Global Creditor Settlement, which allows them to obtain the preferred form of consideration now, rather than receive an uncertain dividend at an indeterminate point in the future.  For all of these reasons, the Global Settlement is, fair, reasonable and consistent with the policy in this Circuit (and all others) favoring compromises in chapter 11.

### iii.    Process and Formulation of the Global Settlement.

91.    The Global Settlement (like the Plan itself) is the product of more than one year of extensive negotiations and discussions among Tronox and its key stakeholders, in particular the Creditors' Committee, the United States, the Nevada Parties and the Ad Hoc Noteholders' Committee — and including the Equity Committee.  As set forth in detail in the Disclosure

---

104 *See* Replacement DIP Agreement [Ex. B to Docket No. 2252] at § 5.20.

Statement and in the Wanlass and Snyder Declaration, these negotiations took place over many months, though numerous in person and telephonic meetings, the exchange of multiple term sheets or related settlement proposals and regular correspondence and conference calls among the parties and their independent and sophisticated legal and financial advisors. These discussions were transparent, inclusive and fair and Tronox kept the Court apprised of developments throughout the process. In addition, the decision to file and pursue the proposed Plan was unanimously approved by Tronox's Board of Directors who determined that no alternative would generate greater value to these estates.

92.    At the time of the filing of the Plan, the Equity Committee was the only major stakeholder in these Chapter 11 Cases that was not a party to the Global Creditor Settlement. At that time, the Equity Committee was focused on pursuing a competing plan and filed its own proposed plan of reorganization on September 2, 2010 [Docket No 1962]. Although the Equity Committee could not obtain financing for its Plan, which it later withdrew, the competing plan process, with two investor groups bidding to backstop the Rights Offering under Tronox's Plan, lead to a substantial increase in the valuation set for the Rights Offering (from $700 million to $875 million) and improved recoveries under the Plan for unsecured creditors. Following these developments, this Court approved Tronox's Disclosure Statement on September 30, 2010 and shortly thereafter, Tronox began soliciting votes on the Plan.

93.    During the solicitation period, negotiations continued among Tronox, the Equity Committee and the other major stakeholders in an effort to resolve the Equity Committee's opposition to the Plan. On November 2, 2010, Tronox, the Equity Committee, the Creditors' Committee, the United States and the Ad Hoc Noteholders' Committee participated in an all-day mediation with the Honorable Robert D. Drain of the United States Bankruptcy Court for the

47

Southern District of New York serving as mediator.  On November 3, 2010, Tronox announced

that it had reached a settlement with the Equity Committee regarding improved terms for the

New Warrants that secured the Equity Committee's support for the Plan and eliminated the

Equity Committee's planned objections to confirmation of the Plan.  On November 5, 2010,

Tronox filed a revised version of the Plan [Ex. B to Docket No. 2402] reflecting the revised

terms for the New Warrants and the Equity Committee's inclusion in the Global Settlement.

94.    The widespread support for the Plan by all of Tronox's key stakeholders —

including the statutory Creditors' Committee and Equity Committee who act as fiduciaries for

the interests of their respective constituents — reflects that all parties had ample opportunity

throughout these chapter 11 cases to negotiate with Tronox in good faith and to work towards a

truly "global" resolution of the contested issues related to the Plan.

### iv.    The Global Settlement Satisfies the Iridium Factors.

95.    When evaluating plan settlements pursuant to section 1123(b) of the Bankruptcy

Code, courts in the Second Circuit typically consider the standards used in evaluating settlements

under Bankruptcy Rule 9019, *i.e.*, the settlement must be "fair and equitable" and in the best

interests of the estate.[105]   The Second Circuit has set forth the list of so-called "*Iridium* factors"

for Courts to consider in evaluating whether a settlement satisfies such standards:

     (a)    the balance between the litigation's possibility of success and the
settlement's future benefits;

     (b)    the likelihood of complex and protracted litigation, "with its
attendant expense, inconvenience, and delay," including the
difficulty in collecting on the judgment;

---

[105] *See Prot. Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson,* 390 U.S. 414 (1968); *In re Best Prods. Co.*, 168 B.R. 35, 50 (Bankr. S.D.N.Y. 1994) ("[W]hether the claim is compromised as part of the plan or pursuant to a separate motion, the standards for approval of the compromise are the same. The settlement must be 'fair and equitable,' … and be in the best interest of the estate.") (internal citations omitted).

48

(c)     "the paramount interests of the creditors," including each affected class's relative benefits "and the degree to which creditors either do not object to or affirmatively support the proposed settlement";

(d)     whether other parties in interest support the settlement;

(e)     the "competency and experience of counsel" supporting and "[t]he experience and knowledge of the bankruptcy court judge" reviewing the settlement;

(f)     "the nature and breadth of releases to be obtained by officers and directors"; and

(g)     "the extent to which the settlement is the product of arm's length bargaining."[106]

96.     Application of these factors confirms that the Global Settlement is fair and equitable and in the best interests of Tronox's estates and should be approved.

### (a)     The Benefits of the Global Settlement Outweigh the Likelihood of Success of Litigation.

97.     As discussed above, the Global Settlement resolves a series of complex and contentious issues presented by these Chapter 11 Cases, including issues related to the estimation of the size and priority of the extensive Claims filed against these estates (including the thousands of Environmental and Tort Claims) and/or the precise amount of distributable value available to satisfy those Claims (including the extent of proceeds recoverable from the Anadarko Litigation, if any).  Rather than spend months or years litigating these complex issues with no assurance of success (and while the value of Tronox's operating assets evaporates), the Global Settlement enables Tronox's constituents to fairly allocate among themselves the current forms of available consideration (and the potential risks and rewards of such recoveries) in accordance with their preferences and the size and priority of their Claims and interests.  Absent the Global Settlement, Tronox could not reorganize and preserve the going concern value of its

---

[106] *In re Iridium Operating LLC*, 478 F.3d 452, 462 (2d Cir. 2007); *see also Adelphia Confirmation Decision*, 368 B.R. at 226  (citing *Texaco*, 84 B.R. at 901).

49

operating business — and distributions to creditors could be delayed indefinitely while Tronox conducts an untimely sale of its operating assets, estimates its environmental and tort liabilities and prosecutes the Anadarko Litigation.  In contrast, the Global Settlement provides real value to stakeholders now and enables Tronox to emerge from chapter 11 as a going concern, well-capitalized and with approximately 1,000 jobs intact.

98.    With respect to the Equity Committee Settlement in particular, the Plan provides existing shareholders with a modest recovery in the form of warrants (or options to purchase stock in the reorganized company) that are exercisable at valuation levels where Tronox's general unsecured creditors would be paid in full on account of their recoveries.  By improving the overall value of the warrant package available for existing shareholders, Tronox and its creditor stakeholders agreed to "buy peace" with the Equity Committee to avoid a costly and unnecessary contested confirmation hearing with related discovery that would distract Tronox and its professionals from the more important tasks of securing the Environmental Claims Settlement Agreement and otherwise preparing for emergence from chapter 11.[107]  Importantly, if the Equity Committee had pursued and prevailed on its valuation and other objections to confirmation of the Plan, the result would not have been an additional recovery to equity. Instead, Tronox's Global Creditor Settlement would be in jeopardy because it is expressly premised on a fair allocation of value among *creditors* where none are being paid in full.  Rather than risk re-opening negotiations with the legacy creditors for additional value (where none exists), Tronox and its stakeholder representatives agreed that the additional consideration to

---

[107] Throughout the Chapter 11 Cases, the Equity Committee has argued, among other things, that the Tronox's various plans of reorganization, including the instant Plan, have substantially undervalued the value of Reorganized Tronox and, as a result, have improperly diverted value to other stakeholders that should properly go to the holders of Class 8 Equity Interests.  Tronox, on the other hand, has argued that Tronox is hopelessly insolvent and that the holders of Class 8 Equity Interests are not entitled to any recovery on account of such interests.  Following a court-supervised mediation process, Tronox and the Equity Committee were able to reach the Equity Committee Settlement.

K&E 17933465

existing shareholders was an appropriate gift to ensure the certainty of proceeding to confirmation without funding an unnecessary fight with the Equity Committee.

99.     For all the foregoing reasons, this factor weighs heavily in favor of the Global Settlement.

### (b)     Litigating the Global Settlement Compromises Would Be Complex and Protracted.

100.     The Global Settlement is premised on the assumption that protracted litigation related to claims estimation and distributable value is not in the best interest of Tronox's creditors.  Tronox believes that such litigation would be costly and unproductive because even if Tronox were to prove that the Environmental and Tort Claims both fall at the low end of the estimated ranges, such claims would still exceed the total enterprise value of Reorganized Tronox.  Tronox also is unable to satisfy the minimum $300 million in administrative or priority Environmental Claims and the non-dischargeable obligations related to the Environmental Claims, all of which are covered by the Environmental Claims Settlement Agreement.  Similarly, estimation of the Tort Claims would be costly and time-consuming and likely would require District Court involvement or oversight, as the vast majority of the Tort Claims are personal injury claims, liquidation of which is subject to the jurisdictional limitations of 28 U.S.C. § 157(b)(2)(O).  In comparison, the Global Settlement efficiently allocates each creditor group's preferred form of consideration without the need for complex and protracted litigation.  Accordingly, this factor weighs heavily in favor of the Global Settlement.

### (c)     The Global Settlement Is in the Paramount Interests of Creditors and Key Creditors and Other Parties in Interest Support the Global Settlement.

101.     The Global Settlement is in the paramount interests of Tronox's creditors.  It forms the basis for the Plan, which would not be possible without the Global Settlement.  The

51

Plan accomplishes the fundamental purpose of chapter 11 in that it preserves Tronox's value as a going concern and maximizes value available to satisfy creditors.[108]   It achieves this purpose by delivering to each creditor group their preferred form and amount of consideration, the allocation of which was negotiated heavily.

#### (d)    The Global Settlement Is Supported by All Key Stakeholders.

102.    The Global Settlement enjoys the overwhelming support of key creditors and other parties in interest.  All major creditor constituencies, including the Creditors' Committee, the Ad Hoc Noteholders' Committee, the United States and the Nevada Parties, as well as the Equity Committee, support the Global Settlement embodied in the Plan.  In addition, all Impaired Classes of creditors have voted by substantial margins to accept the Plan.  These results demonstrate that the Global Settlement is in the best interests of Tronox's estates and all parties in interest in the Chapter 11 Cases.  Accordingly, this factor weighs heavily in favor of the Global Settlement.

#### (e)    The Settling Parties Were Counseled by Experienced, Independent Attorneys and Advisors and the Global Settlement Is the Product of Arm's-Length Bargaining.

103.    All parties to the Global Settlement were advised at all times during the extensive negotiations and discussions leading to the settlement by their respective experienced, independent attorneys and financial advisors.  Moreover, these negotiations were conducted at arm's length and in good faith.  These factors further support the Global Settlement.

#### (f)    The Releases Required by the Global Settlement Are Proper.

104.    Although the Global Settlement does not independently release directors and officers and the other settling parties contributing funding and/or other consideration for the

---

[108] *See 203 N. LaSalle St. P'ship*, 526 U.S. at 453 (basic purposes of chapter 11 are "preserving going concerns" and "maximizing property available to satisfy creditors.").

52

Plan, the settling parties have required that the Plan provide for such releases. These releases, which are discussed in more detail below, are appropriate and justified because they were essential to the formulation of the Plan and are supported by substantial consideration.

**B.      The Plan Settlement of Claims and Controversies Is Fair and Equitable and Should Be Approved.**

105.      The Plan constitutes a good faith compromise and settlement pursuant to section 1123(b)(3)(A) of the Bankruptcy Code and Bankruptcy Rule 9019(a) of all Claims and Equity Interests and controversies resolved pursuant to the Plan.[109]  Such settlement, as reflected in the relative distributions and recoveries under the Plan, (a) will save Tronox and its estates the costs and expenses of prosecuting disputes, the outcome of which is likely to consume substantial resources of Tronox's estates and require substantial time to adjudicate and (b) has facilitated the creation and implementation of the Plan, which benefits Tronox's estates, stakeholders and all parties in interest.[110]

**C.      The Plan's Release, Injunction and Exculpation Provisions Are Appropriate and Should Be Approved.**

106.      The Plan provides for the release of certain Causes of Action of Tronox and its estates and releases by holders of Claims and Equity Interests, an injunction precluding holders of Claims from asserting their Claims against Tronox and the exculpation of Claims for certain parties.  These provisions are proper because, among other things, they are the product of arm's-length negotiations, are in exchange for substantial consideration and were critical to obtaining the support of various constituencies for the Plan.

---

[109] Plan, Art. IV.B.

[110] *See, e.g.*, *In re Spiegel, Inc.*, No. 03-11540, 2005 WL 1278094, at *10 (Bankr. S.D.N.Y. May 25, 2005) (approving provisions similar to those set forth in Article IV.B of Tronox's Plan).

53

i.      **The Tronox Releases**

107.    Pursuant to the terms of the Plan, Tronox shall release and discharge the Released Parties from any and all claims that Tronox, Reorganized Tronox, the Estates or their Affiliates would have been legally entitled to assert in their own right or on behalf of the holder of any Claim or Equity Interest or other Entity against the Released Parties, other than claims arising out of or relating to any act or omission of a Released Party that constitutes willful misconduct, gross negligence, breach of fiduciary duty or a criminal act (the "**Tronox Releases**").[111]   The Released Parties include: (a) Tronox and Reorganized Tronox; (b) the current directors and officers of the Tronox Debtors in place as of July 7, 2010; (c) all current and former members of the Creditors' Committee; (d) the Backstop Parties; (e) the parties to the Equity Commitment Agreement dated December 20, 2009 (attached to Docket No. 1003); (f) the agents and lenders under each of the Prepetition Facilities, the Original DIP Facility and the Replacement DIP Facility solely in connection with such facilities; (g) the Environmental Response Trustees; (h) all current and former members of the Equity Committee; (i) the subsidiaries, Affiliates, members, officers, directors, advisors, attorneys, employees, partners and representatives of (a) through (h), but subject to the limitations with respect thereto set forth in the Plan; (j) the Nevada Parties and any other Government Environmental Entity that is party to the Environmental Claims Settlement Agreement; and (k) the United States and its agents, attorneys and financial advisors.  Notwithstanding this release, Tronox does not release claims against certain Entities relating to the Anadarko Litigation as set forth more fully in the definition of Released Parties.

108.    Section 1123(b)(3)(A) of the Bankruptcy Code specifically provides that a chapter 11 plan may provide for "the settlement or adjustment of any claim or interest belonging

---

[111] Plan, Art. VIII.C.

to the debtor or to the estate."[112]   Although a release may not qualify as a settlement under Bankruptcy Rule 9019, the rules governing the approval of a settlement are useful in evaluating plan releases.  In reviewing releases in a debtor's plan, courts frequently use the "best interests of the estate" benchmark for approval of a settlement under Bankruptcy Rule 9019.[113]

109.    The Tronox Releases are limited to claims that belong to Tronox.  It is well settled that debtors are authorized to settle or release their claims in a chapter 11 plan.[114]  Indeed, courts in this district have approved similar debtor-release provisions in other chapter 11 cases.[115]   In this case, Tronox does not believe that there are any valuable claims against the Released Parties. In addition, Tronox's release of claims is a key component of their consensual Plan process. Accordingly, Tronox submits that the Tronox Releases are consistent with applicable law, represent a valid settlement of whatever claims Tronox may have against the Released Parties pursuant to section 1123(b)(3)(A) of the Bankruptcy Code, represent a valid exercise of Tronox's business judgment and should be approved.

---

[112] 11 U.S.C. § 1123(b)(3)(A).

[113] *See Charter*, 419 B.R. at 257 ("When reviewing releases in a debtor's plan, courts consider whether such releases are in the best interest of the estate."); *see also Bally Total Fitness*, 2007 WL 2779438, at *12 ("To the extent that a release or other provision in the Plan constitutes a compromise of a controversy, this Confirmation Order shall constitute an order under Bankruptcy Rule 9019 approving such compromise."); *Spiegel*, 2005 WL 1278094, at *11 (approving releases pursuant to section 1123(b)(3) of the Bankruptcy Code and Bankruptcy Rule 9019(a).

[114] *See In re DBSD N. Am., Inc.*, 419 B.R. 179, 217 (Bankr. S.D.N.Y. 2009) ("Section 1123(b)(3) permits a debtor to include a settlement of any claims it might own as a discretionary provision in its plan . . ."); *Charter*, 419 B.R. at 257 (noting that a plan may include the settlement of claims belonging to the debtor or to the estate); *Adelphia Confirmation Decision*, 368 at 263 n.289 (holding that a debtor may release its own claims); *In re Oneida Ltd.*, 351 B.R. 79, 94 (Bankr. S.D.N.Y. 2006) (noting that a debtor's release of its own claims is permissible).

[115] *See, e.g., DBSD*, 419 B.R. at 217; *Charter*, 419 B.R. at 257; *In re DJK Residential LLC*, No. 08-10375 (Bankr. S.D.N.Y. May 7, 2008); *In re Calpine Corp.*, No. 05-60200 (Bankr. S.D.N.Y. Dec. 19, 2007); *In re Tower Auto., Inc.*, No. 05-10578 (Bankr. S.D.N.Y. July 9, 2007).

ii.      **Third Party Releases**

110.      In addition to the Tronox Releases, the Plan also provides for the release and

discharge of Tronox, Reorganized Tronox and the Released Parties from all Claims that holders

of a Claim or an Equity Interest would have been legally entitled to assert individually or

collectively, based on or relating to "Tronox, Tronox's restructuring, the Chapter 11 Cases, the

purchase, sale or rescission of the purchase or sale of any Security of Tronox or Reorganized

Tronox, the subject matter of, or the transactions or events giving rise to, any Claim or Equity

Interest that is treated in the Plan, the business or contractual arrangements between Tronox and

any Released Party, the restructuring of Claims and Equity Interests prior to or during the

Chapter 11 Cases, the negotiation, formulation or preparation of the Plan [and related

documents]" other than Claims arising out of or relating to any act or omission of a Released

Party that constitutes willful misconduct, gross negligence, breach of fiduciary duty or a criminal

act (the "**Third Party Releases**").[116]  The Third Party Releases do *not* release any liability with

respect to the Pension Plan and the Plan provides that neither the PBGC, the Pension Plan nor

any other Person will be enjoined or precluded from enforcing any liability with respect to the

Pension Plan as a result of the Chapter 11 Cases or the Plan.[117]  The Third Party Releases also do

*not* release the personal liability of any Released Party for any tax claim[118] or any claims by

government agencies in respect of securities laws, criminal laws or otherwise, except to the

extent such claims may otherwise be subject to the discharge granted to Tronox under

sections 524 and 1141 of the Bankruptcy Code and/or releases and/or covenants not to sue set

forth in the Environmental Claims Settlement Agreement.  As set forth in further detail herein,

---

[116] Plan, Art. VIII.D.

[117] *Id.*

[118] *Id.*

K&E 17933465

the Third Party Releases constitute a good faith settlement and compromise of claims released by

the Third Party Releases, given in exchange for good and valuable consideration. The Third

Party Releases are fair, equitable and reasonable and in the best interests of Tronox and all

holders of Claims and Equity Interests.

111.    In the Second Circuit, a nonconsensual third party release is permissible where

"truly unusual circumstances render the release terms important to success of the plan,"[119]

focusing on the following criteria, which examine whether:

- the estate received substantial consideration;
- the enjoined claims were "channeled" to a settlement fund rather than extinguished;
- the enjoined claims would indirectly impact the reorganization "by way of indemnity or contribution";
- the plan otherwise provided for the full payment of the enjoined claims*; or*
- the affected creditors consent.[120]

112.    The determination of whether non-debtor releases are "important to the success of

a plan" is "not a matter of factors and prongs."[121]    Instead, the Second Circuit considers a

non-exhaustive list of instances where such releases may be appropriate, including the

*Metromedia* instances described above.[122]

---

[119] *JPMorgan Chase Bank, N.A. v. Charter Commc'ns Operating, LLC (In re Charter Commc'ns)*, 419 B.R. 221, 258 (Bankr. S.D.N.Y. 2009).

[120] *Adelphia Confirmation Decision*, 368 B.R. at 266 (citing *Deutsche Bank AG v. Metromedia Fiber Network, Inc. (In re Metromedia)*, 416 F.3d 136, 142-43 (2d Cir. 2005)); *Drexel Burnham*, 960 F.2d at 293 ("In bankruptcy cases, a court may enjoin a creditor from suing a third party, provided the injunction plays an important part in the debtor's reorganization plan."); *see also Rosenberg v. XO Comm'cns, Inc.* (*In re XO Comm'cns, Inc.*), 330 B.R. 394, 440 (Bankr. S.D.N.Y. 2005) (finding that non-consensual third party releases satisfied *Metromedia* standard where substantial consideration was provided for the releases, there was an identity of interest between the debtor and releasees "as a result of indemnification/contribution exposure of the Debtor," and the release was necessary to the Plan process).

[121] *Charter*, 419 B.R. at 258 (citation omitted).

[122] Anadarko suggests in its objection that the instances set forth in *Metromedia* represent the *only* instances where a court should authorize non-consensual releases. (*See* Anadarko Obj. ¶ 24 ("In the Second Circuit, non-debtor

57

113.    Before determining the merits of a non-debtor release, however, a court first must determine that it has jurisdiction to consider the issue.[123]  "[J]urisdiction to enjoin a third party dispute exists where the subject of the third party dispute is property of the estate, *or the dispute would have an effect on the estate*."[124]  "A third party action that will directly and adversely impact the reorganization is more likely to present the 'unusual circumstances' required by *Metromedia*.[125]  Anadarko (without rationale) asserts that the Court lacks jurisdiction to consider the permissiveness of the Third Party Releases.[126]  As stated above, however, as well as in other filings in the Chapter 11 Cases, the Third Party Releases are a central component to the Global Settlement.  Indeed, absent the Third Party Releases, the Global Settlement likely could not be consummated and, rather than seeking confirmation of the Plan, Tronox would instead be pursuing a sale process that likely would result in materially lower recoveries to all stakeholders.  As such, the disputes stayed by the Third Party Releases clearly affect the Tronox estates and the implementation of the "new company/old company" structure upon which the entire reorganization is premised.  Without the Third Party Releases, there would be no Global Settlement and, accordingly, no Plan.  Given the importance of the Third Party Releases to the Plan, the Court possesses jurisdiction to consider the merits of the Third Party Releases.

114.    Turning to the merits of the Third Party Releases, such non-debtor releases are permissible under prevailing law where — as here — unusual circumstances render the releases

---

releases have been approved *in only the following five limited circumstances . . . .*") (emphasis added)).  Such an interpretation, however, is clearly inconsistent with the plain reading of *Metromedia*.

[123] *See In re Dreier LLP*, 429 B.R. 112, 132 (Bankr. S.D.N.Y. 2010).

[124] *Id.* at 131 (emphasis added).

[125] *Id.* at 132.

[126] Anadarko Obj. ¶ 23.

K&E 17933465

critical to Tronox's reorganization.[127]    Tronox is unquestionably receiving substantial consideration in exchange for the releases, an identity of interest exists between Tronox and the Released Parties through indemnification obligations or otherwise, and the unique circumstances of these Chapter 11 Cases render the Third Party Releases important to the success of the Plan.

115.    *First*, substantial consideration is being exchanged in return for the Third Party Releases.    As discussed above, the Released Parties' negotiations with Tronox enabled the parties to reach the Global Settlement, which is a necessary predicate for Tronox's emergence from chapter 11.    The Released Parties' substantial contribution to the negotiating process and capital raises contemplated by the Plan saved Tronox from a potentially value destructive sale process and from expending significant resources litigating the potential Claims of the Released Parties against Tronox, while simultaneously providing for a significant capital infusion into these estates, which is necessary to effect a going-concern reorganization and maximize recoveries to stakeholders.    The Third Party Releases are an essential component of the Plan and the Global Settlement, which was negotiated at arm's-length and in good faith with multiple creditor constituencies and which has been nearly unanimously accepted by all Classes of Claims entitled to vote.    The Third Party Releases are an important component of the settlement and in securing the substantial contributions from each of the Released Parties, all of which are integral to the Plan.

116.    Anadarko and the Lead Plaintiffs have objected to the Third Party Releases, asserting, among other things, that they are overly broad and that the time and resources

---

[127] *See, e.g., Charter*, 419 B.R. at 258  ("Non-debtor releases are permissible in the Second Circuit where 'truly unusual circumstances render the release terms important to success of the plan.") (*citing Metromedia*, 416 B.R. at 142-43).

K&E 17933465

contributed by the Released Parties do not rise to the level to warrant a release.[128]   In alleging

that the Released Parties have not provided substantial contribution, however, Anadarko

misconstrues *Metromedia*.[129]   *Metromedia* requires only that substantial consideration is received

*by the estate* in exchange for the release; it is immaterial who provides the consideration.[130]   In

any event, each of the Released Parties has provided a substantial contribution to the Chapter 11

Cases through the Global Settlement.   Indeed, given the unique ability of the Government

Environmental Claimants to prevent a reorganization by requiring payment in full, in cash on

account of their administrative and/or non-dischargeable claims, they have provided substantial

consideration to these estates and the other Released Parties (including in taking on

responsibilities related to ongoing remediation) in exchange for, among other things, the Third

Party Releases.   Significant consideration is also provided to these estates through the substantial

capital being raised through the backstopped Rights Offering, supporting the Third Party

Releases with respect to the Backstop Parties.   Similarly, the agents and lenders under each of

the Prepetition Facilities, the Original DIP Facility and the Replacement DIP Facility have

provided or are providing significant and critical financing to Tronox, without which Tronox

could not have funded the Chapter 11 Cases and emerged as a reorganized entity.   Tronox's

Class 3 unsecured creditors have agreed to allocate their interests in the proceeds of the

Anadarko Litigation to the legacy environmental and tort creditors as part of the settlement and

in exchange for releases and a stake in the reorganized business.   Tort claimants have agreed to

---

[128] Based on ongoing discussions among counsel, Tronox believes it has reached an agreement with the parties objecting to the Third Party Releases, subject to definitive documentation.  Tronox will nevertheless address these objections herein.

[129] Anadarko Obj. ¶ 27.

[130] *See Metromedia*, 416 F.3d at 142 (stating that "the *estate* received substantial consideration) (emphasis added); *see also Charter*, 419 B.R. at 259  (finding substantial consideration where the parties to be released "agreed to undertake action to permit the reinstatement of senior secured debt at favorable interest rates and refrain from taking that that would degrade the value of the Debtors' [assets].").

have their Claims satisfied through a trust, giving Reorganized Tronox the certainty of having resolved its legacy Tort Claim liability.   Because each element of the Global Settlement embodied in the Plan is a necessary predicate to the success of these Chapter 11 Cases, these are the type of truly unusual circumstances that warrant third party releases.

117.   The Third Party Releases also are justified given that certain of the Released Parties — Tronox's current directors and officers — share an identity of interest with the Tronox estates.[131]  Consistent with responsible business practices, Tronox maintains insurance policies for their current and past directors and officers.  Accordingly, any lawsuits filed by third parties against these individuals essentially would constitute actions against Tronox's estates, and adverse judgments could deplete estate assets if they exceed the applicable policy limits.  To be clear, Tronox does not believe any material liabilities exist against current directors or officers.  But Tronox seeks approval of the proposed releases for the same reason it maintains D&O insurance — as a prophylactic against unknown liabilities or frivolous lawsuits.  As a result, including Tronox's current directors and officers among the Released Parties covered by the Third Party Releases limits Reorganized Tronox's post-emergence obligations, which is *exactly* what this reorganization was designed to achieve.  Similarly, Tronox has agreed to provide indemnities to certain of the Released Parties in connection with these Chapter 11 Cases, including the Backstop Parties, the parties to the equity commitment agreement dated December 20, 2009, and the agents and lenders under each of the Prepetition Facilities, the Original DIP Facility and the Replacement DIP Facility.  Although Tronox is not aware of any claims against

---

[131] *See Charter*, 419 B.R. at 259  ("The indemnification obligations between the Debtors and their directors, officers, agents, and professionals produce an identity of interest between the Debtors and the [parties to be released].").

61

these parties, any lawsuits against these parties would indirectly affect Tronox's estates as a result of the indemnities.[132]

118.    Finally, Anadarko alleges that Tronox is unable to establish that the enjoined claims were "channeled" to a settlement fund,[133] that the Plan does not otherwise provide for full payment of the enjoined claims,[134] and that the affected creditors have not consented.[135] Anadarko misses the point. *Metromedia* does not require that Tronox prove the presence of *any* of the instances listed therein, let alone *each* of them (notwithstanding that Tronox clearly satisfies several of the instances set forth therein).   Instead, *Metromedia* requires that a debtor show that the non-debtor releases are central to the success of a plan of reorganization.   As stated above, the unique circumstances of the Chapter 11 Cases warrant approval of the Third Party Releases.   The Third Party Releases were instrumental to negotiation of the Global Settlement, which, by all accounts, has facilitated confirmation of a value maximizing plan of reorganization (*i.e.*, the Plan) and avoided an otherwise certain sale.

---

[132] Anadarko argues that "there is no basis to assert that [the Released Parties] will seek indemnity and/or contribution from the Debtors" given that such parties also are being exculpated under the Plan.  (Anadarko Obj. ¶ 30.)  The validity of the Exculpation Provision is discussed later herein, however, the Third Party Releases and the Exculpation Provision serve different purposes and were separately negotiated and independently important to consummation of the Global Settlement and the Plan.  Indeed, it is not uncommon for reorganization plans to contain both non-debtor releases and exculpation provisions.  *See, e.g.*, *Charter*, Case No. 09-01132 [Docket No. 850] ; *In re The Reader's Digest Ass'n., Inc.*, Case No. 09-23529 [Docket No. 574]; *In re DJK Residential LLC*, Case No. 08-10375 (JMP) [Docket No. 497].  In any event, in connection with discussions with counsel for Anadarko, Tronox appropriately has agreed to limit the Exculpation Provision to satisfy Anadarko's particular concerns, subject to definitive documentation, which should resolve the objection.

Anadarko further alleges that a party voting to reject the plan "cannot be deemed to have consented to" a non-debtor release.  Anadarko Obj. ¶ 31.  Tronox is not seeking Anadarko's deemed consent, it is seeking the Third Party Releases from Anadarko (one of the *only* creditors who voted to reject the Plan) pursuant to the authority of *Metromedia*.  In any event, Tronox believe it has reached an agreement in principle with Anadarko to obtain its consent to the Third Party Releases, subject to agreement on appropriate carve-outs.

[133] Anadarko Obj. ¶ 28.

[134] *Id.* at ¶ 29.

[135] *Id.* at ¶ 31.

119.    Moreover, the Plan has been overwhelmingly accepted by creditors and the proposed releases are likely to be entirely uncontested upon agreed resolution with the objecting parties.  The Third Party Releases are also fair, equitable and reasonable.  They are the product of arm's-length negotiations in connection with the settlements that are the foundation for the Plan.  Because of the Global Settlement, the Plan (a) provides adequate funding to enable ongoing environmental remediation that serves the public interest, (b) satisfies claims for personal injury and property damage on account of past and future harms, (c) ensures a fresh start for Reorganized Tronox and (d) preserves nearly 1,000 jobs.  The Third Party Releases are reasonable and consistent with public policy because they protect the Plan — with appropriate carve-outs for willful misconduct, fraud and gross negligence — and insulate Tronox from indirect liability while preserving government or regulatory enforcement actions to the extent not otherwise covered in the Environmental Claims Settlement Agreement.[136]

### iii.    Injunction

120.    Pursuant to its terms, the Plan permanently enjoins all Entities from bringing any action that is released pursuant to the Plan or the Confirmation Order (the "**Injunction**").[137]  The Releasing Parties are permanently enjoined from bringing any actions against Tronox, Reorganized Tronox or the Released Parties on account of any Claim or Equity Interest that is released.   The Injunction is necessary to effectuate the Plan's releases and to protect Reorganized Tronox from potential litigation from prepetition creditors as it implements the provisions of the Plan after the Effective Date.  Such litigation would hinder the efforts of Reorganized Tronox to effectively fulfill its responsibilities as contemplated in the Plan and thereby maximize value for all holders of Claims and Equity Interests.  Indeed, in the unique

---

[136] Plan, Art. VIII.D.

[137] Plan, Art. VIII.E.

K&E 17933465

circumstances of these Chapter 11 Cases, such potential litigation would enable collateral attacks on the Plan that would effectively eviscerate the terms of the Global Settlement. The Injunction is also narrowly tailored to achieve its purpose and similar injunctions have been approved by courts in other chapter 11 cases.[138]

### iv.    Exculpation

121.    Pursuant to the terms of the Plan, the Exculpated Parties (which are the Released Parties and Reorganized Tronox) are protected from liability for actions taken or omitted pre- or postpetition in connection with, or arising from or relating in any way to, the Chapter 11 Cases; formulating, negotiating, preparing, disseminating, implementing and/or effecting the Plan Support Agreement, the Equity Commitment Agreement, the Original DIP Facility, the Replacement DIP Documents, the Exit Credit Documents, the Rights Offering, the Rights Offering Procedures, the Disclosure Statement and the Plan; the solicitation of votes for the Plan and the pursuit of Confirmation and Consummation; the administration of the Plan and/or the property to be distributed under the Plan; the offer and issuance of any securities under the Plan; and any other prepetition or postpetition act taken or omitted to be taken in connection with or in contemplation of the restructuring of Tronox (collectively, the "**Exculpation Provision**").[139]

122.    Policy considerations, including the protection of statutory committees and their members, weigh strongly in favor of exculpatory clauses such as the Exculpation Provision. Notably, courts have ruled that exculpation provisions do not affect the liabilities of third parties,

---

[138] *See, e.g., In re DBSD N. Am., Inc.,* No. 09-13061 (Bankr. S.D.N.Y. Nov. 23, 2009); *In re DJK Residential LLC*, No. 08-10375 (Bankr. S.D.N.Y. May 7, 2008); *In re Calpine Corp.*, No. 05-60200 (Bankr. S.D.N.Y. Dec. 19, 2007); *In re Bally Total Fitness*, 2007 WL 2779438, at *8 (finding that the exculpation, release, and injunction provisions appropriate because they were fair and equitable, necessary to successful reorganization, and integral to the plan).

[139] Plan, Art. VIII.F.

K&E 17933465

but merely set forth the appropriate standard of liability for the exculpated parties.[140]   Courts have found exculpation provisions appropriate where, as here, they do not extend to gross negligence, willful misconduct or fraud.[141]   Courts evaluate the appropriateness of exculpation provisions based upon a number of factors, including whether the Plan was proposed in good faith, whether liability is limited and whether the exculpation provision was necessary for plan negotiations.[142]

123.    As discussed above, to confirm the Plan, the Court must find, among other things, that the Plan has been proposed in good faith and not by any means forbidden by law.[143]   Such a finding would extend to the parties involved in the formulation of the Plan, *i.e.*, Tronox, the Creditors' Committee, the Ad Hoc Noteholders' Committee, the Backstop Parties, the Equity Committee, the United States and the Nevada Parties.   Thus, if the Court confirms the Plan, cause exists to approve the Exculpation Provision.

124.    Moreover, it is well established that the liability of statutory committees and their professionals retained under section 1103 of the Bankruptcy Code is limited to acts of gross negligence and willful misconduct.[144]   Finally, exculpation for participating in the plan process is

---

[140] *In re PWS Holding Corp.*, 228 F.3d 224, 245 (3d Cir. 2000) (the exculpation provision, "which is apparently a commonplace provision in Chapter 11 plans, does not affect the liability of [third] parties, but rather states the standard of liability under the Code….").

[141] *See Upstream Energy Servs. v. Enron Corp.* (*In re Enron Corp.*), 326 B.R. 497, 501 (S.D.N.Y. 2005) (finding that the exculpation provision was appropriate where such provision excluded gross negligence and willful misconduct).

[142] *See, e.g., Captran Creditors' Tr. v. McConnell* (*In re Captran Creditors' Trust*), 128 B.R. 469, 476 (M.D. Fla. 1991) (the factors used to evaluate the language of an exculpation provision "include, but are not limited to: how the exculpatory clause limits liability, intent of the parties, and the manner in which the exculpatory clause was made a part of the agreement").

[143] 11 U.S.C. § 1129(a)(3).

[144] *See In re Calpine Corp.*, No. 05-60200, 2007 WL 4565223, at *10 (Bankr. S.D.N.Y. Dec. 19, 2007) (finding that exculpation provisions that do not relieve any party of liability for gross negligence or willful misconduct finding to be appropriate); *Enron Corp.*, 326 B.R. at 501 (noting that the bankruptcy court had addressed the exculpation provision, finding it appropriate because it excluded gross negligence and willful misconduct); *PWS*

65

appropriate where plan negotiations could not have occurred without protection from liability.[145] The Plan would not have materialized if the negotiating parties had not known they would be protected from liability, other than for willful misconduct or gross negligence, in connection therewith.

125.    The Exculpated Parties should be exculpated for acts in connection with the Chapter 11 Cases,...other than those acts involving willful misconduct or gross negligence, as a matter of public policy.    Indeed, failing to include an exculpation clause such as the Exculpation Provision in a plan of reorganization would chill the critical participation of management and the advisors to debtors in possession, as well as essential creditor groups, in the process of trying to formulate and negotiate consensual chapter 11 plans.    In light of the bankruptcy policy in favor of consensual chapter 11 plans and the negotiations that create them, it stands to reason that exculpation provisions are essential to the process and should be approved.[146]

126.    Anadarko has objected to the Exculpation Provisions on the basis that the Exculpation Provision is not limited to acts occurring on or before the Effective Date.    As an

---

*Holding*, 228 F.3d at 246-47 (holding that the appropriate standard of liability under section 1103 of the Bankruptcy Code is "willful misconduct or *ultra vires* acts," and approving an exculpation of the Creditors' Committee and its professionals subject only to liability for willful misconduct or gross negligence).

[145] *See Enron Corp.*, 326 B.R. at 503 (excising similar exculpation provisions would "tend to unravel the entire fabric of the Plan, and would be inequitable to all those who participated in good faith to bring it into fruition"); *see also In re Winn-Dixie Stores, Inc.*, 356 B.R. 239, 261 (Bankr. M.D. Fla. 2006) (holding exculpation provision was appropriate where beneficiaries expected such provision to be included in chapter 11 plan in exchange for participation in the chapter 11 cases); *WorldCom*, 2003 WL 23861928, at *28 (finding that the exculpation provision was appropriate when its inclusion in the plan was vital to the successful negotiation of the plan).

[146] *See In re Jartran, Inc.*, 44 B.R. 331, 363 (Bankr. N.D. Ill. 1984) ("the spirit of Chapter 11 [is] to promote consensual plans…."); *see also Zenith*, 241 B.R. at 15 (stating that the Bankruptcy Code has an overall policy of fostering consensual plans of reorganization); *In re Homestead Partners, Ltd.*, 197 B.R. 706, 710 (Bankr. N.D. Ga. 1996) ("the development of consensual reorganizations lies at the heart of Chapter 11 policy…."); *In re Pub. Serv. Co.*, 88 B.R. 521, 539-40 (Bankr. D.N.H. 1988) ("it is a 'strong policy' underlying chapter 11 of the Bankruptcy Code to foster consensual plans….").

initial matter, though Tronox believes that the Exculpation Provision is appropriately tailored given the circumstances of these Chapter 11 Cases and the prevailing law in this district,[147] Tronox does not dispute that the Exculpation Provision should extend only to a period of time up to and including the Effective Date, provided that none of the Exculpated Parties should incur liability for acts taken or omitted to be taken in connection with the Plan, the Plan Supplement or related documents, and Tronox is working with counsel to Anadarko to include language clarifying the scope of the Exculpation Provision that would be acceptable to key parties in interest and the Court.[148]    In addition, Anadarko objected to the inclusion of certain unknown parties to the Exculpation Provision, including the Environmental Response Trustees.   As it specifically relates to the Environmental Response Trustees, such trustees will be appointed on or before the Effective Date to effectuate obligations arising under the Plan.   More generally, parties not yet appointed or in existence commonly are included within the purview of exculpatory provisions in plans of reorganization (*e.g.*, distribution agents and even a reorganized debtor, itself).   As such, the scope of parties subject to the Exculpation Provision is appropriately tailored in these Chapter 11 Cases.   In any event, based on discussions with Anadarko and the above-described temporal limitation of the Exculpation Provision to which Tronox and Anadarko have agreed (subject to definitive documentation), Tronox believes that Anadarko's objection to the Exculpation Provision has been fully resolved.

---

[147] *See, e.g.*, *In re Truvo USA LLC*, Case No. 10-13513 (AJG) (Bankr. S.D.N.Y. Oct. 26, 2010); *In re EnviroSolutions of New York, LLC*, Case No. 10-11236 (SMB) (Bankr. S.D.N.Y. July 22, 2010); *In re Uno Restaurant Holdings Corp.*, Case No. 10-10209 (MG) (Bankr. S.D.N.Y. July 6, 2010);

[148] Moreover, Tronox recognizes that the Court previously has indicated that an exculpation provision normally should extend to a discernable date (*e.g.*, the confirmation date or the effective date).   *In re Gen. Growth Properties, Inc.*, Case No. 09-11977 (ALG) (Bankr. S.D.N.Y. Dec. 15, 2009).

67

III.    **The Court Should Overrule the Remaining Objections.**

A.    **This Court Should Overrule Anadarko's Objections to the Tort Claims Trust Agreement and Tort Claims Trust Distribution Procedures.**

127.    Anadarko's standing to object to the Tort Claims Trust Agreement (the "**Tort Trust Agreement**"), the Tort Claims Trust Distribution Procedures (the "**TDPs**") and the treatment of Tort Claims is based on the thinnest of threads.

128.    Neither the Tort Claims Trust nor the TDPs affect Anadarko's rights with respect to the Anadarko Litigation.  The only manner in which the Tort Trust Agreement and TDPs affect Anadarko is with respect to a $50,000 Indirect Environmental Claim, which, pursuant to the Anadarko Voting Stipulation, is presently allowed for voting purposes only.[149]

129.    Notwithstanding Anadarko's tenuous standing to object to the Tort Trust Agreement and TDPs, Tronox responds to the six bullet point objections raised by Anadarko as follows:

130.    First, the TDPs are designed to provide a cost-efficient method for liquidating Tort Claims based on values established by a combination of prevailing values for personal injury claims in the jurisdictions in which Anadarko's asserted claims and other Tort Claims arise, Tronox's historical settlement and judgment history with respect to Tort Claims, and preliminary discussions with counsel for certain Tort Claimants.  The Tort Trust will receive approximately $17 million in up-front funding, with the balance of its funding to come from a 12% share of the proceeds of the Anadarko Litigation.  Were the Tort Trust to individually value each type of claim channeled to the Tort Trust, the Tort Trust would likely expend all of the up-

---

[149] *See Stipulated Order Resolving the Objections of Anadarko Petroleum Corporation and Kerr-McGee Corporation to the Rights Offering Procedures and Related Matters* [Docket No. 2282].

front funding liquidating claims. The TDPs are designed to maximize and preserve the distributable value going to the holders of Tort Claims.

131.    Second, the disease categories identified in the TDPs are an exclusive list of those disease categories asserted by holders of Tort Claims against Tronox to the best of Tronox's knowledge, information and belief. The "other disease" category is a catch-all designed to accommodate any unknown toxic exposure claim that might fall within the definition of Tort Claim.

132.    Third, other disease types were not the subject of a separate schedule for the reasons set forth above.

133.    Fourth, Tronox is unaware of any other toxic exposure claims timely asserted in any proofs of claim. Because the TDPs will only make payments on account of Tort Claims timely filed before the bar date or deemed timely filed by order of the Bankruptcy Court, the TDPs do not include the items listed by Anadarko in its fourth bullet-point objection because Tronox is unaware of any such claims. If such a claim arises, then that claimant can look to the "Other Exposure Values" for a quick and efficient liquidation of its claim, but if it, or any Tort Claimant, does not want to rely on the scheduled amounts, it can engage with the Tort Claim Trustee to liquidate its claim in a different manner.

134.    Fifth, because of the desire to minimize the administrative expense associated with liquidating over 5,000 Tort Claims, especially in light of the limited up-front funding, the contingent nature of a further distribution, and the fact that all claimants to be paid from the Tort Trust will either have filed proofs of claim under penalty of perjury (and, to the best of Tronox's knowledge, also had pending litigation against Tronox and/or their predecessors at the time that the bankruptcy was filed) or otherwise will have been permitted to file a late claim after notice to

69

the Trust and a hearing, Tronox believes that the TDPs establish a fair and reasonable mechanism for expedited liquidation of a large number of the Tort Claims which have sufficient indicia of merit.  In addition, the Tort Claims Trustee is a very experienced claims resolution firm which currently serves in that capacity with respect to, among other things, the World Trade Center fund.  The Tort Trust and TDPs provide the Trustee with the power to promulgate such additional procedures as it believes reasonable and consistent with the purposes of a fair liquidation of Tort Claims and maximizing distribution to the holders of Tort Claims generally. It should be noted that if a Tort Claimant does not elect the expedited liquidation process, the TDPs contemplate liquidation through various forms of litigation.

135.    Sixth, the values paid to the holders of Tort Claims under the Tort Claims Trust and TDPs do not establish the value of those claims for purposes of the Anadarko Litigation. The values assigned are not arbitrary, but are also not based on an individual case assessment, which might lead to higher or lower individual values.  While Tronox believes that on average the values do reflect a reasonable value for the Tort Claims, they do not intend to take the position in the Anadarko Litigation that the values assigned are binding for purposes of the Anadarko Litigation.

**B.      The Plan Should Be Confirmed Notwithstanding Any Remaining Objections.**

136.    As set forth on the summary chart attached hereto as <u>Exhibit A</u>, Tronox has made and is making tremendous progress with respect to resolving the remaining objections to the Plan.  To the extent any of these objections are still unresolved by the time of the Confirmation Hearing, Tronox firmly believes that such objections lack merit and that the Plan should be confirmed notwithstanding such objections.

70

## CONCLUSION

For the reasons set forth herein, the Plan satisfies fully all applicable requirements of the Bankruptcy Code. Therefore, Tronox respectfully requests that the Court confirm the Plan pursuant to section 1129 of the Bankruptcy Code.

Respectfully submitted,

New York, New York
Dated: November 13, 2010

/s/ Nicole L. Greenblatt

Richard M. Cieri
Jonathan S. Henes
Nicole L. Greenblatt
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, New York  10022
Telephone:     (212) 446-4800
Facsimile:     (212) 446-4900

- and -

Patrick J. Nash, Jr.
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, Illinois  60654
Telephone:     (312) 862-2000
Facsimile:     (312) 862-2200

*Counsel to the Debtors and Debtors in Possession*

71

## Exhibit A

## Objection Summary Chart

K&E 17933465

**In re Tronox Incorporated,** *et al.*, **Case No. 09-10156 (ALG) (Jointly Administered)**
**Summary of Objections to First Amended Joint Plan of Reorganization of**
**Tronox Incorporated** *et al.* **Pursuant to Chapter 11 of the Bankruptcy Code[1]**

| Objection | Status & Response |
|---|---|
| **I.**  Bowie Central Appraisal District ("Bowie CAD") [Docket No. 2274]. | |
| **A.** Bowie CAD asserts that the Plan fails to provide fair and equitable treatment to Bowie CAD's Claim as required by section 1129(b)(1) and (2)(A) because Bowie CAD's Claim is entitled to retain all property tax liens, specifically for the 2010 tax year, until all taxes, penalties and interest protected by those liens have been paid, and such liens may not be primed or subordinated by any exit financing.<br><br>**B.** Bowie CAD further asserts that its Claim should be paid timely in the ordinary course of business.  To the extent payment is not timely, Bowie CAD is entitled to all penalties and interests available under applicable state law. | **Resolved.**  Tronox has included the following provision in the proposed confirmation order and Bowie CAD has agreed that this provision resolves its objection:<br><br>Any property tax lien securing the payment of real property taxes shall remain in full force and effect until all taxes, penalties and interest secured by those liens are paid in full, and such liens shall not be primed by or subordinated to any liens granted to secure the Exit Financing.  To the extent that 2010 property taxes are not timely paid in the ordinary course of business, the relevant taxing authorities shall be entitled to payment of all penalties and interest they would otherwise be entitled to collect under state law. |
| **II.**  Titanium Metals Corporation ("TIMET") [Docket No. 2388]. | |
| **A.** Classification/ Unfair Discrimination.  TIMET alleges that the Plan's treatment of Class 6 Claims is not "fair and equitable" because the Claims of such creditors are similar to the Claims of creditors in Classes 3 and 4, but the Plan does not provide identical or equivalent treatment to Class 6 Claims, and Tronox has not provided a legitimate reason for the separation of the Class 6 Claims from Claims in Classes 3 | Because each of Classes 3, 4 and 6 have voted to accept the Plan, section 1129(b) of the Bankruptcy Code, including the "fair and equitable" standard, is not implicated.  In any event, for the reasons set forth in Section I.N of the Confirmation Brief, the Plan's classification and treatment of Class 6 creditors is appropriate and justified in light of the nature of those claims as compared to the various other classes of unsecured claims against Tronox, and to effectuate the heavily negotiated recovery scheme provided for in the Plan, which provides different creditor constituencies with their preferred forms of recovery.  Indirect Environmental Claims in Class 6 include Claims of private (non-governmental) parties that may share responsibility environmental remediation at |

---

[1]    Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Plan or the relevant objection.

| Objection | Status & Response |
|---|---|
| and 4.<br><br>Specifically, TIMET asserts that Class 4 creditors may receive a higher pro rata recovery compared to Class 6 creditors because only 6.25% of the tort trust assets will be available for distribution to Class 6 creditors, compared to the 93.75% available to other tort claims, and other tort claims will receive an even higher recovery if the 6.25% allocation to Class 6 claims is reduced as a result of aggregate Class 6 Claims ending up in amounts less than $80 million.<br><br>B. Holders of Class 6 Claims cannot determine whether they are receiving fair treatment under the Plan relative to other Classes until they have reviewed the Environmental Claims Settlement Agreement and the treatment of the impacted sites. | various sites (as a legacy or current owner/operator). The Creditors' Committee, whose members include a holder of an Indirect Environmental Claims, negotiated for the Class to split recoveries between the consideration allocated to Classes 3 and 4. Each of the Claims in Class 6 is substantially similar to the other Claims in Class 6, and the classification structure is necessary to implement the Plan, including the global settlement.<br><br>Importantly, in assessing the relative class recoveries, TIMET appears not to have taken into account that, in addition to receiving a share of recoveries to Class 4, Class 6 claimants will also participate in the recoveries to Class 3. Moreover, with respect to the relative size of the claims in Classes 4 and 6, there is little question based on the latest available information that Class 4 tort claims are significantly greater than the allowed amount of claims in Class 6 (although tort claims are subject to liquidation through the Tort Claims Trust Distribution Procedures).<br><br>Tronox filed the Environmental Claims Settlement Agreement on November 9, 2010. *See* Docket No. 2441. Since then, Tronox has been actively negotiating with TIMET's counsel in an effort to resolve its objection.<br><br>TIMET is a contingent creditor who has asserted claims in these chapter 11 cases for potential remediation costs associated with migration of perchlorate on to its property, which is adjacent to the Henderson, Nevada premises. TIMET's claims are the subject of a pending objection pursuant to section 502(e)(1)(B) of the Bankruptcy Code. Although TIMET has not asserted claims for current or past costs, TIMET asserts that the objection cannot satisfy the "co-liability" standard for disallowance under section 502(e)(1)(B) of the Bankruptcy Code because its claims against Tronox are direct. Tronox continues to discuss potential solutions for addressing TIMET's claims, which may more properly be considered Class 4 property damage tort claims. Although Tronox is hopeful that the parties can find a way to resolve the claim issues, for the reasons set forth herein, Tronox does not believe that TIMET 's objections should prevent confirmation of the Plan. |

K&E 17977592.9

| Objection | Status & Response |
|---|---|
| **III.**   National Coating Corporation ("NCC") [Docket No. 2391]. | |
| **A.** NCC asserted that the Plan does not comply with applicable provisions of title 11, in violation of section 1129(a)(1) and (2), because the Environmental Claims Settlement Agreement had not been filed at the time of NCC's objection and there was no provision for notice and opportunity to object to such agreement when filed.<br><br>**B.** NCC also objected on grounds that the Plan provides no legitimate reason for classifying Class 6 Claims separately from similar Class 5 Claims, and treating Class 6 Claims as 50% Class 3 Claims and 50% Class 5 Claims. To the extent that any Impaired Class does not vote in favor of the Plan and section 1129(b) of the Bankruptcy Code applies, the Plan allegedly violates section 1129(b) because it discriminates unfairly based on the alleged acceptance of the Plan by claimants in Classes 3, 4 and 5. | **Resolved.** Tronox has been engaged in ongoing discussions with NCC in an effort to resolve its Class 6 Claims. Following the filing of the Environmental Claims Settlement Agreement and an opportunity for NCC to understand the treatment of its affected site thereunder, Tronox and NCC reached an agreement to resolve NCC's Claims. In connection therewith, and subject to approval thereof, NCC has agreed to withdraw its objections to the Plan. |
| **IV.**   LaGrange Capital Partners, LP and LaGrange Capital Partners Offshore Fund, Ltd. (the "Lead Plaintiffs") [Docket No. 2392]. | |
| LaGrange Capital Partners, LP and LaGrange Capital Partners Offshore Fund, Ltd. (collectively, "**Lead Plaintiffs**"), lead plaintiffs in the securities fraud class action suit captioned *In re Tronox, Inc. Securities Litigation*, No. 1:09-cv-06220 (SAS) (the "**Securities Litigation**"), filed an objection to the Plan on three grounds:<br><br>A. The Plan fails to provide an adequate mechanism for the preservation of Tronox's | **Agreement In Principle, Pending Final Documentation.** Tronox and the Lead Plaintiffs have reached an agreement in principle to resolve the disputes among the Parties related to the Securities Litigation (and document preservation related thereto), as well as the Lead Plaintiff's ability to file a late proof of claim against Tronox in connection with these chapter 11 (cases solely for purposes of accessing available insurance proceeds), which is the subject of a pending appeal. The parties are in the process of documenting the terms of their agreement and Tronox has also agreed that appropriate language will be included in the proposed form of Confirmation Order, which is also the subject of ongoing negotiations. The terms of the settlement and any changes to the Confirmation Order will be disclosed before the Confirmation Hearing |

K&E 17977592.9

| Objection | Status & Response |
|---|---|
| records or documents that may be relevant to the Securities Litigation; | or on the record thereof. |
| B. The Plan should preserve Lead Plaintiffs' ability to proceed with their claims against Tronox to the extent of available insurance coverage; and | |
| C. The Plan's release and injunction provisions prevent Lead Plaintiffs from pursuing the Securities Litigation against non-debtor defendants. | |

| V. | Travelers Casualty and Surety Co., f/k/a The Aetna Casualty and Surety Co. and The Travelers Indemnity Company ("Travelers") [Docket No. 2393]. |
|---|---|

| | |
|---|---|
| Travelers and Tronox have been engaged in ongoing discussions with respect to disputes arising under certain insurance policies issued by Travelers, and Travelers has asserted contingent and unliquidated claims in these cases to protect its rights. Prior to the settlement being finalized, Travelers filed an objection to the Plan asserting the following issues:<br><br>A. The Plan seeks to assume the Insurance Agreements and assign the Policies to the Tort Claims Trust, allegedly in violation of the Bankruptcy Code, in direct contravention of the Policies and without the consent of Travelers.<br><br>B. The Plan's release of the Debtors (or the Tort Claims Trust) from their contractual obligations under the Insurance Agreements allegedly is improper.<br><br>C. The Plan allegedly violates Travelers' contractual and statutory rights to participate in the defense of and/or settlement of claims | **Resolved.** Tronox and Travelers have negotiated and finalized a settlement agreement, pursuant to which Travelers will buy back the Policies from Tronox, with the proceeds from such sale to be distributed to the Tort Claims Trust. The terms of the settlement are set forth in *Tronox's Motion For Entry of An Order Purusant to Section 363 of the Bankruptcy Code and Bankruptcy Rule 9019 Authorizing Tronox to (A) Transfer Certain Insurance Policies to Travelers Casualty and Surety Co. Free and Clear of Liens, Claims and Encumbrances and (B) Settle Claims Related Thereto* [Docket No. 2410], which is scheduled for hearing simultaneously with the Confirmation Hearing. In connection with the settlement, and subject to approval thereof, all of Traveler's claims against Tronox shall be automatically expunged and Travelers' objections to the Plan will be deemed withdrawn. |

4

| Objection | Status & Response |
|---|---|
| pursuant to the terms and conditions of the Policies.<br><br>**D.** The Plan allegedly is proposed in bad faith and is not fair or equitable in its treatment of Travelers' rights.<br><br>**E.** The treatment of creditors in Class 6 is not fair and equitable. | |
| **VI.** The Landwell Company, L.P. ("<u>Landwell</u>") and Basic Management, Inc. ("<u>BMI</u>") [Docket No. 2394]. ||
| **A.** Landwell, BMI and their respective shareholders and partners have indicated that they have valid rights to consent to the transfer of Tronox's interests in Landwell and BMI (part of the Nevada Assets being transferred under the Plan) to the Environmental Response Trusts pursuant to the Environmental Claims Settlement Agreement, and that the parties intend to enforce their rights of first refusal under the governing documentation for Landwell and BMI.<br><br>**B.** Landwell and BMI incorporate by reference the *Motion for Entry of an Order (I) Pursuant to 11 U.S.C. §363(e) Conditioning Debtors' Proposed Transfer of Certain of the Nevada Assets to the Environmental Response Trusts Subject to their Rights of First Refusal and Consent; or Alternatively, (II) Granting Relief from the Automatic Stay Pursuant to 11 U.S.C. §362 So That These Parties in Interest Can Enforce Such Rights* [Docket No. 2262], as a timely objection to confirmation of the Plan, as agreed in the *Stipulation and Agreed Order* [Docket No. | **Resolution in Process.** Tronox does not dispute that BMI/Landwell has certain rights under the governing documents. Tronox, the Nevada Parties and BMI/Landwell have been working constructively on the terms of an agreed stipulation that will allow Tronox to transfer its interests in BMI/Landwell as required by the Plan while preserving the rights of BMI/Landwell under the applicable, governing documents. In connection therewith, BMI/Landwell has adjourned the hearing on its Motion through confirmation, by which time the parties expect to have the terms of their settlement finalized and BMI/Landwell's limited objection to confirmation resolved. The parties have agreed that, pending resolution of the Stipulation, objections, if any, to Landwell/BMI's Motion [Docket No. 2266] are adjourned so that they can be made orally, on the record, at the Confirmation Hearing. Should any objection(s) be made, Landwell/BMI reserve the right to reply orally, or in writing (to be filed after the hearing), as necessary. |

5

| Objection | Status & Response |
|---|---|
| 2342]. | |
| **VII.**  Regency Field Services, LLC ("Regency") [Docket No. 2395]. | |
| **A.** The Plan allegedly violates section 1129(a) because the Environmental Claims Settlement Agreement has not been filed; thus, Regency cannot determine if it is receiving the same treatment as other creditors in Class 6.<br><br>**B.** If the Calhoun and Dubach Plants are not among the Other Sites covered by the Environmental Claims Settlement Agreement, while sites owned by other holders of Class 6 Claims are covered by the agreement, then such treatment allegedly would be unfair, and would violate section 1123(a)(4).<br><br>**C.** The Plan allegedly violates section 1125 (as incorporated by section 1129(a)(1)) because of Tronox's failure to disclose the terms of the Environmental Claims Settlement Agreement. | **Claim Withdrawn.** Tronox filed the Environmental Claims Settlement Agreement on November 9, 2010.  *See* Docket No. 2441.  The Calhoun and Dubach Plants are included in the list of Other Sites that are being addressed in the Environmental Claims Settlement Agreement.  Following the filing of the Environmental Claims Settlement Agreement and an opportunity for Regency to understand the treatment of its affected sites thereunder, Regency has withdrawn its proof of claim.  *See* Docket No. 2479. |
| **VIII.**  Anadarko Petroleum Corporation ("Anadarko") and Kerr-McGee Corporation ("Kerr-McGee") [Docket No. 2398]. | |
| Anadarko has raised several objections to confirmation on the grounds that the Plan contains certain impermissible and objectionable provisions, as follows:<br><br>**A.** The Plan impermissibly releases claims against non-debtors because the Plan does not exhibit "truly unusual" and "rare" circumstances or satisfy any of the five limited factors set forth in *Metromedia* that would justify the Plan's release of non-debtors.  *See In re Metromedia Fiber* | **Discussions Ongoing.**  Tronox had held constructive discussions with counsel to Anadarko in an effort to resolve its pending confirmation objections by including clarifying language in the Confirmation Order, which the parties are still discussing. The status with respect to each of the objections is as follows:<br><br>A. Tronox believes the releases set forth in the Plan are permissible for the reasons set forth in Section II.C of the Confirmation Brief.  In any event, pursuant to discussions among the parties, Tronox is optimistic that the parties can agree to appropriate carve-out language that will resolve Anadarko's specific concerns with respect to the releases. |

K&E 17977592.9

| Objection | Status & Response |
|---|---|
| *Network, Inc.*, 416 F.3d 136, 141 -143 (2d Cir. 2005).<br><br>B. The Plan's exculpation provisions are overly broad in nature and scope to the extent they purport to release post-Effective Date acts by the Released Parties. | B. Tronox does not dispute that the Exculpation Provision should extend only to a period of time up to and including the Effective Date, provided that none of the Exculpated Parties should incur liability for acts taken or omitted to be taken in connection with the Plan, the Plan Supplement or related documents, and Tronox is working with Anadarko to develop language clarifying the scope of the Exculpation Provision. |
| C. The Plan impermissibly excludes those individuals who were both officers and directors of Tronox and were or are directors and officers of Kerr-McGee Corporation (collectively, the "KM D&Os") from Tronox's indemnity obligations, including those that Tronox will assume under the Plan, in violation of Tronox's bylaws and Delaware corporate law. Tronox also cannot carve out benefits that inure to the KM D&Os under any D&O Liability Insurance Policy. | C. The Plan is neutral with respect to insurance and does not seek to deny the KM D&O's of any coverage to which they may be entitled. Article V.J.1 of the Plan provides, in relevant part, that:<br><br>Nothing contained herein [or the Plan-related documents] shall in any way operate to, or have the effect of, altering or impairing in any respect the legal, equitable or contractual rights and defenses of the insureds or insurers under any policy of insurance and related agreements. The rights and obligations of the parties and others under any policy of insurance and related agreements shall be determined under such policies and related agreements, including the terms, conditions, limitations, exclusions and endorsements thereof, which shall remain in full force and effect, and under any applicable non-bankruptcy law.<br><br>Tronox has been discussing these provisions with Anadarko, including whether any additional language is needed to resolve their objection with respect to the asserted exclusion of the KM D&Os from the assumed indemnity obligations, and expects that this issue will be resolved. |
| D. The Plan impermissibly requires creditors to file a motion prior to Confirmation seeking the right to perform any setoff or recoupment. Anadarko has asserted a claim for setoff and recoupment in its proofs of claim and seeks assurance that such rights are fully preserved without the need to file a motion for authority to assert such rights. | D. Tronox believes this provision in the Plan injunction is common and appropriate (and that, in any event, Anadarko's intentions to preserve its setoff rights have been made clear) but Tronox will work with Anadarko to resolve the objection through agreed upon language that will preserve Anadarko's rights of setoff or recoupment (if any). |

7

| Objection | Status & Response |
|---|---|
| E. The Plan impermissibly seeks to provide funding for the benefit of the Superfund irrespective of whether the amounts are used by the Superfund to satisfy Tronox-related obligations, which violates section 550(a) of the Bankruptcy Code because Tronox cannot recover from Anadarko more than the amount that will accrue for the "benefit of the estate." Tronox should not be allowed to increase its recovery in the Adversary Proceeding by paying obligations under the Plan that are unrelated to Tronox's liabilities. Accordingly, Anadarko requests that the Plan be clarified to provide either (i) the measure of damages in the Anadarko Litigation will not be impacted by the funding of the Superfund obligations unrelated to the United State's claims against Tronox or (ii) to the extent the Superfund does receive funds from the trust, it should not be permitted to use those funds to satisfy any obligations other than those related to the United States' claims against Tronox. Further, Tronox should clarify the process and timing with respect to obtaining approval of the Environmental Claims Settlement Agreement. | E. There is nothing in the Plan that is intended to prohibit or limit Anadarko's rights, defenses or arguments in connection with the Adversary Proceeding. However, Anadarko clearly lacks standing to seek to control in any way the use of funds allocated to environmental response trusts as part of a comprehensive settlement that meets the standards for approval under Rule 9019 of the Federal Rules of Bankruptcy Procedures. *See* Confirmation Brief section II.A. "Creditors are generally free to do whatever they wish with the bankruptcy dividends they receive…." *In re SPM Mfg. Corp.,* 984 F.2d 1305, 1313 (1st Cir. 1993). |
| F. The Plan fails to provide the process by which the Environmental Claims Settlement Agreement will be approved, and Tronox has failed to articulate how the settlement satisfies the standards of Rule 9019 of the Bankruptcy Rules. | F. For the reasons set forth in Section III.A of the Confirmation Brief, and pursuant to the Declarations filed in support thereof and other evidence to be included in the record of the Confirmation Hearing, Tronox can and will demonstrate that the global settlement complies with the standards for a compromise and settlement under Bankruptcy Rule 9019 and applicable Supreme Court and Second Circuit law. |
| G. The Plan may violates the absolute priority rule because it provides value to holders of Equity | G. Anadarko has acknowledged that, to the extent all Impaired Classes of Claims voted to accept the Plan, section 1129(b) of the Bankruptcy Code, including the "absolute priority" rule, would not be implicated with respect |

8

| Objection | Status & Response |
|---|---|
| Interests in Class 8 without providing payment in full for General Unsecured Claims.<br><br>H. The Plan contains several other specific provisions that are objectionable to Anadarko, including:<br><br>    (i)    The Disputed Claims Reserve does not require Tronox to reserve for Anadarko's Claims in *any* amount determined by the Bankruptcy Court, whether by estimation or otherwise;<br><br>    (ii)    The Plan impermissibly delays payment or Distributions on account of a Disputed Claim or any portion thereof until the Claims becomes an Allowed Claim. Anadarko's Rejection Damages Claim (or a portion thereof) may be adjudicated much earlier than the Anadarko Section 502(h) Claim, and Distributions on the Rejection Damages Claim (or any portion thereof) should not be delayed pending determination of the Anadarko Section 502(h) Claim or a final adjudication on the remaining portions of the Rejection Damages Claim;<br><br>    (iii)    The Plan should contain a disclaimer indicating that Anadarko is not bound by the aggregate estimates for the range of Tort Claims and Environmental Claims being compromised and settled pursuant to the Plan;<br><br>    (iv)    The Plan should be clarified to provide that the provision requiring prior | to classes of unsecured claims and its objection is moot.<br><br>H. The parties are working on language for possible inclusion in the Confirmation Order that will resolve Anadarko's specific objections with respect to the issues raised in (i) through (vi). |

K&E 17977592.9

| Objection | Status & Response |
|---|---|
| authorization of either the Court or Reorganized Tronox to amend a Claim on or after the Effective Date does not apply to Anadarko.<br><br>    (v)    The Plan allegedly should exempt the Anadarko Section 502(h) Claim from the Plan provision requiring dismissal of claims held by Entities subject to turnover or avoidance actions until the action has been resolved and all sums due Tronox have been turned over or paid;<br><br>    (vi)    The Plan allegedly should clarify or strike the provision stating that "[a]ny default by Tronox or its Affiliates with respect to any Claim or Equity Interest that existed immediately prior to or on account of the filing of the Chapter 11 Cases shall be deemed cured on the Effective Date."<br><br>I.   The Tort Claims Trust Agreement and related Distribution Procedures are deficient, and Tronox should clarify and/or provide more explanation of procedures and certain values included in the Tort Claims Distribution Procedures. | <br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br>I.   Anadarko's objection on these grounds should be overruled for the reasons set forth in Section III.A of the Confirmation Brief. |
| **IX.**    Massachusetts Institute of Technology ("<u>MIT</u>") [Docket No. 2399]. | |
| A.  MIT joins in the objection of National Coating Corporation [Docket No. 2391] and reserves all rights to file a supplemental objection within two days after its review of the Environmental | <u>**Resolved.**</u>  Tronox has been engaged in ongoing discussions with MIT in an effort to resolve its Class 6 Claims.  Following the filing of the Environmental Claims Settlement Agreement and an opportunity for MIT to understand the treatment of its affected site thereunder, Tronox and MIT reached an agreement to resolve MIT's Claims.  In connection therewith, and subject to approval thereof, MIT has agreed to |

| Objection | Status & Response |
|---|---|
| Claims Settlement Agreement. | withdraw its objections to the Plan. |

| X. | New Water Park LLC [Docket No. 2426]. |
|---|---|

| **A.** New Water Park joins in the objection of National Coating Corporation [Docket No. 2391], the objection of Regency Field Services LLC [Docket No. 2395], and the objection of Titanium Metals Corporation [Docket No. 2388]. | **Resolved.** Tronox has been engaged in ongoing discussions with New Water Park in an effort to resolve its Class 6 Claims. Following the filing of the Environmental Claims Settlement Agreement and an opportunity for New Water Park to understand the treatment of its affected site thereunder, Tronox and New Water Park reached an agreement to resolve New Water Park's Claims. In connection therewith, and subject to approval thereof, New Water Park has agreed to withdraw its objections to the Plan. |

| XI. | Commerce & Industry Insurance Co. and American International Specialty Lines Insurance Company n/k/a Chartis Specialty Insurance Company (Collectively, "Chartis") [Docket No. 2196] |
|---|---|

| Tronox is in the process of analyzing the Chartis Objection, which was filed on the same date as this reply. In sum, however, Chartis's objections are as follows:<br><br>**A.** Chartis objects to the Plan to the extent the Environmental Claims Settlement Agreement assigns Chartis's insurance policies to the Environmental Response Trusts without Chartis's consent to assign the BMI Policy or the Forest Products Policy, in violation of the policies, non-bankruptcy law and sections 365 and 1129(a)(1) and (3) of the Bankruptcy Code. Chartis asserts that assignment of these policies to the Environmental Response Trusts violates section 365(c)(1)(a) of the Bankruptcy Code because Tronox's obligations under the policies are personal to Tronox, and the contemplated | Tronox does not believe its intended assignment of insurance policies violates either the terms of the policies or applicable law. Tronox is in the process of drafting its response to the Chartis Objection, which will be filed before the Confirmation Hearing. |

11

| Objection | Status & Response |
|---|---|
| assignment to a trust with different economic incentives would be a material change to the policies. Thus, assignment of the BMI Policy or the Forest Products Policy to the Environmental Response Trusts would vitiate all remaining coverage.<br><br>**B.** Chartis further objects to the extent the Plan, through the Environmental Claims Settlement Agreement, settles certain Claims without Chartis's consent, in violation of the BMI Policy and the Forest Products Policy. Thus, assignment of these policies to the Environmental Response Trusts and the resulting settlement would vitiate all remaining coverage.<br><br>**C.** Finally, Chartis notes that the Plan's insurance neutral language does not resolve Chartis's objections set forth above. | |

12