## Exhibit 1

**Environmental Response Trust Agreements**

**ENVIRONMENTAL RESPONSE TRUST AGREEMENT**

**(Cimarron)**

**BY AND AMONG**


**TRONOX, INC.,**
**TRONOX LLC,**
**TRONOX FINANCE CORP.,**
**TRONOX HOLDINGS, INC.,**
**TRONOX LUXEMBOURG S.AR.L,**
**TRONOX PIGMENTS (SAVANNAH), INC.,**
**TRONOX WORLDWIDE, LLC,**
**SOUTHWESTERN REFINING COMPANY, INC.,**
**TRANSWORLD DRILLING COMPANY,**
**TRIANGLE REFINERIES, INC.,**
**TRIPLE S, INC.,**
**TRIPLE S ENVIRONMENTAL MANAGEMENT CORP.,**
**TRIPLE S MINERALS RESOURCES CORP.,**
**TRIPLE S REFINING CORP.,**
**and**
**CIMARRON CORP.**
**As Settlors,**

**Environmental Properties Management, LLC**
**not individually but solely in its representative capacity**
**as Cimarron Trustee,**

**AND**

**THE UNITED STATES OF AMERICA and**
**the STATE of OKLAHOMA**
**as Beneficiaries**


**As of February 14, 2011**

# TABLE OF CONTENTS

**ARTICLE I DEFINITIONS** ....................................................................................................**2**
    1.1    Definitions................................................................................................2

**ARTICLE II THE CIMARRON TRUST**......................................................................**7**
    2.1    Creation of and Transfer of Assets to the Cimarron Trust......................................7
    2.2    Objective and Purpose ........................................................................11
    2.3    Holder of Cimarron Trust Assets...........................................................12
    2.4    Management of Cimarron Trust Assets....................................................12
    2.5    Work Performed and Disbursements by the Cimarron Trust .......................13
    2.6    Investment and Safekeeping of Cimarron Trust Assets...........................14
    2.7    Insurance Policy to Cover Future Response Actions................................15
    2.8    Access and Deed Restrictions................................................................15
    2.9    Accounting ..........................................................................................15
    2.10   Termination..........................................................................................16
    2.11   Property Disposition ............................................................................16

**ARTICLE III WORK AND DISTRIBUTIONS** ...................................................**17**
    3.1    Cimarron Trust Accounts......................................................................17
    3.2    Payments by the Cimarron Trust ...........................................................17
    3.3    Liens by Government............................................................................20
    3.4    Manner of Payment..............................................................................20
    3.5    Unclaimed Distributions .......................................................................20

**ARTICLE IV THE CIMARRON TRUSTEE** ..........................................................**20**
    4.1    Appointment .......................................................................................20
    4.2    Generally.............................................................................................21
    4.3    Powers.................................................................................................21
    4.4    Other Professionals..............................................................................22
    4.5    Limitation of the Cimarron Trustee's Authority.................................22
    4.6    Reliance by the Cimarron Trust Parties .................................................22
    4.7    Compensation of the Cimarron Trustee..................................................23
    4.8    Liability of Cimarron Trust Parties........................................................23
    4.9    Exculpation and Indemnification...........................................................24
    4.10   Termination, Replacement, and Removal of the Cimarron Trustee. ...................25
    4.11   Appointment of Successor Cimarron Trustees .......................................27
    4.12   No Bond ..............................................................................................27

**ARTICLE V BENEFICIARIES** ................................................................................**27**
    5.1    Beneficiaries .......................................................................................27
    5.2    Identification of Beneficiaries................................................................27
    5.3    Non-Beneficiaries ...............................................................................29
    5.4    Transfer of Beneficial Interests.............................................................29

**ARTICLE VI REPORTING AND TAXES**.............................................................**30**
    6.1    Reports ...............................................................................................30

i

6.2     Other ....................................................................................................................30
6.3     Reports in Support of Insurance Claims ............................................................30
6.4     Taxes ...................................................................................................................30

**ARTICLE VII MISCELLANEOUS PROVISIONS .................................................................31**
7.1     Amendments and Waivers ..................................................................................31
7.2     Tax Treatment .....................................................................................................31
7.3     Cooperation..........................................................................................................31
7.4     Situs of the Cimarron Trust................................................................................31
7.5     Severability .........................................................................................................32
7.6     Sufficient Notice .................................................................................................32
7.7     Headings ..............................................................................................................32
7.8     Actions Taken on Other Than Business Day ......................................................32
7.9     Consistency of Agreements and Construction ....................................................32
7.10    Compliance with Laws .......................................................................................32
7.11    Preservation of Privilege.....................................................................................32
7.12    No Recourse to Beneficiaries..............................................................................33
7.13    Uniform Custodial Trust Act. .............................................................................33

## ENVIRONMENTAL RESPONSE TRUST AGREEMENT

### (Cimarron)

This Environmental Response Trust Agreement (the "Agreement") is made this 14th day of February, 2011, by and among TRONOX, INC. ("Tronox") and its wholly owned subsidiaries, TRONOX LLC, TRONOX FINANCE CORP., TRONOX HOLDINGS, INC., TRONOX LUXEMBOURG S.AR.L, TRONOX PIGMENTS (SAVANNAH), INC., TRONOX WORLDWIDE, LLC, SOUTHWESTERN REFINING COMPANY, INC., TRANSWORLD DRILLING COMPANY, TRIANGLE REFINERIES, INC., TRIPLE S, INC., TRIPLE S ENVIRONMENTAL MANAGEMENT CORP., TRIPLE S MINERALS RESOURCES CORP., TRIPLE S REFINING CORP., and CIMARRON CORP., as debtors and debtors in possession in the Bankruptcy Cases (defined below) (collectively, "Settlors") and Environmental Properties Management, LLC, not individually but solely in its representative capacity as Cimarron Trustee (defined herein) of the Cimarron Environmental Response Trust established hereby (the "Cimarron Trust"), and the Beneficiaries (defined herein).

## R E C I T A L S:

WHEREAS, on January 12, 2009, Settlors filed voluntary petitions for relief in the Bankruptcy Court under chapter 11 of title 11 of the United States Code, 11 U.S.C. § 101 *et seq.*, as amended (the "Bankruptcy Code") in the United States Bankruptcy Court for the Southern District of New York ("Bankruptcy Court"), which cases have been jointly administered under Case No. 09-10156 (the "Bankruptcy Cases");

WHEREAS, the Settlors, the United States and the State of Oklahoma have entered into that certain Consent Decree and Environmental Settlement Agreement (the "Settlement Agreement") lodged with the Court on November 23, 2010;

WHEREAS, the Settlement Agreement provides for the transfer of the Cimarron Site (defined below) to the Cimarron Trust (defined below) to be administered by the Cimarron Trustee (defined below) pursuant to this Agreement and the Settlement Agreement;

WHEREAS, the Settlement Agreement provides for the creation of four additional trusts, which include the Multistate Trust, the Nevada Trust, the Savannah Trust, and the West Chicago Trust, the transfer to those trusts of the Henderson Property, the Multistate Owned Sites, the Savannah Facility, and the West Chicago Owned Sites, respectively, and the administration of each of those trusts by the Multistate Trustee, the Nevada Trustee, the Savannah Trustee, and the West Chicago Trustee, respectively, pursuant to the Environmental Response Trust Agreement for each trust and the Settlement Agreement;

WHEREAS, the Settlement Agreement provides for the creation of a litigation trust ("Anadarko Litigation Trust") pursuant to the Litigation Trust Agreement (defined below);

WHEREAS, in accordance with Article VII of the Settlement Agreement, the Cimarron Trust is established for the purposes of acting as successor to Debtors solely for the purpose of performing, managing, and funding implementation of all decommissioning and/or Site control and maintenance activities pursuant to the terms and conditions of the Cimarron License,

1

including the preparation and implementation of an NRC-approved decommissioning plan and groundwater remediation plan, and all Environmental Actions required under federal or state law, owning the Cimarron Site, carrying out administrative functions related to the performance of work by or on behalf of the Cimarron Site, paying certain regulatory fees and oversight costs, ultimately selling, transferring or otherwise disposing or facilitating the reuse of all or part of the Cimarron Trust Assets, and fulfilling other obligations as set forth in the Settlement Agreement;

WHEREAS, the Cimarron Trust is to be funded in the amount set forth in the Settlement Agreement;

WHEREAS, this Agreement and the Settlement Agreement govern the Cimarron Trust, which is created pursuant to section 1.468B-1 *et seq.* of the Treasury Regulations promulgated under section 468B of the Internal Revenue Code (the "QSF Regulations");

WHEREAS, presuming that the Cimarron Trust qualifies as a "qualified settlement fund" within the meaning of the QSF Regulations, to the extent permitted by law, the Settlors intend to elect to treat the Cimarron Trust as a grantor trust pursuant to the QSF Regulations; and

WHEREAS, the Cimarron Trust shall be the exclusive holder of the assets described herein for purposes of 31 U.S.C. § 3713(b);

NOW, THEREFORE, in consideration of the foregoing premises and the mutual covenants and agreements contained herein and in the Settlement Agreement the Parties hereby agree as follows:

## ARTICLE I
## DEFINITIONS

1.1    Definitions.

The following terms as used in this Agreement shall have the definitions given below:

1.1.1    "Agreement" has the meaning as given in the preamble.

1.1.2    "Anadarko Litigation Trust" shall have the meaning given in the recitals to this Agreement.

1.1.3    "Anadarko Litigation Proceeds" are eighty-eight percent (88%) of the net recovery in the Anadarko Litigation, which net recovery shall be determined by subtracting from the total gross recovery in the Anadarko Litigation (1) all outstanding and anticipated payments to lead counsel of the Anadarko Litigation Trust pursuant to a separate Special Fee Arrangement; (2) all outstanding and anticipated costs and fees of the Anadarko Litigation Trust and Trustee (including but not limited to attorney's fees and Trustee fees), as set forth in the Anadarko Litigation Trust Agreement referred to in Paragraph 119 of the Settlement Agreement; and (3) the amount of the distribution referred to in Paragraph 122 of the Settlement Agreement as amended by the First Amendment to the Consent Decree and Environmental Settlement Agreement, and which

shall be allocated to the Governments and the Environmental Response Trusts pursuant to the Plan of Reorganization and the Settlement Agreement.

      1.1.4    "<u>Bankruptcy Cases</u>" shall have the meaning given in the recitals to this Agreement.

      1.1.5    "<u>Bankruptcy Court</u>" means the United States Bankruptcy Court for the Southern District of New York.

      1.1.6    "<u>Beneficiary</u>" means the United States (on behalf of the NRC and US EPA) or the State of Oklahoma (through the ODEQ).

      1.1.7    "<u>CERCLA</u>" means the Comprehensive Environmental Response, Compensation, and Liability Act, 42 U.S.C. §§ 9601 *et seq.*, as amended.

      1.1.8    "<u>Cimarron Administrative Costs</u>" means the fees, costs, and expenses incurred in connection with the administration of the Cimarron Trust, including but not limited to real estate management, taxes, insurance, and maintenance costs, but excluding any expenses (including, without limitation, expenses of the trustees and its third-party professionals) incurred in overseeing, managing, and performing Environmental Actions.

      1.1.9    "<u>Cimarron License</u>" means the Radioactive Materials License SNM-928 held by Cimarron Corporation.

      1.1.10    "<u>Cimarron Licensee</u>" means the person or entity retained by the Cimarron Trustee and approved by NRC to hold the Cimarron License.

      1.1.11    "<u>Cimarron LOC</u>" means the Irrevocable Standby Letter of Credit.

      1.1.12    "<u>Cimarron Site</u>" means the site owned by Settlors located in Cimarron, Oklahoma.

      1.1.13    "<u>Cimarron Standby Trust Fund</u>" means the standby trust fund for the benefit of NRC.

      1.1.14    "<u>Cimarron Trust</u>" means the trust established pursuant to this Agreement.

      1.1.15    "<u>Cimarron Trust Account</u>" shall have the meaning given in Section 2.1.5 hereof.

      1.1.16    "<u>Cimarron Trust Administrative Account</u>" means the Cimarron Trust Account established to fund the payment of Cimarron Administrative Costs.

      1.1.17    "<u>Cimarron Trust Assets</u>" means (a) those assets and properties, including the Cimarron Site and sources of funding to be transferred to the Cimarron

Trust pursuant to the Settlement Agreement and (b) such other assets acquired, earned, or held by the Cimarron Trust from time to time pursuant to the Cimarron Trust Agreement

   1.1.18 "<u>Cimarron Trust Environmental Cost Account</u>" shall have the meaning given in Section 2.1.5.

   1.1.19 "<u>Cimarron Trust Parties</u>" means, collectively, the Cimarron Trust, the Cimarron Trustee, and the Cimarron Trustee's shareholders, officers, directors, employees, members, managers, partners, affiliated entities, consultants, agents, accountants, attorneys or other professionals or representatives engaged or employed by the Cimarron Trust or Cimarron Trustee; provided however, that any contractors or consultants retained to perform or oversee Environmental Actions of the Cimarron Trust (for the avoidance of doubt, other than the Cimarron Trustee and its officers, directors, and employees) shall not be Cimarron Trust Parties.

   1.1.20 "<u>Cimarron Trust Proceeds</u>" means the net proceeds of any liquidation, sale, lease, recovery or other disposition of or other proceeds in respect of the Cimarron Trust Assets.

   1.1.21 "<u>Cimarron Trustee</u>" means the trustee of the Cimarron Trust.

   1.1.22 "<u>Court</u>" means the Bankruptcy Court or if the Bankruptcy Court abstains from exercising jurisdiction or is otherwise without jurisdiction over any matter arising out of this Agreement, a United States District Court having competent jurisdiction with respect to such matters.

   1.1.23 "<u>Decommissioning Activities</u>" shall mean activities enabling the Cimarron Site to be safely removed from service, including site visits and inspections by NRC, to reduce residual radioactivity to a level that permits release of the Cimarron Site for unrestricted use and termination of the Cimarron License, or release of the Cimarron Site under restricted conditions and termination of the Cimarron License.

   1.1.24 "<u>Effective Date</u>" means the Effective Date as defined in the Settlement Agreement.

   1.1.25 "<u>Environmental Actions</u>" means any and all environmental activities authorized or required under Environmental Law that occur after the Effective Date and that are related to the Cimarron Site, including but not limited to response or remedial actions, removal actions, corrective action, closure, or post-closure care, reclamation, investigations, studies, remediation, interim actions, final actions, emergency actions, water treatment, implementation of engineered structures and controls, monitoring, repair and replacement of engineered structures, monitoring equipment and controls, operation and maintenance, implementation, operation and maintenance of institutional controls, coordination and integration of reuse and remedial efforts and initiatives (including, without limitation, multi-stakeholder communications), and, if required, long-term stewardship and perpetual custodial care activities. "Environmental Actions" also include the above environmental activities relating to the migration of hazardous substances emanating from the Cimarron Site.  For the avoidance

of doubt, "Environmental Actions" shall not include natural resource assessment or restoration.

1.1.26 "<u>Environmental Costs</u>" means the costs and expenses of implementing Environmental Actions and the costs of payment of certain oversight costs of any Beneficiary with respect to the Cimarron Site.

1.1.27 "<u>Environmental Information</u>" means environmental reports, audits, analyses, records, studies and other documents containing information prepared by or otherwise in the possession of Settlors or their technical consultants that are based on or otherwise reflect information related to environmental activities.

1.1.28 "<u>Environmental Law</u>" means, whenever in effect, all federal, tribal, state and local statutes, regulations, ordinances and similar provisions having the force or effect of law; all judicial and administrative orders and determinations and all common law concerning public health and safety, worker health and safety, pollution or protection of the environment, including, without limitation, the Atomic Energy Act ("AEA"), CERCLA, Clean Water Act ("CWA"), Clean Air Act ("CAA"), Emergency Planning and Community Right-to-Know Act ("EPCRA"), Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA"), Resource Conservation and Recovery Act ("RCRA"), Safe Drinking Water Act ("SDWA"), Toxic Substances Control Act ("TSCA"), and any tribal, state or local equivalents.

1.1.29 "<u>Funding</u>" shall have the meaning given in Section 2.1.2 hereof.

1.1.30 "<u>Internal Revenue Code</u>" means the Internal Revenue Code of 1986, as amended.

1.1.31 "<u>Lead Agencies</u>" shall be (i) the NRC for the Cimarron Trust Federal Environmental Cost Account with respect to the decommissioning and/or Cimarron Site control and maintenance activities pursuant to the terms and conditions of the Cimarron License, and (ii) the ODEQ for the Cimarron Trust State Environmental Cost Account with respect to Environmental Actions other than those related to decommissioning, the Cimarron License, or the NRC.

1.1.32 "<u>Litigation Trust Agreement</u>" means the agreement establishing the Anadarko Litigation Trust.

1.1.33 "<u>Non-Lead Agency</u>" shall be the EPA for matters as to which ODEQ is Lead Agency.

1.1.34 "<u>NRC</u>" means the Nuclear Regulatory Commission

1.1.35 "<u>ODEQ</u>" means the Oklahoma Department of Environmental Quality.

1.1.36 "<u>Other Environmental Trusts</u>" means the Multistate Trust, the Nevada Trust, the Savannah Trust, and the West Chicago Trust.

1.1.37 "<u>Parties</u>" means the Settlors, the Cimarron Trustee, and the Beneficiaries.

1.1.38 "<u>Person</u>" means any individual, corporation, limited liability company, partnership, joint venture, association, joint-stock company, trust, charitable foundation, unincorporated organization, government or any agency or political subdivision thereof or any other entity.

1.1.39 "<u>Plan Administrator</u>" means the administrator of any plan of reorganization confirmed by an order of the Bankruptcy Court in the Bankruptcy Cases.

1.1.40 "<u>Plan of Reorganization</u>" shall mean the Plan of Reorganization for the Settlors.

1.1.41 "<u>Real Property Information</u>" shall mean documents in Settlors' possession related to title, easements and other real property information relating to the Cimarron Site.

1.1.42 "<u>Reorganized Tronox</u>" means Tronox Incorporated, Tronox Worldwide LLC, Tronox LLC, non-Settlor foreign subsidiaries of the Settlors and such other Settlors and/or one or more newly organized successors, or any successor thereto, by merger, consolidation or otherwise, on or after the effective date of the Plan of Reorganization.

1.1.43 "<u>Settlement Agreement</u>" shall have the meaning given in the recitals.

1.1.44 "<u>Settlors</u>" shall have the meaning given in the preamble.

1.1.45 "<u>Superfund</u>" means the "Hazardous Substance Superfund" established by 26 U.S.C. § 9507 or, in the event such Hazardous Substance Superfund no longer exists, any successor fund or comparable account of the Treasury of the United States to be used for removal or remedial actions to address releases or threats of releases of hazardous substances.

1.1.46 "<u>United States</u>" means the United States of America on behalf of agencies and departments named in the Settlement Agreement.

1.1.47 "<u>US EPA</u>" means the United States Environmental Protection Agency and any successor departments or agencies of the United States.

All Capitalized terms not defined above shall have the meanings provided in the Settlement Agreement.

ARTICLE II
THE CIMARRON TRUST

2.1     Creation of and Transfer of Assets to the Cimarron Trust

2.1.1    Pursuant to the Settlement Agreement, the Parties hereby establish, on behalf of the Beneficiaries named herein, and Tronox Worldwide LLC hereby transfers, assigns, and delivers, by quitclaim deed and other appropriate instruments, to, the Cimarron Trust, on behalf of the Beneficiaries, all of Settlors' right, title and interest in and to the Cimarron Trust Assets. Settlors shall retain no ownership or other residual interest whatsoever with respect to the Cimarron Trust, the Cimarron Site.  The transfer of ownership by Tronox Worldwide LLC of the Cimarron Trust Assets shall be a transfer of all of the Settlors' right, title and interests therein, and the transfer shall be (i) "as is" and "where is", with no warranties of any nature; (ii) free and clear of all claims, liens, encumbrances and interests against the Settlors, including mechanics' liens and other liens for the payments of monetary claims, such as property taxes, or other monetary claims asserted or that could have been asserted in the bankruptcy proceeding, but shall remain subject to any existing in rem claims that do not secure payment of monetary claims (such as easements or deed restrictions); (iii)  subject to any rights of the United States and the State of Oklahoma under the Settlement Agreement; and (iv) accomplished by quitclaim deed and/or personal property bill of sale without warranty, with all such conveyance documents to be agreed to in form by the Debtors and the Cimarron Trustee, provided that in no event shall the conveyance include any warranty by the grantor by virtue of the grant document or statutory or common law or otherwise.  Settlors and Reorganized Tronox hereby disclaim any and all express or implied representations or warranties, including any representations or warranties of any kind or nature, express or implied, as to the condition, value or quality of such assets or other property, and specifically disclaim any representation or warranty of merchantability, usage, suitability or fitness for any particular purpose with respect to such assets or other property, any part thereof, the workmanship thereof, and the absence of any defects therein, whether latent or patent, it being understood that such assets are being acquired "as is, where is," and in their condition as of the Effective Date.  The grantee for each such deed and personal property bill of sale shall be the Cimarron Trust by and through Environmental Properties Management, LLC, not individually but solely in its representative capacity as Cimarron Trustee. Settlors and Reorganized Tronox, as applicable, will reasonably cooperate with the United States (including NRC), the State of Oklahoma (including ODEQ), and the Cimarron Trustee to deliver to the title company (which will record or cause to be recorded in the appropriate real property records) the transfer documents as soon as reasonably practicable, but not to exceed 30 days after the Effective Date. Settlors shall pay the recording costs to the title company related to the title transfer. Settlors shall pay to the applicable tax authorities on or prior to the Effective Date all real property taxes relating to the Cimarron Site due on or before the Effective Date. Settlors and the Cimarron Trust shall prorate the real property taxes accruing to or becoming a lien on the Cimarron Site during the calendar year of the Effective Date, and Settlors shall have paid to the Cimarron Trust their pro-rata share of such real property taxes as of the Effective Date. If the actual bills for such real property taxes have not been issued, then such proration shall be based on an amount equal to such real property taxes for the prior year

or tax period, which shall constitute a final proration and not be subject to further adjustment. As of the Effective Date, the Cimarron Trust shall be responsible for paying all real property taxes first coming due following the Effective Date relating to the Cimarron Site. Settlors shall execute, or cause to be executed, and record, if necessary, all necessary releases of any liens or security interests held by any Settlors against the Cimarron Site. The Cimarron Trust hereby accepts and agrees to hold the Cimarron Trust Assets in the Cimarron Trust for the benefit of the Beneficiaries for the purposes described in Section 2.2 below, subject to the terms of the Settlement Agreement, this Agreement, and any applicable orders of the Court.

    2.1.2   Transfer of Funding and Consideration to the Cimarron Trustee

        2.1.2.1 The Funding. On the Effective Date, the Settlors shall cause to be transferred to or at the direction of the Cimarron Trustee cash in the amount of $8,638,384.00 (the "Funding").

        2.1.2.2 The Cimarron LOC. On the Effective Date, the Settlors shall cancel the Cimarron LOC and remit the funds from the Cimarron LOC to the Cimarron Standby Trust Fund already in existence, or to a new Cimarron Standby Trust Fund that may be established by the Cimarron Trustee in accordance with applicable NRC regulations (which, together with the Funding, constitutes the "Funding and Consideration"). If the Cimarron Trustee elects to establish a new Cimarron Standby Trust Fund, the Cimarron Trustee shall provide NRC with proposed language for the agreement governing the new Cimarron Standby Trust Fund to ensure that the agreement conforms with 10 C.F.R. 70.25(e)(ii).

        2.1.2.3 Anadarko Litigation Proceeds. The Anadarko Litigation Trust, which shall receive a portion of Settlors' right to receive the Anadarko Litigation Proceeds, shall transfer 1.75% of the Anadarko Litigation Proceeds to the Cimarron Trust Environmental Cost Accounts (1.5% to be transferred to the Cimarron Trust Federal Environmental Cost Account to be used to decommission and remediate the Cimarron Site, 0.25% to the Cimarron Trust State Environmental Cost Account to be used to conduct or finance Environmental Actions at the Cimarron Site) and 0.089% of the Anadarko Litigation Proceeds, to be deposited in the Cimarron Trust Administrative Account pursuant to the terms of the Plan of Reorganization, the Litigation Trust Agreement, and the Settlement Agreement.

        2.1.3   Upon transfer of the Funding and Consideration on the Effective Date, the Settlors shall have no interest in, or with respect to, any Cimarron Trust Assets, and neither the Settlors, Reorganized Tronox, nor any successors thereto, shall have any further obligation to provide funding to the Cimarron Trust.

        2.1.4   <u>License Order</u>.

            2.1.4.1 On or before the Effective Date, with the approval of NRC and in accordance with the Atomic Energy Act, and applicable regulations in 10 C.F.R. Part 70, the Cimarron License shall be transferred to the Cimarron Trust, to be administered by Environmental Properties Management, LLC, not individually but solely in its representative capacity as Cimarron Trustee.  The Cimarron Trustee, on behalf of the Cimarron Trust, shall oversee and shall receive communications relating to the transfer of the Cimarron License to the Cimarron Trust.

            2.1.4.2 The Cimarron Licensee shall be bound by the requirements of the Cimarron License and applicable regulations, and any future amendments to or transfers of the Cimarron License must be made in accordance with applicable federal law and regulations. Within 120 days after the transfer of the Cimarron License, the Cimarron Trustee shall submit for approval to the Deputy Director, Decommissioning & Uranium Recovery Licensing Directorate, Division of Waste Management and Environmental Protection, Office of Federal and State Materials and Environmental Management Programs, and to the Land Protection Division, Oklahoma Department of Environmental Quality, an evaluation of potential alternative groundwater remediation technologies. The evaluation shall include conceptual technical, total cost, cash flow, and schedule information for each approach. The Cimarron Trustee shall meet with representatives from both agencies within 60 days following submittal of the evaluation to discuss the approaches and obtain regulatory agency concurrence on a groundwater remediation approach. Within 120 days following NRC and ODEQ concurrence, the Cimarron Trustee shall submit to the same parties a groundwater remediation plan leading to termination of the license and release of the Cimarron Site for unrestricted use. The groundwater remediation plan shall include a detailed schedule for all remediation activities and a cost estimate for each action.

      2.1.4.3 Upon NRC and ODEQ approval of the remediation plan, the Cimarron Trustee shall commence remediation of the Cimarron Site pursuant to the terms and conditions of the approved groundwater remediation plan and the Cimarron License.

      2.1.4.4 The Cimarron Trustee shall notify and request relief from the Deputy Director, Decommissioning & Uranium Recovery Licensing Directorate, Division of Waste Management and Environmental Protection, Office of Federal and State Materials and Environmental Management Programs, if the Cimarron Trustee believes it should be relieved of any requirements in the Cimarron License because the Trustee believes that these requirements are impracticable given the parameters of this Agreement or that they have either been satisfactorily completed or are unnecessary. The Cimarron Trustee will continue to comply with all requirements in the Cimarron License pending NRC review and determination of the Cimarron Trustee's request for relief from specified requirements.

      2.1.4.5 Upon completion of the groundwater remediation and in conformance with the requirements in 10 C.F.R. Part 70 and the conditions set forth in the Cimarron License, the Cimarron Trustee shall demonstrate that the Site meets the criteria for unrestricted release.

      2.1.5  <u>Creation of the trust accounts</u>.  Upon receipt of the Cimarron Site and the Funding and Consideration, the Cimarron Trustee shall create a segregated Cimarron Trust Federal Environmental Cost Account and a Cimarron Trust State Environmental Cost Account and a segregated Cimarron Standby Trust Fund within the Cimarron Trust. The purpose of the Cimarron Trust Environmental Cost Accounts and the Cimarron Standby Trust Fund shall be to provide funding for future Decommissioning Activities, Environmental Actions and certain future regulatory fees and oversight costs of NRC and the State of Oklahoma with respect to the Cimarron Site. Funding for the Cimarron Trust Environmental Cost Accounts shall be held in trust for Environmental Actions with respect to the Cimarron Site and may not be used for any Owned or Non-Owned Site except as expressly provided in Section 2.4.3 below. The NRC shall be the sole beneficiary of the Cimarron Standby Trust Fund.  The initial funding of the Cimarron Trust Federal Environmental Cost Account shall be a total of $6,588,381.00. The initial funding of the Cimarron Trust State Environmental Cost Account shall be a total of $746,114.00.  The funding of the Cimarron Standby Trust Fund shall be the funds from the Cimarron LOC.  The Cimarron Trustee shall also create a segregated Cimarron Trust Administrative Account in the amount of $1,303,889.00. The separate accounts are referred to in this Agreement individually as a "Cimarron Trust Account" and collectively as the "Cimarron Trust Accounts." Subject to Section 2.6, the

income and gains from any investment of the Cimarron Trust Assets shall be allocated, paid and credited to such Cimarron Trust Account.

2.1.6   Each Cimarron Trust Account may be divided into such number of trust subaccounts dedicated for specific uses as may be deemed necessary in the sole discretion of the Cimarron Trustee (each, a "Trust Subaccount") to comply with the terms of, and implement, the Settlement Agreement and this Agreement.

2.1.7   For all federal income tax purposes, the Cimarron Trustee and Settlors shall treat the transfer of the Cimarron Trust Assets by Tronox Worldwide LLC to the Cimarron Trust as a transfer to a qualified settlement fund pursuant to section 468B of the Internal Revenue Code and the QSF Regulations. The Cimarron Trustee shall at all times seek to have the Cimarron Trust treated as a "qualified settlement fund" as that term is defined in the QSF Regulations.  The Court shall retain continuing jurisdiction over the Cimarron Trust and Cimarron Trust Accounts sufficient to satisfy the requirements of the QSF Regulations.   The Cimarron Trustee shall cause any taxes imposed on the earnings of the Cimarron Trust to be paid out of such earnings and shall comply with all tax reporting and withholding requirements imposed on the Cimarron Trust under applicable tax laws.  The Cimarron Trustee shall be the "administrator" of the Cimarron Trust pursuant to Treasury Regulation section 1.468B-2(k)(3).  To the extent Settlors elect to treat the Cimarron Trust as a grantor trust pursuant to Treasury Regulation section 1.468B-1(k)(1), the Cimarron Trustee will reasonably cooperate with such election.

2.1.8   The Cimarron Trustee shall use the Cimarron Trust Federal Environmental Cost Account and the Cimarron Standby Trust to fund future decommissioning costs pursuant to the Atomic Energy Act of 1954, including the preparation and implementation of an NRC-approved decommissioning plan and groundwater remediation plan, and future regulatory fees of NRC with respect to the Cimarron Site. The Cimarron Trustee shall use the Cimarron Trust State Environmental Cost Account to fund Environmental Actions and certain oversight costs of the State of Oklahoma with respect to the Cimarron Site.   To the extent any proposed decommissioning or Environmental Actions in the proposed budget entail overlapping work that qualifies for disbursements from both the Cimarron Trust Federal Environmental Cost Account and the Cimarron Trust State Environmental Cost Account, the Lead Agencies and the Cimarron Trustee shall determine an equitable allocation between both Environmental Cost Accounts for such proposed work.  The Cimarron Trustee shall use the Cimarron Trust Administrative Account to fund the Cimarron Administrative Costs that have been approved by the Lead Agency and Non-Lead Agency.

2.2   <u>Objective and Purpose</u>

2.2.1   The exclusive purposes and functions of the Cimarron Trust are to: (i) act as successor to Debtors solely for the purpose of performing, managing, and funding implementation of all decommissioning and/or Site control and maintenance activities pursuant to the terms and conditions of the Cimarron License, including the

preparation and implementation of an NRC-approved decommissioning plan and groundwater remediation plan, and all Environmental Actions required under federal or state law; (ii) own the Cimarron Site; (iii) carry out administrative functions related to the performance of work by or on behalf of the Cimarron Site; (iv) fulfill other obligations as set forth in the Settlement Agreement; (v) pay certain regulatory fees and oversight costs; and (vi) ultimately sell, transfer or otherwise dispose or facilitate the reuse of all or part of the Cimarron Trust Assets, if possible, all as provided herein with no objective or authority to engage in any trade or business. The performance by the Cimarron Trustee of its duties under this Agreement, including but not limited to the sale, lease or other disposition of some or all of the Cimarron Site, shall not be considered to be the Cimarron Trustee's engaging in a trade or business.

2.2.2    The Cimarron Trust is established pursuant to this Agreement and the Settlement Agreement and approved by the Bankruptcy Court for the sole purpose of resolving claims asserting environmental liabilities of Settlors with respect to the Cimarron Site. The Bankruptcy Court shall retain continuing jurisdiction over the Cimarron Trust. The Cimarron Trust satisfies all the requirements of, and is intended by the Parties to be classified as, a qualified settlement fund pursuant to the QSF Regulations.

2.3    <u>Holder of Cimarron Trust Assets</u>

The Cimarron Trust shall be the exclusive holder of the Cimarron Trust Assets and Cimarron Trust Accounts described herein for purposes of 31 U.S.C. § 3713(b)**.**

2.4    <u>Management of Cimarron Trust Assets</u>

2.4.1    Consistent with this Agreement and the Settlement Agreement, the Cimarron Trustee shall use the Cimarron Trust Environmental Cost Accounts and Cimarron Standby Trust Fund for the Cimarron Site to fund future decommissioning costs, including the preparation and implementation of an NRC-approved decommissioning plan and groundwater remediation plan, Environmental Actions and certain future oversight costs approved by the Lead Agency pursuant to applicable environmental law with respect to the Cimarron Site. The Cimarron Trustee shall use the Cimarron Trust Administrative Account to fund the Administrative Costs of the Cimarron Trust that have been approved by the United States and the State of Oklahoma.

2.4.2    The Cimarron Trustee may enter into a consent decree or consent order with the United States and/or Oklahoma, and may perform work pursuant to Unilateral Administrative Orders issued by US EPA, to facilitate implementation of this Section with respect to the Cimarron Site, to the extent of available funds.

2.4.3    NRC and the State of Oklahoma may agree in writing at any time after one year from the Effective Date that, based on new information about the estimated cost of cleanup or the assumption of liability by a buyer or other party for the Cimarron Site, the funding in a Cimarron Trust Environmental Cost Account is more than is projected by one or both Lead Agencies to be needed. Upon such an agreement, NRC and

the State of Oklahoma may instruct the Cimarron Trustee to transfer funds to one of the other Cimarron Trust Environmental Cost Accounts if there are remaining actions to be performed and a need for additional trust funding.

2.4.4    After NRC and the State of Oklahoma have confirmed to the Cimarron Trustee that all final actions have been completed and all final costs have been disbursed with respect to either the Cimarron Trust Federal Environmental Cost Account or the Cimarron Trust State Environmental Cost Account, any funds remaining in that account shall be transferred in the following order: (i) first, in accordance with instructions provided by NRC and the State of Oklahoma, to any of the other Cimarron Trust Environmental Cost Accounts established under the Settlement Agreement if there are remaining actions to be performed and a need for additional trust funding; (ii) second, in accordance with instructions to be provided by the United States Department of Justice after consultation with the States, to any of the Multistate Environmental Cost or Work Accounts, the Nevada Trust Environmental Cost Account, any of the West Chicago Trust Environmental Cost or Work Accounts, or the Savannah Trust Environmental Cost Account, if there are remaining Environmental Actions to be performed at the Owned Funded Sites, the Non-Owned Service Stations, the Non-Owned RAS Properties, or Kress Creek and a need for additional trust funding, with the allocation among such Environmental Cost Accounts to be determined by the projected shortfall of performing such remaining Environmental Actions; (iii) third, to Non-Owned Sites with a need for additional funding beyond the distributions received pursuant to the Settlement Agreement and from the Anadarko Litigation Proceeds; and (iv) fourth, to the Superfund.

2.4.5    Semi-annually, beginning with the first year after the Effective Date, the Cimarron Trustee shall provide the NRC and the State of Oklahoma with an update of anticipated future Administrative Costs of the Cimarron Trust. NRC and the State of Oklahoma may instruct the Cimarron Trustee in writing that any conservatively projected surplus funding in the Cimarron Trust Administrative Account be transferred to the Cimarron Trust Accounts established under the Settlement Agreement for the Cimarron Site if there are remaining actions to be performed and a need for additional trust funding or, to the extent there are no such remaining actions, as described in clauses (ii)-(iv) in the immediately preceding Subparagraph. If there is an anticipated shortfall in the Cimarron Trust Administrative Account based on anticipated future Administrative Costs of the Cimarron Trust, funds from either of the Cimarron Trust Environmental Cost Accounts may be transferred to the Cimarron Trust Administrative Account, upon the joint discretion of the Lead Agency and the Non-Lead Agency, if applicable, for the respective Cimarron Environmental Cost Account.

2.5    <u>Work Performed and Disbursements by the Cimarron Trust</u>

Payments from the Cimarron Trust shall be made as provided in accordance with Subparagraphs 56(d)-(f) of the Settlement Agreement.

2.6    Investment and Safekeeping of Cimarron Trust Assets

2.6.1    The Cimarron Trust Assets, until sold as provided herein and in the Settlement Agreement, shall be held in trust and segregated. All interest, dividends, and other revenue earned in a Cimarron Trust Account shall be retained in the respective Cimarron Trust Account and used only for the same purposes as the principal in that account as provided in this Agreement and the Settlement Agreement, subject to any reallocation approved by the NRC and the State of Oklahoma, after consultation with the US EPA, in accordance with the terms of this Agreement and the Settlement Agreement. The Cimarron Trustee shall be under no liability for interest or producing income on any moneys received by the Cimarron Trust hereunder and held for distribution or payment as provided in this Agreement, except as such interest shall actually be received by the Cimarron Trust. Investments of any moneys held by the Cimarron Trust shall be administered in a manner consistent with the standards and requirements applicable to a trustee in connection with a Chapter 7 liquidation; provided, however, that the right and power of the Cimarron Trust to invest the Cimarron Trust Assets, the Cimarron Trust Proceeds, or any income earned by the Cimarron Trust, shall be limited to the right and power to invest such assets (pending periodic distributions in accordance with Article III hereof) in demand and time deposits, such as certificates of deposit, in banks or other savings institutions whose deposits are federally insured, or other liquid investments, such as Treasury bills; and provided further, that the scope of any such permissible investments shall be limited to include only those investments, or shall be expanded to include any additional types of investments as permitted by the State of Oklahoma, with the concurrence of the Department of Justice ("DOJ"), and these additional types of investments shall be specifically detailed in writing including a directive that the Cimarron Trust is authorized to make such additional types of investments, in each case, such investments that a liquidating trust, within the meaning of Treasury Regulation section 301.7701-4(d), may be permitted to hold, pursuant to Treasury Regulations, or any modification in the IRS guidelines, whether set forth in IRS rulings, other IRS pronouncements or otherwise (although the Parties acknowledge and agree that the Cimarron Trust is properly characterized for federal tax purposes as a qualified settlement fund within the meaning of Section 1.468B-1 of the Treasury Regulations, and not as a liquidating trust under Section 301.7701-4(d) of the Treasury Regulations).

2.6.2    The Cimarron Trustee is expressly prohibited from holding any or all of the Cimarron Trust Assets in a common, commingled or collective trust fund and from holding any or all of the Cimarron Trust Assets in a common, commingled or collective trust fund with the assets of any other entity.  However, the funds provided for administrative expenses can be held in one account.

2.6.3    Nothing in this Section shall be construed as authorizing the Cimarron Trustee to cause the Cimarron Trust to carry on any business or to divide the gains therefrom, including without limitation, the business of an investment company, a company "controlled" by an "investment company," required to register as such under the Investment Company Act of 1940, as amended. The sole purpose of this Section 2.6 is to authorize the investment of the funds in the Cimarron Trust Accounts or any

14

portions thereof as may be reasonably prudent pending use of the proceeds for the purposes of the Cimarron Trust.

                2.6.4   The Cimarron Trust Parties shall not incur any liability for following any written direction or order to act (or to refrain to act) from any Beneficiary so long as such written direction is not inconsistent with this Agreement and the Settlement Agreement.

2.7    Insurance Policy to Cover Future Response Actions

Only at the direction of the United States and Oklahoma shall the Cimarron Trustee investigate the possible purchase of an insurance policy to cover future Environmental Actions and general liability at the Cimarron Site. If, and only if, the United States and Oklahoma unanimously direct the Cimarron Trustee in writing to purchase such insurance, shall the Cimarron Trustee use Cimarron Trust Assets to purchase such insurance.

2.8    Access and Deed Restrictions

The Cimarron Trustee shall provide the NRC, the State of Oklahoma, and their representatives and contractors access to the Cimarron Site at all times for the purposes of conducting Decommissioning Activities and Environmental Actions at or near the Cimarron Site. The Cimarron Trustee shall also cooperate with the NRC, its representatives and contractors in NRC's Site inspections.  The Cimarron Trustee shall implement any institutional controls or deed restrictions requested by the United States, NRC (with respect to decommissioning and termination of the Cimarron License) and the State of Oklahoma with respect to the Cimarron Site.  The Cimarron Trustee shall execute and record with the appropriate recorder's office any easements or deed restrictions requested by NRC and the State of Oklahoma for restrictions on use of the Cimarron Site in order to protect public health, welfare or safety or the environment or ensure non-interference with or protectiveness of any action.  Any existing easements or deed restrictions of record as to the Cimarron Site prior to the Effective Date of the Settlement Agreement shall survive the Settlement Agreement. The Cimarron Trustee shall abide by the terms of any institutional controls or deed restrictions in place or of record as to the Cimarron Site.

2.9    Accounting

The Cimarron Trustee shall maintain proper books, records, and accounts relating to all transactions pertaining to the Cimarron Trust, and the assets and liabilities of the Cimarron Trust in such detail and for such period of time as may be necessary to enable the Cimarron Trustee to make full and proper accounting in respect thereof in accordance with Article VI below and to comply with applicable provisions of law and good accounting practices. Except as otherwise provided herein or by the Settlement Agreement, the Cimarron Trustee shall not be required to file any accounting or seek approval of the Court with respect to the administration of the Cimarron Trust, or as a condition for making any payment or distribution out of the Cimarron Trust Assets. Beneficiaries shall have the right upon fourteen (14) days' prior written notice delivered to the Cimarron Trustee to inspect such books and records.

2.10    Termination

Consistent with the terms of the Settlement Agreement, the Cimarron Trustee shall not unduly prolong the duration of the Cimarron Trust and shall at all times endeavor to resolve, settle, or otherwise dispose of all claims against Cimarron Trust Assets and to effect the distribution of Cimarron Trust Assets and other receipts relating thereto to the Beneficiaries and the others who receive distributions hereunder in accordance with the terms hereof, and to terminate the Cimarron Trust as soon as practicable consistent with this Agreement and the Settlement Agreement.

2.11    Property Disposition

2.11.1  The Cimarron Trustee may, at any time, seek the approval of the United States, NRC (with respect to the Cimarron License), and the State of Oklahoma for the sale or lease or other disposition of all or part of the Cimarron Site.  Subject to the approval of NRC and the State of Oklahoma, the Cimarron Trustee may propose a sale, lease, or disposition of the Cimarron Site that includes funding from, or the retention of some portion of liability by, the respective Cimarron Trust Environmental Cost Account and/or the Cimarron Trust Administrative Account, provided that the net effect of any proposed sale, lease or disposition is to lessen the total financial obligations and liabilities as would otherwise be incurred in the absence of any such sale, lease, or disposition. In the event of any approved sale or lease or other disposition under this Paragraph, any net proceeds from the sale or lease or other disposition shall be paid to the Cimarron Trust Environmental Cost Accounts for the Cimarron Site and/or the Cimarron Trust Administrative Account in a proportion approved by NRC and the State of Oklahoma in writing.

2.11.2  The parties agree that the rule against perpetuities does not apply to the Cimarron Trust, but to the extent that any rule against perpetuities or a rule governing or limiting vesting, accumulations, the suspension of alienation, or the like shall be deemed applicable, the Cimarron Trust shall automatically terminate on the date 90 days after the date on which 21 years less 91 days pass after the death of the last survivor of all of the descendants of the late Joseph P. Kennedy, Sr., father of the late President John F. Kennedy, living on the date hereof, and provided further that if the Cimarron Trust owns real property located in any jurisdiction that sets a maximum duration for interests in real property located in such jurisdiction held in trust under a rule against perpetuities or a rule governing or limiting vesting, accumulations, the suspension of alienation, or the like, that for the Cimarron Trust is shorter than the date 90 days after the date on which 21 years less 91 days pass after the death of the last survivor of all of the descendants of the late Joseph P. Kennedy, Sr., father of the late President John F. Kennedy, living on the date hereof, the Cimarron Trust shall automatically terminate as to such Property upon the expiration of the maximum period authorized pursuant to the laws of such jurisdiction. If the Cimarron Trust is terminated in whole or in part pursuant to this Subsection, title to the relevant Property or Properties as to which the Cimarron Trust is terminated shall be transferred outright and free of trust to or at the direction of the United States in consultation with any of the States in which the relevant Property or Properties are located, provided, however, that the disposition of all relevant Property or

16

Properties shall be governed by applicable state and federal law, or by agreement of the Cimarron Trustee, the United States, and the applicable State, or by order of the Court, and further provided that neither the United States or any State will be required to accept an ownership interest in the relevant Property or Properties as to which the Cimarron Trust is terminated.

ARTICLE III
WORK AND DISTRIBUTIONS

3.1     Cimarron Trust Accounts

The Cimarron Trustee shall establish, maintain and hold trust accounts consistent with the Settlement Agreement and Section 2.1 of this Agreement, to administer the Cimarron Trust Assets and distributions therefrom. The Cimarron Trustee shall also maintain a dedicated Cimarron Trust Administrative Account for administrative funds, which shall be used solely to pay the costs of administering the Cimarron Trust as set forth herein.

3.2     Payments by the Cimarron Trust

Within 60 days following the Effective Date in the first year and thereafter by or before January 1 of each calendar year, the Cimarron Trustee shall provide the United States and the Lead Agency with balance statements and proposed budgets as described in Sections 3.2.1 and 3.2.3 of this Agreement. The Cimarron Trustee shall not pay any expense that has not been provided for in the applicable budget and approved by the Lead Agency except that claims by a governmental agency shall be paid in accordance with Paragraph 56(d)-(e) of the Settlement Agreement.

3.2.1     Administrative Expenses of the Cimarron Trust

Within 60 days following the Effective Date in the first year and thereafter by January 1 of each year, the Cimarron Trustee shall provide the NRC and the State of Oklahoma with an annual budget for administration of the Cimarron Trust for review and approval or disapproval by NRC and the State of Oklahoma. If disapproved, such budget shall be revised and resubmitted as expeditiously as possible. No administrative expenses may be incurred or paid by the Cimarron Trustee that are inconsistent with the approved budget, unless the NRC and the State of Oklahoma approves the request of the Cimarron Trust for the authority to perform an administrative action, before the budget has been approved, or a revised budget. Each annual budget shall include a future year forecast of administrative expenditures, with annual details for at least the next three years (or such longer period as the NRC and Oklahoma shall reasonably request). The Cimarron Trust shall regularly, but not less often than annually, and otherwise upon the reasonable request of the NRC or Oklahoma, provide documentation to the NRC and Oklahoma to substantiate compliance with the applicable approved budget and application of Cimarron Trust Assets consistently with the terms of this Agreement and the Settlement Agreement. The approved budget shall be funded by the transfer of the approved amount from Cimarron Trust Assets.

### 3.2.2    Remuneration for Cimarron Trustee's Start-Up Fees and Expenses

The Cimarron Trustee shall be entitled to remuneration from the Cimarron Trust Administrative Account of up to $37,000 for its reasonable fees and expenses in connection with the formation of the Cimarron Trust prior to the Effective Date. Where the Cimarron Trustee, the United States, and the relevant Lead Agency agree that the Cimarron Trustee accrued pre-Effective Date fees and expenses in furtherance of activities that post-Effective Date would constitute Environmental Action, those pre-Effective Date fees and expenses shall be paid from the Environmental Cost Accounts. After the Effective Date, the Cimarron Trustee will submit detailed invoices reflecting its pre-Effective Date fees and expenses for approval by the United States, NRC and the State of Oklahoma.

### 3.2.3    Environmental Expenses of the Cimarron Trust

The Cimarron Trustee shall prepare balance statements and annual budgets of projected expenditures from each of the Cimarron Trust Environmental Cost Accounts. The first budget for the remainder of the current calendar year and the next calendar year shall be submitted within sixty (60) days following the Effective Date and annual budgets shall be submitted thereafter on or before each January 1 during the term of the Cimarron Trust. The Lead Agency shall have the authority to approve or disapprove the proposed budget for the relevant Cimarron Trust Environmental Cost Account after consultation with the Non-Lead Agency, if such consultation is requested by the Non-Lead Agency. To the extent any proposed decommissioning or Environmental Actions in the proposed budget entail overlapping work that qualifies for disbursements from both the Cimarron Trust Federal Environmental Cost Account and the Cimarron Trust State Environmental Cost Account, the Lead Agencies and the Cimarron Trustee shall determine an equitable allocation between both Environmental Cost Accounts for such proposed work. If disapproved, a budget shall be revised and resubmitted as expeditiously as possible. No expenses may be incurred or paid by the Cimarron Trustee that are inconsistent with an approved budget, unless the Lead Agency after consultation with the other governmental agency approves an emergency response action or a revised budget; provided, however, that the Cimarron Trustee may incur or pay ongoing or recurring expenses approved in the prior year's budget that occur between the time a proposed annual budget is submitted and the time it is approved. Further, by January 1 of each year during the term of the Cimarron Trust and within nine (9) months after termination of the Cimarron Trust, the Cimarron Trustee shall prepare and submit to the Beneficiaries an annual report with respect to each of the Cimarron Trust Environmental Cost Accounts. The annual report shall pertain to the prior calendar year, or if the report is a final report, such period from the most recent annual report to the termination of the Cimarron Trust Environmental Cost Accounts.

### 3.2.4    NRC Notification and Cimarron Standby Trust Account Restrictions

The Cimarron Trustee shall also notify the Deputy Director, Decommissioning & Uranium Recovery Licensing Directorate, Division of Waste

Management and Environmental Protection, Office of Federal and State Materials and Environmental Management Programs, and the Regional Administrator, NRC Region IV, NRC Region IV, 611 Ryan Plaza Drive, Suite 400, Arlington, TX 76011-8064, by certified registered mail, no later than 180 days prior to the anticipated date, that all contractual and other projected obligations will have exhausted 25%, 50%, and 75% of the Cimarron Federal Environmental Cost Account.  Upon notification that 75% of the Cimarron Federal Environmental Cost Account has been exhausted, the Cimarron Trustee shall cease remediation work and commence passive maintenance and monitoring only of the Site in order to provide for the protection of the public health and safety using the remaining funds in the Cimarron Trust Federal Environmental Cost Account to fund monitoring and maintenance until further order of the NRC; provided however, that no more than 5% of the remaining funds available in the Cimarron Trust Federal Environmental Cost Account shall be spent in any six-month period without NRC approval. The assets of the Cimarron Standby Trust shall not be accessed by the Cimarron Trustee until further order of the NRC.

       3.2.5    <u>Reimbursement of Agencies and Performance of Environmental Action by Trust</u>

       The Cimarron Trustee shall pay funds from a Cimarron Trust Environmental Cost Account to the Lead Agency for a Cost Account making a written request for funds for reimbursement within 30 days following such request. Such written request shall: (i) be in accordance with the approved budget set forth in Section 3.2.3 above, and (ii) specify what the funds were used for and shall certify that they were used only for future Decommissioning Activities, Environmental Actions, and future regulatory fees or oversight costs with respect to the Cimarron Site.

       The Cimarron Trustee shall also pay funds from the Cimarron Trust Environmental Cost Account to the Non-Lead Agency making a written request for funds within 30 days following such request where the Lead Agency has requested the assistance of the Non-Lead Agency with respect to the Cimarron Site. Such written request shall: (i) be in accordance with the approved budget set forth in Section 3.2.3 above, and shall specify what the funds were used for and shall certify that they were used only for Environmental Actions performed and/or oversight costs incurred after the Effective Date by the Non-Lead Agency with respect to the Cimarron Site.  In the case of requests by the Lead Agency for a Cimarron Trust Environmental Cost Account to the Cimarron Trustee to use the funds from a particular Cimarron Trust Environmental Cost Account to perform Decommissioning Activities or Environmental Actions, the Cimarron Trustee shall utilize the funds and interest earned thereon from that Cimarron Trust Environmental Cost Account to undertake such work promptly and in accordance with any schedule approved by the Lead Agency pursuant to Section 3.2.3 above. The Cimarron Trustee shall seek the approval of the appropriate Lead Agency of any contractor hired by the Cimarron Trustee and any work plans to be undertaken by the Cimarron Trust under the oversight of the appropriate Lead Agency, unless the Lead Agency has provided a written waiver of such approval or requirements. Except for architectural services and engineering services, the Trustee shall use competitive bidding to select the most suitable contractor for any work on matters to which the Cimarron

Trust Federal Environmental Cost Account or the Cimarron Standby Trust Fund applies, and that is not carried out by the Trustee. The Trustee shall be responsible for the review and selection of any contractors sought to perform work, however, the Trustee shall provide NRC with its intended selection at least 30 days before the contract is awarded, and NRC may object or otherwise deny the award of any contract for any reasonable reason. The Cimarron Trustee shall require liability insurance as set forth in the Cimarron Trust Agreement from each contractor hired to perform work.

3.3     Liens by Government

Notwithstanding anything to the contrary in this Article III, the Cimarron Trust hereby grants to the Cimarron Trustee, the United States, and Oklahoma a first-priority lien on and security interest in the Cimarron Trust Assets, except with respect to any real property, to secure the payment of all amounts owed to, accrued or reserved on account of the Cimarron Trust or to be retained by the Cimarron Trustee hereunder or otherwise due hereunder.  However, only the Cimarron Trustee shall have a first-priority lien on and security interest in the Cimarron Trust Administrative Account and only the United States and Oklahoma shall have a first-priority lien on and security interest in the Cimarron Trust Environmental Cost Accounts. The Cimarron Trust agrees to take appropriate actions and execute appropriate documents to perfect the Cimarron Trustee's, United States', and Oklahoma's liens and security interest hereunder.

3.4     Manner of Payment

Cash payments made by the Cimarron Trust pursuant to the Settlement Agreement and this Agreement shall be in United States dollars by checks drawn on a domestic bank whose deposits are federally insured selected by the Cimarron Trustee, or by wire transfer from such a domestic bank, at the option of the Cimarron Trustee.

3.5     Unclaimed Distributions

In the event that funds remain in the Cimarron Trust at its termination, the amounts remaining shall be transferred, as directed by the United States in consultation with all affected States, to (i) any of the Multistate Trust Environmental Cost Accounts or Multistate Trust Environmental Work Account, any of the West Chicago Trust Environmental Cost Accounts or West Chicago Trust Work Accounts, the Savannah Trust Environmental Cost Account, or any of the Nevada Trust Environmental Cost Accounts if there are Environmental Actions to be performed and a need for additional trust funding, with the allocation among such Environmental Cost Accounts to be determined by the projected shortfall of performing such remaining Environmental Actions, (ii) Non-Owned Sites with a need for additional funding beyond the distributions received from the Anadarko Litigation Proceeds; or (iii) the Superfund.

ARTICLE IV
THE CIMARRON TRUSTEE

4.1     Appointment

4.1.1   Environmental Properties Management, LLC, not individually but solely in its representative capacity, is appointed to serve as the Cimarron Trustee to

administer the Cimarron Trust and the Cimarron Trust Accounts, in accordance with the Settlement Agreement and this Agreement, and the Cimarron Trustee hereby accepts such appointment and agrees to serve in such representative capacity, effective upon the Effective Date. If the Cimarron Trustee is not reappointed and no successor Cimarron Trustee is appointed by the expiration of the Cimarron Trustee's term, as set forth in Section 4.10.2, the Court may reappoint the Cimarron Trustee or appoint a successor Cimarron Trustee.

4.1.2    After consultation with the United States and Oklahoma, the Cimarron Trust is authorized to obtain the services of an environmental consultant to implement the future Environmental Actions, including the development of an approved decommissioning and groundwater remediation plan (the "Consultant"). The Consultant shall obtain environmental, general and professional liability insurance in the sum of $5,000,000 or such lesser amount as agreed to by the Cimarron Trust after consultation with the United States and Oklahoma. The beneficiary of the insurance policies shall be the Cimarron Trust and shall cover negligence committed by the Consultant in implementing the future Environmental Actions or any other negligence committed by the Consultant. The legal relationship of the Consultant to the Cimarron Trust and Cimarron Trustee is that of an independent contractor professional, not that of an entity employed by the Cimarron Trust or the Cimarron Trustee.  The Consultant shall not be deemed a Cimarron Trust Party.

4.2    Generally

The Cimarron Trustee's powers are exercisable solely in a fiduciary capacity consistent with, and in furtherance of, the purposes of the Cimarron Trust and the Settlement Agreement and not otherwise. The Cimarron Trustee shall have the authority to bind the Cimarron Trust, and any successor Cimarron Trustee, or successor or assign of the Cimarron Trust, but shall for all purposes hereunder be acting in its representative capacity as Cimarron Trustee and not individually. Notwithstanding anything to the contrary contained herein, the Cimarron Trustee shall not be required to take action or omit to take any action if, after the advice of counsel, the Cimarron Trustee believes in good faith such action or omission is not consistent with the Cimarron Trustee's fiduciary duties.  The Cimarron Trustee shall have no obligations to perform any activities for which the relevant Environmental Cost Account lacks sufficient funds.

4.3    Powers

In connection with the administration of the Cimarron Trust, except as otherwise set forth in this Agreement or the Settlement Agreement, the Cimarron Trustee is authorized to perform any and all acts necessary to accomplish the purposes of the Cimarron Trust. The powers of the Cimarron Trust shall, without any further Court approval or order, include, without limitation, each of the following: (i) to receive, manage, invest, supervise and protect the Cimarron Trust Assets, withdraw, make distributions and pay taxes and other obligations owed by the Cimarron Trust or the Cimarron Trust Accounts from funds held by the Cimarron Trustee and/or the Cimarron Trust (or the Cimarron Trust Accounts) in accordance with the Settlement Agreement and this Agreement, and withhold and pay to the appropriate taxing authority any withholding taxes on distributions from the Cimarron Trust; (ii) to engage employees and professional

21

Persons to assist the Cimarron Trust and/or the Cimarron Trustee with respect to the responsibilities described herein; (iii) to make distributions of the Cimarron Trust Assets from the Cimarron Trust Accounts for the purposes contemplated in this Agreement and the Settlement Agreement; and (iv) to effect all actions and execute all agreements, instruments and other documents necessary to implement this Agreement, including to exercise such other powers as may be vested in or assumed by the Cimarron Trust and/or the Cimarron Trustee pursuant to this Agreement and any order of the Court or as may be necessary and proper to carry out the provisions of this Agreement and the Settlement Agreement. No Person dealing with the Cimarron Trust shall be obligated to inquire into the authority of the Cimarron Trustee in connection with the protection, conservation or disposition of Cimarron Trust Assets. The Cimarron Trustee is authorized to execute and deliver all documents on behalf of the Cimarron Trust to accomplish the purposes of this Agreement and the Settlement Agreement.

4.4    <u>Other Professionals</u>

Upon the approval of the United States and Oklahoma, the Cimarron Trust is authorized to retain on behalf of the Cimarron Trust and pay such third parties as the Cimarron Trustee (in accordance with a budget approved pursuant to Section 3.2 above) may deem necessary or appropriate to assist the Cimarron Trustee in carrying out its powers and duties under this Agreement and the Settlement Agreement, including, without limitation, (i) counsel to the Cimarron Trust and/or Cimarron Trustee, (ii) a public accounting firm to perform such reviews and/or audits of the financial books and records of the Cimarron Trust as may be appropriate in the Cimarron Trustee's reasonable discretion and to prepare and file any tax returns or informational returns for the Cimarron Trust or the Cimarron Trust Accounts as may be required, and (iii) environmental consultants, custodians, security personnel, engineers, surveyors, brokers, contractors, administrative assistants and clerks. The Cimarron Trustee may pay all such Persons compensation for services rendered and expenses incurred in accordance with a budget approved as provided in Section 3.2.  If approved by the United States and the State of Oklahoma, the Trustee may, consistent with its fiduciary duty, retain an affiliated company to perform services for the Trust.

4.5    <u>Limitation of the Cimarron Trustee's Authority</u>

The Cimarron Trust and the Cimarron Trustee shall not and are not authorized to engage in any trade or business with respect to the Cimarron Trust Assets or any proceeds therefrom except as and to the extent the same is deemed in good faith by the Cimarron Trustee to be reasonably necessary or proper for the conservation or protection of the Cimarron Trust Assets, or the fulfillment of the purposes of the Cimarron Trust. The Cimarron Trust and the Cimarron Trustee shall not take any actions that would cause the Cimarron Trust to fail to qualify as a qualified settlement fund under the QSF Regulations.

4.6    <u>Reliance by the Cimarron Trust Parties</u>

Except as may otherwise be provided herein: (a) the Cimarron Trust Parties may rely on, and shall be protected from liability in acting upon, any resolution, certificate, statement, instrument, opinion, report, notice, request, consent, order, or other paper or document believed by them to be genuine and to have been signed or presented by the proper party or parties; (b) the

Cimarron Trust Parties may consult with legal counsel, financial or accounting advisors and other professionals and shall not be personally liable for any action taken or not taken in accordance with the advice thereof; and (c) persons dealing with the Cimarron Trust Parties shall look only to the Cimarron Trust Assets to satisfy any liability incurred by the Cimarron Trust Parties to such person in carrying out the terms of this Agreement or any order of the Court, and the Cimarron Trust Parties shall have no personal obligations to satisfy any such liability other than as provided in Section 4.9.1.

      4.7     <u>Compensation of the Cimarron Trustee</u>

The Cimarron Trust shall pay its own reasonable and necessary costs and expenses, and shall reimburse the Cimarron Trustee for the actual reasonable out-of-pocket fees and expenses to the extent incurred by the Cimarron Trustee in connection with the Cimarron Trustee's duties hereunder, including, without limitation, necessary travel, lodging, office rent (to be paid directly by the Cimarron Trust), postage, photocopying, telephone and facsimile charges upon receipt of periodic billings, all in accordance with an annual budget or fee schedule approved by the Beneficiaries. The Cimarron Trustee, and employees of the Cimarron Trust and the Cimarron Trustee, who perform services for the Cimarron Trust shall be entitled to receive reasonable compensation for services rendered on behalf of the Cimarron Trust in accordance with an annual budget or fee schedule approved by the Beneficiaries.

The Cimarron Trust Assets shall be subject to the claims of the Cimarron Trustee, and the Cimarron Trustee shall be entitled to reimburse itself out of any available cash in the Cimarron Trust Administrative Account, and the Cimarron Trust shall be obligated to pay, for actual out-of-pocket expenses and for actual hours worked.

All compensation and other amounts payable to the Cimarron Trustee shall be paid from the Cimarron Trust Assets.

      4.8     <u>Liability of Cimarron Trust Parties</u>

      4.8.1   In no event shall any of the Cimarron Trust Parties be held liable to any third parties for any liability, action, or inaction of any other party, including Settlors or any other Cimarron Trust Party. The Cimarron Trust Parties shall, further, be indemnified and exculpated in accordance with Section 4.9 of this Agreement.

      4.8.2   As provided in Sections XVI, XVII, XVIII of the Settlement Agreement, the Cimarron Trust Parties are deemed to have resolved their civil liability under CERCLA and State Environmental Laws to the United States and States, and have protection from contribution actions or claims as provided by Sections 113(f)(2) of CERCLA, 42 U.S.C. Section 9613(f)(2) or similar state law for matters addressed in the Settlement Agreement. The Cimarron Trust Parties shall have the benefits of the covenants not to sue as set forth in Section XVI of the Settlement Agreement, of contribution protection as set forth in Section XVIII of the Settlement Agreement and of the provisions as set forth in Section XVII of the Settlement Agreement**.**

      No provision of this Agreement or the Settlement Agreement shall require the Cimarron Trustee to expend or risk its own personal funds or otherwise incur any personal

financial liability based on the ownership of the Cimarron Assets or the performance or non-performance of any of its duties or the exercise of any of its authorities as Cimarron Trustee hereunder.  Notwithstanding the foregoing, the Cimarron Trustee shall satisfy from its own funds any liability imposed by a final order of the Court, not reversed on appeal, on account of the Cimarron Trustee's fraud or willful misconduct with relation to the performance or non-performance of any of its duties or the exercise of any of its authorities as Cimarron Trustee hereunder.

4.9     Exculpation and Indemnification

4.9.1   Exculpation. None of the Cimarron Trust Parties shall be personally liable unless the Court, by a final order that is not reversed on appeal, finds that it committed fraud or willful misconduct after the Effective Date in relation to the Cimarron Trustee's duties. There shall be an irrebuttable presumption that any action taken or not taken with the approval of the Court does not constitute an act of fraud or willful misconduct.  For the avoidance of doubt, the term "approval of the Court" in this Section 4.9.1 shall not be construed to mean the Findings of Fact, Conclusions of Law and Order Confirming the First Amended Joint Plan of Reorganization of Tronox Incorporated, et al., Pursuant to Chapter 11 of the Bankruptcy Code, any other order that has been entered to date by the Bankruptcy Court, or any future order approving this Agreement or the Anadarko Litigation Trust Agreement.   Any judgment against a Cimarron Trust Party and any costs of defense relating to any Cimarron Trust Party shall be paid from the relevant Cimarron Trust Environmental Cost Account or the Cimarron Trust Administrative Account without the Cimarron Trust Party having to first pay from its own funds for any personal liability or costs of defense, unless a final order of the Court, that is not reversed on appeal, determines that it committed fraud or willful misconduct in relation to the Cimarron Trust Party's duties. However, any payment shall be limited to funds in the relevant Cimarron Trust Environmental Cost Accounts or the Cimarron Trust Administrative Account.

4.9.2   The Cimarron Trust Parties are exculpated by all persons, including without limitation, holders of claims and other parties in interest, of and from any and all claims, causes of action and other assertions of liability arising out of the ownership of Cimarron Trust Assets and the discharge of the powers and duties conferred upon the Cimarron Trust and/or Trustee by the Settlement Agreement or any order of court entered pursuant to or in furtherance of the Settlement Agreement, or applicable law or otherwise. No person, including without limitation, holders of claims and other parties in interest, will be allowed to pursue any claims or cause of action against any Cimarron Trust Party for any claim against Debtors, for making payments in accordance with the Settlement Agreement or any order of court, or for implementing the provisions of the Settlement Agreement or any order of court. Nothing in this Paragraph or the Settlement Agreement shall preclude the United States or the State of Oklahoma from enforcing the terms of the Settlement Agreement and this Agreement against the Cimarron Trust Parties.  Notwithstanding anything in this Section 4.9.2 or elsewhere in this Agreement to the contrary, nothing in this Agreement shall be construed to exculpate the Cimarron Trust Parties from any liability resulting from any act or omission constituting fraud, willful misconduct, or criminal conduct. The parties agree that the

Cimarron Trustee is not contracted to act as an architect, engineer or surveyor in its role as trustee and that N.Y. Gen. Oblig. Law § 5-324 is not applicable to this Section 4.9. This Agreement shall not be construed as one relative to the construction, alteration, repair or maintenance of a building, structure, appurtenances and appliances under N.Y. Gen. Oblig. Law § 5-322.1.

4.9.3    Indemnification. The Cimarron Trust shall indemnify, defend and hold harmless (without the Cimarron Trust Parties having to first pay from their personal funds) the Cimarron Trust Parties from and against any and all claims, causes of action, liabilities, obligations, losses, costs, judgments, damages or expenses (including attorneys' fees) and any other assertion of liability arising out of the ownership of Cimarron Trust Assets or action or inaction or in connection with the Cimarron Trustee's duties, to the fullest extent permitted by applicable law, including but not limited to, those caused or alleged to be caused by negligence or fault of any  Custodial Trust party (except for fraud or willful misconduct), provided that such indemnification shall be limited to funds in the relevant Cimarron Trust Environmental Cost Account for the Cimarron Site. Without limiting the foregoing, any such judgment against a Cimarron Trust Party and any such costs of defense relating to any Cimarron Trust Party shall be paid by the Cimarron Trust consistent with the terms and conditions of this Section. Notwithstanding the foregoing, to the extent fraud or willful misconduct of any Cimarron Trust Party is alleged and the Court finds, by a final order, not reversed on appeal, that such Cimarron Trust Party committed fraud or willful misconduct after the Effective Date in relation to the Cimarron Trustee's duties, there shall be no indemnification, of that Cimarron Trust Party, for any judgments arising from such allegations of fraud or willful misconduct. It shall be an irrebuttable presumption that any action taken, or inaction, consistent with Court approval shall not constitute willful misconduct or fraud.  For the avoidance of doubt, the term "Court approval" in this Section 4.9.3 shall not be construed to mean the Findings of Fact, Conclusions of Law and Order Confirming the First Amended Joint Plan of Reorganization of Tronox Incorporated, et al., Pursuant to Chapter 11 of the Bankruptcy Code, any other order that has been entered to date by the Bankruptcy Court, or any future order approving this Agreement or the Anadarko Litigation Trust Agreement.

4.10    Termination, Replacement, and Removal of the Cimarron Trustee.

4.10.1  Termination

The duties, responsibilities and powers of the Cimarron Trustee will terminate on the date the Cimarron Trust is dissolved under applicable law in accordance with the Settlement Agreement, or by an order of the Court; provided that this Section and Sections 4.6, 4.8 and 4.9 above shall survive such termination, dissolution and entry. The Cimarron Trustee may resign from its trusteeship generally and without cause giving not less than 120 days prior written notice thereof to the Court, the United States (including NRC), and the State of Oklahoma, provided however, that in the event a suitable replacement is not found and approved by the NRC and the State of Oklahoma within 120 days after such written notice is provided, the Cimarron Trustee's resignation shall not become effective and the Cimarron Trustee shall continue to function in its

25

capacity as Trustee until a suitable replacement is found and approved by the NRC and the State of Oklahoma.

### 4.10.2  Replacement:

The Cimarron Trustee may be replaced upon completion of any three (3) year term by the joint direction of NRC and the State of Oklahoma; however, this Section and Sections 4.6, 4.8 and 4.9 above shall survive such termination.

### 4.10.3  Removal

The Cimarron Trustee may be removed or the Cimarron Trust Assets may be transferred to the United States, NRC, or the State of Oklahoma by:

(1)  The entry of an order by the Bankruptcy Court, immediately upon notice of appointment of a temporary or permanent successor, finding that the Cimarron Trustee committed fraud or willful misconduct after the Effective Date in relation to the Cimarron Trustee's duties under the Cimarron Trust; or

(2)  The entry of an order by the Bankruptcy Court, immediately upon notice of appointment of a temporary or permanent successor, finding that (i) the Cimarron Trustee in any material respect, as a result of negligence, exacerbates hazardous conditions at the Cimarron Site, (ii) is seriously or repeatedly deficient or late in performance of the work or violates the provisions of the Settlement Agreement, or (iii) has violated the provisions of this Agreement or other related implementation agreements. In the event of the occurrence of 2(i), 2(ii) or 2(iii), the NRC and the State of Oklahoma may jointly direct that (i) the Cimarron Trustee be replaced in accordance with the Cimarron Trust Agreement or (ii) all remaining funds and future recoveries in the Cimarron Trust be paid to NRC or to the State of Oklahoma to be used in accordance with the terms of this Agreement or the Settlement Agreement. In the event the funds are so paid, so long as title to the Cimarron Site remains in the name of the Cimarron Trust or Cimarron Trustee, funds deemed reasonably sufficient by the applicable beneficiaries to cover property taxes and other property management costs to be paid by the Cimarron Trust for the Cimarron Site shall be left in the Cimarron Trust Administrative Account.

(3)  The provisions of this Section and Section 4.6, 4.8 and 4.9 above shall survive the removal of the Cimarron Trustee or transfer of funds.

4.11   Appointment of Successor Cimarron Trustees

Any successor Cimarron Trustee shall be proposed by the United States and Oklahoma and appointed by the Court. Any successor Cimarron Trustee appointed hereunder shall execute an instrument accepting such appointment hereunder and shall file such acceptance with the Cimarron Trust records. Thereupon, such successor Cimarron Trustee shall, without any further act, become vested with all the estates, properties, rights, powers, trusts and duties of its predecessor in the Cimarron Trust with like effect as if originally named herein; provided, however, that a removed or resigning Cimarron Trustee shall, nevertheless, when requested in writing by the successor Cimarron Trustee, execute and deliver an instrument or instruments conveying and transferring to such successor Cimarron Trustee under the Cimarron Trust all the estates, properties, rights, powers, and trusts of such predecessor Cimarron Trustee.

4.12   No Bond

Notwithstanding any state law to the contrary, the Cimarron Trustee, including any successor Cimarron Trustee, shall be exempt from giving any bond or other security in any jurisdiction.

ARTICLE V
BENEFICIARIES

5.1   Beneficiaries

Beneficial interests in the Cimarron Trust shall be held by each of the Beneficiaries.

5.2   Identification of Beneficiaries

5.2.1   In order to determine the actual names and addresses of the authorized representatives of a Beneficiary, the Cimarron Trust and the Cimarron Trustee shall be entitled to rely conclusively on the name and address of the authorized representative for such Beneficiary listed below in Section 5.2.2, who may from time to time provide additional or replacement names and addresses of authorized representatives, or listed in any written notice provided to the Cimarron Trustee in the future by an authorized representative of such Beneficiary.

5.2.2   The Cimarron Trustee shall send copies of all reports, budgets, annual balance statements, and other documents that the Cimarron Trustee is required to submit to a Beneficiary under the Settlement Agreement and this Agreement, and related implementation documents including any unilateral administrative orders, consent decrees, or administrative orders on consent to the following person(s), as applicable:

27

<u>As to the United States of America (on behalf of the NRC and US EPA, except as to the
Cimarron Standby Trust Account, for which NRC shall be the sole beneficiary) as beneficiary:</u>

Authorized representative and party to receive all notices under 5.2.2:

       Chief, Environmental Enforcement Section
       Environment and Natural Resources Division
       U.S. Department of Justice
       P.O. Box 7611
       Washington, DC 20044-7611
       Telephone: (202) 514-5271
       Facsimile: (202) 514-4180
       File Ref. No. 90-11-3-09688

       Robert William Yalen
       Assistant United States Attorney
       Office of the United States Attorney
         for the Southern District of New York
       86 Chambers Street, Third Floor
       New York, NY 10007
       Telephone: (212) 637-2722
       Facsimile: (212) 637-2686
       E-mail: robert.yalen@usdoj.gov

       Keith I. McConnell, Deputy Director
       Decommissioning & Uranium Recovery Licensing Directorate
       Division of Waste Management and Environmental Protection
       Office of Federal and State Environmental Management Programs
       United States Nuclear Regulatory Commission
       Mailstop T-8F5
       11545 Rockville Pike
       Rockville, MD 20852
       Telephone: (301) 415-7295
       Facsimile: (301) 415-5369
       E-mail: Keith.McConnell@nrc.gov

       Craig Kaufman
       Attorney-Advisor
       United States Environmental Protection Agency
       Office of Site Remediation Enforcement, Regional Support Division
       1200 Pennsylvania Avenue, NW (Mail Code 2272A)
       Washington, D.C. 20460
       Telephone: (202) 564-4284
       E-mail: Kaufman.Craig@epa.gov

<u>As to the State of Oklahoma as beneficiary</u>:

Authorized representative and party to receive all notices under 5.2.2:

> Pam Dizikes
> Attorney, Office of the General Counsel
> Oklahoma Department of Environmental Quality
> 707 N. Robinson
> P.O. Box 1677
> Oklahoma City, OK 73101-1677
> Telephone: (405) 702-7175
> Facsimile:  (405) 702-7199
> E-mail: Pam.Dizikes@deq.ok.gov

> P. Clayton Eubanks
> Assistant Attorney General
> Environmental Protection Unit
> Office of the Attorney General of Oklahoma
> 313 N.E. 21st Street
> Oklahoma City, OK 73105
> Telephone: (405) 522-8992
> Facsimile: (405) 522-0608
> E-mail: clayton.eubanks@oag.ok.gov

5.3      <u>Non-Beneficiaries</u>

Upon the Effective Date of this Agreement, the Settlors and Reorganized Tronox shall have no interests including, without limitation, any reversionary interest, in the Cimarron Trust or any Cimarron Trust Assets. The State of Oklahoma and the United States shall be the sole beneficiaries of the Cimarron Trust Accounts, with the exception of the Standby Trust Fund, for which the NRC is the sole beneficiary.  Neither Settlors nor Reorganized Tronox shall have any rights or interest to the Cimarron Trust Assets distributed to the Cimarron Trust Accounts, nor to any funds remaining in any of the Cimarron Trust Accounts upon the completion of any and all final actions and disbursements for any and all final costs with respect to the Cimarron Site.

5.4      <u>Transfer of Beneficial Interests</u>

The interest of the Beneficiaries in the Cimarron Trust, which are reflected only on the records of the Cimarron Trust maintained by the Cimarron Trust, are not negotiable and may be transferred only after written notice to the Cimarron Trust, by order of the Court or by operation of law. The Cimarron Trust shall not be required to record any transfer in favor of any transferee where, in the sole discretion of the Cimarron Trust, such transfer is or might be construed to be ambiguous or to create uncertainty as to the holder of the interest in the Cimarron Trust. Until a transfer is in fact recorded on the books and records maintained by the Cimarron Trust for the purpose of identifying Beneficiaries, the Cimarron Trust, whether or not in receipt of documents of transfer or other documents relating to the transfer, may nevertheless make distributions and send communications to Beneficiaries, as though it has no notice of any such transfer, and in so

doing the Cimarron Trust and Cimarron Trustee shall be fully protected and incur no liability to any purported transferee or any other Person. Interests in the Cimarron Trust may not be transferred to the Settlors, Reorganized Tronox, or any Persons related to any of the preceding (within the meaning of Section 468B(d)(3) of the Internal Revenue Code).

ARTICLE VI
REPORTING AND TAXES

6.1    Reports

As soon as practicable, but no later than 28 days after the end of each calendar quarter beginning with the quarter ended after assets are first received by the Cimarron Trust and ending as soon as practicable upon termination of the Cimarron Trust, the Cimarron Trust shall submit to the Beneficiaries a written report, including: (a) financial statements of the Cimarron Trust at the end of such calendar quarter or period and the receipts and disbursements of the Cimarron Trust for such period; and (b) a description of any action to be taken by the Cimarron Trust, and prior to such action being taken, in the performance of its duties which, as determined by outside counsel, accountants or other professional advisors, materially and adversely affects the Cimarron Trust and of which notice has not previously been given to the Beneficiaries. The Cimarron Trust shall promptly submit additional reports to the Beneficiaries whenever, as determined by outside counsel, accountants or other professional advisors, an adverse material event or change occurs which affects either the Cimarron Trust or the rights of the Persons receiving distributions (including, without limitation, the Beneficiaries) hereunder. The Cimarron Trust shall also provide the reports or information required by Section 3.2 of this Agreement.

6.2    Other

The Cimarron Trust shall also file (or cause to be filed) any other statements, returns or disclosures relating to the Cimarron Trust, that are required by any applicable governmental unit.

6.3    Reports in Support of Insurance Claims

The Cimarron Trust shall also file (or cause to be filed) reports and cost analyses in support of claims against insurance carriers at the request of the United States and the States and shall provide the United States and the States a copy of any such reports and cost analyses.

6.4    Taxes

The Cimarron Trustee shall be the "administrator," within the meaning of Treasury Regulation Section 1.468B-2(k)(3), of the Cimarron Trust. Subject to definitive guidance from the Internal Revenue Service or a judicial decision to the contrary, the Cimarron Trustee shall file tax returns and pay applicable taxes with respect to the Cimarron Trust in a manner consistent with the provisions of the QSF Regulations. All such taxes shall be paid from the Cimarron Trust Assets.  Settlors may make an election to treat the Cimarron Trust as a grantor trust pursuant to Treasury Regulation section 1.468B-1(k)(1). To the extent the Settlors make such an election, (a) the Cimarron Trustee will provide reasonable cooperation to Settlors as needed to facilitate such election, (b) the Cimarron Trustee will file any returns or reports required by the QSF Regulations or Treasury Regulation § 1.671-4, and (c) the Cimarron Trustee

will provide the Settlors, as transferors to the Cimarron Trust, with any statements or reports required by the QSF Regulations or Treasury Regulation § 1.671-4, in order to enable the Settlors to calculate their share of the Cimarron Trust's tax obligations and attributes.  For the avoidance of doubt, any grantor trust election is for tax purposes only and shall in no way affect the substantive rights and obligations of the parties under the Settlement Agreement or this Agreement.

ARTICLE VII<br>
<u>MISCELLANEOUS PROVISIONS</u>

7.1    <u>Amendments and Waivers</u>

Any provision of this Agreement may be amended or waived by mutual written consent of the Cimarron Trust, the United States, and the States; provided, however, that no change shall be made to this Agreement that would alter the provisions of Section 7.2 hereof or adversely affect the federal income tax status of the Cimarron Trust as a "qualified settlement fund" (in accordance with Section 6.4 hereof), or, unless agreed to in writing by the affected Cimarron Trustee, the rights of the Cimarron Trustee. Technical amendments to this Agreement may be made as necessary, to clarify this Agreement or enable the Cimarron Trustee to effectuate the terms of this Agreement, in a manner consistent with the Settlement Agreement with the mutual consent of the Cimarron Trust, the United States, and the States.

7.2    <u>Tax Treatment</u>

The Cimarron Trust created by this Agreement is intended to be treated as a qualified settlement fund eligible to elect grantor trust classification pursuant to the QSF Regulations for federal income tax purposes, and to the extent provided by law, this Agreement shall be governed and construed in all respects consistent with such intent.

7.3    <u>Cooperation</u>

7.3.1    The Cimarron Trust and Cimarron Trustee shall take such actions and execute such documents as are reasonably requested by Settlors with respect to effectuating the Settlement Agreement and the transactions contemplated thereby, provided that such actions are not inconsistent with this Agreement or the Settlement Agreement. To the extent that Settlor requests the Cimarron Trust and/or the Cimarron Trustee to take such an action, the Cimarron Trust and Cimarron Trustee shall do so at the sole expense of the Settlor.

7.4    <u>Situs of the Cimarron Trust</u>

The situs of the Cimarron Trust herein established is New York, and, except to the extent the Bankruptcy Code or other federal law is applicable, the rights, duties, and obligations arising under this Cimarron Trust Agreement shall be governed by, and construed and enforced in accordance with, the laws of the State of New York, without giving effect to the principles of conflict of law thereof.

31

7.5    Severability

If any provision of this Agreement or application thereof to any Person or circumstance shall be finally determined by the Court to be invalid or unenforceable to any extent, the remainder of this Agreement, or the application of such provision to Persons or circumstances other than those as to which it is held invalid or unenforceable, shall not be affected thereby, and such provision of this Agreement shall be valid and enforced to the fullest extent permitted by law.

7.6    Sufficient Notice

Any notice or other communication hereunder shall be in writing and shall be deemed to have been sufficiently given, for all purposes, if deposited, postage prepaid, in a post office or letter box addressed to the Person for whom such notice is intended, to the name and address set forth in the case of a Beneficiary in Section 5.2 of this Agreement or such other address provided in writing to the Cimarron Trust by an authorized representative of the respective Beneficiary.

7.7    Headings

The section headings contained in this Agreement are solely for convenience of reference and shall not affect the meaning or interpretation of this Agreement or any term or provision hereof.

7.8    Actions Taken on Other Than Business Day

If any payment or act under the Settlement Agreement or this Agreement is required to be made or performed on a date that is not a business day, then the making of such payment or the performance of such act may be completed on the next succeeding business day, but shall be deemed to have been completed as of the required date. For the purposes of this agreement, a business day shall be any of the days Monday through Friday excluding national holidays.

7.9    Consistency of Agreements and Construction

To the extent reasonably possible, the provisions of this Agreement shall be interpreted in a manner consistent with the Settlement Agreement. Where the provisions of this Agreement are irreconcilable with the provisions of the Settlement Agreement, the provisions of the Settlement Agreement shall prevail, with the exception of Sections 2.4.5, and 2.6.1, and Article IV in its entirety, in which case this Agreement controls.

7.10    Compliance with Laws

Any and all distributions of Cimarron Trust Assets shall be in compliance with applicable laws, including, but not limited to, applicable federal and state securities laws.

7.11    Preservation of Privilege.

In connection with the rights, claims, and causes of action that constitute the Cimarron Trust Assets, any attorney-client privilege, work-product privilege, or other privilege or

32

immunity attaching to any documents or communications (whether written or oral) transferred to the Cimarron Trust shall vest in the Cimarron Trust and its representatives, and the Parties are authorized to take all necessary actions to effectuate the transfer of such privileges.

7.12    <u>No Recourse to Beneficiaries</u>.

In no event shall the Beneficiaries have any responsibility for paying any expenses, fees, and other obligations of the Cimarron Trust, and in no event shall the Cimarron Trust or the Cimarron Trustee, or any of their agents, representatives, or professionals, have recourse to the Beneficiaries therefor.

7.13    <u>Uniform Custodial Trust Act.</u>

The Cimarron Trust Agreement shall not be subject to any provision of the Uniform Custodial Trust Act as adopted by any state, now or in the future.

THE UNDERSIGNED PARTIES ENTER INTO THIS AGREEMENT

FOR THE UNITED STATES OF AMERICA

Date: _2/9/11_

ROBERT G. DREHER
Acting Assistant Attorney General
Environment and Natural Resources Division
U.S. Department of Justice
Washington, D.C. 20044

Date: _2/11/11_

PREET BHARARA
United States Attorney for the
 Southern District of New York

By:

ROBERT WILLIAM YALEN
TOMOKO ONOZAWA
JOSEPH A. PANTOJA
Assistant United States Attorneys
86 Chambers Street
New York, New York 10007
Tel: (212) 637-2722
Fax: (212) 637-2686

Date: _2|10|11_

ALAN S. TENENBAUM
National Bankruptcy Coordinator
Environment and Natural Resources Division
U.S. Department of Justice
Washington, D.C. 20044

Date: _2|10|11_

FREDERICK PHILLIPS, Attorney
Environment and Natural Resources Division
U.S. Department of Justice
Washington, D.C. 20044

34

FOR THE UNITED STATES ENVIRONMENTAL PROTECTION AGENCY

Date: 1/14/11                          By: _____
                                            CYNTHIA GILES
                                            Assistant Administrator for Enforcement
                                            and Compliance Assurance
                                            U.S. Environmental Protection Agency


Date: 1/14/11                          By: _____
                                            CRAIG KAUFMAN
                                            Attorney-Advisor
                                            U.S. Environmental Protection Agency
                                            Ariel Rios Building
                                            1200 Pennsylvania Avenue, NW
                                            Washington, DC 20460

*In re: Tronox, Inc., et al.,* Case No. 09-10156 (ALG)

35

**FOR TRONOX LUXEMBOURG S.ar.L**

Date: _____

By: _____
Michael J. Foster
Attorney-in-Fact

**FOR TRONOX INCORPORATED**

Date: _____

By: _____
Michael J. Foster
Vice President, General Counsel & Secretary

**FOR CIMARRON CORPORATION**

Date: _____

By: _____
Michael J. Foster
Director, Vice President & Secretary

**FOR SOUTHWESTERN REFINING COMPANY, INC.**

Date: _____

By: _____
Michael J. Foster
Director, Vice President & Secretary

**FOR TRANSWORLD DRILLING COMPANY**

Date: _____

By: _____
Michael J. Foster
Director, Vice President & Secretary

**FOR TRIANGLE REFINERIES, INC.**

Date: _____

By: _____
Michael J. Foster
Director, Vice President & Secretary

**FOR TRIPLE S, INC.**

Date: _____

By: _____
Michael J. Foster
Director, Vice President & Secretary

**FOR TRIPLE S ENVIRONMENTAL MANAGEMENT CORPORATION**

Date: _____

By: _____
Michael J. Foster
Director, Vice President & Secretary

**FOR TRIPLE S MINERALS RESOURCES CORPORATION**

Date: _____

By: _____
Michael J. Foster
Director, Vice President & Secretary

**FOR TRIPLE S REFINING CORPORATION**

Date: _____

By: _____
Michael J. Foster
Director, Vice President & Secretary

**FOR TRONOX LLC**

Date: _____

By: _____
Michael J. Foster
Manager, Vice President & Secretary

**FOR TRONOX FINANCE CORP.**

Date: _____

By: _____
Michael J. Foster
Director, Vice President & Secretary

**FOR TRONOX HOLDINGS, INC.**

Date: _____

By: _____
Michael J. Foster
Director
Vice President & Secretary

**FOR TRONOX PIGMENTS (SAVANNAH) INC.**

Date: _____

By: _____
Michael J. Foster
Director, Vice President & Secretary

**FOR TRONOX WORLDWIDE LLC**

Date: _____

By: _____
Michael J. Foster
Manager, Vice President & Secretary

**FOR THE STATE OF OKLAHOMA**

Date: _2 - 10 - 11_                    _Gary L. Sherrer_

GARY SHERRER
OKLAHOMA SECRETARY OF THE
ENVIRONMENT

Date: _____                    _____

STEVEN A. THOMPSON
EXECUTIVE DIRECTOR
OKLAHOMA DEPARTMENT OF
ENVIRONMENTAL QUALITY

39A

**FOR THE STATE OF OKLAHOMA**

Date: _____

                _____

                GARY SHERRER
                OKLAHOMA SECRETARY OF THE
                ENVIRONMENT

Date: 2-11-2011

                STEVEN A. THOMPSON
                EXECUTIVE DIRECTOR
                OKLAHOMA DEPARTMENT OF
                ENVIRONMENTAL QUALITY

39B

**FOR THE CIMARRON ENVIRONMENTAL RESPONSE TRUST**

The Cimarron Custodial Trustee By and through Environmental
Properties Management, LLC, not individually but solely in the
representative capacity as Trustee of the Cimarron Environmental
Response Trust

Date: <u>February 9, 2011</u>        By:    _____

Stephen M. Linnemann, P.E,
not individually but solely in the representative capacity as
President of the Trustee of the Custodial Trust

**ENVIRONMENTAL RESPONSE TRUST AGREEMENT**

**(Multistate)**

**BY AND AMONG**

**TRONOX, INC.,
TRONOX LLC,
TRONOX FINANCE CORP.,
TRONOX HOLDINGS, INC.,
TRONOX LUXEMBOURG S.AR.L,
TRONOX PIGMENTS (SAVANNAH), INC.,
TRONOX WORLDWIDE, LLC,
SOUTHWESTERN REFINING COMPANY, INC.,
TRANSWORLD DRILLING COMPANY,
TRIANGLE REFINERIES, INC.,
TRIPLE S, INC.,
TRIPLE S ENVIRONMENTAL MANAGEMENT CORP.,
TRIPLE S MINERALS RESOURCES CORP.,
TRIPLE S REFINING CORP.,
and
CIMARRON CORP.
As Settlors,**

**Greenfield Environmental Multistate Trust LLC
not individually but solely in its representative capacity
as Multistate Trustee,**

**AND**

**THE UNITED STATES OF AMERICA and
the STATES of ALABAMA, FLORIDA, GEORGIA, IDAHO, ILLINOIS,
INDIANA, IOWA, KANSAS, LOUISIANA, MISSISSIPPI, MISSOURI, NEVADA, NEW
YORK, NORTH CAROLINA, OHIO, OKLAHOMA, PENNSYLVANIA, TENNESSEE,
TEXAS, AND WISCONSIN
as Beneficiaries**

**As of February 14, 2011**

## TABLE OF CONTENTS

**ARTICLE I DEFINITIONS** ................................................................................**2**
    1.1    Definitions.........................................................................................2

**ARTICLE II THE MULTISTATE TRUST**.......................................................**7**
    2.1    Creation of and Transfer of Assets to the Multistate Trust....................7
    2.2    Objective and Purpose ........................................................................11
    2.3    Holder of Multistate Trust Assets ......................................................11
    2.4    Management of Multistate Trust Assets ..............................................12
    2.5    Work Performed and Disbursements by the Multistate Trust ..............13
    2.6    Investment and Safekeeping of Multistate Trust Assets......................13
    2.7    Insurance Policy to Cover Future Response Actions...........................15
    2.8    Access and Deed Restrictions.............................................................15
    2.9    Accounting .........................................................................................15
    2.10   Termination........................................................................................16
    2.11   Property Disposition ..........................................................................16

**ARTICLE III WORK AND DISTRIBUTIONS** ...............................................**18**
    3.1    Multistate Trust Accounts...................................................................18
    3.2    Payments by the Multistate Trust .......................................................18
    3.3    Liens by Government...........................................................................21
    3.4    Manner of Payment ............................................................................22
    3.5    Unclaimed Distributions .....................................................................22

**ARTICLE IV THE MULTISTATE TRUSTEE** ...............................................**22**
    4.1    Appointment .......................................................................................22
    4.2    Generally.............................................................................................23
    4.3    Powers.................................................................................................23
    4.4    Other Professionals.............................................................................24
    4.5    Limitation of the Multistate Trustee's Authority................................24
    4.6    Reliance by the Multistate Trust Parties .............................................24
    4.7    Compensation of the Multistate Trustee .............................................25
    4.8    Liability of Multistate Trust Parties....................................................25
    4.9    Exculpation and Indemnification ........................................................26
    4.10   Termination, Replacement, and Removal of the Multistate Trustee. ...27
    4.11   Appointment of Successor Multistate Trustees ..................................28
    4.12   No Bond ..............................................................................................29

**ARTICLE V BENEFICIARIES** .......................................................................**29**
    5.1    Beneficiaries .......................................................................................29
    5.2    Identification of Beneficiaries.............................................................29
    5.3    Non-Beneficiaries...............................................................................29
    5.4    Transfer of Beneficial Interests...........................................................30

**ARTICLE VI REPORTING AND TAXES**.......................................................**30**
    6.1    Reports ...............................................................................................30

6.2     Other ..................................................................................................................30
6.3     Reports in Support of Insurance Claims ...........................................................31
6.4     Taxes ................................................................................................................31

**ARTICLE VII MISCELLANEOUS PROVISIONS ...............................................................31**
7.1     Amendments and Waivers ................................................................................31
7.2     Tax Treatment ..................................................................................................31
7.3     Cooperation......................................................................................................32
7.4     Situs of the Multistate Trust............................................................................32
7.5     Severability ......................................................................................................32
7.6     Sufficient Notice ..............................................................................................32
7.7     Headings ...........................................................................................................33
7.8     Actions Taken on Other Than Business Day....................................................33
7.9     Consistency of Agreements and Construction...................................................33
7.10    Compliance with Laws ....................................................................................33
7.11    Preservation of Privilege..................................................................................33
7.12    No Recourse to Beneficiaries...........................................................................33
7.13    Uniform Custodial Trust Act. .........................................................................33

## ENVIRONMENTAL RESPONSE TRUST AGREEMENT

### (Multistate)

This Environmental Response Trust Agreement (the "Agreement") is made this 14th day of February, 2011, by and among TRONOX, INC. ("Tronox") and its wholly owned subsidiaries, TRONOX LLC, TRONOX FINANCE CORP., TRONOX HOLDINGS, INC., TRONOX LUXEMBOURG S.AR.L, TRONOX PIGMENTS (SAVANNAH), INC., TRONOX WORLDWIDE, LLC, SOUTHWESTERN REFINING COMPANY, INC., TRANSWORLD DRILLING COMPANY, TRIANGLE REFINERIES, INC., TRIPLE S, INC., TRIPLE S ENVIRONMENTAL MANAGEMENT CORP., TRIPLE S MINERALS RESOURCES CORP., TRIPLE S REFINING CORP., and CIMARRON CORP., as debtors and debtors in possession in the Bankruptcy Cases (defined below) (collectively, "Settlors") and Greenfield Environmental Multistate Trust LLC, not individually but solely in its representative capacity as Multistate Trustee (defined herein) of the Multistate Environmental Response Trust established hereby (the "Multistate Trust"), and the Beneficiaries (defined herein).

## R E C I T A L S:

WHEREAS, on January 12, 2009, Settlors filed voluntary petitions for relief in the Bankruptcy Court under chapter 11 of title 11 of the United States Code, 11 U.S.C. § 101 *et seq.*, as amended (the "Bankruptcy Code") in the United States Bankruptcy Court for the Southern District of New York ("Bankruptcy Court"), which cases have been jointly administered under Case No. 09-10156 (the "Bankruptcy Cases");

WHEREAS, the Settlors, the United States and the States have entered into that certain Consent Decree and Environmental Settlement Agreement lodged with the Court on November 23, 2010, and as it may be amended prior to the Effective Date (the "Settlement Agreement");

WHEREAS, the Settlement Agreement provides for the transfer of the Multistate Owned Sites to the Multistate Trust to be administered by the Multistate Trustee pursuant to this Agreement and the Settlement Agreement;

WHEREAS, the Settlement Agreement provides for the creation of four additional trusts, the Cimarron Trust, the Nevada Trust, the Savannah Trust, and the West Chicago Trust, the transfer to those trusts of the Cimarron Site, the Henderson Property, the Savannah Facility, and the West Chicago Owned Sites, respectively, and the administration of each of those trusts by the Cimarron Trustee, the Nevada Trustee, the Savannah Trustee, and the West Chicago Trustee, respectively, pursuant to the Environmental Response Trust Agreement for each trust and the Settlement Agreement;

WHEREAS, the Settlement Agreement provides for the creation of a litigation trust ("Anadarko Litigation Trust") pursuant to the Litigation Trust Agreement (defined below);

WHEREAS, in accordance with Article V of the Settlement Agreement, the Multistate Trust is established for the purposes of owning the Multistate Owned Sites, carrying out administrative and property management functions related to the Multistate Owned Sites, managing and/or funding implementation of future Environmental Actions approved by the Lead

1

Agencies with respect to those Owned Funded Sites transferred to the Multistate Trust ("Multistate Owned Funded Sites") pursuant to the Settlement Agreement and the Non-Owned Service Stations (as defined in the Settlement Agreement), paying certain future oversight costs, and ultimately selling, transferring, or otherwise disposing or facilitating the reuse of all or part of the Multistate Trust Assets, if possible, and fulfilling other obligations as set forth in the Settlement Agreement.

WHEREAS, the Multistate Trust is to be funded in the amount set forth in the Settlement Agreement;

WHEREAS, this Agreement and the Settlement Agreement govern the Multistate Trust, which is created pursuant to section 1.468B-1 *et seq.* of the Treasury Regulations promulgated under section 468B of the Internal Revenue Code (the "QSF Regulations");

WHEREAS, presuming that the Multistate Trust qualifies as a "qualified settlement fund" within the meaning of the QSF Regulations, to the extent permitted by law, the Settlors intend to elect to treat the Multistate Trust as a grantor trust pursuant to QSF Regulations; and

WHEREAS, the Multistate Trust shall be the exclusive holder of the assets described herein for purposes of the Settlement Agreement and this Agreement under 31 U.S.C. § 3713(b);

NOW, THEREFORE, in consideration of the foregoing premises and the mutual covenants and agreements contained herein and in the Settlement Agreement the Parties hereby agree as follows:

## ARTICLE I
## DEFINITIONS

1.1    Definitions.

The following terms as used in this Agreement shall have the definitions given below:

1.1.1    "Agreement" has the meaning as given in the preamble.

1.1.2    "Anadarko Litigation Trust" shall have the meaning given in the recitals to this Agreement.

1.1.3    "Anadarko Litigation Proceeds" are eighty-eight percent (88%) of the net recovery in the Anadarko Litigation, which net recovery shall be determined by subtracting from the total gross recovery in the Anadarko Litigation (1) all outstanding and anticipated payments to lead counsel of the Anadarko Litigation Trust pursuant to a separate Special Fee Arrangement; (2) all outstanding and anticipated costs and fees of the Anadarko Litigation Trust and Trustee (including but not limited to attorney's fees and Trustee fees), as set forth in the Anadarko Litigation Trust Agreement referred to in Paragraph 119 of the Settlement Agreement; and (3) the amount of the distribution referred to in Paragraph 122 of the Settlement Agreement as amended by the First Amendment to the Consent Decree and Environmental Settlement Agreement, and which

2

shall be allocated to the Governments and the Environmental Response Trusts pursuant to the Plan of Reorganization and the Settlement Agreement.

1.1.4    "<u>Bankruptcy Cases</u>" shall have the meaning given in the recitals to this Agreement.

1.1.5    "<u>Bankruptcy Court</u>" means the United States Bankruptcy Court for the Southern District of New York.

1.1.6    "<u>Beneficiary</u>" means any one of the United States and States of Alabama, Florida, Georgia,[1] Idaho, Illinois, Indiana, Iowa, Kansas, Louisiana, Mississippi, Missouri, Nevada, New Jersey, New York, North Carolina, Ohio, Oklahoma, Pennsylvania, Tennessee, Texas, and Wisconsin.

1.1.7    "<u>CERCLA</u>" means the Comprehensive Environmental Response, Compensation, and Liability Act, 42 U.S.C. §§ 9601 *et seq.*, as amended.

1.1.8    "<u>Court</u>" means the Bankruptcy Court or if the Bankruptcy Court abstains from exercising jurisdiction or is otherwise without jurisdiction over any matter arising out of this Agreement, a United States District Court having competent jurisdiction with respect to such matters.

1.1.9    "<u>Effective Date</u>" means the Effective Date as defined in the Settlement Agreement.

1.1.10    "<u>Emergency Environmental Action</u>" shall have the meaning provided in Section 3.2.1.

1.1.11    "<u>Environmental Action</u>" means any and all environmental activities authorized or required under Environmental Law that occur after the Effective Date and that are related to any of the Multistate Owned Sites and certain Non-Owned Sites (for which the Multistate Trust will be performing environmental activities as provided herein), including but not limited to response or remedial actions, removal actions, corrective action, closure, or post-closure care, reclamation, investigations, studies, remediation, interim actions, final actions, emergency actions, water treatment, implementation of engineered structures and controls, monitoring, repair and replacement of engineered structures, monitoring equipment and controls, operation and maintenance, implementation, operation and maintenance of institutional controls, coordination and integration of reuse and remedial efforts and initiatives (including, without limitation, multi-stakeholder communications), and, if required, long-term stewardship and perpetual custodial care activities.  "Environmental Actions" also include the above environmental activities relating to the migration of hazardous substances emanating from the Multistate Owned Sites and certain Non-Owned Sites.  For the avoidance of doubt, "Environmental Actions" shall not include natural resource assessment or restoration.

---

[1] All references to "Georgia" or the "State of Georgia" are limited to the Georgia Department of Natural Resources, Environmental Protection Division.

1.1.12 "<u>Environmental Costs</u>" means the costs and expenses of implementing, managing, and complying with all Environmental Actions, including, without limitation, related Trustee fees and all reasonable consulting and legal fees associated with such activities, and the costs of payment of certain oversight costs of any Beneficiary with respect to a Multistate Owned Site and the certain Non-Owned Service Stations.

1.1.13 "<u>Environmental Information</u>" means environmental reports, audits, analyses, records, studies and other documents containing information prepared by or otherwise in the possession, custody, or control of Settlors or their technical consultants that are based on or otherwise reflect information related to environmental activities.

1.1.14 "<u>Environmental Law</u>" means, whenever in effect, all federal, tribal, state and local statutes, regulations, ordinances and similar provisions having the force or effect of law; all judicial and administrative orders and determinations and all common law concerning public health and safety, worker health and safety, pollution or protection of the environment, including, without limitation, the Atomic Energy Act ("AEA"), CERCLA, Clean Water Act ("CWA"), Clean Air Act ("CAA"), Emergency Planning and Community Right-to-Know Act ("EPCRA"), Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA"), Resource Conservation and Recovery Act ("RCRA"), Safe Drinking Water Act ("SDWA"), Toxic Substances Control Act ("TSCA"), and any similar tribal, state or local environmental protection laws.

1.1.15 "<u>Funding</u>" shall have the meaning given in Section 2.1.2 hereof.

1.1.16 "<u>Internal Revenue Code</u>" means the Internal Revenue Code of 1986, as amended.

1.1.17 "<u>Lead Agencies</u>" shall be the designated Government agencies identified in Paragraph 12 of the Settlement Agreement.

1.1.18 "<u>Litigation Trust Agreement</u>" means the agreement establishing the Anadarko Litigation Trust.

1.1.19 "<u>Multistate Owned Funded Sites</u>" shall have the meaning given in the Recitals.

1.1.20 "<u>Multistate Owned Sites</u>" means all the rights, titles, and interests in and to, including, without limitation, all of the fee ownership in, all appurtenances, rights, easements, rights-of-way, mining rights (including unpatented mining claims, mill site claims, and placer claims), mineral rights, mineral claims, appurtenant groundwater rights, associated surface water rights, claims, and filings, permits, licenses, third-party warranties and guaranties for equipment or services to the extent transferable under bankruptcy law, or other interests (including without limitation all fixtures, improvements, personal property (tangible and intangible) and equipment located thereon as of the Effective Date) related to all portions of the sites listed in Exhibits "A-1," "A-2," "A-3," and "A-4" to this Agreement.

4

1.1.21 "<u>Multistate Trust</u>" means the trust established pursuant to this Agreement.

1.1.22 "<u>Multistate Trust Account</u>" shall have the meaning given in Section 2.1.4 hereof.

1.1.23 "<u>Multistate Trust Administrative Account</u>" means the Multistate Trust Account established to fund the payment of real estate taxes, income taxes (to the extent applicable), insurance, maintenance costs, and other fees, costs, and expenses, including the fees and costs of the Multistate Trustee incurred in connection with the administration of the Multistate Trust, but excluding any expenses incurred in implementing, managing, or performing Environmental Actions.

1.1.24 "<u>Multistate Trust Assets</u>" means (a) those assets and properties, including the Funding, the Multistate Owned Sites, and the Transferred Contracts, to be transferred to the Multistate Trust pursuant to the Settlement Agreement and (b) such other assets acquired, earned, or held by the Multistate Trust from time to time pursuant to this Agreement, the Settlement Agreement, or an order of the Court including, but not limited to, the right to draw on the Letters of Credit, Bonds, and Surety instruments etc. as described in Section 2.1.2.2, below.

1.1.25 "<u>Multistate Trust Environmental Cost Account</u>" shall have the meaning given in Section 2.1.4.

1.1.26 "<u>Multistate Trust Parties</u>" under this Agreement and the Settlement Agreement means, collectively, the Multistate Trust, the Multistate Trustee, and the Multistate Trustee's, and its corporate parent's (Greenfield Environmental Trust Group, Inc.'s) shareholders, officers, directors, members, managers, principals, employees, consultants (except for the Consultant(s) who may be retained to implement future Environmental Actions, as set forth in Section 4.1.2), agents or other professionals or representatives employed by the Multistate Trust or Multistate Trustee.

1.1.27 "<u>Multistate Trust Proceeds</u>" means the net proceeds of any liquidation, sale, lease, recovery or other disposition of or other proceeds in respect of the Multistate Trust Assets.

1.1.28 "<u>Multistate Trust Work Account</u>" shall have the meaning given in Section 2.1.4.

1.1.29 "<u>Multistate Trustee</u>" means the trustee of the Multistate Trust.

1.1.30 "<u>Non-Lead Agency</u>" shall have the meaning given in the Settlement Agreement.

1.1.31 "<u>Non-Owned Service Stations</u>" means service stations not owned by Settlors with ongoing cleanup obligations located in Alabama, Arkansas, Florida, Georgia, Illinois, Indiana, Iowa, Kansas, Kentucky, Louisiana, Michigan, Minnesota, Mississippi, Missouri, Nebraska, New Mexico, North Dakota, Ohio, Oklahoma, South

5

Dakota, Tennessee, Texas, Virginia and Wisconsin listed in Exhibit "A-5" to this Agreement.

1.1.32 "Non-Owned Sites" means those Sites set forth and defined in Attachment B to the Settlement Agreement, and any and all contiguous and non-contiguous areas onto which hazardous substances from such Site may have migrated.

1.1.33 "Other Environmental Trusts" means the Cimarron Trust, the Nevada Trust, the Savannah Trust, and the West Chicago Trust.

1.1.34 "Parties" means the Settlors, the Multistate Trustee, and the Beneficiaries.

1.1.35 "Person" means any individual, corporation, limited liability company, partnership, joint venture, association, joint-stock company, trust, charitable foundation, unincorporated organization, government or any agency or political subdivision thereof or any other entity.

1.1.36 "Plan Administrator" means the administrator of any plan of reorganization confirmed by an order of the Bankruptcy Court in the Bankruptcy Cases.

1.1.37 "Plan of Reorganization" shall mean the Plan of Reorganization for the Settlors.

1.1.38 "Real Property Information" shall mean documents in Settlors' possession related to title, easements and other real property information relating to an Owned Site.

1.1.39 "Reorganized Tronox" means Tronox Incorporated, Tronox Worldwide LLC, Tronox LLC, non-Settlor foreign subsidiaries of the Settlors and such other Settlors and/or one or more newly organized successors, or any successor thereto, by merger, consolidation or otherwise, on or after the effective date of the Plan of Reorganization.

1.1.40 "Settlement Agreement" shall have the meaning given in the recitals.

1.1.41 "Settlors" shall have the meaning given in the preamble.

1.1.42 "States" means the States of Alabama, Florida, Georgia, Idaho, Illinois, Indiana, Iowa, Kansas, Louisiana, Mississippi, Missouri, Nevada, New Jersey, New York, North Carolina, Ohio, Oklahoma, Pennsylvania, Tennessee, Texas, and Wisconsin.

1.1.43 "Superfund" means the "Hazardous Substance Superfund" established by 26 U.S.C. § 9507 or, in the event such Hazardous Substance Superfund no longer exists, any successor fund or comparable account of the Treasury of the United

States to be used for removal or remedial actions to address releases or threats of releases of hazardous substances.

      1.1.44 "<u>Transferred Contracts</u>" means those contracts and agreements relating to the Multistate Owned Sites listed in Exhibit "B" to this Agreement.

      1.1.45 "<u>United States</u>" means the United States of America on behalf of agencies and departments named in the Settlement Agreement.

      1.1.46 "<u>US EPA</u>" means the United States Environmental Protection Agency and any successor departments or agencies of the United States.

All Capitalized terms not defined above shall have the meanings provided in the Settlement Agreement.

ARTICLE II
<u>THE MULTISTATE TRUST</u>

2.1    <u>Creation of and Transfer of Assets to the Multistate Trust</u>

      2.1.1   Pursuant to the Settlement Agreement, the Parties hereby establish, on behalf of the Beneficiaries named herein, and Tronox Worldwide LLC hereby transfers, assigns, and delivers to, the Multistate Trust, or to the Multistate Trustee, not individually but solely in its representative capacity as Multistate Trustee, if the law of the state in which the property to be transferred is situated prohibits a trust entity from holding such title, on behalf of the Beneficiaries, all of Settlors' right, title and interest in and to the Multistate Owned Sites and Multistate Trust Assets. Settlors shall retain no ownership or other residual interest whatsoever with respect to the Multistate Trust or the Multistate Owned Sites. The transfer of ownership by Tronox Worldwide LLC of the Multistate Trust Assets shall be a transfer of all of the Settlors' right, title and interests therein, and the transfer (i) shall be as is and where is, with no warranties of any nature; (ii) shall be free and clear of all claims, liens and interests against the Settlors (except for liens arising under Section 107 of CERCLA against the sites in Jacksonville, Florida and Navassa, North Carolina), including liens for the payments of monetary claims, such as property taxes, or other monetary claims asserted or that could have been asserted in the bankruptcy proceeding, but shall remain subject to any existing in rem claims that do not secure payment of monetary claims (such as easements or deed restrictions); (iii) shall be subject to any rights of the Governments under the Settlement Agreement; and (iv) shall be accomplished by quitclaim deed, in a form substantially similar to the quitclaim deed attached as Exhibit C to the Settlement Agreement, and/or personal property bill of sale without warranty, with all such conveyance documents to be agreed to in form by the Settlors and the Multistate Trustee, provided that in no event shall the conveyance include any warranty by the grantor by virtue of the grant document or statutory or common law or otherwise.  Settlors and Reorganized Tronox hereby disclaim any and all express or implied representations or warranties, including any representations or warranties of any kind or nature, express or implied, as to the condition, value or quality of such assets or other property, and specifically disclaim any representation or warranty

7

of merchantability, usage, suitability or fitness for any particular purpose with respect to such assets or other property, any part thereof, the workmanship thereof, and the absence of any defects therein, whether latent or patent, it being understood that such assets are being acquired "as is, where is," and in their condition as of the Effective Date.  The grantee for each such deed and personal property bill of sale shall be the Multistate Trust by and through Greenfield Environmental Multistate Trust LLC, not individually but solely in its representative capacity as Multistate Trustee, or if the law of the state in which the property to be transferred is situated prohibits a trust entity from holding such title, Greenfield Environmental Multistate Trust LLC, not individually but solely in its representative capacity as Multistate Trustee. Settlors and Reorganized Tronox, as applicable, will reasonably cooperate with the Governments and the Multistate Trustee to deliver to the title company (which will cause to be recorded in the appropriate real property records) the transfer documents as soon as reasonably practicable, but not to exceed 30 days after the Effective Date.  Settlors shall pay the recording costs and transfer fees to the title company relating to the title transfers. Settlors shall pay to the applicable tax authorities on or prior to the Effective Date all real property taxes and assessments then due and relating to the Multistate Owned Sites due on or before the Effective Date. Settlors and the Multistate Trust shall prorate the real property taxes and assessments accruing to or becoming a lien on the Multistate Owned Sites during the calendar year of the Effective Date, and Settlors shall have paid to the Multistate Trust their pro-rata share of such real property taxes and assessments as of the Effective Date. If the actual bills for such real property taxes have not been issued, then such proration shall be based on an amount equal to such real property taxes for the prior year or tax period, which shall constitute a final proration and not be subject to further adjustment. As of the Effective Date, the Multistate Trust shall be responsible for paying all real property taxes first coming due following the Effective Date relating to the Multistate Owned Sites.  Additionally, Settlors shall pay to the Multistate Trust on the Effective Date all costs of goods and services, including, but not limited to, utilities, water/sewer bills, wages, maintenance, and materials, accruing to the Multistate Owned Sites due on or before the Effective Date.  Settlors shall execute, or cause to be executed, and record, if necessary, as soon as practicable after the Effective Date, all necessary releases of any liens or security interests held by any Settlors against any Multistate Owned Sites.  The Multistate Trust shall not be responsible for, and Settlors shall be responsible for, in accordance with the Plan of Reorganization and applicable bankruptcy law, any invoices, statements, and amounts relating to the Multistate Owned Sites that relate to the period prior to the Effective Date even if such items are issued after the Effective Date or are not known of at the time of the Effective Date.   The Multistate Trust hereby accepts and agrees to hold the Multistate Trust Assets in the Multistate Trust for the benefit of the Beneficiaries for the purposes described in Section 2.2 below, subject to the terms of the Settlement Agreement, this Agreement, and any applicable orders of the Court.

2.1.2   Transfer of Funding and Consideration to the Multistate Trustee

    2.1.2.1 The Funding. On the Effective Date, the Settlors shall cause to be transferred to or at the direction of the Multistate Trustee cash in the amount of $97,771,073 which constitutes the "Funding."

2.1.2.2 <u>Financial Instruments.</u>  On the Effective Date, Settlors shall transfer the 100% cash value of the following existing financial instruments to the Multistate Trust Environmental Cost Accounts:

a.      The Encroachment Permit bond for the City of Louisville, Department of Public Utilities, in the amount of $10,000, cash funds to be transferred to the Environmental Cost Account for Owned Service Stations, unless prior to the Effective Date Settlors provide a statement that the Bond is no longer necessary and the City of Louisville releases the Bond.

b.      The Individual Utility Permit bond for the Illinois Department of Transportation, in the amount of $2,000, cash funds to be transferred to the Environmental Trust Cost Account for Non-Owned Service Stations.

c.      The Right of Way Bond for the City of Jacksonville, Department of Public Works, in the amount of $5,000, cash funds to be transferred to the Multistate Trust Environmental Cost Account for the Jacksonville Terminal Site.

d.      The surety bond relating to the Permit to Drill Ground Water Monitoring Wells issued by the City of Springfield, Missouri, in the amount of $19,500, cash funds to be transferred to the Multistate Trust Environmental Cost Account for the Springfield Site.

e.      The Sauget Site Standby Trust Fund No. 3126 (JP Morgan Bank, Account No. 380744), in the amount of $50,000, cash funds to be transferred to the Multistate Trust Environmental Cost Account for the Sauget Site.

2.1.2.3 <u>Insurance</u>. On the Effective Date, to the extent applicable, available insurance policies and other rights to reimbursement or contribution for response actions (whether contractual or otherwise) held by the Settlors as of the Effective Date. (The Funding, Financial Instruments and Insurance shall be collectively referred to as the "Funding and Consideration".)

2.1.2.4 <u>Anadarko Litigation Proceeds</u>. The Anadarko Litigation Trust, which shall receive a portion of Settlors' right to receive the Anadarko Litigation Proceeds, shall transfer 25.419% of the Anadarko Litigation Proceeds to the Multistate Trust pursuant to the terms of the Plan of Reorganization, the Litigation Trust Agreement, and the Settlement Agreement. Additionally, the Multistate Trust shall receive 1.155% of the Anadarko Litigation Proceeds, to be deposited in the Multistate Trust Administrative Account.

9

2.1.3    Upon transfer of the Multistate Owned Sites and the Funding and Consideration on the Effective Date, the Settlors shall have no interest in, or with respect to, any Multistate Trust Assets, and neither the Settlors, Reorganized Tronox, nor any successors thereto, shall have any further obligation to provide funding to the Multistate Trust.

2.1.4    <u>Creation of the trust accounts</u>.    Upon receipt of the Multistate Owned Sites and the Funding and Consideration, the Multistate Trustee shall create segregated trust accounts (each a "Multistate Trust Environmental Cost Accounts") within the Multistate Trust for each of the Multistate Owned Funded Sites listed in Subparagraphs 10(f)(ii)-(xxvii) of the Settlement Agreement, and a segregated trust account (also a "Multistate Trust Work Account") for the Non-Owned Service Stations listed in Subparagraph 10(f)(xxviii) of the Settlement Agreement.    The purpose of a Multistate Trust Environmental Cost Account for a Multistate Owned Funded Site shall be to provide funding for future Environmental Actions and certain future oversight costs of the Governments with respect to that Multistate Owned Funded Site.    The purpose of the Multistate Trust Work Account for the Non-Owned Service Stations shall be to provide funding for future Environmental Actions and certain future oversight costs of the Governments with respect to Non-Owned Service Stations.    Funding from a Multistate Trust Environmental Cost Account for any Multistate Owned Funded Site may not be used for any other Multistate Owned Site or Non-Owned Service Station, except as provided in Sections 2.4.3 and 2.4.4, below.    The initial funding of each of the Multistate Trust Accounts shall be as set forth in the Settlement Agreement. The Multistate Trustee shall also set aside the funding provided for a separate Multistate Trust Administrative Account, which account shall not include any of the Multistate Owned Sites. The separate accounts are referred to in this Agreement individually as a "Multistate Trust Account" and collectively as the "Multistate Trust Accounts." Subject to 2.6, the income, gains, and losses from any investment of the Multistate Trust Assets shall be allocated, paid and credited to, and/or deducted from, such Multistate Trust Account.

2.1.5    Without limiting the foregoing, the Multistate Trust shall at all times maintain at least one Multistate Trust Environmental Cost Account for each of the Multistate Owned Funded Sites to fund Environmental Costs for that Multistate Owned Funded Site. Funds designated by the Settlement Agreement for a particular Multistate Owned Funded Site shall be held and distributed from its respective Multistate Trust Environmental Cost Account as set forth therein, and Funding from a Multistate Trust Environmental Cost Account may not be used for another Multistate Owned Funded Site except as otherwise expressly provided by and in accordance with Section 2.4.3 of this Agreement. Without limiting the foregoing, the Multistate Trust shall at all times maintain at least one Multistate Trust Administrative Account.

2.1.6    Each Multistate Trust Account may be divided into such number of trust subaccounts dedicated for specific uses as may be deemed necessary in the sole discretion of the Multistate Trustee (each, a "Trust Subaccount") to comply with the terms of, and implement, the Settlement Agreement and this Agreement.

2.1.7   For all federal income tax purposes, the Multistate Trustee and Settlors shall treat the transfer of the Multistate Trust Assets by Tronox Worldwide LLC to the Multistate Trust as a transfer to a qualified settlement fund pursuant to section 468B of the Internal Revenue Code and the QSF Regulations. The Multistate Trustee shall at all times seek to have the Multistate Trust treated as a "qualified settlement fund" as that term is defined in the QSF Regulations.   The Court shall retain continuing jurisdiction over the Multistate Trust and Multistate Trust Accounts sufficient to satisfy the requirements of the QSF Regulations.   The Multistate Trustee shall cause taxes, if any, imposed on the earnings of the Multistate Trust to be paid out of such earnings and shall comply with all tax reporting and withholding requirements imposed on the Multistate Trust under applicable tax laws.   The Multistate Trustee shall be the "administrator" of the Multistate Trust pursuant to Treasury Regulation section 1.468B-2(k)(3).   To the extent the Settlors  elect to treat the Multistate Trust as a grantor trust pursuant to Treasury Regulation section 1.468B-1(k)(1), the Multistate Trustee will reasonably cooperate with such election at Tronox's cost.

2.2     Objective and Purpose

2.2.1   The exclusive purposes and functions of the Multistate Trust are to: (i) own the Multistate Owned Sites; (ii) carry out administrative and property management functions related to the Multistate Owned Sites; (iii) manage and/or fund implementation of future Environmental Actions approved by the Lead Agencies with respect to the Multistate Owned Funded Sites and the Non-Owned Service Stations; (iv) fulfill other obligations as set forth in the Settlement Agreement, including making distributions in accordance with the terms of this Agreement and the Settlement Agreement; (v) pay certain future oversight costs (but not those related to the Non-Owned Service Stations); and (vi) ultimately sell, transfer, or otherwise dispose or facilitate the reuse of all or part of the Multistate Trust Assets, if possible, all as provided herein with no objective or authority to engage in any trade or business.   The performance by the Multistate Trustee of its duties under this Agreement, including but not limited to the sale, lease or other disposition of some or all of a Multistate Owned Site and/or  Multistate Owned Assets, shall not be considered to be the Multistate Trustee's engaging in a trade or business.

2.2.2   The Multistate Trust is established pursuant to this Agreement and the Settlement Agreement and approved by the Bankruptcy Court for the sole purpose of resolving claims asserting environmental liabilities of Settlors with respect to the Multistate Owned Sites and Non-Owned Service Stations. The Bankruptcy Court shall retain continuing jurisdiction over the Multistate Trust. The Multistate Trust satisfies all the requirements of, and is intended by the Parties to be classified as, a qualified settlement fund pursuant to the QSF Regulations.

2.3     Holder of Multistate Trust Assets

The Multistate Trust shall be the exclusive holder of the Multistate Trust Assets and Multistate Trust Accounts described herein for purposes of 31 U.S.C. § 3713(b).

11

2.4    Management of Multistate Trust Assets

   2.4.1    Consistent with this Agreement and the Settlement Agreement, the Multistate Trustee shall use the Multistate Trust Environmental Cost Account for each of the Multistate Owned Funded Sites to fund future Environmental Actions and certain future oversight costs approved by the Lead Agency pursuant to applicable Environmental Law with respect to that Multistate Owned Funded Site.  The Multistate Trustee shall use the Multistate Trust Administrative Account to fund the Administrative Costs of the Multistate Trust that have been approved by the United States.

   2.4.2    The Multistate Trustee may enter into a consent decree, consent order, or similar administrative agreement with the United States and/or a State in which a Multistate Owned Funded Site is located, and may perform work pursuant to Unilateral Administrative Orders issued by US EPA, to facilitate implementation of this Section with respect to such Multistate Owned Funded Site to the extent of available funding for such Site in accordance with this Agreement.

   2.4.3    After the United States and a State have confirmed to the Multistate Trustee that all final actions have been completed, and all final costs have been disbursed for all Multistate Owned Funded Sites in that State, any funds remaining in the Multistate Trust Environmental Cost Accounts for all Multistate Owned Funded Sites in that State shall be transferred in the following order: (i) first, in accordance with instructions provided by the United States Department of Justice in writing after consultation with other States and the Multistate Trustee, to the Multistate Trust Administrative Cost Account, or to other Multistate Trust Environmental Cost Accounts for one or more Multistate Owned Funded Sites in one or more States, or to the Multistate Trust Work Account for the Non-Owned Service Stations, if there are remaining actions to be performed and a need for additional funding; (ii) second, in accordance with instructions to be provided by the United States Department of Justice after consultation with other States and after payment of all Multistate Trustee fees, to the Nevada Trust Environmental Cost Account, any of the West Chicago Trust Environmental Cost Accounts or West Chicago Trust Work Accounts, the Savannah Trust Environmental Cost Account, or any of the Cimarron Trust Environmental Cost Accounts if there are Environmental Actions to be performed and a need for additional trust funding, with the allocation among such Environmental Cost Accounts to be determined by the projected shortfall of performing such remaining Environmental Actions; (iii) third, to Non-Owned Sites with a need for additional funding beyond the distributions received from the Anadarko Litigation Proceeds in accordance with written instructions provided by the United States Department of Justice after consultation with other States; and (iv) fourth, to the Superfund.

   2.4.4    The United States and any of the States, after consulting with the Multistate Trustee, may agree in writing at any time after the Effective Date that, based on new information about the estimated cost of cleanup or the assumption of liability by a buyer or other party for one or more Multistate Owned Funded Sites in that State, the funding for one or more Multistate Owned Funded Sites is more than is projected by the Lead Agency for that Site to be needed.  In such event, the United States Department of

Justice may instruct in writing after consultation with the State and the Multistate Trustee that such excess funding be transferred first, to one or more of the other Multistate Trust Accounts in the same State established under the Settlement Agreement if there are remaining actions to be performed and with a need for additional trust funding, second, to one or more of the other Multistate Trust Accounts, including, but not limited to, the Multistate Administrative Cost Account, established under the Settlement Agreement if there are remaining actions to be performed and with a need for additional trust funding or, to the extent there are no such remaining actions, as described in clauses (ii) – (iv) in Section 2.4.3.

       2.4.5   Annually, beginning with the first year after the Effective Date, the Multistate Trustee shall provide the United States and the States with an update of anticipated future Administrative Costs of the Multistate Trust.  The United States Department of Justice may thereafter instruct in writing after consultation with the States and the Multistate Trustee that any conservatively projected surplus funding in the Multistate Trust Administrative Account be transferred to one or more of the other Multistate Trust Accounts established under the Settlement Agreement if there are remaining actions to be performed and with a need for additional trust funding or, to the extent there are no such remaining actions, as described in clauses (ii) – (iv) in Section 2.4.3.

2.5    <u>Work Performed and Disbursements by the Multistate Trust</u>

Payments from the Multistate Trust shall be made as provided in accordance with Subparagraphs 12(b)-(d) of the Settlement Agreement.

2.6    <u>Investment and Safekeeping of Multistate Trust Assets</u>

       2.6.1   The Multistate Trust Assets, until sold as provided herein and in the Settlement Agreement, shall be held in trust and segregated. All interest and other amounts earned in a Multistate Trust Account shall be retained in the respective Multistate Trust Account and used only for the same purposes as the principal in that account as provided in this Agreement and the Settlement Agreement, subject to any reallocation approved by the Governments in accordance with the terms of this Agreement and the Settlement Agreement.  The Multistate Trustee shall have no liability for interest or producing income on any moneys received by the Multistate Trust hereunder and held for distribution or payment as provided in this Agreement, except as such interest or amounts shall actually be received by the Multistate Trust. Investments of any moneys held by the Multistate Trust shall be administered in a manner consistent with the standards and requirements applicable to a trustee in connection with a Chapter 7 liquidation, except as provided in this Section 2.6.1, and further, with the purpose of deriving a reasonable income, from the money pending periodic distributions in accordance with Article III hereof, taking into account the need for the safety and liquidity of principal required by the purposes of the Multistate Trust, and not of speculating or carrying on of any business for profit or derivation of gains therefrom. However, the right and power of the Multistate Trust to invest and reinvest the Multistate Trust Assets, the Multistate Trust Proceeds, or any income earned by the Multistate Trust,

shall be limited to the right and power to invest and reinvest any part or all of such assets (pending periodic distributions in accordance with Article III hereof) in the following investment vehicles, provided that at least 75% (and, at the Trustee's discretion, up to 100%) of the funds in each Multistate Trust Account shall, at any given time, be invested in categories (1) and/or (2):

(1) marketable obligations issued by the United States of America or an agency thereof;

(2) certificates of deposit with a domestic office of any national or state bank or trust company organized under the laws of the United States of America or any state therein and having capital, surplus, and undivided profits of at least $750,000,000 or in such institutions not meeting this specified capital requirement to the extent that the deposits are federally insured;

(3) no-load mutual funds;

(4) a diversified portfolio of equities traded on a recognized national exchange that meet the standards for publicly listed companies;

(5) a diversified portfolio of bonds. The overall average rating of the portfolio shall have a rating of Double A or better, with no individual bond rated below A, exclusive of any bond insurance;

(6) money market funds;

(7) any other investment vehicle approved in writing by USDOJ and any applicable State Lead Agency.

The Multistate Trustee shall consult initially and from time to time with the Beneficiaries regarding the nature and allocation of investments in the Multistate Trust Accounts. The Multistate Trustee shall be under no liability for interest or producing income on any moneys received by the Multistate Trust hereunder and held for distribution or payment as provided in this Agreement, except as such interest or income shall actually be received by the Multistate Trust. The Beneficiaries expressly agree that the Multistate Trustee shall have satisfied applicable standards and requirements and any duty to diversify by investing the Multistate Trust Assets in categories (1), (2), and/or (5) above.

2.6.2    The Multistate Trustee is expressly prohibited from commingling Multistate Trust Accounts, provided that funds in separate Multistate Trust Accounts may be commonly managed, may be invested in common instruments, and may be aggregated with other funds for investment purposes so long as they remain accounted for separately. Funds provided for administrative expenses can be held in one or more separate accounts.

2.6.3    Nothing in this Section shall be construed as authorizing the Multistate Trustee to cause the Multistate Trust to carry on any business or to divide the

gains therefrom, including without limitation, the business of an investment company, a company "controlled" by an "investment company," required to register as such under the Investment Company Act of 1940, as amended. The sole purpose of this Section 2.6 is to authorize the investment of the funds in the Multistate Trust Accounts or any portions thereof as may be reasonably prudent pending use of the proceeds for the purposes of the Multistate Trust.

2.6.4   The Multistate Trust Parties shall not incur any liability for following any written direction or order to act (or to refrain to act) from any Beneficiary so long as such written direction is not inconsistent with this Agreement and the Settlement Agreement.

2.7    Insurance Policy to Cover Future Response Actions

The Multistate Trustee may investigate the possible purchase of an insurance policy to cover the cost of future Environmental Actions at one or more of the Multistate Owned Sites, only at the direction of the United States and the State(s) in which the relevant Multistate Owned Site(s) are located. If, and only if, the United States and the State(s) in which the relevant Multistate Owned Sites are located unanimously direct the Multistate Trustee in writing to purchase such insurance, shall the Multistate Trustee use Multistate Trust Assets to purchase such insurance. Costs associated with all other insurance coverage shall be subject to the approval of the United States only.

2.8    Access and Deed Restrictions

The Multistate Trustee shall provide the United States and the State in which the Owned Site is located and their representatives and contractors access to all portions of the Sites that the Multistate Trust owns at all reasonable times for the purposes of conducting Environmental Actions at or near the Multistate Owned Sites. The Multistate Trustee shall implement any institutional controls or deed restrictions requested by the Governments with respect to any of the Multistate Owned Sites. The Multistate Trustee shall execute and record with the appropriate recorder's office any easements or deed restrictions requested by the Governments for restrictions on use of the Multistate Owned Sites in order to protect public health, welfare or safety or the environment or ensure non-interference with or protectiveness of any action. Any existing easements or deed restrictions of record as to any Multistate Owned Site prior to the Effective Date of the Settlement Agreement shall survive the Settlement Agreement. The Multistate Trustee shall abide by the terms of any institutional controls or deed restrictions in place or of record as to any Multistate Owned Site; however, nothing herein shall create any personal liability for Trustee's failure to abide by any institutional controls of which Trustee is unaware.

2.9    Accounting

The Multistate Trustee shall maintain proper books, records, and accounts relating to all transactions pertaining to the Multistate Trust, and the assets and liabilities of the Multistate Trust in such detail and for such period of time as may be necessary to enable the Multistate Trustee to make full and proper accounting in respect thereof in accordance with Article VI

below and to comply with applicable provisions of law and good accounting practices. Except as otherwise provided herein or by the Settlement Agreement, the Multistate Trustee shall not be required to file any accounting or seek approval of the Court with respect to the administration of the Multistate Trust, or as a condition for making any payment or distribution out of the Multistate Trust Assets. Beneficiaries shall have the right upon fourteen (14) days' prior written notice delivered to the Multistate Trustee to inspect such books and records.

2.10    Termination

Consistent with the terms of the Settlement Agreement, the Multistate Trustee shall not unduly prolong the duration of the Multistate Trust and shall at all times endeavor to resolve, settle, adjudicate, or otherwise dispose of all claims against Multistate Trust Assets as soon as practicable under the circumstances, and to effect the distribution of Multistate Trust Assets and other receipts relating thereto to the Beneficiaries and the others who receive distributions hereunder in accordance with the terms hereof, and to terminate the Multistate Trust as soon as practicable consistent with this Agreement and the Settlement Agreement.

2.11    Property Disposition

2.11.1 The United States, the State in which the relevant Multistate Owned Site is located, or a Government that is a designee thereof, may at any time propose in writing to take ownership of any of the Multistate Owned Sites or any part thereof. Any such proposed transfer and the terms thereof are subject to approval in writing by US EPA and the State (after consultation with the Multistate Trustee) in which the Multistate Owned Site is located. However, neither the United States nor any State shall be required to accept an ownership interest in remaining properties upon termination of the Multistate Trust. Except for the Multistate Owned Funded Sites located in Navassa, North Carolina ("Navassa Site") and Texarkana, Texas ("Texarkana Site"), the Multistate Trustee may, at any time, seek the approval of US EPA and the State in which the relevant Multistate Owned Site is located for the sale, lease, gift, or other disposition of all or part of a Multistate Owned Site. With respect to the Navassa Site, the Multistate Trustee shall seek the approval of US EPA, and the natural resource trustees (the Navassa Trustee Council, consisting of Department of the Interior, National Oceanic and Atmospheric Administration, and the State of North Carolina) concerning the sale, lease, gift, or other disposition of all or part of the Navassa Site. With respect to the Texarkana Site, the Multistate Trustee shall seek the approval of US EPA, and the natural resource trustees for the Texarkana Site (the Texarkana Trustee Council, consisting of Department of the Interior and the State of Texas) concerning the sale, lease, gift, or other disposition of all or part of the Texarkana Site. For sites without Environmental Cost Accounts, the Trustee's proposal of any sale, lease, gift, or other disposition is subject solely to approval of US EPA and the State in which the site is located. The "net proceeds" of any sale, lease, or other disposition of all or part of a Multistate Owned Site shall mean proceeds of any such sale, lease, or other disposition remaining after reimbursement of the Multistate Trust Administrative Account, or other Multistate Trust Account, as appropriate, of all costs incurred facilitating such sale, lease, or other disposition. Except as provided in paragraphs 2.11.2, 2.11.3, and 2.11.4, below, distribution of the net proceeds of such sale, lease, or other disposition, shall be as follows: (i) first, to the extent

16

additional Environmental Actions are required with respect to that Multistate Owned Site, to that Site's Multistate Trust Environmental Cost Account, Trustee to create such account, as appropriate, where one does not already exist; and (ii) second, 10% of the net proceeds shall be distributed to the Multistate Trust Administrative Account, and the remaining 90% shall be distributed among the Multistate Owned Funded Sites requiring additional funding for ongoing or future Environmental    Actions pursuant to the Anadarko Litigation allocations set forth in Section XII of the Settlement Agreement

       2.11.2  Subject to the approval of US EPA and the State (and subject to the additional approval of the Navassa Trustee Council or the Texarkana Trustee Council, for the Navassa Site and the Texarkana Site, respectively), the Multistate Trustee may propose a sale, lease, gift or other disposition of a Multistate Owned  Site that includes funding from, or the retention of some portion of liability by, the respective Multistate Trust Environmental Cost Account and/or the Multistate Trust Administrative Account, provided that the Trustee reasonably believes that the net effect of any proposed sale, lease or disposition is to lessen the total financial obligations and liabilities that would otherwise be incurred in the absence of any such sale, lease, or disposition.  In the event of any approved sale or lease or other disposition under this paragraph, any net proceeds from the sale or lease or other disposition, as defined in Section 2.11.1, above, shall be paid to the Multistate Trust Environmental Cost Account for that Multistate Owned Site and/or the Multistate Trust Administrative Account in a proportion approved by US EPA and the State in writing.

       2.11.3  The Multistate Trustee will make it a first priority to ensure that each State with service stations obtains some funding to meet requirements in each State for service station investigations and cleanup.  No more than 10% of the funds in the Multistate Trust Environmental Cost Account for Owned Service Stations shall be expended on a single service station, provided, however, that this limitation may be overridden where all Owned Service Stations have been studied and the Multistate Trustee determines in its judgment after consultation with the United States that known facts warrant overriding the limitation.

       2.11.4  Proceeds from the sale of any Owned Service Station in a given State shall be placed in a segregated sub-account of the Multistate Trust Environmental Cost Account for Owned Service Stations dedicated solely to Environmental Actions at service stations in that State, so long as any Owned Service Stations in that State require additional funding for Environmental Action.

       2.11.5  Any funds remaining in the Multistate Trust Environmental Cost Account for Owned Service Stations upon completion of all Environmental Actions at all Owned Service Stations shall be distributed in accordance with Section 2.11.1 (ii), above.

       2.11.6  The Multistate Trustee shall hold mill site claims and placer claims specifically identified by Settlors consistent with the 1872 Mining Law, 30 U.S.C. § 22 et seq., and the Federal Land Policy and Management Act, 43 U.S.C. § 1701 et seq.  Any actions by the Multistate Trustee on property administered by any federal agency can only be taken after the written concurrence of the federal agency.

2.11.7 The parties agree that the rule against perpetuities does not apply to the Multistate Trust, but to the extent that any rule against perpetuities or a rule governing or limiting vesting, accumulations, the suspension of alienation, or the like shall be deemed applicable, the Multistate Trust shall automatically terminate on the date 90 days after the date on which 21 years less 91 days pass after the death of the last survivor of all of the descendants of the late Joseph P. Kennedy, Sr., father of the late President John F. Kennedy, living on the date hereof, and provided further that if the Multistate Trust owns real property located in any jurisdiction that sets a maximum duration for interests in real property located in such jurisdiction held in trust under a rule against perpetuities or a rule governing or limiting vesting, accumulations, the suspension of alienation, or the like, that for the Multistate Trust is shorter than the date 90 days after the date on which 21 years less 91 days pass after the death of the last survivor of all of the descendants of the late Joseph P. Kennedy, Sr., father of the late President John F. Kennedy, living on the date hereof, the Multistate Trust shall automatically terminate as to such Property upon the expiration of the maximum period authorized pursuant to the laws of such jurisdiction. If the Multistate Trust is terminated in whole or in part pursuant to this Subsection, title to the relevant Property or Properties as to which the Multistate Trust is terminated shall be transferred outright and free of trust to or at the direction of the United States in consultation with any of the States in which the relevant Property or Properties are located, provided, however, that the disposition of all relevant Property or Properties shall be governed by applicable state and federal law, or by agreement of the Multistate Trustee, the United States, and the applicable State, or by order of the Court, and further provided that neither the United States or any State will be required to accept an ownership interest in the relevant Property or Properties as to which the Multistate Trust is terminated.

ARTICLE III
WORK AND DISTRIBUTIONS

3.1    Multistate Trust Accounts

The Multistate Trustee shall establish, maintain and hold trust accounts consistent with the Settlement Agreement and Section 2.1 of this Agreement, to administer the Multistate Trust Assets and distributions therefrom. The Multistate Trustee shall also maintain a dedicated Multistate Trust Administrative Account for administrative funds, which shall be used solely to pay the costs of administering the Multistate Trust as set forth herein.

3.2    Payments by the Multistate Trust

On or before January 1 of each calendar year, the Multistate Trustee shall provide the United States and the Lead Agency with balance statements and proposed budgets as described in Sections 3.2.2 and 3.2.4 of this Agreement. The Multistate Trustee shall not pay any expense that has not been provided for in an approved budget, approved revised budget, or approved revised line item for an approved budget (except as provided in Section 3.2.1).

### 3.2.1    Emergency Funding

In the event of an emergency at a Site requiring the performance of an Environmental Action within hours or days of the Multistate Trustee first receiving notice of the emergency, if the emergency does not permit sufficient time to amend the Annual Budget for that Site, the Multistate Trustee may utilize funding from the Site's Environmental Cost Account to undertake Environmental Actions necessary to respond to the emergency (the "Emergency Environmental Action").   If an Emergency Environmental Action is performed by the Lead Agency or Non-Lead Agency, the Multistate Trustee may reimburse the Lead Agency (or the Support Agency, if the Lead Agency concurs in writing) for such Emergency Environmental Action from the Site's Environmental Cost  Account.  Nothing in this subparagraph shall preclude the payment or reimbursement of the Emergency Environmental Action through the annual budget or budget revision process.

### 3.2.2    Administrative Expenses of the Multistate Trust

Within 90 days of the Effective Date in the first year and thereafter by January 1 of each year, the Multistate Trustee shall provide the Governments with an annual budget for administration of the Multistate Trust.  The administrative budget shall be subject to the review and approval or disapproval by the United States, and, for each site-specific administrative budget, the United States and the applicable Lead Agency. If disapproved, such budget shall be revised and resubmitted as expeditiously as possible. No administrative expenses may be incurred or paid by the Multistate Trustee that are inconsistent with the approved budget, unless the United States and as applicable, the relevant Lead Agency, approve a revised budget or a revised line item for an approved budget, provided, however, that the Multistate Trustee may incur or pay ongoing or recurring expenses approved in the prior year's budget that occur between the time a proposed annual budget is submitted and the time it is approved. Each annual budget shall include a forecast of administrative expenditures for the first calendar quarter of the following year (or such longer period as the United States and States that are Lead Agencies shall reasonably request). The Multistate Trust shall regularly, but not less often than annually, and otherwise upon the reasonable request of the United States or the relevant Lead Agency, provide documentation to the United States and the relevant Lead Agency to substantiate compliance with the applicable approved budget and application of Multistate Trust Assets consistent with the terms of this Agreement and the Settlement Agreement. The approved budget shall be funded by the transfer of the approved amount from Multistate Trust Assets.

### 3.2.3    Remuneration for Multistate Trustee's Start-Up Fees and Expenses.

The Multistate Trustee shall be entitled to remuneration from the Multistate Trust Administrative Account for its reasonable fees and expenses prior to the Effective Date in connection with the Settlement Agreement, this Agreement, and planning and  creation of the Multistate Trust, such remuneration not to exceed $900,000. Where the Multistate Trustee, the United States, and the relevant Lead Agency agree that

19

Multistate Trustee accrued pre-Effective Date fees and expenses in furtherance of activities that post-Effective Date would constitute Environmental Action at particular Sites (e.g., the Cushing, Oklahoma and Mobile, Alabama Sites), those pre-Effective Date fees and expenses shall be paid from the Environmental Cost Account for the relevant Site. Within 45 days after the Effective Date, the Multistate Trustee will submit detailed invoices reflecting its pre-Effective Date fees and expenses for remuneration from the Multistate Trust Administrative Account for approval by the United States. Within 45 days after the Multistate Trustee, the United States, and the relevant Lead Agency have agreed in writing that certain pre-Effective Date fees and expenses accrued by the Multistate Trustee would constitute Environmental Action at a particular Site, the Multistate Trustee will submit detailed invoices reflecting its pre-Effective Date fees and expenses for remuneration from the relevant Multistate Trust Environmental Cost Account for approval by the United States and the relevant Lead Agency.

3.2.4    Environmental Expenses of the Multistate Trust

The Multistate Trustee shall prepare balance statements and annual budgets of projected expenditures from each of the Multistate Trust Environmental Cost Accounts. The first budget for the remainder of the current calendar year and the next calendar year shall be prepared within ninety (90) days following the Effective Date and annual budgets shall be prepared thereafter on or before each January 1 of the subject calendar year during the term of the Multistate Trust. The Lead Agency shall have the authority to approve or disapprove the proposed budget or revised budget or revised line item of an approved budget for the relevant Multistate Trust Environmental Cost Account after consultation with the Non-Lead Agency (the "Non Lead Agency" will be US EPA for sites where a State is the Lead Agency, and the State when US EPA is the Lead Agency), if the Non-Lead Agency has requested such consultation. If disapproved, a budget shall be revised and resubmitted as expeditiously as possible. Except as provided in Section 3.2.1, no expenses may be incurred or paid by the Multistate Trustee that are inconsistent with an approved budget or an approved revised line item for an approved budget, unless the Lead Agency after consultation with the other governmental agency approves a revised budget; provided, however, that the Multistate Trustee may incur or pay ongoing or recurring expenses approved in the prior year's budget that occur between the time a proposed annual budget is submitted and the time it is approved. Further, by March 1 of each year during the term of the Multistate Trust and within nine (9) months after termination of the Multistate Trust, the Multistate Trustee shall prepare and submit to the Beneficiaries an annual report with respect to each of the Multistate Trust Environmental Cost Accounts. The annual report shall pertain to the prior calendar year, or if the report is a final report, such period from the most recent annual report to the termination of the Multistate Trust Environmental Cost Accounts.

3.2.5    Reimbursement of Agencies and Performance of Environmental Action by Trust

The Multistate Trustee shall pay funds from a Multistate Trust Environmental Cost Account to the Lead Agency making a written request for funds for reimbursement within thirty (30) days of such request. Such written request shall: (i) be

in accordance with the approved budget set forth in Section 3.2.4 above, and (ii) shall specify what the funds were used for and shall certify that they were used only for Environmental Actions performed and/or oversight costs for Environmental Actions incurred after the Effective Date by the Lead Agency with respect to that Site.

3.2.6    The Multistate Trustee shall also pay funds from a Multistate Trust Environmental Cost or Work Account to the Non-Lead Agency making a written request for funds within thirty (30) days of such request where the Lead Agency has requested the assistance of the Non-Lead Agency with respect to that Site.  Such written request shall: (i) be in accordance with the approved budget set forth in Section 3.2.4  above, and (ii) shall specify what the funds were used for and shall certify that they were used only for Environmental Actions performed and/or oversight costs for Environmental Actions incurred after the Effective Date by the Non-Lead Agency with respect to that Site that were requested by the Lead Agency.  In the case of requests by the Lead Agency to the Multistate Trustee to use the funds from a particular Multistate Trust Environmental Cost Account to perform Environmental Actions in accordance with the approved budget set forth in Section 3.2.4 above, the Multistate Trustee shall utilize the funds and interest earned thereon from that Multistate Trust Environmental Cost Account to undertake such work in accordance with the schedule approved by the Lead Agency.  The Multistate Trustee shall seek the prior approval of the Lead Agency of any contractor hired by the Multistate Trustee to perform Environmental Actions and any work plans to be undertaken by the Multistate Trust under the oversight of the Lead Agency, unless the Lead Agency has provided a written waiver of such approval or requirements.  The Multistate Trustee shall require appropriate general commercial liability insurance, naming the Lead and Non-Lead Agencies as additional insureds, from each contractor hired to perform work.   The legal relationship of each contractor to the Multistate Trust and Multistate Trustee is that of an independent contractor professional, not that of an entity employed by the Multistate Trust or the Multistate Trustee.  Each contractor shall not be deemed a Multistate Trust Party.  Pending approval of the initial annual budget, the Multistate Trust may enter into contracts or incur expenditures to continue ongoing Environmental Action and maintain Site security, provided that such costs are in the Multistate Trust's proposed budget and have not been disapproved by the Lead Agency in writing.

3.3    Liens by Government

Notwithstanding anything to the contrary in this Article III, the Multistate Trust hereby grants to the Multistate Trustee, the United States, and the respective States a first-priority lien on and security interest in the Multistate Trust Assets, except with respect to any real property, to secure the payment of all amounts now or hereafter required to fund Environmental Actions and Multistate Trustee costs, fees, and expenses, including, without limitation, amounts owed to, accrued or reserved on account of the Multistate Trust or to be retained by the Multistate Trustee hereunder or otherwise due hereunder.  However, only the Multistate Trustee shall have a first-priority lien on and security interest in the Multistate Trust Administrative Account and only the United States and the respective States shall have a first-priority lien on and security interest in the Multistate Trust Environmental Cost Accounts. The Multistate Trust agrees to take appropriate actions and execute appropriate documents to perfect the Multistate Trustee's,

United States', and respective States' liens and security interest hereunder. Reasonable costs and fees associated with the perfection of the Multistate Trustee's lien shall be paid from the Multistate Trust Administrative Account. Reasonable costs and fees associated with the perfection of the United States' and respective State's liens shall be paid from the applicable Multistate Trust Environmental Cost Accounts.

3.4    Manner of Payment

Cash payments made by the Multistate Trust pursuant to the Settlement Agreement and this Agreement shall be in United States dollars by checks drawn on a domestic bank whose deposits are federally insured selected by the Multistate Trustee, or by wire transfer from such a domestic bank, at the option of the Multistate Trustee.

3.5    Unclaimed Distributions

In the event that funds remain in the Multistate Trust at its termination, the amounts remaining shall be transferred, as directed by the United States in consultation with all affected States, to first, (i) the Nevada Trust Environmental Cost Account, any of the West Chicago Trust Environmental Cost Accounts or West Chicago Trust Work Accounts, the Savannah Trust Environmental Cost Account, or any of the Cimarron Trust Environmental Cost Accounts if there are Environmental Actions to be performed and a need for additional trust funding, with the allocation among such Environmental Cost Accounts to be determined by the projected shortfall of performing such remaining Environmental Actions, second, (ii) Non-Owned Sites with a need for additional funding beyond the distributions received from the Anadarko Litigation Proceeds; or third, (iii) the Superfund.

ARTICLE IV
THE MULTISTATE TRUSTEE

4.1    Appointment

4.1.1    Greenfield Environmental Multistate Trust LLC, not individually but solely in its representative capacity as Multistate Trustee, is hereby appointed to serve as the Multistate Trustee to administer the Multistate Trust and the Multistate Trust Accounts, in accordance with the Settlement Agreement and this Agreement, and the Multistate Trustee hereby accepts such appointment and agrees to serve in such representative capacity, effective upon the Effective Date of this Agreement. Subject to the provisions of Section 4.10 herein, the term of the Multistate Trustee shall be for ten years at which time the Multistate Trustee may be re-appointed or terminated. Any successor Multistate Trustee shall be proposed by the Beneficiaries and appointed by the Bankruptcy Court in accordance with Section 4.11 of this Agreement. If the Multistate Trustee is not reappointed and no successor Multistate Trustee is appointed by the expiration of the Multistate Trustee's term, the Court may reappoint the Multistate Trustee or appoint a successor Multistate Trustee.

4.1.2    After consultation with the United States and the States, the Multistate Trust is authorized to obtain the services of one or more environmental consultants to implement the future Environmental Actions (the "Consultant(s)"). The

Consultant(s) shall obtain environmental, general and professional liability insurance in the range of $1,000,000 to $10,000,000 as agreed to by the Multistate Trust after consultation with the United States and States. The beneficiary of the insurance policies shall be the Multistate Trust and shall cover negligence committed by the Consultant(s) in implementing the future Environmental Actions or any other negligence committed by the Consultant(s). The legal relationship of the Consultant(s) to the Multistate Trust and Multistate Trustee is that of an independent contractor professional, not that of an entity employed by the Multistate Trust or the Multistate Trustee.  The Consultant(s) shall not be deemed a Multistate Trust Party.

4.2     Generally

The Multistate Trustee's powers are exercisable solely in a fiduciary capacity consistent with, and in furtherance of, the purposes of the Multistate Trust and the Settlement Agreement and not otherwise. The Multistate Trustee shall have the authority to bind the Multistate Trust, and any successor Multistate Trustee, or successor or assign of the Multistate Trust, but shall for all purposes hereunder be acting in its representative capacity as Multistate Trustee and not individually. Notwithstanding anything to the contrary contained herein, the Multistate Trustee shall not be required to take action or omit to take any action if, after the advice of counsel, the Multistate Trustee believes in good faith such action or omission is not consistent with the Multistate Trustee's fiduciary duties.  The Multistate Trustee shall not be deemed to have breached its fiduciary duties in connection with any act or omission that is consistent with written directions received from the Court.  The Multistate Trustee shall have no obligations to perform any activities for which the relevant Environmental Cost Account lacks sufficient funds.

4.3     Powers

In connection with the administration of the Multistate Trust, except as otherwise set forth in this Agreement or the Settlement Agreement, the Multistate Trustee is authorized to perform any and all acts necessary to accomplish the purposes of the Multistate Trust. The powers of the Multistate Trust shall, without any further Court approval or order, include, without limitation, each of the following: (i) to receive, manage, invest, supervise and protect the Multistate Trust Assets, withdraw, make distributions and pay taxes, if applicable or required, and other obligations owed by the Multistate Trust or the Multistate Trust Accounts from funds held by the Multistate Trustee and/or the Multistate Trust (or the Multistate Trust Accounts) in accordance with the Settlement Agreement, and withhold and pay to the appropriate taxing authority any withholding taxes on distributions from the Multistate Trust, if applicable; (ii) to engage employees and professional Persons to assist the Multistate Trust and/or the Multistate Trustee with respect to the responsibilities described herein; (iii) to make distributions of the Multistate Trust Assets from the Multistate Trust Accounts for the purposes contemplated in this Agreement and the Settlement Agreement; and (iv) to effect all actions and execute all agreements, instruments and other documents necessary to implement this Agreement, including to exercise such other powers as may be vested in or assumed by the Multistate Trust and/or the Multistate Trustee pursuant to this Agreement and any order of the Court or as may be necessary and proper to carry out the provisions of this Agreement and the Settlement Agreement. No Person dealing with the Multistate Trust shall be obligated to inquire into the authority of the Multistate Trustee in connection with the protection, conservation or disposition of Multistate

Trust Assets. The Multistate Trustee is authorized to execute and deliver all documents on behalf of the Multistate Trust to accomplish the purposes of this Agreement and the Settlement Agreement.

4.4     Other Professionals

After consultation with the United States and the applicable States, the Multistate Trust is authorized to retain on behalf of the Multistate Trust and pay such third parties as the Multistate Trustee (in accordance with a budget approved pursuant to Section 3.2 above) may deem necessary or appropriate to assist the Multistate Trustee in carrying out its powers and duties under this Agreement and the Settlement Agreement, including, without limitation, (i) legal counsels to the Multistate Trust and/or Multistate Trustee, (ii) one or more public accounting firms to perform such bookkeeping functions, reviews and/or audits of the financial books and records of the Multistate Trust as may be appropriate in the Multistate Trustee's reasonable discretion and to prepare and file any tax returns or informational returns for the Multistate Trust or the Multistate Trust Accounts as may be required, and (iii) environmental consultants, investment advisors, custodians, security personnel, engineers, surveyors, brokers, contractors, clerks, and other third parties. The Multistate Trustee may pay all such Persons compensation for services rendered and expenses incurred in accordance with budgets approved as provided in Section 3.2.  Fees due to an investment advisor that are expressed as a percentage of the assets under management or return on investment need not be included in a budget, provided that the United States and the applicable State(s) approve of the investment advisor and the stated percentage.

4.5     Limitation of the Multistate Trustee's Authority

The Multistate Trust and the Multistate Trustee shall not and are not authorized to engage in any trade or business with respect to the Multistate Trust Assets or any proceeds therefrom except as and to the extent the same is deemed in good faith by the Multistate Trustee to be reasonably necessary or proper for the conservation or protection of the Multistate Trust Assets, or the fulfillment of the purposes of the Multistate Trust. The Multistate Trust and the Multistate Trustee shall not take any actions that would cause the Multistate Trust to fail to qualify as a qualified settlement fund under the QSF Regulations.

4.6     Reliance by the Multistate Trust Parties

Except as may otherwise be provided herein: (a) the Multistate Trust Parties may rely on, and shall be protected in acting upon, any resolution, certificate, statement, instrument, opinion, report, notice, request, consent, order, approval, or other electronic or paper document believed by them to be genuine and to have been signed or presented by the proper party or parties; (b) the Multistate Trust Parties may consult with legal counsel, financial or accounting advisors and other professionals and shall not be personally liable for any action taken or not taken in accordance with the advice thereof; and (c) persons dealing with the Multistate Trust Parties shall look only to the Multistate Trust Assets to satisfy any liability incurred by the Multistate Trust Parties to such person in carrying out the terms of this Agreement or any order of the Court, and the Multistate Trust Parties shall have no personal obligations to satisfy any such liability other than as provided in Section 4.9.1.

4.7     Compensation of the Multistate Trustee

The Multistate Trust shall pay its own reasonable and necessary costs and expenses, and shall reimburse the Multistate Trustee for the actual reasonable out-of-pocket fees, costs, and expenses to the extent incurred by the Multistate Trustee in connection with the Multistate Trustee's duties hereunder, including, without limitation, necessary travel, lodging, office rent (to be paid directly by the Multistate Trust), professional fees, postage, photocopying, telephone and facsimile charges upon receipt of periodic billings, all in accordance with an annual budget or fee schedule approved by the Beneficiaries. The Multistate Trustee, and employees of the Multistate Trust, and the Multistate Trustee, and the corporate parent of the Multistate Trustee who perform services for the Multistate Trust shall be entitled to receive reasonable compensation for services rendered on behalf of the Multistate Trust in accordance with an annual budget or fee schedule approved by the Beneficiaries.

The Multistate Trust Assets shall be subject to the claims of the Multistate Trustee, and the Multistate Trustee shall be entitled to reimburse itself out of any available cash in the Multistate Trust Administrative Account, or for services performed in furtherance of Environmental Actions for specific sites out of available funds in the applicable Multistate Trust Environmental Cost Accounts, and the Multistate Trust shall be obligated to pay, for actual out-of-pocket expenses and for actual hours worked.

All compensation and other amounts payable to the Multistate Trustee shall be paid from the Multistate Trust Assets.

4.8     Liability of Multistate Trust Parties

4.8.1    In no event shall any of the Multistate Trust Parties be held liable to any third parties for any liability, action, or inaction of any other party, including Settlors or any other Multistate Trust Party. The liability of the Multistate Trust Parties shall be limited as provided in the Settlement Agreement, and the Multistate Trust Parties shall, further, be indemnified and exculpated in accordance with Section 4.9 of this Agreement.  The Multistate Trustee shall not be deemed in breach of its duties or responsibilities on account of the insufficiency of funds.  Funding from a Multistate Trust Environmental Cost Account or Work Account may not be used except as otherwise expressly provided by and in accordance with the Settlement Agreement. Funding from a Multistate Trust Environmental Cost Account for any Multistate Owned Funded Site may not be used for any other Owned Site or Non-Owned Site, except as otherwise expressly provided by and in accordance with the Settlement Agreement.

4.8.2    As provided in Sections XVI, XVII, XVIII of the Settlement Agreement, the Multistate Trust Parties are deemed to have resolved their civil liability under CERCLA, RCRA and state Environmental Laws to the United States and States, and have protection from contribution actions or claims as provided by Sections 113(f)(2) of CERCLA, 42 U.S.C. Section 9613(f)(2) or similar state law for matters addressed in the Settlement Agreement. The Multistate Trust Parties shall have the benefits of the covenants not to sue as set forth in Section XVI of the Settlement Agreement, of contribution protection as set forth in Section XVIII of the Settlement Agreement and of

25

the provisions as set forth in Section XVII of the Settlement Agreement.  Nothing in this Agreement is intended to, or should be construed as, in any way limiting the covenants, protections, and immunities conferred on the Multistate Trust Parties pursuant to the Settlement Agreement and other applicable law.

4.8.3    No provision of this Agreement or the Settlement Agreement shall require the Multistate Trustee to expend or risk its own personal funds or otherwise incur any personal financial liability in the performance of any of its duties or the exercise of any of its authorities as Multistate Trustee hereunder.  Notwithstanding the foregoing, the Multistate Trustee shall satisfy from its own funds any liability imposed by a court of competent jurisdiction on account of Multistate Trustee's fraud or willful misconduct.

4.9    Exculpation and Indemnification

4.9.1    Exculpation

None of the Multistate Trust Parties shall be personally liable unless the Court, by a final order, finds that it committed acts that constitute fraud or willful misconduct after the Effective Date in relation to the Multistate Trustee's duties.  There shall be an irrebuttable presumption that any action taken or not taken with the approval of the Court does not constitute fraud or willful misconduct.  For the avoidance of doubt, the term "approval of the Court" in this Section 4.9.1 shall not be construed to mean the Findings of Fact, Conclusions of Law and Order Confirming the First Amended Joint Plan of Reorganization of Tronox Incorporated, et al., Pursuant to Chapter 11 of the Bankruptcy Code, any other order that has been entered to date by the Bankruptcy Court, or any future order approving this Agreement or the Anadarko Litigation Trust Agreement.  Any judgment against a Multistate Trust Party and any costs of defense relating to any Multistate Trust Party shall be paid from and limited to funds from the Multistate Trust Environmental Cost Account for the relevant Site or the Multistate Trust Administrative Account without the Multistate Trust Party having to first pay from its own funds for any personal liability or costs of defense unless a final order of the Court, that is not reversed on appeal, determines that it committed a breach of its fiduciary duties and/or fraud or willful misconduct in relation to the Multistate Trust Party's duties.  Nothing herein shall permit any judgment against the Multistate Trust Environmental Cost Account related to a particular Multistate Site to be paid from the Multistate Trust Environmental Cost Account for another Site.

4.9.2    The Multistate Trust Parties are exculpated by all persons, including without limitation, holders of claims and other parties in interest, of and from any and all claims, causes of action and other assertions of liability arising out of the ownership of Multistate Trust Assets and the discharge of the powers and duties conferred upon the Multistate Trust and/or Trustee by the Settlement Agreement or this Agreement or any order of court entered pursuant to or in furtherance of the Settlement Agreement or this Agreement, or applicable law or otherwise.  No person, including without limitation, holders of claims and other parties in interest, will be allowed to pursue any claims or cause of action against any Multistate Trust Party for any claim against Debtors, for making payments in accordance with the Settlement Agreement, this

26

Agreement, or any order of court, or for implementing the provisions of the Settlement Agreement, this Agreement, or any order of court. Nothing in this Paragraph or this Agreement shall preclude the Governments from enforcing the terms of this Agreement against the Multistate Trust Parties. Notwithstanding anything in Section 4.9.2 or elsewhere in this Agreement to the contrary, nothing in this Agreement shall be construed to exculpate the Multistate Trust Parties from any liability resulting from any act or omission constituting fraud, willful misconduct, or criminal conduct.

### 4.9.3    Indemnification

The Multistate Trust shall indemnify, defend and hold harmless (without the Multistate Trust Parties having to first pay from their personal funds) the Multistate Trust Parties from and against any and all claims, causes of action, liabilities, obligations, losses, costs, judgments, damages or expenses (including attorneys' fees) and any other assertion of liability arising out of or in relation to the discharge of the Multistate Trustee's powers and duties, to the fullest extent permitted by applicable law, provided that such indemnification, and any related recovery, shall be limited to funds in the Multistate Trust Environmental Cost Account for the relevant property and the Multistate Trust Administrative Account. Without limiting the foregoing, any such judgment against a Multistate Trust Party and any such costs of defense relating to any Multistate Trust Party shall be paid by the Multistate Trust consistent with the terms and conditions of this Section 4.9.3. Notwithstanding the foregoing, to the extent fraud or willful misconduct of any Multistate Trust Party is alleged and the Court finds, by a final order, that such Multistate Trust Party committed fraud or willful misconduct after the Effective Date in relation to the Multistate Trustee's duties, there shall be no indemnification, of that Multistate Trust Party, for any judgments arising from such allegations of fraud or willful misconduct. It shall be an irrebuttable presumption that any action taken, or inaction, consistent with Court approval shall not constitute willful misconduct or fraud. For the avoidance of doubt, the term "Court approval" in this Section 4.9.3 shall not be construed to mean the Findings of Fact, Conclusions of Law and Order Confirming the First Amended Joint Plan of Reorganization of Tronox Incorporated, et al., Pursuant to Chapter 11 of the Bankruptcy Code, any other order that has been entered to date by the Bankruptcy Court, or any future order approving this Agreement or the Anadarko Litigation Trust Agreement.

## 4.10    Termination, Replacement, and Removal of the Multistate Trustee.

### 4.10.1  Termination

The duties, responsibilities and powers of the Multistate Trustee will terminate on the date the Multistate Trust is dissolved under applicable law in accordance with the Settlement Agreement, or by an order of the Court; provided that this Section and Sections 4.6, 4.8, and 4.9 above shall survive such termination, dissolution and entry. The Multistate Trustee may resign by giving not less than thirty (30) days prior written notice thereof to the Court, the United States, and the States, provided that this Section and Sections 4.6, 4.8, and 4.9 shall survive such resignation.

### 4.10.2  Replacement

The Multistate Trustee may be replaced upon completion of any ten year term; provided, however, that this Section and Sections 4.6, 4.8 and 4.9 above shall survive such replacement.

### 4.10.3  Removal

The Multistate Trustee may be removed or the Multistate Trust Assets may be transferred to the US EPA and/or the States by:

(1) The entry of an order by the Bankruptcy Court, immediately upon notice of appointment of a temporary or permanent successor, finding that the Multistate Trustee committed fraud or willful misconduct after the Effective Date in relation to the Multistate Trustee's duties under the Multistate Trust; or

(2) The entry of an order by the Bankruptcy Court, immediately upon notice of appointment of a temporary or permanent successor, finding that (i) the Multistate Trustee in any material respect, as a result of negligence, exacerbates hazardous conditions at any of the Multistate Owned Active Sites, (ii) is seriously or repeatedly deficient or late in performance of the work or violates the provisions of the Settlement Agreement, or (iii) has violated the provisions of this Agreement or other related implementation agreements. In the event of the occurrence of 2(i), 2(ii) or 2(iii), the United States and the State in which the relevant site is located may jointly direct that (i) the Multistate Trustee be replaced in accordance with the Multistate Trust Agreement or (ii) all remaining funds and future recoveries in the Multistate Trust be paid to US EPA or to the applicable State to be used in accordance with the terms of this Agreement or the Settlement Agreement. In the event the funds are so paid, so long as title to any Multistate Owned Site remains in the name of the Multistate Trust or Multistate Trustee, funds deemed reasonably sufficient by the applicable beneficiaries to cover property taxes and other property management costs to be paid by the Multistate Trust for any Multistate Owned Site shall be left in the Multistate Trust Administrative Account.

(3) The provisions of this Section and Section 4.6, 4.8 and 4.9 above shall survive the removal of the Multistate Trustee or transfer of funds.

### 4.11  Appointment of Successor Multistate Trustees

Any successor Multistate Trustee shall be proposed by the United States and the States and appointed by the Court. Any successor Multistate Trustee appointed hereunder shall execute

an instrument accepting such appointment hereunder and shall file such acceptance with the Multistate Trust records. Thereupon, such successor Multistate Trustee shall, without any further act, become vested with all the estates, properties, rights, powers, trusts and duties of its predecessor in the Multistate Trust with like effect as if originally named herein; provided, however, that a removed or resigning Multistate Trustee shall, nevertheless, when requested in writing by the successor Multistate Trustee, execute and deliver an instrument or instruments conveying and transferring to such successor Multistate Trustee under the Multistate Trust all the estates, properties, rights, powers, and trusts of such predecessor Multistate Trustee.

4.12   No Bond

Notwithstanding any state law to the contrary, the Multistate Trustee, including any successor Multistate Trustee, shall be exempt from giving any bond or other security in any jurisdiction.

ARTICLE V
BENEFICIARIES

5.1   Beneficiaries

Beneficial interests in the Multistate Trust shall be held by each of the Beneficiaries.

5.2   Identification of Beneficiaries

5.2.1   In order to determine the actual names and addresses of the authorized representatives of a Beneficiary, the Multistate Trust and the Multistate Trustee shall be entitled to rely conclusively on the name and address of the authorized representative for such Beneficiary listed in Exhibit "C" to this Agreement, who may from time to time provide additional or replacement names and addresses of authorized representatives, or listed in any written notice provided to the Multistate Trustee in the future by an authorized representative of such Beneficiary.

5.2.2   The Multistate Trustee shall send copies of all reports, budgets, annual balance statements, and other documents that the Multistate Trustee is required to submit to a Beneficiary under the Settlement Agreement and this Agreement, and related implementation documents including any unilateral administrative orders, consent decrees, or administrative orders on consent to the person(s) listed in Exhibit "C" to this Agreement as applicable.

5.3   Non-Beneficiaries

Upon the Effective Date of this Agreement, the Settlors and Reorganized Tronox shall have no interests including, without limitation, any reversionary interest, in the Multistate Trust or any Multistate Trust Assets.  The States and the United States shall be the sole beneficiaries of the Multistate Trust Accounts. Neither Settlors not Reorganized Tronox shall have any rights or interest to the Multistate Trust Assets distributed to the Multistate Trust Accounts, nor to any funds remaining in any of the Multistate Trust Accounts upon the completion of any and all final

actions and disbursements for any and all final costs with respect to the Multistate Owned Sites and Non-Owned Service Stations.

5.4    <u>Transfer of Beneficial Interests</u>

The interest of the Beneficiaries in the Multistate Trust, which are reflected only on the records of the Multistate Trust maintained by the Multistate Trust, are not negotiable and may be transferred only after written notice to the Multistate Trust, by order of the Court or by operation of law. The Multistate Trust shall not be required to record any transfer in favor of any transferee where, in the sole discretion of the Multistate Trust, such transfer is or might be construed to be ambiguous or to create uncertainty as to the holder of the interest in the Multistate Trust. Until a transfer is in fact recorded on the books and records maintained by the Multistate Trust for the purpose of identifying Beneficiaries, the Multistate Trust, whether or not in receipt of documents of transfer or other documents relating to the transfer, may nevertheless make distributions and send communications to Beneficiaries, as though it has no notice of any such transfer, and in so doing the Multistate Trust and Multistate Trustee shall be fully protected and incur no liability to any purported transferee or any other Person. Interests in the Multistate Trust may not be transferred to the Settlors, Reorganized Tronox, or any Persons related to any of the preceding (within the meaning of Section 468B(d)(3) of the Internal Revenue Code).

## ARTICLE VI
## REPORTING AND TAXES

6.1    <u>Reports</u>

As soon as practicable after the end of each calendar quarter,  beginning with the quarter ended after assets are first received by the Multistate Trust and ending as soon as practicable upon termination of the Multistate Trust, the Multistate Trust shall submit to the Beneficiaries a written report, including: (a) financial statements of the Multistate Trust at the end of such calendar quarter or period and the receipts and disbursements of the Multistate Trust for such period; and (b) a description of any action taken by the Multistate Trust in the performance of its duties which, as determined by outside counsel, accountants or other professional advisors, materially and adversely affects the Multistate Trust and of which notice has not previously been given to the Beneficiaries. The Multistate Trust shall promptly submit additional reports to the Beneficiaries whenever, as determined by outside counsel, accountants or other professional advisors, an adverse material event or change occurs which affects either the Multistate Trust or the rights of the Persons receiving distributions (including, without limitation, the Beneficiaries) hereunder. The Multistate Trust shall also provide the reports or information required by Section 3.2 of this Agreement.

6.2    <u>Other</u>

The Multistate Trust shall also file (or cause to be filed) any other statements, returns or disclosures relating to the Multistate Trust, that are required by any applicable governmental unit.

6.3      Reports in Support of Insurance Claims

The Multistate Trust shall also file (or cause to be filed) reports and cost analyses in support of claims against insurance carriers at the request of the United States and the States and shall provide the United States and the States a copy of any such reports and cost analyses.

6.4      Taxes

The Multistate Trustee shall be the "administrator," within the meaning of Treasury Regulation Section 1.468B-2(k)(3), of the Multistate Trust. Subject to definitive guidance from the Internal Revenue Service or a judicial decision to the contrary, the Multistate Trustee shall file tax returns and pay applicable taxes, if any, with respect to the Multistate Trust in a manner consistent with the provisions of the QSF Regulations. All such taxes shall be paid from the Multistate Trust Administrative Account, except that taxes, if any, on gains to the Multistate Environmental Cost Accounts shall be paid from the Multistate Environmental Cost Accounts. Settlors may make an election to treat the Multistate Trust as a grantor trust pursuant to Treasury Regulation section 1.468B-1(k)(1). To the extent Settlors make such an election, (a) the Multistate Trustee will provide, at Settlors' expense, reasonable cooperation to Settlors as needed to facilitate such election, (b) the Multistate Trustee will file any returns or reports required by the QSF Regulations or Treasury Regulation section 1.671-4, and (c) the Multistate Trustee will provide the Settlors, as transferors to the Multistate Trust, with any statements or reports required by the QSG Regulations or Treasury Regulation section 1.671-4, in order to enable the Settlors to calculate their share of the Multistate Trust's tax obligations and attributes. For the avoidance of doubt, any grantor trust election is for tax purposes only and shall in no way affect the substantive rights and obligations of the parties under the Settlement Agreement or this Agreement.

ARTICLE VII
MISCELLANEOUS PROVISIONS

7.1      Amendments and Waivers

Any provision of this Agreement may be amended or waived by mutual written consent of the Multistate Trust, the United States, and the affected State(s); provided, however, that no change shall be made to this Agreement that would alter the provisions of Section 7.2 hereof or adversely affect the federal income tax status of the Multistate Trust as a "qualified settlement fund" (in accordance with Section 6.4 hereof), or, unless agreed to in writing by the Multistate Trustee, the rights or obligations of, or the liability protections or immunities accorded to, the Multistate Trustee. Technical amendments to this Agreement may be made as necessary, to clarify this Agreement or to enable the Multistate Trustee to effectuate the terms of this Agreement, or perform its intended duties in a manner consistent with the Settlement Agreement with the mutual consent of the Multistate Trust, the United States, and the affected State(s).

7.2      Tax Treatment

The Multistate Trust created by this Agreement is intended to be treated as a qualified settlement fund eligible to elect grantor trust classification pursuant to the QSF Regulations for

federal income tax purposes, and to the extent provided by law, this Agreement shall be governed and construed in all respects consistent with such intent.

7.3     <u>Cooperation</u>

Settlors and Reorganized Tronox represent that they have provided, or have provided access to, all relevant documents and other information in their possession, and otherwise have complied, and will continue to comply, post-Effective Date, with the provisions governing transfers of Real Property Information and Environmental Information set forth at Section XIX of the Settlement Agreement.

The Multistate Trust and Multistate Trustee shall take such actions and execute such documents as are reasonably requested by Settlors with respect to effectuating the Settlement Agreement and the transactions contemplated thereby, provided that such actions are not inconsistent with this Agreement or the Settlement Agreement and would not derogate from the liability protections or immunities accorded to the Multistate Trustee in this Agreement or the Settlement Agreement.  To the extent that Settlor requests the Multistate Trust and/or the Multistate Trustee to take such an action, the Multistate Trust and Multistate Trustee shall do so at the sole expense of the Settlor and Settlors agree to separately fund and pay such expense(s).

7.4     <u>Situs of the Multistate Trust</u>

The situs of the Multistate Trust herein established is New York, and, except to the extent the Bankruptcy Code or other federal law is applicable, the rights, duties, and obligations arising under this Multistate Trust Agreement shall be governed by, and construed and enforced in accordance with, the laws of the State of New York, without giving effect to the principles of conflict of law thereof.

7.5     <u>Severability</u>

If any provision of this Agreement or application thereof to any Person or circumstance shall be finally determined by the Court to be invalid or unenforceable to any extent, the remainder of this Agreement, or the application of such provision to Persons or circumstances other than those as to which it is held invalid or unenforceable, shall not be affected thereby, and such provision of this Agreement shall be valid and enforced to the fullest extent permitted by law.

7.6     <u>Sufficient Notice</u>

Any notice or other communication hereunder shall be in writing and shall be deemed to have been sufficiently given, for all purposes, if sent by reliable overnight delivery service, or if deposited, postage prepaid, in a post office or letter box addressed to the Person for whom such notice is intended, to the name and address set forth in the case of a Beneficiary in Section 5.2 of this Agreement or such other address provided in writing to the Multistate Trust by an authorized representative of the respective Beneficiary.

7.7  <u>Headings</u>

The section headings contained in this Agreement are solely for convenience of reference and shall not affect the meaning or interpretation of this Agreement or any term or provision hereof.

7.8  <u>Actions Taken on Other Than Business Day</u>

If any payment or act under the Settlement Agreement or this Agreement is required to be made or performed on a date that is not a business day, then the making of such payment or the performance of such act may be completed on the next succeeding business day, but shall be deemed to have been completed as of the required date. For the purposes of this agreement, a business day shall be any of the days Monday through Friday excluding federally recognized holidays.

7.9  <u>Consistency of Agreements and Construction</u>

To the extent reasonably possible, the provisions of this Agreement shall be interpreted in a manner consistent with the Settlement Agreement. Where the provisions of this Agreement are irreconcilable with the provisions of the Settlement Agreement, the provisions of the Settlement Agreement shall prevail, with the exception of Article IV and Section 1.1.26, in which case this Agreement controls.

7.10  <u>Compliance with Laws</u>

Any and all distributions of Multistate Trust Assets shall be in compliance with applicable laws, including, but not limited to, applicable federal and state securities laws.

7.11  <u>Preservation of Privilege.</u>

In connection with the rights, claims, and causes of action that constitute the Multistate Trust Assets, any attorney-client privilege, work-product privilege, or other privilege or immunity attaching to any documents or communications (whether written or oral) transferred to the Multistate Trust shall vest in the Multistate Trust and its representatives, and the Parties are authorized to take all necessary actions to effectuate the transfer of such privileges.

7.12  <u>No Recourse to Beneficiaries.</u>

In no event shall the Beneficiaries have any responsibility for paying any expenses, fees, and other obligations of the Multistate Trust, and in no event shall the Multistate Trust or the Multistate Trustee, or any of their agents, representatives, or professionals, have recourse to the Beneficiaries therefor.

7.13  <u>Uniform Custodial Trust Act.</u>

The Multistate Trust Agreement shall not be subject to any provision of the Uniform Custodial Trust Act as adopted by any state, now or in the future.

THE UNDERSIGNED PARTIES ENTER INTO THIS AGREEMENT

FOR THE UNITED STATES OF AMERICA

Date: 2/9/11

ROBERT G. DREHER
Acting Assistant Attorney General
Environment and Natural Resources Division
U.S. Department of Justice
Washington, D.C. 20044

Date: 2/11/11

PREET BHARARA
United States Attorney for the
Southern District of New York

By:

ROBERT WILLIAM YALEN
TOMOKO ONOZAWA
JOSEPH A. PANTOJA
Assistant United States Attorneys
86 Chambers Street
New York, New York 10007
Tel: (212) 637-2722
Fax: (212) 637-2686

Date: 2/10/11

ALAN S. TENENBAUM
National Bankruptcy Coordinator
Environment and Natural Resources Division
U.S. Department of Justice
Washington, D.C. 20044

Date: 2/10/11

FREDERICK PHILLIPS, Attorney
Environment and Natural Resources Division
U.S. Department of Justice
Washington, D.C. 20044

34

**FOR THE UNITED STATES ENVIRONMENTAL PROTECTION AGENCY**

Date: _____1/14/11_____        By: _____
                               CYNTHIA GILES
                               Assistant Administrator for Enforcement
                               and Compliance Assurance
                               U.S. Environmental Protection Agency


Date: _____1/14/11_____        By: _____
                               CRAIG KAUFMAN
                               Attorney-Advisor
                               U.S. Environmental Protection Agency
                               Ariel Rios Building
                               1200 Pennsylvania Avenue, NW
                               Washington, DC 20460

*In re: Tronox, Inc., et al.,* Case No. 09-10156 (ALG)

35

**FOR TRONOX LUXEMBOURG S.ar.L**

Date: _____

By: _____
Michael J. Foster
Attorney-in-Fact

**FOR TRONOX INCORPORATED**

Date: _____

By: _____
Michael J. Foster
Vice President, General Counsel & Secretary

**FOR CIMARRON CORPORATION**

Date: _____

By: _____
Michael J. Foster
Director, Vice President & Secretary

**FOR SOUTHWESTERN REFINING COMPANY, INC.**

Date: _____

By: _____
Michael J. Foster
Director, Vice President & Secretary

**FOR TRANSWORLD DRILLING COMPANY**

Date: _____

By: _____
Michael J. Foster
Director, Vice President & Secretary

36

**FOR TRIANGLE REFINERIES, INC.**

Date: _____

By: _____
    Michael J. Foster
    Director, Vice President & Secretary

**FOR TRIPLE S, INC.**

Date: _____

By: _____
    Michael J. Foster
    Director, Vice President & Secretary

**FOR TRIPLE S ENVIRONMENTAL MANAGEMENT CORPORATION**

Date: _____

By: _____
    Michael J. Foster
    Director, Vice President & Secretary

**FOR TRIPLE S MINERALS RESOURCES CORPORATION**

Date: _____

By: _____
    Michael J. Foster
    Director, Vice President & Secretary

**FOR TRIPLE S REFINING CORPORATION**

Date: _____

By: _____
    Michael J. Foster
    Director, Vice President & Secretary

37

**FOR TRONOX LLC**

Date: _____

By: _____
Michael J. Foster
Manager, Vice President & Secretary

**FOR TRONOX FINANCE CORP.**

Date: _____

By: _____
Michael J. Foster
Director, Vice President & Secretary

**FOR TRONOX HOLDINGS, INC.**

Date: _____

By: _____
Michael J. Foster
Director
Vice President & Secretary

**FOR TRONOX PIGMENTS (SAVANNAH) INC.**

Date: _____

By: _____
Michael J. Foster
Director, Vice President & Secretary

**FOR TRONOX WORLDWIDE LLC**

Date: _____

By: _____
Michael J. Foster
Manager, Vice President & Secretary

38

**FOR THE STATE OF ALABAMA**

LUTHER STRANGE
Attorney General
State of Alabama

By: _____    Date: _____February 9, 2011_____
Thomas L. Johnston (JOH081)
Assistant Attorney General

By: _____    Date: _____February 9, 2011_____
Antoinette Jones (JON018)
Assistant Attorney General

**FOR THE STATE OF FLORIDA DEPARTMENT OF ENVIRONMENTAL PROTECTION**

Date: 2/10/11          By: _____

Jonathan H. Alden
Senior Assistant General Counsel
Florida Department of Environmental Protection
3900 Commonwealth Blvd., MS 35
Tallahassee, FL 32399-3000
Telephone: (850) 245-2238
Facsimile: (850) 245-2303
E-mail: jonathan.alden@dep.state.fl.us

**FOR THE STATE OF GEORGIA**

Date: _2/11/2011_

Georgia Environmental Protection
Division

**FOR THE STATE OF IDAHO**

Date: 2/9/11

Darrell G. Early, Deputy Attorney General
Office of the Idaho Attorney General
Environmental Quality Section
1410 N. Hilton St.
Boise, ID 83714
(208) 373-0494

**FOR THE STATE OF ILLINOIS**

PEOPLE OF THE STATE OF ILLINOIS
*ex rel.* LISA MADIGAN
Attorney General of the State of Illinois

MATTHEW J. DUNN, Chief
Environmental Enforcement
Asbestos Litigation Division

BY: _____
        THOMAS DAVIS, Chief
        Assistant Attorney General
        Environmental Bureau South

DATE: _____


ILLINOIS ENVIRONMENTAL
PROTECTION AGENCY

DOUGLAS P. SCOTT, Director
Illinois Environmental Protection Agency

BY: _____
        JOHN J. KIM
        Chief Legal Counsel

DATE: ___1|28|11_____

43A

**FOR THE STATE OF ILLINOIS**

PEOPLE OF THE STATE OF ILLINOIS
*ex rel.* LISA MADIGAN
Attorney General of the State of Illinois

MATTHEW J. DUNN, Chief
Environmental Enforcement
Asbestos Litigation Division

BY: _____
        THOMAS DAVIS, Chief
        Assistant Attorney General
        Environmental Bureau South

DATE: ___/ / 2 8 / 11_____

ILLINOIS ENVIRONMENTAL
PROTECTION AGENCY

DOUGLAS P. SCOTT, Director
Illinois Environmental Protection Agency

BY: _____
        JOHN J. KIM
        Chief Legal Counsel

DATE: _____

43B

**Indiana's Signature Page for**
**"ENVIRONMENTAL TRUST AGREEMENT"**
**in the case of Tronox Incorp., US Brc Ct. SD NY Case No. 09-10156 (ALG)**

Indiana Department of
Environmental Management

Gregory F. Zoeller,
Attorney General of Indiana
Atty. No. 1958-98

By: _____
Thomas W. Easterly,
Commissioner

By: _____
Patricia Orloff Erdmann
Chief Counsel for Litigation
Atty. No. 17664-49A

Ind. Dept. of Environmental Mgmt
100 North Senate Avenue
MC 50-01, ICGN 1301
Indianapolis, IN 46204

By: _____
Timothy J. Junk
Dep. Atty. Gen.
Atty. No. 5987-02

Office of the Attorney General
Indiana Government Center South, 5th Floor
302 West Washington Street
Indianapolis, IN 46204

Date: 1/27/11

44

FOR THE STATE OF IOWA

DATE:

BY: *Wayne Gieselman*
    Wayne Gieselman
    Division Administrator
    Iowa Department of Natural Resources

**FOR THE STATE OF KANSAS**

Date: _____Y27/ 20 11_____          _____

Robert Moser, MD
Acting Secretary
Kansas Department of Health and Environment

Tronox Multistate Trust Agreement

**FOR THE STATE OF LOUISIANA**

**LOUISIANA DEPARTMENT OF
ENVIRONMENTAL QUALITY**
Peggy M. Hatch, Secretary

Date: _11 Feb 2011_     By: _____

Cheryl Sonnier Nolan, Assistant Secretary
Office of Environmental Compliance

47

**FOR THE STATE OF MISSISSIPPI**

MISSISSIPPI COMMISSION ON
ENVIRONMENTAL QUALITY

Date: _1- 31- 11_          By: _____

Trudy D. Fisher
Executive Director
Mississippi Department of Environmental
    Quality
P.O. Box 2261
Jackson, Mississippi 39225

**FOR THE STATE OF MISSOURI**

Date: 1/25/11

CHRIS KOSTER
Attorney General for the State of Missouri

JOHN K. MCMANUS
Chief Counsel
Agriculture and Environment Division
P.O. Box 899
Jefferson City, Missouri  65102
Tel.: 573-751-8370
Fax: 573-781-8796
Email: jack.mcmanus@ago.mo.gov

Date: 1/25/11

Leanne Tippett Mosby
Director
Division of Environmental Quality
Missouri Department of Natural Resources
P.O. Box 176
Jefferson City, Missouri 65102

49

**FOR THE STATE OF NEVADA**

NEVADA DEPARTMENT OF CONSERVATION AND
    NATURAL RESOURCES,
DIVISION OF ENVIRONMENTAL
    PROTECTION

Date: ___2/11/11___    By: _____
COLLEEN CRIPPS, Ph.D.
Administrator


Approved as to form:

CATHERINE CORTEZ MASTO
Attorney General

Date: ___2.11.11___    By: _____
CAROLYN E. TANNER
Deputy Attorney General

50

**FOR THE STATE OF NEW YORK**

ERIC T. SCHNEIDERMAN

Date:  January 27, 2011

By: *Linda E. White*
Linda E. White
Assistant Attorney General
Office of the New York State
Attorney General
Main Place Tower, Ste. 300A
350 Main Street
Buffalo, New York 14202
Tel: (716) 853-8466
Fax: (716) 853-8571

**FOR THE STATE OF NORTH CAROLINA**

Date: *1-28-11*

Dexter R. Matthews
Director, Division of Waste Management
Department of Environment and
    Natural Resources

**FOR THE STATE OF OHIO**

Date: _10 Feb-11_          _____Dale T. Vitale_____

Dale T. Vitale
Assistant Attorney General
Ohio Attorney General's Office
Environmental Enforcement Section
30 East Broad Street, 25th Floor
Columbus, OH 43215
Telephone: (614) 466-2766
Facsimile: (614) 644-1926
E-mail:
dale.vitale@ohioattorneygeneral.gov

**FOR THE STATE OF OKLAHOMA**

Date: ___2 – 10 – 11___         ___Gary L. Sherrer___
                                GARY SHERRER
                                OKLAHOMA SECRETARY OF THE
                                ENVIRONMENT


Date: _____         _____
                                STEVEN A. THOMPSON
                                EXECUTIVE DIRECTOR
                                OKLAHOMA DEPARTMENT OF
                                ENVIRONMENTAL QUALITY

54A

**FOR THE STATE OF OKLAHOMA**

Date: _____          _____

GARY SHERRER
OKLAHOMA SECRETARY OF THE
    ENVIRONMENT

Date:  2-11-2011          ~~~~~~~~~~~~~~~~~~~~

for   STEVEN A. THOMPSON
EXECUTIVE DIRECTOR
OKLAHOMA DEPARTMENT OF
ENVIRONMENTAL QUALITY

54B

**FOR THE COMMONWEALTH OF PENNSYLVANIA
DEPARTMENT OF ENVIRONMENTAL PROTECTION**

Date: 1/26/2011

Thomas M. Thompson, P.G.
Professional Geologist Manager
Environmental Cleanup Program

**FOR THE STATE OF TENNESSEE**

Date: 2/9/11

Robert J. Martineau, Jr.
Commissioner
Dept. of Environment and Conservation

**FOR THE STATE OF TEXAS**

Date: 2-1-2011

MARK R. VICKERY
TCEQ Executive Director

**FOR THE STATE OF WISCONSIN**

CATHY STEPP
Secretary

Date: _____

MATT MORONEY
Deputy Secretary
Wisconsin Department of Natural Resources

Approved as to form:

J.B. VAN HOLLEN
Attorney General

Date: _____

ANNE C. MURPHY
Assistant Attorney General
State Bar # 1031600
Attorneys for the State of Wisconsin

58

**FOR THE MULTISTATE TRUSTEE**

Date: 2/9/2011

Greenfield Environmental Multistate Trust LLC
Not Individually But Solely In Its Representative
Capacity
As Trustee for the Multistate Environmental Response
    Trust
By:  Greenfield Environmental Trust Group, Inc., Member
By:  Cynthia Brooks, President

59

**EXHIBIT "A-1"**
## Owned Funded Sites

| No. | Settlement Agreement Designation | Property Name | Property Location | City or County | State | Trust | Federal Covenant Not to Sue | State Covenant Not to Sue | Other Covenant Not to Sue |
|---|---|---|---|---|---|---|---|---|---|
| 1 | MOBILE SITE | MOBILE PIGMENT COMPLEX | MOBILE PIGMENT COMPLEX | Mobile | AL | Multistate | YES | AL | |
| 2 | BIRMINGPORT SITE | BIRMINGPORT TERMINAL | 7955 BIRMINGPORT RD | Mulga | AL | Multistate | YES | AL | |
| 3 | JACKSONVILLE TERMINAL | JACKSONVILLE - TALLEYRAND | 2470 TALLEYRAND AVE | Duval | FL | Multistate | YES | FL | |
| 4 | JACKSONVILLE TERMINAL | JACKSONVILLE - TERMINAL | JACKSONVILLE TERMINAL | Duval | FL | Multistate | YES | FL | |
| 5 | KERR-MCGEE JACKSONVILLE SITE | JACKSONVILLE - CHEM PLANT | 1611 TALLEYRAND AVE | Duval | FL | Multistate | YES | FL | |
| 7 | SODA SPRINGS SITE | SODA SPRINGS - 1963 - Part I | ACQUIRED PRIOR TO 1963 | Caribou | ID | Multistate | YES | ID | |
| 8 | SODA SPRINGS SITE | SODA SPRINGS - FEE 236 - Part 2 | #2 OF 3 PARCELS AT SODA SPGS | Caribou | ID | Multistate | YES | ID | |
| 9 | SODA SPRINGS SITE | SODA SPRINGS - VANADIAM-Part 3 | ADJ TO VANADIUM PLANT | Caribou | ID | Multistate | YES | ID | |
| 10 | SODA SPRINGS SITE | SODA SPRINGS PLANT SITE | TWO MILES NORTH ON STATE HIGHWAY 34 | Soda Springs | ID | Multistate | YES | ID | |
| 33 | MADISON SITE | MADISON-- Part 1 - E & S BNDRY | ADJ TO E & S BOUNDARY | Madison | IL | Multistate | YES | IL | |
| 34 | MADISON SITE | MADISON-- Part 2 - LECLEDE #1 | ADJ TO N BOUNDARY | Madison | IL | Multistate | YES | IL | |
| 35 | MADISON SITE | MADISON-- Part 3 - LECLEDE #2 | ADJ TO N BOUNDARY | Madison | IL | Multistate | YES | IL | |
| 36 | MADISON SITE | MADISON-- Part 4 - N & S R-O-W | NORTH/SOUTH RIGHT OF WAY | Madison | IL | Multistate | YES | IL | |
| 37 | MADISON SITE | MADISON-- Part 5 - TREATING PLANT | NO. 2 WASHINGTON AVE | Madison | IL | Multistate | YES | IL | |

| No. | Settlement Agreement Designation | Property Name | Property Location | City or County | State | Trust | Federal Covenant Not to Sue | State Covenant Not to Sue | Other Covenant Not to Sue |
|---|---|---|---|---|---|---|---|---|---|
| 38 | SAUGET SITE | SAUGET | 2702 OGDEN AVE | Sauget | IL | Multistate | YES | IL | |
| 39 | INDIANA WOOD TREATING SITE | INDIANAPOLIS - TREATING | 1450 SOUTH EARHART STREET | Indianapolis | IN | Multistate | YES | IN | |
| 40 | INDIANA WOOD TREATING SITE | INDIANAPOLIS - 1735 LASALLE | 1735 S. LASALLE ST | Marion | IN | Multistate | YES | IN | |
| 41 | INDIANA WOOD TREATING SITE | INDIANAPOLIS - 1747 LASALLE | 1747-1749 S. LASALLE ST | Marion | IN | Multistate | YES | IN | |
| 42 | INDIANA WOOD TREATING SITE | INDIANAPOLIS - SHERMAN AVE | ON SOUTH SHERMAN AVENUE | Marion | IN | Multistate | YES | IN | |
| 43 | INDIANA WOOD TREATING SITE | INDIANAPOLIS - STEWART | STEWART MEMORIAL CHURCH | Marion | IN | Multistate | YES | IN | |
| 44 | INDIANA WOOD TREATING SITE | INDIANAPOLIS - VANDEMAN | 1717 VANDEMAN STREET | Marion | IN | Multistate | YES | IN | |
| 45 | INDIANA WOOD TREATING SITE | INDIANAPOLIS- BARRINGTON | BARR.MANOR & MN HTS LOTS | Marion | IN | Multistate | YES | IN | |
| 46 | INDIANA WOOD TREATING SITE | INDIANAPOLIS- LASALLE | 1745 S. LASALLE ST | Marion | IN | Multistate | YES | IN | |
| 47 | RUSHVILLE SITE | RUSHVILLE - 114,115 | LOTS 114, 115 | Rush | IN | Multistate | YES | IN | |
| 48 | RUSHVILLE SITE | RUSHVILLE - 78, 79, 80, 81 & 82 | LOTS 78, 79, 80, 81 & 82 | Rush | IN | Multistate | YES | IN | |
| 49 | BOSSIER CITY SITE | BOSSIER CITY FORMER WOOD TREATING SITE | 600 HAMILTON RD | Bossier City | LA | Multistate | YES | LA | |
| 50 | CALHOUN GAS PLANT- NEIGHBORING PROPERTIES | CALHOUN / CHAMBLISS | 0.916 ACRES ON GRIGGS RD. | Ouachita | LA | Multistate | YES | LA | |
| 51 | CALHOUN GAS PLANT- NEIGHBORING PROPERTIES | CALHOUN / GOLSON | 3 ACRES - GOLSON | Ouachita | LA | Multistate | YES | LA | |
| 52 | CALHOUN GAS PLANT- NEIGHBORING PROPERTIES | CALHOUN / GREENE | 20 ACRES, GREENE | Ouachita | LA | Multistate | YES | LA | |

| No. | Settlement Agreement Designation | Property Name | Property Location | City or County | State | Trust | Federal Covenant Not to Sue | State Covenant Not to Sue | Other Covenant Not to Sue |
|---|---|---|---|---|---|---|---|---|---|
| 53 | CALHOUN GAS PLANT-NEIGHBORING PROPERTIES | CALHOUN / MASSEY B. | 7.5 ACRES-MASSEY(BRUCE) | Ouachita | LA | Multistate | YES | LA | |
| 54 | CALHOUN GAS PLANT-NEIGHBORING PROPERTIES | CALHOUN / MASSEY L. | LARRY W. MASSEY PROPERTY | Ouachita | LA | Multistate | YES | LA | |
| 55 | CALHOUN GAS PLANT-NEIGHBORING PROPERTIES | CALHOUN / NICHOLS | 242 GRIGGS ROAD | Ouachita | LA | Multistate | YES | LA | |
| 56 | CALHOUN GAS PLANT-NEIGHBORING PROPERTIES | CALHOUN / TURNER | 3 ACRES - TURNER | Ouachita | LA | Multistate | YES | LA | |
| 57 | CALHOUN GAS PLANT-NEIGHBORING PROPERTIES | CALHOUN / WILLIAMS | 0.51 ACRE W/HOUSE - WILLIAMS | Ouachita | LA | Multistate | YES | LA | |
| 58 | SPRINGFIELD SITE | SPRINGFIELD FORMER WOOD TREATING | Lot 51B, GOLDEN HILLS | Greene | MO | Multistate | YES | MO | |
| 59 | KANSAS CITY SITE | KANSAS CITY TREATING PLANT | 2300 OAKLAND (AT SOUTH 23RD STREET & I-435) | Kansas City | MO | Multistate | YES | MO | |
| 60 | SPRINGFIELD SITE | SPRINGFIELD-TREATING PLANT | 2800/ 3800 W. HIGH STREET | Springfield | MO | Multistate | YES | MO | |
| 61 | COLUMBUS SITE | COLUMBUS TREATING | 2300 SOUTH 14TH AVENUE | Columbus | MS | Multistate | YES | MS | |
| 62 | MERIDIAN SITE | MERIDIAN ORPHAN SITE | NORTH, ORPHAN SITE | Lauderdale | MS | Multistate | YES | MS | |
| 63 | COLUMBUS SITE | COLUMBUS - LOT 5 SQUARE | SE/C 14TH AVE NO. & 21ST N. (2300 14TH AVE) | Lowndes | MS | Multistate | YES | MS | |
| 64 | MERIDIAN SITE | MERIDIAN TREATING | HIGHWAY 11 SOUTH (310 HIGHWAY S) | Meridian | MS | Multistate | YES | MS | |
| 65 | NAVASSA SITE | WILMINGTON PLANT-Abandoned | NAVASSA ROAD | Navassa | NC | Multistate | YES | NC | |

| No. | Settlement Agreement Designation | Property Name | Property Location | City or County | State | Trust | Federal Covenant Not to Sue | State Covenant Not to Sue | Other Covenant Not to Sue |
|---|---|---|---|---|---|---|---|---|---|
| 67 | BRISTOL MINE SITE | PATENT MINING CLAIMS AND ASSOCIATED LAND NEAR BRISTOL MINE SITES | T3N, R66E (Additional Details on Attachment A-4) | Pioche Area | NV | Multistate | YES | NV | |
| 68 | CASELTON MINE SITE | PATENT MINING CLAIMS AND ASSOCIATED LAND NEAR CASELTON MINE SITES | T01N, R67 E, SEC. 32, E ½ AND W ½, AND T01S, R67E, SEC. 4, NE 1/4, NE 1/4, 7.5' QUADRANGLE; WEST LONGITUDE: -114.4920, NORTH LATITUDE: 37.9250 (Additional Details on Attachment A-4) | Pioche Area | NV | Multistate | YES | NV | |
| 69 | CASELTON MINE SITE | CASELTON MILL, CASELTON HEIGHTS AREA, AND ASSOCIATED MILL TAILINGS | TOWNSHIP 1 NORTH, RANGE 67 EAST, IMMEDIATELY WEST OF THE TOWN OF PIOCHE | Pioche Area | NV | Multistate | YES | NV | |
| 70 | ROME SITE | ROME | 51.29 & 12.93 acre tracts (5856 AND 5900 SUCCESS DRIVE) | Oneida | NY | Multistate | YES | NY | |
| 71 | ROME SITE | ROME | Sec 222, Blk 2, Lot 16 - London Rd | Oneida | NY | Multistate | YES | NY | |
| 72 | CLEVELAND SITE | CLEVELAND FORMER REFINERY FEE LANDS | 400 SOUTH SWAN | Cleveland | OK | Multistate | YES | OK | |
| 73 | CUSHING SITE AND SURROUNDING PROPERTIES | CUSHING-MAVERIC MINI MART | | Cushing | OK | Multistate | YES | OK | |
| 74 | CUSHING SITE AND SURROUNDING PROPERTIES | CUSHING- OKLAHOMA OILWELL CEMENTING CO. | 1 acre | Cushing | OK | Multistate | YES | OK | |
| 76 | CLEVELAND SITE | CLEVELAND FORMER REFINERY FEE LANDS | CLEVELAND REFINERY (500 S. SWAN ROAD) | Pawnee | OK | Multistate | YES | OK | |
| 77 | CUSHING SITE AND SURROUNDING PROPERTIES | CUSHING - BROWN PPTY | 17.19 ACRES W/RESIDENCE | Payne | OK | Multistate | YES | OK | |

| No. | Settlement Agreement Designation | Property Name | Property Location | City or County | State | Trust | Federal Covenant Not to Sue | State Covenant Not to Sue | Other Covenant Not to Sue |
|---|---|---|---|---|---|---|---|---|---|
| 78 | CUSHING SITE AND SURROUNDING PROPERTIES | CUSHING - JEFF CARGILL | 1.28 ACRES + Shed & Mobile Home | Payne | OK | Multistate | YES | OK | |
| 79 | CUSHING SITE AND SURROUNDING PROPERTIES | CUSHING - C.W. CARGILL | 3.75 ACRES - Shop & Mobile Homes | Payne | OK | Multistate | YES | OK | |
| 80 | CUSHING SITE AND SURROUNDING PROPERTIES | CUSHING - PARKER | PARKER PROPERTY | Payne | OK | Multistate | YES | OK | |
| 81 | CUSHING SITE AND SURROUNDING PROPERTIES | CUSHING - ANDERSON | ANDERSON PROPERTY | Payne | OK | Multistate | YES | OK | |
| 82 | CUSHING SITE AND SURROUNDING PROPERTIES | CUSHING - AREA TANKS | CUSHING AREA TANKS | Payne | OK | Multistate | YES | OK | |
| 83 | CUSHING SITE AND SURROUNDING PROPERTIES | CUSHING - BANK PPTY | 2.46A | Payne | OK | Multistate | YES | OK | |
| 84 | CUSHING SITE AND SURROUNDING PROPERTIES | CUSHING - BOYDSTON | BOYDSTON PROP | Payne | OK | Multistate | YES | OK | |
| 85 | CUSHING SITE AND SURROUNDING PROPERTIES | CUSHING - CHANEL | CHANEL ENERGY PROPERTY | Payne | OK | Multistate | YES | OK | |
| 86 | CUSHING SITE AND SURROUNDING PROPERTIES | CUSHING - ERW INC. | ERW INC. PROPERTY | Payne | OK | Multistate | YES | OK | |
| 87 | CUSHING SITE AND SURROUNDING PROPERTIES | CUSHING - FEE 90 - 8.49 ACRES | SW/c SE4 | Payne | OK | Multistate | YES | OK | |

| No. | Settlement Agreement Designation | Property Name | Property Location | City or County | State | Trust | Federal Covenant Not to Sue | State Covenant Not to Sue | Other Covenant Not to Sue |
|---|---|---|---|---|---|---|---|---|---|
| 88 | CUSHING SITE AND SURROUNDING PROPERTIES | CUSHING - FEE 90 - 10.33 ACRES | E481' S935.5 OF E2 S22 18N 5E | Payne | OK | Multistate | YES | OK | |
| 89 | CUSHING SITE AND SURROUNDING PROPERTIES | CUSHING - FEE 90 - 200.479 ACRES | SE4 LESS TRS CONV E2 SW4 | Payne | OK | Multistate | YES | OK | |
| 90 | CUSHING SITE AND SURROUNDING PROPERTIES | CUSHING - FEE 90 - 39.5 ACRES | E16' NW4 SE4 & NE4 SE4 LESS 1A | Payne | OK | Multistate | YES | OK | |
| 91 | CUSHING SITE AND SURROUNDING PROPERTIES | CUSHING - GRAVENS | .35A - GRAVENS PROPERTY | Payne | OK | Multistate | YES | OK | |
| 92 | CUSHING SITE AND SURROUNDING PROPERTIES | CUSHING - HARRIS | 5.58A | Payne | OK | Multistate | YES | OK | |
| 93 | CUSHING SITE AND SURROUNDING PROPERTIES | CUSHING - HUGGENS | JACK & IRA HUGGENS PPTY | Payne | OK | Multistate | YES | OK | |
| 94 | CUSHING SITE AND SURROUNDING PROPERTIES | CUSHING - LAND | LAND | Payne | OK | Multistate | YES | OK | |
| 95 | CUSHING SITE AND SURROUNDING PROPERTIES | CUSHING - MARTIN | MARTIN PROPERTY | Payne | OK | Multistate | YES | OK | |
| 96 | CUSHING SITE AND SURROUNDING PROPERTIES | CUSHING - MULTIMEDIA | MULTIMEDIA PROPERTY | Payne | OK | Multistate | YES | OK | |
| 97 | CUSHING SITE AND SURROUNDING PROPERTIES | CUSHING - NOLAN VINSON | NOLAN VINSON PROPERTY | Payne | OK | Multistate | YES | OK | |

| No. | Settlement Agreement Designation | Property Name | Property Location | City or County | State | Trust | Federal Covenant Not to Sue | State Covenant Not to Sue | Other Covenant Not to Sue |
|---|---|---|---|---|---|---|---|---|---|
| 98 | CUSHING SITE AND SURROUNDING PROPERTIES | CUSHING - RUNNELS PROPERTY | 47.31 ACRES | Payne | OK | Multistate | YES | OK | |
| 99 | CUSHING SITE AND SURROUNDING PROPERTIES | CUSHING - RUTHERFORD | RUTHERFORD PROPERTY | Payne | OK | Multistate | YES | OK | |
| 100 | CUSHING SITE AND SURROUNDING PROPERTIES | CUSHING - TORONTO | TORONTO RESOURCE PROP | Payne | OK | Multistate | YES | OK | |
| 101 | CUSHING SITE AND SURROUNDING PROPERTIES | CUSHING - WILSON | JIMMY WILSON PROPERTY | Payne | OK | Multistate | YES | OK | |
| 102 | AVOCA SITE | AVOCA, PA TREATING PLANT | MCALPINE ST. NEAR YORK AVENUE | Avoca | PA | Multistate | YES | PA | |
| 103 | BEAUMONT SITE | BEAUMONT PLANT | 1110 PINE ST | Beaumont | TX | Multistate | YES | TX | |
| 104 | TEXARKANA FACILITY | TEXARKANA - #1 | 155 Buchanan Road | Bowie | TX | Multistate | YES | TX | |
| 105 | TEXARKANA FACILITY | TEXARKANA GREENBELT - #2 | GREENBELT, E SIDE OF PLANT | Bowie | TX | Multistate | YES | TX | |
| 106 | TEXARKANA FACILITY | TEXARKANA POND - #3 | POND | Bowie | TX | Multistate | YES | TX | |
| 107 | CORPUS CHRISTI NO. 1 TERMINAL | CORPUS CHRISTI #08 | JOHN G. HATCH - TRACT I | Nueces | TX | Multistate | YES | TX | |
| 108 | CORPUS CHRISTI NO. 1 TERMINAL | CORPUS CHRISTI #09 | JOHN G. HATCH - TRACT II | Nueces | TX | Multistate | YES | TX | |
| 109 | CORPUS CHRISTI NO. 1 TERMINAL | CORPUS CHRISTI #10 | JOHN G. HATCH - TRACT III | Nueces | TX | Multistate | YES | TX | |
| 110 | CORPUS CHRISTI NO. 1 TERMINAL | CORPUS CHRISTI #01-A | N. BDWY - TERM 1- #1 | Nueces | TX | Multistate | YES | TX | |
| 111 | CORPUS CHRISTI NO. 1 TERMINAL | CORPUS CHRISTI #01-B | S. BDWY - TERM 1- #2 | Nueces | TX | Multistate | YES | TX | |

| No. | Settlement Agreement Designation | Property Name | Property Location | City or County | State | Trust | Federal Covenant Not to Sue | State Covenant Not to Sue | Other Covenant Not to Sue |
|---|---|---|---|---|---|---|---|---|---|
| 112 | CORPUS CHRISTI NO. 1 TERMINAL | CORPUS CHRISTI #01-C | SALT FLATS - TERM 1- #3 | Nueces | TX | Multistate | YES | TX | |
| 113 | TEXARKANA FACILITY | TEXARKANA PLANT - #4 | 2513 BUCHANON ROAD | Texarkana | TX | Multistate | YES | TX | |

## EXHIBIT "A-2"

### Owned Service Stations

| No. | Settlement Agreement Designation | Property Name | Property Location | City or County | State | Trust | Federal Covenant Not to Sue | State Covenant Not to Sue | Other Covenant Not to Sue |
|---|---|---|---|---|---|---|---|---|---|
| 1 | OWNED SERVICE STATION | SELMA #2157 | 3217 WATERS ST. | Dallas | AL | Multistate | YES | AL | |
| 2 | OWNED SERVICE STATION | SELMA #5030 | US HWY 80 EAST | Dallas | AL | Multistate | YES | AL | |
| 3 | OWNED SERVICE STATION | BOAZ #1 | HWY 431 SOUTH (SARDIS CITY) | Etowah | AL | Multistate | YES | AL | |
| 4 | OWNED SERVICE STATION | E. GADSDEN #7075 | HWY 278 EAST | Etowah | AL | Multistate | YES | AL | |
| 5 | OWNED SERVICE STATION | E. GADSDEN #7090 | 300 E MEIGHAN BLVD | Etowah | AL | Multistate | YES | AL | |
| 6 | OWNED SERVICE STATION | JASPER | OLD HIGHWAY 78W (ADJACENT LOT) | Jasper | AL | Multistate | YES | AL | |
| 7 | OWNED SERVICE STATION | BESSEMER #5011 - PLAT 1 | 4536 BESSEMER HWY | Jefferson | AL | Multistate | YES | AL | |
| 8 | OWNED SERVICE STATION | BESSEMER #5012 - PLAT 2 | 4536 BESSEMER HWY | Jefferson | AL | Multistate | YES | AL | |
| 9 | OWNED SERVICE STATION | BIRMINGHAM #2081 | 1600 DENNISON | Jefferson | AL | Multistate | YES | AL | |
| 10 | OWNED SERVICE STATION | HUNTSVILLE #7095 | 3105 BOB WALLACE AVENUE | Madison | AL | Multistate | YES | AL | |
| 11 | OWNED SERVICE STATION | MONTGOMERY #7101 | 4118 MOBILE RD | Montgomery | AL | Multistate | YES | AL | |

| No. | Settlement Agreement Designation | Property Name | Property Location | City or County | State | Trust | Federal Covenant Not to Sue | State Covenant Not to Sue | Other Covenant Not to Sue |
|-----|------|------|------|------|------|------|------|------|------|
| 12 | OWNED SERVICE STATION | JASPER #7063 | 1302 BANKHEAD HWY | Walker | AL | Multistate | YES | AL | |
| 13 | OWNED SERVICE STATION | DEWITT #1 - AR | 9TH & JEFFERSON | Arkansas | AR | Multistate | YES | NONE | |
| 14 | OWNED SERVICE STATION | STUTTGART #1 | US HWY 79 & SPRING ST. | Arkansas | AR | Multistate | YES | NONE | |
| 15 | OWNED SERVICE STATION | MOUNTAIN HOME #1 | 1025 HIGHWAY 62 SW | Baxter | AR | Multistate | YES | NONE | |
| 16 | OWNED SERVICE STATION | ROGERS #1 | 1540 SOUTH OLRICH (NEAR 8TH STREET) | Benton | AR | Multistate | YES | NONE | |
| 17 | OWNED SERVICE STATION | SILOAM SPRINGS #1 | ARKANSAS HWY 68/59 RT 4 | Benton | AR | Multistate | YES | NONE | |
| 18 | OWNED SERVICE STATION | ARKADELPHIA #1 | ROUTE 3 US HWY 67 | Clark | AR | Multistate | YES | NONE | |
| 19 | OWNED SERVICE STATION | JONESBORO #1 | 1208 E. JOHNSON | Craighead | AR | Multistate | YES | NONE | |
| 20 | OWNED SERVICE STATION | WEST MEMPHIS #1 | 1024 N. MISSOURI | Crittenden | AR | Multistate | YES | NONE | |
| 21 | OWNED SERVICE STATION | CONWAY #2 | SW/C OAK & FACTORY STS | Faulkner | AR | Multistate | YES | NONE | |
| 22 | OWNED SERVICE STATION | HOT SPRINGS #1 | 3521 CENTRAL AVE. | Garland | AR | Multistate | YES | NONE | |
| 23 | OWNED SERVICE STATION | MALVERN #1 | 305 W PAGE AVENUE | Hot Spring | AR | Multistate | YES | NONE | |
| 24 | OWNED SERVICE STATION | MALVERN #3 | HWY 270 & OLD MILITARY RD | Hot Springs | AR | Multistate | YES | NONE | |
| 25 | OWNED SERVICE STATION | BATESVILLE #1 | 614 ST. LOUIS | Independence | AR | Multistate | YES | NONE | |

| No. | Settlement Agreement Designation | Property Name | Property Location | City or County | State | Trust | Federal Covenant Not to Sue | State Covenant Not to Sue | Other Covenant Not to Sue |
|---|---|---|---|---|---|---|---|---|---|
| 26 | OWNED SERVICE STATION | WEST HELENA #1 | 420 N. SEBASTIAN | Phillips | AR | Multistate | YES | NONE | |
| 27 | OWNED SERVICE STATION | RUSSELLVILLE #1 | 1301 S. ARKANSAS | Pope | AR | Multistate | YES | NONE | |
| 28 | OWNED SERVICE STATION | NORTH LITTLE ROCK | NW/C I-40 & CENT APT RD | Pulaski | AR | Multistate | YES | NONE | |
| 29 | OWNED SERVICE STATION | NORTH LITTLE ROCK #6 | 3823 PIKE AVENUE | Pulaski | AR | Multistate | YES | NONE | |
| 30 | OWNED SERVICE STATION | FORREST CITY #1 | 1506 N. WASHINGTON | St. Francis | AR | Multistate | YES | NONE | |
| 31 | OWNED SERVICE STATION | SPRINGDALE #1 | 1901 SUNSET AVE | Washington | AR | Multistate | YES | NONE | |
| 32 | OWNED SERVICE STATION | JACKSONVILLE #3078 | 10414 LEM TURNER RD. | Duval | FL | Multistate | YES | FL | |
| 33 | OWNED SERVICE STATION | JACKSONVILLE #3054 | 6930 103RD STREET | Duval | FL | Multistate | YES | FL | |
| 34 | OWNED SERVICE STATION | JACKSONVILLE #3 | US HWY 1 (Dinsmore) | Duval | FL | Multistate | YES | FL | |
| 35 | OWNED SERVICE STATION | JACKSONVILLE #3064 | 3131 WEST BEAVER ST | Duval | FL | Multistate | YES | FL | |
| 36 | OWNED SERVICE STATION | TAMPA #3045 | 5239 S. MCDILL AVE. | Hillsborough | FL | Multistate | YES | FL | |
| 37 | OWNED SERVICE STATION | MACON #3008 | 5500 SOUTH HOUSTON | Bibb | GA | Multistate | YES | GA | |

| No. | Settlement Agreement Designation | Property Name | Property Location | City or County | State | Trust | Federal Covenant Not to Sue | State Covenant Not to Sue | Other Covenant Not to Sue |
|---|---|---|---|---|---|---|---|---|---|
| 38 | OWNED SERVICE STATION | ATLANTA #2138 | 2095 JONESBORO RD. | Fulton | GA | Multistate | YES | GA | |
| 39 | OWNED SERVICE STATION | WARNER ROBINS #3004 | 101 WATSON BLVD. | Houston | GA | Multistate | YES | GA | |
| 40 | OWNED SERVICE STATION | DEWITT #1 | 200 SOUTH SIXTH | Clinton | IA | Multistate | YES | IA | |
| 41 | OWNED SERVICE STATION | ESTHERVILLE #1 | 1715 E CENTRAL AVENUE | Emmet | IA | Multistate | YES | IA | |
| 42 | OWNED SERVICE STATION | HUMBOLDT #1 | 404 13TH ST. NORTH | Humboldt | IA | Multistate | YES | IA | |
| 43 | OWNED SERVICE STATION | IOWA CITY #2 | 2229 MUSCATINE | Johnson | IA | Multistate | YES | IA | |
| 44 | OWNED SERVICE STATION | RED OAK #1 | 1001 BROADWAY | Montgomery | IA | Multistate | YES | IA | |
| 45 | OWNED SERVICE STATION | MUSCATINE #1 | 201 (210) GREEN ST. | Muscatine | IA | Multistate | YES | IA | |
| 46 | OWNED SERVICE STATION | MUSCATINE #2 | 1507 PARK AVENUE | Muscatine | IA | Multistate | YES | IA | |
| 47 | OWNED SERVICE STATION | DES MOINES #05 | 6601-6667 DOUGLAS BLVD. | Polk | IA | Multistate | YES | IA | |
| 48 | OWNED SERVICE STATION | DES MOINES #18 | SE/C UNIVERSITY & 14TH | Polk | IA | Multistate | YES | IA | |
| 49 | OWNED SERVICE STATION | BETTENDORF #1 | 2838 STATE STREET | Scott | IA | Multistate | YES | IA | |
| 50 | OWNED SERVICE STATION | DAVENPORT #3 | 2334 ROCKINGHAM ROAD | Scott | IA | Multistate | YES | IA | |
| 51 | OWNED SERVICE STATION | AMES #1 | 517-519 LINCOLN WAY | Story | IA | Multistate | YES | IA | |

| No. | Settlement Agreement Designation | Property Name | Property Location | City or County | State | Trust | Federal Covenant Not to Sue | State Covenant Not to Sue | Other Covenant Not to Sue |
|---|---|---|---|---|---|---|---|---|---|
| 52 | OWNED SERVICE STATION | CRESTON #3 | 709 S. ELM ST. | Union | IA | Multistate | YES | IA | |
| 53 | OWNED SERVICE STATION | SIOUX CITY #2 | 1400 INGLESIDE AVE | Woodbury | IA | Multistate | YES | IA | |
| 54 | OWNED SERVICE STATION | URBANA #1 | 1302 N. CUNNINGHAM ROAD | Champaign | IL | Multistate | YES | IL | |
| 55 | OWNED SERVICE STATION | TUSCOLA #1 | 405 S MAIN | Douglas | IL | Multistate | YES | IL | |
| 56 | OWNED SERVICE STATION | PARIS #1 | RT 6 HIGHWAY NO 1 NORTH | Edgar | IL | Multistate | YES | IL | |
| 57 | OWNED SERVICE STATION | WHITE HALL #1 | 715 NORTH MAIN | Greene | IL | Multistate | YES | IL | |
| 58 | OWNED SERVICE STATION | WATSEKA #1 | 337 W. WALNUT | Iroquois | IL | Multistate | YES | IL | |
| 59 | OWNED SERVICE STATION | AURORA #1 | 410 HILL STREET | Kane | IL | Multistate | YES | IL | |
| 60 | OWNED SERVICE STATION | KANKAKEE #1 | 1305 N. SCHUYLER | Kankakee | IL | Multistate | YES | IL | |
| 61 | OWNED SERVICE STATION | GALESBURG #1 | 484 N. HENDERSON | Knox | IL | Multistate | YES | IL | |
| 62 | OWNED SERVICE STATION | GALESBURG #2 | 829 W. GROVE | Knox | IL | Multistate | YES | IL | |
| 63 | OWNED SERVICE STATION | VIRDEN #1 | 110 E. DEANE ST. (110 S. SPRINGFIELD) | Macoupin | IL | Multistate | YES | IL | |
| 64 | OWNED SERVICE STATION | COTTAGE HILLS #1 | 501 WEST MACARTHUR | Madison | IL | Multistate | YES | IL | |
| 65 | OWNED SERVICE STATION | MADISON #1 | 425 MC CAMBRIDGE | Madison | IL | Multistate | YES | IL | |

| No. | Settlement Agreement Designation | Property Name | Property Location | City or County | State | Trust | Federal Covenant Not to Sue | State Covenant Not to Sue | Other Covenant Not to Sue |
|---|---|---|---|---|---|---|---|---|---|
| 66 | OWNED SERVICE STATION | MACOMB #1 | 707 W JACKSON | McDonough | IL | Multistate | YES | IL | |
| 67 | OWNED SERVICE STATION | MOLINE #2 | 4655-4TH AVENUE | Rock Island | IL | Multistate | YES | IL | |
| 68 | OWNED SERVICE STATION | ROCK ISLAND #2 | 5001 11TH ST. | Rock Island | IL | Multistate | YES | IL | |
| 69 | OWNED SERVICE STATION | HERRIN #1 | 1106 S. PARK AVENUE | Williamson | IL | Multistate | YES | IL | |
| 70 | OWNED SERVICE STATION | HARTFORD CITY #1 | 1307 N. WALNUT | Blackford | IN | Multistate | YES | IN | |
| 71 | OWNED SERVICE STATION | LEBANON #1 | 1914 N. LEBANON | Boone | IN | Multistate | YES | IN | |
| 72 | OWNED SERVICE STATION | GREENSBURG | 1208 N. LINCOLN | Decatur | IN | Multistate | YES | IN | |
| 73 | OWNED SERVICE STATION | MUNCIE #1 | 3210 E. JACKSON | Delaware | IN | Multistate | YES | IN | |
| 74 | OWNED SERVICE STATION | NOBLESVILLE #1 - PLAT2 | 200 EAST CONNER | Hamilton | IN | Multistate | YES | IN | |
| 75 | OWNED SERVICE STATION | NOBLESVILLE #1 - PLAT 1 | 2000 EAST CONNER | Hamilton | IN | Multistate | YES | IN | |
| 76 | OWNED SERVICE STATION | KOKOMO #1 | 1023 E MARKLAND | Howard | IN | Multistate | YES | IN | |
| 77 | OWNED SERVICE STATION | INDIANAPOLIS #03 | 4057 SOUTHEASTERN/1425 TEMPERANCE | Marion | IN | Multistate | YES | IN | |
| 78 | OWNED SERVICE STATION | INDIANAPOLIS #04 | 1310 ROOSEVELT AVENUE | Marion | IN | Multistate | YES | IN | |
| 79 | OWNED SERVICE STATION | CRAWFORDSVILLE #1 | DARLINGTON & VERMONT ST | Montgomery | IN | Multistate | YES | IN | |

| No. | Settlement Agreement Designation | Property Name | Property Location | City or County | State | Trust | Federal Covenant Not to Sue | State Covenant Not to Sue | Other Covenant Not to Sue |
|---|---|---|---|---|---|---|---|---|---|
| 80 | OWNED SERVICE STATION | HUMBOLDT #1 | 617 SOUTH 9TH STREET | Allen | KS | Multistate | YES | KS | |
| 81 | OWNED SERVICE STATION | GARNETT #1 | 103 MAPLE STREET | Anderson | KS | Multistate | YES | KS | |
| 82 | OWNED SERVICE STATION | SEDAN #1 - PLAT 1 | MAIN & SCHOOL STREETS | Chautauqua | KS | Multistate | YES | KS | |
| 83 | OWNED SERVICE STATION | SEDAN #1 - PLAT 2 | SE/C MAIN & SCHOOL | Chautauqua | KS | Multistate | YES | KS | |
| 84 | OWNED SERVICE STATION | COLUMBUS #1 | 124 NO. KANSAS AVENUE (NEAR WALNUT) | Cherokee | KS | Multistate | YES | KS | |
| 85 | OWNED SERVICE STATION | ABILENE #1 | SW/C 6TH & BUCKEYE | Dickinson | KS | Multistate | YES | KS | |
| 86 | OWNED SERVICE STATION | PARSONS #1 | 2601 NORTH MAIN | Labette | KS | Multistate | YES | KS | |
| 87 | OWNED SERVICE STATION | McPHERSON #1 | KANSAS AND HICKORY | McPherson | KS | Multistate | YES | KS | |
| 88 | OWNED SERVICE STATION | CANEY #1 | 401 N. McGEE | Montgomery | KS | Multistate | YES | KS | |
| 89 | OWNED SERVICE STATION | COFFEYVILLE #1 | 812 EAST 11TH | Montgomery | KS | Multistate | YES | KS | |
| 90 | OWNED SERVICE STATION | COFFEYVILLE #2 | 403 WEST 11TH ST | Montgomery | KS | Multistate | YES | KS | |
| 91 | OWNED SERVICE STATION | ERIE #1 | 205 W. 4TH | Neosho | KS | Multistate | YES | KS | |
| 92 | OWNED SERVICE STATION | CHANUTE #1 & #2 | 306 (305) S. LINCOLN + EXT. LAND | Neosho | KS | Multistate | YES | KS | |
| 93 | OWNED SERVICE STATION | LARNED #1 | 1404 BROADWAY | Pawnee | KS | Multistate | YES | KS | |

| No. | Settlement Agreement Designation | Property Name | Property Location | City or County | State | Trust | Federal Covenant Not to Sue | State Covenant Not to Sue | Other Covenant Not to Sue |
|---|---|---|---|---|---|---|---|---|---|
| 94 | OWNED SERVICE STATION | SALINA #1 | 235 SOUTH BROADWAY | Saline | KS | Multistate | YES | KS | |
| 95 | OWNED SERVICE STATION | SCOTT CITY #1 | 12TH & S. MAIN | Scott | KS | Multistate | YES | KS | |
| 96 | OWNED SERVICE STATION | TOPEKA #1 (WAKARUSA) | US 75 & FORBES AFB | Shawnee | KS | Multistate | YES | KS | |
| 97 | OWNED SERVICE STATION | TOPEKA #6 | 2635 CALIFORNIA | Shawnee | KS | Multistate | YES | KS | |
| 98 | OWNED SERVICE STATION | NEODESHA #1 | 903 MAIN STREET | Wilson | KS | Multistate | YES | KS | |
| 99 | OWNED SERVICE STATION | FRANKFORT #2166 | US HWY 60/MEADOWVIEW | Franklin | KY | Multistate | YES | NONE | |
| 100 | OWNED SERVICE STATION | MAYFIELD #1 | 723 E. BROADWAY | Graves | KY | Multistate | YES | NONE | |
| 101 | OWNED SERVICE STATION | LOUISVILLE #2123 | 4804 SOUTHSIDE DR. | Jefferson | KY | Multistate | YES | NONE | |
| 102 | OWNED SERVICE STATION | LOUISVILLE #2147 | 8800 MINORS LANE | Jefferson | KY | Multistate | YES | NONE | |
| 103 | OWNED SERVICE STATION | LOUISVILLE #2151 | 8207 OLD 3RD ST. RD | Jefferson | KY | Multistate | YES | NONE | |
| 104 | OWNED SERVICE STATION | LOUISVILLE #2152 | 9123 DIXIE HIGHWAY | Jefferson | KY | Multistate | YES | NONE | |
| 105 | OWNED SERVICE STATION | PADUCAH #1 | 1922 BRIDGE STREET | McCracken | KY | Multistate | YES | NONE | |
| 106 | OWNED SERVICE STATION | PADUCAH #3 | 1391 S. BELTLINE HWY | McCracken | KY | Multistate | YES | NONE | |
| 107 | OWNED SERVICE STATION | HARRODSBURG #1006 | COLLEGE & LEXINGTON | Mercer | KY | Multistate | YES | NONE | |

| No. | Settlement Agreement Designation | Property Name | Property Location | City or County | State | Trust | Federal Covenant Not to Sue | State Covenant Not to Sue | Other Covenant Not to Sue |
|---|---|---|---|---|---|---|---|---|---|
| 108 | OWNED SERVICE STATION | MANSFIELD #9021 | 1006 JENKINS STREET | DeSota Parish | LA | Multistate | YES | LA | |
| 109 | OWNED SERVICE STATION | WINNSBORO #9018 | LOCUST & MAIN STREETS | Franklin | LA | Multistate | YES | LA | |
| 110 | OWNED SERVICE STATION | RAYVILLE #9001 | 219-221 HARRISON | Richland | LA | Multistate | YES | LA | |
| 111 | OWNED SERVICE STATION | RAYVILLE #9022 | 1100 JULIA ST | Richland | LA | Multistate | YES | LA | |
| 112 | OWNED SERVICE STATION | FARMERVILLE #9013 | LA HWY & BOUNDARY | Union Parish | LA | Multistate | YES | LA | |
| 113 | OWNED SERVICE STATION | BLUE EARTH #1 | 321 NORTH GROVE | Faribault | MN | Multistate | YES | NONE | |
| 114 | OWNED SERVICE STATION | WORTHINGTON #1 | 1320 GRAND | Nobles | MN | Multistate | YES | NONE | |
| 115 | OWNED SERVICE STATION | LUVERNE #1 | 211 S. KNISS AVE. | Rock | MN | Multistate | YES | NONE | |
| 116 | OWNED SERVICE STATION | KIRKSVILLE #1 | 1024 E MCPHERSON ST | Adair | MO | Multistate | YES | MO | |
| 117 | OWNED SERVICE STATION | MEXICO #2 | 726 E. LIBERTY | Audrain | MO | Multistate | YES | MO | |
| 118 | OWNED SERVICE STATION | KENNETT #2 | 1333 FIRST STREET | Dunklin | MO | Multistate | YES | MO | |
| 119 | OWNED SERVICE STATION | SPRINGFIELD #2 | 1419 E. KEARNEY | Greene | MO | Multistate | YES | MO | |
| 120 | OWNED SERVICE STATION | MACON #1 | 102 S.MISSOURI | Macon | MO | Multistate | YES | MO | |
| 121 | OWNED SERVICE STATION | CHARLESTON #1 | 200 WEST MARSHALL | Mississippi | MO | Multistate | YES | MO | |

| No. | Settlement Agreement Designation | Property Name | Property Location | City or County | State | Trust | Federal Covenant Not to Sue | State Covenant Not to Sue | Other Covenant Not to Sue |
|---|---|---|---|---|---|---|---|---|---|
| 122 | OWNED SERVICE STATION | PERRYVILLE #1 | 300 W ST JOSEPH | Perry | MO | Multistate | YES | MO | |
| 123 | OWNED SERVICE STATION | MARSHALL #1 | NW/C I-70 & CO. RD. YY | Saline | MO | Multistate | YES | MO | |
| 124 | OWNED SERVICE STATION | NEVADA #1 | 212 SOUTH OAK | Vernon | MO | Multistate | YES | MO | |
| 125 | OWNED SERVICE STATION | JACKSON #5074 | 5502 N. STATE ST. | Hinds | MS | Multistate | YES | MS | |
| 126 | OWNED SERVICE STATION | PASCAGOULA #2154 | 2415 INGALLS AVENUE | Jackson | MS | Multistate | YES | MS | |
| 127 | OWNED SERVICE STATION | BOONEVILLE #1 | 102 SOUTH 2ND ST | Prentiss | MS | Multistate | YES | MS | |
| 128 | OWNED SERVICE STATION | GRAFTON #1 | 640 WEST 12TH ST. | Walsh | ND | Multistate | YES | NONE | |
| 129 | OWNED SERVICE STATION | OMAHA #09 | 8516 BLONDO | Douglas | NE | Multistate | YES | NONE | |
| 130 | OWNED SERVICE STATION | OMAHA #10 | 1902 S. 10TH STREET | Douglas | NE | Multistate | YES | NONE | |
| 131 | OWNED SERVICE STATION | OMAHA #7 | 2932 MYRTLE AVENUE | Douglas | NE | Multistate | YES | NONE | |
| 132 | OWNED SERVICE STATION | LINCOLN #2 | 2910 N. 48TH | Lancaster | NE | Multistate | YES | NONE | |
| 133 | OWNED SERVICE STATION | LINCOLN #5 | 1740 COTNER BLVD. | Lancaster | NE | Multistate | YES | NONE | |
| 134 | OWNED SERVICE STATION | NORFOLK #1 | 311 OMAHA AVE. | Madison | NE | Multistate | YES | NONE | |
| 135 | OWNED SERVICE STATION | NEBRASKA CITY #1 | 718 S. 11TH STREET | Otoe | NE | Multistate | YES | NONE | |

| No. | Settlement Agreement Designation | Property Name | Property Location | City or County | State | Trust | Federal Covenant Not to Sue | State Covenant Not to Sue | Other Covenant Not to Sue |
|---|---|---|---|---|---|---|---|---|---|
| 136 | OWNED SERVICE STATION | BELEN #1 | I-25 SOUTH EDGE OF TOWN | Valencia | NM | Multistate | YES | NONE | |
| 137 | OWNED SERVICE STATION | EL RENO #1 | 1102 S. ROCK ISLAND | Canadian | OK | Multistate | YES | OK | |
| 138 | OWNED SERVICE STATION | OKLA CITY #077 | NE/C SW 29TH & SARA RD. | Canadian | OK | Multistate | YES | OK | |
| 139 | OWNED SERVICE STATION | YUKON-MILLER #1A | SE/C SW 15 & CZECH HALL | Canadian | OK | Multistate | YES | OK | |
| 140 | OWNED SERVICE STATION | LAWTON #1 | 2201 NW SHERIDAN ROAD | Comanche | OK | Multistate | YES | OK | |
| 141 | OWNED SERVICE STATION | LAWTON #2 | 2716 FT SILL BLVD. | Comanche | OK | Multistate | YES | OK | |
| 142 | OWNED SERVICE STATION | LAWTON #3 | 1015 "I" STREET | Comanche | OK | Multistate | YES | OK | |
| 143 | OWNED SERVICE STATION | LAWTON #5 | 1515 LEE BLVD. | Comanche | OK | Multistate | YES | OK | |
| 144 | OWNED SERVICE STATION | DRUMRIGHT #3 | SE/C TUCKER & BROADWAY | Creek | OK | Multistate | YES | OK | |
| 145 | OWNED SERVICE STATION | ENID #2 | 1123 N. GRAND | Garfield | OK | Multistate | YES | OK | |
| 146 | OWNED SERVICE STATION | ENID #8 | 1005 E. WILLOW | Garfield | OK | Multistate | YES | OK | |
| 147 | OWNED SERVICE STATION | CHICKASHA #1 | 2102 S. 4TH | Grady | OK | Multistate | YES | OK | |
| 148 | OWNED SERVICE STATION | MANGUM #1 | 1720 N. LOUIS TITTLE AVE. | Greer | OK | Multistate | YES | OK | |
| 149 | OWNED SERVICE STATION | ALTUS #2 | 1321 N. MAIN. | Jackson | OK | Multistate | YES | OK | |

| No. | Settlement Agreement Designation | Property Name | Property Location | City or County | State | Trust | Federal Covenant Not to Sue | State Covenant Not to Sue | Other Covenant Not to Sue |
|---|---|---|---|---|---|---|---|---|---|
| 150 | OWNED SERVICE STATION | ALTUS #3 | 1921 E. BROADWAY | Jackson | OK | Multistate | YES | OK | |
| 151 | OWNED SERVICE STATION | TONKAWA #1 | 601 E. NORTH AVENUE | Kay | OK | Multistate | YES | OK | |
| 152 | OWNED SERVICE STATION | HENNESSEY #1 | 619 N. MAIN STREET | Kingfisher | OK | Multistate | YES | OK | |
| 153 | OWNED SERVICE STATION | WILBURTON #1 | HIGHWAYS 2 AND 270 | Latimer | OK | Multistate | YES | OK | |
| 154 | OWNED SERVICE STATION | POTEAU #2 | HWY 271 & 59 SOUTH | LeFlore | OK | Multistate | YES | OK | |
| 155 | OWNED SERVICE STATION | PRYOR #2 | 409 SOUTH MILL ST | Mayes | OK | Multistate | YES | OK | |
| 156 | OWNED SERVICE STATION | PURCELL #3 | I-35 & JOHNSON ROAD | McClain | OK | Multistate | YES | OK | |
| 157 | OWNED SERVICE STATION | SULPHUR #1 | 1815 W. BROADWAY | Murray | OK | Multistate | YES | OK | |
| 158 | OWNED SERVICE STATION | PERRY #1 - STATION | 8TH & FIR (STATION) | Noble | OK | Multistate | YES | OK | |
| 159 | OWNED SERVICE STATION | PERRY #2 - BOCOX | BOCOX PROPERTY | Noble | OK | Multistate | YES | OK | |
| 160 | OWNED SERVICE STATION | PERRY #3 - HOMELAND | 702 FIR STREET | Noble | OK | Multistate | YES | OK | |
| 161 | OWNED SERVICE STATION | OKLA CITY #009 | 12000 NORTHEAST EXPWY | Oklahoma | OK | Multistate | YES | OK | |
| 162 | OWNED SERVICE STATION | DEL CITY #2 | 3300 SE 15TH STREET | Oklahoma | OK | Multistate | YES | OK | |
| 163 | OWNED SERVICE STATION | HARRAH #1 | HOLDEN AND HARRAH ROAD | Oklahoma | OK | Multistate | YES | OK | |

| No. | Settlement Agreement Designation | Property Name | Property Location | City or County | State | Trust | Federal Covenant Not to Sue | State Covenant Not to Sue | Other Covenant Not to Sue |
|---|---|---|---|---|---|---|---|---|---|
| 164 | OWNED SERVICE STATION | BETHANY #1 | SW/C NW 39 & COUNCIL, FEE 121 | Oklahoma | OK | Multistate | YES | OK | |
| 165 | OWNED SERVICE STATION | OKLA CITY #014 | 3834 NW 10 | Oklahoma | OK | Multistate | YES | OK | |
| 166 | OWNED SERVICE STATION | OKLA CITY #019 | 4100 NW EXPRESSWAY | Oklahoma | OK | Multistate | YES | OK | |
| 167 | OWNED SERVICE STATION | OKLA CITY #022 | 3216 NORTH MAY | Oklahoma | OK | Multistate | YES | OK | |
| 168 | OWNED SERVICE STATION | OKLA CITY #023 | 2109 NE 23RD ST | Oklahoma | OK | Multistate | YES | OK | |
| 169 | OWNED SERVICE STATION | OKLA CITY #028 - PLAT 1 | 8005 N. MAY | Oklahoma | OK | Multistate | YES | OK | |
| 170 | OWNED SERVICE STATION | OKLA CITY #028 - PLAT 2 | 8005 N. MAY | Oklahoma | OK | Multistate | YES | OK | |
| 171 | OWNED SERVICE STATION | OKLA CITY #056 - PLAT 1 | 25 N.E. 36TH | Oklahoma | OK | Multistate | YES | OK | |
| 172 | OWNED SERVICE STATION | OKLA CITY #056 - PLAT 2 | 25 N.E. 36TH | Oklahoma | OK | Multistate | YES | OK | |
| 173 | OWNED SERVICE STATION | OKLA CITY #062 | 5221 S. WESTERN | Oklahoma | OK | Multistate | YES | OK | |
| 174 | OWNED SERVICE STATION | OKLA CITY #063 - PLAT 1 | 7025 S. WESTERN | Oklahoma | OK | Multistate | YES | OK | |
| 175 | OWNED SERVICE STATION | OKLA CITY #063 - PLAT 2 | 7025 S WESTERN | Oklahoma | OK | Multistate | YES | OK | |
| 176 | OWNED SERVICE STATION | OKLA CITY #064 | 3630 N. MACARTHUR | Oklahoma | OK | Multistate | YES | OK | |
| 177 | OWNED SERVICE STATION | OKLA CITY #074 | 7800 NW 10TH | Oklahoma | OK | Multistate | YES | OK | |

| No. | Settlement Agreement Designation | Property Name | Property Location | City or County | State | Trust | Federal Covenant Not to Sue | State Covenant Not to Sue | Other Covenant Not to Sue |
|---|---|---|---|---|---|---|---|---|---|
| 178 | OWNED SERVICE STATION | OKLA CITY #084 | 1301 SE 15TH | Oklahoma | OK | Multistate | YES | OK | |
| 179 | OWNED SERVICE STATION | OKLA CITY #087 | 9000 N WESTERN | Oklahoma | OK | Multistate | YES | OK | |
| 180 | OWNED SERVICE STATION | OKLA CITY #088 - PLAT 1 | 4300 SE 59TH | Oklahoma | OK | Multistate | YES | OK | |
| 181 | OWNED SERVICE STATION | OKLA CITY #088 - PLAT 2 | 4300 SE 59TH | Oklahoma | OK | Multistate | YES | OK | |
| 182 | OWNED SERVICE STATION | OKLA CITY #096 | 1131 N. MERIDIAN | Oklahoma | OK | Multistate | YES | OK | |
| 183 | OWNED SERVICE STATION | OKLA CITY #098 | 1801 N. LINWOOD | Oklahoma | OK | Multistate | YES | OK | |
| 184 | OWNED SERVICE STATION | OKLA CITY #109 | 4325 N.W. 39TH EXPRESSWAY | Oklahoma | OK | Multistate | YES | OK | |
| 185 | OWNED SERVICE STATION | OKLA CITY #110 | 1520 N. MAY | Oklahoma | OK | Multistate | YES | OK | |
| 186 | OWNED SERVICE STATION | ADA #5 | 201 S. MISSISSIPPI | Pontotoc | OK | Multistate | YES | OK | |
| 187 | OWNED SERVICE STATION | SHAWNEE #2 | 1501 (1502) N. HARRISON | Pottawatomie | OK | Multistate | YES | OK | |
| 188 | OWNED SERVICE STATION | SEMINOLE #2 | STATE & STROTHERS | Seminole | OK | Multistate | YES | OK | |
| 189 | OWNED SERVICE STATION | MARLOW #1 | 210 N. BROADWAY | Stephens | OK | Multistate | YES | OK | |
| 190 | OWNED SERVICE STATION | NEW PERRYMAN - Fee 128 | PERRYMAN SEC 1-17N-12E (35ac) | Tulsa | OK | Multistate | YES | OK | |
| 191 | OWNED SERVICE STATION | TULSA #04 | 7839 E. ADMIRAL PLACE | Tulsa | OK | Multistate | YES | OK | |

| No. | Settlement Agreement Designation | Property Name | Property Location | City or County | State | Trust | Federal Covenant Not to Sue | State Covenant Not to Sue | Other Covenant Not to Sue |
|---|---|---|---|---|---|---|---|---|---|
| 192 | OWNED SERVICE STATION | TULSA #15 | 4108 S. PEORIA | Tulsa | OK | Multistate | YES | OK | |
| 193 | OWNED SERVICE STATION | TULSA #16 | 1135 N. SHERIDAN RD. | Tulsa | OK | Multistate | YES | OK | |
| 194 | OWNED SERVICE STATION | TULSA #18 | 543 S. SHERIDAN | Tulsa | OK | Multistate | YES | OK | |
| 195 | OWNED SERVICE STATION | TULSA #21 | 1435 N. UTICA/1706 E. PINE | Tulsa | OK | Multistate | YES | OK | |
| 196 | OWNED SERVICE STATION | TULSA #26 | 3604 NORTH LEWIS | Tulsa | OK | Multistate | YES | OK | |
| 197 | OWNED SERVICE STATION | TULSA #27 | 740 S. UTICA | Tulsa | OK | Multistate | YES | OK | |
| 198 | OWNED SERVICE STATION | TULSA #30 | 1501 N. MINGO | Tulsa | OK | Multistate | YES | OK | |
| 199 | OWNED SERVICE STATION | TULSA #31 | 5110 E. PINE | Tulsa | OK | Multistate | YES | OK | |
| 200 | OWNED SERVICE STATION | TULSA #32 | 5940 S. PEORIA | Tulsa | OK | Multistate | YES | OK | |
| 201 | OWNED SERVICE STATION | BARTLESVILLE #2 | 3101 E FRANK PHILLIPS BLVD | Washington | OK | Multistate | YES | OK | |
| 202 | OWNED SERVICE STATION | HURON #1 | 39 DAKOTA AVE N | Beadle | SD | Multistate | YES | NONE | |
| 203 | OWNED SERVICE STATION | ABERDEEN #3 | 1802 E 6TH AVE | Brown | SD | Multistate | YES | NONE | |
| 204 | OWNED SERVICE STATION | MITCHELL #1 | 416 W. HAVENS | Davison | SD | Multistate | YES | NONE | |
| 205 | OWNED SERVICE STATION | CAMDEN #1 | 169-A WEST MAIN | Benton | TN | Multistate | YES | TN | |

| No. | Settlement Agreement Designation | Property Name | Property Location | City or County | State | Trust | Federal Covenant Not to Sue | State Covenant Not to Sue | Other Covenant Not to Sue |
|-----|----------------------------------|---------------|-------------------|----------------|-------|-------|------------------------------|----------------------------|----------------------------|
| 206 | OWNED SERVICE STATION | MCKENZIE #1 | 802 (605) N. HIGHLAND | Carroll | TN | Multistate | YES | TN | |
| 207 | OWNED SERVICE STATION | DYERSBURG #1 | 1201 FORREST STREET | Dyer | TN | Multistate | YES | TN | |
| 208 | OWNED SERVICE STATION | HUMBOLDT #1 | 2824 EAST END DRIVE | Gibson | TN | Multistate | YES | TN | |
| 209 | OWNED SERVICE STATION | CHATTANOOGA #2008 | 5510 RINGGOLD RD | Hamilton | TN | Multistate | YES | TN | |
| 210 | OWNED SERVICE STATION | CHATTANOOGA #2034 | 2020 E. 23RD | Hamilton | TN | Multistate | YES | TN | |
| 211 | OWNED SERVICE STATION | BROWNSVILLE #1 | 411 EAST MAIN ST | Haywood | TN | Multistate | YES | TN | |
| 212 | OWNED SERVICE STATION | ETOWAH #2053 | HWY 411E & TENN.AVE. | McMinn | TN | Multistate | YES | TN | |
| 213 | OWNED SERVICE STATION | SOUTH FULTON #1 | HIGHWAY 45 EAST & 10 BROADWAY | Obion | TN | Multistate | YES | TN | |
| 214 | OWNED SERVICE STATION | MEMPHIS #7 | 1309 N. HOLLYWOOD | Shelby | TN | Multistate | YES | TN | |
| 215 | OWNED SERVICE STATION | MEMPHIS #8 | 2232 AIRWAYS BLVD | Shelby | TN | Multistate | YES | TN | |
| 216 | OWNED SERVICE STATION | KINGSPORT #2141 | 2005 BLOOMINGDALE PIKE | Sullivan | TN | Multistate | YES | TN | |
| 217 | OWNED SERVICE STATION | COVINGTON #1 | HWY 51 SOUTH | Tipton | TN | Multistate | YES | TN | |
| 218 | OWNED SERVICE STATION | MARTIN #1 | HWY 45 E & PALACE ST/309 LINDELL HIGHWAY | Weakley | TN | Multistate | YES | TN | |
| 219 | OWNED SERVICE STATION | MULESHOE #1 | 1414 W. AMERICAN BLVD | Bailey | TX | Multistate | YES | TX | |

| No. | Settlement Agreement Designation | Property Name | Property Location | City or County | State | Trust | Federal Covenant Not to Sue | State Covenant Not to Sue | Other Covenant Not to Sue |
|---|---|---|---|---|---|---|---|---|---|
| 220 | OWNED SERVICE STATION | BROWNSVILLE #9078 | 615 CENTRAL AVE | Cameron | TX | Multistate | YES | TX | |
| 221 | OWNED SERVICE STATION | BROWNSVILLE #9079 | 3503 BOCA CHICA BLVD. | Cameron | TX | Multistate | YES | TX | |
| 222 | OWNED SERVICE STATION | CHILDRESS #1 | 111 AVENUE F NE | Childress | TX | Multistate | YES | TX | |
| 223 | OWNED SERVICE STATION | DALHART #1 | W. 7TH & CHERRY ST. | Dallam | TX | Multistate | YES | TX | |
| 224 | OWNED SERVICE STATION | PAMPA #1 | 1801 NORTH HOBART | Gray | TX | Multistate | YES | TX | |
| 225 | OWNED SERVICE STATION | MEMPHIS #1 | FRONT AND DOVER STREET | Hall | TX | Multistate | YES | TX | |
| 226 | OWNED SERVICE STATION | QUANAH #1 | 601 WEST 11TH STREET | Hardeman | TX | Multistate | YES | TX | |
| 227 | OWNED SERVICE STATION | HOUSTON #9034 | 4525 WASHINGTON AVE. | Harris | TX | Multistate | YES | TX | |
| 228 | OWNED SERVICE STATION | HOUSTON #9048 | 115 WEST CAVALCADE | Harris | TX | Multistate | YES | TX | |
| 229 | OWNED SERVICE STATION | HOUSTON #9057 | 2506 KELLY ST. | Harris | TX | Multistate | YES | TX | |
| 230 | OWNED SERVICE STATION | HOUSTON #9062 | 5201 S MARTIN L KING | Harris | TX | Multistate | YES | TX | |
| 231 | OWNED SERVICE STATION | HOUSTON #9091 | 3120 ELYSIAN | Harris | TX | Multistate | YES | TX | |
| 232 | OWNED SERVICE STATION | HOUSTON #9092 | 3701 OLD SPANISH TRAIL | Harris | TX | Multistate | YES | TX | |
| 233 | OWNED SERVICE STATION | EDINBURG #9082 | 800 N. CLOSNER | Hidalgo | TX | Multistate | YES | TX | |

| No. | Settlement Agreement Designation | Property Name | Property Location | City or County | State | Trust | Federal Covenant Not to Sue | State Covenant Not to Sue | Other Covenant Not to Sue |
|------|------|------|------|------|------|------|------|------|------|
| 234 | OWNED SERVICE STATION | PHARR #1060 | 900 BLK OF N CAGE | Hidalgo | TX | Multistate | YES | TX | |
| 235 | OWNED SERVICE STATION | BORGER #1 | 800 S. CEDAR | Hutchinson | TX | Multistate | YES | TX | |
| 236 | OWNED SERVICE STATION | BORGER #2 | 10TH & WEATHERLY | Hutchinson | TX | Multistate | YES | TX | |
| 237 | OWNED SERVICE STATION | BORGER #3 | 907 MONROE | Hutchinson | TX | Multistate | YES | TX | |
| 238 | OWNED SERVICE STATION | DUMAS #1 | 1700 SOUTH DUMAS | Moore | TX | Multistate | YES | TX | |
| 239 | OWNED SERVICE STATION | PERRYTON #3 | 125 NORTH MAIN | Ochiltree | TX | Multistate | YES | TX | |
| 240 | OWNED SERVICE STATION | FRIONA #1 | 11TH & GREEN AVE. | Parmer | TX | Multistate | YES | TX | |
| 241 | OWNED SERVICE STATION | AMARILLO #1 | 300 W. AMARILLO BLVD. | Potter | TX | Multistate | YES | TX | |
| 242 | OWNED SERVICE STATION | AMARILLO #3 | 7611 E. AMARILLO | Potter | TX | Multistate | YES | TX | |
| 243 | OWNED SERVICE STATION | AMARILLO #4 | 1601 N GRAND | Potter | TX | Multistate | YES | TX | |
| 244 | OWNED SERVICE STATION | AMARILLO #5 | 2214 SE 3RD ST. | Potter | TX | Multistate | YES | TX | |
| 245 | OWNED SERVICE STATION | AMARILLO #7 | 4419 SO. GEORGIA | Randall | TX | Multistate | YES | TX | |
| 246 | OWNED SERVICE STATION | CANYON #1 | 1301 23RD ST. | Randall | TX | Multistate | YES | TX | |
| 247 | OWNED SERVICE STATION | ODEM #9088 | 100 PARK AVENUE | San Patricio | TX | Multistate | YES | TX | |

| No. | Settlement Agreement Designation | Property Name | Property Location | City or County | State | Trust | Federal Covenant Not to Sue | State Covenant Not to Sue | Other Covenant Not to Sue |
|------|------|------|------|------|------|------|------|------|------|
| 248 | OWNED SERVICE STATION | FORT WORTH #1 | 301 E.BERRY STREET | Tarrant | TX | Multistate | YES | TX | |
| 249 | OWNED SERVICE STATION | ABINGDON #2132 | 622 WEST MAIN | Washington | VA | Multistate | YES | NONE | |
| 250 | OWNED SERVICE STATION | GREEN BAY - 13TH AVE | 609 13TH AVE | Brown | WI | Multistate | YES | WI | |
| 251 | OWNED SERVICE STATION | GREEN BAY - MASON | 936 W MASON ST | Brown | WI | Multistate | YES | WI | |
| 252 | OWNED SERVICE STATION | GREEN BAY #1 | 2128 UNIVERSITY AVENUE | Brown | WI | Multistate | YES | WI | |
| 253 | OWNED SERVICE STATION | DEPERE | 715 GEORGE STREET | DePere | WI | Multistate | YES | WI | |
| 254 | OWNED SERVICE STATION | MENOMONIE #1 | 1132 (1131) N. BROADWAY | Dunn | WI | Multistate | YES | WI | |
| 255 | OWNED SERVICE STATION | LACROSSE #2 | 2100 (2127)SOUTH AVE. | LaCrosse | WI | Multistate | YES | WI | |
| 256 | OWNED SERVICE STATION | MILWAUKEE #9 | 5626 W. HAMPTON | Milwaukee | WI | Multistate | YES | WI | |
| 257 | OWNED SERVICE STATION | JANESVILLE #1 - PLAT 1 | ORCHARD & COURT | Rock | WI | Multistate | YES | WI | |
| 258 | OWNED SERVICE STATION | JANESVILLE #1 - PLAT 2 | SW/C ORCHARD & COURT | Rock | WI | Multistate | YES | WI | |
| 259 | OWNED SERVICE STATION | NEENAH #1 | 960 W. WHEELER RD./906 AMERICAN DRIVE | Winnebago | WI | Multistate | YES | WI | |

## EXHIBIT "A-3"

## Other Sites- Owned

| No. | Settlement Agreement Designation | Property Name | Property Location | City or County | State | Trust | Federal Covenant Not to Sue | State Covenant Not to Sue | Other Covenant Not to Sue |
|---|---|---|---|---|---|---|---|---|---|
| 1 | OTHER SITES | LAURA LODE-MINING | PAT. MINING CLAIMS (T23S, R11E) (Additional Details on Attachment A-4) | Santa Cruz | AZ | Multistate | YES | NONE | |
| 2 | OTHER SITES | RED MOUNTAIN, AZ | PAT. MINING CLAIMS (T22S, R16E) (Additional Details on Attachment A-4) | Santa Cruz | AZ | Multistate | YES | NONE | |
| 3 | OTHER SITES | VERNON PROPERTY | MAP BOOK 6303, PAGE 004, PARCEL 029- Tract no 275 com N 89c35' E 273.52 Ft from intersection of S. Line of N | Vernon | CA | Multistate | YES | NONE | |
| 4 | OTHER SITES | VERNON PROPERTY | MAP BOOK 6303, PAGE 004, PARCEL 036- San Antonio Rancho * Por of SD RO | Vernon | CA | Multistate | YES | NONE | |
| 5 | OTHER SITES | RED MOUNTAIN, CO | PAT. MINING CLAIMS (Additional Details on Attachment A-4) | Ouray /San Juan | CO | Multistate | YES | NONE | |
| 6 | OTHER SITES | FLORIDA PHOSPHATE LANDS | POLK COUNTY - BREWSTER (31S, R23) (Additional Details on Attachment A-4) | Polk | FL | Multistate | YES | FL | |
| 7 | OTHER SITES | EAST ST. LOUIS - YARD | DSY YARD SITE | St. Clair | IL | Multistate | YES | IL | |
| 8 | OTHER SITES | FEE 312 - LAKE ROAD | LAKE ROAD | Oxford | ME | Multistate | YES | NONE | |
| 9 | OTHER SITES | LAGRANGE TERMINAL | NORTH BUSINESS HIGHWAY 61A (905 N. MAIN) | LaGrange | MO | Multistate | YES | MO | |
| 10 | OTHER SITES | HATTIESBURG SITE (PROPERTY NEAR GULF STATES FORMER WOOD TREATING SITE) | W. PINE STREET | Hattiesburg | MS | Multistate | YES | MS | |

| No. | Settlement Agreement Designation | Property Name | Property Location | City or County | State | Trust | Federal Covenant Not to Sue | State Covenant Not to Sue | Other Covenant Not to Sue |
|---|---|---|---|---|---|---|---|---|---|
| 11 | OTHER SITES | OKC - COLLEGE PARK ADDN - FEE #62 | LOTS 5 thru 14, BLK 31 | Oklahoma | OK | Multistate | YES | OK | |
| 12 | OTHER SITES | OKC - FEE 21 PART 1 - BLK 33 | NE/C NW 88 & SHARTEL | Oklahoma | OK | Multistate | YES | OK | |
| 13 | OTHER SITES | OKC - FEE 21 PART 2 - BLK 33 | NE/C NW 88 & SHARTEL | Oklahoma | OK | Multistate | YES | OK | |
| 14 | OTHER SITES | OKC - FEE 21 PART 3 - BLK 13 | 601 NW 101 - FLORAL PARK ADDN | Oklahoma | OK | Multistate | YES | OK | |
| 15 | OTHER SITES | OKC - FEE 21 PART 4 - BLK 4 | 346 NW 96 - CHESTER HILL ADDN | Oklahoma | OK | Multistate | YES | OK | |
| 16 | OTHER SITES | OKC - FEE 22 HOMEDALE ADDN | 900 NW 101 - HOMEDALE ADDITION | Oklahoma | OK | Multistate | YES | OK | |
| 17 | OTHER SITES | OKC - FEE 22 HOMEDALE ADDN | 930 NW 107 - LOT -16, BLK 007 | Oklahoma | OK | Multistate | YES | OK | |
| 18 | OTHER SITES | NASHVILLE TERMINAL #2 | NASHVILLE TERMINAL | Davidson | TN | Multistate | YES | TN | |
| 19 | OTHER SITES | NASHVILLE TERMINAL #1 | 160 WARF AVENUE | Nashville | TN | Multistate | YES | TN | |
| 20 | OTHER SITES | CORPUS CHRISTI LANDFARM SITE/ CORPUS CHRISTI #05 | 144 BRANIGAN | Nueces | TX | Multistate | YES | TX | |
| 21 | OTHER SITES | CORPUS CHRISTI #02 | 1930 WINNEBAGO | Nueces | TX | Multistate | YES | TX | |
| 22 | OTHER SITES | CORPUS CHRISTI #03 | 1934 WINNEBAGO | Nueces | TX | Multistate | YES | TX | |
| 23 | OTHER SITES | CORPUS CHRISTI #04 | 1925 NUECES STREET | Nueces | TX | Multistate | YES | TX | |
| 24 | OTHER SITES | CORPUS CHRISTI #06 | 1905 NUECES STREET | Nueces | TX | Multistate | YES | TX | |
| 25 | OTHER SITES | CORPUS CHRISTI #07 | NUECES ST | Nueces | TX | Multistate | YES | TX | |
| 26 | OTHER SITES | MOSS AMERICAN NPL SITE (OWNED PORTION) | 9633-49 W. BROWN DEER RD | Milwaukee | WI | Multistate | YES | WI | |

## EXHIBIT "A-4"

### Additional Information-Owned Mines

| No. | Settlement Agreement Designation | Property Name | Property Location | City or County | State | Trust | Federal Covenant Not to Sue | State Covenant Not to Sue | Other Covenant Not to Sue |
|---|---|---|---|---|---|---|---|---|---|
| 1 | OWNED FUNDED SITES | PATENT MINING CLAIMS NEAR BRISTOL/CASELTON | 154 Pat Mining Claims, Millsites, (Map/Parcel Number: '009-011-25) | Lincoln County - Pioche Fire | NV | Multistate | YES | NV | |
| 2 | OWNED FUNDED SITES | PATENT MINING CLAIMS NEAR BRISTOL/CASELTON | 16 Pat Mining Claims, (Map/Parcel Number '09-011-41) | Lincoln County - Pioche | NV | Multistate | YES | NV | |
| 3 | OWNED FUNDED SITES | PATENT MINING CLAIMS NEAR BRISTOL/CASELTON | 2 Pat. Mining claims Jackrabbit (Map/Parcel Number '09-012-09) | Lincoln County | NV | Multistate | YES | NV | |
| 4 | OWNED FUNDED SITES | PATENT MINING CLAIMS NEAR BRISTOL/CASELTON | 27 Pat Claims Bristol Dist. (Map/Parcel Number '09-012-16) | Lincoln County | NV | Multistate | YES | NV | |
| 5 | OTHER SITES | LAURA LODE-MINING | Pat Mine Located in the ORO Blanco Mining Dist., MS #3048, Laura, Sec 20 & 29, T 23S R11 E (20.66 ACRES, Map/Parcel Number: 11335001) | Santa Cruz County | AZ | Multistate | YES | NONE | |
| 6 | OTHER SITES | LAURA LODE-MINING | Patent #02-82-0029 IN Harshaw Ming Dist Sec 19 & 20 T22S R16 EMS #4767 (51.13 ACRES, Map/Parcel Number: 106-24-011 9) | Santa Cruz County | AZ | Multistate | YES | NONE | |
| 7 | OTHER SITES | LAURA LODE-MINING | RED CASTLES #2 | Santa Cruz County | AZ | Multistate | YES | NONE | |
| 8 | OTHER SITES | LAURA LODE-MINING | RED CASTLES #8 | Santa Cruz County | AZ | Multistate | YES | NONE | |
| 9 | OTHER SITES | LAURA LODE-MINING | RED CASTLES #9 | Santa Cruz County | AZ | Multistate | YES | NONE | |
| 10 | OTHER SITES | RED MOUNTAIN, AZ | AAGH NO. 16 | Santa Cruz | AZ | Multistate | YES | NONE | |
| 11 | OTHER SITES | RED MOUNTAIN, AZ | AAGH NO. 21 | Santa Cruz | AZ | Multistate | YES | NONE | |
| 12 | OTHER SITES | RED MOUNTAIN, AZ | AAGH NO. 7 | Santa Cruz | AZ | Multistate | YES | NONE | |

| No. | Settlement Agreement Designation | Property Name | Property Location | City or County | State | Trust | Federal Covenant Not to Sue | State Covenant Not to Sue | Other Covenant Not to Sue |
|---|---|---|---|---|---|---|---|---|---|
| 13 | OTHER SITES | RED MOUNTAIN, AZ | ANDES NO. 1 | Santa Cruz | AZ | Multistate | YES | NONE | |
| 14 | OTHER SITES | RED MOUNTAIN, AZ | ANDES NO. 2 | Santa Cruz | AZ | Multistate | YES | NONE | |
| 15 | OTHER SITES | RED MOUNTAIN, AZ | CHARLOTTE | Santa Cruz | AZ | Multistate | YES | NONE | |
| 16 | OTHER SITES | RED MOUNTAIN, AZ | DORFEE | Santa Cruz | AZ | Multistate | YES | NONE | |
| 17 | OTHER SITES | RED MOUNTAIN, AZ | ELNOR | Santa Cruz | AZ | Multistate | YES | NONE | |
| 18 | OTHER SITES | RED MOUNTAIN, AZ | FOX NO. 4 | Santa Cruz | AZ | Multistate | YES | NONE | |
| 19 | OTHER SITES | RED MOUNTAIN, AZ | FOX NO. 5 | Santa Cruz | AZ | Multistate | YES | NONE | |
| 20 | OTHER SITES | RED MOUNTAIN, AZ | GEM NO. 1 | Santa Cruz | AZ | Multistate | YES | NONE | |
| 21 | OTHER SITES | RED MOUNTAIN, AZ | GEM NO. 2 | Santa Cruz | AZ | Multistate | YES | NONE | |
| 22 | OTHER SITES | RED MOUNTAIN, AZ | HANK NO. 1 | Santa Cruz | AZ | Multistate | YES | NONE | |
| 23 | OTHER SITES | RED MOUNTAIN, AZ | HANK NO. 10 | Santa Cruz | AZ | Multistate | YES | NONE | |
| 24 | OTHER SITES | RED MOUNTAIN, AZ | HANK NO. 11 | Santa Cruz | AZ | Multistate | YES | NONE | |
| 25 | OTHER SITES | RED MOUNTAIN, AZ | HANK NO. 12 | Santa Cruz | AZ | Multistate | YES | NONE | |
| 26 | OTHER SITES | RED MOUNTAIN, AZ | HANK NO. 13 | Santa Cruz | AZ | Multistate | YES | NONE | |
| 27 | OTHER SITES | RED MOUNTAIN, AZ | HANK NO. 14 | Santa Cruz | AZ | Multistate | YES | NONE | |
| 28 | OTHER SITES | RED MOUNTAIN, AZ | HANK NO. 15 | Santa Cruz | AZ | Multistate | YES | NONE | |
| 29 | OTHER SITES | RED MOUNTAIN, AZ | HANK NO. 16 | Santa Cruz | AZ | Multistate | YES | NONE | |

| No. | Settlement Agreement Designation | Property Name | Property Location | City or County | State | Trust | Federal Covenant Not to Sue | State Covenant Not to Sue | Other Covenant Not to Sue |
|---|---|---|---|---|---|---|---|---|---|
| 30 | OTHER SITES | RED MOUNTAIN, AZ | HANK NO. 17 | Santa Cruz | AZ | Multistate | YES | NONE | |
| 31 | OTHER SITES | RED MOUNTAIN, AZ | HANK NO. 18 | Santa Cruz | AZ | Multistate | YES | NONE | |
| 32 | OTHER SITES | RED MOUNTAIN, AZ | HANK NO. 19 | Santa Cruz | AZ | Multistate | YES | NONE | |
| 33 | OTHER SITES | RED MOUNTAIN, AZ | HANK NO. 2 | Santa Cruz | AZ | Multistate | YES | NONE | |
| 34 | OTHER SITES | RED MOUNTAIN, AZ | HANK NO. 20 | Santa Cruz | AZ | Multistate | YES | NONE | |
| 35 | OTHER SITES | RED MOUNTAIN, AZ | HANK NO. 21 | Santa Cruz | AZ | Multistate | YES | NONE | |
| 36 | OTHER SITES | RED MOUNTAIN, AZ | HANK NO. 8 | Santa Cruz | AZ | Multistate | YES | NONE | |
| 37 | OTHER SITES | RED MOUNTAIN, AZ | HANK NO. 9 | Santa Cruz | AZ | Multistate | YES | NONE | |
| 38 | OTHER SITES | RED MOUNTAIN, AZ | HEAVEYSIDE | Santa Cruz | AZ | Multistate | YES | NONE | |
| 39 | OTHER SITES | RED MOUNTAIN, AZ | HEAVEYSIDE NO. 2 | Santa Cruz | AZ | Multistate | YES | NONE | |
| 40 | OTHER SITES | RED MOUNTAIN, AZ | HOPE NO. 1 | Santa Cruz | AZ | Multistate | YES | NONE | |
| 41 | OTHER SITES | RED MOUNTAIN, AZ | HOPE NO. 3 | Santa Cruz | AZ | Multistate | YES | NONE | |
| 42 | OTHER SITES | RED MOUNTAIN, AZ | HOPE NO. 4 | Santa Cruz | AZ | Multistate | YES | NONE | |
| 43 | OTHER SITES | RED MOUNTAIN, AZ | Patent #02-82-0030 in Patagonia Mining Dist Sec 19, 20,21,29,30 T22S R16 EMS (472.97 ACRES, Map/Parcel Number: 106-24-012A 1) | Santa Cruz County | AZ | Multistate | YES | NONE | |
| 44 | OTHER SITES | RED MOUNTAIN, AZ | SOUTH RED MOUNTAIN NO. 1 | Santa Cruz | AZ | Multistate | YES | NONE | |
| 45 | OTHER SITES | RED MOUNTAIN, AZ | SOUTH RED MOUNTAIN NO. 2 | Santa Cruz | AZ | Multistate | YES | NONE | |

| No. | Settlement Agreement Designation | Property Name | Property Location | City or County | State | Trust | Federal Covenant Not to Sue | State Covenant Not to Sue | Other Covenant Not to Sue |
|---|---|---|---|---|---|---|---|---|---|
| 46 | OTHER SITES | RED MOUNTAIN, AZ | SOUTH RED MOUNTAIN NO. 3 | Santa Cruz | AZ | Multistate | YES | NONE | |
| 47 | OTHER SITES | RED MOUNTAIN, AZ | SOUTH RED MOUNTAIN NO. 4 | Santa Cruz | AZ | Multistate | YES | NONE | |
| 48 | OTHER SITES | RED MOUNTAIN, AZ | SOUTH RED MOUNTAIN NO. 5 | Santa Cruz | AZ | Multistate | YES | NONE | |
| 49 | OTHER SITES | RED MOUNTAIN, AZ | SOUTH RED MOUNTAIN NO. 6 | Santa Cruz | AZ | Multistate | YES | NONE | |
| 50 | OTHER SITES | RED MOUNTAIN, AZ | SOUTH RED MOUNTAIN NO. 7 | Santa Cruz | AZ | Multistate | YES | NONE | |
| 51 | OTHER SITES | RED MOUNTAIN, AZ | TEN GRAND NO. 103 | Santa Cruz | AZ | Multistate | YES | NONE | |
| 52 | OTHER SITES | RED MOUNTAIN, AZ | TEN GRAND NO. 113 | Santa Cruz | AZ | Multistate | YES | NONE | |
| 53 | OTHER SITES | RED MOUNTAIN, AZ | TEN GRAND NO. 115 | Santa Cruz | AZ | Multistate | YES | NONE | |
| 54 | OTHER SITES | RED MOUNTAIN, AZ | TEN GRAND NO. 117 | Santa Cruz | AZ | Multistate | YES | NONE | |
| 55 | OTHER SITES | RED MOUNTAIN, AZ | TEN GRAND NO. 119 | Santa Cruz | AZ | Multistate | YES | NONE | |
| 56 | OTHER SITES | RED MOUNTAIN, AZ | TEN GRAND NO. 121 | Santa Cruz | AZ | Multistate | YES | NONE | |
| 57 | OTHER SITES | RED MOUNTAIN, AZ | TEN GRAND NO. 122 | Santa Cruz | AZ | Multistate | YES | NONE | |
| 58 | OTHER SITES | RED MOUNTAIN, AZ | TEN GRAND NO. 123 | Santa Cruz | AZ | Multistate | YES | NONE | |
| 59 | OTHER SITES | RED MOUNTAIN, AZ | TEN GRAND NO. 124 | Santa Cruz | AZ | Multistate | YES | NONE | |
| 60 | OTHER SITES | RED MOUNTAIN, AZ | TEN GRAND NO. 125 | Santa Cruz | AZ | Multistate | YES | NONE | |
| 61 | OTHER SITES | RED MOUNTAIN, AZ | TEN GRAND NO. 126 | Santa Cruz | AZ | Multistate | YES | NONE | |
| 62 | OTHER SITES | RED MOUNTAIN, AZ | TEN GRAND NO. 127 | Santa Cruz | AZ | Multistate | YES | NONE | |

| No. | Settlement Agreement Designation | Property Name | Property Location | City or County | State | Trust | Federal Covenant Not to Sue | State Covenant Not to Sue | Other Covenant Not to Sue |
|---|---|---|---|---|---|---|---|---|---|
| 63 | OTHER SITES | RED MOUNTAIN, AZ | TEN GRAND NO. 128 | Santa Cruz | AZ | Multistate | YES | NONE | |
| 64 | OTHER SITES | RED MOUNTAIN, AZ | TEN GRAND NO. 129 | Santa Cruz | AZ | Multistate | YES | NONE | |
| 65 | OTHER SITES | RED MOUNTAIN, AZ | TEN GRAND NO. 98 | Santa Cruz | AZ | Multistate | YES | NONE | |
| 66 | OTHER SITES | RED MOUNTAIN, AZ | TERRY NO. 1 | Santa Cruz | AZ | Multistate | YES | NONE | |
| 67 | OTHER SITES | RED MOUNTAIN, AZ | UNITED VERDE NO. 1 | Santa Cruz | AZ | Multistate | YES | NONE | |
| 68 | OTHER SITES | RED MOUNTAIN, AZ | UNITED VERDE NO. 3 | Santa Cruz | AZ | Multistate | YES | NONE | |
| 69 | OTHER SITES | RED MOUNTAIN, CO | 50% HUMBOLT, 1558, 10.33 A, #4775-063-00-008 | Ouray County | CO | Multistate | YES | NONE | |
| 70 | OTHER SITES | RED MOUNTAIN, CO | BLUE BELL, 9688, 10.33 A, #4775-082-00-002 | Ouray County | CO | Multistate | YES | NONE | |
| 71 | OTHER SITES | RED MOUNTAIN, CO | DAISY, 4548, 10.33 A, #4775-082-00-002 | Ouray County | CO | Multistate | YES | NONE | |
| 72 | OTHER SITES | RED MOUNTAIN, CO | EASTERN BELLE QUARTZ, 7088, 9.84 A, #4775-172-00-001 | Ouray County | CO | Multistate | YES | NONE | |
| 73 | OTHER SITES | RED MOUNTAIN, CO | ENGLISH MAID, 4548, 10.33A, #4775-082-002 | Ouray County | CO | Multistate | YES | NONE | |
| 74 | OTHER SITES | RED MOUNTAIN, CO | EUREKA MNG DISTRICT; CAPITOL 6585, MARY 18589; 17.37 TOTAL ACRES | San Juan County | CO | Multistate | YES | NONE | |
| 75 | OTHER SITES | RED MOUNTAIN, CO | EUREKA MNG DISTRICT; CORA 16220, DEL MINO 18950, GOLD STANDARD 18950, GOLDEN WONDER #3 16220, KEYSTONE 18950, LITTLE MINNIE 16304, SIBLEY 18950, VESTAL 16642, WETZEL 18950, GOLDEN WONDER 16220; 59.88 TOTAL ACRES | San Juan County | CO | Multistate | YES | NONE | |
| 76 | OTHER SITES | RED MOUNTAIN, CO | EXCELSIOR 18552, 6.85 A, #4775-083-00-004 | Ouray County | CO | Multistate | YES | NONE | |

93

| No. | Settlement Agreement Designation | Property Name | Property Location | City or County | State | Trust | Federal Covenant Not to Sue | State Covenant Not to Sue | Other Covenant Not to Sue |
|---|---|---|---|---|---|---|---|---|---|
| 77 | OTHER SITES | RED MOUNTAIN, CO | EXTENSION 1303, 2560, 10.33A, #4775-053-00-006 | Ouray County | CO | Multistate | YES | NONE | |
| 78 | OTHER SITES | RED MOUNTAIN, CO | JUDSON, 2214, 6.9 A, #4775-084-00-005 | Ouray County | CO | Multistate | YES | NONE | |
| 79 | OTHER SITES | RED MOUNTAIN, CO | LIGHT, 18051, 10.33 A, #4775-054-00-008 | Ouray County | CO | Multistate | YES | NONE | |
| 80 | OTHER SITES | RED MOUNTAIN, CO | LITTLE MONA, 4639, 7.72 A, #4775-063-00-007 | Ouray County | CO | Multistate | YES | NONE | |
| 81 | OTHER SITES | RED MOUNTAIN, CO | MAGGIE, 18552, 4.27 A, #4775-172-00-001 | Ouray County | CO | Multistate | YES | NONE | |
| 82 | OTHER SITES | RED MOUNTAIN, CO | MINERAL BELT, 8071, 10.33 A, #4775-043-00-002 | Ouray County | CO | Multistate | YES | NONE | |
| 83 | OTHER SITES | RED MOUNTAIN, CO | MONA'S QUEEN, 4639, 5.7 A, 4775-063-00-005 | Ouray County | CO | Multistate | YES | NONE | |
| 84 | OTHER SITES | RED MOUNTAIN, CO | NEWPORT, 18552, 6.29 A, #4775-083-00-004 | Ouray County | CO | Multistate | YES | NONE | |
| 85 | OTHER SITES | RED MOUNTAIN, CO | PACIFIC, 4548, 10.33A, #4775-082-00-002 | Ouray County | CO | Multistate | YES | NONE | |
| 86 | OTHER SITES | RED MOUNTAIN, CO | RED MOUNTAIN MNG DISTRICT; BERNARD 16222, CAMP BIRD 18636, DRY GULCH 18636, GOLD DOLLAR 18636, GOLDEN WONDER #1 16220, GOLDEN WONDER #2 16220, GOLDEN WONDER #6 16220, IXION 17361, LIBBIE B 16220, MAMMOTH 16220, NELLIE BLY 16220, MINNIE 16896, PRODIGAL DAUGHTER 16769, TINCUP (UND 1/2 INT IN 8.83 ACRES) 16909, WITCH HAZEL 16202; 116.79 TOTAL ACRES | San Juan | CO | Multistate | YES | NONE | |

94

| No. | Settlement Agreement Designation | Property Name | Property Location | City or County | State | Trust | Federal Covenant Not to Sue | State Covenant Not to Sue | Other Covenant Not to Sue |
|-----|----------------------------------|---------------|-------------------|----------------|-------|-------|------------------------------|----------------------------|----------------------------|
| 87 | OTHER SITES | RED MOUNTAIN, CO | RED MOUNTAIN MNG DISTRICT; BIG HORN #2 18516, BIG HORN #3 18516, BIG HORN #12 18516, BIG HORN #13 18516, BIG HORN #14 18516, WILSON 6689; 55.38 TOTAL ACRES | San Juan | CO | Multistate | YES | NONE | |
| 88 | OTHER SITES | RED MOUNTAIN, CO | RED MOUNTAIN MNG DISTRICT; BOY COTTER 18950, BOY COTTER EXT 18950, DARDENELLE 18627, J C BELL 18950, MILL 18950, WEBSTER 8438; 51.75 TOTAL ACRES | San Juan | CO | Multistate | YES | NONE | |
| 89 | OTHER SITES | RED MOUNTAIN, CO | RED MOUNTAIN MNG DISTRICT; BURLEIGH 18626, DETROUT 18626, KING 18626, LITTLE ROUND TOP 18626, PACIFIC SLIDE 18626, PRIMROSE 18626, VENDOME 18626, VEVA 18626; 69.75 TOTAL ACRES | San Juan | CO | Multistate | YES | NONE | |
| 90 | OTHER SITES | RED MOUNTAIN, CO | RED MOUNTAIN MNG DISTRICT; BUTTERCUP 18626, CONSTELLATION 19014, CONTRA COSTA 18626, CRESCENT 19014, DAISY 18626, DEW DROP 18626, DEW DROP #2 18626, KING #1 18626, LITTLE GEM 18626, MORNING GLORY 18626, RESERVE 18626, ROSE 18626, ROSE BUD 18626, SPARTA 18626, SPARROW 18626, SYNOPSIS 18626, VIOLET 18626, WESTERN RESERVE 18626, WYANDOTE 18626, MAMMOTH 18626; 189.31 TOTAL ACRES | San Juan | CO | Multistate | YES | NONE | |
| 91 | OTHER SITES | RED MOUNTAIN, CO | RED MOUNTAIN MNG DISTRICT; CRESCENT 18672, HILLTOP 18672; 1.63 TOTAL ACRES | San Juan | CO | Multistate | YES | NONE | |

| No. | Settlement Agreement Designation | Property Name | Property Location | City or County | State | Trust | Federal Covenant Not to Sue | State Covenant Not to Sue | Other Covenant Not to Sue |
|---|---|---|---|---|---|---|---|---|---|
| 92 | OTHER SITES | RED MOUNTAIN, CO | RED MOUNTAIN MNG DISTRICT; LITTLE ROCK 16274, LITTLE SIDE HILL 16274, LOS ANGELES 16274, MONTANA 15205 (BAL. OF CLAIM IN OURAY), THERESA #1 14213; 37.53 TOTAL ACRES | San Juan | CO | Multistate | | NONE | |
| 93 | OTHER SITES | RED MOUNTAIN, CO | RED MOUNTAIN MNG DISTRICT; PLEASANT VIEW 19386; 3.4 TOTAL ACRES | San Juan | CO | Multistate | | | |
| 94 | OTHER SITES | RED MOUNTAIN, CO | RED MOUNTAIN MNG DISTRICT;ELLA 18552, EXCELSIOR 18552, JUDSON 2214, MAGGIE 18552, NEVADA (BAL OURAY) 15205, NEWPORT 18552, PENNSYLVANIA 15205, PITTSBURG 15205, RAMONA 15205; 31.49 TOTAL ACRES | San Juan | CO | Multistate | | | |
| 95 | OTHER SITES | RED MOUNTAIN, CO | SAILOR BOY, 1850, 10.33 A, #4775-172-00-001 | Ouray County | CO | Multistate | YES | NONE | |
| 96 | OTHER SITES | RED MOUNTAIN, CO | SIERRA NEVADA, 2207, 8.6 A, #4775-063-00-009 | Ouray County | CO | Multistate | YES | NONE | |
| 97 | OTHER SITES | RED MOUNTAIN, CO | SILVER BUD, 9688, 10.33 A, #4775-082-00-002 | Ouray County | CO | Multistate | YES | NONE | |
| 98 | OTHER SITES | RED MOUNTAIN, CO | ST. BRIDGES, 2557, 10.33 A, #4775-064-00-014 | Ouray County | CO | Multistate | YES | NONE | |
| 99 | OTHER SITES | RED MOUNTAIN, CO | SURE ENOUGH, 18060, 3.71A, #4775-063-00-009 | Ouray County | CO | Multistate | YES | NONE | |
| 100 | OTHER SITES | RED MOUNTAIN, CO | TIN CUP 80%, 16909, 10.33A, #4775-172-00-002 | Ouray County | CO | Multistate | YES | NONE | |
| 101 | OTHER SITES | RED MOUNTAIN, CO | TIP TOP, 18051, 10.33 A, #4775-054-00-008 | Ouray County | CO | Multistate | YES | NONE | |
| 102 | OTHER SITES | RED MOUNTAIN, CO | VULCAN, 4548, 8.61 A, #4775-082-00-002 | Ouray County | CO | Multistate | YES | NONE | |
| 103 | OTHER SITES | FLORIDA PHOSPHATE LANDS | EAST OF HIGHWAY 37, Pt SW/4SW/4,SE/4SW/4  (37.4 Acres) | Polk County | FL | Multistate | YES | FL | |

| No. | Settlement Agreement Designation | Property Name | Property Location | City or County | State | Trust | Federal Covenant Not to Sue | State Covenant Not to Sue | Other Covenant Not to Sue |
|---|---|---|---|---|---|---|---|---|---|
| 104 | OTHER SITES | FLORIDA PHOSPHATE LANDS | EAST OF HIGHWAY 37, NE/4NW/4  (40 Acres) | Polk County | FL | Multistate | YES | FL | |
| 105 | OTHER SITES | FLORIDA PHOSPHATE LANDS | WEST OF HIGHWAY 37, Pt SW/4SW/4  (37.3 Acres) | Polk County | FL | Multistate | YES | FL | |
| 106 | OTHER SITES | FLORIDA PHOSPHATE LANDS | WEST OF HIGHWAY 37, E/2, E/2SW/4, SE/4NW/4, S/2NE/4NW/4  (455 Acres) | Polk County | FL | Multistate | YES | FL | |
| 107 | OTHER SITES | FLORIDA PHOSPHATE LANDS | WEST OF HIGHWAY 37, NE/4, N/2N/2SE/4,N/2NE/4SW/4,NE/4NW/4   (295.5 Acres) | Polk County | FL | Multistate | YES | FL | |
| 108 | OTHER SITES | FLORIDA PHOSPHATE LANDS | WEST OF HIGHWAY 37, W/2SW/4,SW/4NW/4, S/2NW/4NW/4   (140 Acres) | Polk County | FL | Multistate | YES | FL | |
| 109 | OTHER SITES | FLORIDA PHOSPHATE LANDS | WEST OF HIGHWAY 37, NW/4NW/4  (40 Acres) | Polk County | FL | Multistate | YES | FL | |
| 110 | OTHER SITES | FLORIDA PHOSPHATE LANDS | WEST OF HIGHWAY 37, E/2E/2,SE/4NE/4, S/2NE/4NE/4 (140 Acres) | Polk County | FL | Multistate | YES | FL | |
| 111 | OTHER SITES | FLORIDA PHOSPHATE LANDS | WEST OF HIGHWAY 37, E/2, E/2W/2, Pt. W/2W/2  (537.3 Acres) | Polk County | FL | Multistate | YES | FL | |
| 112 | OTHER SITES | FLORIDA PHOSPHATE LANDS | WEST OF HIGHWAY 37, W/2SW/4, Pt. E/2SW/4, S/2NW/4,S/2N/2NW/4, Pt. NW/4NW/4NW/4, NE/4NE/4   (390 Acres) | Polk County | FL | Multistate | YES | FL | |
| 113 | OTHER SITES | FLORIDA PHOSPHATE LANDS | WEST OF HIGHWAY 37, N/2NW/4 (80 Acres) | Polk County | FL | Multistate | YES | FL | |
| 114 | OTHER SITES | FLORIDA PHOSPHATE LANDS | WEST OF HIGHWAY 37, N/2NE/4, NE/4NW/4, Pt. SE/4NW/4 (60 Acres) | Polk County | FL | Multistate | YES | FL | |
| 115 | OTHER SITES | FLORIDA PHOSPHATE LANDS | WEST OF HIGHWAY 37, Pt.W/2W/2 (30.7 Acres) | Polk County | FL | Multistate | YES | FL | |
| 116 | OTHER SITES | FLORIDA PHOSPHATE LANDS | WEST OF HIGHWAY 37, Pt.S/2NW/4 (43.4 Acres) | Polk County | FL | Multistate | YES | FL | |
| 117 | OTHER SITES | FLORIDA PHOSPHATE LANDS | WEST OF HIGHWAY 37, Pt.S/2NE/4 & Pt.NE/4NW/4  (130 Acres) | Polk County | FL | Multistate | YES | FL | |

## EXHIBIT "A-5"

| No. | Settlement Agreement Designation | Property Name | Property Location | City or County | State |
|---|---|---|---|---|---|
| 1 | NON-OWNED SERVICE STATIONS | Albertville 7070 | Highway 431 South | Albertville | AL |
| 2 | NON-OWNED SERVICE STATIONS | Alexander City 50 | Route 2, U.S. 280 By-Pass | Alexander City | AL |
| 3 | NON-OWNED SERVICE STATIONS | Anniston 106 | 2830 Noble St. | Anniston | AL |
| 4 | NON-OWNED SERVICE STATIONS | Arab | Parkway 231 North | Arab | AL |
| 5 | NON-OWNED SERVICE STATIONS | Ardmore 7203 | Highway 53 South | Ardmore | AL |
| 6 | NON-OWNED SERVICE STATIONS | Athens 6085 | 378 Highway 72 East | Athens | AL |
| 7 | NON-OWNED SERVICE STATIONS | Athens 7083 | Highway 72 West | Athens | AL |
| 8 | NON-OWNED SERVICE STATIONS | Athens | Hwy. 72E | Athens | AL |
| 9 | NON-OWNED SERVICE STATIONS | Athens | Hwy. 72W | Athens | AL |
| 10 | NON-OWNED SERVICE STATIONS | Attalla | 929 5th Avenue | Attalla | AL |
| 11 | NON-OWNED SERVICE STATIONS | Bessemer 7110 | 929 5th Avenue N.E. | Attalla | AL |
| 12 | NON-OWNED SERVICE STATIONS | Attalla 7077 | South 3rd Street | Attalla | AL |
| 13 | NON-OWNED SERVICE STATIONS | Bessemer 58 | 1400 First Avenue South | Bessemer | AL |
| 14 | NON-OWNED SERVICE STATIONS | Bessemer 103 | 1405 19th Street | Bessemer | AL |
| 15 | NON-OWNED SERVICE STATIONS | Bessemer | 330 S. 14th Street | Bessemer | AL |
| 16 | NON-OWNED SERVICE STATIONS | Bessemer 17 | 4001 Greenwood Road | Bessemer | AL |
| 17 | NON-OWNED SERVICE STATIONS | Bessemer 43 | Hall Avenue and 14th Street | Bessemer | AL |
| 18 | NON-OWNED SERVICE STATIONS | Bessemer 59 | Route 8 (U.S. Highway 11) | Bessemer | AL |

| 19 | NON-OWNED SERVICE STATIONS | Birmingham 66 | 10th Avenue North | Birmingham | AL |
| 20 | NON-OWNED SERVICE STATIONS | Birmingham 2105 | 1125 Gadsden RD | Birmingham | AL |
| 21 | NON-OWNED SERVICE STATIONS | Birmingham 104 | 1813 Bankhead Highway | Birmingham | AL |
| 22 | NON-OWNED SERVICE STATIONS | Birmingham 7059 | 301 77th Street | Birmingham | AL |
| 23 | NON-OWNED SERVICE STATIONS | Birmingham 23 | 4401 Fourth Avenue South | Birmingham | AL |
| 24 | NON-OWNED SERVICE STATIONS | Birmingham 101 | 4641 Decatur Highway | Birmingham | AL |
| 25 | NON-OWNED SERVICE STATIONS | Birmingham 85 | 490 Forestdale Boulevard | Birmingham | AL |
| 26 | NON-OWNED SERVICE STATIONS | Birmingham 2 | 5501 First Avenue South | Birmingham | AL |
| 27 | NON-OWNED SERVICE STATIONS | Birmingham 102 | 606 Birmingham - Bessemer Super Highway | Birmingham | AL |
| 28 | NON-OWNED SERVICE STATIONS | Birmingham 84 | 6525 Third Avenue North | Birmingham | AL |
| 29 | NON-OWNED SERVICE STATIONS | Birmingham 80 | 816 Sixth Avenue South | Birmingham | AL |
| 30 | NON-OWNED SERVICE STATIONS | Birmingham 37 | 8211 North First Avenue | Birmingham | AL |
| 31 | NON-OWNED SERVICE STATIONS | Birmingham 7702, 8 | Jefferson & 16th | Birmingham | AL |
| 32 | NON-OWNED SERVICE STATIONS | Birmingham 67 | Third Avenue and 9th Street | Birmingham | AL |
| 33 | NON-OWNED SERVICE STATIONS | Birmingham 82 | US Highway 78 West | Birmingham | AL |
| 34 | NON-OWNED SERVICE STATIONS | Birmingham 2167 | 3319 Fifth Avenue North | Birmingham | AL |
| 35 | NON-OWNED SERVICE STATIONS | Blountsville 109 | State Highway 79 & US Highway 231 | Blountsville | AL |
| 36 | NON-OWNED SERVICE STATIONS | Boaz KM-124-7000 | 303 Thomas Avenue | Boaz | AL |
| 37 | NON-OWNED SERVICE STATIONS | Boaz 7007 | NW/C Highway 431 & Bethsaida Road | Boaz | AL |
| 38 | NON-OWNED SERVICE STATIONS | Center Point 86 | 1837 Center Point Road | Center Point | AL |

| 39 | NON-OWNED SERVICE STATIONS | Columbiana 64 | State Highway 25 | Columbiana | AL |
|----|----------------------------|---------------|------------------|------------|-----|
| 40 | NON-OWNED SERVICE STATIONS | Crossville | Hwy. 75S | Crossville | AL |
| 41 | NON-OWNED SERVICE STATIONS | Dothan 48 | 718 North Oates | Dothan | AL |
| 42 | NON-OWNED SERVICE STATIONS | East Gadsden 75 | Highway 278 East | East Gadsden | AL |
| 43 | NON-OWNED SERVICE STATIONS | Fultondale 2159 | US Highway 31 North | Fultondale | AL |
| 44 | NON-OWNED SERVICE STATIONS | Gadsden 7039 | 1325 Noccaula RD Highway 211 | Gadsden | AL |
| 45 | NON-OWNED SERVICE STATIONS | Gadsden 76 | 22225 W. Meighan Blvd. | Gadsden | AL |
| 46 | NON-OWNED SERVICE STATIONS | Gadsden 7114 | 346 Albert Rains Blvd. | Gadsden | AL |
| 47 | NON-OWNED SERVICE STATIONS | Gadsden 99 | Forrest Avenue and First Street | Gadsden | AL |
| 48 | NON-OWNED SERVICE STATIONS | Gadsden | Rainbow Drive | Gadsden | AL |
| 49 | NON-OWNED SERVICE STATIONS | Glencoe 7068 | 16051 Highway 431 South | Glencoe | AL |
| 50 | NON-OWNED SERVICE STATIONS | Grand Bay | US Highway 90 | Grand Bay | AL |
| 51 | NON-OWNED SERVICE STATIONS | Guntersville 431 | US Highway 431 | Guntersville | AL |
| 52 | NON-OWNED SERVICE STATIONS | Hamilton 78 | US Highway 78 | Hamilton | AL |
| 53 | NON-OWNED SERVICE STATIONS | Highland Home K-11 | US Highway 331 | Highland Home | AL |
| 54 | NON-OWNED SERVICE STATIONS | Hollins 60 | Highway 241 | Hollins | AL |
| 55 | NON-OWNED SERVICE STATIONS | Homewood 15 | 2705 South 18th Street | Homewood | AL |
| 56 | NON-OWNED SERVICE STATIONS | Huntsville 53 | 2500 Bob Wallace Avenue | Huntsville | AL |
| 57 | NON-OWNED SERVICE STATIONS | Huntsville 7111 | 2821 University Drive | Huntsville | AL |
| 58 | NON-OWNED SERVICE STATIONS | Huntsville 33 | 611 West Clinton Street | Huntsville | AL |

| 59 | NON-OWNED SERVICE STATIONS | Huntsville 96 | 650 North Parkway | Huntsville | AL |
|----|---------------------------|---------------|-------------------|------------|----|
| 60 | NON-OWNED SERVICE STATIONS | Irondale 104 | 1813 Bankhead Highway | Irondale | AL |
| 61 | NON-OWNED SERVICE STATIONS | Jasper 115 | Bankhead Highway & 2nd Avenue | Jasper | AL |
| 62 | NON-OWNED SERVICE STATIONS | Jasper 7063 | Highway 69 South & 13th Avenue (near bankhead highway) | Jasper | AL |
| 63 | NON-OWNED SERVICE STATIONS | Kilpatrick 7104 | Highway 168 East | Kilpatrick | AL |
| 64 | NON-OWNED SERVICE STATIONS | Loxley 21 | Highway 90 | Loxley or Mobile | AL |
| 65 | NON-OWNED SERVICE STATIONS | Mobile 72 | 1910 St. Stephens Road | Mobile | AL |
| 66 | NON-OWNED SERVICE STATIONS | Mobile 3 | 59 North Broad Street | Mobile | AL |
| 67 | NON-OWNED SERVICE STATIONS | Mobile 9 | 750 Government Street | Mobile | AL |
| 68 | NON-OWNED SERVICE STATIONS | Mobile 55 | Moffat Road | Mobile | AL |
| 69 | NON-OWNED SERVICE STATIONS | Mobile 57 | 1051 Springhill Avenue | Mobile | AL |
| 70 | NON-OWNED SERVICE STATIONS | Montgomery 7 | 137 Madison Avenue | Montgomery | AL |
| 71 | NON-OWNED SERVICE STATIONS | Montgomery k-6 | 1521 Decatur Street | Montgomery | AL |
| 72 | NON-OWNED SERVICE STATIONS | Montgomery K-7 | 3452 Mobile Highway | Montgomery | AL |
| 73 | NON-OWNED SERVICE STATIONS | Tan-Kar Oil Company (11 stations, office space and storage building) | 3452 Mobile Hwy | Montgomery | AL |
| 74 | NON-OWNED SERVICE STATIONS | Montgomery K-1 | 500 Bell Street | Montgomery | AL |
| 75 | NON-OWNED SERVICE STATIONS | Montgomery K-15 | 570 South Decatur Street | Montgomery | AL |
| 76 | NON-OWNED SERVICE STATIONS | Montgomery K-12 | US 82 and 231 | Montgomery | AL |
| 77 | NON-OWNED SERVICE STATIONS | Montgomery K-4 | US Highway 80 | Montgomery | AL |

| 78 | NON-OWNED SERVICE STATIONS | Morgan City 7079 | Highway 231 North | Morgan City | AL |
| 79 | NON-OWNED SERVICE STATIONS | Morgan City | Hwy. 431N | Morgan City | AL |
| 80 | NON-OWNED SERVICE STATIONS | Mountainboro-Boaz 7025 | Highway 431 N - Carlisle | Mountainboro Boaz | AL |
| 81 | NON-OWNED SERVICE STATIONS | Odenville 7030 | Highway 411 South | Odenville | AL |
| 82 | NON-OWNED SERVICE STATIONS | Oneonta 108 | 402 2nd Avenue East | Oneonta | AL |
| 83 | NON-OWNED SERVICE STATIONS | Oneonta 7201 | Highway 231 North | Oneonta | AL |
| 84 | NON-OWNED SERVICE STATIONS | Oneonta 7204 | Highway 75 West | Oneonta | AL |
| 85 | NON-OWNED SERVICE STATIONS | Opelika 63 | US Highway 29 | Opelika | AL |
| 86 | NON-OWNED SERVICE STATIONS | Owens Cross Roads 7080 | 9642 Highway 431 South | Owens Cross Roads | AL |
| 87 | NON-OWNED SERVICE STATIONS | OXFORD | 1200 SNOW | Oxford | AL |
| 88 | NON-OWNED SERVICE STATIONS | Painter-Crossville 7022 | Highway 75 South | Painter-Crossville | AL |
| 89 | NON-OWNED SERVICE STATIONS | Pelham 89 | US Highway 31 South of Birmingham | Pelham | AL |
| 90 | NON-OWNED SERVICE STATIONS | Phenix City 62 | US 280 and 431 | Phenix City | AL |
| 91 | NON-OWNED SERVICE STATIONS | Piedmont 107 | State Highway 74 and US 278 | Piedmont | AL |
| 92 | NON-OWNED SERVICE STATIONS | Prattville 18 | Highway 31 and Alabama River | Prattville | AL |
| 93 | NON-OWNED SERVICE STATIONS | Prattville K-3 | RR #1 | Prattville | AL |
| 94 | NON-OWNED SERVICE STATIONS | Prattville 13 | US Highway 31 | Prattville | AL |
| 95 | NON-OWNED SERVICE STATIONS | Prichard 73 | 3000 St Stephens Road | Prichard | AL |
| 96 | NON-OWNED SERVICE STATIONS | Prichard 54 | Highway 45 & Lott Road | Prichard | AL |
| 97 | NON-OWNED SERVICE STATIONS | Reform 65 | US Highway 82 | Reform | AL |

102

| 98 | NON-OWNED SERVICE STATIONS | Saraland 5071 | 207 Highway #43 | Saraland | AL |
| 99 | NON-OWNED SERVICE STATIONS | Selma 20 | 1327 - 1331 Broad Street | Selma | AL |
| 100 | NON-OWNED SERVICE STATIONS | Selma K-14 | US Highway 80 | Selma | AL |
| 101 | NON-OWNED SERVICE STATIONS | Shawmut 158 | 3000 20th Avenue | Shawmut | AL |
| 102 | NON-OWNED SERVICE STATIONS | Sheffield 7098 | 717 East 2nd Street | Sheffield | AL |
| 103 | NON-OWNED SERVICE STATIONS | Sheffield 94 | 723 East Second | Sheffield | AL |
| 104 | NON-OWNED SERVICE STATIONS | Sheffield 112 | Montgomery Avenue and Cohen Street | Sheffield | AL |
| 105 | NON-OWNED SERVICE STATIONS | Somerville 111 | Decatur-Arab Road (Highway 67) | Somerville | AL |
| 106 | NON-OWNED SERVICE STATIONS | Southside 7084 | Highway 77 South | Southside | AL |
| 107 | NON-OWNED SERVICE STATIONS | Sylacauga 7082 | Highway 21 North | Sylacauga | AL |
| 108 | NON-OWNED SERVICE STATIONS | Tarrant County 7102 | 1021 Pinson Valley Parkway | Tarrant County | AL |
| 109 | NON-OWNED SERVICE STATIONS | Tuscaloosa 12 | Greensboro Avenue and Second Street | Tuscaloosa | AL |
| 110 | NON-OWNED SERVICE STATIONS | Verbena 16 | US Highway 31 | Verbena | AL |
| 111 | NON-OWNED SERVICE STATIONS | Wetempka K-8 | 14 miles east of Montgomery on Highway 231 | Wetumpka | AL |
| 112 | NON-OWNED SERVICE STATIONS | Wetempka 56 | US Highway 231 | Wetumpka | AL |
| 113 | NON-OWNED SERVICE STATIONS | Wetumpka K-2 | US Highway 231 | Wetumpka | AL |
| 114 | NON-OWNED SERVICE STATIONS | Winfield 114 | US Highway 78 | Winfield | AL |
| 115 | NON-OWNED SERVICE STATIONS | Winterborough 61 | US Highway 231 | Winterborough | AL |
| 116 | NON-OWNED SERVICE STATIONS | Beebe 1 | Highway 67 | Beebe | AR |
| 117 | NON-OWNED SERVICE STATIONS | Beebe 74 | | Beebe | AR |

| 118 | NON-OWNED SERVICE STATIONS | Blytheville 1 | 1000 South Division Street | Blytheville | AR |
| 119 | NON-OWNED SERVICE STATIONS | Blytheville 2 | 301 South Elm Street | Blytheville | AR |
| 120 | NON-OWNED SERVICE STATIONS | Blythville 3 | Highway 151 North | Blytheville | AR |
| 121 | NON-OWNED SERVICE STATIONS | Camden 1 | SE/C California & Chestnut | Camden | AR |
| 122 | NON-OWNED SERVICE STATIONS | DeQueen 1 | 830 Elberta Avenue | DeQueen | AR |
| 123 | NON-OWNED SERVICE STATIONS | Eudora 5 | Highway 65 & Fourth Street | Eudora | AR |
| 124 | NON-OWNED SERVICE STATIONS | Fayetteville 1 | 103 South School Street | Fayetteville | AR |
| 125 | NON-OWNED SERVICE STATIONS | Fayetteville 2 | 1236 South School Street | Fayetteville | AR |
| 126 | NON-OWNED SERVICE STATIONS | Fayetteville 4 | 1348 West 6th Street | Fayetteville | AR |
| 127 | NON-OWNED SERVICE STATIONS | Fayetteville 3 | 2402 College | Fayetteville | AR |
| 128 | NON-OWNED SERVICE STATIONS | Fort Smith 4 | 3825 Jenny Lind | Fort Smith | AR |
| 129 | NON-OWNED SERVICE STATIONS | Fort Smith 3 | 3811 Grand Avenue | Ft. Smith | AR |
| 130 | NON-OWNED SERVICE STATIONS | Ft. Smith 1 | 3911 Towson Avenue | Ft. Smith | AR |
| 131 | NON-OWNED SERVICE STATIONS | Fort Smith 2 | 5101 Jenny Lind Avenue | Ft. Smith | AR |
| 132 | NON-OWNED SERVICE STATIONS | Helena 1 | Perry and Oakland Streets | Helena | AR |
| 133 | NON-OWNED SERVICE STATIONS | Hot Springs 2 | 2200 Albert Pike | Hot Springs | AR |
| 134 | NON-OWNED SERVICE STATIONS | Hot Springs 3 | 2245 Malvern Avenue | Hot Springs | AR |
| 135 | NON-OWNED SERVICE STATIONS | Hot Springs | 4109 Central Avenue | Hot Springs | AR |
| 136 | NON-OWNED SERVICE STATIONS | Hoxie 1 | NE/C US Highway 67 & Lindsey St. | Hoxie | AR |
| 137 | NON-OWNED SERVICE STATIONS | Jacksonville 1 | 106 Marshall Road | Jacksonville | AR |

| 138 | NON-OWNED SERVICE STATIONS | Little Rock 5 | 1100 East Roosevelt | Little Rock | AR |
| 139 | NON-OWNED SERVICE STATIONS | Little Rock 2 | 1823 High Street | Little Rock | AR |
| 140 | NON-OWNED SERVICE STATIONS | Little Rock 1 | 2801 West Markham | Little Rock | AR |
| 141 | NON-OWNED SERVICE STATIONS | Little Rock 44 | West 12th Street and South Hayes | Little Rock | AR |
| 142 | NON-OWNED SERVICE STATIONS | Malvern 2 | 1114 East Page Avenue | Malvern | AR |
| 143 | NON-OWNED SERVICE STATIONS | Marianna 1 | US Highway 79 & SH-1 | Marianna | AR |
| 144 | NON-OWNED SERVICE STATIONS | Newport 1 | Highway 67 | Newport | AR |
| 145 | NON-OWNED SERVICE STATIONS | North Little Rock 4 | 224 East Broadway | North Little Rock | AR |
| 146 | NON-OWNED SERVICE STATIONS | North Little Rock 3 | 4600 East Broadway | North Little Rock | AR |
| 147 | NON-OWNED SERVICE STATIONS | Pine Bluff 3 | 1301 West Barraque | Pine Bluff | AR |
| 148 | NON-OWNED SERVICE STATIONS | PINE BLUFF | 1700 N CEDAR | Pine Bluff | AR |
| 149 | NON-OWNED SERVICE STATIONS | Pine Bluff 5 | 2220 Olive Street | Pine Bluff | AR |
| 150 | NON-OWNED SERVICE STATIONS | Pine Bluff 4 | 3820 West Sixth Avenue | Pine Bluff | AR |
| 151 | NON-OWNED SERVICE STATIONS | Pine Bluff 2 | NW/C US Highway 65 & Hutchinson | Pine Bluff | AR |
| 152 | NON-OWNED SERVICE STATIONS | Pine Bluff 1 | US Highway 79 North & Collegiate Dr | Pine Bluff | AR |
| 153 | NON-OWNED SERVICE STATIONS | POTTSVILLE | SE/C i-40 & us 64 | Pottsville | AR |
| 154 | NON-OWNED SERVICE STATIONS | Russellville 2 | 1021 East 4th Street | Russellville | AR |
| 155 | NON-OWNED SERVICE STATIONS | Russellville | 3109 N. Main street | Russellville | AR |
| 156 | NON-OWNED SERVICE STATIONS | Searcy 1 | 502 W. Pleasure St. | Searcy | AR |
| 157 | NON-OWNED SERVICE STATIONS | Searcy 2 | 1901 East Race Street | Searcy | AR |

| 158 | NON-OWNED SERVICE STATIONS | Springdale 1 | 930 South Thompson Street | Springdale | AR |
| 159 | NON-OWNED SERVICE STATIONS | Springdale 2 | 404 W. Emma | Springdale | AR |
| 160 | NON-OWNED SERVICE STATIONS | Atlantic Beach 71 | 1119 Atlantic Boulevard | Atlantic Beach | FL |
| 161 | NON-OWNED SERVICE STATIONS | Atlantic Beach 75 | 880 Mayport Road | Atlantic Beach | FL |
| 162 | NON-OWNED SERVICE STATIONS | Boynton Beach 87 | 730 NW Second Avenue | Boynton Beach | FL |
| 163 | NON-OWNED SERVICE STATIONS | Clearwater 63 | US Alternate Route 19 and Howard Court | Clearwater | FL |
| 164 | NON-OWNED SERVICE STATIONS | COCOA #3057 | SE/C ST ROAD 520/LINCOLN ROAD | Cocoa | FL |
| 165 | NON-OWNED SERVICE STATIONS | Crystal River 44 | Eastside US Highway 19 | Crystal River | FL |
| 166 | NON-OWNED SERVICE STATIONS | Fernandina Beach 67 | State Highway 200 | Fernandina Beach | FL |
| 167 | NON-OWNED SERVICE STATIONS | Fort Walton Beach 76 | 54 Beal Parkway Southwest | Fort Walton Beach | FL |
| 168 | NON-OWNED SERVICE STATIONS | Ft. Walton Beach | 98 Elgin Parkway N.E. | Ft. Walton Beach | FL |
| 169 | NON-OWNED SERVICE STATIONS | Gainesville 79 | 205 NW 8th Avenue | Gainesville | FL |
| 170 | NON-OWNED SERVICE STATIONS | Gainesville 91 | 2225 NW 6th | Gainesville | FL |
| 171 | NON-OWNED SERVICE STATIONS | Holly Hills 92 | 1094 Derbshire | Holly Hills | FL |
| 172 | NON-OWNED SERVICE STATIONS | Jacksonville 74 | 1112 University Boulevard | Jacksonville | FL |
| 173 | NON-OWNED SERVICE STATIONS | Jacksonville 69 | 4233 Brentwood | Jacksonville | FL |
| 174 | NON-OWNED SERVICE STATIONS | Jacksonville 66 | 4321 Moncrief Road | Jacksonville | FL |
| 175 | NON-OWNED SERVICE STATIONS | Jacksonville 70 | 509 South Edgewood Avenue | Jacksonville | FL |
| 176 | NON-OWNED SERVICE STATIONS | Jacksonville 55 | 6186 Cleveland Avenue | Jacksonville | FL |
| 177 | NON-OWNED SERVICE STATIONS | Jacksonville 90 | 6203 Roosevelt Boulevard | Jacksonville | FL |

106

| 178 | NON-OWNED SERVICE STATIONS | Jacksonville 42 | 7136 Atlantic Avenue | Jacksonville | FL |
|---|---|---|---|---|---|
| 179 | NON-OWNED SERVICE STATIONS | Jacksonville 68 | 725 Florida Avenue | Jacksonville | FL |
| 180 | NON-OWNED SERVICE STATIONS | Jacksonville 73 | 729 West Ashley Street | Jacksonville | FL |
| 181 | NON-OWNED SERVICE STATIONS | Jacksonville 41 | 959 Cassatt Avenue | Jacksonville | FL |
| 182 | NON-OWNED SERVICE STATIONS | Jacksonville 40 | NW/C Merrill Road & Cesery Boulevard | Jacksonville | FL |
| 183 | NON-OWNED SERVICE STATIONS | Lake Worth 83 | 1001-05 South Dixie Highway | Lake Worth | FL |
| 184 | NON-OWNED SERVICE STATIONS | Lake Worth 84 | 3138 Lake Worth Road | Lake Worth | FL |
| 185 | NON-OWNED SERVICE STATIONS | Lake Worth 86 | 3380 South Military Trail | Lake Worth | FL |
| 186 | NON-OWNED SERVICE STATIONS | Lakeland 88 | 414 West Memorial Boulevard | Lakeland | FL |
| 187 | NON-OWNED SERVICE STATIONS | Largo 58 | 3390 E. Bay Drive | Largo | FL |
| 188 | NON-OWNED SERVICE STATIONS | Melbourne 29 | 2300 New Haven Street and Acacia Drive | Melbourne | FL |
| 189 | NON-OWNED SERVICE STATIONS | Merritt Island 82 | 325 Merritt Island Causeway | Merritt Island | FL |
| 190 | NON-OWNED SERVICE STATIONS | Ocala Power 52 | US Highway Interstate 75 & State Route 40 | Ocala | FL |
| 191 | NON-OWNED SERVICE STATIONS | Orlando 77 | 10 East Oakridge Road | Orlando | FL |
| 192 | NON-OWNED SERVICE STATIONS | Orlando 3093 | 1905 East Michigan | Orlando | FL |
| 193 | NON-OWNED SERVICE STATIONS | Orlando 76 | 7525 South Orange Avenue | Orlando | FL |
| 194 | NON-OWNED SERVICE STATIONS | Ormond Beach 3072 | 101 W. Granada Blvd | Ormond Beach | FL |
| 195 | NON-OWNED SERVICE STATIONS | Palatka 65 | 2005 Reid Road | Palatka | FL |
| 196 | NON-OWNED SERVICE STATIONS | Panama City | 1920 East Fifth Street | Panama City | FL |
| 197 | NON-OWNED SERVICE STATIONS | Panama City 45 | St. Andrews - Lynn Haven Road | Panama City | FL |

| 198 | NON-OWNED SERVICE STATIONS | Pensacola 47 | 3600 Palafox | Pensacola | FL |
| 199 | NON-OWNED SERVICE STATIONS | Pensacola 35 | 3806 Mobile Highway | Pensacola | FL |
| 200 | NON-OWNED SERVICE STATIONS | Perry 39 | US Highway 19 South | Perry | FL |
| 201 | NON-OWNED SERVICE STATIONS | St Augustine 56 | Green Acres Road & S. Highway 16 | St. Augustine | FL |
| 202 | NON-OWNED SERVICE STATIONS | Tallahassee 38 | 1080 West Tennessee Street | Tallahassee | FL |
| 203 | NON-OWNED SERVICE STATIONS | Tampa 51 | 3057 West Hillsborough Avenue | Tampa | FL |
| 204 | NON-OWNED SERVICE STATIONS | Tampa 59 | 3337 South West Shore Boulevard | Tampa | FL |
| 205 | NON-OWNED SERVICE STATIONS | Titusville 3081 | 1110 Garden Street | Titusville | FL |
| 206 | NON-OWNED SERVICE STATIONS | Titusville 80 | South & DeLeon Streets | Titusville | FL |
| 207 | NON-OWNED SERVICE STATIONS | West Palm Beach 85 | 5713 Voss Road, Mangonia Park | West Palm Beach | FL |
| 208 | NON-OWNED SERVICE STATIONS | Winter Haven 89 | 1506 34th Street, NW | Winter Haven | FL |
| 209 | NON-OWNED SERVICE STATIONS | Albany 47 | 1300 North Slappey Boulevard | Albany | GA |
| 210 | NON-OWNED SERVICE STATIONS | Albany 48 | 615 Radium Springs Road | Albany | GA |
| 211 | NON-OWNED SERVICE STATIONS | Alpharetta 5 | 125 South Main Street | Alpharetta | GA |
| 212 | NON-OWNED SERVICE STATIONS | Athens 28 | 1064 Baxter Street | Athens | GA |
| 213 | NON-OWNED SERVICE STATIONS | Athens 57 | Oconee Street | Athens | GA |
| 214 | NON-OWNED SERVICE STATIONS | Atlanta 17 | 1113 Twiggs Street | Atlanta | GA |
| 215 | NON-OWNED SERVICE STATIONS | Atlanta 24 | 1321 Bankhead Highway | Atlanta | GA |
| 216 | NON-OWNED SERVICE STATIONS | Atlanta 11 | 180 Georgia Avenue S.W. | Atlanta | GA |
| 217 | NON-OWNED SERVICE STATIONS | Atlanta 11 | 1811 Lakewood Avenue SE | Atlanta | GA |

| 218 | NON-OWNED SERVICE STATIONS | Atlanta 12 | 1811 Lakewood Avenue, S.W. | Atlanta | GA |
|---|---|---|---|---|---|
| 219 | NON-OWNED SERVICE STATIONS | Atlanta 2091 | 186 Northside Drive, S.W. | Atlanta | GA |
| 220 | NON-OWNED SERVICE STATIONS | Atlanta 4 | 2125 Piedmont Road, N.E. | Atlanta | GA |
| 221 | NON-OWNED SERVICE STATIONS | Atlanta 3 | 2125 Piedmont Road, NE | Atlanta | GA |
| 222 | NON-OWNED SERVICE STATIONS | Atlanta 2 | 2418 Bolton Road | Atlanta | GA |
| 223 | NON-OWNED SERVICE STATIONS | Atlanta 1 | 2418 Bolton Road N.W. | Atlanta | GA |
| 224 | NON-OWNED SERVICE STATIONS | Atlanta 3030 | 280 Central Avenue | Atlanta | GA |
| 225 | NON-OWNED SERVICE STATIONS | Atlanta 10 | 370 Peters Street | Atlanta | GA |
| 226 | NON-OWNED SERVICE STATIONS | Atlanta 4 | 3955 Buford Highway | Atlanta | GA |
| 227 | NON-OWNED SERVICE STATIONS | Atlanta8 | 409 Mitchell Street S.W. | Atlanta | GA |
| 228 | NON-OWNED SERVICE STATIONS | Atlanta 8 | 409 Mitchelle Street S.W. | Atlanta | GA |
| 229 | NON-OWNED SERVICE STATIONS | Atlanta 2 | 4374 Roswell Road, N.W. | Atlanta | GA |
| 230 | NON-OWNED SERVICE STATIONS | Atlanta 3 | 4374 Roswell Road, N.W. | Atlanta | GA |
| 231 | NON-OWNED SERVICE STATIONS | Atlanta 139 | 646 DeKalb Avenue | Atlanta | GA |
| 232 | NON-OWNED SERVICE STATIONS | Atlanta 26 | 712 Hemphill Avenue | Atlanta | GA |
| 233 | NON-OWNED SERVICE STATIONS | Atlanta 31 | 980 Howell Mill Road | Atlanta | GA |
| 234 | NON-OWNED SERVICE STATIONS | Atlanta 92 | 980 Howell Mill Road | Atlanta | GA |
| 235 | NON-OWNED SERVICE STATIONS | Atlanta Bulk Plant | Avon Avenue & Sylvan Road | Atlanta | GA |
| 236 | NON-OWNED SERVICE STATIONS | Atlanta 29 | Bankhead Highway | Atlanta | GA |
| 237 | NON-OWNED SERVICE STATIONS | Atlanta 30 | Central & Pulliam | Atlanta | GA |

| 238 | NON-OWNED SERVICE STATIONS | Atlanta 10 | 108 Georgia Avenue | Atlanta | GA |
| 239 | NON-OWNED SERVICE STATIONS | Augusta 17 | 1113 Twiggs Street | Augusta | GA |
| 240 | NON-OWNED SERVICE STATIONS | Augusta 25 | 2228 Milledgeville Road | Augusta | GA |
| 241 | NON-OWNED SERVICE STATIONS | Brunswick 49 | 2325 Norwich Street | Brunswick | GA |
| 242 | NON-OWNED SERVICE STATIONS | Chamblee 2 | 3705 Buford Highway | Chamblee | GA |
| 243 | NON-OWNED SERVICE STATIONS | Chamblee 1 | 4477 Peachtree rd | Chamblee | GA |
| 244 | NON-OWNED SERVICE STATIONS | College Park 137 | 2086 Roosevelt Highway | College Park | GA |
| 245 | NON-OWNED SERVICE STATIONS | Columbus 35 | 3238 Cusseta Road | Columbus | GA |
| 246 | NON-OWNED SERVICE STATIONS | Dalton 23 | 606 East Morris | Dalton | GA |
| 247 | NON-OWNED SERVICE STATIONS | Dalton 16 | 900 North Glenwood Avenue | Dalton | GA |
| 248 | NON-OWNED SERVICE STATIONS | Decatur 9 | 1875 Candler Road | Decatur | GA |
| 249 | NON-OWNED SERVICE STATIONS | Decatur 9 | 1881 Candler Road | Decatur | GA |
| 250 | NON-OWNED SERVICE STATIONS | Decatur 2038 | 3647 Covington Highway | Decatur | GA |
| 251 | NON-OWNED SERVICE STATIONS | Dry Branch 3011 | Macon Irwinton Road | Dry Branch | GA |
| 252 | NON-OWNED SERVICE STATIONS | Eatonton | Oak Street & South Madison | Eatonton | GA |
| 253 | NON-OWNED SERVICE STATIONS | Fair Oaks 7 | 505 Austell Road | Fair Oaks | GA |
| 254 | NON-OWNED SERVICE STATIONS | Flippen 3 | SE/C Meadowbrook & Highway 351 | Flippen | GA |
| 255 | NON-OWNED SERVICE STATIONS | Forest Park 2135 | 752 Main Street | Forest Park | GA |
| 256 | NON-OWNED SERVICE STATIONS | Fort Valley 9 | Macon and Church Streets | Fort Valley | GA |
| 257 | NON-OWNED SERVICE STATIONS | Gainesville 6 | 1000 Athens Street | Gainesville | GA |

| 258 | NON-OWNED SERVICE STATIONS | Gainesville 9 | 920 Athens Avenue | Gainesville | GA |
| 259 | NON-OWNED SERVICE STATIONS | Gainesville 6 | Athens Highway | Gainesville | GA |
| 260 | NON-OWNED SERVICE STATIONS | Gray 5 | Gray-Milledgeville Road | Gray | GA |
| 261 | NON-OWNED SERVICE STATIONS | Green Valley 27 | Highway 87 | Green Valley | GA |
| 262 | NON-OWNED SERVICE STATIONS | Griffin 36 | 361 North Expressway | Griffin | GA |
| 263 | NON-OWNED SERVICE STATIONS | Hapeville | 816 South Central Avenue | Hapeville | GA |
| 264 | NON-OWNED SERVICE STATIONS | Irwinton 13 | Main Street & Highway 29 & 57 | Irwinton | GA |
| 265 | NON-OWNED SERVICE STATIONS | Jenkinsburg 3028 | US Highway 23 | Jenkinsburg | GA |
| 266 | NON-OWNED SERVICE STATIONS | Mableton 2093 | 835 Bankhead Highway | Mableton | GA |
| 267 | NON-OWNED SERVICE STATIONS | Macon 24 | 1083 Third Street | Macon | GA |
| 268 | NON-OWNED SERVICE STATIONS | Macon 24 | 1095 Third Street | Macon | GA |
| 269 | NON-OWNED SERVICE STATIONS | Macon | 1194 Broadway | Macon | GA |
| 270 | NON-OWNED SERVICE STATIONS | Macon 20 | 1503 Broadway | Macon | GA |
| 271 | NON-OWNED SERVICE STATIONS | Macon 21 | 161 Emery Highway | Macon | GA |
| 272 | NON-OWNED SERVICE STATIONS | Macon 2 | 2165 Montpelier Avenue | Macon | GA |
| 273 | NON-OWNED SERVICE STATIONS | Macon 15 | 2827 Houston Avenue | Macon | GA |
| 274 | NON-OWNED SERVICE STATIONS | Macon 18 | 3306 Forsyth Road | Macon | GA |
| 275 | NON-OWNED SERVICE STATIONS | Macon 18 | 3306 Vineville Avenue | Macon | GA |
| 276 | NON-OWNED SERVICE STATIONS | Macon 34 | 3430 Pio Nona Avenue | Macon | GA |
| 277 | NON-OWNED SERVICE STATIONS | Macon 46 | 3871 Broadway | Macon | GA |

111

| 278 | NON-OWNED SERVICE STATIONS | Macon 22 | 399 Walnut Street | Macon | GA |
| 279 | NON-OWNED SERVICE STATIONS | Macon 12 | 3992 Napier Avenue | Macon | GA |
| 280 | NON-OWNED SERVICE STATIONS | Macon 23 | 489 Cotton Avenue | Macon | GA |
| 281 | NON-OWNED SERVICE STATIONS | Macon 3 | 659 North Avenue | Macon | GA |
| 282 | NON-OWNED SERVICE STATIONS | Macon 50 | 727 Emery Highway & Fort Hill Road | Macon | GA |
| 283 | NON-OWNED SERVICE STATIONS | Macon 12 | Belleville Station | Macon | GA |
| 284 | NON-OWNED SERVICE STATIONS | macon #3053 | sw/c Hawkinsville road & allen road | Macon | GA |
| 285 | NON-OWNED SERVICE STATIONS | Macon 37 | 3871 Broadway | Macon | GA |
| 286 | NON-OWNED SERVICE STATIONS | Marietta 7 | 1410 Austell Road, Southeast | Marietta | GA |
| 287 | NON-OWNED SERVICE STATIONS | Moultrie 16 | West Central & First Street, S.W. | Moultrie | GA |
| 288 | NON-OWNED SERVICE STATIONS | Moultrie 16 | West Central & Trust | Moultrie | GA |
| 289 | NON-OWNED SERVICE STATIONS | Scottsdale 14 | 3436 East Ponce De Leon Avenue | Scottsdale | GA |
| 290 | NON-OWNED SERVICE STATIONS | Statesboro 7 | Savannah and Vine Streets | Statesboro | GA |
| 291 | NON-OWNED SERVICE STATIONS | Summerville 51 | 463 Commerce Street | Summerville | GA |
| 292 | NON-OWNED SERVICE STATIONS | Thomaston 6 | 904 Barnesville Street | Thomaston | GA |
| 293 | NON-OWNED SERVICE STATIONS | Thomaston 26 | US Highway 19 | Thomaston | GA |
| 294 | NON-OWNED SERVICE STATIONS | Valdosta 14 | 651 South Patterson | Valdosta | GA |
| 295 | NON-OWNED SERVICE STATIONS | Vidalia 10 | First Street | Vidalia | GA |
| 296 | NON-OWNED SERVICE STATIONS | West Point 46 | 100 East 8th Street | West Point | GA |
| 297 | NON-OWNED SERVICE STATIONS | Atlantic 2 | 7th and Walnut Streets | Atlantic | IA |

| 298 | NON-OWNED SERVICE STATIONS | Bettendorf 1 | 2920 State Street | Bettendorf | IA |
|---|---|---|---|---|---|
| 299 | NON-OWNED SERVICE STATIONS | Burlington 1 | 1200 N. Roosevelt Avenue | Burlington | IA |
| 300 | NON-OWNED SERVICE STATIONS | Carroll 1 | US Highway 30 East | Carroll | IA |
| 301 | NON-OWNED SERVICE STATIONS | Cedar Rapids | 1600 6th Street | Cedar Rapids | IA |
| 302 | NON-OWNED SERVICE STATIONS | Cedar Rapids 1 | 4713 6th Street | Cedar Rapids | IA |
| 303 | NON-OWNED SERVICE STATIONS | Centerville 1 | 220 East Maple Street | Centerville | IA |
| 304 | NON-OWNED SERVICE STATIONS | Clive 1 | 1725 N.W. 86th Street | Clive | IA |
| 305 | NON-OWNED SERVICE STATIONS | Cresco 1 | 202 2nd Avenue South | Cresco | IA |
| 306 | NON-OWNED SERVICE STATIONS | Davenport 2 | 2000 West River Road | Davenport | IA |
| 307 | NON-OWNED SERVICE STATIONS | Davenport 1 | 2920 West Locust | Davenport | IA |
| 308 | NON-OWNED SERVICE STATIONS | Denison 1 | White and Prospect Streets | Denison | IA |
| 309 | NON-OWNED SERVICE STATIONS | Des Moines 2 | 14th & Euclid | Des Moines | IA |
| 310 | NON-OWNED SERVICE STATIONS | Des Moines 7 | 1824 Second Avenue | Des Moines | IA |
| 311 | NON-OWNED SERVICE STATIONS | Des Moines 9 | 1954 Indianola Road | Des Moines | IA |
| 312 | NON-OWNED SERVICE STATIONS | Des Moines 11 | 2110 West Army Post Road | Des Moines | IA |
| 313 | NON-OWNED SERVICE STATIONS | Des Moines 3 | 2270 Hubbell Avenue | Des Moines | IA |
| 314 | NON-OWNED SERVICE STATIONS | Des Moines 15 | 2814 E. University Street | Des Moines | IA |
| 315 | NON-OWNED SERVICE STATIONS | Des Moines 17 | 2825 Easton Boulevard | Des Moines | IA |
| 316 | NON-OWNED SERVICE STATIONS | Des Moines 10 | 3200 S.E. 14th | Des Moines | IA |
| 317 | NON-OWNED SERVICE STATIONS | Des Moines 16 | 3418 Sixth Avenue | Des Moines | IA |

| 318 | NON-OWNED SERVICE STATIONS | Des Moines 6 | 3426 Harding Road | Des Moines | IA |
| 319 | NON-OWNED SERVICE STATIONS | Des Moines 1 | 4100 S.W. Ninth St. | Des Moines | IA |
| 320 | NON-OWNED SERVICE STATIONS | Des Moines 14 | 4200 East Hubbell | Des Moines | IA |
| 321 | NON-OWNED SERVICE STATIONS | Des Moines 13 | 4675 North Second Avenue | Des Moines | IA |
| 322 | NON-OWNED SERVICE STATIONS | Des Moines 12 | 6900 Hickman Road | Des Moines | IA |
| 323 | NON-OWNED SERVICE STATIONS | Des Moines 4 | 7101 University Avenue | Des Moines | IA |
| 324 | NON-OWNED SERVICE STATIONS | Dunlap | 7th & Iowa Streets | Des Moines | IA |
| 325 | NON-OWNED SERVICE STATIONS | Des Moines 8 | East 14th & Des Moines | Des Moines | IA |
| 326 | NON-OWNED SERVICE STATIONS | Des Moines Bulk Station | Raccoon Street between 9th & 10th | Des Moines | IA |
| 327 | NON-OWNED SERVICE STATIONS | Fairfield 1 | 605 North Second Street | Fairfield | IA |
| 328 | NON-OWNED SERVICE STATIONS | Fort Dodge 1 | 1202 Second Avenue, South | Fort Dodge | IA |
| 329 | NON-OWNED SERVICE STATIONS | Fort Dodge 2 | 1500 Second Avenue, North | Fort Dodge | IA |
| 330 | NON-OWNED SERVICE STATIONS | Fort Madison 1 | 2311 Avenue "L" | Fort Madison | IA |
| 331 | NON-OWNED SERVICE STATIONS | Indianola 1 | 109 S. Jefferson Avenue | Indianola | IA |
| 332 | NON-OWNED SERVICE STATIONS | Iowa City 1 | 304 East Burlington | Iowa City | IA |
| 333 | NON-OWNED SERVICE STATIONS | Kellogg | Interstate 80 & County Road | Kellogg | IA |
| 334 | NON-OWNED SERVICE STATIONS | Keokuk 1 | 2820 Main | Keokuk | IA |
| 335 | NON-OWNED SERVICE STATIONS | LeMars 1 | 226 Fifth Avenue, S.W. | LeMars | IA |
| 336 | NON-OWNED SERVICE STATIONS | LeMars | 234 5th Avenue | LeMars | IA |
| 337 | NON-OWNED SERVICE STATIONS | Maquoketa 1 | 311 East Platt Street | Maquoketa | IA |

114

| 338 | NON-OWNED SERVICE STATIONS | Mason City 1 | North Federal and 13t Street | Mason City | IA |
|---|---|---|---|---|---|
| 339 | NON-OWNED SERVICE STATIONS | Missouri Valley 1 | 500 West Erie Street | Missouri Valley | IA |
| 340 | NON-OWNED SERVICE STATIONS | Nevada 2 | 1136 East 5th Street | Nevada | IA |
| 341 | NON-OWNED SERVICE STATIONS | Newton 1 | 1901 First Avenue | Newton | IA |
| 342 | NON-OWNED SERVICE STATIONS | Oakland 1 | Main Street | Oakland | IA |
| 343 | NON-OWNED SERVICE STATIONS | Oelwein 1 | 935 South Frederick | Oelwein | IA |
| 344 | NON-OWNED SERVICE STATIONS | Osage 1 | 1428 Main Street | Osage | IA |
| 345 | NON-OWNED SERVICE STATIONS | Osceola 1 | 714 West McLane | Osceola | IA |
| 346 | NON-OWNED SERVICE STATIONS | Oskaloosa 1 | 1102 A Avenue West | Oskaloosa | IA |
| 347 | NON-OWNED SERVICE STATIONS | Ottumwa 1 | 1268 West 2nd | Ottumwa | IA |
| 348 | NON-OWNED SERVICE STATIONS | Ottumwa 2 | 201 North Madison | Ottumwa | IA |
| 349 | NON-OWNED SERVICE STATIONS | Pella 1 | 600 Oskaloosa Street | Pella | IA |
| 350 | NON-OWNED SERVICE STATIONS | Sheldon 1 | 622 Second Avenue | Sheldon | IA |
| 351 | NON-OWNED SERVICE STATIONS | Sioux City 1 | 322 South Lewis Road | Sioux City | IA |
| 352 | NON-OWNED SERVICE STATIONS | Sioux City | 500 Wesley Way | Sioux City | IA |
| 353 | NON-OWNED SERVICE STATIONS | Storm Lake 1 | 420 Flindt Drive | Storm Lake | IA |
| 354 | NON-OWNED SERVICE STATIONS | Washington 1 | Route 2, Box 110-A | Washington | IA |
| 355 | NON-OWNED SERVICE STATIONS | Waterloo 1 | 2102-2116 Lafayette | Waterloo | IA |
| 356 | NON-OWNED SERVICE STATIONS | Abingdon 1 | Monmouth & Monroe Sts. | Abingdon | IL |
| 357 | NON-OWNED SERVICE STATIONS | Belleville 1 | 1531 Lebanon Avenue | Belleville | IL |

| 358 | NON-OWNED SERVICE STATIONS | Belvidere 1 | 600 Logan Avenue | Belvidere | IL |
| 359 | NON-OWNED SERVICE STATIONS | Bushnell #1 | 105 E. Hail Street | Bushnell | IL |
| 360 | NON-OWNED SERVICE STATIONS | Carlinville | 304 East First South Street | Carlinville | IL |
| 361 | NON-OWNED SERVICE STATIONS | Centralia 1 | 138 N. Walnut | Centralia | IL |
| 362 | NON-OWNED SERVICE STATIONS | Charleston 1 | 120 Lincoln Street | Charleston | IL |
| 363 | NON-OWNED SERVICE STATIONS | Chillicothe 1 | 223 N. 4th | Chillicothe | IL |
| 364 | NON-OWNED SERVICE STATIONS | Clinton | 105 East Van Buren | Clinton | IL |
| 365 | NON-OWNED SERVICE STATIONS | Collinsville 1 | 201 North Vandalia | Collinsville | IL |
| 366 | NON-OWNED SERVICE STATIONS | Decatur Bulk Station | 100 Industry Court | Decatur | IL |
| 367 | NON-OWNED SERVICE STATIONS | Decatur 7 | 1500 East Eldorado Street | Decatur | IL |
| 368 | NON-OWNED SERVICE STATIONS | Decatur 5 | 274 West Wood Street | Decatur | IL |
| 369 | NON-OWNED SERVICE STATIONS | Decatur | 560 East Pershing Road | Decatur | IL |
| 370 | NON-OWNED SERVICE STATIONS | DeKalb 1 | 1120 W. Lincoln Highway | DeKalb | IL |
| 371 | NON-OWNED SERVICE STATIONS | LEFTON IRON AND METAL | SCRAP SALVAGE SITE- 205 SOUTH 17TH STREET | East St. Louis | IL |
| 372 | NON-OWNED SERVICE STATIONS | Edwardsville | 100 South Main Street | Edwardsville | IL |
| 373 | NON-OWNED SERVICE STATIONS | Effingham 1 | 419 West Fayette Avenue | Effingham | IL |
| 374 | NON-OWNED SERVICE STATIONS | Fairfield 1 | W. Main and Clarence | Fairfield | IL |
| 375 | NON-OWNED SERVICE STATIONS | Flora 1 | 400 West North Avenue | Flora | IL |
| 376 | NON-OWNED SERVICE STATIONS | Freeport 1 | 901 South Galena | Freeport | IL |

| 377 | NON-OWNED SERVICE STATIONS | Galesburg 2 | RFD 3, Knoxville Road | Galesburg | IL |
| 378 | NON-OWNED SERVICE STATIONS | Galva 1 | S.E. 1st Avenue | Galva | IL |
| 379 | NON-OWNED SERVICE STATIONS | Georgetown 1 | 305 North Main Street | Georgetown | IL |
| 380 | NON-OWNED SERVICE STATIONS | Granite City 1 | 2320 Nameoki Road | Granite City | IL |
| 381 | NON-OWNED SERVICE STATIONS | Greenville 1 | 110 East Harris St. | Greenville | IL |
| 382 | NON-OWNED SERVICE STATIONS | Harrisburg 1 | NW/C Commercial and Church Streets | Harrisburg | IL |
| 383 | NON-OWNED SERVICE STATIONS | Hoopeston 1 | West Main Street and South Sixth Avenue | Hoopeston | IL |
| 384 | NON-OWNED SERVICE STATIONS | Jacksonville 1 | 524 East Morton Avenue | Jacksonville | IL |
| 385 | NON-OWNED SERVICE STATIONS | Kankakee 3 | 121 West Court Street | Kankakee | IL |
| 386 | NON-OWNED SERVICE STATIONS | Kankakee 2 | 750 Fair Street | Kankakee | IL |
| 387 | NON-OWNED SERVICE STATIONS | Kewanee 1 | 501 N. Main | Kewanee | IL |
| 388 | NON-OWNED SERVICE STATIONS | LaSalle 1 | 145 Third Street | LaSalle | IL |
| 389 | NON-OWNED SERVICE STATIONS | Lincoln 1 | 203 North Kickapoo Street | Lincoln | IL |
| 390 | NON-OWNED SERVICE STATIONS | Litchfield 1 | 403 E. Union Avenue | Litchfield | IL |
| 391 | NON-OWNED SERVICE STATIONS | Marion 1 | 1500 West Main | Marion | IL |
| 392 | NON-OWNED SERVICE STATIONS | Mattoon 1 | 1721 Charleston Avenue | Mattoon | IL |
| 393 | NON-OWNED SERVICE STATIONS | Mendota 1 | 1212 13th Avenue | Mendota | IL |
| 394 | NON-OWNED SERVICE STATIONS | Metropolis 1 | NE/C Ferry & Sixth Streets | Metropolis | IL |
| 395 | NON-OWNED SERVICE STATIONS | Moline 1 | 4720 Bridgelane | Moline | IL |
| 396 | NON-OWNED SERVICE STATIONS | Monmouth 1 | Main and Franklin | Monmouth | IL |

| 397 | NON-OWNED SERVICE STATIONS | Monticello 1 | 117 N. Market Street | Monticello | IL |
| 398 | NON-OWNED SERVICE STATIONS | Morrison 1 | US Highway 30, North Route | Morrison | IL |
| 399 | NON-OWNED SERVICE STATIONS | mt. carmel | 330 walnut ave | Mt. Carmel | IL |
| 400 | NON-OWNED SERVICE STATIONS | Mt. Pulaski | Railroad Right-of-way Site | Mt. Pulaski | IL |
| 401 | NON-OWNED SERVICE STATIONS | Mt. Vernon | 100 South 15th Street | Mt. Vernon | IL |
| 402 | NON-OWNED SERVICE STATIONS | MT. VERNON | 1416 S 10TH | Mt. Vernon | IL |
| 403 | NON-OWNED SERVICE STATIONS | Murphysboro 1 | Sixth and Walnut Street | Murphysboro | IL |
| 404 | NON-OWNED SERVICE STATIONS | Normal | 313 West Beaufort | Normal | IL |
| 405 | NON-OWNED SERVICE STATIONS | Olney 1 | 703 West Main Street | Olney | IL |
| 406 | NON-OWNED SERVICE STATIONS | Petersburg | 219 N. 6th | Petersburg | IL |
| 407 | NON-OWNED SERVICE STATIONS | Princeton 1 | Highway 26, Route 1 | Princeton | IL |
| 408 | NON-OWNED SERVICE STATIONS | Rantoul 1 | 714 E. Champaign | Rantoul | IL |
| 409 | NON-OWNED SERVICE STATIONS | Rochelle 1 | US Highway 51, North of Rochelle | Rochelle | IL |
| 410 | NON-OWNED SERVICE STATIONS | Rock Island 1 | 1520 11th Street | Rock Island | IL |
| 411 | NON-OWNED SERVICE STATIONS | Rock Island 3 | 3100 Fifth Avenue | Rock Island | IL |
| 412 | NON-OWNED SERVICE STATIONS | Rockford 3 | 1430 East Broadway | Rockford | IL |
| 413 | NON-OWNED SERVICE STATIONS | Rockford | 2301 Harrison Avenue | Rockford | IL |
| 414 | NON-OWNED SERVICE STATIONS | Rockford 2 | 2903 S. Kishwaukee | Rockford | IL |
| 415 | NON-OWNED SERVICE STATIONS | Rockford 4 | 3410 West State Street | Rockford | IL |
| 416 | NON-OWNED SERVICE STATIONS | Salem 1 | 1435 West Main | Salem | IL |

118

| 417 | NON-OWNED SERVICE STATIONS | Springfield 3 | 1000 N. MacArthur | Springfield | IL |
| 418 | NON-OWNED SERVICE STATIONS | Springfield 2 | 2041 East Cook Street | Springfield | IL |
| 419 | NON-OWNED SERVICE STATIONS | Springfield 1 | 629 North 9th Street | Springfield | IL |
| 420 | NON-OWNED SERVICE STATIONS | Streator 1 | Bridge Street and Bloomington | Streator | IL |
| 421 | NON-OWNED SERVICE STATIONS | Sullivan 1 | 305 S. Hamilton | Sullivan | IL |
| 422 | NON-OWNED SERVICE STATIONS | Sycamore #1 | Route 23, Highway 23 South | Sycamore | IL |
| 423 | NON-OWNED SERVICE STATIONS | Taylorville | 1101 W. Spressor street | Taylorville | IL |
| 424 | NON-OWNED SERVICE STATIONS | Taylorville 1 | Highway 48 & Silver Street or 1101 Route 48 West | Taylorville | IL |
| 425 | NON-OWNED SERVICE STATIONS | Urbana 1 | US Highway 45 North | Urbana | IL |
| 426 | NON-OWNED SERVICE STATIONS | Washington 1 | 1309 Washington Road | Washington | IL |
| 427 | NON-OWNED SERVICE STATIONS | West Frankfort 1 | 1110 East Main | West Frankfort | IL |
| 428 | NON-OWNED SERVICE STATIONS | Anderson 1 | 603 East 8th | Anderson | IN |
| 429 | NON-OWNED SERVICE STATIONS | Clermont 1 | 9054 Crawfordsville Road | Clermont | IN |
| 430 | NON-OWNED SERVICE STATIONS | Clermont Pipeline Terminal | W. 30th St. | Clermont | IN |
| 431 | NON-OWNED SERVICE STATIONS | Clinton 1 | 9th and Vine Street | Clinton | IN |
| 432 | NON-OWNED SERVICE STATIONS | Elwood 1 | 2034 E. Main St | Elwood | IN |
| 433 | NON-OWNED SERVICE STATIONS | Franklin 1 | 650 West Madison | Franklin | IN |
| 434 | NON-OWNED SERVICE STATIONS | Greencastle 1 | 605 Bloomington | Greencastle | IN |
| 435 | NON-OWNED SERVICE STATIONS | Indianapolis 8 | 2801 Post Road | Indianapolis | IN |

| 436 | NON-OWNED SERVICE STATIONS | INDIANAPOLIS | 3311 KENTUCKY AVE | Indianapolis | IN |
|---|---|---|---|---|---|
| 437 | NON-OWNED SERVICE STATIONS | Indianapolis 2 | 4951 South Madison Avenue | Indianapolis | IN |
| 438 | NON-OWNED SERVICE STATIONS | Indianapolis 6 | 5461 East 30th Street | Indianapolis | IN |
| 439 | NON-OWNED SERVICE STATIONS | Indianapolis 1 | 550 South Harding Street | Indianapolis | IN |
| 440 | NON-OWNED SERVICE STATIONS | Indianapolis 7 | 911 West 34th Street | Indianapolis | IN |
| 441 | NON-OWNED SERVICE STATIONS | Kentland 1 | 5th & Seymour Streets | Kentland | IN |
| 442 | NON-OWNED SERVICE STATIONS | Lawrence 1 | 4715 Shadeland Avenue | Lawrence | IN |
| 443 | NON-OWNED SERVICE STATIONS | Linton 1 | 380 N.W. "A" Street | Linton | IN |
| 444 | NON-OWNED SERVICE STATIONS | Logansport 1 | 1001 Wheatland | Logansport | IN |
| 445 | NON-OWNED SERVICE STATIONS | Marion 1 | 1102 S. Baldwin Avenue | Marion | IN |
| 446 | NON-OWNED SERVICE STATIONS | 1741 SOUTH MAIN | 1741 SOUTH MAIN STREET | New Castle | IN |
| 447 | NON-OWNED SERVICE STATIONS | New Castle 1 | 2131 E. Broad Street | New Castle | IN |
| 448 | NON-OWNED SERVICE STATIONS | Peru 1 | 310 N. Broadway | Peru | IN |
| 449 | NON-OWNED SERVICE STATIONS | Plainfield 1 | US Highway & Clarks Road | Plainfield | IN |
| 450 | NON-OWNED SERVICE STATIONS | Princeton 1 | 1600 West Broadway | Princeton | IN |
| 451 | NON-OWNED SERVICE STATIONS | Rockville 1 | 600 North Lincoln Road | Rockville | IN |
| 452 | NON-OWNED SERVICE STATIONS | Speedway 1 | 2490 Georgetown Road | Speedway | IN |
| 453 | NON-OWNED SERVICE STATIONS | Sullivan 1 | Section and Johnson Street | Sullivan | IN |
| 454 | NON-OWNED SERVICE STATIONS | Terre Haute 2 | 1328 Poplar Street | Terre Haute | IN |
| 455 | NON-OWNED SERVICE STATIONS | Terre Haute 1 | 1732 North Third | Terre Haute | IN |

| 456 | NON-OWNED SERVICE STATIONS | Vincennes 1 | 1626 North 6th Street | Vincennes | IN |
| 457 | NON-OWNED SERVICE STATIONS | Wabash 1 | 958 North Cass | Wabash | IN |
| 458 | NON-OWNED SERVICE STATIONS | Ark City | 601 Summit street | Ark City | KS |
| 459 | NON-OWNED SERVICE STATIONS | Arkansas City 1 | 601 S. Summit | Arkansas City | KS |
| 460 | NON-OWNED SERVICE STATIONS | Augusta 2 | 115 East 7th | Augusta | KS |
| 461 | NON-OWNED SERVICE STATIONS | Augusta 1 | 641 Osage | Augusta | KS |
| 462 | NON-OWNED SERVICE STATIONS | Belleville 1 | 28th & L Streets | Belleville | KS |
| 463 | NON-OWNED SERVICE STATIONS | Burlington 1 | 1124 N. 4th | Burlington | KS |
| 464 | NON-OWNED SERVICE STATIONS | Cherryvale Storage Tank | 101 East Fourth Street | Cherryvale | KS |
| 465 | NON-OWNED SERVICE STATIONS | Cherryvale 1 | NE/Third & Liberty (330 W. 3rd) | Cherryvale | KS |
| 466 | NON-OWNED SERVICE STATIONS | Colby | State Highway 25 | Colby | KS |
| 467 | NON-OWNED SERVICE STATIONS | Concordia 1 | NW/C 11th Street & Lincoln | Concordia | KS |
| 468 | NON-OWNED SERVICE STATIONS | Derby 1 | 230 S. Baltimore | Derby | KS |
| 469 | NON-OWNED SERVICE STATIONS | El Dorado 1 | 1631 West Central | El Dorado | KS |
| 470 | NON-OWNED SERVICE STATIONS | Emporia 1 | 1128 Commercial St. | Emporia | KS |
| 471 | NON-OWNED SERVICE STATIONS | Garden City Shop 'N Gas | 308 North Sixth Street | Garden City | KS |
| 472 | NON-OWNED SERVICE STATIONS | Garden City | NE/C 11th and Kansas Street | Garden City | KS |
| 473 | NON-OWNED SERVICE STATIONS | Hays 1 | 401 East 8th Street | Hays | KS |
| 474 | NON-OWNED SERVICE STATIONS | Haysville 1 | 248 South Seneca, Haysville KS 67060 | Haysville | KS |
| 475 | NON-OWNED SERVICE STATIONS | Hillsboro 1 | 414 S. Washington | Hillsboro | KS |

| 476 | NON-OWNED SERVICE STATIONS | Hutchinson 1 | 2629 East 4th Street | Hutchinson | KS |
| 477 | NON-OWNED SERVICE STATIONS | Independence | 112 N. 10th Street | Independence | KS |
| 478 | NON-OWNED SERVICE STATIONS | Iola 1 | 201 South State Street | Iola | KS |
| 479 | NON-OWNED SERVICE STATIONS | Junction City | 711 Grant Avenue | Junction City | KS |
| 480 | NON-OWNED SERVICE STATIONS | Kansas City | 4732 State Avenue | Kansas City | KS |
| 481 | NON-OWNED SERVICE STATIONS | Lawrence 4 | 900 Illinois | Lawrence | KS |
| 482 | NON-OWNED SERVICE STATIONS | Lawrence 3 | 930 W. 23rd Street | Lawrence | KS |
| 483 | NON-OWNED SERVICE STATIONS | Lawrence 2 | West Sixth & Lawrence | Lawrence | KS |
| 484 | NON-OWNED SERVICE STATIONS | Lawrence 1 | 920 N. Second Street | Lawrence | KS |
| 485 | NON-OWNED SERVICE STATIONS | Liberal 2 | US 54 Highway & Jewell Street | Liberal | KS |
| 486 | NON-OWNED SERVICE STATIONS | Manhattan 1 | 12th and Laramie | Manhattan | KS |
| 487 | NON-OWNED SERVICE STATIONS | Manhattan 2 | State Highway 18 West | Manhattan | KS |
| 488 | NON-OWNED SERVICE STATIONS | Marysville 1 | 203 Center Street | Marysville | KS |
| 489 | NON-OWNED SERVICE STATIONS | Oakley | US Highway 83 & Interstate 70 | Oakley | KS |
| 490 | NON-OWNED SERVICE STATIONS | Ogden 1 | Highway 18 | Ogden | KS |
| 491 | NON-OWNED SERVICE STATIONS | Oswego 1 | NW/C 6th & Ohio Street | Oswego | KS |
| 492 | NON-OWNED SERVICE STATIONS | Paola 1 | NW/C Piankishaw and Silver | Paola | KS |
| 493 | NON-OWNED SERVICE STATIONS | Pittsburgh 1 | 719 South Broadway | Pittsburgh | KS |
| 494 | NON-OWNED SERVICE STATIONS | Russell 1 | US 281 E | Russell | KS |
| 495 | NON-OWNED SERVICE STATIONS | Topeka 5 | 101 East Highway 24 | Topeka | KS |

122

| 496 | NON-OWNED SERVICE STATIONS | Topeka 2 | 4710 South Topeka Avenue | Topeka | KS |
| 497 | NON-OWNED SERVICE STATIONS | Topeka 3 | 5335 South Topeka Boulevard | Topeka | KS |
| 498 | NON-OWNED SERVICE STATIONS | Topeka 4 | NW/C I-70 & Valencia Road | Topeka | KS |
| 499 | NON-OWNED SERVICE STATIONS | Washington | 101 West 7th Street | Washington | KS |
| 500 | NON-OWNED SERVICE STATIONS | Wellington 1 | 206 West 15th | Wellington | KS |
| 501 | NON-OWNED SERVICE STATIONS | Wichita 2 | 1439 East 13th | Wichita | KS |
| 502 | NON-OWNED SERVICE STATIONS | Wichita 5 | 1701 East McArthur | Wichita | KS |
| 503 | NON-OWNED SERVICE STATIONS | Wichita 9 | 2160 South Broadway | Wichita | KS |
| 504 | NON-OWNED SERVICE STATIONS | Wichita 6 | 2347 South Senenca | Wichita | KS |
| 505 | NON-OWNED SERVICE STATIONS | Wichita 8 | 2410 South Oliver | Wichita | KS |
| 506 | NON-OWNED SERVICE STATIONS | Wichita 3 | 2439 North Arkansas | Wichita | KS |
| 507 | NON-OWNED SERVICE STATIONS | Wichita 4 | 4710 South East Boulevard | Wichita | KS |
| 508 | NON-OWNED SERVICE STATIONS | Wichita 1 | 6439 Highway 54 West | Wichita | KS |
| 509 | NON-OWNED SERVICE STATIONS | Wichita 7 | 695 North West Street | Wichita | KS |
| 510 | NON-OWNED SERVICE STATIONS | Wichita 10 | NW/C 13th & Maize Road | Wichita | KS |
| 511 | NON-OWNED SERVICE STATIONS | Yates Center 1 | 501 West Mary | Yates Center | KS |
| 512 | NON-OWNED SERVICE STATIONS | Bowling Green 65 | 1588 Laurel | Bowling Green | KY |
| 513 | NON-OWNED SERVICE STATIONS | Cave City 59 | Highway 31 West | Cave City | KY |
| 514 | NON-OWNED SERVICE STATIONS | central city | highway 431 & stroud | Central City | KY |
| 515 | NON-OWNED SERVICE STATIONS | Danville | 501 South Fourth Street | Danville | KY |

| 516 | NON-OWNED SERVICE STATIONS | Elizabethtown 61 | US Highway 31 West at Mt. Zion Road | Elizabethtown | KY |
| 517 | NON-OWNED SERVICE STATIONS | Glasgow | 528 Happy Valley Road | Glasgow | KY |
| 518 | NON-OWNED SERVICE STATIONS | Hopkinsville 130 | 1411 West 7th Street | Hopkinsville | KY |
| 519 | NON-OWNED SERVICE STATIONS | Jeffersontown 145 | 10200 Taylorsville Road | Jeffersontown | KY |
| 520 | NON-OWNED SERVICE STATIONS | Lexington 1 | 2172 Nicholasville Road | Lexington | KY |
| 521 | NON-OWNED SERVICE STATIONS | Lexington 67 | 235 New Circle Road | Lexington | KY |
| 522 | NON-OWNED SERVICE STATIONS | Lexington 4 | 600 East Third Street | Lexington | KY |
| 523 | NON-OWNED SERVICE STATIONS | Lexington 3 | 800 North Broadway | Lexington | KY |
| 524 | NON-OWNED SERVICE STATIONS | Lexington 9 | 901 Georgetown Road | Lexington | KY |
| 525 | NON-OWNED SERVICE STATIONS | Louisville 62 | 2601 Bardstown Road | Louisville | KY |
| 526 | NON-OWNED SERVICE STATIONS | Louisville 146 | 3323 Fern Valley Road | Louisville | KY |
| 527 | NON-OWNED SERVICE STATIONS | Louisville 66 | 3800 Cane Run Road | Louisville | KY |
| 528 | NON-OWNED SERVICE STATIONS | Louisville 124 | 4660 Poplar Level Road | Louisville | KY |
| 529 | NON-OWNED SERVICE STATIONS | Louisville 150 | 619 Outer Loop and Nash Road | Louisville | KY |
| 530 | NON-OWNED SERVICE STATIONS | Louisville 144 | 7401 Preston Highway | Louisville | KY |
| 531 | NON-OWNED SERVICE STATIONS | Louisville 60 | 7528 Dixie Highway | Louisville | KY |
| 532 | NON-OWNED SERVICE STATIONS | Louisville 125 | Fegenbush & Watterson Trail | Louisville | KY |
| 533 | NON-OWNED SERVICE STATIONS | Louisville 126 | 4435 OR 4403 New Manslick Road | Louisville | KY |
| 534 | NON-OWNED SERVICE STATIONS | Louisville 153 | 612 Lyndon Lane | Lyndon | KY |
| 535 | NON-OWNED SERVICE STATIONS | Madisonville 122 | 2425 South Main Street | Madisonville | KY |

| 536 | NON-OWNED SERVICE STATIONS | Owensboro 2063 | 4024 East 4th Street | Owensboro | KY |
| 537 | NON-OWNED SERVICE STATIONS | Owensboro 55 | 623 West Ninth Street | Owensboro | KY |
| 538 | NON-OWNED SERVICE STATIONS | Paducah 2 | Park Avenue West | Paducah | KY |
| 539 | NON-OWNED SERVICE STATIONS | Paris | 585 West 8th Street | Paris | KY |
| 540 | NON-OWNED SERVICE STATIONS | Radcliff 133 | 870 South Dixie Boulevard | Radcliff | KY |
| 541 | NON-OWNED SERVICE STATIONS | Russellville 58 | 523 North Main Street | Russellville | KY |
| 542 | NON-OWNED SERVICE STATIONS | Shelbyville 7 | 1530 Midland Trail West | Shelbyville | KY |
| 543 | NON-OWNED SERVICE STATIONS | Somerset 8 | SE/C West Columbia and Mt. Vernon Streets | Somerset | KY |
| 544 | NON-OWNED SERVICE STATIONS | Winchester 5 | Main & Clark | Winchester | KY |
| 545 | NON-OWNED SERVICE STATIONS | WINCHEsTER | us highway 277 | Winchester | KY |
| 546 | NON-OWNED SERVICE STATIONS | Arcadia 5 | 131 East First Street | Arcadia | LA |
| 547 | NON-OWNED SERVICE STATIONS | Bastrop | 701 North Washington | Bastrop | LA |
| 548 | NON-OWNED SERVICE STATIONS | Bastrop 17 | West Madison and West Hickory | Bastrop | LA |
| 549 | NON-OWNED SERVICE STATIONS | Columbia 1 | Pearl and Kentucky Street | Columbia | LA |
| 550 | NON-OWNED SERVICE STATIONS | Delhi 1 | 205 N.E. First Street | Delhi | LA |
| 551 | NON-OWNED SERVICE STATIONS | Ferriday 1 | 619 South 4th | Ferriday | LA |
| 552 | NON-OWNED SERVICE STATIONS | Girard Tank Yard | Railroad Right of Way | Girard | LA |
| 553 | NON-OWNED SERVICE STATIONS | Jena 1 | West Oak Street | Jena | LA |
| 554 | NON-OWNED SERVICE STATIONS | Jonesboro 6 | 1703 Ringgold | Jonesboro | LA |
| 555 | NON-OWNED SERVICE STATIONS | Lake Providence 3 | Sparrow Street | Lake Providence | LA |

| 556 | NON-OWNED SERVICE STATIONS | Minden | 223 East Union Street | Minden | LA |
| 557 | NON-OWNED SERVICE STATIONS | Monroe 19 | 801 Wiinsboro Road | Monroe | LA |
| 558 | NON-OWNED SERVICE STATIONS | Monroe 20 | Magnolia & DeSiard Street | Monroe | LA |
| 559 | NON-OWNED SERVICE STATIONS | Natchitochas | 210 Hwy. 10 South | Natchitochas | LA |
| 560 | NON-OWNED SERVICE STATIONS | NATCHITOCHES #9016 | 210 HIGHWAY 1 SOUTH | Natchitoches | LA |
| 561 | NON-OWNED SERVICE STATIONS | Oak Grove 11 | Louisiana Highway 17 | Oak Grove | LA |
| 562 | NON-OWNED SERVICE STATIONS | Oak Grove 2 | South Front Street | Oak Grove | LA |
| 563 | NON-OWNED SERVICE STATIONS | Opelousas 40 | US Highway 90 | Opelousas | LA |
| 564 | NON-OWNED SERVICE STATIONS | Ruston | East Georgia Avenue. & Monrovia Dr. | Ruston | LA |
| 565 | NON-OWNED SERVICE STATIONS | Tallulah 1 | 508 West Green Street | Tallulah | LA |
| 566 | NON-OWNED SERVICE STATIONS | Vidalia 1 | Carter Avenue & Hickory | Vidalia | LA |
| 567 | NON-OWNED SERVICE STATIONS | West Monroe | 702 Jonesboro Road | West Monroe | LA |
| 568 | NON-OWNED SERVICE STATIONS | Menominee 1 | 1915 Tenth Street | Menominee | MI |
| 569 | NON-OWNED SERVICE STATIONS | Ada 1 | Park & West Main State Highway 200 | Ada | MN |
| 570 | NON-OWNED SERVICE STATIONS | Austin 2 | 903 Fourth Avenue, NE | Austin | MN |
| 571 | NON-OWNED SERVICE STATIONS | Austin 1 | Highway 218 South | Austin | MN |
| 572 | NON-OWNED SERVICE STATIONS | Bemidji 1 | SW/C US Highway 2 and Irving Avenue | Bemidji | MN |
| 573 | NON-OWNED SERVICE STATIONS | Beroun 1 | I-35 & Co. Road 14 | Beroun | MN |
| 574 | NON-OWNED SERVICE STATIONS | Bloomington | 5001 W. 80th Street | Bloomington | MN |
| 575 | NON-OWNED SERVICE STATIONS | Bloomington 1 | 855 Lyndale Avenue South | Bloomington | MN |

| 576 | NON-OWNED SERVICE STATIONS | Blue Earth 2 | Highway 169 and 16 | Blue Earth | MN |
| 577 | NON-OWNED SERVICE STATIONS | Cass Lake | Main and Cass Streets | Cass Lake | MN |
| 578 | NON-OWNED SERVICE STATIONS | Chisholm | Highway 169 West | Chisholm | MN |
| 579 | NON-OWNED SERVICE STATIONS | Crookston 1 | Broadway & Third Streets | Crookston | MN |
| 580 | NON-OWNED SERVICE STATIONS | Detroit Lakes 1 | 319 East Frazee | Detroit Lakes | MN |
| 581 | NON-OWNED SERVICE STATIONS | Elk River 1 | Route 2, Highway 10 & 52 | Elk River | MN |
| 582 | NON-OWNED SERVICE STATIONS | Fairmont 1 | 415 S. State Street | Fairmont | MN |
| 583 | NON-OWNED SERVICE STATIONS | Grand Rapids 1 | 23 N.E. 4th Street | Grand Rapids | MN |
| 584 | NON-OWNED SERVICE STATIONS | Grand Rapids Bulk Station | Right-of-Way Site | Grand Rapids | MN |
| 585 | NON-OWNED SERVICE STATIONS | Grand Rapids 2 | SW/C 6th Street and Pokegama Avenue | Grand Rapids | MN |
| 586 | NON-OWNED SERVICE STATIONS | Hastings 1 | 1610 S. Vermillion | Hastings | MN |
| 587 | NON-OWNED SERVICE STATIONS | Hastings 1 | 1701 Excelsior Avenue, North | Hastings | MN |
| 588 | NON-OWNED SERVICE STATIONS | LaCrescent 1 | Rt 2, Highway 14, 16 & 61 | LaCrescent | MN |
| 589 | NON-OWNED SERVICE STATIONS | Little Falls | 220 Southeast First Street | Little Falls | MN |
| 590 | NON-OWNED SERVICE STATIONS | Mankato 2 | 328 Park Lane | Mankato | MN |
| 591 | NON-OWNED SERVICE STATIONS | Mankato 1 | 1301 Rhine Street | Mankato 1 | MN |
| 592 | NON-OWNED SERVICE STATIONS | Marshall 1 | East College Drive | Marshall | MN |
| 593 | NON-OWNED SERVICE STATIONS | McIntosh Bulk Station | Johnson Avenue & R.R. Tracks | McIntosh | MN |
| 594 | NON-OWNED SERVICE STATIONS | Melrose 1 | Interstate 94 and 2nd Avenue East | Melrose | MN |
| 595 | NON-OWNED SERVICE STATIONS | Minneapolis 1 | 3601 Chicago Avenue | Minneapolis | MN |

| 596 | NON-OWNED SERVICE STATIONS | Minneapolis | 4737 Minnehaha Avenue | Minneapolis | MN |
| 597 | NON-OWNED SERVICE STATIONS | Minneapolis Office | 6701 Penn Avenue South | Minneapolis | MN |
| 598 | NON-OWNED SERVICE STATIONS | Montevideo 1 | Canton and Chippewa | Montevideo | MN |
| 599 | NON-OWNED SERVICE STATIONS | Moorhead 1 | 21 South 8th Street | Moorhead | MN |
| 600 | NON-OWNED SERVICE STATIONS | Mountain Lake 1 | East High 60 | Mountain Lake | MN |
| 601 | NON-OWNED SERVICE STATIONS | New Brightton | 590 Eighth Avenue, N.W. | New Brighton | MN |
| 602 | NON-OWNED SERVICE STATIONS | New Elm Bulk Station | T.H. 15 and 68 South | New Elm | MN |
| 603 | NON-OWNED SERVICE STATIONS | New Ulm 1 | 2125 South Broadway | New Ulm | MN |
| 604 | NON-OWNED SERVICE STATIONS | Redwood Falles 1 | 713 S. Mill Street | Redwood Falles | MN |
| 605 | NON-OWNED SERVICE STATIONS | Rochester 1 | 604 - 4th Street, S.E. | Rochester | MN |
| 606 | NON-OWNED SERVICE STATIONS | Rochester 2 | I-90 and Co. Rds 6 & 8 | Rochester | MN |
| 607 | NON-OWNED SERVICE STATIONS | Spring Park 1 | NE/C Shouline Blvd and Seton Channel | Spring Park | MN |
| 608 | NON-OWNED SERVICE STATIONS | Springfield 1 | Highway 14 / 603 West Rock Street | Springfield | MN |
| 609 | NON-OWNED SERVICE STATIONS | St. Paul Office Space | 2639 University Avenue | St. Paul | MN |
| 610 | NON-OWNED SERVICE STATIONS | Staples 1 | 201 N.E. Second Street | Staples | MN |
| 611 | NON-OWNED SERVICE STATIONS | Walker | Minnesota Avenue and Sixth Street | Walker | MN |
| 612 | NON-OWNED SERVICE STATIONS | West St. Paul 1 | 1422 South Robert | West St Paul | MN |
| 613 | NON-OWNED SERVICE STATIONS | Willmar 1 | 716 South First Street | Willmar | MN |
| 614 | NON-OWNED SERVICE STATIONS | Anderson 1 | US Highway 71 | Anderson | MO |
| 615 | NON-OWNED SERVICE STATIONS | Boonville 1 | 1105 Main Street | Boonville | MO |

| 616 | NON-OWNED SERVICE STATIONS | Brookfield 1 | Main & Canal Streets | Brookfield | MO |
| 617 | NON-OWNED SERVICE STATIONS | Carrollton | 106 E. Highways 64 & 65 | Carrollton | MO |
| 618 | NON-OWNED SERVICE STATIONS | Carthage 1 | 504 West Central | Carthage | MO |
| 619 | NON-OWNED SERVICE STATIONS | Chillicothe | 301 S. Washington | Chillicothe | MO |
| 620 | NON-OWNED SERVICE STATIONS | Claycomo 1 | US Highway 69 East, Rt. 2, Box 336 | Claycomo | MO |
| 621 | NON-OWNED SERVICE STATIONS | Clinton | 922 N. Second | Clinton | MO |
| 622 | NON-OWNED SERVICE STATIONS | Columbia 1 | 103 North Providence | Columbia | MO |
| 623 | NON-OWNED SERVICE STATIONS | Farmington 1 | US Highway 67 & St. Genevieve Avenue | Farmington | MO |
| 624 | NON-OWNED SERVICE STATIONS | Fulton | 4 Highway 54 South | Fulton | MO |
| 625 | NON-OWNED SERVICE STATIONS | Hazelwood 14 | 47 Village Square Shopping Center | Hazelwood | MO |
| 626 | NON-OWNED SERVICE STATIONS | Holt 1 | NE/C I-35 & St. Rd. Permitted Person | Holt | MO |
| 627 | NON-OWNED SERVICE STATIONS | Independence 1 | 9300 East 24 Highway | Independence | MO |
| 628 | NON-OWNED SERVICE STATIONS | Jefferson City 1 | 800 Missouri Blvd | Jefferson City | MO |
| 629 | NON-OWNED SERVICE STATIONS | Joplin 1 | 1201 S. Rangeline | Joplin | MO |
| 630 | NON-OWNED SERVICE STATIONS | Joplin 4 | 2209 West Seventh Street | Joplin | MO |
| 631 | NON-OWNED SERVICE STATIONS | Joplin 3 | 2637 East 7th Street | Joplin | MO |
| 632 | NON-OWNED SERVICE STATIONS | Joplin 2 | 901 Illinois Street | Joplin | MO |
| 633 | NON-OWNED SERVICE STATIONS | Joplin Pipeline Terminal | ON US Highway 71 | Joplin | MO |
| 634 | NON-OWNED SERVICE STATIONS | Kansas City 1 | 8505 Woodland | Kansas City | MO |
| 635 | NON-OWNED SERVICE STATIONS | Mexico 1 | 1525 East Liberty Street | Mexico | MO |

| 636 | NON-OWNED SERVICE STATIONS | Moberly 1 | 700 Concannon Street | Moberly | MO |
|---|---|---|---|---|---|
| 637 | NON-OWNED SERVICE STATIONS | Monnett 1 | 13th & Cleveland | Monnett | MO |
| 638 | NON-OWNED SERVICE STATIONS | Monroe City | US Highway 36 | Monroe City | MO |
| 639 | NON-OWNED SERVICE STATIONS | Neosho 1 | 520 S. Neosho Road | Neosho | MO |
| 640 | NON-OWNED SERVICE STATIONS | Portageville 1 | U.S. Highway 61 | Portageville | MO |
| 641 | NON-OWNED SERVICE STATIONS | Raytown 1 | 10810 E. Highway 350 | Raytown | MO |
| 642 | NON-OWNED SERVICE STATIONS | Rolla 1 | 406 East Highway 72 | Rolla | MO |
| 643 | NON-OWNED SERVICE STATIONS | Sedalia | 2801 West Broadway | Sedalia | MO |
| 644 | NON-OWNED SERVICE STATIONS | Springfield 3 | 902 South Glenstone | Springfield | MO |
| 645 | NON-OWNED SERVICE STATIONS | Springfield 1 | 950 South Grant Street | Springfield | MO |
| 646 | NON-OWNED SERVICE STATIONS | Union 1 | 310 West Highway 50 | Union | MO |
| 647 | NON-OWNED SERVICE STATIONS | Warrensburg 1 | 215 East Young Street | Warrensburg | MO |
| 648 | NON-OWNED SERVICE STATIONS | Webb City | 1309 S. Madison street | Webb City | MO |
| 649 | NON-OWNED SERVICE STATIONS | Wentzville | 771 West Pearce | Wentzville | MO |
| 650 | NON-OWNED SERVICE STATIONS | Biloxi 10 | 79 B West Beach | Biloxi | MS |
| 651 | NON-OWNED SERVICE STATIONS | Corinth 1 | 320 Highway 72 East | Corinth | MS |
| 652 | NON-OWNED SERVICE STATIONS | Gulfport 22 | 1247 Pass Road | Gulfport | MS |
| 653 | NON-OWNED SERVICE STATIONS | Gulfport 26 | 2301 25th Avenue | Gulfport | MS |
| 654 | NON-OWNED SERVICE STATIONS | Gulfport 49 | 301 Pass Road | Gulfport | MS |
| 655 | NON-OWNED SERVICE STATIONS | Gulfport 5 | NW/C Broad & West Railroad Street | Gulfport | MS |

| 656 | NON-OWNED SERVICE STATIONS | Hattiesburg 27 | 901 Broadway Drive | Hattiesburg | MS |
| 657 | NON-OWNED SERVICE STATIONS | Indianola 149 | 517 Highway 82 East | Indianola | MS |
| 658 | NON-OWNED SERVICE STATIONS | Jackson 44 | 1250 Flowood Drive | Jackson | MS |
| 659 | NON-OWNED SERVICE STATIONS | Jackson 4 | 1629 Highway 80E | Jackson | MS |
| 660 | NON-OWNED SERVICE STATIONS | Louisville 39 | College & Church Streets | Louisville | MS |
| 661 | NON-OWNED SERVICE STATIONS | Meridian 29 | 325 Highway 11 | Meridian | MS |
| 662 | NON-OWNED SERVICE STATIONS | Meridian 34 | 4000 - 8th Street | Meridian | MS |
| 663 | NON-OWNED SERVICE STATIONS | Moss Point 2155 | 4130 Main Street | Moss Point | MS |
| 664 | NON-OWNED SERVICE STATIONS | Ocean Springs 5001 | 1120 Highway 90 | Ocean Springs | MS |
| 665 | NON-OWNED SERVICE STATIONS | Pascagoula 8 | 1002 Telephone Road | Pascagoula | MS |
| 666 | NON-OWNED SERVICE STATIONS | Pascagoula | 3603 Chicot Road | Pascagoula | MS |
| 667 | NON-OWNED SERVICE STATIONS | Devils Lake 1 | 106 Fifth Street | Devils Lake | ND |
| 668 | NON-OWNED SERVICE STATIONS | Devils Lake 2 | 503 Fourth Street | Devils Lake | ND |
| 669 | NON-OWNED SERVICE STATIONS | Fargo 3 | 1213 Fourth Avenue North | Fargo | ND |
| 670 | NON-OWNED SERVICE STATIONS | FARGO | 401 UNIVERSITY | Fargo | ND |
| 671 | NON-OWNED SERVICE STATIONS | Fargo 2 | 901 Northern Pacific Avenue | Fargo | ND |
| 672 | NON-OWNED SERVICE STATIONS | Grand Forks 1 | 410 N. Washington | Grand Forks | ND |
| 673 | NON-OWNED SERVICE STATIONS | Hillsboro 1 | I-29 & County Road 11 | Hillsboro | ND |
| 674 | NON-OWNED SERVICE STATIONS | Jamestown 1 | 920 4th Avenue, SE | Jamestown | ND |
| 675 | NON-OWNED SERVICE STATIONS | Oriska 1 | NW/C I-94 & SH 32 | Oriska | ND |

| 676 | NON-OWNED SERVICE STATIONS | Wahpeton 1 | 11th and Dakota Avenue, S.W. | Wahpeton | ND |
| 677 | NON-OWNED SERVICE STATIONS | West Fargo 1 | 239 West Main Avenue | West Fargo | ND |
| 678 | NON-OWNED SERVICE STATIONS | Beatrice 1 | 900 East Court | Beatrice | NE |
| 679 | NON-OWNED SERVICE STATIONS | Bellevue #1 | 1002 Galvin Road | Bellevue | NE |
| 680 | NON-OWNED SERVICE STATIONS | Fremont 1 | 1105 South Broad Street | Fremont | NE |
| 681 | NON-OWNED SERVICE STATIONS | Fremont 2 | SE/C 23rd & Nye Avenue | Fremont | NE |
| 682 | NON-OWNED SERVICE STATIONS | Hastings 1 | 1213 West "J" Street | Hastings | NE |
| 683 | NON-OWNED SERVICE STATIONS | Lincoln 3 | 1060 N. 27 Street | Lincoln | NE |
| 684 | NON-OWNED SERVICE STATIONS | Lincoln 4 | 3001 North 70th Street | Lincoln | NE |
| 685 | NON-OWNED SERVICE STATIONS | O'Neill 1 | 1002 East Douglas | O'Neill | NE |
| 686 | NON-OWNED SERVICE STATIONS | Omaha Bulk Station | 1126 North Eleventh Street | Omaha | NE |
| 687 | NON-OWNED SERVICE STATIONS | Omaha 1 | 13th and Missouri Avenue 4546 S. 13th | Omaha | NE |
| 688 | NON-OWNED SERVICE STATIONS | Omaha 4 | 2102 N. 24th Street | Omaha | NE |
| 689 | NON-OWNED SERVICE STATIONS | Omaha 11 | 2920 South 120th Street | Omaha | NE |
| 690 | NON-OWNED SERVICE STATIONS | Omaha 2 | 3101 Florence Blvd. | Omaha | NE |
| 691 | NON-OWNED SERVICE STATIONS | Omaha 6 | 3952 "Q" Street | Omaha | NE |
| 692 | NON-OWNED SERVICE STATIONS | Omaha 5 | 421 N. 60th Street | Omaha | NE |
| 693 | NON-OWNED SERVICE STATIONS | Omaha 16 | 4621 N. 24th Street | Omaha | NE |
| 694 | NON-OWNED SERVICE STATIONS | Omaha 3 | 5327 Center Street | Omaha | NE |
| 695 | NON-OWNED SERVICE STATIONS | Omaha 8 | 8724 N. 30th Street | Omaha | NE |

| 696 | NON-OWNED SERVICE STATIONS | So. Sioux City NE | | Sioux City | NE |
| 697 | NON-OWNED SERVICE STATIONS | South Sioux City 2 | 2816 Dakota Avenue | South Sioux City | NE |
| 698 | NON-OWNED SERVICE STATIONS | South Sioux City 1 | SW/C Dakota Avenue & 9th Street | South Sioux City | NE |
| 699 | NON-OWNED SERVICE STATIONS | Albuquerque 4 | 501 Yale Blvd, SW | Albuquerque | NM |
| 700 | NON-OWNED SERVICE STATIONS | Albuquerque 3 | 701 Isleta Boulevard, S.W. | Albuquerque | NM |
| 701 | NON-OWNED SERVICE STATIONS | Albuquerque 2 | NE/C Louisiana and Zuni Road | Albuquerque | NM |
| 702 | NON-OWNED SERVICE STATIONS | Albuquerque #1 | SW/C Central and Cypress | Albuquerque | NM |
| 703 | NON-OWNED SERVICE STATIONS | Carlsbad 1 | 422 East Green Street | Carlsbad | NM |
| 704 | NON-OWNED SERVICE STATIONS | Grants 1 | NE/C Roosevelt Ave & Lobo Canyon rd | Grants | NM |
| 705 | NON-OWNED SERVICE STATIONS | Tucumcari | 1505 E. Tucumcari | Tucumcari | NM |
| 706 | NON-OWNED SERVICE STATIONS | Tucumcari 2 | 716 West Tucumcari Blvd. | Tucumcari | NM |
| 707 | NON-OWNED SERVICE STATIONS | Former kerr-mcgee manufacturing facility | 604 findlay street | Fostoria | OH |
| 708 | NON-OWNED SERVICE STATIONS | Ada 1 | 14th Street & Mississippi | Ada | OK |
| 709 | NON-OWNED SERVICE STATIONS | Ada 2 | 630 N. Broadway | Ada | OK |
| 710 | NON-OWNED SERVICE STATIONS | Ada 3 | 914 West Main Street | Ada | OK |
| 711 | NON-OWNED SERVICE STATIONS | Ada 4 | Cradduck Road and Highway 99 | Ada | OK |
| 712 | NON-OWNED SERVICE STATIONS | Allen 1 | Bulk and Service Station & Tourist Court | Allen | OK |
| 713 | NON-OWNED SERVICE STATIONS | Altus 1 | 721 South Main Street | Altus | OK |
| 714 | NON-OWNED SERVICE STATIONS | Alva | 923 7th Street | Alva | OK |

| 715 | NON-OWNED SERVICE STATIONS | Anadarko 1 | 602 West Kentucky | Anadarko | OK |
| 716 | NON-OWNED SERVICE STATIONS | Anadarko 2 | SW/C South Mission & Kentucky | Anadarko | OK |
| 717 | NON-OWNED SERVICE STATIONS | Antlers 1 | U.S. Highway 271 | Antlers | OK |
| 718 | NON-OWNED SERVICE STATIONS | Antlers 2 | | Antlers | OK |
| 719 | NON-OWNED SERVICE STATIONS | Ardmore 1 | 203 - 14th Street, N.E. | Ardmore | OK |
| 720 | NON-OWNED SERVICE STATIONS | Ardmore 2 | SW/C US Highway 70 & I-35 | Ardmore | OK |
| 721 | NON-OWNED SERVICE STATIONS | Atoka 1 | 206 N. Mississippi Avenue | Atoka | OK |
| 722 | NON-OWNED SERVICE STATIONS | Atoka 2 | Highway 69 | Atoka | OK |
| 723 | NON-OWNED SERVICE STATIONS | Barnsdall 1 | 412 West Spruce | Barnsdall | OK |
| 724 | NON-OWNED SERVICE STATIONS | Bartlesville 3 | 4004 Nowata Road | Bartlesville | OK |
| 725 | NON-OWNED SERVICE STATIONS | Bartlesville 1 | 901 E. Frank Phillips | Bartlesville | OK |
| 726 | NON-OWNED SERVICE STATIONS | Bethany 2 | 7104 N.W. 23rd | Bethany | OK |
| 727 | NON-OWNED SERVICE STATIONS | Blackwell 1 | 1502 South Main Street | Blackwell | OK |
| 728 | NON-OWNED SERVICE STATIONS | Blackwell 2 | 728 North Main Street | Blackwell | OK |
| 729 | NON-OWNED SERVICE STATIONS | Braman 1 | NW/C I-35 & US 77 | Braman | OK |
| 730 | NON-OWNED SERVICE STATIONS | Britton | 301 East Britton Avenue | Britton | OK |
| 731 | NON-OWNED SERVICE STATIONS | Broken Bow 1 | West First and Park Drive | Broken Bow | OK |
| 732 | NON-OWNED SERVICE STATIONS | Cache 1 | 507 H Street | Cache | OK |
| 733 | NON-OWNED SERVICE STATIONS | Calvin 1 | U.S. 75 and 270 | Calvin | OK |
| 734 | NON-OWNED SERVICE STATIONS | Chandler Bulk Station | 6th and Manvel Streets | Chandler | OK |

| 735 | NON-OWNED SERVICE STATIONS | Chandler 1 | Cleveland Street and US Highway 66 | Chandler | OK |
| 736 | NON-OWNED SERVICE STATIONS | Checotah 1 | P.O. Box 28 | Checotah | OK |
| 737 | NON-OWNED SERVICE STATIONS | Cherokee 1 | Highway 64 and South Ohio | Cherokee | OK |
| 738 | NON-OWNED SERVICE STATIONS | Chickasha 2 | 1502 South 4th Street | Chickasha | OK |
| 739 | NON-OWNED SERVICE STATIONS | Choctaw 1 | Muzzy Street | Choctaw | OK |
| 740 | NON-OWNED SERVICE STATIONS | Cleveland 1 | C Street and Caddo | Cleveland | OK |
| 741 | NON-OWNED SERVICE STATIONS | Clinton 1 | 2000 Gary Freeway | Clinton | OK |
| 742 | NON-OWNED SERVICE STATIONS | Clinton 2 | NE/C 4th and Terrace | Clinton | OK |
| 743 | NON-OWNED SERVICE STATIONS | Cordell 1 | 1110 North Church Street | Cordell | OK |
| 744 | NON-OWNED SERVICE STATIONS | Cordell 2 | 1126 East Main Street | Cordell | OK |
| 745 | NON-OWNED SERVICE STATIONS | Cushing 1 | 1624 or 1348 East Main Street | Cushing | OK |
| 746 | NON-OWNED SERVICE STATIONS | Cushing 2 | 905 North Little | Cushing | OK |
| 747 | NON-OWNED SERVICE STATIONS | Cushing 3 | NW/C East Main & Linwood | Cushing | OK |
| 748 | NON-OWNED SERVICE STATIONS | Davis 1 | R.F.D. 1 | Davis | OK |
| 749 | NON-OWNED SERVICE STATIONS | Del City | 1801 S. Sunnylane | Del City | OK |
| 750 | NON-OWNED SERVICE STATIONS | Dill City | SE/4 of Sectio 31, T 10 N, R 18 W, Washita County | Dill City | OK |
| 751 | NON-OWNED SERVICE STATIONS | Drumright 2 | 501 North Harley Street | Drumright | OK |
| 752 | NON-OWNED SERVICE STATIONS | Drumright Bulk Station | Wheeler Lease | Drumright | OK |
| 753 | NON-OWNED SERVICE STATIONS | Duncan 3 | 16th and Pine | Duncan | OK |
| 754 | NON-OWNED SERVICE STATIONS | Duncan 1 | 505 S. 81st Bypass | Duncan | OK |

| 755 | NON-OWNED SERVICE STATIONS | Duncan 2 | 706 East Highway 7 | Duncan | OK |
| 756 | NON-OWNED SERVICE STATIONS | Edmond 2 | 1422 S. Broadway | Edmond | OK |
| 757 | NON-OWNED SERVICE STATIONS | Edmond 1 | 2216 West Edmond Road | Edmond | OK |
| 758 | NON-OWNED SERVICE STATIONS | El Reno 2 | 1519 Sunset Drive | El Reno | OK |
| 759 | NON-OWNED SERVICE STATIONS | Elk City 2 | 2124 West Third Street | Elk City | OK |
| 760 | NON-OWNED SERVICE STATIONS | Elk City | I-40 & County Road | Elk City | OK |
| 761 | NON-OWNED SERVICE STATIONS | Elk City 1 | NE/C First & Van Buren | Elk City | OK |
| 762 | NON-OWNED SERVICE STATIONS | Enid 3 | 129 West Elm Street | Enid | OK |
| 763 | NON-OWNED SERVICE STATIONS | Enid 5 | 1609 South Van Buren | Enid | OK |
| 764 | NON-OWNED SERVICE STATIONS | Enid 4 | 231 West Main Street | Enid | OK |
| 765 | NON-OWNED SERVICE STATIONS | Enid 1 | 308 West Broadway | Enid | OK |
| 766 | NON-OWNED SERVICE STATIONS | Enid 6 | 424 N. Van Buren | Enid | OK |
| 767 | NON-OWNED SERVICE STATIONS | Enid 7 | North 4th & Walnut | Enid | OK |
| 768 | NON-OWNED SERVICE STATIONS | Erick 1 | NE/C I-40 & SH 30 | Erick | OK |
| 769 | NON-OWNED SERVICE STATIONS | Eufaula 1 | 302 North Main Street | Eufaula | OK |
| 770 | NON-OWNED SERVICE STATIONS | Eufaula 2 | State Highway 9 and US 69 Service Road | Eufaula | OK |
| 771 | NON-OWNED SERVICE STATIONS | Fairland | NW/C Connor and Main Street | Fairland | OK |
| 772 | NON-OWNED SERVICE STATIONS | Fairview | Main and Ash Streets | Fairview | OK |
| 773 | NON-OWNED SERVICE STATIONS | Frederick 1 | 1200 S. Main Street | Frederick | OK |
| 774 | NON-OWNED SERVICE STATIONS | Gore 1 | NW/C 8th and Main Streets | Gore | OK |

| 775 | NON-OWNED SERVICE STATIONS | Guthrie 1 | 308 S. Division Street | Guthrie | OK |
| 776 | NON-OWNED SERVICE STATIONS | Guthrie | 617-618 Division Street | Guthrie | OK |
| 777 | NON-OWNED SERVICE STATIONS | Hennessey | I-81 & I-51 | Hennessey | OK |
| 778 | NON-OWNED SERVICE STATIONS | Henryetta | 611 E. Main street | Henryetta | OK |
| 779 | NON-OWNED SERVICE STATIONS | Henryetta 2 | SW/C East Main and F Streets | Henryetta | OK |
| 780 | NON-OWNED SERVICE STATIONS | Henryetta 1 | US Highway 62 East | Henryetta | OK |
| 781 | NON-OWNED SERVICE STATIONS | Holdenville 1 | 7th Avenue and Hinckley Street | Holdenville | OK |
| 782 | NON-OWNED SERVICE STATIONS | Hugo 1 | 601 W. Jackson | Hugo | OK |
| 783 | NON-OWNED SERVICE STATIONS | Idabel 1 | 110 East Washington | Idabel | OK |
| 784 | NON-OWNED SERVICE STATIONS | Kansas | State Highway 33 East | Kansas | OK |
| 785 | NON-OWNED SERVICE STATIONS | Keota 1 | 2 miles East of Keota on State Highway 9 | Keota | OK |
| 786 | NON-OWNED SERVICE STATIONS | Konawa 1 | 111 East Main | Konawa | OK |
| 787 | NON-OWNED SERVICE STATIONS | Lawton 4 | 2401 Cache Road | Lawton | OK |
| 788 | NON-OWNED SERVICE STATIONS | Lawton 6 | 4135 West Gore | Lawton | OK |
| 789 | NON-OWNED SERVICE STATIONS | Lexington 1 | Highway 77 | Lexington | OK |
| 790 | NON-OWNED SERVICE STATIONS | Lindsay 1 | 508 West Cherokee | Lindsay | OK |
| 791 | NON-OWNED SERVICE STATIONS | Madill | 511 S. 1st street | Madill | OK |
| 792 | NON-OWNED SERVICE STATIONS | Madill 1 | 511 South First | Madill | OK |
| 793 | NON-OWNED SERVICE STATIONS | Maysville 1 | Sixth and Ash Streets | Maysville | OK |
| 794 | NON-OWNED SERVICE STATIONS | McAlester 2 | 1101 E. Carl Albert | McAlester | OK |

| 795 | NON-OWNED SERVICE STATIONS | McAlester | 1101 E. Carl Albert pkwy | McAlester | OK |
| 796 | NON-OWNED SERVICE STATIONS | McAlester | Ashland & Main | McAlester | OK |
| 797 | NON-OWNED SERVICE STATIONS | Midwest City | 1100 N. Douglas Blvd. | Midwest City | OK |
| 798 | NON-OWNED SERVICE STATIONS | Midwest City 2 | 1100 North Midwest Blvd | Midwest City | OK |
| 799 | NON-OWNED SERVICE STATIONS | Midwest City 4 | 2725 South Midwest Blvd | Midwest City | OK |
| 800 | NON-OWNED SERVICE STATIONS | Midwest City | 8917 SE 29th street | Midwest City | OK |
| 801 | NON-OWNED SERVICE STATIONS | Midwest City | N.E. 10th street & N. Midwest Blvd. | Midwest City | OK |
| 802 | NON-OWNED SERVICE STATIONS | Midwest City 1 | NW/C NE 10 and Westminster | Midwest City | OK |
| 803 | NON-OWNED SERVICE STATIONS | Midwest City 5 | NW/C SE 29 & Post Road | Midwest City | OK |
| 804 | NON-OWNED SERVICE STATIONS | Midwest City | SE 29th street & Sooner road | Midwest City | OK |
| 805 | NON-OWNED SERVICE STATIONS | Moore | 600 SW 4th street | Moore | OK |
| 806 | NON-OWNED SERVICE STATIONS | Moore 2 | 714 N.W. 27th | Moore | OK |
| 807 | NON-OWNED SERVICE STATIONS | Moore | 714 NW 27th street | Moore | OK |
| 808 | NON-OWNED SERVICE STATIONS | Moore | 800 N.E. 12th street | Moore | OK |
| 809 | NON-OWNED SERVICE STATIONS | Moore 6 | NE/C SE 19th & Eastern | Moore | OK |
| 810 | NON-OWNED SERVICE STATIONS | Moore 1 | NW/C SE 119 & Sunnylane | Moore | OK |
| 811 | NON-OWNED SERVICE STATIONS | Moore 3 | SE/C 119th and Bryant | Moore | OK |
| 812 | NON-OWNED SERVICE STATIONS | Moore 4 | SE/C SE 164th & Bryant Avenue | Moore | OK |
| 813 | NON-OWNED SERVICE STATIONS | Moore 4 | SW 4th and Telephone Road | Moore | OK |
| 814 | NON-OWNED SERVICE STATIONS | Muskogee | 101 W. Southside Blvd. | Muskogee | OK |

| 815 | NON-OWNED SERVICE STATIONS | Muskogee | 111 S. 32nd street | Muskogee | OK |
| 816 | NON-OWNED SERVICE STATIONS | Muskogee 4 | 1202 West Okmulgee | Muskogee | OK |
| 817 | NON-OWNED SERVICE STATIONS | Muskogee | 2340 Gibson street | Muskogee | OK |
| 818 | NON-OWNED SERVICE STATIONS | Muskogee | 2404 E. Chandler road | Muskogee | OK |
| 819 | NON-OWNED SERVICE STATIONS | Muskogee 1 | 3704 West Okmulgee | Muskogee | OK |
| 820 | NON-OWNED SERVICE STATIONS | Muskogee | 737 Callahan street | Muskogee | OK |
| 821 | NON-OWNED SERVICE STATIONS | Muskogee 8 | 838 North Main Street | Muskogee | OK |
| 822 | NON-OWNED SERVICE STATIONS | Muskogee 9 | SW/C Shawnee and North 17th Street | Muskogee | OK |
| 823 | NON-OWNED SERVICE STATIONS | Mustang 2 | NE/C S.W. 74th Street and Czech Hall Road | Mustang | OK |
| 824 | NON-OWNED SERVICE STATIONS | Mustang 1 | NW/C SW 44th and Sara Road | Mustang | OK |
| 825 | NON-OWNED SERVICE STATIONS | Mustang 4 | SE/C Sw 29th St. & Mustang Road | Mustang | OK |
| 826 | NON-OWNED SERVICE STATIONS | Mustang 3 | SW/C SW 59th & Mustang Road | Mustang | OK |
| 827 | NON-OWNED SERVICE STATIONS | New Perryman | | New Perryman | OK |
| 828 | NON-OWNED SERVICE STATIONS | Newcastle 1 | Tuttle & Newcastle 1 | Newcastle | OK |
| 829 | NON-OWNED SERVICE STATIONS | Noble 1 | US Highway 77 | Noble | OK |
| 830 | NON-OWNED SERVICE STATIONS | Norman | 1445 W. Lindsey street | Norman | OK |
| 831 | NON-OWNED SERVICE STATIONS | Norman 2 | 2100 W. Main | Norman | OK |
| 832 | NON-OWNED SERVICE STATIONS | Norman | 2316 E. Lindsey street | Norman | OK |
| 833 | NON-OWNED SERVICE STATIONS | Norman 1 | 2316 West Lindsey | Norman | OK |
| 834 | NON-OWNED SERVICE STATIONS | Norman | 316 W. Robinson street | Norman | OK |

| 835 | NON-OWNED SERVICE STATIONS | Norman 10 | Highway 77 SE | Norman | OK |
| 836 | NON-OWNED SERVICE STATIONS | Norman 6 | NE/C SW 194th and Santa Fe Avenue | Norman | OK |
| 837 | NON-OWNED SERVICE STATIONS | Norman 4 | NW/C New State Highway 9 & Douglas | Norman | OK |
| 838 | NON-OWNED SERVICE STATIONS | Norman 3 | Robinson Street & Berry Street | Norman | OK |
| 839 | NON-OWNED SERVICE STATIONS | Norman 5 | SW/C SE 19th and Midwest Blvd | Norman | OK |
| 840 | NON-OWNED SERVICE STATIONS | Nowata 1 | 216 South Ash | Nowata | OK |
| 841 | NON-OWNED SERVICE STATIONS | Okemah 1 | 402 North Fifth Street | Okemah | OK |
| 842 | NON-OWNED SERVICE STATIONS | Okemah 2 | I-40 & State 27 Interchange | Okemah | OK |
| 843 | NON-OWNED SERVICE STATIONS | Oklahoma City | SE/C 17th and N MacArthur | Oklahoma | OK |
| 844 | NON-OWNED SERVICE STATIONS | Oklahoma City 42 | 100 N.E. 13th Street | Oklahoma City | OK |
| 845 | NON-OWNED SERVICE STATIONS | Oklahoma City 99 | 101 NW 63rd | Oklahoma City | OK |
| 846 | NON-OWNED SERVICE STATIONS | Oklahoma City 39 | 101 South Walker | Oklahoma City | OK |
| 847 | NON-OWNED SERVICE STATIONS | Oklahoma City 1 | 1023 West Main Street | Oklahoma City | OK |
| 848 | NON-OWNED SERVICE STATIONS | Oklahoma City 29 | 1030 North Western | Oklahoma City | OK |
| 849 | NON-OWNED SERVICE STATIONS | Southern Region Office | 105 S.E. 46th Street | Oklahoma City | OK |
| 850 | NON-OWNED SERVICE STATIONS | Oklahoma City | 10830 N. May avenue | Oklahoma City | OK |
| 851 | NON-OWNED SERVICE STATIONS | Oklahoma City 27 | 1100 S.W. 29th Street | Oklahoma City | OK |
| 852 | NON-OWNED SERVICE STATIONS | Oklahoma City 117 | 1207 Sovereign Row, Building A #1207B | Oklahoma City | OK |
| 853 | NON-OWNED SERVICE STATIONS | Oklahoma City | 122nd street & MacArthur blvd | Oklahoma City | OK |
| 854 | NON-OWNED SERVICE STATIONS | Oklahoma City | 122nd street & Rockwell avenue | Oklahoma City | OK |

| 855 | NON-OWNED SERVICE STATIONS | Oklahoma City 113 | 12300 N. MacArthur | Oklahoma City | OK |
| 856 | NON-OWNED SERVICE STATIONS | Oklahoma City 12 | 1301 South Walker | Oklahoma City | OK |
| 857 | NON-OWNED SERVICE STATIONS | Oklahoma City 35 | 1306 East Reno | Oklahoma City | OK |
| 858 | NON-OWNED SERVICE STATIONS | Oklahoma City 60 | 1601 South May Avenue (near 15th) | Oklahoma City | OK |
| 859 | NON-OWNED SERVICE STATIONS | Oklahoma City 32 | 1724 N.W. 16th Street | Oklahoma City | OK |
| 860 | NON-OWNED SERVICE STATIONS | Oklahoma City 75 | 1920 N.E. Eight Street | Oklahoma City | OK |
| 861 | NON-OWNED SERVICE STATIONS | Oklahoma City 7A | 201 South May Avenue | Oklahoma City | OK |
| 862 | NON-OWNED SERVICE STATIONS | Oklahoma City | 201 W. Britton road | Oklahoma City | OK |
| 863 | NON-OWNED SERVICE STATIONS | Oklahoma City 57 | 201 West Britton Road | Oklahoma City | OK |
| 864 | NON-OWNED SERVICE STATIONS | Oklahoma City 36 | 2040 N.W. 23rd Street | Oklahoma City | OK |
| 865 | NON-OWNED SERVICE STATIONS | Oklahoma City Warehouse | 220 N.W. Robert S. Kerr Avenue | Oklahoma City | OK |
| 866 | NON-OWNED SERVICE STATIONS | Oklahoma City 21 | 2321 N. Portland | Oklahoma City | OK |
| 867 | NON-OWNED SERVICE STATIONS | Oklahoma City 8 | 23rd & Eastern | Oklahoma City | OK |
| 868 | NON-OWNED SERVICE STATIONS | Oklahoma City | 23rd street & Portland avenue | Oklahoma City | OK |
| 869 | NON-OWNED SERVICE STATIONS | Oklahoma City | 23rd street & Rockwell avenue | Oklahoma City | OK |
| 870 | NON-OWNED SERVICE STATIONS | Oklahoma City 2 | 2410 S.W. 29th Street | Oklahoma City | OK |
| 871 | NON-OWNED SERVICE STATIONS | OKLAHOMA CITY | 2412 SW 29TH STREET (29TH AND AGNEW) | Oklahoma City | OK |
| 872 | NON-OWNED SERVICE STATIONS | Oklahoma City 31 | 2419 North Classen | Oklahoma City | OK |
| 873 | NON-OWNED SERVICE STATIONS | Oklahoma City | 2421 SW 29th street | Oklahoma City | OK |
| 874 | NON-OWNED SERVICE STATIONS | Oklahoma City 3 | 2523 Classen Blvd | Oklahoma City | OK |

| 875 | NON-OWNED SERVICE STATIONS | Oklahoma City | 2523 Classen Blvd. | Oklahoma City | OK |
| 876 | NON-OWNED SERVICE STATIONS | Oklahoma City 70 | 2726 S. Western | Oklahoma City | OK |
| 877 | NON-OWNED SERVICE STATIONS | Oklahoma City 58 | 2819 South Shields | Oklahoma City | OK |
| 878 | NON-OWNED SERVICE STATIONS | Oklahoma City 54 | 2840 S.W. 59th | Oklahoma City | OK |
| 879 | NON-OWNED SERVICE STATIONS | Oklahoma City 38 | 2900 N.W. 16th | Oklahoma City | OK |
| 880 | NON-OWNED SERVICE STATIONS | Oklahoma City 12 | 2900 Northwest 23rd Street | Oklahoma City | OK |
| 881 | NON-OWNED SERVICE STATIONS | midwest city #3 | 2917 south douglas avenue | Oklahoma City | OK |
| 882 | NON-OWNED SERVICE STATIONS | Oklahoma City 83 | 2922 N. Lincoln | Oklahoma City | OK |
| 883 | NON-OWNED SERVICE STATIONS | Oklahoma City 34 | 3020 N.W. 23rd | Oklahoma City | OK |
| 884 | NON-OWNED SERVICE STATIONS | Oklahoma City 40 | 318 North Walnut | Oklahoma City | OK |
| 885 | NON-OWNED SERVICE STATIONS | Oklahoma City | 3601 and 3603 NW 50th street | Oklahoma City | OK |
| 886 | NON-OWNED SERVICE STATIONS | Oklahoma City | 36th street & May avenue | Oklahoma City | OK |
| 887 | NON-OWNED SERVICE STATIONS | Oklahoma City | 3701 S. Pennsylvania avenue (near 36th street) | Oklahoma City | OK |
| 888 | NON-OWNED SERVICE STATIONS | Oklahoma City 15 | 3701 South Pennsylvania | Oklahoma City | OK |
| 889 | NON-OWNED SERVICE STATIONS | Oklahoma City | 4015 N. Pennsylvania avenue | Oklahoma City | OK |
| 890 | NON-OWNED SERVICE STATIONS | Oklahoma City 90 | 4015 North Pennsylvania | Oklahoma City | OK |
| 891 | NON-OWNED SERVICE STATIONS | Oklahoma City 11 | 402 South Robinson Street | Oklahoma City | OK |
| 892 | NON-OWNED SERVICE STATIONS | Oklahoma City 43 | 4200 Newcastle Road | Oklahoma City | OK |
| 893 | NON-OWNED SERVICE STATIONS | Oklahoma City 52 | 4200 South May Avenue (near may and 41st) | Oklahoma City | OK |

| 894 | NON-OWNED SERVICE STATIONS | Oklahoma City 26 | 429 S.E. 29th Street | Oklahoma City | OK |
| 895 | NON-OWNED SERVICE STATIONS | Oklahoma City 51 | 4430 West Reno | Oklahoma City | OK |
| 896 | NON-OWNED SERVICE STATIONS | Oklahoma City 67 | 4432 N.W. 63rd | Oklahoma City | OK |
| 897 | NON-OWNED SERVICE STATIONS | Oklahoma City | 4th street & Harrison avenue | Oklahoma City | OK |
| 898 | NON-OWNED SERVICE STATIONS | Oklahoma City | 5101 N. Western avenue | Oklahoma City | OK |
| 899 | NON-OWNED SERVICE STATIONS | Oklahoma City 30 | 5101 N. Western Avenue | Oklahoma City | OK |
| 900 | NON-OWNED SERVICE STATIONS | Oklahoma City 68 | 5241 NW 10th Street | Oklahoma City | OK |
| 901 | NON-OWNED SERVICE STATIONS | OKLAHOMA CITY | 5400 MARTIN LUTHER KING | Oklahoma City | OK |
| 902 | NON-OWNED SERVICE STATIONS | Oklahoma City 24 | 5529 SE 15th | Oklahoma City | OK |
| 903 | NON-OWNED SERVICE STATIONS | Oklahoma City | 57th and north may | Oklahoma City | OK |
| 904 | NON-OWNED SERVICE STATIONS | Oklahoma City 16 | 5816 North May Avenue | Oklahoma City | OK |
| 905 | NON-OWNED SERVICE STATIONS | Oklahoma City 6 | 5901 South Shields | Oklahoma City | OK |
| 906 | NON-OWNED SERVICE STATIONS | Oklahoma City | 63rd & Broadway | Oklahoma City | OK |
| 907 | NON-OWNED SERVICE STATIONS | Oklahoma City | 63rd street & May avenue | Oklahoma City | OK |
| 908 | NON-OWNED SERVICE STATIONS | Oklahoma City | 63rd street & Meridian avenue | Oklahoma City | OK |
| 909 | NON-OWNED SERVICE STATIONS | Oklahoma City 33 | 6401 N. May | Oklahoma City | OK |
| 910 | NON-OWNED SERVICE STATIONS | Oklahoma City 5 | 6602 North Western | Oklahoma City | OK |
| 911 | NON-OWNED SERVICE STATIONS | Oklahoma City 17 | 700 S.E. 15th | Oklahoma City | OK |
| 912 | NON-OWNED SERVICE STATIONS | Oklahoma City 18 | 701 N.E. 7th Street | Oklahoma City | OK |
| 913 | NON-OWNED SERVICE STATIONS | Oklahoma City 7 | 701 NE 8th Street | Oklahoma City | OK |

| 914 | NON-OWNED SERVICE STATIONS | Oklahoma City 114 | 7040 N.W. 122nd | Oklahoma City | OK |
| 915 | NON-OWNED SERVICE STATIONS | Oklahoma City 2A | 723 South Walker | Oklahoma City | OK |
| 916 | NON-OWNED SERVICE STATIONS | Oklahoma City 71 | 7941 N.E. Expressway | Oklahoma City | OK |
| 917 | NON-OWNED SERVICE STATIONS | Oklahoma City 111 | 7944 W. Hefner Road | Oklahoma City | OK |
| 918 | NON-OWNED SERVICE STATIONS | Oklahoma City Bulk Station | 814 South Harvey Street | Oklahoma City | OK |
| 919 | NON-OWNED SERVICE STATIONS | Oklahoma City | 89th street & S. Pennsylvania avenue | Oklahoma City | OK |
| 920 | NON-OWNED SERVICE STATIONS | Oklahoma City 116 | 9000 South Pennsylvania | Oklahoma City | OK |
| 921 | NON-OWNED SERVICE STATIONS | Oklahoma City 93 | 901 South Pennsylvania | Oklahoma City | OK |
| 922 | NON-OWNED SERVICE STATIONS | Oklahoma City 37 | 9214 North Western | Oklahoma City | OK |
| 923 | NON-OWNED SERVICE STATIONS | Oklahoma City 108 | 9300 Block of N. Rockwell | Oklahoma City | OK |
| 924 | NON-OWNED SERVICE STATIONS | Oklahoma City 73 | 950 N.E. 23rd Street (near kelley) | Oklahoma City | OK |
| 925 | NON-OWNED SERVICE STATIONS | Oklahoma City 61 | Hefner Road and Broadway Extension | Oklahoma City | OK |
| 926 | NON-OWNED SERVICE STATIONS | Oklahoma City | N. Council road & W. Hefner road | Oklahoma City | OK |
| 927 | NON-OWNED SERVICE STATIONS | Oklahoma City 106 | N. of I-240 & Sooner Road | Oklahoma City | OK |
| 928 | NON-OWNED SERVICE STATIONS | Oklahoma City 13 | N.E. 23rd and Post Road | Oklahoma City | OK |
| 929 | NON-OWNED SERVICE STATIONS | Oklahoma City 53 | N.E. 63rd & Prospect | Oklahoma City | OK |
| 930 | NON-OWNED SERVICE STATIONS | Oklahoma City 69 | N.W. 50th East of Portland | Oklahoma City | OK |
| 931 | NON-OWNED SERVICE STATIONS | Oklahoma City 115 | N.W. Highway & Harvest Hills Road | Oklahoma City | OK |
| 932 | NON-OWNED SERVICE STATIONS | Billboard | N.W/C N. W. 23rd and Ann Arbor | Oklahoma City | OK |
| 933 | NON-OWNED SERVICE STATIONS | Oklahoma City 94 | NE 64th & Oklahoma Avenue | Oklahoma City | OK |

| 934 | NON-OWNED SERVICE STATIONS | Oklahoma City 4 | NE Corner of SE 29th & Sooner Rd. | Oklahoma City | OK |
| 935 | NON-OWNED SERVICE STATIONS | Oklahoma City 91 | NE/C N. Eastern and 52nd | Oklahoma City | OK |
| 936 | NON-OWNED SERVICE STATIONS | Oklahoma City 49 | NE/C N.W. 16th St. and Council Road | Oklahoma City | OK |
| 937 | NON-OWNED SERVICE STATIONS | Oklahoma City 45 | NE/C Reno & Rockwell | Oklahoma City | OK |
| 938 | NON-OWNED SERVICE STATIONS | Oklahoma City 92 | NE/C S.W. 39th and Portland | Oklahoma City | OK |
| 939 | NON-OWNED SERVICE STATIONS | Oklahoma City 105 | NE/C SE 134 & Sunnylane | Oklahoma City | OK |
| 940 | NON-OWNED SERVICE STATIONS | Oklahoma City 104 | NE/C SW 89th & Walker | Oklahoma City | OK |
| 941 | NON-OWNED SERVICE STATIONS | Oklahoma City 44 | NW 24th and MacArthur Boulevard | Oklahoma City | OK |
| 942 | NON-OWNED SERVICE STATIONS | Oklahoma City 55 | NW/C 122nd and N. Kelley | Oklahoma City | OK |
| 943 | NON-OWNED SERVICE STATIONS | Oklahoma City 66 | NW/C N.W. 23rd Street and Ann Arbor | Oklahoma City | OK |
| 944 | NON-OWNED SERVICE STATIONS | Oklahoma City 112 | NW/C NW 122nd & Council | Oklahoma City | OK |
| 945 | NON-OWNED SERVICE STATIONS | Oklahoma City 82 | NW/C Reno & Mustang Road | Oklahoma City | OK |
| 946 | NON-OWNED SERVICE STATIONS | Billboards | NW/C S.E. 29th & Douglas | Oklahoma City | OK |
| 947 | NON-OWNED SERVICE STATIONS | Oklahoma City 78 | NW/C SW 44th & Rockwell | Oklahoma City | OK |
| 948 | NON-OWNED SERVICE STATIONS | Oklahoma City 100 | NW/C Wilshire & Harvey | Oklahoma City | OK |
| 949 | NON-OWNED SERVICE STATIONS | Billboard | S.E. CN.W. 63rd and Meridian | Oklahoma City | OK |
| 950 | NON-OWNED SERVICE STATIONS | Oklahoma City 41 | S.W. 13th and May Avenue | Oklahoma City | OK |
| 951 | NON-OWNED SERVICE STATIONS | Oklahoma City 20 | S.W. 44th and Pennsylvania | Oklahoma City | OK |
| 952 | NON-OWNED SERVICE STATIONS | Oklahoma City 86 | SE/C NW 10 & Morgan Road | Oklahoma City | OK |

| 953 | NON-OWNED SERVICE STATIONS | OKC - MEEKER #2 FARM | SE/C NW 164 STREET & PORTLAND AVENUE | Oklahoma City | OK |
| 954 | NON-OWNED SERVICE STATIONS | OKC - MEEKER #2 FARM | SE/C NW 164 STREET & PORTLAND AVENUE | Oklahoma City | OK |
| 955 | NON-OWNED SERVICE STATIONS | Oklahoma City 103 | SE/C of SW 44th & MacArthur | Oklahoma City | OK |
| 956 | NON-OWNED SERVICE STATIONS | Billboard | SE/C S.W. 59th & May | Oklahoma City | OK |
| 957 | NON-OWNED SERVICE STATIONS | Oklahoma City 76 | SE/C SE 149th & Sooner Road | Oklahoma City | OK |
| 958 | NON-OWNED SERVICE STATIONS | Oklahoma City 80 | SE/C SW 134th & S. Pennsylvania | Oklahoma City | OK |
| 959 | NON-OWNED SERVICE STATIONS | Oklahoma City 48 | SE/C SW 29th & Meridian | Oklahoma City | OK |
| 960 | NON-OWNED SERVICE STATIONS | Billboard | SE/C West Reno and Meridian | Oklahoma City | OK |
| 961 | NON-OWNED SERVICE STATIONS | Knox Service Station, Job 5 | Southwest 29th and Harvey | Oklahoma City | OK |
| 962 | NON-OWNED SERVICE STATIONS | Oklahoma City 72 | Styll Road and Northwest Highway. | Oklahoma City | OK |
| 963 | NON-OWNED SERVICE STATIONS | Oklahoma City | SW 59th street & May avenue | Oklahoma City | OK |
| 964 | NON-OWNED SERVICE STATIONS | Oklahoma City | sw 8th and pennsylvania ave | Oklahoma City | OK |
| 965 | NON-OWNED SERVICE STATIONS | Oklahoma City 97 | SW/C N. Western & Memorial Road | Oklahoma City | OK |
| 966 | NON-OWNED SERVICE STATIONS | Oklahoma City 81 | SW/C NW 10th & Mustang Road | Oklahoma City | OK |
| 967 | NON-OWNED SERVICE STATIONS | Oklahoma City 107 | SW/C SE 89 & Sooner Road | Oklahoma City | OK |
| 968 | NON-OWNED SERVICE STATIONS | Oklahoma City 95 | SW/C SW 29th & Morgan Road | Oklahoma City | OK |
| 969 | NON-OWNED SERVICE STATIONS | Oklahoma City | w. Reno avenue & s. Meridian street | Oklahoma City | OK |
| 970 | NON-OWNED SERVICE STATIONS | Oklahoma City 50 | NEC SW 44th & MacArthur | Oklahoma City | OK |
| 971 | NON-OWNED SERVICE STATIONS | Oklahoma City 47 | SW/C N. W. Highway & MacArthur Blvd | Oklahoma City | OK |

| 972 | NON-OWNED SERVICE STATIONS | Oklahoma City 100 | W. side of S. Western near 93rd Street (9128 western road) | Oklahoma City | OK |
| 973 | NON-OWNED SERVICE STATIONS | Okmulgee | 10 N. Wood Drive | Okmulgee | OK |
| 974 | NON-OWNED SERVICE STATIONS | Okmulgee 1 | 200 South Muskogee Street | Okmulgee | OK |
| 975 | NON-OWNED SERVICE STATIONS | Okmulgee 3 | 210 N. Wood Drive | Okmulgee | OK |
| 976 | NON-OWNED SERVICE STATIONS | Okmulgee 2 | Okmulgee and Fourth Streets | Okmulgee | OK |
| 977 | NON-OWNED SERVICE STATIONS | Owasso 1 | 101 S. Main | Owasso | OK |
| 978 | NON-OWNED SERVICE STATIONS | PAULS VALLEY | 900 S CHICKASAW | Pauls Valley | OK |
| 979 | NON-OWNED SERVICE STATIONS | Pawnee County | Fee 136, Lake Keystone | Pawnee | OK |
| 980 | NON-OWNED SERVICE STATIONS | Pawnee County | Fee 86 Arkansas River Property | Pawnee | OK |
| 981 | NON-OWNED SERVICE STATIONS | Perry | | Perry | OK |
| 982 | NON-OWNED SERVICE STATIONS | Pierce 307 | SW/C I-40 & Pierce Road | Pierce | OK |
| 983 | NON-OWNED SERVICE STATIONS | Ponca City 2 | 200 East Highland | Ponca City | OK |
| 984 | NON-OWNED SERVICE STATIONS | Ponca City | 500 E. Hartford avenue | Ponca City | OK |
| 985 | NON-OWNED SERVICE STATIONS | Ponca City 3 | Highway U.S. 60 West | Ponca City | OK |
| 986 | NON-OWNED SERVICE STATIONS | Ponca City 1 | South 4th Street and East South Avenue | Ponca City | OK |
| 987 | NON-OWNED SERVICE STATIONS | Poteau 1 | 500 North Front Street | Poteau | OK |
| 988 | NON-OWNED SERVICE STATIONS | Poteau | 701 Highway | Poteau | OK |
| 989 | NON-OWNED SERVICE STATIONS | Poteau Bulk Station | East Dewey and KCS right-of-way | Poteau | OK |
| 990 | NON-OWNED SERVICE STATIONS | Pryor 1 | Highway 69 | Pryor | OK |

147

| 991 | NON-OWNED SERVICE STATIONS | Purcell 1 | 508 South Green Street | Purcell | OK |
| 992 | NON-OWNED SERVICE STATIONS | Purcell 2 | 630 S. Green Avenue | Purcell | OK |
| 993 | NON-OWNED SERVICE STATIONS | Rush Springs 1 | West Side U.S. Highway 81 | Rush Springs | OK |
| 994 | NON-OWNED SERVICE STATIONS | Sallisaw | 1101 E. Cherokee avenue | Sallisaw | OK |
| 995 | NON-OWNED SERVICE STATIONS | Sapulpa 2 | 501 Dewey Avenue | Sapulpa | OK |
| 996 | NON-OWNED SERVICE STATIONS | Sapulpa 1 | 717 E. Dewey St. | Sapulpa | OK |
| 997 | NON-OWNED SERVICE STATIONS | Shattuck 1 | NE/C Main & 8th | Shattuck | OK |
| 998 | NON-OWNED SERVICE STATIONS | Shawnee 3 | 1501 North Kickapoo | Shawnee | OK |
| 999 | NON-OWNED SERVICE STATIONS | Shawnee 1 | 301 East Highland Street | Shawnee | OK |
| 1000 | NON-OWNED SERVICE STATIONS | Shawnee 4 | NE/C I-40 & St. Highway 9A | Shawnee | OK |
| 1001 | NON-OWNED SERVICE STATIONS | Spencer 1 | SW/C NE 36th & Spencer Road | Spencer | OK |
| 1002 | NON-OWNED SERVICE STATIONS | Spiro 1 | | Spiro | OK |
| 1003 | NON-OWNED SERVICE STATIONS | Stigler 2 | 701 Maine Street | Stigler | OK |
| 1004 | NON-OWNED SERVICE STATIONS | Stigler 1 | 310 West Main | Stigler | OK |
| 1005 | NON-OWNED SERVICE STATIONS | Stillwater 1 | 1124 Boomer Road | Stillwater | OK |
| 1006 | NON-OWNED SERVICE STATIONS | Stillwater | 1124 N. Boomer Road | Stillwater | OK |
| 1007 | NON-OWNED SERVICE STATIONS | Stillwater | 424 W. 6th Street | Stillwater | OK |
| 1008 | NON-OWNED SERVICE STATIONS | Tahlequah | 1909 S. Muskogee avenue | Tahlequah | OK |
| 1009 | NON-OWNED SERVICE STATIONS | Tahlequah | 904 S. Muskogee | Tahlequah | OK |
| 1010 | NON-OWNED SERVICE STATIONS | Tishomingo 2 | Highway 78 East | Tishomingo | OK |

| 1011 | NON-OWNED SERVICE STATIONS | Tishomingo 1 | Highway 99 (705 North Kemp) | Tishomingo | OK |
|------|------|------|------|------|------|
| 1012 | NON-OWNED SERVICE STATIONS | Tulsa | 10519 E. 11th street | Tulsa | OK |
| 1013 | NON-OWNED SERVICE STATIONS | Tulsa 29 | 10519 East 11th Street | Tulsa | OK |
| 1014 | NON-OWNED SERVICE STATIONS | Tulsa 8 | 1435 South Lewis | Tulsa | OK |
| 1015 | NON-OWNED SERVICE STATIONS | Tulsa 21 | 1706 East Pine Street | Tulsa | OK |
| 1016 | NON-OWNED SERVICE STATIONS | Tulsa 9 | 1823 East Third Street | Tulsa | OK |
| 1017 | NON-OWNED SERVICE STATIONS | Tulsa 3 | 209 S. Peoria | Tulsa | OK |
| 1018 | NON-OWNED SERVICE STATIONS | Tulsa 10 | 21st and Lewis Avenue | Tulsa | OK |
| 1019 | NON-OWNED SERVICE STATIONS | Tulsa 28 | 2341 Southwest Boulevard | Tulsa | OK |
| 1020 | NON-OWNED SERVICE STATIONS | Tulsa 33 | 2604 East Apache | Tulsa | OK |
| 1021 | NON-OWNED SERVICE STATIONS | Tulsa 17 | 2797 North Peoria | Tulsa | OK |
| 1022 | NON-OWNED SERVICE STATIONS | Tulsa 6 | 3252 Southwest Boulevard | Tulsa | OK |
| 1023 | NON-OWNED SERVICE STATIONS | Tulsa 23 | 3625 South Sheridan | Tulsa | OK |
| 1024 | NON-OWNED SERVICE STATIONS | Tulsa 1 | 3917 East 11th Street | Tulsa | OK |
| 1025 | NON-OWNED SERVICE STATIONS | Tulsa 2 | 4106 East Admiral Place | Tulsa | OK |
| 1026 | NON-OWNED SERVICE STATIONS | Tulsa 20 | 6110 East 11th Street | Tulsa | OK |
| 1027 | NON-OWNED SERVICE STATIONS | Tulsa 34 | 6505 E. 91st Street South | Tulsa | OK |
| 1028 | NON-OWNED SERVICE STATIONS | Tulsa | 6505 S. 91st Street | Tulsa | OK |
| 1029 | NON-OWNED SERVICE STATIONS | Tulsa 22 | 6624 E. Pine | Tulsa | OK |
| 1030 | NON-OWNED SERVICE STATIONS | Tulsa 19 | 7200 Charles Page Boulevard | Tulsa | OK |

| 1031 | NON-OWNED SERVICE STATIONS | Tulsa 5 | 7640 Sand Springs Road | Tulsa | OK |
|---|---|---|---|---|---|
| 1032 | NON-OWNED SERVICE STATIONS | Tulsa 7 | 823 South Boston Avenue | Tulsa | OK |
| 1033 | NON-OWNED SERVICE STATIONS | Tulsa 25 | 9616 East 21st Street | Tulsa | OK |
| 1034 | NON-OWNED SERVICE STATIONS | Tulsa | Admiral and Allegheny | Tulsa | OK |
| 1035 | NON-OWNED SERVICE STATIONS | Tulsa | Fee 85, Sec 31-T19N-R10E | Tulsa | OK |
| 1036 | NON-OWNED SERVICE STATIONS | Tulsa 24 | Southwest Boulevard and West 45 Street | Tulsa | OK |
| 1037 | NON-OWNED SERVICE STATIONS | Vian 1 | IH 40 and Lake Road Interchange | Vian | OK |
| 1038 | NON-OWNED SERVICE STATIONS | Wagoner 1 | 1205 West Cherokee | Wagoner | OK |
| 1039 | NON-OWNED SERVICE STATIONS | Warner 1 | NW/C I-40 and St. Highway 2 | Warner | OK |
| 1040 | NON-OWNED SERVICE STATIONS | Waynoka | Cecil & Flynn Streets | Waynoka | OK |
| 1041 | NON-OWNED SERVICE STATIONS | Weatherford 1 | Route 2 | Weatherford | OK |
| 1042 | NON-OWNED SERVICE STATIONS | Webbers Falls 1 | I 40 and SH 100 | Webbers Falls | OK |
| 1043 | NON-OWNED SERVICE STATIONS | Wynnewood | 903 S. D.A. McGee avenue | Wynnewood | OK |
| 1044 | NON-OWNED SERVICE STATIONS | Wynnewood 1 (refinery) | Highway 77 at South City Limits | Wynnewood | OK |
| 1045 | NON-OWNED SERVICE STATIONS | Wynnewood 2 | NE/C I-35 & St. Highway 29 | Wynnewood | OK |
| 1046 | NON-OWNED SERVICE STATIONS | Yukon 5 | 1301 S. Cornwell | Yukon | OK |
| 1047 | NON-OWNED SERVICE STATIONS | Yukon 2 | 307 E. Main | Yukon | OK |
| 1048 | NON-OWNED SERVICE STATIONS | Yukon | 307 E. Main street | Yukon | OK |
| 1049 | NON-OWNED SERVICE STATIONS | Yukon 4 | NE/C NW 10th and Cornwell | Yukon | OK |
| 1050 | NON-OWNED SERVICE STATIONS | Yukon | S. Cornwell drive & W. VandAment avenue | Yukon | OK |

| 1051 | NON-OWNED SERVICE STATIONS | Yukon 3 | SE/C NW 36th and Sara Rd. | Yukon | OK |
|------|------|------|------|------|------|
| 1052 | NON-OWNED SERVICE STATIONS | Yukon 1 | SW/C 23rd and Mustang Road | Yukon | OK |
| 1053 | NON-OWNED SERVICE STATIONS | Aberdeen 2 | 423 North Main Street | Aberdeen | SD |
| 1054 | NON-OWNED SERVICE STATIONS | Brookings 1 | 501 Sixth Street | Brookings | SD |
| 1055 | NON-OWNED SERVICE STATIONS | Hecla 1 | Lots 15 and 16, Block 3 | Hecla | SD |
| 1056 | NON-OWNED SERVICE STATIONS | Vermillion 1 | 801 Cherry Street | Vermillion | SD |
| 1057 | NON-OWNED SERVICE STATIONS | Watertown 1 | 150 Fourth Street, N.E. | Watertown | SD |
| 1058 | NON-OWNED SERVICE STATIONS | Watertown | U.S. Hwy. 212 & Broadway | Watertown | SD |
| 1059 | NON-OWNED SERVICE STATIONS | Webster 1 | Lot 6 of Sandvig's Outlot Addition | Webster | SD |
| 1060 | NON-OWNED SERVICE STATIONS | Bristol Peoples 46 | 301 Bluff City Highway | Bristol | TN |
| 1061 | NON-OWNED SERVICE STATIONS | Bristol 140 | Volunteer Parkway and Shelby Lane | Bristol | TN |
| 1062 | NON-OWNED SERVICE STATIONS | Chattanooga 27 | 1998 Dayton Pike | Chattanooga | TN |
| 1063 | NON-OWNED SERVICE STATIONS | Chattanooga 98 | 2405 Dayton Boulevard | Chattanooga | TN |
| 1064 | NON-OWNED SERVICE STATIONS | Chattanooga 117 | 4239 Bonny Oaks Drive | Chattanooga | TN |
| 1065 | NON-OWNED SERVICE STATIONS | Chattanooga | 5801 Lee Highway | Chattanooga | TN |
| 1066 | NON-OWNED SERVICE STATIONS | Chattanooga 28 | Main Street & Lyerly | Chattanooga | TN |
| 1067 | NON-OWNED SERVICE STATIONS | Clarksville 41 | Highway 41-A & Walnut | Clarksville | TN |
| 1068 | NON-OWNED SERVICE STATIONS | Columbia 47 | 514 North Garden | Columbia | TN |
| 1069 | NON-OWNED SERVICE STATIONS | Columbia 161 | U.S. Highway 31 By-pass and Pillow Drive | Columbia | TN |
| 1070 | NON-OWNED SERVICE STATIONS | Cookeville 163 | South Jefferson Avenue | Cookeville | TN |

| 1071 | NON-OWNED SERVICE STATIONS | Donelson 11 | 3202 Lebanon Road at Central Pike | Donelson | TN |
| 1072 | NON-OWNED SERVICE STATIONS | Elizabethton 142 | Route 7 - Highway 19 East | Elizabethton | TN |
| 1073 | NON-OWNED SERVICE STATIONS | Elizabethton 2143 | State Highway 91 & US Highway 31 | Elizabethton | TN |
| 1074 | NON-OWNED SERVICE STATIONS | Erwin | Main and Elm Streets | Erwin | TN |
| 1075 | NON-OWNED SERVICE STATIONS | Franklin 2164 | 505 Hillsboro Road | Franklin | TN |
| 1076 | NON-OWNED SERVICE STATIONS | Gallatin 51 | South Waters Avenue | Gallatin | TN |
| 1077 | NON-OWNED SERVICE STATIONS | Gray 131 | US Highway 36 | Gray | TN |
| 1078 | NON-OWNED SERVICE STATIONS | Greenville 50 | 1153 Tusculum Boulevard | Greenville | TN |
| 1079 | NON-OWNED SERVICE STATIONS | Greenville 120 | Snapps Ferry Road | Greenville | TN |
| 1080 | NON-OWNED SERVICE STATIONS | Hixon 116 | 4514 Hixson Pike | Hixson | TN |
| 1081 | NON-OWNED SERVICE STATIONS | Johnson City 13 | E. Main & Broadway | Johnson City | TN |
| 1082 | NON-OWNED SERVICE STATIONS | Johnson City 14 | New Jonesboro Highway | Johnson City | TN |
| 1083 | NON-OWNED SERVICE STATIONS | Kingsport 2007 | 1748 Netherland Inn Road | Kingsport | TN |
| 1084 | NON-OWNED SERVICE STATIONS | Kingsport 6 | 2555 Fort Henry Drive | Kingsport | TN |
| 1085 | NON-OWNED SERVICE STATIONS | Kingsport 31 | 340 East Sullivan Street | Kingsport | TN |
| 1086 | NON-OWNED SERVICE STATIONS | Knoxville 39 | 4133 Broadway, N.E. | Knoxville | TN |
| 1087 | NON-OWNED SERVICE STATIONS | Knoxville 29 | 4646 Broadway | Knoxville | TN |
| 1088 | NON-OWNED SERVICE STATIONS | Knoxville 49 | 6211 Chapman Highway | Knoxville | TN |
| 1089 | NON-OWNED SERVICE STATIONS | Knoxville 20 | NE/C Asheville Highway & Stooksbury Rd. | Knoxville | TN |
| 1090 | NON-OWNED SERVICE STATIONS | Lebanon 2121 | 816 North Cumberland | Lebanon | TN |

| 1091 | NON-OWNED SERVICE STATIONS | Lexington 6378 | 562 West Church | Lexington | TN |
| 1092 | NON-OWNED SERVICE STATIONS | Madison 22 | Gallatin Road and Hall's Lane | Madison | TN |
| 1093 | NON-OWNED SERVICE STATIONS | Madisonville 162 | US Highway 411 | Madisonville | TN |
| 1094 | NON-OWNED SERVICE STATIONS | McMinnville 118 | 603 North Chancery Street | McMinnville | TN |
| 1095 | NON-OWNED SERVICE STATIONS | Memphis 5 | 2742 Park Avenue | Memphis | TN |
| 1096 | NON-OWNED SERVICE STATIONS | Memphis 2 | 3087 South Third | Memphis | TN |
| 1097 | NON-OWNED SERVICE STATIONS | Memphis 4 | 3690 Jackson Avenue | Memphis | TN |
| 1098 | NON-OWNED SERVICE STATIONS | Memphis 3 | 3819 Lamar Avenue | Memphis | TN |
| 1099 | NON-OWNED SERVICE STATIONS | Memphis 1 | 4672 South Third Street | Memphis | TN |
| 1100 | NON-OWNED SERVICE STATIONS | Memphis 6 | 908 Chelsea | Memphis | TN |
| 1101 | NON-OWNED SERVICE STATIONS | Mt. Pleasant 127 | 302 North Main Street | Mt. Pleasant | TN |
| 1102 | NON-OWNED SERVICE STATIONS | Murfreesboro 2129 | 1110 Memorial Drive | Murfreesboro | TN |
| 1103 | NON-OWNED SERVICE STATIONS | Murfreesboro 148 | 1149 Northwest Broad St. | Murfreesboro | TN |
| 1104 | NON-OWNED SERVICE STATIONS | Murfreesboro 37 | 215 N.W. Broad Street | Murfreesboro | TN |
| 1105 | NON-OWNED SERVICE STATIONS | Nashville 18 | 1008 East Thompson Lane | Nashville | TN |
| 1106 | NON-OWNED SERVICE STATIONS | Old Hickory 2010 | 1515 Robinson Road | Nashville | TN |
| 1107 | NON-OWNED SERVICE STATIONS | NASHVILLE | 1814 4TH AVE | Nashville | TN |
| 1108 | NON-OWNED SERVICE STATIONS | Nashville 2030 | 3720 Dickerson Road | Nashville | TN |
| 1109 | NON-OWNED SERVICE STATIONS | Nashville 43 | 3901 Hillsboro Road | Nashville | TN |
| 1110 | NON-OWNED SERVICE STATIONS | Nashville 90 | 4537 Nolensville Pike | Nashville | TN |

| 1111 | NON-OWNED SERVICE STATIONS | Nashville 5 | 6012 Charlotte Pike | Nashville | TN |
| 1112 | NON-OWNED SERVICE STATIONS | Nashville 25 | 711 Lebanon Road | Nashville | TN |
| 1113 | NON-OWNED SERVICE STATIONS | Nashville 45 | 721 Jefferson Street | Nashville | TN |
| 1114 | NON-OWNED SERVICE STATIONS | Nashville 2019 | 801 North First Street | Nashville | TN |
| 1115 | NON-OWNED SERVICE STATIONS | Nashville | Abbott-Martin Road | Nashville | TN |
| 1116 | NON-OWNED SERVICE STATIONS | Nashville 39 | Charlotte Pike and Morrow Road | Nashville | TN |
| 1117 | NON-OWNED SERVICE STATIONS | nashville #2168 | trousdale drive and elysian fields road | Nashville | TN |
| 1118 | NON-OWNED SERVICE STATIONS | Paris 1 | 1005 Mineral Wells | Paris | TN |
| 1119 | NON-OWNED SERVICE STATIONS | Shelbyville 121 | SW/C North Main and West Cedar | Shelbyville | TN |
| 1120 | NON-OWNED SERVICE STATIONS | Smithville 128 | US Highway 70 | Smithville | TN |
| 1121 | NON-OWNED SERVICE STATIONS | Tullahoma | South Anderson & Volney Streets | Tullahoma | TN |
| 1122 | NON-OWNED SERVICE STATIONS | Winchester 21 | 1109 First Avenue South | Winchester | TN |
| 1123 | NON-OWNED SERVICE STATIONS | Amarillo 6 | 2508 West 7th Street | Amarillo | TX |
| 1124 | NON-OWNED SERVICE STATIONS | Amarillo 2 | SE/C 50th Street and Western Avenue | Amarillo | TX |
| 1125 | NON-OWNED SERVICE STATIONS | Austin 69 | 1198 Airport Boulevard | Austin | TX |
| 1126 | NON-OWNED SERVICE STATIONS | Austin 73 | 2027 South Lamar | Austin | TX |
| 1127 | NON-OWNED SERVICE STATIONS | Austin 72 | 3903 South First | Austin | TX |
| 1128 | NON-OWNED SERVICE STATIONS | Austin 1 | 5239 Burnet Road | Austin | TX |
| 1129 | NON-OWNED SERVICE STATIONS | Austin 71 | 3903 South Congress Avenue | Austin | TX |
| 1130 | NON-OWNED SERVICE STATIONS | Beaumont 45 | 2820 College | Beaumont | TX |

154

| 1131 | NON-OWNED SERVICE STATIONS | Bovina 1 | Main and Martin Streets | Bovina | TX |
|------|---------------------------|----------|-------------------------|--------|-----|
| 1132 | NON-OWNED SERVICE STATIONS | Brownsville WALCO 96 | 2975 Southmost | Brownsville | TX |
| 1133 | NON-OWNED SERVICE STATIONS | BROWNSVILLE 9079 | 4500 EAST 14TH STREET | Brownsville | TX |
| 1134 | NON-OWNED SERVICE STATIONS | BROWNSVILLE 9078 | 605 CENTRAL BLVD | Brownsville | TX |
| 1135 | NON-OWNED SERVICE STATIONS | Brownsville WALCO 100 | 635 International Blvd. | Brownsville | TX |
| 1136 | NON-OWNED SERVICE STATIONS | Brownsville WALCO 95 | 645 East Madison | Brownsville | TX |
| 1137 | NON-OWNED SERVICE STATIONS | Brownwood 74 | 209 South Main | Brownwood | TX |
| 1138 | NON-OWNED SERVICE STATIONS | Cleburne 1 | 505 West Henderson | Cleburne | TX |
| 1139 | NON-OWNED SERVICE STATIONS | Conway 1 | SE/C I-40 & State Highway 15 | Conway | TX |
| 1140 | NON-OWNED SERVICE STATIONS | Corpus Christi 80 | 1821 Leopard | Corpus Christi | TX |
| 1141 | NON-OWNED SERVICE STATIONS | Corpus Christi 81 | 4500 Ayers | Corpus Christi | TX |
| 1142 | NON-OWNED SERVICE STATIONS | Dallas 5 | 11030 Harry Hines Boulevard | Dallas | TX |
| 1143 | NON-OWNED SERVICE STATIONS | Dallas 6 | 2519 Swiss Avenue | Dallas | TX |
| 1144 | NON-OWNED SERVICE STATIONS | Dallas 8 | 2900 Fordham Road | Dallas | TX |
| 1145 | NON-OWNED SERVICE STATIONS | Dallas 9 | 3151 Kiest Boulevard | Dallas | TX |
| 1146 | NON-OWNED SERVICE STATIONS | Dallas 4 | 4501 North Beltline Road | Dallas | TX |
| 1147 | NON-OWNED SERVICE STATIONS | Dallas 3 | 4847 Scyene Road | Dallas | TX |
| 1148 | NON-OWNED SERVICE STATIONS | Dallas 2 | 7233 Gaston Avenue | Dallas | TX |
| 1149 | NON-OWNED SERVICE STATIONS | Dallas 1 | 8054 Forest Lane | Dallas | TX |
| 1150 | NON-OWNED SERVICE STATIONS | Dallas 7 | 9938 Harry Hines Boulevard | Dallas | TX |

| 1151 | NON-OWNED SERVICE STATIONS | Edinburg 93 | 1020 East University Drive | Edinburg | TX |
| 1152 | NON-OWNED SERVICE STATIONS | Edinburg Walco 93 | 1021 East University Drive | Edinburg | TX |
| 1153 | NON-OWNED SERVICE STATIONS | Fort Worth 3 | 2025 Evans Street | Fort Worth | TX |
| 1154 | NON-OWNED SERVICE STATIONS | Fort Worth 2 | 6401 Baker Boulevard | Fort Worth | TX |
| 1155 | NON-OWNED SERVICE STATIONS | Freeport 46 | 1005 Brazosport Boulevard | Freeport | TX |
| 1156 | NON-OWNED SERVICE STATIONS | Gainesville 1 | 1205 S. California | Gainesville 1 | TX |
| 1157 | NON-OWNED SERVICE STATIONS | Garland 2 | 1917 South First Street | Garland | TX |
| 1158 | NON-OWNED SERVICE STATIONS | Garland 1 | 3525 Forest Lane | Garland | TX |
| 1159 | NON-OWNED SERVICE STATIONS | Grand Prairie 1 | 2217 West Jefferson | Grand Prairie | TX |
| 1160 | NON-OWNED SERVICE STATIONS | harlingen 9083 | 1520 west harrison | Harlingen | TX |
| 1161 | NON-OWNED SERVICE STATIONS | harlingen 9084 | 1821 south 77 sunshine strip | Harlingen | TX |
| 1162 | NON-OWNED SERVICE STATIONS | Houston 65 | 10510 Post Oak Road | Houston | TX |
| 1163 | NON-OWNED SERVICE STATIONS | Houston 64 | 11515 South Post Oak | Houston | TX |
| 1164 | NON-OWNED SERVICE STATIONS | Houston 66 | 1339 West Gray and Waugh Drive | Houston | TX |
| 1165 | NON-OWNED SERVICE STATIONS | Houston 52 | 1621 Federal Road | Houston | TX |
| 1166 | NON-OWNED SERVICE STATIONS | Houston 41 | 1629 E. 25th | Houston | TX |
| 1167 | NON-OWNED SERVICE STATIONS | Houston 44 | 2005 Bingle Road | Houston | TX |
| 1168 | NON-OWNED SERVICE STATIONS | Houston 67 | 2105 Wirtcrest at Wirt Road | Houston | TX |
| 1169 | NON-OWNED SERVICE STATIONS | Houston 31 | 2203 Durham | Houston | TX |
| 1170 | NON-OWNED SERVICE STATIONS | Houston 37 | 2701 Yale | Houston | TX |

| 1171 | NON-OWNED SERVICE STATIONS | Houston 39 | 2804 North Shepherd | Houston | TX |
| 1172 | NON-OWNED SERVICE STATIONS | Houston 39 | 2807 N. Shepherd #39 | Houston | TX |
| 1173 | NON-OWNED SERVICE STATIONS | Houston 101 | 315 East 20th Street | Houston | TX |
| 1174 | NON-OWNED SERVICE STATIONS | Houston 55 | 3403 Irvington Blvd. | Houston | TX |
| 1175 | NON-OWNED SERVICE STATIONS | Houston 38 | 3736 Mangum Road | Houston | TX |
| 1176 | NON-OWNED SERVICE STATIONS | Houston 35 | 4010 North Main | Houston | TX |
| 1177 | NON-OWNED SERVICE STATIONS | Houston 33 | 402 West 11th Street | Houston | TX |
| 1178 | NON-OWNED SERVICE STATIONS | Houston 40 | 407 Yale | Houston | TX |
| 1179 | NON-OWNED SERVICE STATIONS | Houston 36 | 4814 Lockwood | Houston | TX |
| 1180 | NON-OWNED SERVICE STATIONS | Houston 50 | 4901 Darling | Houston | TX |
| 1181 | NON-OWNED SERVICE STATIONS | Houston | 5210 Buffalo Speedway | Houston | TX |
| 1182 | NON-OWNED SERVICE STATIONS | Houston 47 | 5210 Buffalo Speedway | Houston | TX |
| 1183 | NON-OWNED SERVICE STATIONS | Houston 59 | 5502 Bissonnet | Houston | TX |
| 1184 | NON-OWNED SERVICE STATIONS | Houston 53 | 5702 Gulf Freeway | Houston | TX |
| 1185 | NON-OWNED SERVICE STATIONS | Houston 58 | 5906 North Main | Houston | TX |
| 1186 | NON-OWNED SERVICE STATIONS | Houston 63 | 6330 South Martin Luther King Boulevard | Houston | TX |
| 1187 | NON-OWNED SERVICE STATIONS | Houston 56 | 7028 Lawndale | Houston | TX |
| 1188 | NON-OWNED SERVICE STATIONS | Houston 32 | 7402 Long Point 32 | Houston | TX |
| 1189 | NON-OWNED SERVICE STATIONS | Houston 49 | 8221 Clinton Drive | Houston | TX |
| 1190 | NON-OWNED SERVICE STATIONS | Houston 54 | 9909 Hempstead Highway | Houston | TX |

| 1191 | NON-OWNED SERVICE STATIONS | Houston 43 | NW/C FM 1969 & Cashel Forest Drive | Houston | TX |
|---|---|---|---|---|---|
| 1192 | NON-OWNED SERVICE STATIONS | Irving 1 | 2326 W. Shady Grove | Irving | TX |
| 1193 | NON-OWNED SERVICE STATIONS | Lancaster 1 | 2601 N. Dallas | Lancaster | TX |
| 1194 | NON-OWNED SERVICE STATIONS | mcallen 9085 | 1200 south 23rd | McAllen | TX |
| 1195 | NON-OWNED SERVICE STATIONS | McAllen WALCO 94 | 1901 West Highway | McAllen | TX |
| 1196 | NON-OWNED SERVICE STATIONS | mcallen 9086 | 701 East pecan | McAllen | TX |
| 1197 | NON-OWNED SERVICE STATIONS | MERCEDES | 447 W 2ND STREET | Mercedes | TX |
| 1198 | NON-OWNED SERVICE STATIONS | Mesquite 1 | 2022 Gus Thomasson Road | Mesquite | TX |
| 1199 | NON-OWNED SERVICE STATIONS | Pasadena 61 | 1202 South Shaver | Pasadena | TX |
| 1200 | NON-OWNED SERVICE STATIONS | Pasadena 60 | 1516 East Southmore | Pasadena | TX |
| 1201 | NON-OWNED SERVICE STATIONS | Pasadena 42 | 2631 South Shaver | Pasadena | TX |
| 1202 | NON-OWNED SERVICE STATIONS | Perryton 2 | 1422 South Main | Perryton | TX |
| 1203 | NON-OWNED SERVICE STATIONS | Perryton 1 | 822 South Main | Perryton | TX |
| 1204 | NON-OWNED SERVICE STATIONS | PHARR 9089 | 1000 NORTH CAGE | Pharr | TX |
| 1205 | NON-OWNED SERVICE STATIONS | Pharr 9090 | 500 East Highway 83 | Pharr | TX |
| 1206 | NON-OWNED SERVICE STATIONS | Pharr | | Pharr | TX |
| 1207 | NON-OWNED SERVICE STATIONS | Plainview | 1504 West 5th | Plainview | TX |
| 1208 | NON-OWNED SERVICE STATIONS | San Angelo 75 | 1320 North Oakes | San Angelo | TX |
| 1209 | NON-OWNED SERVICE STATIONS | San Antonio 76 | 1815 South W.W. White Road | San Antonio | TX |
| 1210 | NON-OWNED SERVICE STATIONS | San Antonio 77 | 5826 South Flores | San Antonio | TX |

| 1211 | NON-OWNED SERVICE STATIONS | Tyler 3 | 2520 East 5th Street | Tyler | TX |
|------|---------------------------|---------|----------------------|-------|----|
| 1212 | NON-OWNED SERVICE STATIONS | Tyler 2 | 430 South Beckham | Tyler | TX |
| 1213 | NON-OWNED SERVICE STATIONS | Tyler 1 | 716 West Front Street | Tyler | TX |
| 1214 | NON-OWNED SERVICE STATIONS | Vernon 1 | 3228 Wilbarger Street | Vernon | TX |
| 1215 | NON-OWNED SERVICE STATIONS | Waco 70 | 724 East Waco Drive | Waco | TX |
| 1216 | NON-OWNED SERVICE STATIONS | Wharton 68 | 1619 North Richmond | Wharton | TX |
| 1217 | NON-OWNED SERVICE STATIONS | Wichita Falls 2 | 2714 Southwest Parkway | Wichita Falls | TX |
| 1218 | NON-OWNED SERVICE STATIONS | Wichita Falls | 2714 SW Parkway | Wichita Falls | TX |
| 1219 | NON-OWNED SERVICE STATIONS | Wichita Falls 1 | 3703 Sheppard Access Road | Wichita Falls | TX |
| 1220 | NON-OWNED SERVICE STATIONS | Bristol 2160 | U.S. Highway 11 | Bristol | VA |
| 1221 | NON-OWNED SERVICE STATIONS | BLENDER-FARM CENTER | | Portsmouth | VA |
| 1222 | NON-OWNED SERVICE STATIONS | Abbotsford | Spruce Street North of Soo R.R. Depot | Abbotsford | WI |
| 1223 | NON-OWNED SERVICE STATIONS | Antigo 1 | 4th Avenue & Superior Street | Antigo | WI |
| 1224 | NON-OWNED SERVICE STATIONS | Appleton 1 | 504 West College Avenue | Appleton | WI |
| 1225 | NON-OWNED SERVICE STATIONS | Atkinson | | Atkinson | WI |
| 1226 | NON-OWNED SERVICE STATIONS | Berlin 1 | Broadway and Mound Street | Berlin | WI |
| 1227 | NON-OWNED SERVICE STATIONS | Chippewa Falls 3 | 304 West River Street | Chippewa Falls | WI |
| 1228 | NON-OWNED SERVICE STATIONS | Chippewa Falls 2 | 524 North Bridge Street | Chippewa Falls | WI |
| 1229 | NON-OWNED SERVICE STATIONS | Chippewa Falls | Woodward & Park Avenue | Chippewa Falls | WI |
| 1230 | NON-OWNED SERVICE STATIONS | Cudahy 1 | 4570 South Kinnickinnic Avenue | Cudahy | WI |

| 1231 | NON-OWNED SERVICE STATIONS | Dodge Bulk Station | | Dodge | WI |
|---|---|---|---|---|---|
| 1232 | NON-OWNED SERVICE STATIONS | Dodgeville 1 | 1202 North Bequette Street | Dodgeville | WI |
| 1233 | NON-OWNED SERVICE STATIONS | Fennimore | Lincoln Avenue & Warner Street | Fennimore | WI |
| 1234 | NON-OWNED SERVICE STATIONS | Fort Atkinson | 1012 S. Whitewater avenue | Fort Atkinson | WI |
| 1235 | NON-OWNED SERVICE STATIONS | Green Bay | 621 South Broadway | Green Bay | WI |
| 1236 | NON-OWNED SERVICE STATIONS | Green Bay 1 | Van Deuren Street | Green Bay | WI |
| 1237 | NON-OWNED SERVICE STATIONS | Janesville 2 | NW/C Sherman and N. Parker Drive | Janesville | WI |
| 1238 | NON-OWNED SERVICE STATIONS | La Crosse | 2127 S. Avenue | La Crosse | WI |
| 1239 | NON-OWNED SERVICE STATIONS | Lacrosse 1 | 1104 N. Lacrosse | Lacrosse | WI |
| 1240 | NON-OWNED SERVICE STATIONS | Ladysmith 1 | 518 Lake Avenue West | Ladysmith | WI |
| 1241 | NON-OWNED SERVICE STATIONS | Lake Geneva 1 | 600 Williams Street | Lake Geneva | WI |
| 1242 | NON-OWNED SERVICE STATIONS | Madison | 3505 E. Washington avenue | Madison | WI |
| 1243 | NON-OWNED SERVICE STATIONS | Madison 2 | 3505 East Washington | Madison | WI |
| 1244 | NON-OWNED SERVICE STATIONS | Madison 1 | 728 Jenifer | Madison | WI |
| 1245 | NON-OWNED SERVICE STATIONS | Madison Bulk Station | Seminole Highway near Madison | Madison | WI |
| 1246 | NON-OWNED SERVICE STATIONS | Marinette Bulk and Service Sta | Marinette Avenue & Mary Street | Marinette | WI |
| 1247 | NON-OWNED SERVICE STATIONS | Mauston Bulk & Service Station | Highways 12 & 16 | Mauston | WI |
| 1248 | NON-OWNED SERVICE STATIONS | Menasha 1 | U.S. Highway 41 | Menasha | WI |
| 1249 | NON-OWNED SERVICE STATIONS | Menomonie 2 | I-94 & County Road "B" | Menomonie | WI |
| 1250 | NON-OWNED SERVICE STATIONS | Milwaukee 6 | 1545 West Hopkins | Milwaukee | WI |

160

| 1251 | NON-OWNED SERVICE STATIONS | Milwaukee | 405 W. Center Street | Milwaukee | WI |
|------|------|------|------|------|------|
| 1252 | NON-OWNED SERVICE STATIONS | Milwaukee 7 | 405 West Center Street | Milwaukee | WI |
| 1253 | NON-OWNED SERVICE STATIONS | Milwaukee 3 | 4170 South Howell Avenue | Milwaukee | WI |
| 1254 | NON-OWNED SERVICE STATIONS | Milwaukee 4 | 4270 North 76th | Milwaukee | WI |
| 1255 | NON-OWNED SERVICE STATIONS | Milwaukee - Division | 4823 N. Teutonia Avenue | Milwaukee | WI |
| 1256 | NON-OWNED SERVICE STATIONS | Milwaukee 5 | 5510 South 27th Street | Milwaukee | WI |
| 1257 | NON-OWNED SERVICE STATIONS | Milwaukee 8 | 7537 N. Teutonia | Milwaukee | WI |
| 1258 | NON-OWNED SERVICE STATIONS | Milwaukee 2 | 832 West Oklahoma Avenue | Milwaukee | WI |
| 1259 | NON-OWNED SERVICE STATIONS | Milwaukee | | Milwaukee | WI |
| 1260 | NON-OWNED SERVICE STATIONS | Monona 1 | 320 E. Broadway | Monona | WI |
| 1261 | NON-OWNED SERVICE STATIONS | Monroe Bulk Station | Right-of-way | Monroe | WI |
| 1262 | NON-OWNED SERVICE STATIONS | Neenah 1 | Interstate Highway 41 | Neenah | WI |
| 1263 | NON-OWNED SERVICE STATIONS | Neillsville Bulk Station | 7th and Forest Streets | Neillsville | WI |
| 1264 | NON-OWNED SERVICE STATIONS | Neillsville 1 | South Grand Avenue & West 5th Street | Neillsville | WI |
| 1265 | NON-OWNED SERVICE STATIONS | New Richmond | 447 N. Knowles Avenue | New Richmond | WI |
| 1266 | NON-OWNED SERVICE STATIONS | Oconto | U.S. Hwy. 41 South & Plat #2 | Oconto | WI |
| 1267 | NON-OWNED SERVICE STATIONS | Oconto 1 | US Highway 41 South | Oconto | WI |
| 1268 | NON-OWNED SERVICE STATIONS | Oshkosh 6 | 1606 South Main Street | Oshkosh | WI |
| 1269 | NON-OWNED SERVICE STATIONS | Oshkosh 5 | 173 West Algoma Street | Oshkosh | WI |
| 1270 | NON-OWNED SERVICE STATIONS | Oshkosh 1 | 387 Main Street | Oshkosh | WI |

| 1271 | NON-OWNED SERVICE STATIONS | Oshkosh | 415 W. Murdock avenue | Oshkosh | WI |
|------|------|------|------|------|------|
| 1272 | NON-OWNED SERVICE STATIONS | Platteville 1 | US Highway 151 & SH 80-81 | Platteville | WI |
| 1273 | NON-OWNED SERVICE STATIONS | Racine 1 | 2305 Racine Street | Racine | WI |
| 1274 | NON-OWNED SERVICE STATIONS | Rhinelander | 217 Anderson Street | Rhinelander | WI |
| 1275 | NON-OWNED SERVICE STATIONS | Rice Lake 1 | 501 North Main | Rice Lake | WI |
| 1276 | NON-OWNED SERVICE STATIONS | Ripon 1 | East Fond du Lac Street | Ripon | WI |
| 1277 | NON-OWNED SERVICE STATIONS | River Falls 1 | 700 North Main | River Falls | WI |
| 1278 | NON-OWNED SERVICE STATIONS | Rothschild 1 | 407 South Grand | Rothschild | WI |
| 1279 | NON-OWNED SERVICE STATIONS | Shawano | 315 S. Main | Shawano | WI |
| 1280 | NON-OWNED SERVICE STATIONS | Shawano Bulk Plant | Minneapolis, St. Paul & Sault Ste. Marie Railway Right-of-Way | Shawano | WI |
| 1281 | NON-OWNED SERVICE STATIONS | South Milwaukee 1 | 1522 North Chicago Avenue | South Milwaukee | WI |
| 1282 | NON-OWNED SERVICE STATIONS | Stevens Point | 417 N. Division street | Stevens Point | WI |
| 1283 | NON-OWNED SERVICE STATIONS | Superior 1 | 2601 Tower Avenue | Superior | WI |
| 1284 | NON-OWNED SERVICE STATIONS | Superior Advertising Sign | River Street | Superior | WI |
| 1285 | NON-OWNED SERVICE STATIONS | Waukesha 1 | 114 E. Broadway | Waukesha | WI |
| 1286 | NON-OWNED SERVICE STATIONS | Waupaca | Badger & Jefferson Streets | Waupaca | WI |
| 1287 | NON-OWNED SERVICE STATIONS | Waupun 1 | 42 Fond du Lac Street | Waupun | WI |
| 1288 | NON-OWNED SERVICE STATIONS | Wausau 4 | 1033-35 S. Fourth Avenue | Wausau | WI |
| 1289 | NON-OWNED SERVICE STATIONS | Wausau 3 | 526 Bridge Street | Wausau | WI |

| 1290 | NON-OWNED SERVICE STATIONS | Wausau Bulk Station | Chicago, Milwaukee, St. Paul and Pacific Railroad Company Right-of-Way | Wausau | WI |
| 1291 | NON-OWNED SERVICE STATIONS | Wausau 2 | Third Avenue & Callon Street | Wausau | WI |
| 1292 | NON-OWNED SERVICE STATIONS | Whitewater 1 | 1280 West Main Street | Whitewater | WI |

**EXHIBIT "B"**

List of Transferred Contracts and Leases and Access Agreements

| NO. | SETTLOR | COUNTERPARTY | Date | DESCRIPTION OF CONTRACT | CURE AMOUNT | ASSIGNED TO |
|---|---|---|---|---|---|---|
| 1 | Tronox LLC | 5900 Success Drive Realty, LLC | 11/8/2006 | Access Agreement | $0.00 | The Multistate Environmental Response Trust |
| 2 | Triple S Refining Corporation | Abilene Housing, Inc. | 10/23/1996 | Environmental Survey Access Agreement between KMRC and Abilene Housing, Inc. | $0.00 | The Multistate Environmental Response Trust |
| 3 | Tronox LLC | Black & Decker Corporation (Emhart) | 1/7/1991 | Settlement Agreement dated January 1, 1991 by and among Kerr-McGee Chemical Corporation, Emhart Industries Inc. and The Black & Decker Corporation | $0.00 | The Multistate Environmental Response Trust |
| 4 | Tronox LLC | Chesapeake Exploration LP | 5/17/2007 | Lease Agreement - Minerals for AR, White County | $0.00 | The Multistate Environmental Response Trust |
| 5 | Tronox LLC | Chesapeake Exploration LP | 5/17/2007 | Lease Agreement 2 - Minerals for AR, White County | $0.00 | The Multistate Environmental Response Trust |
| 6 | Tronox LLC | Chesapeake Exploration LP | 6/16/2008 | Lease Agreement - Minerals for OK, Woods County | $0.00 | The Multistate Environmental Response Trust |
| 7 | Tronox LLC | CSX Transportation | 9/9/2008 | Supplement to 11/04/04 access agreement for monitor wells and soil sampling | $0.00 | The Multistate Environmental Response Trust |

| 8 | Tronox LLC | Cumulus Broadcasting LLC | 1/11/2008 | Environmental Remediation Agreement | $0.00 | The Multistate Environmental Response Trust |
|---|---|---|---|---|---|---|
| 9 | Triple S Refining Corporation | Diocese Episcopal Church | 10/21/1996 | Environmental Survey Access Agreement between Kerr-McGee Refining Corporation and Diocese Episcopal Church, Richard S. Cowan, Sr. Warden | $0.00 | The Multistate Environmental Response Trust |
| 10 | Triple S Refining Corporation | First Christian Church of Abilene | 10/22/1996 | Environmental Survey Access Agreement between Kerr-McGee Refining Corporation and First Christian Church of Abilene | $0.00 | The Multistate Environmental Response Trust |
| 11 | Tronox LLC | Floyd T Sizemore Sr. and Jean F. Sizemore | 2/1/2007 | License Access Agreement dated February 1,2007 between Floyd T. Sizemore Sr and Jean F. Sizemore and Tronox LLC | $0.00 | The Multistate Environmental Response Trust |
| 12 | Triple S Refining Corporation | Great Plains Federal Credit Union | 12/21/1996 | Environmental Survey Access Agreement between KMRC and Great Plains Federal Credit Union, Kenneth Martin, President | $0.00 | The Multistate Environmental Response Trust |
| 13 | Triple S Refining Corporation | Greg Eastburn | 12/20/1999 | Environmental Survey Access Agreement between KMRC and Greg Eastburn | $0.00 | The Multistate Environmental Response Trust |
| 14 | Tronox LLC | Jacksonville Port Authority | 9/10/2004 | Installation of monitor wells and collection of environmental samples | $0.00 | The Multistate Environmental Response Trust |
| 15 | Tronox LLC | JM Family Enterprises, Inc. | 9/10/2004 | Installation of monitor wells and collection of environmental samples | $0.00 | The Multistate Environmental Response Trust |

165

| 16 | Tronox Worldwide LLC | Kansas Dept of Transportation | 10/4/2006 | Highway Permit Use of Right of Way 10/4/2006 between Tronox Worldwide LLC and Kansas Dept of Transportation Permit #1-06-374 | $0.00 | The Multistate Environmental Response Trust |
| 17 | Triple S Refining Corporation | Kansas State University Foundation | 10/24/1996 | Environmental Survey Access Agreement between Kerr-McGee Refining Corporation and Kansas State University Foundation | $0.00 | The Multistate Environmental Response Trust |
| 18 | Tronox LLC | Martha A Kidder | 1/31/2007 | License Agreement between Martha A Kidder and Tronox LLC | $0.00 | The Multistate Environmental Response Trust |
| 19 | Triple S Refining Corporation | Mr. Lonnie Jump | 9/23/2005 | Enviornmental Survey Access Agreement between KMRC and Lonnie Jump | $0.00 | The Multistate Environmental Response Trust |
| 20 | Tronox LLC | Murray, David S. | 2/12/2007 | Access Agreement dated Feb. 12, 2007 by and between David S. Murray and Tronox, LLC | $0.00 | The Multistate Environmental Response Trust |
| 21 | Tronox LLC | Norfolk Southern Railway Company (Norfolk and Western Railway Company) | 1/2/1991 | Right of Entry License Agreement between Kerr-McGee Chemical Corporation and Norfolk and Western Railway Company dated January 2, 1991 | $0.00 | The Multistate Environmental Response Trust |
| 22 | Tronox LLC | Norfolk Southern Railway Company (Norfolk and Western Railway Company) | 1/7/1997 | Second Supplement Agreement between Norfolk and Western Railway Company and Kerr-McGee Chemical Corporation dated Jan. 7, 1997 | $0.00 | The Multistate Environmental Response Trust |

| 23 | Tronox LLC | Oliver M. Miller | 2/1/2007 | Environmental Remediation / Spirit of Prayer Church, 2601 7th Avenue, N.  Columbus, MS | $0.00 | The Multistate Environmental Response Trust |
|----|------------|------------------|----------|------------------------------------------------|-------|-----------------------------------------------|
| 24 | Triple S Refining Corporation | Rev. Ralph I. Bauman Trust | 10/23/1996 | Environmental Survey Access Agreement bewteen KMRC and Ralph I. Bauman | $0.00 | The Multistate Environmental Response Trust |
| 25 | Tronox LLC | Spirit of Prayer Holiness Church | 2/1/2007 | License Access Agreement dated February 1, 2007 between Spirit of Prayer Holiness Church and Tronox LLC | $0.00 | The Multistate Environmental Response Trust |
| 26 | Tronox Worldwide LLC | Springfield Discount Liquor | 1/16/2009 | Environmental Survey Access Agreement dated 16 January 2009 between Tronox Worldwide LLC and James Bradley, owner Springfield Discount Liquor | $0.00 | The Multistate Environmental Response Trust |
| 27 | Tronox Worldwide LLC | Terminal Railroad Association of St. Louis | 9/22/2004 | Right of Entry License Agreement between Terminal Railroad Association of St. Louis and Kerr McGee Chemical World Wide LLC | $0.00 | The Multistate Environmental Response Trust |
| 28 | Tronox LLC | Texas General Land Office | 4/1/2003 | Enviornmental Remediation Commercial Coastal Easement  LC 20030010 | $0.00 | The Multistate Environmental Response Trust |
| 29 | Tronox LLC | The Columbus Cemetery and Investment Co | 6/5/1992 | Lease Agreement dated June 5, 1992 between The Columbus Cemetery and Investment Co and Kerr McGee Chemical Corp.(operating wells) | $0.00 | The Multistate Environmental Response Trust |

| 30 | Tronox LLC | The Columbus Cemetery and Investment Co | 6/5/1992 | Amendment and Extension to Lease Agreement dated June 5, 1992 between The Columbus Cemetery and Investment Co. and Tronox LLC | $0.00 | The Multistate Environmental Response Trust |
|---|---|---|---|---|---|---|
| 31 | Tronox LLC | The Columbus Cemetery and Investment Co | 7/7/2008 | Amendment and Extension to Lease Agreement dated July 7,2008 between The Columbus Cemetery and Investment Co. and Tronox LLC | $0.00 | The Multistate Environmental Response Trust |
| 32 | Tronox Worldwide LLC | The Doe Run Resources Corporation | 5/8/2006 | Lease Agreement - Minerals for MO, Viburnum | $0.00 | The Multistate Environmental Response Trust |
| 33 | Tronox LLC | Union Pacific Railroad | 1/18/2011 | Pipeline and Wireline Crossing Agreement | $0.00 | The Multistate Environmental Response Trust |
| 34 | Tronox Worldwide LLC | W. T. Spurlock | 6/5/2009 | Access Agreement dated June 5, 2009, W.T. Spurlock and Tronox, Inc. | $0.00 | The Multistate Environmental Response Trust |
| 35 | Tronox LLC | Alabama Power | 1/1/2009 | Light and Power Service | $3,906.87 | The Multistate Environmental Response Trust |
| 36 | Tronox LLC | Allied Waste Services | 8/31/2009 | Customer Service Agreement 4444 | $1,437.87 | The Multistate Environmental Response Trust |
| 37 | Triple S Refining Corporation | Birmingham Southern Railroad Company | 1/1/2000 | License Agreement | $0.00 | The Multistate Environmental Response Trust |
| 38 | Tronox Worldwide LLC | Cytec Industries Inc. | 8/15/2000 | Agreement Relating to Partnership Assets and Liabilities | $0.00 | The Multistate Environmental Response Trust |

| 39 | Tronox Worldwide LLC | International Minerals & Chemical Corporation, Brewster Phosphates, and American Cyanamid Company | 7/22/2002 | Extension of 1986 Mineral Lease to June 30, 2007 | $0.00 | The Multistate Environmental Response Trust |
|----|----------------------|--------------------------------------------------------------------------------------------------|-----------|--------------------------------------------------|-------|---------------------------------------------|
| 40 | Triple S Refining Corporation | Schrader Environmental Services, Inc. | 11/17/2008 | Rental Agreement | $2,800.00 | The Multistate Environmental Response Trust |
| 41 | Tronox LLC | UNAVCO | 9/7/2006 | Access Agreement | $0.00 | The Multistate Environmental Response Trust |
| 42 | Tronox LLC | The Center for Snow and Avalanche Studies | 8/28/2006 | Access Agreement | $0.00 | The Multistate Environmental Response Trust |
| 43 | Tronox LLC | JIMCO Integrated Services | 11/20/07 | Statement of Work as Exhibit A to the Master Work Agreement for Construction or Field Services | $0.00 | The Multistate Environmental Response Trust |

**EXHIBIT "C"**

As to the United States of America as beneficiary:

Authorized representative and party to receive all notices:

The United States:

Chief, Environmental Enforcement Section
Environment and Natural Resources Division
U.S. Department of Justice
P.O. Box 7611
Washington, DC 20044-7611
Telephone: (202) 514-5271
Facsimile: (202) 514-4180
File Ref. No. 90-11-3-09688

Robert William Yalen
Assistant United States Attorney
Office of the United States Attorney
  for the Southern District of New York
86 Chambers Street, Third Floor
New York, NY 10007
Telephone: (212) 637-2722
Facsimile: (212) 637-2686
E-mail: robert.yalen@usdoj.gov

US EPA:

Craig Kaufman
Attorney-Advisor
U.S. Environmental Protection Agency
Ariel Rios Building
1200 Pennsylvania Avenue, NW
Washington, DC 20460
Telephone: (202) 564-4284
E-mail: Kaufman.Craig@epa.gov

170

<u>DOI</u>

Amy Horner
Attorney Advisor
Environmental Restoration
U.S. Department of the Interior
Office of the Solicitor
1849 C Street, NW (MS 5325)
Washington, DC 20240
Telephone: (202) 208-6356
E-mail: Amy.Horner@sol.doi.gov

<u>NOAA</u>:

M.E. Rolle
National Oceanic and Atmospheric Administration
263 13th Avenue South
Saint Petersburg, FL 33701
Telephone: (727) 824-5388
E-mail: MaryElliott.Rolle@noaa.gov

<u>As to each of the following state beneficiaries</u>:

**Alabama:**

Gerald Hardy, P.E.
Chief, Land Division
Alabama Department of Environmental Management
1400 Coliseum Boulevard
P.O. Box 301463
Montgomery, Alabama 36130-1463
Telephone: (334) 271-7732
E-mail: wgh@adem.state.al.us

**Florida:**

Jonathan H. Alden
Senior Assistant General Counsel
Florida Department of Environmental Protection
3900 Commonwealth Blvd., MS 35
Tallahassee, FL 32399-3000
Telephone: (850) 245-2238
Facsimile: (850) 245-2303
E-mail: jonathan.alden@dep.state.fl.us

**Georgia:**

Jim Brown
Program Manager

Hazardous Waste Corrective Action Program
Georgia Environmental Protection Division
2 Martin Luther King Jr. Drive SE, Suite 1154
Atlanta, GA 30334-9000
Telephone: (404) 656-7802
E-mail: Jim.Brown@dnr.state.ga.us

**Idaho:**

Darrell G. Early
Deputy Attorney General
Office of the Idaho Attorney General
Environmental Quality Section
1410 N. Hilton
Boise, ID 83706
Telephone: (208) 373-0494
Facsimile: (208) 373-0481
E-mail: Darrell.Early@deq.idaho.gov

**Illinois:**

James L. Morgan
Assistant Attorney General
Environmental Bureau South
Office of the Attorney General
500 South Second Street
Springfield, IL 62706
Telephone: (217) 524-7506
Facsimile: (217) 524-7740
E-mail: jmorgan@atg.state.il.us

James Kropid
Division of Legal Counsel, Mail Code 21
Illinois Environmental Protection Agency
1021 North Grand Avenue East
P.O. Box 19276
Telephone: (217) 782-5544
Facsimile: (217) 782-9807
E-mail: james.kropid@illinois.gov

**Indiana:**

  Craig Schroer, CHMM
  Section Chief, LUST
  Indiana Department of Environmental Management - OLQ
  100 North Senate Ave
  MC 67-18   IGCN 1101
  Indianapolis, IN  46204-2251
  Telephone: (317) 234-0974
  Facsimile: (317) 234-0428
  E-mail: cschroer@idem.in.gov

**Iowa:**

  Wayne Gieselman
  Division Administrator
  Iowa Department of Natural Resources
  Wallace State Office Building
  Des Moines, Iowa 50319
  Telephone:  (515) 281-5817
  Facsimile: (515) 281-8895
  E-mail:  wayne.gieselman@dnr.ia.gov

**Kansas:**

  Paul Gerard Marx, Esq.
  Office of Legal Services
  Kansas Department of Health and Environment
  1000 SW Jackson; Ste. 560
  Topeka, Kansas 66612
  Telephone: (785) 296-6917
  Facsimile:  (785) 296-7119
  E-mail:  PMarx@kdheks.gov

**Louisiana:**

  G. Allen Kirkpatrick
  Louisiana Department of Environmental Quality
  602 North 5th Street
  Baton Rouge, LA 70802
  Telephone: (225) 219-4048
  Facsimile: (225) 219-4068
  E-mail: george.kirkpatrick@la.gov

**Missouri:**

    Harry Bozoian
    General Counsel
    Missouri Department of Natural Resources
    P.O. Box 176
    Jefferson City, MO 65102
    Telephone: (573) 751-0323
    Facsimile:  (573) 526-3444
    E-mail:  harry.bozoian@dnr.mo.gov

    Jack McManus
    Chief Counsel
    Agriculture & Environment Division
    Missouri Attorney General's Office
    Telephone: (573)751-1622
    Facsmile: (573) 751-8796
    E-mail: jack.mcmanus@ago.mo.gov

    Richard A. Nussbaum, P.E., R.G.
    Chief, Permits Section
    Missouri Department of Natural Resources - Hazardous Waste Program
    P.O. Box 176
    Jefferson City, MO 65102
    Telephone: (573) 751-3553
    Facsimile: (573) 526-5268
    E-mail: rich.nussbaum@dnr.mo.gov

    Jacki Hicks
    Chief, Outreach Planning & Stewardship Unit, Permits Section
    Missouri Department of Natural Resources - Hazardous Waste Program
    P.O. Box 176
    Jefferson City, MO 65102
    Telephone: (573) 751-3553
    Facsimile:  (573) 526-5268
    E-mail: jacki.hicks@dnr.mo.gov

**Mississippi:**

    Jere "Trey" Hess, P.E.
    Mississippi Brownfield Program Coordinator
    Mississippi Department of Environmental Quality
    515 E. Amite Street (39201)
    P.O. Box 2261
    Jackson, MS 39225
    Telephone: (601) 961-5654
    Facsimile: (601) 961-5300
    E-mail: Trey_Hess@deq.state.ms.us

**Nevada:**

NEVADA DIVISION OF ENVIRONMENTAL PROTECTION
Attn: Jim Najima, Chief, Bureau of Corrective Actions
901 S. Stewart Street, Suite 4001
Carson City, NV  89701
Telephone: (775) 687-9484
Facsimile: (775) 687-8335
E-mail: jnajima@ndep.nv.gov

NEVADA ATTORNEY GENERAL
Attn:  Carolyn E. Tanner, DAG
5420 Kietzke Lane, Suite 202
Reno, NV  89511
Telephone: (775)850-4101
Facsimile: (775)688-1822
E-mail: ctanner@ag.nv.gov

**New York:**

Benjamin Conlon, Esq.
Bureau Chief, Bureau of Remediation and Revitalization
Office of General Counsel
NYSDEC
625 Broadway
Albany, New York 12203
Telephone: (518) 402-9510
E-mail: bxconlon@gw.dec.state.ny.us

**North Carolina:**

Jack Randel Butler, PE
Chief, NC Superfund Section
1646 Mail Service Center
Raleigh, North Carolina 27699
Telephone: (919)508-8450
Facsimile:  (919)733-4811
E-mail: Jack.Butler@NCDENR.GOV

**Ohio:**

Dale T. Vitale
Assistant Attorney General
Ohio Attorney General's Office
Environmental Enforcement Section
30 East Broad Street, 25th Floor
Columbus, OH 43215
Telephone: (614) 466-2766
Facsimile: (614) 644-1926
E-mail: dale.vitale@ohioattorneygeneral.gov

175

**Oklahoma:**

Pam Dizikes
Attorney
Office of the General Counsel
Oklahoma Department of Environmental Quality
707 N. Robinson
P.O. Box 1677
Oklahoma City, OK 73101-1677
Telephone: (405) 702-7175
Facsimile: (405) 702-7199
E-mail:  Pam.Dizikes@deq.ok.gov

P. Clayton Eubanks
Assistant Attorney General
Environmental Protection Unit
Office of the Attorney General of Oklahoma
313 N.E. 21st Street
Oklahoma City, OK 73105
Telephone: (405) 522-8992
Facsimile:(405) 522-0608
E-mail:  clayton.eubanks@oag.ok.gov

**Pennsylvania:**

Thomas M. Thompson, P.G.
Professional Geologist Manager
Environmental Cleanup Program
PA Department of Environmental Protection
2 Public Square
Wilkes-Barre, PA 18701-1915
Telephone: (570) 826-2391
Facsimile: (570) 820-4907
E-mail: thothompso@state.pa.us

**Tennessee:**

Steven R. Stout
Environmental Legal Counsel
Tennessee Department of Environment & Conservation
401 Church St., 20th Fl.
Nashville, TN 37243-1548
Telephone: (615) 532-0138
Facsimile: (615) 532-0145
E-mail: steven.stout@tn.gov

176

**Texas:**

      Bob Patton, Jr., Manager
      Superfund Section
      Federal Superfund Program Manager
      Remediation Division
      Texas Commission on Environmental Quality
      P. O. Box 13087
      Austin, TX 78711-3087
      Telephone:  (512) 239-2277
      Facsimile:  (512) 239-2450
      E-mail: Bob.Patton@tceq.texas.gov

      William J. Shafford, P.E., Manager
      VCP-CA Section
      Remediation Division
      Texas Commission on Environmental Quality
      Mail Code 221
      PO Box 13087
      Austin, TX 78711-3087
      Telephone:  (512) 239-6651
      Facsimile: (512) 239-6400
      E-mail: Bill.Shafford@tceq.texas.gov

**Wisconsin:**

      Director
      Bureau for Remediation and Redevelopment
      Wisconsin Department of Natural Resources
      P.O. Box 7921
      Madison, WI 53707-7921

# ENVIRONMENTAL RESPONSE TRUST AGREEMENT

## (Nevada)

## BY AND AMONG

**TRONOX, INCORPORATED,
TRONOX LLC,
TRONOX FINANCE CORP.,
TRONOX HOLDINGS, INC.,
TRONOX LUXEMBOURG S.AR.L,
TRONOX PIGMENTS (SAVANNAH), INC.,
TRONOX WORLDWIDE, LLC,
SOUTHWESTERN REFINING COMPANY, INC.,
TRANSWORLD DRILLING COMPANY,
TRIANGLE REFINERIES, INC.,
TRIPLE S, INC.,
TRIPLE S ENVIRONMENTAL MANAGEMENT CORPORATION,
TRIPLE S MINERALS RESOURCES CORPORATION,
TRIPLE S REFINING CORPORATION,
and
CIMARRON CORPORATION.
As Settlors,**

**Le Petomane XXVII, Inc.
not individually but solely in its representative capacity
as Nevada Trustee,**

## AND

**THE UNITED STATES OF AMERICA and
the STATE of NEVADA
as Beneficiaries**

**As of February 14, 2011**

# TABLE OF CONTENTS

**ARTICLE I DEFINITIONS** ............................................................................................**4**
    1.1     Definitions.............................................................................................4

**ARTICLE II THE NEVADA TRUST** ..........................................................................**9**
    2.1     Creation of and Transfer of Assets to the Nevada Trust...........................9
    2.2     Objective and Purpose ............................................................................15
    2.3     Holder of Nevada Trust Assets ...............................................................16
    2.4     Management of Nevada Trust Assets .......................................................16
    2.5     Investment and Safekeeping of Nevada Trust Assets...............................17
    2.6     Insurance Policy to Cover Future Response Actions..............................18
    2.7     Access and Deed Restrictions .................................................................19
    2.8     Accounting ..............................................................................................19
    2.9     Termination .............................................................................................19
    2.10    Property Disposition ...............................................................................19
    2.11    Document Disposition. ............................................................................20

**ARTICLE III WORK AND DISTRIBUTIONS** .........................................................**21**
    3.1     Nevada Trust Accounts............................................................................21
    3.2     Payments by the Nevada Trust ................................................................21
    3.3     Liens by Government ...............................................................................24
    3.4     Manner of Payment .................................................................................24

**ARTICLE IV THE NEVADA TRUSTEE**......................................................................**24**
    4.1     Appointment ............................................................................................24
    4.2     Generally .................................................................................................25
    4.3     Powers .....................................................................................................25
    4.4     Other Professionals .................................................................................26
    4.5     Limitation of the Nevada Trustee's Authority........................................26
    4.6     Reliance by the Nevada Trust Parties .....................................................26
    4.7     Compensation of the Nevada Trustee .....................................................27
    4.8     Liability of Nevada Trust Parties ............................................................27
    4.9     Exculpation and Indemnification.............................................................27
    4.10    Termination, Replacement, and Removal of the Nevada Trustee. .........29
    4.11    Appointment of Successor Nevada Trustees ...........................................30
    4.12    No Bond ...................................................................................................30

**ARTICLE V BENEFICIARIES**....................................................................................**30**
    5.1     Beneficiaries ...........................................................................................30
    5.2     Identification of Beneficiaries.................................................................30
    5.3     Non-Beneficiaries ...................................................................................31
    5.4     Transfer of Beneficial Interests...............................................................32

**ARTICLE VI REPORTING AND TAXES**.................................................................**32**
    6.1     Reports ....................................................................................................32
    6.2     Other .......................................................................................................33
    6.3     Reports in Support of Insurance Claims .................................................33

MILW_10918886.7

6.4     Taxes ................................................................................................................33

**ARTICLE VII MISCELLANEOUS PROVISIONS ........................................................33**
7.1     Amendments and Waivers ...............................................................................33
7.2     Tax Treatment ..................................................................................................33
7.3     Cooperation .......................................................................................................34
7.4     Situs of the Nevada Trust .................................................................................34
7.5     Severability .......................................................................................................34
7.6     Sufficient Notice ...............................................................................................34
7.7     Headings ............................................................................................................34
7.8     Actions Taken on Other Than Business Day....................................................35
7.9     Consistency of Agreements and Construction ..................................................35
7.10    Compliance with Laws .....................................................................................35
7.11    Preservation of Privilege...................................................................................35
7.12    No Recourse to Beneficiaries............................................................................35
7.13    Uniform Custodial Trust Act. ..........................................................................35

## ENVIRONMENTAL RESPONSE TRUST AGREEMENT

### (Nevada)

        This Environmental Response Trust Agreement (the "Agreement") is made this 14th  day
of February, 2011, by and among TRONOX, INCORPORATED ("Tronox") and its wholly
owned subsidiaries, TRONOX LLC, TRONOX FINANCE CORP., TRONOX HOLDINGS,
INC., TRONOX LUXEMBOURG S.AR.L, TRONOX PIGMENTS (SAVANNAH), INC.,
TRONOX WORLDWIDE, LLC, SOUTHWESTERN REFINING COMPANY, INC.,
TRANSWORLD DRILLING COMPANY, TRIANGLE REFINERIES, INC., TRIPLE S, INC.,
TRIPLE S ENVIRONMENTAL MANAGEMENT CORPORATION, TRIPLE S MINERALS
RESOURCES CORPORATION, TRIPLE S REFINING CORPORATION, and CIMARRON
CORPORATION, as debtors and debtors in possession in the Bankruptcy Cases (defined below)
(collectively, "Settlors") and Le Petomane XXVII, Inc, not individually but solely in its
representative capacity as Nevada Trustee (defined herein) of the Nevada Environmental
Response Trust (defined herein) established hereby, and the Beneficiaries (defined herein).

### R E C I T A L S:

        WHEREAS, on January 12, 2009, Settlors filed voluntary petitions for relief in the
Bankruptcy Court under chapter 11 of title 11 of the United States Code, 11 U.S.C. § 101 *et seq.*,
as amended (the "Bankruptcy Code") in the United States Bankruptcy Court for the Southern
District of New York ("Bankruptcy Court"), which cases have been jointly administered under
Case No. 09-10156 (the "Bankruptcy Cases");

        WHEREAS, the Settlors, the United States, the State of Nevada, and certain other parties
have entered into that certain Consent Decree and Environmental Settlement Agreement lodged
with the Court on November 23, 2010 (the "Settlement Agreement");

2

WHEREAS, the Settlement Agreement provides for the transfer of the Henderson Property (defined below) to the Nevada Trust (defined below) to be administered by the Nevada Trustee (defined below) pursuant to the Agreement and the Settlement Agreement;

WHEREAS, the Settlement Agreement provides for the creation of four additional trusts, which include the Cimarron Trust, the Multistate Trust, the Savannah Trust, and the West Chicago Trust, the transfer to those trusts of the Cimarron Site, the Multistate Owned Sites, the Savannah Facility, and the West Chicago Owned Sites, respectively, and the administration of each of those trusts by the Cimarron Trustee, the Multistate Trustee, the Savannah Trustee, and the West Chicago Trustee/Licensee, respectively, pursuant to the Environmental Response Trust Agreement for each trust and the Settlement Agreement;

WHEREAS, the Settlement Agreement provides for the creation of a litigation trust ("Anadarko Litigation Trust") pursuant to the Litigation Trust Agreement (defined below);

WHEREAS, in accordance with Article VIII of the Settlement Agreement, the Nevada Trust is established for the purposes of owning the Henderson Property for the purposes of implementing the Settlement Agreement, carrying out administrative and property management functions related to the Henderson Property, managing and/or funding implementation of future Environmental Actions for the Henderson Legacy Conditions that are approved by the Lead Agency and paying certain future oversight costs of the Lead Agency and Non-Lead Agency, acting as legal successor to Settlors under the Henderson Chartis Policy, and any other insurance policies, including but not limited to the BMI Chartis Policy, for the sole purpose of pursuing and securing claims, proceeds, and recoveries under the insurance policies, acting as landlord under the Henderson Facility Lease, and acting as substituted party for Tronox LLC under the 2006 Henderson Consent Decree, as more specifically provided in such 2006 Henderson Consent Decree, Paragraph 73 of the Settlement Agreement, and the 2006 Henderson Consent Decree Substitution and Clarification Agreement, including the receipt of such payments as may in the future be due to the Nevada Trust pursuant to the 2006 Henderson Consent Decree, and fulfilling other obligations as set forth in the Settlement Agreement.

WHEREAS, the Nevada Trust is to be funded in the amount set forth in the Settlement Agreement;

WHEREAS, the Agreement and the Settlement Agreement govern the Nevada Trust, which is created pursuant to section 1.468B-1 *et seq.* of the Treasury Regulations promulgated under section 468B of the Internal Revenue Code (the "QSF Regulations");

WHEREAS, the Southern Nevada Water Authority, the Metropolitan Water District of Southern California, and the Central Arizona Project/Central Arizona Water Conservation District (collectively, the "Colorado River Authorities") are state agencies, authorities, or political subdivisions charged with the management of water supplies taken from, among other sources, the Colorado River and, as such, desire to remain apprised and, in the sole discretion of each respective Colorado River Authority, to participate in an advisory capacity with respect to the progress of Environmental Actions and the administration of the Nevada Trust;

3

WHEREAS, presuming that the Nevada Trust qualifies as a "qualified settlement fund" within the meaning of the QSF Regulations, to the extent permitted by law, the Settlors intend to elect to treat the Nevada Trust as a grantor trust pursuant to the QSF Regulations; and

WHEREAS, the Nevada Trust shall be the exclusive holder of the assets described herein for purposes of the Settlement Agreement, this Agreement and 31 U.S.C. § 3713(b);

NOW, THEREFORE, in consideration of the foregoing premises and the mutual covenants and agreements contained herein and in the Settlement Agreement the Parties hereby agree as follows:

ARTICLE I

DEFINITIONS

1.1    Definitions.

The following terms as used in the Agreement shall have the definitions given below:

1.1.1    "Agreement" has the meaning as given in the preamble.

1.1.2    "Anadarko Litigation Trust" shall have the meaning given in the recitals to the Agreement.

1.1.3    "Anadarko Litigation Proceeds" are eighty-eight percent (88%) of the net recovery in the Anadarko Litigation, which net recovery shall be determined by subtracting from the total gross recovery in the Anadarko Litigation (1) all outstanding and anticipated payments to lead counsel of the Anadarko Litigation Trust pursuant to a separate Special Fee Arrangement; (2) all outstanding and anticipated costs and fees of the Anadarko Litigation Trust and Trustee (including but not limited to attorneys' fees and Trustee fees), as set forth in the Anadarko Litigation Trust Agreement referred to in Paragraph 119 of the Settlement Agreement; and (3) the amount of the distribution referred to in Paragraph 122 of the Settlement Agreement as amended by the First Amendment to the Consent Decree and Environmental Settlement Agreement, and which shall be allocated to the Governments and the Environmental Response Trusts pursuant to the Plan of Reorganization and the Settlement Agreement.

1.1.4    "Bankruptcy Cases" shall have the meaning given in the recitals to the Agreement.

1.1.5    "Bankruptcy Court" means the United States Bankruptcy Court for the Southern District of New York.

1.1.6    "Beneficiaries" means the United States and the State of Nevada.

1.1.7    "BMI Chartis Policy" means the BMI, et al., Pollution Clean-Up and Legal Liability Manuscript Policy, Policy Number 267-9176.

1.1.8    "BMI/Landwell Assets" means the Settlors' interests in Basic Management, Inc. and The Landwell Company, LP.

1.1.9    "CERCLA" means the Comprehensive Environmental Response, Compensation, and Liability Act, 42 U.S.C. §§ 9601 *et seq.*, as amended.

1.1.10    "Colorado River Authorities" shall have the meaning provided in the recitals to the Agreement.

1.1.11    "Court" means the Bankruptcy Court or if the Bankruptcy Court abstains from exercising jurisdiction or is otherwise without jurisdiction over any matter arising out of the Agreement, a United States District Court having competent jurisdiction with respect to such matters.

1.1.12    "Effective Date" means the Effective Date as defined in the Settlement Agreement.

1.1.13    "Environmental Actions" means any and all environmental activities authorized or required under Environmental Law that occur after the Effective Date and that are related to the Henderson Property, including but not limited to response or remedial actions, removal actions, corrective action, closure, or post-closure care, reclamation, investigations, studies, remediation, interim actions, final actions, emergency actions, water treatment, implementation of engineered structures and controls, monitoring, repair and replacement of engineered structures, monitoring equipment and controls, operation and maintenance, implementation, operation and maintenance of institutional controls, coordination and integration of reuse and remedial efforts and initiatives (including, without limitation, multi-stakeholder communications), and, if required, long-term stewardship and perpetual custodial care activities. "Environmental Actions" also include the above environmental activities relating to the migration of hazardous substances emanating from the Henderson Property.  For the avoidance of doubt, "Environmental Actions" shall not include natural resource assessment or restoration.

1.1.14    "Environmental Information" means environmental reports, audits, analyses, records, studies and other documents containing information prepared by or otherwise in the possession, custody or control of Settlors or their technical consultants that are based on or otherwise reflect information related to environmental activities.

1.1.15    "Environmental Laws" means, whenever in effect, all federal, tribal, state and local statutes, regulations, ordinances and similar provisions having the force or effect of law; all judicial and administrative orders and determinations and all common law concerning public health and safety, worker health and safety, pollution or protection of the environment, including, without limitation, the Atomic Energy Act ("AEA"), CERCLA, Clean Water Act ("CWA"), Clean Air Act ("CAA"), Emergency Planning and Community Right-to-Know Act ("EPCRA"), Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA"), Resource Conservation and Recovery Act ("RCRA"), Safe Drinking Water Act ("SDWA"), Toxic Substances Control Act ("TSCA"), and any tribal, state or local equivalents.

5

1.1.16 "Existing Leases" means (i) the Lease Agreement dated May 6, 2005, by and between Tronox LLC f/k/a Kerr-McGee Chemical LLC, as lessor, and Pronto Constructors, Inc., as lessee, as amended by the First Amendment to Lease Agreement dated May 1, 2007 and (ii) Lease Agreement dated August 31, 2006, by and between Tronox LLC, as landlord, and Industrial Supply Co, Inc., as tenant.

1.1.17 "Funding" shall have the meaning given in Section 2.1.6.1 hereof.

1.1.18 "Henderson Chartis Policy" means the Kerr-McGee Henderson Pollution Clean-Up and Legal Liability Manuscript Policy, Policy Number 619-0315.

1.1.19 "Henderson Deed" means the quitclaim deed transferring the Henderson Property from the Settlors to the Nevada Trust.

1.1.20 "Henderson Facility Lease" means the triple net lease between Tronox LLC or its assigns and the Nevada Trust for the Henderson Leased Facility and which is referred to in Paragraph 71 of the Settlement Agreement.

1.1.21 "Henderson Leased Facility" means the portion of the Henderson Property described under the caption "Leased Premises" in the Lease Term Sheet annexed as Attachment G to the Settlement Agreement.

1.1.22 "Henderson Legacy Conditions" has the meaning provided in Paragraph 75(b) of the Settlement Agreement.

1.1.23 "Henderson Property" means all of Settlors' right, title, and interest in and to, including, without limitation, all of their fee ownership in that certain real property comprising all of the real property currently owned by Settlors and located in Clark County, Nevada (including, without limitation, the tax assessor parcels described in Attachment D annexed to the Settlement Agreement and the real property described by the legal description set forth in Attachment E annexed to the Settlement Agreement, together with all appurtenances, rights, easements, rights-of-way, mining rights (including unpatented mining claims, mill site claims, and placer claims), mineral rights, mineral claims, appurtenant groundwater rights, associated surface water rights, claims, filings and permits (to the extent applicable to the Nevada Trust as owner of the Henderson Property), licenses, third-party warranties and guaranties for equipment or services to the extent transferable under bankruptcy law and that are not related to the Henderson Business, or other interests (including without limitation all fixtures, improvements, and equipment located thereon as of the Effective Date) owned by Settlors and related to the Henderson Property, including without limitation, all development rights, with the exception of: any machinery, equipment, fixtures, furniture, computers, tools, parts, supplies, and other tangible personal property, filings, permits, licenses, warranties, guaranties, or other interests used or held for use in connection with the operation of the Henderson Business, and located in or on the Henderson Leased Facility.

1.1.24 "Henderson Remediation System" means all of Settlors' right, title, and interest to all personal property, equipment, fixtures, easements, contracts or other

rights necessary for the continued operation of the chromium- and perchlorate-related groundwater intercept and treatment systems and all other on-going environmental contamination investigation, treatment or remediation systems or programs at or associated with the Henderson Property.

1.1.25  "<u>Internal Revenue Code</u>" means the Internal Revenue Code of 1986, as amended.

1.1.26  "<u>Lead Agency</u>" shall be the Nevada Department of Conservation and Natural Resources, Division of Environmental Protection.

1.1.27  "<u>Litigation Trust Agreement</u>" means the agreement establishing the Anadarko Litigation Trust.

1.1.28  "<u>Nevada Administrative Costs</u>" means real estate taxes except as otherwise provided under the Henderson Facility Lease, insurance, and other administrative costs incurred in administering the Nevada Trust other than the administrative expenses to be paid by Tronox LLC and any approved assigns to the leasehold interest pursuant to the Henderson Facility Lease.

1.1.29  "<u>Nevada Trust</u>" means the trust established pursuant to the Agreement, and shall have the same meaning as the Henderson Trust in the Settlement Agreement.

1.1.30  "<u>Nevada Trust Account</u>" shall have the meaning given in Section 2.1.10 hereof.

1.1.31  "<u>Nevada Trust Administrative Account</u>" means the Nevada Trust Account established pursuant to Section 2.1.10 to fund the payment of Nevada Administrative Costs.

1.1.32  "<u>Nevada Trust Assets</u>" means (a) those assets and properties, including the Funding, the Henderson Property, the Henderson Remediation System, the Settlors' rights, title and interest in and to the Henderson and BMI Chartis Policies, the Anadarko Litigation Proceeds (defined herein), the BMI/Landwell Assets (defined herein) and the right to receive any payments due under the 2006 Henderson Consent Decree and (b) such other assets acquired, earned, or held by the Nevada Trust from time to time pursuant to the Agreement, the Settlement Agreement, or an order of the Court.

1.1.33  "<u>Nevada Trust Environmental Cost Account</u>" shall have the meaning given in Section 2.1.10.

1.1.34  "<u>Nevada Trust Parties</u>" means, collectively, the Nevada Trust, the Nevada Trustee, and the Nevada Trustee's shareholders, officers, directors, employees, members, managers, partners, affiliated entities, consultants, agents, accountants, attorneys or other professionals or representatives engaged or employed by the Nevada Trust or Nevada Trustee; provided however, that any contractors or consultants retained to perform or oversee Environmental Actions of the Nevada Trust (for the avoidance of

7

doubt, other than the Nevada Trustee and its shareholders, officers, directors and employees) shall not be Nevada Trust Parties.

1.1.35 "Nevada Trust Proceeds" means the net proceeds of any liquidation, sale, lease, recovery or other disposition of or other proceeds in respect of the Nevada Trust Assets.

1.1.36 "Nevada Trustee" means the trustee of the Nevada Trust.

1.1.37 "Net Sale Proceeds" shall mean an amount equal to the purchase price paid as a result of a sale by the Nevada Trust of the BMI/Landwell Assets, whether by right of first refusal or otherwise, plus any profits earned by the Nevada Trust on the BMI/Landwell Assets prior to the sale, minus (a) any litigation, valuation, or transaction costs reasonably incurred by the Nevada Trust in connection with the sale but excluding any costs that otherwise would have been expended by the Nevada Trust in the absence of the exercise of a sale and (b) any carrying costs reasonably incurred by the Nevada Trust as owner of the BMI/Landwell Assets but excluding any costs that otherwise would have been expended by the Nevada Trust in the absence of its ownership of the BMI/Landwell Assets.

1.1.38 "Non-Lead Agency" shall be the US EPA.

1.1.39 "Parties" means the Settlors, the Nevada Trustee, and the Beneficiaries.

1.1.40 "Person" means any individual, corporation, limited liability company, partnership, joint venture, association, joint-stock company, trust, charitable foundation, unincorporated organization, government or any agency or political subdivision thereof or any other entity.

1.1.41 "Plan of Reorganization" shall mean the First Amended Joint Plan of Reorganization of Tronox Incorporated et al. pursuant to Chapter 11 of the Bankruptcy Code dated November 5, 2010, as amended.

1.1.42 "Real Property Information" shall have the meaning in the Settlement Agreement.

1.1.43 "Reorganized Tronox" means Tronox Incorporated, Tronox Worldwide LLC, Tronox LLC, non-Settlor foreign subsidiaries of the Settlors and such other Settlors and/or one or more newly organized successors, or any successor thereto, by merger, consolidation or otherwise, on or after the effective date of the Plan of Reorganization.

1.1.44 "Settlement Agreement" shall have the meaning given in the recitals.

1.1.45 "Settlors" shall have the meaning given in the preamble.

MILW_10918886.7

1.1.46 "<u>Superfund</u>" means the "Hazardous Substance Superfund" established by 26 U.S.C. § 9507 or, in the event such Hazardous Substance Superfund no longer exists, any successor fund or comparable account of the Treasury of the United States to be used for removal or remedial actions to address releases or threats of releases of hazardous substances.

1.1.47 "<u>Tenant</u>" shall mean the tenant of the Henderson Facility Lease.

1.1.48 "<u>Title Insurer</u>" shall mean Chicago Title Insurance Company.

1.1.49 "<u>United States</u>" means the United States of America on behalf of agencies and departments named in the Settlement Agreement.

1.1.50 "<u>US EPA</u>" means the United States Environmental Protection Agency and any successor departments or agencies of the United States.

All Capitalized terms not defined above shall have the meanings provided in the Settlement Agreement.

## ARTICLE II
## <u>THE NEVADA TRUST</u>

2.1    <u>Creation of and Transfer of Assets to the Nevada Trust</u>

2.1.1    Pursuant to the Settlement Agreement, the Parties hereby establish, on behalf of the Beneficiaries named herein, and Tronox Worldwide LLC hereby transfers, assigns, and delivers, by quitclaim deed and other appropriate instruments, to, the Nevada Trust, or to the Nevada Trustee, not individually but solely in its representative capacity as Nevada Trustee, if the law of the state in which the property to be transferred is situated prohibits a trust entity from holding such title, on behalf of the Beneficiaries, all of Settlors' right, title and interest in and to the Henderson Property. Settlors shall retain no ownership or other residual interest whatsoever with respect to the Nevada Trust, the Henderson Property or the Henderson Remediation System, but as of the Effective Date, Tronox LLC and any assigns approved in accordance with the terms of the Henderson Facility Lease shall have all rights and obligations as Tenant as set forth in the Henderson Facility Lease. To the extent owned by Settlors, the transfers of the Henderson Property shall include any land lying in bed or any street, road or avenue opened or proposed, public or private, in front of or adjoining the portions of the Henderson Property along with (x) any award made or to be made or made in lieu thereof, (y) any unpaid award for damage to the Henderson Property by reason of change of grade of any street, and (z) any strips and gores adjoining the adjacent property. The transfer of ownership by Tronox Worldwide LLC of the Henderson Property shall be a transfer of all of the Settlors' right, title and interests therein, and the transfer shall be (i) "as is" and "where is", with no warranties of any nature; (ii) free and clear of all claims, liens, encumbrances and interests against the Settlors, including mechanics' liens and other liens for the payments of monetary claims, such as real property taxes (except statutory liens for real property taxes that are not yet due and payable), or other monetary

MILW_10918886.7

claims asserted or that could have been asserted in the bankruptcy proceeding, but shall remain subject to any existing in rem claims that do not secure payment of monetary claims (such as easements or deed restrictions); (iii) free and clear of all leases and tenancies, other than the Henderson Facility Lease, and the two Existing Leases, which Existing Leases shall not be assigned to or assumed by the Nevada Trust, but will continue as subleases between Tenant and the tenants under the Existing Leases, subject and subordinate to the Henderson Facility Lease; (iv) subject to any rights of the United States and the State of Nevada under the Settlement Agreement; and (v) accomplished by the Henderson Deed and personal property bill of sale without warranty, with all such conveyance documents to be agreed to in form by the Settlors and the Nevada Trustee. The grantee for each such deed and personal property bill of sale shall be the Nevada Trust by and through Le Petomane XXVII, Inc., not individually but solely in its representative capacity as Nevada Trustee, or if the law of the state in which the property to be transferred is situated prohibits a trust entity from holding such title, Le Petomane XXVII, Inc., not individually but solely in its representative capacity as Nevada Trustee. Settlors and Reorganized Tronox, as applicable, will cooperate with the United States, the State of Nevada and the Nevada Trustee to deliver the Henderson Deed to the Title Insurer prior to the Effective Date (which Title Insurer will record or cause to be recorded in the appropriate real property records the Henderson Deed as soon as reasonably practicable, but not to exceed 30 days after the Effective Date), together with all affidavits of title and all other documents necessary, if any, for the Nevada Trust's Title Insurer to insure title (including, without limitation, gap insurance and insurance against mechanics liens) to the Henderson Property free and clear of all liens and encumbrances except as otherwise provided herein.  In the event the Henderson Deed is not recorded by the Title Insurer on the Effective Date, Reorganized Tronox will cooperate with the State of Nevada, the United States, the Nevada Trustee and the Title Insurer to cause to be recorded in the appropriate real property records the Henderson Deed as soon as reasonably practicable, but not to exceed 30 days after the Effective Date. Notwithstanding the foregoing sentence, none of Settlors' or Reorganized Tronox's obligations nor its cooperation with the Nevada Trust or its Title Insurer (as the case may be) shall in any way be construed to impose a duty on Settlors or Reorganized Tronox to provide title insurance to the Nevada Trust for the Henderson Property and the issuance of a title insurance policy for the Henderson Property shall not be deemed a condition precedent to the transfer of the Henderson Property to the Nevada Trust.  Settlors shall pay the recording costs to the title company relating to the title transfers.  Settlors shall pay all real property taxes relating to the Henderson Property prorated through the Effective Date. As of the Effective Date, the Nevada Trust shall be responsible for all real property taxes relating to the Henderson Property, except the real property taxes relating to the Henderson Leased Facility shall be the responsibility of Tenant after the Effective Date.  On or before the Effective Date, Settlors shall execute, or cause to be executed, and record, if necessary, all necessary releases of any liens or security interests held by any Settlors against the Henderson Property.  The Nevada Trust hereby accepts and agrees to hold the Nevada Trust Assets in the Nevada Trust for the benefit of the Beneficiaries for the purposes described in Section 2.2 below, subject to the terms of the Settlement Agreement, the Agreement, and any applicable orders of the Court.

2.1.2    BMI/Landwell Assets

2.1.2.1 Transfer to Nevada Trust. On the Effective Date, Tronox Worldwide LLC will transfer the BMI/Landwell Assets to the Nevada Trust or, at the direction of the Nevada Trust, to an entity in which the Nevada Trust has an interest, in either case on terms and conditions to be reasonably agreed upon by Settlors, the Nevada Trustee, the State of Nevada, and the United States.

2.1.2.2 Optional Transfer of Interest to Other Trusts.  At any time prior to any sale by the Nevada Trust of the BMI/Landwell Assets, whether by right of first refusal or otherwise, and prior to a distribution by the Anadarko Litigation Trust, the Nevada Trustee may transfer 65% of its economic interest in the BMI/Landwell Assets to one or more of the Multistate Trust, Cimarron Trust, Savannah Trust, and West Chicago Trust, in such proportions and upon such terms as the United States may direct.

2.1.2.3 Distribution of Net Sale Proceeds. If at any time any person or entity purchases the BMI/Landwell Assets from the Nevada Trust, whether by right of first refusal or otherwise, the Net Sale Proceeds shall be distributed as follows: (x) the first $20 million, to the Nevada Trust Environmental Cost Account and/or Nevada Trust Administrative Account, as jointly directed by the State of Nevada and the United States, (y) 35% of the Net Sale Proceeds above $20 million, to the Nevada Trust Environmental Cost Account and/or Nevada Trust Administrative Account, as jointly directed by the State of Nevada and the United States, and (z) 65% of the Net Sale Proceeds above $20 million, (i) first, to any Administrative Account, Environmental Cost Account, or Work Account in the Multistate Trust, Cimarron Trust, Nevada Trust, Savannah Trust, or West Chicago Trust, as directed by the United States, if there are remaining Environmental Actions to be performed at the Owned Sites, the Non-Owned RAS Properties, Kress Creek, and the Non-Owned Service Stations (each as defined in the Settlement Agreement) in those Trusts and a need for additional trust funding; (ii) second, to any Non-Owned Site (as defined in the Settlement Agreement), as directed by the United States, with a need for additional funding of Environmental Actions beyond the distributions designated to be received from the Anadarko Litigation Proceeds; and (iii) third, to the Superfund.  Nothing in this Subsection is intended to preclude or limit any transfers of funds from any other accounts established in the Settlement Agreement to the Nevada Trust Environmental Cost Account or Nevada

11

Trust Administrative Account pursuant to the terms of any applicable funds transfer provision in the Settlement Agreement if there are remaining Environmental Actions to be performed at or with respect to the Henderson Property and a need for additional trust funding.

2.1.3    The 2006 Henderson Consent Decree.  The United States, the State of Nevada, the Nevada Trust and Tronox LLC (but only with respect to its consent to the substitution) shall also enter into, and the United States shall file with the Bankruptcy Court, a 2006 Henderson Consent Decree Substitution and Clarification Agreement to clarify the meaning of and otherwise document the parties' stipulations and reservations of rights concerning certain provisions of the 2006 Henderson Consent Decree, and the United States shall seek an order from the United States District Court for the District of Columbia adopting and approving all clarifications of and stipulations concerning the 2006 Henderson Consent Decree that are set forth in the 2006 Henderson Consent Decree Substitution and Clarification Agreement, all as provided in the Settlement Agreement and the 2006 Henderson Consent Decree Substitution and Clarification Agreement.

2.1.4    The Henderson Facility Lease.  On the Effective Date, the Nevada Trust shall enter into the Henderson Facility Lease and Tronox Incorporated shall execute and deliver to the Henderson Trust an irrevocable and unconditional guaranty of the observance and performance of Tenant's obligations under (i) the Henderson Facility Lease and (ii) the Settlement Agreement as its obligations pertain to the Henderson Leased Facility, in form and substance reasonably satisfactory to Tronox Incorporated and the Henderson Trust.

2.1.5    The Henderson Remediation Power Agreement.  On the Effective Date, the Nevada Trustee and Tenant shall enter into an agreement, described in and complying with the terms of the Settlement Agreement, under which Tenant shall provide to the Nevada Trust or its designee or assignee on and after the Effective Date the uninterrupted supply of hydroelectric power as necessary to continue to power components of the existing perchlorate- and chromium-related groundwater intercept and treatment systems at the same prices, terms and conditions as are applicable to Tenant's allocation of hydroelectric power from the Colorado River Commission of Nevada ("CRC"), subject to all applicable CRC laws, regulations or other requirements and as further described in Paragraph 79 of the Settlement Agreement.

2.1.6    Transfer of Funding and Consideration to the Nevada Trustee

2.1.6.1  The Funding.  On the Effective Date, the Settlors shall cause to be transferred to or at the direction of the Nevada Trustee cash in the amount of $81,020,018 which constitutes the "Funding."

2.1.6.2  Insurance.  On the Effective Date, the Nevada Trust shall become the legal successor-in-interest to certain rights under the Henderson Chartis Policy and the BMI Chartis Policy and shall succeed to all of Settlors' right, title and

12

interest in claims, proceeds, and recoveries against the Henderson Chartis Policy and the BMI Chartis Policy. For the sole purpose of securing recovery to the Nevada Trust, the Nevada Trust shall succeed to the liabilities of Settlors with respect to the Henderson Property. Proceeds and recoveries from the Henderson Chartis Policy through the Effective Date shall be placed in the Nevada Trust Environmental Cost Account for the Henderson Property, excluding reimbursements for funds expended by Settlors on the Henderson Property prior to the Effective Date, provided that insurance claims for such funds expended by Settlors are or were submitted timely as provided by the Henderson Chartis Policy and are for costs incurred before the Effective Date. Settlors shall provide the Nevada Trust with copies of such claims at the time they are submitted. To the extent applicable, any other available insurance policies and other rights to reimbursement or contribution for response actions (whether contractual or otherwise) held by the Settlors as of the Effective Date shall be transferred to the Nevada Trust. (The Funding and Insurance shall be collectively referred to as the "Funding and Consideration".)

2.1.7   <u>Anadarko Litigation Proceeds</u>. The Anadarko Litigation Trust, which shall receive all of Settlors' right to receive the Anadarko Litigation Proceeds, shall transfer 23.75% of the Anadarko Litigation Proceeds to the Nevada Trust pursuant to the terms of the Plan of Reorganization, the Litigation Trust Agreement, and the Settlement Agreement. Such funds shall be retained and used to conduct or finance Environmental Actions at or in connection with the Henderson Property, except as otherwise expressly provided in this Agreement. Additionally, the Nevada Trust shall receive 1.25% of the Anadarko Litigation Proceeds, to be deposited in the Nevada Trust Administrative Account.

2.1.8   <u>Colorado River Authorities</u>. The Nevada Trustee shall (a) consult with the Colorado River Authorities to keep the Colorado River Authorities reasonably apprised of any material developments with respect to the progress of Environmental Actions and the administration of the Nevada Trust and (b) provide to the Colorado River Authorities (which may be expanded or curtailed by each Colorado River Authority from time to time in its discretion) (at the address(es) specified below, or as amended from time to time by written notice to the Nevada Trustee from each respective Colorado River Authority) for their review and comment copies of all work plans concerning proposed Environmental Actions at or relating to the Henderson Property, reports, budgets, annual balance statements, and other documents that the Nevada Trustee is required to submit to the Lead Agency, the Non-Lead Agency, or a Beneficiary under this Agreement and at the same time such document is provided to the Lead Agency, the Non-Lead Agency, or a Beneficiary for their review or approval, as applicable. Notwithstanding the foregoing, nothing in this Agreement shall in any way be construed to impose an obligation or

13

liability on the Colorado River Authorities under this Agreement or otherwise with respect to the Henderson Property.

Southern Nevada Water Authority
Charles K. Hauser, Esq.
General Counsel
1001 South Valley View Blvd.
Las Vegas, NV 89153
Office main (702) 258-3930
E-mail: chuck.hauser@snwa.com

Metropolitan Water District of Southern California
700 North Alameda Street
Los Angeles, CA 90012
Attn: Marcia Scully, Assistant General Counsel
Telephone: (213) 217-7130
E-mail: mscully@mwdh2o.com

Central Arizona Water Conservation District
P.O. Box 43020
Phoenix, AZ 85080-3020
Attn: John R. McNeill, Senior Attorney
Telephone: (623) 869-2425
E-mail: jmcneill@cap-az.com

2.1.9 Upon transfer of the Henderson Property, the Henderson Remediation System, the BMI/Landwell Assets, and the Funding and Consideration on the Effective Date, the Settlors shall have no interest in, or with respect to, any Nevada Trust Assets, other than the Henderson Facility Lease, and neither the Settlors, Reorganized Tronox, nor any successors thereto, shall have any further obligation to provide funding to the Nevada Trust.

2.1.10 Creation of the trust accounts. Upon receipt of the Henderson Property and the Funding and Consideration, the Nevada Trustee shall create a segregated Nevada Trust Environmental Cost Account for the Henderson Property. The purpose of the Nevada Trust Environmental Cost Account shall be to provide funding for Environmental Actions for the Henderson Legacy Conditions and future oversight costs of the Lead Agency and the Non-Lead Agency with respect to the Henderson Property. Funding for the Nevada Trust Environmental Cost Account shall be held in trust for Environmental Actions with respect to the Henderson Property and may not be used for any Owned or Non-Owned Site except as expressly provided in Section 2.4.3 below. The initial funding of the Nevada Environmental Response Trust Account shall be a total of $72,417,165.00. The Nevada Trustee shall also create a segregated Nevada Trust Administrative Account which shall be funded with $8,602,853.00, and which shall fund the Nevada Administrative Costs. The separate accounts are referred to in the Agreement individually as a "Nevada Trust Account" and collectively as the "Nevada Trust Accounts." Subject to 2.5, the income and gains from any investment of the Nevada Trust Assets shall be allocated, paid and credited to such Nevada Trust Account.

14

2.1.11 Each Nevada Trust Account may be divided into such number of trust subaccounts dedicated for specific uses as may be deemed necessary in the sole discretion of the Nevada Trustee (each, a "Trust Subaccount") to comply with the terms of, and implement, the Settlement Agreement and the Agreement.

2.1.12 For all federal income tax purposes, the Nevada Trustee and Settlors shall treat the transfer of the Nevada Trust Assets by Tronox Worldwide LLC to the Nevada Trust as a transfer to a qualified settlement fund pursuant to section 468B of the Internal Revenue Code and the QSF Regulations. The Nevada Trustee shall at all times seek to have the Nevada Trust treated as a "qualified settlement fund" as that term is defined in the QSF Regulations.  The Court shall retain continuing jurisdiction over the Nevada Trust and Nevada Trust Accounts sufficient to satisfy the requirements of the QSF Regulations.  The Nevada Trustee shall cause any taxes imposed on the earnings of the Nevada Trust to be paid out of such earnings and shall comply with all tax reporting and withholding requirements imposed on the Nevada Trust under applicable tax laws. The Nevada Trustee shall be the "administrator" of the Nevada Trust pursuant to Treasury Regulation section 1.468B-2(k)(3).  To the extent Tronox elects to treat the Nevada Trust as a grantor trust pursuant to Treasury Regulation section 1.468B-1(k)(1), the Nevada Trustee will reasonably cooperate with such election.

2.1.13 The Nevada Trustee shall provide Tenant at least 15 business days, or such shorter period as is established by the Henderson Lead Agency, to comment on work plans (including approvable deliverables that describe work to be performed at or relating to the Henderson Leased Facility) concerning proposed Environmental Actions at or relating to the Henderson Leased Facility, at the same time such proposed work plans (including such approvable deliverables as described above) are provided to the Henderson Lead Agency and Non-Lead Agency for their review or approval, as applicable. The Nevada Trustee shall consult with Tenant to keep Tenant reasonably apprised of any major developments with respect to such Environmental Actions.

2.1.14 The Nevada Trustee shall be provided with Environmental Information and Real Property Information in accordance with Section XIX of the Settlement Agreement.

2.2    Objective and Purpose

2.2.1    The exclusive purposes and functions of the Nevada Trust are to: (i) own the Henderson Property for purposes of implementing the Settlement Agreement; (ii) carry out administrative and property management functions related to the Henderson Property; (iii) manage and/or fund implementation of Environmental Actions for the Henderson Legacy Conditions that are approved by the Lead Agency, and pay future oversight costs of the Lead Agency and Non-Lead Agency, as applicable; (iv) act as legal successor to Settlors under the Henderson and BMI Chartis Policies for the sole purpose of pursuing and securing claims, proceeds, and recoveries under the Henderson and BMI Chartis Policies; (v) act as landlord under the Henderson Facility Lease; (vi) act as substituted party for Tronox LLC under the 2006 Henderson Consent Decree, as more specifically provided in such 2006 Henderson Consent Decree, Paragraph 73 of the Settlement Agreement, and the 2006 Henderson Consent Decree Substitution and

Clarification Agreement, including the receipt of such payments as may in the future be due to the Nevada Trust pursuant to the 2006 Henderson Consent Decree, including the right to receive any payments due under the 2006 Henderson Consent Decree; and (vii) to receive and use 25% of the Anadarko Litigation Proceeds consistent with the Agreement and the Settlement Agreement and such other assets acquired, earned, or held by the Nevada Trust from time to time pursuant to the Agreement, the Settlement Agreement, or an order of the Court. The performance by the Nevada Trustee of its duties under the Agreement, including but not limited to the sale, lease or other disposition of some or all of the Henderson Property or BMI/Landwell Assets, shall not be considered to be the Nevada Trustee engaging in a trade or business.

       2.2.2   The Nevada Trust is established pursuant to the Agreement and the Settlement Agreement and approved by the Court for the purpose of resolving claims asserting environmental liabilities of Settlors with respect to the Henderson Property and the Henderson Legacy Conditions. The Court shall retain continuing jurisdiction over the Nevada Trust. The Nevada Trust satisfies all the requirements of, and is intended by the Parties to be classified as, a qualified settlement fund pursuant to the QSF Regulations.

2.3    Holder of Nevada Trust Assets

The Nevada Trust shall be the exclusive holder of the Nevada Trust Assets and Nevada Trust Accounts described herein for purposes of the Agreement, the Settlement Agreement, 31 U.S.C. § 3713(b).

2.4    Management of Nevada Trust Assets

       2.4.1   As required by the Agreement and the Settlement Agreement, the Nevada Trustee shall use the Nevada Trust Environmental Cost Account to fund future Environmental Actions associated with the Henderson Legacy Conditions and certain future oversight costs approved by the Lead Agency with respect to the Henderson Property. The Nevada Trustee shall use the Nevada Trust Administrative Account to fund the Nevada Administrative Costs that have been approved by the Lead Agency after consultation with the Non-Lead Agency.

       2.4.2   The Nevada Trustee may enter into a consent decree or consent order with the United States and/or Nevada, and may perform work pursuant to unilateral administrative orders issued by the Lead Agency or Non-Lead Agency, to facilitate implementation of this Section with respect to the Henderson Property, to the extent of available funds.

       2.4.3   After the Lead Agency and the Non-Lead Agency have confirmed to the Nevada Trustee that all final actions have been completed, including the sale of parcels comprising the Henderson Property, and disbursements have been made for all final costs and expenses for the Henderson Property, any funds remaining in the Nevada Trust Environmental Cost Account shall be transferred in the following order: (i) first, the Nevada Trustee, in consultation with the Lead Agency and Non-Lead Agency, shall agree to a reservation of funds necessary to preserve and maintain any parcels of the Henderson Property that have not been sold, pending winding up and termination of the Nevada

16

Trust, including taxes and holding costs; (ii) second, in accordance with instructions to be provided by the United States Department of Justice ("DOJ"), to the West Chicago Trust Environmental Cost or Work Accounts, the Cimarron Trust Environmental Cost Accounts, the Savannah Environmental Cost Account, or any of the Multistate Trust Environmental Cost Accounts established under the Settlement Agreement if there are remaining Environmental Actions to be performed at the Owned Funded Sites, the Non-Owned Service Stations, the Non-Owned RAS Properties or Kress Creek and a need for additional trust funding, with the allocation among such Environmental Cost or Work Accounts to be determined by the projected shortfall of performing such remaining Environmental Actions; (iii) third, to Non-Owned Sites with a need for additional funding beyond the distributions received from the Anadarko Litigation Proceeds in accordance with instructions provided by the United States after consultation with Nevada; and (iv) fourth, to the Superfund; provided however, that the remaining balance of any local, state or federal appropriation to, or any grant, loan or donation that has been transferred by any entity to a segregated account within the Nevada Trust that is established for those funds shall be distributed pursuant to the terms of any such appropriation, grant, loan, or donation, and may not be transferred pursuant to clauses (ii)-(iv) of this Subsection.

2.4.4    Annually, beginning with the first year after the Effective Date, the Nevada Trustee shall provide the Lead Agency and the Non-Lead Agency with an update of anticipated future Administrative Costs of the Nevada Trust. In the fourth year after the Effective Date and every year thereafter, the Lead Agency and the Non-Lead Agency may thereafter instruct in writing after consultation with the Nevada Trustee that any conservatively projected surplus funding in the Nevada Trust Administrative Account be transferred to the Nevada Trust Environmental Cost Account established under the Agreement and the Settlement Agreement if there are remaining actions to be performed and with a need for additional trust funding or, to the extent there are no such remaining actions, as described in clauses (i)-(iv) in the immediately preceding Subsection. The Lead Agency and the Non-Lead Agency may also instruct in writing after consultation with the Nevada Trustee that, if there is an anticipated shortfall in the Nevada Trust Administrative Account based on anticipated future Administrative Costs of the Nevada Trust, funds from the Nevada Trust Environmental Cost Account may be transferred to the Nevada Trust Administrative Account.

2.5    Investment and Safekeeping of Nevada Trust Assets

2.5.1    The Nevada Trust Assets, until sold as provided herein and in the Settlement Agreement, shall be held in trust and segregated. All interest earned in a Nevada Trust Account shall be retained in the respective Nevada Trust Account and used only for the same purposes as the principal in that account as provided in the Agreement and the Settlement Agreement, subject to any reallocation approved by the Lead Agency or Non-Lead Agency in accordance with the terms of the Agreement and the Settlement Agreement. The Nevada Trustee shall be under no liability for interest or producing income on any monies received by the Nevada Trust hereunder and held for distribution or payment as provided in the Agreement, except as such interest shall actually be received by the Nevada Trust. Investments of any monies held by the Nevada Trust shall be administered in a manner consistent with the standards and requirements applicable to

17

a trustee in connection with a Chapter 7 liquidation; provided, however, that the right and power of the Nevada Trust to invest the Nevada Trust Assets, the Nevada Trust Proceeds, or any income earned by the Nevada Trust, shall be limited to the right and power to invest such assets (pending periodic distributions in accordance with Article III hereof) in demand and time deposits, such as certificates of deposit, in banks or other savings institutions whose deposits are federally insured, or other liquid investments, such as Treasury bills; and provided further, that the scope of any such permissible investments shall be limited to include only those investments, or shall be expanded to include any additional types of investments as permitted by the State of Nevada, with the concurrence of the DOJ, and these additional types of investments shall be specifically detailed in writing including a directive that the Nevada Trust is authorized to make such additional types of investments, in each case, such investments that a liquidating trust, within the meaning of Treasury Regulation section 301.7701-4(d), may be permitted to hold, pursuant to Treasury Regulations, or any modification in the IRS guidelines, whether set forth in IRS rulings, other IRS pronouncements or otherwise (although the Parties acknowledge and agree that the Nevada Trust is properly characterized for federal tax purposes as a qualified settlement fund within the meaning of Section 1.468B-1 of the Treasury Regulations, and not as a liquidating trust under Section 301.7701-4(d) of the Treasury Regulations).

2.5.2    The Nevada Trustee is expressly prohibited from holding any or all of the Nevada Trust Assets in a common, commingled or collective trust fund with the assets of any other entity.

2.5.3    Nothing in this Section shall be construed as authorizing the Nevada Trustee to cause the Nevada Trust to carry on any business or to divide the gains therefrom, including without limitation, the business of an investment company, a company "controlled" by an "investment company," required to register as such under the Investment Company Act of 1940, as amended.  The sole purpose of this Section 2.5 is to authorize the investment of the funds in the Nevada Trust Accounts or any portions thereof as may be reasonably prudent pending use of the proceeds for the purposes of the Nevada Trust.

2.5.4    The Nevada Trust Parties shall not incur any liability for following any written direction or order to act (or to refrain to act) from any Beneficiary so long as such written direction is not inconsistent with the Agreement and the Settlement Agreement.

2.6    <u>Insurance Policy to Cover Future Response Actions</u>

Only at the direction of the United States and Nevada, shall the Nevada Trustee investigate the possible purchase of an insurance policy to cover future Environmental Actions at the Henderson Property.  If, and only if, the United States and Nevada both direct the Nevada Trustee in writing to purchase such insurance, shall the Nevada Trustee use Nevada Trust Assets to purchase such insurance.  In addition, the Nevada Trustee shall obtain general liability policy insurance as appropriate through the administrative expense budget process under Section 3.2.1 of this Agreement.

18

2.7    <u>Access and Deed Restrictions</u>

The Nevada Trustee shall provide the United States and Nevada and their representatives and contractors access to the Henderson Property at all reasonable times for the purposes of conducting Environmental Actions at or near the Henderson Property. The Nevada Trustee shall implement any institutional controls or deed restrictions requested by the United States and Nevada or required under applicable Environmental Laws with respect to the Henderson Property. The Nevada Trustee shall execute and record with the appropriate recorder's office any easements or deed restrictions requested by the United States and Nevada for restrictions on use of the Henderson Property in order to protect public health, welfare or safety or the environment or ensure non-interference with or protectiveness of any action. Any existing easements or deed restrictions of record as to the Henderson Property prior to the Effective Date of the Settlement Agreement shall survive the Settlement Agreement. The Nevada Trustee shall abide by the terms of any institutional controls or deed restrictions in place or of record as to the Henderson Property.

2.8    <u>Accounting</u>

The Nevada Trustee shall maintain proper books, records, and accounts relating to all transactions pertaining to the Nevada Trust, and the assets and liabilities of the Nevada Trust in such detail and for such period of time as may be necessary to enable the Nevada Trustee to make full and proper accounting in respect thereof in accordance with Article VI below and to comply with applicable provisions of law and good accounting practices. Except as otherwise provided herein or by the Settlement Agreement, the Nevada Trustee shall not be required to file any accounting or seek approval of the Court with respect to the administration of the Nevada Trust, or as a condition for making any payment or distribution out of the Nevada Trust Assets. In addition, the Nevada Trustee shall have no accounting obligation once an account has no funds and a final accounting, for that account, has been made by the Nevada Trustee. Beneficiaries shall have the right upon fourteen (14) days prior written notice delivered to the Nevada Trustee to inspect such books and records.

2.9    <u>Termination</u>

Consistent with the terms of the Settlement Agreement, the Nevada Trustee shall not unduly prolong the duration of the Nevada Trust and shall at all times endeavor to resolve, settle, or otherwise dispose of all claims against Nevada Trust Assets and to effect the distribution of Nevada Trust Assets and other receipts relating thereto to the Beneficiaries and the others who receive distributions hereunder in accordance with the terms hereof, and to terminate the Nevada Trust as soon as practicable consistent with the Agreement and the Settlement Agreement.

2.10    <u>Property Disposition</u>

2.10.1 The Nevada Trustee may, at any time, seek the approval of the Lead Agency and the Non-Lead Agency for the sale or lease or other disposition of all or part of the BMI/Landwell Assets or the Henderson Property, subject to any existing lease(s) then in effect by its terms. Subject to the approval of the Lead Agency and the Non-Lead Agency, the Nevada Trustee may propose a sale, lease, or disposition of all or part of the Henderson Property that includes funding from, or the retention of some

portion of liability by, the Nevada Trust Environmental Cost Account and/or the Nevada Trust Administrative Account, provided that the net effect of any proposed sale, lease or disposition is to lessen the total financial obligations and liabilities as would otherwise be incurred in the absence of any such sale, lease, or disposition. In the event of any approved sale or lease or other disposition of the Henderson Property under this Section, any net proceeds from the sale or lease or other disposition shall be paid to the Nevada Trust Environmental Cost Account and/or the Nevada Trust Administrative Account in a proportion approved by the Lead Agency and the Non-Lead Agency in writing. The disposition of the BMI/Landwell Assets shall be effectuated consistent with the above procedure and Section 2.1.2.  Neither the United States nor the State of Nevada shall be required to accept an ownership interest in the BMI/Landwell Assets or the Henderson Property or any part thereof upon termination of the Nevada Trust.

2.10.2  The Parties agree that the rule against perpetuities does not apply to the Nevada Trust, but to the extent that any rule against perpetuities or a rule governing or limiting vesting, accumulations, the suspension of alienation, or the like shall be deemed applicable, the Nevada Trust shall automatically terminate on the date 90 days after the date on which 21 years less 91 days pass after the death of the last survivor of all of the descendants of the late Joseph P. Kennedy, Sr., father of the late President John F. Kennedy, living on the date hereof, and provided further that if the Nevada Trust owns real property located in any jurisdiction that sets a maximum duration for interests in real property located in such jurisdiction held in trust under a rule against perpetuities or a rule governing or limiting vesting, accumulations, the suspension of alienation, or the like, that for the Nevada Trust is shorter than the date 90 days after the date on which 21 years less 91 days pass after the death of the last survivor of all of the descendants of the late Joseph P. Kennedy, Sr., father of the late President John F. Kennedy, living on the date hereof, the Nevada Trust shall automatically terminate as to such Property upon the expiration of the maximum period authorized pursuant to the laws of such jurisdiction. If the Nevada Trust is terminated in whole or in part pursuant to this Subsection, title to the relevant Property or Properties as to which the Nevada Trust is terminated shall be transferred outright and free of trust to or at the direction of the United States in consultation with any of the States in which the relevant Property or Properties are located, provided, however, that the disposition of all relevant Property or Properties shall be governed by applicable state and federal law, or by agreement of the Nevada Trustee, the United States, and the applicable State, or by order of the Court, and further provided that neither the United States or any State will be required to accept an ownership interest in the relevant Property or Properties as to which the Nevada Trust is terminated.

2.11    Document Disposition.

In the event of a termination of the Nevada Trust, the Nevada Trustee shall provide to the Lead Agency, the Non-Lead Agency and the Colorado River Authorities reasonable advanced notice to enable such entities an opportunity to prepare and implement a protocol for the preservation of any books, records, reports, or other documents in the custody or control of the Nevada Trustee with respect to the BMI/Landwell Assets or the Henderson Property.

MILW_10918886.7

ARTICLE III
WORK AND DISTRIBUTIONS

3.1    Nevada Trust Accounts

The Nevada Trustee shall establish, maintain and hold trust accounts in accordance with the Settlement Agreement and Section 2.1 of the Agreement, to administer the Nevada Trust Assets and distributions therefrom. The Nevada Trustee shall also maintain a dedicated Nevada Trust Administrative Account for administrative funds, which shall be used solely to pay the costs of administering the Nevada Trust as set forth herein.

3.2    Payments by the Nevada Trust

On or before January 30 of each calendar year, the Nevada Trustee shall provide the United States and the Lead Agency with balance statements and proposed budgets as described in Sections 3.2.1 and 3.2.3 of the Agreement. The Nevada Trustee shall not pay any expense that has not been provided for in the applicable budget and approved by the Lead Agency except that claims by a governmental agency shall be paid in accordance with Section 3.2.4 and Paragraph 81(c)-(e) of the Settlement Agreement, except as expressly provided in Sections 3.2.1 and 3.2.3.

3.2.1    Administrative Expenses of the Nevada Trust

Within 90 days following the Effective Date in the first year and thereafter by January 30 of each year, the Nevada Trustee shall submit to the Lead Agency and Non-Lead Agency a balance statement and an annual budget of projected expenditures from the Nevada Trust Administrative Account for administration of the Nevada Trust for review and approval or disapproval by the Lead Agency after consultation with the Non-Lead Agency. If disapproved, such budget shall be revised and resubmitted as expeditiously as possible. No administrative expenses may be incurred or paid by the Nevada Trustee that are inconsistent with the approved budget, unless the Lead Agency, in consultation with the Non-Lead Agency, approves the request of the Nevada Trust for the authority to perform an administrative action, before the budget has been approved, or a revised budget. Each annual budget shall include a future year forecast of administrative expenditures, with annual details for at least the next three years (or such longer period as the United States and Nevada shall reasonably request). The Nevada Trust shall regularly, but not less often than annually, and otherwise upon the reasonable request of the United States or Nevada, provide documentation to the United States and Nevada to substantiate compliance with the applicable approved budget and application of Nevada Trust Assets consistently with the terms of the Agreement and the Settlement Agreement. The approved budget shall be funded by the transfer of the approved amount from Nevada Trust Assets.

3.2.2    Remuneration for Nevada Trustee's Start-Up Fees and Expenses

The Nevada Trustee shall be entitled to remuneration from the Nevada Trust Administrative Account of up to $750,000 for its reasonable fees and expenses in connection with the formation of the Nevada Trust prior to the Effective Date.  Where the Nevada Trustee, the United States, and the State of Nevada agree that the Nevada Trustee

MILW_10918886.7

accrued pre-Effective Date fees and expenses in furtherance of activities that post-Effective Date would constitute Environmental Actions, those pre-Effective Date fees and expenses shall be paid from the Nevada Trust Environmental Cost Account. After the Effective Date, the Nevada Trustee will submit detailed invoices reflecting its pre-Effective Date fees and expenses for approval by the State of Nevada and the United States.

### 3.2.3    Environmental Expenses of the Nevada Trust

The Nevada Trustee shall prepare balance statements and annual budgets of projected expenditures from the Nevada Trust Environmental Cost Account. The first budget for the remainder of the current calendar year and the next calendar year shall be submitted within ninety (90) days following the Effective Date and annual budgets shall be submitted thereafter on or before each January 30 during the term of the Nevada Trust. The Lead Agency shall have the authority to approve or disapprove the proposed budget for the Nevada Trust Environmental Cost Account after consultation with the Non-Lead Agency. If disapproved, a budget shall be revised and resubmitted as expeditiously as possible. No expenses may be incurred or paid by the Nevada Trustee that are inconsistent with an approved budget, unless the Lead Agency after consultation with the Non-Lead Agency approves emergency Environmental Actions or a revised budget; provided, however, that the Nevada Trustee may incur or pay ongoing or recurring expenses approved in the prior year's budget that occur between the time a proposed annual budget is submitted and the time it is approved. Further, by January 30 of each year during the term of the Nevada Trust and within nine (9) months after termination of the Nevada Trust, the Nevada Trustee shall prepare and submit to the Beneficiaries an annual report with respect to the Nevada Trust Environmental Cost Account. The annual report shall pertain to the prior calendar year, or if the report is a final report, such period from the most recent annual report to the termination of the Nevada Trust Environmental Cost Account.

### 3.2.4    Reimbursement of Agencies and Performance of Environmental Action by Trust

The Nevada Trustee shall pay funds from the Nevada Trust Environmental Cost Account to the Lead Agency making a written request for funds for reimbursement within 30 days of such request. Such written request shall: (i) be in accordance with the approved budget set forth in Section 3.2.3 above, and (ii) specify what the funds were used for and shall certify that they were used only for Environmental Actions performed and/or oversight costs incurred after the Effective Date by the Lead Agency with respect to the Henderson Property.

The Nevada Trustee shall also pay funds from the Nevada Trust Environmental Cost Account to the Non-Lead Agency making a written request for funds within 30 days of such request where the Lead Agency has requested the assistance of the Non-Lead Agency with respect to the Henderson Property. Such written request shall: (i) be in accordance with the approved budget set forth in Section 3.2.3 above, and (ii) shall specify what the funds were used for and shall certify that they were used only for Environmental Actions performed and/or oversight costs incurred after the Effective Date

22

by the Non-Lead Agency with respect to the Henderson Property. At the request of the Non-Lead Agency, such payments to the Non-Lead Agency shall be deposited in the Henderson Special Account within the EPA Hazardous Substance Superfund to be retained and used to conduct or finance Environmental Actions performed and/or oversight costs incurred after the Effective Date by the Non-Lead Agency. Notwithstanding any other provision of this Agreement, the Lead Agency and Non-Lead Agency may agree that the Nevada Trustee shall pay funds to the Henderson Special Account in accordance with the approved budget set forth in Section 3.2.3 above prior to the incurrence of such costs, to the extent deemed reasonably necessary to ensure the timely conduct of such Environmental Actions or oversight. Such funds may only be used for the purposes specified in the approved budget set forth in Section 3.2.3. In the event there are any such funds remaining after the performance of such Environmental Actions or oversight, the Lead Agency and Non-Lead Agency agree that the funds may be retained in the Henderson Special Account for future work in accordance with an approved budget under Section 3.2.3 above. On a quarterly basis, the Non-Lead Agency shall send the Nevada Trust a detailed summary of all payments made from the funds so advanced to determine the outstanding balance of unused funds.

In the case of requests by the Lead Agency to the Nevada Trustee to use the funds from the Nevada Trust Environmental Cost Account to perform Environmental Actions associated with the Henderson Legacy Conditions in accordance with the approved budget set forth in Section 3.2.3 above, the Nevada Trustee shall utilize the funds and interest earned thereon from the Nevada Trust Environmental Cost Account to undertake such work promptly and in accordance with any schedule approved by the Lead Agency.

The Nevada Trustee shall seek the approval of the Lead Agency of any contractor hired by the Nevada Trust and any work plans to be undertaken by the Nevada Trust under the oversight of the Lead Agency, unless the Lead Agency has provided a written waiver of such approval or requirements. The Nevada Trustee shall require the following minimum insurance coverages, naming the Nevada Trust, Nevada Trustee, Lead Agency and Non-Lead Agency as additional insureds, from each contractor hired by the Nevada Trust, except to the extent the Lead Agency has agreed to waive such requirement and, to the extent such work is to be performed at the Henderson Leased Facility, shall name Tenant as an additional insured under such policies:

(a) **Commercial General Liability—Occurrence Form**
Policy shall include bodily injury, property damage and broad form contractual liability coverage

| | |
|---|---|
| General Aggregate | $2,000,000 |
| Products-Completed Operations Aggregate | $2,000,000 |
| Personal and Advertising Injury | $1,000,000 |
| Each Occurrence | $1,000,000 |

(b) **Automobile Liability**
Policy shall cover bodily injury and property damage for any owned, hired, and non-owned vehicles.

| | |
|---|---|
| Combined Single Limit | $1,000,000 |

23

(c) **Worker's Compensation and Employer's Liability**

| | |
|---|---|
| Workers' Compensation | $1,000,000 |
| Employers' Liability | $1,000,000 |

(d) **Professional Liability (Errors and Omissions Liability)**

The Policy shall cover professional misconduct or lack of ordinary skill.

| | |
|---|---|
| Each claim | $1,000,000 |
| Annual Aggregate | $5,000,000 |

The Nevada Trust will name Tenant as an additional insured under any liability insurance policy that it has related to the Henderson Property, to the extent commercially reasonable and does not cause a material increase in the premiums for such insurance coverage or diminish the coverage available to the Nevada Trust in any material respect. However, the coverage shall not include any of the Tenant's operations and Tenant's liability insurance shall be primary and non-contributory to the Nevada Trust's policy.

3.3    Liens by Government

Notwithstanding anything to the contrary in this Article III, the Nevada Trust hereby grants to the Nevada Trustee, the United States, and Nevada a first-priority lien on and security interest in the Nevada Trust Assets, except with respect to any real property, to secure the payment of all amounts owed to or accrued or reserved on account of the Nevada Trust or to be retained by the Nevada Trustee hereunder or otherwise due hereunder and to secure the performance of all Environmental Actions required under the Settlement Agreement. However, only the Nevada Trustee shall have a first-priority lien on and security interest in the Nevada Trust Administrative Account and only the United States and Nevada shall have a first-priority lien on and security interest in the Nevada Trust Environmental Cost Account. The Nevada Trust agrees to take appropriate actions and execute appropriate documents to perfect the Nevada Trustee's, United States', and Nevada's liens and security interest hereunder.

3.4    Manner of Payment

Cash payments made by the Nevada Trust pursuant to the Settlement Agreement and the Agreement shall be in United States dollars by checks drawn on a domestic bank whose deposits are federally insured selected by the Nevada Trustee, or by wire transfer from such a domestic bank, at the option of the Nevada Trustee.

ARTICLE IV
THE NEVADA TRUSTEE

4.1    Appointment

4.1.1    Le Petomane XXVII, Inc, not individually but solely in its representative capacity as the Nevada Trustee, is appointed to serve as the Nevada Trustee to administer the Nevada Trust and the Nevada Trust Accounts, in accordance with the Settlement Agreement and the Agreement, and the Nevada Trustee hereby accepts such appointment and agrees to serve in such representative capacity, effective upon the Effective Date of the Agreement. Subject to the provisions of Section 4.1

24

herein, the term of the Nevada Trustee shall be for ten years, as long as Jay A. Steinberg is the President and sole shareholder and in control of the Nevada Trustee. If Jay A. Steinberg is no longer the President and sole shareholder, then the Beneficiaries shall propose a successor Nevada Trustee for appointment by the Bankruptcy Court in accordance with Section 4.11 of the Agreement. After the expiration of the initial ten year term, the Nevada Trustee may be re-appointed or terminated. Any successor Nevada Trustee shall be proposed by the Beneficiaries and appointed by the Court in accordance with Section 4.11 of the Agreement. If the Nevada Trustee is not reappointed and no successor Nevada Trustee is appointed by the expiration of the Nevada Trustee's term, the Court may reappoint the Nevada Trustee or appoint a successor Nevada Trustee.

4.1.2   After consultation with the United States and Nevada, the Nevada Trust is authorized to obtain the services of an environmental consultant to implement the future Environmental Actions (the "Consultant"). The Consultant shall obtain environmental, general and professional liability insurance in the sum of $25,000,000 or such lesser amount as agreed to by the Nevada Trust after consultation with the Lead Agency and Non-Lead Agency. The beneficiary of the insurance policies shall be the Nevada Trust and shall cover negligence committed by the Consultant in implementing the future Environmental Actions or any other negligence committed by the Consultant. To the extent that such Environmental Actions are being performed at the Henderson Leased Facility, Tenant shall be named as an additional insured under such policies. The legal relationship of the Consultant to the Nevada Trust and Nevada Trustee is that of an independent contractor professional, not that of an entity employed by the Nevada Trust or the Nevada Trustee. The Consultant shall not be deemed a Nevada Trust Party.

4.2    <u>Generally</u>

The Nevada Trustee's powers are exercisable solely in a fiduciary capacity consistent with, and in furtherance of, the purposes of the Nevada Trust, the Settlement Agreement and this Agreement and not otherwise. The Nevada Trustee shall have the authority to bind the Nevada Trust, and any successor Nevada Trustee, or successor or assign of the Nevada Trust, but shall for all purposes hereunder be acting in its representative capacity as Nevada Trustee and not individually. Notwithstanding anything to the contrary contained herein, the Nevada Trustee shall not be required to take action or omit to take any action if, after the advice of counsel, the Nevada Trustee believes in good faith such action or omission is not consistent with the Nevada Trustee's fiduciary duties.

4.3    <u>Powers</u>

In connection with the administration of the Nevada Trust, except as otherwise set forth in the Agreement or the Settlement Agreement, the Nevada Trustee is authorized to perform any and all acts necessary to accomplish the purposes of the Nevada Trust. The powers of the Nevada Trust shall, without any further Court approval or order, include, without limitation, each of the following: (i) to receive, manage, invest, supervise and protect the Nevada Trust Assets, withdraw, make distributions and pay taxes and other obligations owed by the Nevada Trust or the Nevada Trust Accounts from funds held by the Nevada Trustee and/or the Nevada Trust (or the Nevada Trust Accounts) in accordance with the Agreement and the Settlement Agreement, and withhold and pay to the appropriate taxing authority any withholding taxes on distributions

25

from the Nevada Trust; (ii) to engage employees and professional Persons to assist the Nevada Trust and/or the Nevada Trustee with respect to the responsibilities described herein; (iii) to make distributions of the Nevada Trust Assets from the Nevada Trust Accounts for the purposes contemplated in and in accordance with the terms of the Agreement and the Settlement Agreement; and (iv) to effect all actions and execute all agreements, instruments and other documents necessary to implement the Agreement, including to exercise such other powers as may be vested in or assumed by the Nevada Trust and/or the Nevada Trustee pursuant to the Agreement and any order of the Court or as may be necessary and proper to carry out the provisions of the Agreement and the Settlement Agreement. No Person dealing with the Nevada Trust shall be obligated to inquire into the authority of the Nevada Trustee in connection with the protection, conservation or disposition of Nevada Trust Assets. The Nevada Trustee is authorized to execute and deliver all documents on behalf of the Nevada Trust to accomplish the purposes of the Agreement and the Settlement Agreement.

4.4     Other Professionals

After consultation with the United States and Nevada, the Nevada Trust is authorized to retain on behalf of the Nevada Trust and pay such third parties as the Nevada Trustee (in accordance with a budget approved pursuant to Section 3.2 above) may deem necessary or appropriate to assist the Nevada Trustee in carrying out its powers and duties under the Agreement and the Settlement Agreement, including, without limitation, (i) counsel to the Nevada Trust and/or Nevada Trustee, (ii) a public accounting firm to perform such reviews and/or audits of the financial books and records of the Nevada Trust as may be appropriate in the Nevada Trustee's reasonable discretion and to prepare and file any tax returns or informational returns for the Nevada Trust or the Nevada Trust Accounts as may be required, and (iii) environmental consultants, custodians, security personnel, engineers, surveyors, brokers, contractors, administrative assistants and clerks. The Nevada Trustee may pay all such Persons compensation for services rendered and expenses incurred in accordance with a budget approved as provided in Section 3.2.

4.5     Limitation of the Nevada Trustee's Authority

The Nevada Trust and the Nevada Trustee shall not and are not authorized to engage in any trade or business with respect to the Nevada Trust Assets or any proceeds therefrom except as and to the extent the same is deemed in good faith by the Nevada Trustee to be reasonably necessary or proper for the conservation or protection of the Nevada Trust Assets, or the fulfillment of the purposes of the Nevada Trust. The Nevada Trust and the Nevada Trustee shall not take any actions that would cause the Nevada Trust to fail to qualify as a qualified settlement fund under the QSF Regulations.

4.6     Reliance by the Nevada Trust Parties

Except as may otherwise be provided herein: (a) the Nevada Trust Parties may rely on, and shall be protected from liability in acting upon, any resolution, certificate, statement, instrument, opinion, report, notice, request, consent, order, or other paper or document believed by them to be genuine and to have been signed or presented by the proper party or parties; (b) the Nevada Trust Parties may consult with legal counsel, financial or accounting advisors and other professionals and shall not be personally liable for any action taken or not taken in accordance

26

with the advice thereof; and (c) persons dealing with the Nevada Trust Parties shall look only to the Nevada Trust Assets to satisfy any liability incurred by the Nevada Trust Parties to such person in carrying out the terms of the Agreement or any order of the Court, and the Nevada Trust Parties shall have no personal obligations to satisfy any such liability other than as provided in Section 4.9.1.

4.7     Compensation of the Nevada Trustee

The Nevada Trust shall pay its own reasonable and necessary costs and expenses, and shall reimburse the Nevada Trustee for the actual reasonable out-of-pocket fees and expenses to the extent incurred by the Nevada Trustee in connection with the Nevada Trustee's duties hereunder, including, without limitation, necessary travel, lodging, office rent (to be paid directly by the Nevada Trust), postage, photocopying, telephone and facsimile charges upon receipt of periodic billings, all in accordance with an annual budget or fee schedule approved by the Lead Agency after consultation with the Non-Lead Agency. The Nevada Trustee, and employees of the Nevada Trust and the Nevada Trustee, who perform services for the Nevada Trust shall be entitled to receive reasonable compensation for services rendered on behalf of the Nevada Trust in accordance with an annual budget or fee schedule approved by the Lead Agency after consultation with the Non-Lead Agency.

The Nevada Trust Assets shall be subject to the claims of the Nevada Trustee, and the Nevada Trustee shall be entitled to reimburse itself out of any available cash in the Nevada Trust Administrative Account, and the Nevada Trust shall be obligated to pay, for actual out-of-pocket expenses and for actual hours worked.

All compensation and other amounts payable to the Nevada Trustee shall be paid from the Nevada Trust Assets.

4.8     Liability of Nevada Trust Parties

4.8.1    In no event shall any of the Nevada Trust Parties be held liable to any third parties for any liability, action, or inaction of any other party, including Settlors or any other Nevada Trust Party. The Nevada Trust Parties shall, further, be indemnified and exculpated in accordance with Section 4.9 of the Agreement.

4.8.2    As provided in Sections XVI, XVII, XVIII of the Settlement Agreement, the Nevada Trust Parties are deemed to have resolved any civil liability under CERCLA and State Environmental Laws to the United States and States, and have protection from contribution actions or claims as provided by Sections 113(f)(2) of CERCLA, 42 U.S.C. Section 9613(f)(2) or similar state law for matters addressed in the Settlement Agreement. The Nevada Trust Parties shall have the benefits of the covenants not to sue as set forth in Section XVI of the Settlement Agreement, of contribution protection as set forth in Section XVIII of the Settlement Agreement and of the provisions as set forth in Section XVII of the Settlement Agreement.

4.9     Exculpation and Indemnification

The Nevada Trust Parties are exculpated by all persons, including without limitation, holders of claims and other parties in interest, of and from any and all claims, causes of action and other assertions of liability arising out of the ownership of the Nevada Trust Assets and the discharge of the powers and duties conferred upon the Nevada Trust and/or Trustee by the Settlement Agreement, the Agreement, or any order of court entered pursuant to or in furtherance of the Settlement Agreement, the Agreement, or applicable law or otherwise.  No person, including without limitation, holders of claims and other parties in interest, will be allowed to pursue any claims or cause of action against any Nevada Trust Party for any claim against Settlors, for making payments in accordance with the Agreement, the Settlement Agreement, or any order of court, for claims or causes of action relating to the ownership of the Nevada Trust Assets or for implementing or non-implementing the provisions of the Agreement, the Settlement Agreement or any order of court.  Nothing in this Section, the Agreement, or the Settlement Agreement shall preclude the United States or the State of Nevada from enforcing the terms of the Settlement Agreement or the Agreement against the Nevada Trust Parties.

4.9.1    Exculpation. None of the Nevada Trust Parties shall be personally liable except to the extent the Court, by a final order, not reversed on appeal, finds that it committed fraud or willful misconduct after the Effective Date in relation to such Nevada Trust Parties' duties or actions that are asserted as the basis for liability.  There shall be an irrebuttable presumption that any action taken or not taken with the approval of the Court does not constitute a breach of the Nevada Trust Parties' fiduciary duties or an act of fraud or willful misconduct.  For the avoidance of doubt, the term "approval of the Court" in this Section 4.9.1 shall not be construed to mean the Findings of Fact, Conclusions of Law and Order Confirming the First Amended Joint Plan of Reorganization of Tronox Incorporation, et al., pursuant to Chapter 11 of the Bankruptcy Code, any other order that has been entered to date by the Bankruptcy Court, or any future order approving this Agreement or the Anadarko Litigation Trust Agreement.  Any judgment against a Nevada Trust Party and any costs of defense relating to any Nevada Trust Party shall be paid from and limited to funds from the Nevada Trust Environmental Cost Account for the Henderson Property or the Nevada Trust Administrative Account without the Nevada Trust Party having to first pay from its own funds for any personal liability or costs of defense unless a final order of the Court, that is not reversed on appeal, determines that it committed  fraud or willful misconduct in relation to the Nevada Trust Party's duties that are asserted as the basis for liability.

4.9.2    Indemnification. The Nevada Trust shall indemnify, defend and hold harmless (without the Nevada Trust Parties having to first pay from their personal funds) the Nevada Trust Parties from and against any and all claims, causes of action, liabilities, obligations, losses, costs, judgments, damages or expenses (including attorneys' fees and expenses) and any other assertion of liability arising out of the ownership of Nevada Trust Assets, the Nevada Trust Parties' negligent action or inaction, or in connection with, the matters contained in the provisions of Section 4.9, to the fullest extent permitted by applicable law, provided that such indemnification shall be limited to funds in the Nevada Trust Environmental Cost Account for the Henderson Property.  Without limiting the foregoing, any such judgment against a Nevada Trust Party and any such costs of defense relating to any Nevada Trust Party shall be paid by the Nevada Trust consistent with the terms and conditions of this Section 4.9.2.  Notwithstanding the foregoing, to the extent fraud or willful misconduct of any Nevada Trust Party is alleged

28

and the Court finds, by a final order, not reversed on appeal, that such Nevada Trust Party committed fraud or willful misconduct after the Effective Date in relation to such Nevada Trust Party's duties or actions, that are asserted as the basis for liability, there shall be no indemnification, of that Nevada Trust Party, for any judgments arising from such allegations of fraud or willful misconduct. It shall be an irrebuttable presumption that any action taken, or inaction, consistent with Court approval shall not constitute willful misconduct or fraud. For the avoidance of doubt, the term "approval of the Court" in this Section 4.9.2 shall not be construed to mean the Findings of Fact, Conclusions of Law and Order Confirming the First Amended Joint Plan of Reorganization of Tronox Incorporation, et al., pursuant to Chapter 11 of the Bankruptcy Code, any other order that has been entered to date by the Bankruptcy Court, or any future order approving this Agreement or the Anadarko Litigation Trust Agreement.

4.10    Termination, Replacement, and Removal of the Nevada Trustee.

      4.10.1    Termination

The duties, responsibilities and powers of the Nevada Trustee will terminate on the date the Nevada Trust is dissolved under applicable law in accordance with the Settlement Agreement, or by an order of the Court; provided that this Section and Sections 4.6, 4.8 and 4.9 above shall survive such termination, dissolution and entry. The Nevada Trustee may resign by giving not less than 120 days prior written notice thereof to the Court, the United States, and Nevada.

      4.10.2    Replacement:

The Nevada Trustee may be replaced upon completion of any ten (10) year term; however, this Section and Sections 4.6, 4.8 and 4.9 above shall survive such replacement.

      4.10.3    Removal

            4.10.3.1 The Nevada Trustee may be removed upon entry of a final order by the Bankruptcy Court, not reversed on appeal, immediately upon notice of appointment of a temporary or permanent successor, finding that the Nevada Trustee committed fraud or willful misconduct after the Effective Date in relation to the Nevada Trustee's duties under the Nevada Trust.

            4.10.3.2 The Nevada Trustee may be removed upon entry of a final order by the Bankruptcy Court, not reversed on appeal, finding that the Nevada Trustee (i) in any material respect, as a result of negligence, exacerbates hazardous conditions at the Henderson Property, (ii) is seriously or repeatedly deficient or late in performance of the work or violates the provisions of the Settlement Agreement, or (iii) has violated the provisions of the Agreement or other related

MILW_10918886.7

implementation agreements. The United States and Nevada may jointly direct that (A) the Nevada Trustee be replaced in accordance with the Nevada Trust Agreement or (B) all remaining funds and future recoveries in the Nevada Trust be paid to US EPA or to Nevada to be used in accordance with the terms of the Agreement or the Settlement Agreement. In the event the funds are so paid, so long as title to the Henderson Property remains in the name of the Nevada Trust or Nevada Trustee, funds deemed reasonably sufficient by the applicable beneficiaries to cover property taxes and other property management costs to be paid by the Nevada Trust for the Henderson Property shall be left in the Nevada Trust Administrative Account.

4.10.3.3 The provisions of this Section 4.10.3 and Section 4.6, 4.8 and 4.9 above shall survive the removal of the Nevada Trustee or transfer of funds.

4.11    Appointment of Successor Nevada Trustees

Any successor Nevada Trustee shall be proposed by the United States and Nevada and appointed by the Court. Any successor Nevada Trustee appointed hereunder shall execute an instrument accepting such appointment hereunder and shall file such acceptance with the Nevada Trust records. Thereupon, such successor Nevada Trustee shall, without any further act, become vested with all the estates, properties, rights, powers, trusts and duties of its predecessor in the Nevada Trust with like effect as if originally named herein; provided, however, that a removed or resigning Nevada Trustee shall, nevertheless, when requested in writing by the successor Nevada Trustee, execute and deliver an instrument or instruments conveying and transferring to such successor Nevada Trustee under the Nevada Trust all the estates, properties, rights, powers, and trusts of such predecessor Nevada Trustee.

4.12    No Bond

Notwithstanding any state law to the contrary, the Nevada Trustee, including any successor Nevada Trustee, shall be exempt from giving any bond or other security in any jurisdiction.

ARTICLE V
BENEFICIARIES

5.1    Beneficiaries

Beneficial interests in the Nevada Trust shall be held by each of the Beneficiaries.

5.2    Identification of Beneficiaries

5.2.1    In order to determine the actual names and addresses of the authorized representatives of a Beneficiary, the Nevada Trust and the Nevada Trustee shall be entitled to rely conclusively on the name and address of the authorized

30

representative for such Beneficiary listed below in Section 5.2.2, who may from time to time provide additional or replacement names and addresses of authorized representatives, or listed in any written notice provided to the Nevada Trustee in the future by an authorized representative of such Beneficiary.

      5.2.2   The Nevada Trustee shall send copies of all reports, budgets, annual balance statements, and other documents that the Nevada Trustee is required to submit to a Beneficiary under the Settlement Agreement and the Agreement, and related implementation documents including any unilateral administrative orders, consent decrees, or administrative orders on consent to the following person(s), as applicable:

As to the United States of America as beneficiary:

Authorized representative and party to receive all notices under 5.2.2:

Stephen F. Tyahla, P.E., CHMM
Project Manager, RCRA Correction Action Office
Waste Managmenet Division
U.S. EPA Region IX
75 Hawthorne Street (WSR-5)
San Francisco, CA  94105
Phone:  415-972-3466
Email:  tyahla.stephen@epa.gov

As to Nevada as beneficiary:

Authorized representative and party to receive all notices under 5.2.2:

NEVADA DIVISION OF ENVIRONMENTAL PROTECTION
Attn: Jim Najima, Chief, Bureau of Corrective Actions
901 S. Stewart Street, Suite 4001
Carson City, NV  89701
Tel.:     775.687.9484
Fax :    775.687.8335
E-mail: jnajima@ndep.nv.gov

NEVADA ATTORNEY GENERAL
Attn:  Carolyn E. Tanner, DAG
5420 Kietzke Lane, Suite 202
Reno, NV  89511
Tel.:     775.850.4101
Fax :    775.688.1822
E-mail: ctanner@ag.nv.gov

5.3     Non-Beneficiaries

31

Upon the Effective Date of the Agreement, except with respect to enforcement of the Henderson Leased Facility, the Settlors and Reorganized Tronox shall have no interests including, without limitation, any reversionary interest, in the Nevada Trust or any Nevada Trust Assets; provided, however, Tronox LLC shall have a leasehold interest in the Henderson Leased Facility as described in further detail in the Settlement Agreement and insurance reimbursement rights as described herein. The State of Nevada and the United States shall be the sole beneficiaries of the Nevada Trust Accounts and the other Nevada Trust Assets. Neither Settlors, Reorganized Tronox, nor Tenant shall have any rights or interest to the Nevada Trust Assets distributed to the Nevada Trust Accounts, nor to any funds remaining in any of the Nevada Trust Accounts upon the completion of any and all final actions and disbursements for any and all final costs with respect to the Henderson Property.

5.4     Transfer of Beneficial Interests

The interest of the Beneficiaries in the Nevada Trust, which are reflected only on the records of the Nevada Trust maintained by the Nevada Trust, are not negotiable and may be transferred only after written notice to the Nevada Trust, by order of the Court or by operation of law. The Nevada Trust shall not be required to record any transfer in favor of any transferee where, in the sole discretion of the Nevada Trust, such transfer is or might be construed to be ambiguous or to create uncertainty as to the holder of the interest in the Nevada Trust. Until a transfer is in fact recorded on the books and records maintained by the Nevada Trust for the purpose of identifying Beneficiaries, the Nevada Trust, whether or not in receipt of documents of transfer or other documents relating to the transfer, may nevertheless make distributions and send communications to Beneficiaries, as though it has no notice of any such transfer, and in so doing the Nevada Trust and Nevada Trustee shall be fully protected and incur no liability to any purported transferee or any other Person. Interests in the Nevada Trust may not be transferred to the Settlors, Reorganized Tronox, or any Persons related to any of the preceding (within the meaning of Section 468B(d)(3) of the Internal Revenue Code).

ARTICLE VI
REPORTING AND TAXES

6.1     Reports

As soon as practicable after the end of each calendar quarter beginning with the quarter ended after assets are first received by the Nevada Trust and ending as soon as practicable upon termination of the Nevada Trust, the Nevada Trust shall submit to the Beneficiaries a written report, including: (a) financial statements of the Nevada Trust at the end of such calendar quarter or period and the receipts and disbursements of the Nevada Trust for such period; and (b) a description of any action taken by the Nevada Trust in the performance of its duties which, as determined by outside counsel, accountants or other professional advisors, materially and adversely affects the Nevada Trust and of which notice has not previously been given to the Beneficiaries. The Nevada Trust shall promptly submit additional reports to the Beneficiaries whenever, as determined by outside counsel, accountants or other professional advisors, an adverse material event or change occurs which affects either the Nevada Trust or the rights of the Persons receiving distributions (including, without limitation, the Beneficiaries) hereunder. The Nevada Trust shall also provide the reports or information required by Section 3.2 of the Agreement.

32

6.2     Other

The Nevada Trust shall also file (or cause to be filed) any other statements, returns or disclosures relating to the Nevada Trust, that are required by any applicable governmental unit.

6.3     Reports in Support of Insurance Claims

The Nevada Trust shall also file (or cause to be filed) reports and cost analyses in support of claims against insurance carriers at the request of the United States and the State of Nevada and shall provide the United States and the State of Nevada a copy of any such reports and cost analyses.

6.4     Taxes

The Nevada Trustee shall be the "administrator," within the meaning of Treasury Regulation Section 1.468B-2(k)(3), of the Nevada Trust. Subject to definitive guidance from the Internal Revenue Service or a judicial decision to the contrary, the Nevada Trustee shall file tax returns and pay applicable taxes with respect to the Nevada Trust in a manner consistent with the provisions of the QSF Regulations. All such taxes shall be paid from the Nevada Trust Assets. Settlors may make an election to treat the Nevada Trust as a grantor trust pursuant to Treasury Regulation Section 1.468B-1(k)(1). To the extent the Settlors make such an election, (a) the Nevada Trustee will provide reasonable cooperation to Settlors as needed to facilitate such election, (b) the Nevada Trustee will file any returns or reports required by the QSF Regulations or Treasury Regulation § 1.671-4, and (c) the Nevada Trustee will provide the Settlors, as transferors to the Nevada Trust, with any statements or reports required by the QSF Regulations or Treasury Regulation § 1.671-4, in order to enable the Settlors to calculate their share of the Nevada Trust's tax obligations and attributes.  For the avoidance of doubt, any grantor trust election is for tax purposes only and shall in no way affect the substantive rights and obligations of the parties under the Settlement Agreement or the Agreement.

ARTICLE VII
MISCELLANEOUS PROVISIONS

7.1     Amendments and Waivers

Any provision of the Agreement may be amended or waived by mutual written consent of the Nevada Trust, the United States, and the State of Nevada; provided, however, that no change shall be made to the Agreement that would alter the provisions of Section 7.2 hereof or adversely affect the federal income tax status of the Nevada Trust as a "qualified settlement fund" (in accordance with Section 6.4 hereof), or, unless agreed to in writing by the affected Nevada Trustee, the rights of the Nevada Trustee. Technical amendments to the Agreement may be made as necessary, to clarify the Agreement or enable the Nevada Trustee to effectuate the terms of the Agreement, in a manner consistent with the Settlement Agreement with the mutual consent of the Nevada Trust, the United States, and the State of Nevada.

7.2     Tax Treatment

The Nevada Trust created by the Agreement is intended to be treated as a qualified settlement fund eligible to elect grantor trust classification pursuant to the QSF Regulations for

MILW_10918886.7

federal income tax purposes, and to the extent provided by law, the Agreement shall be governed and construed in all respects consistent with such intent.

7.3    Cooperation

7.3.1    The Nevada Trust and Nevada Trustee shall take such actions and execute such documents as are reasonably requested by Settlors with respect to effectuating the Settlement Agreement and the transactions contemplated thereby, provided that such actions are not inconsistent with the Agreement or the Settlement Agreement. To the extent that Settlors request the Nevada Trust and/or the Nevada Trustee to take such an action, the Nevada Trust and Nevada Trustee shall do so at the sole expense of the Settlor.

7.3.2    Settlors and Reorganized Tronox shall take such actions and execute such documents as are reasonably requested by the Nevada Trust or the Nevada Trustee with respect to effectuating the Settlement Agreement and the transactions contemplated thereby, provided that such actions are not inconsistent with the Agreement or the Settlement Agreement. To the extent that the Nevada Trust or the Nevada Trustee requests Settlors or Reorganized Tronox to take such an action, Settlors or Reorganized Tronox shall do so at the sole expense of the Nevada Trust.

7.4    Situs of the Nevada Trust

The situs of the Nevada Trust herein established is Nevada, and, except to the extent the Bankruptcy Code or other federal law is applicable, the rights, duties, and obligations arising under this Nevada Trust Agreement shall be governed by, and construed and enforced in accordance with, the laws of the State of Nevada, without giving effect to the principles of conflict of law thereof.

7.5    Severability

If any provision of the Agreement or application thereof to any Person or circumstance shall be finally determined by the Court to be invalid or unenforceable to any extent, the remainder of the Agreement, or the application of such provision to Persons or circumstances other than those as to which it is held invalid or unenforceable, shall not be affected thereby, and such provision of the Agreement shall be valid and enforced to the fullest extent permitted by law.

7.6    Sufficient Notice

Any notice or other communication hereunder shall be in writing and shall be deemed to have been sufficiently given, for all purposes, if deposited, postage prepaid, in a post office or by commercial overnight mail courier service, addressed to the Person for whom such notice is intended, to the name and address set forth in the case of a Beneficiary in Section 5.2 of the Agreement or such other address provided in writing to the Nevada Trust by an authorized representative of the respective Beneficiary.

7.7    Headings

MILW_10918886.7

The section headings contained in the Agreement are solely for convenience of reference and shall not affect the meaning or interpretation of the Agreement or any term or provision hereof.

### 7.8    Actions Taken on Other Than Business Day

If any payment or act under the Settlement Agreement or the Agreement is required to be made or performed on a date that is not a business day, then the making of such payment or the performance of such act may be completed on the next succeeding business day, but shall be deemed to have been completed as of the required date. For the purposes of the Agreement, a business day shall be any of the days Monday through Friday excluding national holidays.

### 7.9    Consistency of Agreements and Construction

To the extent reasonably possible, the provisions of the Agreement shall be interpreted in a manner consistent with the Settlement Agreement. Where the provisions of the Agreement are irreconcilable with the provisions of the Settlement Agreement, the provisions of the Settlement Agreement shall prevail, with the exception of Section 1.1.34, Section 2.5.1, Sections 3.2.1 through 3.2.4 and Article IV in its entirety, in which case the Agreement controls.

### 7.10    Compliance with Laws

Any and all distributions of Nevada Trust Assets shall be in compliance with applicable laws, including, but not limited to, applicable federal and state securities laws.

### 7.11    Preservation of Privilege.

In connection with the rights, claims, and causes of action that constitute the Nevada Trust Assets, any attorney-client privilege, work-product privilege, or other privilege or immunity attaching to any documents or communications (whether written or oral) transferred to the Nevada Trust shall vest in the Nevada Trust and its representatives, and the Parties are authorized to take all necessary actions to effectuate the transfer of such privileges.

### 7.12    No Recourse to Beneficiaries.

In no event shall the Beneficiaries have any responsibility for paying any expenses, fees, and other obligations of the Nevada Trust, and in no event shall the Nevada Trust or the Nevada Trustee, or any of their agents, representatives, or professionals, have recourse to the Beneficiaries therefor.

### 7.13    Uniform Custodial Trust Act.

The Nevada Trust Agreement shall not be subject to any provision of the Uniform Custodial Trust Act as adopted by any state, now or in the future.

MILW_10918886.7

THE UNDERSIGNED PARTIES ENTER INTO THIS AGREEMENT

**FOR THE UNITED STATES OF AMERICA**

Date: 2/9/11

ROBERT G. DREHER
Acting Assistant Attorney General
Environment and Natural Resources Division
U.S. Department of Justice
Washington, D.C. 20044

Date: 2/11/11

PREET BHARARA
United States Attorney for the
Southern District of New York

By:

ROBERT WILLIAM YALEN
TOMOKO ONOZAWA
JOSEPH A. PANTOJA
Assistant United States Attorneys
86 Chambers Street
New York, New York 10007
Tel: (212) 637-2722
Fax: (212) 637-2686

Date: 2/10/11

ALAN S. TENENBAUM
National Bankruptcy Coordinator
Environment and Natural Resources Division
U.S. Department of Justice
Washington, D.C. 20044

Date: 2/10/11

FREDERICK PHILLIPS, Attorney
Environment and Natural Resources Division
U.S. Department of Justice
Washington, D.C. 20044

36

MILW_10918886.7

**FOR THE UNITED STATES ENVIRONMENTAL PROTECTION AGENCY**

Date: _____         By: _____
                                CYNTHIA GILES
                                Assistant Administrator for Enforcement
                                and Compliance Assurance
                                U.S. Environmental Protection Agency


Date: _____         By: _____
                                CRAIG KAUFMAN
                                Attorney-Advisor
                                U.S. Environmental Protection Agency
                                Ariel Rios Building
                                1200 Pennsylvania Avenue, NW
                                Washington, DC 20460

37

**FOR TRONOX LUXEMBOURG S.ar.L**

Date: _____

By: _____

Michael J. Foster
Attorney-in-Fact

**FOR TRONOX INCORPORATED**

Date: _____

By: _____

Michael J. Foster
Vice President, General Counsel & Secretary

**FOR CIMARRON CORPORATION**

Date: _____

By: _____

Michael J. Foster
Director, Vice President & Secretary

**FOR SOUTHWESTERN REFINING COMPANY, INC.**

Date: _____

By: _____

Michael J. Foster
Director, Vice President & Secretary

**FOR TRANSWORLD DRILLING COMPANY**

Date: _____

By: _____

Michael J. Foster
Director, Vice President & Secretary

38

**FOR TRIANGLE REFINERIES, INC.**

Date: _____

By: _____
Michael J. Foster
Director, Vice President & Secretary

**FOR TRIPLE S, INC.**

Date: _____

By: _____
Michael J. Foster
Director, Vice President & Secretary

**FOR TRIPLE S ENVIRONMENTAL MANAGEMENT CORPORATION**

Date: _____

By: _____
Michael J. Foster
Director, Vice President & Secretary

**FOR TRIPLE S MINERALS RESOURCES CORPORATION**

Date: _____

By: _____
Michael J. Foster
Director, Vice President & Secretary

**FOR TRIPLE S REFINING CORPORATION**

Date: _____

By: _____

Michael J. Foster
Director, Vice President & Secretary

**FOR TRONOX LLC**

Date: _____

By: _____
Michael J. Foster
Manager, Vice President & Secretary

**FOR TRONOX FINANCE CORP.**

Date: _____

By: _____
Michael J. Foster
Director, Vice President & Secretary

**FOR TRONOX HOLDINGS, INC.**

Date: _____

By: _____
Michael J. Foster
Director
Vice President & Secretary

**FOR TRONOX PIGMENTS (SAVANNAH) INC.**

Date: _____

By: _____
Michael J. Foster
Director, Vice President & Secretary

**FOR TRONOX WORLDWIDE LLC**

Date: _____

By: _____
Michael J. Foster
Manager, Vice President & Secretary

40

**FOR THE STATE OF NEVADA**

DEPARTMENT OF CONSERVATION AND
   NATURAL RESOURCES,
DIVISION OF ENVIRONMENTAL
PROTECTION

Date: _____     By: _____

COLLEEN CRIPPS, PhD.
Administrator

Approved as to form:

CATHERINE CORTEZ MASTO
Attorney General

Date: _____     By: _____

CAROLYN E. TANNER
Deputy Attorney General

41

MILW_10918886.7

**FOR THE NEVADA ENVIRONMENTAL RESPONSE TRUST**

Date: 2/9/11

Le Petomane XXVII, Inc., not individually but solely in its representative capacity as the Nevada Environmental Response Trust Trustee

By: *Jay A. Steinberg, not individually, as President and not individually*

Jay A. Steinberg, not individually but solely in his representative capacity as President of the Nevada Environmental Response Trust Trustee

42

MILW_10918886.7

**ENVIRONMENTAL RESPONSE TRUST AGREEMENT**

**(Savannah)**

**BY AND AMONG**

**TRONOX, INC.,**
**TRONOX LLC,**
**TRONOX FINANCE CORP.,**
**TRONOX HOLDINGS, INC.,**
**TRONOX LUXEMBOURG S.AR.L,**
**TRONOX PIGMENTS (SAVANNAH), INC.,**
**TRONOX WORLDWIDE, LLC,**
**SOUTHWESTERN REFINING COMPANY, INC.,**
**TRANSWORLD DRILLING COMPANY,**
**TRIANGLE REFINERIES, INC.,**
**TRIPLE S, INC.,**
**TRIPLE S ENVIRONMENTAL MANAGEMENT CORP.,**
**TRIPLE S MINERALS RESOURCES CORP.,**
**TRIPLE S REFINING CORP.,**
and
**CIMARRON CORP.**
as Settlors,

**Greenfield Environmental Savannah Trust LLC**
**not individually but solely in its representative capacity**
**as Savannah Trustee,**

**AND**

**THE UNITED STATES OF AMERICA and**
**the STATE of GEORGIA**
**as Beneficiaries**

**As of February 14, 2011**

# TABLE OF CONTENTS

**ARTICLE I DEFINITIONS** ...................................................................................**2**
    1.1    Definitions............................................................................................2

**ARTICLE II THE SAVANNAH TRUST** ..............................................................**8**
    2.1    Creation of and Transfer of Assets to the Savannah Trust ....................8
    2.2    Objective and Purpose .........................................................................14
    2.3    Holder of Savannah Trust Assets ........................................................14
    2.4    Savannah Plant Operations ..................................................................15
    2.5    Management of Savannah Trust Assets ................................................17
    2.6    Work Performed and Disbursements by the Savannah Trust ...............18
    2.7    Investment and Safekeeping of Savannah Trust Assets .......................18
    2.8    Insurance Policy to Cover Future Response Actions............................20
    2.9    Access and Deed Restrictions ..............................................................20
    2.10  Accounting...........................................................................................20
    2.11  Termination..........................................................................................21
    2.12  Property Disposition ............................................................................21

**ARTICLE III WORK AND DISTRIBUTIONS** ..................................................**22**
    3.1    Savannah Trust Accounts ....................................................................22
    3.2    Payments by the Savannah Trust .........................................................22
    3.3    Liens by Government ...........................................................................25
    3.4    Manner of Payment..............................................................................25
    3.5    Unclaimed Distributions ......................................................................26

**ARTICLE IV THE SAVANNAH TRUSTEE** ......................................................**26**
    4.1    Appointment ........................................................................................26
    4.2    Generally..............................................................................................27
    4.3    Powers..................................................................................................27
    4.4    Other Professionals ..............................................................................28
    4.5    Limitation of the Savannah Trustee's Authority .................................28
    4.6    Reliance by the Trust Parties ...............................................................28
    4.7    Compensation of the Savannah Trustee...............................................29
    4.8    Liability of Savannah Trust Parties......................................................29
    4.9    Exculpation and Indemnification .........................................................30
    4.10  Termination, Replacement, and Removal of  the Savannah Trustee....32
    4.11  Appointment of Successor Savannah Trustees ....................................33
    4.12  No Bond...............................................................................................33

**ARTICLE V BENEFICIARIES**..........................................................................**33**
    5.1    Beneficiaries ........................................................................................33
    5.2    Identification of Beneficiaries..............................................................33
    5.3    Non-Beneficiaries ................................................................................34
    5.4    Transfer of Beneficial Interests............................................................35

i

**ARTICLE VI REPORTING AND TAXES**................................................................**35**

    6.1    Reports ................................................................................35

    6.2    Other ...................................................................................36

    6.3    Reports in Support of Insurance Claims .............................36

    6.4    Taxes ..................................................................................36

**ARTICLE VII MISCELLANEOUS PROVISIONS** ..............................................**36**

    7.1    Amendments and Waivers ..................................................36

    7.2    Tax Treatment ....................................................................37

    7.3    Cooperation........................................................................37

    7.4    Situs of the Savannah Trust ...............................................37

    7.5    Severability .......................................................................37

    7.6    Sufficient Notice ...............................................................38

    7.7    Headings ............................................................................38

    7.8    Actions Taken on Other Than Business Day.......................38

    7.9    Consistency of Agreements and Construction.....................38

    7.10    Compliance with Laws ......................................................38

    7.11    Preservation of Privilege....................................................38

    7.12    No Recourse to Beneficiaries.............................................39

    7.13    Uniform Custodial Trust Act. ............................................39

# ENVIRONMENTAL RESPONSE TRUST AGREEMENT

## (Savannah)

This Environmental Response Trust Agreement (the "Agreement") is made this 14th day of February, 2011, by and among TRONOX, INC. ("Tronox") and its wholly owned subsidiaries, TRONOX LLC, TRONOX FINANCE CORP., TRONOX HOLDINGS, INC., TRONOX LUXEMBOURG S.AR.L, TRONOX PIGMENTS (SAVANNAH), INC., TRONOX WORLDWIDE, LLC, SOUTHWESTERN REFINING COMPANY, INC., TRANSWORLD DRILLING COMPANY, TRIANGLE REFINERIES, INC., TRIPLE S, INC., TRIPLE S ENVIRONMENTAL MANAGEMENT CORP., TRIPLE S MINERALS RESOURCES CORP., TRIPLE S REFINING CORP., and CIMARRON CORP., as debtors and debtors in possession in the Bankruptcy Cases (defined below) (collectively, "Settlors") and Greenfield Environmental Savannah Trust LLC, not individually but solely in its representative capacity as Savannah Trustee of the Savannah Environmental Response Trust established hereby (the "Savannah Trust"), and the Beneficiaries (defined herein).

# R E C I T A L S:

WHEREAS, on January 12, 2009, Settlors filed voluntary petitions for relief in the Bankruptcy Court under chapter 11 of title 11 of the United States Code, 11 U.S.C. § 101 *et seq.*, as amended (the "Bankruptcy Code") in the United States Bankruptcy Court for the Southern District of New York ("Bankruptcy Court"), which cases have been jointly administered under Case No. 09-10156 (the "Bankruptcy Cases");

WHEREAS, the Settlors, the United States and the States have entered into that certain Consent Decree and Environmental Settlement Agreement lodged with the Court on November 23, 2010, and as it may be amended prior to the Effective Date (the "Settlement Agreement");

WHEREAS, the Settlement Agreement provides for the transfer of the Savannah Facility (defined below) to the Savannah Trust (defined below) to be administered by the Savannah Trustee (defined below) pursuant to this Agreement and the Settlement Agreement;

WHEREAS, the Settlement Agreement provides for the creation of four additional trusts, the Cimarron Trust, the Nevada Trust, the Multistate Trust, and the West Chicago Trust, the transfer to those trusts of the Cimarron Site, the Henderson Property, the Multistate Owned Sites, and the West Chicago Owned Sites, respectively, and the administration of each of those trusts by the Cimarron Trustee, the Nevada Trustee, the Multistate Trustee, and the West Chicago Trustee, respectively, pursuant to the Environmental Response Trust Agreement for each trust and the Settlement Agreement;

WHEREAS, the Settlement Agreement provides for the creation of a litigation trust ("Anadarko Litigation Trust") pursuant to the Litigation Trust Agreement (defined below);

WHEREAS, in accordance with Article VI of the Settlement Agreement, the Savannah Trust is established for the purposes of owning the Savannah Facility, carrying out administrative and property management functions related to the Savannah Facility, managing and/or funding implementation of future Environmental Actions approved by the Lead Agency with respect to

1

the Savannah Facility, acting as a substituted party under the Savannah Consent Decree, paying certain future oversight costs, operating and/or liquidating the Savannah Acid Business and Gypsum Operations for the benefit of the Savannah Trust Accounts, and ultimately selling, transferring, or otherwise disposing or facilitating the reuse of all or part of the Savannah Trust Assets, if possible, and fulfilling other obligations as set forth in the Settlement Agreement.

WHEREAS, the Savannah Trust is to be funded in the amount set forth in the Settlement Agreement;

WHEREAS, this Agreement and the Settlement Agreement govern the Savannah Trust, which is created pursuant to section 1.468B-1, *et seq.* of the Treasury Regulations promulgated under section 468B of the Internal Revenue Code (the "QSF Regulations");

WHEREAS, presuming that the Savannah Trust qualifies as a "qualified settlement fund" within the meaning of the QSF Regulations, to the extent permitted by law, the Settlors intend to elect to treat the Savannah Trust as a grantor trust pursuant to QSF Regulations; and

WHEREAS, the Savannah Trust shall be the exclusive holder of the assets described herein for purposes of the Settlement Agreement and this Agreement;

NOW, THEREFORE, in consideration of the foregoing premises and the mutual covenants and agreements contained herein and in the Settlement Agreement the Parties hereby agree as follows:

ARTICLE I
DEFINITIONS

1.1    Definitions.

The following terms as used in this Agreement shall have the definitions given below:

1.1.1    "Agreement" has the meaning as given in the preamble.

1.1.2    "Anadarko Litigation Trust" shall have the meaning given in the recitals to this Agreement.

1.1.3    "Anadarko Litigation Proceeds" shall mean eighty-eight percent (88%) of the net recovery in the Anadarko Litigation, which net recovery shall be determined by subtracting from the total gross recovery in the Anadarko Litigation (1) all outstanding and anticipated payments to lead counsel of the Anadarko Litigation Trust pursuant to a separate Special Fee Arrangement; (2) all outstanding and anticipated costs and fees of the Anadarko Litigation Trust and Trustee (including but not limited to attorney's fees and Trustee fees), as set forth in the Anadarko Litigation Trust Agreement; and (3) the amount of the distribution referred to in Paragraph 122 of the Settlement Agreement, as amended by the First Amendment to the Consent Decree and Environmental Settlement Agreement, and which shall be allocated to the Governments and the Environmental Response Trusts pursuant to the Plan of Reorganization and the Settlement Agreement.

1.1.4    "Bankruptcy Cases" shall have the meaning given in the recitals to this Agreement.

1.1.5    "Bankruptcy Court" means the United States Bankruptcy Court for the Southern District of New York.

1.1.6    "Beneficiary" means the United States and the State of Georgia (all references to "Georgia" or the "State of Georgia" are limited to the Georgia Department of Natural Resources, Environmental Protection Division ("GA EPD")).

1.1.7    "CAA" means the Clean Air Act, U.S.C. §§ 7401-7671(q), as amended.

1.1.8    "CERCLA" means the Comprehensive Environmental Response, Compensation, and Liability Act, 42 U.S.C. §§ 9601 *et seq.*, as amended.

1.1.9    "Court" means the Bankruptcy Court or, if the Bankruptcy Court abstains from exercising jurisdiction or is otherwise without jurisdiction over any matter arising out of this Agreement, a United States District Court having competent jurisdiction with respect to such matters.

1.1.10    "Effective Date" means the Effective Date as defined in the Settlement Agreement.

1.1.11    "Emergency Environmental Action" shall have the meaning provided in Section 3.2.1.

1.1.12    "Environmental Actions" means any and all environmental activities authorized or required under Environmental Law that occur after the Effective Date and that are related to the Savannah Facility, including but not limited to response or remedial actions, removal actions, corrective action, closure, or post-closure care, reclamation, investigations, studies, remediation, interim actions, final actions, emergency actions, water treatment, implementation of engineered structures and controls, monitoring, repair and replacement of engineered structures, monitoring equipment and controls, operation and maintenance, implementation, operation and maintenance of institutional controls, coordination and integration of reuse and remedial efforts and initiatives (including, without limitation, multi-stakeholder communications), and, if required, long-term stewardship and perpetual custodial care activities. "Environmental Actions" also include the above environmental activities relating to the migration of hazardous substances emanating from the Savannah Facility.  For the avoidance of doubt, "Environmental Actions" shall not include natural resource assessment or restoration.

1.1.13 "Environmental Costs" means the costs and expenses of implementing, managing, and complying with all Environmental Actions, including, without limitation, related Trustee fees and all reasonable consulting and legal fees

associated with such activities, and the costs of payment of certain oversight costs of any Beneficiary with respect to the Savannah Facility.

1.1.14 "Environmental Information" means environmental reports, audits, analyses, records, studies and other documents containing information prepared by or otherwise in the possession, custody, or control of Settlors or their technical consultants that are based on or otherwise reflect information related to environmental activities.

1.1.15 "Environmental Law" means, whenever in effect, all federal, tribal, state and local statutes, regulations, ordinances and similar provisions having the force or effect of law; all judicial and administrative orders and determinations and all common law concerning public health and safety, worker health and safety, pollution or protection of the environment, including, without limitation, the Atomic Energy Act ("AEA"), CERCLA, Clean Water Act ("CWA"), Clean Air Act ("CAA"), Emergency Planning and Community Right-to-Know Act ("EPCRA"), Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA"), Resource Conservation and Recovery Act ("RCRA"), Safe Drinking Water Act ("SDWA"), Toxic Substances Control Act ("TSCA"), and any tribal, state or local equivalents.

1.1.16 "Funding" shall have the meaning given in Section 2.1.2 hereof.

1.1.17 "Georgia Federal Court" means the District Court for the Southern District of Georgia.

1.1.18 "Gypsum Operations" means the Savannah gypsum operations and all associated gypsum processing equipment.

1.1.19 "Internal Revenue Code" means the Internal Revenue Code of 1986, as amended.

1.1.20 "Lead Agency" shall be the GA EPD. GA EPD and US EPA may provide the Savannah Trustee with joint written notice that the Lead Agency for the Savannah Facility has changed.

1.1.21 "Line of Credit Agreement" means the agreement entered into on or before the Effective Date by the Settlors, Reorganized Tronox, and the Savannah Trust-Owned Entity recognizing a $500,000 line of credit provided to the Savannah Trust-Owned Entity by Reorganized Tronox.

1.1.22 "Litigation Trust Agreement" means the agreement establishing the Anadarko Litigation Trust.

1.1.23 "Maximum Draw" means the maximum draw on the line of credit provided in the Line of Credit Agreement.

1.1.24 "Non-Lead Agency" shall be the US EPA.

4

1.1.25 "Other Environmental Trusts" means the Cimarron Trust, the Nevada Trust, the Multistate Trust, and the West Chicago Trust.

1.1.26 "Parties" means the Settlors, the Savannah Trustee, and the Beneficiaries.

1.1.27 "Person" means any individual, corporation, limited liability company, partnership, joint venture, association, joint-stock company, trust, charitable foundation, unincorporated organization, government or any agency or political subdivision thereof or any other entity.

1.1.28 "Plan Administrator" means the administrator of any plan of reorganization confirmed by an order of the Bankruptcy Court in the Bankruptcy Cases.

1.1.29 "Plan of Reorganization" shall mean the Plan of Reorganization for the Settlors.

1.1.30 "RCRA" means the Resource Conservation and Recovery Act, 42 U.S.C. §§ 6901-6992k, as amended.

1.1.31 "Real Property Information" shall mean documents in Settlors' possession related to title, easements and other real property information relating to the Savannah Facility.

1.1.32 "Reorganized Tronox" means Tronox Incorporated, Tronox Worldwide LLC, Tronox LLC, non-Settlor foreign subsidiaries of the Settlors and such other Settlors and/or one or more newly organized successors, or any successor thereto, by merger, consolidation or otherwise, on or after the effective date of the Plan of Reorganization.

1.1.33 "Repayment Date" shall have the meaning provided in Section 2.5.5.

1.1.34 "Savannah Acid Business" means all equipment and operations associated with the Savannah Plant.

1.1.35 "Savannah Acid Business Administrative Account" shall have the meaning provided in Section 2.1.6.

1.1.36 "Savannah Acid Business Operations Account" shall have the meaning provided in Section 2.1.6.

1.1.37 "Savannah Consent Decree" means the Consent Decree for the Savannah Facility between the United States and Tronox Pigments (Savannah) Inc., *United States v. Tronox Pigments (Savannah) Inc.*, No. CV 408-259 (S.D. Ga.).

1.1.38 "Savannah Facility" means the right, title, and interest in and to the owned site located in Savannah, Georgia, including the former Titanium Dioxide plants,

5

the Savannah Plant, the Savannah Acid Business, and the Gypsum Operations in Savannah, Georgia, including, without limitation, all of the fee ownership in, all appurtenances, rights, easements, rights-of-way, mining rights (including unpatented mining claims, mill site claims, and placer claims), mineral rights, mineral claims, appurtenant groundwater rights, associated surface water rights, claims, and filings, permits, or other interests (including without limitation all fixtures, improvements, and equipment located thereon as of the Effective Date) related to the Savannah Facility, Savannah Working Capital, and including all machinery, equipment, fixtures, furniture, computers, tools, parts, supplies, and other tangible personal property necessary to support the operation of the Savannah Facility.

1.1.39  "Savannah Operating Agreement" shall have the meaning provided in Section 2.4.3.

1.1.40  "Savannah Plant" means the sulfuric acid plant owned by Settlors in Savannah, Georgia.

1.1.41   "Savannah Site" means the site owned by Settlors located in Savannah, Georgia.

1.1.42  "Savannah Trust" means the trust established pursuant to this Agreement.

1.1.43  "Savannah Trust Account" shall have the meaning given in Section 2.1.6 of this Agreement.

1.1.44  "Savannah Trust Administrative Account" means the Savannah Trust Account established to fund the payment of real estate taxes, income taxes (to the extent applicable), insurance, maintenance costs, and other fees, costs, and expenses, including the fees and costs of the Savannah Trustee incurred in connection with the administration of the Savannah Trust, but excluding any expenses incurred in implementing, managing, or performing Environmental Actions.

1.1.45  "Savannah Trust Assets" means (a) those assets and properties, including the Funding, Working Capital, the Savannah Facility, and Transferred Contracts to be transferred to the Savannah Trust pursuant to the Settlement Agreement, and (b) such other assets acquired, earned, or held by the Savannah Trust from time to time pursuant to this Agreement, the Settlement Agreement, or an order of the Court, including, but not limited to, the right to draw on Letters of Credit, Bonds, Surety Instruments, and other Instruments.

1.1.46  "Savannah Trust Environmental Cost Account" shall have the meaning provided in Section 2.1.6.

1.1.47  "Savannah Trust-Owned Entity" shall have the meaning provided in Section 2.4.1.

6

1.1.48 "Savannah Trust Parties" under this Agreement and the Settlement Agreement means, collectively, the Savannah Trust, any Savannah Trust-Owned Entity, the Savannah Trustee, and the Savannah Trustee's corporate parent (Greenfield (Environmental Trust Group, Inc.) and the shareholders, officers, directors, managers, members, principals, employees, consultants, agents or other professionals or representatives of or employed by the Savannah Trust-Owned Entity, the Savannah Trust, or the Savannah Trustee; provided however, that any contractors or consultants retained to operate or oversee operation of the Savannah Plant and/or Savannah Acid Business or to perform or oversee Environmental Actions of the Savannah Trust (for the avoidance of doubt, other than the Savannah Trustee and the Savannah Trust-Owned Entity and their respective officers, directors, and employees) shall not be Savannah Trust Parties. For the further avoidance of doubt, to the extent any contractor or consultant is performing human resource or employment management services for the benefit of the Savannah Trust-Owned Entity, that contractor or consultant, and its shareholders, officers, directors, managers, members and principals, shall be included in the definition of Savannah Trust Parties.

1.1.49 "Savannah Trust Proceeds" means the net proceeds of any liquidation, sale, lease, recovery or other disposition of or other proceeds in respect of the Savannah Trust Assets, including the positive cash flow of the Savannah Acid Business, net of the costs of the Savannah Acid Business including cash necessarily retained for future operations.

1.1.50 "Savannah Trustee" means the trustee of the Savannah Trust.

1.1.51 "Savannah Working Capital" means all accounts receivable, inventory, accounts payable, and other current liabilities as of the Effective Date of the Savannah Acid Business.

1.1.52 "Settlement Agreement" shall have the meaning given in the recitals.

1.1.53 "Settlors" shall have the meaning given in the preamble.

1.1.54 "Superfund" means the "Hazardous Substance Superfund" established by 26 U.S.C. § 9507 or, in the event such Hazardous Substance Superfund no longer exists, any successor fund or comparable account of the Treasury of the United States to be used for removal or remedial actions to address releases or threats of releases of hazardous substances.

1.1.55 "Transferred Contracts" means those contracts and agreements relating to the Savannah Facility listed in Exhibit "A" to this Agreement.

1.1.56 "United States" means the United States of America on behalf of agencies and departments named in the Settlement Agreement.

1.1.57 "US EPA" means the United States Environmental Protection Agency and any successor departments or agencies of the United States.

7

All capitalized terms not defined above shall have the meanings provided in the Settlement Agreement.


## ARTICLE II
## THE SAVANNAH TRUST

2.1    Creation of and Transfer of Assets to the Savannah Trust

       2.1.1    Pursuant to the Settlement Agreement, the Parties hereby establish, on behalf of the Beneficiaries named herein, and Tronox Worldwide LLC hereby transfers, assigns, and delivers to, the Savannah Trust, or to the Savannah Trustee, not individually but solely in its representative capacity as Savannah Trustee, if the law of Georgia prohibits a trust entity from holding such title, on behalf of the Beneficiaries, all of Settlors' right, title and interest in and to the Savannah Trust Assets. Settlors shall retain no ownership or other residual interest whatsoever with respect to the Savannah Trust or the Savannah Facility. The transfer of ownership by Tronox Worldwide LLC of the Savannah Trust Assets shall be a transfer of all of the Settlors' right, title and interests therein, and the transfer (i) shall be as is and where is, with no warranties of any nature; (ii) shall be free and clear of all claims, liens and interests against the Settlors, including liens for the payments of monetary claims, such as property taxes, or other monetary claims asserted or that could have been asserted in the bankruptcy proceeding, but shall remain subject to any existing in rem claims that do not secure payment of monetary claims (such as easements or deed restrictions); (iii) shall be subject to any rights of the United States or the State of Georgia under the Settlement Agreement; and (iv) shall be accomplished by quitclaim deed, in a form substantially similar to the quitclaim deed attached as Attachment C to the Settlement Agreement, and/or personal property bill of sale without warranty, with all such conveyance documents to be agreed to in form by the Settlors and the Savannah Trustee, provided that in no event shall the conveyance include any warranty by the grantor by virtue of the grant document or statutory or common law or otherwise. Settlors and Reorganized Tronox hereby disclaim any and all express or implied representations or warranties, including any representations or warranties of any kind or nature, express or implied, as to the condition, value or quality of such assets or other property, and specifically disclaim any representation or warranty of merchantability, usage, suitability or fitness for any particular purpose with respect to such assets or other property, any part thereof, the workmanship thereof, and the absence of any defects therein, whether latent or patent, it being understood that such assets are being acquired "as is, where is," and in their condition on the Effective Date. The grantee for each such deed and personal property bill of sale shall be the Savannah Trust by and through Greenfield Environmental Savannah Trust LLC, not individually but solely in its representative capacity as Savannah Trustee, or if the law of Georgia prohibits a trust entity from holding such title, Greenfield Environmental Savannah Trust LLC, not individually but solely in its representative capacity as Savannah Trustee. Settlors and Reorganized Tronox, as applicable, will reasonably cooperate with the Governments and the Savannah Trustee to deliver to the title company (which will cause to be recorded in the appropriate real property records) the transfer documents as soon as reasonably practicable, but not to exceed 30 days after the Effective Date. Settlors shall

pay the recording costs and transfer fees to the title company relating to the title transfers. Settlors shall pay to the applicable tax authorities on or prior to the Effective Date all real property taxes and assessments then due and relating to the Savannah Facility due on or before the Effective Date. Settlors and the Savannah Trust shall prorate the real and personal property taxes accruing to or becoming a lien on the Savannah Facility during the calendar year through the Effective Date, and Settlors shall have paid to the Savannah Trust their pro-rata share of such real and personal property taxes as of the Effective Date. If the actual bills for such real and personal property taxes have not been issued, then such proration shall be based on an amount equal to such real and personal property taxes for the prior year or tax period, which shall constitute a final proration and not be subject to further adjustment. As of the Effective Date, the Savannah Trust shall be responsible for paying all real and personal property taxes first coming due following the Effective Date relating to the Savannah Facility. Settlors shall execute, or cause to be executed, and record, if necessary, all necessary releases of any liens or security interests held by any Settlor against the Savannah Facility. Settlors shall pay to the Savannah Trust, not later than 60 days after the Trustee's presentation of same, all liabilities of the Savannah Facility accrued as of the Effective Date other than those current liabilities accounted for by the Savannah Working Capital as defined at Section 2.1.2.2, below. The Savannah Trust hereby accepts and agrees to hold the Savannah Trust Assets in the Savannah Trust for the benefit of the Beneficiaries for the purposes described in Section 2.2 below, subject to the terms of the Settlement Agreement, this Agreement, and any applicable orders of the Court.

2.1.2    Transfer of Funding and Consideration to the Savannah Trustee

2.1.2.1    The Funding. On the Effective Date, the Settlors shall cause to be transferred to or at the direction of the Savannah Trustee cash in the amount of $7,107,355, which constitutes the "Funding."

2.1.2.2    Savannah Working Capital. On the Effective Date, Settlors shall transfer to the Savannah Trust the Savannah Working Capital. In the event that at the Effective Date, inventory and accounts receivable of the Savannah Acid Business fail to exceed the current liabilities of the Savannah Acid Business by $2,000,000, Settlors shall make a cash payment to the Savannah Trust in the amount of the difference, which payment shall not be subject to repayment. Trustee shall deposit Savannah Working Capital, including any cash transferred by Settlors, in the Savannah Acid Business Operations Account and Savannah Acid Business Administrative Account to be established pursuant to subsection 2.1.6, below. Settlors shall have no right to any repayment of the cash so transferred.

2.1.2.3    Line of Credit. As of the Effective Date, Reorganized Tronox shall provide to the Savannah Trust (or such

9

Savannah-Trust Owned Entity as may operate the Savannah Acid Business) a line of credit in the amount of $500,000, subject to the limitations on draw-down set forth in Section 2.1.4. The Savannah Trustee shall allocate Savannah Working Capital and any draw-down on the Line of Credit amongst the Savannah Acid Business Operations Account and Savannah Acid Business Administrative Account in such manner as the Savannah Trustee deems to be in best interest of the Savannah Acid Business.

2.1.2.4 <u>Insurance</u>. To the extent applicable, Settlors shall transfer all available insurance policies and other rights to reimbursement or contribution for response actions (whether contractual or otherwise) held by the Settlors as of the Effective Date. (The Funding, Savannah Working Capital, Line of Credit and Insurance shall be collectively referred to as the "Funding and Consideration".)

2.1.2.5 <u>Anadarko Litigation Proceeds</u>. The Anadarko Litigation Trust, which shall receive a portion of Settlors' right to receive the Anadarko Litigation Proceeds, shall transfer 1% of the Anadarko Litigation Proceeds to the Savannah Trust Environmental Cost Account pursuant to the terms of the Plan of Reorganization, the Litigation Trust Agreement, and the Settlement Agreement. Additionally, the Savannah Trust shall receive 0.285% of the Anadarko Litigation Proceeds, to be deposited in the Savannah Trust Administrative Account.

2.1.3 Except as otherwise provided in Section 2.1.2.3, above, upon transfer of the Savannah Facility and the Funding and Consideration on the Effective Date, the Settlors shall have no interest in, or with respect to, any Savannah Trust Assets, and neither the Settlors, Reorganized Tronox, nor any successors thereto, shall have any further obligation to provide funding to the Savannah Trust.

2.1.4 <u>Line of Credit Agreement</u>. Settlors, Reorganized Tronox, and the Savannah Trust or the Savannah Trust-Owned Entity shall enter into a Line of Credit Agreement on or before the Effective Date, which agreement must be acceptable in form and substance to the United States, the State of Georgia and Reorganized Tronox. The material terms of the Line of Credit Agreement shall be the following: The Savannah Trust or Savannah Trust-Owned Entity, with the consent of the United States and the State of Georgia, may draw upon this line of credit without need to consult with, or obtain consent from, Reorganized Tronox or any other party but must provide reasonable advanced written notice. The line of credit will be secured by $500,000.00 of accounts receivable of the Savannah Acid Business and will carry no interest unless required by law to create such line. In such an event, the lowest interest rate required by law will be used. The Maximum Draw shall be reduced as follows: (i) on the Effective Date,

$500,000.00; (ii) one month after the Effective Date, $450,000.00; (iii) two months after the Effective Date, $250,000.00; (iv) three months after the Effective Date: $125,000.00; (v) four months after the effective date and thereafter: $0. Reorganized Tronox's security interest in the accounts receivable shall be reduced to the greater of the amount of the Maximum Draw or the amount due and payable at any point in time. The outstanding draw on the line of credit in excess of the Maximum Draw on any given date shall be immediately due and payable. If the Savannah Trust defaults on this obligation, a reasonable rate of interest (to be agreed in the Line of Credit Agreement) on the amount in excess of the Maximum Draw running from the date of such default shall be added to the amount due.  Reorganized Tronox, the Savannah Trust, and any other parties to the Line of Credit Agreement reserve the right to enforce the terms of the Line of Credit Agreement.

       2.1.5    <u>Savannah Consent Decree.</u>  With respect to the Savannah Consent Decree, the United States and Tronox Pigments (Savannah) Inc. will file papers with the Georgia Federal Court to substitute the Savannah Trust for Tronox Pigments (Savannah) Inc. as a party to the Savannah Consent Decree after the Effective Date for all purposes, except for the following limitations:

       2.1.5.1 Notwithstanding any contrary provision in the Savannah Consent Decree, the Savannah Trust shall have no obligation under the Savannah Consent Decree in excess of the assets in the Savannah Trust Environmental Cost Account.

       2.1.5.2 Notwithstanding any contrary provision in the Savannah Consent Decree, the Savannah Trust shall not be liable for any penalties provided for in the Savannah Consent Decree.

       2.1.5.3 Notwithstanding the provisions of this subsection, it shall be a purpose of the Savannah Trust to comply fully with all applicable provisions of the Savannah Consent Decree to the extent funding permits. Notwithstanding any contrary provision in the Savannah Consent Decree, it shall not be deemed a violation of the Savannah Consent Decree for the Savannah Trust to fail to expend funds on a lower priority project (as described in the following sentence), when that failure is reasonable in light of a higher priority project. Highest priority projects are those relating to Site maintenance, including well abandonment, plant ditch system, Deptford Tract, and berm and stormwater maintenance; second priority projects are those related to completion of the Clean Water Act remediation described in Paragraphs 43 to 45 and Appendix B of the Savannah Consent Decree; third priority projects are those related to the RCRA corrective action measures described in Paragraphs 36 to 42 of the Savannah Consent Decree;

fourth priority projects are all other projects. Nothing in this subsection shall affect the budget process, or be construed as a limitation on the Savannah Trust's ability to propose, and the Lead Agency's ability to approve, a budget containing terms inconsistent with the priorities listed above; provided, however, that the protection from a finding of violation of the Savannah Consent Decree contained in this subsection applies only under the circumstances described in the second and third sentences of this subsection.

2.1.5.4  Notwithstanding any contrary provision in the Savannah Consent Decree, the Savannah Trust need not comply with Paragraphs 22 to 35 of the Savannah Consent Decree, relating to the CAA, except insofar as the Savannah Trust should resume operations of a titanium dioxide plant at the Savannah Site.

2.1.5.5  The United States, the State of Georgia, the Savannah Trustee, Debtors, and Reorganized Tronox agree that the request for substitution of the Savannah Trustee as party to the Savannah Consent Decree subject to the limitations described in subsections 2.1.5.1-2.1.5.5 is authorized by Paragraphs 6, 7, 21, and 82 of the Savannah Consent Decree, without the need for further modification of that decree. To the extent that further modification of the Savannah Consent Decree nonetheless proves necessary to effect this substitution, and the limitations thereto, the United States and the Savannah Trustee (and, if necessary under the circumstances, Debtors and Reorganized Tronox), after conferring with the State of Georgia, agree to submit an appropriate request to the Georgia Federal Court for modification of subsections 2.1.5.1-2.1.5.5. Further, if it appears that other modifications to the Savannah Consent Decree may be necessary or appropriate in light of the purpose and funding of the Savannah Trust, the United States, the State of Georgia, and the Savannah Trustee agree (and, if necessary under the circumstances, Debtors and Reorganized Tronox) to negotiate in good faith concerning the terms of any such modifications and the United States and the Savannah Trust (and, if necessary under the circumstances, Debtors and Reorganized Tronox) agree to seek any agreed modifications from the Georgia Federal Court. Notwithstanding the substitution of the Savannah Trust for Tronox Pigments (Savannah) Inc., Tronox Pigments (Savannah) Inc. and its successors shall

be bound by any releases or covenants not to sue contained in the Savannah Consent Decree.

2.1.6    <u>Creation of the Trust Accounts.</u>    Upon receipt of the Savannah Facility and the Funding and Consideration, the Savannah Trustee shall create segregated trust accounts within the Savannah Trust including a "Savannah Trust Environmental Cost Account", a "Savannah Trust Administrative Account", a "Savannah Acid Business Operations Account", and a "Savannah Acid Business Administrative Account". The separate accounts are referred to in this Agreement as "Savannah Trust Accounts". The purpose of a Savannah Trust Environmental Cost Account shall be to provide funding for future Environmental Actions and certain future oversight costs of the United States and the State of Georgia with respect to the Savannah Facility. Funding from the Savannah Trust Environmental Cost Account may not be used for any other Site, except as provided in Section 2.4 below.   The purpose of the Savannah Acid Business Operations Account and Savannah Acid Business Administrative Accounts shall be to provide funding for the operational costs of the Savannah Acid Business and the costs of administering the Savannah Acid Business, respectively.   The purpose of the Savannah Trust Administrative Account shall be to fund the payment of real estate taxes, income taxes (to the extent applicable), insurance, and other Savannah Administrative Costs. The initial funding of the Savannah Trust Accounts shall be as set forth in the Settlement Agreement and at Section 2.1.2.2 of this Agreement. The payments set forth in the Settlement Agreement and this Agreement shall for purposes of the Bankruptcy Cases be accorded the status of expenses of administration.  Subject to 2.7, the income and gains from any investment of the Savannah Trust Assets, shall be allocated, paid and credited to such Savannah Trust Account.  Notwithstanding the foregoing, revenue generated by the Savannah Acid Business shall be allocated, paid, and credited amongst the Savannah Trust Accounts as deemed appropriate by the Savannah Trustee, with the approval of the Beneficiaries, for the profitable operation of the Savannah Acid Business and the successful performance of Environmental Actions at the Savannah Facility.   Upon termination of the Savannah Acid Business, all funds in the Savannah Acid Business Operations Account and the Savannah Acid Business Administrative Account, net of liabilities of the Savannah Acid Business incurred and owing in accordance with budgets approved pursuant to this Agreement, shall be transferred to the Savannah Trust Environmental Cost Account and the Savannah Trust Environmental Administrative Account in such amounts as are approved by Georgia in consultation with US EPA.

2.1.7    Each Savannah Trust Account may be divided into such number of trust subaccounts dedicated for specific uses as may be deemed necessary in the sole discretion of the Savannah Trustee (each, a "Trust Subaccount") to comply with the terms of, and implement, the Settlement Agreement and this Agreement.

2.1.8    For all federal income tax purposes, the Savannah Trustee and Settlors shall treat the transfer of the Savannah Trust Assets by Tronox Worldwide LLC to the Savannah Trust as a transfer to a qualified settlement fund pursuant to section 468B of the Internal Revenue Code and the QSF Regulations. The Savannah Trustee

shall at all times seek to have the Savannah Trust treated as a "qualified settlement fund" as that term is defined in the QSF Regulations. The Court shall retain continuing jurisdiction over the Savannah Trust and Savannah Trust Accounts sufficient to satisfy the requirements of the QSF Regulations. The Savannah Trustee shall cause taxes, if any, imposed on the earnings of the Savannah Trust to be paid out of such earnings and shall comply with all tax reporting and withholding requirements imposed on the Savannah Trust under applicable tax laws. The Savannah Trustee shall be the "administrator" of the Savannah Trust pursuant to Treasury Regulation section 1.468B-2(k)(3). To the extent the Settlors elect to treat the Savannah Trust as a grantor trust pursuant to Treasury Regulation section 1.468B-1(k)(1), the Savannah Trustee will reasonably cooperate with such election at Tronox's cost.

2.2    Objective and Purpose

2.2.1    The exclusive purposes and functions of the Savannah Trust are to: (i) own the Savannah Facility; (ii) carry out administrative and property management functions related to the Savannah Facility; (iii) manage and/or fund implementation of future Environmental Actions approved by the Lead Agency with respect to the Savannah Facility; (iv) to act as a substituted party under the Savannah Consent Decree; (v) fulfill other obligations as set forth in the Settlement Agreement, including making distributions in accordance with the terms of this Agreement and the Settlement Agreement; (vi) pay certain future oversight costs; (vii) to operate and/or liquidate the Savannah Acid Business and Gypsum Operations so as to make available to the Savannah Trust Accounts the maximum funding possible (provided that the Savannah Trustee may retain sufficient cash in the Savannah Acid Business so as to ensure the continued viability of future operations); and (viii) ultimately sell, transfer, or otherwise dispose or facilitate the reuse of all or part of the Savannah Trust Assets, if possible, all as provided herein with no objective or authority to engage in any trade or business. As described in (vii) above, in furtherance of the objective and purpose of the Savannah Trust, the Savannah Trustee or a Savannah Trust-Owned Entity may own and/or operate the Savannah Acid Business specifically for the purpose of generating additional funding for Environmental Actions at the Savannah Facility. The performance by the Savannah Trustee of its duties under this Agreement, including but not limited to the operation of the Savannah Acid Business, the operation of the Gypsum Operations, and the sale, lease or other disposition of some or all of the Savannah Trust Assets, shall not be considered to be the Savannah Trustee's engaging in a trade or business.

2.2.2    The Savannah Trust is established pursuant to this Agreement and the Settlement Agreement and approved by the Bankruptcy Court for the sole purpose of resolving claims asserting environmental liabilities of Settlors with respect to the Savannah Site. The Bankruptcy Court shall retain continuing jurisdiction over the Savannah Trust. The Savannah Trust satisfies all the requirements of, and is intended by the Parties to be classified as, a qualified settlement fund pursuant to the QSF Regulations.

2.3    Holder of Savannah Trust Assets

The Savannah Trust shall be the exclusive holder of the Savannah Trust Assets and Savannah Trust Accounts described herein for purposes of 31 U.S.C. § 3713(b).

2.4    Savannah Plant Operations

2.4.1    Savannah Trust-Owned Entity.  In furtherance of the purposes of the Savannah Trust, the Savannah Trustee shall determine whether the creation of a limited liability company or similar entity in which the Savannah Trust is at least an 80% owner ("Savannah Trust-Owned Entity") is necessary to safeguard the Savannah Trust Accounts and the Savannah Trust Assets other than the Savannah Acid Business. If created, the Savannah Trust-Owned Entity shall own and/or operate, as appropriate, the Savannah Acid Business for the benefit of the Savannah Trust in the Trust's performance of required Environmental Actions at the Savannah Facility. Any liabilities of the Savannah Trust-Owned Entity shall be satisfied only by assets of the Savannah Trust-Owned Entity, and creditors of the Savannah Trust-Owned Entity shall look only to the assets of the Savannah Trust-Owned Entity for satisfaction of any liabilities thereof. For avoidance of doubt, under no circumstances may any creditor of the Savannah Trust-Owned Entity look to the Savannah Trust Administrative Account or Savannah Trust Environmental Cost Account for satisfaction of any liabilities of the Savannah Trust-Owned Entity.   The creation of any Savannah Trust-Owned Entity shall be permitted only with approval of the Lead and Non-Lead Agencies.

2.4.1.1 Nothing herein shall require the Savannah Trust-Owned Entity, or its members, shareholders, or any contract operator or consultant to take or assume any liability for any Environmental Action with respect to the remediation of any preexisting contamination.  Notwithstanding the foregoing, nothing in this Section shall affect any obligation or liability of the Savannah Trust-Owned Entity, its members, shareholders, or any contract operator or consultant may have by law or agreement with respect to (i) any new contamination resulting from the Savannah Plant and/or Savannah Acid Business after the Effective Date; or (ii) any exacerbation of preexisting contamination, to the extent of exacerbation only. Additionally, in the event that new contamination from the Savannah Plant and/or Savannah Acid Business or  any exacerbation of preexisting contamination cannot be distinguished from preexisting contamination or commingles with preexisting contamination to create an indivisible harm, then nothing herein shall affect any obligation or liability of the Savannah Trust-Owned Entity, its members, shareholders, or any contract operator or consultant may have for Environmental Actions required to remediate such indistinguishable contamination or indivisible harm.

15

2.4.1.2 The protections from liability provided by the Settlement Agreement to the Savannah Trust-Owned Entity and its members, shareholders, or any Person contracting with the Savannah Trust-Owned Entity to operate or provide consulting services with respect to the Savannah Plant and/or Savannah Acid Business shall not apply to any act, omission, condition, status, or potential liability relating to the Savannah Site arising or occurring after any sale or transfer of the Savannah Plant and/or Savannah Acid Business ownership or operation to any entity that is not a Savannah Trust-Owned Entity. In the event that, by virtue of a reduction of the Savannah Trust's ownership interest in an entity, an entity that once qualified as a Savannah Trust-Owned Entity ceases thereafter to so qualify, such protections from liability shall not apply to any act, omission, condition, status, or potential liability relating to the Savannah Site arising or occurring after the date when the entity ceases to qualify as a Savannah Trust-Owned Entity.

2.4.2    <u>Savannah Acid Business Cash Flow</u>.  The Savannah Trustee shall, at the close of each calendar quarter beginning with the close of the first full quarter after the Effective Date, transfer the positive cash flow of the Savannah Acid Business, net of the costs of the Savannah Acid Business (including, without limitation, reasonable payments to any contract operator of or consultant to the Savannah Plant and/or Savannah Acid Business or pro rata sharing of profits with any equity investor in the Savannah Trust-Owned Entity, as applicable), and net of cash necessarily retained for future operations as determined by the Savannah Trustee, to the Savannah Trust Accounts to fund the performance of required Environmental Actions at the Savannah Facility, with such funds to be allocated between the Savannah Trust Environmental Cost Account and the Savannah Trust Administrative Account in a proportion to be approved in writing by the Lead and Non-Lead Agencies.

2.4.3    <u>Savannah Operating Agreement</u>.  The Savannah Trustee shall enter into an operating and/or management consulting agreement ("Savannah Operating Agreement") that shall govern any operations of the Savannah Plant and/or the Savannah Acid Business. The Savannah Operating Agreement shall be subject to the approval of the Lead and the Non-Lead Agencies. The Savannah Operating Agreement shall provide that any operator of the Savannah Plant and/or Savannah Acid Business, including each of its members, shareholders, and any contract operator of and/or consultant to the Savannah Plant and/or Savannah Acid Business, shall: (i) exercise due care at the Savannah Facility with respect to preexisting contamination by preventing or limiting human exposure to the preexisting contamination, provided that the parties to the Settlement Agreement agree that the exercise of due care shall not include any Environmental Action required to remediate the preexisting contamination; and (ii) comply with all applicable federal, state, and local laws and regulations with respect to its

operations or activities at the Savannah Plant and/or the Savannah Acid Business after the Effective Date.

2.5      Management of Savannah Trust Assets

2.5.1    Consistent with this Agreement and the Settlement Agreement, the Savannah Trustee shall use the Savannah Trust Environmental Cost Account to fund future Environmental Actions and certain future oversight costs with respect to the Savannah Facility.  The Savannah Trustee shall use the Savannah Trust Administrative Account to fund the Administrative Costs of the Savannah Trust.  The Savannah Trustee shall not spend any funds from the Savannah Trust except in accordance with budgets approved by the Lead Agency and consistent with this Agreement and the Settlement Agreement.

2.5.2    The Savannah Trustee may enter into a consent decree, consent order, or similar administrative agreement with the United States and/or the State of Georgia and may perform work pursuant to Unilateral Administrative Orders issued by US EPA, to facilitate implementation of this Section with respect to the Savannah Facility to the extent of available funding for the Savannah Facility.

2.5.3    After the United States and Georgia have confirmed to the Savannah Trustee that all final actions have been completed, and all final costs have been disbursed for the Savannah Facility, any funds remaining in the  Savannah Trust Accounts shall be transferred in the following order: (i) first, in accordance with instructions provided by the United States Department of Justice in writing after consultation with the  State of Georgia, to the Multistate Trust Environmental Cost Accounts, to the Nevada Trust Environmental Cost Account, any of the West Chicago Trust Environmental Cost Accounts, or any of the Cimarron Trust Environmental Cost Accounts if there are Environmental Actions to be performed and a need for additional trust funding, with the allocation among such Environmental Cost Accounts to be determined by the projected shortfall of performing such remaining Environmental Actions; (ii) second, to Non-Owned Sites with a need for additional funding beyond the distributions received from the Anadarko Litigation Proceeds; and (iii) third, to the Superfund.

2.5.4    Annually, beginning with the first year after the Effective Date, the Savannah Trustee shall provide the United States and Georgia with an update of anticipated future Administrative Costs of the Savannah Trust.  The United States Department of Justice may thereafter instruct in writing after consultation with the State of Georgia and the Savannah Trustee that any conservatively projected surplus funding in the Savannah Trust Administrative Account be transferred to the Savannah Trust Environmental Cost Account established under this Agreement if there are remaining actions to be performed and with a need for additional trust funding, or, to the extent there are no such remaining actions, as described in clauses (i) – (iii) in Section 2.5.3. The Lead Agency and the Non-Lead Agency may also instruct in writing after

17

consultation with the Savannah Trustee that, if there is an anticipated shortfall in the Savannah Trust Administrative Account based on anticipated future Administrative Costs of the Savannah Trust, funds from the Savannah Trust Environmental Cost Account may be transferred to the Savannah Trust Administrative Account.

2.5.5    During the six months beginning on the Effective Date, the Savannah Trustee may, with the consent, in writing, of the United States and the State of Georgia, make one or more transfers of up to a total of $2,000,000.00 from the Savannah Trust Administrative Account to serve as start-up working capital for the Savannah Acid Business. The Savannah Trustee shall only transfer such funds to the extent that it concludes (a) the Savannah Working Capital and the funds available under the Line of Credit Agreement are insufficient to operate the Savannah Acid Business; (b) such transfer is necessary to allow for the ongoing operations of the Savannah Acid Business; and (c) such transfer is in the best interests of the long-term remediation of the Savannah Facility. Unless the United States and the State of Georgia otherwise agree, in writing, the Savannah Trust shall return such funds to the Savannah Trust Administrative Account from positive cash flows (in addition to cash necessarily retained for future operations) generated from the Savannah Acid Business no later than a date six months after the last transfer authorized by the first sentence of this subparagraph (the "Repayment Date"). To the extent such cash flows are insufficient to allow the Savannah Trust to return the entire amount of such funds by the Repayment Date, the funds shall be returned to the extent that cash flows allow by the Repayment Date and the remainder of such funds shall be returned as soon thereafter as additional cash flows become available.

2.6    Work Performed and Disbursements by the Savannah Trust

Payments from the Savannah Trust shall be made as provided in accordance with Subparagraphs 39(b)-(e) of the Settlement Agreement.

2.7    Investment and Safekeeping of Savannah Trust Assets

2.7.1    The Savannah Trust Assets, until sold as provided herein and in the Settlement Agreement, shall be held in trust and segregated. All interest and other amounts earned in a Savannah Trust Account shall be retained in the respective Savannah Trust Account and used only for the same purposes as the principal in that account as provided in this Agreement and the Settlement Agreement, subject to any reallocation approved by the Governments in accordance with the terms of this Agreement and the Settlement Agreement.  The Savannah Trustee shall have no liability for interest or producing income on any moneys received by the Savannah Trust hereunder and held for distribution or payment as provided in this Agreement, except as such interest or amounts shall actually be received by the Savannah Trust. Except as allowed by this Section 2.7.1, investments of any moneys held by the Savannah Trust shall be administered in a manner consistent with the standards and requirements applicable to a trustee in connection with a Chapter 7 liquidation, and further, with the purpose of deriving a reasonable income, from the money pending periodic distributions in accordance with Article III hereof, taking into account the need for the safety and liquidity of principal required by the purposes of the Savannah Trust, and not of speculating or carrying on of any business for

profit or derivation of gains therefrom. However, the right and power of the Savannah Trust to invest and reinvest the Savannah Trust Assets, the Savannah Trust Proceeds, or any income earned by the Savannah Trust, shall be limited to the right and power to invest such assets (pending periodic distributions in accordance with Article III hereof) in the following investment vehicles, provided that at least 75% (and, at the Savannah Trustee's discretion, up to 100%) of the funds in each Savannah Trust Account shall, at any given time, be invested in categories (1) and/or (2):

> (1) marketable obligations issued by the United States of America or an agency thereof;

> (2) certificates of deposit with a domestic office of any national or state bank or trust company organized under the laws of the United States of America or any state therein and having capital, surplus, and undivided profits of at least $750,000,000 or in such institutions not meeting this specified capital requirement to the extent that the deposits are federally insured;

> (3) no-load mutual funds;

> (4) a diversified portfolio of equities traded on a recognized national exchange that meet the standards for publicly listed companies;

> (5) a diversified portfolio of bonds. The overall average rating of the portfolio shall have a rating of Double A or better, with no individual bond rated below A, exclusive of any bond insurance;

> (6) money market funds; or

> (7) any other investment vehicle approved in writing by US DOJ and Georgia EPD.

The Savannah Trustee shall consult initially and from time to time with the Beneficiaries regarding the nature and allocation of investments in the Savannah Trust Accounts. The Beneficiaries expressly agree that the Savannah Trustee shall have satisfied applicable standards and requirements and any duty to diversify by investing the Savannah Trust Assets in categories (1), (2), and/or (5) above.

2.7.2    The Savannah Trustee is expressly prohibited from commingling Savannah Trust Accounts, provided that funds in separate Savannah Trust Accounts may be commonly managed, may be invested in common instruments, and may be aggregated with other funds for investment purposes so long as they remain accounted for separately. Funds provided for administrative expenses can be held in one or more separate accounts.

2.7.3    Nothing in this Section shall be construed as authorizing the Savannah Trustee to cause the Savannah Trust to carry on any business or to divide the gains therefrom, including without limitation, the business of an investment company, a company "controlled" by an "investment company," required to register as such under

the Investment Company Act of 1940, as amended. The sole purpose of this Section 2.7 is to authorize the investment of the funds in the Savannah Trust Accounts or any portions thereof as may be reasonably prudent pending use of the proceeds for the purposes of the Savannah Trust.

       2.7.4 The Savannah Trust Parties shall not incur any liability for following any written direction or order to act (or to refrain to act) from any Beneficiary so long as such written direction is not inconsistent with this Agreement and the Settlement Agreement.

2.8    <u>Insurance Policy to Cover Future Response Actions</u>

       The Savannah Trustee may investigate the possible purchase of an insurance policy to cover the cost of future Environmental Actions at the Savannah Facility only at the direction of the United States and the State of Georgia.  If, and only if, the United States and the State of Georgia unanimously direct the Savannah Trustee in writing to purchase such insurance shall the Savannah Trustee use Savannah Trust Assets to purchase such insurance.  Costs associated with all other insurance coverage shall be subject to the approval of the GA EPD only.

2.9    <u>Access and Deed Restrictions</u>

       The Savannah Trustee shall provide the United States and the State of Georgia and their representatives and contractors access to all portions of the Savannah Facility that the Savannah Trust owns at all reasonable times for the purposes of conducting Environmental Actions at or near the Savannah Facility.  The Savannah Trustee shall implement any institutional controls or deed restrictions requested by GA EPD or US EPA with respect to any portion of the Savannah Facility.  The Savannah Trustee shall execute and record with the appropriate recorder's office any easements or deed restrictions requested by the United States or the State of Georgia for restrictions on use of the Savannah Facility in order to protect public health, welfare or safety or the environment or ensure non-interference with or protectiveness of any action.  Any existing easements or deed restrictions of record as to the Savannah Facility prior to the Effective Date of the Settlement Agreement shall survive the Settlement Agreement. The Savannah Trustee shall abide by the terms of any institutional controls or deed restrictions in place or of record as to the Savannah Facility; however, nothing herein shall create any personal liability for the Savannah Trustee's failure to abide by any institutional controls of which the Savannah Trustee is unaware.

2.10    <u>Accounting</u>

       The Savannah Trustee shall maintain proper books, records, and accounts relating to all transactions pertaining to the Savannah Trust, and the assets and liabilities of the Savannah Trust in such detail and for such period of time as may be necessary to enable the Savannah Trustee to make full and proper accounting in respect thereof in accordance with Article VI below and to comply with applicable provisions of law and good accounting practices. Except as otherwise provided herein or by the Settlement

Agreement, the Savannah Trustee shall not be required to file any accounting or seek approval of the Court with respect to the administration of the Savannah Trust, or as a condition for making any payment or distribution out of the Savannah Trust Assets. Beneficiaries shall have the right upon fourteen (14) days' prior written notice delivered to the Savannah Trustee to inspect such books and records.

2.11    Termination

Consistent with the terms of the Settlement Agreement, the Savannah Trustee shall not unduly prolong the duration of the Savannah Trust and shall at all times endeavor to resolve, settle, or otherwise dispose of all claims against Savannah Trust Assets and to effect the distribution of Savannah Trust Assets and other receipts relating thereto to the Beneficiaries and the others who receive distributions hereunder in accordance with the terms hereof, and to terminate the Savannah Trust as soon as practicable consistent with this Agreement and the Settlement Agreement.

2.12    Property Disposition

2.12.1  The United States or the State of Georgia may at any time propose in writing to take ownership of the Savannah Facility or any part thereof.  Any such proposed transfer and the terms thereof are subject to approval in writing by US EPA and GA EPD after consultation with the Savannah Trustee.  However, neither the United States nor Georgia shall be required to accept an ownership interest in the Savannah Facility or any part thereof upon termination of the Savannah Trust.  Subject to the approval of the US EPA and GA EPD, to the extent otherwise consistent with this Agreement and the Settlement Agreement,, the Savannah Trustee may propose a sale, lease, or disposition of the Savannah Facility that includes funding from, or the retention of some portion of liability by, the Savannah Trust Environmental Cost Account, provided that the net effect of any proposed sale, lease or disposition is to lessen the total financial obligations and liabilities as would otherwise be incurred in the absence of any such sale, lease, or disposition.  Any lease shall contain customary provisions relating to indemnity by a tenant with respect to the operation of the tenant at the leased property following the Effective Date.  In the event of any approved sale or lease or other disposition under this subsection, any net proceeds from the sale or lease or other disposition shall be paid to the Savannah Trust Environmental Cost Account and/or the Savannah Trust Administrative Account (subject to Section 2.5.3 hereof) in a proportion approved by US EPA and GA EPD in writing.

2.12.2  The parties agree that the rule against perpetuities does not apply to the Savannah Trust, but to the extent that any rule against perpetuities or a rule governing or limiting vesting, accumulations, the suspension of alienation, or the like shall be deemed applicable, the Savannah Trust shall automatically terminate  on the date 90 days after the date on which 21 years less 91 days pass after the death of the last survivor of all of the descendants of the late Joseph P. Kennedy, Sr., father of the late President John F. Kennedy, living on the date hereof, and provided further that if the State of Georgia sets a maximum duration for interests in real property located in Georgia held in trust under a rule against perpetuities or a rule governing or limiting vesting,

accumulations, the suspension of alienation, or the like, that for the Savannah Trust is shorter than the date 90 days after the date on which 21 years less 91 days pass after the death of the last survivor of all of the descendants of the late Joseph P. Kennedy, Sr., father of the late President John F. Kennedy, living on the date hereof, the Savannah Trust shall automatically terminate as to such Property upon the expiration of the maximum period authorized pursuant to the laws of Georgia. If the Savannah Trust is terminated in whole or in part pursuant to this Subsection, title to the relevant Property or Properties as to which the Savannah Trust is terminated shall be transferred outright and free of trust to or at the direction of the State of Georgia in consultation with the United States, provided, however, that the disposition of all relevant Property or Properties shall be governed by applicable state and federal law, or by agreement of the Savannah Trustee, the United States, and the State, or by order of the Court, and further provided that neither the United States or Georgia will be required to accept an ownership interest in the relevant Property or Properties as to which the Savannah Trust is terminated.

ARTICLE III<br>WORK AND DISTRIBUTIONS

3.1    Savannah Trust Accounts

The Savannah Trustee shall establish, maintain and hold trust accounts consistent with the Settlement Agreement and Section 2.1 of this Agreement, to administer the Savannah Trust Assets and distributions therefrom. The Savannah Trustee shall also maintain a dedicated Savannah Trust Administrative Account for administrative funds, which shall be used solely to pay the costs of administering the Savannah Trust as set forth herein.

3.2    Payments by the Savannah Trust

On January 1 of each calendar year, the Savannah Trustee shall provide the United States and the Lead Agency with balance statements and proposed budgets as described in Sections 3.2.2 and 3.2.4 of this Agreement. The Savannah Trustee shall not pay any expense that has not been provided for in an approved budget, an approved revised budget, or approved revised line item for an approved budget (except as provided in Section 3.2.1).

3.2.1    Emergency Funding

In the event of an emergency at the Savannah Facility requiring the performance of an Environmental Action within hours or days of the Savannah Trustee first receiving notice of the emergency, if the emergency does not permit sufficient time to amend the annual budget, the Savannah Trustee may utilize funding from the Savannah Trust Environmental Cost Account to undertake Environmental Actions necessary to respond to the emergency (the "Emergency Environmental Action"). If an Emergency Environmental Action is performed by US EPA or GA EPD, the Savannah Trustee may reimburse the US EPA or GA EPD for such Emergency Environmental Action from the Savannah Trust Environmental Cost Account. Nothing in this

subsection shall preclude the payment or reimbursement of the Emergency Environmental Action through the annual budget or budget revision process.

### 3.2.2    Administrative Expenses of the Savannah Trust

Within 90 days of the Effective Date in the first year and thereafter by January 1 of each year, the Savannah Trustee shall provide GA EPD and US EPA with an annual budget for administration of the Savannah Trust, including a separate budget for administration of the Savannah Acid Business and the Gypsum Operations. The administrative budget shall be subject to the review and approval or disapproval by the United States and the State of Georgia. If disapproved, such budgets shall be revised and resubmitted as expeditiously as possible. No administrative expenses may be incurred or paid by the Savannah Trustee that are inconsistent with the approved budgets, unless the United States and State of Georgia approve a revised budget or a revised line item for an approved budget, provided, however, that the Savannah Trustee may incur or pay ongoing or recurring expenses approved in the prior year's budget that occur between the time a proposed annual budget is submitted and the time it is approved. Each annual budget shall include a forecast of administrative expenditures for the first calendar quarter of the following year (or such longer period at the United States and the State of Georgia shall reasonably request). The Savannah Trust shall regularly, but not less often than annually, and otherwise upon the reasonable request of the United States or Georgia, provide documentation to the United States and Georgia to substantiate compliance with the applicable approved budgets and application of Savannah Trust Assets consistently with the terms of this Agreement and the Settlement Agreement. The approved budgets shall be funded by the transfer of the approved amount from Savannah Trust Assets, except that the Savannah Acid Business Operations Account and Administrative Account budgets shall be funded only by the Savannah Working Capital and the revenues of the Savannah Acid Business and the Gypsum Operations.

### 3.2.3    Remuneration for Savannah Trustee's Start-Up Fees and Expenses

The Savannah Trustee shall be entitled to remuneration from the Savannah Trust Administrative Account for its reasonable fees and expenses prior to the Effective Date in connection with the Settlement Agreement, this Agreement, and planning and creation of the Savannah Trust, such remuneration not to exceed $290,000. Where the Savannah Trustee, United States, and the State of Georgia agree that Savannah Trustee accrued pre-Effective Date fees and expenses in furtherance of activities that post-Effective Date would constitute Environmental Action at the Savannah Facility, those pre-Effective Date fees and expenses shall be paid from the Savannah Trust Environmental Cost Account. Within 30 days after the Effective Date, the Savannah Trustee will submit detailed invoices reflecting its pre-Effective Date fees and expenses for approval by Georgia and the United States.

### 3.2.4    Environmental and Acid Business Expenses of the Savannah Trust

The Savannah Trustee shall prepare balance statements and annual budgets of projected expenditures from the Savannah Trust Environmental Cost Account

and the Savannah Acid Business Operations Account. The first budget for the remainder of the current calendar year shall be prepared within ninety (90) days following the Effective Date and annual budgets shall be prepared thereafter on or before each January 1 of the subject calendar year during the term of the Savannah Trust.  The State of Georgia shall have the authority to approve or disapprove the proposed budget or revised budget or revised line item of an approved budget for the Savannah Trust Environmental Cost Account and the Savannah Acid Business Operations Account after consultation with US EPA, if the US EPA has requested such consultation. If disapproved, a budget shall be revised and resubmitted as expeditiously as possible. Except as provided in Section 3.2.1 and the last sentence of Section 3.2.5, no expenses may be incurred or paid by the Savannah Trustee that are inconsistent with an approved budget or an approved revised line item for an approved budget, unless the State of Georgia, after consultation with US EPA, approves a revised budget; provided, however, that the Savannah Trustee may incur or pay ongoing or recurring expenses approved in the prior year's budget that occur between the time a proposed annual budget is submitted and the time it is approved.  Further, by March 1 of each year during the term of the Savannah Trust (excluding only the year in which the Effective Date occurs) and within nine (9) months after termination of the Savannah Trust, the Savannah Trustee shall prepare and submit to the Beneficiaries an annual report with respect to the Savannah Trust Environmental Cost Account and the Savannah Acid Business Operations Account. The annual report shall pertain to the prior calendar year, or if the report is a final report, such period from the most recent annual report to the termination of the Savannah Trust Environmental Cost Accounts and/or Savannah Acid Business Operations Account.

3.2.5    Reimbursement of Agencies and Performance of Environmental Actions by Savannah Trust

The Savannah Trustee shall pay funds from the Savannah Trust Environmental Cost Account to the Lead Agency making a written request for funds for reimbursement within 30 days of such request.  Such written request shall: (i) be in accordance with the approved budget set forth in Section 3.2.4 above; and (ii) shall specify what the funds were used for and shall certify that they were used only for Environmental Actions performed and/or oversight costs incurred after the Effective Date by the Lead Agency with respect to the Savannah Facility.

The Savannah Trustee shall also pay funds from the Savannah Trust Environmental Cost Account to the Non-Lead Agency making a written request for funds within 30 days of such request where the Lead Agency has requested the assistance of the Non-Lead Agency.  Such written request shall: (i) be in accordance with the approved budget set forth in Section 3.2.4  above; and (ii) shall specify what the funds were used for and shall certify that they were used only for Environmental Actions performed and/or oversight costs incurred after the Effective Date by the Non-Lead Agency with respect to the Savannah Facility.

In the case of requests by the Lead Agency to the Savannah Trustee to use the funds from the Savannah Trust Environmental Cost Account to perform Environmental Actions in accordance with the approved budget set forth in Section 3.2.4

above, the Savannah Trustee shall utilize the funds and interest earned thereon from the Savannah Trust Environmental Cost Account to undertake such work promptly and in accordance with any schedule approved by the Lead Agency. The Savannah Trustee shall seek the approval of the Lead Agency of any contractor hired by the Savannah Trustee and any work plans to be undertaken by the Savannah Trust under the oversight of the Lead Agency, unless the Lead Agency has provided a written waiver of such approval or requirements. The Savannah Trustee shall require general liability insurance deemed appropriate by the Trustee and Georgia EPD, in consultation with the United States, naming the Lead and Non-Lead Agencies as additional insureds, from each contractor hired to perform work. The legal relationship of each contractor to the Savannah Trust and Savannah Trustee is that of an independent contractor professional, not that of an entity employed by the Savannah Trust or the Savannah Trustee. Each contractor shall not be deemed a Savannah Trust Party. Pending approval of the initial annual budget, the Savannah Trust may enter into contracts or incur expenditures to continue ongoing Environmental Action and maintain Savannah Facility security, provided that such costs are in the Savannah Trust's proposed budget and have not been disapproved by the Lead Agency in writing.

3.3    Liens by Government

Notwithstanding anything to the contrary in this Article III, the Savannah Trust hereby grants to the Savannah Trustee and the United States a first-priority lien on and security interest in the Savannah Trust Assets, except with respect to any real property, and grants to Georgia a first priority lien on and security interest in the Savannah Trust Assets, including all real property, to secure the payment of all amounts now or hereafter required to fund Environmental Actions and Savannah Trustee costs, fees, and expenses, including, without limitation, amounts owed to, accrued or reserved on account of the Savannah Trust or to be retained by the Savannah Trustee hereunder or otherwise due hereunder. However, only the Savannah Trustee shall have a first-priority lien on and security interest in the Savannah Trust Administrative Account and only the United States and the State of Georgia shall have a first-priority lien on and security interest in the Savannah Trust Environmental Cost Account, the Savannah Acid Business Administrative Account, and the Savannah Acid Business Operations Account. The Savannah Trust agrees to take appropriate actions and execute appropriate documents to perfect the Savannah Trustee's, United States', and the State of Georgia's liens and security interest hereunder. Reasonable costs and fees associated with the perfection of the Savannah Trustee's lien shall be paid from the Savannah Trust Administrative Account. Reasonable costs and fees associated with the perfection of the United States' and the State of Georgia's liens shall be paid from the Savannah Trust Environmental Cost Account.

3.4    Manner of Payment

Cash payments made by the Savannah Trust pursuant to the Settlement Agreement and this Agreement shall be in United States dollars by checks drawn on a domestic bank whose deposits are federally insured selected by the Savannah Trustee, or by wire transfer from such a domestic bank, at the option of the Savannah Trustee.

3.5     Unclaimed Distributions

In the event that funds remain in the Savannah Trust at its termination, the amounts remaining shall be transferred, as directed by the United States Department of Justice in writing, in consultation with all affected States, to first, (i) the Nevada Trust Environmental Cost Account, any of the West Chicago Trust Environmental Cost Accounts or West Chicago Trust Work Accounts, any of the Multistate Trust Environmental Cost Accounts, or any of the Cimarron Trust Environmental Cost Accounts if there are Environmental Actions to be performed and a need for additional trust funding, with the allocation among such Environmental Cost Accounts to be determined by the projected shortfall of performing such remaining Environmental Actions, second (ii) Non-Owned Sites with a need for additional funding beyond the distributions received from the Anadarko Litigation Proceeds; or third (iii) the Superfund.

ARTICLE IV
THE SAVANNAH TRUSTEE

4.1     Appointment

4.1.1     Greenfield Environmental Savannah Trust LLC, not individually but solely in its representative capacity as Savannah Trustee, is appointed to serve as the Savannah Trustee to administer the Savannah Trust and the Savannah Trust Accounts, in accordance with the Settlement Agreement and this Agreement, and the Savannah Trustee hereby accepts such appointment and agrees to serve in such representative capacity, effective upon the Effective Date of this Agreement. Subject to the provisions of Section 4.9.3 herein, the term of the Savannah Trustee shall be for one year, such term to be subject to extension or renewal upon the agreement of Trustee and GA EPD, in consultation with the United States.  If no successor Trustee has been appointed at the expiration of any one year term of the Savannah Trustee, then the Savannah Trustee will continue to serve until a successor Savannah Trustee is appointed.  Any successor Savannah Trustee shall be proposed by the Beneficiaries and appointed by the Bankruptcy Court in accordance with Section 4.11 of this Agreement. If the Savannah Trustee is not reappointed and no successor Savannah Trustee is appointed within 120 days of the expiration of the Savannah Trustee's term, then the Trustee or either Beneficiary may request that the Court reappoint the Savannah Trustee or appoint a successor Savannah Trustee.

4.1.2     Not later than 180 days after the Effective Date, and after consultation with the United States and the State of Georgia, the Savannah Trust shall obtain the services of one or more environmental consultants (as distinct from environmental contractors) to implement the future Environmental Actions (the "Consultant(s)"). The Consultant(s) shall obtain environmental, general and professional liability insurance deemed appropriate by the Trustee and Georgia EPD after consultation with the United States. The beneficiary of the insurance policies shall be the Savannah Trust, and the policies shall cover negligence committed by the Consultant(s) in implementing the future Environmental Actions or any other negligence committed by the Consultant(s). The legal relationship of the Consultant(s) to the Savannah Trust and

Savannah Trustee is that of an independent contractor professional, not that of an entity employed by the Savannah Trust or the Savannah Trustee.  The Consultant(s) shall not be deemed a Savannah Trust Party.

4.2    Generally

        The Savannah Trustee's powers are exercisable solely in a fiduciary capacity consistent with, and in furtherance of, the purposes of the Savannah Trust and the Settlement Agreement and not otherwise. The Savannah Trustee shall have the authority to bind the Savannah Trust, and any successor Savannah Trustee, or successor or assign of the Savannah Trust, but shall for all purposes hereunder be acting in its representative capacity as Savannah Trustee and not individually. Notwithstanding anything to the contrary contained herein, the Savannah Trustee shall not be required to take action or omit to take any action if, after the advice of counsel, the Savannah Trustee believes in good faith such action or omission is not consistent with the Savannah Trustee's fiduciary duties.  The Savannah Trustee shall not be deemed to have breached its fiduciary duties in connection with any act or omission that is consistent with written directions received from the Court.  The Savannah Trustee shall have no obligations to perform any activities for which the Savannah Trust Account lacks sufficient funds.

4.3    Powers

        In connection with the administration of the Savannah Trust, except as otherwise set forth in this Agreement or the Settlement Agreement, the Savannah Trustee is authorized to perform any and all acts necessary to accomplish the purposes of the Savannah Trust. The powers of the Savannah Trust shall, without any further Court approval or order, include, without limitation, each of the following: (i) to receive, manage, invest, supervise and protect the Savannah Trust Assets, including, but not limited to, the Savannah Acid Business and the Gypsum Operations, withdraw, make distributions and pay taxes, if applicable or required, and other obligations owed by the Savannah Trust or the Savannah Trust Accounts from funds held by the Savannah Trustee and/or the Savannah Trust (or the Savannah Trust Accounts) in accordance with the Settlement Agreement, and withhold and pay to the appropriate taxing authority any withholding taxes on distributions from the Savannah Trust, if applicable; (ii) to engage employees and professional persons to assist the Savannah Trust and/or the Savannah Trustee with respect to the responsibilities described herein; (iii) to make distributions of the Savannah Trust Assets from the Savannah Trust Accounts for the purposes contemplated in this Agreement and the Settlement Agreement; and (iv) to effect all actions and execute all agreements, instruments and other documents necessary to implement this Agreement, including to exercise such other powers as may be vested in or assumed by the Savannah Trust and/or the Savannah Trustee pursuant to this Agreement and any order of the Court or as may be necessary and proper to carry out the provisions of this Agreement and the Settlement Agreement. No Person dealing with the Savannah Trust shall be obligated to inquire into the authority of the Savannah Trustee in connection with the protection, conservation or disposition of Savannah Trust Assets.

The Savannah Trustee is authorized to execute and deliver all documents on behalf of the Savannah Trust to accomplish the purposes of this Agreement and the Settlement Agreement.


4.4      Other Professionals

After consultation with the United States and Georgia, the Savannah Trust is authorized to retain on behalf of the Savannah Trust and pay such third parties as the Savannah Trustee (in accordance with a budget approved pursuant to Section 3.2 above) may deem necessary or appropriate to assist the Savannah Trustee in carrying out its powers and duties under this Agreement and the Settlement Agreement, including, without limitation: (i) legal counsel to the Savannah Trust and/or Savannah Trustee; (ii) one or more public accounting firms to perform such bookkeeping functions, reviews and/or audits of the financial books and records of the Savannah Trust as may be appropriate in the Savannah Trustee's reasonable discretion and to prepare and file any tax returns or informational returns for the Savannah Trust or the Savannah Trust Accounts as may be required; and (iii) environmental consultants, investment advisors, custodians, security personnel, engineers, surveyors, brokers, contractors, clerks, and other third parties. The Savannah Trustee may pay all such Persons compensation for services rendered and expenses incurred in accordance with budgets approved as provided in Section 3.2.  Fees due to an investment advisor that are expressed as a percentage of the assets under management or return on investment need not be included in a budget, provided that the United States and the State of Georgia approve of the investment advisor and the stated percentage.

4.5      Limitation of the Savannah Trustee's Authority

The Savannah Trust and the Savannah Trustee shall not and are not authorized to engage in any trade or business with respect to the Savannah Trust Assets or any proceeds therefrom except as and to the extent the same is deemed in good faith by the Savannah Trustee to be reasonably necessary or proper for the conservation or protection of the Savannah Trust Assets, or the fulfillment of the purposes of the Savannah Trust. For the avoidance of doubt, the Savannah Trust and/or the Savannah Trustee may operate, or arrange for the operation of, the Savannah Plant and/or Savannah Acid Business, as contemplated by Section 2.2.1, above, and doing so shall not constitute engaging in a trade or business.  The Savannah Trust and the Savannah Trustee shall not take any actions that would cause the Savannah Trust to fail to qualify as a qualified settlement fund under the QSF Regulations.

4.6      Reliance by the Trust Parties

Except as may otherwise be provided herein: (a) the Savannah Trust Parties may rely conclusively on, and shall be protected in acting upon, any resolution, certificate, statement, instrument, opinion, report, notice, request, consent, order, approval, or other electronic or paper document believed by them to be genuine and to have been signed or

presented by the proper party or parties; (b) the Savannah Trust Parties may, on behalf of the Savannah Trust or on their own behalf in their capacity as Savannah Trust Parties, consult with legal counsel, financial or accounting advisors and other professionals and shall not be personally liable for any action taken or not taken in accordance with the advice thereof; and (c) persons dealing with the Savannah Trust Parties shall look only to the Savannah Trust Assets that may be available to them consistent with this Agreement and the Settlement Agreement to satisfy any liability incurred by the Savannah Trust Parties to such person in carrying out the terms of this Agreement, the Settlement Agreement, or any order of the Court, and the Savannah Trust Parties shall have no personal obligations to satisfy any such liability other than as provided in Section 4.8.3.

4.7    Compensation of the Savannah Trustee

The Savannah Trust shall pay its own reasonable and necessary costs and expenses, and shall reimburse the Savannah Trustee for the actual reasonable out-of-pocket fees, costs, and expenses to the extent incurred by the Savannah Trustee in connection with the Savannah Trustee's duties hereunder, including, without limitation, necessary travel, lodging, office rent (to be paid directly by the Savannah Trust), professional fees, postage, photocopying, telephone and facsimile charges upon receipt of periodic billings, all in accordance with an annual budget or fee schedule approved by the Beneficiaries. The Savannah Trustee and employees of the Savannah Trust and the Savannah Trustee, and the corporate parent of the Savannah Trustee, who perform services for the Savannah Trust shall be entitled to receive reasonable compensation for services rendered on behalf of the Savannah Trust in accordance with an annual budget or fee schedule approved by the Beneficiaries. All requests for compensation shall be set forth in quarterly billings to be reviewed and approved by Georgia EPD and US EPA prior to payment. The Savannah Trust Assets shall be subject to the claims of the Savannah Trustee, and the Savannah Trustee shall be entitled to reimburse itself out of any available cash in the Savannah Trust Administrative Account, or, as appropriate, the Savannah Acid Business Administrative Account, or, for services performed in furtherance of Environmental Actions at the Savannah Facility, out of available funds in the Savannah Trust Environmental Cost Account, and the Savannah Trust shall be obligated to pay, for actual out-of-pocket expenses and for actual hours worked.

All compensation and other amounts payable to the Savannah Trustee shall be paid from the Savannah Trust Assets.

4.8    Liability of Savannah Trust Parties

4.8.1    In no event shall any of the Savannah Trust Parties be held liable to any third parties for any liability, action, or inaction of any other party, including Settlors or any other Savannah Trust Party. The Savannah Trust Parties shall, further, be indemnified and exculpated in accordance with Section 4.9 of this Agreement. The Savannah Trustee shall not be deemed in breach of its duties or responsibilities on account of the insufficiency of funds. Funding from a Savannah Trust Account may not be used except as otherwise expressly provided by and in accordance with this Agreement and the Settlement Agreement. Funding from the Savannah Trust

Environmental Cost Account for the Savannah Facility may only be used for the Savannah Facility, except as otherwise expressly provided by and in accordance with this Agreement and the Settlement Agreement.

4.8.2    As provided in Sections XVI, XVII, XVIII of the Settlement Agreement, the Savannah Trust Parties are deemed to have resolved their civil liability under CERCLA, RCRA and State Environmental Laws to the United States and Georgia, and have protection from contribution actions or claims as provided by Sections 113(f)(2) of CERCLA, 42 U.S.C. Section 9613(f)(2) or similar state law for matters addressed in the Settlement Agreement. The Savannah Trust Parties shall have the benefits of the covenants not to sue as set forth in Section XVI of the Settlement Agreement, of contribution protection as set forth in Section XVIII of the Settlement Agreement and of the provisions as set forth in Section XVII of the Settlement Agreement**.**  Nothing in this Agreement is intended to, or should be construed as, in any way limiting the covenants, protections, and immunities conferred on the Savannah Trust Parties pursuant to the Settlement Agreement and other applicable law.

4.8.3    No provision of this Agreement or the Settlement Agreement shall require the Savannah Trustee to expend or risk its own personal funds or otherwise incur any personal financial liability in the performance of any of its duties or the exercise of any of its authorities as Savannah Trustee hereunder.  Notwithstanding the foregoing, the Savannah Trustee shall satisfy from its own funds any liability imposed by a court of competent jurisdiction on account of Savannah Trustee's fraud or willful misconduct.

4.8.4    Notwithstanding any other provision in this Agreement, Reorganized Tronox and the other parties to the Line of Credit Agreement set forth in Subparagraph 28(c) to the Settlement Agreement reserve all rights to enforce the Line of Credit Agreement.

4.9    Exculpation and Indemnification

4.9.1    Exculpation.  None of the Savannah Trust Parties shall be personally liable for any claim, cause of action, or other assertion of liability arising out of or in relation to the discharge of the powers and duties conferred upon the Savannah Trust and/or Trustee by the Settlement Agreement or this Agreement unless the Court, by a final order that is not reversed on appeal, finds that it committed fraud or willful misconduct after the Effective Date in relation to those powers or duties.  There shall be an irrebuttable presumption that any action taken or not taken with the approval of the Court does not constitute an act of fraud or willful misconduct.  For the avoidance of doubt, the term "approval of the Court" in this Section 4.9.1 shall not be construed to mean the Findings of Fact, Conclusions of Law and Order Confirming the First Amended Joint Plan of Reorganization of Tronox Incorporation, et al., pursuant to Chapter 11 of the Bankruptcy Code ("Confirmation Order"), any other order that has been entered to date by the Bankruptcy Court, or any future order approving this Agreement or the Anadarko Litigation Trust Agreement. Nothing in this Agreement shall be construed to exculpate the Savannah Trust Parties from any liability resulting from any act or omission constituting fraud, willful misconduct, or criminal conduct.  Any judgment

30

against a Savannah Trust Party and any costs of defense relating to any Savannah Trust Party shall be paid from and limited to funds from the Savannah Trust Environmental Cost Account and the Savannah Trust Administrative Account, except that if the judgment results from a cause of action relating to the operations of the Savannah Acid Business, it shall be paid from and limited to funds from the Savannah Acid Business Operations Account, or the Savannah Acid Business Administrative Account, without the Savannah Trust Party having to first pay from its own funds for any personal liability or costs of defense <u>unless</u> a final order of the Court, that is not reversed on appeal, determines that it committed fraud or willful misconduct in relation to the Savannah Trust Party's duties.

4.9.2    The Savannah Trust Parties are exculpated by all persons, including without limitation, holders of claims and other parties in interest, of and from any and all claims, causes of action and other assertions of liability arising out of the ownership or operation of the Savannah Trust Assets and the discharge of the powers and duties conferred upon the Savannah Trust and/or Savannah Trustee by the Settlement Agreement, this Agreement, or any order of court entered pursuant to or in furtherance of the Settlement Agreement, this Agreement, or applicable law or otherwise. No person, including without limitation, holders of claims and other parties in interest, will be allowed to pursue any claims or causes of action against any Savannah Trust Party for any claim against Settlors, for making payments in accordance with this Agreement, the Settlement Agreement or any order of court, or for implementing the provisions of this Agreement, the Settlement Agreement or any order of court. Nothing in this Section, this Agreement, or the Settlement Agreement shall preclude the United States or the State of Georgia from enforcing the terms of the Settlement Agreement or this Agreement against the Savannah Trust Parties.

4.9.3    <u>Indemnification</u>. The Savannah Trust shall indemnify, defend and hold harmless (without the Savannah Trust Parties having to first pay from their personal funds) the Savannah Trust Parties from and against any and all claims, causes of action, liabilities, obligations, losses, costs, judgments, damages or expenses (including attorneys' fees) and any other assertion of liability arising out of or in relation to the discharge of the  powers and duties conferred upon the Savannah Trust and/or Trustee by the Settlement Agreement or this Agreement, to the fullest extent permitted by applicable law, provided that such indemnification, and any related recovery, shall be limited to funds in the Savannah Trust Environmental Cost Account and the Savannah Trust Administrative Account, except that if  the judgment results from a cause of action relating to the operations of the Savannah Acid Business, it shall be paid from and limited to funds from the Savannah Acid Business Operations Account, or the Savannah Acid Business Administrative Account. Without limiting the foregoing, any such judgment against a Savannah Trust Party and any such costs of defense relating to any Savannah Trust Party shall be paid by the Savannah Trust consistent with the terms and conditions of this Section. Notwithstanding the foregoing, to the extent fraud or willful misconduct of any Savannah Trust Party is alleged and the Court finds, by a final order, that such Savannah Trust Party committed fraud or willful misconduct after the Effective Date in relation to the Savannah Trustee's duties, there shall be no indemnification, of that Savannah Trust Party, for any judgments arising from such allegations of fraud or willful

misconduct. It shall be an irrebuttable presumption that any action taken, or inaction, consistent with Court approval shall not constitute willful misconduct or fraud. For the avoidance of doubt, the term "approval of the Court" in this Section 4.9.3 shall not be construed to mean the Findings of Fact, Conclusions of Law and Order Confirming the First Amended Joint Plan of Reorganization of Tronox Incorporation, et al., pursuant to Chapter 11 of the Bankruptcy Code ("Confirmation Order"), any other order that has been entered to date by the Bankruptcy Court, or any future order approving this Agreement or the Anadarko Litigation Trust Agreement.

4.10    Termination, Replacement, and Removal of the Savannah Trustee.

4.10.1  Termination

The duties, responsibilities and powers of the Savannah Trustee will terminate on the date the Savannah Trust is dissolved under applicable law in accordance with the Settlement Agreement, or by an order of the Court; provided that this Section and Sections 4.6, 4.8 and 4.9 above shall survive such termination, dissolution and entry. Consistent with the provisions of Section 4.1.1 regarding appointment of a successor trustee, the Savannah Trustee may resign by giving not less than 120 days prior written notice thereof to the Court, the United States, and Georgia, provided that this Section and Sections 4.6, 4.8 and 4.9 above shall survive such resignation.

4.10.2  Replacement

The Savannah Trustee may be replaced upon completion of any term; provided, however, that this Section and Sections 4.6, 4.8 and 4.9 above shall survive such replacement.

4.10.3  Removal

The Savannah Trustee may be removed or the Savannah Trust Assets may be transferred to the US EPA and/or the State of Georgia upon:

(1) The entry of an order by the Bankruptcy Court, immediately upon notice of appointment of a temporary or permanent successor, finding that the Savannah Trustee committed fraud or willful misconduct after the Effective Date in relation to the Savannah Trustee's duties under the Savannah Trust; or

(2) The entry of an order by the Bankruptcy Court, immediately upon notice of appointment of a temporary or permanent successor, finding that (i) the Savannah Trustee in any material respect, as a result of negligence, exacerbates hazardous conditions at the Savannah Facility, (ii) is seriously or repeatedly deficient or late in performance of the work or violates the provisions of the Settlement Agreement, or (iii) has violated the provisions of this Agreement or other related implementation agreements. In the event of the occurrence of 2(i), 2(ii) or 2(iii), the United States and

Georgia may jointly direct that (i) the Savannah Trustee be replaced in accordance with this Agreement or (ii) all remaining funds and future recoveries in the Savannah Trust be paid to US EPA or to GA EPD to be used in accordance with the terms of this Agreement or the Settlement Agreement. In the event the funds are so paid, so long as title to the Savannah Facility remains in the name of the Savannah Trust or Savannah Trustee, funds deemed reasonably sufficient by the Beneficiaries to cover property taxes and other property management costs to be paid by the Savannah Trust for the Savannah Facility shall be left in the Savannah Trust Administrative Account.

(3) The provisions of this Section and Section 4.6, 4.8 and 4.9 above shall survive the removal of the Savannah Trustee or transfer of funds.

4.11    Appointment of Successor Savannah Trustees

Any successor Savannah Trustee shall be proposed by the United States and the State of Georgia and appointed by the Court. Any successor Savannah Trustee appointed hereunder shall execute an instrument accepting such appointment hereunder and shall file such acceptance with the Savannah Trust records. Thereupon, such successor Savannah Trustee shall, without any further act, become vested with all the estates, properties, rights, powers, trusts and duties of its predecessor in the Savannah Trust with like effect as if originally named herein; provided, however, that a removed or resigning Savannah Trustee shall, nevertheless, when requested in writing by the successor Savannah Trustee, execute and deliver an instrument or instruments conveying and transferring to such successor Savannah Trustee under the Savannah Trust all the estates, properties, rights, powers, and trusts of such predecessor Savannah Trustee.

4.12    No Bond

Notwithstanding any state law to the contrary, the Savannah Trustee, including any successor Savannah Trustee, shall be exempt from giving any bond or other security in any jurisdiction.

ARTICLE V
BENEFICIARIES

5.1    Beneficiaries

Beneficial interests in the Savannah Trust shall be held by each of the Beneficiaries.

5.2    Identification of Beneficiaries

5.2.1    In order to determine the actual names and addresses of the authorized representatives of a Beneficiary, the Savannah Trust and the Savannah Trustee shall be entitled to rely conclusively on the name and address of the authorized

33

representative for such Beneficiary listed below in Section 5.2.2, who may from time to time provide additional or replacement names and addresses of authorized representatives, or listed in any written notice provided to the Savannah Trustee in the future by an authorized representative of such Beneficiary.

      5.2.2   The Savannah Trustee shall send copies of all reports, budgets, annual balance statements, and other documents that the Savannah Trustee is required to submit to a Beneficiary under the Settlement Agreement and this Agreement, and related implementation documents including any unilateral administrative orders, consent decrees, or administrative orders on consent to the following person(s), as applicable:

As to the United States of America as beneficiary:

Authorized representative and party to receive all notices under 5.2.2:

      Chief, Environmental Enforcement Section
      Environment and Natural Resources Division
      U.S. Department of Justice
      P.O. Box 7611
      Washington, DC 20044-7611
      Telephone: (202) 514-5271
      Facsimile: (202) 514-4180
      File Ref. No. 90-11-3-09688

      Robert William Yalen
      Assistant United States Attorney
      Office of the United States Attorney
       for the Southern District of New York
      86 Chambers Street, Third Floor
      New York, NY 10007
      Telephone: (212) 637-2722
      Facsimile: (212) 637-2686
      E-mail: robert.yalen@usdoj.gov

As to Georgia as beneficiary:

      Jim Brown
      Program Manager
      Hazardous Waste Corrective Action Program
      Georgia Environmental Protection Division
      2 Martin Luther King Jr. Drive SE, Suite 1154
      Atlanta, GA 30334-9000
      Telephone: (404) 656-7802
      E-mail: Jim.Brown@dnr.state.ga.us

5.3    Non-Beneficiaries

Upon the Effective Date of this Agreement, the Settlors shall have no interests including, without limitation, any reversionary interest, in the Savannah Trust or any Savannah Trust Assets. The State of Georgia and the United States shall be the sole beneficiaries of the Savannah Trust Accounts. Neither Settlors nor Reorganized Tronox shall have any rights to or interest in the Savannah Trust Assets distributed to the Savannah Trust Accounts, nor to any funds remaining in any of the Savannah Trust Accounts upon the completion of any and all final actions and disbursements for any and all final costs with respect to the Savannah Facility.

5.4     Transfer of Beneficial Interests

The interest of the Beneficiaries in the Savannah Trust, which is reflected only on the records of the Savannah Trust maintained by the Savannah Trust, is not negotiable and may be transferred only after written notice to the Savannah Trust, by order of the Court or by operation of law. The Savannah Trust shall not be required to record any transfer in favor of any transferee where, in the sole discretion of the Savannah Trust, such transfer is or might be construed to be ambiguous or to create uncertainty as to the holder of the interest in the Savannah Trust. Until a transfer is in fact recorded on the books and records maintained by the Savannah Trust for the purpose of identifying Beneficiaries, the Savannah Trust, whether or not in receipt of documents of transfer or other documents relating to the transfer, may nevertheless make distributions and send communications to Beneficiaries, as though it has no notice of any such transfer, and in so doing the Savannah Trust and Savannah Trustee shall be fully protected and incur no liability to any purported transferee or any other Person. Interests in the Savannah Trust may not be transferred to the Settlors, Reorganized Tronox, or any Persons related to any of the preceding (within the meaning of Section 468B(d)(3) of the Internal Revenue Code).

ARTICLE VI
REPORTING AND TAXES

6.1     Reports

As soon as practicable after the end of each calendar quarter beginning with the quarter ended after assets are first received by the Savannah Trust and ending as soon as practicable upon termination of the Savannah Trust, the Savannah Trust shall submit to the Beneficiaries a written report, including: (a) financial statements of the Savannah Trust at the end of such calendar quarter or period and the receipts and disbursements of the Savannah Trust for such period; and (b) a description of any action taken by the Savannah Trust in the performance of its duties which, as determined by outside counsel, accountants or other professional advisors, materially and adversely affects the Savannah Trust and of which notice has not previously been given to the Beneficiaries. The Savannah Trust shall promptly submit additional reports to the Beneficiaries whenever, as determined by outside counsel, accountants or other professional advisors, an adverse material event or change occurs which affects either the Savannah Trust or the rights of the Persons receiving distributions (including, without limitation, the Beneficiaries)

hereunder. The Savannah Trust shall also provide the reports or information required by
Section 3.2 of this Agreement.

6.2    Other

The Savannah Trust shall also file (or cause to be filed) any other statements,
returns or disclosures relating to the Savannah Trust, that are required by any applicable
governmental unit.

6.3    Reports in Support of Insurance Claims

The Savannah Trust shall also file (or cause to be filed) reports and cost analyses
in support of claims against insurance carriers at the request of the United States and the
State of Georgia and shall provide the United States and the State of Georgia a copy of
any such reports and cost analyses.

6.4    Taxes

The Savannah Trustee shall be the "administrator," within the meaning of
Treasury Regulation Section 1.468B-2(k)(3), of the Savannah Trust. Subject to definitive
guidance from the Internal Revenue Service or a judicial decision to the contrary, the
Savannah Trustee shall file tax returns and pay applicable taxes, if any, with respect to
the Savannah Trust in a manner consistent with the provisions of the QSF Regulations.
All such taxes shall be paid from the Savannah Trust Assets.  Settlors may make an
election to treat the Savannah Trust as a grantor trust pursuant to Treasury Regulation
section 1.468B-1(k)(1). To the extent the Settlors make such an election, (a) the
Savannah Trustee will provide reasonable cooperation to Settlors as needed to facilitate
such election, (b) the Savannah Trustee will file any returns or reports required by the
QSF Regulations or Treasury Regulation § 1.671-4, and (c) the Savannah Trustee will
provide the Settlors, as transferors to the Savannah Trust, with any statements or reports
required by the QSF Regulations or Treasury Regulation section 1.671-4, in order to
enable the Settlors to calculate their share of the Savannah Trust's tax obligations and
attributes.  For the avoidance of doubt, any grantor trust election is for tax purposes only
and shall in no way affect the substantive rights and obligations of the parties under the
Settlement Agreement or this Agreement.

ARTICLE VII
MISCELLANEOUS PROVISIONS

7.1    Amendments and Waivers

Any provision of this Agreement may be amended or waived by mutual written
consent of the Savannah Trust, the United States, and the State of Georgia; provided,
however, that no change shall be made to this Agreement that would alter the provisions

of Section 7.2 hereof or adversely affect the federal income tax status of the Savannah Trust as a "qualified settlement fund" (in accordance with Section 6.4 hereof), or, unless agreed to in writing by the affected Savannah Trustee (including any predecessor Savannah Trustee), the rights of the Savannah Trustee. Technical amendments to this Agreement may be made as necessary, to clarify this Agreement or enable the Savannah Trustee to effectuate the terms of this Agreement, or perform its intended duties in a manner consistent with the Settlement Agreement with the mutual consent of the Savannah Trust, the United States, and the State of Georgia.

### 7.2    Tax Treatment

The Savannah Trust created by this Agreement is intended to be treated as a qualified settlement fund eligible to elect grantor trust classification pursuant to the QSF Regulations for federal income tax purposes, and to the extent provided by law, this Agreement shall be governed and construed in all respects consistent with such intent.

### 7.3    Cooperation

Settlors and Reorganized Tronox represent that they have provided, or have provided access to, all relevant documents and other information in their possession, and otherwise have complied, and will continue to comply, post-Effective Date, with the provisions governing transfers of Real Property Information and Environmental Information set forth at Section XIX of the Settlement Agreement.

The Savannah Trust and Savannah Trustee shall take such actions and execute such documents as are reasonably requested by Settlors with respect to effectuating the Settlement Agreement and the transactions contemplated thereby, provided that such actions are not inconsistent with this Agreement or the Settlement Agreement and would not derogate from the liability protections or immunities accorded to the Savannah Trustee in this Agreement or the Settlement Agreement. To the extent that Settlor requests the Savannah Trust and/or the Savannah Trustee to take such an action, the Savannah Trust and Savannah Trustee shall do so at the sole expense of the Settlor and Settlors agree to separately fund and pay such expense(s).

### 7.4    Situs of the Savannah Trust

The situs of the Savannah Trust herein established is Georgia, and, except to the extent the Bankruptcy Code or other federal law is applicable, the rights, duties, and obligations arising under this Savannah Trust Agreement shall be governed by, and construed and enforced in accordance with, the laws of the State of Georgia without giving effect to the principles of conflict of law thereof. The Bankruptcy Court shall retain jurisdiction over matters arising under or in connection with this Savannah Trust Agreement.

### 7.5    Severability

If any provision of this Agreement or application thereof to any Person or circumstance shall be finally determined by the Court to be invalid or unenforceable to

any extent, the remainder of this Agreement, or the application of such provision to Persons or circumstances other than those as to which it is held invalid or unenforceable, shall not be affected thereby, and such provision of this Agreement shall be valid and enforced to the fullest extent permitted by law.


7.6     Sufficient Notice

Any notice or other communication hereunder shall be in writing and shall be deemed to have been sufficiently given, for all purposes, if sent by reliable overnight delivery service, or if deposited, postage prepaid, in a post office or letter box addressed to the Person for whom such notice is intended, to the name and address set forth in the case of a Beneficiary in Section 5.2 of this Agreement or such other address provided in writing to the Savannah Trust by an authorized representative of the respective Beneficiary.

7.7     Headings

The section headings contained in this Agreement are solely for convenience of reference and shall not affect the meaning or interpretation of this Agreement or any term or provision hereof.

7.8     Actions Taken on Other Than Business Day

If any payment or act under the Settlement Agreement or this Agreement is required to be made or performed on a date that is not a business day, then the making of such payment or the performance of such act may be completed on the next succeeding business day, but shall be deemed to have been completed as of the required date. For the purposes of this Agreement, a business day shall be any of the days Monday through Friday excluding federally recognized holidays.

7.9     Consistency of Agreements and Construction

To the extent reasonably possible, the provisions of this Agreement shall be interpreted in a manner consistent with the Settlement Agreement. Where the provisions of this Agreement are irreconcilable with the provisions of the Settlement Agreement, the provisions of the Settlement Agreement shall prevail, with the exception of Article IV, Section 1.1.48, and Section 1.1.51, in which case this Agreement controls.

7.10    Compliance with Laws

Any and all distributions of Savannah Trust Assets shall be in compliance with applicable laws, including, but not limited to, applicable federal and state securities laws.

7.11    Preservation of Privilege.

In connection with the rights, claims, and causes of action that constitute the Savannah Trust Assets, any attorney-client privilege, work-product privilege, or other privilege or immunity attaching to any documents or communications (whether written or oral) transferred to the Savannah Trust shall vest in the Savannah Trust and its representatives, and the Parties are authorized to take all necessary actions to effectuate the transfer of such privileges.

7.12    <u>No Recourse to Beneficiaries</u>.

In no event shall the Beneficiaries have any responsibility for paying any expenses, fees, and other obligations of the Savannah Trust, and in no event shall the Savannah Trust or the Savannah Trustee, or any of their agents, representatives, or professionals, have recourse to the Beneficiaries therefor.

7.13    <u>Uniform Custodial Trust Act.</u>

The Savannah Trust Agreement shall not be subject to any provision of the Uniform Custodial Trust Act as adopted by any state, now or in the future.

THE UNDERSIGNED PARTIES ENTER INTO THIS AGREEMENT

**FOR THE UNITED STATES OF AMERICA**

Date: 2/9/11

ROBERT G. DREHER
Acting Assistant Attorney General
Environment and Natural Resources Division
U.S. Department of Justice
Washington, D.C. 20044

Date: 2/11/11

PREET BHARARA
United States Attorney for the
    Southern District of New York

By:

ROBERT WILLIAM YALEN
TOMOKO ONOZAWA
JOSEPH A. PANTOJA
Assistant United States Attorneys
86 Chambers Street
New York, New York 10007
Tel: (212) 637-2722
Fax: (212) 637-2686

Date: 2/10/11

ALAN S. TENENBAUM
National Bankruptcy Coordinator
Environment and Natural Resources Division
U.S. Department of Justice
Washington, D.C. 20044

Date: 2/10/11

FREDERICK PHILLIPS, Attorney
Environment and Natural Resources Division
U.S. Department of Justice
Washington, D.C. 20044

FOR THE UNITED STATES ENVIRONMENTAL PROTECTION AGENCY

Date: 1/14/11                    By: _____
                                       CYNTHIA GILES
                                       Assistant Administrator for Enforcement
                                       and Compliance Assurance
                                       U.S. Environmental Protection Agency


Date: 1/14/11                    By: _____
                                       CRAIG KAUFMAN
                                       Attorney-Advisor
                                       U.S. Environmental Protection Agency
                                       Ariel Rios Building
                                       1200 Pennsylvania Avenue, NW
                                       Washington, DC 20460

*In re: Tronox, Inc., et al.,* Case No. 09-10156 (ALG)

**FOR TRONOX LUXEMBOURG S.ar.L**

Date: _____

By: _____
Michael J. Foster
Attorney-in-Fact

**FOR TRONOX INCORPORATED**

Date: _____

By: _____
Michael J. Foster
Vice President, General Counsel & Secretary

**FOR CIMARRON CORPORATION**

Date: _____

By: _____
Michael J. Foster
Director, Vice President & Secretary

**FOR SOUTHWESTERN REFINING COMPANY, INC.**

Date: _____

By: _____
Michael J. Foster
Director, Vice President & Secretary

**FOR TRANSWORLD DRILLING COMPANY**

Date: _____

By: _____
Michael J. Foster
Director, Vice President & Secretary

**FOR TRIANGLE REFINERIES, INC.**

Date: _____

By: _____

Michael J. Foster
Director, Vice President & Secretary

**FOR TRIPLE S, INC.**

Date: _____

By: _____

Michael J. Foster
Director, Vice President & Secretary

**FOR TRIPLE S ENVIRONMENTAL MANAGEMENT CORPORATION**

Date: _____

By: _____

Michael J. Foster
Director, Vice President & Secretary

**FOR TRIPLE S MINERALS RESOURCES CORPORATION**

Date: _____

By: _____

Michael J. Foster
Director, Vice President & Secretary

**FOR TRIPLE S REFINING CORPORATION**

Date: _____

By: _____

Michael J. Foster
Director, Vice President & Secretary

43

**FOR TRONOX LLC**

Date: _____

By: _____
Michael J. Foster
Manager, Vice President & Secretary

**FOR TRONOX FINANCE CORP.**

Date: _____

By: _____
Michael J. Foster
Director, Vice President & Secretary

**FOR TRONOX HOLDINGS, INC.**

Date: _____

By: _____
Michael J. Foster
Director
Vice President & Secretary

**FOR TRONOX PIGMENTS (SAVANNAH) INC.**

Date: _____

By: _____
Michael J. Foster
Director, Vice President & Secretary

**FOR TRONOX WORLDWIDE LLC**

Date: _____

By: _____
Michael J. Foster
Manager, Vice President & Secretary

44

**FOR THE STATE OF GEORGIA**

Date:  2/11/2011

Georgia Environmental Protection
Division

**FOR THE SAVANNAH TRUSTEE**

Date: 2/9/2011

Greenfield Environmental Savannah Trust LLC
Not Individually But Solely In Its Representative Capacity
As Trustee for the Savannah Trust
By: Greenfield Environmental Trust Group, Inc., Member
By: Cynthia Brooks, President

46

## EXHIBIT "A"

List of Transferred Contracts and Leases and Access Agreements

| NO. | SETTLOR | COUNTERPARTY | Date | DESCRIPTION OF CONTRACT | CURE AMOUNT | ASSIGNED TO |
|---|---|---|---|---|---|---|
| 1 | Tronox Pigments (Savannah) Inc. | Autocad | Prior to the Petition Date | License Agreements | $0.00 | The Savannah Environmental Response Trust |
| 2 | Tronox Pigments (Savannah) Inc. | Baytek Software License | 6/18/2008 | Software License | $0.00 | The Savannah Environmental Response Trust |
| 3 | Tronox Pigments (Savannah) Inc. | CSI Licensing (Emerson) | 9/7/2005 | Software License | $0.00 | The Savannah Environmental Response Trust |
| 4 | Tronox Pigments (Savannah) Inc. | Emerson | 7/24/2008 | Software License | $0.00 | The Savannah Environmental Response Trust |
| 5 | Tronox Pigments (Savannah) Inc. | Clifton Construction, Inc | 11/16/2006 | Master Work Agreement | $0.00 | The Savannah Environmental Response Trust |
| 6 | Tronox Pigments (Savannah) Inc. | OSIsoft, Inc. | 6/16/2005 | OSIsoft Software License and Services Agreement | $0.00 | The Savannah Environmental Response Trust |
| 7 | Tronox Pigments (Savannah) Inc. | Otis Elevator | 1/24/2002 | Class II Master Work Agreement | $343.97 | The Savannah Environmental Response Trust |
| 8 | Tronox Pigments (Savannah) Inc. | Port City Courier and Storage | 8/3/2004 | Master Work Agreement | $0.00 | The Savannah Environmental Response Trust |
| 9 | Tronox Pigments (Savannah) Inc. | Resource Development Authority for the City of Savannah | 12/1/1984 | Multiple Agreements | $0.00 | The Savannah Environmental Response Trust |
| 10 | Tronox Pigments (Savannah)Inc. | Southern States Chemical | 10/6/1999 | Sulfuric acid sales and purchase agreement, including all modifications, amendments, addenda, exhibits, and supplements that affect such agreement, as well as the amendment dated January | $0.00 | The Savannah Environmental Response Trust |

| | | | | | | |
|---|---|---|---|---|---|---|
| | | | | 10, 2011. | | |
| 11 | Tronox Pigments (Savannah) Inc. | City of Savannah - Deptford tract | 6/23/2003 | Work Management 7 Cost-Sharing Agreement at Former Deptford Landfill Site | $0.00 | The Savannah Environmental Response Trust |
| 12 | Tronox Pigments (Savannah) Inc. | Agri-Business | 1/4/2005 | Savgyp001-05 | $0.00 | The Savannah Environmental Response Trust |
| 13 | Tronox Pigments (Savannah) Inc. | ALLOY INDUSTRIAL CONTRACTORS | 2/23/2004 | Class II Master Work Agreement | $0.00 | The Savannah Environmental Response Trust |
| 14 | Tronox Pigments (Savannah) Inc. | APEX PROPERTY MAINTENANCE | 1/10/2004 | Class I Master Work Agreement | $0.00 | The Savannah Environmental Response Trust |
| 15 | Tronox Pigments (Savannah) Inc. | APPLIED TECHNICAL SERVICES | 2/23/2004 | Class II Master Work Agreement | $0.00 | The Savannah Environmental Response Trust |
| 16 | Tronox Pigments (Savannah) Inc. | BARLOWORLD HANDLING LP | 1/10/2004 | Class I Master Work Agreement | $0.00 | The Savannah Environmental Response Trust |
| 17 | Tronox Pigments (Savannah) Inc. | BLAKE & PENDLETON | 2/23/2004 | Class II Master Work Agreement | $0.00 | The Savannah Environmental Response Trust |
| 18 | Tronox Pigments (Savannah) Inc. | BOAEN MECHANICAL CONTRACTOR | 9/27/2001 | Class II Master Work Agreement | $0.00 | The Savannah Environmental Response Trust |
| 19 | Tronox Pigments (Savannah) Inc. | BRADDY ELECTRIC COMPANY | 2/23/2004 | Class II Master Work Agreement | $0.00 | The Savannah Environmental Response Trust |
| 20 | Tronox Pigments (Savannah) Inc. | CENTIMARK CORP | 2/10/2009 | Class II Master Work Agreement | $0.00 | The Savannah Environmental Response Trust |
| 21 | Tronox Pigments (Savannah) Inc. | CLIFTON CONSTRUCTION | 2/23/2004 | Class II Master Work Agreement | $0.00 | The Savannah Environmental Response Trust |
| 22 | Tronox Pigments (Savannah)Inc. | COMBUSTION SERVICES | 1/10/2004 | Class I Master Work Agreement | $0.00 | The Savannah Environmental Response Trust |
| 23 | Tronox Pigments (Savannah) Inc. | CONSOLIDATED MECHANICAL | 2/23/2004 | Class II Master Work Agreement | $0.00 | The Savannah Environmental Response Trust |

| 24 | Tronox Pigments (Savannah) Inc. | CONTROL SYSTEM ENGINEERING | 2/23/2004 | Class I Master Work Agreement | $0.00 | The Savannah Environmental Response Trust |
| 25 | Tronox Pigments (Savannah) Inc. | COOPERHEAT - MQS | 2/23/2004 | Class II Master Work Agreement | $0.00 | The Savannah Environmental Response Trust |
| 26 | Tronox Pigments (Savannah) Inc. | CUSTOM QUALITY INSULATION & REFRACTORY | 2/23/2004 | Class II Master Work Agreement | $0.00 | The Savannah Environmental Response Trust |
| 27 | Tronox Pigments (Savannah) Inc. | EASON DIVING & MARINE CONTRACTORS, INC. | 6/9/2004 | Class II Master Work Agreement | $0.00 | The Savannah Environmental Response Trust |
| 28 | Tronox Pigments (Savannah) Inc. | FIVE STAR ELECTRICAL CONTRACTORS, INC. | 5/5/2004 | Class II Master Work Agreement | $0.00 | The Savannah Environmental Response Trust |
| 29 | Tronox Pigments (Savannah) Inc. | HARBISONWALKER REFRACTORIES | 5/31/2007 | Class II Master Work Agreement | $0.00 | The Savannah Environmental Response Trust |
| 30 | Tronox Pigments (Savannah) Inc. | INDUSTRIAL MECHANICAL CONTRACTORS | 9/21/2001 | Class II Master Work Agreement | $0.00 | The Savannah Environmental Response Trust |
| 31 | Tronox Pigments (Savannah) Inc. | IVS VIDEO | 10/2/2001 | Class I Master Work Agreement | $0.00 | The Savannah Environmental Response Trust |
| 32 | Tronox Pigments(Savannah)Inc. | JM TEST SYSTEMS, INC. | 11/10/2004 | Class II Master Work Agreement | $0.00 | The Savannah Environmental Response Trust |
| 33 | Tronox Pigments (Savannah) Inc. | JOHN KERN (KERN-COLEMAN) | 12/12/2000 | Engineering Work Agreement | $0.00 | The Savannah Environmental Response Trust |
| 34 | Tronox Pigments (Savannah) Inc. | K MACHINE & MECHANICAL CONTRACTORS | 9/27/2001 | Class II Master Work Agreement | $0.00 | The Savannah Environmental Response Trust |
| 35 | Tronox Pigments (Savannah) Inc. | KINNE CORP. | 5/8/2007 | Engineering Work Agreement | $0.00 | The Savannah Environmental Response Trust |
| 36 | Tronox Pigments (Savannah) Inc. | LOCKWOOD GREENE | 3/4/2005 | Engineering Work Agreement | $0.00 | The Savannah Environmental Response Trust |
| 37 | Tronox Pigments (Savannah) Inc. | LONGVIEW INSPECTION, INC. | 1/24/2003 | Class II Master Work Agreement | $0.00 | The Savannah Environmental Response Trust |

| 38 | Tronox Pigments (Savannah) Inc. | LYNN WHITSETT | 12/16/2004 | Class II Master Work Agreement | $0.00 | The Savannah Environmental Response Trust |
| 39 | Tronox Pigments (Savannah) Inc. | MACALJON ENGINEERING LLC | 2/19/2009 | Class II Master Work Agreement | $0.00 | The Savannah Environmental Response Trust |
| 40 | Tronox Pigments (Savannah) Inc. | MACALJON, INC. | 2/23/2004 | Class II Master Work Agreement | $0.00 | The Savannah Environmental Response Trust |
| 41 | Tronox Pigments (Savannah) Inc. | MAHANY CONSTRUCTION CO. | 2/23/2004 | Class II Master Work Agreement | $0.00 | The Savannah Environmental Response Trust |
| 42 | Tronox Pigments (Savannah)Inc. | MARLEY COOLING TOWER COMPANY | 2/26/2001 | Class II Master Work Agreement | $0.00 | The Savannah Environmental Response Trust |
| 43 | Tronox Pigments (Savannah) Inc. | MAXIM CRANE WORKS | 2/23/2004 | Class II Master Work Agreement | $0.00 | The Savannah Environmental Response Trust |
| 44 | Tronox Pigments (Savannah) Inc. | MCCORD COMMUNICATIONS | 1/10/2004 | Class I Master Work Agreement | $0.00 | The Savannah Environmental Response Trust |
| 45 | Tronox Pigments (Savannah) Inc. | MDT TECHNOLOGY, LLC | 2/22/2005 | Engineering Work Agreement | $0.00 | The Savannah Environmental Response Trust |
| 46 | Tronox Pigments (Savannah) Inc. | METALCRAFTS, INC. | 3/5/2004 | Class II Master Work Agreement | $0.00 | The Savannah Environmental Response Trust |
| 47 | Tronox Pigments (Savannah) Inc. | MID GA ELECTRICAL SERVICES INC | 11/30/2004 | Class II Master Work Agreement | $0.00 | The Savannah Environmental Response Trust |
| 48 | Tronox Pigments (Savannah) Inc. | MILTON J. WOOD FIRE PROTECTION, INC. | 2/23/2004 | Class II Master Work Agreement | $0.00 | The Savannah Environmental Response Trust |
| 49 | Tronox Pigments (Savannah) Inc. | MORAN ENVIRONMENTAL RECOVERY LLC | 2/23/2004 | Class II Master Work Agreement | $0.00 | The Savannah Environmental Response Trust |
| 50 | Tronox Pigments (Savannah) Inc. | MYRICK MARINE CONTRACTING CORP. | 2/23/2004 | Class II Master Work Agreement | $0.00 | The Savannah Environmental Response Trust |
| 51 | Tronox Pigments (Savannah) Inc. | NATIONAL CRANE SERVICES, INC. | 1/10/2004 | Class I Master Work Agreement | $0.00 | The Savannah Environmental Response Trust |

| 52 | Tronox Pigments (Savannah)Inc. | NATURCHEM, INC. | 1/10/2004 | Class I Master Work Agreement | $0.00 | The Savannah Environmental Response Trust |
| 53 | Tronox Pigments (Savannah) Inc. | OLIVER KOCH, INC. | 5/21/2001 | Engineering Work Agreement | $0.00 | The Savannah Environmental Response Trust |
| 54 | Tronox Pigments (Savannah) Inc. | ONYX INDUSTRIAL SERVICES, INC. | 2/23/2004 | Class II Master Work Agreement | $0.00 | The Savannah Environmental Response Trust |
| 55 | Tronox Pigments (Savannah) Inc. | PAT'S INSULATION INC. | 7/24/2003 | Class II Master Work Agreement | $0.00 | The Savannah Environmental Response Trust |
| 56 | Tronox Pigments (Savannah) Inc. | POPPELL BROTHERS, INC. | 10/2/2001 | Class I Master Work Agreement | $0.00 | The Savannah Environmental Response Trust |
| 57 | Tronox Pigments (Savannah) Inc. | RAIL SCALE, INC. | 1/10/2004 | Class I Master Work Agreement | $0.00 | The Savannah Environmental Response Trust |
| 58 | Tronox Pigments (Savannah) Inc. | RAYMOND QUINN ASSOCIATES | 4/1/2003 | Engineering Work Agreement | $0.00 | The Savannah Environmental Response Trust |
| 59 | Tronox Pigments (Savannah) Inc. | ROSEBERRY & ASSOCIATES | 1/10/2004 | Class I Master Work Agreement | $0.00 | The Savannah Environmental Response Trust |
| 60 | Tronox Pigments (Savannah) Inc. | ROWE DRILLING COMPANY, INC. | 10/31/2005 | Class II Master Work Agreement | $0.00 | The Savannah Environmental Response Trust |
| 61 | Tronox Pigments (Savannah) Inc. | RWP ENGINEERING | 10/9/2000 | Engineering Work Agreement | $0.00 | The Savannah Environmental Response Trust |
| 62 | Tronox Pigments(Savannah)Inc. | S&ME, INC. | 1/22/2009 | Class II Master Work Agreement | $0.00 | The Savannah Environmental Response Trust |
| 63 | Tronox Pigments (Savannah) Inc. | SAVANNAH FENCE & ENTRY SYSTEMS, INC. | 10/10/2004 | Class I Master Work Agreement | $0.00 | The Savannah Environmental Response Trust |
| 64 | Tronox Pigments (Savannah) Inc. | SAVANNAH OVERHEAD DOOR COMPANY, INC. | 2/23/2004 | Class II Master Work Agreement | $0.00 | The Savannah Environmental Response Trust |
| 65 | Tronox Pigments (Savannah) Inc. | SHEPPARD ENGINEERING LLC | 9/17/2003 | Engineering Work Agreement | $0.00 | The Savannah Environmental Response Trust |

| 66 | Tronox Pigments (Savannah) Inc. | SPRAYING SERVICES INC DBA COOLING TOWER SOLUTIONS | 5/25/2009 | Class II Master Work Agreement | $0.00 | The Savannah Environmental Response Trust |
| 67 | Tronox Pigments (Savannah) Inc. | STEVENSON & PALMER | 6/12/2001 | Engineering Work Agreement | $0.00 | The Savannah Environmental Response Trust |
| 68 | Tronox Pigments (Savannah) Inc. | TAW SAVANNAH SERVICE CENTER | 2/23/2004 | Class II Master Work Agreement | $0.00 | The Savannah Environmental Response Trust |
| 69 | Tronox Pigments (Savannah) Inc. | TDW SERVICES, INC. | 3/10/2004 | Class II Master Work Agreement | $0.00 | The Savannah Environmental Response Trust |
| 70 | Tronox Pigments (Savannah) Inc. | THOMPSON INDUSTRIAL SERVICES, INC. | 3/24/2004 | Class II Master Work Agreement | $0.00 | The Savannah Environmental Response Trust |
| 71 | Tronox Pigments (Savannah) Inc. | UNION TANK CAR COMPANY | 5/9/2005 | Class II Master Work Agreement | $0.00 | The Savannah Environmental Response Trust |
| 72 | Tronox Pigments (Savannah)Inc. | VIP INTERNATIONAL INC. | 2/23/2004 | Class II Master Work Agreement | $0.00 | The Savannah Environmental Response Trust |
| 73 | Tronox Pigments (Savannah) Inc. | W.W. GAY MECHANICAL CONTRACTOR, INC. | 2/23/2004 | Class II Master Work Agreement | $0.00 | The Savannah Environmental Response Trust |
| 74 | Tronox Pigments (Savannah) Inc. | WARD EDWARDS, INC. | 2/23/2004 | Class II Master Work Agreement | $0.00 | The Savannah Environmental Response Trust |
| 75 | Tronox Pigments (Savannah) Inc. | WEEDS INC. | 1/10/2004 | Class I Master Work Agreement | $0.00 | The Savannah Environmental Response Trust |
| 76 | Tronox Pigments (Savannah) Inc. | WHITAKER LABORATORY, INC. | 1/10/2004 | Class I Master Work Agreement | $0.00 | The Savannah Environmental Response Trust |
| 77 | Tronox Pigments (Savannah) Inc. | WHITE ELECTRICAL CONSTRUCTION CO. | 11/1/2007 | Class II Master Work Agreement | $0.00 | The Savannah Environmental Response Trust |
| 78 | Tronox Pigments (Savannah) Inc. | WIELAND ENTERPRISES, INC. | 9/28/2000 | Engineering Work Agreement | $0.00 | The Savannah Environmental Response Trust |
| 79 | Tronox Pigments (Savannah) Inc. | WPC, INC. | 8/20/2009 | Class II Master Work Agreement | $0.00 | The Savannah Environmental Response Trust |

| 80 | Tronox Pigments (Savannah) Inc. | YANCEY POWER SYSTEMS | 3/23/2004 | Class I Master Work Agreement | $0.00 | The Savannah Environmental Response Trust |
| 81 | Tronox Pigments (Savannah) Inc. | YORK INTERNATIONAL CORPORATION | 2/23/2004 | Class II Master Work Agreement | $0.00 | The Savannah Environmental Response Trust |
| 82 | Tronox Pigments (Savannah)Inc. | ADAMS-WARNOCK | 9/27/2001 | Class II Master Work Agreement | $0.00 | The Savannah Environmental Response Trust |
| 83 | Tronox Pigments (Savannah) Inc. | AMETEK PROCESS & ANALYTICAL INSTRUMENT | 5/22/2003 | Class I Master Work Agreement | $0.00 | The Savannah Environmental Response Trust |
| 84 | Tronox Pigments (Savannah) Inc. | ANDRESS ENGINEERING ASSOCIATES | 1/10/2004 | Class I Master Work Agreement | $0.00 | The Savannah Environmental Response Trust |
| 85 | Tronox Pigments (Savannah) Inc. | ASHLAND ENVIRONMENTAL SERVICES | 4/24/2003 | Class II Master Work Agreement | $0.00 | The Savannah Environmental Response Trust |
| 86 | Tronox Pigments (Savannah) Inc. | BURKHALTER RIGGING (HAMILTON MWA) | 11/10/2004 | Class II Master Work Agreement | $0.00 | The Savannah Environmental Response Trust |
| 87 | Tronox Pigments (Savannah) Inc. | C.F.F., INC. | 2/23/2004 | Class II Master Work Agreement | $0.00 | The Savannah Environmental Response Trust |
| 88 | Tronox Pigments (Savannah) Inc. | COASTAL GRADING & RENTAL | 2/23/2004 | Class II Master Work Agreement | $0.00 | The Savannah Environmental Response Trust |
| 89 | Tronox Pigments (Savannah) Inc. | COATING SYSTEMS, INC. | 2/23/2004 | Class II Master Work Agreement | $0.00 | The Savannah Environmental Response Trust |
| 90 | Tronox Pigments (Savannah) Inc. | CONTROL SOUTHERN | 2/6/2001 | Class I Master Work Agreement | $0.00 | The Savannah Environmental Response Trust |
| 91 | Tronox Pigments (Savannah) Inc. | CRYSTAL SPRINGS WATER CO. | 1/10/2004 | Class I Master Work Agreement | $0.00 | The Savannah Environmental Response Trust |
| 92 | Tronox Pigments(Savannah)Inc. | E.E.U., INC. (ELECTRICAL EQUIPMENT UPGRADING) | 9/27/2001 | Class II Master Work Agreement | $0.00 | The Savannah Environmental Response Trust |
| 93 | Tronox Pigments (Savannah) Inc. | EMC ENGINEERING SERVICES, INC. | 1/8/2007 | Engineering Work Agreement | $0.00 | The Savannah Environmental Response Trust |

| 94 | Tronox Pigments (Savannah) Inc. | ENVIRONMENTAL SERVICES, INC. | 2/23/2004 | Class II Master Work Agreement | $0.00 | The Savannah Environmental Response Trust |
| 95 | Tronox Pigments (Savannah) Inc. | ENVIROVAC, INC. | 2/23/2004 | Class II Master Work Agreement | $0.00 | The Savannah Environmental Response Trust |
| 96 | Tronox Pigments (Savannah) Inc. | FLOTECH INC | 9/12/2006 | Class II Master Work Agreement | $0.00 | The Savannah Environmental Response Trust |
| 97 | Tronox Pigments (Savannah) Inc. | FLOWSERVE CORP. - INDUSTRIAL SERVICES GROUP | 3/30/2004 | Class II Master Work Agreement | $0.00 | The Savannah Environmental Response Trust |
| 98 | Tronox Pigments (Savannah) Inc. | HARGROVE & ASSOCIATES, INC. | 5/27/2009 | Engineering Work Agreement | $0.00 | The Savannah Environmental Response Trust |
| 99 | Tronox Pigments (Savannah) Inc. | INDUSTRIAL LININGS, INC. | 8/20/2004 | Class II Master Work Agreement | $0.00 | The Savannah Environmental Response Trust |
| 100 | Tronox Pigments (Savannah) Inc. | INDUSTRIAL METALWORKS, INC. | 2/23/2004 | Class II Master Work Agreement | $0.00 | The Savannah Environmental Response Trust |
| 101 | Tronox Pigments (Savannah) Inc. | INDUSTRIAL TECHNICAL COATINGS, INC. | 7/8/2005 | Class II Master Work Agreement | $0.00 | The Savannah Environmental Response Trust |
| 102 | Tronox Pigments (Savannah)Inc. | JIMCO INTEGRATED SERVICES, INC. | 2/1/2005 | Class II Master Work Agreement | $0.00 | The Savannah Environmental Response Trust |
| 103 | Tronox Pigments (Savannah) Inc. | JOHNSON CONTROLS | 2/23/2004 | Class II Master Work Agreement | $0.00 | The Savannah Environmental Response Trust |
| 104 | Tronox Pigments (Savannah) Inc. | KONECRANES INC | 3/6/2007 | Class II Master Work Agreement | $0.00 | The Savannah Environmental Response Trust |
| 105 | Tronox Pigments (Savannah) Inc. | MILTON J. WOOD COMPANY | 2/23/2004 | Class II Master Work Agreement | $0.00 | The Savannah Environmental Response Trust |
| 106 | Tronox Pigments (Savannah) Inc. | O'NEAL, INC. | 8/22/2002 | Engineering Work Agreement | $0.00 | The Savannah Environmental Response Trust |
| 107 | Tronox Pigments (Savannah) Inc. | ONEX, INC. | 2/23/2004 | Class II Master Work Agreement | $0.00 | The Savannah Environmental Response Trust |

| 108 | Tronox Pigments (Savannah) Inc. | RABEY ELECTRIC COMPANY, INC. | 5/25/2004 | Class II Master Work Agreement | $0.00 | The Savannah Environmental Response Trust |
| 109 | Tronox Pigments (Savannah) Inc. | REMOTE TECHNOLOGY, INC. | 1/6/2004 | Class II Master Work Agreement | $0.00 | The Savannah Environmental Response Trust |
| 110 | Tronox Pigments (Savannah) Inc. | RFM CONSULTANTS INC. | 10/22/2008 | Class II Master Work Agreement | $0.00 | The Savannah Environmental Response Trust |
| 111 | Tronox Pigments (Savannah) Inc. | RICHMOND SUPPLY | 2/23/2004 | Class II Master Work Agreement | $0.00 | The Savannah Environmental Response Trust |
| 112 | Tronox Pigments (Savannah)Inc. | SISSON SCALE & EQUIPMENT COMPANY, INC. | 1/10/2004 | Class I Master Work Agreement | $0.00 | The Savannah Environmental Response Trust |
| 113 | Tronox Pigments (Savannah) Inc. | SUNBELT COATINGS, INC. | 2/23/2004 | Class II Master Work Agreement | $0.00 | The Savannah Environmental Response Trust |
| 114 | Tronox Pigments (Savannah) Inc. | TEAM INDUSTRIAL SERVICES, INC. | 2/23/2004 | Class II Master Work Agreement | $0.00 | The Savannah Environmental Response Trust |
| 115 | Tronox Pigments (Savannah) Inc. | THOMAS & HUTTON ENGINEERING CO | 12/8/2004 | Class II Master Work Agreement | $0.00 | The Savannah Environmental Response Trust |
| 116 | Tronox Pigments (Savannah) Inc. | TIM'S CRANE & RIGGING, INC. | 2/23/2004 | Class II Master Work Agreement | $0.00 | The Savannah Environmental Response Trust |
| 117 | Tronox Pigments (Savannah) Inc. | TRANTER PHE INC | 1/4/2007 | Class II Master Work Agreement | $0.00 | The Savannah Environmental Response Trust |
| 118 | Tronox Pigments (Savannah) Inc. | UNITED RENTALS, INC. | 9/27/2001 | Class II Master Work Agreement | $0.00 | The Savannah Environmental Response Trust |
| 119 | Tronox Pigments (Savannah) Inc. | WESTON SOLUTIONS, INC. | 3/3/2008 | Class II Master Work Agreement | $0.00 | The Savannah Environmental Response Trust |
| 120 | Tronox Pigments (Savannah) Inc. | YANCEY BROS. CO. | 3/23/2004 | Class I Master Work Agreement | $0.00 | The Savannah Environmental Response Trust |
| 121 | Tronox Pigments (Savannah) Inc. | Blu-John of Savannah, Inc | 3/9/2006 | Master Work Agreement | $0.00 | The Savannah Environmental Response Trust |

| 122 | Tronox Pigments(Savannah)Inc. | Lewis-Goetz | 4/29/2008 | Master Work Agreement | $0.00 | The Savannah Environmental Response Trust |
|-----|-------------------------------|-------------|-----------|-----------------------|-------|-------------------------------------------|
| 123 | Tronox Pigments (Savannah) Inc. | Lindsey Tel Com | 4/5/2004 | Master Work Agreement | $0.00 | The Savannah Environmental Response Trust |
| 124 | Tronox Pigments (Savannah) Inc. | ICEC | 12/29/2010 | Sulfur Contract, as amended | $0.00 | The Savannah Environmental Response Trust |
| 125 | Tronox Pigments (Savannah) Inc. | SCANA Energy Marketing, Inc. | 8/12/10 | Gas Sales Agreement | $0.00 | The Savannah Environmental Response Trust |
| 126 | Tronox Pigments (Savannah) Inc. | Windstream Nuvox, Inc. | 3/4/10 | Customer Service Agreement | $0.00 | The Savannah Environmental Response Trust |

# ENVIRONMENTAL RESPONSE TRUST AGREEMENT

## (West Chicago)

## BY AND AMONG

**TRONOX INCORPORATED,**
**TRONOX LLC,**
**TRONOX FINANCE CORP.,**
**TRONOX HOLDINGS, INC.,**
**TRONOX LUXEMBOURG S.AR.L,**
**TRONOX PIGMENTS (SAVANNAH), INC.,**
**TRONOX WORLDWIDE, LLC,**
**SOUTHWESTERN REFINING COMPANY, INC.,**
**TRANSWORLD DRILLING COMPANY,**
**TRIANGLE REFINERIES, INC.,**
**TRIPLE S, INC.,**
**TRIPLE S ENVIRONMENTAL MANAGEMENT CORP.,**
**TRIPLE S MINERALS RESOURCES CORP.,**
**TRIPLE S REFINING CORP.,**
**and**
**CIMARRON CORP.**
**As Settlors,**

**Weston Solutions, Inc.**
**not individually but solely in its representative capacity**
**as West Chicago Trustee/Licensee,**

## AND

**THE UNITED STATES OF AMERICA and**
**the STATE of ILLINOIS**
**as Beneficiaries**

## AND

**THE CITY OF WARRENVILLE, ILLINOIS, the CITY OF WEST CHICAGO,**
**ILLINOIS, the FOREST PRESERVE DISTRICT OF DUPAGE COUNTY, ILLINOIS,**
**and the COUNTY OF DUPAGE, ILLINOIS**

**As of February 14, 2011**

## TABLE OF CONTENTS

**ARTICLE I DEFINITIONS** ...................................................................................**3**
    1.1    Definitions.................................................................................3

**ARTICLE II THE WEST CHICAGO TRUST** ......................................................**9**
    2.1    Creation of and Transfer of Assets to the West Chicago Trust ..............................9
    2.2    Objective and Purpose .........................................................18
    2.3    Holder of West Chicago Trust Assets...................................................19
    2.4    Management of West Chicago Trust Assets ...........................................19
    2.5    Work Performed and Disbursements by the West Chicago Trust .......................23
    2.6    Investment and Safekeeping of West Chicago Trust Assets .................................23
    2.7    Insurance Policy to Cover Future Response Actions....................................24
    2.8    Access and Deed Restrictions.....................................................24
    2.9    Accounting .....................................................................25
    2.10   Termination....................................................................25
    2.11   Property Disposition ........................................................25

**ARTICLE III WORK AND DISTRIBUTIONS** .....................................................**29**
    3.1    West Chicago Trust Accounts ....................................................29
    3.2    Payments by the West Chicago Trust ............................................29
    3.3    Review of Site Plans.............................................................34
    3.4    Liens by Government.............................................................34
    3.5    Manner of Payment..............................................................34

**ARTICLE IV THE WEST CHICAGO TRUSTEE/LICENSEE** .............................................**35**
    4.1    Appointment ..................................................................35
    4.2    Generally.......................................................................35
    4.3    Powers.........................................................................36
    4.4    Other Professionals..............................................................37
    4.5    Limitation of the West Chicago Trustee/Licensee's Authority ...........................37
    4.6    Reliance by the West Chicago Trust Parties.....................................37
    4.7    Compensation of the West Chicago Trustee/Licensee .......................38
    4.8    Liability of West Chicago Trust Parties............................................39
    4.9    Exculpation and Indemnification .................................................39
    4.10   Termination and Removal of the West Chicago Trustee/Licensee. ....................41
    4.11   Appointment of Successor West Chicago Trustee/Licensee ...............................43
    4.12   No Bond .......................................................................43
    4.13   Records .......................................................................43
    4.14   Confidential Business Information .................................................43

**ARTICLE V BENEFICIARIES** ......................................................................**45**
    5.1    Beneficiaries ...................................................................45
    5.2    Identification of Beneficiaries and Local Communities ...........................45
    5.3    Non-Beneficiaries ..............................................................48
    5.4    Transfer of Beneficial Interests..................................................49

i

**ARTICLE VI REPORTING AND TAXES**.................................................................**49**
  6.1    Reports ...........................................................................................49
  6.2    Other ..............................................................................................49
  6.3    Reports in Support of Insurance Claims .................................................50
  6.4    Taxes ..............................................................................................50

**ARTICLE VII MISCELLANEOUS PROVISIONS** ........................................**51**
  7.1    Amendments and Waivers ...................................................................51
  7.2    Tax Treatment ..................................................................................51
  7.3    Cooperation......................................................................................51
  7.4    Situs of the West Chicago Trust ..........................................................51
  7.5    Severability .....................................................................................51
  7.6    Sufficient Notice ..............................................................................52
  7.7    Retention of Records.........................................................................52
  7.8    Headings ........................................................................................52
  7.9    Actions Taken on Other Than Business Day...........................................52
  7.10   Consistency of Agreements and Construction.........................................52
  7.11   Compliance with Laws ......................................................................53
  7.12   Preservation of Privilege ...................................................................53
  7.13   No Recourse to Beneficiaries..............................................................53
  7.14   Uniform Custodial Trust Act. .............................................................53

## ENVIRONMENTAL RESPONSE TRUST AGREEMENT

### (West Chicago)

This Environmental Response Trust Agreement (this "Agreement") is made this 14th day of February, 2011, by and among TRONOX INCORPORATED ("Tronox") and its wholly owned subsidiaries, TRONOX LLC, TRONOX FINANCE CORP., TRONOX HOLDINGS, INC., TRONOX LUXEMBOURG S.AR.L, TRONOX PIGMENTS (SAVANNAH), INC., TRONOX WORLDWIDE, LLC, SOUTHWESTERN REFINING COMPANY, INC., TRANSWORLD DRILLING COMPANY, TRIANGLE REFINERIES, INC., TRIPLE S, INC., TRIPLE S ENVIRONMENTAL MANAGEMENT CORP., TRIPLE S MINERALS RESOURCES CORP., TRIPLE S REFINING CORP., and CIMARRON CORP., as debtors and debtors in possession in the Bankruptcy Cases (defined below) (collectively, "Settlors") and Weston Solutions, Inc., a Pennsylvania corporation qualified to do business as a foreign corporation in the State of Illinois, not individually but solely in its representative capacity as West Chicago Trustee/Licensee (defined herein) of the West Chicago Environmental Response Trust established hereby (the "West Chicago Trust"), and the Beneficiaries (defined herein).

### R E C I T A L S:

WHEREAS, on January 12, 2009, Settlors filed voluntary petitions for relief in the Bankruptcy Court under Chapter 11 of Title 11 of the United States Code, 11 U.S.C. § 101 *et seq.*, as amended (the "Bankruptcy Code") in the United States Bankruptcy Court for the Southern District of New York ("Bankruptcy Court"), which cases have been jointly administered under Case No. 09-10156 (the "Bankruptcy Cases");

WHEREAS, the Settlors, the United States and the State of Illinois have entered into that certain Consent Decree and Environmental Settlement Agreement lodged with the Court on November 23, 2010 (the "Settlement Agreement");

WHEREAS, the Settlement Agreement provides for the transfer of the West Chicago Owned Sites (defined below) to the West Chicago Trust (defined below) to be administered by the West Chicago Trustee/Licensee (defined below) pursuant to this Agreement and the Settlement Agreement;

WHEREAS, the Settlement Agreement provides for the creation of four additional trusts, which include the Cimarron Trust, the Multistate Trust, the Nevada Trust, and the Savannah Trust, the transfer to those trusts of the Cimarron Trust, Henderson Property, the Multistate Owned Sites, and the Savannah Facility, respectively, and the administration of each of those trusts by the Cimarron Trustee, Multistate Trustee, the Nevada Trustee, and the Savannah Trustee, respectively, pursuant to the Environmental Response Trust Agreement for each trust and the Settlement Agreement;

WHEREAS, the Settlement Agreement provides for the creation of a litigation trust ("Anadarko Litigation Trust") pursuant to the Litigation Trust Agreement (defined below);

WHEREAS, in accordance with Article IX of the Settlement Agreement, the West Chicago Trust is established for the purposes of (i) acting as successor to Settlors solely for the

1

purpose of performing, managing, and funding implementation of Environmental Actions selected by US EPA for (a) RAS Properties and (b) for Kress Creek, pursuant to the Federal West Chicago Consent Decree and the Local Communities Consent Decree; (ii) acting as successor to the Settlors solely for the purpose of performing, managing, and funding implementation of Environmental Actions at the REF; (iii) using all reasonable efforts, by and through the West Chicago Trustee/Licensee, to secure Title X Reimbursements owed after the Effective Date from the Department of Energy, to which the West Chicago Trustee/Licensee is legally entitled based on Environmental Actions performed by or on behalf of Settlors and the West Chicago Trust (and regardless of whether further Environmental Actions continue to be necessary at Kress Creek, the RAS Properties, or the REF); (iv) owning the West Chicago Owned Sites; (v) carrying out administrative functions related to the performance of Environmental Actions by or on behalf of the West Chicago Trust at Kress Creek and the RAS Properties, and other administrative functions with respect to the West Chicago Owned Sites; (vi) ultimately selling, transferring or otherwise disposing or facilitating the reuse of all or part of the Owned RAS Properties (including, but not limited to, any appurtenances, machinery, equipment, fixtures, furniture, computers, tools, parts, supplies, and other tangible property on the Owned RAS Properties that are transferred to the West Chicago Trust), if possible; (vii) ultimately selling or transferring the REF to the City of West Chicago, pursuant to the conditions and terms set forth in the Phase 2 Final Agreement as shall be specified in the West Chicago Trust Agreement with the approval of IEMA and the City of West Chicago; (viii) acting as successor to Settlors for the purpose of complying with the provisions of the Kress Creek Settlement Agreement; and (ix) fulfilling other obligations as set forth in the Settlement Agreement.

WHEREAS, the West Chicago Trust is to be funded in the amount set forth in the Settlement Agreement;

WHEREAS, this Agreement and the Settlement Agreement govern the West Chicago Trust, which is created pursuant to Section 1.468B-1 *et seq.* of the Treasury Regulations promulgated under Section 468B of the Internal Revenue Code (the "QSF Regulations");

WHEREAS, presuming that the West Chicago Trust qualifies as a "qualified settlement fund" within the meaning of the QSF Regulations, to the extent permitted by law, the Settlors intend to elect to treat the West Chicago Trust as a grantor trust pursuant to the QSF Regulations; and

WHEREAS, the West Chicago Trust shall be the exclusive holder of the assets described herein for purposes of the Settlement Agreement, this Agreement, and 31 U.S.C. § 3713(b);

NOW, THEREFORE, in consideration of the foregoing premises and the mutual covenants and agreements contained herein and in the Settlement Agreement the Parties hereby agree as follows:

2

ARTICLE I
DEFINITIONS

1.1    Definitions.

The following terms as used in this Agreement shall have the definitions given below:

1.1.1    "Agreement" has the meaning as given in the preamble.

1.1.2    "Anadarko Litigation Trust" shall have the meaning given in the recitals to this Agreement.

1.1.3    "Anadarko Litigation Proceeds" are eighty-eight (88%) of the net recovery in the Anadarko Litigation, which net recovery shall be determined by subtracting from the total gross recovery in the Anadarko Litigation (1) all outstanding and anticipated payments to lead counsel of the Anadarko Litigation Trust pursuant to a separate Special Fee Arrangement; (2) all outstanding and anticipated costs and fees of the Anadarko Litigation Trust and Trustee (including but not limited to attorney's fees and Trustee fees), as set forth in the Anadarko Litigation Trust Agreement referred to in Paragraph 119 of the Settlement Agreement; and (3) the amount of the distribution referred to in Paragraph 122 of the Settlement Agreement, as amended by the First Amendment to the Consent Decree and Environmental Settlement Agreement, and which shall be allocated to the Governments and the Environmental Response Trusts pursuant to the Plan of Reorganization and the Settlement Agreement.

1.1.4    "Bankruptcy Cases" shall have the meaning given in the recitals to this Agreement.

1.1.5    "Bankruptcy Code" shall have the meaning given in the recitals to this Agreement.

1.1.6    "Bankruptcy Court" means the United States Bankruptcy Court for the Southern District of New York.

1.1.7    "Beneficiary" means the State of Illinois on behalf of IEMA and the IEPA and the United States on behalf of US EPA.

1.1.8    "CERCLA" means the Comprehensive Environmental Response, Compensation, and Liability Act, 42 U.S.C. §§ 9601 *et seq.*, as amended.

1.1.9    "Consultant" shall have the meaning given in Section 4.1.2 hereof.

1.1.10    "Court" means the Bankruptcy Court or if the Bankruptcy Court abstains from exercising jurisdiction or is otherwise without jurisdiction over any matter arising out of this Agreement, a United States District Court having competent jurisdiction with respect to such matters.

1.1.11 "<u>Effective Date</u>" means the Effective Date as defined in the Settlement Agreement.

1.1.12 "<u>Environmental Actions</u>" means any and all environmental activities authorized or required under Environmental Law that occur after the Effective Date and that are related to the West Chicago Trust Sites, including but not limited to response or remedial actions, removal actions, corrective action, closure, or post-closure care, reclamation, investigations, studies, remediation, interim actions, final actions, emergency actions, water treatment, implementation of engineered structures and controls, monitoring, repair and replacement of engineered structures, monitoring equipment and controls, operation and maintenance, implementation, operation and maintenance of institutional controls, coordination and integration of reuse and remedial efforts and initiatives (including, without limitation, multi-stakeholder communications), and, if required, long-term stewardship and perpetual custodial care activities. "Environmental Actions" also include the above environmental activities relating to the migration of hazardous substances emanating from the West Chicago Trust Sites. For the avoidance of doubt, "Environmental Actions" shall not include natural resource assessment or restoration, unless required by the Federal West Chicago Consent Decree, the Local Communities Consent Decree, and the REF License.

1.1.13 "<u>Environmental Costs</u>" means the costs and expenses of implementing Environmental Actions and the costs of payment of certain oversight costs of any Beneficiary with respect to the West Chicago Trust Sites.

1.1.14 "<u>Environmental Information</u>" means environmental reports, audits, analyses, records, studies and other documents containing information prepared by or otherwise in the possession of Settlors or their technical consultants that are based on or otherwise reflect information related to environmental activities.

1.1.15 "<u>Environmental Law</u>" means, whenever in effect, all federal, tribal, state and local statutes, regulations, ordinances and similar provisions having the force or effect of law; all judicial and administrative orders and determinations and all common law concerning public health and safety, worker health and safety, pollution or protection of the environment, including, without limitation, the Atomic Energy Act ("AEA"), CERCLA, Clean Water Act ("CWA"), Clean Air Act ("CAA"), Emergency Planning and Community Right-to-Know Act ("EPCRA"), Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA"), Resource Conservation and Recovery Act ("RCRA"), Safe Drinking Water Act ("SDWA"), Toxic Substances Control Act ("TSCA"), and any tribal, state or local equivalents.

4

1.1.16 "Federal West Chicago Consent Decree" means the Consent Decree for the Kerr-McGee West Chicago NPL Sites, *United States and the State of Illinois v. Kerr-McGee Chemical LLC,* Civil Action No. 05C2318 (N.D. Ill.).

1.1.17 "Funding" shall have the meaning given in Section 2.1.2 hereof.

1.1.18 "Funding and Consideration" shall have the meaning given in Section 2.1.2.5 hereof.

1.1.19 "IEMA" means the Illinois Emergency Management Agency.

1.1.20 "IEPA" means the Illinois Environmental Protection Agency.

1.1.21 "Internal Revenue Code" means the Internal Revenue Code of 1986, as amended.

1.1.22 "Kerr-McGee West Chicago NPL Sites" means the RAS Properties, Reed-Keppler Park in West Chicago Illinois, the Sewage Treatment Plant Site in West Chicago and DuPage County, Illinois, and Kress Creek.

1.1.23 "Kress Creek" means Kress Creek and the West Branch DuPage River Site in DuPage County, Illinois.

1.1.24 "Kress Creek Escrow Account" means the escrow account created pursuant to the Kress Creek Settlement Agreement and any amendment or stipulation thereto, as defined in Section 2.1.2.3 hereof.

1.1.25 "Kress Creek Settlement Agreement" means the Kress Creek Settlement Agreement executed by the Settlors and the United States and dated May 1, 2010, and any amendment or stipulation thereto.

1.1.26 "Lead Agencies" shall be IEMA for REF, US EPA for Kress Creek, and US EPA for the RAS Properties.

1.1.27 "Litigation Trust Agreement" means the agreement establishing the Anadarko Litigation Trust.

1.1.28 "Local Communities" means the County of DuPage, Illinois, the Forest Preserve District of DuPage County, Illinois, the City of West Chicago, and the City of Warrenville.

1.1.29 "Local Communities Consent Decree" means the Consent Decree filed in *County of DuPage v. Kerr-McGee Chemical, LCC*, Civil Action No. 05C 1874 (N.D. Ill.)

1.1.30 "Natural Resource Damages" means damages for injury to, destruction of, or loss of natural resources as defined in 42 U.S.C. § 101(16).

1.1.31 "<u>Non-Owned RAS Properties</u>" means the portions of the RAS Properties in West Chicago, Illinois and DuPage County, Illinois that are not owned by Settlors.

1.1.32 "<u>Non-Lead Agency</u>" shall be IEPA for Kress Creek and the RAS Properties.

1.1.33 "<u>Other Environmental Trusts</u>" means the Cimarron Trust, Multistate Trust, the Nevada Trust, and the Savannah Trust.

1.1.34 "<u>Owned RAS Properties</u>" means the properties owned by Settlors in the RAS in West Chicago, Illinois and DuPage County, Illinois.

1.1.35 "<u>Parties</u>" means the Settlors, the West Chicago Trustee/Licensee, the Beneficiaries, and the Local Communities.

1.1.36 "<u>Person</u>" means any individual, corporation, limited liability company, partnership, joint venture, association, joint-stock company, trust, charitable foundation, unincorporated organization, government or any agency or political subdivision thereof or any other entity.

1.1.37 "<u>Phase 2 Final Agreement</u>" means the Phase 2 Final Agreement Between Kerr-McGee Chemical Corporation and The City of West Chicago, Illinois dated February 24, 1997.

1.1.38 "<u>Plan Administrator</u>" means the administrator of any plan of reorganization confirmed by an order of the Bankruptcy Court in the Bankruptcy Cases.

1.1.39 "<u>Plan of Reorganization</u>" shall mean the Plan of Reorganization for the Settlors.

1.1.40 "<u>QSF Regulations</u>" shall have the meaning given in the recitals to this Agreement.

1.1.41 "<u>RAS</u>" means the Residential Areas Site.

1.1.42 "<u>RAS Properties</u>" means the Non-Owned RAS Properties and the Owned RAS Properties

1.1.43 "<u>Real Property Information</u>" shall mean documents in Settlors' possession related to title, easements and other real property information relating to the West Chicago Trust Sites.

1.1.44 "<u>REF</u>" means the Rare Earths Facility in West Chicago, Illinois.

1.1.45 "<u>REF Letter of Credit</u>" means Letter of Credit No. CPCS-648701.

1.1.46 "REF License" means the Radioactive Material License issued by IEMA to the West Chicago Trustee/Licensee.

1.1.47 "REF Surety Bond" means Bond No. 2971100-2630.

1.1.48 "Reorganized Tronox" means Tronox Incorporated, Tronox Worldwide LLC, Tronox LLC, non-Settlor foreign subsidiaries of the Settlors and such other Settlors and/or one or more newly organized successors, or any successor thereto, by merger, consolidation or otherwise, on or after the effective date of the Plan of Reorganization.

1.1.49 "Settlement Agreement" shall have the meaning given in the recitals.

1.1.50 "Settlors" shall have the meaning given in the preamble.

1.1.51 "State of Illinois" shall mean the State of Illinois on behalf of agencies and departments named in the Settlement Agreement and this Agreement.

1.1.52 "Superfund" means the "Hazardous Substance Superfund" established by 26 U.S.C. § 9507 or, in the event such Hazardous Substance Superfund no longer exists, any successor fund or comparable account of the Treasury of the United States to be used for removal or remedial actions to address releases or threats of releases of hazardous substances.

1.1.53 "Title X" means Title X of the Energy Policy Act of 1992, as amended, Pub L. No. 102-486 (1992).

1.1.54 "Title X Reimbursements" shall have the meaning given in Section 2.1.2 hereof.

1.1.55 "Tronox" means Tronox Incorporated.

1.1.56 "United States" means the United States of America on behalf of agencies and departments named in the Settlement Agreement.

1.1.57 "US EPA" means the United States Environmental Protection Agency and any successor departments or agencies of the United States.

1.1.58 "West Chicago Administrative Costs" means the fees, costs, and expenses incurred in connection with the administration of the West Chicago Trust, including but not limited to real estate management, taxes, insurance, and maintenance costs, but excluding any expenses (including, without limitation, expenses of the West Chicago Trustee/Licensee and its third-party professionals) incurred in overseeing, managing, and performing Environmental Actions.

1.1.59 "<u>West Chicago Owned Sites</u>" means the real property owned by Settlors located in West Chicago, Illinois, which include the REF and Owned RAS Properties and listed in Exhibit A.

1.1.60 "<u>West Chicago Special Account</u>" means the Kress Creek/West Branch DuPage River Superfund Site Special Account and the Residential Areas Site Properties Special Account.

1.1.61 "<u>West Chicago Trust</u>" means the trust established pursuant to this Agreement.

1.1.62 "<u>West Chicago Trust Account</u>" shall have the meaning given in Section 2.1.8 hereof.

1.1.63 "<u>West Chicago Trust Administrative Account</u>" means the West Chicago Trust Account established to fund the payment of West Chicago Administrative Costs.

1.1.64 "<u>West Chicago Trust Assets</u>" means (a) those assets and properties, including the West Chicago Owned Sites, the Funding and Consideration and any other sources of funding to be transferred to the West Chicago Trust pursuant to this Agreement and the Settlement Agreement and (b) such other assets acquired, earned or held by the West Chicago Trust from time to time pursuant to this Agreement.

1.1.65 "<u>West Chicago Trust Environmental Cost Account</u>" shall have the meaning given in Section 2.1.8.

1.1.66 "<u>West Chicago Trust Parties</u>" means, collectively, the West Chicago Trust, the West Chicago Trustee/Licensee, and the West Chicago Trustee/Licensee's shareholders, officers, directors, employees, members, managers, partners, affiliated entities, consultants, agents, accountants, attorneys or other professionals or representatives engaged or employed by the West Chicago Trust or West Chicago Trustee/Licensee; provided however, that any contractors or consultants retained to perform or oversee Environmental Actions of the West Chicago Trust (for the avoidance of doubt, other than the West Chicago Trustee/Licensee and its officers, directors, and employees) shall not be West Chicago Trust Parties.

1.1.67 "<u>West Chicago Trust Proceeds</u>" means the net proceeds of any liquidation, sale, lease, recovery or other disposition of or other proceeds in respect of the West Chicago Trust Assets.

1.1.68 "<u>West Chicago Trust Sites</u>" means (i) the REF, (ii) Kress Creek, (iii) Owned RAS Properties, and (iv) Non-Owned RAS Properties.

8

1.1.69 "West Chicago Trust Title X Account" means the segregated West Chicago Trust holding account to serve as a repository for Title X Reimbursements.

1.1.70 "West Chicago Trust Work Accounts" shall have the meaning given in Section 2.1.8.

1.1.71 "West Chicago Trustee/Licensee" means Weston Solutions, Inc., not individually but in a representative capacity on behalf of the West Chicago Trust.

All Capitalized terms not defined above shall have the meanings provided in the Settlement Agreement.


ARTICLE II
THE WEST CHICAGO TRUST

2.1    Creation of and Transfer of Assets to the West Chicago Trust

2.1.1    Pursuant to the Settlement Agreement, the Parties hereby establish, on behalf of the Beneficiaries named herein, and Tronox Worldwide LLC hereby transfers, assigns, and delivers, by quitclaim deed and other appropriate instruments to, the West Chicago Trustee, not individually but in its representative capacity on behalf of the West Chicago Trust, on behalf of the Beneficiaries, all of Settlors' right, title and interest in and to the West Chicago Trust Assets, including without limitation the West Chicago Owned Sites listed in Exhibit A to this Agreement.  Settlors shall retain no ownership or other residual interest whatsoever with respect to the West Chicago Trust or any West Chicago Trust Assets, including without limitation, the West Chicago Owned Sites. The transfer of ownership by Tronox Worldwide LLC of the West Chicago Trust Assets shall be a transfer of all of the Settlors' right, title and interests therein, and the transfer shall be (i) "as is" and "where is", with no warranties of any nature; (ii) free and clear of all claims, liens, encumbrances and interests against the Settlors, including, without limitation, mechanics' liens and other liens for the payments of monetary claims, such as property taxes, or other monetary claims asserted or that could have been asserted in the bankruptcy proceeding, but shall remain subject to any existing in rem encumbrances that do not secure payment of monetary claims (such as easements or deed restrictions), and subject to the occupancy fees and permit fees set forth in Section 2.11; (iii) subject to any rights of the United States and the State of Illinois under the Settlement Agreement; and (iv) accomplished by quitclaim deed and/or personal property bill of sale without warranty, with all such conveyance documents to be agreed to in form by the Settlors and the West Chicago Trustee/Licensee before the Effective Date, provided that in no event shall

9

the conveyance include any warranty by the grantor by virtue of the grant document or statutory or common law or otherwise. Settlors and Reorganized Tronox hereby disclaim any and all express or implied representations or warranties, including any representations or warranties of any kind or nature, express or implied, as to the condition, value or quality of such assets or other property, and specifically disclaim any representation or warranty of merchantability, usage, suitability or fitness for any particular purpose with respect to such assets or other property, any part thereof, the workmanship thereof, and the absence of any defects therein, whether latent or patent, it being understood that such assets are being acquired "as is, where is," and in their condition as of the Effective Date. The grantee for each such deed and personal property bill of sale shall be the West Chicago Trust by and through the West Chicago Trustee/Licensee, not individually but solely in its representative capacity as West Chicago Trustee/Licensee. Settlors and Reorganized Tronox, as applicable, will deliver to the title company (which will record or cause to be recorded in the appropriate real property records) the transfer documents as soon as reasonably practicable, but not to exceed 30 days after the Effective Date. Settlors shall pay the recording costs to the title company related to the title transfers. Settlors shall pay to the applicable tax authorities on or prior to the Effective Date all real property taxes to the West Chicago Owned Sites due for the period ending on the Effective Date. Settlors and the West Chicago Trust shall prorate the real property taxes accruing to or becoming a lien on the West Chicago Owned Sites during the calendar year 2010 (to the extent not already paid) and the calendar year of the Effective Date, and Settlors shall have paid to the West Chicago Trust their pro-rata share of such real property taxes on or before the Effective Date. If the actual bills for such real property taxes have not been issued, then such proration shall be based on an amount equal to such real property taxes for the prior year or tax period, which shall constitute a final proration and not be subject to further adjustment. As of the Effective Date, the West Chicago Trust shall be responsible for paying all real property taxes first coming due following the Effective Date relating to the West Chicago Owned Sites. Settlors shall execute, or cause to be executed on or before the Effective Date, and record, if necessary, all necessary releases of any liens or security interests held by any Settlors against the West Chicago Owned Sites. The West Chicago Trustee/Licensee, not individually but in its representative capacity on behalf of the West Chicago Trust, hereby accepts and agrees to hold the West Chicago Trust Assets in the West Chicago Trust for the benefit of the Beneficiaries for the purposes described in Section 2.2 below, subject to the terms of the Settlement Agreement, this Agreement, and any applicable orders of the Court.

2.1.2    <u>Transfer of Funding and Consideration to the West Chicago Trustee/Licensee</u>

2.1.2.1  <u>The Funding</u>. On the Effective Date, the Settlors shall cause to be transferred to or at the direction of the West Chicago Trustee/Licensee cash in the amount of $10,356,780.00 (the "Funding").

2.1.2.2  <u>Title X Reimbursements</u>. The Settlors hereby transfer and assign to the West Chicago Trustee/Licensee all of the Settlors' rights, title, and interest in (a) all Title X Reimbursements from the Department of Energy to which Settlors would have been entitled based on remediation work performed by or on behalf of Settlors at the REF and the Kerr-McGee West Chicago NPL Sites to the West Chicago Trust, and (b) all Title X Reimbursements from the Department of Energy to which the Settlors would have been entitled based on remediation work performed by the Settlors under the Kress Creek Settlement Agreement as set forth in Paragraph 8 of the Kress Creek Settlement Agreement (collectively, the "Title X Reimbursements").   The West Chicago Trustee/Licensee shall ensure that all Title X Reimbursements received by the West Chicago Trust after the Effective Date from the Department of Energy are deposited in the West Chicago Trust Title X Account, as set forth in Sections 2.1.8 and 2.2.1 below.

2.1.2.3  <u>Kress Creek Third-Party Escrow</u>.  On the Effective Date, and as set forth in Paragraph 9 of the Kress Creek Settlement Agreement, Settlors shall transfer the funds remaining in the third-party escrow account established under the Kress Creek Settlement Agreement to either the West Chicago Trust Environmental Cost Account for the Owned RAS Properties, the West Chicago Trust Work Account for the Non-Owned RAS Properties, or to the West Chicago Trust Work Account for Kress Creek, pursuant to written instructions to be provided by US EPA before the Effective Date (the "Kress Creek Escrow Account").

2.1.2.4  <u>REF Surety Bond and REF Letter of Credit</u>.  On the Effective Date, Settlors shall convert to cash the REF Surety Bond and the REF Letter of Credit and transfer the $39,797,247.65 in total funds to the West Chicago Trust Environmental Cost Account for the REF to fund future Environmental Actions and certain past and future oversight costs of IEMA with respect to the REF.

2.1.2.5  "Funding and Consideration" consists of the following: The Funding, the REF Surety Bond funds, the REF Letter of Credit funds, the Title X Reimbursements, and the Kress Creek Escrow Account.

2.1.2.6 <u>Elgin, Joliet, and Eastern Railway Company Railroad Surety Bond and West Chicago Letter of Credit Escrow Accounts</u>.  Within 30 days after the Effective Date, Reorganized Tronox, the West Chicago Trustee/Licensee, the Elgin, Joliet and Eastern Railway Company or its successor, and an escrow agent will enter into an agreement which will provide that upon completion by the West Chicago Trust of the remediation of the real property subject to such railroad company's right-of-way in accordance with the Lease Agreement, dated September 1, 1994, as amended by Renewal dated September 1, 2008, the Operating, Side Track and Construction Agreement, dated September 1, 1994, and the REF License, the Elgin, Joliet and Eastern Railway Company Railroad Surety Bond will be converted to cash and all such cash will be transferred to the West Chicago Trust for deposit to such West Chicago Trust Account(s) as directed, pursuant to written instructions to be provided by the Beneficiaries to the West Chicago Trustee/Licensee prior to such transfer.

2.1.2.7 <u>West Chicago Letter of Credit</u>.  After the Effective Date, the West Chicago Trust will be the recipient of any funds from the West Chicago Letter of Credit that are remaining after the infrastructure work required under the January 14, 2011 West Chicago Infrastructure Fund Agreement and secured by said Letter of Credit is completed.

2.1.3   Upon transfer of the Funding and Consideration on the Effective Date, the Settlors, Reorganized Tronox and any successors thereto shall have no interest in, or with respect to, any West Chicago Trust Assets, and the Settlors, Reorganized Tronox, and any successors thereto shall have no further obligation to provide funding to the West Chicago Trust.

2.1.4   <u>Modification of Consent Decrees</u>.

2.1.4.1 With respect to the Federal West Chicago Consent Decree, the United States, the State of Illinois, and Tronox LLC will file papers with the District Court for the Northern District of Illinois to modify the Federal West Chicago Consent Decree (and including without limitation any other applicable orders, decrees or agreements regarding investigation, remediation, cleanup or oversight as appropriate) to substitute the West Chicago Trust for Tronox LLC as a party to the Federal West Chicago Consent Decree after the Effective Date for all purposes; provided, however, that (i) nothing in this Section shall impose any obligation on the West Chicago Trust or the West Chicago Trustee/Licensee in excess of the West Chicago Trust Assets, and (ii) other than the substitution of the West Chicago Trust for Tronox LLC, nothing in this Agreement or the Settlement

Agreement shall affect any other provision of the Federal West Chicago Consent Decree.

2.1.4.2 With respect to the Local Communities Consent Decree, the Local Communities and Tronox LLC will file papers with the District Court for the Northern District of Illinois to modify the Local Communities Consent Decree (and including without limitation any other applicable orders, decrees or agreements regarding investigation, remediation, cleanup or oversight as appropriate) to substitute the West Chicago Trust as a party to the Local Communities Consent Decree after the Effective Date for all purposes; provided, however, that (i) nothing in this Section shall impose any obligation on the West Chicago Trust or the West Chicago Trustee/Licensee in excess of the West Chicago Trust Assets, (ii) nothing in this Section shall relieve Tronox LLC or its successors of any releases or covenants not to sue in the Local Communities Consent Decree, and (iii) other than the substitution of the West Chicago Trust for Tronox LLC, nothing in this Agreement or the Settlement Agreement shall affect any other provision of the Local Communities Consent Decree.

2.1.4.3 The Settlors shall deliver to the West Chicago Trustee/Licensee, a true and complete copy of the Federal West Chicago Consent Decree, the Local Communities Consent Decree and the Kress Creek Settlement Agreement before the Effective Date.

2.1.5   REF License.  Upon the execution of this Agreement, the West Chicago Trustee/Licensee shall submit to IEMA a fully signed copy of this Agreement and such other documents as requested by IEMA to support the application for IEMA to issue the REF License to the West Chicago Trustee/Licensee to be effective on the Effective Date.  It is acknowledged and agreed that the West Chicago Trustee/Licensee's obligation to perform any Environmental Actions at the REF is expressly conditioned upon the issuance of the REF License to the West Chicago Trustee/Licensee.  The West Chicago Trustee/Licensee shall be bound by the requirements of the REF License and applicable regulations, and any future amendments to or transfers of the REF License must be made in accordance with applicable state and federal law and regulations.  In accordance with applicable state and federal law and regulations, the West Chicago Trustee/Licensee shall be given advance notice of and shall receive an opportunity to comment on future amendments of the REF License by IEMA.  For the avoidance of doubt, the West Chicago Trustee/Licensee shall have no obligation to perform work required by the REF License obtained pursuant to the Settlement Agreement and this Agreement if the cost of such work exceeds the value of the West Chicago Trust Environmental Cost Account for the REF.

2.1.6    Kress Creek Settlement Agreement.

2.1.6.1 As set forth in Paragraph 4 of the Kress Creek Settlement Agreement, on the Effective Date, the Settlors shall assign the ARCADIS Contract, as defined in Paragraph 3 of the Kress Creek Settlement Agreement, to the West Chicago Trust in order that all rights, obligations, interests and liabilities of the Settlors pursuant to the ARCADIS Contract are assigned to and assumed by the West Chicago Trust.  Settlors shall deliver to the West Chicago Trustee/Licensee a complete copy of the ARCADIS Contract as soon as possible but in all events before the Effective Date. The West Chicago Trust shall not be required to pay any cure costs, to the extent required.

2.1.6.2 As set forth in Paragraph 6 of the Kress Creek Settlement Agreement, US EPA, at its discretion, may transfer funds from the West Chicago Special Account to the West Chicago Trust Work Account for Kress Creek or the West Chicago Trust Work Account for the Non-Owned RAS Properties, for the West Chicago Trustee/Licensee to conduct or finance response actions at or in connection with those Sites. Nothing in this Agreement shall impose any obligation on the West Chicago Trust or the West Chicago Trustee/Licensee in excess of the West Chicago Trust Assets.

2.1.6.3 As set forth in Paragraph 7 of the Kress Creek Settlement Agreement, on or before the Effective Date, the Settlors shall provide to the West Chicago Trustee/Licensee all information and documentation necessary to submit a Title X claim for any remedial costs incurred by the Settlors for work performed under the Kress Creek Settlement Agreement that was not previously claimed by the Settlors in Paragraph 5 of the Kress Creek Settlement Agreement.

2.1.7    Executory Contracts or Unexpired Leases.  The West Chicago Trust by and through the West Chicago Trustee/Licensee not individually but solely in its representative capacity, the Settlors, and the respective Lead Agencies for the REF, the RAS Properties, and Kress Creek shall exchange information and reasonably cooperate to determine the appropriate disposition of any executory contracts or unexpired leases that relate to the relevant site and are listed in Exhibit B, provided however, that the West Chicago Trustee/Licensee shall not be required to take an assignment of any executory contract or unexpired lease without the consent of the West Chicago Trustee/Licensee, and further provided that such assignments are finalized on or before the Effective Date.  The Settlors shall obtain all consents necessary to assign such executory contracts and unexpired leases to the West Chicago Trustee/Licensee free

14

and clear of all claims, liens, encumbrances and interests against the Settlors, before the Effective Date. The Settlors and Reorganized Tronox shall retain no ownership or other residual interest whatsoever with respect to any assigned executory contract or unexpired lease. The Settlors shall cooperate with the West Chicago Trustee/Licensee to transition the assigned executory contracts and unexpired leases and take such other action thereto as the Lead Agencies or the West Chicago Trustee/Licensee may request to transition such assigned executory contract and unexpired leases. The Settlors shall deliver to the West Chicago Trustee/Licensee a complete copy of each assigned executory contract and unexpired lease as soon as possible. The West Chicago Trust shall not be required to pay any cure costs, to the extent required.

2.1.8    <u>Creation of the West Chicago Trust Accounts</u>.    The West Chicago Trustee/Licensee shall create segregated West Chicago Trust Environmental Cost Accounts and segregated West Chicago Trust Work Accounts within the West Chicago Trust for each of the West Chicago Trust Sites as follows: (i) a West Chicago Trust Environmental Cost Account for REF; (ii) a West Chicago Trust Work Account for Kress Creek; (iii) a West Chicago Trust Environmental Cost Account for the Owned RAS Properties; and (iv) a West Chicago Trust Work Account for the Non-Owned RAS Properties. The purpose of the West Chicago Trust Environmental Cost Account for the REF shall be to provide funding for future Environmental Actions and certain past and future oversight costs of the State of Illinois with respect to the REF (such past costs are unpaid costs incurred by IEMA during the period July 1, 2010 through the Effective Date and payable pursuant to Section 331.200 of the Radiation Protection regulations, 32 Ill. Adm. Code 331.200); additionally, in accordance with Subparagraph 107(b) of the Settlement Agreement, the West Chicago Trustee/Licensee shall transfer funds from the West Chicago Trust Environmental Cost Account for the REF to the West Chicago Trust Work Account for Kress Creek. The purpose of the West Chicago Trust Work Account for Kress Creek shall be to fund the performance of Environmental Actions by the West Chicago Trust with respect to Kress Creek. The purpose of the West Chicago Trust Environmental Cost Account for the Owned RAS Properties shall be to provide funding for future Environmental Actions and certain future oversight costs of the State of Illinois and/or US EPA with respect to the Owned RAS Properties. The purpose of the West Chicago Trust Work Account for the Non-Owned RAS Properties shall be to fund the performance of Environmental Actions by the West Chicago Trust for the Non-Owned RAS Properties. Funding from a West Chicago Trust Environmental Cost Account or West Chicago Trust Work Account for any of the West Chicago Trust Sites may not be used for any other site except as expressly provided by and in accordance with Section 2.4.3 below and Paragraph 107(b) of the Settlement Agreement. The initial funding of the West Chicago Trust Environmental Cost Account for the

15

REF shall be $39,797,247.65 in funds from the REF Surety Bond and REF Letter of Credit. The initial funding of the West Chicago Trust Environmental Cost Account for the Owned RAS Properties shall be a total of $306,448.00. The initial funding of the West Chicago Trust Work Account for the Non-Owned RAS Properties shall be a total of $77,240.00. The initial funding of the West Chicago Trust Work Account for Kress Creek shall be $1,670,090.00. Also, the West Chicago Trust Environmental Cost Account for the Owned RAS Properties, the West Chicago Trust Work Account for the Non- Owned RAS Properties, or the West Chicago Trust Work Account for Kress Creek shall receive the funding currently contained in the Kress Creek Escrow Account, pursuant to Section 2.1.2.3.

The West Chicago Trustee/Licensee shall also create a segregated West Chicago Trust Administrative Account in the amount of $8,303,002.00.

Lastly, the West Chicago Trustee/Licensee shall also create a segregated West Chicago Trust Title X Account to serve as a repository for the Title X Reimbursements. The West Chicago Trustee/Licensee shall ensure that all Title X Reimbursements received by the West Chicago Trust after the Effective Date from the Department of Energy are deposited in the West Chicago Trust Title X Account.

The separate accounts are referred to in this Agreement individually as a "West Chicago Trust Account" and collectively as the "West Chicago Trust Accounts." To the extent feasible, the West Chicago Trust Assets shall be invested as set forth in Section 2.6.1. Subject to Section 2.6, the income and gains from an investment of any West Chicago Trust Assets shall be allocated, paid and credited to such West Chicago Trust Account. The State of Illinois on behalf of IEMA and IEPA, and the United States on behalf of the US EPA shall be the sole beneficiaries of the West Chicago Trust Accounts. Neither Settlors nor Reorganized Tronox shall have any rights or interest to the West Chicago Assets, including but not limited to any Title X Reimbursements received from the Department of Energy after the Effective Date, or to any funds remaining in any of the West Chicago Trust Accounts upon the completion of any and all final actions and disbursement of any and all final costs with respect to the West Chicago Trust Sites.

2.1.9    Each West Chicago Trust Account may be divided into such number of trust subaccounts dedicated for specific uses as may be deemed necessary in the sole discretion of the West Chicago Trustee/Licensee to comply with the terms of, and implement, the Settlement Agreement and this Agreement.

2.1.10   For all federal income tax purposes, the West Chicago Trustee/Licensee and Settlors shall treat the transfer of the West Chicago Trust Assets by

16

Tronox Worldwide LLC to the West Chicago Trust as a transfer to a qualified settlement fund pursuant to Section 468B of the Internal Revenue Code and the QSF Regulations. The West Chicago Trustee/Licensee shall at all times seek to have the West Chicago Trust treated as a "qualified settlement fund" as that term is defined in the QSF Regulations. The Court shall retain continuing jurisdiction over the West Chicago Trust and the West Chicago Trust Assets sufficient to satisfy the requirements of the QSF Regulations. Subject to Section 6.4 below, the West Chicago Trustee/Licensee shall cause any taxes imposed on the West Chicago Trust to be paid out of the West Chicago Trust Assets and shall comply with all tax reporting and withholding requirements imposed on the West Chicago Trust under applicable tax laws. The West Chicago Trustee/Licensee shall be the "administrator" of the West Chicago Trust pursuant to Treasury Regulation Section 1.468B-2(k)(3). To the extent Settlors elect to treat the West Chicago Trust as a grantor trust pursuant to Treasury Regulation Section 1.468B-1(k)(1), the West Chicago Trustee/Licensee will reasonably cooperate with the Settlors with respect to such election, provided the Settlors agree that the West Chicago Trustee/Licensee does not represent or guaranty that the West Chicago Trust is a qualified settlement fund and that the Settlors are eligible to make the election in accordance with IRS rules and Treasury Regulation Section 1.468B-1, and it is not responsible to take any action to verify or confirm such qualification or eligibility.

2.1.11   The West Chicago Trustee/Licensee shall use the West Chicago Trust Environmental Cost Account for the REF to fund future Environmental Actions and certain past and future oversight costs of IEMA with respect to the REF in accordance with Paragraph 107(b) of the Settlement Agreement, and to fund the completion of Environmental Actions at Kress Creek pursuant to Section 2.4.3.2. The West Chicago Trustee/Licensee shall use the West Chicago Trust Environmental Cost Account for the Owned RAS Properties to fund future Environmental Actions and certain future oversight costs of the State of Illinois and US EPA with respect to the Owned RAS Properties. The West Chicago Trustee/Licensee shall use the West Chicago Trust Work Account for the Non-Owned RAS Properties to fund future Environmental Actions for the Non-Owned RAS Properties; however, these funds may not be used for future oversight costs of the State of Illinois and US EPA with respect to the Non-Owned RAS Properties. The West Chicago Trustee/Licensee shall use the West Chicago Trust Work Account for Kress Creek to fund future Environmental Actions for Kress Creek; however, these funds may not be used for future oversight costs of the State of Illinois and US EPA with respect to Kress Creek. The West Chicago Trustee/Licensee shall use the West Chicago Trust Administrative Account to fund the West Chicago Administrative Costs approved by the United States and the State of Illinois, and the change of occupancy fees and the permit fees referenced in Section 2.11.

2.1.12 The Settlors and the West Chicago Trustee/Licensee will compile within ten (10) days after the Effective Date, a complete list of all permits, licenses, and similar instruments for the operation of the West Chicago Trust Assets currently held by Settlors.    The West Chicago Trustee/Licensee, with the cooperation of the Settlors as may be requested, either will cause such permits, licenses and similar instruments to be transferred to the West Chicago Trustee/Licensee as of the Effective Date, or will apply for the issuance to the West Chicago Trustee/Licensee of replacement permits, licenses and similar instruments.

2.2    Objective and Purpose

2.2.1    The exclusive purposes and functions of the West Chicago Trust are to: (i) act as successor to Settlors solely for the purpose of performing, managing, and funding implementation of Environmental Actions selected by US EPA for (a) RAS Properties and (b) for Kress Creek, pursuant to the Federal West Chicago Consent Decree and the Local Communities Consent Decree; (ii) act as successor to the Settlors under the REF License solely for the purpose of performing, managing, and funding implementation of Environmental Actions at the REF; (iii) use all reasonable efforts, by and through the West Chicago Trustee/Licensee, to secure Title X Reimbursements owed after the Effective Date from the Department of Energy, to which the West Chicago Trustee/Licensee is legally entitled based on Environmental Actions performed by or on behalf of Settlors and the West Chicago Trust (and regardless of whether further Environmental Actions continue to be necessary at Kress Creek, the RAS Properties, or the REF); (iv) own the West Chicago Owned Sites; (v) carry out administrative functions related to the performance of Environmental Actions by or on behalf of the West Chicago Trust at Kress Creek and the RAS Properties, and other administrative functions with respect to the West Chicago Owned Sites; (vi) ultimately sell, transfer or otherwise dispose or facilitate the reuse of all or part of the Owned RAS Properties (including, but not limited to, any appurtenances, machinery, equipment, fixtures, furniture, computers, tools, parts, supplies, and other tangible property on the Owned RAS Properties that are transferred to the West Chicago Trust), if possible; (vii) ultimately sell or transfer the REF to the City of West Chicago, pursuant to the conditions and terms set forth in Section 2.11.3 herein; and (viii) to act as successor to Settlors for the purpose of complying with the provisions of the Kress Creek Settlement Agreement.  The actions of the West Chicago Trust and the West Chicago Trustee/Licensee in its representative capacity, including, without limitation, the sale, lease or other disposition of some or all of the West Chicago Assets, and the performance by the West Chicago Trustee/Licensee of its duties pursuant to the Settlement Agreement and this Agreement shall not be deemed an engagement in any trade or business.

18

2.2.2   The West Chicago Trust is established pursuant to this Agreement and the Settlement Agreement and approved by the Bankruptcy Court for the sole purpose of resolving claims asserting environmental liabilities of Settlors with respect to the West Chicago Trust Sites.  The Bankruptcy Court shall retain continuing jurisdiction over the West Chicago Trust. The West Chicago Trust is intended by the Parties to be classified as a qualified settlement fund pursuant to the QSF Regulations.

2.3   Holder of West Chicago Trust Assets

From the Effective Date, the West Chicago Trust shall be the exclusive holder of the West Chicago Trust Assets and West Chicago Trust Accounts described herein for purposes of 31 U.S.C. § 3713(b).

2.4   Management of West Chicago Trust Assets

2.4.1   Consistent with this Agreement and the Settlement Agreement, the West Chicago Trustee/Licensee shall use the West Chicago Trust Environmental Cost Accounts and West Chicago Trust Work Accounts for the purposes set forth in Section 2.1.11.

2.4.2   The West Chicago Trustee/Licensee may enter into additional consent decrees or consent orders with the United States and/or the State of Illinois, and may perform work pursuant to Unilateral Administrative Orders issued by US EPA, to facilitate implementation of this Section with respect to the West Chicago Trust Sites, to the extent of available funds and subject to the terms of the Settlement Agreement and this Agreement.

2.4.3   Transfers of Funds from the West Chicago Trust Accounts.

2.4.3.1 Transfers from the West Chicago Trust Administrative Account. US EPA, IEMA and the Local Communities may jointly direct the West Chicago Trustee/Licensee to transfer 30% of the funds initially deposited in the West Chicago Trust Administrative Account into the West Chicago Trust Work Account for Kress Creek.

2.4.3.2 Transfers from the West Chicago Trust Environmental Cost Account for the REF.  To facilitate completion of Environmental Actions at Kress Creek in a timely manner, IEMA authorizes the West Chicago Trustee/Licensee to transfer up to a total of $14,000,000.00 in funds from the West Chicago Trust Environmental Cost Account for the REF to the West Chicago Trust Work Account for Kress Creek to pay for transportation and disposal costs as follows: (i) First, within 30 days after the Effective Date, and upon receipt and review of applicable invoices for costs incurred for transportation and disposal during the 2010 construction season through the Effective Date, the West Chicago

Trustee/Licensee shall transfer funds in the total amount of transportation and disposal invoices during the 2010 construction season through the Effective Date, from the West Chicago Trust Environmental Cost Account for the REF to the West Chicago Trust Work Account for Kress Creek; and (ii) Second, upon receipt of an invoice or invoices for transportation and disposal costs of materials from Kress Creek, the Owned RAS Properties, and the Non-Owned RAS Properties that were incurred after the Effective Date, the West Chicago Trustee/Licensee shall transfer the amount of the invoices due and owing from the West Chicago Trust Environmental Cost Account for the REF to the West Chicago Trust Work Account for Kress Creek to provide for payment pursuant to the terms of the invoice(s). The West Chicago Trustee/Licensee shall maintain funds in the West Chicago Trust Environmental Cost Account for the REF as long as possible consistent with the terms of the invoices in order to provide for the generation of interest. If any portion of the transferred REF funds remains after payment of all transportation and disposal costs described herein, those funds shall be returned to the West Chicago Trust Environmental Cost Account for the REF.

2.4.3.3 Transfers from the West Chicago Trust Title X Account.  In the event that the West Chicago Trustee/Licensee is directed to transfer funds deposited in the West Chicago Trust Administrative Account into the West Chicago Trust Work Account for Kress Creek any funds that become available to the West Chicago Trust Title X Account shall be transferred to the West Chicago Trust Administrative Account until such time as the funds transferred are restored (with no provision for interest).

2.4.3.4 Subject to Section 2.4.3.3, the West Chicago Trustee/Licensee shall allocate any funds from the West Chicago Trust Title X Account as money becomes available according to the following priority list: (i) first, to the West Chicago Trust Work Account for Kress Creek, in a total amount not to exceed $17,000,000.00 (including Title X Reimbursements relating to approved reimbursement requests submitted to Department of Energy after April 1, 2010); (ii) second, to the West Chicago Trust Environmental Cost Account for the REF to replenish the West Chicago Trust Environmental Cost Account for the REF in the amount of funds previously transferred to the West Chicago Trust Work Account for Kress Creek; (iii) third, to the West Chicago Trust Environmental Cost Account for the Owned RAS Properties or to the West Chicago Trust Work Account for the Non-Owned RAS Properties, to fund site evaluations and/or to fund remaining Environmental Actions identified as of the Effective Date; (iv) fourth, to the West Chicago Special Account to replenish the

balance of the West Chicago Special Account up to the sum of the amounts contained in the West Chicago Special Account at the Effective Date and any amount of West Chicago Special Account funds transferred by US EPA to the Kress Creek Escrow Account prior to the Effective Date, provided, however, that the West Chicago Special Account shall be reimbursed first unless the West Chicago Trustee/Licensee determines, with the approval of US EPA and IEMA, that any of the other West Chicago Trust Sites has a need for additional funding for remaining Environmental Actions in which case those other West Chicago Trust Sites shall receive such funding; (v) fifth, to the extent allowed by law, to reimburse all Superfund monies provided to any of the West Chicago Trust Work Accounts, if any, in full or in part; (vi) sixth, with the approval of US EPA and IEMA, to the Multistate Trust Environmental Cost Account for any site located in the State of Illinois; (vii) seventh, in accordance with instructions to be provided by the United States Department of Justice and the relevant States, to the Henderson Trust Environmental Cost Account, the Cimarron Trust Environmental Cost Account, the Savannah Trust Environmental Cost Account, or any of the Multistate Trust Environmental Cost Accounts or Work Accounts if there are remaining Environmental Actions to be performed at the Owned Funded Sites or the Non-Owned Service Stations and a need for additional trust funding, with the allocation among such Environmental Cost or Work Accounts to be determined by the projected shortfall of performing such remaining Environmental Actions; (viii) eighth, to Non- Owned Sites with a need for additional funding beyond the distributions received pursuant to Paragraph 117 of the Settlement Agreement and from the Anadarko Litigation Proceeds; and (ix) ninth, to the Superfund.

2.4.3.5 Notwithstanding any other provision in this Settlement Agreement, with respect to any West Chicago Trust Environmental Cost Account or West Chicago Trust Work Account, in no event shall funds be removed from an account without the express written consent of the Lead Agency for that account, except that IEMA hereby approves the transfer of funds from the West Chicago Trust Environmental Cost Account for the REF to the West Chicago Trust Work Account for Kress Creek pursuant to this Section 2.4.3.

2.4.4    After US EPA, IEMA and/or IEPA (in its capacity as the Lead Agency) has confirmed to the West Chicago Trustee/Licensee that all final Environmental Actions have been completed pursuant to the Federal West Chicago Consent Decree, the Local Communities Consent Decree, the Kress Creek Settlement Agreement and the REF License, and as otherwise required under applicable law, and all related costs have been finally

21

disbursed with respect to each West Chicago Trust Site, any funds remaining in that site's Environmental Cost Account or Work Account shall be transferred in the following order: (i) first, to the West Chicago Trust Work Account for Kress Creek to fund remaining Environmental Actions at Kress Creek; (ii) second, to the West Chicago Trust Environmental Cost Account for the REF to replenish that account in the amount of funds transferred to the West Chicago Trust Work Account for Kress Creek; (iii) third, to the West Chicago Trust Environmental Cost Account for the Owned RAS Properties or the West Chicago Trust Work Account for the Non-Owned RAS Properties, to fund site evaluations and/or to fund remaining Environmental Actions identified as of the Effective Date; (iv) fourth, to the West Chicago Special Account to replenish the balance of the West Chicago Special Account up to the sum of the amounts contained in the West Chicago Special Account at the Effective Date and any amount of West Chicago Special Account funds transferred by US EPA to the Kress Creek Escrow Account prior to the Effective Date, provided, however, that the West Chicago Special Account shall be reimbursed first unless the West Chicago Trustee/Licensee determines, with the approval of US EPA and IEMA, that any of the other West Chicago Trust Sites has a need for additional funding for remaining Environmental Actions in which case those other West Chicago Trust Sites shall receive such funding; (v) fifth, to the extent allowed by law, to reimburse all Superfund monies provided to any of the West Chicago Trust Work Accounts, if any, in full or in part; (vi), sixth, with the approval of US EPA and IEMA, to the Multistate Trust Environmental Cost Account for any site located in the State of Illinois; (vii) seventh, in accordance with instructions to be provided by the United States Department of Justice and the relevant States, to the Henderson Trust Environmental Cost Account, the Cimarron Trust Environmental Cost Account, the Savannah Trust Environmental Cost Account, or any of the Multistate Trust Environmental Cost Accounts or Work Accounts if there are remaining Environmental Actions to be performed at Owned Sites or certain Non-Owned Sites in those Trusts and a need for additional trust funding, with the allocation among such Environmental Cost or Work Accounts to be determined by the projected shortfall of performing such remaining Environmental Actions; (viii) eighth, to Non-Owned Sites with a need for additional funding beyond the distributions received pursuant to Paragraph 117 of the Settlement Agreement, and from the Anadarko Litigation Proceeds; and (ix) ninth, to the Superfund.

2.4.5    Annually, beginning with the first year after the Effective Date, the West Chicago Trustee/Licensee shall provide the United States and the State of Illinois with an update of anticipated future West Chicago Administrative Costs. The United States may thereafter instruct in writing after consultation with the State of Illinois and the West Chicago Trustee/Licensee that any conservatively projected surplus funding in the West Chicago Trust Administrative Account be transferred to one or more

of the other West Chicago Trust Environmental Cost Accounts or West Chicago Trust Work Accounts established under the Settlement Agreement for a West Chicago Trust Site if there are remaining actions to be performed and with a need for additional trust funding or, to the extent there are no such remaining actions, as described in clauses (i)-(ix) in the immediately preceding Section. If there is an anticipated shortfall in the West Chicago Trust Administrative Account based on anticipated future West Chicago Administrative Costs, funds from either of the West Chicago Trust Environmental Cost Accounts may be transferred to the West Chicago Trust Administrative Account, upon the joint discretion of the Lead Agency and the Non-Lead Agency, if applicable, for the respective West Chicago Trust Environmental Cost Account.

2.5    <u>Work Performed and Disbursements by the West Chicago Trust</u>

Payments from the West Chicago Trust shall be made as provided in accordance with Subparagraphs 105(e)-(g) of the Settlement Agreement and Article III below.

2.6    <u>Investment and Safekeeping of West Chicago Trust Assets</u>

2.6.1    The West Chicago Trust Assets shall be held in trust and segregated. All interest, dividends, and other revenue earned in a West Chicago Trust Account shall be retained in the respective West Chicago Trust Account and used only for the same purposes as the principal in that account as provided in this Agreement and the Settlement Agreement, subject to any reallocation approved by the State of Illinois, the United States, and, as applicable, the Local Communities, in accordance with the terms of this Agreement and the Settlement Agreement.    The West Chicago Trustee/Licensee shall be under no liability to earn income or interest on any moneys received by the West Chicago Trust hereunder and held for distribution or payment as provided in this Agreement, except as such interest shall actually be received by the West Chicago Trust.    Any moneys held by the West Chicago Trust, including without limitation the West Chicago Trust Proceeds, or any income earned by the West Chicago Trust, shall be invested, and the West Chicago Trustee/Licensee shall have the right and power to so invest such assets (pending periodic distributions in accordance with Article III hereof), in any combination of (a) demand and time deposits, such as checking and savings accounts, and certificates of deposit, in banks or other savings institutions, (b) any other investment vehicle that cannot result in a reduction of the principal amount originally invested, or (c) any other investment vehicle approved in writing by the Lead Agency for the particular West Chicago Trust Environmental Cost Account or Work Account, or approved in writing by the State of Illinois and the United States for the West Chicago Trust Administrative Account and the West Chicago Trust Title X Account.

23

<u>Provided, however</u>, that with respect to any investment under this Section 2.6.1, all certificates of deposit must be with a domestic office of any national or state bank or trust company organized under the laws of the United States or any state and having capital, surplus, and undivided profits of at least $750,000,000, or in such institutions not meeting this specified capital requirement to the extent that the deposits are federally insured.

2.6.2   The West Chicago Trustee/Licensee is expressly prohibited from holding any or all of the West Chicago Trust Assets in a common, commingled or collective trust fund and from holding any or all of the West Chicago Trust Assets in a common, commingled or collective trust fund with the assets of any other entity.  However, the funds provided for administrative expenses can be held in one account.

2.6.3   Nothing in this Section shall be construed as authorizing the West Chicago Trustee/Licensee to cause the West Chicago Trust to carry on any business or to divide the gains therefrom, including without limitation, the business of an investment company, a company "controlled" by an "investment company," required to register as such under the Investment Company Act of 1940, as amended. The sole purpose of this Section 2.6 is to authorize the investment of the funds in the West Chicago Trust Accounts or any portions thereof as may be reasonably prudent pending use of the proceeds for the purposes of the West Chicago Trust.

2.6.4   The West Chicago Trust Parties shall not incur any liability for following any written direction or order to act (or to refrain to act) from any Beneficiary so long as such written direction is not inconsistent with this Agreement and the Settlement Agreement.

2.7     <u>Insurance Policy to Cover Future Response Actions</u>

Only at the direction of the United States and the State of Illinois shall the West Chicago Trustee/Licensee investigate the possible purchase of an insurance policy to cover future Environmental Actions at the West Chicago Owned Sites. If, and only if, the United States and the State of Illinois unanimously direct the West Chicago Trustee/Licensee in writing to purchase such insurance, shall the West Chicago Trustee/Licensee use West Chicago Trust Assets to purchase such insurance.

2.8     <u>Access and Deed Restrictions</u>

The West Chicago Trustee/Licensee shall provide the United States, the State of Illinois, and their representatives and contractors access to all portions of the West Chicago Trust Sites at all reasonable times for the purposes of conducting Environmental Actions at or near the West Chicago Trust Sites. With respect to Kress Creek, the West Chicago Trustee/Licensee shall also provide the Forest Preserve District of DuPage County and their representatives and contractors access to all portions of the site at all reasonable times for the purposes of conducting

Environmental Actions at or near the site. The West Chicago Trustee/Licensee shall execute and record with the appropriate recorder's office any easements or deed restrictions requested by the United States and IEPA for restrictions on use of the Owned RAS Properties, or requested by IEMA for restrictions on the use of the REF, in order to protect public health, welfare or safety or the environment or ensure non-interference with or protectiveness of any action. Any restrictions requested by IEMA shall not be inconsistent with the lease and transfer of the REF to the City of West Chicago for use as a park and for recreational purposes as provided herein. Additionally, the West Chicago Trustee/Licensee shall abide by the terms of any institutional controls or deed restrictions in place or of record as to the REF and the Owned RAS Properties. Any existing easements or deed restrictions of record as to the West Chicago Owned Sites prior to the Effective Date of the Settlement Agreement shall survive the Settlement Agreement.

2.9    Accounting

The West Chicago Trustee/Licensee shall maintain proper books, records, and accounts relating to all transactions pertaining to the West Chicago Trust, and the assets and liabilities of the West Chicago Trust in such detail and for such period of time as may be necessary to enable the West Chicago Trustee/Licensee to make full and proper accounting in respect thereof in accordance with Article VI below and to comply with applicable provisions of law and good accounting practices. Except as otherwise provided herein or by the Settlement Agreement, the West Chicago Trustee/Licensee shall not be required to file any accounting or seek approval of the Court with respect to the administration of the West Chicago Trust, or as a condition for making any payment or distribution out of the West Chicago Trust Assets. Beneficiaries shall have the right upon fourteen (14) days' prior written notice delivered to the West Chicago Trustee/Licensee to inspect such books and records.

2.10    Termination

Consistent with the terms of the Settlement Agreement, the West Chicago Trustee/Licensee shall not unduly prolong the duration of the West Chicago Trust and shall at all times endeavor to resolve, settle, or otherwise dispose of all claims against West Chicago Trust Assets and to effect the distribution of West Chicago Trust Assets and other receipts relating thereto to the Beneficiaries and the others who receive distributions hereunder in accordance with the terms hereof, and to terminate the West Chicago Trust as soon as practicable consistent with this Agreement and the Settlement Agreement.

2.11    Property Disposition

The Settlors have requested that the City of West Chicago allow transfer of the West Chicago Owned Sites without occupancy inspections and code compliance.   In return for the City of West Chicago's agreement to allow such transfer to take place to facilitate the creation and effectiveness of this Trust Agreement, once these properties are transferred to the West Chicago Trustee, the West Chicago Trustee shall have each property inspected for code compliance, pay all change of occupancy fees and repair any code violations to meet all applicable code provisions within thirty days of the Effective Date.  If any structure on any of these properties is to be demolished as opposed to being renovated to meet City Code requirements, such a demolition permit shall be applied for from the City of West Chicago

within thirty days of the effective date of this Agreement and demolition shall take place within ninety days of the issuance of that permit and payment of all permit fees. Notwithstanding anything to the contrary herein, all of these fees and expenses shall be paid by the Trustee from the West Chicago Trust Administrative Account. Notwithstanding the foregoing, Settlors shall have no responsibility to obtain the occupancy inspections and comply with City Code requirements with respect to the West Chicago Owned Sites.

    2.11.1 The United States and the State of Illinois may at any time propose in writing to take ownership of the Owned RAS Properties or any part thereof. Any such proposed transfer and the terms thereof are subject to approval in writing by the United States and the State of Illinois (after consultation with the West Chicago Trustee/Licensee). The West Chicago Trustee/Licensee may, at any time, seek the approval of the United States and the State of Illinois for the sale or lease or other disposition of all or part of the Owned RAS Properties. The West Chicago Trustee/Licensee shall also take all necessary steps to effectuate the transfer of the REF to the City of West Chicago, as set forth in Section 2.11.3 below. However, neither the United States nor the State of Illinois shall be required to accept an ownership interest in remaining properties upon termination of the West Chicago Trust.

    2.11.2 Subject to the approval of the United States and the State of Illinois, the West Chicago Trustee/Licensee may propose a sale, lease, or disposition of the Owned RAS Properties that includes funding from, or the retention of some portion of liability by, the West Chicago Trust Environmental Cost Account for the Owned RAS Properties and/or the West Chicago Trust Administrative Account, provided that the net effect of any proposed sale, lease or disposition is to lessen the West Chicago Trust's total financial obligations and liabilities as would otherwise be incurred in the absence of any such sale, lease, or disposition. In the event of any approved sale or lease or other disposition under this Section, any net proceeds from the sale or lease or other disposition shall be payable to the West Chicago Trust Environmental Cost Account for the Owned RAS Properties and/or the West Chicago Trust Administrative Account in a proportion approved by the United States and the State of Illinois in writing.

    2.11.3 <u>Transfer of REF Property to the City of West Chicago</u>. The West Chicago Trustee/Licensee shall also take all necessary steps to effectuate the lease and transfer of title of all of the property constituting the REF to the City of West Chicago in accordance with the following conditions.

        2.11.3.1 The REF will be leased and then sold to the City of West Chicago for use as a park and recreational field site as further described herein and in the Settlement Agreement. The price for the lease is $1.00 for every ten years with the provision for renewal of at least ten (10) ten-year periods.

The price for purchase of the entire REF acreage is an additional $1.00. The City of West Chicago and IEMA desire that transfer of the REF take place as soon as is practicable.

2.11.3.2 The schedule for leasing any portions of the REF to the City of West Chicago is subject to completion and compliance with the REF License requirements at those portions of the REF. The West Chicago Trustee/Licensee shall obtain approval from IEMA, pursuant to the terms of the REF License, prior to leasing any portion of the REF to the City of West Chicago. Portions of the REF may be leased to the City of West Chicago with IEMA approval before completion of the Closure Plan for the entire REF. The Trustee, IEMA and the City of West Chicago acknowledge and agree that portions of the REF may be leased to the City of West Chicago prior to the completion of the groundwater remediation at the REF.

2.11.3.3 The schedule for selling the REF to the City of West Chicago is subject to completion of the Closure Plan at the REF and termination of the REF License. Upon termination of the REF License, the West Chicago Trustee/Licensee shall transfer ownership of the entire REF to the City of West Chicago.

2.11.3.4 Future use of the REF by the City of West Chicago is as a park and recreational fields; the proposed design of the park and recreational fields are depicted in the Final Remediation Plan figure that is attached to the Phase 2 Final Agreement. The West Chicago Licensee/Trustee and its contractors, and IEMA as the licensing agency, will use their best efforts to: keep wells and piping out of the field envelopes, flush mount wells to the extent possible, vegetatively screen those wells which cannot be flush mounted, and place all piping underground.

2.11.3.5 The West Chicago Trustee/Licensee will vegetate (seed) and grade the REF prior to lease or sale consistent with future use as a park and recreational space.

2.11.3.6 The West Chicago Trustee/Licensee and its contractors will not disturb the portions of the REF leased or sold to the City of West Chicago or interfere with City of West Chicago use without prior notice and agreement from the City of West Chicago; provided that, agreement from the City of West Chicago is not required for installation,

maintenance and monitoring of groundwater wells and piping. Any disturbance due to the West Chicago Trustee/Licensee's access or work to the property leased or sold to the City of West Chicago shall be repaired by the West Chicago Trustee/Licensee to return the property to its pre-access or disturbance condition at no cost to the City of West Chicago.

2.11.3.7 The City of West Chicago shall allow the West Chicago Trustee/Licensee, IEMA, and their respective contractors access to those portions of the REF leased/sold to it for purposes of completing Closure Plan work.

2.11.3.8 The West Chicago Trustee/Licensee shall refer to the following provisions of the Phase 2 Final Agreement as guidance in drafting applicable documents: Paragraph 12, the Final Remediation Plan for the Kerr-McGee Chemical Corporation West Chicago Rare Earths Facility (Exhibit B) and the Lease (Exhibit D).

2.11.3.9 The West Chicago Trustee/Licensee is bound to implement the terms of the REF License. The REF License shall control in the event of a conflict between any other term or condition of this Agreement, the Settlement Agreement, the Phase 2 Final Agreement or its attachments, or any other agreement. Notwithstanding the foregoing, for the avoidance of doubt, it is agreed that the West Chicago Trustee/Licensee shall have no obligation to implement the REF License or perform work required by the REF License if the cost of such work exceeds the value of the West Chicago Trust Environmental Cost Account for the REF.

2.11.3.10 Notwithstanding any other provision herein, the West Chicago Trust Environmental Cost Account for the REF shall only be used for work approved in the REF License issued by IEMA for the REF and in accordance with Paragraph 107(b) of the Settlement Agreement, unless otherwise approved in writing by the Lead Agency consistent with Paragraph 101(e) of the Settlement Agreement.

2.11.3.11 The West Chicago Trustee/Licensee will confer with the City of West Chicago regarding ongoing work at the REF as reasonably requested by the City of West Chicago.

28

2.11.4 The parties agree that the rule against perpetuities does not apply to the West Chicago Trust, but to the extent that any rule against perpetuities or a rule governing or limiting vesting, accumulations, the suspension of alienation, or the like shall be deemed applicable, the West Chicago Trust shall automatically terminate on the date 90 days after the date on which 21 years less 91 days pass after the death of the last survivor of all of the descendants of the late Joseph P. Kennedy, Sr., father of the late President John F. Kennedy, living on the date hereof, and provided further that if the West Chicago Trust owns real property located in any jurisdiction that sets a maximum duration for interests in real property located in such jurisdiction held in trust under a rule against perpetuities or a rule governing or limiting vesting, accumulations, the suspension of alienation, or the like, that for the West Chicago Trust is shorter than the date 90 days after the date on which 21 years less 91 days pass after the death of the last survivor of all of the descendants of the late Joseph P. Kennedy, Sr., father of the late President John F. Kennedy, living on the date hereof, the West Chicago Trust shall automatically terminate as to such property upon the expiration of the maximum period authorized pursuant to the laws of such jurisdiction. If the West Chicago Trust is terminated in whole or in part pursuant to this Subsection, title to the relevant property or properties as to which the West Chicago Trust is terminated shall be transferred outright and free of trust to or at the direction of the United States in consultation with any of the States in which the relevant property or properties are located, provided, however, that the disposition of all relevant property or properties shall be governed by applicable state and federal law, or by agreement of the West Chicago Trustee/Licensee, the United States, and the applicable State, or by order of the Court, and further provided that neither the United States nor the State of Illinois will be required to accept an ownership interest in the relevant property or properties as to which the West Chicago Trust is terminated.

## ARTICLE III
## WORK AND DISTRIBUTIONS

3.1     West Chicago Trust Accounts

The West Chicago Trustee/Licensee shall establish, maintain and hold trust accounts consistent with the Settlement Agreement and Section 2.1 of this Agreement, to administer the West Chicago Trust Assets and distributions therefrom. The West Chicago Trustee/Licensee shall also maintain a dedicated West Chicago Trust Administrative Account for administrative funds, which shall be used solely to pay the costs of administering the West Chicago Trust as set forth herein.

3.2     Payments by the West Chicago Trust

Within 90 days following the Effective Date in the first year and thereafter by January 1 of each year following the Effective Date, the West Chicago Trustee/Licensee shall provide to

US EPA and IEMA a statement for each of the West Chicago Trust Environmental Cost and Work Accounts showing the balance of each cost account and proposed budget for the coming year as described in Sections 3.2.1 and 3.2.3 of this Agreement. The Lead Agency shall have the authority to approve or disapprove the proposed budget for the relevant West Chicago Trust Environmental Cost or West Chicago Trust Work Account after consultation with the Non-Lead Agency, if such consultation is requested.  The West Chicago Trustee/Licensee shall not pay any expense that has not been provided for in the applicable budget approved by the Lead Agency except that claims by a governmental agency shall be paid in accordance with Paragraph 105(e)-(g) of the Settlement Agreement.

    3.2.1   <u>Administrative Expenses of the West Chicago Trust</u>

Within 90 days following the Effective Date in the first year and thereafter by January 1 of each year, the West Chicago Trustee/Licensee shall provide the United States and the State of Illinois with an annual budget for administration of the West Chicago Trust for review and approval or disapproval by the United States and the State of Illinois. If disapproved, such budget shall be revised and resubmitted as expeditiously as possible. No administrative expenses may be incurred or paid by the West Chicago Trustee/Licensee that are inconsistent with the approved budget, unless the United States and the State of Illinois approves the request of the West Chicago Trust for the authority to perform an administrative action, before the budget has been approved, or a revised budget; <u>provided, however,</u> that the West Chicago Trustee/Licensee may incur or pay ongoing or recurring expenses approved in the prior year's budget that occur between the time a proposed annual budget is submitted and the time it is approved. Each annual budget shall include a future year forecast of administrative expenditures, with annual details for at least the next three years (or such longer period as the United States and the State of Illinois shall reasonably request). The West Chicago Trust shall regularly, but not less often than annually, and otherwise upon the reasonable request of the United States or the State of Illinois, provide documentation to the United States and the State of Illinois to substantiate compliance with the applicable approved budget and application of West Chicago Trust Assets consistently with the terms of this Agreement and the Settlement Agreement. The approved budget shall be funded by the transfer of the approved amount from West Chicago Trust Assets.

    3.2.2   <u>Remuneration for West Chicago Trustee/Licensee's Start-Up Fees and Expenses</u>

The West Chicago Trustee/Licensee shall be entitled to remuneration from the West Chicago Trust Administrative Account of up to $400,000.00 for its reasonable fees and expenses in connection with the formation of the West Chicago Trust prior to the Effective Date.  Where the West Chicago Trustee/Licensee, the United States, and the relevant Lead Agency agree that the West Chicago Trustee/Licensee accrued pre-Effective Date fees

and expenses in furtherance of activities that post-Effective Date would constitute Environmental Actions, those pre-Effective Date fees and expenses shall be paid from the Environmental Cost Accounts. After the Effective Date, the West Chicago Trustee/Licensee will submit detailed invoices reflecting its pre-Effective Date fees and expenses for approval by the United States and the State of Illinois. The West Chicago Trustee/Licensee will calculate such fees and expenses using the following "cost plus fixed fee" formula:

a)      Direct costs, such as raw hourly labor rates or external costs (including without limitation equipment and material purchases and subcontractor services), plus;

b)      Indirect costs, such as breakeven overhead, fringe benefits, and general and administrative costs equal to the West Chicago Trustee/Licensee's most recent federal cognizant audit agency rate (currently, the Defense Contract Audit Agency rate), plus;

c)      For each category listed below, a fee equal to the corresponding percentage calculated on the sum of (a) and (b) immediately above:

    i.      3% for the West Chicago Trustee/Licensee's employees dedicated to any of the West Chicago Trust Sites.

    ii.      7% for other labor and external costs, except for the costs set forth in (iii) through (vi) below.

    iii.      3% for contractor costs related to the performance of Environmental Actions at Kress Creek

    iv.      3% for 11(e)2 byproduct transportation and disposal costs.

    v.      0% for counsel to the West Chicago Trust and/or the West Chicago Trustee/Licensee and for any public accounting firm retained by the West Chicago Trust pursuant to Section 4.4 of this Agreement.

    vi.      0% for Beneficiary oversight costs.

3.2.3   Environmental Expenses of the West Chicago Trust

Within 90 days following the Effective Date in the first year and thereafter by January 1 of each year following the Effective Date, the West Chicago Trustee/Licensee shall provide to US EPA and IEMA a statement for each of the West Chicago Trust Environmental Cost Accounts and the West Chicago Trust Work Accounts showing the balance of each account and proposed budget for the coming year. The Lead Agency shall have the authority to approve or disapprove the proposed budget for the relevant

West Chicago Trust Environmental Cost or West Chicago Trust Work Account after consultation with the Non-Lead Agency, if such consultation is requested. If disapproved, a budget shall be revised and resubmitted as expeditiously as possible. No expenses may be incurred or paid by the West Chicago Trustee/Licensee that are inconsistent with an approved budget, unless the Lead Agency after consultation with the Non-Lead Agency, if such consultation is requested, approves an emergency response action or a revised budget; provided, however, that the West Chicago Trustee/Licensee may incur or pay ongoing or recurring expenses approved in the prior year's budget that occur between the time a proposed annual budget is submitted and the time it is approved. Further, by January 1 of each year during the term of the West Chicago Trust and within nine (9) months after termination of the West Chicago Trust, the West Chicago Trustee/Licensee shall prepare and submit to the Beneficiaries an annual report with respect to each of the West Chicago Trust Environmental Cost Accounts and West Chicago Trust Work Accounts. The annual report shall pertain to the prior calendar year, or if the report is a final report, such period from the most recent annual report to the termination of the West Chicago Trust Environmental Cost Accounts and West Chicago Trust Work Accounts.

3.2.4    Reimbursement of Agencies and Performance of Environmental Action by Trust

3.2.4.1. The West Chicago Trustee/Licensee shall pay funds from the West Chicago Trust Environmental Cost Account for the REF and the West Chicago Trust Environmental Cost Account for the Owned RAS Properties to the Lead Agency making a written request for funds for reimbursement within 10 days following such request, for costs incurred for the REF or the Owned RAS Properties. Such written request shall: (i) be in accordance with the approved budget set forth in Section 3.2.3 above, (ii) specify what the funds were used for, and (iii) certify that they were used only for Environmental Actions, certain past costs and future oversight costs incurred after the Effective Date by the Lead Agency with respect to that site. The West Chicago Trustee/Licensee shall also pay funds from the West Chicago Trust Environmental Cost Account for the Owned RAS Properties to the Non- Lead Agency making a written request for funds within 30 days following such request where the Lead Agency has requested the assistance of the Non-Lead Agency with respect to that site. Such written request shall: (i) be in accordance with the approved budget set forth in Section 3.2.3 above, (ii) specify what the funds were used for, and (iii) certify that they were used only for Environmental Actions performed and/or oversight costs incurred after the Effective Date by the Non-Lead Agency with respect to the Owned RAS Properties.

32

3.2.4.2   The West Chicago Trustee/Licensee shall pay funds from the West Chicago Trust Work Account for Kress Creek and the West Chicago Trust Work Account for the Non-Owned RAS Properties to the Lead Agency making a written request for funds for reimbursement within 30 days following such request. Such written request shall: (i) be in accordance with the approved budget set forth in Section 3.2.3  above, (ii) specify what the funds were used for, and (iii) certify that they were used only for Environmental Actions. The West Chicago Trustee/Licensee shall also pay funds from the West Chicago Trust Work Account for Kress Creek and the West Chicago Trust Work Account for the Non-Owned RAS Properties to the Non-Lead Agency making a written request for funds within 30 days following such request where the Lead Agency has requested the assistance of the Non-Lead Agency with respect to either site. Such written request shall: (i) be in accordance with the approved budget set forth in Section 3.2.3  above, (ii) specify what the funds were used for, and (iii) certify that they were used only for Environmental Actions performed by the Non-Lead Agency with respect to Kress Creek or the Non-Owned RAS Properties, and will not be used to reimburse the Lead Agency or the Non-Lead Agency for oversight costs. The funds paid pursuant to this Subsection 3.2.4.2 may not be used to reimburse the Lead Agency or Non-Lead Agency for oversight costs.

3.2.4.3   In the case of requests by the Lead Agency to the West Chicago Trustee/Licensee to use the funds from a particular West Chicago Trust Environmental Cost or West Chicago Trust Work Account to perform Environmental Actions in accordance with the approved budget set forth in Section 3.2.3  above, the West Chicago Trustee/Licensee shall utilize the funds and interest earned thereon from that West Chicago Trust Environmental Cost or West Chicago Trust Work Account to undertake such work promptly and in accordance with any schedule approved by the Lead Agency.

3.2.5   Contractor Approval.  The West Chicago Trustee/Licensee shall seek the approval of the Lead Agency of any contractor hired by the West Chicago Trustee/Licensee and any work plans to be undertaken by the West Chicago Trust under the oversight of the Lead Agency, unless the Lead Agency has provided a written waiver of such approval or requirements. Each contractor and subcontractor shall maintain commercial comprehensive general liability insurance of at least $2,000,000.00, unless either a higher amount is required by a consent decree, or a lower amount is approved in writing by the relevant Lead Agency, and name the West Chicago Trust as an additional insured.

33

3.3    Review of Site Plans.

The West Chicago Trustee/Licensee, IEMA, IEPA and US EPA shall designate a contact for each West Chicago Trust Site. Upon request, the West Chicago Trustee/Licensee shall provide to IEMA, IEPA, and US EPA electronic or paper copies of technical memoranda, scopes of work, work plans, progress reports, and cost estimates and cost expenditures at the same time as the West Chicago Trustee/Licensee distributes those documents to the Lead Agency for each West Chicago Trust Site. With respect to Kress Creek, all such documents shall also be provided to the Forest Preserve District of DuPage County and the Local Communities Representative for their review in accordance with the Local Communities Consent Decree. Upon request, the West Chicago Trustee/Licensee shall also provide copies of each West Chicago Trust Environmental Cost Account and the West Chicago Trust Work Account statement, work schedule, and budget to IEMA, IEPA, and US EPA, as those documents are generated. IEMA, IEPA or US EPA may contact each other or the West Chicago Trustee/Licensee for information purposes. However, each Lead Agency fully reserves its authority, rights and responsibilities to make decisions regarding its respective Work Chicago Trust Environmental Cost Account or Work Account. The West Chicago Trustee/Licensee shall also provide an update on completed and scheduled work and other activities, especially of interest to the public, related to their respective West Chicago Trust Site(s) at the regularly scheduled Intergovernmental Forum.

3.4    Liens by Government

Subject to the other provisions of this Article III, the West Chicago Trust hereby grants to the West Chicago Trustee/Licensee, the United States, and the State of Illinois a first-priority lien on and security interest in the West Chicago Trust Accounts to secure the payment of all amounts owed to, accrued or reserved on account of the West Chicago Trust or to be retained by the West Chicago Trustee/Licensee hereunder or otherwise due hereunder. However, only the West Chicago Trustee/Licensee shall have a first-priority lien on and security interest in the West Chicago Trust Administrative Account. Only IEMA shall have a first-priority lien on and security interest in the West Chicago Trust Environmental Cost Account for the REF. Only the Lead Agency shall have a first-priority lien on and security interest in the West Chicago Trust Environmental Cost Account for the Owned RAS, the West Chicago Trust Work Account for the Non-Owned RAS, and the West Chicago Trust Work Account for Kress Creek. Only the United States and the State of Illinois shall have a first-priority lien and security interest in the West Chicago Trust Title X Account. The Parties acknowledge, however, that unless an agreement, in the nature of a security and control account agreement, is signed with the financial institution(s) with whom the West Chicago Trust Accounts are invested, the liens and security interest described in this Section 3.4 will not be perfected liens and security interests entitled to priority.

3.5    Manner of Payment

Cash payments made by the West Chicago Trust pursuant to the Settlement Agreement and this Agreement shall be in United States dollars by checks drawn on a domestic bank whose deposits are federally insured selected by the West Chicago Trustee/Licensee, or by wire transfer from such a domestic bank, at the option of the West Chicago Trustee/Licensee.

ARTICLE IV
THE WEST CHICAGO TRUSTEE/LICENSEE

4.1     Appointment

    4.1.1    Weston Solutions, Inc., a Pennsylvania corporation qualified to do business as a foreign corporation in the State of Illinois, not individually but solely in its representative capacity, is appointed to serve as the West Chicago Trustee/Licensee, to serve as the West Chicago Trustee/Licensee to administer the West Chicago Trust and the West Chicago Trust Assets, in accordance with the Settlement Agreement and this Agreement, and the West Chicago Trustee/Licensee hereby accepts such appointment and agrees to serve in such representative capacity, effective upon the Effective Date of this Agreement.

    4.1.2    The West Chicago Trustee/Licensee shall obtain environmental, general and professional liability insurance in the sum of $10,000,000.00. In the alternative, after consultation with the respective Lead Agencies, the West Chicago Trust may obtain the services of an environmental consultant to implement the future Environmental Actions (the "Consultant"), that shall obtain environmental, general and professional liability insurance in the sum of $10,000,000.00 or such lesser amount as agreed to by the West Chicago Trust after consultation with the United States and the State of Illinois.  The Consultant shall ensure that its contractors or subcontractors satisfy all applicable laws and regulations regarding the provision of worker's compensation insurance for all persons performing Environmental Actions on behalf of the West Chicago Trustee/Licensee. The beneficiary of the insurance policies shall be the West Chicago Trust and shall cover negligence committed by the Consultant in implementing the future Environmental Actions or any other negligence committed by the Consultant. The legal relationship of the Consultant to the West Chicago Trust and West Chicago Trustee/Licensee is that of an independent contractor professional, not that of an entity employed by the West Chicago Trust or the West Chicago Trustee/Licensee.  The Consultant shall not be deemed a West Chicago Trust Party.  The insurance requirements contained in this Agreement shall be in addition to, and not in place of, the insurance requirements in the Federal West Chicago Consent Decree and the Local Communities Consent Decree, and the West Chicago Trustee/Licensee's obligations to comply with such.

4.2     Generally

    The West Chicago Trustee/Licensee's powers are exercisable solely in a fiduciary capacity consistent with, and in furtherance of, the purposes of the West Chicago Trust, this Agreement and the Settlement Agreement and not otherwise. The West Chicago Trustee/Licensee shall have the authority to bind the West Chicago Trust, and any successor West Chicago Trustee/Licensee, or successor or assign of the West Chicago Trust, but shall for

35

all purposes hereunder be acting in its representative capacity as West Chicago Trustee/Licensee and not individually. Notwithstanding anything to the contrary contained herein, (a) the West Chicago Trustee/Licensee shall not be required to take action or omit to take any action if, after the advice of counsel, the West Chicago Trustee/Licensee believes in good faith such action or omission is not consistent with the West Chicago Trustee/Licensee's fiduciary duties, and (b) the West Chicago Trustee/Licensee may, subject to the budget approval requirements set forth in Section 3.2.3 and the contractor approval requirements set forth in Section 3.2.5, perform any work required to be performed hereunder, which, itself, shall be deemed not to violate any prohibition against self-dealing under statutory or common law, or any breach of fiduciary duty, it being the intent of the Parties that the West Chicago Trustee/Licensee may perform Environmental Actions under this Agreement, subject to the budget approval requirements set forth in Section 3.2.3 and the contractor approval requirements set forth in Section 3.2.5. The West Chicago Trustee/Licensee shall have no obligations to perform any activities for which the relevant Environmental Cost Account lacks sufficient funds.

4.3    Powers

In connection with the administration of the West Chicago Trust, except as otherwise set forth in this Agreement or the Settlement Agreement, the West Chicago Trustee/Licensee is authorized to perform, manage and fund the implementation of Environmental Actions as set forth herein and in the Settlement Agreement, and generally perform any and all acts necessary to accomplish the purposes of the West Chicago Trust. The powers of the West Chicago Trust shall, without any further Court approval or order, include, without limitation, each of the following: (i) to receive, manage, invest, supervise, sell, assign, transfer, lease, convey and protect the West Chicago Trust Assets, withdraw, make distributions and pay taxes and other obligations owed by the West Chicago Trust or the West Chicago Trust Accounts from funds held by the West Chicago Trustee/Licensee and/or the West Chicago Trust (or the West Chicago Trust Accounts) and perform Environmental Actions in accordance with the Settlement Agreement and this Agreement, and withhold and pay to the appropriate taxing authority any withholding taxes on distributions from the West Chicago Trust; (ii) to engage employees and professional Persons to assist the West Chicago Trust and/or the West Chicago Trustee/Licensee with respect to the responsibilities described herein; (iii) to make distributions of the West Chicago Trust Assets from the West Chicago Trust Accounts for the purposes contemplated in this Agreement and the Settlement Agreement; and (iv) to effect all actions and execute all agreements, instruments and other documents necessary to implement this Agreement, including, without limitation, to exercise such other powers as may be vested in or assumed by the West Chicago Trust and/or the West Chicago Trustee/Licensee pursuant to this Agreement, the Settlement Agreement and any order of the Court or as may be necessary and proper to carry out the provisions of this Agreement and the Settlement Agreement. No Person dealing with the West Chicago Trust shall be obligated to inquire into the authority of the West Chicago Trustee/Licensee in connection with its performance hereunder or the protection, conservation or disposition of West Chicago Trust Assets. The West Chicago Trustee/Licensee is authorized to execute and deliver all documents on behalf of the West Chicago Trust to accomplish the purposes of this Agreement and the Settlement Agreement.

4.4    Other Professionals

After consultation with the United States and the State of Illinois, the West Chicago Trust is authorized to retain on behalf of the West Chicago Trust and pay such third parties as the West Chicago Trustee/Licensee (in accordance with a budget approved pursuant to Section 3.2 above) may deem necessary or appropriate to assist the West Chicago Trustee/Licensee in carrying out its powers and duties under this Agreement and the Settlement Agreement, including, without limitation, (i) counsel to the West Chicago Trust and/or West Chicago Trustee/Licensee, (ii) a public accounting firm to perform such reviews and/or audits of the financial books and records of the West Chicago Trust as may be appropriate in the West Chicago Trustee/Licensee's reasonable discretion and to prepare and file any tax returns or informational returns for the West Chicago Trust or the West Chicago Trust Accounts as may be required, and (iii) environmental consultants, custodians, security personnel, engineers, surveyors, brokers, contractors, administrative assistants and clerks. The West Chicago Trustee/Licensee may pay all such Persons compensation for services rendered and expenses incurred in accordance with a budget approved as provided in Section 3.2.

4.5    Limitation of the West Chicago Trustee/Licensee's Authority

The West Chicago Trust and the West Chicago Trustee/Licensee shall not and are not authorized to engage in any trade or business with respect to the West Chicago Trust Assets or any proceeds therefrom except as and to the extent the same is deemed in good faith by the West Chicago Trustee/Licensee to be reasonably necessary or proper for the conservation or protection of the West Chicago Trust Assets, or the fulfillment of the purposes of the West Chicago Trust. The West Chicago Trust and the West Chicago Trustee/Licensee shall not take any actions that would cause the West Chicago Trust to fail to qualify as a qualified settlement fund under the QSF Regulations.

4.6    Reliance by the West Chicago Trust Parties

Except as may otherwise be provided herein: (a) the West Chicago Trust Parties may rely on, and shall be protected in acting upon, any resolution, certificate, statement, instrument, opinion, report, notice, request, consent, order, or other paper or document believed by any of them to be genuine and to have been authorized, signed or presented by the proper party or parties; (b) the West Chicago Trust Parties may consult with legal counsel, financial, tax, accounting or other advisors and professionals as they deem appropriate and shall not be personally liable for any action taken or not taken in accordance with the advice thereof; and (c) persons and entities dealing with the West Chicago Trust Parties shall look only to the West Chicago Trust Assets that may be available to them consistent with this Agreement and the Settlement Agreement to satisfy any liability incurred by the West Chicago Trust Parties to such person in carrying out the terms of this Agreement, the Settlement Agreement or any order of the Court, and the West Chicago Trust Parties shall have no personal obligations to satisfy any such liability other than as provided in Section 4.9.1. For the avoidance of doubt, and without limiting the generality of the foregoing, the West Chicago Trustee/Licensee shall have no obligation to perform work required by the REF License obtained pursuant to this Settlement Agreement and the West Chicago Trust Agreement if the cost of such work exceeds the value of the West Chicago Trust Environmental Cost Account for the REF.

4.7    Compensation of the West Chicago Trustee/Licensee

The West Chicago Trust shall pay its own reasonable and necessary costs and expenses, and shall reimburse the West Chicago Trustee/Licensee for the actual reasonable out-of-pocket fees and expenses to the extent incurred by the West Chicago Trustee/Licensee in connection with the West Chicago Trustee/Licensee's duties hereunder, including, without limitation, necessary travel, lodging, office rent (to be paid directly by the West Chicago Trust), postage, photocopying, telephone and facsimile charges upon receipt of periodic billings, all in accordance with an annual budget (including a contracting plan if requested by the Lead Agency) or fee schedule approved by the Beneficiaries. The West Chicago Trustee/Licensee, and employees of the West Chicago Trust and the West Chicago Trustee/Licensee, who perform services for the West Chicago Trust shall be entitled to receive reasonable compensation for services rendered on behalf of the West Chicago Trust in accordance with an annual budget or fee schedule approved by the Beneficiaries pursuant to Section 3.2. The West Chicago Trustee/Licensee will calculate the annual budget or fee schedule using the following "cost plus fixed fee" formula:

   a) Direct costs, such as raw hourly labor rates or external costs (including without limitation equipment and material purchases and subcontractor services), plus;

   b) Indirect costs, such as breakeven overhead, fringe benefits, and general and administrative costs equal to the West Chicago Trustee/Licensee's most recent federal cognizant audit agency rate (currently, the Defense Contract Audit Agency rate), plus;

   c) For each category listed below, a fee equal to the corresponding percentage calculated on the sum of (a) and (b) immediately above:

        i.    3% for the West Chicago Trustee/Licensee's employees dedicated to any of the West Chicago Trust Sites.

        ii.   7% for other labor and external costs, except for the costs set forth in (iii) through (vi) below.

        iii.  3% for contractor costs related to the performance of Environmental Actions at Kress Creek.

        iv.   3% for 11(e)2 byproduct transportation and disposal costs.

        v.    0% for counsel to the West Chicago Trust and/or the West Chicago Trustee/Licensee and for any public accounting firm retained by the West Chicago Trust pursuant to Section 4.4 of this Agreement.

        vi.   0% for Beneficiary oversight costs.

In addition, the West Chicago Trustee/Licensee and the relevant Lead Agency may agree to a written incentive program for the performance of Environmental Actions at a West Chicago

Trust Site. If the proposed incentive for a West Chicago Trust Site has the potential to adversely affect funding at another West Chicago Trust Site, then the Lead Agency of that site must also agree in writing to the incentive program.

The West Chicago Administrative Account, which shall be funded as described in Section 2.4.5, unless otherwise agreed to by the United States and the State of Illinois, shall be subject to the claims of the West Chicago Trustee/Licensee, and the West Chicago Trustee/Licensee shall be entitled to reimburse itself out of any available cash in the West Chicago Trust Administrative Account, and the West Chicago Trust shall be obligated to pay, for actual out-of-pocket expenses and for actual hours worked.

All compensation and other amounts payable to the West Chicago Trustee/Licensee shall be paid from the West Chicago Trust Assets.

4.8     Liability of West Chicago Trust Parties

4.8.1   In no event shall any of the West Chicago Trust Parties be held liable to any third parties for any liability, action, or inaction of any other party, including Settlors or any other West Chicago Trust Party. The West Chicago Trust Parties shall, further, be indemnified and exculpated in accordance with Section 4.9 of this Agreement.

4.8.2   As provided in Sections XVI, XVII, XVIII of the Settlement Agreement, the West Chicago Trust Parties are deemed to have resolved their civil liability under CERCLA and State Environmental Laws to the United States and the States, and have protection from contribution actions or claims as provided by Sections 113(f)(2) of CERCLA, 42 U.S.C. Section 9613(f)(2) or similar state law for matters addressed in the Settlement Agreement. The West Chicago Trust Parties shall have the benefits of the covenants not to sue as set forth in Section XVI of the Settlement Agreement, of contribution protection as set forth in Section XVIII of the Settlement Agreement and of the provisions as set forth in Section XVII of the Settlement Agreement.

No provision of this Agreement or the Settlement Agreement shall require the West Chicago Trustee/Licensee to expend or risk its own personal funds or otherwise incur any personal financial liability based on the ownership of the West Chicago Trust Assets or the performance or non-performance of any of its duties or the exercise of any of its authorities as West Chicago Trustee/Licensee hereunder. Notwithstanding the foregoing, the West Chicago Trustee/Licensee shall satisfy from its own funds any liability imposed by a final order of the Court, not reversed on appeal, that determines that it committed acts that were grossly negligent, and/or committed fraud or willful misconduct in relation to the performance or non-performance of any of its duties or the exercise of any of its authorities as West Chicago Trustee/Licensee hereunder.

4.9     Exculpation and Indemnification

4.9.1   <u>Exculpation</u>. None of the West Chicago Trust Parties shall be personally liable unless the Court, by a final order that is not reversed on appeal, finds that it committed acts that were grossly negligent, and/or committed fraud or willful misconduct after the Effective Date in relation to the West Chicago Trustee/Licensee's duties. There shall be an irrebuttable presumption that any action taken or not taken with the approval of the Court does not constitute gross negligence, or an act of fraud or willful misconduct.  For the avoidance of doubt, the term "approval of the Court" in this Section 4.9.1 shall not be construed to mean the Findings of Fact, Conclusions of Law and Order Confirming the First Amended Joint Plan of Reorganization of Tronox Incorporated et al., Pursuant to Chapter 11 of the Bankruptcy Code, any other order that has been entered to date by the Bankruptcy Court, or any future order approving this Agreement or the Anadarko Litigation Trust Agreement.   Any judgment against a West Chicago Trust Party and any costs of defense relating to any West Chicago Trust Party shall be paid from the West Chicago Trust Environmental Cost Account or West Chicago Trust Work Account for the relevant site or the West Chicago Trust Administrative Account without the West Chicago Trust Party having to first pay from its own funds for any personal liability or costs of defense, unless a final order of the Court, that is not reversed on appeal, determines that it committed acts that were grossly negligent, and/or committed fraud or willful misconduct in relation to the West Chicago Trust Party's duties. However, any payment shall be limited to funds in the West Chicago Trust Environmental Cost Account or West Chicago Trust Work Account for the relevant West Chicago Trust Site or the West Chicago Trust Administrative Account.

4.9.2   The West Chicago Trust Parties are exculpated by all persons, including without limitation, holders of claims and other parties in interest, of and from any and all claims, causes of action and other assertions of liability arising out of the ownership of West Chicago Trust Assets and the discharge of the powers and duties conferred upon the West Chicago Trust and/or West Chicago Trustee/Licensee by this Agreement or the Settlement Agreement or any order of court entered pursuant to or in furtherance of this Agreement or the Settlement Agreement, or applicable law or otherwise. No person, including without limitation, holders of claims and other parties in interest, will be allowed to pursue any claims or cause of action against any West Chicago Trust Party for any claim against Settlors, for making payments in accordance with this Agreement, the Settlement Agreement or any order of court, or for implementing the provisions of this Agreement, the Settlement Agreement or any order of court. Nothing in this Section, this Agreement or the Settlement Agreement shall preclude the United States, the State of Illinois, or the Local Communities from enforcing the terms of this Agreement or the Settlement Agreement against the West Chicago Trustee/Licensee.

4.9.3    <u>Indemnification</u>. The West Chicago Trust shall indemnify, defend and hold harmless (without the West Chicago Trust Parties having to first pay from their personal funds) the West Chicago Trust Parties from and against any and all claims, causes of action, liabilities, obligations, losses, costs, judgments, damages or expenses (including, without limitation, attorneys' fees) and any other assertion of liability arising out of the ownership of West Chicago Trust Assets or action, inaction or otherwise in connection with, the ownership of the West Chicago Trust Assets or performance as the West Chicago Trustee/Licensee, to the fullest extent permitted by applicable law, provided that such indemnification shall be limited to funds in the West Chicago Trust Environmental Cost Accounts or West Chicago Trust Work Accounts for the West Chicago Trust Sites or the West Chicago Trust Administrative Account. Without limiting the foregoing, any such judgment against a West Chicago Trust Party and any such costs of defense relating to any West Chicago Trust Party shall be paid by the West Chicago Trust consistent with the terms and conditions of this Section. Notwithstanding the foregoing, to the extent fraud or willful misconduct of any West Chicago Trust Party is alleged and the Court finds, by a final order, not reversed on appeal, that such West Chicago Trust Party committed fraud or willful misconduct after the Effective Date in relation to the West Chicago Trust Party's duties, there shall be no indemnification of that West Chicago Trust Party for any judgments arising from such fraud or willful misconduct. It shall be an irrebuttable presumption that any action taken, or inaction, consistent with Court approval shall not constitute willful misconduct or fraud.  For the avoidance of doubt, the term "Court approval" in this Section 4.9.3 shall not be construed to mean the Findings of Fact, Conclusions of Law and Order Confirming the First Amended Joint Plan of Reorganization of Tronox Incorporated et al., Pursuant to Chapter 11 of the Bankruptcy Code, any other order that has been entered to date by the Bankruptcy Court, or any future order approving this Agreement or the Anadarko Litigation Trust Agreement.

4.10    <u>Termination and Removal of the West Chicago Trustee/Licensee.</u>

4.10.1    <u>Termination</u>

The duties, responsibilities and powers of the West Chicago Trustee/Licensee will terminate on the date the West Chicago Trust is dissolved under applicable law in accordance with the Settlement Agreement, or by an order of the Court; provided that this Section and Sections 4.6, 4.8 and 4.9 above shall survive such termination, dissolution and entry. The West Chicago Trustee/Licensee may resign from its trusteeship generally and without cause by giving not less than 120 days prior written notice thereof to the Bankruptcy Court, the United States, the State of Illinois and the Local Communities; provided however, that in the event a suitable replacement is not found and approved by the United

States, the State of Illinois and the Local Communities within 120 days after such written notice is provided, the West Chicago Trustee/Licensee's resignation shall not become effective and the West Chicago Trustee/Licensee shall continue to function in its capacity as Trustee/Licensee until a suitable replacement is found and approved by the United States, the State of Illinois, and the Local Communities. Such termination shall be without prejudice to the terminated West Chicago Trustee/Licensee's rights to compensation and to be reimbursed under Section 4.7 and Article III hereunder

4.10.2 <u>Removal</u>

The West Chicago Trustee/Licensee may be removed or the West Chicago Trust Assets may be transferred to the United States or the State of Illinois by:

(1) The entry of an order by the Bankruptcy Court, immediately upon notice of appointment of a temporary or permanent successor, finding that the West Chicago Trustee/Licensee committed fraud or willful misconduct after the Effective Date in relation to the West Chicago Trustee/Licensee's duties under the West Chicago Trust; or

(2) The entry of an order by the Bankruptcy Court, immediately upon notice of appointment of a temporary or permanent successor, finding that (i) the West Chicago Trustee/Licensee in any material respect, as a result of negligence, exacerbates or aggravates hazardous conditions at any of the West Chicago Trust Sites, (ii) is seriously or repeatedly deficient or late in performance of the work; or (iii) has violated the provisions of this Agreement or any amendments thereto which continues for 30 days after receipt by the West Chicago Trustee/Licensee of written notice specifying the violation. In the event of the occurrence of 2(i) or 2(ii), the United States and the State of Illinois may jointly direct that (i) the West Chicago Trustee/Licensee be replaced in accordance with this Section or (ii) all remaining funds and future recoveries in the West Chicago Trust be paid to the United States or to the State of Illinois to be used in accordance with the terms of this Agreement or the Settlement Agreement. In the event the funds are so paid, so long as title to the West Chicago Owned Sites remains in the name of the West Chicago Trust or West Chicago Trustee/Licensee, funds deemed reasonably sufficient by the applicable Beneficiaries to cover property taxes and other property management costs to be paid by the West Chicago Trust for the West Chicago Owned Sites shall be left in the West Chicago Trust Administrative Account.

42

(3) The provisions of this Section and Section 4.6, 4.8 and 4.9 above shall survive the removal of the West Chicago Trustee/Licensee or transfer of funds.  Such removal shall be without prejudice to the removed West Chicago Trustee/Licensee's rights to compensation and to be reimbursed under Section 4.7 and Article III hereunder.

4.10.3  In the event the West Chicago Trustee/Licensee resigns, is terminated or removed, the West Chicago Trustee/Licensee shall take all necessary actions for an IEMA-approved transfer of the REF License to the successor West Chicago Trustee/Licensee.    The West Chicago Trustee/Licensee retains all responsibilities and obligations under the REF License until the REF License is transferred or a termination amendment is issued by IEMA.

4.11    Appointment of Successor West Chicago Trustee/Licensee

Any successor West Chicago Trustee/Licensee shall be proposed by the United States and the State of Illinois and appointed by the Court. Any successor West Chicago Trustee/Licensee appointed hereunder shall execute an instrument accepting such appointment hereunder and shall file such acceptance with the West Chicago Trust records. Thereupon, such successor West Chicago Trustee/Licensee shall, without any further act, become vested with all the estates, properties, rights, powers, trusts and duties of its predecessor in the West Chicago Trust with like effect as if originally named herein; provided, however, that a removed or resigning West Chicago Trustee/Licensee shall, nevertheless, when requested in writing by the successor West Chicago Trustee/Licensee, execute and deliver an instrument or instruments conveying and transferring to such successor West Chicago Trustee/Licensee under the West Chicago Trust all the estates, properties, rights, powers, and trusts of such predecessor West Chicago Trustee/Licensee.   Any successor West Chicago Trustee/Licensee shall obtain the necessary REF License from IEMA as referenced in Section 4.10.3 above.

4.12    No Bond

Notwithstanding any state law to the contrary, the West Chicago Trustee/Licensee, including, without limitation, any successor to the West Chicago Trustee/Licensee, shall be exempt from giving any bond or other security in any jurisdiction.

4.13    Records

The Settlors shall furnish the West Chicago Trustee/Licensee with (a) within 30 days after the Effective Date, and provided the West Chicago Trustee/Licensee has entered into a confidentiality agreement, a list of archived records that are stored in boxes in off-site storage and (b) electronic files and hard copies of all Environmental Information concerning the West Chicago Trust Assets in accordance with the requirements of the Settlement Agreement.

4.14    Confidential Business Information

4.14.1  The West Chicago Trustee/Licensee may assert business confidentiality claims (trade secrets and commercial or financial information) covering

43

part or all of the documents or information submitted to Beneficiaries under this Agreement to the extent permitted by and in accordance with Section 104(e)(7) of CERCLA, 42 U.S.C. § 9604(e)(7), 40 C.F.R. § 2.203(b), and Section 7(1) of the Freedom of Information Act, 5 ILCS/140/7(1) (2010). Documents or information determined to be confidential by US EPA and/or the State of Illinois will be afforded the protection specified in 40 C.F.R. Part 2, Subpart B, or 5 ILCS 140/7(1). If no claim of confidentiality accompanies documents or information when they are submitted to US EPA and the State of Illinois, or if more than 30 days after US EPA has notified the West Chicago Trustee/Licensee that the documents or information is not confidential under the standards of Section 104(e)(7) of CERCLA or 40 C.F.R. Part 2, Subpart B, or if the State of Illinois has notified the West Chicago Trustee/Licensee before public access is granted that the documents or information is not confidential under the standards of 5 ILCS 140/7(1), the public may be given access to such documents or information without further notice to the West Chicago Trustee/Licensee.

4.14.2   The West Chicago Trustee/Licensee may assert that certain documents, records and other information are privileged under the attorney-client privilege or any other privilege recognized by federal or state law. If the West Chicago Trustee/Licensee asserts such a privilege in lieu of providing documents, the West Chicago Trustee/Licensee shall provide the Beneficiaries with the following: (1) the title of the document, record, or information; (2) the date of the document, record, or information; (3) the name and title of the author of the document, record, or information; (4) the name and title of each addressee and recipient; (5) a description of the contents of the document, record, or information: and (6) the privilege asserted by the West Chicago Trustee/Licensee. However, no documents, reports or other information created or generated pursuant to the requirements of the Settlement Agreement or this Agreement, or generated pursuant to consent decrees, administrative orders, or the REF License shall be withheld on the grounds that they are privileged. Furthermore, no claim of confidentiality shall be made with respect to any data, including, but not limited to, all sampling, analytical, monitoring, hydrogeologic, scientific, chemical, or engineering data, or any other documents or information evidencing conditions at or around the Kerr-McGee West Chicago NPL Sites or the REF.

4.14.3   Any confidential business information furnished by the West Chicago Trustee/Licensee that is identified as "confidential" (subject to Section 4.14) will be maintained by each recipient as Weston Solutions, Inc.'s confidential business information, and will not be used for any purpose other than the performance of obligations hereunder.

ARTICLE V
BENEFICIARIES

5.1     Beneficiaries

Beneficial interests in the West Chicago Trust shall be held by each of the Beneficiaries.

5.2     Identification of Beneficiaries and Local Communities

> 5.2.1    In order to determine the actual names and addresses of the authorized representatives of a Beneficiary or the Local Communities, the West Chicago Trust and the West Chicago Trustee/Licensee shall be entitled to rely conclusively on the name and address of the authorized representative listed below in Section 5.2.2, who may from time to time provide additional or replacement names and addresses of authorized representatives, or listed in any written notice provided to the West Chicago Trustee/Licensee in the future by such authorized representative.

> 5.2.2    Any Party shall send all notices and copies of all reports, budgets, annual balance statements, requests for approval, and other documents that it is required to submit to any other Party under the Settlement Agreement or this Agreement, and related implementation documents including any administrative orders or consent decrees to the following person(s), as applicable:

As to the United States of America (on behalf of the US EPA) as Beneficiary:

Authorized representative and party under Section 5.2.2 to receive all documents:

Chief, Environmental Enforcement Section
Environment and Natural Resources Division
U.S. Department of Justice
P.O. Box 7611
Washington, DC 20044-7611
Telephone: (202) 514-5271
Facsimile: (202) 514-4180
File Ref. No. 90-11-3-09688

Robert William Yalen
Assistant United States Attorney
Office of the United States Attorney
  for the Southern District of New York
86 Chambers Street, Third Floor
New York, NY 10007
Telephone: (212) 637-2722
Facsimile: (212) 637-2686
E-mail: robert.yalen@usdoj.gov

45

Timothy Fischer
Remedial Project Manager
U.S. EPA Region 5
Mail Code SR-6J
77 W. Jackson Blvd.
Chicago, Illinois 60604
Telephone: (312) 886-5787
Facsimile: (312) 692-2512
E-mail: fischer.timothy@epa.gov

Mary L. Fulghum
Associate Regional Counsel
Mail Code C-14J
U.S. EPA Region 5
77 W. Jackson Blvd.
Chicago, IL  60604
Telephone: (312) 886-4683
Facsimile: (312) 692-2469
E-mail: fulghum.mary@epa.gov

David P. Seely
Remedial Project Manager
U.S. EPA Region 5
Mail Code SR-6J
77 W. Jackson Blvd.
Chicago, Illinois 60604
Telephone: (312) 886-7058
Facsimile: (312) 697-2048
E-mail: seely.david@epa.gov

As to the State of Illinois (on behalf of the IEPA and IEMA) as Beneficiary:

Authorized representatives and party under Section 5.2.2 to receive all documents:

For the Illinois Attorney General's Office

Chief, Environmental Bureau (or designee)
Office of the Illinois Attorney General
69 West Washington Street, 18th Floor
Chicago, Illinois 60602
Telephone: (312) 814-2550
Facsimile: (312) 814-2347

46

Contact person:
Elizabeth Wallace, Supervisory Attorney
Telephone: (312) 814-5396
E-mail: ewallace@atg.state.il.us

For the Illinois Environmental Protection Agency

Chief, Bureau of Land
Illinois Environmental Protection Agency
1021 North Grand Avenue East
P.O. Box 19276
Springfield, Illinois 62794-9276
Telephone: (217) 782-3397

Contact person:
Chuck Grigalauski, Regional Manager
Telephone:  (847) 294-4059
E-mail:  Chuck.Grigalauski@illinois.gov

For the Illinois Emergency Management Agency

Chief, Bureau of Environmental Safety
Illinois Emergency Management Agency
1035 Outer Park Drive
Springfield, IL 62704
Telephone: (217) 785-9954
Facsimile: (217) 524-6417

Contact person:
Gary McCandless, Bureau Chief
Direct Line: (217) 782-1329
E-mail: Gary.McCandless@illinois.gov

As to the Local Communities:

Authorized representative and party under Section 5.2.2 to receive all documents:

Barbara Magel
Barnes & Thornburg LLP
Suite 4400
One North Wacker Drive
Chicago, IL 60606
Telephone: (312) 214-4585
Facsimile: (312) 759-5646
E-mail: Barbara.Magel@btlaw.com

47

John Wills
Wills Burke Kelsey Engineering
116 West Main Street, Suite 201
St. Charles, IL 60174
Telephone: (630) 443-7755
Facsimile: (630) 443-0533

As to the West Chicago Trustee/Licensee:

Authorized representatives and party under Section 5.2.2 to receive all documents:

Scott M. Levin
Howard & Howard Attorneys PLLC
200 S. Michigan Avenue, Suite 1100
Chicago, IL 60604
Telephone: (312) 456-3418
Facsimile: (312) 939-5617
Electronic mail: slevin@howardandhoward.com

Kurt S. Stimpson
Vice President
Weston Solutions, Inc.
750 Bunker Court, Suite 500
Vernon Hills, IL 60060
Telephone: (847) 918-4050
Facsimile: (847) 918-4055
E-mail: kurt.stimpson@westonsolutions.com

Mark Krippel
Program Manager
West Chicago Environmental Response Trust
800 Weyrauch Street
West Chicago, IL 60185
Telephone: (847) 393-6626
Facsimile: (630) 231-3990
E-mail: mark.krippel@westonsolutions.com

5.3    Non-Beneficiaries

Upon the Effective Date of this Agreement, the Settlors and Reorganized Tronox shall have no interests including, without limitation, any reversionary interest, in the West Chicago Trust or any West Chicago Trust Assets.  The State of Illinois and the United States shall be the sole beneficiaries of the West Chicago Trust Accounts.  Neither Settlors nor Reorganized Tronox shall have any rights or interest to the West Chicago Trust Assets distributed to the West Chicago Trust Accounts, nor to any funds remaining in any of the West Chicago Trust Accounts upon the completion of any and all final actions and disbursements for any and all final costs with respect to the West Chicago Trust Sites.

48

5.4     Transfer of Beneficial Interests

The interest of the Beneficiaries in the West Chicago Trust, which are reflected only on the records of the West Chicago Trust maintained by the West Chicago Trust, are not negotiable and may be transferred, subject to the last sentence hereof, only after written notice to the West Chicago Trust, by order of the Court or by operation of law. The West Chicago Trust shall not be required to record any transfer in favor of any transferee where, in the sole discretion of the West Chicago Trust, such transfer is or might be construed to be ambiguous or to create uncertainty as to the holder of the beneficial interest in the West Chicago Trust. Until a transfer is in fact recorded on the books and records maintained by the West Chicago Trust for the purpose of identifying Beneficiaries, the West Chicago Trust, whether or not in receipt of documents of transfer or other documents relating to the transfer, may nevertheless make distributions and send communications to Beneficiaries, as though it has no notice of any such transfer, and in so doing the West Chicago Trust and West Chicago Trustee/Licensee shall be fully protected and incur no liability to any purported transferee or any other Person. Interests in the West Chicago Trust may not be transferred to the Settlors, Reorganized Tronox, or any Persons related to any of the preceding (within the meaning of Section 468B(d)(3) of the Internal Revenue Code).

ARTICLE VI
REPORTING AND TAXES

6.1     Reports

As soon as practicable after the end of each calendar quarter beginning with the quarter ended after assets are first received by the West Chicago Trust and ending as soon as practicable upon termination of the West Chicago Trust, the West Chicago Trust shall submit to the Beneficiaries a written report, including: (a) financial statements of the West Chicago Trust at the end of such calendar quarter or period and the receipts and disbursements of the West Chicago Trust for such period; and (b) a description of any action taken by the West Chicago Trust in the performance of its duties which, as determined by outside counsel, accountants or other professional advisors, materially and adversely affects the West Chicago Trust and of which notice has not previously been given to the Beneficiaries. The West Chicago Trust shall promptly submit additional reports to the Beneficiaries whenever, as determined by outside counsel, accountants or other professional advisors, an adverse material event or change occurs which affects either the West Chicago Trust or the rights of the Persons receiving distributions (including, without limitation, the Beneficiaries) hereunder. The West Chicago Trust shall also provide the reports or information required by Section 3.2 of this Agreement.

6.2     Other

The West Chicago Trust shall also file (or cause to be filed) any other statements, returns or disclosures relating to the West Chicago Trust, that are required by any applicable governmental unit.

6.3     Reports in Support of Insurance Claims

The West Chicago Trust shall also file (or cause to be filed) reports and cost analyses in support of claims against insurance carriers at the request of the United States and the States and shall provide the United States and the States a copy of any such reports and cost analyses.

6.4     Taxes

The West Chicago Trustee/Licensee shall be the "administrator," within the meaning of Treasury Regulation Section 1.468B-2(k)(3), of the West Chicago Trust. Subject to definitive guidance from the Internal Revenue Service or a judicial decision to the contrary, the West Chicago Trustee/Licensee shall file tax returns and pay applicable taxes imposed on the West Chicago Trust with respect to the taxable income of the West Chicago Trust in a manner consistent with the provisions of the QSF Regulations. All such taxes for which the West Chicago Trust is liable shall be paid from the West Chicago Trust Assets. The West Chicago Trust shall in no event be deemed liable for taxes on income taxable to one or more Settlors under the income tax rules applicable to grantor trusts. If they are eligible to do so, the Settlors may make an election to treat the West Chicago Trust as a grantor trust pursuant to Treasury Regulation Section 1.468B-1(k)(1). To the extent the Settlors make such an election, (a) the West Chicago Trustee/Licensee will reasonably cooperate with the Settlors as requested to facilitate the Settlors' making such election, (b) the West Chicago Trustee/Licensee will file any returns or reports required by the QSF Regulations or Treasury Regulation Section 1.671-4, and (c) the West Chicago Trustee/Licensee will provide the Settlors, as transferors to the West Chicago Trust, with any statements or reports required by the QSF Regulations or Treasury Regulation Section 1.671-4 in order to enable the Settlors to calculate their share of the West Chicago Trust's tax obligations and attributes, assuming, in each case, that the Settlors furnish the West Chicago Trustee/Licensee all necessary paperwork, information, and records with ample time to enable the tax preparer for the West Chicago Trust to prepare the Form 1041 for the West Chicago Trust and for the West Chicago Trustee/Licensee to file it on a timely basis. Without limiting the generality of the foregoing, the Settlors will promptly furnish to the West Chicago Trustee/Licensee all paperwork, information, and records reasonably requested by the West Chicago Trustee/Licensee that is necessary to enable it to determine the income, gains and losses, deductions, credits and other tax items of the West Chicago Trust to be reported in the Form 1041 grantor trust return each year for which a grantor trust information return is filed, including, where needed, information as to the Settlors' cost basis, holding period, and depreciation, amortization, and credits allowable for tax years prior to the first tax year of the West Chicago Trust with respect to each West Chicago Trust Asset transferred by Settlors to the West Chicago Trust. The West Chicago Trustee/Licensee and its preparer shall be entitled to rely on the information provided by the Settlors. The West Chicago Trustee/Licensee shall be entitled to report and file all such grantor trust returns in accordance with the advice and direction given by its tax preparer. For the avoidance of doubt, any grantor trust election is for tax purposes only and shall in no way affect the substantive rights and obligations of the parties under the Settlement Agreement or this Agreement.

ARTICLE VII
MISCELLANEOUS PROVISIONS

7.1    Amendments and Waivers

Any provision of this Agreement may be amended or waived by mutual written consent of the West Chicago Trust, the United States, the State of Illinois and the Local Communities; provided, however, that no change shall be made to this Agreement that would alter the provisions of Section 7.2 hereof or adversely affect the federal income tax status of the West Chicago Trust as a "qualified settlement fund" (in accordance with Section 6.4 hereof), or, unless agreed to in writing by the affected West Chicago Trustee/Licensee, the rights of the West Chicago Trustee/Licensee. Technical amendments to this Agreement may be made as necessary, to clarify this Agreement or enable the West Chicago Trustee/Licensee to effectuate the terms of this Agreement, in a manner consistent with the Settlement Agreement with the mutual consent of the West Chicago Trust, the United States, and the State of Illinois.

7.2    Tax Treatment

The West Chicago Trust created by this Agreement is intended to be treated as a qualified settlement fund eligible to elect grantor trust classification pursuant to the QSF Regulations for federal income tax purposes, and to the extent provided by law, this Agreement shall be governed and construed in all respects consistent with such intent.

7.3    Cooperation

The West Chicago Trustee/Licensee, on behalf of the West Chicago Trust, and the Settlors shall take such actions and execute such documents as are reasonably requested by the other with respect to effectuating the Settlement Agreement and the transactions contemplated thereby, provided that such actions are not inconsistent with this Agreement or the Settlement Agreement. To the extent that the Settlors request the West Chicago Trust and/or the West Chicago Trustee/Licensee to take such an action, the West Chicago Trust and West Chicago Trustee/Licensee shall do so at the sole expense of the Settlors.

7.4    Situs of the West Chicago Trust

The situs of the West Chicago Trust herein established is the State of Illinois, and, except to the extent the Bankruptcy Code or other federal law is applicable, the rights, duties, and obligations arising under this West Chicago Trust Agreement shall be governed by, and construed and enforced in accordance with, the laws of the State of Illinois, without giving effect to the principles of conflict of law thereof.

7.5    Severability

If any provision of this Agreement or application thereof to any Person or circumstance shall be finally determined by the Court to be invalid or unenforceable to any extent, the remainder of this Agreement, or the application of such provision to Persons or circumstances other than those as to which it is held invalid or unenforceable, shall not be affected thereby, and

such provision of this Agreement shall be valid and enforced to the fullest extent permitted by law.

7.6    <u>Sufficient Notice</u>

Any notice or other communication hereunder shall be transmitted electronically and shall be deemed to have been sufficiently given, for all purposes, upon an affirmative response or confirmation from the recipient of the electronic message. Upon the request by a Beneficiary or the West Chicago Trustee/Licensee, any reports or other specified documents also shall be transmitted by hard copy and shall be deemed to have been sufficiently given, for all purposes, five days after being deposited if deposited, postage prepaid, in a post office or letter box addressed to the Person for whom such notice, report or other document is intended. In all cases, the notice, report or other document shall be sent to the name and address of the authorized representative set forth in Section 5.2 of this Agreement or such other Person or address that a Party provides in writing to each other Party.

7.7    <u>Retention of Records</u>

Notwithstanding Paragraph 163(d) of the Settlement Agreement, at any time after 365 days following the Effective Date, the West Chicago Trustee/Licensee may elect to relinquish control and/or destroy any Environmental Information, Real Property Information or other records relating to the West Chicago Owned and Non-Owned Sites. Prior to relinquishing control and/or destroying any Environmental Information, Real Property Information or other records relating to the West Chicago Owned and Non-Owned Sites, the West Chicago Trustee/Licensee shall obtain approval of the State of Illinois and the United States. Additionally, the West Chicago Trustee/Licensee shall retain documents related to the REF License in accordance with the REF License.

7.8    <u>Headings</u>

The section headings contained in this Agreement are solely for convenience of reference and shall not affect the meaning or interpretation of this Agreement or any term or provision hereof.

7.9    <u>Actions Taken on Other Than Business Day</u>

If any payment or act under the Settlement Agreement or this Agreement is required to be made or performed on a date that is not a business day, then the making of such payment or the performance of such act may be completed on the next succeeding business day, but shall be deemed to have been completed as of the required date. For the purposes of this agreement, a business day shall be any of the days Monday through Friday excluding national holidays.

7.10    <u>Consistency of Agreements and Construction</u>

To the extent reasonably possible, the provisions of this Agreement shall be interpreted in a manner consistent with the Settlement Agreement. Where the provisions of this Agreement are irreconcilable with the provisions of the Settlement Agreement, the provisions of the Settlement

Agreement shall prevail, with the exception of Sections 1.1.60, 1.1.64, and 2.6.1, and Article IV in its entirety, in which case this Agreement controls.

7.11    <u>Compliance with Laws</u>

Any and all distributions of West Chicago Trust Assets shall be in compliance with applicable laws, including, but not limited to, applicable federal and state securities laws.

7.12    <u>Preservation of Privilege</u>

In connection with the rights, claims, and causes of action that constitute the West Chicago Trust Assets, any attorney-client privilege, work-product privilege, or other privilege or immunity attaching to any documents or communications (whether written or oral) transferred to the West Chicago Trust shall vest in the West Chicago Trust and its representatives, and the Parties are authorized to take all necessary actions to effectuate the transfer of such privileges.

7.13    <u>No Recourse to Beneficiaries</u>.

In no event shall the Beneficiaries have any responsibility for paying any expenses, fees, and other obligations of the West Chicago Trust, and in no event shall the West Chicago Trust or the West Chicago Trustee, or any of their agents, representatives, or professionals, have recourse to the Beneficiaries therefor.

7.14    <u>Uniform Custodial Trust Act.</u>

The West Chicago Trust Agreement shall not be subject to any provision of the Uniform Custodial Trust Act as adopted by any state, now or in the future.

*(signature pages follow)*

THE UNDERSIGNED PARTIES ENTER INTO THIS AGREEMENT

FOR THE UNITED STATES OF AMERICA

Date: 2/9/11

ROBERT G. DREHER
Acting Assistant Attorney General
Environment and Natural Resources Division
U.S. Department of Justice
Washington, D.C. 20044

Date: 2/11/11

PREET BHARARA
United States Attorney for the
Southern District of New York

By:

ROBERT WILLIAM YALEN
TOMOKO ONOZAWA
JOSEPH A. PANTOJA
Assistant United States Attorneys
86 Chambers Street
New York, New York 10007
Tel: (212) 637-2722
Fax: (212) 637-2686

Date: 2/10/11

ALAN S. TENENBAUM
National Bankruptcy Coordinator
Environment and Natural Resources Division
U.S. Department of Justice
Washington, D.C. 20044

Date: 2/10/11

FREDERICK PHILLIPS, Attorney
Environment and Natural Resources Division
U.S. Department of Justice
Washington, D.C. 20044.

54

FOR THE UNITED STATES ENVIRONMENTAL PROTECTION AGENCY

Date: ___1/14/11___          By: _____
                                  CYNTHIA GILES
                                  Assistant Administrator for Enforcement
                                  and Compliance Assurance
                                  U.S. Environmental Protection Agency


Date: ___1/14/11___          By: _____
                                  CRAIG KAUFMAN
                                  Attorney-Advisor
                                  U.S. Environmental Protection Agency
                                  Ariel Rios Building
                                  1200 Pennsylvania Avenue, NW
                                  Washington, DC 20460

*In re: Tronox, Inc., et al.,* Case No. 09-10156 (ALG)

**FOR TRONOX LUXEMBOURG S.ar.L**

Date: _____

By: _____

Michael J. Foster
Attorney-in-Fact

**FOR TRONOX INCORPORATED**

Date: _____

By: _____

Michael J. Foster
Vice President, General Counsel & Secretary

**FOR CIMARRON CORPORATION**

Date: _____

By: _____

Michael J. Foster
Director, Vice President & Secretary

**FOR SOUTHWESTERN REFINING COMPANY, INC.**

Date: _____

By: _____

Michael J. Foster
Director, Vice President & Secretary

**FOR TRANSWORLD DRILLING COMPANY**

Date: _____

By: _____

Michael J. Foster
Director, Vice President & Secretary

**FOR TRIANGLE REFINERIES, INC.**

Date: _____

By: _____
Michael J. Foster
Director, Vice President & Secretary

**FOR TRIPLE S, INC.**

Date: _____

By: _____
Michael J. Foster
Director, Vice President & Secretary

**FOR TRIPLE S ENVIRONMENTAL MANAGEMENT CORPORATION**

Date: _____

By: _____
Michael J. Foster
Director, Vice President & Secretary

**FOR TRIPLE S MINERALS RESOURCES CORPORATION**

Date: _____

By: _____
Michael J. Foster
Director, Vice President & Secretary

**FOR TRIPLE S REFINING CORPORATION**

Date: _____

By: _____
Michael J. Foster
Director, Vice President & Secretary

**FOR TRONOX LLC**

Date: _____

By: _____
Michael J. Foster
Manager, Vice President & Secretary

**FOR TRONOX FINANCE CORP.**

Date: _____

By: _____
Michael J. Foster
Director, Vice President & Secretary

**FOR TRONOX HOLDINGS, INC.**

Date: _____

By: _____
Michael J. Foster
Director
Vice President & Secretary

**FOR TRONOX PIGMENTS (SAVANNAH) INC.**

Date: _____

By: _____
Michael J. Foster
Director, Vice President & Secretary

**FOR TRONOX WORLDWIDE LLC**

Date: _____

By: _____
Michael J. Foster
Manager, Vice President & Secretary

58

**FOR THE WEST CHICAGO TRUSTEE**

WESTON SOLUTIONS, INC.,
NOT INDIVIDUALY BUT SOLELY
IN ITS REPRESENTATIVE CAPACITY AS
TRUSTEE OF THE WEST CHICAGO
ENVIRONMENTAL RESPONSE TRUST

Date: _8 FEB 11_          By: _____
                          Kurt Stimpson
                          Senior Vice President

**FOR THE STATE OF ILLINOIS**

PEOPLE OF THE STATE OF ILLINOIS
*ex rel*. LISA MADIGAN
Attorney General of the State of Illinois

MATTHEW J. DUNN, Chief
Environmental Enforcement
Asbestos Litigation Division

BY: _____

ROSEMARIE CAZEAU, Chief
Assistant Attorney General
Environmental Bureau North

DATE: 2|8|11

ILLINOIS EMERGENCY MANAGEMENT AGENCY

JOSEPH KLINGER, Interim Director
Illinois Emergency Management Agency

BY: _____

JOSEPH KLINGER
Interim Director

DATE: 2/7/2011

60

**FOR THE CITY OF WARRENVILLE, ILLINOIS**

Date: _2/4/2011_                    _____
                                    David L. Brummel
                                    Mayor

61

**FOR THE CITY OF WEST CHICAGO, ILLINOIS**

Date:  1/31/11

Michael B. Kwasman
Mayor

62

**FOR THE FOREST PRESERVE DISTRICT OF DUPAGE COUNTY, ILLINOIS**

Date: 2/1/2011

D. "Dewey" Pierotti, Jr.
President

ATTEST:

Date: 2/1/2011

Flo E. Orlik
Executive Assistant

63

FOR THE COUNTY OF DUPAGE, ILLINOIS

Date: 2/8/11

Dan Cronin
Chairman

64

<u>EXHIBIT "A"</u>
**West Chicago Owned Sites**

| No. | Settlement Agreement Designation | Property Name | Property Location | City or County | State | Trust | Federal Covenant Not to Sue | State Covenant Not to Sue | Other Covenant Not to Sue |
|---|---|---|---|---|---|---|---|---|---|
| 1 | REF AND OWNED RAS PROPERTIES | W. CHICAGO - Parcel 04-09-423-002 | RARE EARTHS FACILITY - Factory Street | DuPage | IL | West Chicago | YES | IL | W. Chi. Local Communities |
| 2 | REF AND OWNED RAS PROPERTIES | W. CHICAGO - Parcel 04-09-423-003 | RARE EARTHS FACILITY - Factory Street | DuPage | IL | West Chicago | YES | IL | W. Chi. Local Communities |
| 3 | REF AND OWNED RAS PROPERTIES | W. CHICAGO - Parcel 04-09-423-004 | RARE EARTHS FACILITY - Factory Street | DuPage | IL | West Chicago | YES | IL | W. Chi. Local Communities |
| 4 | REF AND OWNED RAS PROPERTIES | W. CHICAGO - Parcel 04-09-423-005 | RARE EARTHS FACILITY - Factory Street | DuPage | IL | West Chicago | YES | IL | W. Chi. Local Communities |
| 5 | REF AND OWNED RAS PROPERTIES | W. CHICAGO - Parcel 04-09-423-006 | RARE EARTHS FACILITY - Factory Street | DuPage | IL | West Chicago | YES | IL | W. Chi. Local Communities |
| 6 | REF AND OWNED RAS PROPERTIES | W. CHICAGO - Parcel 04-09-423-007 | RARE EARTHS FACILITY - Factory Street | DuPage | IL | West Chicago | YES | IL | W. Chi. Local Communities |

| 7 | REF AND OWNED RAS PROPERTIES | W. CHICAGO - Parcel 04-09-432-012 | RARE EARTHS FACILITY - Factory & Weyrauch St | DuPage | IL | West Chicago | YES | IL | W. Chi. Local Communities |
|---|---|---|---|---|---|---|---|---|---|
| 8 | REF AND OWNED RAS PROPERTIES | W. CHICAGO - Parcel 04-09-433-001 | RARE EARTHS FACILITY - 800 Weyrauch Street | DuPage | IL | West Chicago | YES | IL | W. Chi. Local Communities |
| 9 | REF AND OWNED RAS PROPERTIES | W. CHICAGO - Parcel 04-16-202-001 | RARE EARTHS FACILITY | DuPage | IL | West Chicago | YES | IL | W. Chi. Local Communities |
| 10 | REF AND OWNED RAS PROPERTIES | W. CHICAGO - TAX # 04-04-402-002 | 553 YALE STREET | DuPage | IL | West Chicago | YES | IL | W. Chi. Local Communities |
| 11 | REF AND OWNED RAS PROPERTIES | W. CHICAGO - TAX # 04-09-415-009 | 323 WEST BLAIR STREET | DuPage | IL | West Chicago | YES | IL | W. Chi. Local Communities |
| 12 | REF AND OWNED RAS PROPERTIES | W. CHICAGO - TAX # 04-09-416-015 | 318 W. BLAIR STREET | DuPage | IL | West Chicago | YES | IL | W. Chi. Local Communities |
| 13 | REF AND OWNED RAS PROPERTIES | W. CHICAGO - TAX # 04-09-432-001 | 250 W. BROWN STREET | DuPage | IL | West Chicago | YES | IL | W. Chi. Local Communities |

| 14 | REF AND OWNED RAS PROPERTIES | W. CHICAGO - TAX # 04-09-439-015 | 740 JOLIET ST | DuPage | IL | West Chicago | YES | IL | W. Chi. Local Communities |
|----|------|------|------|------|------|------|------|------|------|
| 15 | REF AND OWNED RAS PROPERTIES | W. CHICAGO - TAX # 04-09-440-007 | 826 JOLIET & 826 1/2 JOLIET | DuPage | IL | West Chicago | YES | IL | W. Chi. Local Communities |
| 16 | REF AND OWNED RAS PROPERTIES | W. CHICAGO - TAX # 04-09-440-007 | 826 1/2 JOLIET & 826 JOLIET | DuPage | IL | West Chicago | YES | IL | W. Chi. Local Communities |
| 17 | REF AND OWNED RAS PROPERTIES | W. CHICAGO - TAX # 04-16-405-006 | 479 MELOLANE | DuPage | IL | West Chicago | YES | IL | W. Chi. Local Communities |
| 18 | REF AND OWNED RAS PROPERTIES | W. CHICAGO - TAX # 04-16-406-004 | 65 JOY ROAD | DuPage | IL | West Chicago | YES | IL | W. Chi. Local Communities |
| 19 | REF AND OWNED RAS PROPERTIES | W. CHICAGO - TAX # 04-09-439-013 | 700 BLK OF JOLIET STREET & HAZEL ST. | DuPage | IL | West Chicago | YES | IL | W. Chi. Local Communities |
| 20 | REF AND OWNED RAS PROPERTIES | W. CHICAGO - TAX # 04-09-439-014 | 736 JOLIET STREET | DuPage | IL | West Chicago | YES | IL | W. Chi. Local Communities |

| 21 | REF AND OWNED RAS PROPERTIES | W. CHICAGO - TAX # 04-09-440-001 | LESTER & WEYRAUCH - LOT 8 | DuPage | IL | West Chicago | YES | IL | W. Chi. Local Communities |
|----|------|------|------|------|------|------|------|------|------|
| 22 | REF AND OWNED RAS PROPERTIES | W. CHICAGO - TAX # 04-09-440-002 | LESTER STREET - LOT 7 | DuPage | IL | West Chicago | YES | IL | W. Chi. Local Communities |

4

EXHIBIT "B"

List of Transferred Contracts and Leases and Access Agreements

| NO. | SETTLOR | COUNTERPARTY | Date | DESCRIPTION OF CONTRACT | CURE AMOUNT | ASSIGNED TO |
|---|---|---|---|---|---|---|
| 1 | Tronox LLC | Arcadis U.S., Inc. | 1/1/2007 | Agreement for Construction or Field Services Class II #701358, including all annexes, statements of work, work orders, scheduled and other ordering documents issued under or in connection therewith dated after the Petition Date. | $0.00 | The West Chicago Environmental Response Trust |
| 2 | Tronox LLC | Arcadis U.S., Inc. | 8/28/2003 | Master Work Agreement Formerly Arcadis of New York, formerly BBL Engineering (Engineering Service Agreement C-1436 Feb. 8, 2002) aka Blasland Engineering Services aka Blasland, Bouck, and Lee, Inc. agreements with Kerr-McGee Chemical Corp LLC | $0.00 | The West Chicago Environmental Response Trust |
| 3 | Tronox LLC | Edward & Tamara Michnick | 7/1/2010 | Lease Agreement for IL, W. Chicago, 740 Joliet St. | $0.00 | The West Chicago Environmental Response Trust |
| 4 | Tronox LLC | Elgin, Joliet, and Eastern Railway | 9/1/1994 | Lease Agreement for W. Chicago | $0.00 | The West Chicago |

| | | | | | | Environmental Response Trust |
|---|---|---|---|---|---|---|
| 5 | Tronox LLC | Elgin, Joliet, and Eastern Railway | 9/1/2008 | Doc #494014-K - Lease Renewal Endorsement | $0.00 | The West Chicago Environmental Response Trust |
| 6 | Tronox LLC | City of West Chicago | 2/24/1997 | Amended and Restated Annexation Agreement, Kerr-McGee Rare Earths Facility , made and entered into on February 24, 1997, between the City of West Chicago and Kerr-McGee Chemical Corporation. (15.1.5.87, p. 5; 15.1.5.90 p. 3; 15.1.5.91 p. 3) | $567.79 | The West Chicago Environmental Response Trust |
| 7 | Tronox LLC | City of West Chicago | 2/24/1997 | Phase 2 Final Agreement between Kerr-McGee Chemical Corporation and the City of West Chicago, Illinois, entered into on February 24, 2007 (15.1.5.87, p. 43; 15.1.5.88, p. 7; 15.1.5.89 p.49; 15.1.5.91 p 37) | $0.00 | The West Chicago Environmental Response Trust |
| 8 | Tronox LLC | City of West Chicago | 2/24/1997 | First Amendment to the Phase 2 Final Agreement between Kerr-McGee Chemical Corporation and the | $0.00 | The West Chicago Environmental Response Trust |

| | | | | City of West Chicago, Illinois, dated October 7, 1997 (15.1.5.89, p. 14) | | |
|---|---|---|---|---|---|---|
| 9 | Tronox LLC | City of West Chicago | 2/24/1997 | Interim Lease Agreement between Kerr-McGee Chemical Corporation and the City of West Chicago | $0.00 | The West Chicago Environmental Response Trust |
| 10 | Tronox LLC | County of Dupage, Forest Preserve District of DuPage County, City of West Chicago, City of Warrenville, and the West Chicago Park District) | 4/1/2005 | Local Communities/Kerr-McGee Agreement for Clean Up and Restoration of the Kress Creek Site, dated April 1, 2005 (15.1.5.86) | $0.00 | The West Chicago Environmental Response Trust |
| 11 | Tronox LLC | Elgin, Joliet, and Eastern Railway | 9/1/1994 | Operating, Side Track and Construction Agreement | $0.00 | The West Chicago Environmental Response Trust |
| 12 | Tronox LLC | Arcadis U.S., Inc. | 2/8/2002 | Master Work Agreement Formerly Arcadis of New York, formerly BBL Engineering (Engineering Service Agreement C-1304 Feb. 8, 2002) aka Blasland Engineering Services aka Blasland, Bouck, and Lee, Inc. agreements with Kerr-McGee Chemical Corp LLC, including all annexes, statements of work, work orders, schedules and other | $0.00 | The West Chicago Environmental Response Trust |

7

|  |  |  |  | ordering documents issued under or in connection therewith dated after the Petition Date. |  |  |
|---|---|---|---|---|---|---|
| 13 | Tronox LLC | Sean Crumes | 7/14/2010 | Lease Agreement | $0.00 | The West Chicago Environmental Response Trust |
| 14 | Tronox LLC | Arcadis | 2/8/2002 | Engineering Service Agreement, including all annexes, statements of work, work orders, schedules and other ordering documents issued under or in connection therewith dated after the Petition Date. | $0.00 | The West Chicago Environmental Response Trust |

8