UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

_____
                                             :
In re:                                       :      Chapter 11
                                             :
TRONOX INCORPORATED, et al.,                 :      Case No. 09-10156 (MEW)
                                             :      Jointly Administered
                    Reorganized Debtors.     :
_____:

**MEMORANDUM OPINION AS TO TORT
CLAIMS TRUSTEE'S MOTION FOR INSTRUCTIONS**

A P P E A R A N C E S :

KEATING MUETHING & KLEKAMP PLL
Cincinnati, Ohio
*Counsel for the Debtors*
        By:  Robert G. Sanker, Esq.

BROWN RUDNICK
New York, New York
*Counsel for the Avoca Plaintiffs*
        By:  Edward S. Weisfelner, Esq.
             Bennett S. Silverberg, Esq.

JENNER & BLOCK
New York, New York
*Counsel for the Mississippi Claimants*
        By:  Richard Levin, Esq.

HAL L. McCLANAHAN, III
Columbus, Mississippi
*Counsel for Maranatha Faith Center*
        By: Hal L. McClanahan, III, Esq.

**MICHAEL E. WILES
UNITED STATES BANKRUPTCY JUDGE**

        The Garretson Resolution Group, Inc. (the "**Trustee**") administers the Tronox

Incorporated Tort Claims Trust (the "**Trust**").  The Trust was established under the Debtors'

First Amended Joint Plan of Reorganization (as amended, the "**Plan**").  The Trust is governed by

a Tort Claims Trust Agreement (the "**Trust Agreement**") and by a set of Tort Claims Trust

Distribution Procedures (the "**TDPs**").  The Plan and the Trust Agreement establish categories

into which allowed tort claims are to be divided, and the TDPs are the rules that the Trustee

follows in collecting, reviewing, categorizing, allowing and paying such tort claims.

The Trustee has filed a motion seeking instructions as to claims made by individuals (the

"**Mississippi Claimants**") who were plaintiffs in many pre-bankruptcy lawsuits relating to

releases of creosote from a plant in Columbus, Mississippi.  The Trustee seeks instructions as to

whether the Trustee was correct in permitting Mississippi Claimants who had asserted

"nuisance" claims to seek compensation from the Trust for alleged personal injury, wrongful

death, sickness or disease, and/or whether the TDPs should be amended to allow the Trustee to

undo the Trustee's prior notices of determination that allowed those claims.

The Trustee's request for instructions is the outgrowth of complaints made by another

large group of claimants (the "**Avoca Plaintiffs**") who have asserted tort claims arising out of

creosote releases from a plant in Avoca, Pennsylvania.  The Avoca Plaintiffs contend that the

Trustee should not have permitted Mississippi Claimants who made "nuisance" claims in the

bankruptcy case to file any claims against the Trust for personal injury, wrongful death, sickness

or disease, and that instructions should not have been necessary.

The Mississippi Claimants oppose the Trustee's motion; they argue that the governing

documents are clear and that the Trustee's prior notices of determination as to the claims were

correct.  The Maranatha Faith Center, Inc. ("**Maranatha**"), which holds a claim in a different

category under the Trust, argues that the Trustee acted correctly and that the claims of the

Mississippi Claimants should stay in the previously designated categories.

For the reasons set forth below, the Court grants the Trustee's request for instructions,

and holds that the Trustee properly allowed the Mississippi Claimants who had timely filed

"nuisance" claims in the bankruptcy case to file claims seeking compensation from the Trust for

personal injury, wrongful death, sickness or disease.  The Court also holds that the Avoca

Plaintiffs have no standing to object to the claims filed by the Mississippi Claimants, and that the

objections are without merit in any event.

### Background

On January 12, 2009, Tronox Incorporated and related entities filed voluntary chapter 11

petitions in this Court.  On May 28, 2009, the Court entered an order setting August 12, 2009

(the "Bar Date") as the deadline by which to file any proof of claim against the Debtors.

### A.    Claims of the Mississippi Claimants

On August 3, 2009, the Columbus, Mississippi Creosote Plaintiffs Ad Hoc Committee

(the "**Ad Hoc Committee**") filed a proof of claim (the "**Mississippi Claim**") in the Tronox

chapter 11 case on behalf of approximately 2,690 individuals or their estates who were plaintiffs

in many cases pending in Mississippi.  *See* Exhibit C to the Trustee's Motion [ECF Dkt. 3030].

The Mississippi Claim attached an Order dated October 3, 2007 that listed the pending cases and

described the terms under which the parties had agreed to mediate individual claims "based on

categories of injuries, which categories shall be randomly selected."  *Id*.  A separate Mediation

Agreement dated December 1, 2007 (attached to the Mississippi Claim) provided that the

defendants would reserve a sum of $3 million to pay settlements reached during mediation; if the

$3 million was exhausted, either the mediations would end or the defendants would replenish the

reserve fund, in which case the mediations would continue.

The Mississippi Claim stated that the amount of the claim was unliquidated but was "not

less than $12,500,000.00 based on personal injury and property damage arising out of toxic tort

litigation arising more than one year prior to the filing of the bankruptcy petition."  It stated that

the "names of the entities and the nature of their claims is attached hereto as Exhibit B" and that

a "detailed explanation of the claim is set out below."  The description of the claim referred to

the operation of a wood treatment plant in Columbus, Mississippi at which railroad ties were

treated with creosote, and stated that the pending Mississippi lawsuits sought damages that

"included personal injury/wrongful death, diminution of property values, and interference with

the use of domicile (nuisance)."  The claim attached, as Exhibit B, "[a] list of individuals and the

categories of individual claims" to which the parties had agreed as part of their Mediation

Agreement.  Exhibit B divided claims into the following categories:

| Category | Number Listed |
|---|---|
| Autoimmune (includes Sarcoidosis, Lupus) | 48 |
| Blood (includes Leukemia, Aplastic Anemia, Finger Hemangiosarcoma, Multiple Myeloma) | 21 |
| Bone and Lymphatic (includes Bone Cancer, Hodgkins Lymphoma, Lymphosarcoma, Non-Hodgkins Lymphoma) | 10 |
| Brain Cancer | 12 |
| Congenital (includes Birth Defects, Encephalopathy, Neuroblastoma and in some cases "other nuisance type ailments" | 83 |
| Digestive (includes Gastrointestinal, Small Intestine Cancer, Colon Cancer, Pancreatic Cancer, Stomach Cancer, Esophogeal Cancer, Oral Cancer, Gall Bladder Cancer, Liver Cancer) | 45 |
| Nuisance Claims and No Complaint Nuisance Claims | 186 |
| Reproductive (Prostate Cancer, Cervical Cancer, Uterine Cancer, Testicular Cancer, Ovarian Cancer) | 42 |
| Respiratory (Mesothelioma, Lung Cancer, other Lung Disease, Larynx Cancer, Nasal Cancer, Bronchial Cancer, Throat Cancer, Trachea Cancer, Pleural Plaques) | 42 |
| Skin (Skin Cancer, Melanoma) | 30 |
| "Unspecified" (Thyroid Cancer, "Cancer Cells," Unspecified Cancer, Cancerous Ulcers, Amyloidosis) | 27 |
| Urinary (Kidney Cancer, Bladder Cancer) | 11 |
| Nuisance Claims | 2135 |

Exhibit B therefore has two separate lists of "nuisance" claimants, without explanation.  The first

list of nuisance claims (consisting of 186 claims) has different headings on different pages: the

first page is entitled "Nuisance Claims," but the rest of those pages are entitled "No Complaint

Nuisance Claims."  Again, there is no further explanation.

The Mississippi Claim also summarized the "types of claims" being mediated as follows:

> There were three broad classifications: personal injury/wrongful death,
> property, and nuisance.  Personal injury was further divided into
> classifications . . . There were 371 claimants with categorized personal
> injury or wrongful death claims, and an additional 50 who were placed in
> multiple categories.  There were 200 individuals claiming only diminution
> of property values, and the other approximately 2100 individuals could
> claim only nuisance damages.

The claim stated that twelve personal injury cases had been mediated and that some of them

"were determined to have been better classified as nuisance cases, and were settled as such."

The Mississippi Claim did not explain the types of injuries for which the "nuisance"

claimants sought compensation or what (if anything) distinguished them from "personal injury"

claims and claims alleging "diminution of property values."  The complaints in the Mississippi

lawsuits were not attached to the proof of claim, but copies of two of the complaints were

submitted to the Court in connection with the Trustee's motion for instructions.  Count Seven of

the complaint in *Hunter v. Kerr-McGee Corp.*, case no. 1:04CV271-D-A (N.D. Miss. Aug. 31,

2004), asserted a cause of action for "Private Nuisance," and alleged that the Defendants' actions

constituted a nuisance that had deprived Plaintiffs of "the enjoyment and use of their own

property."  The very next paragraph then stated:

> 180.  As a direct and proximate result of the acts of private nuisance
> of the Defendants and their employees, agents, and representatives, the
> Plaintiffs have suffered physical and emotional injuries; past, present and
> future pain and suffering; loss of wages; past, present and future medical
> expenses; severe, permanent, disabling and life threatening injuries;
> permanent medical and emotional distress; loss of enjoyment of life,
> property damage and other actual and compensatory damages.

*See* Exhibit A to the Mississippi Claimants' Submission [ECF Dkt. 3039].  Similarly, the

Complaint in *Aurthur v. Kerr-McGee Corp., et al.*, case no. 1:05-cv-00225-JAD (N.D. Miss.),

which apparently was originally filed in state court, asserted a "private nuisance" claim. The

Complaint alleged that as a result:

> . . . the Plaintiffs have suffered physical and emotional injuries; past,
> present and future pain and suffering; loss of wages; past, present and future
> medical expenses; severe, permanent, disabling and life threatening injuries;
> permanent mental and emotional distress; loss of enjoyment of life, property
> damage, and other actual and compensatory damages in excess of Five
> Million Dollars ($5,000,000.00) per Plaintiff.

*See* Exhibit B to the Declaration of Bennett S. Silverberg in Support of Response of the Avoca

Plaintiffs [ECF Dkt. 3041 at ¶ 81].

In addition, the Mississippi Claimants provided the Court with a copy of a memorandum

dated November 2, 2007 that proposed categories of claims for mediation in Mississippi. One

part of the Memorandum sets forth thirty-one proposed categories of "Nuisance" claims for

mediation, and another part sets forth fourteen proposed categories of "Personal Injury" claims

for mediation. The "Nuisance" claims were divided into categories based on two factors: (a) the

distance between a plaintiff's residence and the Columbus facility, and (b) the number of

"illnesses" linked to creosote exposure that had been manifested by the plaintiff. Accordingly,

some categories of "nuisance" claims were for individuals who had manifested "three or fewer

linked illnesses"; other categories were for nuisance claimants who had "at least three but fewer

than ten of the common illnesses causally linked to creosote exposure by the Epidemiologist";

and others were for nuisance claimants who had "ten or more" of such illnesses. *See* Exhibit B

to the Mississippi Claimants' Submission [ECF Dkt. 3039].

### B.    The Plan

On November 30, 2010, the Court confirmed the Debtors' First Amended Joint Plan of

Reorganization (the "Plan"), which became effective on February 14, 2011. The Plan

established the Trust and specified four separate categories of tort claims that would be allowed

and paid through the Trust.  The Trust was to be funded with a payment of $12.5 million in cash,

plus insurance assets, plus the right to 12% of the proceeds of a litigation (the "**Anadarko**

**Litigation**").  The Plan and the Trust established separate categories for Property Damage

Claims and various other kinds of Tort Claims.  Most of the funding (at least 82.25%) was to be

set aside for Fund D, which was a category of "Allowed Non-Asbestos Toxic Exposure Claims."

The Plan defines "Non-Asbestos Toxic Exposure Claims" as:

> . . . timely filed Tort Claims against any Tronox Debtor for personal injury,
> wrongful death, sickness or disease arising directly or indirectly from
> exposure to or release of creosote, benzene, radiation or other
> environmental contamination or chemical exposure or release.

Plan, Article I(A)(110) [ECF Dkt. 2567, Ex.].  The Plan defines "Tort Claims" as:

> . . . non-governmental Claims against Tronox, whether such Claims are
> known or unknown, whether by contract, tort or statute, whether existing or
> hereinafter arising, for death, bodily injury, sickness, disease, medical
> monitoring or other personal physical injuries or damage to property to the
> extent caused or allegedly caused directly or indirectly by the presence of or
> exposure to any product or toxin manufactured or disposed of, or other
> property owned, operated or used for disposal by, Tronox or any Entity for
> whose products or operations Tronox allegedly has liability . . .

*Id.*, Article I(A)(156) [ECF Dkt. 2567, Ex.].

The Plan provides that all Tort Claims, including Non-Asbestos Toxic Exposure

Claims, were to be allowed or disallowed in accordance with the terms of the Trust and

the TDPs.  Accordingly, the term "Allowed," when used with respect to Tort Claims, was

defined as "a Claim that is allowed pursuant to the Tort Claims Trust Distribution

Procedures."  *Id.*, Article I(A)(4); *see also id.,* Article IV(c)(4) ("Holders of Allowed Tort

Claims will receive on account of such Allowed Tort Claims a Distribution from the Tort

Claims Trust in accordance with the Tort Claims Trust Distribution Procedures . . .")  The

Plan defined the Tort Claims Trust Distribution Procedures as:

> . . . the procedures to be implemented by the Tort Claims Trustee, pursuant
> to the terms and conditions of the Plan and the Tort Claims Trust
> Agreement, to process, liquidate and make Distributions on account of Tort
> Claims.

*Id.*, Article I (A)(161). The Plan stated that "[f]inal determinations" as to the allowance or

disallowance of Tort Claims would be made in accordance with the TDPs. *Id.* The order

confirming the Plan similarly states that all Tort Claims would be resolved pursuant to the TDPs.

*See* Findings of Fact, Conclusions of Law and Order Confirming the First Amended Joint Plan

(the "**Confirmation Order**") [ECF Dkt. 2567 at ¶ 184].

## C.    The Trust and the TDPs

A proposed Trust Agreement and proposed TDPs were filed as part of a Plan Supplement

on October 29, 2010 [ECF Dkt. 2343]. Amended copies were filed on February 4, 2011, several

months after the entry of the Confirmation Order but prior to the effective date of the Plan. [ECF

Dkt. 2768]. The origin and reasons for the amendments were not explained. However, no party

has challenged the amendments, and all of the parties who appeared in connection with the

Trustee's Motion treated the amended TDPs as those that had been authorized by the Plan and by

the Confirmation Order.

The Trust Agreement includes defined terms that are not entirely identical to those used

in the Plan but that are comparable to them. The Trust Agreement defines "Allowed Non-

Asbestos Toxic Exposure Claim" as "a Non-Asbestos Toxic Exposure Claim which was the

subject of a timely filed proof of claim . . . and is Allowed through the [TDPs]." *See* Trust

Agreement, submitted as Exhibit A to the Trustee's Motion [ECF Dkt. 3030 at ¶ 1.2(d)]. The

Trust Agreement also defines "Non-Asbestos Toxic Exposure Claims" as "timely filed Tort

Claims against any Tronox Debtor for personal injury, wrongful death, sickness or disease

arising directly or indirectly from exposure or release of creosote" or other contaminants. *Id.* at

¶ 1.2(p).  The Trust Agreement confirmed that the final allowance or disallowance of any Tort

Claim would occur pursuant to the TDPs.  *Id*. at ¶ 1.2(v).  The Trustee had power to do anything

"necessary or proper to fulfill the purposes of the Tort Claims Trust," subject to the limits set

forth in the Trust Agreement and the TDPs themselves.  *Id*. at ¶ 3.1(a).

      The TDPs also confirmed that all Tort Claims would be processed and resolved in the

manner set forth in the TDPs.  *See* TDPs, submitted as Exhibit B to the Trustee's Motion [ECF

Dkt. 3030 at ¶ 2.1].  Paragraph 2.2(b) of the TDPs specifies that a "Holder of a Tort Claim" may

"assert a Claim against the Trust" pursuant to the TDPs.  *Id*.  Paragraph 2.2(b) provided that a

timely filed proof of claim in the bankruptcy case "shall be accepted as irrefutable and final

proof of exposure and injury asserted in the proof of claim with respect to such exposure . . ."  *Id*.

at ¶ 2.2(b).  However, it also contemplated that claimants could specify injuries that differed

from those set forth in their original proofs of claim:

> Where illness/injury was not specified on a timely Proof of Claim Form or
> where the illness/injury sought to be compensated has changed, a sworn
> statement by the Holder of a Tort Claim or such Holder's authorized
> representative shall be sufficient proof of injury.

*Id.*

      The TDPs further contemplated that the Trustee would send "Trust Claim Forms" to

persons who had filed timely proofs of claim.  Paragraph 5.1 of the TDPs provided that the Trust

Claim Forms "shall require" claimants to assert "all diseases" for which their Claims qualified at

the time of filing of the Trust Claim Forms.  *Id.* at ¶ 5.1.  The claimant was to specify, in the

Trust Claim Form, the specific category into which the Trust Claim belonged; only one category

could be specified.  *Id*. at ¶ 2.2(c).  The TDPs stated, however, that Category D claims (for Non-

Asbestos Toxic Exposure) would be disallowed if "no official bankruptcy proof of claim was

timely filed."  *Id.* at ¶ 2.2(e).

The TDPs called for the Trustee to issue a "Determination Notice" as to Trust Claims in Category D, stating whether the Trust Claim Form was complete. *Id.* at ¶ 3.2(a). The TDPs also required the Trustee to propose an allowed "Scheduled Value" for each Category D claim that differed depending on the nature of the illness, injury, disease or other damage described in the Trust Claim Form. The Scheduled Values for claims based on creosote exposures were:

| Disease | Scheduled Value |
|---|---|
| Precancerous Skin Lesion | $26,000 |
| Skin Cancer | $120,000 |
| Lung Cancer | $700,000 |
| Breast Cancer | $475,000 |
| Other Cancer | $600,000 |
| Asthma Adult | $150,000 |
| Asthma Child | $175,000 |
| Cardiovascular | $250,000 |
| Respiratory | $80,000 |
| Medical Monitoring/Unimpaired | $5,000 |

*See* Schedule B to the TDPs. Holders of claims could accept the proposed Scheduled Values (and were deemed to accept them if they did not demand other treatment within thirty days), but otherwise could elect to proceed with mediation or other methods to resolve the amounts of the claims. *Id*. The TDPs state that "A Holder accepting the Scheduled Value shall not be required to meet any further evidentiary requirements . . . with regard to such Claim, and the Claim shall then be liquidated and Allowed in the amount of the Scheduled Value." *Id*. at ¶ 3.2(f).

### D.    Trust Claims Submitted by the Mississippi Claimants

At some point after the Plan became effective, the Trustee sent Trust Claim Forms to persons who had filed proofs of claim for tort liabilities in the bankruptcy cases; the date when this happened is unclear. In response, 2,120 of the Mississippi Claimants submitted Trust Claim Forms asserting that they held Category D "Non-Asbestos Toxic Exposure Claims." Of those,

296 were filed by individuals who had been listed in the original Mississippi Claim as holding

"categorized personal injury or wrongful death claims," and the other 1,824 were filed by

individuals who had been listed as holding "nuisance" claims.  It is not clear when the Trust

Claim Forms were filed, though apparently they were filed some time prior to 2012.

The Trustee determined that the Mississippi Claim was a timely proof of claim and that

"nuisance" claimants had the right, under the TDPs, to assert that they suffered from diseases,

injuries or conditions that qualified for compensation under Category D.  In accordance with the

TDPs, the Trustee accepted the assertions in the Trust Claim Forms (all of which had been

signed under penalty of perjury) and issued Determination Notices that proposed to allow the

claims for their Scheduled Values.  The total Allowed Scheduled Values for all of the

Mississippi Claimants is $357,215,500, of which $262,138,500 is attributable to claims that were

originally described as "nuisance" claims.

### E.    Objections by Other Claimants and the Trustee's Motion

The Trustee acknowledges that it received complaints from other claimants in 2011

regarding the allowance of the Category D claims filed by the Mississippi Claimants.  The

Trustee discussed the issues with the attorneys who had made complaints, and the Trustee

defended (and adhered to) its determination to allow the claims of the Mississippi Claimants.

The Trustee has also represented to the Court that in May 2012 the Trustee conducted a

random audit of some of the Trust Claim Forms filed by the Mississippi Claimants to attempt to

identify any fraud that might have occurred in the filing of the claims.  The Trustee reviewed

medical records of one hundred Mississippi Claimants selected at random and determined that

95% of the claims were adequately supported.  The Trustee concluded from this review that no

fraud had occurred.

Issues regarding the Mississippi Claimants intensified in 2014, however, after it became apparent that there would be a very large recovery from the Anadarko Litigation. The Trust ultimately received more than $599 million as its share of the proceeds from that litigation. As a result, the expected recoveries for tort claimants have increased exponentially. The Avoca Plaintiffs hold Allowed Scheduled Claims in Category D totaling approximately $966 million, and the payments on their allowed claims are significantly affected by the allowance of the claims of the Mississippi Claimants.

The parties submitted correspondence which shows that until late 2014 the Trustee vehemently defended the prior determinations and took the position that the Trustee's actions were in accord with the plain language of the Plan, the Trust and the TDPs. At some point in late 2014, however, the members of the Trust Advisory Council (the "**TAC**"), with whom the Trustee is to consult on various issues, raised questions about the Trustee's allowance of the Mississippi Claims and about the complaints made by the Avoca Plaintiffs.[1] After discussions with the TAC, the Trustee filed the motion for instructions. In the motion, the Trustee stated that it had come to believe (notwithstanding earlier arguments) that the TDPs actually were ambiguous as to whether the Mississippi Claimants had to explicitly assert claims for personal injury, wrongful death, illness or disease in their original bankruptcy proof of claim in order to qualify as claimants in Category D. Later, in its reply brief, the Trustee went further and argued that the "better view" is that the "nuisance" claimants should never have been permitted to assert Category D claims. The Trustee also submitted a set of possible amendments to the TDPs that would permit the Trustee to reconsider claims (a practice not authorized by the TDPs as they currently are formulated) and that would further clarify that Category D claims should be

---

[1]    It appears that one of the three members of the TAC is an attorney who represented the Avoca Claimants.

disallowed if the original bankruptcy proof of claim did not specify that an individual held a claim for personal injury, wrongful death, sickness or disease.  However, the Trustee stated that it only sought instructions regarding the proposed amendment if the Court determined that "nuisance" claimants should have been barred from making claims in Category D.

The Avoca Plaintiffs filed a response in which they did not oppose the proposed amendments or the request for instructions, but in which they argued that the Category D claims of the "nuisance" claimants should never have been permitted and that no instructions should have been necessary.  They argue that the Mississippi Claimants did not file proper proofs of claim in the bankruptcy cases but instead filed a "group" claim that should not have been permitted; that only some of the Mississippi Claimants had asserted personal injury claims in the "group" claim that was filed; that the individual Mississippi Claimants who held "nuisance" claims should have been barred from filing Trust Claims based on illness, disease or other personal injury; and that the claims filed by the Mississippi Claimants against the Trust are so different in number, nature and dollar value from those described in the bankruptcy proof of claim that a further inquiry should be made as to whether fraud was committed.

As noted above, the Mississippi Claimants have opposed the Trustee's motion and have argued that the Trustee's prior determinations were correct.  Maranatha also filed a response, arguing that the claims of the Mississippi Claimants belong where they are and that they should not be moved to the "Property Damage" category in which Maranatha holds an allowed claim.

## DISCUSSION

The Court has some skepticism as to whether the motion before this Court is an appropriate request for instructions.  Ordinarily a Trustee seeks instructions when it has not yet taken action and where the Trustee is unsure as to what to do, and may even face liability for an incorrect choice.  *See Peierls Family Inter Vivos Trusts*, 59 A.3d 471, 477 (Del. Ch. 2012)

(noting that a "request for judicial relief involving a trust can be appropriate in many circumstances," including when the trust agreement is "genuinely ambiguous"); *see also In re Am. Home Mortg. Inv. Trust*, 2005–2, No. 14 Civ. 2494(AKH), 2014 WL 3858506, at *12 (S.D.N.Y. July 24, 2014) (noting that "trust instruction proceedings are a well-established procedure by which trustees (and other affected parties) can seek judicial guidance from the court about how to resolve immediate and difficult issues of interpretation of governing documents"). Here, the Trustee has already taken action – the Trustee allowed the Mississippi Claims several years ago – but now has misgivings about the determinations it made. In this regard the Trustee's motion seems mainly to be a request for "comfort" as to actions already taken, rather than truly a request for "instructions" as to what the Trustee should do going forward in administering the Trust.

Similarly, the Trustee's request for "instructions" as to the proposed amendment of the TDPs is not really a request for "instructions" as to how to interpret the existing Trust documents. Instead, it is more of a request for an advisory opinion as to whether a proposed change to the TDPs would be consistent (or inconsistent) with the terms of the Plan and the vested rights of claimants.

On the other hand, it is plain that the Trustee's prior actions, and the disputes among the parties as to the interpretation of the Plan, the Trust Agreement and the TDPs, represent genuine, active controversies. It is also plain that further litigation – and thereby further delays in distributions to the beneficiaries of the Trust, who have already been waiting for many years – are inevitable unless some binding clarification of these issues is provided. The Plan provides that this Court has continuing jurisdiction over any issue relating to the interpretation and application of the Trust Agreement and the TDPs, *see* Article XI of Plan at ¶¶ 14, 16 [ECF

14

Dkt. 2567, Ex.]; *see also* Trust Agreement at ¶ 9.16 [ECF Dkt. 3030, Ex. A], and it is appropriate to exercise that power in the hope that a ruling will avoid further expense and delay.

## I.    "Nuisance" Claimants Who Suffered From Creosote-Related Diseases Or Medical Conditions Were Not Prohibited From Filing Trust Claim Forms In Category D

The gist of the argument made by the Trustee and the Avoca Plaintiffs is that Category D is reserved for claimants who explicitly asserted claims for personal injury, wrongful death, sickness or disease in their original bankruptcy proofs of claim, and excludes all other claimants. In their view, the "nuisance" claimants only alleged property damage in their bankruptcy proof of claim; the Plan, the Trust Agreement and the TDPs irrevocably classified those claims as "property damage" claims; and the "nuisance" claimants therefore were prohibited from making Category D Trust Claims – even if the nuisance claims were timely filed, and even if the claimants actually had serious illnesses at the time the Trust Claim Forms were filed.  The Court rejects the Trustee's and the Avoca Plaintiffs' arguments for two independent reasons.

First, the Trustee and the Avoca Plaintiffs are wrong in their interpretation of the underlying Mississippi Claim and the types of injuries for which the "nuisance" claimants sought compensation.  The Trustee and the Avoca Plaintiffs urge the Court to interpret the Mississippi Claim as if it were an affirmative statement that the nuisance claimants *only* held claims for property damage and never held, or could hold, any claims for personal injury, wrongful death, disease or sickness.  However, that is not a fair reading of the claims that were made.

Under Mississippi law, a nuisance claim must be premised on an invasion of a property interest, but damages for a valid nuisance claim are not limited to property damages, and may include damages for sickness or other personal injury.  *See T.K. Stanley, Inc. v. Cason*, 614 So. 2d 942, 944, 953 (Miss. 1992); *Shaw v. Owen*, 229 Miss. 126, 90 So. 2d 179, 181 (1956).  In this case, the Mississippi Claim referred to and incorporated the claims asserted in the underlying

Mississippi lawsuits.  The parties before this Court in connection with the Trustee's Motion

treated the two Mississippi complaints that were provided to the Court as being representative of

the complaints in all of the Mississippi lawsuits.  The two complaints were explicit in alleging

that the "nuisance" violations had resulted in various forms of personal injury, wrongful death,

sickness and disease, for which the plaintiffs sought compensation.

The proposed categories of "nuisance" claims for mediation in Mississippi (set forth in

the November 2, 2007 memorandum described above) were even more explicit in stating that

"nuisance" claimants included persons who had shown signs of illnesses associated with creosote

exposure.  Some categories of "nuisance" claims were for individuals who had shown signs of

"ten or more" such illnesses.

The Trustee and the Avoca Plaintiffs seize on the fact that the Mississippi Claim (viewed

without reference to the other materials cited above) appears to distinguish between "nuisance"

claims and "personal injury" claims.  However, the November 2, 2007 memorandum that listed

categories of "nuisance" claims for mediation – broken down by the number of illnesses that

claimants had suffered – also listed separate categories of "Personal Injury" claims for

mediation.  No party explained how the categories were developed but, in context, the separate

listing of "personal injury" claims cannot reasonably be interpreted as meaning that the

"nuisance" claimants had no claims to recover for personal injury, wrongful death, sickness or

disease.  Instead, it was quite clear, in context, that many of the nuisance claims had an injury or

illness component.  One or more of the Debtors was a party to the Mississippi cases and is

properly charged with knowledge of the complaints and the mediation categories, and therefore

with knowledge of the nature of the injuries being asserted by "nuisance" claimants.

Second, the Trustee and the Avoca Plaintiffs are wrong in their contentions as to what the

Plan and the TDPs contemplated.  The Plan did not "freeze" claims into inflexible categories

based on narrow readings of the way the original proofs of claim were worded.  Instead, the Plan

contemplated that Tort Claims would be categorized based on the actual injuries that claimants

suffered, as reflected in the Trust Claim Forms that they filed.  The TDPs (which were

incorporated into the Plan) compel this conclusion.

The TDPs do not say that claims will be categorized based on the ways in which the

original bankruptcy proofs of claim were worded.  Nor do they say that the "category" of a claim

could not change from the category into which the original bankruptcy claim might have been

placed.  Instead, paragraph 2.2(c) of the TDPs states clearly that the *claimant* is to specify the

proper category into which the claim falls, and that the claimant is to do so in the Trust Claim

Form.

Similarly, the TDPs do not say that a claimant is limited to the "types" of injuries

specified in the original bankruptcy proof of claim.  To the contrary: paragraph 5.1 of the TDPs

requires Holders of Tort Claims to identify all diseases for which they are entitled to

compensation at the time the Trust Claim Forms are filed.  Paragraph 2.2(b) of the TDPs also

explicitly allows a claimant to make a claim for personal injury, wrongful death, sickness or

disease even if the original proof of claim did not specify such an injury or if the nature of the

illness or injury had changed.  Paragraph 2.2(b) states:

> Where illness/injury was not specified on a timely Proof of Claim Form or
> where the illness/injury sought to be compensated has changed, a sworn
> statement by the Holder of a Tort Claim or such Holder's authorized
> representative shall be sufficient proof of injury.

The Avoca Plaintiffs argue that the second part of Paragraph 2.2(b) of the TDPs only

permits a claimant to "change" the nature of an illness or "personal injury" that the claimant

previously asserted, and does not allow the claimant to allege a personal injury if the original

proof of claim did not already specify a different kind of personal injury.  However, paragraph

2.2(b) referred to changes in the type of "illness/injury" being asserted; the word "injury" was

not limited to "personal injury." If (as the Avoca Plaintiffs wrongly contend) each "nuisance"

claimant had only alleged an "injury to property," the subsequent allegation of personal injury,

wrongful death, sickness or disease would just have been a "change" to the "injury" for which

compensation was sought, which was permitted by Paragraph 2.2(b).

Moreover, even if the phrase "illness/injury" in Paragraph 2.2(b) were interpreted as a

reference to "illness/personal injury," as the Avoca Plaintiffs urge, the result would still be

contrary to the result they seek. In addition to "changes" in illnesses or injuries, Paragraph

2.2(b) permits claimants to file claims for personal injury "[w]here illness/injury was not

specified on a timely proof of claim form." If (as the Avoca Plaintiffs argue) this was a

reference to persons as to whom "illness/personal injury was not specified" on a proof of claim

form, and if (as the Avoca Plaintiffs also argue) the "nuisance" claimants were persons who did

not specify an "illness/personal injury" in their proof of claim, then under Paragraph 2.2(b) the

Mississippi Claimants would still be entitled to assert Category D claims.

The interpretation of Paragraph 2.2(b) urged by the Trustee and the Avoca Plaintiffs also

would have unreasonable and unfair consequences, in violation of the terms of the Trust

Agreement. During argument the Court asked hypothetical questions as to how the interpretation

of the Plan and the TDPs now advocated by the Trustee and by the Avoca Plaintiffs would affect

similar proofs of claim that might have been worded slightly differently but that had all been

filed by persons who wished to file Trust Claim Forms alleging they currently suffered from

brain cancer. One hypothetical involved a claimant who filed an unliquidated bankruptcy proof

of claim alleging exposure to creosote, stating at that time that the only symptom experienced to

date had been nausea. A second hypothetical question involved a claimant whose bankruptcy

proof of claim stated generally that "I have suffered a personal injury," without more. The

18

Trustee answered that these two claimants would be permitted to file a Category D claim seeking

compensation for brain cancer, because the original bankruptcy claim had alleged some form of

personal injury.  In the Trustee's view, however, a "nuisance" claimant could not do so.  In short,

the Trustee contends that the Plan, the Trust and the TDPs allow some holders of Tort Claims to

change the injury for which they seek compensation (*e.g.*, the "nausea" claimant may seek

compensation for brain cancer), but prohibit other holders of Tort Claims (*e.g.,* those who held

"nuisance" claims) from doing the same thing.

The Court can think of no good reason why the Plan and the TDPs would have imposed

such a manifestly unfair distinction between similarly-situated claimants.  The Trust Agreement

states that the Trust Agreement and the TDPs are to be interpreted to promote fairness in the

treatment of similar claims [Trust Agreement at ¶ 1.3(a), ECF Dkt. 3030, Ex. A], but the

interpretation urged by the Trustee and the Avoca Plaintiffs would do the opposite.  Similar

treatment of similar claims is also a bedrock principle of bankruptcy law, yet the Trustee and the

Avoca Plaintiffs urge the Court to adopt an interpretation of the Plan and its implementing

documents that would be utterly inconsistent with the principle of similar treatment.

The Court also asked the Trustee how a claim should have been treated if the claimant

currently had brain cancer but had stated, in a bankruptcy proof of claim, that "so far as I know,

the only injury I have suffered is damage to my property, but I fully reserve all of my rights to all

injuries that manifest themselves by the time the claim is allowed."  The Trustee answered only

that this was a "good question" to which the Trustee could not provide a clear answer.  However,

common sense compels the conclusion that a proof of claim worded in this way had to be

sufficient to preserve a claimant's rights to seek compensation for whatever injuries had

manifested themselves at the time the claim was allowed or disallowed.  In fact, it appears that at

least some of the bankruptcy proofs of claim filed by the Avoca Plaintiffs were very similar to

19

the claim described in this hypothetical question.  Copies of the Avoca Plaintiffs' proofs of claim

were not provided to the Court, but the Court was able to locate two of them (claims 3784 and

3793) and takes judicial notice of them.  These two proofs of claim asserted that the claimants

sought damages for medical monitoring under Pennsylvania law and compensation for

"[d]iseases not yet known or diagnosed and to be proven at the time of trial."  The Trustee and

the other parties who have appeared in this Court in connection with the Trustee's request for

instructions have acknowledged that the Avoca Plaintiffs made valid Category D Claims, yet

these two Avoca claims were no more specific about the "injuries" or diseases that the claimants

had suffered than the "nuisance" claims were.

The contention that minor differences in the terminology used in a proof of claim would

have such drastic consequences – and that a "nuisance" claimant should be barred from making a

Category D Claim regardless of the illness, condition or injury that the claimant actually suffered

– is not reasonable.  The Proofs of Claim were filed before the Bar Date, which was long before

the Plan was confirmed and long before the Plan divided Tort Claims into various categories.

No tort claimant could have known or appreciated, at the bar date, the significance of the

categories of tort claims that were later established.  Nor was any tort claimant advised that the

kinds of injuries for which compensation could be sought might be "frozen" by the language

used in the proof of claim.

The injuries suffered from exposures to creosote can manifest themselves in different

ways over time.  All of the Mississippi Claimants alleged injury due to creosote exposure, and a

reservation of rights to seek compensation for all injuries resulting from that exposure is implicit

in the claim, regardless of whether that reservation of rights was stated expressly.  Even if that

were not the case, the Court in the ordinary course would have routinely permitted an

amendment to a proof of claim that had alleged exposure to creosote if the nature of the

claimant's injury had changed.  The TDPs effectively allowed the same thing: claims were categorized based on the injuries asserted in the Trust Claim Forms, which were not limited to the injuries set forth in the timely filed bankruptcy proofs of claim.

Accordingly, the Court holds that the Plan and the TDPs contemplated that Tort Claimants who filed timely proofs of claim would be able to make claims for any illness, injury or medical condition they had actually suffered at the time the Trust Claim Forms were due, and that such claims would be placed into categories based on the injuries actually specified in the Trust Claim Forms.  This ruling moots the Trustee's request for instructions regarding a possible amendment to the TDPs, as the Trustee only sought such instructions in the event the Court held that the Plan and the TDPs did not permit the nuisance claimants to make Category D claims.

## II.    The Avoca Plaintiffs Have No Standing To Object To The Mississippi Claim And In Any Event Their Objections To The Claim Are Unfounded

Parties in interest ordinarily have a right to file objections to proofs of claim with the Bankruptcy Court.  11 U.S.C. § 502(a).  Here, however, the Confirmation Order and the confirmed Plan provided that all Tort Claims would be "deemed objected to" and that the allowance or disallowance of those claims would occur pursuant to the TDPs.  *See* Confirmation Order at ¶ 184; Plan, Article I(A)(4), (28).  The Plan also stated that, "except as provided" in the Plan, the only party who could file objections to claims was Reorganized Tronox.  *See* Plan, Article VII(C).  The Plan (and the TDPs incorporated into the Plan) gave the Trustee the right to resolve claims, but other claimants were given no rights to object.  The Avoca Plaintiffs made no objection to the proof of claim filed by the Ad Hoc Committee prior to confirmation of the Plan and have no right to make any such objection thereafter.

In addition, there is no merit to the objections asserted by the Avoca Plaintiffs.  They argue that the claim filed by the Ad Hoc Committee was an impermissible "group" claim.

21

However, the cases cited by the Avoca Plaintiffs do not involve "group" claims, but instead involve purported "class action" claims, in which one claimant attempts to appoint itself as a representative of other claimants (without prior authorization by those claimants) for purposes of making claims.  Courts have often held that permission should be obtained before a "class" proof of claim is filed.  *See Ephedra Products Liability Litigation*, 329 B.R. 1, 5 (S.D.N.Y. 2005); *In re Musicland Holding Corp.*, 362 B.R. 644, 650 (Bankr. S.D.N.Y. 2007).  Here, however, the claim was filed by the Ad Hoc Committee, which represented that it had authority to file the claim on behalf of the individuals listed therein.  Such a "group" proof of claim was acceptable.  *See Adair v. Bartholow (In re Great Western Cities*, Inc.), 107 B.R. 116, 119 (N.D. Tex. 1989).

The Avoca Plaintiffs also argue that the Ad Hoc Committee did not provide evidence of its authority to file claims on behalf of the Mississippi Claimants.  It is plain, however, that the Avoca Plaintiffs are not trying to protect the Mississippi Claimants from unauthorized acts; instead, they are trying to disallow the claims that were filed, to the detriment of the Mississippi Claimants.  In any event, the Trust Claim Form required claimants to identify the bankruptcy proof of claim on which their claims were based, and the Mississippi Claimants filed individually-signed Trust Claim Forms that adopted and ratified the original proof of claim filed by the Ad Hoc Committee.  As a result, the authority of the Ad Hoc Committee to make the original filing is not properly at issue.

## III.    Allegations of Fraud

For the reasons stated above, the Mississippi Claim cannot fairly be read as foreclosing contentions that "nuisance" claimants suffered (or would suffer) from illnesses and serious medical conditions, and the Plan and the TDPs permitted "nuisance" claimants to assert Category D Claims in their Trust Claim Forms.  However, it is difficult to understand how nearly every

one of the "nuisance" claimants could have a Category D claim, with "Scheduled Values" that average more than $143,000 each.

An inflation of claims is an inherent risk of trusts that are structured in the manner that the Trust in this case was structured. The Trust (like similar trusts in many other cases, especially those involving asbestos claims) requires the submission of statements made under oath, but contemplates no further investigation of the facts asserted by claimants. In an effort to avoid delay and expense, the Trust contemplates that the sworn statements by claimants will simply be accepted as true, and that the vast majority of claimants will receive allowed claims based on Scheduled Values, without further inquiry or dispute. The "Scheduled Values" for various creosote-based claims also were very high, as indicated in the table on page 10 of this Opinion. In fact, the Avoca Plaintiffs have reported that the Scheduled Values of their own creosote-based claims are approximately $966 million. There were approximately 4,000 Avoca Plaintiffs (the precise number was not provided to the Court), which means that the average Scheduled Value for the Avoca Plaintiffs' own claims is approximately $240,000.

The Avoca Plaintiffs ask for further investigation, but it is not clear what can or should be done. During oral argument the Trustee took the position that fraud had not occurred and that the Trustee was satisfied with the results of the previous random audit that the Trustee had completed. The Avoca Plaintiffs argue that the Trustee should have done a more thorough review, but no party has sought instructions from the Court on that point. Nor is it clear that a further investigation would make any difference. The Plan states that "final" determinations as to the allowance or disallowance of claims will occur under the TDPs, and the TDPs state that claims "shall" be allowed if Notices of Determination are issued and Scheduled Values are accepted. The TDPs also state that the holders of such allowed claims shall not be required to meet "any further evidentiary requirements" with regard to those claims. Since the claims of the

Mississippi Claimants have already been allowed pursuant to the Trustee's prior notices of

determination, it is not clear that any further investigation of the circumstances would be fruitful.

In any event, if the Avoca Plaintiffs believe that further investigations should be made by

the Trustee or by the TAC, the Avoca Plaintiffs should raise those issues with those parties.

## **CONCLUSION**

The request for instructions is granted, and instructions are provided as set forth above.

The Court will issue a separate Order incorporating the rulings set forth in this Opinion.

Dated: New York, New York
      June 17, 2015

                    **s/Michael E. Wiles**
                    UNITED STATES BANKRUPTCY JUDGE