UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

———————————————————————————

|  |  |  |
|---|---|---|
| In re: | : | Chapter 11 |
|  | : |  |
| TRONOX INCORPORATED, et al., | : | Case No. 09-10156 (MEW) |
|  | : | Jointly Administered |
| Reorganized Debtors. | : |  |
|  | : |  |

———————————————————————————

**MEMORANDUM OPINION AS TO TORT CLAIMS TRUSTEE'S MOTION
FOR INSTRUCTIONS REGARDING FUTURE TORT CLAIMS**

A P P E A R A N C E S:

KEATING MUETHING & KLEKAMP PLL
Cincinnati, Ohio
*Counsel for the Garretson Resolution Group, Inc.
As Tronox Incorporated Tort Claims Trustee*
    By:  Robert G. Sanker, Esq.
           Bethany P. Recht, Esq.

**MICHAEL E. WILES
UNITED STATES BANKRUPTCY JUDGE**

      The Tronox Incorporated Tort Claims Trust (the "**Trust**") was established under the confirmed plan of reorganization in these cases (the "**Plan**"). The Trust is governed by a Tort Claims Trust Agreement (the "**Trust Agreement**") and by a set of Tort Claims Trust Distribution Procedures (the "**TDPs**"). The Plan and the Trust Agreement establish categories into which allowed tort claims are to be divided, and the TDPs are rules that govern the collection, review, allowance and payment of tort claims.

      The Garretson Resolution Group, Inc., as trustee of the Trust (the "**Trustee**"), has filed a motion [ECF No. 3069] seeking instructions as to the interpretation and application of the provisions of the Plan, the Trust Agreement and the TDPs that govern "Future Tort Claims." For the reasons set forth below, the Court grants the Trustee's request for instructions, and holds that

a claim qualifies as a "Future Tort Claim" if it does not fall into the other categories of Tort Claims and if one or more of the following conditions are met:

(1) The claim is based on an alleged exposure to a harmful substance that occurred on or after August 12, 2009;

(2) The claim is based on an exposure that occurred before August 12, 2009, but as to which no injury or disease was manifested until on or after August 12, 2009; or

(3) The exposure, as well as the manifestation of an injury or disease, predated August 12, 2009, but the claimant is able to establish (a) that the claimant's failure to file a timely proof of claim should be excused on grounds of excusable neglect, (b) that the purported discharge of the claimant's claim was a violation of due process and therefore ineffective.

Determinations as to claims that fall into categories (1) and (2), above, will be made by the Trustee pursuant to the TDPs and subject to the dispute resolution procedures that are set forth in the TDPs. Claimants in category (3) who wish to obtain relief will be required to file motions seeking such relief from this Court.

## Background

Tronox Incorporated and related entities filed voluntary chapter 11 petitions in this Court on January 12, 2009. The Court entered an order setting August 12, 2009 (the "**Bar Date**") as the deadline by which to file any proof of claim against the Debtors. The Order required the Debtors to send notice of the Bar Date to all known creditors, including all parties to pending litigation with the Debtors (with the proviso that such notices were to be sent to counsel if the Debtors did not have the litigants' addresses). In addition, the Order approved many "site-specific" notices that were designed to inform potential tort claimants of the Bar Date. The site-specific notices were to be published in local newspapers in locations where facilities had been

operated and where prior waste disposals had given rise to injury claims. Judge Gropper approved the form and manner of notices, and also found that the approved notices constituted "adequate and sufficient notice of each of the Bar Dates . . ." *See* ECF No. 466, ¶ 20.

On November 30, 2010, the Court confirmed the Plan, which later became effective on February 14, 2011. The term "Tort Claims" was broadly defined in the Plan so as to include claims that had already arisen or that might arise in the future:

> "*Tort Claim*" means non-governmental Claims against Tronox, whether such Claims are known or unknown, whether by contract, tort or statute, ***whether existing or hereinafter arising***, for death, bodily injury, sickness, disease, medical monitoring or other personal physical injuries or damage to property to the extent caused or allegedly caused directly or indirectly by the presence of or exposure to any product or toxin manufactured or disposed of, or other property owned, operated or used for disposal by, Tronox or any Entity for whose products or operations Tronox allegedly has liability . . .

Plan, Article I(A)(156) [ECF No. 2567, Ex. A] (emphasis added). All Tort Claims were to be channeled to the Trust for processing, allowance and payment, and the Plan made clear that holders of "Tort Claims" could only seek recovery from the Trust:

> The sole recourse of Holders of Tort Claims shall be the Tort Claims Trust, and such Holders shall have no right at any time to assert Tort Claims against Reorganized Tronox. Final determinations on the allowance or disallowance of Tort Claims for distribution purposes shall be made in accordance with the Tort Claims Trust Distribution Procedures.

*Id.* Article III(B)(4)(b). The Trust was funded with a cash deposit and by a contingent interest in the proceeds of certain litigation. That litigation ultimately resulted in a very large judgment in November 2014, and therefore in more than $580 million of total funding for the Trust.

The Plan established many separate subcategories of Tort Claims, and provided that the total amounts allocated to the Trust would be divided as follows:

- "up to" 6.25% would be available for "Indirect Environmental Claims;"

3

- 6.25% would be available for "Holders of Asbestos Claims and Future Tort Claimants;"

- 6.25% would be available to "Holders of Property Damage Claims;" and

- the largest share (at least 81.25%) would be set aside for "Non-Asbestos Toxic Exposure Claims."

*Id*., Article III(B)(4)(b).

The Trust Agreement was filed with the Court after the proposed Plan had been filed, but prior to confirmation of the Plan. [ECF No. 2343, Ex. C]. The Trust Agreement effectively added further limitations on the persons who would qualify for distributions in many of the Tort Claim categories. More particularly, the definitions of the terms "Allowed Indirect Environmental Claim," "Allowed Asbestos Claim," "Allowed Property Damage Claims" and "Allowed Non-Asbestos Toxic Exposure Claims" made clear that the only claims that fell in those categories were claims (i) that were the subject of proofs of claim that were filed prior to the Bar Date, or (ii) that were the subject of proofs of claim that the Court had authorized to be late-filed through a Final Order entered prior to the Effective Date of the Plan. *Id.* at ¶ 1.2(a), (c)-(e). These conditions had the effect of limiting the claimants who could qualify for inclusion in these categories.

As noted above, the Plan also defined a category of "Future Tort Claims." The Plan did not define the term "Future Tort Claim," but it did define the term "Future Tort Claimant," as follows:

> . . . an entity that establishes that it holds a Tort Claim that ***did not arise prior to the Effective Date and was not discharged under the Plan***.

4

[ECF No. 2567, Ex A, Article I(A)(75) (emphasis added). The proposed Trust Agreement, however, contained a different definition. The Trust Agreement defined the term "Future Tort Claimant" as:

> . . . an entity that establishes that it holds a Tort Claim *that arose prior to the Effective Date and was not discharged under the Plan*.

*See* Trust Agreement, ECF No. 2343, Ex. C, § 1.2(m). The Term "Allowed Future Tort Claim" was also defined in the Trust Agreement as "a Tort Claim held by a Future Tort Claimant that is Allowed by a Final Order." [ECF No. 2343, Ex. C, ¶ 1.2(b).]

The Confirmation Order provided that the definition of "Future Tort Claimant" in the Trust Agreement would be deemed to have been incorporated into Article I of the Plan and to have replaced the prior definition. Confirmation Order [ECF No. 2567] at ¶ 185. The Confirmation Order also approved the other terms of the Trust Agreement and TDPs. *Id*. at ¶¶ 85, 184. As a result of this change the definition of "Future Tort Claimant" was changed from one that would include only claims that arose *after* the Effective Date to one that was limited to certain claims that arose *before* the Effective Date. The parties did not explain the differences, or the changes to the definitions, in their filings with the Court or at the confirmation hearing. Similarly, no explanation was offered as the how and when a Tort Claim would be deemed to "arise" prior to the Effective Date. Nor was any explanation offered as to how these provisions were intended to apply in light of Section VIII.A of the Plan and paragraph 129 of the Confirmation Order, which stated that all Tort Claims that "arose" prior to the Effective Date were deemed to have been discharged.

The Trust Agreement also added a new category of "Allowed Unknown Tort Claims," and the Confirmation Order incorporated that category into the terms of the Plan. Confirmation Order [ECF No. 2567] at ¶ 185. On February 4, 2011, amended versions of the Trust Agreement

5

and Trust Distribution Procedures were filed. [ECF no. 2768, Ex A, B] This version of the Trust Agreement amended the defined term "Allowed Unknown Tort Claim" to "Allowed Unaccounted-For Tort Claims," and the definition was also circumscribed by a requirement that the underlying claim be included in the Debtors' schedules of liabilities or that the claim be the subject of proof of claim that was timely filed:

> "Allowed Unaccounted-for Tort Claim" means any Tort Claim that is (a)(i) a Claim that is listed in the Schedules by Tronox as neither disputed, contingent nor unliquidated, and as to which Tronox or any other party in interest has not filed an objection by the Claims Objection Bar Date or such other applicable period of limitation fixed by the Bankruptcy Code, Bankruptcy Rules or the Bankruptcy Court or (ii) that is a Claim to which a Proof of Claim was timely filed and as to which no objection was filed by the Claims Objection Bar Date; and (b) is not an Asbestos Claim, Future Tort Claim, Indirect Environmental Claim, Non-Asbestos Toxic Exposure Claim, or Property Damage Claim, which Tort Claim is Allowed through the Tort Claims Trust Distribution Procedures.

*Id.* Ex. A at ¶ 1.2(g). As it currently stands, then, this category is not available to claimants unless they filed timely claims or obtained permission, prior to the effective date, to file a late claim.

The Trust Agreement and the TDPs contain provisions that allow further amendments. At some point after the effective date the definition of "Allowed Future Tort Claim" was further amended to make clear that such a claim could be allowed by final Order or pursuant to the TDPs. [ECF no. 3030, Ex. A, ¶ 1.2(b)].

## The Request for Instructions

More than 19,000 claims have been filed as purported Future Tort Claims – a far greater number than anyone anticipated, and more than twice the number of other claims that the Trustee has received and processed. Additional Future Tort Claims continue to be filed each week. The Trustee contends that the relevant terms of the governing trust documents could be interpreted in different ways and do not provide sufficiently clear guidance to the Trustee as to whether the

6

claims qualify as Future Tort Claims. The Trustee has suggested a resolution under which a "Future Tort Claim" would be allowed only if (1) the claimant was exposed to a Tronox product before the Effective Date of the Plan, and (2) the claimant was not diagnosed with the claimed disease or condition until after the Bar Date. All other claims, in the Trustee's view, would be barred by the prior discharge orders, and the Trustee has proposed to so inform the claimants. In addition, the Trustee has suggested that each claimant who wishes to appeal from such determinations should be required to pay a fee of $250, which fee would be refundable if the claimant were successful. *See* ECF No. 3069, ¶¶ 18-21.

The Trustee argued, in its motion papers, that the ambiguous provisions of the Trust must be interpreted in a way that will give effect to the intent of the parties who established the Trust. *See* Motion at pp. 8-9 (citing, *Annan v. Wilmington Trust Co.*, 559 A.2d 1289, 1292 (Del. 1989) (citing *Dutra de Amorim v. Norment*, 460 A.2d 511, 514 (Del. 1983)); *Fiduciary Trust Co. of New York v. Fiduciary Trust Co. of New York*, 445 A.2d 927, 980 (Del. 1982). The Court therefore directed that the Trustee to present evidence as to the intent of the parties in drafting the provisions that are at issue. The Court also directed the Trustee to serve notice of the Motion, and of the evidentiary hearing, on all persons who had filed Future Tort Claims.

Hundreds of *pro se* responses to the Motion were sent to the Court and to the Trustee, and all of those responses have been placed on the docket. *See* ECF Nos. 3072-3193, 3195-3258, 3260-61. The responses made the following arguments:

- That some claimants were not aware of their injuries prior to the Bar Date.
- That some claimants were not aware of the Bar Date itself.
- That some claimants may have known of their diseases prior to the Bar Date but may not have had any reason to understand that the diseases had been caused by their

7

- exposure to creosote or to other products released into the environment by Tronox and its predecessors.

- That notice of the Bar Date was not reasonably calculated to reach claimants.

- That claimants' failure to file claims by the Bar Date was the result of excusable neglect and should be excused pursuant to Fed. R. Bankr. P. 9006.

Other responses referred to payments made to the tort claimants who filed timely claims, and argued that in fairness later-filed claims should be given the same treatment. Many other responses simply stated that the claimants disagreed with any proposed disallowance of their claims, without further explanation.

## Evidence at the Hearing

Three witnesses testified at the hearing. No claimant appeared and no cross-examination questions were asked, though the Court asked its own questions of each witness.

The first witness was Natalie Ramsey of Montgomery McCracken Walker & Rhoads LLP. Ms. Ramsey testified that she had represented a creditor who was a member of the Official Committee of Unsecured Creditors in the Tronox cases and that she had been involved in negotiating and drafting the provisions of the Plan and related documents that dealt with Tort Claims. She confirmed that one major concern was that all Tort Claims be channeled to the Trust and "that there be absolute certainty that no legacy liability would fall on reorganized Tronox." (Transcript, October 25, 2016, at 8:11-14.) Ms. Ramsey testified that the definitions were modified to reflect the fact that diseases sometimes did not manifest themselves until some time after exposure to a harmful product. Under questioning from the Court, she also testified that it was her understanding that the category of "Future Tort Claims" would include each of the following possible types of claims:

- Claims by people who were first exposed to a harmful product after the effective date of the Plan (Transcript, October 25, 2016, at 10:20 – 11:3.)  However, Ms. Ramsey was unable to explain how such a claim would have "arisen" prior to the effective date (which appears to be a requirement of the modified definition), and suggested that in this respect the parties may have been inexact in the words they chose.  *Id*. at 11:4 – 11:22.

- Claims by people who were exposed to substances prior to the effective date but whose diseases or injuries did not manifest themselves until after the Bar Date.  *Id*. at 11:23 – 12:14.

- Claims by people whose symptoms had manifested themselves prior to the Bar Date, but who contend they were not aware of the Bar Date or of the bankruptcy cases, to the extent such claimants were successful in arguing that they did not receive sufficient notice as a matter of due process.  *Id*. at 12:15 – 13:15.

- Claims by people whose symptoms had manifested themselves prior to the Bar Date and who seek, after the Effective Date, to file late claims on grounds of "excusable neglect" under Rule 9006 of the Federal Rules of Bankruptcy Procedure.  *Id*. at 13:16 – 14:6.

*See also id*. at 15:7 – 15:17.  Ms. Ramsey also testified, however, that at the time the Plan and related documents were drafted the parties believed that all tort claims would likely have already manifested themselves, and did not expect that there would be a substantial number of future claimants.  *Id.* at 15:23 – 16:8.

The second witness was Nicole Greenblatt of Kirkland & Ellis LLP.  Ms. Greenblatt testified that she had been counsel to the Tronox debtors in their bankruptcy cases.  She testified

9

that the overriding intent of the parties was that all Tort Claims would be covered in one or more of the categories of claims that were established by the Trust. She explained:

> And so with respect to future tort claims, the concept was that there were a category of claims that may not be known or knowable at the time of the bar date but that could – you know, arise is probably the wrong word because of legal developments around what that means – but there could have been claims that came into existence post bar date and the trust set aside funds to deal with that category of claims.

*Id.* at 18:11 – 18:18; *see also* 27:14 – 27:20 (confirming witness's understanding that it would be inconsistent with the plain intent of the parties if the Tort Claim categories were interpreted in a way that would leave any Tort Claim uncovered).

Under questioning from the Court, Ms. Greenblatt agreed with Ms. Ramsey's testimony regarding the different types of claims that should be considered to be "Future Tort Claims." *Id.* at 19:25 – 20:8. She noted, however, the parties did not really contemplate that exposures to substances would occur post-bankruptcy, because all of the releases of the relevant substances had occurred many years earlier and because the Plan established environmental trusts that were designed to fund remediation programs. *Id.* at 20:9 – 20:23. To the extent that this assumption was wrong, and to the extent a person was injured by a post-Effective Date exposure to a substance that Tronox had released in the past, Ms. Greenblatt agreed that the claim should be treated as a Future Tort Claim. *Id.* at 21:9 – 20:24.

Finally, Ms. Greenblatt confirmed that the Trust documents contemplated that the Trustee would make determinations as to the nature of the injuries that a claimant had suffered and the categories into which various claims fell (subject to dispute resolution procedures set forth in the Trust documents), but that any "due process" or "excusable neglect" contentions were to be resolved by the Court. *Id.* at 21:25 – 23:17, 25:17 – 26:15.

10

The third witness was Joseph Bruemmer of the Garretson Resolution Group. He testified as to the number of Future Tort Claims that had been received, and also testified that approximately 2,800 of those claims appeared to be based on injuries or diseases that had not manifested themselves until after the Bar Date.

## DISCUSSION

A Trustee may seek instructions when the Trustee is unsure as to how to interpret the terms of trust documents and uncertain as to how to act. *See Peierls Family Inter Vivos Trusts*, 59 A.3d 471, 477 (Del. Ch. 2012) (noting that a "request for judicial relief involving a trust can be appropriate in many circumstances," including when the trust agreement is "genuinely ambiguous"); *see also In re Am. Home Mortg. Inv. Trust*, 2005–2, No. 14 Civ. 2494(AKH), 2014 WL 3858506, at *12 (S.D.N.Y. July 24, 2014) (noting that "trust instruction proceedings are a well-established procedure by which trustees (and other affected parties) can seek judicial guidance from the court about how to resolve immediate and difficult issues of interpretation of governing documents"). It is plain that the interpretation of the "Future Tort Claim" provisions of the trust documents present genuine, active controversies and that some binding clarification of these issues is required. The Plan provides that this Court has continuing jurisdiction over any issue relating to the interpretation and application of the Trust Agreement and the TDPs, *see* Article XI of Plan at ¶¶ 14, 16 [ECF No. 2567, Ex.]; *see also* Trust Agreement at ¶ 9.16 [ECF No. 3030, Ex. A], and it is appropriate for this Court to exercise that power.

With respect to the relevant provisions: the evidence supports the Trustee's suggestion that "Future Tort Claims" includes persons whose diseases or injuries did not manifest themselves until after the Bar Date. However, the Trustee proposes to include only claims of this kind that are based on exposures to substances that occurred prior to the Effective Date of the Plan. That limitation would not be consistent with the evidence presented to the Court.

11

In the abstract, one does not usually consider a Tort Claim to "arise" before a particular date just because the release of an offensive substance occurred before that date. Ordinarily, therefore, it would be reasonable to suggest (as the Trustee does) that a claim could not have "arisen" before the Effective Date unless some exposure occurred before the Effective Date. However, this interpretation (if adopted) effectively would mean that some claims would constitute "Tort Claims" as that term is defined in the Plan and in the Trust Agreement, but nevertheless would not fall into any of the defined sub-categories of Tort Claims. The witnesses made clear that the overriding intent of the parties was that all Tort Claims would be covered by the Trust and by the sub-categories of claims in the Trust. They further made clear (without regard to potential technical arguments over when a claim "arises") that their own understanding and intent was that claims based on post-Effective Date exposures, if there were any, would be treated as Future Tort Claims. The Court therefore will not limit "Future Tort Claims" to those based on exposures that occurred prior to the Effective Date of the Plan.

The Trustee also suggested, at the hearing on October 25, that the Trustee would notify any claimants whose injuries had manifested themselves prior to the Bar Date that their claims were discharged. The Court expressed concern at the hearing that this approach would suggest to claimants that the Court, in effect, had already ruled that no successful "due process" or "excusable neglect" argument could possibly be made. Claimants are entitled to receive fair notice of their potential rights, and in these circumstances the Court believes that such notice must include a description of the grounds on which claimants whose injuries were manifested prior to the Bar Date, and who did not file proofs of claim, might nevertheless be entitled to seek relief from the Bar Date or to argue that due process bars the discharge of their claims.

Finally, the Trustee has suggested the imposition of a filing fee for appeals. The Trustee has described this proposed fee as follows:

> In addition, to preserve the monies in Fund A from unnecessary depletion due to frivolous appeals and litigation, the Trust will charge a $250.00 filing fee for any Category A claimant that seeks review of the disallowance of his claim (to be fully refunded upon a successful appeal by the claimant), as contemplated by Section 5.4 of the TDPs, to help defray the cost of any litigation that may result from the disallowance of thousands of filed Future Tort Claims.

Trustee Motion [ECF No. 3069] at p. 14. Section 5.4 of the TDPs, which is referenced in this excerpt, provides as follows:

> The Trustee shall have the discretion to determine, with the consent of the Trust Advisory Committee, whether a filing fee should be required for any Claims that do not accept the Scheduled Value. Any such requirement shall be applied, within any Category, on a non-discriminatory basis.

[ECF no. 3030, Ex. A, ¶ 5.4].

The circumstances under which the Trustee intended to impose such fees are not clear from the motion papers. The Trustee originally proposed to notify claimants whose claims were based on exposures that pre-dated the Bar Date, and whose diseases or injuries manifested themselves prior to the Bar Date, that their claims were discharged. It appears that the proposed "appeal fee" was intended for claimants who wished to contest such "discharge" issues pursuant to the dispute resolution procedures of the TDPs. However, under the instructions set forth in this Order any Claimant who seeks relief pursuant to Rule 9006 of the Federal Rules of Bankruptcy Procedure, or on "due process" grounds, must do so through an application to this Court, and not through the dispute resolution procedures in the TDPs. The proposed "appeal fee" therefore would not be applicable to disputes of that nature.

On the other hand, the Trustee may believe that an exposure and manifest injury each pre-dated the Bar Date, and the claimant may contest the Trustee's factual determinations on those points. That sort of appeal should be made through the TDPs. However, it does not appear that such an appeal would really be a challenge to the "Scheduled Value," which is the sort of

13

challenge that Section 5.4 of the TDPs addresses. Challenges to the "Scheduled Values" involve cases in which the Trustee agrees that a claim is an allowed claim but the claimant contends that the presumptive "Scheduled Values" are not sufficient and that the amount of the claimant's allowed claim should be higher.

In any event, it is not clear whether the Trustee has asked for the Court's approval of the proposed fees (and the circumstances under which they might be imposed), or has simply informed the Court of the Trustee's intentions. To the extent the Trustee has sought this Court's approval of such a fee, the request is denied. To the extent the Trustee wishes to impose fees pursuant to the authority granted in Section 5.4 of the TDPs, the Trustee and the Advisory Committee should ensure that such fees apply only to the types of challenges that are covered by Section 5.4, and that the fees be applied on a "non-discriminatory basis" as required by that Section of the TDPs.

## **CONCLUSION**

The request for instructions is granted, and instructions are provided as set forth in the second paragraph of this Opinion. The Trustee has previously submitted a proposed order and a proposed form of notice, and is hereby directed to submit revised forms that reflect the rulings set forth above. The form of notice to claimants should include a proposed description of the categories of claims that may constitute Future Tort Claims. It should also include a brief explanation of claimants' rights to argue (a) that their failure to file a timely proof of claim should be excused on grounds of excusable neglect, or (b) that the purported discharge of the claimant's claim was a violation of due process and therefore ineffective. Those descriptions should include brief statements as to the showings that claimants must make in order to obtain relief from the Bar Date and/or the discharge order.

In addition, since the final distributions to Future Tort Claimants cannot be made unless and until the values of the Allowed Claims are finally determined, the Court will also set deadlines for the submission of "due process" or "excusable neglect" claims to the Court by persons who have filed currently pending Future Tort Claims.  The proposed Order and form of notice to be presented by the parties should include proposed deadlines for such filings that are consistent with this ruling.

Dated: New York, New York
      December 14, 2016

                                      **s/Michael E. Wiles**
                                      UNITED STATES BANKRUPTCY JUDGE