**UNITED STATES BANKRUPTCY COURT**          **FOR PUBLICATION**
**SOUTHERN DISTRICT OF NEW YORK**
_____
                                                        :
**In re:**                                            :          **Chapter 11**
                                                        :
**TRONOX INCORPORATED, et al.,**      :          **Case No. 09-10156 (MEW)**
                                                        :          **Jointly Administered**
                     **Reorganized Debtors.**    :
_____:

### DECISIONS AS TO PENDING MOTIONS FOR PERMISSION TO FILE "FUTURE TORT CLAIMS" AND FOR RELIEF FROM THE 2009 BAR DATE

These bankruptcy cases were filed in January 2009. The Court set a deadline (known in bankruptcy as a bar date) of August 12, 2009 for the filing of proofs of claim. A plan of reorganization (the "Plan") was later confirmed on November 30, 2010. The Plan established a Tort Claims Trust for the payment of tort claims, including claims based on exposures to creosote. More than 80% of the Trust assets were set aside for distribution to the holders of tort claims that were timely filed before the August 12, 2009 bar date, which were described in the Plan as "Category D" claims. A much smaller portion of the Trust assets (about 6.125%) were to be set aside collectively for holders of "future" tort claims and asbestos claims, all of which are referred to collectively in this Decision either as "Future Tort Claims" or "Category A Claims." After hearing evidence in 2016, I ruled that a claim qualifies as a Category A Claim if:

(1)    The claim is based on an alleged exposure to a harmful substance that occurred on or after August 12, 2009; or

(2)    The claim is based on an exposure that occurred before August 12, 2009, but as to which no injury or disease was manifested until on or after August 12, 2009; or

(3)    The exposure, as well as the manifestation of an injury or disease, predated August 12, 2009, but the claimant is able to establish (a) that the claimant's

failure to file a timely proof of claim should be excused on grounds of excusable

neglect, or (b) that the purported discharge of the claimant's claim was a violation

of due process and therefore ineffective.

*See* Memorandum Opinion as to Tort Claims Trustee's Motion for Instructions Regarding Future

Tort Claims on December 14, 2016 (ECF No. 3268).  The witnesses at the 2016 hearing testified

that they believed (at the time the Plan was confirmed) that injuries from creosote exposures

would already have manifested themselves, and that they did not expect that there would be

significant numbers of "future" tort claims based on creosote exposures.  *See* Oct. 25, 2016 Hr'g

Tr. (ECF No. 3267) at 15:23-16:8, 20:9-20:23.

It was not clear, when the Plan was confirmed, whether tort claimants would receive

significant recoveries, because the main funding for the Tort Claims Trust was to come from the

proceeds of a fraudulent transfer litigation that was still pending in 2010.  However, a very

successful resolution of that litigation in 2015 resulted in the infusion of more than $600 million

to the Tort Claims Trust.  *See Annual Report and Account of the Tronox Incorporated Tort*

*Claims Trust for the Year ending December 31, 2015*, filed on April 29, 2016 (the "2015 Trust

Report"), at Dkt No, 3064-1, ¶ 6.  That large infusion enabled the Trust to make distributions to

Category D tort claimants that greatly exceeded the average recoveries that tort claimants had

received in pre-bankruptcy litigations.

The large distributions in 2015 sparked an explosion in the filing of "future" tort claims.

As of early 2015 the Tort Claims Trust had received only about 600 such claims.  *See* Jan. 24,

2018 Hr'g Tr. (ECF No. 8041) at 5:1-5.  After word circulated about the Category D

distributions, however, more than 10,000 new Category A claims were filed in a four-month

period.  *Id.* 5:5-8.  At the latest count the Trust has received more than 38,000 such claims.  The

2

Trust has issued "Determination Notices" to more than 19,000 claimants, stating whether the

Trustee agrees or disagrees with the asserted future tort claims and, in cases where the Trustee

agrees, what the proposed allowed amounts of the claims would be.  *See Annual Report and*

*Account of the Tronox Incorporated Tort Claims Trust for the Year ending December 31, 2019*,

filed on April 30, 2020 (the "**2019 Trust Report**"), Ex. B [ECF No. 9461].  In many instances

the Trust took the position that the proposed claims arose prior to the bar date and were barred

because no timely proofs of claim had been filed.  In response, 4,676 claimants have filed

motions with this Court seeking permission to file claims notwithstanding the expiration of the

August 12, 2009 bar date.

Many of the movants have described serious illnesses, and reviewing the motions is a

difficult task.  Unfortunately, however, it is obvious that there are many serious misconceptions

as to the recoveries that the holders of "future" tort claims are likely to receive and as to the

standards that govern the motions.

**Likely Recoveries**.  *It is plain that many movants believe that if their Future Tort*

*Claims are allowed they will receive compensation that is similar to what has been paid to*

*persons who filed Category D tort claims before the original bar date in 2009.  Unfortunately,*

*however, that is not the case.*  Any recoveries by holders of Category A Claims will be relatively

small, and I am powerless to do anything to change that outcome.

The confirmation of the 2010 plan of reorganization discharged all tort claims against the

Tronox companies.  That discharge was final in 2010.  I have no continuing jurisdiction over

Tronox or its predecessors or successors.  Those companies have no obligation to contribute

additional funds to the Tort Claims Trust.  Claimants' only recourse is to whatever funds are still

held in the Tort Claims Trust.  No other funds are available in these bankruptcy cases.

As noted above, most of the assets of the Tort Claims Trust were set aside for claimants who filed timely proofs of claim in 2009.  Those funds have already been distributed, except for a minor amount that is awaiting distribution while administrative issues are resolved.  *See* 2019 Trust Report.  The only funds to which the movants would have access (if their motions were granted) are the funds that were set aside for "Category A" claims.  At the end of 2019 the amount that remained for all of these claims was only $20,705,258.

Once the claims process is finished, each Category A claimant whose claim is allowed will be entitled to a share of whatever is left.  That share will be based on the size of the claimant's allowed claim compared to the total of all allowed Category A claims.  ***Given the amount of available funds, and the huge numbers of Future Tort Claims that have been filed, the Tort Claims Trustee anticipates that Future Tort Claimants will receive payments that are less than 1% of the "allowed amounts" of their claims.***  *See* 2019 Trust Report ¶ 6A.  That means (for example) that a future tort claimant who has an "allowed" claim of $10,000 will likely receive less than $100 as an actual distribution.  The actual amounts of the payments could be less, and ultimately will depend on how much (if anything) is left after paying the ongoing costs of reviewing and resolving the many thousands of remaining claims.

The Court understands that the holders of timely-filed tort claims received much larger distributions of approximately 35% of the "allowed" amounts of their claims.  The payments to Future Tort Claimants therefore will necessarily be only a small fraction of the payments that were made to persons who filed timely claims.  The claimants who have filed future tort claims understandably may feel that it is unfair that timely-filed claims received better recoveries.  However, I cannot do anything to change that fact.  The allocations of funds among the different categories of tort claims happened long ago – with participation by attorneys who represented

4

tort claimants – and those allocations became final when the plan was confirmed in 2010. *See Tronox Inc. v. Anadarko Petro. Corp. (In re Tronox Inc.)*, No. 14-cv-5495(KF), 2014 U.S. Dist. LEXIS 158767 *21-22 (S.D.N.Y. Nov. 10, 2014) (rejecting a request in 2014 for a change to the allocation of settlement proceeds because the allocations had been set by the 2010 confirmation order and requests for changes were barred by *res judicata*). I do not have the power to alter the plan or the allocations of funds that were previously approved. In any event it would be fruitless to try, because as noted above all of the monies that were set aside for "timely" tort claims have already been distributed or designated for distribution.

**<u>Claims that were Barred Before the Bankruptcy Filing.</u>** In a bankruptcy case, the court sets a bar date for the filing of claims. Claimants may ask to be excused from the bar date based on excusable neglect, but such a showing only excuses a failure to comply with the bar date itself. The claim still must be a claim that is valid and enforceable under non-bankruptcy law. *See* 11 U.S.C. § 502(a). A very high proportion of the motions that have been filed, however, identify claims that plainly were barred prior to the Tronox bankruptcy filing.

For example, many of the claims that are the subject of the pending motions have been filed by claimants in Mississippi. Mississippi imposes a three-year statute of limitations for the assertion of a tort claim of the kind that is at issue here. Miss. Code § 15-1-49. The Mississippi Supreme Court has held that a claim for latent injury or disease based on creosote exposure accrues when the claimant was diagnosed with the injury or a disease, regardless of whether the claimant knew of the cause of the injury or disease. *See Angle v. Koppers, Inc.*, 42 So.3d 1, 7 (Miss. 2010) (holding that "[n]o provision of Section 15-1-49 provides that a plaintiff must have knowledge of the cause of the injury before the cause of action accrues, initiating the running of the statute of limitations.")

The Tronox bankruptcy case was filed on January 12, 2009.  Claims under Mississippi law that are based on injuries or diseases that were diagnosed on or before January 12, 2006 therefore were time-barred when the Tronox bankruptcy cases were filed.  Nevertheless, a very large number of claimants in Mississippi have filed claims based on conditions that admittedly were diagnosed before January 2006.  An "excusable neglect" motion merely explains why a claimant did not file a claim in the bankruptcy case itself; it does not revive a claim that expired before the bankruptcy case was filed.  It appears that many time-barred Mississippi claimants have somehow been misled into thinking otherwise, giving rise to false hopes that long-extinguished claims might have been revived, which is not the case.

Similarly, many movants were participants in other lawsuits that were resolved before the Tronox bankruptcy filing.  They received compensation that was far less than the amounts that "Category D" claimants eventually received following the bankruptcy case, and many of them now want to renew their previously resolved claims in the hopes of getting increased recoveries.  However, a prior resolution of a claim in another proceeding is final, and a claim that was resolved in a prior proceeding cannot be re-asserted in the Tronox bankruptcy case.

**<u>Grounds for Bar Date Relief.</u>**  The grounds upon which late-filed claims may be permitted due to "excusable neglect," or due to violations of due process, are limited.  Many movants contend that they did not receive a direct notice of the claims process and that they were unaware of the bankruptcy case.  But as a due process matter it is well-established that a failure to receive direct, individualized notice of the bar date is not a ground for relief unless there is a showing that the Debtors knew the identity of the claimant.  The Debtors mailed notices to persons whose litigation claims were pending, and no movant who has complained about the lack of direct notice has shown that the Debtors knew of the movant's identity and claim in 2009.

6

It is also well-settled that a lack of knowledge alone does not suffice to establish a right to relief from the bar date based on "excusable neglect." Whether a claimant can show "excusable neglect" requires consideration of four factors:

- the danger of prejudice to others;

- the length of the delay and its potential impact on proceedings;

- the reason for the delay, including whether it was in the reasonable control of the movant; and

- whether the movant acted in good faith.

*Pioneer Inv. Servs. v. Brunswick Assocs, Ltd. P'ship*, 507 U.S. 380, 396 (1993).

Here, every late-filed claim that is allowed would reduce the already-low percentage recoveries of asbestos claimants and persons whose diseases had not even manifested at the time of the bar date, and therefore would be prejudicial to those other claimants. The costs of resolving disputes as to the merits of many thousands of additional claims also would deplete the Trust's available resources and delay the wind-up of the Trust, thereby imposing huge administrative costs and forcing other claimants to wait longer to receive distributions. Overcoming these factors requires good reasons for movants' delays in pursuing their claims and a showing that those delays were not in the movants' reasonable control. But very few of the motions have explained the many years that passed after the bar date – in most cases more than six years – before the claimants took any action to pursue their claims.

I do not enjoy the job of enforcing the foregoing standards, particularly in the cases of claimants whose underlying injuries and illnesses seem very real. However, I am bound to apply strict due process and excusable neglect standards even if the movants may feel that the results are harsh.

7

**Conditions First Diagnosed After the Bar Date.**  On a more positive note (from the perspective of the movants): many of the pending motions have identified claims that are based on conditions that allegedly did not manifest themselves until after the bar date.  As explained in more detail below, I confirm that a claim based on a condition or disease that was first diagnosed after the bar date is automatically a "future" tort claim for purposes of the Trust, and a claimant does not need to establish "excusable neglect" or a violation of due process in order to pursue a claim of that kind.  The Tort Claims Trust may dispute the merits of these claims, and as part of that process the Trust may dispute the dates on which the relevant diseases or conditions actually manifested themselves, but those disputes are to be resolved under the Trust's normal dispute resolution procedures, which do not contemplate further involvement by the Court.

I have carefully reviewed each of the 4,676 pending motions and the many supplemental submissions that we have received with respect to those motions.  Many claimants have expressed their frustration at how long this has taken, but the sheer number of motions and related filings, and the sheer number of issues raised, has made it impossible for me to finish the task earlier.  It also made sense to rule on all the motions at one time, rather than ruling on them in a piecemeal fashion, to ensure consistency in our rulings and to preserve order in the handling of any appeals that might be filed.  In addition, the Trust cannot calculate distributions to individual claimants until it knows what the total universe of allowed claims will be, so interim decisions would not have changed the ultimate distribution dates in any event.

Issues common to many or all of the motions are discussed in this Decision, and the individual motions and the Court's rulings on them are summarized in the tables that are being filed as Tables A and B to this Decision.  To be clear: statements made in Tables A and B as to diagnosis dates, movants' knowledge and movants' reasons for not having filed claims are

8

summaries of the movants' contentions, and should not be treated as factual findings by the

Court. The tables are identical but they are sorted differently. Table A lists the motions by

docket number, and Table B lists the movants by name (as did the list of motions that was

submitted by the Trust when it filed its objections to the pending motions). The column entitled

"Comments and explanations for rulings" is color-coded to reflect the outcome of the motion.

More particularly:

- Items shaded in red are motions as to which relief is denied in its entirety.

- Items shaded in green are motions as to which no grounds for relief from the bar date

  have been established but which (in whole or in part) also involve conditions that

  allegedly were first diagnosed after the bar date. The portions of those motions that

  are based on conditions first diagnosed after the bar date should be resolved by the

  Tort Claims Trust under its normal dispute resolution procedures.

- Items shaded in blue are motions as to which relief from the bar date has been

  granted.

- Items shaded in yellow are motions as to which movants are permitted to make

  supplemental submissions to address certain issues that the Court has identified.

It is conceivable that there were inadvertent errors in the color-coding of the rulings and in such

cases it is the text (and not the color coding) that specifies the actual rulings of the Court.

There were a number of motions that were filed with the Court that did not appear on the

summaries that the Trust filed. In addition, there were instances in which the Trust's summaries

contained minor errors (transposed claim numbers, for example). We have used bold-faced red

type in Tables A and B to identify discrepancies and to assist the Trust in reconciling our rulings

with the Trust's prior submission. An original copy of the Excel spreadsheet that was used to

generate the tables also will be sent to the Trust to assist the Trust in updating its database.  As

indicated at the end of this Decision, the Court will defer the entry of a formal Order until after a

conference on March 19, 2021, at which the Trust is directed to discuss the most efficient means

of providing notice of the Court's rulings to the movants.

### Background

Before 2000, Kerr-McGee Corporation and its affiliates engaged in a wide variety of

businesses that included oil and gas exploration, uranium mining and milling, specialty chemical

production, and wood treatment.  Kerr-McGee's wood treatment business began in 1967 when it

acquired T.J. Moss Tie Co., which operated 15 wood-treating plants using creosote and which

had previously operated 18 other such plants throughout the country.

Over time, Kerr-McGee terminated most of its business lines except for oil and gas

exploration and titanium dioxide production.  The many past business lines had left Kerr-McGee

and its affiliates with huge environmental and tort liabilities.  Environmental liabilities posed the

biggest challenge: the Kerr-McGee companies owned 2,700 environmental sites including at

least seven federal Superfund sites, and incurred more than $1 billion in environmental response

costs just in the period from 2000 through November 2005.  Tort claims (mainly based on

creosote exposures) also posed big issues.  Litigation over creosote exposures had begun in 1998,

and from 2000 through early 2006 more than 24,500 creosote tort claims had been filed against

Kerr-McGee, of which 15,000 had been settled at a total cost of $72 million (excluding defense

costs).  *See Tronox Inc. v. Kerr McGee Corp. (In re Tronox Inc.)*, 503 B.R. 239, 249, 314 (2013)

(the "**Anadarko Decision**").

During the period 2000-2006 Kerr-McGee and its advisors planned and executed a series

of transactions through which certain profitable businesses were transferred to other entities.

The original Kerr-McGee entities were renamed and Kerr-McGee Corporation became Tronox Incorporated. The legacy environmental and tort liabilities of the discontinued business lines were left with Tronox and its affiliates. *Id.* at 251-260. The Tronox companies then were part a spin-off transaction in 2006, in which Tronox stock was distributed to Kerr-McGee shareholders.

Tronox did not fare well. Its ongoing businesses did not produce sufficient revenues to cover its expenses, and Tronox and its affiliates filed bankruptcy petitions on January 12, 2009. A Committee of Unsecured Creditors was named to protect the interests of unsecured claimants, and a tort claimant (Michael E. Carroll) was named as one of the seven members of that Committee. [ECF No. 76.]

One of the earliest events to occur in the bankruptcy cases was the filing of a large fraudulent transfer litigation that challenged the various transactions that had transferred businesses to other companies while leaving the Tronox companies with legacy environmental and tort liabilities. *See Tronox, Inc., et al. v. Anadarko Petroleum Corp., et al.,* Adv. Pro No. 09-01198. That lawsuit (the "Anadarko Litigation") was filed on May 12, 2009 but it was not resolved until many years later.

### The Bankruptcy Process in General

Many movants appear to be under the mistaken impression that the Tort Claims Trust is somehow related to various class action lawsuits that preceded the Tronox bankruptcy case. For the benefits of the movants (many of whom have proceeded without counsel) we have set forth below a description of the bankruptcy process and how it differs from class action procedures.

Tronox and its affiliated companies filed bankruptcy petitions under chapter 11 of the Bankruptcy Code. A bankruptcy filing creates an "estate" that consists of all of a company's

11

property. *See* 11 U.S.C. § 1141. All competing claims against the company and its property are then resolved in the chapter 11 bankruptcy case.

The key event in a chapter 11 case is the confirmation of a plan of reorganization. A plan describes how the company's business will be conducted in the future. It also classifies the company's various creditors based on the natures of their claims, and describes the treatment that each class of creditors will receive.

Each member of a creditor class is entitled to share equally in the distributions that are available for that particular class. The first step in the process of identifying eligible creditors is the filing by the bankrupt company of a schedule that discloses the names of all persons and entities who are known to have claims. *See* 11 U.S.C. § 521. The schedule must state whether the debtor agrees that a debt is owed or whether the debtor believes that the claim is disputed, unliquidated or contingent. A claim is disputed if the debtor disagrees that a debt is owed. A claim is "unliquidated" if it has not been reduced to a specific dollar amount. A claim is "contingent" if the existence of the debt depends on future events that have not yet occurred.

If a debtor lists a creditor's claim and does not identify it as being contingent, unliquidated or disputed, then that creditor is entitled to be treated as a claimant in the bankruptcy case and does not need to file a proof of claim. However, any creditor whose claim is not listed in the debtor's schedule of liabilities must file a proof of claim in order to be treated as a creditor for purposes of voting and distributions. *See* Fed. R. Bankr. P. 3003(c)(2). Similarly, any creditor whose claim is listed as disputed, contingent or unliquidated must file a proof of claim in order to vote on a bankruptcy plan and to receive distributions. *Id.*

As a practical matter, a bankruptcy case cannot be administered unless a deadline is set for the filing of creditor claims. Creditors vote on a proposed plan of reorganization, and so a

process is needed to identify the people who are entitled to vote. In addition, creditors' shares of distributions cannot be calculated without knowing the universe of claims that are entitled to participate in those distributions. Without a deadline, all creditors would have to wait (and no distributions could be calculated or made) until it was no longer possible that any additional creditor claims could be filed. *See In re Waterman Steamship Corp.*, 59 B.R. 724, 726 (Bankr. S.D.N.Y. 1986) ("Absent the setting of a bar date, a Chapter 11 case could not be administered to a conclusion. There would be no time established for the filing of claims"); *First Fid. Bank, N.A. v Hooker Invs., Inc. (In re Hooker Invs., Inc.)*, 937 F.2d 833, 840 (2d Cir. 1991) ("[i]f individual creditors were permitted to postpone indefinitely the effect of a bar order . . . the institutional means of ensuring the sound administration of the bankruptcy estate would be undermined."); *In re Drexel Burnham Lambert Group, Inc.*, 129 B.R. 22, 26 (Bankr. S.D.N.Y. 1991) (without the finality of a bar date, reorganization would be impossible.)

Rule 3003(c)(3) of the Federal Rules of Bankruptcy Procedure therefore provides that the bankruptcy court "shall" set a deadline for the filing of proofs of claim. *See* Fed. R. Bankr. P. 3003(c)(3). That deadline is typically referred to as the "bar date." As a general rule any creditor who fails to file a claim before the bar date "shall not be treated as a creditor with respect to such claim for the purposes of voting and distribution." *See* Fed. R. Bankr. P. 3003.

The bankruptcy claims process differs from a class action procedure in at least one very important respect. In a typical class action, one or more plaintiffs seek permission to sue on behalf of all similarly situated persons. If a court allows the action to continue as a class action, then in the usual case all persons who fall within the class definition automatically become part of the class; the only exception is if they affirmatively exercise a right to "opt out" of the class. *See* Fed. R. Civ. P. 23. In a bankruptcy case, by contrast, claimants are only allowed to

13

participate if they (or someone authorized to act for them) affirmatively file claims before the bar

date. If a claimant fails to take that affirmative step, then the claim is barred.

When a plan is confirmed, all prior "claims" against the reorganized company are

discharged. *See* 11 U.S.C. § 1141. This is true regardless of whether a claim was listed on the

company's schedules, and regardless of whether a proof of claim was filed. *Id.* For this purpose,

the term "claim" has a very broad definition. It includes any and all rights to payment of any

kind, "whether or not such right is reduced to judgment, liquidated, unliquidated, fixed,

contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured."

*See* 11 U.S.C. § 101(5)(A).

### The Tronox Bar Date

Tronox and its affiliates filed lengthy schedules of creditor claims, including a 1,301-

page list of creditors who had made litigation-related claims. *See* Schedules [ECF No. 275],

Rider F1. Those claims were listed as contingent, unliquidated and disputed. Tronox then filed

a motion asking the Court to set a bar date. *See* Tronox's Motion for Entry of an Order (A)

Setting Bar Dates for Filing Proofs of Claim, (B) Approving the Form and Manner for Filing

Proofs of Claim, and (C) Approving Notice Thereof," dated May 5, 2009 [ECF No. 399].

Tronox represented that 120 separate tort lawsuits were outstanding and that Tronox did not have

the mailing addresses of some of the named plaintiffs; in those instances, Tronox proposed to

mail notice of the bar date to counsel of record. *Id.* ¶ 16. Tronox also represented that "there

may be thousands of unknown claimants who may have environmental, personal injury, property

or other Claims against Tronox," and proposed to publish site-specific notices in local

newspapers that were chosen to correspond to locations where facilities had been operated and

where prior waste disposals had given rise to injury claims. *Id.* ¶¶ 20-21 and Exs. E and F.

14

No party objected to the bar date motion, and the Court entered an order setting August

12, 2009 as the deadline (the "**Bar Date**") for the filing of claims.  The Order required the

Debtors to send a notice of the Bar Date to all known creditors, including all parties to pending

litigation with the Debtors, with the proviso that such notices were to be sent to counsel if the

Debtors did not have the litigants' addresses.  *See* Order (A) Setting Bar Dates for Filing Proofs

of Claim, (B) Approving the Form and Manner for Filing Proofs of Claim, and (C) Approving

Notice Thereof, May 28, 2009 [ECF No. 466] (hereafter, the "**Bar Date Order**") ¶ 12(k).  The

Bar Date Order also approved the publication notices that the debtors had proposed.  *See* Bar

Date Order [ECF No. 466], ¶¶ 15-17.  Judge Gropper found that the approved notices constituted

"adequate and sufficient notice of each of the Bar Dates (including with respect to any

environmental or tort Claims arising from or relating to the Legacy Businesses) . . ."  *Id.* ¶ 20.

Notices of the bar date were mailed to all of the creditors listed on the Debtors'

Schedules, including all persons on the lengthy list of "litigation-related" creditors.  *See*

Affidavit of Service [ECF No. 497].  The mailed notices were accompanied by pre-printed proof

of claim forms that included a description of how each creditor's claim had been listed in the

Schedules and whether the claim had been listed as contingent, unliquidated and/or disputed.

Notices of the Bar Date were also published in 40 separate newspapers, which included one

newspaper of national circulation (the Wall Street Journal) and 39 local newspapers.  Copies of

the published notices, and certificates attesting to their publication, were filed with the Court.

*See* Affidavit of Publication of Notice of Bar Date [ECF No. 1465] and the Exhibits thereto.

The published notices described the bankruptcy filings and the claims process in general,

and also included many site-specific terms relevant to the localities in which they were

published.  For example, a site-specific notice for Columbus, Mississippi was published in The

15

Commercial Dispatch (a local Columbus newspaper) on June 23, 2009.  The first part of the

notice described the bar date and the claims process generally.  It also described the spin-off of

Tronox from Kerr-McGee, and stated that "it is possible that you may have a Claim against the

Debtors that is related to Kerr-McGee Corporation's operations prior to March 2006."  The

notice also listed all of the names under which the Tronox debtors had done business during the

prior six years.  Finally, the notice set forth the following statement about the Columbus site in a

separate text box:

> Tronox Incorporated and certain of its affiliates (collectively, the "Debtors")
> are required to provide notice to parties who may have a claim against the
> Debtors related to exposure to hazardous materials at particular sites.  One of
> these sites is a wood-treating facility in Columbus, Mississippi and
> surrounding areas, at which creosote contamination from operations at the
> wood-treating facility is alleged to exist or to have previously existed.
>
> If you, your property, your spouse or an immediate family member was
> exposed to contaminants at or near the Columbus site, and if that exposure
> directly or indirectly caused injury that becomes apparent now or in the
> future, you may have a claim under various legal theories for damages.
> Personal injury damages could relate to physical, emotional or other personal
> injuries such as bodily injury, wrongful death, medical monitoring,
> survivorship or proximate, consequential, general and special damages or
> punitive damages.  Property-related damages could relate to cost of removal,
> diminution of property value or economic loss, or proximate, consequential,
> general and special damages or punitive damages.  More information about
> the definition of "claims" that must be filed before the August 12, 2009
> deadline is included in the legal notice that appears above.
>
> If you believe that you may have a claim related to you or your property's
> exposure to any products, raw materials or contaminants that were produced,
> manufactured, supplied, used or disposed of at the Columbus site, you
> **MUST** file a proof of claim form with the Bankruptcy Court according to the
> legal instructions above by August 12, 2009, **or you will forever lose your
> rights to recover on your claim in the future.**  Filing a proof of claim does
> not automatically entitle you to compensation.
>
> For more information about the filing process and/or to receive a proof of
> claim form, please call (866) 381-9100 or visit www.kccllc.net/tronox.

16

*Id.*, Ex. N (emphasis in original).  Similar site-specific notices were published in the areas where

other wood-treatment plans had been located.  The site-specific notices for Hattiesburg,

Mississippi and Avoca, Pennsylvania – from which (together with Columbus, Mississippi)

almost all of the creosote-related claims have originated – can be found at Exhibits T, U and HH

to the Affidavit of Publication.  *Id.*, Exs. T, U and HH.

### The Confirmed Plan of Reorganization

On November 30, 2010, the Court confirmed a plan of reorganization (the "**Plan**"), which

later became effective on February 14, 2011.  The term "Tort Claims" was broadly defined in the

Plan so as to include claims that had already arisen or that might arise in the future:

> "*Tort Claim*" means non-governmental Claims against Tronox, whether such
> Claims are known or unknown, whether by contract, tort or statute, whether
> existing or hereinafter arising, for death, bodily injury, sickness, disease,
> medical monitoring or other personal physical injuries or damage to property
> to the extent caused or allegedly caused directly or indirectly by the presence
> of or exposure to any product or toxin manufactured or disposed of, or other
> property owned, operated or used for disposal by, Tronox or any Entity for
> whose products or operations Tronox allegedly has liability . . .

Plan, Article I(A)(156) [ECF No. 2567, Ex. A].  All Tort Claims were to be channeled to the

Trust for processing, allowance and payment, and the Plan made clear that holders of "Tort

Claims" could only seek recovery from the Trust:

> The sole recourse of Holders of Tort Claims shall be the Tort Claims Trust,
> and such Holders shall have no right at any time to assert Tort Claims against
> Reorganized Tronox.  Final determinations on the allowance or disallowance
> of Tort Claims for distribution purposes shall be made in accordance with the
> Tort Claims Trust Distribution Procedures.

*Id.*  Article III(B)(4)(b).  The Confirmation Order approved these terms, discharged the

reorganized Tronox companies from all claims (including Tort Claims), and directed that holders

of Tort Claims could only seek recourse from the Tort Claims Trust and not from Reorganized

Tronox or its assets.  *See* Confirmation Order [ECF No. 2567] at ¶¶ 129, 134(ii), 184**.**

The Trust was funded with a cash deposit of $12.5 million, the proceeds of available insurance policies, and the right to receive 12% of the proceeds of the fraudulent transfer litigation that had been filed against Anadarko and against the Kerr-McGee companies. Plan, Article IV(C)(4). The Plan established many separate subcategories of Tort Claims, and provided that the total amounts allocated to the Trust would be divided among those categories of claims as follows:

- "up to" 6.25% would be available for "Indirect Environmental Claims;"

- 6.25% would be available for "Holders of Asbestos Claims and Future Tort Claimants;"

- 6.25% would be available to "Holders of Property Damage Claims;" and

- the largest share (at least 81.25%) would be set aside for timely-filed Category D "Non-Asbestos Toxic Exposure Claims."

*Id.*, Article III(B)(4)(b).

The Confirmation Order also approved a Tort Claims Trust Agreement (the "**Trust Agreement**") and a set of Tort Claims Trust Distribution Procedures (the "**TDPs**"). The Trust Agreement established the categories into which allowed tort claims were to be divided, and the TDPs set forth rules that would govern the collection, review, allowance and payment of tort claims. The Confirmation Order approved the categories of claims and the procedures for the resolution of claims, and it provided that certain amendments that appeared in the Trust documents were deemed to have been incorporated into the Plan. Confirmation Order [ECF No. 2567] at ¶¶ 85, 184, 185. The confirmed terms of the Plan, the Trust Agreement and the TDPs included a condition that Category D "Non-Asbestos Toxic Exposure Claims" would be limited to persons who had filed timely proofs of claim. *Id.*

18

The TDPs set forth the procedures that the Tort Claims Trustee would follow in reviewing claims. One of the key procedures was paragraph 2.2(b) of the TDPs, which specified that a timely filed proof of claim in the Tronox bankruptcy case "shall be accepted as irrefutable and final proof of exposure and injury asserted in the proof of claim with respect to such exposure . . ." [ECF No. 3030-2, ¶ 2.2(b).] However, the TDPs also contemplated that the Trust would solicit follow-up claim forms from those claimants who had filed prior proofs of claim, and that in those forms the claimants could specify injuries that differed from those set forth in their original proofs of claim:

> Where illness/injury was not specified on a timely Proof of Claim Form or where the illness/injury sought to be compensated has changed, a sworn statement by the Holder of a Tort Claim or such Holder's authorized representative shall be sufficient proof of injury.

*Id.* Effectively these provisions meant that claimants could modify their claimed injuries in sworn claim forms and those forms would simply be accepted as true statements of both the fact of a claimant's injury and its cause, without any room for objection.

The TDPs also included a schedule that set forth the "allowed amounts" that would be assigned to tort claims depending on the nature of the injuries or claims alleged. These scheduled values were as follows for creosote victims:

| Disease | Scheduled Value |
|---|---|
| Precancerous Skin Lesion | $26,000 |
| Skin Cancer | $120,000 |
| Lung Cancer | $700,000 |
| Breast Cancer | $475,000 |
| Other Cancer | $600,000 |
| Asthma Adult | $150,000 |
| Asthma Child | $175,000 |
| Cardiovascular | $250,000 |
| Respiratory | $80,000 |
| Medical Monitoring/Unimpaired | $5,000 |

*See* TDPs, Schedule B. As noted above, Tronox had previously settled 15,000 creosote-based claims at a total cost of $72 million, or approximately $4,800 per claim. The allowed claim amounts provided pursuant to the TDPs therefore were dramatically higher than the average pre-bankruptcy claim settlements had been. However, the scheduled values of claims did not necessarily reflect what the payouts would be. Each claimant was entitled to receive a *pro rata* share of whatever the distribution funds turned out to be, based on how each claimant's scheduled claim compared to the total scheduled values of all allowed claims.

### Claims Filed with the Tort Claims Trust and the 2015 Request for Instructions

A total of 11,501 tort claims were filed before the bar date. *See* Disclosure Statement Regarding the First Amended Joint Plan of Reorganization of Tronox Incorporated, et al. Pursuant to Chapter 11 of the Bankruptcy Code [ECF No. 2196] at 30. Some of those filed claims likely may have been duplicative claims, as some claimants may have filed identical claims against more than one debtor.

During 2011 the Tort Claims Trust asked each claimant to submit a sworn statement describing the type of claim being asserted and the category into which the claim fell. A total of 6,783 claims were submitted as "Category D" claims. By the end of 2013 all but a handful of those claims had been processed and the vast majority had been assigned "allowed" amounts. Only ten claimants rejected the proposed "allowed" values of the claims, and three claims were withdrawn. *See Annual Report and Account of the Tronox Incorporated Tort Claims Trust for the Year ending December 31, 2013,* filed on April 30, 2014 [ECF No. 2986] at 5.

About 2,120 of the allowed Category D claims were submitted by claimants in Columbus, Mississippi; those claims were "allowed" in the total amount of $357,215,000. *See* Transcript of Proceedings, Adv. Pro. 09-01198 [ECF No. 681] at 41:4-6; *see also* Declaration of

Bennett S. Silverberg, dated May 26, 2015 [ECF No. 3041, Ex. A]. Another 4,358 of the

allowed Category D tort claims were filed by claimants in or near Avoca, Pennsylvania; those

claims were allowed in the total amount of $966,382,000. *Id.* Only 289 other Category D claims

were filed and allowed, in the total scheduled amount of $42,197,500. *Id.*

The cash funding of the Tort Claims Trust was relatively small, and so the recoveries by

tort claimants depended primarily on the outcome of the Anadarko Litigation. That litigation led

to a very large judgment and a subsequent settlement, with the result that the Trust received a

payment of more than $611 million in early 2015. *See* 2015 Trust Report, Ex. A at 14-15. Most

of those funds were allocated to Category D Non-Asbestos Toxic Exposure Claims in

accordance with the terms of the Plan and the Trust Agreement.

Disputes arose among some of the holders of Category D claims, and the trustee of the

Tort Claims Trust sought instructions from the Court as to how to resolve those disputes. A

group of Avoca-based claimants contended that claims filed by claimants from the Columbus,

Mississippi area should be disallowed because an allegedly impermissible "group" proof of

claim had been filed on behalf of the Columbus claimants. The Avoca claimants also argued that

any Columbus, Mississippi claimants who had filed proofs of claim alleging "nuisance" damages

should be barred from filing claims with the Tort Claims Trust based on personal injuries,

wrongful death, sickness or disease, and suggested that some of the Mississippi claims should be

investigated for fraud. This Court rejected those arguments, upheld the legitimacy of the

"group" proof of claim that had been filed, and ruled that Columbus-area tort claimants who had

filed timely proofs of claim were entitled to make claims against the Tort Claims Trust based on

their then-current injuries or conditions. *See Memorandum Opinion as to Tort Claims Trustee's

Motion for Instructions,* dated June 17, 2015 [ECF No. 3046]. The Court also noted that no

21

specific evidence of fraud had been identified, and that the Trustee had reported finding no

evidence of fraud in the course of the Trust's reviews of the filed claims.

The Trust then made distributions to the holders of "allowed" Category D claims.  Most

of those distributions were made in 2015 and 2016.  The holders of allowed Category D claims

received distributions equal to approximately 35% of the allowed amounts of their claims.  *See*

Oct. 25, 2016 Hr'g Tr. (ECF No. 3267) at 32:2-7

### The 2016 Request for Instructions

As of early 2015, when the Trust received its share of the litigation proceeds, a total of

880 asbestos claims had been filed, along with approximately 600 Future Tort Claims.  *See* Jan.

24, 2018 Hr'g Tr. at 5:1-5.  News of the large distributions to Category D claimants spread

quickly, however, and led to the filing of many additional claims.  In a four-month period more

than 10,000 additional claims were filed.  *Id.* 5:5-8.  By October 2016, more than 19,000

purported future tort claims had been filed – a far greater number than anyone had anticipated,

and more than twice the number of "allowed" Category D claims that the Trust had processed.

*See* Oct. 25, 2016 Hr'g Tr. at 15:23-16:7, 28:19-29:4.  About 15,000 of those 19,000 claims had

been filed by claimants in Mississippi.  *Id.* at 29:5-9.

In 2016, the Trustee asked the Court for instructions as to how to handle certain of the

future tort claims that were being filed.  The Trustee contended that the governing trust

documents could be interpreted in different ways and did not provide sufficiently clear guidance

as to which claims qualified as future tort claims.  The Trustee suggested a resolution under

which a "Future Tort Claim" would be allowed only if (1) the claimant was exposed to a Tronox

product before the Effective Date of the Plan, and (2) the claimant was not diagnosed with the

claimed disease or condition until after the Bar Date.  All other claims, under the Trustee's

proposal, would have been barred by the prior discharge orders.  *See* Motion of Tort Claims

Trustee, Garretson Resolution Group, Inc., for Instructions Regarding Future Tort Claims, ECF

No. 3069, ¶¶ 18-21.

The Court scheduled an evidentiary hearing and directed the Trustee to present evidence

as to the intent of the parties in drafting the provisions that were at issue.  The Court also directed

the Trustee to serve notice of the Motion, and of the evidentiary hearing, on all persons who had

filed Future Tort Claims.  Hundreds of *pro se* responses to the Motion were sent to the Court and

to the Trustee.  *See* ECF Nos. 3072-3193, 3195-3258, 3260-61.  The responses made the

following arguments, among others:

- That some claimants were not aware of their injuries prior to the Bar Date;

- That some claimants were not aware of the Bar Date itself;

- That some claimants may have known of their diseases prior to the Bar Date but may

  not have had any reason to understand that the diseases had been caused by their

  exposure to creosote or to other products released into the environment by Tronox

  and its predecessors;

- That notice of the Bar Date was not reasonably calculated to reach claimants; and

- That claimants' failure to file claims by the Bar Date was the result of excusable

  neglect and should be excused pursuant to Fed. R. Bankr. P. 9006.

Some claimants referred to payments made to the tort claimants who filed timely claims, and

argued that in fairness later-filed claims should be given the same treatment.  Many other

responses simply stated that the claimants disagreed with any proposed disallowance of their

claims, without further explanation.

At an evidentiary hearing on October 25, 2016 the Court heard testimony from three witnesses, two of whom had participated in the drafting of the Trust documents.  The Court then issued its Memorandum Opinion as to Tort Claims Trustee's Motion for Instructions Regarding Future Tort Claims on December 14, 2016 (ECF No. 3268).  The Court held that a claim qualifies as a "Future Tort Claim" if it does not fall into any of the other categories of Tort Claims under the Trust documents and if one or more of the following conditions are met:

(1)    The claim is based on an alleged exposure to a harmful substance that occurred on or after August 12, 2009;

(2)    The claim is based on an exposure that occurred before August 12, 2009, but as to which no injury or disease was manifested until on or after August 12, 2009; or

(3)    The exposure, as well as the manifestation of an injury or disease, predated August 12, 2009, but the claimant is able to establish (a) that the claimant's failure to file a timely proof of claim should be excused on grounds of excusable neglect, or (b) that the purported discharge of the claimant's claim was a violation of due process and therefore ineffective.

The Court ruled that determinations as to claims that fall into categories (1) and (2) would be made by the Trustee pursuant to the TDPs and subject to the dispute resolution procedures that are set forth in the TDPs.  Claimants in category (3) who wished to obtain relief were required to file motions seeking such relief from this Court.  The Court also approved the Trustee's proposed form of notice to be sent to claimants.  *See* Order dated January 19, 2017 (ECF No. 3270).

### The Pending Motions

The Trustee sent Determination Notices that proposed the allowance of approximately 6,200 Future Tort Claims and the disallowance of 11,000 others.  However, nothing seemed to

stem the tide of additional claim filings. *See* Jan. 24, 2018, Hr'g Tr. at 5:23-6:2 ("every time

some notice goes out to existing claimants that we need additional information or their claims

have been handled by the trust and either allowed or disallowed word gets out in the

communities and additional claims get filed.") By January 2018, when the Court held a status

hearing, more than 17,000 additional future tort claims had been filed. (Hr'g. Tr., 6:3-8). The

total number of future tort claims reached more than 38,000 by the spring of 2020, when the

Trust filed its report for the year ended December 31, 2019. *See* 2019 Trust Report, Ex. B.

In January 2018, the Trust held $23 million allocable to Category A claims.

Approximately 7,000 claims had been allowed in the total allowed amounts of $930 million, and

many more claims remained to be processed. The Trustee projected that once the additional

claims had been processed and resolved the likely distributions to allowed claimants would be

1% or lower. *See* Jan. 24, 2018 Hr'g Tr. at 6:11-20.

As described above, the Trust sent notices to claimants whose claims were disallowed

due to a failure to file a timely claim by the Bar Date. As of December 11, 2017, 4,381 motions

had been filed with this Court, seeking relief from the Bar Date based upon a claim of excusable

neglect and/or due process. Some additional motions were filed thereafter, and about 4,676 such

motions are now pending, some of which are just mistaken filings of rejection notices and claim

forms rather than motions that actually seek affirmative relief.

The Trust filed an omnibus objection to all of the then-pending motions on April 25,

2018. (ECF No. 8047.) A notice that accompanied the omnibus objection advised all movants

that they could submit additional evidence or other materials in response to the objection, *id.*, and

hundreds of supplemental filings were submitted.

## Discussion

The pending motions all invoke "excusable neglect" or "due process" as grounds for relief, but many other issues arose during the course of reviewing the motions.

**I.      Whether Motions Were Timely Filed.**

The Court issued an Order that directed that motions seeking relief on grounds of excusable neglect or due process be made within ninety days after notice from the Trust.  (ECF No. 3270.)  The Trust sent notices on or before August 31, 2017, and the Trust has noted that a large number of the pending motions were not docketed until more than ninety days after August 31, 2017.  However, the Court notes that the prior notices did not make clear whether a motion would be deemed to have been made at the time it was deposited in the mail (or deposited with other delivery services), or whether it would be timely only if it were actually received by the Court in 90 days.  The Court has reviewed all of the allegedly untimely filings and has determined to accept those motions bearing a post-mark or equivalent deposit date of December 1, 2017 or earlier.  Only a relative handful of motions were untimely on this basis.  Tables A and B reflect the Court's rulings in this respect.

Some movants sent motions to the Tort Claims Trust and did not file them directly with the Court.  The Court will excuse those movants from strict compliance with the filing requirements, and will treat motions as timely, so long as the motions were timely served upon the Tort Claims Trust.

**II.      Claims Based on Alleged Post-Bar Date Diagnoses.**

Two of the grounds on which I previously held that a claim may qualify as a "future" tort claim are (a) if the claim is based on an exposure to a harmful substance that occurred after August 12, 2009, or (b) if the claim is based on an exposure that occurred before August 12,

2009, but as to which no injury or disease was "manifested" until on or after August 12, 2009.

Claimants do not need to seek relief from the bar date in order to pursue such claims. However,

the pending motions have identified a number of points of potential confusion as to which claims

fall into these categories, and so clarifications are appropriate.

A.    **When Claims "Manifest" Themselves.**

The Court previously held that a claim is a "future" tort claim if the injury or disease did

not "manifest" itself until after the Bar Date. Many of the pending motions allege that the

movants suffer from diseases or conditions that were not "diagnosed" until after the Bar Date. It

is certainly possible that a disease or condition could "manifest" itself prior to the date on which

the disease or condition has actually been formally diagnosed. I note, however, that the Tort

Claims Trust originally proposed that diagnosis dates be used in deciding whether claims qualify

as "future" tort claims. *See* ECF No. 3069, ¶¶ 18-21. We also understand that in processing

claims the Trust has treated diagnosis dates as the dates on which diseases or conditions

"manifested" themselves, as the diagnosis dates are easier to determine and to verify.

The Trust's proposal (and its practice) make good sense. When I referred in my prior

Order to the dates on which diseases or conditions had "manifested" themselves it was not my

intent to require the Trust to follow a different and potentially more cumbersome rule. The

administrative costs of investigating and possibly litigating the question of whether a disease or

condition had "manifested" itself prior to the date of a formal diagnosis would likely far exceed

the benefits given the level of the recoveries that have been projected.

Accordingly, I hereby clarify that claims that are based on diseases or conditions that

were not diagnosed until after the bar date are "future" tort claims as defined in the Plan and the

Trust documents and that claimants need not establish "excusable neglect" or a violation of due

process in order to pursue those particular claims. For the avoidance of doubt, however, the

Trust has the right to object if it believes that the alleged condition or disease actually was

diagnosed *before* the bar date, in which case the claim would not qualify as a "future" tort claim.

Such objections, like all other objections to the merits of post-bar date diagnosis claims, should

be resolved by the Tort Claims Trust under its normal dispute resolution procedures.

> **B.      Claims Based on Multiple Conditions, Some of Which Were First Diagnosed Before the Bar Date and Some of Which Were First <u>Diagnosed After the Bar Date</u>.**

Many claimants have submitted long lists of diagnoses of multiple conditions, some of

which were diagnosed before the bar date and others of which were diagnosed after the bar date.

A claimant, for example, may have been diagnosed with asthma in 1988, then with heart

problems in 2007, and then with cancer in 2014.

The Order that I entered in 2016 stated that a claim would be a "future" tort claim if

(among other things) the underlying exposure occurred before the Bar Date but "no" injury or

disease manifested itself until after the Bar Date. The wording of this paragraph could be

interpreted to mean that "future tort claim" treatment might be available only to claimants who

manifested no pre-Bar Date injuries at all, and is not available to claimants who were diagnosed

with some conditions before the Bar Date but who were then later diagnosed with additional (but

new) conditions or illnesses after the Bar Date. Frankly, however, I do not recall why that

paragraph was worded in that particular way. I note that the form of "Determination Notice" that

I approved as part of the same Order advised claimants that a claim would be considered a

"future tort claim" if "your alleged disease or condition had not manifested or been diagnosed"

until after the Bar Date. *See* Order Regarding Tort Claims Trustee's Motion for Instructions

Regarding Future Tort Claims, Ex. A (ECF No. 3270-1) at p. 1 ¶ (b). The Determination Notice

therefore focused on whether the particular diseases or conditions for which compensation was sought were new, and not on whether the claimant had also manifested a different disease or condition at an earlier time.

I understand further that the Tort Claims Trust has been treating all claims based on new post-Bar Date diagnoses as "future tort claims," regardless of whether claimants had been diagnosed with different conditions before the Bar Date. After reviewing the record, I agree and confirm that this is the correct approach.

I have reviewed the transcripts of the hearings in 2016. The witnesses at that hearing testified that the parties intended that conditions first diagnosed after the Bar Date would give rise to "future" tort claims. There was no suggestion or indication that a post-Bar Date diagnosis might be treated differently if the claimant had also had a separate pre-Bar Date diagnosis of a different condition, though in fairness that specific possibility had not occurred to the Court and that specific question was not posed to the witnesses.

I have also considered the terms of the Plan and the Trust documents, but they are of virtually no help in resolving this question. The Tronox plan of reorganization, when proposed, defined the term "Future Tort Claimant" as "an entity that establishes that it holds a Tort Claim that *did not arise prior to the Effective Date and was not discharged under the Plan.*" [ECF No. 2567, Ex A, Article I(A)(75) (emphasis added). The proposed Trust Agreement, which was prepared later, contained a different definition. The Trust Agreement defined the term "Future Tort Claimant" as "an entity that establishes that it holds a Tort Claim *that arose prior to the Effective Date and was not discharged under the Plan*." *See* Trust Agreement, ECF No. 2343, Ex. C, § 1.2(m). The Confirmation Order then provided that the definition of "Future Tort Claimant" in the Trust Agreement would be deemed to have been incorporated into Article I of

29

the Plan and to have replaced the prior definition.  *See* Confirmation Order [ECF No. 2567] at

¶ 185.  As a result of this change the definition of "Future Tort Claimant" was changed from one

that would include only claims that arose *after* the Effective Date to one that was limited to

certain claims that arose *before* the Effective Date.  There is no explanation in the record as to

the reasons for this change in language, and the witnesses in 2016 could not recall why the

change had been made.

      As the Trust has previously recognized, the language used to define "future tort claims"

cannot be applied literally without producing anomalous results.  A claim cannot be a "future tort

claim," under the literal definition in the confirmed Plan, unless it arose "before" the effective

date of the Plan and yet was not discharged.  However, Section VIII.A of the Plan, and paragraph

129 of the Confirmation Order, stated that *all* Tort Claims that "arose" prior to the Effective Date

were deemed to have been discharged.  If "future tort claims" were limited to people whose

claims arose before the effective date (for bankruptcy purposes) but were *not* discharged, then

there could never be a "future tort claim."  Yet the parties plainly contemplated that there would

be such claims, and made provision for them in the Trust documents.

      In fact, the whole idea of defining "future tort claims" in terms of whether claims had

been "discharged" never made any sense at all, and was a plainly ill-suited way of describing

what the parties sought to accomplish.  The whole purpose of the Trust was to handle the tort

claims that *were* discharged under the Tronox Plan, including future tort claims.  If parties were

able to prove that their claims against Tronox had *not* been discharged, then there would be no

basis upon which to channel those claims to the Tort Claims Trust in the first place.  The

question of how to treat future tort claims therefore is not really a question of whether a

bankruptcy discharge occurred.  Instead, it is a question of interpretation as to how the Trust documents treated the various discharged claims.

It was quite clear, from the testimony I received in 2016, that the overriding intent of all the parties was that Tronox would be discharged from all claims; that all of those discharged claims (without exception) would be channeled to the Trust for resolution and payment; and that the category of "future tort claims" would include those claims based on conditions that had not manifested themselves as of the Bar Date.  In short, the parties recognized that there would be types of claims that technically might have "arisen" for bankruptcy purposes (based on when exposures occurred) and from which Tronox would be discharged from liability, but as to which equity required some separate provision under the Trusts.  Whether the claims had been "discharged" therefore was an inapt way to describe what the parties meant to accomplish with regard to "future" tort claims.  The defining standard was not whether Tronox itself had been discharged from liability.  Instead, the defining standard was whether the claim – based on the date of manifestation of the disease or injury – should fairly be excused from the rules that otherwise might have barred a recovery on the claim, such as strict Bar Date compliance.

I note that under state law questions often arise as to how to define a tort victim's "claim" where exposures give rise, over time, to multiple but distinct conditions or illnesses.  *See, e.g., Schiro v. American Tobacco Co.*, 611 So.2d 962, 965-66 (Miss. 1992) (a smoker who sued based on a cancer diagnosis suffered the relevant "injury" on the date of the cancer diagnosis in 1981, and not on the dates on which she had earlier been diagnosed with other smoking-related illnesses such as emphysema).  It is certainly conceivable that new conditions and illnesses that were first diagnosed after the Bar Date may be treated under the applicable state laws as new and separate injuries giving rise to new and separate claims, regardless of the fact that a claimant

may have suffered from other conditions or illnesses at an earlier time based on the same underlying exposures.

We therefore concur with the Trust, and confirm that if a claimant has identified a new post-Bar Date diagnosis there is no equitable reason to distinguish between claimants who had prior diagnoses of other conditions and those who did not.  We also confirm that claims based on conditions that were first diagnosed after the Bar Date are "future tort claims" to which the Bar Date itself did not apply.

Accordingly, where claimants have listed multiple conditions, we have done two things. First, we have made rulings as to whether the claimants have established grounds for relief from the Bar Date as to those conditions that were diagnosed prior to the Bar Date.  If the movants have not done so, then claims based on those pre-Bar Date diagnoses are time-barred.  Second, we have noted that the evaluation of any claims based on conditions that were first diagnosed after the Bar Date are for resolution by the Trust under its normal dispute resolution procedures. If the Tort Claims Trust believes that an allegedly new post-Bar Date diagnosis actually should not be treated as a distinct condition or injury from one that was previously diagnosed, then the Tort Claims Trust may assert a defense to this effect.  Similarly, if the Trust believes that the relevant condition or illness actually was diagnosed *before* the Bar Date, the Trust may assert that defense to the merits of the claim.  Such defenses (like any other defense to the merits of a future tort claim) should then be resolved under the Tort Claims Trust dispute resolution procedures.

**C.    Claims Based on Conditions that Were Diagnosed Before the Bar Date but Continued Thereafter.**

Many claimants have alleged that they suffer from "continuing" conditions or illnesses (asthma or heart conditions, for example) that were first diagnosed before the bar date but that

have continued to exist after the bar date. Those are claims that plainly accrued before the bar

date. Their continuing character does not mean that the claim is based on a post-bar date

diagnosis. They are not to be treated as "future" tort claims in the absence of relief from the bar

date based on excusable neglect or due process.

**III.    <u>Claims that are Barred by Statutes of Limitation</u>.**

Many movants appear to be under the misimpression that "excusable neglect," if

established, would enable the filing of any claim that a movant (or a related person) ever had,

even if that claim was barred by the applicable statute of limitations prior to the commencement

of the Tronox bankruptcy case. That is not correct. Even if relief from the bar date were

granted, section 502 of the Bankruptcy Code would still require disallowance of any claim that is

not valid under applicable non-bankruptcy law. *See* 11 U.S.C. § 502. Claims that were barred

by the statute of limitations prior to the Tronox bankruptcy filing could not be allowed as claims

even if relief from the bar date were to be granted.

The Trust has objected to many of the pending motions on the ground that the movants

seek to pursue claims that are barred by the relevant statutes of limitation and therefore that relief

from the bar date would be pointless. We found that this objection was valid and could be

decided as a matter of law as to many claims and motions filed by parties in some states.

However, we could not rule on such issues as a matter of law as to many other movants, and so

and statute of limitations defenses as to those movants must be resolved by the Tort Claims Trust

under its normal dispute resolution procedures.

**A.    <u>Mississippi</u>.**

Mississippi requires that actions based on creosote exposures must be filed within three

years from the point when "the plaintiff has discovered . . . the injury." *See* Miss. Code Ann.

§ 15-1-49.  The Mississippi Supreme Court and Mississippi federal courts have consistently held that the statute of limitations begins to run upon the discovery of the injury itself, regardless of whether the claimant knows of the cause of the injury or the identity of the person responsible for the injury.  *See Angle v. Koppers, Inc.*, 42 So.3d 1, 6 (Miss. 2010) (holding that a cause of action for recovery on account of latent disease or injury "accrues upon discovery of the injury, not discovery of the injury and its cause"); *Lincoln Electric Co. v. McLemore,* 54 So.3d 833, 838 (Miss. 2010) (holding that "Section 15-1-49 does not require a plaintiff to know the cause of the injury before accrual of the cause of action," and thus "knowledge of the cause of an injury is irrelevant to the analysis [under § 15-1-49(2)]"); *Owens-Illinois, Inc. v. Edwards*, 573 So.2d 704, 709 (Miss. 1990) ("[t]he cause of action accrues and the limitations period begins to run when the plaintiff can reasonably be held to have knowledge of the injury or disease . . . Though the cause of the injury and the causative relationship between the injury and the injurious act or product may also be ascertainable on this date, these facts are not applicable under § 15-1-49(2)"); *Barnes v. Koppers, Inc.*, 534 F.3d 357, 361 (5th Cir. 2008) ("[u]nder § 15-1-49, a cause of action accrues when the plaintiff has knowledge of the injury, not knowledge of the injury and its cause"); *Bryant v. Wyeth*, 816 F. Supp. 2d 329, 332 (S.D. Miss. 2011), *aff'd*, 487 Fed. App'x 207 (5th Cir. 2012) (holding that under § 15-1-49(20, a cause of action accrues "when the plaintiff "has knowledge of the injury, not knowledge of the injury and its cause"); *Hewitt v. Wyeth*, 812 F. Supp. 2d 768, 770 (S.D. Miss. 2011) (same).

The Tronox bankruptcy filing occurred in January 2009.  Claims held by Mississippi residents that were based on injuries that were known before January 2006 were time-barred under Mississippi law before the Tronox bankruptcy filing occurred.  Nevertheless, many motions filed by claimants in Mississippi allege that the relevant claims are based on conditions

or illnesses that were diagnosed before January 2006.  The Trust has correctly noted that, if claims are barred as a matter of law by the Mississippi statute of limitations, then those claimants' requests for relief from the Bar Date make no difference, because there are no valid claims for which any bankruptcy relief or recovery would be available.

The Mississippi statute of limitations rules are subject to a few exceptions.  For example, persons who were infants at the time they were injured may sue within three years after reaching adulthood, and persons who were unsound of mind at the time of injury may sue within three years after the date when the disability is removed.  *See* Miss. Code Ann. § 15-1-59.  The Mississippi exemption for "unsoundness of mind" applies only if a person cannot manage the ordinary affairs of life; mental illness is not sufficient.  *Shippers Express v. Chapman*, 364 So. 2d 1097, 1100 (Miss. 1978); *Brumfield v. Lowe*, 744 So. 2d 383, 387-88 (Miss. Ct. App. 1999) (schizophrenia diagnosis insufficient).  We have not sustained objections on statute of limitations grounds except in those instances where we could do so as a matter of law based on the statements made in the relevant motions.  If claimants referred to facts that arguably invoked one or more of the foregoing exceptions, then we have not made legal rulings on the statute of limitations issues, and if bar date relief is granted the merits of any statute of limitations defense is to be resolved by the Tort Claims Trust under its normal dispute resolution procedures.

**B.      Pennsylvania.**

In Pennsylvania (where the Avoca site is located), the statute of limitations for a tortious injury to person or property is two years.  *See* 42 Pa. C.S.A. § 5524.  However, Pennsylvania follows a "discovery rule" as an exception to the strict statute of limitations.  Under the discovery rule, the running of the limitations period is tolled where the existence of the injury is not known to the complaining party and such knowledge cannot reasonably be ascertained within

the prescribed statutory period. *Fine v. Checcio*, 870 A.2d 850, 860 (Pa. 2005); *Hayward v. Medical Ctr. of Beaver Cty.,* 608 A.2d 1040, 1043 (1992).

In contrast to Mississippi, the discovery rule in Pennsylvania apparently tolls the running of the statute of limitations until a claimant can reasonably ascertain both the fact of injury and the cause of the injury. *Id.*; *see also Waleski v. Montgomery, McCracken, Walker & Rhoads, LLP (In re Tronox Inc.)*, 616 BR 280, 293 (Bankr. S.D.N.Y. 2020); *Gleason v. Borough of Moosic*, 609 Pa. 353, 15 A.3d 479, 484 (2011). Nevertheless, in order to invoke the discovery rule a plaintiff must show that in the exercise of reasonable diligence the plaintiff could not have ascertained that the plaintiff had a cause of action. *See Pocono Int'l Raceway, Inc. v. Pocono Produce, Inc.*, 468 A.2d 468, 471 (1983); *see also Today's Express, Inc. v. Barkan,* 626 A.2d 187, 190 (Pa. Super. Ct. 1993) ("[t]he standard by which one's efforts to learn of a cause of action, so as to forestall the running of a statute of limitations, is measured by the inability, despite the exercise of diligence, to determine the injury or its cause, not upon a retrospective view of whether the facts were *actually* ascertained within the period") (emphasis in original) (citations omitted). Furthermore, "[t]he standard of reasonable diligence is an objective and external one that is the same for all individuals." *Ingenito v. AC&S, Inc.*, 633 A.2d 1172, 1174 (Pa. Super. Ct. 1993) (citations omitted). "To demonstrate reasonable diligence, a plaintiff must 'establish[] that he pursued the cause of his injury with those qualities of attention, knowledge, intelligence and judgment which society requires of its members for the protection of their own interests and the interests of others.'" *Mest v. Cabot Corp.*, 449 F.3d 502, 511 (3d Cir. 2006) (*quoting from Cochran v. GAF Corp.*, 666 A.2d 245, 250 (Pa. 1995)). The burden of proof is on the claimant, *Cochran v. GAF Corp.*, 666 A.2d 245, 250 (1995), and the determination of

whether a claimant could have known of a cause of action with reasonable diligence is normally a factual issue. *Hayward*, 608 A.2d at 1043.

The Trustee has objected to the claims of many of the movants who are from Pennsylvania on the ground that the claims are barred by the statute of limitations. As described below, many facts were available to residents in Pennsylvania about the risks of creosote exposures, and there was widespread publication of news about creosote-based lawsuits. I have considered that information in evaluating movants' contentions that they missed the bar date due to "excusable neglect." However, while movants were notified that they needed to show "excusable neglect" in order to obtain relief from the bar date, they were not asked to make any submissions regarding the application of the Pennsylvania statute of limitations and/or their diligence before 2009 in pursuing claims. We have therefore not made statute of limitations rulings with regard to the Pennsylvania claimants. We have ruled on the pending motions for relief from the bar date, but if such relief is granted, and if the Trust believes that the relevant claims are subject to statute of limitations defenses, then those defenses (like all other defenses on the merits) must be resolved under the Tort Claims Trust dispute resolution procedures.

## C.   <u>Louisiana</u>.

In Louisiana (where the Bossier City site is located), the "liberative prescription" for "delictual actions" is one year. *See La. C.C.* Art. 3492. The one-year period "commences to run from the day injury or damage is sustained," but it does not run against minors. *Id.* The prescriptive period may be suspended until a plaintiff discovers or should have discovered the facts upon which a cause of action is based. *In re Succession of Scurlock*, 140 So.3d 318, 322 (La. App. 2014). But actual knowledge is not required, and a plaintiff will be charged with knowing what he or she could have learned with reasonable diligence. *Id.* The fact that a

plaintiff has been diagnosed with an injury or condition is constructive notice that a plaintiff

should investigate the cause of the condition, and the prescriptive period will not be suspended if

the reason why the plaintiff did not know of a claim was that the plaintiff failed to make such an

inquiry.  *See Tenorio v. Exxon Mobil Corp.*, 170 So.3d 269, 275 (La. App. 2015) (no suspension

for claimant who was diagnosed with throat cancer in 2009 but who did not file suit until 2013).

As noted above, movants were asked to explain why they did not file claims before the

bar date, but they were not even asked to explain facts that were relevant to the application of the

statute of limitations, and this Court does not even have copies of the complete claim files that

were submitted to the Tort Claims Trust.  We therefore cannot rule as a matter of law as to

whether any of the Louisiana claims are barred by the statute of limitations.  We have made

rulings as to whether movants whose claims are subject to Louisiana law are entitled to relief

from the bar date, but if such relief is granted, and if the Trust believes that the relevant claims

are subject to statute of limitations defenses, those defenses (like all other defenses on the merits)

should be resolved under the Tort Claims Trust dispute resolution procedures.

### D.  **Alabama**.

The limitations period for personal injury claims in Alabama is two years.  Ala Code § 6-

2-38(1).  In *Griffin v. Unocal Corp.*, 990 So. 2d 291, 293 (Ala. 2008), the Supreme Court of

Alabama held that a personal injury claim accrues when a physical injury is manifested by

observable signs or symptoms or is medically identifiable, even if the injured person is ignorant

of it and even if the injured person is not aware of the cause or origin of the injury.  However, the

rule set forth in *Griffin* was to apply only prospectively – that is, to persons whose last exposure

to a toxic substance, and first manifested injury resulting from that exposure, occurred on or after

the date that was two years prior to the issuance of the *Griffin* decision in January 2008.  *Id*.

The prior rule in Alabama (still applicable to some pre-*Griffin* exposures) was that a claim had to be brought within two years after the last exposure occurred, regardless of when an injury had manifested itself. *See Garrett v. Raytheon Co.*, 368 So.2d 516, 521 (Ala. 1979). However, if a claim is governed by *Garrett* the plaintiff can only recover damages that were attributable to injuries that were incurred within the two-year limitations period, *i.e.*, within two years prior to filing suit. *Jerkins v. Lincoln Elec. Co.*, 103 So.3d 1, 6-7 (Ala. 2011). Taken together, the rule under *Garrett* and *Jerkins* is that claims for damages based on an injury caused by long-term exposures to toxic substances must be brought no later than the sooner to occur of (a) the date that is two years after the date of last exposure to the substance, or (c) the date that is two years after the date of the relevant injury.

Trying to apply these rules to claims governed by Alabama law is a bit confusing, but the following seems to be the case:

- If a movant's "last exposure" occurred more than two years before *Griffin* was decided (*i.e.*, before January 2006), then the claim is governed by the *Garrett* rule, and the claim was time-barred unless suit was brought within two years of the last exposure, regardless of whether any injury had manifested itself.

- If an exposure continued after January 2006, but the injury had manifested itself before January 2006, then under *Garrett* and *Jerkins* the movant had until two years after the injury in which to file a claim. Otherwise, claims for damages based on that injury were barred.

- If the exposure continued after January 2006 and the first manifestation of injury was after January 2006, then under *Griffin* the claim had to be made within two years after the manifestation of injury.

39

In some instances, these rules could be applied as a matter of law to movants whose claims are governed by Alabama law.  In other instances, we did not have sufficient information to make such rulings.  In cases where we did not rule on the application of the statute of limitations those defenses would still available to the Trust if relief from the bar date were to be granted.

### E.    Other States.

Some motions were filed by residents of other states.  In many cases it was clear from the motions that the underlying exposures had occurred at plants in Mississippi or Pennsylvania.  In some cases, however, it was not clear just where the underlying exposures had occurred.  In those cases, we found an insufficient basis on the record to sustain the Trust's general statute of limitations defense.  We have made rulings as to whether these movants have established grounds for relief from the bar date based on excusable neglect or violations of due process, but if such relief is granted, and if the Trust believes a claim is subject to a statute of limitations defense, that defense should be resolved by the Tort Claims Trust under its normal dispute resolution procedures.

### IV.    Claims Resolved in Prior Litigations.

Many movants have disclosed that they participated in prior lawsuits, and many previously received settlement payments.  The Trust has argued that bar date issues need not be resolved as to these claims, because the prior litigation settlements are *res judicata* and bar the reassertion of the settled claims.  As a general rule that is plainly correct.  In cases where the diagnoses preceded the litigation settlements, therefore, we have sustained the Trust's objections as a matter of law.

However, some claimants have alleged that they suffered from additional diseases or conditions that arose after the prior litigation settlements, raising questions as to whether those

claims also are barred. It is certainly possible that a litigation settlement extinguished all claims that a person might ever have – even as to conditions that had not yet manifested themselves. However, the terms of the prior settlements are not available to the Court and so the Court cannot make such a determination as a matter of law.

Accordingly, in cases where new diagnoses were made after the date of a litigation settlement but before the bar date, we have evaluated whether the movant has established grounds for relief based on excusable neglect or due process. If such relief is granted, any defenses based on the effects of prior litigation settlements are then to be resolved by the Tort Claims Trust under its normal dispute resolution procedures. Similarly, if a litigation claimant alleges a new condition or diseases that first was diagnosed after the bar date, we have referred that claim to the Trust, and the merits of any defense (including defenses based on the prior litigations) are for resolution by the Trust under its normal dispute resolution procedures.

## V.    Due Process/Challenges to Publication Notices.

The confirmation of a company's plan of reorganization extinguishes all debts and claims that arose prior to confirmation. *See* 11 U.S.C. § 1141(d)(1). The discharge "operates as an injunction against the commencement or continuation of an action, the employment of process, or an act, to collect, recover or offset" any such discharged debt. 11 U.S.C. § 524(a)2). The confirmation order that was entered in these cases in 2010 provided for a discharge of all claims against the Debtors and Reorganized Debtors (while channeling future tort claims to the Trust). However, a discharge may be challenged on due process grounds.[1] Any claimant who makes

---

[1]    For the reasons discussed above, it is somewhat anomalous to discuss future tort claims in terms of "discharge" standards. The Trust exists to handle the tort claims that *were* discharged by the Plan. When claimants seek access to the Trust on the ground of improper notice, then, the real issue for this Court is not so much whether Tronox was discharged of liability, but whether the enforcement of the Bar Date as to those claimants would violate

41

such a challenge bears the burden of proof. *See Waterman S.S. Corp.*, 200 B.R. 770, 774-75 (Bankr. S.D.N.Y. 1996).

The failure to provide a form of notice that complies with due process requirements is a ground for relief from a discharge. *City of New York v. New York, N.H. & H.R. Co.*, 344 U.S. 293, 297 (1953) ("even creditors who have knowledge of a reorganization have a right to assume that the statutory 'reasonable notice' will be given to them before their claims are forever barred"). However, the type of notice that due process requires depends on whether creditors' identities and claims are known or reasonably ascertainable by a debtor. Creditors whose identities and claims are known are entitled to be listed in a debtor's schedules and are entitled to receive direct notice, by mail, of the bar date for filing claims. *Id.* However, it is true in most bankruptcy cases (and is often true in other types of *in rem* proceedings) that unknown persons may have claims.[2] This includes cases, like the Tronox case, that involve potential tort claims due to exposures to toxic substances. Direct notice cannot be given to claimants whose identities are not known, and so some substitute for direct notice must be used.

Notice to unknown claimants is governed by the decision of the United States Supreme Court in *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306 (1950). *Mullane* involved

---

due process as a result of improper notice. In any event, the due process standards are the same no matter how the issue is phrased.

[2] In an *in rem* proceeding a court exercises jurisdiction over property, often for the purpose of resolving competing claims against the property. The Supreme Court has held that a bankruptcy case is a form of *in rem* proceeding. *See, e.g., Tennessee Student Assistance Corp. v. Hood*, 541 U.S. 440, 447-8 (2004) (holding that the power to grant a discharge of all claims derives from the bankruptcy court's *in rem* jurisdiction over all of a debtor's property); *see also Central Va. Comm. College v. Katz*, 546 U.S. 356, 362 (2005) ("Bankruptcy jurisdiction, at its core, is *in rem*"); *Local Loan Co. v. Hunt*, 292 U.S. 234, 241 (1934) (same); *Gardner v. New Jersey*, 329 U.S. 565, 574 (1947) (same); *Hanover Nat'l Bank v. Moyses*, 186 U.S. 181, 192 (1902) (same).

a dispute over the sufficiency of a publication notice given by a trustee who sought to settle

claims against a common trust fund, some of whose beneficiaries were unknown.  339 U.S. at

309.  The Supreme Court declared that "[a]n elementary and fundamental requirement of due

process in any proceeding which is to be accorded finality is notice reasonably calculated, under

all the circumstances, to apprise interested parties of the pendency of the action and afford them

an opportunity to be heard." *Id*. at 314. The Supreme Court recognized, however, that actual

notice is not always possible. It therefore held that due process requires actual notice to *known*

parties but that for *unknown* parties, reasonable publication notice is sufficient.  *Id.* at 314-318.

The Supreme Court recognized, in *Mullane*, that publication notices often are not read

and often do not actually come to the attention of all of the desired recipients:

> It would be idle to pretend that publication alone as prescribed here, is a
> reliable means of acquainting interested parties of the fact that their rights are
> before the courts. It is not an accident that the greater number of cases
> reaching this Court on the question of adequacy of notice have been
> concerned with actions founded on process constructively served through
> local newspapers.  Chance alone brings to the attention of even a local
> resident an advertisement in small type inserted in the back pages of a
> newspaper, and if he makes his home outside the area of the newspaper's
> normal circulation the odds that the information will never reach him are
> large indeed.  The chance of actual notice is further reduced when as here the
> notice required does not even name those whose attention it is supposed to
> attract, and does not inform acquaintances who might call it to attention.  In
> weighing its sufficiency on the basis of equivalence with actual notice we are
> unable to regard this as more than a feint.

*Id.* at 315.  Nevertheless, the Supreme Court held that such publication notice is the only option,

and therefore is sufficient for due process purposes, where direct notice is not possible or

practicable:

> This Court has not hesitated to approve of resort to publication as a
> customary substitute in another class of cases where it is not reasonably
> possible or practicable to give more adequate warning.  Thus it has been
> recognized that, in the case of persons missing or unknown, employment of
> an indirect and even a probably futile means of notification is all that the

43

> situation permits and creates no constitutional bar to a final decree
> foreclosing their rights.

*Id.* at 317.  The Court noted that publication notice is particularly appropriate in cases involving

claimants whose claims are disputed, merely possible, or dependent on future events:

> Nor do we consider it unreasonable for the State to dispense with more
> certain notice to those beneficiaries whose interests are either conjectural or
> future or, although they could be discovered upon investigation, do not in due
> course of business come to knowledge of the common trustee.  Whatever
> searches might be required in another situation under ordinary standards of
> diligence, in view of the character of the proceedings and the nature of the
> interests here involved we think them unnecessary.  We recognize the
> practical difficulties and costs that would be attendant on frequent
> investigations into the status of great numbers of beneficiaries, many of
> whose interests in the common fund are so remote as to be ephemeral; and
> we have no doubt that such impracticable and extended searches are not
> required in the name of due process.

*Id.* at 317-18.

*Mullane* was not a bankruptcy case, but the Supreme Court held that the principles set

forth in *Mullane* apply to "any proceeding which is to be accorded finality." *Mullane*, 339 U.S. at

314.  For decades, the Supreme Court and other courts have applied the *Mullane* decision to

determine the sufficiency of notice in bankruptcy cases.  *See, e.g.*, *United Student Aid Funds,*

*Inc. v. Espinosa*, 130 S. Ct. 1367, 1378 (2010) (applying *Mullane* to a dispute concerning an

individual's discharge under chapter 13 of the Bankruptcy Code); *GAC Enterprises, Inc. v.*

*Medaglia (In re Medaglia)*, 52 F.3d 451, 455 (2d Cir. 1995) (applying *Mullane* to a dispute

concerning an individual's discharge under chapter 7 of the Bankruptcy Code); *In re Drexel*

*Burnham Lambert Group, Inc.*, 995 F.2d 1138, 1144 (2d Cir. 1993) (applying *Mullane* in a

bankruptcy case to consider the sufficiency of notice to creditors of a proposed settlement);

*Curatola v. St. Vincent's Catholic Medical Centers of N.Y.*, No. 07 Civ. 8257 (WHP), 2008 WL

1721471, at *1 (S.D.N.Y. Apr. 10, 2008) (applying *Mullane* and holding that "publication notice

is generally sufficient for 'unknown' creditors"); *DePippo v. Kmart Corp.*, 335 B.R. 290, 296

44

(S.D.N.Y. 2005) (same).  The Supreme Court has also applied *Mullane* in assessing the

sufficiency of notice in state court probate actions, which (like bankruptcy cases) require the

filing of claims and impose bars against any claims that are not filed by a deadline. *See Tulsa*

*Professional Collection Services, Inc. v. Pope*, 485 U.S. 478, 490 (1988).

In addition, courts have regularly applied *Mullane* in determining whether publication

notice is sufficient as to unknown tort claimants.  *See, e.g.*, *In re Waterman S.S. Corp.*, 157 B.R.

220, 222 (S.D.N.Y. 1993); *In re Chateaugay Corp.*, No. 86 B 11334 (BRL), 2009 WL 367490, at

\*5 (Bankr. S.D.N.Y. Jan. 14, 2009) (applying *Mullane* and related cases to determine that notice

to unknown tort claimants was sufficient to bar their lawsuits); *In re Best Prods. Co. Inc.*, 140

B.R. 353, 357-58 (Bankr. S.D.N.Y. 1992) (same); *see also Placid Oil Co. v. Williams (In re*

*Placid Oil Co.)*, 463 B.R. 803, 815-17 (Bankr. N.D. Tex. 2012) (same); *Charter Int'l Oil Co. v.*

*Young (In re Charter Int'l Oil Co.)*, No. 06 AP 00179 (GLP), 2007 WL 879176, at \*6 (Bankr.

M.D. Fla. Mar. 14, 2007) (same).

In this case, many movants have complained that they should have received direct notice

of the bar date by mail.  However, a movant who is making such a complaint is required to show

that Tronox knew of the movant's identity and claims.  A few movants whose claims were

resolved in prior class actions have argued that Tronox knew of their claims, but by definition

the prior lawsuits resolved those claims, and none of those movants has shown that Tronox knew

that the movants had additional claims that post-dated the prior litigations.  No other movant who

has complained about the lack of direct notice has even contended that Tronox actually knew of

the movant's identity or claims.  To the contrary: virtually all of those movants have alleged that

they themselves were not aware that they had claims against Tronox.  Requiring direct notice, by

mail, to persons whose identities and claims are not known would be an impossible standard, and

one that due process does not require.  *See Mullane*, 339 U.S. at 314, 317 (stating that the Due

Process Clause requires the best notice practicable under the circumstances and warning against

requirements so inflexible as to render due process an "impractical or impossible or impractical

obstacle[].") ; *Drexel*, 995 F.2d. at 1144 ("No rigid constitutionally mandated standard governs

the contents of notice in a case like the one before us."); *see also Grannis v. Ordean*, 234 U.S.

385, 395 (1914) (the Due Process Clause "does not impose an unattainable standard of

accuracy"); *In re A.H. Robins Co.*, 880 F.2d 709, 745 (4th Cir. 1989) ("Due process . . . 'is a

flexible concept,' intended to ensure 'fundamental fairness.'") (quoting *Walters v. Nat'l Ass'n of

Radiation Survivors*, 473 U.S. 305, 320 (1985)).

Other movants have argued that the Debtors should have canvassed the relevant

communities to identify persons with relevant conditions or injuries and should have provided

notice of the bar date directly to such persons.  It is true as a general matter that direct notice is

required if a creditor's identity is "reasonably ascertainable," which requires that a debtor use

reasonable diligence to identify creditors.  *See Mennonite Bd. of Missions v. Adams*, 462 U.S.

791, 798 n. 4 (1983)). To be reasonably diligent, however, a debtor's efforts do not need to

include "impracticable and extended searches . . . in the name of due process." *Mullane*, 339

U.S. at 317-318).  Accordingly, a debtor is not required to conduct a "vast, open-ended

investigation." *Chemetron v. Jones*, 72 F.3d 341, 346 (3d Cir. 1995).  Rather, a creditor is

generally treated as unknown if it cannot be identified through a search of the debtor's own

books and records.  *Id.* at 347; *see also Louisiana Dep't of Environmental Quality v. Crystal Oil

Co. (In re Crystal Oil Co.)*, 158 F.3d 291, 297 (5th Cir. 1998) (holding that "in order for a claim

to be reasonably ascertainable, the debtor must have in his possession, at the very least, some

specific information that reasonably suggests both the claim for which the debtor may be liable

46

and the entity to whom he would be liable"); *Pacificorp. and Vancott Bagley Cornwall & McCarthy v. W.R. Grace*, No. 05-764 (SJB), 2006 WL 2375371, at *4 (D. Del. Aug. 16, 2006). The Debtors were not required, by due process, to canvass the community to unearth possible claimants. *See In re Peabody Energy Corp.*, 579 B.R. 208, 216-17 ("[t]he Debtors were not required to conduct a search of the Tri-State Mining District to see who lives there and may have become ill"); *Placid Oil Co.*, 753 F.3d 151, 156 (5th Cir. 2014) ("to conclude that a creditor is known, a court must determine that, at a minimum, a debtor has 'specific information' related to an actual injury suffered by the creditor"); *In re Nat'l Steel Corp.*, 316 B.R. 510, 518 (Bankr. N.D. Ill. 2004) ("It is not the duty of the Debtors to make JFE or any of its creditors aware of every potential claim they may have against the Debtors. To the contrary, it was JFE's responsibility to explore, investigate and file a proof of claim against the Debtors, not the other way around"); *In re Brooks Fashion Stores, Inc.*, 124 B.R. 436, 445 (Bankr. S.D.N.Y. 1991) (a debtor has no duty to search out each conceivable or possible creditor and urge that person or entity to make a claim against it).

Other movants have argued that they did not actually read the publication notices in this case and therefore should be treated as not having received notice at all. However, the bar date would effectively be nullified (and bankruptcy proceedings would be stymied) if publication notices were only given effect as to claimants who admit they read the notices. *See, e.g., In re Best Prods. Co., Inc.*, 140 B.R. 353, 359 (Bankr. S.D.N.Y. 1992) (if failure to read a published notice were sufficient by itself to warrant relief from the bar date then "notice of a bar date by publication would be rendered a useless means of establishing a date by which all claims must be filed or forever barred"). The Supreme Court has recognized that it is always true that publication notices may not actually be read. *See Mullane*, 339 U.S. at 617; *City of New York v.*

*New York, N.H. & H.R. Co.*, 344 U.S. 293, 296 (1953) (observing that notice by publication "is a poor and sometimes a hopeless substitute for actual service of notice," but that "when the names, interests and addresses of persons are unknown, plain necessity may cause a resort to publication.")  Nevertheless, bankruptcy proceedings, and many other legal proceedings, need a mechanism to provide finality as to the persons who are entitled to participate, and publication notices are given effect and are enforced even if claimants do not actually see them.  *See In re US Airways,* No. 04-13819 (SSM), 2005 WL 3676186 at *8 (Bankr. E.D. Va. Nov. 21, 2005) (noting that allowing a late claim because a claimant had not read the notice would render notice of the bar date by publication "a useless means of establishing a date by which all claims must be filed" (quoting *Best Prods, Inc.*, 140 B.R. at 159).); *see also In re New Century TRS Holdings, Inc.*, No. 07-10416 (KJC), 2012 Bankr. LEXIS 6245 (Bankr. D. Del. May 17, 2012) (allowing a creditor to assert a claim because of not having read the publication notice would render the notice "a useless means of establishing a date by which all clams must be filed or forever barred" (quoting *Best Prods. Co.,* Inc, 140 B.R. at 359).

Some movants have alleged generally that the publication notices in this case were too vague to enable claimants to know of their rights.  However, no movant who has made these complaints has discussed the actual language of the published notices.  The language was approved by Judge Gropper in 2009, and even with the benefit of hindsight I find the notices to be thorough and informative.  An example (from the notice published in Columbus, Mississippi) is quoted above, and I have reviewed the notices published in other jurisdictions as well.  The published notices included descriptions of Tronox's connections to the Kerr-McGee companies, along with site-specific terms that described the types of substances that might have been released from particular plants and the types of injuries for which people needed to make claims.

Some other claimants have alleged that they no longer lived in the areas where the notices were published.  Again, however, due process requires what is reasonable, not what is impossible.  The possibility that claimants may not reside in the areas covered by the local newspapers is the reason why notice was also published in a newspaper with a national circulation (The Wall Street Journal).  As the Supreme Court recognized in *Mullane*, there is of course no guarantee that claimants will receive such a publication or that they will read it even if they receive the newspaper.  But it was the best that could be done and it satisfied due process under all applicable authorities.  *See Chemetron Corp. v. Jones*, 72 F.3d 341, 348-59 (3d Cir.1995) (holding that publication in national newspaper is sufficient where supplemented by publication in local papers where debtor does business); *Placid Oil Co.*, 753 F.3d at 155, 158 (publication in a national newspaper is sufficient); *In re Best Prods. Co.*, 140 B.R. at 358 ("[i]t is impracticable, however, to expect a debtor to publish notice in every newspaper a possible unknown creditor may read"); *In re Motors Liquidation Company*, 576 B.R. 761, 776 (Bankr. S.D. N.Y. 2017) (publication notice in a number of global, national and local newspapers was constitutionally sufficient for unknown creditor).

A number of movants have argued that the notices that were published were insufficient because they did not name the individuals who had claims and the nature of the claims that those people owned.  Again, however, due process did not require the impossible.  The whole point of the published notices was that Tronox did not know who had claims, or what those claims might be.  Not every person in an affected locality had diseases or conditions for which compensation might be sought.  Furthermore, it is a simple fact of life that respiratory, pulmonary and other diseases or conditions affect persons throughout the country, and not every such disease or condition in a given area could reasonably be attributed to exposure to a Tronox product.  More

49

specific notice to each claimant of the nature of each claimant's own injuries and claims was not

feasible and was not required by due process. *See Castleman v. Liquidating Tr.*, No. 6:06-CV-

1077 (LEK), 2007 WL 2492792 at *9 (N.D.N.Y. Aug. 28, 2007).

Finally, some movants have complained that they did not receive additional, direct

notices and an opportunity to file Category D claims after the fraudulent transfer litigation was

settled in 2015.  These movants appear to believe that the underlying settlement of the fraudulent

transfer litigation was similar to a settlement of a pending class action and that the movants were

members of a class who were entitled, under class action rules, to notice of the settlement.  That

is not correct.  The 2015 settlement occurred in a fraudulent transfer litigation.  That litigation

was a source of funding for the Trust, but it did not involve a settlement of claims owned by tort

claimants.  The persons who were entitled to be treated as Class D claimants consisted only of

persons who had filed claims on or before the Bar Date in August 2009, and that limitation was

approved and became final in 2010.  The settlement of the Anadarko action did not reopen that

issue and did not entitle any person to additional notice or to a renewed opportunity to file

claims.

For the foregoing reasons I did not find merit in any of the alleged requests for relief

from the Bar Date based on due process grounds.

## VI.    <u>Excusable Neglect</u>

Rule 3003(c)(2) states that a creditor who fails to file a proof of claim before the bar date

"shall not be treated as a creditor with respect to such claim for the purpose of voting or

distribution."  Fed. R. Bankr. P. 3003(c)(2).  However, Rule 9006 of the Federal Rules of

Bankruptcy Procedure states that if an order of the court requires an action to be taken on or

before a particular date, and if the action is not taken by the specified deadline, the court

nevertheless may extend the deadline after the fact, and may permit the act to be done belatedly, "where the failure to act was the result of excusable neglect." *See* Fed. R. Bankr. P. 9006(b)(1).

The leading decision on the criteria to be applied in considering an "excusable neglect" claim is the decision of the United States Supreme Court in *Pioneer Inv. Servs. v. Brunswick Assocs, Ltd. P'ship*, 507 U.S. 380 (1993). In *Pioneer*, an attorney filed a claim 20 days after the bar date. The attorney claimed that he had been experiencing "a major and significant disruption" in his life due to his withdrawal from his former law firm and that he was unaware of the bar date until after the date had passed. The Supreme Court held that the wording of the rule shows that relief may be available even if a deadline is missed due to neglect, and that the term "neglect" encompasses "both simple, thoughtless omissions to act and, more commonly, omissions caused by carelessness." *Id*. at 388. The Supreme Court also held that the determination of whether neglect is excusable is "at bottom an equitable one, taking account of all relevant circumstances surrounding the party's omission." *Id*. at 395. The relevant factors include: (1) the danger of prejudice; (2) the length of the delay and its potential impact on proceedings; (3) the reason for the delay, including whether it was in the reasonable control of the movant; and (4) whether the movant acted in good faith. *Id.*

Applying these principles, the Supreme Court held in *Pioneer* that excusable neglect had been demonstrated. *Id*. at 397-99. The Supreme Court confirmed that parties are responsible for the conduct of their attorneys, and it held that clients cannot obtain relief from deadlines that their lawyers missed unless the lawyers' own neglect was excusable. *Id.* at 397. The Court also gave "little weight" to the fact that counsel was allegedly experiencing upheaval in his law practice. *Id*. at 398. However, since the bar date notice had been set forth in a notice of a creditor meeting, without any indication in the title of the notice that it also included information

51

about a bar date, the Supreme Court held that counsel's admitted lack of actual knowledge of the

bar date, coupled with a lack of prejudice and a demonstration of good faith, constituted

excusable neglect.  *Id*. at 398-99.

The Second Circuit Court of Appeals has taken "a hard line" in applying the *Pioneer*

factors.  *See Silivanch v. Celebrity Cruises, Inc.*, 333 F.3d 355, 368 (2d Cir. 2003).  In *Silivanch*,

the Second Circuit applied the *Pioneer* factors in determining whether an untimely filing of an

appeal was due to excusable neglect.  The Court held in *Silivanch* that if a deadline is clear and

understood, but is missed anyway, "we continue to expect that a party claiming excusable

neglect will, in the ordinary course, lose under the *Pioneer* test," even if other factors favor the

movant.  *Id*. at 366-67.  The *Silivanch* rule has been affirmed in subsequent decisions.  *See*

*Williams v. KFC Nat'l Mgmt. Co.*, 391 F.3d 411, 415-16 (2d Cir. 2004); *Midland Cogeneration*

*Venture L. P. (In re Enron Corp.)*, 419 F.3d 115, 122 (2d Cir. 2005).

The burden of proving "excusable neglect" rests with the party who seeks relief.  *See*

*Midland Cogeneration Venture L.P. v. Enron Corp. (In re Enron Corp.)*, 419 F.3d 115, 121 (2d

Cir. 2005); *Jones v. Chemetron Corp.*, 212 F.3d 199, 205 (3d Cir. 2000); *In re Andover Togs,*

*Inc.,* 231 B.R. 521, 549 (Bankr. S.D.N.Y. 1999).  Applying the foregoing criteria, as interpreted

in *Silivanch*, demonstrates that most of the pending motions do not qualify for relief on grounds

of excusable neglect.

### A.     <u>Danger of Prejudice</u>

When the Plan was confirmed the parties believed that it was unlikely that there would be

a large number of future tort claims.  As a result, only a relatively small amount of money was

set aside for such claims.  Other categories were strictly limited to the payment of claims that

were timely filed.  The Plan (and the Tort Trust documents) did not make any explicit provision

for late-filed claims that might be permitted on grounds of excusable neglect. After hearing

evidence in 2016, however, the Court held that claimants who can establish "excusable neglect"

are to be entitled to treatment as "future" or "unaccounted for" tort claims in Category A.

However, a claimant still must show "excusable neglect" under the applicable standards in order

to be entitled to this treatment.

In this particular case, the only funds that remain for distribution to persons injured by

creosote exposures are the limited funds that were set aside for Category A claimants, which

include persons injured from asbestos exposures and persons whose creosote-related injuries did

not manifest themselves until after the bar date. Each "excusable neglect" claim that is allowed,

on behalf of a claimant whose injuries were manifested in 2009 or in many cases much earlier,

would further reduce the already low recoveries that can be expected by those persons whose

illnesses had not even appeared until after 2009, and who therefore had no opportunity to file a

claim before the Bar Date. I am greatly sympathetic for the plight of ordinary persons who may

not be well-versed in legal proceedings and who may not actually have known of the 2009 Bar

Date, but I must also be mindful of the fact that an overly-generous allowance of "excusable

neglect" claims would virtually destroy any chance for meaningful recoveries by those persons

who had no prior opportunity to make claims.

It is well-settled that if the allowance of late-filed claims on the grounds of excusable

neglect would "open the floodgates" to a large number of new claims, and if those additional

claims would have a large impact on the recoveries of other creditors, then permitting the late-

filed claims would be a form of prejudice that weighs against a finding of "excusable neglect."

*See Black v. Diamond*, 163 Fed. App'x 58, 60-61 (2d Cir. 2006) (holding that reductions in other

claimants' recoveries is a form of prejudice that is relevant under the *Pioneer* factors); *Midland*

*Cogeneration Venture L.P. v. Enron Corp (In re Enron Corp.)*, 419 F.3d 115, 130, 132 (2d Cir. 2005) (hereafter cited as "***Enron***") (holding that a "dollar-for-dollar depletion of assets" is not automatically enough but that the size of the late-filed claim or claims "cannot be irrelevant to the analysis," and approving a finding of prejudice where the lower court had found that allowing late-filed claims could lead to a "mountain" of such claims); *Meadows v AMR Corp.*, 539 BR 246, 252 (S.D.N.Y. 2015) ("allowing late-filed amendments years after the confirmation of the debtors' reorganization plan would create a serious risk of opening the floodgates to other potential late claims").

It is plain here that we face a "mountain" of potential additional claims, and that is true regardless of whether one focuses on the 38,000 "future" tort claims or the 4,700 claims as to which "excusable neglect" motions have so far been filed.  Allowing vast numbers of additional Category A claims would have a severe effect on the distribution fund and on other claimants. Accordingly, the "prejudice" factor weighs strongly against the movants who seek permission to file late claims.

### B.    Length of the Delay/Effect on Proceedings

Virtually all (if not all) of the late-filed claims that are the subjects of the motions that are presently pending before the Court were filed in late 2015 or later.[3]  They therefore were filed more than six years after the bar date.  In some Circuits a delay of that magnitude might be disqualifying by itself.  *See, e.g., In re O'Brien Envtl. Energy, Inc.*, 188 F.3d 116, 130 (3d Cir. 1999) (holding that in applying the *Pioneer* factors the length of a delay should be evaluated "in absolute terms"); *In re Energy Future Holdings Corp.*, 619 B.R. 99, 113 (Bankr. D. Del. 2020)

---

[3]    In its Omnibus Objection the Trust argued that the earliest claim filed by any of the movants was filed in 2014, but the earliest claim filing identified in the information provided to the Court was on November 13, 2015.

(same).  In this Circuit, however, the determination of whether to grant relief on grounds of

"excusable neglect" is an equitable decision in which all of the relevant factors need to be

considered together.  Accordingly, "the lateness of a claim must be considered in the context of

the proceeding as a whole" and also based on the excuse that is offered for the delay.  *Enron*, 419

F.3d at 128-130.  No bright-line rule exists, therefore, under which a certain amount of delay will

automatically disqualify a late-filed claim without consideration of other factors.  *Id*.

Notwithstanding the absence of a bright-line rule, it is still the case in this Circuit that a

"presumption of prejudice is particularly appropriate where . . . the plaintiff's delay was

prolonged."  *Shannon v. Gen. Elec. Co.*, 186 F.3d 186, 195 (2d Cir. 1999); *Williams v. City of

New York*, 771 Fed. Appx. 94, 95 (2d Cir. 2019).  In this case, timely-filed claims were resolved

years ago.  The overwhelming majority of the pending late-filed claims were filed only after

distributions were made in 2015 with regard to the timely-filed claims.  We will not apply a

bright-line rule, but we must note that we do not know, offhand, of any case in which significant

numbers of late-filed claims have been permitted on grounds of "excusable neglect" after delays

of the length that are at issue in this case.

The late-filed claims plainly are having an enormous impact on these proceedings, and if

the lateness is excused they will have further adverse impacts.  As explained above, the

allowance of large numbers of late-filed claims in this case would drive down the recoveries of

other Category A claimants and therefore would be prejudicial to those other claimants.  The

processing of late-filed claims also imposes huge administrative expenses, and additional

litigation expenses would have to be incurred to evaluate and resolve the merits of the late-filed

claims.  In addition, *pro rata* distributions to Category A claimants cannot be made until the

universe of participating claims is known, so that the time involved in resolving the merits of the

late-filed claims inevitably would delay distributions to those claimants who have acted with
more diligence in the pursuit and protection of their legal rights.  These long delays and high
costs weigh strongly against the movants' requests for permission to file late claims.

C.    **Good Faith**

For the most part the good faith of claimants has not been challenged.  However, we have
received many letters from claimants in Columbus, Mississippi who contend that some claimants
in Mississippi have filed fraudulent claims.

The sheer number of the filed claims from the Columbus area is striking.  The evidence
submitted during the trial in the Anadarko Litigation before Judge Gropper confirmed that
Columbus, Mississippi had accounted for 6,451 creosote-related litigation claims in 1999 and
another 5,100 creosote-related litigation claims in 2002.  *See Direct Examination of Denise
Neumann Martin*, Adv. Pro. No. 09-01198 [ECF No. 421] (the "**Martin Report**"), Exhibit 2.
Another 2,100 claims from Columbus were allowed as Category D claims during the Tronox
case, raising the total to approximately 13,600.  Columbus-area residents also accounted for
about 10,000 of the first 19,000 of the future tort claims that were filed.  *See* Oct. 25, 2016 Hr'g
Tr. at 29:7-9.  This means that more than 27,600 claims have come from the Columbus area,
without even counting the Columbus-based claims that likely are included in the last 19,000
future claims that have been filed.  The 2010 census showed that Columbus had a total
population of only 23,640, and that Lowndes County (in which Columbus is located) had a total
population of 59,779.  *See* U.S. Dep't. of Commerce, Bureau of Census, Mississippi: 2010
Population and Housing Unit Counts (August 2012) (Table 9 at pdf p. 60 of 87) & (Table 4 pdf
p. 32 of 87).  That means that creosote-based litigation claims from the Columbus, Mississippi
area have been filed in numbers that exceed the entire population of the city, and that represent

almost half of the entire population of the county.  Granted, some claimants are former (not current) residents of Columbus, but the numbers still are astonishing.

Some of the letters and other papers filed with the Court have suggested that the collection and filing of claims and motions became a cottage industry in Columbus.  Individuals or groups apparently contacted potential claimants and offered to make the necessary claim and motion filings in return for the payment of set fees.  The Trust complained at one point that an individual had represented himself as a representative of the Trust and had solicited claims in exchange for the payment of a processing fee.  We have noted that a large number of the pending motions use the same language, including pre-printed and cut-and-pasted explanations of why the bar date was missed.  Many even repeat the same typographical or grammatical errors, suggesting that motions are being copied or mass-produced.  The Court does not know who is engaging in these activities, whether attorneys are involved, or what representations have been made to claimants about what the likely outcomes might be.  However, the potential for abuse is obvious.

While these are matters of concern, I have no evidence before me showing (or suggesting) fraud on behalf of any specific claimant or movant.  The Tort Claims Trust has not challenged the good faith of any movant, and none of the generalized allegations that have been set forth in the thousands of letters and motions that the Court has received has identified any particular claimant who allegedly has proceeded fraudulently.  I will presume, then, for purposes of these rulings that each motion has been filed in good faith, though "good faith" by itself is not sufficient to entitle a movant to relief.  *Silivanch v Celebrity Cruises, Inc*., 333 F.3d at 366 ("rarely in the decided cases is the absence of good faith at issue"); *In re Motors Liquidation Co*.,

No. 09-50026 (MG), 2020 WL 4589667, at *14 (Bankr. S.D.N.Y. Aug. 11, 2020) ("the presence of good faith is almost never a determinative factor in the *Pioneer* analysis").

### D.    **Reasons for Delay/Reasonable Control of Movants.**

As explained above, claims that are based on diseases or conditions that were not diagnosed until after the bar date constitute "future" tort claims under the Plan and the Trust. The claims (and motions) to which "excusable neglect" and "due process" arguments are relevant are claims based on conditions or illnesses that were diagnosed before the bar date.

The motions before the Court all involve claims that were filed in late 2014 or thereafter. They all involve claims, then, that were filed more than five years after the bar date, and some as long as eight years after the bar date.  Given the long delays, the prejudice to other claimants, and the effects that the allowance of late claims would have on the process, movants bear a particularly strong burden of showing reasons for their delays.  The Court has reviewed each motion individually to determine if, after all factors have been considered, the movant has demonstrated that relief based on excusable neglect should be granted.  The Court's rulings on each individual motion are set forth in summary form in the Tables that are submitted with this Decision, but the following paragraphs provide a more detailed explanation of the Court's rulings as to many of the excuses that have been offered.

### 1.    **Lack of Knowledge/Failures to Investigate**.  Nearly all of the movants contend

that they did not actually know of the bar date or of the Tronox bankruptcy process.  Most of them also allege that they did not know that their diseases or conditions had been caused by exposure to Tronox products.  However, all of the underlying diagnoses that are relevant to the "excusable neglect" motions predated the Bar Date, often by many years.  Furthermore, more than six years passed after the Bar Date before the late claims were filed.  But not a single one of

the pending motions has identified any efforts that the movant made (either before or after the Bar Date) to investigate the causes of the movant's illnesses or conditions, or to pursue the movant's potential legal rights.

Before the *Pioneer* decision, many courts had held that "excusable neglect" could not be demonstrated where a party's delay was attributable to its own lack of diligence in investigating and pursuing the party's rights. *See, e.g., In re Davis*, 936 F.2d 771, 774 (4th Cir. 1991) (holding that "excusable neglect" required proof of circumstances beyond the party's control and that a delay due to lack of diligence was not sufficient). The Supreme Court discarded such absolute rules in *Pioneer* and required courts to conduct a more general consideration of the equities before ruling whether "excusable neglect" has been established. Nevertheless, the Supreme Court confirmed that the reason for a claimant's delay, and whether that delay was in the reasonable control of the movant, continues to be a relevant factor, and the Court of Appeals for this Circuit has identified this as the factor that is usually the most important consideration in evaluating a request for relief. *Enron*, 419 F.3d at 123; *Pioneer*, 507 U.S. at 396.

Courts generally have held that a mere lack of actual knowledge is not sufficient to show that a delay was reasonable or that the delay was not within the movant's control. *PacifiCorp v. W. R. Grace & Co.,* No. 05-764, 2006 U.S. Dist. LEXIS 57470 at *49 (D. Del. Aug. 16, 2006) (confirming that ignorance of a claim does not by itself suffice to show excusable neglect); *Jones v. Chemetron Corp.*, 212 F.3d at 205 (same); *In re Motors Liquidation Co.,* 598 B.R. 744, 757 (Bankr. S.D.N.Y. 2019) (same); *In re New Century TRS Holdings, Inc.*, No. 07-10416, 2014 Bankr. LEXIS 827 at *27-28 (Bankr. D. Del. Mar. 4, 2014) (same); *In re Best Prods. Co., Inc.*, 140 B.R. at 359 ("even ignorance of one's own claims does not constitute excusable neglect"). In particular, whether movants' lack of "actual knowledge" of their injuries or their legal options

was within the movants' own control depends on the amount of information that was readily available to persons who chose to investigate such matters.

In *Jones v. Chemetron Corp.*, 212 F.3d 199, for example, the Court of Appeals for the Third Circuit considered "excusable neglect" arguments made by claimants who alleged that they incurred injuries from exposure to radioactive and other toxic substances that Chemetron had deposited at a waste site. The claims were filed four years after the bar date and two years after the confirmation of the plan of reorganization. The claimants argued that they "had no way of knowing that they had a claim against Chemetron prior to the 1988 bar date" and therefore that the delay in the filing of their claims "was beyond their control." *Id.* at 205. The Court of Appeals rejected these contentions:

> We conclude that the determinations of the bankruptcy court that contamination generally was known in the community in the early 1980's, and that some residents publicly expressed concern about the health effects of these toxins in press accounts and at public meetings, are supported by the record. Moreover . . . the record supports the court's observation that the plaintiffs introduced no evidence to show what measures they took to specifically investigate the cause of their medical problems. . . .
>
> Accordingly, the bankruptcy court committed no abuse of its discretion in holding that the plaintiffs have failed to sustain their burden of proving excusable neglect. The prejudice to the "fresh start" to which Chemetron was entitled as a result of the Chapter 11 reorganization, the delay of four years after the bar date and two years after the confirmation date before the plaintiffs brought their claim, and their failure to specifically investigate the cause of their illnesses, even though the danger from the Bert Avenue dump generally was known in the community, combine to defeat their request that they be permitted to file late claims.

*Id.*

Similarly, in *In re Peabody Energy Corporation*, 579 B.R. 208, 218 (Bankr. E.D. Mo. 2017), the court rejected "excusable neglect" claims by persons who claimed they had been injured by substances released by non-debtor companies and who further claimed that they did not know that the Debtors had indemnification obligations that covered their claims. The court

noted that the claimants "knew or certainly could have found out through investigation" that certain non-debtor companies were responsible for the relevant contamination and then could have "further pursued their claims by conducting additional investigations to see the relationship between Peabody Energy Corporation and Gold Fields, which is a matter of public record." *Id.* at 219-20.

The court in *Peabody* went pretty far in holding claimants responsible for their own failures to make inquiries, given the fact that the debtor in that case was not the party who had caused the underlying contamination. In the Tronox case, however (as in *Chemetron*), there was a wealth of publicly available information about creosote contaminations, the injuries that were caused by creosote exposures, and the legal options available to injured persons.

Submitted as Exhibit A to this Decision is a summary of some of the publicly available information about creosote exposures, lawsuits and governmental actions in Columbus, Mississippi, and the Court takes judicial notice of the existence of these reports and litigations. Well more than 10,000 litigation claims were filed by Columbus-area residents and the progress of those claims was regularly reported in the local newspaper. A prominent local church sued Kerr-McGee because of creosote exposures. The federal government also investigated the Columbus site and issued bulletins and notices advising residents of the potential effects of creosote exposure. Public meetings were conducted to explain such matters as well. Many local attorneys were actively involved in creosote-related litigation, and thousands of local residents participated in such litigations and received settlement payments. In short, the risks of creosote exposures, Kerr-McGee's and Tronox's roles in such exposures, and the available litigation options plainly were widely known. The affidavits of service on file with the Court also show

that the local attorneys who had filed creosote-based lawsuits, and the claimants in pending

creosote claims, were notified directly of the bankruptcy process and of the bar date.

Some movants from the Columbus area have alleged that groups within the city somehow

conspired to keep information to themselves and not to share it with others. This contention is

impossible to reconcile with the widespread public reporting that occurred and the widespread

participation of the Columbus populace in prior litigations. I will accept the representations by

individual movants that they personally were not actually aware of this activity. However, it is

plain that even the smallest inquiry into the potential causes of their injuries or conditions

certainly would have alerted them to the potential connection between their conditions and

creosote exposures, and that even modest inquiries about legal remedies would have disclosed

the many claims that had been made against Kerr-McGee and Tronox as well as the bankruptcy

filing and the bankruptcy process.

Attached as Exhibits B and C are similar summaries of publicly available information

regarding creosote exposures and controversies in Hattiesburg, Mississippi and Avoca,

Pennsylvania, which are other jurisdictions from which large numbers of motions have been

received. As in the case of Columbus, Mississippi, the local press for Hattiesburg and Avoca

reported widely on the risks of creosote exposures, and very large numbers of local residents

participated in lawsuits that themselves were widely reported. Again, I accept movants'

statements that they did not actually know of these matters. However, any inquiry or

investigation at all into the possible causes of a movants' injuries and medical conditions, and

possible remedies therefor, would have identified the risks of creosote exposures, the many

litigation claims that had already been filed against Kerry McGee and Tronox, and the existence

of the bankruptcy case and the bankruptcy claims process.

In this case, movants may have elected not to investigate the possible causes of their injuries, or may have elected not to investigate potential legal claims they might have, but those were decisions that were within movants' control.  A movant's lack of actual knowledge of the bar date, or of the causes of the movant's injuries, or of the movant's potential claims, is a relevant factor, but it is not enough, by itself, to show that a movant's delays were beyond the movant's reasonable control.  *See Chemetron,* 212 F.2d at 205; *Peabody Energy*, 579 at 219-220; *see also In re Gordian Med., Inc.*, 499 B.R. 793, 798 (Bankr. C.D. Cal. 2013) (IRS sought permission to file late claim, alleging it did not know that the debtor was a successor in interest to another company, finding that the delay "was in the reasonable control" of the IRS because with reasonable diligence it could have easily discovered the link between the two companies); *US Airways*, No. 04-13819, 2005 WL 3676186 at *8 (Bankr. E.D. Va. Nov. 21, 2005) ("the court is unable to find that failure to keep up with the news is a reasonable excuse for the lengthy delay in seeking to file a claim in this case.")  I sympathize with movants who were surprised to learn that the bankruptcy claims process had produced such large recoveries.  However, given the widespread availability of information, and the prejudice to other claimants and the long delays and costs that late-filed claims will pose, something more than a mere actual lack of knowledge is required to justify relief on grounds of excusable neglect.  I conclude that under the governing case law and the circumstances of this case, given the very long delays and the prejudice to other claimants that would result from the allowance of large numbers of late-filed claims, that movants should be required to demonstrate not merely that they lacked an actual awareness of the process but also that it was not reasonably within their control to identify and to pursue their claims.  In all but a very few cases the movants have failed to do so.

2.    **Failure to Act Promptly after Discovery.**    A party who misses a deadline, and

who wishes relief based on equitable considerations, must act promptly to take the action that

should have been taken earlier.    *See, e.g., In re AMR Corp.*, 492 B.R. 660, 667 (Bankr. S.D.N.Y.

2013), (holding that a three-month delay was an unreasonable delay in applying the *Pioneer*

factors); *Board v. AMF Bowling Worldwide, Inc. (In re AMF Bowling Worldwide, Inc.)*, 520

B.R. 185, 196–97 (Bankr. E.D. Va. 2014), *aff'd*, 533 B.R. 144 (E.D. Va 2015) (unknown creditor

receiving notice of the administrative claim bar date by publication failed to demonstrate

excusable neglect where creditor waited more than a year before commencing lawsuit against

debtor in state court alleging post-petition personal injury claim, and only filed a motion for

enlargement in bankruptcy case at state court judge's direction, six months after she received

actual notice of the bankruptcy); *Toscano v. RSH Liquidating Trust (In re RS Legacy Corp.)*, 577

B.R. 134, 142 (Bankr. D. Del. 2017) (refusing to find excusable neglect where creditor with

actual notice of the bar date first learned about her potential claim after the bar date but waited an

additional eleven months before asserting a claim); *Seven Oaks Partners, LP v. Licata (In re*

*Seven Oaks Partners, LP)*, 749 Fed. Appx. 67, 69 (2d Cir. 2019) (summary order) (once creditor

had knowledge of bankruptcy and of allegedly incorrect listing it was creditor's obligation to file

a claim); *In re Majestic Holdco, LLC*, No. 09-14142 (KG), 2013 Bankr. LEXIS 657, at *1

(Bankr. D. Del. Feb. 21, 2013) (five-month delay after learned of error barred relief); *State Dep't*

*of Envtl. Prot. v. W.R. Grace & Co. (In re W.R. Grace & Co.)*, No. 01-1139 (JKF), 2008 WL

687357, at *4 (D. Del. Mar. 11, 2008) (4-year delay).

The pending motions for the most part explain only the reasons why a movant did not file

a proof of claim before the Bar Date in 2009.  As noted above, with very few exceptions the

motions fail to identify any effort by the movants to investigate or to pursue claims based on

injuries once they became known.  As explained in the attached summary of reasons for the

disposition of each separate motion, many of the motions identify particular dates or times at

which the movants learned of the prior Bar Date, only to confirm that the movants then failed to

act with sufficient promptness in then making a claim and seeking relief from the Bar Date.

> 3.      **Movants who Participated in Prior Proceedings**.  A large number of movants

have contended that they were unaware that they had claims against Tronox and unaware that

creosote was connected to their illnesses or conditions, while at the same time acknowledging

that they had previously filed their own litigation claims against Tronox based on injuries caused

by creosote exposures or that they had been members of class actions in which such claims were

made.  Any movant who was a litigant or a class member had good reason to know both of the

connections between creosote exposures and various injuries and of the possible liabilities of

Tronox, and has a particularly high burden of explaining why the movant took no action to

pursue claims before the Bar Date.  As indicated in the rulings set forth in Tables A and B, most

if not all of those movants have failed to do so.

> 4.      **Mistakes as to Legal Rights**.  Some movants have contended (without

elaboration) that they did not understand the terms of bar date notices and did not know that the

notices applied to their claims.  Courts have consistently held, however, that such mistakes of

law do not constitute "excusable neglect."  *See, e.g., In re Manhattan Jeep Chrysler Dodge, Inc.*,

599 B.R. 247, 253 (Bankr. S.D.N.Y. 2019) (mistaken legal judgment as to whether bar date order

applied was not "excusable neglect"); *In re Motors Liquidation Co.*, 576 B.R. 761, 778-79

(Bankr. S.D.N.Y. 2017) (holding that a claimant who did not file a claim because he believed his

claim had not accrued made a mistake of law that did not constitute excusable neglect); *Canfield

v. Van Atta Buick/GMC Truck Inc.*, 127 F.3d 248, 250 (2d Cir. 1997) (holding that, as a general

matter, a mistake of law does not constitute excusable neglect.)  In addition, the movants who

have raised this issue have failed to explain why they were confused by the bar date notices or

how they could have interpreted the bar date notices as not covering their claims.  Finally, the

movants who have contended that they made such mistakes have not shown that their mistakes

should be excused given the long delays in pursuing the movants' claims and the prejudice that

late-filed claims will have on other claimants and on the claims process in general.

     5.    **Mistakes by Counsel**.  A very large number of movants have claimed that

attorneys lost their claim files or failed to take proper actions to protect the movants' interests.

However, in *Pioneer* the Supreme Court rejected the contention that a party should not be held

responsible for the excusable neglect of its counsel.  *Pioneer*, 507 U.S. at 397.   Parties generally

are responsible for the actions of their attorneys, even when the attorneys act negligently.  *See*

*United States v. Malachowski*, 623 Fed. Appx. 555, 557 (2d Cir. 2015) (summary order) (late

filing not excused by mistakes that counsel made); *Latshaw v. Trainer Wortham & Co., Inc.*, 452

F.3d 1097, 1101 (9th Cir. 2006) ("[P]arties should be bound by and accountable for the deliberate

actions of themselves and their chosen counsel. This includes not only an innocent, albeit

careless or negligent, attorney mistake, but also intentional attorney misconduct."); *U.S.*

*Commodity Futures Trading Comm'n v. eFloorTrade, LLC*, No. 16 Civ. 7544 (PGG), 2020 WL

2216660, at *4 n.5 (S.D.N.Y. 2020) (rejecting argument that stipulation entered into as a result

of poor legal advice should be set aside); *Mason Tenders Dist. Council Welfare Fund v. LJC*

*Dismantling Corp.*, 400 F. Supp. 3d 7, 16 (S.D.N.Y. 2019) ("Litigants are generally bound by the

professional conduct of the attorneys they choose to represent them, although the conduct of

counsel may give rise to a claim for malpractice by the client.") (internal citations omitted);

*Brooks v. Kmart Corp. (In re Kmart Corp.)*, 315 B.R. 718, 723 (N.D. Ill. 2004) (where "the

66

responsibility for delay is that of claimant's counsel, that responsibility must be attributed to the claimant . . .").  As the Supreme Court held in *Link v. Wabash R. Co.*, 82 S.Ct. 1386, 1390, 370 U.S. 626, 633–34 & n.10 (1962):

> Petitioner voluntarily chose this attorney as his representative in the action, and he cannot now avoid the consequences of the acts or omissions of this freely selected agent.  Any other notion would be wholly inconsistent with our system of representative litigation, in which each party is deemed bound by the acts of his lawyer-agent and is considered to have 'notice of all facts, notice of which can be charged upon the attorney.' . . . [I]f an attorney's conduct falls substantially below what is reasonable under the circumstances, the client's remedy is against the attorney in a suit for malpractice.  But keeping this suit alive merely because plaintiff should not be penalized for the omissions of his own attorney would be visiting the sins of plaintiff's lawyer upon the defendant.

Accordingly, errors by counsel do not constitute grounds for "excusable neglect" relief unless counsel's own failings should be excused.  *See Pioneer*, 507 U.S. at 397 (holding that clients are bound by counsel's mistakes and permitting relief only if counsel can show that counsel's own mistakes were based on excusable neglect).  Relief based on errors by counsel is particularly inappropriate where counsel has made a mistake in reviewing a bar date notice or in otherwise complying with a procedural requirement.  *Id.* 392 ("inadvertence, ignorance of the rules, or mistakes construing the rules do not usually constitute 'excusable neglect'"); *Silivanch v. Celebrity Cruises, Inc.*, 333 F.3d at 36 (holding that "the equities will rarely if ever" favor a party who fails to follow a clear court rule and that a party seeking relief on grounds of excusable neglect in such a case ordinarily should lose under the *Pioneer* standard).

The movants who have pointed fingers at their attorneys have not offered any explanations or excuses for their attorneys' mistakes.  The motions do not seek to excuse the attorneys' mistakes, but instead just ask the Court to relieve the clients from the effects of those mistakes.  Those are not proper requests for relief based on "excusable neglect."

A large number of motions have also contended that the movants retained William Bambach as counsel and that Mr. Bambach passed away without filing their claims. However, public records show that Mr. Bambach died in 2013. His death in 2013 does not explain a failure to file a claim before the Bar Date in 2009.

6.    **Bad Decisions that were Consciously Made.**  Some movants have acknowledged that they were aware of the Bar Date but that they did not expect the bankruptcy case would lead to significant recoveries, and so they decided to wait to see if a better opportunity to make claims might present itself. The honesty of these movants is commendable, but their explanations do not warrant relief based on excusable neglect. *See In re Mother Hubbard, Inc.*, 152 B.R. 189, 193-94 (Bankr. W.D. Mich. 1993) ("Although [the creditor] may have made a bad decision in failing to timely file his claim, making such a conscious decision is not 'excusable.' Indeed [the creditor's] decision is not 'neglect' -- it was a voluntary omission within his sole control.").

7.    **Allegedly Short Notices and Busy Schedules.**  Many movants have argued that there was too little time between the date when notices were published and the Bar Date itself. Other movants have argued (without elaboration) that they were otherwise busy or distracted by other personal circumstances in August 2009 and should be excused from the consequences of their failures to file claims. As a general rule, "excusable neglect" requires something more than a simple failure to meet the deadline due to a busy schedule." *United States v. Dumas*, 94 F.3d 286, 289 (7th Cir. 1996), *cert. denied*, 117 S. Ct. 1109 (1997); *Milligan v. Tupperware Worldwide*, 159 F.3d 1347 at *2 (2d Cir. Mar. 13, 1998) (summary order). More importantly, however, all of the claims that are the subject of the pending motions were filed in 2015 or later – at least six years after the Bar Date. Even if personal circumstances, or the length of time

between the publication notice and the original bar date, might have explained a failure to file by August 2009, those excuses do not explain or justify the long delays after the bar date before claims were filed.

8.    **Complaints about Notices to Counsel of Record.**  Some movants have complained that notices were sent to counsel of record.  However, that practice was followed only where Tronox did not have the addresses of the individual litigants.  Sending notices to counsel in such situations is the only practical alternative and is sufficient.  *See Robbins v. Amoco Prod. Co.*, 952 F.2d 901, 908 (5th Cir. 1992); *In re Northwest Airlines Corp.*, No. 05-17930 (ALG), 2007 WL 2815917 at *4 (Bankr. S.D.N.Y. 2007); *In re Solutia, Inc.*, Case No. 03-17949, Order Setting a Final Date to File Proof of Claim and Related Notice Procedures, dated Sept. 30, 2004 (ECF No. 1475, at 6 ¶ 10) (authorizing notice by mail to counsel of record for litigation claimants where personal information not available).

9.    **Alleged Failures to receive mailed notices.**  Mail properly addressed, stamped and deposited in the mail system is presumed to have been received by the party to whom it has been addressed.  *Hagner v. United States*, 285 U.S. 427, 430 (1932) ("The rule is well settled that proof that a letter properly directed was placed in a post office creates a presumption that it reached its destination in usual time and was actually received by the person to whom it was addressed.")  No movant has offered evidence sufficient to overcome this presumption.

10.    **Complaints about Instructions Regarding Future Tort Claims.**  Many movants have complained that they allegedly were misled, or confused, when they filed future tort claims many years after the Bar Date.  However, movants' complaints about their later communications with the Trust do not explain the movants' failures to file timely claims in 2009.

11.    **Complaints that Additional Claims Were Not Solicited after the Anadarko**

**Settlement.**  As noted above, many movants appear to be under the mistaken belief that the

settlement of the Anadarko Litigation was a settlement of a class action in which they were class

members, and as to which they should have been given the chance to submit class action claim

forms in 2015.  However, the Anadarko Litigation was not a class action, and the tort claimants'

own claims were not at issue and were not resolved in the Anadarko Litigation.  Instead, the

Anadarko Litigation involved claims that were owned by the Tronox debtors under the

Bankruptcy Code.  The proceeds of the Anadarko Litigation were used (in part) to fund

payments to tort claimants who were creditors in the bankruptcy case, but the deadline for the

filing of claims in the bankruptcy case was in 2009, not in 2015.

VII.    **Special Situations**.

A number of motions raised issues that require consideration of additional statutes and

rules in considering whether relief from the bar date should be granted.

A.    **Infants and Incompetent Persons.**

A number of motions have argued that claimants are entitled to relief from the bar date on

the ground that the claimants were minors or were incompetent at the time of the bar date.  These

allegations potentially raise issues not only under Rule 9006 but also under Rule 3002(c)(2) of

the Federal Rules of Bankruptcy Procedure, which is incorporated into Rule 3003(c)(3).  Rule

3002(c)(2) states that "[i]n the interest of justice and if it will not unduly delay the administration

of the case, the court may extend the time for filing a proof of claim by an infant or incompetent

person or the representative of either."  Fed. R. Bankr. P. 3002(c)(2).

None of the motions identified Rule 3002(c)(2) as a ground for relief.  However, neither

the Court nor the Trustee identified Rule 3002(c)(2) as a possible ground for relief when the

Trustee sought instructions in 2016.  The failure to refer to Rule 3002(c)(2) in 2016 was an

oversight rather than an intentional omission, and the Court has the power to invoke Rule

3002(c)(2) on its own initiative.  *See* 9 COLLIER ON BANKRUPTCY ¶ 3002.03[3] (16th 2020).

Most movants in this case have acted without counsel, and if a movant has identified infancy or

incompetence as a ground for relief from the bar date, it is appropriate and fair for the Court to

apply all of the rules that are relevant to those circumstances in deciding whether the movants are

entitled to relief.  Accordingly, the Court will apply Rule 3002(c)(2), as well as Rule 9006, in

evaluating those motions that seek relief based on the movant's age or competency at the time of

the bar date.

Unfortunately, neither the Bankruptcy Code nor the Federal Rules of Bankruptcy

Procedure defines the terms "infant" or "incompetent."  In popular usage the word "infant"

usually refers to a young child or baby.  *See, e.g.,* Collins English Dictionary,

https://www.collinsdictionary.com/us/dictionary/english/infant (last visited November 9, 2020)

"[a]n infant is a baby or very young child").  In some legal contexts the word "infant" similarly

is limited to persons of very young age.  *See, e.g.,* 42 U.S.C. § 1786 (defining "infant" as a

person under one year of age for purposes of the Special Supplemental Nutrition Program).

Legal dictionaries, however, more commonly equate the term "infant" with the term "minor,"

meaning anyone who has not reached the age of adulthood (which usually ranges from 18 to 21

years old).  *See* Black's Law Dictionary (11th ed. 2019) (defining "infant" as a "person under the

age of twenty-one years," although by statute in some jurisdictions the age may be lower);

*Ballentine's Law Dictionary*, 3d ed. (noting that in "ordinary usage" an infant is "a child of

tender and helpless age," but that in law an infant is "a person who has not reached the age of

majority, usually 21 years, at which the law recognizes a general contractual capacity"); 42 Am.

71

Jur. 2d Infants § 1 (noting that in ordinary usage an infant is a "child of a tender and helpless

age" but that in law the word has "a technical meaning different" from its meaning in common

speech, and refers to a person "who has not arrived at majority as fixed by law . . .").

On its face, Rule 3002(c)(2) is meant to address claims by persons who do not legally

have the capacity to represent their own interests.  In this particular context, I believe it makes

most sense to interpret the word "infant' in Rule 3002(c)(2) as referring to a person who is a

"minor" under applicable law.

A "competent" person means someone who is legally qualified by age, mental and

physical capacity to perform a relevant act.  *See Ballentine's Law Dictionary*, 3d ed. (defining a

"competent" person as a "capable person; a personal legally qualified by age and mental

capacity.")  One of the few reported decisions that has addressed a claim of "incompetency"

under Rule 3002(c)(2) has held that courts should look to applicable state law to determine a

person's legal competency.  *See In re Toriello*, No. 08-18063 (DHS), 2010 WL 3943737 at *4

(Bankr. D. N.J. Oct. 5, 2010).  There are potential problems with this approach, however.  A

person's "competency" under state law may be highly relevant in assessing competency for

purposes of Rule 3002(c)(2), but people may be legally competent to perform some acts but not

others.  In the context of Rule 3002(c)(2), the issue ought to be whether or not, as a practical

matter, a person suffered from a mental or physical incapacity of a kind that prevented the person

from complying with a bar date.  That means generally that a movant who seeks relief on the

ground of incompetence should show the existence of a condition that rendered the movant

incapable of understanding the need to file a proof of claim form before the bar date, or (if the

person was capable of understanding that requirement) the existence of a condition that rendered

the movant incapable of making such a filing personally and also incapable of enlisting help from others for that purpose.

The movant, as the party seeking relief, bears the burden of proving that relief is warranted under Rule 3002(c)(2).  A movant's age is relatively easy to prove, though some movants who have alleged that they were minors have failed to provide such information.  "Incompetence" is more difficult to prove.  With few exceptions, the movants who have alleged "incompetence" have provided no supporting details and no verification of that status.

There also remains the question of what standard to apply in considering whether to grant relief under Rule 3002(c)(2) to those movants who have demonstrated that they were infants or incompetent at the time of the bar date.  Relief under Rule 3002(c)(2) "may" be granted and therefore is discretionary, not mandatory.  *Vicenty v. San Miguel Sandoval (In re San Miguel Sandoval)*, 327 B.R. 493, 506 (BAP 1st Cir. 2005).  The Rule provides that the Court "may" grant relief if doing so would serve the "interest of justice" and would not unduly delay the administration of the case.  Fed. R. Bankr. P. 3002(c)(2).  The Court has found no authorities, however, that have definitively identified the considerations that should govern a decision as to whether relief is warranted under these standards.  Indeed, there are surprisingly few reported decisions that discuss the application of the bar date to persons who are infants or incompetents.

In *In re Davis*, 243 B.R. 127, 130 (Bankr. M.D. Ala. 1999), the Bankruptcy Court for the Middle District of Alabama extended the time by which the Montgomery County Department of Human Resources could file a proof of claim for child support in a chapter 13 case as the representative of a minor child.  The court determined that the "interest of justice" warranted relief based on (1) Congress's emphasis on familial responsibilities throughout the Bankruptcy Code, (2) the Supreme Court decision in *Clark v. Jeter*, 486 U.S. 456(1988), in which the

Supreme Court held that statutes of limitations which restrict the rights of illegitimate children to

bring claims for financial support may be subject to heightened scrutiny under the equal

protection clause of the fourteenth amendment to the United States Constitution, and (3) the fact

that Rule 3002(c)(3) does not require a motion for relief to be filed prior to the expiration of the

bar date.  *Id.* at 129-130.

The court took a different approach in *In re Toriello*, No. 08-18064 (DHS), 2010 WL

3943737 (Bankr. D.N.J. 2010).  In *Toriello* the court considered a request for relief on behalf of a

married couple, one of whom had been incapacitated as a result of strokes and the other of whom

suffered from memory loss and was in the early stages of Alzheimer's disease.  The couple's

daughter had assumed control of her parents' financial affairs and had actual knowledge of the

bankruptcy well in advance of the bar date.  Without making a finding that the creditors were

incompetent, the court evaluated both the "interest of justice" and "undue delay" prongs as

factual matters and determined that neither was met.  As for the "interest of justice" prong, the

court considered the fact that the creditors' daughter knew about the bankruptcy well in advance

of the bar date but did not seek any legal counsel.  *Id.* at *7.  As for "undue delay," the court

considered the fact that the extension motion was brought after the confirmation of the debtors'

plan and that the debtors would have to propose a modified plan if the creditors' claim were to be

allowed.  *Id.* at *6.

At least one other court has considered requests for relief on grounds of infancy or

incompetence in the context of due process claims.  *See, e.g., Chicago, Rock Island & Pac. Ry.,*

788 F.2d 1280, 1283 (7th Cir. 1986).  In the *Rock Island* case the court considered a request for

relief from a bar date on behalf of a nine-year old boy who had lost his foot in a railroad

accident.  Notice of the bar date had been given to the boy's mother but no claim had been filed.

74

Years later (after the boy reached adulthood) the boy retained an attorney, who notified the

railroad of the claim but who filed no application to the court for permission to make a claim.

The railroad took the position that the claim was time-barred, and the injured party then took no

action until after the railroad emerged from bankruptcy, at which point he filed suit against the

reorganized entity. *Id.* at 1281. The court held that the application of the bar date did not violate

due process, that the reorganization court was not obligated to appoint a *guardian ad litem* for

the injured party, and that notice to the mother (and her opportunity to file a claim) was sufficient

for purposes of due process. *Id*. at 1282-4. The court also noted that the claimant had not acted

promptly and diligently in seeking relief from the application of the bar date, and so granting

such relief would be barred by laches. *Id.* at 1284.

   From the foregoing I draw the following conclusions.

   <u>First</u>, although the "interest of justice" standard is open-ended, many of the factors that

are considered by courts in deciding whether to grant relief on grounds of "excusable neglect"

under Rule 9006 are plainly also relevant in deciding whether relief is warranted under Rule

3002(c)(2). The determination of whether a claimant missed a deadline due to "excusable

neglect" requires consideration of: (1) the danger of prejudice; (2) the length of the delay and its

potential impact on proceedings; (3) the reason for the delay, including whether it was in the

reasonable control of the movant; and (4) whether the movant acted in good faith. *See Pioneer*,

507 U.S. at 396. The second "excusable neglect" factor (the potential impact on proceedings) is

similar to the express requirement in Rule 3002(c)(2) that the court consider whether permitting

a late claim would "unduly delay" the administration of the case. The first, third and fourth

factors all are relevant in deciding whether the "interest of justice" warrants relief in favor of a

particular claimant.

<u>Second</u>, relief from a bar date based on infancy or incompetence should not be automatic. As explained above, the bar date serves a critical function in a chapter 11 case.  Granting automatic relief would effectively nullify the bar date as to many creditors and would make it impossible to deal comprehensively with all claims, particularly in cases involving tort liabilities that likely will include creditors who are still minors.  State laws permit parents, guardians or other legal representatives to file claims or to take legal actions on behalf of minors or persons who are not competent, and the proper and efficient administration of bankruptcy cases require that such persons exercise those rights on behalf of minors and incompetent persons where they can do so.  Accordingly, while a claimant's infancy or incompetence may itself be the movant's own "reason for delay" in filing a claim, the determination of whether the "interest of justice" calls for relief requires consideration of whether the movant had parents or guardians (in the case of infants) or representatives (in the case of incompetent persons) who had the authority and responsibility to act for the movant and, if so, the reasons why those responsible persons did not take action.

In cases where movants have sought relief based on infancy or incompetence, therefore, we have first assessed whether the motion provides sufficient grounds for the proposed relief. There were a number of common problems in this regard:

- Many motions alleged the movants are entitled to relief as minors, while at the same time making clear (based on the movant's own contentions as to the dates of exposure) that the movant was 21 years or older at the time of the Bar Date.  Plainly those movants were not minors at the time of the Bar Date and are not entitled to relief on that ground.

- Many movants have filed claims on behalf of persons who died before the Bar Date and have argued that the deceased claimants were "incompetent" due to their deaths. The "incompetence" that is relevant for bar date purposes, however, is the competence or incompetence of the person who owned the claim at the time of the Bar Date.  If an injured person died, then the only question is whether the executor or personal representative who acquired that claim under state law was competent to assert it.

- A number of other movants have argued that they suffered from various infirmities but have failed to carry their burden of showing that they were "incompetent" to the extent that they were incapable of understanding the need to file a proof of claim form before the bar date, or (if the person was capable of understanding that requirement) that they were incapable of making such a filing.

We have noted that infancy or incompetence were mentioned as possible grounds for relief from the bar date in notices that the Trust previously sent, but that movants seeking relief on that ground were not directed to explain why their parents, guardians or representatives had not taken action on their behalf.  In situations where movants have sufficiently demonstrated that they were minors or that they were incompetent at the time of the Bar Date, therefore, we will provide the movants with the opportunity make additional submissions, within sixty days after the issuance of an Order reflecting the Court's rulings, showing why the movants' parents, guardians or legal representatives did not file claims on the movants' behalf, so that we may determine whether relief is warranted under Rule 3002 and/or Rule 9006.  The movants who may make such additional submissions are marked on the tables that is submitted with this Decision as Tables A and B.

B.   **Military Service**.

Section 3936(a) of title 50 of the United States Code (which formerly was codified at

section 526 of title 50) provides as follows:

> The period of a servicemember's military service may not be included in
> computing any period limited by law, regulation or order for the bringing of
> any action or proceeding in a court, or in any board, bureau, commission,
> department, or other agency of a State (or political subdivision of a State) or
> the United States by or against the servicemember or the servicemember's
> heirs, executors, administrators or assigns.

*See* 50 U.S.C. § 3936(a).  Some movants have cited to section 3936(a) and have argued that the

bar date cannot be applied to bar the claims of persons who were in active military service at the

time of the bar date. Other movants have not made reference to section 3936(a) but nevertheless

have noted that they were in military service at some points.

There is surprisingly little authority on the effect of section 3936(a) on bar dates in

bankruptcy cases.  One bankruptcy court held that section 3936 does not bar the application of a

bar date in bankruptcy, but that decision was reversed on appeal by the United States Court of

Appeals for the Fourth Circuit.  *See In re A.H. Robins Co.,* 129 B.R. 457, 461 n. 5 (Bankr. E.D.

Va. 1991), *rev'd on appeal*, 996 F.2d 716 (4th Cir. 1993).  The bankruptcy court in *Robins* ruled

that a bar date should not be treated as a "statute of limitation" because it prescribes a date

certain for the completion of an act.  The Court of Appeals found that reasoning to be deficient:

> We find the Trust's attempted distinction between a "period" of time and a
> "date certain" to be without substance.  In our opinion the bar date in this
> case represents the end point of a *period of time*, beginning the day the order
> establishing the bar date was entered, November 21, 1985, within which
> Dalkon Shield-related claims were to have been filed.  This period operates in
> precisely the same way as any other limitations period.  All such periods are
> bound by terminal dates, a fact that does not transform every period into a
> "date certain" to which the tolling provision of the Act would not apply.
> Thus we decide that the filing period fixed by the bar date is a "period . . .
> limited by any law, regulation or order" for purposes of section 525.

996 F.2d at 719. The Court expressed sympathy as to the possible problems that could arise in bankruptcy cases if bar dates could not be applied to all claimants, but held that the plain language of the statute required relief. *Id*. at 719-20.

    We have found some decisions in which courts have excused persons in military service from other kinds of deadlines set by bankruptcy court orders. *See, e.g., Detroit Harbor Terminals, Inc. v. Kuschinski*, 181 F.2d 541, 542-43 (6th Cir. 1950) (holding that military service required an extension of the deadline for an exchange of stock under a confirmed bankruptcy plan). However, we are not aware of any relevant authorities in this Circuit.

    In bankruptcy parlance a chapter 11 filing creates a "case," and within that case individual "proceedings" (either contested matters or adversary proceedings) may be resolved. As a purely technical matter there could be an issue as to whether the filing of a proof of claim constitutes "the bringing of any action or proceeding in a court . . ." A proof of claim is deemed to be allowed unless an objection is filed; it is the objection to a claim (not the claim itself) that gives rise to a "proceeding," which is either a contested matter (if only an objection is filed) or an adversary proceeding (if the objection is joined by a request for other relief). *See* 11 U.S.C. §§ 501, 502; Fed. R. Bankr. P. 3001, 3007, 7001, 9014. I suppose that on this basis a hyper-technical argument could be made that a deadline for the filing of a bankruptcy proof of claim is not a deadline for the "bringing of any action or proceeding . . ." However, such an argument would put far more weight on the technical definition of what constitutes a "proceeding" in bankruptcy than seems reasonable under the circumstances. We have found no indication that Congress intended to exempt bar dates from the application of section 3936(a), which is quite broad and mandatory in its application to "any" period limited by law, regulation or order. There may be good reasons why a bar date should be exempt from the application of section 3936(a),

but that is a decision for Congress to make. The filing of a proof of claim is a prerequisite to a

creditor's participation in a bankruptcy case and to the creditor's right to seek relief in the

bankruptcy case, and under those circumstances it would run afoul of the obvious intended

meaning of the statute if we were to interpret bar dates as being exempt from section 3936(a).

On the other hand, section 3936(a) by its terms provides only for a tolling of a relevant

time period, not for an outright exemption from a bar date. If (as the Court of Appeals held in

*Robins*) a bar date order effectively establishes a limitation period equal to the time between the

entry of the bar date order and the bar date itself, and if that time period is tolled by section

3936(a), then when the creditor's military service ends the time period would no longer be tolled

and the creditor still would need to file a claim within the amount of time that the court originally

allowed. In the Tronox case, the order setting the bar date was entered on May 28, 2009, and the

bar date was August 12, 2009. That means that the "time period" that was tolled under section

3936(a) was 76 days. Claimants who invoke the protections of section 3936(a) therefore must

still show that they filed proofs of claim within 76 days after their military service ended, or must

seek relief from that requirement on grounds of excusable neglect.

Some movants have referenced military service, but it is plain from the papers they

submitted that their military service ended prior to the entry of the bar date order, making section

3936(a) inapplicable. In other cases it is plain that a proof of claim was not filed within 76 days

after military service ended, so that the "tolling" set forth in section 3936(a) would not itself

justify the late filing, and so that the movant must show "excusable neglect" in order to obtain

relief. In many other cases the period of military service simply is not clear from the papers that

have been submitted; in those cases we have provided that the movants may make supplemental

submissions to verify the precise dates of their military service.

\*        \*        \*        \*

Our rulings as to individual motions, applying the foregoing standards, are set forth in the tables being filed with this Decision. The Court will hold a conference on March 19, 2021 at 10:00 a.m., at which time the Tort Claims Trust is directed to report to the Court as to the most efficient means of serving notice of the Court's decisions and of making this written decision available to movants. The Court will defer the entry of an Order (which otherwise would begin appeal periods) until after that conference.

Dated: New York, New York
      March 10, 2021

**s/  Michael E. Wiles**
Honorable Michael E. Wiles
United States Bankruptcy Judge

Exhibit A

**Summary of Public Information Regarding Columbus, Mississippi Plant**

1.          In 1996, approximately 951 plaintiffs filed suit against Kerr-McGee in the federal

district court for the Northern District of Mississippi, alleging injuries from creosote exposures.

*See Hanson, et al. v. Kerr-McGee Corp., et al.*, 96-CV-00076 (N.D. Miss. 1996).  The case

apparently was combined with a later action.  *See Barham, et al. v. Kerr-McGee Corp., et al.,* 99-

CV-00025 (N.D. Miss. 1999).  The two cases were settled in 1999, and the court approved

distributions of $5,242,909.69 to the settling plaintiffs.  *See Hanson,* 96-CV-00076, docket no.

707.  The number of participating plaintiffs is not clear.

2.          In September 1999 the *Associated Press* released articles about the progress of the

Mississippi actions and disputes over requests to test local sites.  *See* "Attorney wants to drill to

support lawsuit against Kerr-McGee," *The Associated Press State & Local Wire*, Sept. 21, 1999;

"School board won't allow digging on land," *The Associated Press State & Local Wire*, Sept. 23,

1999; "Attorney rejects conditions for tests near chemical plant," *The Associated Press State &

Local Wire*, Oct. 1, 1999.

3.          The United States Department of Environmental Protection (the "EPA") and the

Mississippi Department of Environmental Quality began an investigation of the Columbus site in

1999.  *See* "Contamination Found Near Plant," *The Sun Herald* (Biloxi, MS), Jan. 5, 2001, p.

A3.

4.          The Maranatha Faith Center in Columbus, Mississippi filed a $100 million

lawsuit against Kerr-McGee in 1999 or 2000, alleging that creosote contamination had damaged

its property.  *See* "Miss. Church sues, says creosote fouls property," *The Advocate* (Baton Rouge,

Louisiana) Feb. 23, 2000, p. 5-B; *see also* "Columbus church files $100 million property

contamination suit," *The Associated Press State & Local Wire*, Feb. 21, 2000.

5.      Another tort action was filed in the state court in 1999 and was removed to the

federal district court for the Northern District of Mississippi in 2000.  *See Andrews, et al. v.*

*Kerr-McGee Corp., et al.,* 00-CV-00158 (N.D. Miss 2000).  In addition, a class action complaint

was filed in the federal district court for the Northern District of Mississippi in 2001.  *See*

*Batchelder, et al. v. Kerr-McGee Corp., et al.*, 01-CV-00077 (N.D. Miss. 2001).

6.      Newspapers reported the filing of the *Batchelder* action and reported that the

attorneys had funded a research report that had analyzed the effects of creosote exposures in

Columbus.[1]  Newspaper reports quoted the attorneys for plaintiffs as stating that as many as

10,000 people could be members of the affected class.  *See* "Creosote plant hit with class-action

suit," *The Clarion-Leader (Jackson, MS)*, Mar. 8, 2001, p. 5B; "Lawsuit Says Pollution from

Plant Caused Serious Health Problems," *The Commercial Appeal*, Mar. 10, 2001.

7.      Stories about the 2001 class action appeared in national news sources as well.  *See*

"Kerr-McGee Sued in Mississippi Class Action for Creosote Syndrome," *PR Newswire*, Mar. 9,

2001; "Lawsuit claims health problems associated with Columbus plant," *The Associated Press*

*State & Local Wire*, Mar. 9, 2001; "Residents of Miss. Community Sue Kerr-McGee," *Dow*

*Jones Institutional News*, Mar. 9, 2001.  CNN issued a televised report about the Columbus class

action in March 2001.  *See* "Residents of Columbus, Mississippi File Lawsuit Against Kerr-

McGee," *CNN Transcripts*, Mar. 13, 2001.  It televised a follow-up report on creosote problems

generally on April 2, 2001.  *See* "Newsroom for April 2, 2001," *CNN Transcripts*, Apr. 2, 2001.

---

[1]     The report was also published.  *See* Dahlgren, Warshaw, Horsak, Parker & Takhar,
"Exposure assessment of residents living near a wood treatment plant," 92 *Environmental*
*Research* (2003) 99-1009.

8.      By 2002 seven separate actions were pending against Kerr-McGee on behalf of Columbus residents, in addition to the class action that had been resolved in 1999.  Two of the cases (*Andrews* and *Bachelder*) were pending in the federal district court for the Northern District of Mississippi; three other cases were pending in the Circuit Court for Lowndes County; and two cases were pending in the Circuit Court of Hinds County.  *See* Kerr-McGee Corp., *SEC Form 10-K for Year Ended December 31, 2002*, filed March 27, 2003.[2]

9.      In May 2002, the Associated Press reported nationally that settlement talks were underway in the Mississippi cases.  *See* "Settlement talks continue in Kerr-McGee case in Mississippi," *The Associated Press State & Local Wire*, May 29, 2002.

10.     In 2002 a $50 million settlement was reached that potentially covered 6,000 north Mississippi plaintiffs.  News reports stated that the settlement "includes most pending lawsuits against the company in state and federal courts in Mississippi," but did not include the lawsuit filed by the Maranatha Faith Center.  *See* "Kerr-McGee suit settled for $50M," *The Clarion-Leader* (Jackson, MS), June 21, 2002, p. 1B.  News of the settlement was reported nationally by the Associated Press.  *See* "Settlement offered by Kerr-McGee tops $50 million in Columbus," *The Associated Press State & Local Wire*, May 31, 2002.

11.     Also in 2002, the Agency for Toxic Substances and Disease Registry (the "**ATSDR**"), part of the U.S. Department of Health and Human Services, decided to prepare a public health assessment to evaluate environmental hazards at the Kerr-McGee site in Columbus. *See* https://www.atsdr.cdc.gov/sites/kerrmcgee/background.html; *see also* "Second federal

---

[2]      Available at https://www.sec.gov/Archives/edgar/data/1141185/000114118503000033/form10k2002.txt, at Item 8 Financial Statements and Supplementary Data, Note 16 to Financial Statements [Contingencies, Forest Products Litigation].

agency eyeing pollution cleanup at Columbus plant," *The Associated Press State & Local Wire*,

Nov. 20, 2002; "Columbus Wood-Treatment Plant Investigation Expands," *The Commercial*

*Appeal*, Nov. 21, 2002, p. DS4.

12.    Between 2002 and 2005 approximately 250 additional lawsuits (filed on behalf of

approximately 5,100 claimants) were filed in the federal district court for the Northern District of

Mississippi. *See Kerr-McGee Corp., SEC Form 10-K for Year Ended December 31, 2005*, filed

on March, 16, 2006.[3]  A filing in the Tronox bankruptcy case by the Columbus, Mississippi

Creosote Plaintiffs Ad Hoc Committee stated that 2,690 persons (or their estates) were plaintiffs

in those pending cases at the time of the 2009 bankruptcy filing. *See* Dkt. No. 605.  An unknown

number of these plaintiffs may have been individuals who elected not to participate in the

settlements that were offered in 2002.

13.    In November 2006 the Agency for Toxic Substances and Disease Registry (the

"ATSDR") published a "fact sheet" that described the effects of creosote exposure and that

recommended certain steps to be taken by people in the Columbus area.  The Court could not

locate a copy of the original fact sheet that was issued in 2006 but an updated version can still be

found at the ATSDR website.[4]

14.    In June 2007 the ATDSR hosted a "health education workshop" in Columbus.

Two presentations were made at the workshop.  One was entitled "Creosote Health Effects and

---

[3]    Available at
https://www.sec.gov/Archives/edgar/data/1141185/000114118506000039/annualreport2005.
htm, at Item 8 Financial Statements and Supplementary Data, Note 16 to Consolidated
Financial Statements [Contingencies, Contingencies of Tronox, Litigation and Claims,
Forest Products Litigation].

[4]    https://www.atsdr.cdc.gov/sites/kerrmcgee/docs/Kerr%20McGee%20Fact%20Sheet%20-
%20Creosote%20Health%20Effects.pdf.

How to Prevent Exposure," and the other was entitled "Drinking Water Quality in Your Community." *See* ATSDR, Public Health Assessment for Kerr-McGee Chemical Corporation (a/k/a Tronox) Columbus, Lowndes County, Mississippi, September 22, 2008 at 37.[5]

15.    On September 22, 2008 the ATDSR released two public health assessments with respect to the Columbus site.  The assessment of hazardous substances in soil, sediment and surface water concluded "that the Kerr-McGee site is a past public health hazard and an indeterminate present public health hazard."  *Id.* at 36.  The ATSDR encouraged local residents to read the reports at the Columbus Public Library and to comment upon them.  The ATSDR also scheduled media availability seminars in Columbus, to be held at the Trotter Convention Center. *See* "ATSDR Seeks Public Comments on Public Health Assessments for the Tronox (Formerly Kerr-McGee) Chemical Corporation Site," September 22, 2008.[6]

16.    In October 2008, the *Commercial Dispatch* (the local Columbus newspaper) published an article about the September 2008 findings by the ATDSR and noted that lawsuits based on creosote exposure had been filed throughout the country and had been settled for hundreds of millions of dollars.  *See* "Community members still concerned about contamination," *The Commercial Dispatch* Oct. 15, 2008.

17.    The ATSDR also published "fact sheets" that were specific to the Columbus site. The fact sheets were posted on the ATSDR web-site and may have been distributed by other means as well).  The fact sheets described the dangers of creosote exposure, the status of

---

[5]    This report is available at:
https://www.atsdr.cdc.gov/hac/pha/kerrmcgeesite/kerr_mcgee_soil_surface_water_sediment%20PHA%20Pub%20Com%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.pdf.

[6]    This release is available at https://www.atsdr.cdc.gov/news/displaynews.asp?PRid=2415.

investigative efforts, and a number of facts specific to the Columbus facility. It appears that fact sheets were published as early as 2006 but the versions available on the internet have been updated, so the precise history is not clear.[7]

18.    In October 2008, the local newspaper reported that Rep. John Mayo, chairman of the House of Representatives' Conservation and Water Resource Committee, addressed local residents and assured them he would try to help to resolve their complaints of contamination from the Kerr-McGee site. *See* "Community members still concerned about contamination," *The Commercial Dispatch*, Oct. 15, 2008.

19.    The Tronox bankruptcy filing was reported in the local newspaper on January 13, 2009. *See* "Tronox Bankruptcy won't affect Hamilton facility," *The Commercial Dispatch*, Jan. 13, 2009.

20.    On June 23, 2009, notice of the Tronox bar date was published in *The Commercial Dispatch*. *See* Affidavit of Publication of Notice of Bar Date [ECF No. 1465], Exhibit N.

21.    The local newspaper reported in July 2009 that additional testing for creosote was being done by officials from the Environmental Protection Agency. *See* "EPA testing soil at

---

**7**   Updated versions of four separate fact sheets may be found at the following addresses:
- https://www.atsdr.cdc.gov/sites/kerrmcgee/docs/Kerr%20McGee%20Air%20Exposure%20Fact%20Sheet.pdf
- https://www.atsdr.cdc.gov/sites/kerrmcgee/docs/Kerr%20McGee%20Fish%20Exposure%20Investigation%20Fact%20Sheet.pdf
- https://www.atsdr.cdc.gov/sites/kerrmcgee/docs/Kerr%20McGee%20Site%20-%20Drinking%20Water%20Exposure%20Fact%20Sheet.pdf
- https://www.atsdr.cdc.gov/sites/kerrmcgee/docs/Soil_and_Sediment_Exposure_factsheet.pdf

local church," *The Commercial Dispatch,* July 17, 2009.  The article noted that thousands of

creosote-related lawsuits remained pending.  *Id.*

22.    Another article in August 2009 referred to requests for more investigations of soil

contamination and referenced the reports that the ATSDR had issued in September 2008.  *See*

"Church pastor asks city to investigate soil contamination," *The Commercial Dispatch* Aug. 5,

2009.

23.    In October 2010, the local newspaper reported that the EPA was taking action to

add the Columbus site to the superfund list.  *See* "EPA to take over cleanup of old Columbus

Kerr-McGee site," *The Commercial Dispatch*, Oct. 8, 2010.  The article also reported that the

EPA would host a community meeting at the Lee Middle School and referred to the bankruptcy

of Tronox.  *Id.*

24.    Another October 2010 article noted that the EPA had sent notices of a local

meeting to everyone who lived within one-half mile of the site, and that 160 people had attended.

*See* "Residents skeptical of plans to clean up old Kerr-McGee site," *The Commercial Dispatch*,

Oct. 15, 2010.  The article noted that creosote has been linked to cancer, skin irritation and

breathing problems.  *Id.*

25.    More than 100 residents from various places in Mississippi, including from

Columbus, appeared at a State Capitol hearing room in 2011 to air grievances over creosote

contamination.  *See* "Environmental Justice group exposes polluted chemical sites at Capitol

hearing," *Jackson Advocate*, Jan. 28, 2011.

26.    The EPA designated the Columbus site as a superfund site in 2011 and held

another community meeting in October 2011.  *See* "Kerr-McGee land designated Superfund site;

EPA to host community meeting tonight," *The Commercial Dispatch*, Oct. 27, 2011.

27.     An article in 2013 reported that a decade had passed since the Columbus plant had been closed but that local residents continued to believe that creosote effects threatened 3,500 people in the area.  *See* "Work continues on Kerr-McGee rehabilitation," *The Commercial Dispatch* Mar. 14, 2013.  It also noted that prior claims by residents had been settled for $50 million.  *Id.*

28.     In February 2014, The Commercial Dispatch reported that the bankruptcy court had ruled against Kerr-McGee in the pending fraudulent transfer litigation and that damages remained to be assessed.  *See* "14th Ave. drainage project moving forward," *The Commercial Dispatch*, Feb. 21, 2014.

29.     In April 2014, The Commercial Dispatch reported the settlement that had been reached in the fraudulent transfer action and reported that, among other things, $67 million would be allocated for environmental work at the Columbus site.  *See* "Columbus site gets $67M in Kerr-McGee settlement," *The Commercial Dispatch*, Apr. 4, 2014.

30.     A follow-up article on April 19, 2014 described the fraudulent transfer settlement and the terms of the Tort Claims Trust that had been established under the Tronox plan.  It reported that the Trust would receive $618 million to pay claims, and listed the telephone number and email address for the Trust.  *See* "Settlement brings new hope for Kerr-McGee cleanup," *The Commercial Dispatch*, Apr. 19, 2014.

31.     The Commercial Dispatch reported on May 29, 2014 that the fraudulent transfer settlement had been approved by the bankruptcy court over objections that had been posed, including objections that had been raised by two attorneys from Columbus.  *See* "Kerr-McGee settlement proceeds despite objections," *The Commercial Dispatch*, May 29, 2014.

32.    An article in November 2014 reported that the federal district court had upheld the bankruptcy court's approval of the settlement of the fraudulent transfer litigation, and that the settlement was final.  *See* "Anadarko suit finalized, $68M to Columbus site," *The Commercial Dispatch*, Nov. 12, 2014.

33.    Another November 2015 article reported on the progress of the cleanup and again listed the contact information for the Tort Claims Trust.  *See* "Columbus residents graduate with skills to cleanup community," *The Commercial Dispatch* Nov. 23, 2015.

**Exhibit B**

**Summary of Public Information Regarding Hattiesburg, Mississippi Plant**

1.      The Mississippi Department of Environmental Quality discovered creosote contamination in Hattiesburg in the early 1990s.  *See* "No private wells found near Gulf States site," *Hattiesburg American* Oct. 15, 2000, p. 1A.

2.      On September 9, 1993, the Hattiesburg Public School District filed suit against Kerr-McGee for damages caused by creosote contamination.  Several local business owners joined the suit in 1996.  *See* "Creosote lawsuit timeline," *Hattiesburg American*, June 24, 2007, p. 5A.

3.      In 2002, the local newspaper reported that an agreement had been reached under which Kerr-McGee would clean up creosote contamination near the former plant on West Pine Street.  *See* Untitled Article, *Hattiesburg American* July 16, 2002, p. 1A.

4.      A public hearing was held in 2002 to discuss the plans for cleanup at the Hattiesburg site, and the local newspaper published an article about it in advance of the hearing. *See* "16th section cleanup plan set," *Hattiesburg American* Oct. 20, 2002 p. 1A.

5.      In August 2002, additional local residents attempted to intervene as plaintiffs in the lawsuit that had been filed in 1993 by the local school district, but their request was denied. *See* "Creosote lawsuit timeline," *Hattiesburg American*, June 24, 2007, p. 5A.  Many of them then filed separate lawsuits, some of which were removed to the federal district court for the Southern District of Mississippi.  *Id.*

6.      In November 2002 the Mississippi Department of Environmental Quality held the first of two public meetings to discuss the Hattiesburg creosote site.  *See* "Residents kept in dark about creosote issues," *Hattiesburg American*, June 24, 2007, p. 1A.

7.      An article in the Hattiesburg American reported in 2003 that Kerr-McGee had made settlement offers to 1,500 plaintiffs in creosote-based litigation.  The article stated that Kerr-McGee had offered $400 to each claimant and that 700 of the estimated 1,500 plaintiffs had already accepted the proposals.  *See* "Residents protest $400 offer," *Hattiesburg American*, May 20, 2003, p. 2A.

8.      In October 2003 the local newspaper in Jackson, Mississippi reported on the progress of cleanup efforts in Hattiesburg and described the potential health effects of creosote exposures.  *See* "A toxic culprit," *The Clarion-Ledger*, Oct. 19, 2003, p. 1B.

9.      In January 2004, the local Hattiesburg newspaper reported that famous attorney Johnnie Cochran was scheduled to meet in mid-February with Hattiesburg residents who wished to pursue legal action based on creosote exposures.  *See* "Cochran coming to Hattiesburg," *Hattiesburg American*, Jan. 22, 2004, p. 1D.

10.     In September 2005 a federal judge ruled that 1,600 Hattiesburg residents needed to file individual suits to the extent they wished to seek compensation for property damages or personal injury due to creosote exposures.  The same judge also denied a motion to reopen a prior settlement of a damage action that had been filed in 1993 and settled in 2002.  *See* "Judge orders individual suits in pollution case," *Hattiesburg American*, Sept. 28, 2005, p. 1A.

11.     In December 2005 the local newspaper reported that approximately 600 residents had accepted settlement offers ranging from $500 to more than $10,000 to resolve creosote-based claims against Kerr-McGee.  *See* "Kerr-McGee suit settled with some residents," *Hattiesburg American*, Dec. 2, 2005, p. 1A.

12.     Another article in February 2006 reported that some residents continued to plan to sue Kerr-McGee and that a total of 2,000 claims had been settled at a total cost of more than $1.3 million.  *See* "Many wait on creosote settlement," *Hattiesburg American*, Feb. 13, 2006, p. 1A.

13.     A public meeting was held in March 2006 to discuss lawsuits that had been filed against Kerr-McGee and complaints by some local residents that they had not been included in the prior filings.  *See* "Officials discuss Kerr-McGee suit," *Hattiesburg American*, Mar. 24, 2006, p. 1C.

14.     A group of 20 Hattiesburg residents staged a protest at the local city hall to complain about the city's role in the lawsuits that had been filed against Tronox/Kerr-McGee relating to creosote exposures.  *See* "Hattiesburg residents call for city to take a stand," *Hattiesburg American*, Apr. 19, 2006, p. 9A.

15.     Another protest was staged in 2007 as the final cleanup work in Hattiesburg was being prepared.  *See* "Creosote project to resume despite officials' requests," *Hattiesburg American*, Apr. 21, 2007, p. 1A.

16.     In May 2007, local officials agreed to conduct more creosote testing in response to complaints from local residents who had outstanding claims against Kerr-McGee.  *See* "Officials OK more creosote testing," *Hattiesburg American*, May 15, 2007, p. 3A.

17.     The local newspaper reported in June 2007 that the city council would meet with the Mississippi Department of Environmental Quality to discuss the creosote cleanup by Tronox, and noted that residents of the neighborhood were concerned that they had not been adequately compensated for work done on their properties.  *See* "Council, MDEQ to discuss creosote," *Hattiesburg American*, June 8, 2007, p. 3A.

Exhibit B – page 3

18.     Another protest in June 2007 was held in Hattiesburg.  The local newspaper

explained that the school district and other plaintiffs had settled claims against Kerr-McGee in

2002 but that other parties who sought to intervene in the late stages of the case had been denied

the right to do so.  Some of those residents had settled their claims but others continued to

litigate.  *See* "Residents stage protest," *Hattiesburg American*, June 13, 2007, p. 3A.

19.     In June 2007 the local newspaper publicly disclosed that Tronox had paid $17

million in 2002 to settle the lawsuit filed by the Hattiesburg School District and several local

businesses.  *See* "Creosote lawsuit settled for $17," *Hattiesburg American*, June 23, 2007, p. 1A.

The article also reported that separate settlements had been reached with 2,000 residents.  *Id.*

20.     In August 2007 the local newspaper reported that city officials and local residents

were preparing to select an environmental firm to perform an analysis of cleanup work that

Tronox had done.  *See* "Officials set to decide on firm for study," *Hattiesburg American*, Aug.

22, 2007.

21.     In December 2007 the city council had a special meeting to hear complaints by

local residents who alleged racial injustice in connection with the dissemination of information

about cleanup efforts.  *See* "Special meeting addresses creosote," *Hattiesburg American*, Dec.

19, 2007.

22.     In May 2008 the local newspaper reported that the consultant who had been hired

to test groundwater samples had found only trace amounts of creosote and that there was no risk

to area residents, but that many residents disagreed.  *See* "Study: Chemical poses no danger,"

*Hattiesburg American*, May 20, 2008.  Two weeks later, local residents submitted a counter

report contending that the amounts of creosote that had been found posed a danger to residents.

*See* "Council received conflicting creosote report," *Hattiesburg American*, June 3, 2008.

Exhibit B – page 4

23.      Another protest was held in June 2008 to voice concerns about creosote exposures

and other issues.  *See* "Minority treatment protested," *Hattiesburg American*, June 7, 2008.

24.      In June 2008 the major of Hattiesburg wrote to the CEO of Tronox, complaining

that residents had not been fairly compensated.  *See* "Major seeks 'fair' compensation from

creosote company," *Hattiesburg American*, June 19, 2008.  Tronox responded with a letter

stating that it would not offer additional compensation to those who had settled their claims.  *See*

"Residents will get no creosote compensation," *Hattiesburg American*, July 19, 2008.

25.      An October 2008 editorial reported that Councilman Henry Naylor had held

meetings for constituents to address creosote contamination.  *See* "Naylor's actions make no

sense," *Hattiesburg American*, Oct. 6, 2008.

26.      The Tronox bankruptcy filing was reported in the local newspaper on January 13,

2009.  *See* "Tronox files for Chapter 11 bankruptcy," *Hattiesburg American*, Jan. 13, 2009.  The

article noted that Tronox was the owner of the former Kerr-McGee plan in Hattiesburg and that

the bankruptcy could affect efforts to clean up creosote contamination in Hattiesburg.  *Id*.  It

further reported that Tronox had been "at the center of a controversy" in south Hattiesburg over

creosote cleanup efforts.  *Id.*

27.      In June 2009, notices of the Tronox bar date were published in area newspapers.

*See* Affidavit of Publication of Notice of Bar Date [ECF No. 1465], Exs. T, U.

28.      In September 2009, the local newspaper reported concerns that substances found

in a monitoring well were creosote.  The article recited the history of local battles with Kerr-

McGee and Tronox over creosote exposures and cleanup.  *See* "Creosote believed found along

creek," *Hattiesburg American*, Sept. 3, 2009.

29.     More than 100 residents from various places in Mississippi, including Hattiesburg and Columbus, appeared at a State Capitol hearing room in 2011 to air grievances over creosote contamination.  *See* "Environmental Justice group exposes polluted chemical sites at Capitol hearing," *Jackson Advocate*, Jan. 28, 2011.

**Exhibit C**

**Summary of Public Information Regarding Avoca, Pennsylvania Plant**

1.      In February 2001, the Pennsylvania Department of Environmental Protection, at the urging of the mayor of Avoca, announced that it would investigate alleged contamination problems at the Avoca site.  *See* "Pennsylvania Eyes Closed Kerr-McGee Plant for Possible Contamination," *The Times Leader*, Feb. 5, 2001.

2.      In May 2001, four Pennsylvania residents filed class action lawsuits alleging damages from creosote and other substances released from the Avoca plant.  *See* "Pa. residents file contamination suite against Kerr-McGee," *The Associated Press State & Local Wire*, May 19, 2001.  The case was *Cavalari, et al. v. Kerr-McGee Chemical*, et al., Case No. 3:01-cv-00882, filed in the United States District Court for the Middle District of Pennsylvania.  For undisclosed reasons the docket shows that the action was dismissed in July 2001.

3.      In 2001, 29 people filed four lawsuits in state court alleging that they had been injured by contamination from the Avoca plant.  *See* "Suits filed against Avoca, Pa., Ex-Wood Treatment Plant," *The Times Leader*, Oct. 26, 2001.  The attorneys representing the plaintiffs stated that they had 500 additional clients who had been part of a federal class action that had been withdrawn.  *Id.*  The article also reported that some plaintiffs resided in Duryea and Dupont as well as in Avoca.  *Id.*

4.      The Associated Press wire service reported that the 2001 actions had been filed.  *See* "Pa. residents file contamination suit against Kerr-McGee," *The Associated Press State & Local Wire*, May 19, 2001.

5.      The 29 lawsuits that had been filed in 2001 apparently were settled in 2003 without a class certification.  A newspaper article reported on the range of recoveries that

Exhibit C – page 1

plaintiffs had received.  *See* "Kerr-McGee Settles Chemical-Exposure Cases in Wilkes-Barre,

Pa," *The Times Leader*, Nov. 6, 2003.  The article noted that the settlements ranged from $2,700

to $457,360, with most of the settlements at less than $20,000.  *Id.*

6.      In August 2004 a local newspaper reported that a new round of lawsuits was

being prepared and that a law firm, The Powell Law Group, had made fliers available at the

Dupont Borough Building.  *See* "Ex-Avoca Plant Feels Legal Heat; Kerr-McGee Wood

Treatment Site Might Face More Plaintiffs Seeking Damages," *Wilkes Barre Times Leader*, Aug.

14, 2004, p. 1C.  The law firm disclosed that approximately 71 persons had submitted

information about injuries they might have suffered.  *Id.*

7.      The Powell Law Group filed 24 lawsuits on behalf of more than 3,000 plaintiffs

in January 2005 in the Luzerne County Court of Common Pleas.  *See* "Illnesses the Focus of

Suits vs. Plant; Kerr-McGee Faces Legal Action Contamination from Ex-Avoca Facility Claimed

by Thousands," *Wilkes Barre Times Leader* Jan. 4, 2005, p. 1A.  The article noted that "[t]he

new wave of suits apparently stem from fliers the Powell Law Group distributed last year in

communities surrounding Avoca.  The fliers sought persons who 'lived by the Kerr-McGee plant

and/or have been harmed by the Kerr-McGee plant.'"  *Id.*

8.      At some point the Avoca plaintiffs and Kerr-McGee agreed that arbitrators would

assess damage claims by at least some of the plaintiffs.  In November 2008 the attorneys for the

Avoca plaintiffs argued that Kerr-McGee had failed to pay damages that had been awarded and

had breached the arbitration agreements.  *See* "Attorneys: Kerr-McGee slow in paying damages:

More than 3,000 people sued company, claiming its Avoca plant caused health problems," *The*

*Times Leader*, Nov. 19, 2008.  The article also noted that Tronox was contemplating a

bankruptcy filing.  *Id.*

Exhibit C – page 2

9.      A local newspaper reported that a Luzerne County judge approved the disputed

arbitration awards in late November 2008.  *See* "Arbitration award ruling in Kerr-McGee suit

upheld; Judge Olszewski signs orders confirming original award totaling $943,885.72," *The*

*Times Leader*, Nov. 25, 2008.  The article noted that the plaintiffs had alleged that they or their

family members had been injured by creosote exposures and that developed various conditions

and illnesses including cancer.  *Id.*

10.     Articles at year-end 2008 reported on efforts by local attorneys to attach assets of

Tronox in order to secure the payments of monies awarded to plaintiffs in the Pennsylvania state

court actions.  *See* "Owner of former Kerr-McGee Corp. must pay: Attorneys for plaintiffs state

owner of former Kerr-McGee has continually delayed in paying," *The Times Leader*, Dec. 31,

2008.  The article noted that the plaintiffs claimed they suffered health problems, including

cancer, as the result of exposures to chemicals at the site.  *Id.*

11.     An article in February 2009 reported that the 8 plaintiffs who had received

arbitration awards had been paid, but that Tronox had filed for bankruptcy in January 2009.  *See*

"8 plaintiffs in Kerr-McGee suit paid $900,000: Original lawsuit involved nearly 3,500 plaintiffs

who alleged health problems from Avoca plant," *The Times Leader*, Feb. 2, 2009.

12.     Later articles referred to the 2005 litigations as having included 4,000 employees

and residents of the Avoca area.  *See* "DEP Targets former Duryea plant for hazardous material

removal," *The Times Leader*, June 25, 2011.

13.     On June 25, 2009, notice of the Tronox bar date was published in local

newspapers.  *See* Affidavit of Publication of Notice of Bar Date [ECF No. 1465], Ex. HH.

14.     A June 2012 article described the "multibillion" dollar fraudulent transfer trial

that was underway and stated that the outcome would determine "whether thousands of Avoca-

Exhibit C – page 3

area residents will be compensated for health problems they say they suffered from living near a now-shuttered creosote plant." *See* "Avoca families' illness claims at stake in trial," *The Citizen's Voice & Sunday Voice*, June 11, 2012. The article described the Tort Claims Trust and its funding. *Id. See also* "Federal case to determine fate of Avoca families' injury claims," *The Times-Tribune*, June 12, 2012.

15. The settlement of the fraudulent transfer litigation was reported in April 2014, along with reports that local residents who had made litigation claims were waiting to learn of their recoveries. *See* "Avoca Residents Exposed To Toxic Waste Await News On Cut Of Settlement," *The Times-Tribune*, Apr. 9, 2014.

16. Another local article reported in April that anyone who objected to the terms of the fraudulent transfer settlement had until mid-May to file objections. *See* "Regional Briefs," *The Times Tribune*, Apr. 23, 2014.

17. In August 2014 the local newspapers reported on controversies that had arisen regarding fees owed to one of the attorneys who had represented the Avoca plaintiffs. *See* "Lawsuit: Powell to receive $200 million from Avoca creosote plant settlement," *The Citizens' Voice*, Aug. 6, 2014.

18. In 2017, a local newspaper reported that 1,600 former and current residents of Avoca had settled creosote-related claims in 2003, and that a second wave of 4,400 sued in 2005 and received compensation through the Tronox bankruptcy plan. The article noted that Avoca had a current population of 2,600 and that additional residents were seeking compensation from the Tort Claims Trust as "future" tort claims. *See* "The aftermath in Avoca: Cancer, other health problems blamed on emissions," *The Times Leader*, Nov. 12, 2017.

Exhibit C – page 4