**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |  |
|---|---|---|
| | : | |
| **In re:** | : | **Chapter 11** |
| | : | |
| **TRONOX INCORPORATED, et al.,** | : | **Case No. 09-10156 (MEW)** |
| | : | **Jointly Administered** |
| **Reorganized Debtors.** | : | |
| | : | |

**DECISIONS AS TO THE TORT CLAIMS TRUSTEE'S SIXTH OMNIBUS
OBJECTION TO MOTIONS FOR PERMISSION TO FILE "FUTURE TORT
CLAIMS" AND FOR RELIEF FROM THE AUGUST 12, 2009 BAR DATE**

On March 10, 2021, this Court issued a Decision (the "**March 2021 Decision**") that ruled

on approximately 4,676 separate motions that had been filed by tort claimants who sought

permission to file claims notwithstanding their failure to do so by the August 12, 2009 "bar date"

that a predecessor judge had set in these cases. *See In re Tronox Inc.*, 626 B.R. 688 (Bankr.

S.D.N.Y. 2021). On March 3, 2022, the Court issued rulings (the "**March 2022 Rulings**") with

respect to motions for reconsideration and with respect to supplemental submissions that had

been made by claimants whose claims were the subject of the March 2021 Decision. *See In re*

*Tronox Inc.,* 2022 Bankr. Lexis 569, Case No. 09-10156 (Bankr. S.D.N.Y. Mar. 3, 2022). Some

movants filed notices of appeal from one or both of the Court's decisions; most of the appeals

were dismissed for various procedural reasons, and the Court's rulings on the merits otherwise

were affirmed by the United States District Court for the Southern District of New York. *See In*

*re Tronox Inc.*, 2023 U.S. Dist. LEXIS 57146, No. 21 Civ. 7785 (S.D.N.Y. Mar. 31, 2023).

On August 5, 2024, the Court issued a Decision regarding 260 additional motions for

permission to file future tort claims and/or for relief from the August 12, 2009 bar date in these

cases. *See In re Tronox Inc.*, No. 09-10156, 2024 Bankr. LEXIS 1819, (Bankr. S.D.N.Y. Aug. 5,

2024) (the "**August 2024 Rulings**"). The August 2024 Rulings resolved the objections by the

1

Tort Claims Trustee (the "**Trustee**") in its second, third, fourth and fifth omnibus objections. *See* ECF Nos. 9943, 9973, 10041 and 10081. Separate orders were entered on September 12, 2024 to reflect the Court's rulings. *See* ECF Nos. 10111, 10112. No further appeals were filed from those rulings.

This Decision resolves another 89 motions that are the subject of the Trustee's Sixth Omnibus Objection. *See* ECF No. 10193.[1] A separate Order issued this same day describes the means of providing notice to the Movants of their appeal rights and deadlines, and the procedure that will be followed for the entry of claim-specific Orders that reflect the Court's rulings.

### Background

These bankruptcy cases were filed in January 2009. Tronox and its affiliates filed lengthy schedules of creditor claims, including a 1,301-page list of creditors who had made litigation-related claims. *See* Schedules [ECF No. 275], Rider F1. The Court set a deadline (the "**Bar Date**") of August 12, 2009 for the filing of proofs of claim. The Order that established the Bar Date required the Debtors to send notices to all known creditors, including all parties to pending litigation with the Debtors, with the proviso that such notices were to be sent to counsel if the Debtors did not have the litigants' addresses. *See* Order (A) Setting Bar Dates for Filing Proofs of Claim, (B) Approving the Form and Manner for Filing Proofs of Claim, and (C) Approving Notice Thereof, May 28, 2009 [ECF No. 466] (hereafter, the "**Bar Date Order**") ¶ 12(k). The Bar Date Order also approved the publication notices that the debtors had proposed. *See* Bar Date Order [ECF No. 466], ¶¶ 15-17. Judge Gropper found that the approved notices

---

[1] The attachments to the Trustee's Sixth Omnibus Objection identify 91 docket entries for the motions. However, in two instances a claimant filed multiple items on the docket, and those separate items were listed separately on the Trustee's summaries. The actual number of relevant motions is 89.

constituted "adequate and sufficient notice of each of the Bar Dates," including as to "tort Claims arising from or relating to the Legacy Businesses . . ." *Id.* ¶ 20.

Notices of the bar date were mailed to all of the creditors listed on the Debtors' Schedules, including all persons on the lengthy list of "litigation-related" creditors. *See* Affidavit of Service [ECF No. 497]. Notices of the Bar Date were also published in 40 separate newspapers, which included one newspaper of national circulation (the Wall Street Journal) and 39 local newspapers. Copies of the published notices, and certificates attesting to their publication, were filed with the Court. *See* Affidavit of Publication of Notice of Bar Date [ECF No. 1465] and the Exhibits thereto. The published notices described the bankruptcy filings and the claims process in general, and also included many site-specific terms relevant to the localities in which they were published. For example, a site-specific notice for Columbus, Mississippi was published in The Commercial Dispatch (a local Columbus newspaper) on June 23, 2009. The first part of the notice described the bar date and the claims process generally as well as the corporate history of Tronox, and then stated as follows in a separate text box:

> Tronox Incorporated and certain of its affiliates (collectively, the "Debtors") are required to provide notice to parties who may have a claim against the Debtors related to exposure to hazardous materials at particular sites. One of these sites is a wood-treating facility in Columbus, Mississippi and surrounding areas, at which creosote contamination from operations at the wood-treating facility is alleged to exist or to have previously existed.
>
> If you, your property, your spouse or an immediate family member was exposed to contaminants at or near the Columbus site, and if that exposure directly or indirectly caused injury that becomes apparent now or in the future, you may have a claim under various legal theories for damages. Personal injury damages could relate to physical, emotional or other personal injuries such as bodily injury, wrongful death, medical monitoring, survivorship or proximate, consequential, general and special damages or punitive damages. Property-related damages could relate to cost of removal, diminution of property value or economic loss, or proximate, consequential, general and special damages or punitive damages. More information about the definition of "claims" that must be filed before the August 12, 2009 deadline is included in the legal notice that appears above.

If you believe that you may have a claim related to you or your property's exposure to any products, raw materials or contaminants that were produced, manufactured, supplied, used or disposed of at the Columbus site, you **MUST** file a proof of claim form with the Bankruptcy Court according to the legal instructions above by August 12, 2009, **or you will forever lose your rights to recover on your claim in the future.** Filing a proof of claim does not automatically entitle you to compensation.

For more information about the filing process and/or to receive a proof of claim form, please call (866) 381-9100 or visit www.kccllc.net/tronox.

*Id.*, Ex. N (emphasis in original). Similar site-specific notices were published in other areas where wood-treatment plans had been located. ECF No. 1465.

On November 30, 2010, the Court confirmed a plan of reorganization (the "**Plan**"), which later became effective on February 14, 2011. The Plan broadly defined the term "Tort Claims" so as to include claims that had already arisen or that might arise in the future. Plan, Article I(A)(156) [ECF No. 2567, Ex. A]. All Tort Claims were to be channeled to a Tort Claims Trust (the "**Trust**") for processing, allowance and payment, and the Plan made clear that holders of "Tort Claims" could only seek recovery from the Trust and not from Reorganized Tronox. *Id.* Article III(B)(4)(b). The Confirmation Order approved these terms, discharged the reorganized Tronox companies from all claims (including Tort Claims), and directed that holders of Tort Claims could only seek recourse from the Tort Claims Trust and not from Reorganized Tronox or its assets. *See* Confirmation Order [ECF No. 2567] at ¶¶ 129, 134(ii), 184**.**

The Trust was funded with a cash deposit of $12.5 million, the proceeds of available insurance policies, and the right to receive 12% of the proceeds of the fraudulent transfer litigation that had been filed against the prior owners of Tronox. Plan, Article IV(C)(4). The Plan established separate subcategories of Tort Claims, and provided that the total amounts allocated to the Trust would be divided among those subcategories of claims as follows:

- "up to" 6.25% would be available for "Indirect Environmental Claims;"

- 6.25% would be available for "Holders of Asbestos Claims and Future Tort Claimants;"

- 6.25% would be available to "Holders of Property Damage Claims;" and

- the largest share (at least 81.25%) would be set aside for timely-filed Category D "Non-Asbestos Toxic Exposure Claims."

*Id.*, Article III(B)(4)(b).  These allocations were supported by representatives of various tort claimants and also by forecasts (backed by expert testimony at the confirmation hearing) that it was unlikely that there would be large numbers of future claims.

The Confirmation Order approved these terms, and also approved a Tort Claims Trust Agreement (the "**Trust Agreement**") and a set of Tort Claims Trust Distribution Procedures (the "**TDPs**").  Confirmation Order [ECF No. 2567] at ¶¶ 85, 184, 185.  The TDPs set forth the procedures that the Tort Claims Trustee would follow in reviewing claims.  The confirmed Plan further clarified that Category D "Non-Asbestos Toxic Exposure Claims" would be limited to persons who had actually filed proofs of claim before the Bar Date.  *Id.*

One of the key procedures in the TDPs was paragraph 2.2(b), which specified that a timely filed proof of claim in the Tronox bankruptcy case "shall be accepted as irrefutable and final proof of exposure and injury asserted in the proof of claim with respect to such exposure . . ." [ECF No. 3030-2, ¶ 2.2(b).]  The TDPs set forth the "allowed amounts" that would be assigned to tort claims depending on the nature of the injuries or claims alleged.  These scheduled values were as follows for creosote victims:

| Disease | Scheduled Value |
|---|---|
| Precancerous Skin Lesion | $26,000 |
| Skin Cancer | $120,000 |
| Lung Cancer | $700,000 |
| Breast Cancer | $475,000 |

5

| | |
|---|---|
| Other Cancer | $600,000 |
| Asthma Adult | $150,000 |
| Asthma Child | $175,000 |
| Cardiovascular | $250,000 |
| Respiratory | $80,000 |
| Medical Monitoring/Unimpaired | $5,000 |

*See* TDPs, Schedule B.  In the ten years prior to its bankruptcy filing Tronox had settled 15,000

creosote-based claims at a total cost of $72 million, or approximately $4,800 per claim.  The

allowed claim amounts provided pursuant to the TDPs therefore were dramatically higher than

the average pre-bankruptcy claim recoveries had been.  However, the scheduled values of claims

did not necessarily reflect the payouts that parties would receive.  Each claimant was entitled to

receive a *pro rata* share of whatever the distribution funds turned out to be, based on how each

claimant's scheduled claim compared to the total scheduled values of all allowed claims.  The

size of the distribution fund, in turn, depended on the outcome of the pending fraudulent transfer

litigation.

### Claims Filed with the Tort Claims Trust and the 2015 Anadarko Recoveries

A total of 11,501 tort claims were filed before the bar date.  *See* Disclosure Statement

Regarding the First Amended Joint Plan of Reorganization of Tronox Incorporated, et al.

Pursuant to Chapter 11 of the Bankruptcy Code [ECF No. 2196] at 30.  Some of those filed

claims likely may have been duplicative claims, as some claimants may have filed identical

claims against more than one debtor.

During 2011 the Tort Claims Trust asked each claimant to submit a sworn statement

describing the type of claim being asserted and the category into which the claim fell.  A total of

6,783 claims were submitted as "Category D" claims.  By the end of 2013 all but a handful of

those claims had been processed and the vast majority had been assigned "allowed" amounts.

Only ten claimants rejected the proposed "allowed" values of the claims, and three claims were

6

withdrawn.  *See Annual Report and Account of the Tronox Incorporated Tort Claims Trust for the Year ending December 31, 2013,* filed on April 30, 2014 [ECF No. 2986] at 5.

About 2,120 of the allowed Category D claims were submitted by claimants in Columbus, Mississippi; those claims were "allowed" in the total amount of $357,215,000.  *See* Transcript of Proceedings, Adv. Pro. 09-01198 [ECF No. 681] at 41:4-6; *see also* Declaration of Bennett S. Silverberg, dated May 26, 2015 [ECF No. 3041, Ex.  A].  Another 4,358 of the allowed Category D tort claims were filed by claimants in or near Avoca, Pennsylvania; those claims were allowed in the total amount of $966,382,000.  *Id.*  Only 289 other Category D claims were filed and allowed, in the total scheduled amount of $42,197,500.  *Id.*

The initial cash funding of the Tort Claims Trust was relatively small.  However, the pending fraudulent transfer action resulted in the entry of a very large judgment and then a subsequent settlement in 2015, with the result that the Trust received an infusion of more than $611 million in early 2015.  *See Annual Report and Account of the Tronox Incorporated Tort Claims Trust for the Year ending December 31, 2015*, filed on April 29, 2016 (the "**2015 Trust Report**"), at Dkt No, 3064-1, Ex. A at 14-15.  That large infusion enabled the Trust to make distributions to Category D tort claimants equal to about 35% of the allowed amounts of their claims.  *See* Oct. 25, 2016 Hr'g Tr. (ECF No. 3267) at 32:2-7.  As noted above, those recoveries greatly exceeded the average recoveries that tort claimants had received in pre-bankruptcy litigations.

The large distributions in 2015 sparked an explosion in the filing of "future" tort claims.  As of early 2015, when the Trust received its share of the litigation proceeds, a total of 880 asbestos claims had been filed, along with approximately 600 Future Tort Claims.  *See* Jan. 24, 2018 Hr'g Tr. at 5:1-5.  News of the large distributions to Category D claimants spread quickly,

however, and led to the filing of many additional claims.  In a four-month period more than 10,000 additional claims were filed.  *Id.* 5:5-8.  By October 2016, more than 19,000 purported future tort claims had been filed – a far greater number than anyone had anticipated, and more than twice the number of "allowed" Category D claims that the Trust had previously processed. *See* Oct. 25, 2016 Hr'g Tr. at 15:23-16:7, 28:19-29:4.  About 15,000 of those 19,000 claims had been filed by claimants in Mississippi.  *Id.* at 29:5-9.

In 2016, the Trustee asked the Court for instructions as to how to handle certain of the future tort claims that were being filed.  The Trustee contended that the governing trust documents could be interpreted in different ways and did not provide sufficiently clear guidance as to which claims qualified as future tort claims.  After an evidentiary hearing, the Court issued its Memorandum Opinion as to Tort Claims Trustee's Motion for Instructions Regarding Future Tort Claims [ECF No. 3268].  The Court held that a claim qualifies as a "Future Tort Claim" if it does not fall into any of the other categories of Tort Claims under the Trust documents and if one or more of the following conditions are met:

(1)     The claim is based on an alleged exposure to a harmful substance that occurred on or after August 12, 2009;

(2)     The claim is based on an exposure that occurred before August 12, 2009, but as to which no injury or disease was manifested until on or after August 12, 2009; or

(3)     The exposure, as well as the manifestation of an injury or disease, predated August 12, 2009, but the claimant is able to establish (a) that the claimant's failure to file a timely proof of claim should be excused on grounds of excusable neglect, or (b) that the purported discharge of the claimant's claim was a violation of due process and therefore ineffective.

The Court ruled that determinations as to claims that fall into categories (1) and (2) would be made by the Trustee pursuant to the TDPs and subject to the dispute resolution procedures that are set forth in the TDPs. Claimants in category (3) who wished to obtain relief were required to file motions seeking such relief from this Court. The Court also approved the Trustee's proposed form of notice to be sent to claimants. *See* Order dated January 19, 2017 [ECF No. 3270].

The Trustee then sent Determination Notices that proposed the allowance of approximately 6,200 Future Tort Claims and the disallowance of 11,000 others. However, nothing seemed to stem the tide of additional claim filings. *See* Jan. 24, 2018, Hr'g Tr. at 5:23-6:2 ("every time some notice goes out to existing claimants that we need additional information or their claims have been handled by the trust and either allowed or disallowed word gets out in the communities and additional claims get filed.") By January 2018, when the Court held a status hearing, more than 17,000 additional future tort claims had been filed. (Hr'g. Tr., 6:3-8). The total number of future tort claims reached more than 38,000 by the spring of 2020, when the Trust filed its report for the year ended December 31, 2019. *See* 2019 Trust Report, Ex. B.

On November 13, 2025, the Trustee filed a Notice of Termination of the Tort Claims Trust pursuant to section 8.1(b)(i)(dd) of the Trust Agreement, which permits a termination if the Trustee determines that "the administrative costs of operating the Tort Claims Trust will erode the funds remaining in the Tort Claims Trust." *See* ECF No. 10190. The effective date of the termination was February 11, 2026. *Id.* The most recent annual report shows that the total number of "future" tort claims that had been filed as of December 31, 2025 had reached 40,333. *See* 2025 Trust Report (ECF No. 10199), Ex. B. The Trustee had issued determination notices with respect to 39,405 of those claims as of that same date. *Id.* The claims resolution process will continue as to claims filed on or before the February 11, 2026 Trust Determination Date.

9

**Limited Likely Recoveries of Future Tort Claimants**

It is quite apparent that many of the claimants who have filed future tort claims have the mistaken belief that the amounts paid to the holders of such claims will be equivalent to the amounts that were paid to those who timely filed Category D claims. **That is not the case, as the Court and the Trustee have repeatedly attempted to emphasize to potential claimants.** Only a relatively small portion of the total trust assets were set aside for future tort claims, because when the Plan was confirmed the parties and their experts did not believe there would be a significant number of such claims. **Payments to holders of allowed future tort claims are expected to be less than 1% of their nominal allowed amounts.**

**Standards Governing the Pending Motions**

In the March 2021 Decision and the August 2024 Decision the Court established the following general principles that govern the review of motions for relief from the Bar Date. Those principles were affirmed on appeal and they govern the 89 motions now before the Court.

**I.    Claims Based on Alleged Post-Bar Date Diagnoses.**

Two of the grounds on which I previously held that a claim may qualify as a "future" tort claim are (a) if the claim is based on an exposure to a harmful substance that occurred after August 12, 2009, or (b) if the claim is based on an exposure that occurred before August 12, 2009, but as to which no injury or disease was "manifested" until on or after August 12, 2009. Claimants do not need to seek relief from the bar date in order to pursue such claims. In the March 2021 Decision I further clarified item (b) to make clear that a claim would be a Future Tort Claim if it were based on a condition or disease that was not "diagnosed" until after the Bar Date. That modification was incorporated into the Determination Notices that the Trustee has sent in subsequent years.

10

Some of the now-pending motions make claims based on alleged conditions that were diagnosed after August 12, 2009.  Any claims of that kind are to be resolved by the Tort Claims Trust under its normal dispute resolution procedures.

## II.    Claims (A) Based on Multiple Conditions Diagnosed at Different Times, or (B) Based on Continuing Conditions or Diseases.

Many claimants have submitted long lists of diagnoses of multiple conditions, some of which were diagnosed before the bar date and others of which were diagnosed after the bar date. A claimant, for example, may have been diagnosed with asthma in 1988, then with heart problems in 2007, and then with cancer in 2014.  In the March 2021 Decision I confirmed (without objection) that any claimant who was diagnosed after the Bar Date with a new and separate disease or condition would be treated as having a future tort claim with respect to that newly diagnosed disease or condition, and that the Bar Date did not apply to the filing of a claim based on that newly diagnosed disease or condition.  However, the Bar Date does apply to conditions or diseases first diagnosed before the Bar Date, and claims based on such conditions or diseases were barred unless the claimant could show proper grounds for relief from the Bar Date.

Other claimants have alleged that they suffer from "continuing" conditions or illnesses (asthma or heart conditions, for example) that were first diagnosed before the Bar Date but that have continued to exist after the Bar Date.  Those are claims that plainly accrued before the Bar Date.  Their continuing character does not mean that the claim is based on a post-Bar Date diagnosis.  They are not to be treated as "future" tort claims in the absence of relief from the Bar Date based on excusable neglect or due process.

11

**III.     <u>Claims that are Barred by Statutes of Limitation.</u>**

A claimant who failed to file a claim by the applicable Bar Date may seek to excuse that failure by filing a motion with the Court.  However, relief from a Bar Date does not revive a claim that expired for other reasons prior to the commencement of a bankruptcy case.  Even if relief from the Bar Date were granted, section 502 of the Bankruptcy Code would still require disallowance of any claim that is not valid under applicable non-bankruptcy law.  *See* 11 U.S.C. § 502.  For example, claims that were barred by the statute of limitations prior to the Tronox bankruptcy filing could not be allowed as claims even if relief from the Bar Date were granted.

Some relevant statutes of limitations raise issues that would require determination by the Tort Claims Trust under its dispute resolution procedures.  Motions and claims that are based on exposures that occurred in Mississippi, however, are subject to well-articulated statutes of limitation.

Mississippi requires that actions based on creosote exposures must be filed within three years from the point when "the plaintiff has discovered . . . the injury."  *See* Miss. Code Ann. § 15-1-49.  The Mississippi Supreme Court and Mississippi federal courts have consistently held that the statute of limitations begins to run upon the discovery of the injury itself, regardless of whether the claimant knows of the cause of the injury or the identity of the person responsible for the injury.  *See Angle v. Koppers, Inc.*, 42 So.3d 1, 6 (Miss. 2010) (holding that a cause of action for recovery on account of latent disease or injury "accrues upon discovery of the injury, not discovery of the injury and its cause"); *see also F & S Sand, Inc. v Stringfellow*, 265 So 3d 170, 174 (Miss 2019) (same); *Lincoln Electric Co. v. McLemore,* 54 So.3d 833, 838 (Miss. 2010) (holding that "Section 15-1-49 does not require a plaintiff to know the cause of the injury before accrual of the cause of action," and thus "knowledge of the cause of an injury is irrelevant to the

analysis [under § 15-1-49(2)]"); *Am. Optical Corp. v. Rankin*, 227 So.3d 1062, 1068 (Miss. 2017) (same); *Owens-Illinois, Inc. v. Edwards*, 573 So.2d 704, 709 (Miss. 1990) ("[t]he cause of action accrues and the limitations period begins to run when the plaintiff can reasonably be held to have knowledge of the injury or disease . . . Though the cause of the injury and the causative relationship between the injury and the injurious act or product may also be ascertainable on this date, these facts are not applicable under § 15-1-49(2)"); *Barnes v. Koppers, Inc.*, 534 F.3d 357, 361 (5th Cir. 2008) ("[u]nder § 15-1-49, a cause of action accrues when the plaintiff has knowledge of the injury, not knowledge of the injury and its cause"); *Bryant v. Wyeth*, 816 F. Supp. 2d 329, 332 (S.D. Miss. 2011), *aff'd*, 487 Fed. App'x 207 (5th Cir. 2012) (holding that under § 15-1-49(2), a cause of action accrues when the plaintiff has knowledge of the injury, not knowledge of "the injury and its cause"); *Hewitt v. Wyeth*, 812 F. Supp. 2d 768, 770 (S.D. Miss. 2011) (same).

The Tronox bankruptcy filing occurred in January 2009.  Claims held by Mississippi residents that were based on injuries that were known before January 2006 were time-barred under Mississippi law before the Tronox bankruptcy filing occurred.  In those cases, the  requests for relief from the Bar Date make no difference, because there are no valid claims for which any bankruptcy relief or recovery would be available.

The Mississippi statute of limitations rules are subject to a few exceptions.  For example, persons who were infants at the time they were injured may sue within three years after reaching adulthood, and persons who were unsound of mind at the time of injury may sue within three years after the date when the disability is removed.  *See* Miss. Code Ann. § 15-1-59.  The Mississippi exemption for "unsoundness of mind" applies only if a person cannot manage the ordinary affairs of life; mental illness is not sufficient.  *Shippers Express v. Chapman*, 364 So. 2d

13

1097, 1100 (Miss. 1978); *Brumfield v. Lowe*, 744 So. 2d 383, 387-88 (Miss. Ct. App. 1999) (schizophrenia diagnosis insufficient).  Any movant who sought relief from the Mississippi statute of limitations based on age or other disability, or relief from the Bar Date for those reasons, was notified that supporting information had to be provided or the motion would be denied.

### IV.    Due Process/Challenges to Publication Notices.

The confirmation of a company's plan of reorganization extinguishes all debts and claims that arose prior to confirmation.  *See* 11 U.S.C. § 1141(d)(1).  The discharge "operates as an injunction against the commencement or continuation of an action, the employment of process, or an act, to collect, recover or offset" any such discharged debt.  11 U.S.C. § 524(a)2).  The confirmation order that was entered in these cases in 2010 provided for a discharge of all claims against the Debtors and Reorganized Debtors, while channeling future tort claims to the Trust.  However, a discharge may be challenged on due process grounds.[2]  Any claimant who makes such a challenge bears the burden of proof.  *See Waterman S.S. Corp.*, 200 B.R. 770, 774-75 (Bankr. S.D.N.Y. 1996).

The failure to provide a form of notice that complies with due process requirements is a ground for relief from a discharge.  *City of New York v. New York, N.H. & H.R. Co.*, 344 U.S. 293, 297 (1953) ("even creditors who have knowledge of a reorganization have a right to assume

---

[2]    It is somewhat anomalous to discuss future tort claims in terms of "discharge" standards.  The Trust exists to handle the tort claims that *were* discharged by the Plan.  When claimants seek access to the Trust on the ground of improper notice, then, the real issue for this Court is not so much whether Tronox was discharged of liability, but whether the enforcement of the Bar Date as to those claimants would violate due process as a result of improper notice.  In any event, the due process standards are the same no matter how the issue is phrased.

that the statutory 'reasonable notice' will be given to them before their claims are forever barred"). However, the type of notice that due process requires depends on whether creditors' identities and claims are known or reasonably ascertainable by a debtor. Creditors whose identities and claims are known are entitled to be listed in a debtor's schedules and are entitled to receive direct notice, by mail, of the bar date for filing claims. *Id.* However, it is true in most bankruptcy cases (and is often true in other types of *in rem* proceedings) that unknown persons may have claims. This includes cases, like the Tronox case, that involve potential tort claims due to exposures to toxic substances. Direct notice cannot be given to claimants whose identities are not known, and so some substitute for direct notice must be used.

Notice to unknown claimants is governed by the decision of the United States Supreme Court in *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306 (1950). *Mullane* involved a dispute over the sufficiency of a publication notice given by a trustee who sought to settle claims against a common trust fund, some of whose beneficiaries were unknown. 339 U.S. at 309. The Supreme Court declared that "[a]n elementary and fundamental requirement of due process in any proceeding which is to be accorded finality is notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to be heard." *Id*. at 314. The Supreme Court recognized, however, that actual notice is not always possible. It therefore held that due process requires actual notice to *known* parties but that for *unknown* parties, reasonable publication notice is sufficient. *Id*. at 314-318.

The Supreme Court recognized, in *Mullane*, that publication notices often are not read and often do not actually come to the attention of all of the desired recipients:

> It would be idle to pretend that publication alone as prescribed here, is a reliable means of acquainting interested parties of the fact that their rights are before the courts. It is not an accident that the greater number of cases reaching this Court on the question of adequacy of notice have been

15

concerned with actions founded on process constructively served through local newspapers. Chance alone brings to the attention of even a local resident an advertisement in small type inserted in the back pages of a newspaper, and if he makes his home outside the area of the newspaper's normal circulation the odds that the information will never reach him are large indeed. The chance of actual notice is further reduced when as here the notice required does not even name those whose attention it is supposed to attract, and does not inform acquaintances who might call it to attention. In weighing its sufficiency on the basis of equivalence with actual notice we are unable to regard this as more than a feint.

*Id.* at 315. Nevertheless, the Supreme Court held that such publication notice is the only option, and therefore is sufficient for due process purposes, where direct notice is not possible or practicable:

This Court has not hesitated to approve of resort to publication as a customary substitute in another class of cases where it is not reasonably possible or practicable to give more adequate warning. Thus it has been recognized that, in the case of persons missing or unknown, employment of an indirect and even a probably futile means of notification is all that the situation permits and creates no constitutional bar to a final decree foreclosing their rights.

*Id.* at 317. The Court noted that publication notice is particularly appropriate in cases involving claimants whose claims are disputed, merely possible, or dependent on future events:

Nor do we consider it unreasonable for the State to dispense with more certain notice to those beneficiaries whose interests are either conjectural or future or, although they could be discovered upon investigation, do not in due course of business come to knowledge of the common trustee. Whatever searches might be required in another situation under ordinary standards of diligence, in view of the character of the proceedings and the nature of the interests here involved we think them unnecessary. We recognize the practical difficulties and costs that would be attendant on frequent investigations into the status of great numbers of beneficiaries, many of whose interests in the common fund are so remote as to be ephemeral; and we have no doubt that such impracticable and extended searches are not required in the name of due process.

*Id.* at 317-18.

*Mullane* was not a bankruptcy case, but the Supreme Court held that the principles set forth in *Mullane* apply to "any proceeding which is to be accorded finality." *Mullane*, 339 U.S. at

16

314. For decades, the Supreme Court and other courts have applied the *Mullane* decision to determine the sufficiency of notice in bankruptcy cases. *See, e.g.*, *United Student Aid Funds, Inc. v. Espinosa*, 130 S. Ct. 1367, 1378 (2010) (applying *Mullane* to a dispute concerning an individual's discharge under chapter 13 of the Bankruptcy Code); *GAC Enterprises, Inc. v. Medaglia (In re Medaglia)*, 52 F.3d 451, 455 (2d Cir. 1995) (applying *Mullane* to a dispute concerning an individual's discharge under chapter 7 of the Bankruptcy Code); *In re Drexel Burnham Lambert Group, Inc.*, 995 F.2d 1138, 1144 (2d Cir. 1993) (applying *Mullane* in a bankruptcy case to consider the sufficiency of notice to creditors of a proposed settlement); *Curatola v. St. Vincent's Catholic Medical Centers of N.Y.*, No. 07 Civ. 8257 (WHP), 2008 WL 1721471, at *1 (S.D.N.Y. Apr. 10, 2008) (applying *Mullane* and holding that "publication notice is generally sufficient for 'unknown' creditors"); *DePippo v. Kmart Corp.*, 335 B.R. 290, 296 (S.D.N.Y. 2005) (same). The Supreme Court has also applied *Mullane* in assessing the sufficiency of notice in state court probate actions, which (like bankruptcy cases) require the filing of claims and impose bars against any claims that are not filed by a deadline. *See Tulsa Professional Collection Services, Inc. v. Pope*, 485 U.S. 478, 490 (1988).

In addition, courts have regularly applied *Mullane* in determining whether publication notice is sufficient as to unknown tort claimants. *See, e.g.*, *In re Waterman S.S. Corp.*, 157 B.R. 220, 222 (S.D.N.Y. 1993); *In re Chateaugay Corp.*, No. 86 B 11334 (BRL), 2009 WL 367490, at *5 (Bankr. S.D.N.Y. Jan. 14, 2009) (applying *Mullane* and related cases to determine that notice to unknown tort claimants was sufficient to bar their lawsuits); *In re Best Prods. Co. Inc.*, 140 B.R. 353, 357-58 (Bankr. S.D.N.Y. 1992) (same); *see also Placid Oil Co. v. Williams (In re Placid Oil Co.)*, 463 B.R. 803, 815-17 (Bankr. N.D. Tex. 2012) (same); *Charter Int'l Oil Co. v. Young (In re Charter Int'l Oil Co.)*, No. 06 AP 00179 (GLP), 2007 WL 879176, at *6 (Bankr.

17

M.D. Fla. Mar. 14, 2007) (same); *In re RML, LLC*, 657 BR 709, 718 (Bankr, S.D.N.Y. 2023) (same).

Furthermore, a debtor's efforts to identify creditors do not need to include "impracticable and extended searches . . . in the name of due process." *Mullane*, 339 U.S. at 317-318). Accordingly, a debtor is not required to conduct a "vast, open-ended investigation." *Chemetron Corp. v. Jones*, 72 F.3d 341, 346 (3d Cir. 1995). Rather, a creditor is generally treated as unknown if it cannot be identified through a search of the debtor's own books and records. *Id.* at 347; *see also Louisiana Dep't of Environmental Quality v. Crystal Oil Co. (In re Crystal Oil Co.)*, 158 F.3d 291, 297 (5th Cir. 1998) (holding that "in order for a claim to be reasonably ascertainable, the debtor must have in his possession, at the very least, some specific information that reasonably suggests both the claim for which the debtor may be liable and the entity to whom he would be liable"); *Pacificorp. and Vancott Bagley Cornwall & McCarthy v. W.R. Grace*, No. 05-764 (SJB), 2006 WL 2375371, at *4 (D. Del. Aug. 16, 2006). The Debtors were not required, by due process, to canvass the community to unearth possible claimants. *See In re Peabody Energy Corp.*, 579 B.R. 208, 216-17 (Bankr. E.D. Mo. 2017) ("[t]he Debtors were not required to conduct a search of the Tri-State Mining District to see who lives there and may have become ill"); *Placid Oil Co.*, 753 F.3d 151, 156 (5th Cir. 2014) ("to conclude that a creditor is known, a court must determine that, at a minimum, a debtor has 'specific information' related to an actual injury suffered by the creditor"); *In re Nat'l Steel Corp.*, 316 B.R. 510, 518 (Bankr. N.D. Ill. 2004) ("It is not the duty of the Debtors to make JFE or any of its creditors aware of every potential claim they may have against the Debtors. To the contrary, it was JFE's responsibility to explore, investigate and file a proof of claim against the Debtors, not the other way around"); *In re Brooks Fashion Stores, Inc.*, 124 B.R. 436, 445

(Bankr. S.D.N.Y. 1991) (a debtor has no duty to search out each conceivable or possible creditor and urge that person or entity to make a claim against it). *In re Motors Liquidation Co.*, 576 BR 761, 773-74 (Bankr. S.D.N.Y. 2017), affd, 599 BR 706 (S.D.N.Y. 2019) (only claimants identifiable through "reasonably diligent efforts" are known creditors).

In this case, Tronox sent bar date notices to individuals who had actually filed lawsuits against Tronox. However, Tronox did not know the identities of other potential victims of creosote exposure. Requiring direct notice, by mail, to persons whose identities and claims are not known would be an impossible standard, and one that due process does not require. *See Mullane*, 339 U.S. at 314, 317 (stating that the Due Process Clause requires the best notice practicable under the circumstances and warning against requirements so inflexible as to render due process an "impractical or impossible or impractical obstacle[]."); *Drexel*, 995 F.2d. at 1144 ("No rigid constitutionally mandated standard governs the contents of notice in a case like the one before us."); *see also Grannis v. Ordean*, 234 U.S. 385, 395 (1914) (the Due Process Clause "does not impose an unattainable standard of accuracy"); *In re A.H. Robins Co.*, 880 F.2d 709, 745 (4th Cir. 1989) ("Due process . . . 'is a flexible concept,' intended to ensure 'fundamental fairness.'") (quoting *Walters v. Nat'l Ass'n of Radiation Survivors*, 473 U.S. 305, 320 (1985)).

Many Future Tort Claimants have complained that they did not actually see notices that were published. However, the Supreme Court has recognized that it is always true that publication notices may not actually be read. *See Mullane*, 339 U.S. at 317; *City of New York v. New York, N.H. & H.R. Co.*, 344 U.S. 293, 296 (1953) (observing that notice by publication "is a poor and sometimes a hopeless substitute for actual service of notice," but that "when the names, interests and addresses of persons are unknown, plain necessity may cause a resort to publication.") Nevertheless, bankruptcy proceedings, and many other legal proceedings, need a

mechanism to provide finality as to the persons who are entitled to participate, and publication

notices are given effect and are enforced even if claimants do not actually see them. *See In re*

*US Airways,* No. 04-13819 (SSM), 2005 WL 3676186 at *8 (Bankr. E.D. Va. Nov. 21, 2005)

(noting that allowing a late claim because a claimant had not read the notice would render notice

of the bar date by publication "a useless means of establishing a date by which all claims must be

filed" (quoting *Best Prods. Co., Inc.*, 140 B.R. at 359).); *see also In re New Century TRS*

*Holdings, Inc.*, No. 07-10416 (KJC), 2012 Bankr. LEXIS 6245 (Bankr. D. Del. May 17, 2012)

(allowing a creditor to assert a claim because of not having read the publication notice would

render the notice "a useless means of establishing a date by which all clams must be filed or

forever barred" (quoting *Best Prods. Co.,* Inc, 140 B.R. at 359).

Some other claimants have alleged that they no longer lived in the areas where the

notices were published.  Again, however, due process requires what is reasonable, not what is

impossible.  The possibility that claimants may not reside in the areas covered by the local

newspapers is the reason why notice was also published in a newspaper with a national

circulation (The Wall Street Journal).  As the Supreme Court recognized in *Mullane*, there is of

course no guarantee that claimants will receive such a publication or that they will read it even if

they receive the newspaper.  But it was the best that could be done and it satisfied due process

under all applicable authorities. *See Chemetron Corp. v. Jones*, 72 F.3d at 348-59(holding that

publication in national newspaper is sufficient where supplemented by publication in local

papers where debtor does business); *Placid Oil Co.*, 753 F.3d at 155, 158 (publication in a

national newspaper is sufficient); *In re Best Prods. Co.*, Inc., 140 B.R. at 358 ("[i]t is

impracticable, however, to expect a debtor to publish notice in every newspaper a possible

unknown creditor may read"); *In re Motors Liquidation Company*, 576 B.R. at 776 ( (publication

notice in a number of global, national and local newspapers was constitutionally sufficient for unknown creditor).

## V.    Excusable Neglect Standards

Rule 3003(c)(2) of the Federal Rules of Bankruptcy Procedure states that a creditor who fails to file a proof of claim before the bar date "shall not be treated as a creditor with respect to such claim for the purpose of voting or distribution." Fed. R. Bankr. P. 3003(c)(2). However, Rule 9006 of the Federal Rules of Bankruptcy Procedure states that if an order of the court requires an action to be taken on or before a particular date, and if the action is not taken by the specified deadline, the court nevertheless may extend the deadline after the fact, and may permit the act to be done belatedly, "where the failure to act was the result of excusable neglect." *See* Fed. R. Bankr. P. 9006(b)(1).

The leading decision on the criteria to be applied in considering an "excusable neglect" claim is the decision of the United States Supreme Court in *Pioneer Inv. Servs. v. Brunswick Assocs, Ltd. P'ship*, 507 U.S. 380 (1993). In *Pioneer*, an attorney filed a claim 20 days after the bar date. The attorney claimed that he had been experiencing "a major and significant disruption" in his life due to his withdrawal from his former law firm and that he was unaware of the bar date until after the date had passed. The Supreme Court held that the wording of the rule shows that relief may be available even if a deadline is missed due to neglect, and that the term "neglect" encompasses "both simple, thoughtless omissions to act and, more commonly, omissions caused by carelessness." *Id*. at 388. The Supreme Court also held that the determination of whether neglect is excusable is "at bottom an equitable one, taking account of all relevant circumstances surrounding the party's omission." *Id*. at 395. The relevant factors include: (1) the danger of prejudice; (2) the length of the delay and its potential impact on

21

proceedings; (3) the reason for the delay, including whether it was in the reasonable control of the movant; and (4) whether the movant acted in good faith. *Id.*

Applying these principles, the Supreme Court held in *Pioneer* that excusable neglect had been demonstrated. *Id*. at 397-99. The Supreme Court confirmed that parties are responsible for the conduct of their attorneys, and it held that clients cannot obtain relief from deadlines that their lawyers missed unless the lawyers' own neglect was excusable. *Id.* at 397. The Court also gave "little weight" to the fact that counsel was allegedly experiencing upheaval in his law practice. *Id*. at 398. However, since the bar date notice had been set forth in a notice of a creditor meeting, without any indication in the title of the notice that it also included information about a bar date, the Supreme Court held that counsel's admitted lack of actual knowledge of the bar date, coupled with a lack of prejudice and a demonstration of good faith, constituted excusable neglect. *Id*. at 398-99.

The Second Circuit Court of Appeals has taken "a hard line" in applying the *Pioneer* factors. *See Silivanch v. Celebrity Cruises, Inc.*, 333 F.3d 355, 368 (2d Cir. 2003). In *Silivanch*, the Second Circuit applied the *Pioneer* factors in determining whether an untimely filing of an appeal was due to excusable neglect. The Court held in *Silivanch* that if a deadline is clear and understood, but is missed anyway, "we continue to expect that a party claiming excusable neglect will, in the ordinary course, lose under the *Pioneer* test," even if other factors favor the movant. *Id*. at 366-67. The *Silivanch* rule has been affirmed in subsequent decisions. *See Midland Cogeneration Venture L. P. (In re Enron Corp.)*, 419 F.3d 115, 122 (2d Cir. 2005). (hereafter cited as "Enron")

The burden of proving "excusable neglect" rests with the party who seeks relief. *See Enron*, 419 F.3d at 121; *Jones v. Chemetron Corp.*, 212 F.3d 199, 205 (3d Cir. 2000); *In re*

*Andover Togs, Inc.,* 231 B.R. 521, 549 (Bankr. S.D.N.Y. 1999). Applying the foregoing criteria, as interpreted in *Silivanch*, demonstrates that the pending motions do not qualify for relief on grounds of excusable neglect.

### A.  Danger of Prejudice

When the Plan was confirmed the parties believed that it was unlikely that there would be a large number of future tort claims. As a result, only a relatively small amount of money was set aside for such claims. Other categories were strictly limited to the payment of claims that were timely filed. The Plan (and the Tort Trust documents) did not make any explicit provision for late-filed claims that might be permitted on grounds of excusable neglect. After hearing evidence in 2016, the Court held that claimants who can establish "excusable neglect" are to be entitled to treatment as "future" or "unaccounted for" tort claims in Category A. However, a claimant still must show "excusable neglect" under the applicable standards in order to be entitled to this treatment.

In this particular case, the only funds that remain for distribution to persons injured by creosote exposures are the limited funds that were set aside for Category A claimants, which include persons injured from asbestos exposures and persons whose creosote-related injuries did not manifest themselves until after the bar date. Each "excusable neglect" claim that is allowed, on behalf of a claimant whose injuries were manifested in 2009 or in many cases much earlier, would further reduce the already low recoveries that can be expected by those persons whose illnesses had not even appeared until after 2009, and who therefore had no opportunity to file a claim before the Bar Date. I am greatly sympathetic for the plight of ordinary persons who may not be well-versed in legal proceedings and who may not actually have known of the 2009 Bar Date, but I must also be mindful of the fact that an overly-generous allowance of "excusable

23

neglect" claims would virtually destroy any chance for meaningful recoveries by those persons who had no prior opportunity to make claims.

It is well-settled that if the allowance of late-filed claims on the grounds of excusable neglect would "open the floodgates" to a large number of new claims, and if those additional claims would have a large impact on the recoveries of other creditors, then permitting the late-filed claims would be a form of prejudice that weighs against a finding of "excusable neglect." *See Black v. Diamond*, 163 Fed. App'x 58, 60-61 (2d Cir. 2006) (holding that reductions in other claimants' recoveries is a form of prejudice that is relevant under the *Pioneer* factors); *Enron*, 419 F.3d at 130, 132 (holding that a "dollar-for-dollar depletion of assets" is not automatically enough but that the size of the late-filed claim or claims "cannot be irrelevant to the analysis," and approving a finding of prejudice where the lower court had found that allowing late-filed claims could lead to a "mountain" of such claims); *Meadows v AMR Corp.*, 539 BR 246, 252 (S.D.N.Y. 2015) ("allowing late-filed amendments years after the confirmation of the debtors' reorganization plan would create a serious risk of opening the floodgates to other potential late claims").

It is plain here that we face a "mountain" of potential additional claims, and that is true regardless of whether one focuses on the 40,333 "future" tort claims or the more than 5,100 claims as to which "excusable neglect" motions have so far been filed.  Allowing vast numbers of additional Category A claims would have a severe effect on the distribution fund and on other claimants.   Accordingly, the "prejudice" factor weighs strongly against the movants who seek permission to file late claims.

### B.    Length of the Delay/Effect on Proceedings

Virtually all (if not all) of the late-filed claims that are the subjects of the motions that are presently pending before the Court were filed in late 2015 or later.  Many of the claims were not filed until 2025.  In all cases the claims that are subject to the pending motions were filed many years after the August 12, 2009 bar date.  In some Circuits a delay of that magnitude might be disqualifying by itself.  *See, e.g., In re O'Brien Envtl. Energy, Inc.*, 188 F.3d 116, 130 (3d Cir. 1999) (holding that in applying the *Pioneer* factors the length of a delay should be evaluated "in absolute terms"); *In re Energy Future Holdings Corp.*, 619 B.R. 99, 113 (Bankr. D. Del. 2020) (same).  In this Circuit, however, the determination of whether to grant relief on grounds of "excusable neglect" is an equitable decision in which all of the relevant factors need to be considered together.  Accordingly, "the lateness of a claim must be considered in the context of the proceeding as a whole" and also based on the excuse that is offered for the delay.  *Enron*, 419 F.3d at 128-130.  No bright-line rule exists, therefore, under which a certain amount of delay will automatically disqualify a late-filed claim without consideration of other factors.  *Id*.

Notwithstanding the absence of a bright-line rule, it is still the case in this Circuit that a "presumption of prejudice is particularly appropriate where . . . the plaintiff's delay was prolonged."  *Shannon v. Gen. Elec. Co.*, 186 F.3d 186, 195 (2d Cir. 1999); *Williams v. City of New York*, 771 Fed. Appx. 94, 95 (2d Cir. 2019).  In this case, timely-filed claims were resolved years ago.  The overwhelming majority of the pending late-filed claims were filed only after distributions were made in 2015 with regard to the timely-filed claims.  We will not apply a bright-line rule, but we must note that we do not know, offhand, of any case in which significant numbers of late-filed claims have been permitted on grounds of "excusable neglect" after delays of the length that are at issue in this case.

The late-filed claims plainly are having an enormous impact on these proceedings, and if the lateness is excused they will have further adverse impacts. As explained above, the allowance of large numbers of late-filed claims in this case would drive down the recoveries of other Category A claimants and therefore would be prejudicial to those other claimants. The processing of late-filed claims also imposes huge administrative expenses, and additional litigation expenses would have to be incurred to evaluate and resolve the merits of the late-filed claims. In addition, *pro rata* distributions to Category A claimants cannot be made until the universe of participating claims is known, so that the time involved in resolving the merits of the late-filed claims inevitably would delay distributions to those claimants who have acted with more diligence in the pursuit and protection of their legal rights. These long delays and high costs weigh strongly against the movants' requests for permission to file late claims.

## C. Good Faith

For the most part the good faith of claimants has not been challenged. I will presume, for purposes of these rulings that each motion has been filed in good faith, though "good faith" by itself is not sufficient to entitle a movant to relief. *Silivanch v Celebrity Cruises, Inc.*, 333 F.3d at 366 ("rarely in the decided cases is the absence of good faith at issue"); *In re Motors Liquidation Co.*, No. 09-50026 (MG), 2020 WL 4589667, at *14 (Bankr. S.D.N.Y. Aug. 11, 2020) ("the presence of good faith is almost never a determinative factor in the *Pioneer* analysis").

## D. Reasons for Delay/Reasonable Control of Movants.

The claims (and motions) to which "excusable neglect" and "due process" arguments are relevant are claims based on conditions or illnesses that were first diagnosed before August 12, 2009. The motions before the Court all involve claims that were filed in late 2015 or thereafter.

Given the long delays, the prejudice to other claimants, and the effects that the allowance of late claims would have on the process, movants bear a particularly strong burden of showing reasons for their delays.

The Court has reviewed each motion individually to determine if, after all factors have been considered, the movant has demonstrated that relief based on excusable neglect should be granted.  The Court's rulings on each individual motion are set forth in attachments to the Orders that accompany this Decision, but the following paragraphs provide a more detailed explanation of the Court's rulings as to many of the excuses that have been offered.

### 1.    **Lack of Knowledge/Failures to Investigate**.

Nearly all of the movants contend that they did not actually know of the Bar Date or of the Tronox bankruptcy process.  Many of them also allege that they did not know that their diseases or conditions had been caused by exposure to Tronox products.  However, all of the underlying diagnoses that are relevant to the "excusable neglect" motions predated the Bar Date, often by many years.  Furthermore, six or more years passed after the Bar Date before the late claims were filed.  But not a single one of the pending motions has identified any efforts that the movant made (either before or after the Bar Date) to investigate the causes of the movant's illnesses or conditions, or to pursue the movant's potential legal rights.

Before the *Pioneer* decision, many courts had held that "excusable neglect" could not be demonstrated where a party's delay was attributable to its own lack of diligence in investigating and pursuing the party's rights.  *See, e.g., In re Davis*, 936 F.2d 771, 774 (4th Cir. 1991) (holding that "excusable neglect" required proof of circumstances beyond the party's control and that a delay due to lack of diligence was not sufficient).  The Supreme Court discarded such absolute rules in *Pioneer* and required courts to conduct a more general consideration of the equities

27

before ruling whether "excusable neglect" has been established.  Nevertheless, the Supreme Court confirmed that the reason for a claimant's delay, and whether that delay was in the reasonable control of the movant, continues to be a relevant factor, and the Court of Appeals for this Circuit has identified this as the factor that is usually the most important consideration in evaluating a request for relief.  *Enron*, 419 F.3d at 123; *Pioneer*, 507 U.S. at 396.

Courts generally have held that a mere lack of actual knowledge is not sufficient to show that a delay was reasonable or that the delay was not within the movant's control.  *PacifiCorp,* 2006 WL 2375371, at *14 (confirming that ignorance of a claim does not by itself suffice to show excusable neglect); *Jones v. Chemetron Corp.*, 212 F.3d at 205 (same); *In re Motors Liquidation Co.,* 598 B.R. 744, 757 (Bankr. S.D.N.Y. 2019) (same); *In re New Century TRS Holdings, Inc.*, No. 07-10416, 2014 Bankr. LEXIS 827 at *27-28 (Bankr. D. Del. Mar. 4, 2014) (same); *In re Best Prods. Co., Inc.*, 140 B.R. at 359 ("even ignorance of one's own claims does not constitute excusable neglect").  In particular, whether movants' lack of "actual knowledge" of their injuries or their legal options was within the movants' own control depends on the amount of information that was readily available to persons who chose to investigate such matters.

In *Jones v. Chemetron Corp.*, 212 F.3d 199, for example, the Court of Appeals for the Third Circuit considered "excusable neglect" arguments made by claimants who alleged that they incurred injuries from exposure to radioactive and other toxic substances that Chemetron had deposited at a waste site.  The claims were filed four years after the bar date and two years after the confirmation of the plan of reorganization.  The claimants argued that they "had no way of knowing that they had a claim against Chemetron prior to the 1988 bar date" and therefore

28

that the delay in the filing of their claims "was beyond their control." *Id*. at 205. The Court of

Appeals rejected these contentions:

> We conclude that the determinations of the bankruptcy court that
> contamination generally was known in the community in the early 1980's,
> and that some residents publicly expressed concern about the health effects of
> these toxins in press accounts and at public meetings, are supported by the
> record. Moreover . . . the record supports the court's observation that the
> plaintiffs introduced no evidence to show what measures they took to
> specifically investigate the cause of their medical problems. . . .
>
> Accordingly, the bankruptcy court committed no abuse of its discretion in
> holding that the plaintiffs have failed to sustain their burden of proving
> excusable neglect. The prejudice to the "fresh start" to which Chemetron was
> entitled as a result of the Chapter 11 reorganization, the delay of four years
> after the bar date and two years after the confirmation date before the
> plaintiffs brought their claim, and their failure to specifically investigate the
> cause of their illnesses, even though the danger from the Bert Avenue dump
> generally was known in the community, combine to defeat their request that
> they be permitted to file late claims.

*Id.*

Similarly, in *In re Peabody Energy Corp.*, 579 B.R. at 218, the court rejected "excusable

neglect" claims by persons who claimed they had been injured by substances released by non-

debtor companies and who further claimed that they did not know that the Debtors had

indemnification obligations that covered their claims. The court noted that the claimants "knew

or certainly could have found out through investigation" that certain non-debtor companies were

responsible for the relevant contamination and then could have "further pursued their claims by

conducting additional investigations to see the relationship between Peabody Energy Corporation

and Gold Fields, which is a matter of public record." *Id.* at 219-20.

The court in *Peabody Energy Corp.* went pretty far in holding claimants responsible for

their own failures to make inquiries, given the fact that the debtor in that case was not the party

who had caused the underlying contamination. In the Tronox case, however (as in *Chemetron*),

there was a wealth of publicly available information about creosote contaminations, the injuries

29

that were caused by creosote exposures, and the legal options available to injured persons. *See*, for example, Exhibits A, B and C to the March 2021 Decision, 626 B.R. at 741-750, which summarized the information that was available in certain areas of Mississippi and Pennsylvania and the widespread publicity about creosote-based litigations. It is clear from such materials that any reasonable inquiry or investigation at all into the possible causes of a movants' injuries and medical conditions, and possible remedies therefor, would have identified the risks of creosote exposures, the many litigation claims that had already been filed against Tronox and its corporate predecessor, and the existence of the bankruptcy case and the bankruptcy claims process.

In this case, movants may have elected not to investigate the possible causes of their injuries, or may have elected not to investigate potential legal claims they might have, but those were decisions that were within movants' control. A movant's lack of actual knowledge of the bar date, or of the causes of the movant's injuries, or of the movant's potential claims, is a relevant factor, but it is not enough, by itself, to show that a movant's delays were beyond the movant's reasonable control. *See Jones v. Chemetron, Corp.,* 212 F.3d at 205; *Peabody Energy Corp.*, 579 B.R. at 219-220; *see also In re Gordian Med., Inc.*, 499 B.R. 793, 798 (Bankr. C.D. Cal. 2013) (IRS sought permission to file late claim, alleging it did not know that the debtor was a successor in interest to another company; court found that the delay "was in the reasonable control" of the IRS because with reasonable diligence it could have easily discovered the link between the two companies); *US Airways*, 2005 WL 3676186 at *8 ("the court is unable to find that failure to keep up with the news is a reasonable excuse for the lengthy delay in seeking to file a claim in this case.")

I sympathize with movants who were surprised to learn that the bankruptcy claims process had produced such large recoveries for people who filed timely claims. However, given

the widespread availability of information, and the prejudice to other claimants and the long delays and costs that late-filed claims will pose, something more than a mere actual lack of knowledge is required to justify relief on grounds of excusable neglect.  Given the very long delays and the prejudice to other claimants that would result from the allowance of large numbers of late-filed claims, movants are required to demonstrate not merely that they lacked an actual awareness of the process but also that it was not reasonably within their control to identify and to pursue their claims.

### 2.      Failure to Act Promptly after Discovery.

A party who misses a deadline, and who wishes relief based on equitable considerations, must act promptly to take the action that should have been taken earlier.  *See, e.g., In re AMR Corp.*, 492 B.R. 660, 667 (Bankr. S.D.N.Y. 2013), (holding that a three-month delay was an unreasonable delay in applying the *Pioneer* factors); *Board v. AMF Bowling Worldwide, Inc. (In re AMF Bowling Worldwide, Inc.)*, 520 B.R. 185, 196–97 (Bankr. E.D. Va. 2014), *aff'd*, 533 B.R. 144 (E.D. Va 2015) (unknown creditor receiving notice of the administrative claim bar date by publication failed to demonstrate excusable neglect where creditor waited more than a year before commencing lawsuit against debtor in state court alleging post-petition personal injury claim, and only filed a motion for enlargement in bankruptcy case at state court judge's direction, six months after she received actual notice of the bankruptcy); *Toscano v. RSH Liquidating Trust (In re RS Legacy Corp.)*, 577 B.R. 134, 142 (Bankr. D. Del. 2017) (refusing to find excusable neglect where creditor with actual notice of the bar date first learned about her potential claim after the bar date but waited an additional eleven months before asserting a claim); *Seven Oaks Partners, LP v. Licata (In re Seven Oaks Partners, LP)*, 749 Fed. Appx. 67, 69 (2d Cir. 2019) (summary order) (once creditor had knowledge of bankruptcy and of allegedly

incorrect listing it was creditor's obligation to file a claim); *In re Majestic Holdco, LLC*, No. 09-14142 (KG), 2013 Bankr. LEXIS 657, at *1 (Bankr. D. Del. Feb. 21, 2013) (five-month delay after learned of error barred relief); *State Dep't of Envtl. Prot. v. W.R. Grace & Co. (In re W.R. Grace & Co.)*, No. 01-1139 (JKF), 2008 WL 687357, at *4 (D. Del. Mar. 11, 2008) (4-year delay).

The Determination Notices were revised in May 2021 to emphasis this particular point, as well as to reflect rulings that the Court had made in March 2021.  [ECF No. 9503-1].  The revised notice stated expressly that "[i]f you seek relief from the bar date based on 'excusable neglect' then you need to explain not only your failure to file by the bar date in August 2009 but also the reason(s) for the delay between the bar date and the date you did file a claim.  You should include a description of any efforts you made to investigate and to pursue your legal rights with respect to your claim."  *Id*. at 3, ¶ 5 . The movants whose motions are presently before the Court all received this revised form of Determination Notice.  However, none of them have explained the reasons for delay in proper terms.  Instead, they have all simply stated that they were unaware of the claims process, with no elaboration.

## VI.    **Minors or Incompetent Persons.**

A few motions have argued that claimants are entitled to relief from the bar date on the ground that the claimants were minors or were incompetent at the time of the bar date.  These allegations potentially raise issues not only under Rule 9006 but also under Rule 3002(c)(2) of the Federal Rules of Bankruptcy Procedure, which is incorporated into Rule 3003(c)(3).  Rule 3002(c)(2) states that "[i]n the interest of justice and if it will not unduly delay the administration of the case, the court may extend the time for filing a proof of claim by an infant or incompetent person or the representative of either."  Fed. R. Bankr. P. 3002(c)(2).

32

Neither the Bankruptcy Code nor the Federal Rules of Bankruptcy Procedure defines the terms "infant" or "incompetent." In some legal contexts the word "infant" is limited to persons of very young age. *See, e.g.,* 42 U.S.C. § 1786 (defining "infant" as a person under one year of age for purposes of the Special Supplemental Nutrition Program). Legal dictionaries, however, more commonly equate the term "infant" with the term "minor," meaning anyone who has not reached the age of adulthood (which usually ranges from 18 to 21 years old). *See* Black's Law Dictionary (11th ed. 2019) (defining "infant" as a "person under the age of twenty-one years," although by statute in some jurisdictions the age may be lower); *Ballentine's Law Dictionary*, 3d ed. (noting that in "ordinary usage" an infant is "a child of tender and helpless age," but that in law an infant is "a person who has not reached the age of majority, usually 21 years, at which the law recognizes a general contractual capacity"); 42 Am. Jur. 2d Infants § 1 (noting that in ordinary usage an infant is a "child of a tender and helpless age" but that in law the word has "a technical meaning different" from its meaning in common speech, and refers to a person "who has not arrived at majority as fixed by law . . .").

On its face, Rule 3002(c)(2) is meant to address claims by persons who do not legally have the capacity to represent their own interests. In this particular context, I believe it makes most sense to interpret the word "infant' in Rule 3002(c)(2) as referring to a person who is a "minor" under applicable law.

A "competent" person means someone who is legally qualified by age, mental and physical capacity to perform a relevant act. *See Ballentine's Law Dictionary*, 3d ed. (defining a "competent" person as a "capable person; a personal legally qualified by age and mental capacity.") One of the few reported decisions that has addressed a claim of "incompetency" under Rule 3002(c)(2) has held that courts should look to applicable state law to determine a

person's legal competency.  *See In re Toriello*, No. 08-18063 (DHS), 2010 WL 3943737 at *4 (Bankr. D. N.J. Oct. 5, 2010).  There are potential problems with this approach, however.  A person's "competency" under state law may be highly relevant in assessing competency for purposes of Rule 3002(c)(2), but people may be legally competent to perform some acts but not others.  In the context of Rule 3002(c)(2), the issue ought to be whether or not, as a practical matter, a person suffered from a mental or physical incapacity of a kind that prevented the person from complying with a bar date.  That means generally that a movant who seeks relief on the ground of incompetence should show the existence of a condition that rendered the movant incapable of understanding the need to file a proof of claim form before the bar date, or (if the person was capable of understanding that requirement) the existence of a condition that rendered the movant incapable of making such a filing personally and also incapable of enlisting help from others for that purpose.

The movant, as the party seeking relief, bears the burden of proving that relief is warranted under Rule 3002(c)(2).  A movant's age is relatively easy to prove, though some movants who have alleged that they were minors have failed to provide such information.  "Incompetence" is more difficult to prove.  With few exceptions, the movants who have alleged "incompetence" have provided no supporting details and no verification of that status.

There also remains the question of what standard to apply in considering whether to grant relief under Rule 3002(c)(2) to those movants who have demonstrated that they were infants or incompetent at the time of the bar date.  Relief under Rule 3002(c)(2) "may" be granted and therefore is discretionary, not mandatory.  *Vicenty v. San Miguel Sandoval (In re San Miguel Sandoval)*, 327 B.R. 493, 506 (BAP 1st Cir. 2005).  The Rule provides that the Court "may" grant relief if doing so would serve the "interest of justice" and would not unduly delay the

administration of the case.  Fed. R. Bankr. P. 3002(c)(2).  However, there are surprisingly few reported decisions that discuss the application of the bar date to persons who are infants or incompetents.

In *In re Davis*, 243 B.R. 127, 130 (Bankr. M.D. Ala. 1999), the Bankruptcy Court for the Middle District of Alabama extended the time by which the Montgomery County Department of Human Resources could file a proof of claim for child support in a chapter 13 case as the representative of a minor child.  The court determined that the "interest of justice" warranted relief based on (1) Congress's emphasis on familial responsibilities throughout the Bankruptcy Code, (2) the Supreme Court decision in *Clark v. Jeter*, 486 U.S. 456(1988), in which the Supreme Court held that statutes of limitations which restrict the rights of illegitimate children to bring claims for financial support may be subject to heightened scrutiny under the equal protection clause of the fourteenth amendment to the United States Constitution, and (3) the fact that Rule 3002(c)(3) does not require a motion for relief to be filed prior to the expiration of the bar date.  *Id*. at 129-130.

The court took a different approach in *In re Toriello*, No. 08-18064 (DHS), 2010 WL 3943737 (Bankr. D.N.J. 2010).  In *Toriello* the court considered a request for relief on behalf of a married couple, one of whom had been incapacitated as a result of strokes and the other of whom suffered from memory loss and was in the early stages of Alzheimer's disease.  The couple's daughter had assumed control of her parents' financial affairs and had actual knowledge of the bankruptcy well in advance of the bar date.  Without making a finding that the creditors were incompetent, the court evaluated both the "interest of justice" and "undue delay" prongs as factual matters and determined that neither was met.  As for the "interest of justice" prong, the court considered the fact that the creditors' daughter knew about the bankruptcy well in advance

of the bar date but did not seek any legal counsel. *Id.* at *7. As for "undue delay," the court

considered the fact that the extension motion was brought after the confirmation of the debtors'

plan and that the debtors would have to propose a modified plan if the creditors' claim were to be

allowed. *Id.* at *6.

At least one other court has considered requests for relief on grounds of infancy or

incompetence in the context of due process claims. *See, e.g., Chicago, Rock Island & Pac. Ry.,*

788 F.2d 1280, 1283 (7th Cir. 1986). In the *Rock Island* case the court considered a request for

relief from a bar date on behalf of a nine-year old boy who had lost his foot in a railroad

accident. Notice of the bar date had been given to the boy's mother but no claim had been filed.

Years later (after the boy reached adulthood) the boy retained an attorney, who notified the

railroad of the claim but who filed no application to the court for permission to make a claim.

The railroad took the position that the claim was time-barred, and the injured party then took no

action until after the railroad emerged from bankruptcy, at which point he filed suit against the

reorganized entity. *Id.* at 1281. The court held that the application of the bar date did not violate

due process, that the reorganization court was not obligated to appoint a *guardian ad litem* for

the injured party, and that notice to the mother (and her opportunity to file a claim) was sufficient

for purposes of due process. *Id.* at 1282-4. The court also noted that the claimant had not acted

promptly and diligently in seeking relief from the application of the bar date, and so granting

such relief would be barred by laches. *Id.* at 1284.

From the foregoing I draw the following conclusions, each of which I also explained in

the March 2021 Decision and which were affirmed by the District Court.

First, although the "interest of justice" standard is open-ended, many of the factors that

are considered by courts in deciding whether to grant relief on grounds of "excusable neglect"

under Rule 9006 are plainly also relevant in deciding whether relief is warranted under Rule

3002(c)(2).  The determination of whether a claimant missed a deadline due to "excusable

neglect" requires consideration of: (1) the danger of prejudice; (2) the length of the delay and its

potential impact on proceedings; (3) the reason for the delay, including whether it was in the

reasonable control of the movant; and (4) whether the movant acted in good faith.  *See Pioneer*,

507 U.S. at 396.  The second "excusable neglect" factor (the potential impact on proceedings) is

similar to the express requirement in Rule 3002(c)(2) that the court consider whether permitting

a late claim would "unduly delay" the administration of the case.  The first, third and fourth

factors all are relevant in deciding whether the "interest of justice" warrants relief in favor of a

particular claimant.

Second, relief from a bar date based on infancy or incompetence should not be automatic.

As explained above, the bar date serves a critical function in a chapter 11 case.  Granting

automatic relief would effectively nullify the bar date as to many creditors and would make it

impossible to deal comprehensively with all claims, particularly in cases involving tort liabilities

that likely will include creditors who are still minors.  State laws permit parents, guardians or

other legal representatives to file claims or to take legal actions on behalf of minors or persons

who are not competent, and the proper and efficient administration of bankruptcy cases require

that such persons exercise those rights on behalf of minors and incompetent persons where they

can do so.  Accordingly, while a claimant's infancy or incompetence may itself be the movant's

own "reason for delay" in filing a claim, the determination of whether the "interest of justice"

calls for relief requires consideration of whether the movant had parents or guardians (in the case

of infants) or representatives (in the case of incompetent persons) who had the authority and

37

responsibility to act for the movant and, if so, the reasons why those responsible persons did not take action.

The Determination Notice was modified in May 2021 to make clear that any movant who seeks relief from the bar date on behalf of infancy or incompetence must "provide evidence of that condition and should also explain (a) why your parent or representative did not file a claim on your behalf, and (b) the reason(s) for any delay between the bar date and the date you did file a claim." ECF No. 9503-1 at 3, ¶ 7.

## VII.    **Military Service**.

Our prior decisions have discussed the extent to which Section 3936(a) of title 50 of the United States Code provided for an extension of the Bar Date in favor of claimants who were in active military service at the time of the Bar Date. That issue is not relevant to the 89 motions that are presently before the Court.

*        *        *        *

Our rulings as to individual motions, applying the foregoing standards, are set forth in Exhibits to the order that accompanies this Decision. The Order describes the notices to be provided to movants regarding the Court's rulings and prescribes the date on which orders will be entered with respect to the disposition of each pending motion.

Dated: New York, New York
        July 2, 2026

/s/ **Michael E. Wiles**
Honorable Michael E. Wiles
United States Bankruptcy Judge